# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE MINDBODY, INC. SECURITIES
LITIGATION

Index No. 1:19-cv-08331-VEC

**ORAL ARGUMENT REQUESTED**

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

---

Patrick Gibbs
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5535

Sarah M. Lightdale
Brian M. French
Daniel P. Roy III
COOLEY LLP
55 Hudson Yards, 44th Floor
New York, New York 10001
(212) 479-6374

*Attorneys for Defendant Eric Liaw*

Matthew Solum, P.C.
John Del Monaco
Ian C. Spain
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Defendants MINDBODY, Inc.,
Richard L. Stollmeyer, and Brett White*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND .......................................................................................2

    A.    Mindbody Is Founded and then Becomes a Public Company. ...............................2

    B.    Mindbody Misses Its Q3 Revenue Guidance and Reduces Its Q4 Guidance. ...........................................................................................................4

    C.    Stollmeyer Engages in Networking. ....................................................................5

    D.    Mindbody Conducts a Sales Process. ...................................................................6

    E.    Mindbody Conducts a 30-Day Go-Shop and a Subsequent No-Shop. ..................9

    F.    Mindbody Issues Its Proxy, Class Actions Are Filed, and Mindbody Supplements Its Disclosures. ............................................................................10

LEGAL STANDARDS ............................................................................................10

ARGUMENT ..........................................................................................................12

I.    PLAINTIFFS HAVE FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT. .................................................................................................12

    A.    The Guidance Statements Are Protected Forward-Looking Statements. ............13

    B.    Plaintiffs Have Not Plausibly Alleged the Integration Statements Regarding Historical Challenges Were False, and the Integration Statements Regarding Future Challenges Are Protected. .....................................15

    C.    Plaintiffs Have Not Plausibly Alleged the Premium Statements Were False, and They Are Opinions and Puffery in Any Event. ...................................17

    D.    Plaintiffs Have Not Plausibly Alleged the Value Statement Was False, and It Is an Opinion in Any Event. ..............................................................................18

    E.    Plaintiffs Have Not Plausibly Alleged the Process Statements Were False, and They Are Also Opinions and Puffery in Any Event. ....................................20

    F.    Plaintiffs Have Not Plausibly Alleged the Rationale Statements Were False and They Are Also Opinions and Puffery in Any Event. ............................21

    G.    Plaintiffs Have Not Plausibly Alleged the Background Statements Were False. ...................................................................................................................22

    H.    Plaintiffs Have Not Plausibly Alleged the Transaction Committee Statements Were False. ........................................................................................24

I.      Plaintiffs Have Not Plausibly Alleged the Employment Statements Were
        False. ..........................................................................................................24

J.      Even if Any of the Above Statements Were Actionable, Plaintiffs Do Not
        Allege that Any Such Statement Was Material. ........................................25

II.     PLAINTIFFS FAIL TO PLEAD THAT LIAW MADE OR DISSEMINATED
        ANY OF THE ALLEGEDLY FALSE OR MISLEADING STATEMENTS. .................26

III.    NONE OF THE ALLEGED OMISSIONS ARE ACTIONABLE. ...................................28

A.      Mindbody Had No Duty to Disclose Its Preliminary, Unaudited Q4
        Revenue nor Was That Information Material. ..........................................29

B.      Mindbody Had No Duty to Disclose Qatalyst's Business Dealings with
        Past or Future Vista Acquisitions, nor Was That Information Material. ...............31

C.      The Remainder of Plaintiffs' Purported Omissions Are Neither Subject to
        a Disclosure Obligation nor Material. ......................................................33

IV.     PLAINTIFFS HAVE FAILED TO PLEAD SCIENTER ...................................................35

A.      The Most Compelling Inference Is That the Individual Defendants Were
        Motivated to Maximize the Value of Their Mindbody Stock ..............................36

B.      Plaintiffs Have Not Pled Conscious Misbehavior or Recklessness. .....................44

V.      THE SECTION 20(a) CLAIMS SHOULD BE DISMISSED. ...........................................50

CONCLUSION ...............................................................................................................................50

―――

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allaire Corp. v. Okumus,*
   433 F.3d 248 (2d Cir. 2006)......................................................................................2

*Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP,*
   2018 WL 1627266 (S.D.N.Y. Mar. 30, 2018) ........................................................27

*Altayyar v. Etsy, Inc.,*
   242 F. Supp. 3d 161 (E.D.N.Y. 2017),
   *aff'd,* 731 F. App'x 35 (2d Cir. 2018) ....................................................................17

*In re Am. Express Co. Sec. Litig.,*
   2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008),
   *aff'd sub nom. Slayton v. Am. Express Co.,*
   604 F.3d 758 (2d Cir. 2010)...........................................................................48, 49, 50

*In re AmTrust Fin. Servs., Inc. Sec. Litig.,*
   2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019)..........................................................17

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).................................................................................................11

*In re AstraZeneca Sec. Litig.,*
   559 F. Supp. 2d 453 (S.D.N.Y. 2008).....................................................................18

*Atl. Gypsum Co. v. Lloyds Int'l Corp.,*
   753 F. Supp. 505 (S.D.N.Y. 1990) ..........................................................................38

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007)..........................................................................3, 26, 28, 35

*Avon Pension Fund v. GlaxoSmithKline PLC,*
   343 F. App'x 671 (2d Cir. 2009) .............................................................................38

*In re Banco Bradesco S.A. Sec. Litig.,*
   277 F. Supp. 3d 600 (S.D.N.Y. 2017),
   *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
   752 F.3d 173 (2d Cir. 2014).............................................................................27, 28

*Barrett v. PJT Partners Inc.,*
   2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) (Caproni, J.)...............................15, 44

*In re Barrick Gold Corp. Sec. Litig.*,
    341 F. Supp. 3d 358 (S.D.N.Y. 2018)....................................................................15

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)................................................................................28, 29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................11

*Biotech. Value Fund, L.P. v. Celera Corp.*,
    2014 WL 988913 (N.D. Cal. Mar. 10, 2014)....................................................26, 27

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012)................................................................25

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)............................................................................35

*In re Cannavest Corp. Sec. Litig.*,
    307 F. Supp. 3d 222 (S.D.N.Y. 2018)................................................................28

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)......................................................................33, 50

*Chen v. Select Income REIT*,
    2019 WL 6139014 (S.D.N.Y. Oct. 11, 2019)......................................................19

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)................................................................28

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F. Supp. 2d 277 (S.D.N.Y. 2013)................................................................18

*In re Columbia Pipeline, Inc.*,
    405 F. Supp. 3d 494 (S.D.N.Y. 2019)................................................25, 29, 33, 35

*In re Duane Reade Inc. Sec. Litig.*,
    2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003).........................................25, 29, 30

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................. *passim*

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)..........................................................13, 16

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................48, 50

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 353 (2d Cir. 2002)............................................................................25

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015) (Caproni, J.),
    *aff'd*, 649 F. App'x 7 (2d Cir. 2016) ................................................................11, 33

*Holbrook v. Trivago N.V.*,
    2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) ................................................................29

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ................................................................12, 26, 27

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................................................12, 35

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001) ................................................................ *passim*

*Kuwait Inv. Office v. Am. Int'l Grp.*,
    128 F. Supp. 3d 792 (S.D.N.Y. 2015) ................................................................11

*Larkin v. Shah*,
    2016 WL 4485447 (Del. Ch. Aug. 25, 2016) ................................................................37, 38

*Leventhal v. Tow*,
    48 F. Supp. 2d 104 (D. Conn. 1999) ................................................................40

*Lopez v. Ctpartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016) ................................................................13, 14

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019) ................................................................26, 28

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ................................................................15

*McCauley v. City of Chicago*,
    671 F.3d 611 (7th Cir. 2011) ................................................................10

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................39

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010),
    *aff'd sub nom. Wilson v. Merrill Lynch Co.*,
    671 F.3d 120 (2d Cir. 2012) ................................................................21

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) ................................................................11

*meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*,
    260 F. Supp. 2d 616 (S.D.N.Y. 2003) ................................................................15

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011)........................................................38

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)........................................................30

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)........................................................13, 48

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)........................................................17, 18

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
    538 F. Supp. 2d 662 (S.D.N.Y. 2008)........................................................24

*Patel v. L-3 Commc'ns Holdings Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016) (Caproni, J.) ......................44

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ........................................................38, 40

*Polar Int'l Brokerage Corp. v. Reeve*,
    108 F. Supp. 2d 225 (S.D.N.Y. 2000)........................................................32, 33

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)........................................................27

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)........................................................28

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)........................................................12, 18, 22, 35

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015),
    *aff'd sub nom. Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)........................................................14, 15

*Seaboard World Airlines, Inc. v. Tiger Int'l, Inc.*,
    600 F.2d 355 (2d Cir. 1979)........................................................35

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)........................................................26

*In re ShengdaTech, Inc. Sec. Litig.*,
    2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)........................................................28

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)........................................................48

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)...................................................................................13, 14

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012)................................................................................27

*Sodhi v. Gentium, S.p.A.*,
   2015 WL 273724 (S.D.N.Y. Jan. 22, 2015) ....................................................................32

*Solow v. Citigroup, Inc.*,
   2012 WL 1813277 (S.D.N.Y. May 18, 2012) ..................................................................35

*Stransky v. Cummins Engine Co.*,
   51 F.3d 1329 (7th Cir. 1995) ...........................................................................................30

*In re Synthes, Inc. S'holder Litig.*,
   50 A.3d 1022 (Del. Ch. 2012)..........................................................................................38

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................ *passim*

*In re The Hain Celestial Grp. Inc. Sec. Litig.*,
   2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019) .................................................................48

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)........................................................................................17, 18

*In re Toys "R" Us, Inc. S'holder Litig.*,
   877 A.2d 975 (Del. Ch. 2005)..........................................................................................37

*Tung v. Bristol-Myers Squibb Co.*,
   412 F. Supp. 3d 453 (S.D.N.Y. 2019).................................................................35, 44, 47

*Walsh v. Rigas*,
   2019 WL 294798 (S.D.N.Y. Jan. 23, 2019) ....................................................................39

*Welch v. TD Ameritrade Holding Corp.*,
   2009 WL 2356131 (S.D.N.Y. July 27, 2009) ..................................................................22

*Winshall v. Viacom Int'l, Inc.*,
   76 A.3d 808 (Del. 2013) ..................................................................................................38

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*,
   2009 WL 464934 (S.D.N.Y. Feb. 25, 2009).....................................................................21

**Statutes**

15 U.S.C. § 78m..................................................................................................................30

15 U.S.C. § 78u-5(c)(1) ......................................................................................................13

The Private Securities Litigation Reform Act,
    15 U.S.C. § 78u-4(b) ................................................................................... 1, 11, 36

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................... 11

**Other Authorities**

17 C.F.R. § 240.13a-1 ............................................................................................ 30

17 C.F.R. § 240.13a-13 .......................................................................................... 30

17 C.F.R. § 240.15d-1 ............................................................................................ 30

17 C.F.R. § 240.15d-13 .......................................................................................... 30

17 C.F.R. § 249.308a .............................................................................................. 30

17 C.F.R. § 249.310 ................................................................................................ 30

*2018 Private Equity Portfolio Company Management Compensation Survey*
    (PricewaterhouseCoopers LLP Aug. 2018),
    https://www.pwc.com/us/en/services/hr-management/assets/pwc-private-
    equity-portfolio-company-management-compensation-survey-2018.pdf ............................ 41

Eric Swedenburg, Esq., *The Four-Ring Circus - Round Twenty-Three; A Further*
    *Updated View of The Mating Dance Among Announced Merger Partners and*
    *An Unsolicited Second or Third Bidder* (Mar. 15, 2019),
    https://www.stblaw.com/docs/default-source/related-link-pdfs/the-four-ring-
    circus---round-twenty-three-(march-2019).pdf ................................................................ 9

Jon Herzon & John LeClaire, *2018 Rollover Survey: Rollover and Incentive*
    *Equity Terms in Middle Market Private Equity* (Goodwin Proctor LLP May 6,
    2018), https://www.goodwinlaw.com/-/media/files/
    publications/rolloversurvey_2018_rd6_aq.pdf ............................................................... 41

Michael C. Jensen, *Agency Costs of Overvalued Equity*,
    34 Fin. Mgmt. 5 (2005) .......................................................................................... 31

Presutti, Richard, et al., *Private Equity Buyer/Public Target M&A Deal Study:*
    *2015-17 Review and Comparative Analysis* (Schulte Roth & Zabel Sept. 17,
    2018), https://www.srz.com/images/content/1/5/v4/159733/PE-M-A-
    DealStudy-2017-FINAL-web.pdf ........................................................................ 20, 21

Staff Accounting Bulletin No. 99,
    1999 WL 1123073, at *2 ...................................................................................... 30, 31

Defendant MINDBODY, Inc. ("Mindbody" or the "Company") and Defendants Richard L. Stollmeyer, Brett White, and Eric Liaw (the "Individual Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint ("AC") (Dkt. No. 22), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b).

## PRELIMINARY STATEMENT

This action is centered on a merger transaction that saw the public stockholders of Mindbody, following a sales process overseen by Mindbody's board and a stockholder vote that garnered overwhelming support, receive a 68% premium for the purchase of their shares by non-party Vista Equity Partners ("Vista"). Plaintiffs seek to transform that highly beneficial transaction into something it was not: the product of a corrupt scheme that violated the federal securities laws. Cobbling together a narrative that Plaintiffs concede relies on "suspicion" (AC ¶¶ 21, 117, 120, 134), Plaintiffs advance the extraordinary theory that three individuals— Stollmeyer, Mindbody's CEO; White, Mindbody's CFO; and Liaw, one of Mindbody's non-executive board members—engaged in an effort to intentionally depress Mindbody's stock price, despite their (or in Liaw's case, his firm's) large personal holdings, to "pave the way" for a sale to Vista at a below-market price. Based on this inventive story, Plaintiffs assert Section 10(b), Section 14(a), and Section 20(a) claims on behalf of a putative class of stockholders who sold Mindbody stock during the purported months-long scheme, ending the day before the merger closed in February 2019.

Plaintiffs' claims suffer from a number of debilitating defects. *First*, Plaintiffs do not allege a viable misstatement. As noted, a pillar of Plaintiffs' theory is that Mindbody allegedly intentionally issued false revenue guidance for Q4 2018. But that revenue guidance is a protected forward-looking statement under the PSLRA. With respect to the balance of the alleged misstatements asserted in the AC, Plaintiffs have failed to adequately plead falsity, and in

any event, many of the statements constitute opinions that are not actionable.

**Second**, Plaintiffs do not allege a viable omission.  Plaintiffs' theory also hinges on the claim that, in early 2019, Defendants purportedly chose not release Mindbody's preliminary and unaudited Q4 financial results as part of an effort to conceal, before the merger vote, that Mindbody's revenue might modestly exceed the previously reduced guidance.  This fails because there was no duty to release these preliminary financial results early, and in any case, the results would not have altered the "total mix of information" available to stockholders.

**Third**, Plaintiffs do not adequately allege the necessary element of scienter.  The allegations in the AC establish that Stollmeyer, White, and the private equity investment firm in which Liaw is a general partner, Institutional Venture Partners ("IVP"), were three of Mindbody's largest stockholders, thus giving them economic incentives that were directly aligned with the putative class.  Indeed, if one were to accept Plaintiffs' theory, Stollmeyer, White, and IVP were the parties who suffered the most direct economic harm from the alleged fraudulent scheme.  Recognizing this flaw in their case, Plaintiffs conjure a kitchen sink of purported ulterior motives, but all are based on speculation rather than the particularized factual allegations necessary to sustain a claim.  Ultimately, Plaintiffs are unable to overcome the most logical inference to be drawn from Stollmeyer, White, and IVP's substantial Mindbody holdings: They acted the way any rational economic actor would have and sought to achieve the highest sale price possible.  That simple and straightforward inference is fatal to all of Plaintiffs' claims.

## FACTUAL BACKGROUND[1]

### A.    **Mindbody Is Founded and then Becomes a Public Company.**

In 2001, Stollmeyer co-founded Mindbody from his garage.  Mindbody subsequently grew into a global business as wellness service businesses and consumers adopted its software.

---

[1]    Defendants contest the veracity of many of Plaintiffs' allegations, but accept them as true solely for purposes of this motion.  *See, e.g.*, *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006).

(*See* AC ¶¶ 48, 50; Ex. 1 at 1 (the "Proxy").)[2]  In 2015, Mindbody went public.  (Proxy at 26.)

At all relevant times, Stollmeyer was Mindbody's Chairman and CEO, White was its CFO and COO, and Liaw was on the Board and the Audit Committee.  (AC ¶¶ 40-42.)  Liaw is a general partner of non-party IVP, a private equity investment firm that held a large stake in Mindbody before the Vista acquisition on February 15, 2019 (the "Merger").  (*Id.* ¶ 42.)

Part of Mindbody's historic growth strategy involved acquisitions.  (*See id.* ¶¶ 53-54.)  In 2018, Mindbody made two acquisitions—acquiring FitMetrix, Inc. on February 19, 2018 and Booker Software, Inc. ("Booker") on April 2, 2018 (the "Acquisitions").  (*Id.* ¶¶ 55, 58.)  Mindbody informed investors that the integration of these Acquisitions might have a dampening effect on 2018 financial results but would strengthen the Company's long-term prospects.[3]

During the Company's Q2 earnings call, Stollmeyer reported that there had been "solid progress on our integration," noting that the completion of integration would "fuel strong growth in the target market [and] customer base in 2019."  (Ex. 4 at 5.)  Stollmeyer also stated that the integration was "a massive project that touches on every aspect of our business" and that "as we drive and accelerate the pace of integration, we are experiencing some near-term friction."  (*Id.* at 5; *see also* AC ¶¶ 69-71.)  Mindbody thus "lowered the midpoint of [its] full year revenue guide by $1 million" and the high end by $2 million.  (Ex. 4 at 5, 10.)  Stollmeyer explained that

---

[2]   References to "Ex. _" are to exhibits accompanying the declaration of John Del Monaco.  Under the PSLRA, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The documents that the Court may consider in deciding this motion include "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The exhibits cited herein consist of SEC filings, call transcripts, historic stock price data, and various documents that were expressly incorporated into the AC by reference.

[3]   On May 8, 2018, during the Company's Q1 earnings call, Stollmeyer cautioned that "the integration of these businesses is a nontrivial matter."  (Ex. 2 at 8.)  Stollmeyer also stated that "in the near term, there [wa]s a significant amount of effort" that would need to be expended on integration, but that those efforts would "set [Mindbody] up as we exit 2018 for a really fabulous '19 and '20, '21 ahead."  (*Id.* at 13.)  Analysts reacted by noting the likely suppressive impact on revenues of the "significant integration and investments planned for this year, as well as the fact Booker is MB's biggest acquisition to date."  (Ex. 3 at 2.)

Mindbody nevertheless remained "very bullish on where this is going to take us in 2019." (*Id.* at 10.) White also reported that, despite near-term challenges, Mindbody believed the Acquisitions would help it achieve profitability over the long term. (AC ¶ 72; Ex. 4 at 12.) Following these disclosures, JPMorgan noted that issues with integration, as well as with the implementation of Mindbody's planned update to its payments platform, would "likely hinder growth for the next two quarters" and thus "tweak[ed] down second-half growth." (Ex. 5 at 1.) Jefferies also noted that issues integrating Mindbody and Booker sales representatives "might reduce sales force productivity." (Ex. 6 at 1.)

On September 18, 2018, during its annual BOLD Customer Conference and Investor Analyst Day, Mindbody stated that its integration of the Acquisitions was "working." (AC ¶ 78.) Mindbody did not state that the process was complete or that Mindbody had put behind it the integration challenges that had led it to revise downward its full-year guidance in July. Instead, Mindbody reiterated that the integration efforts were being "frontload[ed]" in 2018 "so that we can enter the New Year in '19, first of all, with strong growth." (Ex. 7 at 49-50.) Analysts understood that significant integration work remained to be done. (*See, e.g.*, Ex. 8; Ex. 9.)

### B.    Mindbody Misses Its Q3 Revenue Guidance and Reduces Its Q4 Guidance.

In reporting financial results, Mindbody's practice was to include revenue broken down by subscription and payments, GAAP and non-GAAP net loss, adjusted EBITDA, subscriber information, and guidance for the following quarter and remainder of year ("Earnings Release"), and thereafter to issue its balance sheet, statements of operations, cash flows, and reconciliation data ("Quarterly/Annual Report"). (*See, e.g.*, Ex. 10.) At the end of the fiscal year, Mindbody would disclose its Earnings Release (*see, e.g.*, Ex. 11) and file an Annual Report thereafter (*see, e.g.*, Ex. 10). In 2018, Mindbody's Earnings Release occurred on February 21st and its Annual Report was filed on March 1st. (Ex. 10; Ex. 11.)

The Audit Committee oversaw Earnings Releases and Quarterly/Annual Reports. (*See*

Ex. 12 at 2-5.)   It was comprised of Eric Liaw, Cipora Herman, and Graham Smith (the committee chair).  (Ex. 13 at 22 ("2018 Proxy").)[4]

On November 6, 2018, Mindbody announced Q3 revenue of $63.8 million, slightly missing both Mindbody's reduced guidance at the end of Q2 and analyst expectations.  (Ex. 14, Ex. 99.1 at 1; Ex. 4 at 5, 10; *see* Ex. 15 at 1 (Q3 revenue "missed" Jefferies and Street estimates); AC ¶ 105 (revenue came in below $64 million guidance mid-point).)  Aware of this result, the day before releasing earnings, the Audit Committee met with management to review the latest Q4 forecasts and their associated risks, and "aligned around a substantial guide down for the quarter."  (AC, Ex. E.)  As a result, and as it had done the prior quarter, Mindbody modestly reduced its Q4 revenue guidance by $1 million to $65-67 million.  (Ex. 14, Ex. 99.1 at 2.)

### C.     Stollmeyer Engages in Networking.

As Mindbody's CEO, Stollmeyer occasionally met and attended conferences with bankers and investors to network and discuss business opportunities for Mindbody.  (*See* Proxy at 26.)  On August 7, 2018, Stollmeyer met with Jeff Chang of Qatalyst Partners ("Qatalyst").  (AC ¶ 88; Ex. 16 at 4 (the "February Supplement" or "Feb. Supp.").)  On August 23, 2018, Stollmeyer allegedly met with Monti Saroya, a Vista principal, and Nicolas Stahl, another Vista employee "to discuss Mindbody's business."  (AC ¶ 89.)  Stollmeyer and Saroya also met on September 4, 2018, where Stollmeyer provided a general overview of Mindbody and its approach.  (Feb. Supp. at 4.)  Shortly thereafter, Vista invited Stollmeyer (along with hundreds of other executives) to attend Vista's annual Chief Executive Officer Summit conference on October 8 and 9, 2018.  (AC ¶ 90; Feb. Supp. at 4.)  There, Stollmeyer spoke with Saroya about Mindbody, and he also spoke with Vista's co-founder, Robert Smith.  (AC ¶ 90; Feb. Supp. at 4.)

---

[4]     Herman previously served as CFO for the San Francisco 49ers, VP of finance and treasurer for Facebook, Inc., and in various finance positions at Yahoo! Inc.  (2018 Proxy at 9.)  Smith also had significant experience in the software industry, having served in various leadership roles at salesforce.com (including as CFO), and as a board member for three different software companies.  (*Id.*)

On October 16, 2018, Saroya told Stollmeyer that Vista was interested in potentially acquiring Mindbody at "a substantial premium to recent trading range."  (AC ¶ 95 (emphasis omitted); Feb. Supp. at 4.)  The next day, Stollmeyer relayed this initial overture to members of Mindbody's management team.  (AC ¶ 95.)  In his email, Stollmeyer cautioned that Vista had "no idea what we are about to report or guide" in the third quarter.  (AC, Ex. D.)  Stollmeyer discussed reaching out to potential financial advisors "as we explore the possibility of taking MB private."  (*Id.*)  Stollmeyer also told members of the management team that within the next week he would inform Mindbody's Board about Vista's expression of interest.  (*Id.*)

On October 26, 2018, the Board held a telephonic meeting with Mindbody's senior management and Cooley LLP ("Cooley"), Mindbody's outside counsel, to discuss potential strategic opportunities, engaging a financial advisor, and the formation of a transaction committee.  (AC ¶¶ 14, 100; Proxy at 26.)  On October 30, 2018, the Board established a Transaction Committee (the "Transaction Committee"), (AC ¶ 103; Proxy at 26), and ultimately vested it with authority to interview and retain a financial advisor and to oversee the transaction process, (Proxy at 28).  The Board appointed Liaw, Cunningham, and Goodman to the Transaction Committee, and Liaw was designated as Chairman.[5]  (Proxy at 26.)

### D.    Mindbody Conducts a Sales Process.

On November 14, 2018, the Transaction Committee "interviewed Qatalyst and other potential financial advisors."  (AC ¶ 137; Proxy at 27.)  Following the financial advisors' presentations, the Transaction Committee and the Board authorized Mindbody to engage Qatalyst to evaluate potential strategic transactions.  (Proxy at 27.)

On November 17 and 18, 2018, Mindbody management, Cooley, and Qatalyst discussed

---

[5]    Liaw had previously worked at Morgan Stanley where he was involved in strategic and financing transactions for clients across the technology industry.  Cunningham had more than 15 years of experience as an executive in the software industry, and experience with acquisitions, having served as CEO and director of Yodle, Inc.,

the strategic transaction process and initial outreach to potential acquirers.  (Proxy at 27.)

Between November 19, 2018 and mid-December, Qatalyst contacted 15 potential bidders (eight

strategic companies and seven financial sponsors).  (*Id.*)  During that time, Mindbody executed

confidentiality agreements with, and made management presentations to, 10 of those parties,

including ███████████████████████, and Vista.  (Proxy at 28.)   The

confidentiality agreements included a customary standstill provision but did not preclude

submission of a confidential bid to Mindbody at any time, including after Mindbody signed a

definitive agreement to be acquired by a different party.  (*Id.*; Feb. Supp. at 5.)

On December 15, 2018, Qatalyst made an electronic data room containing legal and

business diligence materials available to ████████, Vista, and four other financial

sponsors.  (Proxy at 28-29.)  Two days later, ████████████████ a potential

"strategic" acquirer, obtained data room access.  (*Id.* at 29; *see also* AC ¶ 145.)  The two other

parties that had executed confidentiality agreements chose not to continue.  (*See* Proxy at 29.)

On December 17, 2018, the Board approved Mindbody's projections for 2019 to 2023, as

"the most current and predictive forecasts" of Mindbody's financial performance (the

"Management Projections").  (*Id.*)  The Board authorized Qatalyst to share portions of the

Management Projections with bidders that had access to the data room, and to use them in its

own analyses.  (*Id.*)  On December 17th and 18th, Mindbody participated in diligence calls with

Vista.  (*Id.*)  Similar calls were conducted with ████ and ████████ between December 17th

and 19th, and ████ received a product demo on December 19th.  (*Id.*)

On December 18, 2018, Vista submitted a non-binding indication of interest to acquire

Mindbody for $35.00 per share in cash (the "Initial Vista Offer").  (*Id.*)  The Initial Vista Offer

stated that it would expire on December 19, 2018 (*i.e.*, the next day), at 11:59 p.m., unless the

---

which was acquired by Web.com Group, Inc.  (2018 Proxy at 9.)  Similarly, Goodman had extensive executive

parties entered into an exclusivity agreement.  (*Id*. at 29.)   The next day, the Transaction Committee, Mindbody management, and Cooley discussed the Initial Vista Offer, and the status of other potential bids.  (*Id*. at 30.)  Qatalyst reported that it had informed ███ and ███ ███, who were still engaged in diligence, that the competitive nature and timing of the process required them to provide an indication of value within 24 to 48 hours.  (*Id*.)  Qatalyst also reported that only one strategic party remained in the process ███, but ███ was unable to communicate a timeframe for making an offer.  (*Id.*)

The Transaction Committee determined not to respond to the Initial Vista Offer until (i) further discussions with the Board occurred, and (ii) Qatalyst reiterated to the remaining parties the need for prompt and competitive indications of interest.  (*Id.*)  Thus, the Transaction Committee chose not to engage with Vista before the Initial Vista Offer expired on December 19th, despite lacking other offers.  After Qatalyst followed up with the remaining parties as instructed—as well as to all other parties who had not responded to Qatalyst's initial outreach— the four financial sponsors with data room access other than Vista, ███, and ███ declined to participate further.  (*Id.*)

On December 20, 2018, Qatalyst reported to the Board that (i) ███ aimed to "provide additional information" the following day; (ii) ███ o declined to continue; and (iii) ███ did not seem likely to produce a competitive offer.  (*Id*. at 30.)  The Board resolved to provide a counter of $40.00/share to Vista, as well as a decreased termination fee of 3.0% for the period after expiration of a go-shop that would occur after any agreement.  (*Id*. at 31.)

Further negotiations ensued after Qatalyst relayed that counteroffer to Vista.  Vista responded with what it described as its "best and final" offer, which increased its all-cash offer to $36.50 per share, decreased the termination fee as requested, and made other concessions (the

---

leadership experience with companies in the software and marketing industries, and acquisitions.  (*Id.*)

"Revised Vista Offer").  (*Id.*)  On December 21st, Qatalyst reported to the Board that the only remaining financial sponsor, ███, had not provided an offer or any further information.  (*Id.*) Nonetheless, the Board declined to provide Vista with exclusivity and required a go-shop period (to which Vista ultimately agreed) (the "Go-Shop").  (*Id.*)

Over the next two days, Vista performed confirmatory due diligence, while a merger agreement was negotiated (the "Merger Agreement").  (*Id.*)  Qatalyst provided the Board with its opinion that the Revised Vista Offer was fair from a financial perspective.  (*Id*. at 32.) Afterward, the Board voted to approve the transaction, finding it in the best interest of Mindbody's stockholders.[6]  (*Id.*)

### E.    Mindbody Conducts a 30-Day Go-Shop and a Subsequent No-Shop.

After executing the Merger Agreement, Mindbody continued to solicit bids.  During the Go-Shop, which stretched from December 23, 2018 to January 22, 2019, Qatalyst contacted 52 parties (23 strategic companies and 29 financial sponsors), executed confidentiality agreements with nine of them, and gave data room access to every interested party.  (*Id.*)  The potential acquirers contacted during the initial sales process could have remained engaged during the Go-Shop, but ████████, and ████ all "declined to continue discussions."  (*Id.*)

Mindbody was thereafter subject to a no-shop period from January 22 to February 14, 2019 (the "No-Shop").  (*See id.* at A-41-42).  The termination fee during this time was 3.0% of the transaction equity.  No party made a bid during either the Go-Shop or the No-Shop.[7]

---

6    All seven independent, non-insider Board members owned Mindbody stock, aligning their interests with those of stockholders.  (Proxy at 52.)  None of these Board members continued on as a director following the Merger.

7    Deal-jumping, when a new bidder surfaces after a definitive merger agreement, has become a "standard execution risk of getting a deal done."  *See* Eric Swedenburg, Esq., *The Four-Ring Circus - Round Twenty-Three; A Further Updated View of The Mating Dance Among Announced Merger Partners and An Unsolicited Second or Third Bidder*, at 2 (Mar. 15, 2019), https://www.stblaw.com/docs/default-source/related-link-pdfs/the-four-ring-circus---round-twenty-three-(march-2019).pdf.  In 2018, this occurred in six deals. *Id.* at 3.

### F.   Mindbody Issues Its Proxy, Class Actions Are Filed, and Mindbody Supplements Its Disclosures.

Mindbody filed its preliminary proxy statement on January 9, 2019 (the "Preliminary Proxy"), and the Proxy on January 23, 2019.  (Ex. 17 ("Prelim. Proxy"); Proxy.)  After that latter filing, multiple Mindbody stockholders filed complaints alleging material misstatements in the Proxy, including many of the same allegations made in the AC.  (*See* Ex. 18.)  On January 29, 2019, Mindbody filed a Form 8-K publicly disclosing those complaints and attaching them as exhibits.  (*Id.*)  Mindbody also filed a Schedule 14A on January 29, 2019, which disclosed and attached a books and records demand by a hedge fund, Luxor Capital Partners, LP ("Luxor"), and Mindbody's response to that demand.  (Ex. 19 at 2, 12-37 ("Jan. Supp.").)

On February 7, 2019, Mindbody issued yet additional disclosures, including, among other things, further details regarding the sale process, (Feb. Supp. at 4-7), and the stockholder litigations, including filings from Luxor's books and records action (*id.* at 3-4, 9-49) and two additional stockholder complaints alleging similar disclosure violations (*id.* at 3-4, 50-83).

On February 14, 2019, an overwhelming majority of Mindbody's stockholders voted in favor of the Merger.  (Ex. 20 at 2.)  Excluding votes cast by Luxor, only 1.5% of stockholders voted against the Merger.  (*See id.*)[8]  The Merger closed on February 15, 2019, and Mindbody's stockholders received the second highest one-day premium ever paid for a public software company.  (*Id.* at 1; Jan. Supp. at 4.)

### LEGAL STANDARDS

The PSLRA imposes the "most stringent pleading requirement in American civil law." *McCauley v. City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("As a check against abusive litigation by private parties, Congress enacted the [PSLRA] . . . .  Exacting pleading requirements are among the

---

[8]   Luxor's ownership of approximately 6.3 million shares in Mindbody stock and its opposition to the Merger are documented in its Schedule 13D filing dated January 10, 2019.  (Ex. 21 at 9, 13.)

control measures Congress included in the PSLRA.") (citation omitted).  To survive a motion to dismiss, "[a] claim must raise more than the 'mere possibility of misconduct . . . .'" *Kuwait Inv. Office v. Am. Int'l Grp.*, 128 F. Supp. 3d 792, 802 (S.D.N.Y. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 168 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).  However, the Court should not accept "legal conclusions, naked assertions, mere conclusory statements or implausible inferences" alleged in the AC.  *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires Plaintiffs to plead "the circumstances constituting fraud . . . with particularity." *Tellabs*, 551 U.S. at 319 (quoting Fed. R. Civ. P. 9(b)).  Congress recognized that, in the context of securities fraud, even that heightened standard is not enough and enacted the PSLRA to reign in "abuses of the class-action vehicle in litigation involving nationally traded securities" that were "injur[ing] the entire U.S. economy." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (quotations omitted).  Thus, securities fraud claims "must satisfy two layers of heightened pleading requirements:  first, a complaint alleging securities fraud must satisfy Rule 9(b) of the Federal Rules of Civil Procedure, and, second, private securities fraud class actions must satisfy the pleading requirements set forth in PSLRA, 15 U.S.C. § 78u-4(b)(1)." *Harris*, 135 F. Supp. 3d at 169.

The "PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements [or] omissions . . . of a material fact' and acted with the '[r]equired state of mind' (the 'scienter requirement')." *Id.* (quotations and citations omitted).  The AC must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" with "specificity why and how" each statement is allegedly misleading,

and must also "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." *Rombach v. Chang*, 355 F.3d 164, 172, 174, 176 (2d Cir. 2004) (quotations omitted).

To plead a claim under Section 14(a), Plaintiffs must allege "(1) the proxy statement contained a material misstatement or omission, which (2) caused [their] injury, and (3) that the proxy solicitation itself . . . was an essential link in the accomplishment of the transaction." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (quotations omitted).

Plaintiffs have utterly failed to meet these requirements.

## ARGUMENT

Plaintiffs' allegations fail for the three independent reasons below.[9]

## I.   PLAINTIFFS HAVE FAILED TO PLEAD AN ACTIONABLE MISSTATEMENT.

The purportedly false and misleading statements delineated in the AC (*see* AC ¶¶ 209-261) can be grouped as follows:[10]

1.   Statements regarding Mindbody's Q4 2018 guidance (the "Guidance Statements").  (*Id.* ¶¶ 210, 212.)

2.   Statements regarding the operational challenges that the Company expected to face as a result of the Acquisitions (the "Integration Statements").  (*Id.* ¶¶ 106, 107, 109, 209, 211, 213, 214, 215.)

3.   Statements regarding or characterizing the size of the 68% merger premium to Mindbody's pre-signing stock price (the "Premium Statements").  (*Id.* ¶¶ 28, 29, 30, 31, 149, 180, 185, 218, 219, 225, 230, 231, 250.)

4.   A statement regarding the Mindbody Board's belief that $36.50 was the best available price for Mindbody (the "Value Statement").  (*Id.* ¶ 233.)

5.   Statements regarding the Go-Shop process and buyer access to the data room (the "Process Statements").  (*Id.* ¶¶ 29, 223, 235, 247, 252, 254.)

---

[9]   As discussed in Part II, Plaintiffs' claims against Liaw fail for the additional, and independent, reason that Liaw did not "make" any of the allegedly false or misleading statements and, therefore, cannot be liable for them. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011).  Thus, the arguments in Parts I and III—including references to statements "made" by Defendants—concern Liaw only if and to the extent the statements in question are legally attributable to him.

[10]   For the Court's convenience, Appendix A to this memorandum contains a full list of the statements that Plaintiffs contend are false or misleading, as well as a summary of the arguments made herein as to why each statement is not actionable as a matter of law.

6.     Statements regarding the Merger rationale (the "Rationale Statements").  (*Id.* ¶¶ 181, 185, 225.)

7.     Statements describing the origins of the sales process (the "Background Statements"). (*Id.* ¶¶ 227, 237, 256.)

8.     A statement describing the establishment of the Transaction Committee (the "Transaction Committee Statements").  (*Id.* ¶¶ 239, 258.)

9.     Statements regarding the fact that no pre-signing employment discussions took place between Vista and Mindbody management (the "Employment Statements").  (*Id.* ¶¶ 190, 241, 260.)

As explained below, Plaintiffs have failed to allege facts establishing that any such statement is

actionable under either Section 10(b) or Section 14(a).

### A.     The Guidance Statements Are Protected Forward-Looking Statements.

The linchpin of Plaintiffs' theory is that Stollmeyer and White intentionally drove down

Mindbody's stock price through the Guidance Statements that were made in connection with Q3

2018 earnings.  But the Guidance Statements cannot support a securities fraud claim because

they are expressly protected by the PSLRA safe harbor and the "bespeaks caution" doctrine.

Forward-looking statements "speak predictively about the future" or address "projection of

revenues," "the plans and objectives of management for future operations," or "future economic

performance." *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010) (quotations omitted);

*Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39 (S.D.N.Y. 2016) (quoting *Slayton*

*v. Am. Express Co.*, 604 F.3d 758, 765 (2d Cir. 2010)).  The PSLRA specifically protects such

statements because "[c]orporate officials need not be clairvoyant" and "allegations that

defendants should have anticipated future events . . . do not suffice to make out a claim of

securities fraud." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  Forward-looking

statements are not actionable under the PSLRA and the "bespeaks caution" doctrine when they

are "identified and accompanied by meaningful cautionary language *or* [are] immaterial *or* the

plaintiff fails to prove that [they were] made with actual knowledge that [they were] false or

misleading." *Slayton*, 604 F.3d at 766; *see also* 15 U.S.C. § 78u-5(c)(1).  "Because the statute is

written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 530 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

Here, the Guidance Statements were accompanied by meaningful cautionary language. "To qualify as 'meaningful,' cautionary language 'must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" *Lopez*, 173 F. Supp. 3d at 39 (quoting *Slayton*, 604 F.3d at 771). The two allegedly false statements regarding Mindbody's Q4 guidance were made in Mindbody's November 6, 2018 earnings press release (AC ¶ 210; Ex. 14, Ex. 99.1 at 2) or during Mindbody's earnings call that same day (AC ¶ 212; Ex. 22 at 7). The press release cautioned that both the press release and the accompanying earnings conference call "contain forward-looking statements, including, among others, current estimates of fourth quarter and full year 2018 revenue, non-GAAP net loss and weighted average shares outstanding . . . ." (Ex. 14, Ex. 99.1 at 3.) The release further described some of the "risks and uncertainties" that could impact the guidance, including "our ability to successfully integrate Booker and FitMetrix; our ability to achieve expected synergies and efficiencies of operations between MINDBODY and Booker and FitMetrix; our ability to realize the market opportunities provided by our acquisitions of Booker and FitMetrix," among other factors specifically related to the integration of the Acquisitions, as well as other risks and uncertainties that could impact the guidance. (*Id.*) The press release specifically informed investors that Mindbody's "actual results could differ materially from the results expressed or implied by these forward-looking statements." (*Id.*) Nicole Gunderson, the Head of Investor Relations, also highlighted in the November 6, 2018 earnings call that "[o]ur remarks today will include forward-looking statements, including, . . . projected financial results for Q4 2018 and full year 2018 and beyond" and referred listeners to

"today's press release" for an articulation of the various risks related thereto.  (Ex. 22 at 4.)

These statements fully and meaningfully conveyed the risks that allegedly materialized here.  Such warnings that convey "substantive information about the risk that ultimately materialized" are meaningful and "not mere boilerplate."  *See Sanofi*, 87 F. Supp. 3d at 536.  The Guidance Statements are thus not actionable.

>   **B.      Plaintiffs Have Not Plausibly Alleged the Integration Statements Regarding Historical Challenges Were False, and the Integration Statements Regarding Future Challenges Are Protected.**

Plaintiffs' theory concerning the Integration Statements made in connection with Q3 2018 earnings is that they were false and misleading insofar as they (i) attributed Mindbody's financial performance to earlier integration challenges, and (ii) attributed Mindbody's reduced guidance to anticipated future integration challenges.  Neither of these presents a viable claim.

Regarding the former, Plaintiffs have not plausibly alleged the Integration Statements were false when made.  To plead an actionable misstatement, Plaintiffs must allege that the "material misstatement was false *at the time it was made*."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014); *accord meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, L.P.*, 260 F. Supp. 2d 616, 635 (S.D.N.Y. 2003).  It is not enough simply to "contend that the statement was false."  *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 371 (S.D.N.Y. 2018).  Plaintiffs must "explain why the statements are false and allege 'specific facts' that support [their] claim that the complained of statements were 'false when made,'" *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *4 (S.D.N.Y. Sept. 8, 2017) (Caproni, J.). Plaintiffs' own allegations contradict the notion that statements regarding prior challenges made in connection with Q3 earnings were false.  Indeed, Plaintiffs allege that integrating the Acquisitions was a "massive project" that involved "'near term' costs and frictions" and that involved "a lot of heavy lifting" and "exceptional effort."  (AC ¶¶ 64, 69, 71, 72.)  Stollmeyer's statement regarding the humbling effect of "dealing with the magnitude of

integrating these businesses and ramping up growth at the same time" (*id.* ¶ 214) is a rephrasing of a proposition Plaintiffs accept as true.  Similarly, Stollmeyer's reference to having "faced significant operating challenges in the past 2 quarters" (*id.* ¶ 211) is not plausibly alleged to be false when Plaintiffs agree that integrating the Acquisitions was a "massive project."

Nor do Plaintiffs dispute the accuracy of Stollmeyer's description of the magnitude of Mindbody's ramp-up of its sales force hiring in Q2 2018, either that the "50 additional reps" Mindbody hired were not, in fact, hired or that they comprised "the largest amount of sales reps we've ever hired in one group."  (*Id.* ¶ 213.)  And, while Plaintiffs do allege that it was false that the Company "did not meet our own growth expectations in the second and third quarters" (*Id.* ¶ 211), their contention is again belied by the facts in the AC.  Mindbody's Q3 revenue of $63.8 million was below the midpoint of its Q3 guidance of $64 million (*Id.* ¶ 105), guidance Mindbody had reduced when announcing its Q2 results (Ex. 4 at 5, 10).

The remaining Integration Statements describe integration challenges Mindbody projected it would face in Q4 2018 and are thus protected forward-looking statements.  (*See* AC ¶ 211 ("We expect this to . . . continue to lag the expectations we communicated in our last call."); *id.* ¶ 213 ("[W]e still have some operational challenges around, for example, the 2 instances in Salesforce which we're working to resolve.").)  These parts of the Integration Statements "speak predictively about the future" with respect to whether the past challenges that Mindbody had experienced in integrating the Acquisitions would continue.  *See Gissin*, 739 F. Supp. 2d at 505.  And they were accompanied by the same meaningful cautionary language as the Guidance Statements, which disclosed the risk that the integration might proceed differently than projected for a variety of reasons.  (*See* Ex. 14, Ex. 99.1 at 3; *supra* Part. I.A (discussing the specific and meaningful cautionary language that accompanied the Guidance Statements).)  The Integration Statements are not actionable.

-16-

C.    **Plaintiffs Have Not Plausibly Alleged the Premium Statements Were False, and They Are Opinions and Puffery in Any Event.**

Plaintiffs' attempt to predicate a securities law violation on Mindbody's statement comparing the merger premium to its historic stock price also fails.  The $36.50 per share price Vista paid to acquire Mindbody constituted, as a mathematical matter, a 68% premium to the unaffected closing price of $21.72 as of December 21, 2018 and a 42% premium to the 30-day volume weighted average price, ending on December 21, 2018.  (*See, e.g.*, AC ¶ 185.)  Plaintiffs thus have not, and cannot, allege that the Premium Statements were false or misleading.

To the extent Plaintiffs are attempting to challenge the characterization of the premium as "significant," that is also unavailing.  This characterization plainly expresses an opinion, which is generally not actionable, *see Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015), because opinions "are not quantifiable or factual" and "are subject to interpretation," *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).  Liability for an opinion attaches only in narrow circumstances—where (i) the speaker "did not hold the belief she professed;" (ii) "the supporting fact[s] she supplied were untrue;" or (iii) the statement omitted information "whose omission ma[de] the . . . statement . . . misleading to a reasonable [investor]." *Omnicare*, 575 U.S. at 186, 194; *Tongue*, 816 F.3d at 210.  Establishing liability for statements of opinion "is no small task for an investor," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts" and do "not expect that every fact known to an issuer supports its opinion." *Omnicare*, 575 U.S. at 189-90, 194.  To adequately plead that a statement of opinion is false or misleading, Plaintiffs must allege that the statement was both objectively "wrong" and that "the speaker did not actually hold the stated belief at the time the statement was made." *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *12 (S.D.N.Y. Sept. 9, 2019).

Plaintiffs do not allege that Defendants did not actually believe that a 68% premium over

the unaffected closing price on the previous trading day was a "significant premium."  *See Omnicare*, 575 U.S. at 186, 194 (opinions are not actionable if they are honestly held); *Tongue*, 816 F.3d at 210 (same).   And in any case, investors were fully capable of making their own assessments about whether the premium was significant given their ready access to Mindbody's historical stock prices.  *See Omnicare*, 575 U.S. at 186, 194 (opinions are not actionable if the disclosed basis is true); *Tongue*, 816 F.3d at 210 (same).  Furthermore, a 68% or 42% premium is certainly within the range of any reasonable person's understanding of "significant."

Moreover, using the adjective "significant" to describe the premium is exactly the type of "expression[] of puffery and corporate optimism" that "do[es] not give rise to securities violations."  *Rombach*, 355 F.3d at 174.  Plaintiffs' semantic quibble with this description of the premium (*see* AC ¶¶ 28, 29, 149, 219) cannot create an actionable securities claim.  *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 298 (S.D.N.Y. 2013) ("Section 10-b is not concerned with such subtle disagreements over adjectives and semantics.").  For the same reasons, Plaintiffs' disagreement with Mindbody's optimistic characterization of the deal price as "highly attractive for shareholders" (AC ¶ 250) cannot state a claim.

### D.    Plaintiffs Have Not Plausibly Alleged the Value Statement Was False, and It Is an Opinion in Any Event.

Plaintiffs have not plausibly alleged that the Value Statement was false, nor can they. The Value Statement was a truthful description of the Board's belief that $36.50 was the best price available as of the Merger Agreement.  Where management or the Board make statements they "honestly believe[] to be true, and where there is no reckless disregard for truth, then that is not securities fraud."  *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008). Here, the Proxy even explains the basis for the Board's belief[11]:  "[R]epresentatives of Qatalyst

---

[11]   Plaintiffs primarily rely on the Preliminary Proxy rather than the Proxy to support their false statement allegations.  (*Compare* AC ¶¶ 229-44 (alleging eight false statements in the Preliminary Proxy), *with* AC ¶¶ 246-48 (alleging one false statement in the actual Proxy).)  But it is fundamental that the supplementation of

Partners relayed Vista's instruction that $36.50 per share price was the highest price Vista would be willing to offer." (Proxy at 31.) And the Proxy disclosed that, when the Merger Agreement was signed, only two of the 15 originally solicited parties remained actively engaged, one of which had indicated that it likely valued Mindbody at "between $30 and $35 per share" and one who "had not provided an indication of valuation or timing" despite repeated requests that they do so. (*Id.* at 30-32.) Plaintiffs do not allege that any of these supporting facts is untrue.

Significantly, Plaintiffs' only support for the allegation that the Board did not believe that Vista's offer constituted the "highest price that Vista was willing to pay" is that Vista, over two months earlier and before any diligence, supposedly had "indicated a willingness to pay a 'substantial premium to [Mindbody's] recent trading range, as of October 16, 2018.'"[12] (AC ¶ 234.) Contrary to Plaintiffs' protestations, there is no contradiction between Vista having initially expressed a general interest in purchasing the Company at a substantial premium at a time when the stock was trading around $31.86 to $34.59 per share, and ultimately purchasing the Company at a 68% premium. Plaintiffs fail to allege—and cannot allege—that as of December 23, 2018, Vista (or anyone) was willing to pay more than $36.50 per share to acquire Mindbody. Plaintiffs do not plead, or even intimate, the existence of any superior offer.

In addition, the Value Statement is a protected opinion because it describes the Board's

---

a proxy with allegedly missing disclosures moots claims regarding those disclosures. *See, e.g.*, *Chen v. Select Income REIT*, 2019 WL 6139014, at *12 (S.D.N.Y. Oct. 11, 2019). Plaintiffs' attempt to allege disclosure violations based on Mindbody's preliminary disclosures rather than its definitive and supplemental disclosures on the same topics cannot state a claim.

[12] Plaintiffs misleadingly suggest that the range of this indicated premium was "no less than $41.25" and impliedly "at least $49.50 per share." (*See, e.g.*, AC ¶¶ 96, 234.) But those valuations are based on deceptive math. Stollmeyer's description of Vista's indicated valuation was that Vista had said it "would pay a substantial premium to recent trading range **and see the stock correction as opportunity**." (AC, Ex. D (emphasis added).) Although Mindbody had traded as high as $43.85 per share on September 25, 2018, the "stock correction" referred to in Stollmeyer's email occurred from October 5, 2018, when the stock traded at $41.25 per share, to October 11, 2018, when it traded as low as $31.86 per share. (Ex. 23.) By October 16, 2018, the stock had rebounded only slightly to $34.59 per share. (*Id.*) Thus, Vista's comment, as relayed by Stollmeyer, was that Vista was potentially willing, *in October*, to pay a premium over that range of $31.86 to $34.59 per share. (*See* AC, Ex. D.) The $36.50 per share price Vista ultimately paid represents a 15% premium over $31.86 per share and a 6% premium over $34.59 per share.

belief that $36.50 was the best price available at the time of the Merger.  Plaintiffs make no allegation that the Board did not believe that $36.50 was the best price available as of December 23, 2018, nor could they; the Board did hold that belief.  (Proxy at 33.)

   **E.    Plaintiffs Have Not Plausibly Alleged the Process Statements Were False, and They Are Also Opinions and Puffery in Any Event.**

   Plaintiffs' attempt to transform ordinary statements about the transaction process into securities fraud also fails.  Plaintiffs first contend that the description of the 30-day Go-Shop period as "customary" was false and misleading.  (AC ¶¶ 29, 223, 235.)  That is wrong.  In the Proxy, Mindbody described the Go-Shop process, including the dates it began and ended (including a disclosure that it "ran through the holiday season" (*id.* ¶ 160)), and explained that during that period there was a right "to solicit alternative Acquisition Proposals from, and participate in discussions and negotiations with, third parties regarding any alternative Acquisition Proposals," (Proxy at 34).  According to Plaintiffs' authority, go-shops customarily range from 25-60 days, with 30-days being quite common.  *See* Presutti, Richard, et al., *Private Equity Buyer/Public Target M&A Deal Study: 2015-17 Review and Comparative Analysis*, at 7 (Schulte Roth & Zabel Sept. 17, 2018), https://www.srz.com/images/content/1/5/v4/159733/PE-M-A-DealStudy-2017-FINAL-web.pdf ("Schulte Analysis").  Further, Mindbody disclosed the entire Merger Agreement, including the terms of the Go-Shop, publicly.  (Proxy at Annex A.)

   Nor have Plaintiffs adequately alleged that the Process Statements relating to the data room were false and misleading.  A fair reading of the Proxy contradicts Plaintiffs' suggestion that the Proxy misleadingly indicated that all parties were granted the same level of access to diligence as Vista.  As Qatalyst's December 24, 2018 email regarding the "Go Shop Process" shows, *before a party made a full bid*, it would be granted access to the same data room "that all parties were granted access to prior to Vista's bid."  (AC, Ex. H.)  While Plaintiffs allege that after it made its offer, Vista was granted access to broader materials for confirmatory diligence

(AC ¶ 164), the Go-Shop plan provided any party that submitted an indication of interest the ability to access "the full data room" for its own "confirmatory diligence" (AC, Ex. H).

The Proxy thus explained to investors that parties that executed confidentiality agreements were "granted access to the same electronic data room populated by Mindbody with the same documents to which Vista was provided access" after it had executed a confidentiality agreement.  (AC ¶ 247; Proxy at 32.)  The Proxy also made clear that the data room described was the initial data room, which contained "select business and legal diligence documents," (Proxy at 28), and additional diligence would be provided following an indication of interest. There was thus nothing false or misleading about the Proxy's discussion of the data room.

In addition, the Process Statements cannot support a securities law violation because they were opinions to the extent they use the word "customary" to characterize the 30-day Go-Shop. Plaintiffs do not allege that Defendants did not believe that the Go-Shop was customary.  Nor could they since 30 days is, in fact, a customary length for a go-shop.  *See* Schulte Analysis, at 7.

Finally, the description of the deal process as "rigorous and fulsome" (AC ¶¶ 252, 254) is classic puffery, as is the description of the 30-day Go-Shop as "customary" (*id.* ¶¶ 223, 235). *See In re Xinhua Fin. Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("[S]oft adjectives are nothing more than puffery.").  Plaintiffs' semantic quibbles with the adjectives used to describe the deal process do not state a claim.  *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 392 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch Co.*, 671 F.3d 120 (2d Cir. 2012).

**F.     Plaintiffs Have Not Plausibly Alleged the Rationale Statements Were False and They Are Also Opinions and Puffery in Any Event.**

On December 24, 2018, Stollmeyer stated that the Board and management had "decided that partnering with Vista is our best option for shareholders, and a fantastic option to foster value for you and long-term growth for Mindbody."  (AC ¶ 225; Ex. 24 at 4.)  Plaintiffs do not

plausibly allege the Board and management did not reach this decision.

In addition, the Rationale Statements are opinions and puffery because they optimistically describe why Defendants believed the Merger was the best course of action for shareholders and the Company.  These statements describe the Merger as the "best option for shareholders" (AC ¶ 225), a "fantastic option to foster value" (*id.*), and Vista as an "ideal partner" (*id.* ¶ 227).  Those descriptions are exactly the sort of "corporate optimism" that is not actionable under the securities laws.  *Rombach*, 355 F.3d at 174; *Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131, at *6 (S.D.N.Y. July 27, 2009) (statements describing "'outstanding personal service,' 'impartial guidance,' and 'great' Cash Sweep Options, were immaterial puffery").  And Plaintiffs make no allegation that Defendants did not honestly believe that the Merger was the best course of action for shareholders and the Company.  Thus, the Rationale Statements are not actionable.

### G.    Plaintiffs Have Not Plausibly Alleged the Background Statements Were False.

Nor have Plaintiffs plausibly alleged that the Background Statements were false.  Plaintiffs claim that the Proxy materials falsely described the origins of the Merger when they stated: (i) "[i]n October, our Board of Directors and I [Stollmeyer] agreed to explore of [sic] the possibility of taking Mindbody private" (AC ¶ 227; Ex. 25 ("Jan. Ltr.")); and (ii) "from time to time . . . Mindbody senior management ha[d] engaged in business development and/or strategic discussions . . . .  None of those discussions progressed beyond preliminary phases" prior to the discussions that took place between Stollmeyer, Vista, and two other financial sponsors in October 2018 (AC ¶ 237; Preliminary Proxy at 26).  Plaintiffs contend that these statements were false because they "denied the existence of negotiations between Vista and Stollmeyer, which began in August 2018, despite the fact that those negotiations had been far from merely preliminary and had even included an indication by Vista that it was willing to pay a premium to Mindbody's recent trading price."  (AC ¶ 238.)  Plaintiffs are mistaken.

The February Supplement fully discloses all communication between Stollmeyer and Vista in 2018, and makes clear that the only communications that took place between Stollmeyer and Vista *before* October 2018 involved an introductory email on August 7, 2018 that scheduled a lunch meeting, which took place on September 4, 2018 and involved Stollmeyer providing a "general overview of MINDBODY" such "as was typical for Mr. Stollmeyer to present to potential investors."   (Feb. Supp. at 4.)   Plaintiffs' allegation that there was an additional August 23, 2018 meeting that similarly involved a general "discuss[ion]" of "Mindbody's business" does not come close to alleging the existence of "negotiations" or other serious communications before October 2018.  (AC ¶¶ 88-89.)   After those initial overview meetings, Vista invited Stollmeyer to attend an annual conference Vista hosted for "hundreds of executives in the technology sector."   (Feb. Supp. at 4.)   That conference took place on October 8 and 9, 2018, and on October 16, 2018, "Vista indicated to Mr. Stollmeyer that it was interested in pursuing strategic transaction discussions with MINDBODY."   (*Id.*)   Plaintiffs do not allege that any discussion of Vista acquiring Mindbody occurred before that October 16 communication.

Extraordinarily, Plaintiffs claim that even the expanded disclosure in the February Supplement was "false and misleading" because it did not disclose Plaintiffs' baseless theory "that Stollmeyer had already begun *negotiating* the sale of Mindbody to Vista prior to October." (AC ¶¶ 256-57.)   But Plaintiffs do not allege that negotiations actually took place before October 16, 2018.  All Plaintiffs allege is that, "[b]y October 17, 2018, it was clear that the discussions between Mindbody and Vista had become a negotiation" (*id.* ¶ 95), after listing earlier communications that clearly did not involve deal negotiations (*id.* ¶¶ 88-94).  Far from demonstrating falsity, Plaintiffs make clear that the earliest point "negotiations" may have begun was October 16, 2018, when, as Mindbody disclosed, "Vista indicated to Mr. Stollmeyer that it was interested in pursuing strategic transaction discussions with MINDBODY."  (*Id.* ¶ 256; Feb.

Supp. at 4.)  Similarly, Plaintiffs' allegation that Stollmeyer "was 'in love' with Vista well before the Board even knew about his secret negotiations" (AC ¶ 228) distorts the timeline by attributing sentiments Stollmeyer expressed in late December 2018—*after the Merger Agreement was signed*—to a time before mid-October 2018.  As Mindbody disclosed, serious conversations with potential acquirers, including Vista, began only in October 2018.

> ### H.   Plaintiffs Have Not Plausibly Alleged the Transaction Committee Statements Were False.

"[I]t is undisputed that accurate statements of historical fact . . . are non-actionable." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008) (quotations omitted).  The Preliminary Proxy and February Supplement state that, "[o]n October 30, 2018, the Board of Directors established the Transaction Committee and delegated authority to the Transaction Committee for the limited purpose of reviewing the potential engagement of a financial advisor . . . ."  (AC ¶ 239; Prelim. Proxy at 26; AC ¶ 258; Feb. Supp. at 4.)  Plaintiffs do not dispute that the Board voted to establish the Transaction Committee on October 30, 2018.

Instead, Plaintiffs claim that these statements were false because the Transaction Committee allegedly discussed forming the committee via email before the Board established it on October 30, 2018.  (AC ¶ 240.)  But Plaintiffs acknowledge that the Proxy disclosed that conversations regarding forming the Transaction Committee took place as early as October 26, 2018.  (AC ¶¶ 14, 100; Proxy at 26.)  Plaintiffs' allegations of informal discussions regarding the formation of the Transaction Committee between that October 26, 2018 meeting and the October 30, 2018 vote to establish the Transaction Committee (*see* AC ¶ 103) is of no moment.  Those conversations are not inconsistent with the fact that the Board formally established the committee, as described.  (AC ¶ 239; Prelim. Proxy at 26; AC ¶ 258; Feb. Supp. at 4.)

> ### I.   Plaintiffs Have Not Plausibly Alleged the Employment Statements Were False.

Plaintiffs have also failed to allege facts that establish that the Employment Statements in

the Preliminary Proxy and February Supplement were false or misleading.  Unable to allege that there were in fact employment discussions prior to the Merger, Plaintiffs speculate that such discussions occurred due to the presence of minor differences between the disclosures made in the Preliminary Proxy and those made in the February Supplement.  Specifically, Plaintiffs compare the Preliminary Proxy's statement that "[a]t the time of the signing of the Merger Agreement, Vista and Mindbody had not engaged in any employment or retention-related discussions with regard to Mindbody management" (Prelim. Proxy at 32; AC ¶ 241), with the February Supplement's statement that "[a]t the time of the signing of the Merger Agreement, Vista and Mindbody had not discussed the terms of post-closing employment or equity participation for Mindbody management" (Feb. Supp. at 5; AC ¶¶ 260-61).  Plaintiffs' attempt to parse this language is not a viable substitute for alleging actual facts, which they do not do.

### J.    Even if Any of the Above Statements Were Actionable, Plaintiffs Do Not Allege that Any Such Statement Was Material.

Plaintiffs do not adequately allege that any specific statement was material.  Under Section 10(b), a statement is immaterial if "a reasonable shareholder would [not] consider it important in deciding how to act."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).  Similarly, a Section 14(a) claim fails where it does not allege misstatements where "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) (quoting *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 238 (S.D.N.Y. 2012)).  Here, Plaintiffs' primary theory of materiality addresses only the Guidance and Integration Statements.  (*See, e.g.*, AC ¶ 208.)  But it is well established that forward-looking statements containing "cautionary language" that "addresses the relevant risk directly" are immaterial as a matter of law.  *See Halperin v. eBanker USA.com, Inc.*, 295 F.3d 353, 361 (2d Cir. 2002); *In re Duane*

*Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *7 (S.D.N.Y. Nov. 25, 2003) (financial guidance statements were "immaterial opinions").

And Plaintiffs do not actually allege that any of the other categories of purported misstatements would have impacted a reasonable shareholder's decision to sell Mindbody stock or their voting decision regarding the Merger.[13]  Even if they had, any such allegation would be unsupportable.  For example, it cannot possibly be material to shareholders whether Mindbody's 30-day Go-Shop was "customary" (AC ¶¶ 29, 223, 235.), when the Proxy fully described the Go-Shop (Proxy at 34), disclosed that it "ran through the holiday season" (*id.* ¶ 160), and disclosed the full terms of the Go-Shop as agreed to in the Merger Agreement (Proxy at Annex A).

## II.   PLAINTIFFS FAIL TO PLEAD THAT LIAW MADE OR DISSEMINATED ANY OF THE ALLEGEDLY FALSE OR MISLEADING STATEMENTS.

Plaintiffs fail to allege that Liaw personally made or disseminated any of the allegedly false or misleading statements and, therefore, cannot state a Rule 10b-5 claim against Liaw.[14] An individual cannot be liable under Rule 10b-5 where she "neither *makes* nor *disseminates* false information—provided, of course, that the individual is not involved in some other form of fraud." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1103 (2019).  "[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders* 564 U.S. 135, 142 (2011).  Because only the person who actually made a statement can be liable for it, group pleading or "[g]eneral allegations not tied to the defendants or resting upon speculation are insufficient." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007).

---

[13]  The latter theory is particularly nonsensical given that Plaintiffs' proposed class includes only investors who sold their stock prior to the Merger vote.  (AC ¶ 1.)

[14]  Because Section 14(a) and Rule 10b-5 are treated similarly and have the same functional meaning when it comes to creating primary liability, *Janus* should apply equally to Section 14(a) claims premised on making false or misleading statements, as Plaintiffs' claim is here.  *Cf. SEC v. Kelly*, 817 F. Supp. 2d 340, 345 (S.D.N.Y. 2011) (applying *Janus* to a claim under subsection (2) of Section 17(a)); *Biotech. Value Fund, L.P. v. Celera Corp.*, 2014 WL 988913, at *3-6 (N.D. Cal. Mar. 10, 2014) (applying *Janus* to a Section 14(e) claim).

Plaintiffs do not allege that Liaw communicated or disseminated any alleged misstatement, that he was involved with any relevant press release, or that he signed any relevant SEC filing.  This precludes a finding that he "made" any of those statements.  *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) ("[Daidone] did not sign those [SEC] filings, [so] he did not 'make' the statements they contained."); *Biotech. Value Fund, L.P. v. Celera Corp.*, 2014 WL 988913, at *4 (N.D. Cal. Mar. 10, 2014) (same).

It makes no difference that Liaw allegedly "reviewed and made edits" to one filing.  (*See* AC ¶ 316.)  "Make" means "to state," not "to create."  *See Janus*, 564 U.S. at 144-46; *Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, 2018 WL 1627266, at *9 (S.D.N.Y. Mar. 30, 2018).  At most, Liaw stood in the shoes of a speechwriter, and cannot be liable under *Janus*.  564 U.S. at 143; *see Alpha Capital*, 2018 WL 1627266, at *10 ("As the individual who 'drafted' the September 2012 8-K and 'at least reviewed' the other statements, Hughes played a role much like that of a speechwriter, without any ultimate authority over the final content.").  And here, Plaintiffs do not allege that Liaw did more than fix a typo, or that his proposed edits were even incorporated into the final filing.

Nor can Plaintiffs rely on the so-called "group pleading" doctrine, which, before *Janus*, presumed that SEC filings and press releases "are the collective work of those individuals with direct involvement in the everyday business of the company."  *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (quotations omitted).  But the group pleading doctrine "is insufficient to meet the requirements of *Janus*, and is thus no longer viable."  *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 640-41 & n.8 (S.D.N.Y. 2017), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).  As explained in *Banco Bradesco*:  "If undeniable proof that an individual worked on a statement does not meet *Janus*'s requirement that the individual have ultimate authority over the

statement, . . . a mere presumption that a person worked on a statement by virtue of his or role within the company must also fall short." *Id.* at 640 (citations and quotations omitted).

Even if the group pleading doctrine did survive *Janus* (which it did not), Plaintiffs would still fall short of alleging that Liaw "made" any allegedly false or misleading statement. "The group pleading doctrine is extremely limited in scope, and outside directors are almost by definition excluded from the day-to-day management of a corporation, unless by virtue of their status or a special relationship with the corporation, they have access to information more akin to a corporate insider." *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (citations and quotations omitted). In *ShengdaTech,* where there were no allegations that the directors (including the chair of the audit committee) had "exceeded th[eir] roles [as outside directors] and became involved in the everyday business of ShengdaTech," the court held that neither one had "made" any of the statements in SEC filings they did not sign. *Id.* Similarly, here, Plaintiffs do not plead that Liaw ever exceeded his role as an outside director.[15]

Because Liaw did not "make" or "disseminate" any allegedly false or misleading statement, Plaintiffs' last hope would be to allege, under Rules 10b-5(a) and (c), that Liaw engaged in "some *other* form of fraud." *Lorenzo*, 139 S. Ct. at 1103 (emphasis added). But they make no such allegation here, much less with the requisite particularity. *See ATSI*, 493 F.3d at 101; *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 304 (S.D.N.Y. 2009).

## III.    NONE OF THE ALLEGED OMISSIONS ARE ACTIONABLE.

"For an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see also Basic Inc. v.*

---

[15]  Plaintiffs' generic allegations of "influence" and "control" cannot change that. *Compare In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 242 (S.D.N.Y. 2018) (holding "generic and conclusory allegation" that outside directors "did influence and control, directly or indirectly, the decision-making of the Company," was insufficient under the group pleading doctrine) (citations and quotations omitted), *with* AC ¶ 297 ("Liaw had enormous control over the Company."), *id.* ¶ 315 ("Liaw . . . clearly had considerable control over the Company."), *and id.* ¶ 376 ("[T]he Individual Defendants had direct involvement and influence over the Company's day-to-day operations.").

*Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading.")

An omission must also be material, and the same standard of materiality governs both Section 10(b) and Section 14(a) claims. *Basic*, 485 U.S. at 231. Where omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance[,]" they are immaterial. *ECA*, 553 F.3d at 197; *see Columbia Pipeline*, 405 F. Supp. 3d at 506. An omission in a Proxy statement is material "if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Columbia Pipeline*, 405 F. Supp. 3d at 506 (quotations omitted). Thus, "to succeed on a material omission claim, the plaintiff must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the *total mix* of information made available." *Id.* (quotations and alterations omitted).

None of the alleged omissions in the AC (*see* AC ¶¶ 224, 226, 228, 234, 238, 240, 244; 248; 251; 255; 257; 259; 261) are actionable because Mindbody had no duty to disclose the allegedly omitted information (or because it actually was disclosed) and/or because none of the alleged omissions would have altered the total mix of information available to stockholders.

### A.   Mindbody Had No Duty to Disclose Its Preliminary, Unaudited Q4 Revenue nor Was That Information Material.

Mindbody's decision not to prematurely release the Company's preliminary, unaudited fourth quarter revenue is not an actionable omission because this theory relies "on a non-existent duty to disclose financial trends" prior to the Company's scheduled quarterly earnings publication. *Holbrook v. Trivago N.V.*, 2019 WL 948809, at *20 (S.D.N.Y. Feb. 26, 2019); *see Duane Reade*, 2003 WL 22801416, at *7 n.15. Such allegations are "improperly premised on a theory of fraud by hindsight and must be rejected." *Holbrook*, 2019 WL 948809, at *20. "A company has no duty to update forward-looking statements merely because changing

circumstances have proven them wrong." *Duane Reade*, 2003 WL 22801416, at *7 (quoting *Stransky v. Cummins Engine Co.*, 51 F.3d 1329 (7th Cir. 1995)). "The rule that there is no obligation to pre-announce results has long been embraced by courts." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000).

In *Duane Reade*, this Court held that the decision not to update guidance prior to the next-scheduled earnings call was not actionable, "[e]ven though defendants may have learned before the close of the second quarter that their prior predictions would prove incorrect, 'the federal securities laws do not obligate companies to disclose their internal forecasts.'" 2003 WL 22801416, at *7 (quoting *N. Telecom*, 116 F. Supp. 2d at 458). This logic squarely applies here. Mindbody had no duty to update its Q4 guidance by releasing preliminary fourth quarter results[16] because "[a]s forward-looking predictions for the next quarter, the statements of which plaintiffs complain constitute immaterial opinions and thus, cannot form the basis of a duty to update." *Id.*

In any event, the "total mix of information" available to a reasonable investor would not have been altered by knowing that Mindbody's Q4 revenue modestly beat its guidance. The SEC has issued internal guidance, reflected in Staff Accounting Bulletin 99 ("SAB 99"), regarding whether a financial misstatement is material. The Second Circuit has endorsed SAB 99 as a guide to assess whether an alleged statement was material under the federal securities laws. *See ECA*, 553 F.3d at 197-98. SAB 99 provides that "the misstatement or omission of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances." SAB 99, 1999 WL 1123073, at *2. SAB 99 delineates a set of nine qualitative factors to assess whether such "egregious circumstances" exist. *Id.* at *3-4.

Under this framework, Mindbody's preliminary Q4 results were not material as a matter

---

16  Furthermore, disclosing unaudited Q4 revenue without all information required under federal law, *see* 15 U.S.C. § 78m; 17 C.F.R. § 240.13a-13; 17 C.F.R. § 240.15d-13; 17 C.F.R. § 249.308a; 17 C.F.R. § 240.13a-1; 17 C.F.R. § 240.15d-1; 17 C.F.R. § 249.310, would have created potential legal exposure for Mindbody.

of law.  The information was not quantitatively material:  The preliminary Q4 revenue of $68.3 million was 1.9% above the upper-end of the guidance range of $67 million, and 3.5% above the midpoint of $66 million.  (*See* AC ¶ 121.)

Nor do the SEC's nine qualitative factors suggest that the failure to release the preliminary revenue establishes a "particularly egregious circumstance."  SAB 99 provides that a misstatement that "hides a ***failure*** to meet analysts' consensus expectations" can "affect the materiality of a quantitatively small misstatement," SAB 99, 1999 WL 1123073, at *3-4 (emphasis added), but is silent with respect to unaudited financial results that preliminarily beat earlier guidance.  This contrast is notable because the SEC's qualitative factors are otherwise two-sided, *i.e.*, they go both ways.  For example, other two-sided qualitative factors include "whether the misstatement changes a loss into income ***or vice versa***" and "whether the misstatement masks a ***change*** in earnings or other trends."  *Id.* (emphasis added).

The SEC's decision to treat modest guidance beats differently makes sense.  It is industry practice for publicly traded companies to exercise conservatism in their guidance to beat "the Street's" expectations given the market's predilection for punishing a company's stock price for near misses of quarterly guidance.  *See* Michael C. Jensen, *Agency Costs of Overvalued Equity*, 34 Fin. Mgmt. 5, 7 (2005) ("CEOs and CFOs know that the capital markets will punish the entire firm if they miss analysts' forecasts by as much as a penny . . . .").

### B.  Mindbody Had No Duty to Disclose Qatalyst's Business Dealings with Past or Future Vista Acquisitions, nor Was That Information Material.

Plaintiffs have also failed to plead any actionable omission with respect to the Preliminary Proxy's disclosure of "material relationship[s]" between Qatalyst and either Mindbody or Vista "during the two-year period prior to the date of Qatalyst Partners' [fairness]

opinion." (AC ¶ 243; *see also* Proxy at 42.)[17]  As this Court has held in the analogous context of a Section 14(e) claim, "[w]ithout some basis for believing there is an undisclosed conflict of interest, a Section 14(e) plaintiff is not entitled to know the business relationship [between financial advisor and client] over the past two years." *Sodhi v. Gentium, S.p.A.*, 2015 WL 273724, at *7 (S.D.N.Y. Jan. 22, 2015) (alterations in original) (quotations omitted).  While Plaintiffs list seven purported Qatalyst "relationships with and work for Vista" (AC ¶ 87), the only purported "material" conflict Plaintiffs identify was that "Qatalyst . . . worked for Vista on its investment in and 'partnership' with iCIMS Inc." (*id.* ¶ 87(c)).  But this was fully disclosed in the Proxy, which stated that Qatalyst received "a fee of approximately $7 million" for "acting as financial advisor to Vista" in its acquisition of iCIMS, Inc.  (Proxy at 42; AC ¶ 243.)

Neither of the other alleged "relationships" Plaintiffs identify are actual conflicts.  *See Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 244 (S.D.N.Y. 2000) (a conflict of interest may exist "where a corporate director has a personal stake in a corporate decision or has a special relationship with a party whose interests may be adverse to those of shareholders"). *First*, Plaintiffs allege that a Qatalyst co-founder, Brian Cayne, had, at one point in his career, worked for Vista, and that another Qatalyst co-founder, Frank Quattrone, co-founded a company, CVent, that Vista purchased in 2016.  (AC ¶ 87(a)-(b).)  Neither of these attenuated connections presents a conflict or would reasonably require disclosure.  Plaintiffs do not allege any ongoing relationship between Vista and Mr. Cayne or Mr. Quattrone, that either had any involvement in the Merger, or any benefit to Qatalyst related to Vista's acquisition of CVent.

*Second*, Plaintiffs describe transactions in which Qatalyst either advised a company that Vista was acquiring (*id.* ¶ 87(d)), or where Qatalyst's role is "unknown" to Plaintiffs (*id.* ¶ 87(e)-

---

[17]  Plaintiffs only allege that this statement is "false and misleading because it failed to disclose the many other relationships between Qatalyst and Vista." (AC ¶ 244.)  Plaintiffs do not allege that there was any undisclosed "material relationship" between Vista and Qatalyst during the two-year period preceding Qatalyst's fairness opinion such that this statement was false.

(g)).[18]  That Qatalyst, at times, advised companies that were ultimately acquired by Vista cannot credibly be considered a conflict of interest.  Plaintiffs do not allege that Qatalyst received any benefit *from Vista* for these transactions that could create a conflict of interest.

In sum, "it is frivolous to suggest that there is a 'substantial likelihood' that reasonable [Mindbody] shareholders" would have considered the fact that Qatalyst's co-founder had once[19] worked for Vista, or that Qatalyst had advised other companies in acquisitions by Vista, "important in deciding whether to accept" the Merger.  *See Polar Int'l*, 108 F. Supp. 2d at 245. A reasonable shareholder would not have been surprised, or found it important, that a "technology investment bank" had been involved in transactions where the acquirer was a private equity firm focused "exclusively . . . in software, data, and technology-enabled organizations."  (AC ¶¶ 43, 45.)

### C. The Remainder of Plaintiffs' Purported Omissions Are Neither Subject to a Disclosure Obligation nor Material.

Plaintiffs' remaining omission theories are similarly unviable.  They are not based on alleged failures to disclose "important facts," *Columbia Pipeline*, 405 F. Supp. 3d at 521, but rather on trivialities like the details of Stollmeyer's and White's holiday vacation plans in late 2018 and early 2019, that the Board discussed forming the Transaction Committee right before forming it, or that Vista had expressed interest in acquiring Mindbody before its 2015 IPO.  (*Id.* ¶¶ 224, 240, 257.)  None could reasonably be considered "important facts" related to the issue upon which shareholders were asked to vote:  whether $36.50 was a desirable sale price. Instead, these purported omissions are "obviously unimportant."  *ECA*, 553 F.3d at 197.

Moreover, many of the alleged omissions are not omissions at all.  Plaintiffs allege that

---

[18]  Plaintiffs' claim that Qatalyst's role was "unknown" does not "demonstrate with specificity" that there was a material omission, *see Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014), and does not "raise a right to relief above the speculative level."  *Harris*, 135 F. Supp. 3d at 168.

[19]  Brian Cayne's alleged work for Vista was before Qatalyst was founded, and thus certainly before the 2011 date Plaintiffs identify as when Jeff Chang began working there (*id.* ¶ 46).

Mindbody failed to disclose "negotiations between Vista and Stollmeyer" prior to October 2018 (AC ¶ 238), but the AC pleads no such "negotiations" before October 2018, just initial, preliminary contacts (*id.* ¶¶ 88-89).  And the February Supplement fully disclosed Stollmeyer's meetings with Vista in 2018.  (Feb. Supp. at 4.)  Similarly, Plaintiffs' allegation that Mindbody did not disclose that Stollmeyer "was 'in love' with Vista well before the Board ever knew about his secret negotiations" (AC ¶ 228) is premised upon Plaintiffs' deceptively imputing Stollmeyer's exuberant statements immediately after the signing to a period months earlier.  In early October, Plaintiffs admit that Stollmeyer "liked" Vista, a fact that in no way conflicts with his subsequently becoming convinced that Vista was an "ideal partner."  (*Compare* AC, Ex. C ("On top of it all.  I actually like them."), *with* AC, Ex. F ("Vista's in love with me (and me with them).").)  Nor would a reasonable investor find it "important" to know that, in October, Vista had indicated it might value Mindbody at a higher price than $36.50 per share.  (AC ¶ 234.) Shareholders were well aware that as recently as early October, Mindbody's market value was higher than $36.50 per share, but that fact could not alter the actually important fact that $36.50 was the highest price Vista, or anyone, was willing to pay in late-December.  (Proxy at 31-34.) Because shareholders were fully informed with respect to these allegations, the alleged omissions could not have altered the "total mix of information" available to shareholders.

Finally, Plaintiffs allege that Defendants should have disclosed that they "were executing a fraudulent scheme and had prioritized their personal interests, not the interests of shareholders."  (*See, e.g.*, AC ¶ 226.)  But Mindbody filed a Form 8-K publicly disclosing various stockholder complaints *in toto* (*see* Ex. 18), the books and records demand by Luxor, Mindbody's response and related court filings (Jan. Supp. at 2, 12-37; Feb. Supp. at 3-4, 9-49), and two additional stockholder complaints alleging similar disclosure violations (Feb. Supp. at 3-4, 50-83), which detailed almost all of these accusations. In any event, Defendants were "not

obligated to . . . paint themselves in the most unflattering light possible." *Solow v. Citigroup, Inc.*, 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012); *see also Seaboard World Airlines, Inc. v. Tiger Int'l, Inc.*, 600 F.2d 355, 363 (2d Cir. 1979).

## IV.   PLAINTIFFS HAVE FAILED TO PLEAD SCIENTER.

Plaintiffs' AC should be dismissed for the independent reason that Plaintiffs have failed to adequately allege scienter.  Scienter means an intent "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313.  The same standard applies to Plaintiffs' Section 14(a) claim because it is also "grounded in alleged fraudulent conduct." *JP Morgan*, 363 F. Supp. 2d at 636 (citing *Rombach*, 355 F.3d at 170).  This is true "even if [Plaintiffs attempt to] disclaim reliance on a fraud theory," *id.*; *see also Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144 (3d Cir. 2004) (applying heightened PSLRA pleading requirements to Section 14(a) claims sounding in fraud); *Columbia Pipeline*, 405 F. Supp. 3d at 506, which, in any event, is not the case here.[20]

To adequately plead this element, Plaintiffs must allege sufficient facts showing "that the defendants had both motive and opportunity to commit the [alleged] fraud," *ATSI*, 493 F.3d at 99; *Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 458-59 (S.D.N.Y. 2019), or alternatively, sufficient facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness," *ATSI*, 493 F.3d at 99; *Tung*, 412 F. Supp. 3d at 458-59.  But where Plaintiffs have failed to plead a fraudulent motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

Plaintiffs' allegations of scienter are subject to the PSLRA's heightened pleading requirements, which requires Plaintiffs to "plead 'with particularity facts giving rise to a *strong*

---

[20]   Plaintiffs' claims embrace a fraud theory.  (*See* AC ¶ 1 (alleged Defendants engaged in an "egregious scheme to defraud investors").)  Indeed, the AC uses variations of the word "fraud" 66 times, variations of the word "manipulate" 12 times, and variations of the word "deceive" 10 times.  In stark contrast, Plaintiffs only gesture at the idea of negligence with boilerplate language in three instances.  (*See* AC ¶ 342(f) (boilerplate reference to existence of common questions of law and fact); *id.* ¶ 367 (alleged misstatements were made "in at least a negligent manner"); *id.* ¶ 368 (alleging "fraudulent and/or negligent" preparation, review, and dissemination of

-35-

inference that the defendant acted with the required state of mind.'" *ECA*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(1)). "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* (quoting *Tellabs*, 551 U.S. at 309).

The allegations in the AC do not come close. They do not support a "strong inference" that any of the Defendants possessed a cogent and compelling motive to engage in fraud against Mindbody's stockholders. Try as they might, Plaintiffs cannot change the straightforward fact that the Individual Defendants, by virtue of their (or in Liaw's case, IVP's) large holdings of Mindbody stock, possessed a motive to maximize the value of their investments that was directly aligned with the interests of Mindbody stockholders writ large. Plaintiffs' allegations also do not establish conscious misbehavior or recklessness, nor could they given the powerful inference created by the Individual Defendants' Mindbody holdings.

### A.    The Most Compelling Inference Is That the Individual Defendants Were Motivated to Maximize the Value of Their Mindbody Stock.

Plaintiffs do not plead facts showing that the Individual Defendants possessed a motive to commit fraud, much less that the inference of such a motive is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 309. The information properly considered on this motion establishes that each Individual Defendant had a powerful financial motive to maximize shareholder value, based on their substantial equity interests in Mindbody, and no plausible countervailing motive to depress Mindbody's stock price. As illustrated in the following table, Stollmeyer stood to gain nearly $2 million for every $1 increase in Mindbody's sale price, White nearly $0.5 million, and IVP over $2.6 million:

---

the Proxy).) None of these generic references to negligence, however, can suffice to disclaim reliance on a theory of fraud as the basis of Plaintiffs' Section 14(a) claim.

| Mindbody Equity Holdings of the Individual Defendants and IVP and Incremental Impact of a $1.00 Change in Share Price | | | |
|---|---|---|---|
| | Number of Shares[21] | Value at $36.50/Share[22] | Incremental Value of a $1.00 Change in Share Price |
| Stollmeyer | 1,943,235 | $58.08 million | $1.94 million |
| White | 463,330 | $11.12 million | $0.46 million |
| Liaw | 12,605 | $0.46 million | $12,605 |
| IVP | 2,642,032 | $96.43 million | $2.64 million |

Thus, the Individual Defendants unequivocally had a compelling incentive to sell Mindbody for the highest price. *See In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1005 (Del. Ch. 2005) (holding that CEO being "heavily invested in the Company's equity no doubt encouraged him to take value-maximizing steps without regard for his future employment because he recognized that a good deal for [the company's] stockholders would leave him very wealthy, too"). This alone is fatal to the theory that the defendants engineered a below market sale, because it is "fundamentally implausible" that "rational economic actors have chosen to short-change themselves." *Larkin v. Shah*, 2016 WL 4485447, at *16 (Del. Ch. Aug. 25, 2016).

Nevertheless, Plaintiffs vainly attempt to construct a fraudulent motive. Those efforts go nowhere. To begin with, Plaintiffs suggest that the fact that Stollmeyer and White stood to receive "an enormous immediate payout" from the Merger itself establishes a fraudulent motive. (AC ¶ 275; *see also id.* ¶ 286.) But that supports the opposite inference: Investors with large sums invested in a company have an incentive to maximize the value of that company, not to fraudulently undervalue it. *See Toys "R" Us*, 877 A.2d at 1005. The Second Circuit has repeatedly held that a defendant's purchase of company stock during a period of alleged artificial inflation "cannot support a 'cogent and compelling' inference of fraudulent intent." *See, e.g.,*

---

[21]  Number of Shares is listed based on the equity interests included in the Proxy (Proxy at 52), except with respect to IVP, whose interest is based on the beneficial ownership values in the Proxy (*id.* at 90). With respect to the Individual Defendants, the beneficial ownership values differ from their equity interests based on various differences in the method in which these two values are calculated, which is described in more detail in the Proxy. (*See id.* at 51-52, 89.) The share holdings of Stollmeyer and White do not include anticipated equity compensation grants $3.5 million (95,890 shares) for Stollmeyer and $1.8 million (49,315 shares) for White were scheduled to take place in February 2019. (*Id.* at 52, n.4.)

*Avon Pension Fund v. GlaxoSmithKline PLC*, 343 F. App'x 671, 673 (2d Cir. 2009); *see also In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (collecting cases).  The corollary is that where, as here, defendants *sold* the entirety of their holdings during a period of alleged artificial *deflation*, the allegation that they "gained some personal benefit by depressing the [stock] price . . . seems totally without logical basis."  *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 623 (4th Cir. 1999); *see also Kalnit*, 264 F.3d at 140-41 (theory that "defies economic reason" cannot support an inference of fraudulent intent); *Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (same).

Plaintiffs' theory that Stollmeyer, White, and IVP needed to liquidate their shares (*see* AC ¶¶ 275, 286, 294) is equally unavailing.  Unlike courts in this circuit, the Delaware Court of Chancery has addressed this theory.  It deems such a theory "'unusual,' 'counterintuitive,' and 'aggressive,'" because it requires one "to make an extraordinary inference:  that rational economic actors have chosen to short-change themselves."  *Larkin*, 2016 WL 4485447, at *16.  That court finds such an inference reasonably conceivable only where plaintiffs have alleged "a crisis," "fire sale," or other "exigent need" sufficient to propel the stockholder to "force[] a sale of the entity at below fair market value in order to meet its own idiosyncratic need for immediate cash."  *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1036 (Del. Ch. 2012).[23]

Plaintiffs do not plausibly allege that any defendant possessed an immediate need for liquidity such that any of Stollmeyer, White, or IVP would intentionally forego vast sums of money.  Straining to justify this theory, Plaintiffs allege that Stollmeyer, White, and IVP's super-voting Class B shares would convert to single-vote Class A shares (of the same market value) *3.5*

---

[22]   Because option values account for exercise prices, the Stollmeyer and White values are less than what would be achieved by an application of the $36.50/share price to their total holdings.  (*See* Proxy at 52, n.2.)

[23]   Notably, Delaware courts evaluate motions to dismiss under a "reasonably conceivable" standard, which is significantly less rigorous than the Rule 8 plausibility standard, let alone the PSLRA's "strong inference" requirement.  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013).

*years in the future.*  (AC ¶¶ 276, 287, 296.)  But the prospect of share conversion in 3.5 years does not present an "exigent crisis" that could have incentivized the Individual Defendants to *immediately* sell their stock for tens of millions of dollars less than its alleged value.

Plaintiffs half-heartedly suggest that IVP might have had other reasons to sacrifice tens of millions of dollars by selling its shares at a discount, but none withstands even minimal scrutiny. Plaintiffs' allegation that "IVP's target exit date for its Mindbody investment was '2018'" (AC ¶ 291) is based on a presentation that describes 2018 as an *estimated* exit date, not as a target (Ex. 26 at MB0003179), and Plaintiffs never allege that the estimate was inflexible or, indeed, any other details about it.  Plaintiffs also suggest that IVP needed the Vista deal because it would have "struggle[d] to dispose of its shares through open market sales" without "depress[ing] Mindbody's stock price."  (AC ¶¶ 293-94.)  But this conclusory allegation does not make sense, as it accuses Liaw of engineering a discounted sale to Vista of all of IVP's shares to avoid IVP's accepting an unspecified discount from someone else on only some of its shares.  Finally, Plaintiffs meekly point to a "proposed side agreement" that contained "some bells and whistles for IVP."  (*Id.* ¶ 295.)  But Plaintiffs never say what the "bells and whistles" were or whether IVP ever entered that, or any, side agreement.   Nor is there any allegation that IVP's hypothesized receipt of these "bells and whistles" depended on Vista receiving a discount.

Plaintiffs cannot change the decisive fact that, as Plaintiffs admit, the alleged fraud would have severely harmed IVP—costing it, by Plaintiffs' own math, ~$35 million or over 26% of its investment—not "benefitted [it] in some concrete and personal way."  *See Walsh v. Rigas*, 2019 WL 294798, at *6 (S.D.N.Y. Jan. 23, 2019).  This emphatically precludes Plaintiffs' theory that Liaw acted with scienter.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) (no scienter where "Plaintiff's premise . . . contradict[ed] the assumption that [defendants] were acting in their own economic self-interest").

Nor does Stollmeyer and White's purported interest in retaining their jobs establish scienter.  (*See* AC ¶¶ 272, 283.)  Such "a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."  *Kalnit*, 264 F.3d at 140; *see also Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999).  In analogous circumstances, courts have rejected as "totally without logical basis" the allegation that scienter can be inferred from a director's desire to keep his board seat and later sell his stock at a premium when the alleged fraud devalued the company's stock to assure the success of a merger.  *Phillips*, 190 F.3d at 623.

Next, Plaintiffs posit that Stollmeyer and White believed that they could derive a future financial benefit from a depressed sale price in the hope of a larger financial benefit from Vista at some time in the future.  (AC ¶¶ 274, 285.)  But Plaintiffs allege no well-pled facts in support of this theory.  Specifically, Plaintiffs do not allege that Stollmeyer or White engaged in any conversations with anyone, let alone Vista, about selling Mindbody on the cheap because that sale price would supposedly be used as a benchmark for future financial rewards.  Instead, Plaintiffs' only "support" comes from an unpublished academic article that purports to analyze whether general private equity compensation models could theoretically influence manager behavior in take-private transactions.  (*See id.* ¶ 274 & nn.24, 25.)  Notably, Plaintiffs do not even allege that Vista used such a model, much less that Stollmeyer or White were aware of such a model or discussed such a model with Vista, or anyone else.

Likewise, Plaintiffs' corollary theory that Stollmeyer and White might have believed that they could increase their equity stake in Mindbody through a Vista acquisition (*id.* ¶¶ 229-271, 274, 285) is also devoid of particularized allegations of fact.  Plaintiffs have alleged no actual statements, promises, or agreements indicating that Stollmeyer or White possessed such an expectation, let alone that it motivated them to shortchange Mindbody's public stockholders and

themselves.  In reality, and as Plaintiffs even identify in the AC, if Stollmeyer and White had been aware of general trends regarding private equity firm equity grants to management, that would have led them to expect either no change or a moderate decline in their equity following a privatization.  As the AC makes clear, the average expected equity for a CEO in a private equity deal is "3.8% of the fully diluted equity."  (*Id.* ¶ 270 n.22 (citing Jon Herzon & John LeClaire, *2018 Rollover Survey: Rollover and Incentive Equity Terms in Middle Market Private Equity*, at 18 (Goodwin Proctor LLP May 6, 2018), https://www.goodwinlaw.com/-/media/files/ publications/rolloversurvey_2018_rd6_aq.pdf (the "Goodwin Study")).)  A further review of public studies regarding management compensation in private equity portfolio companies indicates the average is actually 3.0%, that it is only "2.0% - 2.5% for those investments greater than $300 million," and that technology companies included almost three times as many employees in their equity pools as the average portfolio company.  *See 2018 Private Equity Portfolio Company Management Compensation Survey*, at 4, 7 (PricewaterhouseCoopers LLP Aug. 2018), https://www.pwc.com/us/en/services/hr-management/assets/pwc-private-equity-portfolio-company-management-compensation-survey-2018.pdf (the "PwC Study").

In contrast, Stollmeyer's pre-Merger equity interest in Mindbody was 3.76%, in line with what the AC alleges is industry average and significantly greater than what the PwC Study indicates is the norm for acquisitions with high valuations.  (AC ¶ 270.)  Plaintiffs ignore their own evidence and focus on the fact that the overall employee equity pool would be expected to double, from 5% to 10%.  (*Id.*)  But both the Goodwin Study and the PwC Study assume equity pools of 10% or greater.  (*See* Goodwin Study at 18 (CEO equity grant of 3.8% and 10.34% grant to management); PwC Study at 3 (average equity grant for investments over $1 billion is 10%).)  Despite this, Plaintiffs extraordinarily claim that their mathematical extrapolation is a "reasonable assumption."  (AC ¶ 270.)  Far from "reasonable," Plaintiffs' assumption defies the

study they themselves cite and cannot sustain any inference that Stollmeyer or White expected increased equity as a result of a privatization.  And even if Plaintiffs were correct that Stollmeyer and White had such an expectation, and they are not, that still would not justify an inference that they sought to fraudulently devalue the company prior to seeking to privatize it; Stollmeyer and White would have been able to derive that same hypothetical benefit from any privatization and had no reason to devalue their interests in the Company to achieve that goal.

Plaintiffs' claims that Stollmeyer held an "antipathy" toward public markets (*id.* ¶ 267) and was "enamored with Vista" (*id.* ¶ 268) are contradicted by the AC itself.  From October 28-30, 2018, Liaw, Stollmeyer, and Goodman emailed about ways to tailor messaging to potential buyers.  In that "marketing" context, Stollmeyer suggested that Mindbody could advertise to interested parties that it "would like to be able to move more quickly out of the public eye and have a partner to work with that shares the vision."  (Ex. 27.)  Liaw replied that, "[e]arlier on, you can throw the public investors under the bus" to mitigate the risk that buyers would be concerned "that something's fundamentally broken about the business."  (*Id.*)  Liaw later used the line "freed from the shackles of public market investors" in the context, again, of discussing how best to pitch Mindbody to potential acquirers.  (Ex. 28.)  And, once the deal closed, Stollmeyer repeated these talking points to employees in a post-signing letter that was concerned with maintaining employee morale in the wake of the Merger announcement.  (*See* Jan. Ltr.)  None of these statements demonstrates an actual antipathy of Stollmeyer toward public markets.

Moreover, Plaintiffs' claim that Stollmeyer constructed a process designed to "free[] [Mindbody] from the shackles of public market investors" (AC ¶ 267) is belied by allegations describing the actual deal process Mindbody pursued.  In the initial sales process, most buyers Qatalyst contacted were "strategics," not financial sponsors.  (Proxy at 27.)  They included large, publicly traded companies like ███████████, and █████.  (Ex. 28.)  And, during the Go-

Shop, Qatalyst contacted even more strategics.  (Proxy at 32.)  The parties from the initial sales process were also encouraged to remain involved, but each "declined to continue discussions" with Mindbody.  (*Id.*)  The sum of these facts in the AC runs contrary to the idea that Mindbody (and Stollmeyer) had an "antipathy" toward public markets.

But in any event, such an "antipathy" would provide no basis to infer that Stollmeyer possessed an intent to fraudulently devalue Mindbody.  Where the logic of a claim "defies economic reason," courts consistently reject any inference of scienter.  *Kalnit*, 264 F.3d at 140-41.  Here, even if Stollmeyer preferred a private equity buyer, that would not support Plaintiffs' fraud theory.  There is no reason why devaluing Mindbody's stock would make it more likely that Mindbody would be acquired by a private equity buyer rather than someone else.

Similarly, Plaintiffs mischaracterize snippets of documents, taken out of context, to try to present a picture that Stollmeyer was "enamored with Vista and was deeply committed to closing a deal specifically with them."  (AC ¶ 268.)  But a full reading of these materials undermines that conclusion.  Prior to the Merger Agreement, Stollmeyer stated, with respect to Vista, that he "actually like[d] them" (AC, Ex. C)—hardly words evocative of a deep commitment to sell only to Vista.   And while Vista had indicated that it had "built a strong relationship with [Stollmeyer]," in the same sentence, Vista pondered whether Mindbody was an actionable short-term target, again demonstrating the absence of any scheme.  (Ex. 29.)  Between Stollmeyer's unremarkable statements of admiration and the signing of the Merger Agreement, the AC identifies no other support for the notion that Stollmeyer was "deeply committed to closing a deal specifically with [Vista]."  (AC ¶ 268.)

Instead, Plaintiffs point to a few of Stollmeyer's texts and emails from after Mindbody signed the Merger Agreement.  (*See id.* ¶ 268 & Exs. F & G.)  Those comments, like those in Stollmeyer's January 2, 2019 letter to Mindbody employees, are not significant in the least, as

they show only a CEO's enthusiasm for a transformative transaction that had just been signed. They cannot plausibly support an inference, let alone a strong one, that Stollmeyer intentionally drove down Mindbody's stock price to his own personal disadvantage. And, again, even if this allegation that Stollmeyer wanted to pursue a deal specifically with Vista were true, it is not, that still does not provide any logical basis for believing Stollmeyer had an incentive to fraudulently devalue Mindbody, including his own substantial interests in the Company.

**B.      Plaintiffs Have Not Pled Conscious Misbehavior or Recklessness.**

In the absence of motive and opportunity, a plaintiff can still plead scienter via "strong circumstantial evidence of conscious misbehaviour or recklessness," but "the strength of the circumstantial allegations must be correspondingly greater." *Barrett*, 2017 WL 3995606, at *7 (quotations omitted); *Tung*, 412 F. Supp. 3d at 460. Under the PSLRA, "recklessness" is conduct that is "highly unreasonable and which represents an *extreme departure* from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Barrett*, 2017 WL 3995606, at *7 (emphasis added) (quoting *Kalnit*, 264 F.3d at 142.) To plead circumstantial evidence of scienter, Plaintiffs must plead "facts giving rise to a strong inference that the Individual Defendants themselves knew or should have known" the truth "at the time the alleged misstatements were made." *Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *9 (S.D.N.Y. Apr. 21, 2016) (Caproni, J.). Plaintiffs' allegations create no such inference.

In attempting to do so, Plaintiffs cherry-pick snippets of documents from the voluminous record they reviewed (*see* AC, at 1), identify statements subject to multiple interpretations in otherwise innocuous emails and communications, and project Plaintiffs' pre-fabricated notions onto those statements. Specifically, Plaintiffs identify a handful of communications relating to the Q4 guidance and claim they relate to a "scheme." For example, Plaintiffs contend that Stollmeyer's October 17, 2018 comment to White, Mansbach, and Lytikainen that Vista had "no

idea what we are about to report or guide," is circumstantial evidence of a "scheme."  (AC ¶ 113 & Ex. D.)  More plausibly, Stollmeyer was simply noting to these executives (two of whom are not alleged by Plaintiffs to be part of the supposed scheme) that Vista's interest in acquiring Mindbody could change after learning about Mindbody's recent performance.

Plaintiffs even more dramatically misread the October 17, 2018 messages between White and Gunderson (another Mindbody employee not alleged to be part of the supposed scheme) regarding whether there was a "creative way to guide *2019*."  (AC ¶ 115 (emphasis added).)  Plaintiffs try to imply some link between this and Mindbody's subsequent downward guidance for Q4 *2018* (*see id.* ¶¶ 115-118), even though Plaintiffs' allegations do not concern 2019 guidance.  In any event, the "creativ[ity]" referenced in the exchange relates to how to avoid telling a *negative* story about anticipated delays to the launch of Payments 2.0, Mindbody's next generation payments platform.  (Ex. 30.)  Thus, Gunderson advises that she thinks it is unavoidable that the earnings call mention that "we won't see monetization of Payments 2.0 until the back half of 2019," and White agrees that he still thought Mindbody was "going to have to explain why payments is slowing down more rapidly than [subscriptions and services]."  (*Id.*)[24] The purpose was to avoid analysts and investors attributing the entirety of any downward guidance to "sub[scriptions] & services and then [Mindbody] would still miss on payments." (*Id.*)  Far from revealing efforts to lower Mindbody's stock price, this exchange shows Mindbody executives discussing how to keep the market fully informed regarding problems with the Payments 2.0 rollout *without* lowering Mindbody's stock price.

Plaintiffs then argue that an October 19, 2018 email from Josh McCarter (another executive who is not alleged to be part of the supposed scheme) to Mansbach indicates that Mindbody's *internal* three-year plan "was 'shortchanging . . . payments and related financial

services.'"   (*Id.* ¶ 21; Ex. 31.)   But McCarter does not say anything about Mindbody's expectations for the performance of Q4 2018 Payments or Mindbody's revenue guidance for that quarter, and his opinion was not grounded in the actual numbers reflecting the performance of Payments.  (*See* Ex. 31 (McCarter would "need finance to help with pulling [numbers] together" if Mansbach agreed with his proposal to "highlight [Payments] more").)  If McCarter had looked at those numbers, he would have seen the same concerns that animated White and Gunderson's earlier conversation about how to de-emphasize the short-term problems generated by delays in the rollout of Payments 2.0.  (Ex. 30.)

Stollmeyer's private and public statements were consistent with this longer-term optimism.  For example, on November 7, 2018, in privately discussing the downward guidance with Mindbody's new Chief Technology Officer, Stollmeyer reassured him that "[w]e have a strong year of growth planned in 2019."  (AC ¶ 119.)  And in the November 6, 2018 Earnings Call, Stollmeyer publically stated that "we have a high confidence that our ability to achieve strong growth and profitability will occur in 2019."  (Ex. 22 at 5.)  This continued optimism demonstrates that Stollmeyer was not trying to depress Mindbody's value, but to "reset[] street expectations" to position Mindbody for a "strong year of growth planned in 2019."  (AC ¶ 119.)

Finally, the text message exchange with Chang on November 6, 2018 demonstrates that no "scheme" existed.  Plaintiffs' alleged scheme involves Qatalyst as an active participant that allegedly manipulated the sales process to advantage Vista.  (*Id.* ¶¶ 23, 138-39.)  But Chang's immediate reaction to the downward guidance was not to text to tell Stollmeyer that their "scheme" was working—as one would expect if Plaintiffs' allegations were true—but to check in on Stollmeyer because he knew "today was a difficult day" and wanted Stollmeyer to know he was thinking of him and that "there are much brighter days ahead."  (Ex. 32 at MB0022641.)  In

---

24   Mindbody's practice had been to release revenue figures for its "payments" business and its "subscriptions and

response, Stollmeyer predictably reassured Chang that he was "fine" and that he had not been caught off guard by the market reaction.  (Ex. 32 at MB0022642; AC ¶ 118.)  Chang's concern for Stollmeyer and Stollmeyer's reaction thereto clearly evidence that there was no scheme afoot.

And with respect to Liaw, Plaintiffs never even attempt to allege that Liaw knew most of the facts they contend Mindbody misrepresented or omitted.  For example, Plaintiffs do not allege—anywhere—that Liaw knew of Stollmeyer's purported (and unsubstantiated) discussions regarding post-Merger employment or that Mindbody's Q4 guidance was allegedly unjustified. And as for the handful of things Plaintiffs do claim Liaw knew, they come nowhere close to "indicat[ing] a state of mind approximating actual intent" to commit fraud and sacrifice ~26% of his firm's investment.  *See Tung*, 412 F. Supp. 3d at 460 (quotations omitted).

Specifically, Plaintiffs argue that "Qatalyst made clear to . . . the Transaction Committee that any potential buyer would need four to five weeks of diligence before submitting a bid." (AC ¶ 25.)  But Plaintiffs' allegation is based on a November 14, 2018 Qatalyst presentation that contained a *sample* timeline that provided approximate ranges for different phases of an "Illustrative Process."  (Ex. 33 at MB0022823.)  Each phase contemplated multiple tasks, not only diligence.  Nowhere did the sample timeline suggest that, in any given phase, a potential bidder must begin the relevant tasks on the first day of the range to complete them by the last day of that range.  The sample timeline also expressly cautioned that it was an "Illustrative" "DRAFT," that "[a]ll time durations are subject to change depending on how the process evolves," and that MINDBODY could "[p]otentially accelerate the process if a party provides a pre-emptive bid that the Board finds compelling and other parties indicate lower ranges of value."  (*Id.*)  Even if the sample timeline could be read as Plaintiffs insist, they overlook that the speed at which Vista made its bid and executed the Merger Agreement proved that Qatalyst's

services" business as separate line items.  (*See supra* Facts Section B.)

early estimate, if it can even be construed as one, was wildly inaccurate.

And Plaintiffs claim that in January 2019, "White wrote to the Audit Committee (which included Liaw) that 4Q 2018 revenues 'meaningfully' exceeded the prior November 6, 2018 guidance." (AC ¶ 195 (emphasis omitted).) But as explained above, Mindbody had no duty to prematurely disclose its preliminary, unaudited Q4 2018 revenue results, and, in any event, the revenue results were immaterial as a matter of law. (*See supra* Part III.A.)

Nor can Plaintiffs rely on the allegations of their three purported confidential witnesses as circumstantial evidence of scienter. Courts may credit allegations of confidential witnesses only where they are described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314. This is because, "[i]t is hard to see how information from anonymous sources could be deemed compelling or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *7 (S.D.N.Y. Sept. 26, 2008) (quotations omitted), *aff'd sub nom. Slayton*, 604 F.3d 758. Thus, a confidential witness must make "some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-590 (S.D.N.Y. 2011). In addition, "confidential sources cannot be used to 'merely parrot [] . . . conclusory allegations contained in the complaint'" or make "conclusory" allegations regarding Defendants' awareness. *Id.* (quoting *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 376 (S.D.N.Y. 2007)). Here, the confidential witness statements fail this standard and thus should be discarded entirely.

*First*, CW-1's allegations are unsupported hearsay and are therefore unreliable. *See In re The Hain Celestial Grp. Inc. Sec. Litig.*, 2019 WL 1429560, at *18 (E.D.N.Y. Mar. 29, 2019)

(rejecting inference of scienter from "vague" statements of confidential witnesses that were "often based on multiple layers of belief or hearsay").  CW-1's allegations are vague and inconsistent with the facts of Mindbody and Vista's relationship.  For example, CW-1 alleges that "he was told that [Vista was] a large shareholder" (AC ¶ 99), but Plaintiffs never allege that Vista owned even a single share of Mindbody prior to the Merger.  Nor does CW-1 provide any details regarding the purported "all access pass" Vista was allegedly granted, except general statements describing the access as "full-access" or that Vista could walk around "freely" and "ask whatever" without alleging anything specific they did or asked, or even how, when, or from whom CW-1 allegedly learned of this "all access pass."  (*See id.*)  And nowhere does CW-1 tie any of his allegations to Defendants.  Plaintiffs do not allege that CW-1 ever "had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period."  *Am. Express*, 2008 WL 4501928, at *8.

      *Second*, Plaintiffs also do not allege that CW-2 ever "had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period."  *Id.*  CW-2's role was limited to oversight of a 12-person sales team, in a company that employed 585 individuals in sales & marketing.  (Ex. 34 at 39.)  Plaintiffs do not allege that CW-2 knew how the broader sales teams were performing, was informed about the impact of the integration on the establishment of sales goals, or otherwise possessed personal knowledge regarding the truth or falsity of Defendants' statements regarding Q4 revenue guidance and the existence of ongoing integration challenges.  Instead, CW-2 testifies vaguely to his "impression" of how the integration was progressing, without stating any basis for that "impression," and states that "sales quota were increased each quarter from 3Q18 until 2Q19."  (AC ¶ 123.)  Of course, increasing sales goals were fully consistent with Mindbody's guidance, which expected revenue growth from $63.8 million in Q3 to a range of $65-67 million for Q4.  (Ex. 14, Ex. 99.1

at 2.)  CW-2's vague "impression" that his sales team was performing adequately does not say anything about company-wide performance or the integration of the Acquisitions, and it certainly cannot sustain an inference of scienter where CW-2 alleges no contact of any kind with the Individual Defendants.  *Am. Express*, 2008 WL 4501928, at *8.

*Third*, Plaintiffs concede that CW-3 "left [Mindbody] during 3Q18," before Mindbody revised down its guidance and before any of the allegedly false or misleading statements were made.  (AC ¶ 125.)  Because CW-3 was not employed at Mindbody when the relevant decisions were made, his understanding of the Company's performance at earlier points in time cannot sustain a strong inference of scienter.  *See Glaser*, 772 F. Supp. 2d at 595 (allegations regarding statements made six months earlier could not support an inference of scienter regarding alleged falsity of statement regarding present nature of a key business relationship).  Moreover, CW-3's speculation that "he would be surprised if the Company was caught off guard by a drop in sales" is belied by the fact that Mindbody was forced to lower revenue expectations when reporting its Q2 2018 financials, and then still delivered disappointing third quarter results that failed to meet that reduced revenue guidance.  (Ex. 4 at 5, 10; AC ¶ 105.)  Mindbody's decision to revise guidance downward for Q4 following its miss of its already-lowered Q3 revenue guidance is unremarkable and does not support any inference of scienter.

## V.   THE SECTION 20(a) CLAIMS SHOULD BE DISMISSED.

Because Plaintiffs have not adequately pled a violation of either Section 10(b) or Section 14(a), their Section 20(a) claim also fails.  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

## CONCLUSION

For all of the reasons stated herein, all claims against Defendants should be dismissed.

Respectfully submitted,

Dated:  February 18, 2020

/s/ Matthew Solum

Matthew Solum, P.C.
John Del Monaco
Ian C. Spain
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
ian.spain@kirkland.com

*Attorneys for Defendants MINDBODY, Inc.,*
*Richard L. Stollmeyer, and Brett White*

Patrick Gibbs
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5535

Sarah M. Lightdale
Brian M. French
Daniel P. Roy III
COOLEY LLP
55 Hudson Yards, 44th Floor
New York, New York 10001
(212) 479-6374

*Attorneys for Defendant Eric Liaw*