**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Case No. 1:19-cv-08331-VEC |

---

**APPENDIX A IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

---

Patrick Gibbs
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
(650) 843-5535

Sarah M. Lightdale
Brian M. French
Daniel P. Roy III
COOLEY LLP
55 Hudson Yards, 44th Floor
New York, New York, 10001
(212) 479-6374

*Attorneys for Defendant Eric Liaw*

Matthew Solum, P.C.
John Del Monaco
Ian C. Spain
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Defendants MINDBODY, Inc.,*
*Richard L. Stollmeyer, and Brett White*

**Appendix A: Bases for Dismissal with Respect to Each Allegedly False or Misleading Statement**

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| **Guidance Statements** | | | | | |
| "The press release also stated:<br><br>*For the fourth quarter 2018, Mindbody expects to report:*<br><br>*• Revenue for the fourth quarter of 2018 in the range of $65.0 million to $67.0 million, representing 31% to 35% growth over the fourth quarter of 2017.*<br><br>*• Non-GAAP net loss for the fourth quarter of 2018 in the range of $(5.0) million to $(3.5) million and weighted average shares outstanding for the fourth quarter of approximately 47.9 million shares.*<br><br>*The outlook has been updated to reflect the acquisitions of FitMetrix and Booker.*"[1] | ¶ 210 | X | X | | |
| "…Defendant White issued downward guidance stating that:<br><br>*For the fourth quarter, we expect revenue to be in the range of $65 million to $67 million or 31% to 35% growth over the fourth quarter of last year. We expect non-GAAP net loss in the range of $5 million to $3.5 million,…*" | ¶ 212 | X | X | | |

---

[1]   All emphasis throughout this appendix is from Plaintiffs' Amended Class Action Complaint (Dkt. No. 22) ("AC").

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| **Integration Statements** | | | | | |
| "During the Q&A portion of the earnings call, Defendant White similarly described certain costs the Company was facing as it grew and completed the integrations of Booker and FitMetrix—but firmly stated *'it's kind of a steady course and speed on the expense side.'* … Rather, he said the Company was *'pulling back on the revenue'* and that it had *'tapped the brakes on the revenue a little bit here in Q4.'*…" | ¶ 109 | X | X | X | |
| "…The press release quoted Defendant Stollmeyer as stating *'Our recent acquisitions have introduced greater operational challenges than expected in the back half of the year.'*" | ¶ 209; see also ¶ 106 | X | X | | |
| "…Defendant Stollmeyer stated:…*we must acknowledge that we have faced significant operating challenges in the past 2 quarters. The combined effects of our recent acquisitions, go-to-market reorganization and expanding consumer and partner initiatives have made Mindbody a considerably more complex business to operate than it was just 6 months ago, and we did not meet our own growth expectations in the second and third quarters. We expect this to continue lagging a bit in Q4 as we communicated on our last call -- or continue to lag the expectations we communicated in our last call.*" | ¶ 211; see also ¶ 107 | X | X | | |

2

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "[Analyst]: … Can you just give us a sense of when incremental costs are coming into that model that perhaps we weren't all estimating? <br><br> [Stollmeyer]: Sure. **So I'll talk about the growth challenges on the first side. This is really about go-to-market. It's about our ability to scale our sales and marketing efforts across 3 dimensions simultaneously. First and foremost, our go-to-market on the subscriber side, we now have 2 separate sales teams, fitness and beauty and wellness. We hired 50 additional reps, as I mentioned, in the tail end of Q2, and it's taking a bit longer than expected to get them up to speed. This is the largest amount of sales reps we've hired in one group. It's the first time we've done it across 2 different teams. And of course, we still have some operational challenges around, for example, the 2 instances in Salesforce, which we're working to resolve. The other one is a resolution of our branded mobile app deferral issue that Brett talked about. It's unclear whether we're going to get that resolved in Q4, and we went ahead and factored that into our guidance.**" | ¶ 213 | X | X | | |
| "Defendant Stollmeyer reiterated the false narrative that the Company was facing issues caused by the acquisitions, stating: <br><br> …**And as I said, the team has been -- we've been humbled by the last couple of quarters in dealing with the magnitude of integrating these businesses and ramping up growth at the same time.**" | ¶ 214 | X | | | |

3

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "[Analyst]: … at what point did you realize that the results were going to be disappointing?<br><br>[Stollmeyer]: *Well, at that point, we were looking at results that were end of August, remember. We were looking at the prior 2 months, and we were meeting our milestones. The formation of the 2 go-to-market teams, some important product milestones were coming together. The general vibe amongst the teams, the ability for our leadership to work together, from a former Booker's and Frederick's and FitMetrix folks, the other subtleties around how quickly sales team efficiency was ramping were things that we really started realizing in October. And yes, I mean, Brett, do you want to speak about that?*<br><br>[White]: *Yes. I think relative to Q3 results, the big surprise was the delay and the elongated deployment to the Apple App Store. And that was a new rule that they rolled out in May. So we had very little data on which to understand what the new timeline was around deploying the apps. And the -- our customers have to go through several steps on their own that we really can't help them with, like obtaining a DUNS number, obtaining a developer account, to deploy the app. And so we didn't know, in the middle of September, how many of those apps were actually going to get deployed and that we did, in fact, have a backlog challenge.*" | ¶ 215 | X | | | |
| **Premium Statements** | | | | | |
| "Two days later Defendants filed a Form 8-K continuing to tout the *'significant premium'* and boasting that the deal would be subject to a *'customary 30-day 'go-shop' period,'* in which Mindbody would continue to attempt to find superior bids…" | 29 | X | | X | X |

4

| Statement | AC | Not False/ Misleading | Forward- Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "On January 18, 2019, all but one Board member received **'a presentation regarding . . . fourth quarter 2018 actuals.'** Yet, on January 23, 2019, Defendants issued the Final Proxy, once again touting the **'premium'** and falsely describing the history of the transaction." | ¶ 31 | X | | | |
| "…The press release stated: <br><br> …Vista will acquire all outstanding shares of *Mindbody common stock for a total value of approximately $1.9 billion. Mindbody shareholders will receive $36.50 in cash per share, representing a 68% premium to the unaffected closing price as of December 21, 2018.*" | ¶ 218; *see also* ¶¶ 25, 28 149 | X | | | |
| "The press release quoted Defendant Stollmeyer as stating: <br><br> *We are thrilled to provide immediate liquidity to our shareholders at a significant premium to market prices …*" | ¶ 219; see also ¶ 28, 149 | X | | X | X |
| "Defendant Stollmeyer [ ] stated that: <br><br> **Why now?** <br><br> *As a public company, one of the responsibilities of our board and management team is to maximize shareholder value. We decided that partnering with Vista is our best option for shareholders, and a fantastic option to foster value for you and long-term growth for Mindbody. Vista has agreed to acquire all outstanding Mindbody common stock for $36.50 per share, representing an approximately 68% premium compared to the closing price of our stock as of December 21, 2018.*" | ¶ 225; *see also* ¶ 180 | X | | X | X |

| Statement | AC | Not False/ Misleading | Forward- Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "…*(1) 68% to the closing price of Mindbody's Class A common stock on December 21, 2018, the last full trading day prior to public announcement of Mindbody's entry into the Merger Agreement; and*<br><br>*(2) 42% to the 30-day volume weighted average price, ending on December 21, 2018.*" | ¶ 230; *see also* ¶¶ 30, 185 | X | | | |
| "…the Board considered:<br><br>*[T]he current and historical trading price of Mindbody's Class A common stock, including that the Per Share Merger Consideration constituted a premium of:*<br><br>• *approximately 68% to $21.72, the closing price of Mindbody's Class A common stock on December 21, 2018, the last full trading day prior to public announcement of Mindbody's entry into the Merger Agreement; and*<br><br>• *approximately 42% to the 30-day volume weighted average price of $25.68, ending on December 21, 2018;*" | ¶ 231 | X | | | |
| "The slide deck included a slide titled *'Why $36.50 Per Share is Highly Attractive for Shareholders,'* which stated that the *'$36.50 offer price implies a 68% 1-day premium.'*" | ¶ 250 | X | | X | X |
| **Value Statement** | | | | | |
| "…the Board considered:<br><br>*[T]he belief that the Per Share Merger Consideration represented the highest price that Vista was willing to pay (based on specific instruction from Vista) and the highest price per share value reasonably obtainable as of the date of the Merger Agreement;*" | ¶ 233 | X | | X | |

6

| Statement | AC | Not False/ Misleading | Forward- Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| **Process Statements** | | | | | |
| "…Form 8-K stated:<br><br>*The Company also has the right to a customary 30-day 'go-shop' period beginning on December 23, 2018 and continuing until 12:00 p.m. Pacific time on January 22, 2019 to solicit alternative acquisition proposals from third parties and to provide information to, and participate in discussions and engage in negotiations with, third parties regarding any alternative acquisition proposals.*" | ¶ 223; *see also* ¶ 29 | X | | X | X |
| "…the Board considered:<br><br>*[T]he right, pursuant to a customary 30-day 'go-shop' period beginning on December 23, 2018 and continuing until 12:00 p.m., Pacific time on January 22, 2019, to solicit alternative Acquisition Proposals from, and participate in discussions and negotiations with, third parties regarding any alternative Acquisition Proposals;*" | ¶ 235 | X | | X | X |
| "The Final Proxy also stated that:<br><br>*Each party that executed a confidentiality agreement with Mindbody during the Go Shop Period that requested access was granted access to the same electronic data room populated by Mindbody with the same documents to which Vista was provided access. Party A, Party B, and Party C declined to continue discussions with the Company during the Go Shop Period. To date, the Company has not received an alternative Acquisition Proposal.*" | ¶ 247 | X | | | |
| "The slide deck included a slide titled *'Vista's Offer Is the Result of a Rigorous and Fulsome Transaction Process.'*" | ¶ 252 | X | | X | X |

7

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "In support of the assertion in the slide titled, *'Vista's Offer Is the Result of a Rigorous and Fulsome Transaction Process,'* the slide deck stated that *'8 parties received data room access'*…" | ¶ 254 | X | | X | X |
| **Rationale Statements** | | | | | |
| "…The Preliminary Proxy continued the same song, touting the Merger as *'in the best interests of the Company and its stockholders,'* representing a premium to approximately: *'(1) 68% to the closing price of Mindbody's Class A common stock on December 21, 2018, the last full trading day prior to public announcement of Mindbody's entry into the Merger Agreement; and (2) 42% to the 30-day volume weighted average price, ending on December 21, 2018.'*…" | ¶ 185 | X | | X | X |
| "Defendant Stollmeyer [ ] stated that: **Why now?** *As a public company, one of the responsibilities of our board and management team is to maximize shareholder value. We decided that partnering with Vista is our best option for shareholders, and a fantastic option to foster value for you and long-term growth for Mindbody. Vista has agreed to acquire all outstanding Mindbody common stock for $36.50 per share, representing an approximately 68% premium compared to the closing price of our stock as of December 21, 2018.*" | ¶ 225; *see also* ¶ 181 | X | | X | X |

8

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| **Background Statements** | | | | | |
| "…letter from Defendant Stollmeyer, [responding] to a Q&A-style question, asking 'why are we taking the company private?' with the following explanation: <br><br>*In October, our Board of Directors and I agreed to explore of the possibility of taking Mindbody private, because we realized that the right acquirer could enable us to be even more successful in the years ahead. Since then, through conversations with multiple interested acquirers and CEOs, I became convinced that going private now is our best path forward, and that Vista is an ideal partner. …"* | ¶ 227 | X | | X | X |
| "…*As part of this process, from time to time, during the period since Mindbody's initial public offering in 2015 and prior to the contacts described below and the process that resulted in Mindbody's entry into the Merger Agreement, members of Mindbody senior management have engaged in business development and/or strategic discussions with participants in the software, payments services and/or health and wellness industries. None of those discussions progressed beyond preliminary phases, nor did Mindbody enter into any acquisition-related non-disclosure or standstill agreements with such parties other than as discussed below.* <br><br>*In October 2018, representatives of Vista and Mr. Stollmeyer discussed Vista's investment strategy and the firm's interest in learning more about Mindbody's approach to the fitness, beauty and wellness services industries. During this time period, Mr. Stollmeyer also had introductory meetings with representatives of two other financial sponsors, Party A and Party B."* | ¶ 237 | X | | | |

9

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "…as described by the Preliminary Proxy : <br><br>*In the first half of August 2018, as part of Qatalyst Partners' customary coverage of software companies, a representative of Qatalyst Partners had a meeting with Mr. Stollmeyer. Following this meeting, Qatalyst Partners reached out to Vista, Party A, and Party B as typical outreach to connect strategic companies, including Mindbody, to such parties…* <br><br>*On October 16, 2018, Vista indicated to Mr. Stollmeyer that it was interested in pursuing strategic transaction discussions with Mindbody. During this time period, Mr. Stollmeyer also had meetings with representatives of two other financial sponsors, Party A and Party B, which meetings (the latter occurring on October 15, 2018 and the former on November 1, 2018) were facilitated by Qatalyst Partners after the early August 2018 introductions described above as customary outreach to reconnect strategic companies like Mindbody to such parties.*" | ¶ 256 | X | | | |
| **Transaction Committee Statements** | | | | | |
| "The Preliminary Proxy purported to describe the origins of the Committee as follows: <br><br>*On October 30, 2018, the Board of Directors established the Transaction Committee and delegated authority to the Transaction Committee for the limited purpose of reviewing the potential engagement of a financial advisor to assist Mindbody with evaluating potential strategic alternatives and evaluating candidates for this role, including Qatalyst Partners. Based upon experience with strategic alternatives and a willingness to serve in such role, the Board of Directors appointed Eric Liaw, Court Cunningham, and Gail Goodman to the Transaction Committee and designated Mr. Liaw as Chairman of the Transaction Committee.*" | ¶ 239 | X | | | |

10

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "The February 7, 2019 Proxy Materials also disclosed information regarding the Transaction Committee:<br><br>*On October 30, 2018, the Board of Directors established the Transaction Committee and delegated authority to the Transaction Committee for the limited purpose of reviewing the potential engagement of a financial advisor to assist Mindbody with evaluating potential strategic alternatives and evaluating candidates for this role, including financial advisors that had previously advised Mindbody, as well as other financial advisors, such as Qatalyst Partners, in each case based on such financial advisors' experience and reputation in the market for the type of strategic technology transaction Mindbody's Board of Directors intended to consider.*" | ¶ 258 | X | | | |
| **Employment Statements** | | | | | |
| "The Preliminary Proxy also stated that:<br><br>…*At the time of the signing of the Merger Agreement, Vista and Mindbody had not engaged in any employment or retention-related discussions with regard to Mindbody management.*" | ¶ 241; *see also* ¶ 190 | X | | | |

11

| Statement | AC | Not False/ Misleading | Forward-Looking | Opinion | Puffery |
|---|---|---|---|---|---|
| "Proxy Materials also disclosed…: <br><br> *At the time of the signing of the Merger Agreement, Vista and Mindbody* had not ~~engaged in any employment or retention-related discussions with regard to Mindbody management~~ *discussed the terms of post-closing employment or equity participation for Mindbody management. Prior to (but after the signing of the Merger Agreement) and following the closing of the Merger, however, certain of our executive officers may already have had, or may have discussions, and following the closing of the Merger, may enter into agreements with, Parent or Merger Sub, their subsidiaries or their respective affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates.*" | ¶ 260 | X | | | |
| **Qatalyst** | | | | | |
| "The Preliminary Proxy also stated that: <br><br> *Other than as set forth below, during the two-year period prior to the date of Qatalyst Partners' opinion, no material relationship existed between Qatalyst Partners or any of its affiliates and Mindbody or Parent pursuant to which compensation was received by Qatalyst Partners or its affiliates, other than a fee of approximately $7 million received by an affiliate of Qatalyst Partners in connection with acting as financial advisor to Vista, an affiliate of Parent, in connection with Vista's acquisition of iCIMS, Inc. Qatalyst Partners and/or its affiliates may in the future provide investment banking and other financial services to Mindbody, Parent or Vista and their respective affiliates for which Qatalyst Partners would expect to receive compensation.*" | ¶ 243 | X | | | |

12