# EXHIBIT 10

10-K 1 mb_12-31x2017x10xk.htm 10-K

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

---

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2017**
**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____
**Commission File Number 001-37453**

---

# MINDBODY, INC.
**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **Delaware** | **20-1898451** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **4051 Broad Street, Suite 220** | |
| **San Luis Obispo, CA** | **93401** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (877) 755-4279**

---

Securities registered pursuant to Section 12(b) of the Act:

| <u>Title of each class</u> | <u>Name of each exchange on which registered</u> |
|---|---|
| Class A Common Stock, par value $0.000004 per share | NASDAQ Stock Market LLC (NASDAQ Global Market) |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

As of June 30, 2017 (the last business day of the registrant's most recently completed second fiscal quarter), the aggregate market value of shares of Class A common stock and Class B common stock held by non-affiliates of the registrant was approximately $1,010,860,000.

As of February 22, 2018, the registrant had 43,268,897 shares of Class A common stock, and 3,872,725 shares of Class B common stock outstanding.

---

**DOCUMENTS INCORPORATED BY REFERENCE**

The information required by Part III of this Annual Report on Form 10-K, to the extent not set forth herein, is incorporated by reference from the registrant's definitive proxy statement relating to the registrant's Annual Meeting of Stockholders to be held in 2018.  Such definitive proxy statement will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this Annual Report on Form 10-K relates.

**Table of Contents**

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 14 |
| Item 1B. | Unresolved Staff Comments | 36 |
| Item 2. | Properties | 36 |
| Item 3. | Legal Proceedings | 36 |
| Item 4. | Mine Safety Disclosures | 36 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. | Selected Financial Data | 39 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 61 |
| Item 8. | Financial Statements and Supplementary Data | 61 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 61 |
| Item 9A. | Controls and Procedures | 61 |
| Item 9B. | Other Information | 62 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 63 |
| Item 11. | Executive Compensation | 63 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 63 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 63 |
| Item 14. | Principal Accounting Fees and Services | 63 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | F-1 |

Table of Contents

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the federal securities laws. Forward-looking statements generally relate to future events or our future financial or operating performance. In some cases, you can identify forward-looking statements because they contain words such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential," "possible," "continue" or the negative of these words or other similar terms or expressions that concern, among other things, our expectations, strategy, plans or intentions. We have based the forward-looking statements contained in this Annual Report on Form 10-K primarily on our current expectations and projections about future events and trends that we believe may affect our business, financial condition, results of operations and prospects. Forward-looking statements contained in this Annual Report on Form 10-K include, but are not limited to, statements about:

- our ability to grow revenue by adding new customers, retaining and deepening relationships with existing customers, growing our consumer user base and increasing transaction volume across our two-sided marketplace of wellness;
- our ability to timely and effectively scale and adapt our existing technology;
- the effects of the evolving regulatory framework for privacy, security and data protection on our platform;
- the effects of price increases;
- benefits associated with use of our products and services;
- our ability to develop or acquire new products and services, improve our existing products and services and increase the value of our products and services;
- the network effects associated with our business;
- our ability to maintain our revenue growth rate;
- our future financial performance, including expectations regarding trends in revenue, cost of revenue, operating expenses, other income and expenses, income taxes;
- our future key metric performance;
- our ability to further develop strategic relationships, including our ability to increase or maintain our revenue from our API and technology partners;
- our ability to strengthen or maintain partnerships with payment processors;
- the security of our platform and the protection of data on our platform;
- our ability to achieve positive returns on investments;
- our plans to further invest in and grow our business, including investment in research and development, sales and marketing, the development of our customer and consumer support teams and our data center infrastructure, and our ability to effectively manage our growth and associated investments;
- our ability to successfully identify, acquire and integrate companies (including FitMetrix, Inc.) and assets;
- our expectations relating to our acquisition of FitMetrix, Inc.;
- the sufficiency of our cash and cash equivalents, cash generated from operations or equity debt financing activities to meet requirements for working capital and capital expenditures;
- the effects of seasonal trends on our operating results;
- our ability to attract and retain senior management, qualified employees and key personnel;
- our ability to successfully enter new markets and manage our international expansion; and
- our ability to maintain, protect and enhance our intellectual property and not infringe upon others' intellectual property.

We caution you that the foregoing list may not contain all of the forward-looking statements made in this Annual Report on Form 10-K. You should not rely upon forward-looking statements as predictions of future events. The outcomes of the events described in these forward-looking statements are subject to substantial risks, uncertainties and other factors described in Part I, Item 1A, *Risk Factors*, and elsewhere, in this Annual Report on Form 10-K. Moreover, we operate in a very competitive and rapidly changing environment. New risks and uncertainties emerge from time to time and it is not possible for us to predict all risks and uncertainties that could have an impact on the forward-looking statements contained in this Annual Report on Form 10-K. We cannot assure you that the results, events and circumstances reflected in the forward-looking statements will be achieved or occur, and actual results, events or circumstances could differ materially from those described in the forward-looking statements.

The forward-looking statements made in this Annual Report on Form 10-K relate only to events as of the date on which the statements are made. We undertake no obligation to update any forward-looking statements made in this Annual Report on Form 10-K to reflect events or circumstances after the date of this Annual Report on Form 10-K or to reflect new information or the occurrence of unanticipated events, except as required by law. We may not actually achieve the plans, intentions or expectations disclosed in our forward-looking statements and you should not place undue reliance on our forward-looking statements. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures or investments we may make.

1

Table of Contents

## GLOSSARY

To assist you in reading this Annual Report on Form 10-K, we have provided definitions of some of the terms and acronyms that we use:

**"Active consumer"** - As of a given date, the estimated number of unique clients of our customers' services who have used our platform to transact with our customers during the two years ending on such date.

**"API"** - Application programming interface.

**"app"** - Application.

**"ARPS"** - Average monthly revenue per subscriber.

**"Client"** - A consumer who has chosen to purchase services from a customer's business.

**"Consumer"** - Any person who may purchase wellness services.

**"Customer"** - A business owner who has one or more subscriber locations or individual practitioners who have an active subscription to our platform.

"**High Value Subscriber**" - A customer on our Starter, Pro, Accelerate or Ultimate software level, and commencing in 2018, also includes customers on our Essential software level.

**"Subscriber"** - This is one of our key metrics and is defined as unique physical locations or individual practitioners who have active subscriptions to our platform as of the end of the period.

**"The app"** or **"The MINDBODY app"** - The MINDBODY app, our consumer-facing mobile application.

**"Wellness Practitioner"** or **"Practitioner"** - Generally, staff members, instructors, trainers and stylists, and specifically where discussed as a number, those staff members, instructors, trainers and stylists with one or more bookings on our platform in the last month of the applicable period.

Table of Contents

**PART I**

**Item 1. Business.**

### Our Purpose

Our purpose is to help people lead healthier, happier lives by connecting the world to wellness.

This purpose defines our growth strategy and priorities. Our primary objective is growing a transaction-enabled wellness marketplace by adding high quality wellness businesses to our platform, deepening relationships with the existing businesses we serve and rapidly increasing consumer awareness, adoption and engagement.

### Overview

We are the leading provider of cloud-based business management software for the wellness services industry and a rapidly growing marketplace for wellness services. As of December 31, 2017, our customers employed over 372,000 wellness practitioners serving approximately 41 million consumers in more than 100 countries. Our integrated software and payments platform helps wellness business owners run, market and build their businesses, while engaging consumers by aggregating available classes and appointments, and enabling rapid discovery, booking and payment. Together, our cloud-based business and consumer software platform comprise a two-sided marketplace, enabling market innovations such as targeted introductory offers and dynamic pricing that simultaneously increases consumer engagement and wellness business capacity utilization.

We were founded in 2001 with a mission to leverage technology to improve the wellness of the world by addressing the vast and growing demand for wellness services by providing innovative business management software and consumer booking tools. We started as a hybrid desktop-web solution focused on yoga, Pilates and indoor cycling businesses.  In 2005, we released MINDBODY Online, our software-as-a-service, or SaaS, platform, and began to scale our business into adjacent fitness categories, increasing our total addressable market and fueling growth in consumer online bookings.  In 2009, we released MINDBODY Finder, enabling available classes and appointments to be aggregated for consumer search, and an open web services application programming interface, or API, that enabled other developers to build solutions on our platform. In 2013, we launched our MINDBODY Express mobile application for businesses and our MINDBODY Connect application for consumers, establishing our transaction-enabled wellness marketplace. In 2015, we redesigned MINDBODY Connect and re-released it as "The MINDBODY App," following which we saw a substantial inflection in consumer discovery, bookings and purchases. Over the course of our history, we have consistently made significant investments in our platform to enable increased business penetration and consumer adoption of our two-sided marketplace.

Through our integrated cloud-based business management software and payments platform, we enable our customers to easily manage class and appointment schedules, staff members, client information, online bookings, inventory, payroll and retail sales - all in a cost-effective manner. We also offer advanced marketing and client retention capabilities to help businesses acquire and retain their clients, and analytics capabilities to help them strengthen their businesses and manage future growth. At the same time, we connect consumers with local businesses through the MINDBODY app, which powers a mobile interface that allows consumers to discover, evaluate, book and pay for wellness services, whether they are near their homes or traveling. The MINDBODY app also provides these consumers a unified account that allows them to: access and manage multiple wellness services with one sign-in; see their aggregated schedule and histories with multiple wellness businesses; store multiple credit cards for instant payment; read authentic consumer reviews written by people who actually attended the classes or services; find targeted introductory offers to introduce them to new wellness activities; and view and book offers for dynamically-priced classes to increase their opportunities to engage in wellness. All of this functionality is designed to encourage consumers to more actively participate in wellness and help our customers fill their classes and ultimately be more successful.

### The MINDBODY Solution

Our integrated cloud-based business management software and payments platform is specifically designed to engage both wellness services businesses and consumers through a powerful two-sided marketplace. We offer business management solutions that power our customers' transactions and interactions with consumers, connecting them with millions of people who are seeking these types of services and creating a seamless relationship between practitioners and the clients they serve.  We target boutique fitness, salon, spa and integrative health businesses within the wellness services industry.

3

Table of Contents

***Integrated Software and Payments Platform***

Our platform is continuously evolving to help our customers simplify and enhance the way they run their businesses; attract, engage and retain more consumers; increase their revenues; and focus more on what they love to do - improving people's lives. We have developed this platform with powerful functionality that addresses key aspects of operating a wellness services business, including:

- *Scheduling and Online Booking.* Our customers can give their clients the opportunity to book and pay for their next visit wherever and whenever it is most convenient, whether through the MINDBODY app, our customers' own website or branded mobile app built by MINDBODY, integrated search engines and social media sites such as Google, Facebook, Bing and Yahoo. We offer robust features that enable many different types of scheduling that wellness businesses encounter, including:

  - *Appointments.* One-on-one appointments typically require preparation time before the appointment as well as off-boarding time after the appointment. Our software can manage practitioner availability as well as gaps between appointments in a time-efficient manner.

  - *Open classes.* Open classes offer reserved or drop-in attendance on a first-come, first-served basis. Our software can transact at different price points, send automatic check-in and cancellation confirmations and manage waitlists to optimize capacity utilization.

  - *Enrollments and workshops.* Enrollments and workshops are pre-registered events or series of classes with the same group of attendees. Our software offers the ability to set separate pricing outside of pre-paid packages and track absences, make-ups and various payment plans.

  - *Arrivals.* Many gyms allow their members to use their facilities and equipment without attending a class. Our software tracks these open-gym arrivals, allowing consumers to check-in to a gym without having a scheduled class to attend.

  - *Resource scheduling.* To effectively manage their day-to-day business, wellness service providers need to manage and allocate their equipment and facilities. Our software can easily track, manage and allocate equipment and facilities for the classes and services these businesses provide.

- *Performance Tracking.* With FitMetrix performance tracking solutions, our customers can integrate in-studio leaderboards and workout machines, like treadmills and indoor bikes, with wearables that track heart rate and calorie burn. In addition, fitness businesses can identify in their MINDBODY software which machines are enhanced with this integration, making it possible for a client to reserve a specific machine while booking a class. As a result, FitMetrix-enabled studios provide consumers with a highly immersive experience where they can gain valuable insights into the quantifiable results of their workouts.

- *Staff Management.* With our staff and resource scheduling software features, customers can keep their entire staff schedule in one place and enable staff to easily access and maintain their changing availabilities via MINDBODY for Business, our business-facing application. Our customers can also track staff substitutions, hourly and service-based payroll and commissions, all of which can be easily linked and exported to any of several popular payroll service formats, including ADP, Paychex and Exact Payroll Services.

- *Client Relationship Management.* With our client relationship management features, our customers have all of their clients' information in one place and can take advantage of powerful relationship management and engagement marketing tools. Customers can securely store their clients' personal information in a unique profile and manage account, visit and purchase history for more effective service. Our platform also helps our customers target new consumers, keep in touch with loyal clients and offer variable, targeted promotions and discounts.

- *Integrated Payment Processing.* We offer our customers integrated payment processing solutions with our software at competitive rates. Our integrated payments capability grows our customers' revenue by allowing for convenient and secure storage of client card information, enabling seamless online booking and payment from all consumer interfaces, as well as recurring auto-payments for monthly memberships. Additionally, the integration between point-of-sale and payment processing saves customers time by linking payments authorizations and settlements to sales records, thereby eliminating the need for time-consuming and error-prone manual reconciliations. Our payments platform provides instant authorization and nightly settlement of credit card, debit card and ACH transactions. Once a sale is complete, staff can void, edit or return the sale. All client payment information is protected behind Payment Card Industry, or PCI, Level I Data Security Standards.

Table of Contents

- *Retail Point-of-Sale*.  Our point-of-sale capabilities help customers earn more revenue and create a seamless omni-channel purchase experience for their clients, allowing them to sell products and services, contracts and memberships, packages, workshops and store-branded gift cards from every web and mobile interface we offer.  Our point-of-sale feature tracks product inventory levels and automatically issues purchase orders when product levels reach a re-order point.

- *Purchase Tracking.*  Customers can sell products and services as well as memberships, monthly contracts and packages that combine products and services at their place of business and online.  Customers can securely store client billing information to facilitate quicker transactions.  Payments for classes or appointments can be applied before or after client check-in, and before or after the session is complete.  Our point-of-sale functionality allows the assignment of staff commissions to appropriate parties.

- *Inventory.*  Customers can set inventory re-order points, automatically generate purchase orders and easily log arriving inventory.  As a result, customers can more efficiently manage availability, calculate gross margin and monitor inventory shrinkage, among other benefits.

- *Hardware Integration.*  Our integration with the wireless Poynt Smart Terminal allows customers' staff and clients a seamless, mobile payment experience, including pin-pad debit, chip-reading EMV, contactless payments, Google Wallet and Apple Pay. The Poynt Smart Terminal is loaded with MINDBODY for Business, so every transaction is fast, convenient and can be processed away from the front desk. Additionally, we offer point-of-sale hardware, such as cash drawers, receipt printers and barcode scanners, smartphone and table credit or debit card readers, as well as branded key chain tags and gift cards that our customers may desire.

- *Analytics and Reporting*.  We track key information that helps customers achieve their business goals, including revenue growth, contribution margin of classes, client retention rates, referral sources, return on investment for client retention campaigns and practitioner performance based on client loyalty and reviews by class or type of service.  Our platform also generates reports that help our customers allocate their resources, set budgets and measure their performance against goals.  Customers are empowered to identify trends and opportunities for improvement in their businesses by leveraging analytics and marketing tools to pull a variety of reports, including, among others, sales forecasts, best-selling products and services, cancellations and no-shows, staff sales commissions, client retention rates, client account balances and many more.

- *Branded web*. Our branded web solution gives our customers the ability to embed their MINDBODY class and appointment schedules within their web and social sites, creating a seamless and branded online experience for their clients.

- *Mobile*.  Our platform enables our customers to manage their operations anytime and anywhere via a number of mobile devices and operating systems, including Mac, iOS, Android and Windows.

    ◦ *MINDBODY for Business*.  Our business-facing mobile app enhances our core offering by enabling our customers to easily run their business, book clients and sell products and services while on the go.

    ◦ *Branded Mobile App*.  Our branded mobile app offering enables our customers to have their own consumer-facing app to create a unique branded experience for their clients.

    ◦ *MINDBODY App*. Our consumer app offering enables our customers to manage consumer and client interactions, including surfacing inventory, sending appointment reminders and providing updates to clients.

    ◦ *MINDBODY Class Check-In*.  The MINDBODY Class Check-In app helps our customers create a better consumer experience at the front desk. Clients can check themselves into class, freeing up front desk staff to help others and making it possible for instructors to start classes faster.

- *Social Integration*.  Our platform integrates with popular social networks like Facebook and Twitter.  For example, our platform allows our customers to publish schedules on their Facebook page, enabling consumers to directly book appointments and classes via Facebook.

- *Client Acquisition Dashboard*.  Our customers can attribute new consumers to various acquisition channels.  For example, customers can track conversion of new consumers into clients by tracking the aggregate value of their subsequent purchases, which clients purchased specific introductory offers, and the reviews generated about their business in the MINDBODY app.

5

Table of Contents

- *Integration with Other Cloud-based Partners*.  We have built an open and extensible platform with an application programming interface, or API, that offers developers access to our inventory of classes, payments and scheduling capabilities.  Approved developers can pull information from and post data to our platform and use that capability to create a variety of unique applications with custom interfaces. Our platform can be integrated with other cloud-based software that our customers may be using for critical business management tasks to extend the capabilities of our platform within a variety of focus areas such as automation, marketing, accounting, mobile and social.

- *Security and Compliance*.  We have consistently passed our Level I Payment Card Industry Data Security Standard, or PCI DSS, audits.  In addition, because we, in certain instances, collect, access, use, maintain and/or transmit protected health information in connection with providing services to customers who are subject to the requirements of the Health Insurance Portability and Accountability Act of 1996, or HIPAA, we have certified to the Health Information Trust Alliance Common Security Framework, or the HITRUST CSF, and consistently passed our HITRUST CSF audits.  Our platform is engineered to provide high reliability and availability.  We continually monitor our infrastructure for any sign of failure or pending failure and we take preemptive action to minimize or prevent downtime.  We maintain the reliability of our service by utilizing redundant network infrastructure, clusters that tolerate failure of individual nodes and deploying high availability server pairs.  We also implement various disaster recovery measures, including full replication of hardware and data in our geographically distinct data centers, to minimize data loss in the event of a data center disaster.

### The MINDBODY App

The MINDBODY app is our consumer-facing mobile application that consumers can use to manage their wellness activities and relationships with multiple MINDBODY customers, using a unified account with a single login and multiple stored cards.  Consumers can discover local wellness services using a geo-located map function, view class and appointment descriptions, schedules and real-time availability, read practitioner biographies and user reviews written by consumers who have actually attended the class or received the service, and then book and pay for their desired services in a few taps from their mobile devices.  Through the app, consumers can also receive appointment reminders and check-in to classes before they arrive, receive real-time updates regarding changes in class schedules, and access their account profile to review their class visit and payment history.

*Introductory Offers and Dynamic Pricing.* The MINDBODY app helps customers actively promote their businesses by surfacing targeted introductory offers and dynamically-priced classes to targeted consumers, helping to increase consumer demand for wellness services while increasing customers' revenue and improving their profitability. Introductory offers are targeted via a proprietary recommendation engine that considers a user's prior history, preferences and geo-location. Dynamically-priced offerings are developed and targeted by a proprietary algorithm that can offer the class to the consumer above or below our customer's standard drop-in rate, based on factors like time until class, relative demand, historical trends and other proprietary methods.

### The MINDBODY Network

The MINDBODY Network is a fee-based marketing platform that connects our customers with local consumers via the MINDBODY app and third-party partner applications or websites. Customers who opt in to the MINDBODY Network receive greater exposure through additional promotion of their intro offers or deals on various screens throughout the MINDBODY app, as well as featured placement on third-party partner apps and/or websites including Google and Bing.

### MINDBODY API Platform and Partner Ecosystem

We have enabled a rich partner ecosystem that extends the value of our software and payments platform in powerful ways.  Our partners have built applications that supplement our capabilities in areas such as marketing automation, accounting, loyalty, mobile and social interactions.  Several of these partners have created significant consumer-facing businesses that rely on our unique inventory of classes, scheduling and payments capabilities.  All of this is enabled by our APIs, to which we grant access to approved developers and partners.  We also integrate with partners that provide email marketing, customer survey, events management and other functionality to augment the capabilities of our platform for the benefit of our customers.

Table of Contents

*Software Subscription Packages*

Because each of our customers is unique and at a different stage of their respective professional journeys, our software subscriptions are provided on a tiered pricing model based upon different software functionality packages. Each of these packages has been carefully crafted to meet our customers' differing needs and levels of complexity, giving them appropriate functionality to optimize their business.

| ESSENTIAL | ACCELERATE | ULTIMATE |
|---|---|---|
| Get the features you need to manage schedules, sell services and streamline tasks. | Expand your reach and increase engagement with advanced retention and marketing tools. | Elevate your brand with custom mobile apps, extensive analytics and enterprise-grade features. |
| **Key Features:**<br><br>• Full listing in the MINDBODY app<br>• Business app + web software<br>• Ability to sell services and gift cards<br>• Appointment, class and event scheduling<br>• Branded web tools<br>• Payroll, tips and commission tracking<br>• Full staff and consumer management<br>• Automated emails and texts<br>• Mobile analytics dashboard<br>• Google Calendar integration<br>• Unlimited access to MINDBODY University on Demand business courses | **Key Features:**<br><br>All Essential features, plus:<br><br>• Advanced marketing dashboard<br>• Automated consumer retention and win-back campaigns<br>• 2-way SMS confirmations<br>• Marketing analytics<br>• Promotions and loyalty rewards tracking<br>• Room and equipment scheduling<br>• Custom API access | **Key Features:**<br><br>All Accelerate features, plus:<br><br>• Branded mobile app<br>• Mobile push notifications |

**With MINDBODY Integrated Payments, all Software Levels gain:**

• Integrated point of sale credit and debit card acceptance from smartphone, iPad, MacOS and PC
• Full online and mobile book + pay capabilities
• Fully integrated online store
• Consumer booking and e-commerce payments from the MINDBODY app mobile interface
• Securely stored credit/debit cards and ACH for automated recurring billing
• Automatic nightly settlement with audit trail to sales records

*Customer and Consumer Services and Support*

We believe that many wellness services business owners are not technical experts and that they bear an enormous responsibility to successfully run their businesses day in and day out. Therefore, we provide end-to-end customer support, including full data conversion and import from prior systems, live onboarding and 24/7 technical support via telephone, email, in-software chat and screen sharing; in-software self-service tools; advanced professional services; and educational events. In addition, we also have a dedicated support team that is focused on ensuring that the millions of registered MINDBODY app users are having the best possible experience.

• *Customer Onboarding.* We typically onboard new customers with live training sessions delivered via telephone and web conference. These trainings are supplemented by self-service setup checklists, online help materials and webinars.

• *Customer Success.* To identify opportunities for greater adoption of our products and services and to further help our customers be more successful on our platform, we engage with them to better understand their business goals and objectives; provide targeted education about relevant features, products and services as well as business best practices; and develop a recommended success plan with periodic outreach to check in on their progress.

• *Ongoing Customer Support.* Inclusive with our base subscription fees, we offer 24/7 customer service and support via phone, chat, emails and self-help knowledge centers. All customer service and support is provided by our in-house personnel who are invested in MINDBODY's core values and closely connected to our Product, Technology and Experience team.

Table of Contents

- *Professional Services.*  Our premium support services enable customers to access dedicated, advanced product and business operations support from software and business experts.  This service is usually chosen by our higher-end small businesses and multi-location chains or franchises.

- *MINDBODY University.*  MINDBODY University is a multi-day advanced customer education event held multiple times per year in various destination locations around the world (*e.g.*, London, New York, San Diego and Sydney).  This high-impact business conference teaches advanced software skills and best business practices that help customers increase revenues and improve their bottom line. In addition, all customers have unlimited, online access to recorded business management material derived from our MINDBODY University courses at no additional cost.

- *BOLD Conference.*  We provide our customers with a three-day annual user conference where they can learn best business practices and participate in networking opportunities designed to help fuel their business growth and success.  Program sessions typically include key topics needed to thrive within the competitive wellness services industry market — from the latest trends in consumer marketing and social media, to selling strategies and strategic business partnerships — taught by MINDBODY team members, industry experts and fellow MINDBODY customers.

- *Consumer Support.* We provide consumer support through live in-app and online chat, email, and self-service support articles.

**Key Benefits to MINDBODY's Constituents**

MINDBODY connects the world to wellness by connecting wellness practitioners with millions of consumers who are seeking these types of services. We have created a two-sided marketplace that benefits both customers and consumers by powering and enabling interactions that drive healthier businesses and healthier lifestyles.

*Benefits to consumers:*

- *Increased Discovery and Engagement.*  Our platform aggregates nearly 5 million transaction-enabled wellness class spots and wellness services per day, together with millions of class ratings and hundreds of thousands of consumer reviews written by consumers who have actually participated in a class or used a service. This creates a convenient "one-stop-shop" experience that is much easier and less time consuming for consumers than browsing through numerous disparate websites and making phone calls to schedule a class or service. The MINDBODY app further aggregates compelling introductory offers for first time visitors that encourages consumers to try new things. These benefits increase the consumer's likelihood to repeat wellness experiences more frequently, which we believe enhances their health and happiness.

- *Broadened Access to Wellness.* Our growing suite of web and mobile interfaces, as well as our consumer partnerships, surface transaction-enabled class and appointment inventory, enticing more people to adopt wellness practices. We also believe that our ability to allow consumers to more easily manage their wellness routine and consume more wellness services on a regular basis increases their engagement in wellness activities and encourages them to live a more active and full life.

- *Cost Savings and Increased Availability.* We believe that dynamic pricing will enable price-sensitive consumers, such as those who are more flexible with their time or are willing to book further in advance, to find a class they can easily afford. Conversely, less price-sensitive consumers, such as busy professionals or travelers, will be more likely to find a popular experience for which they are willing and able to pay a premium.

- *Ability to Track Personal Health Data with Each Wellness Activity.*  New technologies, including third-party wearable fitness trackers and mobile apps within the health and fitness category enable consumers to track various aspects of their health and fitness.  As part of this trend, the MINDBODY app offers consumers the ability to track their personal health data and to monitor the effectiveness of their wellness activities.  With the MINDBODY app, consumers can access their wellness activity history, such as class attendance frequency and class duration, as well as personal activity data tracked by integrated wearable devices.

*Benefits to customers and wellness practitioners:*

- *Increased Growth in Client Base and Revenue.*  We help our customers increase their client base by taking advantage of a free business listing on the MINDBODY app, allowing them to attract a larger pool of consumers.  Customers who choose to opt in to the fee-based MINDBODY Network receive greater exposure through additional promotion of their introductory offers or deals on various screens throughout the app, as well as featured placement on third-party partner apps and/or websites. Customers can also opt in to fee-based dynamic pricing, which allows them to dynamically price their inventory based on demand factors such as class times, day of the week, popularity and more.

8

Table of Contents

This helps them sell under-utilized inventory and fill their classes, while maximizing revenue by charging more for classes with the highest demand. Moreover, by having the ability to send reminders, promotions and special offers via email, text, push or in-app notifications to clients based on a record of their past interactions, customers can increase their client engagement and loyalty.  We also help customers sell their products and services through a variety of channels: an online store, their website, social sites, or the MINDBODY Network thus helping them to increase their revenue opportunities.

- *Mobility*. The MINDBODY app and our branded mobile apps give consumers fast and convenient access to wellness services in their local communities. The business app and class check-in app help customers manage their business and classes on the go. Customers can also utilize these mobile apps to enhance their consumer experience, offering in-app membership contract and liability waivers as well as push notifications.

- *Simplified Operations*.  Our business management software and payments platform allows customers and practitioners to streamline and simplify their operations.  MINDBODY automates a large number of time-consuming workflows, thus reducing the administrative effort and time customers and their employees need to invest in business operations.

- *Greater Focus on Clients*.  By simplifying the operations of wellness businesses, we enable customers and practitioners to focus on their clients.  In addition, our analytical tools provide critical insights that help customers focus on optimizing their business and achieving their goals.

**Competition**

The market for business management software and payments solutions for wellness businesses, as well as wellness booking services for consumers, is highly competitive, fragmented and rapidly evolving due to technological innovations.  We believe our competitors fall into the following primary categories:

- On-premise software providers and small cloud-based providers that typically focus on a specific vertical within the wellness services industry;

- Cloud-based software providers that offer generic scheduling tools with minimal customization by vertical;

- Payments services providers that offer basic scheduling tools; and

- Consumer apps and websites that offer wellness inventory at a discount or for a monthly subscription fee.

In addition, for some small to medium-sized organizations, we compete with basic productivity tools that these organizations have adapted for scheduling and business management uses, including desktop applications (*e.g.*, Microsoft Office, Google Docs) and pen and paper for tracking and management purposes.

The principal competitive factors in our market include:

- Industry expertise

- Depth of product functionality and ease of use

- Brand recognition and reputation

- Ability to drive consumer demand via a large and rapidly growing consumer network

- 24/7 customer service

- Price

- Product extensibility via APIs

- Partnerships and integrations with major consumer brands

- Integration with mobile devices

- Payment processing integration

- Marketing capabilities and analytics

- Strong company culture

- Security and reliability

- Global presence

Table of Contents

We believe that we compete favorably on the factors described above.  However, some of our competitors have greater financial, technical and other resources, greater name recognition and larger sales and marketing budget; therefore, we may not always compare favorably with respect to some or all of the factors above.

## Our Technology

We have developed our proprietary technology platform over the last decade, with a focus on delivering industry-leading breadth and flexibility of functionality.  Our platform is built API-first with a service-oriented multi-tenant architecture, making it fully extensible to our business and consumer web and mobile applications, as well as complementary technology partner integrations.  Maintaining the integrity and security of our technology platform is mission critical to our business and our customers' success.

- *Reliable*.  Our platform is engineered to provide high reliability and availability.  Our agreements with customers typically provide for limited service level commitments. In certain circumstances, our customers may be eligible for credits if we are unable to meet these service level commitments. Our infrastructure is hosted in two dual redundant Tier 4 (the highest rating available) data centers separately located in North America.  Our network operations center provides 24/7 monitoring of hundreds of sensors on all systems, including global synthetic and real user monitoring, to ensure we have complete visibility into our platform and are able to instantly respond to any potential service issue.

- *Secure*.  Our platform hosts a large quantity of customer data and processes a large volume of business-to-consumer transactions.  We therefore maintain a comprehensive security program designed to help safeguard the confidentiality, integrity and availability of our customers' data, which includes both organizational and technical control measures.  Our platform includes a host of third-party encryption, malware prevention, firewall and intrusion detection, data loss detection and patch management technologies to protect and maintain all systems.  We routinely test and review our security program.  In addition, we regularly obtain third-party security audits of our technical operations and procedures covering data security including the PCI-DSS, as well as Statement on Standards for Attestation Engagements No. 16, or SSAE 18, and Service Organizations Controls 2, or SOC 2, Type 1 and Type 2 Attestations.

- *Scalable*.  We have developed a robust and scalable platform that processes millions of queries per day. By leveraging best-in-breed technology components, server virtualization and a service-oriented architecture, we believe we can seamlessly scale our compute and storage capacity.

- *Dynamic Cloud-Based Architecture*.  Our software platform is powered by a dynamic cloud-based architecture that allows our customers to manage their operations as efficiently as possible, while requiring low upfront investment and no maintenance.  This architecture allows for automatic software updates and rapid launch of new product features while also allowing our platform to easily scale with customers as their businesses grow.

## Our Customers

We have a diverse customer base with approximately 59,000 subscribers located in over 100 countries and territories across a variety of industries within the wellness services industry.  No single customer, API partner, or technology partner represented more than 10% of our total revenue in any of fiscal 2017, 2016 or 2015. As of December 31, 2017 and 2016, one trade receivable represented 17% and 15% of our total accounts receivable balance, respectively.

## Our Culture and Employees

Our company and employees share an exceptional corporate culture that is built upon a detailed set of core values that are reinforced throughout the Company through new hire orientation, monthly corporate wellness initiatives and annual performance appraisals.  Our employees thrive in a nurturing environment that is driven by innovation, passion for health and wellness and dedication towards excellent customer experience.

As of December 31, 2017, we had 1,426 employees.  None of our employees is represented by a labor organization or is a party to any collective bargaining arrangement.  We have never had a work stoppage, and we consider our relationship with our employees to be good.

Table of Contents

**Sales and Marketing**

We deploy a direct sales approach driven by an outbound tele-sales team located primarily in San Luis Obispo, California with several regional offices throughout the United States, and locations in the United Kingdom and Australia. Our sales team qualifies and manages prospective and current customers, aiming to initiate, retain and expand their use of our platform over time. Our sales team partners with sales engineers to provide consultation and product demonstration to prospects to accelerate the onboarding of new customers.

Our marketing efforts are focused on generating awareness of our platform and consumer app, creating sales leads, establishing and promoting our brand, and cultivating a community of successful and vocal customers and consumers. We utilize both online and offline marketing initiatives, including search engine and email marketing, online display and print advertising, participation in trade shows, events and conferences, permission marketing, social media and media outreach, mass media and strategic partnerships and endorsements.

Our sales prospecting, lead qualification and lead development functions are performed by sales development representatives and lead acquisition specialists. Our sales and marketing headcount as of December 31, 2017 was 471. Our sales and marketing expenses were $71.8 million, $56.5 million and $46.3 million for the years ended December 31, 2017, 2016 and 2015, respectively.

**Research and Development**

Our research and development organization is responsible for the ideation, research, design, development and testing of all aspects of our platform. To create a roadmap that meets the needs of our customers, we emphasize collaboration during the development process. Customers provide direct input through dialog with our customer support, product management and user experience teams, as well as our community forum and feature utilization data. We deploy new features, functionality and technologies for our platform through monthly software releases or updates to minimize disruption and deliver continuous improvement.

As of December 31, 2017, we had 243 employees in our research and development organization, which is based primarily in San Luis Obispo, California. Our research and development expenses were $35.8 million, $30.3 million and $23.1 million, for the years ended December 31, 2017, 2016 and 2015, respectively.

**Intellectual Property**

We rely on a combination of trade secret, copyright and trademark laws, a variety of contractual arrangements, such as license agreements, assignment agreements, confidentiality and non-disclosure agreements and confidentiality procedures and technical measures to gain rights to and protect the intellectual property used in our business.

We have also developed a patent program and a strategy to identify, apply for, and secure patents for innovative aspects of our platform and technology. We have eight U.S. patent applications pending. We also have four pending patent applications in jurisdictions outside of the United States. We intend to pursue additional patent protection to the extent we believe it would be beneficial and cost-effective.

We actively pursue registration of our trademarks, logos, service marks and domain names in the United States and in other key jurisdictions. We are the registered holder of a variety of U.S. and international domain names that include the term MINDBODY and similar variations. We use several trademarks or registered trademarks for our products and services, including "MINDBODY," and several logos and images, such as the Enso logo, as well as the slogans "LOVE YOUR BUSINESS," "BOOK YOUR BEST DAY. EVERY DAY." and "CONNECTING THE WORLD TO WELLNESS."

We also rely on certain intellectual property rights that we license from third parties, including under certain open source licenses. Though such third-party technologies may not continue to be available to us on commercially reasonable terms, we believe that alternative technologies would be available to us, if needed.

Our policy is to require employees and independent contractors to sign agreements assigning to us any inventions, trade secrets, works of authorship, developments and other processes generated by them on our behalf and agreeing to protect our confidential information. All of our key employees have done so. In addition, we generally enter into confidentiality agreements or have confidentiality provisions in our agreements with our vendors and customers. We also control and monitor access to, and distribution of, our software, documentation and other proprietary information.

Despite our precautions, it may be possible for unauthorized third parties to copy our products and use information that we regard as proprietary to create products and services that compete with ours.

11

Table of Contents

Some license provisions protecting against unauthorized use, copying, transfer and disclosures of our products may be unenforceable under the laws of certain jurisdictions and foreign countries.  In addition, the laws of some countries do not protect proprietary rights to as great of an extent as the laws of the United States, and many foreign countries do not enforce these laws as diligently as government agencies and private parties in the United States.  To the extent that we expand our international activities, our exposure to unauthorized copying and use of our products and misappropriation of our proprietary information may increase.

We expect that software and other solutions in our industry may be increasingly subject to third-party infringement claims as the number of competitors grows and the functionality of products in different industry segments overlap.

## Seasonality

We believe there are significant seasonal factors that may cause us to record higher revenue in some quarters compared with others.  We believe this variability is largely due to our focus on the wellness services industry, as many of our customers experience an increase in demand for their services in the first quarter of each year due to consumers becoming more motivated to pursue health and fitness goals in the new year. However, this seasonality may not be fully evident in our historical business performance because of our significant growth. If our revenue growth rate slows, we expect that the seasonality in our business may become more pronounced and may cause our operating results to fluctuate in the future. In addition, as we attempt to expand the number of our customers and consumers, we may see changes to this pattern of seasonality.

## Segments

We have one operating and reporting segment consisting of various products and services that are all related to our integrated cloud-based business management software and payments platform for the wellness services industry. For our revenue, net loss and total assets, see our Consolidated Financial Statements included in Part IV, Item 15 of this Annual Report on Form 10-K.

## Geographic Information

Financial information about geographic areas is set forth in Note 12 of the Notes to Consolidated Financial Statements included in Part IV, Item 15 of this Annual Report on Form 10-K. For a discussion of the risks attendant to foreign operations, see the information in Part 1, Item 1A: "Risk Factors" under the caption "Our international sales and operations subject us to additional risks that can adversely affect our business, operating results and financial condition."

## Government Regulation

As a service provider to our customers, we must comply with a number of federal, state and international laws and regulations regarding security, data protection and the privacy and protection of consumer data that affect companies conducting business on the Internet. In addition, in connection with providing online scheduling services for certain customers, we may be subject to specific compliance obligations under HIPAA and similar state laws that govern the collection, use, protection and disclosure of personally identifiable information.  HIPAA imposes specific requirements regarding data privacy and security on covered entities (providers, health plans and health care clearinghouses); business associates (entities that may perform services for covered entities, pursuant to which they may access personal information); and business associates' subcontractors, including us.   There may be civil and criminal penalties, as well as contractual ramifications, for violating HIPAA.

Table of Contents

## Corporate Information

We were organized as a California limited liability company in February 2001 and converted into a California corporation in October 2004. We were reincorporated in Delaware in March 2015. Our principal executive offices are located at 4051 Broad Street, Suite 220, San Luis Obispo, California 93401, and our telephone number is (877) 755-4279. Our website address is https://www.mindbodyonline.com, and our investor relations website is http://investors.mindbodyonline.com.  Information contained on, or that can be accessed through, our website, does not constitute part of and is not incorporated by reference into this Annual Report on Form 10-K or in any other report or document we file with the SEC, and any references to our website are intended to be inactive textual references only.

Unless expressly indicated or the context requires otherwise, the terms "MINDBODY," "company," "we," "us," and "our" in this Annual Report on Form 10-K refer to MINDBODY, Inc., a Delaware corporation, and, where appropriate, its wholly owned subsidiaries. The Enso design logo, "MINDBODY," as well as the slogans "LOVE YOUR BUSINESS," "BOOK YOUR BEST DAY. EVERY DAY." and "CONNECTING THE WORLD TO WELLNESS" are trademarks or registered trademarks of MINDBODY.  Other trademarks and trade names referred to in this Annual Report on Form 10-K are the property of their respective owners. Except as set forth above and solely for convenience, the trademarks and tradenames in this Annual Report on Form 10-K are referred to without the ® and ™ symbols, but such references should not be construed as any indicator that their respective owners will not assert, to the fullest extent under applicable law, their rights thereto.

## Available Information

We file annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to reports filed or furnished pursuant to Sections 13(a) and 15(d) of the Exchange Act. The public may obtain these filings at the Securities and Exchange Commission's, or SEC, Public Reference Room at 100 F Street, NE, Washington, DC 20549 or by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website at www.sec.gov that contains reports, proxy and information statements and other information that we file with the SEC electronically. We make available on our website, free of charge, our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and any amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

We webcast our earnings calls and certain events we participate in or host with members of the investment community on our investor relations page of our website located at investors.mindbodyonline.com. Press releases and corporate governance information, including our board committee charters, code of business conduct and ethics and corporate governance guidelines, are also available on the investor relations page of our website.

## Executive Officers of MINDBODY

The following table provides information regarding our executive officers as of February 22, 2018:

| Name | Age | Position |
|---|---|---|
| Richard Stollmeyer | 52 | Chief Executive Officer and Chairman of the Board of Directors |
| Michael Mansbach | 50 | President |
| Brett White | 55 | Chief Financial Officer and Chief Operating Officer |
| Kimberly Lytikainen | 51 | Chief Legal Officer, Secretary and Compliance Officer |
| Kunal Mittal | 39 | Chief Technology Officer |
| Mark Baker | 51 | Chief Revenue Officer |

***Richard Stollmeyer***. Mr. Stollmeyer is a founder and has served as our chief executive officer and as chairman of our board of directors since October 2004. He also served as our president from October 2004 to June 2017. Mr. Stollmeyer holds a B.S. degree in Political Science and Russian Language, with a concentration in International Relations, from the United States Naval Academy.

13

*Michael Mansbach*. Mr. Mansbach has served as our president since June 2017. From November 2015 to February 2017, Mr. Mansbach served as president of Blue Jeans Network, Inc., a cloud-based video communications company. From September 2014 to September 2015, Mr. Mansbach served as the chief executive officer of PunchTab, Inc., an engagement and insights platform. From November 2004 to April 2014, Mr. Mansbach served in various senior management roles with the software-as-a-service division of Citrix Systems, Inc., a provider of business mobility and security software, including as vice president, customer care from November 2013 to April 2014; vice president and general manager, global sales and client services from December 2007 to November 2013; and vice president, enterprise marketing and business development from November 2004 to December 2007. Mr. Mansbach received his B.A. degree in French Language and Literature from the University of California, Los Angeles, and his M.A. degree in International Economics, European Area Studies, from the Paul H. Nitze School of Advanced International Studies at The Johns Hopkins University.

*Brett White*. Mr. White has served as our chief financial officer since July 2013 and our chief operating officer since July 2016. From January 2008 to July 2013, Mr. White served as chief financial officer at Meru Networks, Inc., a provider of Wi-Fi solutions. From November 2005 to December 2007, Mr. White served as chief financial officer at Fortinet, Inc., a provider of network security solutions. Mr. White holds a B.A. degree in Business Economics from the University of California, Santa Barbara.

*Kimberly Lytikainen*. Ms. Lytikainen has served as our chief legal officer since January 2017, our corporate secretary since March 2015, and our compliance officer since June 2015. Ms. Lytikainen previously served as our general counsel from July 2014 through December 2016. From June 2013 to July 2014, Ms. Lytikainen served as associate general counsel at Pivotal Software, Inc., a provider of computer software and services. From April 2006 to June 2013, Ms. Lytikainen served as vice president, assistant general counsel at NVIDIA Corporation, a visual computing company. Ms. Lytikainen holds a B.A. degree in Political Science and Government from Florida State University, and a J.D. degree from Loyola Law School, Loyola Marymount University.

*Kunal Mittal*. Mr. Mittal has served as our chief technology officer since June 2016. From November 2015 to May 2016, Mr. Mittal served as our senior vice president of technology. From July 2008 to November 2015, Mr. Mittal served as executive director of enterprise technologies at Sony Pictures Entertainment Inc., a global entertainment company. Mr. Mittal holds a B.S. degree in Computer Science from Beloit College and an M.S. degree in Software Engineering from Walden University.

*Mark Baker*. Mr. Baker has served as our chief revenue officer since February 2018. From January 2017 to January 2018, he served as the executive vice president of global sales at Symphony Talent, LLC, a recruitment marketing SaaS platform company. From July 2014 to April 2016, Mr. Baker served as senior vice president, global sales, at Urban Airship, Inc., a SaaS mobile marketing platform company. From April 2010 to May 2014, Mr. Baker served in senior management roles with the Citrix Online division of Citrix Systems, Inc., a provider of business mobility and security software, providing SaaS-based collaboration and support solutions, including as vice president and general manager of sales and service - Americas from April 2010 to June 2013, and as vice president of global sales, SaaS division from June 2013 to May 2014. Mr. Baker holds a B.S. degree in Business, with an emphasis in Marketing, from Portland State University.

## Item 1A. Risk Factors

*Investing in our Class A common stock involves a high degree of risk.  You should carefully consider the following risks, together with all of the other information contained in this Annual Report on Form 10-K, including our financial statements and related notes, before making a decision to invest in our Class A common stock.  Any of the following risks could have a material adverse effect on our business, operating results and financial condition and could cause the trading price of our Class A common stock to decline, which would cause you to lose all or part of your investment.*

## Risks Related to Our Business

***We have a history of losses, and we may not achieve or maintain profitability in the future.  In addition, our revenue growth rate may not sustain the levels experienced in recent years.***

We have incurred a net loss in each year since our inception, including a net loss of $14.8 million, $23.0 million and $36.1 million in the years ended December 31, 2017, 2016 and 2015, respectively. We have expended and expect to continue to expend financial and other resources on, among other things:

- continuing the development of, and ongoing improvements to, our platform, including research and development investments in our technology infrastructure, the development or acquisition of new products, features and functionality and improvements to the scalability, availability and security of our platform;

- strategic acquisitions;

Table of Contents

- sales and marketing expenses, including personnel, lead generation and consumer advertising expenses;

- expenses related to international expansion in an effort to increase our customer and consumer base; and

- general and administrative expenses, including legal, regulatory, accounting and other expenses related to being a public company.

If we expend more resources on growing our business than currently anticipated or if we encounter unforeseen operating expenses, difficulties, complications and other unknown factors, we may not be able to achieve or sustain profitability and our operating results and business would be harmed.

For the years ended December 31, 2017, 2016 and 2015, our revenue was $182.6 million, $139.0 million and $101.4 million, respectively, representing a 31% and 37% growth rate, respectively. Our historical revenue growth rates are not necessarily indicative of future growth, and we may not achieve similar revenue growth rates in future periods.

***If we fail to increase market acceptance of our platform, enhance and adapt our platform to changing market dynamics and customer preferences, or keep pace with technological developments, our business, results of operations, financial condition and growth prospects would be adversely affected.***

We derive, and expect to continue to derive, a majority of our revenue and cash inflows from our integrated cloud-based business management software and payments platform for the wellness services industry. As such, market acceptance of this platform is critical to our success. Our ability to attract new customers and increase revenue from existing customers depends in part on our ability to enhance and improve our existing platform and to introduce new and innovative features, products and services, including features, products and services designed for a mobile user environment. Demand for our platform is affected by a number of factors, many of which are beyond our control, such as the timing of development and release of new products, features and functionality by our competitors, technological change, consumer preferences and growth or contraction in our addressable market.

To grow our business, we must develop features, products and services that reflect the changing nature of business management software and expand beyond our core scheduling and point-of-sale functionality to other areas of managing relationships with our customers and consumers. For example, in 2013, we expanded our platform to include MINDBODY Connect (now the MINDBODY app), in 2015 we introduced the MINDBODY Marketing Platform (now the MINDBODY Network), and in 2017 we introduced dynamic pricing. The success of these and any other enhancements to our platform depends on several factors, including timely completion, adequate quality testing and sufficient customer or consumer demand. Any new feature, product or service that we develop may not be introduced in a timely or cost-effective manner, may contain defects and/or may not achieve the market acceptance necessary to generate sufficient revenue. If we are unable to successfully develop new and innovative features, products or services, meet the demands and expectations of our customers and consumers for features, products and services that meet their needs and are easy to use and deploy, or enhance our existing platform to meet customer requirements, our ability to achieve widespread market acceptance of our platform will be undermined, and our business, results of operations, financial condition and growth prospects will be adversely affected.

In addition, because our platform is available over the Internet, we need to continuously modify and enhance our platform to keep pace with changes in Internet-related hardware, software, communications and database technologies and standards. If we are unable to respond in a timely and cost-effective manner to these rapid technological developments and changes in standards, our platform may become less marketable, less competitive, or obsolete, and our operating results will be harmed. If new technologies emerge that are able to deliver competitive products and applications at lower prices, more efficiently, more conveniently or more securely, such technologies could adversely impact our ability to compete. Our platform must also integrate with a variety of network, hardware, mobile and software platforms and technologies, and we need to continuously modify and enhance our products and services to adapt to changes and innovation in these technologies. Any failure of our platform to operate effectively with future infrastructure platforms and technologies could reduce the demand for our platform. If we are unable to respond to these changes in a cost-effective manner, our platform may become less marketable, less competitive or obsolete, and our operating results may be adversely affected.

15

Table of Contents

***Our business depends substantially on our customers renewing, upgrading, or expanding their subscriptions to our platform and our ability to sell subscriptions to a large number of new small and medium-sized businesses on a consistent basis and in a cost-effective manner. Any decline in the rate at which customers renew, upgrade, or expand their subscriptions could harm our future operating results.***

The vast majority of our subscription revenue is derived from subscriptions to our platform that have monthly terms, with some larger customers on longer term contracts. For us to maintain or improve our operating results, it is important that our customers renew, upgrade and/or expand their subscriptions. Our retention rate may decline or fluctuate as a result of a number of factors, including our customers' satisfaction with our platform, accessibility of our platform, our customer support, our prices, the prices of competing software systems, system uptime, network performance, data breaches, mergers and acquisitions affecting our customer base, the effects of global economic conditions and the strength of our customers' businesses. If our customers do not renew and/or expand their subscriptions or renew but shift to lower priced software subscriptions, our revenue may decline and we may not realize improved operating results from our customer base.

In addition, even if our market grows as expected, our business depends on our sales team's ability to sell subscriptions to a large number of new small and medium-sized businesses on a consistent basis, with each sale constituting only a small portion of our overall revenue. To achieve this type of customer growth and expansion in a cost-effective manner, it is crucial that our platform is easy to use and implement and remains accessible to our customers through our distribution channels without the need for excessive post-sale customer support. If we are unable to sell a large volume of subscriptions on a consistent basis, if we are forced to incur excessive costs to provide post-sale customer support, or if we are unable to retain, upgrade, or expand offerings to our existing customers, our business, results of operations, financial condition and growth prospects will be adversely affected.

***If pricing for our software subscriptions is not acceptable to our customers, our operating results will be harmed.***

We have, from time to time, increased the price of our software subscriptions and may do so again in the future. For example, we have implemented several price increases over the past few years, including most recently in February 2018 for some of our software levels. We believe these increases have caused and may continue to cause customers to leave our platform, and such increases may also have reduced, and in the future may reduce, the number of new customers adopting our software. We cannot guarantee that new or existing customers will adopt or renew subscriptions at our current prices. Additionally, in the future we may further refine our tiered pricing model and our software levels, and/or increase pricing. Such further changes may cause customers to migrate to lower level offerings or leave our platform entirely, which would adversely affect our customer numbers, and could adversely affect our revenue, gross margin, profitability, financial position and cash flow.

***If our network or computer systems are breached, unauthorized access to customer or consumer data is otherwise obtained, or denial-of-service attacks occur, our platform may be perceived as insecure, we may lose existing customers or fail to attract new customers, and we may incur significant liabilities.***

Use of our platform, including some of our third-party applications, involves the storage, transmission and processing of our customers' proprietary data, including personal or identifying information regarding their clients or employees. As a result, unauthorized access to, security breaches of, or denial-of-service attacks against our platform could result in the unauthorized access to or use of, and/or loss of, such data, as well as loss of intellectual property or trade secrets.

If any unauthorized access to our systems or data, security breach, or significant denial-of-service attack occurs or is believed to have occurred, our reputation and brand could be damaged, we could be required to expend significant capital and other resources to alleviate problems caused by such actual or perceived breaches or attacks and remediate our systems, and we could be exposed to a risk of loss, litigation or regulatory action and possible liability, some or all of which may not be covered by insurance, and our ability to operate our business may be impaired. We have in the past and may in the future experience denial-of-service attacks against our platform. If potential new customers or existing customers believe that our platform does not provide adequate security for the storage of personally identifiable or sensitive information or its transmission over the Internet, they may not adopt our platform or may choose not to renew their subscriptions to our platform, which could harm our business. Additionally, actual, potential or anticipated attacks may cause us to incur increasing costs, including costs to deploy additional personnel and protection technologies, train employees, and engage third-party experts and consultants. Our errors and omissions insurance policies covering certain security and privacy damages and claim expenses may not be sufficient to compensate for all potential liability. Although we maintain cyber liability insurance, we cannot be certain that our coverage will be adequate for liabilities actually incurred or that insurance will continue to be available to us on economically reasonable terms, or at all.

Because the techniques used to obtain unauthorized access or to sabotage systems change frequently and generally are not identified until they are launched against a target, we may be unable to anticipate these techniques or to implement adequate

preventative measures.  We may also experience security breaches that may remain undetected for extended periods of time.

16

Case 1:19-cv-08331-VEC    Document 37-10    Filed 02/18/20    Page 26 of 206

preventative measures.  We may also experience security breaches that may remain undetected for extended periods of time.

16

Table of Contents

Because data security is a critical competitive factor in our industry, we make statements in our privacy policies and terms of service, through our certifications to privacy standards, and in our marketing materials, describing the security of our platform, including descriptions of certain security measures we employ.  Should any of these statements be untrue, become untrue, or be perceived to be untrue, even if through circumstances beyond our reasonable control, we may face claims, including claims of unfair or deceptive trade practices, brought by the U.S. Federal Trade Commission, state, local or foreign regulators (*e.g.*, a European Union-based data protection agency) or private litigants.

***Because our platform can be used to collect and store personal information, domestic and international privacy and data security concerns could result in additional costs and liabilities to us or inhibit sales of our platform.***

Our customers can use our platform to use, collect and store personal or identifying information regarding their employees and clients. Federal, state and foreign governments and agencies have adopted laws and regulations concerning the collection and use of personally identifiable information obtained from their residents or by businesses operating within their jurisdiction.  The costs of compliance with and other burdens imposed by privacy-related laws, regulations and standards may limit the use or adoption of our platform, reduce overall demand for our platform, lead to significant fines, penalties or liabilities for noncompliance, or slow the pace at which we close sales transactions, any of which could harm our business.  Moreover, if our employees fail to adhere to adequate data protection practices around the usage of our customers' data, it may damage our reputation and brand.

We also expect that there will continue to be new proposed laws, regulations and industry standards concerning privacy, data protection and information security in the United States, the European Union and other jurisdictions, and we may not be able to predict the impact such future laws, regulations and standards may have on our business.  For example, in April 2016, the EU Parliament formally adopted the General Data Protection Regulation, or GDPR, which supersedes existing EU data protection legislation, imposes more stringent EU data protection requirements, and provides for greater penalties for noncompliance. The GDPR will be effective in May 2018. Complying with the GDPR has caused us to incur operational costs and divert attention from other operational priorities. Our efforts to bring practices into compliance before the effective date of the GDPR may not be successful. Additionally, in July 2016, the European Union and the United States adopted a new framework for legitimizing trans-Atlantic data flows, the EU-U.S. Privacy Shield. Uncertainty remains as to whether the EU-U.S. Privacy Shield and other legal mechanisms for the lawful transfer of data from the European Union to the United States will withstand legal challenges, whether from regulators or private parties. If one or more of the legal bases for transferring data from Europe to the United States is invalidated, it could affect the manner in which we provide our services or adversely affect our financial results. Moreover, if our privacy and data policies and practices, are, or are perceived to be, insufficient, customer demand for our platform could decline, and our business could be negatively impacted.

The U.S. Federal Trade Commission and numerous state attorneys general are also applying federal and state consumer protection laws to enforce regulations related to the online collection, use and dissemination of personally identifiable information and other data.  Some of these requirements include obligations on companies to notify individuals of security breaches involving particular personal information, which could result from breaches experienced by us or our service providers.  For example, our solutions must conform, in certain circumstances, to requirements set forth in the Health Insurance Portability and Accountability Act of 1996, or HIPAA, which governs the privacy and security of protected health information.  Through the provision of online scheduling services to certain of our customers, we may collect, access, use, maintain and transmit protected health information in ways that may be subject to certain of these laws and regulations.

Additionally, because we process a significant portion of our payments through debit or credit cards and enable our customers to engage in payments through our service, we are contractually required to maintain Payment Card Industry Data Security Standard, or PCI DSS, compliance as part of our information security program.   We also may be bound by additional, more stringent contractual obligations relating to our collection, use and disclosure of personal, financial and other data.  If we cannot comply with or if we incur a violation of any of these regulations or requirements, we could incur significant liability through fines and penalties imposed by credit card associations or other organizations or breach of contracts with our payment processors, either of which could have an adverse effect on our reputation, business, financial condition and operating results.

Finally, in March 2017, the U.K. government invoked Article 50 of the Lisbon Treaty to initiate the process to leave the European Union, which follows the results of the referendum in June 2016 in which the United Kingdom voted to leave the European Union.  The impact of the foregoing on data and privacy regulations in the United Kingdom remains uncertain.

We may find it necessary to change our business practices or expend significant resources to modify our software or platform to adapt to new laws, regulations and industry standards concerning these matters.  We may be unable to make such changes and modifications in a commercially reasonable manner or at all. Any failure to comply with federal, state or foreign laws or regulations, industry standards or other legal obligations, or any actual or suspected security incident, may result in governmental enforcement actions and prosecutions, private litigation, fines, penalties or adverse publicity and could cause our customers to lose trust in us, which could have an adverse effect on our reputation and business.

Table of Contents

***Interruptions or performance problems associated with our technology and infrastructure may adversely affect our business and operating results.***

Our continued growth depends in part on the ability of our existing and potential customers and consumers to access our platform at any time and within an acceptable amount of time.  Our platform is proprietary, and we rely on the expertise of members of our engineering, operations and software development teams for our platform's continued performance.  In addition, we depend on external data centers to host our applications. While we control and have access to our servers located in our external data centers, we do not control the operation of these facilities. We have experienced, and may in the future experience, disruptions, outages and other performance problems related to our platform due to a variety of factors, including infrastructure changes, introductions of new functionality, human or software errors, delays in scaling our technical infrastructure if we do not maintain enough excess capacity and accurately predict our infrastructure requirements, capacity constraints due to an overwhelming number of users accessing our platform simultaneously, denial-of-service attacks or other security-related incidents.  For example, we have been the subject of denial-of-service attacks that have rendered our core software inaccessible for several hours.  In addition, from time to time we experience limited periods of server downtime due to server failure or other technical difficulties.  In some instances, we may not be able to identify the cause or causes of these performance problems within an acceptable period of time.  It may become increasingly difficult to maintain and improve our performance, especially during peak usage times and as our platform becomes more complex and our user traffic increases due to, among other things, a growing number of customers and consumers originating from and demanding service in a greater number of countries.  If our platform is unavailable or if our users are unable to access our platform within a reasonable amount of time, or at all, our business would be adversely affected and our brand could be harmed.  In the event of any of the factors described above, or certain other failures of our infrastructure, customer or consumer data may be permanently lost.  Moreover, our agreements with customers typically provide for limited service level commitments. Our customers may be eligible for credits if we are unable to meet these service level commitments.  If we experience significant periods of service downtime in the future, we may be subject to claims by our customers against these service level commitments.  To the extent that we do not effectively address capacity constraints, upgrade our systems as needed, and continually develop our technology and network architecture to accommodate actual and anticipated changes in technology, our business and operating results may be adversely affected.

***Real or perceived errors, failures, or bugs in our platform could adversely affect our operating results and growth prospects.***

Because our platform is complex, undetected errors, failures, vulnerabilities or bugs may occur, especially when updates are deployed or if there are issues with our secure access management procedures.  Our platform is often used in connection with computing environments with different operating systems, system management software, equipment and networking configurations, which may cause errors in or failures of our platform or other aspects of the computing environments.  In addition, deployment of our platform into complicated, large-scale computing environments may expose undetected errors, failures, vulnerabilities or bugs in our platform.  Despite testing by us, errors, failures, vulnerabilities or bugs may not be found in our platform until after it is deployed to our customers or consumers.  We have discovered, and expect to discover in the future, software errors, failures, vulnerabilities and bugs in our platform, and we anticipate that certain of these errors, failures, vulnerabilities and certain bugs can only be discovered and remediated after deployment to customers.  Real or perceived errors, failures or bugs in our platform could result in negative publicity, loss of or delay in market acceptance of our platform, loss of competitive position or claims by customers for losses sustained by them.  In such an event, we may be required, or may choose for customer relations or other reasons, to expend additional resources in order to help correct the problem and or repair goodwill with our customers.

***Our payments platform is a core element of our business, and any failure to grow and develop our payment processing activities, or to anticipate changes in consumer behavior, could materially and adversely affect our business and financial results.***

Our payments platform is a core element of our business.  For the years ended December 31, 2017, 2016 and 2015, our payments platform generated 39%, 39% and 37% of our total revenue, respectively. Our future success depends in large part on the continued growth and development of our payments platform.  If such activities are limited, restricted, curtailed or degraded in any way, or if we fail to continue to grow and develop such activities, our business may be materially and adversely affected.

The continued growth and development of our payments platform will depend on our ability to anticipate and adapt to changes in consumer behavior.  For example, consumer behavior may change regarding the use of payment types, including the relative increased use of cash, ACH, crypto-currencies, card-based transactions, and other emerging or alternative payment methods and payment systems that we or our processing partners do not adequately support or that do not provide adequate commissions to Independent Sales Organizations such as us. Any failure to timely integrate emerging payment methods (*e.g.,* Alipay, Bitcoin or other crypto-currencies) into our software, anticipate consumer behavior changes, or contract with processing partners that support such emerging payment technologies could cause us to lose traction among our customers, resulting in a corresponding loss of revenue, in the event such methods become popular among their consumers.

18

Table of Contents

***Our payments platform is subject to U.S. and international rules and regulations, some of which are still developing.  If we fail to comply with such rules and regulations or if new laws, rules or practices applicable to payment systems restrict our ability to collect fees from our payments platform, our financial results could be materially and adversely effected.***

Payment processing is subject to extensive regulation in the United States and other countries where we operate, and presents a wide range of risks.  We may encounter increased regulatory scrutiny and new regulatory compliance requirements brought about by evolving laws, rules and regulations.  Some of the payment processing activities on our platform are subject to price controls within the United States and other countries, and may be subject to an increase of price controls, including controls limiting the amount we are allowed to charge customers for processing transactions.  In addition, certain countries limit payments-related activities by foreign companies, including by restricting the transfer of funds out of such countries.  Changes in the laws, rules or practices applicable to payment systems such as VISA, MasterCard or American Express, among others, including changes resulting in increased costs that we or our customers must pay, may force changes to our payments platform that could adversely affect our business.

***If we incur an actual or perceived breach to our payments platform, we may incur significant liabilities and our brand and reputation may be damaged.***

We may suffer an attack on our payments platform that results in a breach of consumer cardholder data.  We maintain payment records of our customers and consumers on our payments platform, and we are a potential target for hackers and other parties attempting to steal card data via cyber-attacks or other means.  As we increase our consumer base and our brand becomes more widely known and recognized, we may become more of a target for these malicious third parties.  If we experience any actual or perceived data breach as a result of third-party actions, employee negligence or error, or malfeasance, whether or not resulting in the unauthorized acquisition of or access to cardholder data, we could incur significant liability, our business may suffer and our brand and reputation may be damaged.  We could be required to pay extensive fines and costs related to any such data breach, including costs incurred to replace cards and cardholder information and provide security monitoring services, and we could lose future sales and customers, any of which could harm our business and operating results.  Such fines and costs could become due soon after such breach and exceed the amount of cash available to us, thereby impacting our ability to operate our business.  In addition, a data breach or failure to comply with rules or regulations of payment systems could also result in the termination of our status as a registered Independent Sales Organization / Merchant Service Provider, thereby dramatically impairing our ability to continue doing business in the payments industry.

***We are subject to risks related to our reliance on third-party processing partners to perform our payment processing services.***

We depend on our third-party processing partners to perform payment processing services.  Our processing partners may go out of business or otherwise be unable or unwilling to continue providing such services, which could significantly and materially reduce our payments revenue and disrupt our business.  A number of our processing contracts require us to assume liability for any losses our processing partners may suffer as a result of losses caused by our customers, including losses caused by chargebacks and consumer or customer fraud.  We have in the past and may in the future incur losses caused by chargebacks and fraud.  In the event of a significant loss by our processing partners, we may be required to remit a large amount of cash following such event and, if we do not have sufficient cash on hand, may be deemed in breach of such contracts.  In addition, our customers may be subject to quality issues related to products or services provided by our third-party processing partners or we may become involved in contractual disputes with our processing partners, both of which could impact our reputation and adversely impact our revenue.  Certain contracts may expire or be terminated, and we may not be able to replicate the associated revenue through a new processing partner relationship for a considerable period of time.

We have initiated and expect to continue to initiate new third-party payment relationships or migrate to other third-party payment partners in the future.  The initiation of these relationships and the transition from one relationship to another could require significant time and resources.  Due to non-solicitation obligations under our existing contracts, establishing these new relationships may be challenging. Further, any new third-party payment processing relationships may not be as effective, efficient or well received by our customers and consumers, nor is there any assurance that we will be able to reach an agreement with such processing partners.  Our contracts with such processing partners may be less lucrative.  For instance, we may be required to pay more for payment processing or receive a less favorable revenue arrangement from our payment processing partners.  We may also experience the termination of revenue streams due to such migrations or be subject to claims relating to any disputes that could arise as a result of migrations.

19

Table of Contents

***We may undertake to directly perform certain payment processing services and expand the scope of payment processing services we provide, which may require a significant investment of time and resources, and expand our exposure to potential liabilities.***

In the future, we may undertake to directly perform certain payment processing services that we currently depend upon our processing partners to perform, expand the scope of payment processing services we provide, offer additional payment processing services or otherwise undertake additional responsibilities and liabilities related to such payment processing services. For example, in the future, we may undertake to act as a registered payment facilitator or payment service provider of the payment systems, providing merchants with a suite of services, including payment processing and funding and accepting payments as the merchant of record on behalf of other merchants. As part of our dynamic pricing functionality, we have undertaken to act as a payment service provider and the merchant of record for those dynamically priced classes booked on our mobile applications, and we may undertake to expand our role as a payment service provider to other areas of our platform. Any of these endeavors could require a significant investment of time and effective management of resources before presenting any potential upside for us, and may dramatically expand the scope of our potential contractual liability or exposure in the event of a lawsuit. Further, we may fail to effectively execute in performing such an expansion of services.

***The market for business management software is intensely competitive, and if we do not compete effectively, our operating results could be harmed.***

The market for business management software for the wellness services industry is fragmented and rapidly evolving, with relatively low barriers to entry. We face competition from in-house developed software systems, other software companies, and traditional paper-based methods. Our competitors vary in size and in the breadth and scope of the products and services they offer. In addition, there are a number of companies that are not currently direct competitors but that could in the future shift their focus to the wellness services industry and offer competing products and services. Some of these companies, such as Intuit and Square, have or may in the future acquire greater financial and other resources than we do and could bundle competing products and services with their other offerings or offer such products and services at lower prices as part of a larger sale. There is also a risk that certain of our current business partners could terminate their relationships with us and use the insights they have gained from partnering with us to introduce their own competing products. Many of our current and potential competitors have greater name recognition, established marketing relationships, access to larger customer bases and pre-existing relationships with customers, consultants, system integrators and resellers. Additionally, some potential customers in the wellness services industry, particularly large organizations, have elected, and may in the future elect, to develop their own business management software. Certain of our competitors have partnered with, or have acquired or been acquired by, and may in the future partner with or acquire, or be acquired by, other competitors to offer services, leveraging their collective competitive positions, which makes, or would make, it more difficult to compete with them. Moreover, we may also face competition from wellness booking services for consumers, or other consumer app or website companies, particularly as we grow our consumer brand and awareness.

Our competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards or customer requirements. With the introduction of new technologies, the evolution of our platform and new market entrants, we expect competition to intensify in the future. Pricing pressures and increased competition generally could result in reduced sales, reduced margins, increased churn, reduced customer retention, further losses or the failure of our platform to achieve or maintain more widespread market acceptance, any of which could harm our business. For all of these reasons, we may fail to compete successfully against our current and future competitors, and if such failure occurs, our business will be harmed.

20

Table of Contents

***Failure to effectively expand our sales and marketing capabilities could harm our ability to increase our customer base and achieve broader market acceptance of our platform.***

Increasing our customer base and number of active consumers, upgrading and expanding services to our existing customers, and achieving broader market acceptance of our platform will depend, to a significant extent, on our ability to effectively expand our sales and marketing operations and activities, including internationally.  We are substantially dependent on our marketing organization to generate a sufficient pipeline of qualified sales leads and on our direct sales force to close new customers.  From December 31, 2016 to December 31, 2017, our sales and marketing organizations decreased from 493 to 471 employees.  We plan to expand our direct sales and account development specialist workforce, both domestically and internationally.  We believe that there is significant competition for experienced sales professionals with the sales skills and technical knowledge that we require.  Our ability to achieve significant revenue growth in the future will depend, in part, on our success in recruiting, training, and retaining a sufficient number of experienced sales professionals.  New hires require significant training and time before they achieve full productivity, particularly in new sales segments and territories.  Our recent and planned hires may not become productive as quickly as we expect, and we may be unable to hire or retain sufficient numbers of qualified individuals in the future in the markets where we do business.  We cannot predict whether, or to what extent, our sales will increase, our existing customers will upgrade or expand their usage of our platform as we invest in our sales force, or how long it will take for sales personnel to become productive.  If our marketing organization does not generate a sufficient pipeline of qualified sales leads and our direct sales force is unable to close customers, our business and future growth prospects could be harmed.

***Any failure to offer high-quality customer support may adversely affect our relationships with our customers and our financial results.***

In deploying and using our platform, our customers depend on our 24/7 customer support team to resolve complex technical and operational issues, including ensuring that our platform is implemented in a manner that integrates with a variety of third-party platforms.  We may be unable to respond quickly enough to accommodate short-term increases in customer demand for customer support or to modify the nature, scope and delivery of our customer support to compete with changes in customer support services provided by our competitors.  Increased customer demand for customer support, without corresponding revenue, could increase costs and adversely affect our operating results.  Our sales are highly dependent on our business reputation and on positive recommendations from our existing customers.  Any failure to maintain high-quality customer support, or a market perception that we do not maintain high-quality customer support, could adversely affect our reputation and brand, our ability to sell our platform to existing and prospective customers, our business, operating results and financial position.

***Our quarterly results may fluctuate for various reasons, and if we fail to meet the expectations of analysts or investors, our stock price and the value of your investment could decline substantially.***

Our quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of our control.  If our quarterly financial results fall below the expectations of investors or any securities analysts who follow our stock, the price of our Class A common stock could decline substantially.  Some of the important factors that may cause our revenue, operating results and cash flows to fluctuate from quarter to quarter include but are not limited to:

- our ability to attract new customers, retain and increase sales to existing customers and satisfy our customers' requirements;

- the mix of our customer base, including the concentration of high value subscribers;

- the volume of transactions processed on our payments platform;

- the adoption of our fee-based dynamic pricing marketing services by our customers and consumers;

- significant security breaches, technical difficulties or interruptions to our platform and any related impact on our reputation;

- the variability of revenues derived from our partners;

- the number of employees added;

- the rate of expansion and productivity of our sales force;

- the entrance of new competitors in our market, whether by established companies or new companies;

- changes in our or our competitors' pricing;

- the amount and timing of operating costs and capital expenditures related to the expansion of our business, including

our sales force, and expenses related to the development or acquisition of technologies or businesses;

21

our sales force, and expenses related to the development or acquisition of technologies or businesses;

Table of Contents

- new pricing models, products, features or functionalities introduced by us or our competitors;

- the timing of payments by customers and other payment processing partners and payment defaults by customers or other payment processing partners;

- litigation, including class action litigation, involving our company, our services or our industry;

- general economic conditions or declines in consumer interest in the wellness industries that we serve, either of which may adversely affect either our customers' ability or willingness to purchase additional subscriptions, delay a prospective customer's purchasing decision, reduce the value of new subscription contracts or affect customer retention;

- changes in the relative and absolute levels of customer support we provide;

- changes in foreign currency exchange rates;

- extraordinary expenses such as litigation or other dispute-related settlement payments;

- the impact of new accounting pronouncements; and

- the timing of the grant or vesting of equity awards to employees.

Many of these factors are outside of our control, and the occurrence of one or more of them might cause our revenue, operating results and cash flows to vary widely. As such, we believe that quarter-to-quarter comparisons of our revenue, operating results and cash flows may not be meaningful and should not be relied upon as an indication of future performance.

***If we fail to effectively manage our growth in a manner that preserves the key aspects of our corporate culture, our business and operating results could be harmed.***

We believe that our corporate culture fosters innovation, creativity and teamwork.  However, as our organization grows, we may find it increasingly difficult to maintain the beneficial aspects of such culture, and the failure to do so could adversely impact our ability to retain and attract the kind of employees necessary for our future success.  If we are unable to manage our anticipated growth and change in a manner that preserves the key aspects of our culture, the quality of our products and services may suffer, which could adversely affect our brand and reputation and harm our ability to retain and attract customers.

***We depend on our executive officers and other key employees, and the loss of one or more of these employees or an inability to attract and retain highly skilled employees could adversely affect our business.***

Our success depends largely upon the continued services of our executive officers and other key employees, including our Chairman and Chief Executive Officer, Richard Stollmeyer.  We rely on our leadership team in the areas of research and development, operations, security, marketing, sales, support, general and administrative functions, and on individual contributors in our research and development and operations.  We have experienced, and may in the future experience, changes in our executive management team resulting from the hiring or departure of executives, which could disrupt our business.  We do not have employment agreements with our executive officers or other key personnel that require them to continue to work for us for any specified period, and, therefore, they could terminate their employment with us at any time.  The loss of one or more of our executive officers, especially our Chief Executive Officer, or other key employees, could have an adverse effect on our business.

In addition, to execute our growth plan, we must attract and retain highly qualified personnel.  Competition for these personnel in the locations where we maintain offices is intense, especially in the San Luis Obispo area, where our headquarters is located, due in part to the relatively close proximity to the San Francisco Bay Area.  We have from time to time experienced, and we expect to continue to experience, difficulty in hiring and retaining employees with appropriate qualifications.  In some cases, we have recruited employees from the San Francisco Bay Area and other regions with a greater supply of managerial, sales and engineering talent, and in such cases, we have sometimes found it necessary to offer compensation packages that were larger than would have been necessary if no relocation had been required.   We also outsource some of our research and development to India, which requires compliance with security protocols. Many of the companies with which we compete for experienced personnel have greater resources than we have and are located in areas in which sales and engineering talent is more readily available.  Moreover, job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment.  If the perceived value of our equity awards declines, our ability to recruit and retain highly skilled employees may be adversely impacted.  If we hire employees from competitors or other companies, their former employers may attempt to assert that these employees have breached their legal obligations, resulting in a diversion of our time and resources. If we fail to attract new personnel or fail to retain and motivate our current personnel, our business and future growth prospects could be adversely affected.

22

Table of Contents

***If we are not able to maintain and enhance our brand, then our business, operating results and financial condition may be adversely affected.***

We believe that maintaining and enhancing our reputation as a differentiated and category-defining business management software company serving the wellness services industry and consumers through a two-sided marketplace is critical to our relationship with our existing customers and to our ability to attract new customers. The successful promotion of our brand attributes will depend on a number of factors, including our marketing efforts, our ability to continue to develop high-quality software, and our ability to successfully differentiate our platform from competitive products and services.

The promotion of our brand requires us to make substantial expenditures, and we anticipate that the expenditures will increase as our market becomes more competitive and as we seek to expand our platform. To the extent that these activities yield increased revenue, this revenue may not offset the increased expenses we incur. If we do not successfully maintain and enhance our brand, our business may not grow, we may have reduced pricing power relative to competitors, and we could lose customers or fail to attract potential customers, all of which would adversely affect our business, results of operations and financial condition.

***Unfavorable conditions in our industry or the global economy or reductions in information technology spending could limit our ability to grow our business and adversely affect our operating results.***

Our operating results may vary based on the impact of changes in our industry or the global economy on us or our customers. The revenue growth and potential profitability of our business depend on demand for business management software generally and for business management software serving the wellness services industry in particular. Historically, during economic downturns, there have been reductions in spending on information technology as well as pressure for extended billing terms and other financial concessions. The adverse impact of economic downturns may be particularly acute among small and medium-sized businesses, which comprise the vast majority of our customer base. If economic conditions deteriorate, our current and prospective customers may elect to decrease their information technology budgets, which would limit our ability to grow our business and adversely affect our operating results.

***Our financial results may fluctuate due to increasing variability in our sales cycles resulting from, among other things, an expansion of the focus of our sales efforts to include larger organizations.***

We plan our expenses based on certain assumptions about the length and variability of our sales cycle. These assumptions are based upon historical trends for sales cycles and conversion rates associated with our existing customers, many of whom to date have been small to medium-sized organizations. As we expand our sales efforts to include larger organizations, we have incurred and expect to continue to incur higher costs and longer and more unpredictable sales cycles. With larger organizations, the decision to subscribe to our platform may require the approval of more technical personnel and management levels within a potential customer's organization than we have historically encountered, and if so, these types of sales would require us to invest more time educating these potential customers. In addition, larger organizations may demand more features and integration and customer support services. We have limited experience in developing and managing sales strategies for larger organizations and in successfully onboarding larger organizations as new customers. As a result of these factors, these sales opportunities may not prove to be successful or may require us to devote greater research and development, sales, customer support and professional services resources to individual customers, resulting in increased costs and reduced profitability, and will likely lengthen our typical sales cycle, which could strain our resources. Moreover, these larger transactions may require us to delay recognizing the associated revenue we derive from these customers until any technical or implementation requirements have been met, and larger customers may demand discounts to the prices they pay for our platform.

Other factors that may influence the length and variability of our sales cycle include but are not limited to:

- our pricing terms;

- the need to educate prospective customers about the uses and benefits of our platform;

- lead generation, including both inbound and outbound;

- the discretionary nature of purchasing and budget cycles and decisions;

- the competitive nature of evaluation and purchasing processes;

- evolving functionality demands;

- announcements or planned introductions of new products, features or functionality by us or our competitors; and

- lengthy purchasing approval processes, particularly among larger organizations.

23

Table of Contents

If we are unsuccessful expanding sales to larger organizations, our business and results of operations could be adversely affected. In addition, if we are unable to close one or more expected significant transactions with customers in a particular period, or if one or more expected transactions are delayed until a subsequent period, our operating results for that period, and for any future periods in which revenue from such transactions would otherwise have been recognized, may be adversely affected.

***Our future performance depends in part on our reliance on third-party platforms to distribute our mobile applications, and support from our partner ecosystem.***

We rely on third-party distribution platforms, including the Apple App Store and Google Play, for distribution of our mobile applications. We are subject to these platform providers' standard terms and conditions for application developers, which govern the promotion, distribution and operation of applications on their platforms. If we violate, or if a platform provider believes that we have violated, its terms and conditions, the platform provider may, at its discretion, discontinue or limit our access to their platform. We are currently in the process of operationalizing changes to our branded mobile apps offering to comply with Apple's recent changes to its terms of service. These platform providers have broad discretion to change their terms and conditions at any time, with or without notice to application developers, and to interpret their respective terms and conditions in a manner that limits, eliminates or otherwise interferes with our ability to distribute our mobile applications through their platforms. If Apple or Google took any of these steps to limit or otherwise interfere with our business, our business, financial condition and results of operations could be adversely affected.

We also depend on our partner ecosystem to create applications that will integrate with our platform.  This presents certain risks to our business, including:

- our API's security standards could limit integration possibilities for our apps with partners' products;

- these applications may not meet the same quality standards that we apply to our own development efforts (including, among other things, data and privacy protections), and to the extent they contain bugs or defects, they may create disruptions in our customers' use of our platform or adversely affect our brand;

- we do not currently provide substantive support for software applications developed by our partner ecosystem, and users may be left without adequate support and potentially cease using our platform if our partners do not provide adequate support for these applications;

- our partners may not possess the appropriate intellectual property rights to develop and share their applications;

- our relationship with our partners may change, particularly those partners who contribute or who have contributed more significantly to our revenue or demand for our platform, which could adversely affect our revenue and our results of operations;

- some of our partners may use the insight or access to data that they gain from integrating with our software and from information publicly available to develop competing products or product features; and

- our partners may establish relationships with, or functionality to offer to, our customers that diminish or eliminate the need or desire for our API platform.

Since many of these risks are not within our control, any new standards or requirements by these third-party developers or platforms could adversely affect our business, thereby reducing our revenue or increase our operating costs and adversely affecting our growth prospects.

***We have in the past completed acquisitions, and we may in the future acquire or invest in companies.  Such acquisitions and investments divert our management's attention and may in some cases result in additional dilution to our stockholders.  In addition, we may be unable to integrate the acquired businesses and technologies successfully or achieve the expected benefits of such acquisitions.***

We have in the past acquired companies, including our acquisition of HealCode LLC in 2016, Lymber Wellness, Inc. in 2017 and FitMetrix in 2018, and we may in the future evaluate and consider potential strategic transactions, including acquisitions of, or investments in, businesses, technologies, services, products and other assets in the future.  We also may enter into relationships with other businesses to expand our platform, which could involve preferred or exclusive licenses, additional channels of distribution, discount pricing or investments in other companies.

24

Any acquisition, investment or business relationship may result in unforeseen operating difficulties and expenditures. In particular, we may encounter difficulties assimilating or integrating the businesses, technologies, products, personnel or operations of the acquired companies, particularly if the key personnel of the acquired company choose not to work for us, their software is not easily adapted to work with our platform or we have difficulty retaining the customers of any acquired business due to changes in ownership, management or otherwise. The pursuit of potential acquisitions, whether or not they are consummated, may also disrupt our business, divert our resources and require significant management attention that would otherwise be available for development of our existing business. Moreover, the anticipated benefits of any acquisition, investment or business relationship may not be realized and/or we may be exposed to unknown risks or liabilities.

Negotiating these transactions can be time-consuming, difficult and expensive, and our ability to complete these transactions may be subject to approvals that are beyond our control. Consequently, these transactions, even if announced, may not be completed. For one or more of these transactions, we may:

- issue additional equity securities that would dilute our existing stockholders;

- use cash that we may need in the future to operate our business;

- incur large charges or substantial liabilities, whether known or unknown, associated with the acquisition;

- encounter difficulties maintaining relationships with customers and partners of the acquired business;

- encounter difficulties incorporating acquired technologies and rights into our platform, providing access and rights to our internal systems and of maintaining quality and security standards consistent with our reputation and brand;

- incur debt on terms unfavorable to us or that we are unable to repay;

- encounter difficulties retaining key employees of the acquired company, integrating diverse software codes or business cultures or coordinating organizations that are geographically diverse and that have different business cultures;

- incur impairment charges related to potential write-downs of acquired assets or goodwill;

- incur acquisition-related costs, which would be recognized as current period expenses; and

- become subject to adverse tax consequences, substantial depreciation or deferred compensation charges.

The occurrence of any of these risks could have a material adverse effect on our business operations and financial results.

***Real or perceived inaccuracies in our key, user and other metrics may harm our reputation and negatively affect our business.***

The numbers for certain of our key, user and other metrics, including, among others, active consumers, registered users of our applications and number of wellness practitioners employed by our customers, are calculated using internal company data based on the activity of customer and consumer accounts. While these numbers are based on what we believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in measuring usage of our platform, usage of specific features of our platform, and user information across large online and mobile populations around the world. For example, we estimate that approximately 41 million active consumers used our platform during the two years ended December 31, 2017. In calculating this number, we have attempted to avoid duplicative counting of consumers by identifying consumers who may have used our platform through different customers. However, in certain cases, a single consumer may have transacted with multiple customers under slightly different names, in which case there is a chance that we have counted the same consumer more than once. Given the challenges inherent in identifying whether a single consumer has engaged in transactions on our platform under different names, we do not have a reliable way of identifying the precise number of consumers using our platform. We are continuing to invest in our systems and controls to improve the precision and reliability of our metrics. If third parties, including investors and analysts, do not perceive our metrics to be accurate, or if we discover material inaccuracies in our metrics, we may be subject to liability and our reputation may be harmed, which could negatively affect our business and financial results.

25

Table of Contents

***Our international sales and operations subject us to additional risks that can adversely affect our business, operating results and financial condition.***

In the years ended December 31, 2017, 2016 and 2015, we derived 19%, 17% and 16%, respectively, of our revenue from customers located outside of the United States. We are continuing to expand our international operations as part of our growth strategy.  We currently have sales personnel and sales and customer support operations in the United States, the United Kingdom and Australia.  Our sales organization outside the United States is substantially smaller than our sales organization in the United States.  We believe our ability to convince new customers to subscribe to our platform or to convince existing customers to renew or expand their use of our platform is directly correlated to the level of engagement we obtain with the customer.  To the extent we are unable to effectively engage with non-U.S. customers due to our limited sales force capacity, we may be unable to effectively grow in international markets.

Our international operations subject us to a variety of additional risks and challenges, including:

- compliance with foreign privacy, information security and data protection laws and regulations and the risks and costs of non-compliance;

- differing technical standards, existing or future regulatory and certification requirements and required features and functionality;

- requirements or customer requests for localized software and licensing programs, and localized language support;

- increased management, travel, infrastructure and legal compliance costs associated with having international operations;

- uncertainty regarding the expected departure of the United Kingdom from the European Union;

- increased financial accounting and reporting burdens and complexities;

- longer payment cycles and difficulties in enforcing contracts, collecting accounts receivable or satisfying revenue recognition criteria, especially in emerging markets;

- requirements or preferences for domestic products;

- economic conditions in each country or region and general economic uncertainty around the world;

- compliance with laws and regulations for foreign operations, including anti-bribery laws (such as the U.S. Foreign Corrupt Practices Act of 1977, as amended, or the FCPA, the U.S. Travel Act, and the U.K. Bribery Act 2010), import and export control laws, tariffs, trade barriers, economic sanctions and other regulatory or contractual limitations on our ability to sell our platform in certain foreign markets, and the risks and costs of non-compliance;

- heightened risks of unfair or corrupt business practices in certain geographies and of improper or fraudulent sales arrangements that may impact our financial results and result in restatements of our consolidated financial statements;

- fluctuations in currency exchange rates and related effect on our operating results;

- difficulties in repatriating or transferring funds from or converting currencies in certain countries;

- communication and integration problems related to entering new markets with different languages, cultures and political systems;

- differing labor standards, including restrictions related to, and the increased cost of, terminating employees in some countries;

- the need or customer requests for localized language support;

- reduced protection for intellectual property rights in some countries and practical difficulties of enforcing rights abroad; and

- compliance with the laws of numerous foreign taxing jurisdictions, including withholding obligations, and overlapping of different tax regimes.

Any of these risks could adversely affect our international operations, reduce our international revenue or increase our operating costs, adversely affecting our business, operating results, financial condition and growth prospects.

26

Table of Contents

Compliance with laws and regulations applicable to our international operations substantially increases our cost of doing business in foreign jurisdictions.  We may be unable to keep current with changes in government requirements as they change from time to time.  Failure to comply with these regulations could have adverse effects on our business.  In many foreign countries, it is common for others to engage in business practices that are prohibited by our internal policies and procedures or U.S. or other regulations applicable to us.  Although we have implemented policies and procedures designed to ensure compliance with these laws and policies, there can be no assurance that all of our employees, contractors, partners and agents will comply with these laws and policies.  Violations of laws or key control policies by our employees, contractors, partners, or agents could result in delays in revenue recognition, financial reporting misstatements, enforcement actions, disgorgement of profits, fines, civil and criminal penalties, damages, injunctions, other collateral consequences, or the prohibition of the importation or exportation of our platform and services and could adversely affect our business and results of operations.

***We are subject to anti-corruption and anti-money laundering laws with respect to our operations and non-compliance with such laws can subject us to criminal and/or civil liability and harm our business.***

We are subject to the FCPA, the U.S. domestic bribery statute contained in 18 U.S.C. § 201, the U.S. Travel Act, the USA PATRIOT Act, the U.K. Bribery Act 2010 and Proceeds of Crime Act 2002, and possibly other anti-bribery and anti-money laundering laws in countries in which we conduct activities.  Anti-corruption laws are interpreted broadly and prohibit companies and their employees and third-party intermediaries from authorizing, offering, or providing, directly or indirectly, improper payments or benefits to recipients in the public or private sector.  We use third-party representatives to sell our products and services abroad.  In addition, as we increase our international sales and business, we may engage with additional business partners and third-party intermediaries to sell our products and services abroad and to obtain necessary permits, licenses and other regulatory approvals.  We or our third-party intermediaries may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities.  We can be held liable for the corrupt or other illegal activities of these third-party intermediaries, our employees, representatives, contractors, partners and agents, even if we do not explicitly authorize such activities.

Noncompliance with anti-corruption and anti-money laundering laws could subject us to whistleblower complaints, investigations, sanctions, settlements, prosecution, other enforcement actions, disgorgement of profits, significant fines, damages, other civil and criminal penalties or injunctions, suspension and/or debarment from contracting with certain persons, the loss of export privileges, reputational harm, adverse media coverage and other collateral consequences.  If any subpoenas or investigations are launched, or governmental or other sanctions are imposed, or if we do not prevail in any possible civil or criminal litigation, our business, results of operations and financial condition could be materially harmed.  In addition, responding to any action will likely result in a materially significant diversion of management's attention and resources and significant defense costs and other professional fees.  Enforcement actions and sanctions could further harm our business, results of operations and financial condition.

***Certain of our operating results and financial metrics may be difficult to predict as a result of seasonality.***

We believe there are significant seasonal factors that may cause us to record higher revenue in some quarters compared with others.  We believe this variability is largely due to our focus on the wellness services industry, as many of our customers experience an increase in demand for their services in the first quarter of each year due to their clients becoming more motivated to pursue health and fitness goals in the new year.  Our rapid growth rate over the last couple years may have made seasonal fluctuations more difficult to detect.  In addition, as we attempt to expand the number of our customers and consumers, we may see changes to this pattern of seasonality. If our rate of growth slows over time, seasonal or cyclical variations in our operations may become more pronounced, and our business, results of operations and financial position may be adversely affected.

***Our business and growth depend in part on the success of our strategic relationships with third parties, including payments partners, API platform partners and technology partners.***

We depend on, and anticipate that we will continue to depend on, various third-party relationships in order to sustain and grow our business.  We are highly dependent upon partners for certain critical features and functionality of our platform, including data centers and third-party payment processors supporting our payments platform.  Failure of these or any other technology providers to maintain, support or secure their technology platforms in general, and our integrations in particular, or errors or defects in their technology, could materially and adversely impact our relationship with our customers, damage our reputation and brand, and harm our business and operating results. Any loss of the right to use any of this hardware or software could result in delays or difficulties in our ability to provide our platform until equivalent technology is either developed by us or, if available, identified, obtained and integrated.

27

Table of Contents

Identifying, negotiating and documenting relationships with strategic third parties such as payments partners, API partners and technology partners requires significant time and resources.  In addition, integrating third-party technology is complex, costly and time-consuming.  Our agreements with these partners are typically limited in duration, non-exclusive and do not prohibit them from working with our competitors or from offering competing services.  Our competitors may be effective in providing incentives to third parties to favor their products or services or to prevent or reduce subscriptions to our platform.  In addition, our partners could develop competing products or services.

Our third-party partners may also suffer disruptions or weakness in their businesses unrelated to the relationships with us that could cause declines in their business performance. Such occurrences could be harmful to our financial results and cause our stock price to decline.

If we are unsuccessful in establishing or maintaining our relationships with these strategic third parties, our ability to compete in the marketplace or to grow our revenue could be impaired and our operating results could suffer.  Even if we are successful, we cannot assure you that these relationships will result in improved operating results.

***We depend and rely upon SaaS technologies from third parties and on technology systems and electronic communication networks that are supplied and managed by third parties to operate our business, and interruptions or performance problems with these technologies may adversely affect our business and operating results.***

We rely heavily on hosted SaaS applications from third parties in order to operate critical functions of our business, including sales automation and pipeline management, billing and order management, customer support, access to our API, IT support, enterprise resource planning, payroll and financial accounting services.  If these services become unavailable due to extended outages or interruptions, security vulnerabilities or cyber-attacks, including prolonged denial-of-service attacks, or because they are no longer available on commercially reasonable terms, our expenses could increase, our ability to manage finances could be interrupted and our processes for managing sales of our platform and supporting and communicating with our customers could be impaired until equivalent services, if available, are identified, obtained and implemented, all of which could adversely affect our business.

Our ability to provide services and solutions to our customers also depends on our ability to communicate with our customers through the public Internet and electronic networks that are owned and operated by third parties.  In addition, in order to provide services on-demand and promptly, our computer equipment and network servers must be functional 24 hours per day, which requires access to telecommunications facilities managed by third parties and the availability of electricity, which we do not control.  A severe disruption of one or more of these networks, including as a result of utility or third-party system interruptions, could impair our ability to process information, which could impede our ability to provide services to our customers, harm our reputation, result in a loss of customers and adversely affect our business and operating results.

***We are subject to risks related to litigation, including, among others, intellectual property , commercial and employment claims and regulatory disputes.***

From time to time we may become involved in legal proceedings or be subject to claims, lawsuits (whether class actions or individual lawsuits), government investigations and other proceedings involving alleged infringement of third-party patents and other intellectual property rights, or commercial, corporate and securities, privacy, accessibility, marketing and communications practices, labor and employment, wage and hour and other matters.  Our future success depends in part on not infringing upon the intellectual property rights of others.  From time to time, we may receive claims from third parties, including our competitors that our platform and underlying technology infringe or violate a third-party's intellectual property rights, and we may be found to be infringing upon such rights.  We may be unaware of the intellectual property rights of others that may cover some or all of our technology.  Any claims or litigation could cause us to incur significant expenses and, if successfully asserted against us, could require that we pay substantial damages or ongoing royalty payments, prevent us from offering our platform, or require that we comply with other unfavorable terms.  We may also be obligated to indemnify our customers or business partners in connection with any such litigation and to obtain licenses, modify our platform or refund subscription fees, which could further exhaust our resources.  In addition, we may incur substantial costs to resolve claims or litigation, whether or not successfully asserted against us, which could include payment of significant settlement, royalty or license fees, modification of our platform or refunds to customers of subscription fees.  Even if we were to prevail in the event of claims or litigation against us, such claims or litigation could be costly and time-consuming and divert the attention of our management and other employees from our business operations.

Table of Contents

***Our use of "open source" software could adversely affect our ability to sell our platform and subject us to possible litigation.***

We use open source software in our platform and expect to continue to use open source software in the future. We may face claims from others claiming ownership of, or seeking to enforce the terms of, an open source license, including by demanding release of the open source software, derivative works or our proprietary source code that was developed using such software. These claims could also result in litigation, require us to purchase a costly license or require us to devote additional research and development resources to change our platform, any of which would have a negative effect on our business and operating results. In addition, if the license terms for the open source software we utilize change, we may be forced to reengineer our platform or incur additional costs. Although we have implemented policies to regulate the use and incorporation of open source software into our platform, we cannot be certain that we have not incorporated open source software in our platform in a manner that is inconsistent with such policies.

***Any failure to protect our intellectual property rights could impair our ability to protect our proprietary technology and our brand.***

Our success and ability to compete depend in part upon our intellectual property. We currently have twelve pending patent applications, but there is no guarantee that such applications will result in issued patents. We primarily rely on copyright, trade secret and trademark laws, trade secret protection and confidentiality or license agreements with our employees, customers, partners and others to protect our intellectual property rights. However, the steps we take to protect our intellectual property rights may be inadequate.

To protect our intellectual property rights, we may be required to spend significant resources to monitor and protect these rights. Litigation brought to protect and enforce our intellectual property rights could be costly, time-consuming and distracting to management, and could result in the impairment or loss of portions of our intellectual property. Furthermore, our efforts to enforce our intellectual property rights may be met with defenses, counterclaims and countersuits attacking the validity and enforceability of our intellectual property rights. Our failure to secure, protect and enforce our intellectual property rights could adversely affect our brand and adversely impact our business.

***We may not be able to secure additional financing on favorable terms, or at all, to meet our future capital needs.***

We have funded our operations since inception primarily through equity financings, loan facilities, financing agreements for software and license maintenance and subscription payments by our customers for use of our platform. For instance, in May 2017, we completed a follow-on public offering in which we issued and sold 5,060,000 shares of our Class A common stock at a public offering price of $27.95 per share. In the future, we intend to continue to make investments to support our business growth, and we may require additional capital to respond to business opportunities, challenges, acquisitions, or unforeseen circumstances. We may not be able to timely secure additional debt or equity financing on favorable terms, or at all. Any debt financing obtained by us could involve restrictive covenants relating to financial and operational matters, which may make it more difficult for us to obtain additional capital and to pursue business opportunities, including potential acquisitions. If we raise additional funds through further issuances of equity, convertible debt securities or other securities convertible into equity, our existing stockholders could suffer significant dilution in their percentage ownership of our company, and any new equity securities we issue could have rights, preferences and privileges senior to those of holders of our Class A common stock. If we are unable to obtain adequate financing or financing on terms satisfactory to us, when we require it, our ability to continue to grow or support our business and to respond to business challenges could be significantly limited.

***Our loan agreement contains operating and financial covenants that restrict our business and financing activities.***

Borrowings under our loan agreement with Silicon Valley Bank are secured by substantially all of our assets, including our intellectual property. In addition, borrowings under our loan agreement are based on a percentage of our monthly recurring revenue for the prior months, up to $20 million, with an accordion feature that allows for additional borrowings under our loan agreement in an aggregate amount of $20 million, upon our request and subject to certain conditions. If our revenue declines, our ability to draw under the loan agreement could be adversely affected or if we were to draw under the loan agreement, a decline in our revenue could force us to repay all or a portion of the outstanding loan earlier than we may have originally anticipated.

Our loan agreement also restricts our ability to, among other things:

- sell or otherwise dispose of our assets;

- make material changes in our business;

- enter into a transaction in which stockholders who were not stockholders immediately prior to such transaction own

more than 40% of our voting stock after giving effect to such transaction;

29

Table of Contents

- consolidate, merge with, or acquire other entities;

- incur additional indebtedness;

- create liens on our assets;

- pay dividends or make other distributions on our capital stock;

- make investments;

- enter into transactions with affiliates; and

- pay off or redeem subordinated indebtedness.

These restrictions are subject to certain exceptions.  The operating and financial restrictions and covenants in the loan agreement, as well as any future financing agreements that we may enter into, could restrict our ability to finance our operations and to engage in, expand or otherwise pursue business activities and strategies that we or our stockholders may consider beneficial.  Our ability to comply with these covenants may be affected by events beyond our control, and future breaches of any of these covenants could result in a default under the loan agreement.

The loan agreement also contains customary events of default, subject to cure periods for certain defaults, including, among others, payment defaults, covenant defaults, the occurrence of a material adverse change in our business, defaults relating to certain legal processes affecting our assets or business, insolvency and bankruptcy defaults, cross-defaults to other material indebtedness, material judgment defaults and material misrepresentations.  Future defaults, if not waived, could cause all of the outstanding indebtedness under our loan agreement to become immediately due and payable and would permit Silicon Valley Bank to terminate all commitments to extend further credit and exercise remedies against the collateral in which we granted Silicon Valley Bank a security interest.

If we do not have or are unable to generate sufficient cash available to repay our debt obligations when they become due and payable, either upon maturity or in the event of a default, we may not be able to obtain additional debt or equity financing on favorable terms, if at all.  This could materially and adversely affect our liquidity and financial condition and our ability to operate and continue our business as a going concern.

***We face exposure to foreign currency exchange rate fluctuations.***

We conduct transactions in currencies other than the U.S. dollar.  While we have primarily transacted with customers and vendors in U.S. dollars, we have transacted in foreign currencies for subscriptions to our platform and expect to significantly expand the number of transactions with customers for our platform that are denominated in foreign currencies in the future.  As a result of such foreign currency exchange rate fluctuations, it could be more difficult to detect underlying trends in our business and results of operations.  In addition, to the extent that fluctuations in currency exchange rates, including, any fluctuations resulting from uncertainties relating to the expected departure of the United Kingdom from the European Union, cause our results of operations to differ from our expectations or the expectations of our investors, the trading price of our Class A common stock could be adversely affected.

We do not currently maintain a program to hedge transactional exposures in foreign currencies.  However, in the future, we may use derivative instruments, such as foreign currency forward and option contracts, to hedge certain exposures to fluctuations in foreign currency exchange rates.  The use of such hedging activities may not offset any or more than a portion of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place.  Moreover, the use of hedging instruments may introduce additional risks if we are unable to structure effective hedges with such instruments.

***We may be subject to additional tax liabilities in connection with our operations or due to future legislation, each of which could materially impact our financial position and results of operation.***

We are subject to federal and state income, sales, use, value added and other taxes in the United States and other countries in which we conduct business, and such laws and rates vary by jurisdiction.  We do not collect sales and use, value added and similar taxes in all jurisdictions in which we have sales, based on our belief that such taxes are not applicable.  Certain jurisdictions in which we do not collect sales, use, value added or other taxes on our sales may assert that such taxes are applicable, which could result in tax assessments, penalties and interest, and we may be required to collect such taxes in the future.

Table of Contents

Significant judgment is required in determining our worldwide provision for income taxes.  We generally conduct our international operations through wholly owned subsidiaries and report our taxable income in various jurisdictions worldwide based upon our business operations in those jurisdictions.  Our intercompany relationships are subject to complex transfer pricing regulations administered by taxing authorities in various jurisdictions.  These determinations are highly complex and require detailed analysis of the available information and applicable statutes and regulatory materials.  In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain.

Although we believe our tax practices and provisions are reasonable, the final determination of tax audits and any related litigation could be materially different from our historical tax practices, provisions and accruals. If we receive an adverse ruling as a result of an audit, or we unilaterally determine that we have misinterpreted provisions of the tax regulations to which we are subject, there could be a material effect on our tax provision, net income or cash flows in the period or periods for which that determination is made, which could materially impact our financial results.  Further, any changes in the taxation of our activities, including recent changes in U.S. tax laws, may increase our worldwide effective tax rate and adversely affect our financial position and results of operations.  In addition, liabilities associated with taxes are often subject to an extended or indefinite statute of limitations period.  Therefore, we may be subject to additional tax liability (including penalties and interest) for a particular year for extended periods of time.

***Our ability to use our net operating losses to offset future taxable income may be subject to certain limitations.***

As of December 31, 2017, we had federal and state net operating loss carryforwards, or NOLs, of $118.0 million and $103.0 million, respectively, due to prior period losses, which, subject to the following discussion, are generally available to be carried forward to offset our future taxable income, if any, until such NOLs are used or expire. Our federal NOLs begin to expire in the year ending December 31, 2025, and our state NOLs started to expire in 2016 for the earliest net operating loss layers. In general, under Section 382 of the U.S. Internal Revenue Code of 1986, as amended, or the Code, a corporation that undergoes an "ownership change" is subject to limitations on its ability to utilize its NOLs to offset future taxable income.  Similar rules may apply under state tax laws. During the year ended December 31, 2015, we completed an analysis under Section 382 of the Code through December 31, 2014, and determined that we experienced multiple ownership changes during this period which will limit future utilization of NOL carryforwards. U.S. federal NOLs of approximately $430,000 are expected to expire due to limitations under Section 382 and, as such, have not been reflected in the NOL carryforward above. Future changes in our stock ownership, some of which are outside of our control, could result in additional ownership changes under Section 382 of the Code. Furthermore, our ability to utilize NOLs of companies that we have acquired or may acquire in the future may be subject to limitations.  There is also a risk that due to regulatory changes, such as suspensions on the use of NOLs, or other unforeseen reasons, our existing NOLs could expire or otherwise be unavailable to offset future income tax liabilities.  For these reasons, we may not be able to realize a tax benefit from the use of our NOLs, whether or not we attain profitability

***Changes in laws and regulations related to the Internet or changes in the Internet infrastructure itself may diminish the demand for our platform, and could have a negative impact on our business.***

The future success of our business depends upon the continued use of the Internet as a primary medium for commerce, communication and business applications.  Federal, state or foreign government bodies or agencies have in the past adopted, and may in the future adopt, laws or regulations affecting the use of the Internet as a commercial medium.  Changes in these laws or regulations could require us to modify our platform in order to comply with these changes.  In addition, government agencies or private organizations have imposed and may impose additional taxes, fees or other charges for accessing the Internet or commerce conducted via the Internet.  These laws or charges could limit the growth of Internet-related commerce or communications generally, or result in reductions in the demand for Internet-based platforms and services such as ours.  In addition, the use of the Internet as a business tool could be adversely affected due to delays in the development or adoption of new standards and protocols to handle increased demands of Internet activity, security, reliability, cost, ease-of-use, accessibility and quality of service.  The performance of the Internet and its acceptance as a business tool has been adversely affected by "viruses," "worms" and similar malicious programs, and the Internet has experienced a variety of outages and other delays as a result of damage to portions of its infrastructure.  If the use of the Internet is adversely affected by these issues, demand for our platform could decline.

31

*Catastrophic events may disrupt our business.*

Our corporate headquarters are located in San Luis Obispo, California, and we utilize data centers that are located in North America. Key features and functionality of our platform are enabled by third parties that are headquartered in California and operate or utilize data centers in the United States. Additionally, we rely on our network and third-party infrastructure and enterprise applications, internal technology systems, and our website for our development, marketing, operational support, hosted services and sales activities. The west coast of the United States contains active earthquake zones, both Northern and Southern California have experienced devastating wildfires, and Southern California has recently experiences significant flooding. In addition, the Diablo Canyon nuclear power plant is located a short distance from San Luis Obispo. In the event of a major earthquake, hurricane or other natural disaster, or a catastrophic event such as a nuclear disaster, fire, power loss, telecommunications failure, cyber-attack, war or terrorist attack, we may be unable to continue our operations and may endure system interruptions, reputational harm, delays in our app development, lengthy interruptions in our platform, breaches of data security or data integrity and loss of critical data, all of which could have an adverse effect on our future operating results.

*We are subject to governmental economic sanctions and export and import controls that could impair our ability to compete in international markets or subject us to liability if we are not in compliance with applicable laws.*

As a U.S. company, we are subject to U.S. export control and economic sanctions laws and regulations, and we are required to export our technology, software, products and services in compliance with those laws and regulations, including the U.S. Export Administration Regulations and economic embargo and trade sanction programs administered by the Treasury Department's Office of Foreign Assets Control. U.S. economic sanctions and export control laws and regulations prohibit the shipment of certain products and services to countries, governments and persons targeted by U.S. sanctions. While we are currently taking precautions to prevent doing any business, directly or indirectly, with countries, governments and persons targeted by U.S. sanctions and to ensure that our business management software is not exported or used by countries, governments and persons targeted by U.S. sanctions, such measures may be circumvented.

Furthermore, if we export our technology, hardware or software, the exports may require authorizations, including a license, a license exception or other appropriate government authorization. Complying with export control and sanctions regulations for a particular sale may be time-consuming and may result in the delay or loss of sales opportunities. Failure to comply with export control and sanctions regulations for a particular sale may expose us to government investigations and penalties, which could have an adverse effect on our business, operating results and financial condition.

If we are found to be in violation of U.S. sanctions or export control laws, it could result in fines or penalties for us and for individuals, including civil penalties of up to $250,000 or twice the value of the transaction, whichever is greater, per violation, and in the event of conviction for a criminal violation for willful and knowing violations, fines of up to $1 million and possible incarceration for those responsible could be imposed against employees and managers. In addition, we may lose our export or import privileges and suffer reputational harm.

In addition, various countries regulate the import of certain encryption technology, including imposing import permitting and licensing requirements, and have enacted laws that could limit our ability to offer our platform or distribute our platform or could limit our customers' ability to implement our platform in those countries. Changes in our platform or future changes in export and import regulations may create delays in the introduction of our platform in international markets or prevent our customers with international operations from deploying our platform globally. Any change in export or import regulations, economic sanctions or related legislation, or change in the countries, governments, persons, or technologies targeted by such regulations, could result in decreased use of our platform by, or in our decreased ability to export or sell our platform to, existing or potential customers with international operations. Any decreased use of our platform or limitation on our ability to export or sell our platform would likely adversely affect our business operations and financial results.

32

Table of Contents

**Risks Related to Ownership of Our Class A Common Stock**

*The dual class structure of our common stock has the effect of allowing those stockholders who held our capital stock prior to the completion of our initial public offering, including our executive officers, employees and directors and their affiliates, to limit your ability to influence the outcome of important transactions, including a change in control.*

Our Class B common stock has ten votes per share, and our Class A common stock has one vote per share. Stockholders who held shares of our Class B common stock as of December 31, 2017, including, among others, our executive officers, employees and directors and their respective affiliates, collectively held approximately 47.5% of the voting power of our outstanding capital stock as of such date. Because of the ten-to-one voting ratio between our Class B common stock and Class A common stock, the holders of our Class B common stock will collectively continue to have significant influence over our management and affairs and over all matters requiring stockholder approval. These holders of our Class B common stock may have interests that differ from yours and may vote in a way with which you disagree and which may be adverse to your interests. The effect of this dual class structure may have the effect of delaying, preventing or deterring a change in control of our company, could deprive our stockholders of an opportunity to receive a premium for their capital stock as part of a sale of our company and might ultimately affect the market price of our Class A common stock.

Significant individual holders of our Class B common stock include our Chairman and Chief Executive Officer, Richard Stollmeyer. If, for example, Mr. Stollmeyer retains a significant portion of his holdings of shares of our Class B common stock for an extended period of time, he could control a significant portion of the voting power of our capital stock for the foreseeable future. In addition, Mr. Stollmeyer holds an irrevocable proxy to vote certain shares of our Class A common stock and Class B common stock held by certain of our stockholders. As a board member, Mr. Stollmeyer owes a fiduciary duty to our stockholders and must act in good faith and in a manner he reasonably believes to be in the best interests of our stockholders. As a stockholder, Mr. Stollmeyer is entitled to vote his shares in his own interest, which may not always be in the interests of our stockholders generally.

*Anti-takeover provisions contained in our amended and restated certificate of incorporation and amended and restated bylaws, as well as provisions of Delaware law, could impair a takeover attempt.*

Our amended and restated certificate of incorporation, amended and restated bylaws and Delaware law contain provisions which could have the effect of rendering more difficult, delaying or preventing an acquisition deemed undesirable by our board of directors. Among other things, our amended and restated certificate of incorporation and amended and restated bylaws include provisions:

- establishing a classified board of directors whose members serve staggered three-year terms;

- authorizing "blank check" preferred stock, which could be issued by our board of directors without stockholder approval and may contain voting, liquidation, dividend and other rights superior to our common stock;

- limiting the liability of, and providing indemnification to, our directors and officers;

- limiting the ability of our stockholders to call and bring business before special meetings;

- requiring advance notice of stockholder proposals for business to be conducted at meetings of our stockholders and for nominations of candidates for election to our board of directors;

- controlling the procedures for the conduct and scheduling of board of directors and stockholder meetings; and

- authorizing two classes of common stock, as discussed above.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in our management.

As a Delaware corporation, we are also subject to provisions of Delaware law, including Section 203 of the Delaware General Corporation Law, which prevents certain stockholders holding more than 15% of our outstanding capital stock from engaging in certain business combinations without approval of the holders of at least two-thirds of our outstanding common stock not held by any such stockholder.

Any provision of our amended and restated certificate of incorporation, amended and restated bylaws or Delaware law that has the effect of delaying, preventing or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our capital stock, and could also affect the price that some investors are willing to pay for our Class A common stock.

33

Table of Contents

***An active trading market for our Class A common stock may not be sustained.***

Our Class A common stock is listed on The NASDAQ Global Market under the symbol "MB." However, we cannot assure you that an active trading market for our Class A common stock will be sustained. Accordingly, we cannot assure you of the liquidity of any trading market, your ability to sell your shares of our Class A common stock when desired or the prices that you may obtain for your shares of our Class A common stock.

***The market price of our Class A common stock may be volatile, and you could lose all or part of your investment.***

Prior to our initial public offering, there had been no public market for shares of our Class A common stock. The market price of our Class A common stock since our initial public offering has been and may continue to be subject to wide fluctuations in response to various factors, some of which are beyond our control and may not be related to our operating performance. Factors that could cause fluctuations in the market price of our Class A common stock include the following:

- price and volume fluctuations in the overall stock market from time to time;

- volatility in the market prices and trading volumes of technology securities;

- changes in operating performance and stock market valuations of other technology companies generally or those in our industry in particular;

- sales of shares of our Class A common stock by us or our stockholders;

- failure of securities analysts to maintain coverage of us, changes in financial estimates by securities analysts who follow us, or our failure to meet these estimates or the expectations of investors;

- the financial projections we may provide to the public, any changes in those projections or our failure to meet those projections;

- announcements by us or our competitors of new products or services;

- the public's reaction to our press releases, other public announcements and filings with the SEC;

- rumors and market speculation involving us or other companies in our industry;

- actual or anticipated changes in our operating results or fluctuations in our operating results;

- actual or anticipated developments in our business, our competitors' businesses or the competitive landscape generally;

- litigation involving us, our industry or both, or investigations by regulators into our operations or those of our competitors;

- developments or disputes concerning our intellectual property or other proprietary rights;

- announced or completed acquisitions of businesses or technologies by us or our competitors;

- political, economic and regulatory developments in the United States or other geographies;

- new laws or regulations or new interpretations of existing laws or regulations applicable to our business;

- changes in accounting standards, policies, guidelines, interpretations or principles;

- any significant change in our management; and

- general economic conditions and slow or negative growth of our markets.

In addition, in the past, following periods of volatility in the overall market and the market price of a particular company's securities, securities class action litigation has often been instituted against these companies. This litigation, if instituted against us, could result in substantial costs and a diversion of our management's attention and resources.

34

Table of Contents

***Future sales of shares of our Class A common stock in the public market, or the perception that such sales might occur, could depress the market price of our Class A common stock.***

Sales of a substantial number of shares of our Class A common stock in the public market, or the perception that these sales might occur, could depress the market price of our Class A common stock and could impair our ability to raise capital through the sale of additional equity securities. As of December 31, 2017, we had 43.0 million shares of Class A common stock and 3.9 million shares of Class B common stock outstanding. All outstanding shares of Class A common stock are freely tradable without restrictions or further registration under the Securities Act of 1933, as amended, or the Securities Act, except for any shares held by our affiliates as defined in Rule 144 under the Securities Act and subject in some cases to our insider trading policy.

In addition, shares of our capital stock (including those shares of our capital stock issued upon exercise of outstanding options to purchase shares of our Class A common stock and Class B common stock or upon settlement of outstanding restricted stock units) may be freely sold in the public market upon issuance and once vested, subject to other restrictions provided under the terms of the applicable plan and/or the award agreements, and except for any options or restricted stock units held by our affiliates and subject to our insider trading policy. Certain of our existing stockholders are also entitled under contracts providing for registration rights, to require us to file registration statements covering the sale of their shares or to include their shares in registration statements that we may file for ourselves or other stockholders. Any sales of securities by these stockholders, or the expectation that such sales may occur, could have a material adverse effect on the trading price of our Class A common stock and make it more difficult for you to sell shares of our Class A common stock.

***The requirements of being a public company may strain our resources, divert management's attention and affect our ability to attract and retain qualified board members.***

As a public company, we incur significant legal, financial, and other expenses that we did not incur as a private company. We are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and are required to comply with the applicable requirements of the Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, the listing requirements of the NASDAQ Stock Market, and other applicable securities rules and regulations and corporate governance requirements. Continuing to comply with these rules and regulations may increase our legal and financial compliance costs, make some activities more difficult, time-consuming or costly, and increase demand on our systems and resources. In addition, our management and personnel must divert attention from operational and other business concerns to devote time to these requirements, which could harm our business and results of operations. Although we have already hired additional employees to comply with these requirements, we may need to hire even more employees in the future, which would increase our costs and expenses.

Being a public company and these new rules and regulations have made it more expensive for us to maintain director and officer liability insurance, and in the future we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These factors could also make it more difficult for us to attract and retain qualified executive officers and members of our board of directors, particularly to serve on our audit committee and compensation committee.

In addition, as a result of our disclosure obligations as a public company, we have reduced strategic flexibility and are under pressure to focus on short-term results, which may adversely impact our ability to achieve long-term profitability.

***If our internal control over financial reporting is not effective, it may adversely affect investor confidence in our company and, as a result, the value of our Class A common stock could decline.***

As a public company, we are required to design and maintain effective internal control over financial reporting and to report any material weaknesses in such internal controls. Section 404 of the Sarbanes-Oxley Act of 2002 requires that we assess the effectiveness of our internal control over financial reporting and furnish a report by management on the effectiveness of our internal control over financial reporting, which must be attested to, and reported on, by our independent registered public accounting firm. During such assessment, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective. As a result, we may need to undertake various actions, such as implementing new internal controls and procedures and hiring accounting or internal audit staff. Our remediation efforts may not enable us to avoid a material weakness in the future.

Table of Contents

If material weaknesses or control deficiencies occur in the future, and we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to attest to management's report on the effectiveness of our internal controls, we may be unable to report our financial results accurately or on a timely basis, which could cause our reported financial results to be materially misstated and result in the loss of investor confidence or delisting and cause the trading price of our Class A common stock to decline. As a result of such failures, we could also become subject to investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, and become subject to litigation from investors and stockholders, which could harm our reputation, financial condition or divert financial and management resources from our core business.

***If securities or industry analysts cease publishing research or reports about us, our business, our market or our competitors, or if they adversely change their recommendations regarding our Class A common stock, the market price of our Class A common stock and trading volume could decline.***

The trading market for our Class A common stock is influenced by the research and reports that securities or industry analysts may publish about us, our business, our market or our competitors.  If any of the analysts who cover us adversely change their recommendations regarding our Class A common stock or provide more favorable recommendations about our competitors, the market price of our Class A common stock would likely decline.  If any of the analysts who cover us were to cease coverage of our company or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price of our Class A common stock and trading volume to decline.

***We do not expect to declare any dividends on our Class A common stock in the foreseeable future so any returns will be limited to changes in the value of our Class A common stock.***

We do not anticipate declaring any cash dividends on our Class A common stock in the foreseeable future. In addition, our existing loan agreement with Silicon Valley Bank imposes restrictions on our ability to pay dividends.  Consequently, investors may need to rely on sales of our Class A common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment.  Investors seeking cash dividends should not purchase shares of our Class A common stock.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

Our corporate headquarters are located in San Luis Obispo, California, where we operate under various leases for an aggregate of approximately 160,000 square feet of space.  These leases expire between April 2019 and April 2030.

We lease additional offices throughout the United States and various international locations, including the United Kingdom and Australia.  We lease all of our facilities and do not own any real property.  We intend to procure additional space as we add employees and expand geographically.  We believe our facilities are adequate and suitable for our current needs and that, should it be needed, suitable additional or alternative space will be available to accommodate any such expansion of our operations.

**Item 3. Legal Proceedings.**

 From time to time we may become involved in legal proceedings or be subject to claims arising in the ordinary course of our business. We are not presently a party to any legal proceedings that in the opinion of our management, if determined adversely to us, would have a material adverse effect on our business, financial condition, operating results or cash flows. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**Item 4. Mine Safety Disclosures.**

Not applicable.

Table of Contents

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.**

### *Market Information*

Our Class A common stock began trading on the NASDAQ Global Market on June 19, 2015 under the symbol "MB." There is no public trading market for our Class B common stock. The following table sets forth for the periods indicated the high and low sales prices per share of our Class A common stock as reported on the NASDAQ Global Market.

| | | High | | Low |
|---|---|---|---|---|
| **Year Ended December 31, 2017** | | | | |
| First quarter | $ | 28.25 | $ | 21.20 |
| Second quarter | $ | 29.75 | $ | 23.55 |
| Third quarter | $ | 27.75 | $ | 21.57 |
| Fourth quarter | $ | 36.25 | $ | 25.92 |
| **Year Ended December 31, 2016** | | | | |
| First quarter | $ | 15.91 | $ | 9.20 |
| Second quarter | $ | 16.58 | $ | 11.91 |
| Third quarter | $ | 20.38 | $ | 15.46 |
| Fourth quarter | $ | 22.95 | $ | 16.95 |

### *Holders*

As of February 22, 2018, there were 47 holders of record of our Class A common stock and 54 holders of record of our Class B common stock. The actual number of stockholders is greater than this number of record holders, and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or other institutions and nominees.

### *Dividends*

We have never declared or paid any cash dividends on our capital stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. In addition, our ability to pay dividends on our capital stock is subject to restrictions under the terms of our loan agreement with Silicon Valley Bank. Any future determination to declare cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions and other factors that our board of directors may deem relevant.

### *Securities Authorized for Issuance under Equity Compensation Plans*

Information about our equity compensation plans is incorporated herein by reference to Item 12 of Part III of this Annual Report on Form 10-K.

### *Stock Performance Graph*

The following shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or incorporated by reference into any of our other filings under the Exchange Act or the Securities Act, except to the extent we specifically incorporate it by reference into such filing.

This chart compares the cumulative total return on our Class A common stock with that of the S&P 500 Index and the NASDAQ Computer Index. The chart assumes $100 was invested at the close of market on June 19, 2015, in the Class A common stock of MINDBODY, Inc., the S&P 500 Index and the NASDAQ Computer Index, and assumes the reinvestment of any dividends. The stock price performance on the following graph is not necessarily indicative of future stock price performance.

Table of Contents



**Comparison of Cumulative Total Return**

| Company / Index | Base Period 6/19/2015 | 6/30/2015 | 9/30/2015 | 12/31/2015 | 3/31/2016 | 6/30/2016 | 9/30/2016 | 12/31/2016 | 3/31/2017 | 6/30/2017 | 9/30/2017 | 12/31/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MINDBODY, Inc. | $ 100.00 | $ 119.64 | $ 135.21 | $ 130.88 | $ 115.31 | $ 139.62 | $ 170.07 | $ 184.26 | $ 237.46 | $ 235.29 | $ 223.62 | $ 263.41 |
| S&P 500 Index | 100.00 | 97.83 | 91.53 | 97.97 | 99.29 | 101.73 | 105.65 | 109.69 | 116.35 | 119.94 | 125.31 | 133.64 |
| NASDAQ Computer Index | 100.00 | 96.91 | 92.35 | 102.13 | 103.48 | 99.77 | 114.69 | 116.46 | 131.87 | 137.80 | 150.27 | 163.50 |

*Recent Sales of Unregistered Securities*

None.

*Use of Proceeds*

On June 18, 2015, the Registration Statement on Form S-1 (File No. 333-204068) for our initial public offering of our Class A common stock was declared effective by the SEC. On June 24, 2015, we closed our initial public offering and sold 7,150,000 shares of our Class A common stock at a public offering price of $14.00 per share for an aggregate offering price of approximately $100.1 million.

There has been no material change in the planned use of proceeds from our initial public offering as described in our final prospectus filed with the SEC on June 19, 2015 pursuant to Rule 424(b)(4).

*Issuer Purchases of Equity Securities*

None.

38

Table of Contents

**Item 6. Selected Financial Data.**

The selected consolidated financial data should be read together with the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," our audited consolidated financial statements, related notes, and other financial information included elsewhere in this Annual Report on Form 10-K. We have derived the consolidated statement of operations data for the years ended December 31, 2017, 2016 and 2015 and consolidated balance sheet data as of December 31, 2017 and 2016 from the audited consolidated financial statements included elsewhere in this Annual Report on Form 10-K.    The consolidated statement of operations data for the years ended December 31, 2014 and 2013, and the balance sheet data as of December 31, 2015, 2014, and 2013 were derived from audited consolidated financial statements that are not included in this Annual Report on Form 10-K. Our historical results are not necessarily indicative of the results to be expected in the future.

*Consolidated Statement of Operations Data*

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2015 | 2014 | 2013 |
| | (in thousands, except per share data) | | | | |
| Revenue | $ 182,626 | $ 139,021 | $ 101,369 | $ 70,010 | $ 48,687 |
| Cost of revenue[1] | 51,870 | 43,080 | 37,190 | 30,004 | 21,890 |
| Gross profit | 130,756 | 95,941 | 64,179 | 40,006 | 26,797 |
| Operating expenses: | | | | | |
| Sales and marketing[1] | 71,825 | 56,460 | 46,345 | 30,922 | 20,957 |
| Research and development[1] | 35,810 | 30,316 | 23,057 | 16,167 | 10,517 |
| General and administrative[1] | 37,471 | 30,497 | 29,530 | 18,422 | 10,730 |
| Change in fair value of contingent consideration | | — | (11) | (1,434) | 428 |
| Total operating expenses | 145,106 | 117,273 | 98,921 | 64,077 | 42,632 |
| Loss from operations | (14,350) | (21,332) | (34,742) | (24,071) | (15,835) |
| Change in fair value of preferred stock warrant | | — | (25) | (283) | (302) |
| Interest income (expense), net | 109 | (1,123) | (943) | (68) | (21) |
| Other income (expense), net | (384) | (203) | (132) | (68) | (26) |
| Loss before provision for income taxes | (14,625) | (22,658) | (35,842) | (24,490) | (16,184) |
| Provision for income taxes | 167 | 321 | 246 | 116 | 63 |
| Net loss | (14,792) | (22,979) | (36,088) | (24,606) | (16,247) |
| Accretion of redeemable convertible preferred stock | — | — | (9,862) | (21,311) | (27,892) |
| Deemed dividend—preferred stock modification | — | — | 1,748 | — | — |
| Net loss attributable to common stockholders | $ (14,792) | $ (22,979) | $ (44,202) | $ (45,917) | $ (44,139) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.33) | $ (0.58) | $ (1.68) | $ (4.17) | $ (4.10) |
| Weighted-average shares used to compute net loss per share attributable to common stockholders, basic and diluted | 44,309 | 39,913 | 26,320 | 11,014 | 10,758 |

[1] Cost of revenue and operating expenses include stock-based compensation expense as follows:

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2015 | 2014 | 2013 |
| Cost of revenue | $ 1,334 | $ 910 | $ 651 | $ 220 | $ 51 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sales and marketing | | 2,872 | | 2,059 | | 3,533 | | 196 | 56 |
| Research and development | | 3,864 | | 1,971 | | 902 | | 298 | 68 |
| General and administrative | | 6,031 | | 3,823 | | 3,289 | | 1,023 | 252 |
| Total stock-based compensation expense | $ | 14,101 | $ | 8,763 | $ | 8,375 | $ | 1,737 | $ 427 |

Table of Contents

*Consolidated Balance Sheet Data*

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | 2017 | 2016 | 2015 | 2014 | 2013 |
| | (in thousands) | | | | |
| Cash and cash equivalents | $ 232,019 | $ 85,864 | $ 93,405 | $ 34,675 | $ 9,545 |
| Restricted cash | — | — | — | 772 | 2,533 |
| Working capital | 219,855 | 77,958 | 86,781 | 26,962 | 3,359 |
| Total assets | 301,313 | 143,515 | 141,414 | 73,051 | 30,735 |
| Total deferred revenue | 9,519 | 8,128 | 5,253 | 2,756 | 2,002 |
| Total financing obligation | 15,450 | 15,961 | 16,427 | 15,654 | 3,872 |
| Preferred stock warrant | — | — | — | 1,188 | 905 |
| Total redeemable convertible preferred stock | — | — | — | 166,448 | 95,224 |
| Total stockholders' equity (deficit) | 251,936 | 101,656 | 105,783 | (124,925) | (81,115) |

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with the section titled "Selected Consolidated Financial Data" and our consolidated financial statements and related notes included elsewhere in this Annual Report on Form 10-K.  This discussion contains forward-looking statements that involve risks and uncertainties.  Our actual results could differ materially from those discussed below.  Factors that could cause or contribute to such differences include, but are not limited to, those identified below and those discussed in the section titled "Risk Factors" included in Part I, Item 1A of this Annual Report on Form 10-K.*

### Overview

We are the leading provider of cloud-based business management software for the wellness services industry and a rapidly growing marketplace for wellness services. As of December 31, 2017, our customers employed over 372,000 wellness practitioners serving approximately 41 million consumers in more than 100 countries. We are also a leading payments platform dedicated to the wellness services industry transacting approximately $7.9 billion and $6.5 billion on our payments platform for the years ended December 31, 2017, and 2016, respectively, representing a 23% increase year over year.

We provide our software as a subscription-based service to our 58,584 subscribers as of December 31, 2017. We primarily market and sell subscriptions for our platform to small and medium-sized businesses within the wellness services industry, targeting specifically boutique fitness, salon, spa and integrative health businesses.

Our integrated software and payments platform creates powerful network effects. As more local wellness businesses adopt our platform, more customer listings appear on the MINDBODY app and third-party partner sites available through the MINDBODY Network.  As awareness of these businesses increases through these marketing channels, they attract more consumers to our platform. Those consumers then attract even more businesses to our platform. As those businesses and consumers engage in more transactions on our platform, this increases payments and API revenue and enables additional revenue streams from demand generation. Finally, as we add more customers and consumers to our wellness ecosystem, we attract more technology developers and partners who can use our open API to develop additional apps that extend the capabilities of our open platform.

In the first quarter of 2017, we refined our subscriber growth strategy to focus on high value subscribers, which we define as customers on our Starter, Pro, Accelerate and Ultimate software levels. In connection with this strategy, as of January 1, 2017, we stopped actively selling subscriptions of our Solo software level to new customers and increased the monthly subscription pricing across all other software levels for new customers. We also increased monthly subscription pricing across all of our software levels for existing customers without long-term contracts and focused our growth strategy on the United States, Canada, the United Kingdom, Ireland, Australia, New Zealand, Hong Kong, and Singapore. Furthermore, in the first quarter of 2018, we rolled out simplified software packaging to better address the needs of our customers, and we intend to migrate our existing customers to one of these software packages.

40

Table of Contents

The vast majority of our customers enter into one-month contracts that are billed in advance, but we have a growing number of larger multi-location customers that subscribe to our software platform through contracts ranging from one to three years for which we bill quarterly or monthly in advance. We recognize software subscription revenue ratably over the term of the subscription period.  Additionally, we earn revenue based on the value of transactions processed by our customers utilizing our payments platform, net of the costs charged to us by our processing partners.

We deploy a direct sales approach driven by an outbound tele-sales team located primarily in San Luis Obispo, California with several regional offices throughout the United States, and locations in the United Kingdom and Australia.  Our sales team qualifies and manages prospective and current customers, aiming to initiate, retain, and expand their use of our platform over time.

Our marketing efforts are focused on generating awareness of our platform and consumer app, creating sales leads, establishing and promoting our brand, and cultivating a community of successful and vocal customers and consumers.  We utilize both online and offline marketing initiatives, including search engine and email marketing, online display and print advertising, participation in trade shows, events and conferences, permission marketing, social media and media outreach, mass media, and strategic partnerships and endorsements.

In May 2017, we completed a follow-on public offering in which we issued and sold 5,060,000 shares of Class A common stock at a public offering price of $27.95 per share. We received net proceeds of $134.7 million after deducting underwriters' discounts and commissions of $6.7 million, but before deducting offering expenses of approximately $0.4 million.

We intend to continue scaling our organization in order to meet the needs of our customers. We also intend to continue growing the inventory of wellness services on our transaction-enabled marketplace. We have invested and expect to continue to invest in our sales and marketing teams to sell our platform globally, including, in particular, to high value subscribers in the countries noted above. A key element of our growth strategy is the continuous enhancement and expansion of our software and payments platform, as well as our transaction-enabled marketplace by continuously developing and implementing new features and functionality. Through consistent innovation and strategic acquisitions, we have increased both the number of high value subscribers and the revenue we generate from our customers over time.

We plan to continue to enhance our software architecture and enhance and expand our platform through ongoing investments in research and development and sales and marketing, and by pursuing strategic acquisitions of complementary businesses and technologies that will enable us to continue to drive growth in the future.

We also expect to continue to make investments in both our data center infrastructure and our customer service and customer onboarding teams to meet the needs of our growing user base.

While these areas represent significant opportunities for us, we also face significant risks and challenges that we must successfully address in order to sustain the growth of our business and improve our operating results. Due to our continuing investments to grow our business in preparation for our expected increase in sales, we are continuing to incur expenses in the near term from which we may not realize any long-term benefit. In addition, any investments that we make in sales and marketing or other areas will occur in advance of our experiencing any benefits from such investments, so it may be difficult for us to determine if we are efficiently allocating our resources in these areas.

Set forth below are summary financial highlights for the years ended December 31, 2017, 2016, and 2015:

| | Year Ended December 31, | | Change | Year Ended December 31, | | Change |
|---|---|---|---|---|---|---|
| | 2017 | 2016 | % | 2016 | 2015 | % |
| | (dollars in millions) | | | | | |
| Revenue | $ 182.6 | $ 139.0 | 31% | $ 139.0 | $ 101.4 | 37% |
| Net loss | (14.8) | (23.0) | | (23.0) | (36.1) | |
| Adjusted EBITDA[1] | $ 8.9 | $ (4.8) | | $ (4.8) | $ (19.9) | |

[1] For a reconciliation of Adjusted EBITDA to net loss, see the section below titled "Non-GAAP Financial Measure."

During the years ended December 31, 2017 and 2016, approximately 81% and 83% of our revenue came from the United States, respectively.

Our employee headcount has increased to 1,426 employees as of December 31, 2017, from 1,350 as of December 31, 2016 .

41

Table of Contents

In this Annual Report on Form 10-K, when we use the term "active consumers" as of a given date, we are referring to the estimated number of unique consumers of our customers' services who have used our platform to transact with our customers during the two years ending on such date.  While we do not directly monetize consumers of our customers' services, we believe that growth in the number of active consumers on our platform also contributes to subscriber growth.  For a discussion of risks related to our calculation of active consumers, see the section titled "Risk Factors - Real or perceived inaccuracies in our key, user and other metrics may harm our reputation and negatively affect our business" included in Item 1A of Part I of this Annual Report on Form 10-K.

On February 19, 2018, we completed the acquisition of FitMetrix, Inc., or FitMetrix, a privately-held company, for an aggregate cash purchase price of $15.5 million. FitMetrix, a MINDBODY platform partner at the time of acquisition, specializes in innovative performance tracking integrations with fitness studio equipment and wearables. The FitMetrix technology helps enable business owners to increase retention in the group and personal training environments and provide wellness seekers with an engaging, more interactive fitness experience.  We expect to expand adoption of FitMetrix across our customer base while continuing to develop new cutting-edge workout innovations. We believe the acquisition of FitMetrix expands our value proposition for fitness studios and clubs worldwide, while also helping us attract new high value subscribers.

42

Table of Contents

**Our Business Model**

Our business model focuses on maximizing the lifetime value of a customer relationship.  We make significant investments in acquiring and onboarding new customers and believe that we will be able to achieve a positive return on these investments by retaining customers and expanding the revenue derived from them over the lifetime of the relationship.  In connection with the acquisition of new customers, we incur and recognize significant upfront costs.  These costs include sales; onboarding and marketing costs associated with acquiring new customers, such as sales commission expenses, which are expensed upfront; the cost of the onboarding personnel who provide the initial onboarding training to our new customers; marketing costs, which are expensed as incurred; and the cost associated with converting and importing customer data from competitors' products.

Due to our subscription model, we recognize software subscription revenue ratably over the monthly term of the subscription period, which commences when all of the revenue recognition criteria have been met.  We recognize revenue from our payments platform on a net basis when the transactions occur. Although our objective is for each customer to be profitable for us over the duration of our relationship, the costs we incur with respect to any customer relationship, whether a new customer or to a lesser extent selling higher value subscriptions to customers on lower software levels, may exceed revenue in early periods of the relationship because we recognize those costs earlier than we recognize the associated revenue.  As a result, an increase in the mix of new customers as a percentage of total customers will initially have a negative impact on our operating results.

We realize different levels of profitability from our customers in large part depending on the fee level of their software subscription and the volume of transactions they process through our payments platform.  For new customers, our associated sales, onboarding and marketing expenses typically exceed the first year revenue we recognize from them.  For typical customers, their monthly subscriptions automatically renew each month.  As a result, our sales and marketing expenses associated with renewals for our existing customers have been de minimis.  Over the lifetime of the customer relationship, we incur sales and marketing costs to sell higher value subscriptions to customers on lower software levels, to have customers opt in to our payments platform, to our premium services and to our API and technology partners' software offerings.  However, these costs are significantly less than the costs initially incurred to acquire the customer.

**Key Metrics**

We regularly review the following key metrics to measure our performance, identify trends affecting our business, formulate financial projections, make strategic business decisions and assess working capital needs.

| | As of and for the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | **2016** | | **2015** | |
| Subscribers (end of period) | | 58,584 | | 60,385 | | 51,481 |
| Average monthly revenue per subscriber | $ | 253 | $ | 205 | $ | 182 |
| Payments volume (in billions) | $ | 7.9 | $ | 6.5 | $ | 5.1 |
| Dollar-based net expansion rate (end of period) | | 107% | | 108% | | 113% |

43

Table of Contents

- *Subscribers*. Subscribers are defined as unique physical business locations or individual practitioners who have active subscriptions to our platform as of the end of the period. We believe the number of subscribers is one indicator of the growth of our platform, but the revenue contribution of individual subscribers can vary widely. For example, the vast majority of our revenue is generated from our high value subscribers. The number of subscribers on our *Solo* software level decreased from 7,391 as of December 31, 2016, to 3,405 as of December 31, 2017, and the number of our high value subscribers increased from 52,994 as of December 31, 2016, to 55,179 as of December 31, 2017.  Growth in the number of our high value subscribers depends, in part, on our ability to successfully develop and market our platform to wellness businesses and consumers who have not yet become part of our network. While growth in the number of subscribers can be an important indicator of expected revenue growth, it also informs our management's decisions with respect to the areas of our business that will require further investment in order to support expected future growth. For example, as the number of high value subscribers increases, we may need to increase the headcount in our customer support organization, as well as increase our IT infrastructure capital expenditures in order to maintain the effectiveness of our platform and the performance of our software for our subscribers and consumers. The number of our overall subscribers has decreased year over year, while the number of high value subscribers increased year over year. We expect the number of high value subscribers to continue to increase over time, however our overall subscriber count may continue to decline in the near term as we continue to execute on our growth strategy, focus on high value subscribers, and as a result of pricing increases implemented in February 2018. As of January 1, 2017, we stopped actively selling subscriptions of our *Solo* software level to new subscribers and increased the monthly subscription pricing across all other software levels for new subscribers. We also increased monthly subscription pricing across all of our software levels for existing subscribers without long term contracts. In addition, we concentrated our subscriber growth strategy on high value subscribers in specific countries, which contributed to a decrease in the total number of subscribers by 1,801, with an increase in the total number of our high value subscribers by 2,185, for the year ended December 31, 2017.  The growth rate of the number of subscribers declined as of December 31, 2017 compared to December 31, 2016 and may continue to do so in the future as we execute on our growth strategy and we make changes to our pricing and subscription offerings.

- *Average Monthly Revenue per Subscriber*. We believe that our ability to increase the average monthly revenue per subscriber, which we also refer to as ARPS, is an indicator of our ability to increase the long-term value of our existing subscriber relationships. ARPS is calculated by dividing the subscription and services and payments revenue generated in a given month by the number of subscribers at the end of the previous month. For periods greater than one month, ARPS is the sum of the average monthly revenue per subscriber for each month in the applicable period, divided by the number of months in the period. For example, the ARPS measurement period in the table above was measured over the twelve months ended December 31, 2017, 2016 and 2015. ARPS increased for the year ended December 31, 2017 compared to the year ended December 31, 2016, and we expect it to continue to increase in the future, although we expect the growth rate to fluctuate over time. During the year, we measure ARPS on a quarterly basis rather than a year-to-date basis. To assist in sequential review of our ARPS metric, for the three months ended December 31, 2017 our ARPS was $278, compared to $212 for the three months ended December 31, 2016, a 31% increase year over year.

- *Payments Volume*. We believe that payments volume is an indicator of the underlying current health of our customers' businesses and of consumer spending trends as well as being a major driver of our payments revenue. Payments volume is the total dollar volume of transactions between our customers and consumers utilizing our payments platform. Payments volume increased for the year ended December 31, 2017 compared to the year ended December 31, 2016, and we expect it to continue to increase in the future.  The growth rate in payments volume decreased for the year ended December 31, 2017 compared to the year ended December 31, 2016, and we expect it to fluctuate over time.

- *Dollar-Based Net Expansion Rate*. Our business model focuses on maximizing the lifetime value of a customer relationship. We can achieve this by focusing on delivering value and functionality that retains our existing customers and by expanding the revenue derived from our customers over the lifetime of the relationship by selling higher value subscriptions to customers on lower software levels, through the utilization of our premium customer support offering, by increasing the value of transactions processed through our payments platform, and through services provided by our application programming interface, or API, and technology partners. We assess our performance in this area by measuring our dollar-based net expansion rate. Our dollar-based net expansion rate provides a measurement of our ability to increase revenue across our existing customer base, offset by churn, downgrades in subscriptions, reduction in services utilization and reductions in the value of transactions that our customers process through our payments platform. Our dollar-based net expansion rate

44

Table of Contents

is based upon our monthly subscription and services and payments revenue for a set of customer accounts. We calculate our dollar-based net expansion rate by dividing our retained revenue net of contraction and churn by our base revenue. We define our base revenue as the aggregate monthly subscription and services and payments revenue of our customer base as of the date one year prior to the date of calculation. We define our retained revenue net of contraction and churn as the aggregate monthly subscription and services and payments revenue of the same customer base included in our measure of base revenue at the end of the period being measured. In addition, beginning with the first quarter of 2018, we intend to calculate our dollar-based net expansion rate using a quarterly average. We believe that this change in methodology for calculating our dollar-based net retention rate will mitigate some of the volatility that can occur when this key metric is calculated using only the last month in the period. We expect our dollar based net expansion rate to fluctuate over time.

**Non-GAAP Financial Measure**

*Adjusted EBITDA*

To provide investors with additional information regarding our financial results prepared in accordance with U.S. generally accepted accounting principles, or GAAP, we have presented Adjusted EBITDA, which is a non-GAAP financial measure defined by us as our net loss before stock-based compensation expense, depreciation and amortization, change in fair value of contingent consideration (where applicable), change in fair value of preferred stock warrant (where applicable), provision for income taxes, and other income (expense), net, which consisted of interest income (expense), net, and other income (expense), net. We have provided below a reconciliation of Adjusted EBITDA to net loss, the most directly comparable GAAP financial measure. We have presented Adjusted EBITDA in this Annual Report on Form 10-K because it is a key measure used by our management and board of directors to understand and evaluate our core operating performance and trends, to prepare and approve our annual budget, and to develop short and long-term operational plans. In particular, we believe that the exclusion of the amounts eliminated in calculating Adjusted EBITDA can provide a useful measure for period-to-period comparisons of our core business. Accordingly, we believe that Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as our management and board of directors.

Our use of Adjusted EBITDA has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our financial results as reported under GAAP. Some of these limitations are as follows:

- Although depreciation and amortization expense are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and Adjusted EBITDA does not reflect cash capital expenditure requirements for such replacements or for new capital expenditure requirements;

- Adjusted EBITDA does not reflect: (1) changes in, or cash requirements for, our working capital needs; (2) the potentially dilutive impact of stock-based compensation; or (3) tax payments that may represent a reduction in cash available to us;

- Adjusted EBITDA excludes stock-based compensation expense, which has been and will continue to be for the foreseeable future a significant recurring expense in our business; and

- Other companies, including companies in our industry, may calculate Adjusted EBITDA or similarly titled measures differently, which reduces its usefulness as a comparative measure.

Because of these and other limitations, you should consider Adjusted EBITDA along with other GAAP-based financial performance measures, including various cash flow metrics, net loss, and our GAAP financial results. The following table presents a reconciliation of Adjusted EBITDA to net loss for each of the periods indicated:

45

Table of Contents

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2017 | 2016 | 2015 |
| | | (in thousands) | | |
| Net loss | $ | (14,792) $ | (22,979) $ | (36,088) |
| Stock-based compensation expense | | 14,101 | 8,763 | 8,375 |
| Depreciation and amortization | | 9,150 | 7,755 | 6,516 |
| Change in fair value of contingent consideration | | — | — | (11) |
| Change in fair value of preferred stock warrant | | — | — | 25 |
| Provision for income taxes | | 167 | 321 | 246 |
| Other expense, net | | 275 | 1,326 | 1,075 |
| Adjusted EBITDA | $ | 8,901 $ | (4,814) $ | (19,862) |

## Components of Statements of Operations

### Revenue

We generate revenue primarily from providing an integrated cloud-based business management software and payments platform for the wellness services industry. Revenue is recognized when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable and collectability is reasonably assured.

Our total revenue consists of the following:

- *Subscription and services*. Subscription and services revenue is generated primarily from sales of subscriptions to our cloud based business management software for the wellness services industry. The majority of subscription fees are prepaid by customers on a monthly basis via a credit card and, to a lesser extent, billed to customers on an annual or quarterly basis. Subscription revenue is recognized ratably over the term of the subscription agreement. Amounts invoiced in excess of revenue recognized are deferred. Service revenue is generated primarily through our premium customer support offering and is recognized ratably over the term of the agreement. Additionally, our customers can choose to enter into a separate contract with our technology partners to purchase additional features and functionality. We receive a revenue share from these arrangements from our technology partners, which is recognized in the period services are rendered. We also earn revenue from API partners for customer site access, data query, and consumer bookings through our platform. The revenue from API partners is recognized in the period services are rendered. We expect our subscription and services revenue to increase over time as we increase the number of our customers, the average monthly subscription revenue per subscriber, and our revenue from our technology and API partners.

- *Payments*. We earn payments revenue from revenue share arrangements with third-party payment processors on transactions between our customers who utilize our payments platform and their consumers. These payment transactions are generally related to purchases of classes, memberships, goods or services through a customer's website, at its business location, and through the MINDBODY app. These transaction fees are recorded as revenue on a net basis when the payment transactions occur. We expect our payments revenue to increase in absolute dollars as we add new customers who utilize our payments platform and as existing customers increase the volume of transactions that they process through our payments platform.

- *Product and other*. We offer various point-of-sale system products and physical gift cards to our customers. Product and other revenue is recognized upon the delivery of these products to our customers.

### Cost of Revenue

Cost of revenue primarily consists of costs associated with personnel and related infrastructure for operation of our cloud-based business management platform, data center operations, global customer support and onboarding services, payment processing for customers that pay via credit card, and allocated overhead. Personnel costs consist of salaries, benefits, bonuses and stock-based compensation. Overhead consists of certain facilities costs, depreciation expense, amortization expense associated with acquired intangible assets, information technology costs, and impairment charges for acquired intangible assets and internally developed software.

### Operating Expenses

Our operating expenses consist of sales and marketing, research and development, and general and administrative expenses.

46

Table of Contents

- *Sales and marketing*. Sales and marketing expense consists primarily of personnel costs, including salaries, benefits, bonuses, stock-based compensation and commission costs for our sales and marketing personnel. Sales and marketing expense also includes costs for market development programs, advertising, lead generation, promotional and other marketing activities, and allocated overhead. Sales and marketing expense is our largest operating expense, driving growth in customers, ARPS and consumer adoption, and we expect to continue to increase this expense in absolute dollars as we increase our sales and marketing efforts, including consumer marketing efforts, although such expense may fluctuate as a percentage of total revenue. For instance, in 2017 we held BOLD, our annual customer conference in the third quarter, instead of the fourth quarter as in previous years, which resulted in a significant year over year increase in sales and marketing expense for the third quarter of 2017.

- *Research and development*. Research and development expense consists primarily of personnel costs, including salaries, benefits, bonuses, and stock-based compensation for our development personnel. Research and development expense also includes outsourced software development costs and allocated overhead. We expect research and development expense to continue to increase in absolute dollars as we continue to invest in our research and product development efforts to enhance our product capabilities and access new markets, although such expense may fluctuate as a percentage of total revenue.

- *General and administrative*. General and administrative expense consists primarily of personnel costs, including salaries, benefits, bonuses, and stock-based compensation for our executive, finance, legal, human resources, information technology, and other administrative personnel. General and administrative expense also includes consulting, legal and accounting services and allocated overhead. We expect general and administrative expense to continue to increase in absolute dollars as we grow our operations and operate as a public company, although we expect such expense to continue to decline as a percentage of total revenue.

### Other Income and Expenses

Our other income and expenses line items consist of interest income (expense), net, and other expense, net.

- *Interest income (expense), net*. Interest income (expense), net, consists primarily of the interest incurred on the financing obligation associated with our build-to-suit lease arrangement and interest earned on our cash and cash equivalent balances. We entered into a loan agreement with Silicon Valley Bank in 2015 for a secured revolving credit facility, and any future draws on this loan agreement will incur interest expense and result in increased interest expense in future periods. This loan agreement is set to expire in January 2019.

- *Other expense, net*. Other expense, net, consists primarily of gains and losses on disposals of property and equipment, gains and losses from foreign currency transactions, and other income and expenses.

### Provision for Income Taxes

Provision for income taxes consists primarily of federal and state income taxes in the United States and income taxes in certain foreign jurisdictions in which we conduct business. We have a full valuation allowance for U.S. deferred tax assets, including net operating loss carryforwards. We expect to maintain this full valuation allowance for the foreseeable future.

### Results of Operations for Fiscal Years Ended December 31, 2017, 2016, and 2015

The following tables set forth our results of operations data in dollars and as a percentage of revenue for those periods. The period-to-period comparison of results of operations is not necessarily indicative of results to be expected for future periods.

47

Table of Contents

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2017 | | 2016 | 2015 |
| | | (in thousands) | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ | 182,626 | $ 139,021 | $ | 101,369 |
| Cost of revenue[1] | | 51,870 | 43,080 | | 37,190 |
| Gross profit | | 130,756 | 95,941 | | 64,179 |
| Operating expenses: | | | | | |
| Sales and marketing[1] | | 71,825 | 56,460 | | 46,345 |
| Research and development[1] | | 35,810 | 30,316 | | 23,057 |
| General and administrative[1] | | 37,471 | 30,497 | | 29,530 |
| Change in fair value of contingent consideration | | | — | | (11) |
| Total operating expenses | | 145,106 | 117,273 | | 98,921 |
| Loss from operations | | (14,350) | (21,332) | | (34,742) |
| Change in fair value of preferred stock warrant | | — | — | | (25) |
| Interest income (expense), net | | 109 | (1,123) | | (943) |
| Other expense, net | | (384) | (203) | | (132) |
| Loss before provision for income taxes | | (14,625) | (22,658) | | (35,842) |
| Provision for income taxes | | 167 | 321 | | 246 |
| Net loss | $ | (14,792) | $ (22,979) | $ | (36,088) |

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | 2015 |
| **Consolidated Statements of Operations Data:** | | | |
| Revenue | 100 % | 100 % | 100 % |
| Cost of revenue | 28 % | 31 % | 37 % |
| Gross profit | 72 % | 69 % | 63 % |
| Operating expenses: | | | |
| Sales and marketing | 39 % | 40 % | 45 % |
| Research and development | 20 % | 22 % | 23 % |
| General and administrative | 21 % | 22 % | 29 % |
| Total operating expenses | 80 % | 84 % | 97 % |
| Loss from operations | (8)% | (15)% | (34)% |
| Interest expense, net | — % | (1)% | (1)% |
| Other expense, net | — % | — % | (1)% |
| Loss before provision for income taxes | (8)% | (16)% | (36)% |
| Provision for income taxes | — % | (1)% | — % |
| Net loss | (8)% | (17)% | (36)% |

(1) Cost of revenue and operating expenses include stock-based compensation expense as follows (in thousands):

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2017 | 2016 | | 2015 |
| Cost of revenue | $ | 1,334 | $ 910 | $ | 651 |
| Sales and marketing | | 2,872 | 2,059 | | 3,533 |
| Research and development | | 3,864 | 1,971 | | 902 |

| | | | | | |
|---|---|---|---|---|---|
| General and administrative | | 6,031 | | 3,823 | 3,289 |
| Total stock-based compensation expense | $ | 14,101 | $ | 8,763 | $ 8,375 |

48

**Comparison of the Years Ended December 31, 2017 and 2016**

*Revenue*

| | | Year Ended December 31, | | | Change | |
|---|---|---|---|---|---|---|
| | | 2017 | 2016 | | $ | % |
| | | (dollars in thousands) | | | | |
| Revenue: | | | | | | |
| Subscription and services | $ | 109,174 | $ 82,919 | $ | 26,255 | 32 % |
| Payments | | 71,263 | 53,808 | | 17,455 | 32 % |
| Product and other | | 2,189 | 2,294 | | (105) | (5)% |
| Total revenue | $ | 182,626 | $ 139,021 | $ | 43,605 | 31 % |

Revenue increased $43.6 million, or 31%, in the year ended December 31, 2017 compared to the year ended December 31, 2016.  Subscription and services revenue increased $26.3 million, or 32%, of which $24.4 million was due to pricing increases, the increased adoption of our branded mobile app offering, and an improvement in the mix to high value subscribers. Payments revenue increased $17.5 million, or 32%, due to an increase in the volume of transactions processed by our customers combined with an increase in the number of customers that utilize our payments platform and an increase in the value retained from payments transactions.

*Cost of Revenue and Gross Margin*

| | | Year Ended December 31, | | | Change | |
|---|---|---|---|---|---|---|
| | | 2017 | 2016 | | $ | % |
| | | (dollars in thousands) | | | | |
| Cost of revenue | $ | 51,870 | $ 43,080 | $ | 8,790 | 20% |
| Gross margin | | 72% | 69% | | | |

Cost of revenue increased $8.8 million, or 20%, in the year ended December 31, 2017 compared to the year ended December 31, 2016.  The increase was primarily attributable to a $5.2 million increase in personnel-related expenses due to an increase in headcount, a $2.6 million increase in infrastructure costs, and a $1.0 million increase in amortization of acquired intangible assets.  As of December 31, 2017, we had 560 employees dedicated to data center operations, global customer support and onboarding services as compared to 497 employees as of December 31, 2016.

The increase in gross margin, or gross profit as a percentage of revenue, in the year ended December 31, 2017 compared to the year ended December 31, 2016, was primarily driven by an increase in the number of customers adopting payment processing through our platform and an increase in the number of high value subscribers, combined with leveraging our existing infrastructure and customer support.

49

### *Operating Expenses*

*Sales and Marketing*

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2017 | 2016 | $ | % |
| | (dollars in thousands) | | | |
| Sales and marketing | $ 71,825 | $ 56,460 | $ 15,365 | 27% |

Sales and marketing expense increased $15.4 million, or 27%, in the year ended December 31, 2017 compared to the year ended December 31, 2016. The increase was primarily attributable to a $9.6 million increase in personnel-related expenses, which includes $0.8 million in stock-based compensation expense due to an increase in the average headcount as we expanded our sales and marketing efforts to increase both the number of high value subscribers and average revenue per subscriber, and a $4.8 million increase in promotional spending and other marketing programs. As of December 31, 2017, we had 471 employees, which includes 22 part time employees, dedicated to sales and marketing, compared to 493 employees, which includes 65 part time employees, as of December 31, 2016. The overall decrease in the total headcount for sales and marketing was due primarily to our focus on building a sales team with a dedicated and skilled full-time workforce.

*Research and Development*

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2017 | 2016 | $ | % |
| | (dollars in thousands) | | | |
| Research and development | $ 35,810 | $ 30,316 | $ 5,494 | 18% |

Research and development expense increased $5.5 million, or 18%, in the year ended December 31, 2017 compared to the year ended December 31, 2016.  The increase was primarily attributable to an increase in headcount and resulting personnel-related expenses of $6.4 million, including a $1.9 million increase in stock-based compensation, offset by capitalized qualifying development costs incurred during the year ended December 31, 2017 of $1.9 million. As of December 31, 2017, we had 243 employees dedicated to research and development, compared to 222 employees as of December 31, 2016.

*General and Administrative*

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2017 | 2016 | $ | % |
| | (dollars in thousands) | | | |
| General and Administrative | $ 37,471 | $ 30,497 | $ 6,974 | 23% |

General and administrative expense increased $7.0 million, or 23%, in the year ended December 31, 2017 compared to the year ended December 31, 2016. The increase was primarily due to a $5.3 million increase in personnel-related expenses, including a $2.2 million increase in stock-based compensation, and a $1.1 million increase in audit, legal and consulting fees. As of December 31, 2017, we had 152 employees dedicated to general and administrative as compared to 138 employees as of December 31, 2016.

Table of Contents

### Other Expense, net, and Income Taxes Expense

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2017 | 2016 | $ | % |
| | (dollars in thousands) | | | |
| Interest income (expense), net | $ 109 | $ (1,123) | $ 1,232 | 110 % |
| Other expense, net | 384 | 203 | 181 | 89 % |
| Provision for income taxes | 167 | 321 | (154) | (48)% |

Interest income (expense), net increased during the during the year ended December 31, 2017 compared to the year ended December 31, 2016 as a result of interest income earned on our higher cash balances, which are invested in money market funds.

### Comparison of the Years Ended December 31, 2016 and 2015

#### Revenue

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2016 | 2015 | $ | % |
| | (dollars in thousands) | | | |
| Revenue: | | | | |
| Subscription and services | $ 82,919 | $ 61,339 | $ 21,580 | 35 % |
| Payments | 53,808 | 37,460 | 16,348 | 44 % |
| Product and other | 2,294 | 2,570 | (276) | (11)% |
| Total revenue | $ 139,021 | $ 101,369 | $ 37,652 | 37 % |

Revenue increased $37.7 million, or 37%, in the year ended December 31, 2016 compared to the year ended December 31, 2015.  Subscription and services revenue increased $21.6 million, or 35%, of which $16.4 million was due to a 17% increase in our number of subscribers to 60,385 as of December 31, 2016 from 51,481 as of December 31, 2015, combined with the impact of pricing increases and additional product offerings, and $4.7 million of which was due to an increase in revenue from arrangements with our API and technology partners. Payments revenue increased $16.3 million, or 44%, due to an increase in the volume of transactions processed by our customers combined with the increase in the number of customers that utilize our payments platform as well as an increase in a value retained from payments transactions.

#### Cost of Revenue and Gross Margin

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| | 2016 | 2015 | $ | % |
| | (dollars in thousands) | | | |
| Cost of revenue | $ 43,080 | $ 37,190 | $ 5,890 | 16% |
| Gross margin | 69% | 63% | | |

Cost of revenue increased $5.9 million, or 16%, in the year ended December 31, 2016 compared to the year ended December 31, 2015.  The increase was primarily attributable to a $4.1 million increase in personnel-related expenses and a $1.8 million increase in infrastructure costs to support the growing number of customers.  As of December 31, 2016, we had 497 employees dedicated to data center operations, global customer support and onboarding services as compared to 454 employees as of December 31, 2015.

The increase in gross margin, or gross profit as a percentage of revenue, in the year ended December 31, 2016 compared to the year ended December 31, 2015 was primarily driven by growth in the number of customers and average revenue per subscriber, combined with leveraging our existing infrastructure and customer support.

51

***Operating Expenses***

*Sales and Marketing*

|  | Year Ended December 31, | | Change | |
|  | 2016 | 2015 | $ | % |
| --- | --- | --- | --- | --- |
|  | (dollars in thousands) | | | |
| Sales and marketing | $ 56,460 | $ 46,345 | $ 10,115 | 22% |

Sales and marketing expense increased $10.1 million, or 22%, in the year ended December 31, 2016 compared to the year ended December 31, 2015. The increase was primarily attributable to a $5.7 million increase in personnel-related expenses with the purpose of both acquiring new customers as well as increasing the average revenue per subscriber. As of December 31, 2016, we had 493 employees dedicated to sales and marketing, compared to 422 employees as of December 31, 2015. The increase in sales and marketing expense was also attributable to a $3.4 million increase in promotional spending related to acquiring new customers, selling our payment processing services, selling higher value subscriptions to customers on lower software levels, and driving consumer adoption of the MINDBODY app.

*Research and Development*

|  | Year Ended December 31, | | Change | |
|  | 2016 | 2015 | $ | % |
| --- | --- | --- | --- | --- |
|  | (dollars in thousands) | | | |
| Research and development | $ 30,316 | $ 23,057 | $ 7,259 | 31% |

Research and development expense increased $7.3 million, or 31%, in the year ended December 31, 2016 compared to the year ended December 31, 2015. The increase was primarily attributable to a $6.2 million increase in personnel-related expenses and to a $0.5 million increase in outsourced development costs. During the year, certain entry-level employees were replaced with fewer, more skilled and experienced employees, and a Chief Technology Officer was added, bringing the number of employees as of December 31, 2016 to 222, from 224 as of December 31, 2015.

*General and Administrative*

|  | Year Ended December 31, | | Change | |
|  | 2016 | 2015 | $ | % |
| --- | --- | --- | --- | --- |
|  | (dollars in thousands) | | | |
| General and Administrative | $ 30,497 | $ 29,530 | $ 967 | 3% |

General and administrative expense increased $1.0 million, or 3%, in the year ended December 31, 2016 compared to the year ended December 31, 2015. The increase was primarily attributable to a $1.6 million increase in personnel-related expenses and corporate overhead costs incurred to support our growth, partially offset by a $0.5 million decrease in outsourced legal and professional fees. As of December 31, 2016, we had 138 employees dedicated to general and administrative as compared to 126 employees as of December 31, 2015.

Table of Contents

*Other Expense, net, and Income Taxes Expense*

| | | Year Ended December 31, | | Change | |
|---|---|---|---|---|---|
| | | 2016 | 2015 | $ | % |
| | | (dollars in thousands) | | | |
| Interest expense, net | $ | 1,123 | $      943 | $      180 | 19% |
| Other expense, net | | 203 | 132 | 71 | 54% |
| Provision for income taxes | | 321 | 246 | 75 | 30% |

The increase in interest expense during the year ended December 31, 2016 was primarily due to interest on the financing obligation associated with the build-to-suit lease arrangement.

## Quarterly Results of Operations

The following tables set forth our unaudited consolidated statements of operations data for each of the eight quarters in the period ended December 31, 2017, as well as the percentage that each line item represents of total revenue for each quarter. The unaudited quarterly statements of operations data set forth below have been prepared on a basis consistent with our audited annual consolidated financial statements and include, in our opinion, all normal recurring adjustments necessary for a fair statement of the financial information. Our historical results are not necessarily indicative of the results that may be expected in the future. The following quarterly financial data should be read in conjunction with our audited consolidated financial statements and the related notes included in Item 15 of Part IV of this Annual Report on Form 10-K.

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2017 | Sept. 30, 2017 | June 30, 2017 | March 31, 2017 | Dec. 31, 2016 | Sept. 30, 2016 | June 30, 2016 | March 31, 2016 |
| | (in thousands, except per share data) | | | | | | | |
| Revenue | $ 49,693 | $ 46,612 | $ 44,107 | $ 42,214 | $ 38,191 | $ 35,262 | $ 33,561 | $ 32,006 |
| Cost of revenue[1] | 13,990 | 13,123 | 12,738 | 12,019 | 11,423 | 10,972 | 10,713 | 9,972 |
| Gross profit | 35,703 | 33,489 | 31,369 | 30,195 | 26,768 | 24,290 | 22,848 | 22,034 |
| Operating expenses: | | | | | | | | |
| Sales and marketing[1] | 19,615 | 18,514 | 17,362 | 16,334 | 14,926 | 14,599 | 13,706 | 13,229 |
| Research and development[1] | 9,384 | 8,976 | 8,802 | 8,648 | 7,558 | 7,747 | 7,594 | 7,417 |
| General and administrative[1] | 9,664 | 9,763 | 9,358 | 8,686 | 7,947 | 7,346 | 7,681 | 7,523 |
| Total operating expenses | 38,663 | 37,253 | 35,522 | 33,668 | 30,431 | 29,692 | 28,981 | 28,169 |
| Loss from operations | (2,960) | (3,764) | (4,153) | (3,473) | (3,663) | (5,402) | (6,133) | (6,135) |
| Interest income (expense), net | 234 | 172 | (83) | (214) | (258) | (261) | (292) | (312) |
| Other income (expense), net | (328) | 45 | (21) | (80) | 23 | (90) | (61) | (74) |
| Loss before provision for income taxes | (3,054) | (3,547) | (4,257) | (3,767) | (3,898) | (5,753) | (6,486) | (6,521) |
| Provision for income taxes | (176) | 83 | 118 | 142 | 42 | 142 | 64 | 73 |
| Net loss | $ (2,878) | $ (3,630) | $ (4,375) | $ (3,909) | $ (3,940) | $ (5,895) | $ (6,550) | $ (6,594) |
| Net loss per share attributable to common stockholders, basic and diluted | (0.06) | (0.08) | (0.10) | (0.10) | (0.10) | (0.15) | (0.16) | (0.17) |
| Weighted-average shares used to compute net loss per share attributable to common stockholders, basic and diluted | 46,783 | 46,460 | 43,147 | 40,757 | 40,521 | 39,965 | 39,706 | 39,450 |

53

Table of Contents

(1) Stock-based compensation expense included above was as follows:

|  | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Dec. 31, 2017 | Sept. 30, 2017 | June 30, 2017 | March 31, 2017 | Dec. 31, 2016 | Sept. 30, 2016 | June 30, 2016 | March 31, 2016 |
|  | (in thousands) | | | | | | | |
| Cost of revenue | $ 420 | $ 287 | $ 366 | $ 261 | $ 244 | $ 231 | $ 220 | $ 215 |
| Sales and marketing | 859 | 836 | 671 | 506 | 423 | 613 | 440 | 583 |
| Research and development | 1,190 | 1,167 | 980 | 527 | 515 | 490 | 470 | 495 |
| General and administrative | 1,707 | 1,625 | 1,496 | 1,203 | 975 | 975 | 1,253 | 620 |
| Total stock-based compensation expense | $ 4,176 | $ 3,915 | $ 3,513 | $ 2,497 | $ 2,157 | $ 2,309 | $ 2,383 | $ 1,913 |

|  | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Dec. 31, 2017 | Sept. 30, 2017 | June 30, 2017 | March 31, 2017 | Dec. 31, 2016 | Sept. 30, 2016 | June 30, 2016 | March 31, 2016 |
|  | (percentage of revenue) | | | | | | | |
| Revenue | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| Cost of revenue | 28 % | 28 % | 29 % | 28 % | 30 % | 31 % | 32 % | 31 % |
| Gross margin | 72 % | 72 % | 71 % | 72 % | 70 % | 69 % | 68 % | 69 % |
| Operating expenses: | | | | | | | | |
| Sales and marketing | 40 % | 40 % | 39 % | 39 % | 39 % | 41 % | 41 % | 41 % |
| Research and development | 19 % | 19 % | 20 % | 20 % | 20 % | 22 % | 22 % | 23 % |
| General and administrative | 19 % | 21 % | 21 % | 21 % | 21 % | 21 % | 23 % | 24 % |
| Total operating expenses | 78 % | 80 % | 80 % | 80 % | 80 % | 84 % | 86 % | 88 % |
| Loss from operations | (6)% | (8)% | (9)% | (8)% | (10)% | (15)% | (18)% | (19)% |
| Interest income (expense), net | — % | — % | (1)% | (1)% | — % | (1)% | (1)% | (1)% |
| Other income (expense), net | — % | — % | — % | — % | — % | — % | — % | — % |
| Loss before provision for income taxes | (6)% | (8)% | (10)% | (9)% | (10)% | (16)% | (19)% | (20)% |
| Provision for income taxes | — % | — % | — % | — % | — % | (1)% | (1)% | (1)% |
| Net loss | (6)% | (8)% | (10)% | (9)% | (10)% | (17)% | (20)% | (21)% |

### Adjusted EBITDA(1)

|  | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | Dec. 31, 2017 | Sept. 30, 2017 | June 30, 2017 | March 31, 2017 | Dec. 31, 2016 | Sept. 30, 2016 | June 30, 2016 | March 31, 2016 |
|  | (in thousands) | | | | | | | |
| Net loss | $ (2,878) | $ (3,630) | $ (4,375) | $ (3,909) | $ (3,940) | $ (5,895) | $ (6,550) | $ (6,594) |
| Stock-based compensation | 4,176 | 3,915 | 3,513 | 2,497 | 2,157 | 2,309 | 2,383 | 1,913 |
| Depreciation and amortization | 2,414 | 2,337 | 2,309 | 2,090 | 2,084 | 2,013 | 1,810 | 1,848 |
| Provision for income tax | (176) | 83 | 118 | 142 | 42 | 142 | 64 | 73 |
| Other (income) expense, net | 94 | (217) | 104 | 294 | 235 | 351 | 353 | 386 |
| Adjusted EBITDA | $ 3,630 | $ 2,488 | $ 1,669 | $ 1,114 | $ 578 | $ (1,080) | $ (1,940) | $ (2,374) |

(1)   We define Adjusted EBITDA as our net loss before stock-based compensation expense, depreciation and amortization, provision for income taxes, and other income (expense), net, which consisted of interest income (expense), net, and other income (expense), net.

Table of Contents

**Quarterly Trends**

Our quarterly revenue increased sequentially for each period presented. The quarterly revenue increases were due to varying reasons, including, pricing increases, an increased adoption of our branded mobile app offering, an increase in the number of high value subscribers, an increase in the volume of transactions processed by our customers on our payments platform combined with an increase in the number of high value subscribers that utilize our payments platform as well as an increase in the value retained from these transactions, and an increase in revenue from API and technology partners.

Our quarterly total operating expenses increased sequentially for each period presented, primarily due to increased expenses related to our rapid growth, including continued expansion of our technical infrastructure and expenses related to increases in employee headcount.

Historical patterns in our business may not be a reliable indicator of our future revenue growth or performance.

**Liquidity and Capital Resources**

As of December 31, 2017 and December 31, 2016, we had cash and cash equivalents of $232.0 million and $85.9 million, respectively. Cash and cash equivalents consist of cash on deposit and money market funds.

In June 2015, we completed our IPO in which we issued and sold 7,150,000 shares of our Class A common stock at a public offering price of $14.00 per share, resulting in aggregate proceeds of approximately $93.1 million, net of underwriters' discounts and commissions but before deducting offering expenses of approximately $4.0 million.

In May 2017, we completed a follow-on public offering in which we issued and sold 5,060,000 shares of Class A common stock at a public offering price of $27.95 per share. We received net proceeds of $134.7 million after deducting underwriters' discounts and commissions of $6.7 million, but before deducting offering expenses of approximately $0.4 million.

In January 2015, we entered into a loan agreement with Silicon Valley Bank for a secured revolving credit facility that allows us to borrow up to $20 million for working capital and general business requirements. Borrowings under our loan agreement are available based on a percentage of our monthly recurring revenue for the previous three months. Amounts outstanding under the credit facility will bear interest at the greater of the prime rate (4.5% as of December 31, 2017) plus 0.5%, or 3.25% with accrued interest payable on a monthly basis and outstanding and unpaid principal due upon maturity of the credit facility in January 2018. The credit facility is secured by substantially all of our corporate assets. We also granted and pledged a security interest to the lender in all rights, title, and interest in our intellectual property. We are also subject to certain reporting and financial performance covenants, which require us to meet certain revenue targets. We did not draw down any amounts under the loan agreement during the year ended December 31, 2017.

In the first quarter of 2018 we amended our loan agreement with Silicon Valley Bank, which amended, among other things, (a) extended the maturity date of the revolving credit facility from January 12, 2018 to January 11, 2019, (b) added an accordion feature for the revolving credit facility, such that the revolving credit facility may, upon our request and subject to certain conditions, be increased by an aggregate amount of up to $20 million, (c) reduced the interest rate to the greater of the prime rate or 4.5% and (d) deleted the revenue covenant.

We believe that our existing cash and cash equivalents balance will be sufficient to meet our working capital requirements for at least the next 12 months. However, our liquidity assumptions may prove to be incorrect, and we could utilize our available financial resources sooner than we currently expect. Our future capital requirements and the adequacy of available funds will depend on many factors, including our growth rate, the timing and extent of spending to support development efforts, the expansion of sales and marketing activities, and those factors set forth in the "Risk Factors" section of this Annual Report on Form 10-K. We cannot assure you that we will be able to raise additional capital on acceptable terms or at all. In addition, if we fail to meet our operating plan during the next 12 months, our liquidity and ability to operate our business could be adversely affected.

Table of Contents

The following table summarizes our cash and cash equivalents and our cash flows for the periods presented (in thousands):

| | As of December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| Cash and cash equivalents | $ 232,019 | $ 85,864 |

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **2015** |
| Cash provided by (used in) operating activities | $ 11,110 | $ (3,896) | $ (18,574) |
| Cash used in investing activities | (10,513) | (12,729) | (12,131) |
| Cash provided by financing activities | 145,296 | 9,167 | 89,518 |

***Operating Activities***

During the year ended December 31, 2017, operating activities provided $11.1 million, primarily as a result of $23.6 million of non-cash charges included in our net loss of $14.8 million, and $2.3 million provided by the net change in operating assets and liabilities. The non-cash charges primarily consisted of $14.1 million of stock-based compensation expense and $9.2 million of depreciation and amortization expense. The net change in operating assets and liabilities was primarily a result of a $4.3 million increase in accounts payable, accrued expenses, and other liabilities and a $1.4 million increase in deferred revenue, which were partially offset by a $1.9 million increase in prepaid expenses and other current assets and a $1.7 million increase in accounts receivable. The increase in accounts payable, accrued expenses, and other liabilities was due to the increase in headcount and the timing of payments to our vendors and employees.

During the year ended December 31, 2016, operating activities used $3.9 million, primarily as a result of our net loss of $23.0 million, partially offset by $16.8 million of non-cash charges and $2.3 million provided by the net change in operating assets and liabilities. The non-cash charges primarily consisted of $8.8 million of stock-based compensation expense and $7.8 million of depreciation and amortization expense. The net change in operating assets and liabilities was primarily a result of a $2.7 million increase in accounts payable, accrued expenses, and other liabilities and a $2.8 million increase in deferred revenue, which were partially offset by a $2.6 million increase in accounts receivable and a $0.6 million increase in prepaid expenses and other current assets. The increase in accounts receivable was primarily from higher payments revenue. The increase in accounts payable, accrued expenses, and other liabilities was due to the increase in headcount and the timing of payments to our vendors and employees.

During the year ended December 31, 2015, operating activities used $18.6 million, primarily as a result of our net loss of $36.1 million, offset by $15.4 million of non-cash charges, primarily consisting of $8.4 million of stock-based compensation expense and $6.5 million of depreciation and amortization expense, and a $2.1 million net change in operating assets and liabilities. The change in net operating assets and liabilities were primarily a result of a $3.5 million increase in accounts payable, accrued expenses, and other current liabilities due to the increase in headcount and the timing of payments to our vendors and contributions from our employees under our employee stock purchase plan, in addition to a $2.6 million increase in deferred revenue. These were partially offset by a $3.8 million increase in accounts receivable resulting primarily from higher payments revenue.

***Investing Activities***

During the year ended December 31, 2017, investing activities used $10.5 million as a result of purchases of property and equipment of $6.9 million, additions of intangible assets through the capitalization of qualifying development costs of $2.0 million, and cash paid to acquire a business of $1.7 million.

During the year ended December 31, 2016, investing activities used $12.7 million as a result of purchases of property and equipment of $8.6 million and cash paid to acquire a business of $4.1 million.

During the year ended December 31, 2015, investing activities used $12.1 million, primarily as a result of purchases of property and equipment of $9.9 million and cash paid to acquire a business of $3.0 million.

***Financing Activities***

During the year ended December 31, 2017, financing activities provided $145.3 million, consisting primarily of $134.3 million in net proceeds from the issuance of Class A common stock in May 2017, $10.0 million in proceeds from the exercise of equity awards

and $3.2 million in proceeds from our employee stock purchase plan, which was partially offset by $1.7 million in tax payments related to employee shares withheld from RSUs vesting during the period.

56

Table of Contents

During the year ended December 31, 2016, financing activities provided $9.2 million, consisting primarily of proceeds from the exercise of equity awards of $6.6 million and proceeds from our employee stock purchase plan of $3.0 million, which was partially offset by $0.5 million in repayments on financing and capital lease obligations.

During the year ended December 31, 2015, financing activities provided $89.5 million, consisting of $93.1 million in proceeds from our initial public offering, partially offset by $3.4 million in payments of offering costs.

## Contractual Obligations and Commitments

Our principal commitments consist of obligations under non-cancelable lease agreements for our corporate headquarters in San Luis Obispo, California, our smaller regional offices throughout the United States, and international locations in the United Kingdom and Australia, and non-cancelable purchase commitments for software subscriptions and communication services.  The following summarizes our contractual obligations and commitments as of December 31, 2017:

| | | Payment Due by Period | | | |
| --- | --- | --- | --- | --- | --- |
| | Total | Less Than 1 Year | 1-3 Years | 3-5 Years | More Than 5 Years |
| | | | (in thousands) | | |
| Operating leases[1] | $ 31,418 | $ 4,703 | $ 9,424 | $ 7,184 | $ 10,107 |
| Finance obligation, building leases[2] | 24,551 | 1,679 | 3,510 | 3,725 | 15,637 |
| Purchase commitments | 5,949 | 2,819 | 3,130 | — | — |
| Total minimum payments | $ 61,918 | $ 9,201 | $ 16,064 | $ 10,909 | $ 25,744 |

[1] We lease office facilities under various non-cancelable operating lease agreements.

[2] For certain build-to-suit lease arrangements where we have concluded that we are the "deemed owner" of a building (for accounting purposes only) during the construction period, we are required to record an asset with a corresponding construction financing obligation for the costs incurred by the landlord.

## Off Balance Sheet Arrangements

As of December 31, 2017, we did not have any relationships with unconsolidated entities or financial partnerships, such as structured finance or special purpose entities, which were established for the purpose of facilitating off-balance sheet arrangements or other purposes.

## Segment Information

We have one primary business activity and operate in one reportable segment.

## Critical Accounting Policies and Estimates

Our consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses, and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. We evaluate our estimates and assumptions on an ongoing basis. Actual results may differ from these estimates. To the extent that there are material differences between these estimates and our actual results, our future financial statements will be affected.

We believe that the assumptions and estimates associated with revenue recognition, internal-use software development costs and the useful life of that software, income taxes, stock-based compensation expense and valuation assumptions have the greatest potential impact on our consolidated financial statements.  Therefore, we consider these to be our critical accounting policies and estimates.

For further information on all of our significant accounting policies, see the notes to our consolidated financial statements.

### Revenue Recognition

We recognize revenue on a transaction when all of the following conditions have been satisfied:
- persuasive evidence of an agreement exists;

57

Table of Contents

- the service has been or is being provided to the customer or delivery of the product has occurred;
- fees are fixed or determinable; and
- the collection of the fees is reasonably assured.

Our primary sources of revenue are derived from monthly subscription and support services and revenue share arrangements with technology partners and third-party payment processors. The subscription revenue is recognized ratably over the term of the agreement, which is most often monthly but can be quarterly or annual. Our customers enter into separate arrangements with technology partners and third-party payment processors. Revenue derived from revenue share arrangements with technology partners and third-party payment processors is recognized in the period services are rendered on a net basis. We also earn revenue from API platform partners for customer site access, data query, and consumer bookings. The revenue from API platform partners is recorded in the period services are rendered on a gross basis.

In certain circumstances, our arrangements include multiple elements which may consist of some or all of subscription services, support services, and hardware products. When multiple-element arrangements exist, we evaluate whether any of these deliverables should be accounted for as separate units of accounting.

Our support services do not have standalone value because we and other vendors do not sell support services separately. Such support services are therefore combined with our subscription services as a single unit of accounting. Our hardware products, such as point-of-sale systems, have standalone value because we and other vendors sell the same products separately. Additionally, while there is a general right of return relative to our hardware products, which are generally delivered upfront, performance of the subscription and support services is considered probable and substantially in our control. Accordingly, we consider the separate units of accounting in our multiple-element arrangements to be the hardware products and subscription and support services. For arrangements with multiple elements which can be separated into different units of accounting, we allocate the arrangement fee to the separate units of accounting based on vendor-specific objective evidence, as demonstrated by separate sales with sufficient concentration in selling prices.

### *Capitalized Software Costs*

We capitalize certain development costs incurred in connection with internal use software. Software projects qualify for capitalization when they add significant new functionality that was not previously available in any former version of our software. Capitalization begins when the preliminary project stage is complete, management with the relevant authority authorizes and commits to the funding of the software project, it is probable the project will be completed, and the software will be used to perform the functions intended and certain functional and quality standards have been met. Capitalization of these costs ceases once the project is substantially complete and the software is ready for its intended purpose.

Research and development costs incurred during the preliminary project stage or costs incurred for training, maintenance, and general and administrative or overhead costs are expensed as incurred. Development costs related to upgrades or enhancements to existing applications are expensed as maintenance costs because such projects do not significantly enhance functionality.

Capitalized software development costs are amortized to cost of revenue using the straight-line method over an estimated useful life of the software of two to three years, commencing when the software is ready for its intended use.

### *Income Taxes*

We account for income taxes under the asset and liability method of accounting for income taxes. Under this method, deferred taxes are recognized for the future tax consequences attributable to differences between the consolidated financial statement carrying amounts of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates expected to be applied to taxable income in the years in which those temporary differences are expected to be recovered or settled. A valuation allowance is recorded to reduce the carrying amount of deferred tax assets, unless it is more likely than not such assets will be realized.

We also apply the provisions for uncertainty of income taxes. This guidance prescribes a recognition threshold and measurement attribute for consolidated financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities. This guidance also applies to various related matters, such as derecognition, interest, penalties, and required disclosures. We recognize interest and penalties, if any, related to unrecognized tax benefits in our income tax provision.

Table of Contents

### *Stock-Based Compensation*

Stock-based compensation expense is measured and recognized in the financial statements based on the fair value of the awards granted. The fair value of stock option awards and stock purchases under our employee stock purchase plan (ESPP) are estimated on the grant date using the Black-Scholes option pricing model. The fair value of restricted stock awards and restricted stock units is considered to be the closing market price of our Class A common stock on the grant date. Stock-based compensation expense is recognized, net of forfeitures, using a straight-line basis over the requisite service period of the awards, which is generally four years. We estimate a forfeiture rate to calculate the stock-based compensation for our awards based on an analysis of our actual historical experience and expected employee attrition rates.

Our use of the Black-Scholes option-pricing model requires the input of highly subjective assumptions, including the fair value of the underlying common stock, expected term of the option, expected volatility of the price of our common stock, risk-free interest rates, and the expected dividend yield of our common stock. The assumptions used in our option-pricing model represent management's best estimates. These estimates involve inherent uncertainties and the application of management's judgment. If factors change and different assumptions are used, our stock-based compensation expense could be materially different in the future.

These assumptions and estimates are as follows:

- *Fair value of common stock.* Prior to our IPO in June 2015, the fair value of the common stock underlying our stock-based awards was determined by our board of directors, with input from management and a third-party valuation firm as discussed below under the heading "Common Stock Valuations Prior to Our Initial Public Offering". Since our IPO, the fair value of common stock was determined based on the closing market price of our Class A common stock as reported on the NASDAQ Stock Market at each grant date.
- *Expected term.* The expected term of employee stock options represents the weighted-average period that the stock options are expected to remain outstanding.
- *Volatility.* As we have a limited trading history for our common stock, the expected stock price volatility for our common stock was estimated by taking the average historic price volatility for industry peers based on daily price observations over a period equivalent to the expected term of the stock option grants. Industry peers consist of several public companies in our industry which are similar in size, stage of life cycle, and financial leverage. We did not rely on implied volatilities of traded stock options in our industry peers' common stock because the volume of activity was relatively low. We intend to continue to consistently apply this methodology using the same or similar public companies until sufficient historical information regarding the volatility of our Class A common stock price becomes available, or unless circumstances change such that the identified companies are no longer similar to MINDBODY, in which case, more suitable companies whose share prices are publicly available would be utilized in the calculation.
- *Risk-free interest rate.* We base the risk-free interest rate used in the Black-Scholes option-pricing model on the yields of U.S. Treasury securities with maturities appropriate for the term of employee stock option awards.
- *Dividend yield.* We have never declared or paid any cash dividends and do not presently plan to pay cash dividends on our common stock in the foreseeable future. Consequently, we used an expected dividend yield of zero.

The following table summarizes the assumptions used in the Black-Scholes option-pricing model to determine the fair value of our stock options as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2017** | **2016** | **2015** |
| Expected term (in years) | 5.8 | 5.8 | 5.8 |
| Expected volatility | 38% - 44% | 44% - 45% | 45% - 46% |
| Risk-free interest rate | 1.8% - 2.1% | 1.2% - 1.9% | 1.4% - 1.8% |
| Expected dividend yield | 0% | 0% | 0% |

59

Table of Contents

In addition to the assumptions used in the Black-Scholes option-pricing model, we must also estimate a forfeiture rate to calculate the stock-based compensation expense for our awards.  Our forfeiture rate is based on historical experience and expected employee attrition rates.  We will continue to evaluate the appropriateness of the forfeiture rate based on actual forfeiture experience, analysis of employee turnover, and other factors.  Quarterly changes in the estimated forfeiture rate can have a significant impact on our stock-based compensation expense as the cumulative effect of adjusting the rate is recognized in the period the forfeiture estimate is changed.  If a revised forfeiture rate is higher than the previously estimated forfeiture rate, an adjustment is made that will result in a decrease to the stock-based compensation expense recognized in the financial statements.  If a revised forfeiture rate is lower than the previously estimated forfeiture rate, an adjustment is made that will result in an increase to the stock-based compensation expense recognized in the financial statements.

We will continue to use judgment in evaluating the assumptions related to our stock-based compensation on a prospective basis.  As we continue to accumulate additional data related to our common stock, we may have refinements to our estimates, which could materially impact our future stock-based compensation expense.

### Common Stock Valuations Prior to Our Initial Public Offering

Prior to completion of our IPO, we were a private company with no active public market for our common stock. The fair value of the common stock underlying our stock options was determined by our board of directors, which intended all options granted to be exercisable at a price per share not less than the per share fair value of our common stock underlying those options on the date of grant.  The valuations of our common stock were determined in accordance with the guidelines outlined in the American Institute of Certified Public Accountants Practice Aid, *Valuation of Privately-Held-Company Equity Securities Issued as Compensation*, or AICPA Practice Aid.  The assumptions we used in the valuation model were based on future expectations combined with management judgment.  In the absence of a public trading market, our board of directors, with input from management and assistance of third-party valuation specialists hired by us, exercised significant judgment and considered numerous objective and subjective factors to determine the fair value of our common stock as of the date of each option grant, including the following factors:

- contemporaneous valuations performed by unrelated third-party specialists;
- the prices, rights, preferences, and privileges of our redeemable convertible preferred stock relative to those of our common stock;
- the prices of our redeemable convertible preferred stock and common stock sold to outside investors in arm's-length transactions;
- the lack of marketability of our common stock;
- our actual operating and financial performance;
- current business conditions and projections;
- our hiring of key personnel and the experience of our management;
- our history and the timing of the introduction of new products and services;
- our stage of development;
- the likelihood of achieving a liquidity event, such as an initial public offering or a merger or acquisition of our company given prevailing market conditions;
- the illiquidity of stock-based awards involving securities in a private company;
- the market performance of comparable publicly traded companies; and
- the U.S. and global capital market conditions.

The valuations were highly complex and subjective.  Following the completion of our initial public offering in June 2015, common stock valuations were no longer necessary as we rely on market prices as reported on the NASDAQ Stock Market to determine the fair value of our common stock.

### Redeemable Convertible Preferred Stock

Prior to completion of our IPO, we recorded the carrying value of redeemable convertible preferred stock at fair value upon issuance, net of issuance costs, accreted to its estimated redemption value using the effective interest method.  Accretion to the carrying value was recorded as an increase in the carrying value of the redeemable convertible preferred stock and a reduction of stockholder's deficit.

60

Table of Contents

We reviewed the rights and preferences of our redeemable convertible preferred stock for any changes in terms, rights or preferences to determine if such change is a modification or an extinguishment. An amendment that, based on either quantitative or qualitative considerations, changes a substantive contractual term or fundamentally changes the nature of the preferred share is considered an extinguishment. We considered both expected economics as well as the business purpose of the amendment. If considered an extinguishment, we removed the carrying value of the old securities and recognized the new securities at their current fair value. If considered a modification, we recognized the change in the fair value of the security immediately before and after the amendment as either a deemed dividend or a deemed capital contribution.

### *Preferred Stock Warrant*

Prior to completion of our IPO, we accounted for freestanding warrants to purchase shares of our redeemable convertible preferred stock as liabilities in the consolidated balance sheets at their estimated fair value. Our preferred stock warrant was subject to re-measurement at each balance sheet date, and any change in fair value was recognized as a component of other expense, net, in the consolidated statements of operations.

### *Recently Issued and Adopted Accounting Pronouncements*

For a discussion of new accounting pronouncements, refer to Note 1 – "Summary of Business and Significant Accounting Policies" contained in the "Notes to Audited Consolidated Financial Statements" in Item 15 of Part IV of this Annual Report on Form 10-K.

## Item 7A. Quantitative and Qualitative Disclosures about Market Risk.

### *Foreign Currency Exchange Risk*

We have foreign currency risks related to our revenue and expenses denominated in currencies other than the U.S. Dollar, principally the British Pound Sterling, the Euro and the Australian Dollar, which are subject to fluctuations due to changes in foreign currency exchange rates. Additionally, fluctuations in foreign currency exchange rates may cause us to recognize transaction gains and losses in our statements of operations. To date, foreign currency transaction gains and losses have not been material to our financial statements, and we have not engaged in foreign currency hedging transactions. A hypothetical 10% change in foreign currency exchange rates during any of the periods presented would not have had a material impact on our consolidated financial statements. As our international operations grow, we will continue to reassess our approach to managing the risks relating to fluctuations in currency rates.

### *Interest Rate Risk*

Our cash and cash equivalents consist of cash on deposit and money market accounts. The primary objective of our investment activities is to preserve principal while maximizing income without significantly increasing risk. Because our cash equivalents have a short maturity, our portfolio's fair value is relatively insensitive to interest rate changes. To date, we have not been exposed, nor do we anticipate being exposed, to material risks due to changes in interest rates. A hypothetical 100 basis points change in interest rates during any of the periods presented would not have had a material impact on our consolidated financial statements. In future periods, we will continue to evaluate our investment policy in order to ensure that we continue to meet our overall objectives.

## Item 8. Financial Statements and Supplementary Data.

The consolidated financial statements required pursuant to this item are included in Part IV, Item 15 of this Annual Report on Form 10-K, and are presented beginning on page F-1.

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure.

None.

## Item 9A. Controls and Procedures.

### *Limitations on Effectiveness of Controls*

In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

61

Table of Contents

### *Evaluation of Disclosure Controls and Procedures*

Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Annual Report on Form 10-K, our disclosure controls and procedures are designed at a reasonable assurance level and are effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

### *Changes in Internal Control over Financial Reporting*

There was no change in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the fourth fiscal quarter of fiscal 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Based on that assessment, our management has concluded that our internal control over financial reporting was effective as of December 31, 2017. The effectiveness of our internal control over financial reporting as of December 31, 2017 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in its report which appears herein.

### Item 9B. Other Information.

None.

Table of Contents

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

The information required by this item is incorporated herein by reference from our definitive proxy statement relating to our Annual Meeting of Stockholders to be held in 2018.  The definitive proxy statement will be filed with the SEC within 120 days after the end of the 2017 fiscal year.

Our Board of Directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including our Chief Executive Officer, Chief Financial Officer, and other executive and senior financial officers. The full text of our Code of Business Conduct and Ethics is posted on the Corporate Governance portion of our website at investors.mindbodyonline.com. We will post amendments to our Code of Business Conduct and Ethics or waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

**Item 11. Executive Compensation.**

The information required by this item is incorporated herein by reference from our definitive proxy statement relating to our Annual Meeting of Stockholders to be held in 2018.  The definitive proxy statement will be filed with the SEC within 120 days after the end of the 2017 fiscal year.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

The information required by this item is incorporated herein by reference from our definitive proxy statement relating to our Annual Meeting of Stockholders to be held in 2018.  The definitive proxy statement will be filed with the SEC within 120 days after the end of the 2017 fiscal year.

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

The information required by this item is incorporated herein by reference from our definitive proxy statement relating to our Annual Meeting of Stockholders to be held in 2018.  The definitive proxy statement will be filed with the SEC within 120 days after the end of the 2017 fiscal year.

**Item 14. Principal Accounting Fees and Services.**

The information required by this item is incorporated herein by reference from our definitive proxy statement relating to our Annual Meeting of Stockholders to be held in 2018.  The definitive proxy statement will be filed with the SEC within 120 days after the end of the 2017 fiscal year.

Table of Contents

## PART IV

**Item 15. Exhibits, Financial Statement Schedules.**

(a) The following documents are filed as part of this Annual Report on Form 10-K:

    (1) Financial Statements:

| | **Page** |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Operations | F-5 |
| Consolidated Statements of Comprehensive Loss | F-6 |
| Consolidated Statements of Redeemable Convertible   Preferred Stock and Stockholders' Equity (Deficit) | F-7 |
| Consolidated Statements of Cash Flows | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

    (2) Financial Statement Schedules

All financial statement schedules have been omitted because they are not required, not applicable, not present in amounts sufficient to require submission of the schedule, or the required information is shown in our Consolidated Financial Statements or Notes thereto.

    (3) Exhibits

The documents listed in the Exhibit Index of this Annual Report on Form 10-K are incorporated by reference or are filed or furnished with this Annual Report on Form 10-K, in each case as indicated therein (numbered in accordance with Item 601 of Regulation S-K).

64

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

MINDBODY, Inc.

Date:  March 1, 2018                                     By:   _____/s/ Richard Stollmeyer_____

Richard Stollmeyer
Chief Executive Officer

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Richard Stollmeyer and Brett White, and each of them, as his or her true and lawful attorney-in-fact and agent with full power of substitution, for him or her in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact, proxy, and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully for all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorney-in-fact, proxy and agent, or his substitute, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Name | Title | Date |
|---|---|---|
| /s/ Richard Stollmeyer<br>Richard Stollmeyer | Chief Executive Officer and Director<br>(Principal Executive Officer) | March 1, 2018 |
| /s/ Brett White<br>Brett White | Chief Financial Officer and Chief Operating Officer<br>(Principal Financial Officer and Principal Accounting Officer) | March 1, 2018 |
| /s/ Katherine Blair Christie<br>Katherine Blair Christie | Director | March 1, 2018 |
| /s/ Court Cunningham<br>Court Cunningham | Director | March 1, 2018 |
| /s/ Gail Goodman<br>Gail Goodman | Director | March 1, 2018 |
| /s/ Cipora Herman<br>Cipora Herman | Director | March 1, 2018 |
| /s/ Eric Liaw<br>Eric Liaw | Director | March 1, 2018 |

| /s/ Adam Miller | Director | March 1, 2018 |
| --- | --- | --- |
| Adam Miller | | |

| /s/ Graham Smith | Director | March 1, 2018 |
| --- | --- | --- |
| Graham Smith | | |

65

Table of Contents

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | |
|---|---|
| Reports of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-4 |
| Consolidated Statements of Operations | F-5 |
| Consolidated Statements of Comprehensive Loss | F-6 |
| Consolidated Statements of Redeemable Convertible   Preferred Stock and Stockholders' Equity (Deficit) | F-7 |
| Consolidated Statements of Cash Flows | F-8 |
| Notes to Consolidated Financial Statements | F-9 |

F-1

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the stockholders and the Board of Directors of MINDBODY, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of MINDBODY, Inc. and subsidiaries (the "Company") as of December 31, 2017 and 2016, the related consolidated statements of operations, comprehensive loss, redeemable convertible preferred stock and stockholders' equity (deficit) and cash flows for each of the three years in the period ended December 31, 2017, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2017, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 1, 2018 expressed an unqualified opinion on the Company's internal control over financial reporting.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities law and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Deloitte & Touche LLP

San Jose, California
March 1, 2018

We have served as the Company's auditor since 2010.

F-2

Table of Contents

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the stockholders and the Board of Directors of MINDBODY, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited the internal control over financial reporting of MINDBODY, Inc. and subsidiaries (the "Company") as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the COSO.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated financial statements as of and for the year ended December 31, 2017, of the Company and our report dated March 1, 2018 expressed an unqualified opinion on those financial statements.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Deloitte & Touche LLP

San Jose, California
March 1, 2018

F-3

**MINDBODY, Inc.**
**Consolidated Balance Sheets**
*(in thousands, except share and per share data)*

|  | As of December 31, | | |
|---|---|---|---|
|  | **2017** | | **2016** |
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 232,019 | $ | 85,864 |
| Accounts receivable | 10,917 | | 9,129 |
| Prepaid expenses and other current assets | 5,612 | | 3,702 |
| Total current assets | 248,548 | | 98,695 |
| Property and equipment, net | 32,871 | | 33,084 |
| Intangible assets, net | 7,377 | | 2,047 |
| Goodwill | 11,583 | | 9,039 |
| Other non-current assets | 934 | | 650 |
| TOTAL ASSETS | $ 301,313 | $ | 143,515 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 7,448 | $ | 4,827 |
| Accrued expenses and other liabilities | 13,099 | | 10,470 |
| Deferred revenue, current portion | 6,318 | | 4,859 |
| Other current liabilities | 1,828 | | 581 |
| Total current liabilities | 28,693 | | 20,737 |
| Deferred revenue, non-current portion | 3,201 | | 3,269 |
| Deferred rent, non-current portion | 1,966 | | 1,387 |
| Financing obligation on leases, non-current portion | 14,932 | | 15,450 |
| Other non-current liabilities | 585 | | 1,016 |
| Total liabilities | 49,377 | | 41,859 |
| Commitments and contingencies (Note 7) | | | |
| Stockholders' equity: | | | |
| Class A common stock, par value of $0.000004 per share; 1,000,000,000 shares authorized, 43,041,405 and 30,820,502 shares issued and outstanding as of December 31, 2017 and 2016, respectively. | 1 | | — |
| Class B common stock, par value of $0.000004 per share; 100,000,000 shares authorized, 3,901,966 and 9,777,757 shares issued and outstanding as of December 31, 2017 and 2016, respectively. | — | | — |
| Additional paid-in capital | 454,196 | | 289,317 |
| Accumulated other comprehensive loss | (108) | | (300) |
| Accumulated deficit | (202,153) | | (187,361) |
| Total stockholders' equity | 251,936 | | 101,656 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 301,313 | $ | 143,515 |

The accompanying notes are an integral part of these consolidated financial statements.

F-4

**MINDBODY, Inc.**
**Consolidated Statements of Operations**
*(in thousands, except per share data)*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Revenue | $ 182,626 | $ 139,021 | $ 101,369 |
| Cost of revenue | 51,870 | 43,080 | 37,190 |
| Gross profit | 130,756 | 95,941 | 64,179 |
| Operating expenses: | | | |
| Sales and marketing | 71,825 | 56,460 | 46,345 |
| Research and development | 35,810 | 30,316 | 23,057 |
| General and administrative | 37,471 | 30,497 | 29,530 |
| Change in fair value of contingent consideration | — | — | (11) |
| Total operating expenses | 145,106 | 117,273 | 98,921 |
| Loss from operations | (14,350) | (21,332) | (34,742) |
| Change in fair value of preferred stock warrant | — | — | (25) |
| Interest income (expense), net | 109 | (1,123) | (943) |
| Other expense, net | (384) | (203) | (132) |
| Loss before provision for income taxes | (14,625) | (22,658) | (35,842) |
| Provision for income taxes | 167 | 321 | 246 |
| Net loss | (14,792) | (22,979) | (36,088) |
| Accretion of redeemable convertible preferred stock | — | — | (9,862) |
| Deemed dividend—preferred stock modification | — | — | 1,748 |
| Net loss attributable to common stockholders | $ (14,792) | $ (22,979) | $ (44,202) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.33) | $ (0.58) | $ (1.68) |
| Weighted-average shares used to compute net loss per share attributable to common stockholders, basic and diluted | 44,309 | 39,913 | 26,320 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**MINDBODY, Inc.**
**Consolidated Statements of Comprehensive Loss**
*(in thousands)*

|  | Year Ended December 31, | | |
|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Net loss | $ (14,792) | $ (22,979) | $ (36,088) |
| Other comprehensive loss, net of taxes: | | | |
| Change in cumulative translation adjustment | 192 | (29) | (139) |
| Comprehensive loss | $ (14,600) | $ (23,008) | $ (36,227) |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**MINDBODY, Inc.**

**Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit)**

*(in thousands, except share data)*

| | Redeemable Convertible Preferred Stock | | Class A and B Common Stock[1] | | Additional Paid-In Capital | Accumulated Other Comprehensive Loss | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance as of January 1, 2015 | 20,454,489 | 166,448 | 11,189,360 | — | — | (132) | (124,793) | (124,925) |
| Reclassification of restricted stock award liability to common stock | — | — | — | — | 88 | — | — | 88 |
| Deemed dividend—preferred stock modification | — | (1,748) | — | — | — | — | 1,748 | 1,748 |
| Accretion of redeemable convertible preferred stock to redemption value | — | 9,862 | — | — | (4,613) | — | (5,249) | (9,862) |
| Issuance of common stock upon initial public offering, net of offering costs of $4,024 | — | — | 7,150,000 | — | 89,069 | — | — | 89,069 |
| Conversion of redeemable convertible preferred stock to common stock in connection with initial public offering | (20,454,489) | (174,562) | 20,673,680 | — | 174,562 | — | — | 174,562 |
| Reclassification of preferred stock warrant liability to equity in connection with initial public offering | — | — | — | — | 1,213 | — | — | 1,213 |
| Stock-based compensation expense | — | — | — | — | 8,375 | — | — | 8,375 |
| Issuance of common stock for equity awards, net of tax withholdings | — | — | 34,140 | — | 242 | — | — | 242 |
| Issuance of common stock upon net exercise of warrants | — | — | 76,565 | — | — | — | — | — |
| Issuance of stock for business acquisition | — | — | 103,617 | — | 1,500 | — | — | 1,500 |
| Other comprehensive loss | — | — | — | — | — | (139) | — | (139) |
| Net loss | — | — | — | — | — | — | (36,088) | (36,088) |
| Balance as of December 31, 2015 | — | — | 39,227,362 | — | 270,436 | (271) | (164,382) | 105,783 |
| Stock-based compensation expense | — | — | — | — | 8,763 | — | — | 8,763 |
| Issuance of common stock for contingent consideration payment | — | — | 207,234 | — | — | — | — | — |
| Issuance of common stock for equity awards, net of tax withholdings | — | — | 857,489 | — | 6,578 | — | — | 6,578 |
| Issuance of common stock under employee stock purchase plan | — | — | 277,215 | — | 3,040 | — | — | 3,040 |
| Issuance of common stock related to HealCode Acquisition | | | 28,959 | | 500 | | | 500 |
| Other comprehensive income | — | — | — | — | — | (29) | — | (29) |
| Net loss | — | — | — | — | — | — | (22,979) | (22,979) |
| Balance as of December 31, 2016 | — | — | 40,598,259 | — | 289,317 | (300) | (187,361) | 101,656 |
| Stock-based compensation expense | — | — | — | — | 13,898 | — | — | 13,898 |
| Issuance of common stock for equity awards, net of tax withholdings | — | — | 1,013,661 | — | 8,334 | — | — | 8,334 |
| Issuance of common stock under employee stock purchase plan | — | — | 271,451 | — | 3,238 | — | — | 3,238 |
| Earn-out deemed consideration related to Lymber Acquisition | | | | | 5,143 | | | 5,143 |
| Issuance of common stock upon follow-on public offering, net of offering costs | | | 5,060,000 | 1 | 134,266 | — | — | 134,267 |
| Accumulated Other comprehensive income | — | — | — | — | — | 192 | — | 192 |
| Net loss | — | — | — | — | — | — | (14,792) | (14,792) |
| Balance as of December 31, 2017 | — | $ — | 46,943,371 | $ 1 | $ 454,196 | $ (108) | $ (202,153) | $ 251,936 |

(1) The activity through June 24, 2015 reflects the sole class of common stock authorized through the closing of the IPO on June 24, 2015, at which point the Company's certificate of incorporation was amended and restated to authorize Class A and Class B common stock. All capital stock outstanding prior to the

IPO was reclassified into Class B common stock and Class A common stock was issued in the IPO.

The accompanying notes are an integral part of these consolidated financial statements.

F-7

**MINDBODY, Inc.**
**Consolidated Statements of Cash Flows**
*(in thousands)*

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2017 | | 2016 | 2015 |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | | |
| Net loss | $ | (14,792) | $ | (22,979) | (36,088) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | | | |
| Stock-based compensation expense | | 14,101 | | 8,763 | 8,375 |
| Depreciation and amortization | | 9,150 | | 7,755 | 6,516 |
| Other | | 342 | | 265 | 554 |
| Changes in operating assets and liabilities net of effects of acquisitions: | | | | | |
| Accounts receivable | | (1,739) | | (2,561) | (3,842) |
| Prepaid expenses and other current assets | | (1,871) | | (638) | (526) |
| Other assets | | (277) | | (132) | 148 |
| Accounts payable | | 1,965 | | 92 | 722 |
| Accrued expenses and other liabilities | | 2,307 | | 2,631 | 2,743 |
| Deferred revenue | | 1,351 | | 2,775 | 2,556 |
| Deferred rent | | 573 | | 133 | 268 |
| Net cash provided by (used in) operating activities | | 11,110 | | (3,896) | (18,574) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | | |
| Purchase of property and equipment | | (6,850) | | (8,591) | (9,784) |
| Capitalized software development costs | | (1,963) | | — | (135) |
| Acquisition of business | | (1,700) | | (4,138) | (3,000) |
| Change in restricted cash and deposits | | — | | — | 788 |
| Net cash used in investing activities | | (10,513) | | (12,729) | (12,131) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | | |
| Net proceeds from follow-on public offering | | 134,266 | | — | — |
| Proceeds from exercise of equity awards | | 10,040 | | 6,626 | 194 |
| Proceeds from employee stock purchase plan | | 3,238 | | 3,040 | — |
| Payment related to shares withheld for taxes | | (1,704) | | — | — |
| Repayment on financing and capital lease obligations | | (511) | | (466) | (316) |
| Proceeds from initial public offering | | — | | — | 93,093 |
| Payments of deferred offering cost | | — | | — | (3,380) |
| Other | | (33) | | (33) | (73) |
| Net cash provided by financing activities | | 145,296 | | 9,167 | 89,518 |
| Effect of exchange rate changes on cash and cash equivalents | | 262 | | (83) | (83) |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | | 146,155 | | (7,541) | 58,730 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | | 85,864 | | 93,405 | 34,675 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ | 232,019 | $ | 85,864 | $ 93,405 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | | | | |
| Cash paid for interest | $ | 1,244 | $ | 1,302 | $ 934 |
| Cash paid for income taxes | | 355 | | 226 | 77 |
| SUPPLEMENTAL DISCLOSURE OF NONCASH INVESTING AND FINANCING ACTIVITIES: | | | | | |
| Unpaid equipment purchases | $ | 1,396 | $ | 778 | $ 448 |
| Acquisition consideration held back to satisfy potential indemnification claims | | 500 | | 750 | — |

| | | | |
|---|---|---|---|
| Stock issued in business acquisition | 5,143 | 500 | 1,500 |
| Accretion of redeemable convertible preferred stock to redemption value | — | — | 9,862 |
| Deemed dividend—preferred stock modification | — | — | 1,748 |
| Conversion of redeemable convertible preferred stock to common stock | — | — | 174,562 |
| Conversion of preferred stock warrants to common stock warrants | — | — | 1,213 |
| Reclassification of restricted stock award liability to common stock | — | — | 88 |
| Property and equipment acquired with financing obligations and leases | — | — | 1,089 |

The accompanying notes are an integral part of these consolidated financial statements.

F-8

Table of Contents

**MINDBODY, Inc.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. SUMMARY OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### Description of Business

MINDBODY, Inc. ("MINDBODY" or the "Company") was incorporated in California in 2004 and reincorporated in Delaware in March 2015. MINDBODY is headquartered in San Luis Obispo, California and has operations in the United States, the United Kingdom, and Australia.

MINDBODY and its wholly owned subsidiaries (collectively, the "Company", "we", "us" or "our") is a provider of cloud-based business management software for the wellness services industry and a rapidly growing consumer brand. Its integrated software and payments platform helps business owners in the wellness services industry run, market and build their businesses. MINDBODY enables the consumers to evaluate, engage, and transact with local businesses in its marketplace.

In May 2017, MINDBODY completed a follow-on public offering in which it issued and sold 5,060,000 shares of Class A common stock at a public offering price of $27.95 per share. MINDBODY received net proceeds of $134,709,000 after deducting underwriters' discounts and commissions of $6,718,000, but before deducting offering expenses of approximately $443,000.

### Initial Public Offering

In June 2015, the Company completed its initial public offering (the "IPO") in which it issued and sold 7,150,000 shares of its Class A common stock, $0.000004 par value, at a public offering price of $14.00 per share. The Company received net proceeds of $93,093,000 after deducting underwriting discounts and commissions of $7,007,000, but before deducting offering expenses of $4,024,000. Immediately prior to the closing of the IPO, all shares of the Company's then-outstanding redeemable convertible preferred stock were automatically converted and reclassified into 20,673,680 shares of its Class B common stock, $0.000004 par value, and all shares of the Company's then-outstanding common stock were automatically reclassified into 11,305,355 shares of Class B common stock.

### Basis of Presentation and Consolidation

The consolidated financial statements are presented in accordance with United States generally accepted accounting principles ("GAAP") which include the accounts of MINDBODY and its wholly owned foreign subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

### Use of Estimates

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Significant items subject to such estimates and assumptions include the capitalization and estimated useful life of the Company's capitalized internal-use software, useful lives of property and equipment, the determination of fair value of stock awards issued and forfeiture rates, a valuation allowance for deferred tax assets, contingencies, and the purchase price allocation of acquired businesses. The Company bases its estimates on historical experience and on various other assumptions that it believes to be reasonable under the circumstances. Changes in facts or circumstances may cause the Company to change its assumptions and estimates in future periods, and it is possible that actual results could differ from current or future estimates.

### Cash and Cash Equivalents

Cash and cash equivalents consist of cash and money market accounts. The Company considers all highly liquid short-term investments with original maturities of three months or less at the time of purchase to be cash equivalents.

F-9

Table of Contents

### Accounts Receivable and Allowance for Doubtful Accounts

The Company's accounts receivable are derived from client obligations due under normal trade terms and are reported at the principal amount outstanding, net of the allowance for doubtful accounts.  The Company maintains an allowance for doubtful accounts that is based upon historical experience and a review in each period of the number of days that billings are past due and an evaluation of the potential risk of loss associated with delinquent accounts. For all periods presented, the allowance for doubtful accounts activity was not significant.

### Concentration of Credit Risk

As of December 31, 2017 and 2016, one trade receivable represented 17% and 15% of our total accounts receivable balance, respectively.  No single customer, API partner, or technology partner represented over 10% of revenue for any of the periods presented in the consolidated statements of operations.

### Fair Value of Financial Instruments

Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date.  Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs.

The Company carries its cash equivalents at fair value.  The carrying amounts of the Company's accounts receivable, accounts payable, and other accrued expenses approximate fair value due to their short maturities.  The Company classifies its cash equivalents, which are made up of money market accounts, within Level 1 because the Company values these investments using quoted market prices.

### Property and Equipment, Net

Property and equipment, including leasehold improvements, are recorded at cost less accumulated depreciation and amortization.  Repairs and maintenance are charged to expense when incurred.  Depreciation expense is calculated using the straight-line method over the useful lives of the related assets or leasehold improvements as follows:

| Property and Equipment | Estimated Useful Life |
|---|---|
| Property (Building) | 15 years |
| Office equipment | 5 years |
| Computer equipment | 3 years |
| Servers | 3 years |
| Software licenses | 3-4 years |
| Leasehold improvements | Shorter of estimated useful life or remaining lease term |

Useful lives of significant assets are periodically reviewed and adjusted prospectively to reflect the Company's current estimates of the respective assets' expected utility.

In the event the Company has been deemed the owner for accounting purposes of construction projects in build-to-suit lease arrangements, the estimated construction costs incurred to date are recorded as assets in Property and Equipment, net.  Upon occupancy of facilities under build-to-suit leases, the Company did not meet the sale-leaseback criteria for de-recognition of the building assets and liabilities. Therefore, the Company continues to be the deemed owner for accounting purposes and the cost of the building is depreciated over its estimated useful life or lease term, whichever is shorter.

Table of Contents

### Capitalized Software Development Costs

Certain development costs incurred in connection with internal use software that are probable to result in additional functionality are capitalized. Research and development costs incurred during the preliminary project stage or costs incurred for training, maintenance, and general and administrative or overhead costs are expensed as incurred. Capitalization begins when the preliminary project stage is complete, management with the relevant authority authorizes and commits to the funding of the software project, it is probable the project will be completed and the software will be used to perform the functions intended, and certain functional and quality standards have been met. Capitalization of these costs ceases once the project is substantially complete and the software is ready for its intended purpose. Development costs related to upgrades or enhancements to existing applications are expensed as maintenance costs because such projects do not significantly enhance functionality. Internally developed software costs that are capitalized are classified as intangible assets and amortized over an estimated useful life of the software of two to three years, commencing when the software is ready for its intended use.

### Business Combinations

As discussed further in Note 4 of these consolidated financial statements, the Company acquired Lymber Wellness Inc. ("Lymber") during the year ended December 31, 2017, HealCode LLC ("HealCode") during the year ended December 31, 2016, and the Fitness Mobile Apps business of Petrol Designs LLC ("Fitness Mobile Apps") during the year ended December 31, 2015. The Company performs valuations of assets acquired and liabilities assumed for acquisitions and allocates the purchase price to its respective net tangible and intangible assets, and liabilities based on their estimated fair values. Any residual purchase price is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management to use significant judgment and estimates including the selection of valuation methodologies, estimates of future revenue and cash flows, discount rates and selection of comparable companies. During the measurement period, the Company may record certain adjustments to the assets acquired and liabilities assumed with the corresponding offset to goodwill. After the measurement period, which could be up to one year after the transaction date, all adjustments are recorded to the Company's consolidated statements of operations. Contingent payments that are dependent upon post-combination services, if any, are considered separate transactions outside of the business combination and therefore included in the post-combination operating results. There has been no such adjustment as of December 31, 2017.

### Goodwill and Acquired Intangible Assets

The Company records goodwill when the consideration paid in a purchase acquisition exceeds the fair value of the net tangible assets and the identified intangible assets acquired. Goodwill is not amortized, but rather is tested for impairment. The Company performs testing for impairment of goodwill annually or as events occur or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. The Company tests goodwill for impairment at the reporting unit level using a two-step approach. In step one, the Company determines if the fair value of the reporting unit exceeds the unit's carrying value. If step one indicates that the fair value of the reporting unit is less than its carrying value, the Company performs step two, determining the fair value of goodwill and, if the carrying value of goodwill exceeds the implied fair value, recording an impairment charge. The Company has determined that there is a single reporting unit for the purpose of goodwill impairment tests. Since inception through December 31, 2017, the Company did not have any goodwill impairment.

Acquired intangible assets consist of identifiable intangible assets, primarily developed technology and customer relationships. These intangible assets have been determined to have definite lives and are carried at cost, less accumulated amortization. The Company amortizes the intangible assets with finite lives using the straight-line method over the estimated economic lives of the assets, which is normally two to five years. The amortization expense for acquired technology is recorded in cost of revenues. The amortization expense for the acquired network list is recorded in sales and marketing expense.

### Impairment of Long-Lived Assets

Long-lived assets, primarily consisting of property and equipment and intangible assets other than goodwill, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying value of an asset group may not be recoverable. Recoverability of asset groups to be held and used is measured by a comparison of the carrying value of an asset group to the estimated undiscounted future cash flows expected to be generated from the use of such assets. If the undiscounted future cash flows is less than the carrying value of an asset group, an impairment loss is recognized based on the amount by which the carrying value exceeds the estimated fair value of the asset group. For any of the periods presented, the Company did not have any long-lived assets impairment.

F-11

Case 1:19-cv-08331-VEC    Document 37-10    Filed 02/18/20    Page 110 of 206

Table of Contents

### *Operating Leases and Financing Obligations*

The Company leases office facilities under various non-cancelable operating lease agreements. Certain lease agreements contain free or escalating rent payment provisions. The Company recognizes rent expense under such leases on a straight-line basis over the term of the lease with the difference between the expense and the payments recorded as deferred rent on the consolidated balance sheets.

For certain build-to-suit lease arrangements where the Company has concluded that it is the "deemed owner" of the building (for accounting purposes only) during the construction period, the Company is required to record an asset with a corresponding construction financing obligation for the costs incurred by the landlord. The financing obligation is recorded as a component of other non-current liabilities in the consolidated balance sheets. The Company will increase the asset and financing obligation as additional building costs are incurred by the landlord during the construction period. Once construction is complete, the Company will evaluate whether the asset qualifies for sale-leaseback accounting treatment. If the lease meets the sale-leaseback criteria, the Company will remove the asset and the related liability from its consolidated balance sheet and treat the lease as either an operating or capital lease based on an assessment of the accounting guidance. If the arrangement does not qualify for sale-leaseback treatment, the Company will reduce the obligation over the lease term as payments are made and will depreciate the asset over its estimated useful life or lease term, whichever is shorter. Future lease payments associated with the build-to-suit lease where the Company is the deemed owner are allocated between the land and building components. Payments attributable to the land are recognized as rent expense on a straight-line basis upon commencement of the contract. The Company does not report rent expense for the portion of the rent payment allocated to the buildings, which are owned for accounting purposes. Rather, this portion of the rent payment under the lease is recognized as a reduction of the financing obligation and as interest expense.

### *Revenue Recognition*

The Company has three primary sources of revenue consisting of (i) subscription and support services, (ii) payments, and (iii) product and other sales.

The Company commences revenue recognition when all of the following conditions have been satisfied:
- persuasive evidence of an agreement exists;
- the service has been or is being provided to the customer or delivery of the product has occurred;
- fees are fixed or determinable; and
- the collection of the fees is reasonably assured.

Software revenue recognition arrangements that do not give the customer the option to take possession of the software are service arrangements and are outside the scope of the specific industry rules for software recognition. This applies to the Company's cloud-based business management software, and as such, the Company accounts for the subscription and support services as service arrangements. Amounts invoiced in excess of revenue recognized are deferred. The majority of the fees are prepaid by customers on a monthly basis, and to a lesser extent, for certain customers on an annual or quarterly basis. The subscription revenue is recognized ratably over the term of the agreement.

The customer support offering is delivered together with the subscription services, and the term of the customer support is the same as the related subscription services arrangement. Accordingly, the Company recognizes customer support revenue in the same manner as the associated subscription service. The Company's customers enter into separate arrangements with the technology partners. Revenue derived from revenue share arrangements with the technology partners is recognized in the period services are rendered on a net basis. The Company also derives revenue from API platform partners for customer site access, data query, and consumer bookings. The revenue from API platform partners is recognized in the period services are rendered.

The Company collects a revenue share from third-party payment processors on transactions between its customers who utilize the MINDBODY payments platform and their consumers. These payment transactions are generally for purchasing classes, goods, or services through a customer's website, at their business location or through the MINDBODY app or third-party site included in the MINDBODY Network. Transaction fees are recorded as payments revenue on a net basis.

Product revenues are recognized when all revenue recognition criteria have been met, which is upon delivery.

In certain circumstances, the Company's arrangements include multiple elements which may consist of some or all of subscription services, support services, and hardware products, which are included in product and other. When multiple-element arrangements exist, the Company evaluates whether any of these deliverables should be accounted for as separate units of accounting.

F-12

Table of Contents

The Company's support services do not have standalone value because it and other vendors do not sell support services separately.  Such support services are therefore combined with the Company's subscription services as a single unit of accounting.  The Company's hardware products, such as point of sale systems, have standalone value because it, and other vendors, sell the same products separately.  Additionally, while there is a general right of return relative to the Company's hardware products, which are generally delivered upfront, performance of the subscription and support services is considered probable and substantially in the Company's control.  Accordingly, the Company considers the separate units of accounting in its multiple-element arrangements to be the hardware products and subscription and support services.  For arrangements with multiple elements which can be separated into different units of accounting, the Company allocates the arrangement fee to the separate units of accounting based on vendor-specific objective evidence, as demonstrated by separate sales with sufficient concentration in selling prices.

### Cost of Revenue

Cost of revenue primarily consists of costs associated with personnel and related infrastructure for operation of the Company's cloud-based business management platform, data center operations, global customer support and onboarding services, payment processing for customers that pay via credit card, and allocated overhead. Personnel costs consist of salaries, benefits, bonuses and stock-based compensation. Overhead consists of certain facilities costs, depreciation expense, amortization expense associated with acquired technology and internally developed software, and information technology costs.

### Advertising Costs

Advertising costs are expensed when incurred and are included in sales and marketing expenses in the accompanying consolidated statements of operations.  The Company's advertising expenses, which include print and online advertising, were $12,221,000, $9,083,000, and $5,820,000 during the years ended December 31, 2017, 2016, and 2015, respectively. Expenses for online advertising were omitted in amounts disclosed in previous filings. Previously disclosed amounts, in which online advertising expenses were omitted, were $474,000 and $598,000 for the years ended December 31, 2016 and 2015, respectively. The amount of online advertising expenses omitted, were $8,609,000 and $5,222,000 for the years ended December 31, 2016 and 2015, respectively.

### Research and Development

Research and development expenses consist primarily of wages and benefits for development personnel, contingent retention-based bonus expense related to the Company's acquisitions, rent expense, and depreciation of assets used in development. The Company's research and development efforts are focused on both improving the Company's platform and software used in operations, as well as developing new offerings. These costs are expensed unless they meet the requirements for capitalization. The Company capitalized costs of $1,963,000, zero, and $135,000 for the years ended December 31, 2017, 2016, and 2015, respectively, related to internally developed computer software to be sold as a service.

### Stock-Based Compensation

Stock-based compensation expense is measured and recognized in the financial statements based on the fair value of the awards granted.  The fair value of stock option awards and stock purchases under the Company's employee stock purchase plan ("ESPP") are estimated on the grant date using the Black-Scholes option pricing model.  This model requires the Company to estimate the grant date fair value of the underlying common stock, the expected life of options, the expected volatility of the price of the underlying common stock, risk-free interest rates, and expected dividend yield of the common stock. The fair value of restricted stock awards and restricted stock units is based on the closing market price of the Company's Class A common stock on the date of grant.  The stock-based compensation expense for stock options, net of forfeitures, is recognized using a straight-line basis over the requisite service periods of the awards, which is generally four years.

The Company estimates a forfeiture rate to calculate the stock-based compensation for the awards based on an analysis of actual historical experience and expected employee attrition rates.  Changes in estimated forfeitures will be recognized through a cumulative catch-up adjustment in the period of change and will also affect the amount of compensation expense to be recognized in future periods.

### Segments

The Company's chief operating decision maker reviews financial information on a consolidated basis to make decisions about how to allocate resources and to measure the Company's performance.  Accordingly, the Company has determined that it operates in one segment.

F-13

Table of Contents

### Income Taxes

The Company accounts for income taxes under the asset and liability method of accounting for income taxes.  Under this method, deferred taxes are recognized for the future tax consequences attributable to differences between the consolidated financial statement carrying amounts of existing assets and liabilities and their respective tax bases.  Deferred tax assets and liabilities are measured using enacted tax rates expected to be applied to taxable income in the years in which those temporary differences are expected to be recovered or settled.  A valuation allowance is recorded to reduce the carrying amount of deferred tax assets, unless it is more likely than not such assets will be realized.

The Company also applies the provisions for uncertainty of income taxes.  This guidance prescribes a recognition threshold and measurement attribute for consolidated financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return.  For those benefits to be recognized, a tax position must be more likely than not to be sustained upon examination by taxing authorities.  This guidance also applies to various related matters, such as derecognition, interest, penalties, and required disclosures.  The Company recognizes interest and penalties, if any, related to unrecognized tax benefits in its income tax provision.

### Net Loss Per Share Attributable to Common Stockholders

The Company applies the two-class method in calculating the net loss per share amounts which requires net loss to be allocated between the common and preferred stockholders based on their respective right to receive dividends.  Accordingly, the Company's basic net loss per share attributable to common stockholders is calculated by dividing the net loss attributable to common stockholders by the weighted-average number of shares of common stock outstanding during the period.  Net loss attributable to common stockholders is equal to the Company's net loss as adjusted for accretion of cumulative preferred stock dividends of the related series of redeemable convertible preferred stock to their redemption value.  Diluted loss per share attributable to common stockholders adjusts the basic weighted-average number of shares of common stock outstanding for the potential dilution that could occur if stock options, warrants, and redeemable convertible preferred stock were exercised or converted into common stock.  For purposes of this calculation, redeemable convertible preferred stock, options to purchase common stock, and preferred stock warrants are considered common stock equivalents but have been excluded from the calculation of diluted net loss per share attributable to common stockholders as their effect is anti-dilutive.

### Foreign Currency Translation

The functional currency of the Company's foreign subsidiaries are their local currencies.  The assets and liabilities of the foreign subsidiaries are translated using exchange rates in effect at the balance sheet date.  Revenues and expenses are translated using the average exchange rates prevailing during the period.  Exchange rate differences resulting from translation adjustments are accounted for as a component of accumulated other comprehensive loss.

### Comprehensive Loss

Comprehensive loss is composed of two components: net loss and other comprehensive loss.  Other comprehensive loss refers to expenses and losses that under GAAP are recorded as an element of stockholders' deficit, but are excluded from the Company's net loss.  For all periods presented, the Company's other comprehensive loss is made up of foreign currency translation adjustments related to the Company's foreign subsidiaries.

### Recently Adopted Accounting Pronouncements

On March 30, 2016, the Financial Accounting Standards Board ("FASB") issued authoritative guidance related to employee share-based payment transactions. The new guidance requires entities to recognize all excess tax benefits and tax deficiencies as income tax expense or benefit in the income statement and provides guidance on the related cash flow presentation. The new guidance also allows entities to make an accounting policy election to either continue to estimate the total number of awards for which the requisite service period will not be rendered (as currently required) or to account for forfeitures when they occur. The new guidance also stipulates that the net settlement of an award for statutory tax withholding purposes would not result, by itself, in liability classification of the award provided that the amount withheld for taxes does not exceed the maximum statutory tax rate in the employees' relevant tax jurisdictions. Effective January 1, 2017, the Company adopted this standard. In accordance with this standard, the Company elected to continue the Company's historical approach of estimating forfeitures during the award vesting period. The adoption of this standard did not have a material effect on the Company's consolidated financial statements for the year ended December 31, 2017.

Table of Contents

In November 2015, the FASB issued authoritative guidance related to balance sheet classification of deferred taxes. The new guidance requires entities to present deferred tax assets ("DTAs") and deferred tax liabilities ("DTLs") as noncurrent in a classified balance sheet. It thus simplifies the current guidance, which requires entities to separately present DTAs and DTLs as current or noncurrent in a classified balance sheet. Netting of DTAs and DTLs by tax jurisdiction is still required under the new guidance. The new authoritative guidance is effective for annual periods, including interim periods within those annual periods, beginning after December 15, 2016. Early adoption is permitted. The guidance did not have a material impact on the Company's consolidated financial statements.

### Recently Issued Accounting Pronouncements

In May 2017, the FASB issued authoritative guidance related to employee Share-Based Payments Transactions. The new guidance clarifies which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting. Specifically, an entity would not apply modification accounting if the fair value, vesting conditions, and classification of the awards are the same immediately before and after the modification. The amendments in this guidance are effective for fiscal years beginning after December 15, 2017, including interim periods within those years. Early adoption is permitted, including adoption in any interim period, for reporting periods for which financial statements have not yet been issued. The Company intends to adopt the guidance on the effective date and does not expect the adoption of the new guidance to have a material impact on the Company's consolidated financial statements.

In January 2017, the FASB issued authoritative guidance related to Clarifying the Definition of a Business. The new guidance clarifies whether transactions should be accounted for as acquisitions of assets or businesses. To be considered a business, the assets in the transaction need to include an input and a substantive process that together significantly contribute to the ability to create outputs. Prior to the adoption of the new guidance, an acquisition or disposition would be considered a business if there were inputs, as well as processes that when applied to those inputs had the ability to create outputs. The standard is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted. The Company intends to adopt the guidance on the effective date and the adoption of the new guidance may have a material impact on the Company's consolidated financial statements if it enters into future business combinations.

In January 2017, the FASB issued authoritative guidance related to Simplifying the Test for Goodwill Impairment. The new guidance simplifies the accounting for goodwill impairment by removing Step 2 of the goodwill impairment test. The standard is effective for annual or interim goodwill impairment tests in fiscal years beginning after December 15, 2019, and should be applied on a prospective basis. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company intends to adopt the guidance on the effective date and does not expect the adoption of the new guidance to have a material impact on the Company's consolidated financial statements.

In February 2016, the FASB issued authoritative guidance intended to improve financial reporting about leasing transactions. The new guidance requires entities to recognize assets and liabilities for leases with lease terms of more than 12 months. The new guidance also requires qualitative and quantitative disclosures regarding the amount, timing, and uncertainty of cash flows arising from leases. The new guidance is effective for the Company beginning January 1, 2019. The Company is evaluating the impact of the new standard on its consolidated financial statements and anticipates recording certain operating leases on the balance sheet upon adoption on the effective date.

In August 2016, the FASB issued authoritative guidance related to the Classification of Certain Cash Receipts and Cash Payments. The new guidance standardizes cash flow statement classification of certain transactions, including cash payments for debt prepayment or extinguishment, proceeds from insurance claim settlements, and distributions received from equity method investments. The new guidance is effective for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years. Early adoption is permitted. The amendments in this update should be applied using a retrospective transition method to each period presented. If impracticable to apply the amendments retrospectively for some of the issues, the amendments for those issues would be applied prospectively as of the earliest date practicable. The Company will adopt the new standard as of January 1, 2018. The Company intends to adopt the guidance on the effective date and does not expect the adoption of the new guidance to have a material impact on the Company's consolidated financial statements.

In May 2014, the FASB issued new guidance on revenue from contracts with customers. The guidance requires the recognition of revenue when promised goods or services are transferred to customers in an amount that reflects the considerations to which the entity expects to be entitled to in exchange for those goods or services. It also states that an entity should recognize as an asset the incremental costs of obtaining a contract that the entity expects to recover and amortize that cost over a period consistent with the period over which the transfer to the customer of the underlying good or services occurs. The guidance requires more detailed disclosures to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers.

F-15

Table of Contents

The Company expects to adopt this guidance effective January 1, 2018 using the modified retrospective method applying this guidance to all contracts at the date of initial application, which is expected to result in an adjustment to accumulated deficit for the cumulative effect of applying the guidance.

The Company has substantially completed its assessment of the impacts of the new guidance on incremental costs of obtaining a contract with a customer and the Company expects to record an adjustment to decrease accumulated deficit as of January 1, 2018 for approximately $800,000 to $900,000 related to the accounting for the incremental costs of obtaining a contract. Historically, the Company expensed these costs as incurred, but under the new guidance, incremental costs of obtaining a contract will be recorded as an asset and recognized as an operating expense over the period that the Company expect to recover the costs. The Company continues to assess the impact the adoption of this guidance will have on its disclosures.

The Company has also substantially completed its assessment of the impacts of the new guidance on revenue from contracts with customers. Revenue recognition related to software subscription, API services, technology partners, payments, and the Company's product & other will remain substantially unchanged. The most significant impact of the new standard to the Company is the deferral of revenue related to one of its payment contracts. Under the new standard, the Company will recognize revenue at the commencement of the contract based on estimated transaction price rather than when fees become fixed and determinable.  The Company expects to record an adjustment to decrease accumulated deficit as of January 1, 2018 for approximately $2.8 million to $3.1 million related to the timing of revenue recognition.

Also, in preparation for adoption of the standard, the Company has implemented internal controls and key system functionality to enable the preparation of financial information and have reached conclusions on key accounting assessments related to the standard. The Company continues to assess the impact the adoption of this guidance will have on its disclosures.

## 2. FAIR VALUE MEASUREMENTS

The Company measures and reports its cash equivalents and contingent consideration on a recurring basis. The Company's cash equivalents are invested in money market funds. The accounting guidance for fair value measurements provides a framework for measuring fair value on either a recurring or nonrecurring basis, whereby the inputs used in the Company's valuation techniques are assigned a hierarchical level. The following are the three levels of inputs to measure fair value:

*Level 1:* Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

*Level 2*: Inputs that reflect quoted prices for identical assets or liabilities in less active markets; quoted prices for similar assets or liabilities in active markets; benchmark yields, reported trades, broker/dealer quotes, inputs other than quoted prices that are observable for the assets or liabilities; or inputs that are derived principally from or corroborated by observable market data by correlation or other means.

*Level 3*: Unobservable inputs that reflect the Company's own assumptions incorporated in valuation techniques used to measure fair value. These assumptions are required to be consistent with market participant assumptions that are reasonably available.

The Company considers an active market to be one in which transactions for the asset or liability occur with sufficient frequency and volume to provide pricing information on an ongoing basis, and consider an inactive market to be one in which there are infrequent or few transactions for the asset or liability, the prices are not current, or price quotations vary substantially either over time or among market makers. Where appropriate, the Company's own or the counterparty's non-performance risk is considered in measuring the fair values of assets.

The following table presents the fair value of the Company's financial assets and liabilities using the above input categories (in thousands):

|  | December 31, 2017 | | | |
|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Financial Assets:** | | | | |
| Money market funds[1] | $    224,165 | $         — | $         — | $    224,165 |
|  | | | | |
| **Equity:** | | | | |
| Acquisition-related contingent consideration[2] | $         — | $         — | $    5,143 | $    5,143 |

F-16

Table of Contents

|  | December 31, 2016 | | | |
|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| **Financial Assets:** | | | | |
| Money market funds[1] | $ 81,878 | $ — | $ — | $ 81,878 |

(1)  The Company held certain assets that are required to be measured at fair value on a recurring basis, included in cash equivalents, which are held in money market funds. All such assets as of December 31, 2017 and 2016 were recorded based on Level 1 inputs.

(2)  The contingent consideration related to the acquisition of Lymber (Note 4) is recorded as equity and is not subject to remeasurement. Fair value was based on significant inputs not observable in the market, which represents a Level 3 measurement within the fair value hierarchy. The Company determined the fair value of the contingent consideration by discounting payments that are calculated based on Lymber's projected future gross profit scenarios using the Monte Carlo simulation. The significant inputs used in the fair value measurement of contingent consideration are the timing and amount of gross profit in the respective periods (Note 4) and the discount rate.

There were no transfers of financial instruments between the three levels of the fair value hierarchy during the years ended December 31, 2017 or 2016. As of and for the years ended December 31, 2017 and 2016, the Company did not have any assets or liabilities that were required to be measured at fair value on a nonrecurring basis.

## 3. BALANCE SHEET COMPONENTS

### *Property and Equipment, net*

Property and equipment consisted of the following (in thousands)[1]:

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Computer equipment | $ 20,671 | $ 17,262 |
| Leasehold improvements | 11,386 | 11,123 |
| Office equipment | 2,702 | 2,668 |
| Software licenses | 5,378 | 3,258 |
| Building, leased | 16,438 | 16,438 |
| Property and equipment – gross | 56,575 | 50,749 |
| Less: accumulated depreciation | (23,704) | (17,665) |
| Property and equipment – net | $ 32,871 | $ 33,084 |

(1) Internally developed software is now presented with intangible assets. Refer Note 5.

Depreciation of property and equipment was $7,718,000, $7,008,000, and $5,862,000 for the years ended December 31, 2017, 2016 and 2015, respectively.

### *Accrued Expenses and Other Liabilities*

Accrued expenses and other liabilities consisted of the following (in thousands):

|  | December 31, 2017 | December 31, 2016 |
|---|---|---|
| Accrued payroll | $ 7,591 | $ 6,072 |
| Accrued vacation | 2,400 | 2,069 |
| Employee stock purchase plan contributions | 1,548 | 1,171 |
| Other liabilities | 1,560 | 1,158 |
| Total accrued expenses and other liabilities | $ 13,099 | $ 10,470 |

F-17

Table of Contents

## 4. BUSINESS COMBINATION

*Lymber*

On March 27, 2017, the Company completed the acquisition of substantially all of the assets of Lymber, a privately-held application programming interface ("API") partner that specializes in yield management solutions for class and appointment-based businesses. Lymber's technology enables business owners to set dynamic pricing parameters for class and appointment sessions. The technology identifies open class and appointment inventory, and automatically adjusts session prices in real-time to match supply and demand.

The total purchase consideration for these assets was $7,342,000, which included cash consideration of $2,200,000, of which $500,000 was held to satisfy potential indemnification claims as of December 31, 2017, and is included in other current liabilities; and contingent consideration with a fair value of approximately $5,142,000, of which $1,304,000 and $3,838,000 are expected to be earned in 2018 and 2019 respectively, payable in shares of the Company's Class A common stock. This consideration is contingent upon Lymber's product achieving certain levels of gross profit, measured annually, in 2018 and 2019, respectively. The fair value of the equity classified contingent consideration was measured using a Monte Carlo simulation with various unobservable market data inputs, which are Level 3 measurements.

The acquisition of Lymber was accounted for in accordance with the acquisition method of accounting for business combinations with MINDBODY as the accounting acquirer. Acquisition-related costs incurred and expensed by the Company were immaterial and were included within general and administrative expenses on the consolidated statements of operations. Under the acquisition method of accounting, the total purchase consideration is allocated to the tangible and identifiable intangible assets acquired and liabilities assumed based on their estimated fair values. Goodwill of $2,544,000 was allocated to the Company's one operating segment and represents 35% of the total purchase consideration. Goodwill is primarily attributable to expanded market opportunities from selling and integrating Lymber's yield management solution with the Company's other offerings and the associated assembled workforce acquired. Goodwill is amortized over 15 years for tax purposes.

The acquisition provided the Company with acquired intangible assets representing internally developed software/technology. The fair value of the acquired intangible asset was determined based on the income approach and discounted cash flow/excess earnings method and is subject to amortization on a straight-line basis over its remaining useful life of five years.

The allocation of the purchase price consideration is as follows (in thousands):

|  | | Amount |
|---|---|---:|
| Intangible asset – developed software/technology | $ | 4,798 |
| Goodwill | | 2,544 |
| Fair value of total purchase consideration | $ | 7,342 |

The results of Lymber are included in the Company's consolidated statements of operations since the acquisition date, including revenues and net loss, and were not material. Pro forma results of operations have not been presented because the acquisition was not material to the Company's results of operations.

Contemporaneous to signing the purchase agreement, the stockholders of Lymber amended the existing company charter to effectively increase the distribution of ownership interest to existing stockholders who continued as employees with MINDBODY. The change in the ownership interest is viewed to have benefited MINDBODY, and as such, a portion of the contingent consideration discussed above is attributed to post-acquisition expense. The approximate fair value of this consideration is $2,547,000, of which $646,000 and $1,901,000 relate to the 2018 and 2019 earnouts, respectively. This post-acquisition expense is recorded as non-cash operating expense over the requisite service periods.

*HealCode*

On September 1, 2016, the Company completed the acquisition of substantially all of the assets of HealCode, a privately held technology partner that creates web-based and mobile application widgets for the Company's customers.

The total purchase consideration of $5,388,000 consisted of the payment of $4,888,000 in cash, of which $750,000, was held back to satisfy potential indemnification claims as of December 31, 2017, and is included in other current liabilities, and the issuance of 28,959 shares of the Company's Class A common stock at a total acquisition date fair value of $500,000.

The acquisition of HealCode was accounted for in accordance with the acquisition method of accounting for business combinations with MINDBODY as the accounting acquirer. The Company incurred and expensed de minimis acquisition-related

F-18

Table of Contents

costs, which are included within general and administrative expenses on the consolidated statements of operations. Under the acquisition method of accounting, the total purchase consideration is allocated to the tangible and identifiable intangible assets acquired and liabilities assumed based on their estimated fair values. Goodwill of $3,643,000 was allocated to the Company's one operating segment and represents 68% of the total purchase consideration. Goodwill is primarily attributable to expanded market opportunities from selling and integrating HealCode's "website widget" solution with the Company's other offerings and the associated assembled workforce acquired. Goodwill is amortized over 15 years for tax purposes.

The acquisition provided the Company with acquired intangible assets representing internally developed software/technology. HealCode's "website widget" solution enables the Company's customers to embed the MINDBODY class and appointment schedules within their web and social sites. The fair value of the acquired intangible asset was determined based on the income approach and discounted cash flow/excess earnings method and is subject to amortization on a straight-line basis over its remaining useful life of five years.

The allocation of the purchase price consideration is as follows (in thousands):

| | | Amount |
|---|---|---|
| Liabilities assumed | $ | (105) |
| Tangible assets acquired | | 32 |
| Intangible asset – developed software/technology | | 1,818 |
| Goodwill | | 3,643 |
| Fair value of total purchase consideration | $ | 5,388 |

The results of HealCode are included in the Company's consolidated statements of operations since the acquisition date, including revenues and net loss, and were not material. Pro forma results of operations have not been presented because the acquisition was not material to the Company's results of operations.

### *Fitness Mobile Apps*

On February 2, 2015, the Company completed the acquisition of the Fitness Mobile Apps, a privately held technology partner that creates tailored mobile apps for the Company's customers. The Company accounted for the acquisition of Fitness Mobile Apps as a business combination. The Company acquired all of the assets that were used in, or otherwise benefit, the mobile apps business for 103,617 shares of the Company's common stock with a fair value of $14.476 per share, of which 74,260 shares were issued and 29,357 shares were held with an escrow agent and were released in February 2016 following the first anniversary of the closing date, and $3,000,000 in cash, resulting in an aggregate purchase price of $4,500,000. The acquisition also included an obligation to issue up to 207,234 shares of the Company's common stock to certain former employees of Fitness Mobile Apps, contingent upon performance obligations and their continuous employment with the Company. The measurement period for the contingent consideration ended during the year ended December 31, 2016 and the Company issued 207,234 shares of Class A common stock to such former employees of Fitness Mobile Apps on February 22, 2016 under its 2015 Equity Incentive Plan (see Note 9 Common Stock and Stockholder's Equity below). The related compensation expense for the fair value of these additional shares was recorded over the respective service period.

The fair value of the Company's common stock issued for the Fitness Mobile Apps acquisition was based on the Company's valuation of its common stock as of February 2, 2015. Given the absence of a public trading market, the Company's board of directors considered numerous objective and subjective factors to determine the fair value of the Company's common stock. These factors included, but were not limited to (i) contemporaneous third-party valuations of common stock; (ii) the rights and preferences of convertible preferred stock relative to common stock; (iii) the lack of marketability of common stock; (iv) developments in the business; and (v) the likelihood of achieving a liquidity event, such as an IPO or sale of the Company, given prevailing market conditions. The aggregate enterprise value was determined using a combination of the income approach and two market approaches in order to estimate an Enterprise Value under five different possible future scenarios, which were weighted as follows:

| | Weighting |
|---|---|
| IPO | 75% |
| Transaction | 20% |
| Private company (DCF) | 5% |

The Company allocated the total purchase consideration to tangible assets acquired and identifiable intangible assets acquired based on their estimated fair values with the excess of the purchase consideration over the aggregate fair values recorded as

F-19

Table of Contents

goodwill allocated to the Company's one operating segment. Goodwill of $3,569,000 represents 80% of the total purchase consideration and is primarily attributable to the value of acquired personnel, and the Company's ability to expand its consumer base by transitioning Fitness Mobile Apps onto its platform. Goodwill is amortized over 15 years for tax purposes.

The internally developed software/technology with a remaining useful life of three years represents the tools to create consumer facing customized mobile apps for the Company's customers. The fair values of the acquired intangible assets were determined based on the income approach and relief-from-royalty method approach and the identifiable intangible assets are subject to amortization on a straight-line basis over their remaining useful lives.

The Company incurred and expensed $150,000 in acquisition-related costs, which are included within general and administrative expenses on the consolidated statements of operations.

The following table summarizes the consideration paid and the fair values of the assets acquired and liabilities assumed at the acquisition date (in thousands):

|  | Amount |
| --- | --- |
| Tangible assets acquired | $ 18 |
| Intangible asset – developed software/technology | 913 |
| Goodwill | 3,569 |
| Fair value of total purchase consideration | $ 4,500 |

The results of Fitness Mobile Apps are included in the Company's consolidated statements of operations since the acquisition date, including revenues and net loss, and were not material. Pro forma results of operations have not been presented because the acquisition was not material to the Company's results of operations.

## 5. GOODWILL AND OTHER INTANGIBLE ASSETS

The Company's goodwill balance is solely attributable to acquisitions. There have been no impairment charges recorded against goodwill.

The Company's intangible assets consisted of the following (in thousands except years):

|  | | December 31, 2017 | | |
| --- | --- | --- | --- | --- |
|  | Useful Life (Years) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Acquired technology | 3 to 5 | 7,529 | (2,104) | 5,425 |
| Internally developed software | 2 to 3 | $ 3,703 | $ (1,751) | $ 1,952 |
| Acquired network list | 2 | $ 420 | $ (420) | $ — |
| Total intangible assets | | 11,652 | (4,275) | 7,377 |

|  | | December 31, 2016 | | |
| --- | --- | --- | --- | --- |
|  | Useful Life (Years) | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Acquired technology | 3 to 5 | 2,731 | (704) | 2,027 |
| Internally developed software | 2 to 3 | 1,877 | (1,857) | 20 |
| Acquired network list | 2 | $ 420 | $ (420) | $ — |
| Total intangible assets | | 5,028 | (2,981) | 2,047 |

(1) Internally developed software, which used to be presented with property and equipment, is now presented with intangible assets.

The Company capitalized software development costs of $1,963,000, zero, and $135,000 for the years ended December 31, 2017, 2016 and 2015, respectively. The Company has internally developed software in process of $1,559,000, zero, and $10,000 for the years ended December 31, 2017, 2016 and 2015, respectively.

Table of Contents

Amortization of intangible assets (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| Amortization of acquired intangible assets | 1,401 | 426 | 337 |
| Amortization of internally developed software | 31 | 321 | 317 |
| Total amortization of intangible assets | 1,432 | 747 | 654 |

The expected future annual amortization expense of intangible assets as of December 31, 2017 is presented below (in thousands):

| **Year Ending December 31,** | | |
|---|---|---|
| 2018 | $ | 1,482 |
| 2019 | | 1,456 |
| 2020 | | 1,451 |
| 2021 | | 1,203 |
| 2022 | | 226 |
| Total amortization expense | $ | 5,818 |
| Internally developed software in process | $ | 1,559 |
| Total net book value of intangible assets | $ | 7,377 |

## 6. DEBT

### *Credit Facility*

On January 12, 2015, the Company entered into a loan agreement with Silicon Valley Bank for a secured revolving credit facility that allows the Company to borrow up to $20,000,000 for working capital and general business requirements. Amounts outstanding under the credit facility will bear interest at the greater of the prime rate (4.50% as of December 31, 2017) plus 0.5%, or 3.25% with accrued interest payable on a monthly basis and outstanding and unpaid principal due upon maturity of the credit facility in January 2018. There are no prepayment penalties if the Company repays principal and interest prior to maturity. The credit facility is secured by substantially all of the Company's corporate assets. The Company also granted and pledged a security interest to the lender in all rights, title, and interest in its intellectual property. The Company is also subject to certain reporting and financial performance covenants, which require the Company to meet certain revenue targets. The Company did not draw down any amounts under the loan agreement during the year ended December 31, 2017. Refer to Note 14: Subsequent Events for details about the extension and alteration of the loan agreement.

On January 12, 2018, the Company amended the loan agreement with Silicon Valley Bank. Silicon Valley Bank extended the maturity date of the revolving line from January 12, 2018 to January 11, 2019 and included an accordion feature for the revolving line, such that the revolving line may, upon the Company's request and subject to certain conditions, be increased by an additional aggregate amount of up to $20,000,000. Silicon Valley Bank also reduced the interest rate to the greater of the prime rate or 4.5% and deleted the revenue covenant.

## 7. COMMITMENTS AND CONTINGENCIES

### *Operating Lease*

The Company has operating lease agreements with lease periods expiring between 2019 and 2030. Rent expense was $6,306,000, $4,767,000, and 4,332,000 for the years ended December 31, 2017, 2016, and 2015, respectively.

Table of Contents

### Financing Obligation

During April 2015, the Company began to occupy additional office space constructed under a 15 year build-to-suit lease arrangement entered into in October 2013. During the construction of the facility, the Company concluded that it was the "deemed owner" for accounting purposes due to its extensive involvement in the construction process. Upon completion of the construction, the Company was still considered to be the "deemed owner" of the building for accounting purposes as the asset did not qualify for sale-leaseback accounting treatment due to the Company's continuing involvement. As such, costs for the building were recorded to "Building, leased" within "Property and equipment, net" and the related financing obligation of $15,450,000 remained recorded as of December 31, 2017. The portion of the lease obligation allocated to the land is being treated for accounting purposes as an operating lease.

The obligation is being settled through monthly lease payments to the landlord and the asset is being depreciated over the initial term of the lease. The lease has an original term of 15 years and the Company also has an option to extend the term of the lease for three consecutive terms of five years each. The Company is responsible to pay landlord's insurance costs, real property taxes, and operating expenses related to the premises as additional rent.

### Future Minimum Lease Payments

Future minimum lease payments under non-cancellable lease agreements as of December 31, 2017 were as follows (in thousands):

| Year Ending December 31, | Operating Leases | | Financing Obligation, Building-Leased | | Total | |
|---|---|---|---|---|---|---|
| 2018 | $ | 4,703 | $ | 1,679 | $ | 6,382 |
| 2019 | | 4,773 | | 1,729 | | 6,502 |
| 2020 | | 4,651 | | 1,781 | | 6,432 |
| 2021 | | 3,926 | | 1,835 | | 5,761 |
| 2022 | | 3,258 | | 1,890 | | 5,148 |
| Thereafter | | 10,107 | | 15,637 | | 25,744 |
| Total minimum lease payments | $ | 31,418 | $ | 24,551 | $ | 55,969 |

The remaining future minimum lease payments on the building, leased, include interest of $9,101,000 to be recognized over the remainder of the initial term of the lease agreement. A total financing obligation of $15,450,000 remained recorded as of December 31, 2017 of which $518,000 is recorded as a current obligation.

### Purchase Commitments

Future unconditional purchase commitments for software subscriptions and data center and communication services as of December 31, 2017 were as follows (in thousands):

| Year Ending December 31, | | |
|---|---|---|
| 2018 | $ | 2,819 |
| 2019 | | 2,530 |
| 2020 | | 600 |
| Total minimum purchase commitments | $ | 5,949 |

### Litigation

From time to time, the Company may become involved in legal proceedings, claims, and litigation arising in the ordinary course of business. Management is not currently aware of any matters that it expects will have a material adverse effect on the consolidated financial position, results of operations, or cash flows of the Company.

**8. WARRANT**

F-22

Table of Contents

In connection with entering into a credit facility during the year ended December 31, 2010, the Company issued a warrant to purchase 87,500 shares of Series C redeemable convertible preferred stock to the lender. The warrant was fully vested and exercisable upon issuance, had an expiration date in June 2020. In connection with the IPO completed on June 24, 2015, the warrant to purchase 87,500 shares of Series C redeemable convertible preferred stock converted into a warrant to purchase 89,177 shares of the Class B common stock with an aggregate exercise price of $151,603 and a fair value of $1,213,000, and the related preferred stock warrant liability was reclassified to additional paid-in capital, a component of stockholders' equity (deficit), and the Company ceased recording any further related periodic fair value adjustments. The warrant was exercised on a net basis on July 24, 2015, which resulted in the issuance of 76,565 shares of Class B common stock.

## 9. COMMON STOCK AND STOCKHOLDERS' EQUITY

### Redeemable Convertible Preferred Stock

#### *Amendment and Restatement of Certificate of Incorporation*

In March 2015, the Company adopted an amended and restated certificate of incorporation (the "Pre-IPO Restated Certificate") to modify the dividend, conversion and liquidation rights of the Series A, Series B, Series C and Series D redeemable convertible preferred stock. Under the  Pre-IPO Restated Certificate, the Series C and Series D were no longer entitled to cumulative dividends upon a liquidation of the Company, and the Series A, Series B, Series C, and Series D were no longer entitled to receive cumulative dividends upon conversion into common stock, including in connection with an initial public offering.  In addition, under the Pre-IPO Restated Certificate, the conversion ratio of each series of redeemable convertible preferred stock, which was 1-to-1 for all series prior to the amendment, was adjusted to 1.0088 for Series A, 1.0148 for Series B, 1.0192 for Series C, and 1.0218 for Series D.  As a result of this amendment, the redeemable convertible preferred stock became convertible into shares of common stock upon a qualifying event, including completion of an initial public offering, as follows:

| Preferred Stock | Number of Shares, Actual | Conversion Rate | Number of Shares, As Converted |
|---|---|---|---|
| Series A | 1,319,940 | 1.0088 | 1,331,507 |
| Series B | 988,411 | 1.0148 | 1,003,071 |
| Series C | 4,019,524 | 1.0192 | 4,096,561 |
| Series D | 5,308,875 | 1.0218 | 5,424,802 |
| Series E | 2,439,058 | 1.0000 | 2,439,058 |
| Series F | 2,685,997 | 1.0000 | 2,685,997 |
| Series G | 3,692,684 | 1.0000 | 3,692,684 |
| **Total** | 20,454,489 | | 20,673,680 |

The Company has determined that the changes to the rights underlying the Series A, Series B, Series C and Series D preferred stock resulted in a modification, for accounting purposes, of these shares.  The change in the fair value of the Series A, Series B, Series C, and Series D immediately before and after the amendment was recognized as a deemed dividend of $1,748,000 from the Series A, Series B, Series C and Series D preferred stockholders, which was recorded as a reduction of accumulated deficit during the year ended December 31, 2015.

The fair value of the Series A, Series B, Series C, and Series D preferred stock immediately before and after the amendment was estimated by the Company's board of directors with assistance from a third-party valuation that utilized methodologies and assumptions consistent with the Company's most recent common stock valuations, including on a minority, nonmarketable interest basis. The Company's aggregate enterprise value was determined using a combination of valuation approaches, including an income approach and various market approaches, and under five different possible future scenarios.

### Preferred Stock

Immediately prior to the completion of the IPO, all outstanding convertible preferred stock was converted and reclassified into 20,673,680 shares of Class B common stock and the Company's certificate of incorporation was amended and restated to authorize the Company to issue 100,000,000 shares of preferred stock with a par value of $0.000004 per share. No shares of preferred stock were issued or outstanding as of December 31, 2017 and December 31, 2016.

### Common Stock

F-23

Table of Contents

Immediately prior to the completion of the IPO, all outstanding shares of common stock were reclassified into 11,305,355 shares of Class B common stock and the Company's certificate of incorporation was amended and restated to authorize the Company to issue 1,000,000,000 shares of Class A common stock and 100,000,000 shares of Class B common stock, each with a par value of $0.000004 per share. The amended and restated certificate of incorporation also:

- established that, on any matter that is submitted to a vote of the stockholders, the holder of each share of Class A common stock is entitled to 1 vote per share, while the holder of each share of Class B common stock is entitled to 10 votes per share;

- established that shares of Class B common stock are convertible into shares of Class A common stock at the option of the holder and automatically convert into shares of Class A common stock upon transfer, subject to limited exceptions; and

- established that, except with respect to voting and conversion rights, as discussed above, the rights of the holders of Class A and Class B common stock are identical.

Following the IPO, the number of outstanding shares of Class A common stock has increased, with an associated decrease in the number of outstanding shares of Class B common stock, primarily as a result of the conversion of shares of Class B common stock held by pre-IPO investors and stockholders into shares of Class A common stock. In addition, several options have been exercised and RSUs have vested, as well as purchases under the Company's 2015 ESPP (as defined herein), all resulting in an increase in the number of shares of Class A common stock. Finally, in May 2017, the number of shares of Class A common stock increased as a result of the issuance of 5,060,000 shares of Class A common stock in the Company's follow-on public offering.

### 2015 Equity Incentive Plan

The Company's 2015 Equity Incentive Plan ("2015 Plan") became effective on June 17, 2015 and serves as the successor to the Company's 2009 Stock Option Plan ("2009 Plan").  As of December 31, 2017, there were 6,195,773 shares of Class A common stock available for issuance under the 2015 Plan. The number of shares available for issuance under the 2015 Plan includes an annual increase on the first day of each fiscal year beginning in 2016, equal to the least of 3,915,682 shares, 5% of the outstanding shares of common stock as of the last day of the immediately preceding fiscal year, or such other amount as the Company's board of directors or compensation committee may determine. Accordingly, effective as of January 1, 2018, the number of shares available for issuance under the 2015 Plan was increased by 2,347,168 shares of Class A common stock. All stock options under the 2015 Plan have a term of no greater than ten years from the date of grant. As of December 31, 2017, options to purchase 1,162,485 shares of Class A common stock and 1,322,650 restricted stock units ("RSUs") which will be settled in shares of Class A common stock remained outstanding under the 2015 Plan.

The 2015 Plan provides for the grant of non-statutory stock options, restricted stock awards ("RSAs"), RSUs, stock appreciation rights, performance units and performance shares to the Company's employees, directors and consultants and its parent and subsidiary corporations' employees and consultants. Neither RSAs nor RSUs require payment from the employee or service provider. Each RSA and RSU represents the right to receive one share of Class A common stock upon vesting or settlement, as applicable. The RSUs generally vest over a period of approximately one or four years depending on the nature of the award.  These awards are contingent upon the related employees' continuous employment with the Company. As such, compensation expense is being recorded over the requisite service period of one or four years.

### 2015 Employee Stock Purchase Plan

The Company's 2015 Employee Stock Purchase Plan ("2015 ESPP Plan") became effective on June 2, 2015. As of December 31, 2017, there were 1,032,725 shares of Class A common stock available for issuance under the 2015 ESPP Plan. The number of shares available for sale under the 2015 ESPP Plan includes an annual increase on the first day of each fiscal year beginning in 2016, equal to the least of 783,136 shares, 1% of the outstanding shares of common stock as of the last day of the immediately preceding fiscal year, or such other amount as the Company's board of directors or compensation committee may determine. Accordingly, effective as of January 1, 2018, the number of shares available for issuance under the 2015 ESPP Plan was increased by 469,433 shares of Class A common stock.

Under the 2015 ESPP Plan, eligible employees are granted options to purchase shares of Class A common stock through payroll deductions. The 2015 ESPP Plan provides for 24 months offering periods. Each offering period includes purchase periods, which are approximately six-month periods commencing with one exercise date and ending with the next exercise date. At the end of each purchase period, employees are able to purchase shares at 85% of the lower of the fair market value of the Class A common stock on the first trading day of each offering period or the end of each six-month purchase period. New offering periods commence every six

months on or about February 22 and August 22 of each year. Employees purchased 271,451 shares of Class A common stock for an aggregate cost of $3,238,000 under the 2015 ESPP Plan during the year ended December 31, 2017.

F-24

Table of Contents

### 2009 Stock Option Plan

The 2009 Plan, which provides for the grant of incentive stock options, non-statutory stock options, and restricted stock to employees, directors, and consultants, terminated on June 18, 2015. Accordingly, no shares were available for issuance under the 2009 Plan after that time. The 2009 Plan continues to govern outstanding awards granted thereunder. As of December 31, 2017, options to purchase 2,273,563 shares of Class B common stock remained outstanding under the 2009 Plan.

### RSU and RSA Activity

A summary of the activity for the Company's RSUs and RSAs is presented below (in thousands, except share numbers, per share amounts, and contractual life years):

| | Number of Shares | Weighted-Average Grant Date Fair Value (per share) | Aggregate Intrinsic Value |
|---|---|---|---|
| Unvested balance – December 31, 2015 | — | $ — | $ — |
| Granted | 1,002,778 | 14.13 | |
| Vested | (208,311) | 12.94 | |
| Forfeited | (50,774) | 13.80 | |
| Unvested balance – December 31, 2016 | 743,693 | $ 14.49 | $ 15,841 |
| Granted | 978,202 | 27.04 | |
| Vested | (215,662) | 14.34 | |
| Forfeited | (183,583) | 19.23 | |
| Unvested balance – December 31, 2017 | 1,322,650 | $ 23.14 | $ 40,275 |

As of December 31, 2017, there was a total of $25,697,000 in unrecognized compensation cost related to unvested RSUs, which is expected to be recognized over a weighted average period of approximately 3.0 years.

### Stock Option Activity

A summary of the activity for the Company's stock option plans during the reporting periods and a summary of information related to options vested and expected to vest and options exercisable are presented below (in thousands, except shares, per share amounts, contractual life years):

F-25

Table of Contents

| | Options Outstanding | | | | |
|---|---|---|---|---|---|
| | Number of Shares Underlying Outstanding Options | Weighted-Average Exercise Price | Weighted-Average Grant Date Fair Value | Weighted-Average Remaining Contractual Term (Years) | Aggregate Intrinsic Value |
| Outstanding – January 1, 2015 | 2,568,781 | $ 6.39 | | 8.1 | $ 20,773 |
| Granted | 2,039,875 | 14.48 | $ 6.57 | | |
| Exercised | (34,140) | 7.10 | | | $ 274 |
| Forfeited or cancelled | (263,053) | 12.07 | | | |
| Outstanding – December 31, 2015 | 4,311,463 | $ 9.87 | | 7.9 | $ 22,709 |
| Granted | 674,102 | 14.54 | $ 6.28 | | |
| Exercised | (856,412) | 7.68 | | | $ 11,664 |
| Forfeited or cancelled | (285,877) | 13.11 | | | |
| Outstanding – December 31, 2016 | 3,843,276 | $ 10.93 | | 7.5 | $ 39,902 |
| Granted | 758,914 | $ 25.60 | $ 10.86 | | |
| Exercised | (858,709) | $ 11.69 | | | $ 16,108 |
| Forfeited or cancelled | (307,433) | $ 17.02 | | | |
| Outstanding – December 31, 2017 | 3,436,048 | $ 13.44 | | 6.8 | $ 58,605 |
| Exercisable – December 31, 2017 | 1,960,704 | $ 8.83 | | 5.6 | $ 42,388 |
| Vested and expected to vest – December 31, 2017 | 3,400,765 | $ 13.34 | | 6.8 | $ 58,325 |

The total fair value of options vested during the years ended December 31, 2017, 2016, and 2015 was $4,741,000, $5,234,000, and $4,898,000, respectively.

As of December 31, 2017, the total unrecognized stock-based compensation expense for unvested stock options, net of expected forfeitures, was $11,125,000, which is expected to be recognized over a weighted-average period of 2.4 years.

### *Other Stock-Based Compensation*

During the years ended December 31, 2017 and 2016, the Company recorded stock-based compensation expense of zero and $271,000, respectively, related to contingent bonuses to certain former employees of Fitness Mobile Apps payable in shares of the Company's common stock for post-combination employment services.

During the years ended December 31, 2017 and 2016, the Company recorded stock-based compensation expense of $808,000 and zero, respectively, attributed to post-acquisition services that are payable in shares of the Company's common stock.

There were no non-employee grants during the year ended December 31, 2017.

### *Determination of Fair Value*

The Company records stock-based compensation based on the fair value of stock options on grant date using the Black-Scholes option-pricing model. The Company determines the fair value of shares of common stock to be issued under the ESPP using the Black-Scholes option-pricing model. The fair value of restricted stock units and restricted stock awards equals the market value of the underlying stock on the date of grant. Use of the Black-Scholes option-pricing model requires the input of highly subjective assumptions, including the fair value of the underlying common stock, expected term of the option, expected volatility of the price of the common stock, risk-free interest rates, and expected dividend yield of the common stock. The assumptions used in the Company's option-pricing model represent management's best estimates. Compensation expense related to stock-based transactions is measured and recognized in the consolidated financial statements based on the fair value of the awards granted. The stock-based compensation expense, net of forfeitures, is recognized on a straight-line basis over the requisite service periods of the awards, which is generally four years. The Company determined valuation assumptions as follows:

Table of Contents

### *Fair Value of Common Stock*

Prior to the Company's IPO on June 18, 2015, the fair value of the common stock underlying its stock-based awards was determined by the Company's board of directors, with input from management and a third-party valuation firm.

Since the Company's IPO, the fair value of common stock was determined based on the market closing price for the Company's Class A common stock as reported on the NASDAQ Stock Market at each grant date.

### *Expected Term*

The expected term of employee stock options represents the weighted-average period that the stock options are expected to remain outstanding. The expected term assumptions were determined based on the vesting terms, exercise terms, and contractual lives of the options.

### *Expected Volatility*

The expected volatility of stock options is estimated based upon the historical volatility of a number of publicly traded companies in similar stages of development and comparable industries for a period commensurate with the expected life. The Company intends to continue to consistently apply this methodology using the same or similar public companies until sufficient historical information regarding the volatility of the Company's Class A common stock price becomes available, or unless circumstances change such that the identified companies are no longer similar to MINDBODY, in which case, more suitable companies whose share prices are publicly available would be utilized in the calculation.

### *Risk-Free Interest Rate*

The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for zero-coupon U.S. Treasury notes with maturities approximately equal to the option's expected term.

### *Dividend Yield*

The Company has never declared or paid any cash dividends and does not presently plan to pay cash dividends in the foreseeable future. Consequently, an expected dividend yield of zero was utilized.

The following table summarizes the assumptions used in the Black-Scholes option-pricing model to determine the fair value of the Company's stock options:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **2015** |
| Expected term (in years) | 5.8 | 5.8 | 5.8 |
| Expected volatility | 38% - 44% | 44% - 45% | 45% - 46% |
| Risk-free interest rate | 1.8% - 2.1% | 1.2% - 1.9% | 1.4% - 1.8% |
| Dividend yield | 0% | 0% | 0% |

The following table summarizes the assumptions used in the Black-Scholes option-pricing model to determine fair value of the Company's common shares to be issued under the ESPP:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| Expected term (in years) | 0.5 - 2.0 | 0.5 - 2.0 |
| Expected volatility | 31% - 50% | 39% - 50% |
| Risk-free interest rate | 0.45% - 1.33% | 0.45% - 0.78% |
| Dividend yield | 0% | 0% |

### *Total Stock-Based Compensation Expenses*

Total stock-based compensation expense related to stock options, ESPP and restricted stock units and awards is included in the consolidated statements of operations as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **2015** |
| Cost of revenue | $ 1,334 | $ 910 | $ 651 |
| Sales and marketing | 2,872 | 2,059 | 3,533 |
| Research and development | 3,864 | 1,971 | 902 |
| General and administrative | 6,031 | 3,823 | 3,289 |
| Total stock-based compensation expense | $ 14,101 | $ 8,763 | $ 8,375 |

## 10. INCOME TAXES

The Tax Cuts and Jobs Act (the "Act") was enacted on December 22, 2017. The Act, among other things, reduces the US federal corporate tax rate from 35% to 21%, requires companies to pay a one-time transition tax on earnings of certain foreign subsidiaries that were previously tax deferred, changes rules related to uses and limitations of net operating loss carryforwards created in tax years beginning after December 31, 2017, and creates new taxes on certain foreign sourced earnings.

The SEC staff issued SAB 118, which provides guidance on accounting for the tax effects of the Tax Act. SAB 118 provides a measurement period that should not extend beyond one year from the Tax Act enactment date for companies to complete the accounting under ASC 740. In accordance with SAB 118, a company must reflect the income tax effects of those aspects of the Act for which the accounting under ASC 740 is complete. To the extent that a company's accounting for certain income tax effects of the Tax Act is incomplete but it is able to determine a reasonable estimate, it must record a provisional estimate in the financial statements. If a company cannot determine a provisional estimate to be included in the financial statements, it should continue to apply ASC 740 on the basis of the provisions of the tax laws that were in effect immediately before the enactment of the Tax Act. At December 31, 2017, the Company has not completed its accounting for the tax effects of enactment of the Act; however, in certain cases, as described below, the Company has made a reasonable estimate of the effects on its existing deferred tax balances and the one-time transition tax. In other cases, the Company has not been able to make a reasonable estimate and continue to account for those items based on its existing accounting under ASC 740, Income Taxes, and the tax laws that were in effect immediately prior to enactment. The items for which the Company was able to determine a reasonable estimate did not have a material impact on income tax expense.

The Company remeasured certain deferred tax assets and liabilities based on the rates at which they are expected to reverse in the future, which is generally 21%. However, the Company is still analyzing certain aspects of the Act and refining its calculations, which could potentially affect the measurement of these balances or potentially give rise to new deferred tax amounts. For certain of our DTAs the Company has recorded a decrease of $15,884,000, with a corresponding adjustment to valuation allowance for the year ended December 31, 2017.  The re-measurement of our indefinite lived DTLs resulted in an immaterial deferred income tax benefit.

The Deemed Repatriation Transition Tax ("Transition Tax") is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of certain of our foreign subsidiaries. To determine the amount of the Transition Tax, the Company must determine, in addition to other factors, the amount of post-1986 E&P of the relevant subsidiaries, as well as the amount of non-U.S. income taxes paid on such earnings. The Company was able to make a reasonable estimate of the Transition Tax and recorded a provisional Transition Tax obligation of $993,000 that is expected to be offset by current year net operating losses. However, the Company is continuing to gather additional information to more precisely compute the amount of the Transition Tax.

The Company must assess whether its valuation allowance analyses are affected by various aspects of the Tax Act (e.g., deemed repatriation of deferred foreign income, GILTI inclusions, new categories of FTCs). Since, as discussed herein, the Company has recorded provisional amounts related to certain portions of the Tax Act, any corresponding determination of the need for or change in a valuation allowance is also provisional.

The following table presents domestic and foreign components of consolidated loss before income taxes for the periods presented (in thousands):

F-28

Table of Contents

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Domestic | $ (15,378) | $ (23,297) | $ (36,197) |
| Foreign | 753 | 639 | 355 |
| Loss before provision for income taxes | $ (14,625) | $ (22,658) | $ (35,842) |

The Company recorded an income tax expense of $167,000, $321,000, and $246,000 for the years ended December 31, 2017, 2016, and 2015. This tax expense is largely attributable to the deferred tax liability associated with the amortization of intangible assets and foreign income taxes associated with the Company's operations in the United Kingdom and Australia. The Company continues to maintain a valuation allowance for its U.S. federal and state deferred tax assets.

The components of income tax expense were as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Current provisions for income taxes: | | | |
| Federal | $ — | $ — | $ — |
| State | 73 | 39 | 29 |
| Foreign | 187 | 162 | 158 |
| Total current | 260 | 201 | 187 |
| Deferred tax provision (benefit): | | | |
| Federal | (156) | 95 | 93 |
| State | 63 | 19 | 21 |
| Foreign | — | 6 | (55) |
| Total provision for income taxes | $ 167 | $ 321 | $ 246 |

The tax effects of temporary differences and related deferred tax assets and liabilities as of December 31, 2017 and 2016 are as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Deferred tax assets: | | |
| Net operating losses carryforwards | $ 31,699 | $ 39,520 |
| Accrued expenses and reserves | 668 | 844 |
| Stock Compensation | 752 | 2,226 |
| Deferred revenue | 847 | 1,270 |
| Deferred rent | 513 | 539 |
| Depreciation | 1,340 | 915 |
| Other | 357 | 224 |
| Total deferred tax assets | 36,176 | 45,538 |
| Deferred tax liabilities: | | |
| Amortization | (393) | (216) |
| Other | (265) | (241) |
| Total deferred tax liabilities | (658) | (457) |
| Valuation allowance | (35,665) | (45,329) |
| Net deferred tax liabilities | $ (147) | $ (248) |

The following table presents a reconciliation of statutory federal rate and the Company's effective tax rate for the periods presented:

F-29

Table of Contents

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2017** | **2016** | **2015** |
| Tax at statutory federal rate | 34 % | 34 % | 34 % |
| State tax – net of federal benefit | 4.8 | 4.7 | 5.0 |
| Stock-based compensation — ISOs | 6.3 | 1.0 | (2.4) |
| Change in valuation allowance | (42.5) | (38.3) | (35.6) |
| Other | (3.7) | (2.8) | (1.7) |
| Effective tax rate | (1.1)% | (1.4)% | (0.7)% |

It is the Company's intention to reinvest undistributed earnings of its foreign subsidiaries, which approximates $1,752,000 at December 31, 2017, and thereby indefinitely postpone their remittance. Accordingly, no provision has been made for foreign withholding taxes or United States income taxes, which may become payable if undistributed earnings of the foreign subsidiaries were paid as dividends to the Company. Should the Company decide to no longer indefinitely reinvest such earnings outside the United States, the Company would have to adjust the income tax provision in the period management makes such determination.

As of December 31, 2017 and 2016, respectively, deferred tax assets included federal net operating loss carryforwards of $118,864,000 and $103,047,000, and state net operating loss carryforwards of $104,049,000 and $88,929,000. The federal net operating loss carryforwards start to expire in the year ending December 31, 2025. State net operating losses started to expire in 2016 for the earliest net operating loss layers.

As of December 31, 2017 and 2016, the Company had no assurance that future taxable income would be sufficient to fully utilize the net operating loss carryforwards and other deferred tax assets in the future. Consequently, the Company determined that a valuation allowance of $35,665,000 and $45,329,000 as of the years ended December 31, 2017 and 2016, respectively, was needed to offset the deferred tax assets resulting mainly from the net operating loss carryforwards. The net change in the valuation allowance during the years ended December 31, 2017, 2016, and 2015 was a $9,664,000 decrease, $7,881,000 increase, and $13,435,000 increase, respectively.

Section 382 of the Internal Revenue Code of 1986, as amended, places a limitation on the realizability of Net Operating Losses ("NOLs") in future periods when a loss corporation has undergone significant changes in stock ownership. During the year ended December 31, 2015, the Company completed an analysis under IRC Section 382 through December 31, 2014, and determined that the Company experienced multiple ownership changes during this period. U.S. federal NOLs of approximately $430,000 are expected to expire unused due to limitations under Section 382. The Company performed an IRC Section 382 analysis as of December 31, 2017 and determined that there would be no additional effects on the NOL deferred tax asset if ownership changes occurred between January 1, 2015 and December 31, 2017.

The Company evaluates tax positions for recognition using a more-likely-than-not recognition threshold, and those tax positions eligible for recognition are measured as the largest amount of tax benefit that is greater than 50% likely of being realized upon the effective settlement with a taxing authority that has full knowledge of all relevant information. As of December 31, 2017 and 2016, the Company has not identified any unrecognized income tax benefits and uncertain tax positions, as well as any associated interest and penalties.

All tax years remain subject to examination by the U.S. federal and state tax authorities.

## 11. NET LOSS PER SHARE

The following table sets forth the computation of the Company's basic and diluted net loss per share attributable to common stockholders for the periods presented (in thousands, except per share data):

Table of Contents

| | For Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Net loss attributable to common stockholders | $ (14,792) | $ (22,979) | $ (44,202) |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.33) | $ (0.58) | $ (1.68) |
| Weighted-average shares used to compute net loss per share attributable to common stockholders, basic and diluted | 44,309 | 39,913 | 26,320 |

Diluted loss per common share is the same as basic loss per common share for all periods presented because the effects of potentially dilutive items were anti-dilutive given the Company's net loss. The following shares have been excluded from the calculation of diluted net loss per share attributable to common stockholders for each period presented because they are anti-dilutive (in thousands):

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Shares subject to outstanding stock options and employee stock purchase plan | 3,552 | 3,944 | 4,437 |
| Shares subject to outstanding restricted stock units | 1,323 | 744 | — |
| Total | 4,875 | 4,688 | 4,437 |

## 12. SEGMENTS AND INFORMATION BY GEOGRAPHIC LOCATION

Operating segments are components of an enterprise for which separate financial information is available and is evaluated regularly by the Company's chief operating decision maker in deciding how to allocate resources and assessing performance. The Company's chief operating decision maker is its Chief Executive Officer.

The Chief Executive Officer reviews financial information presented on a consolidated basis for purposes of allocating resources and evaluating financial performance. Further, there is one business activity, and there are no segment managers who are held accountable for operations, operating results, and plans for levels, components, or types of products or services below the consolidated unit level. Accordingly, the Company has a single operating and reporting segment.

### *Revenue*

The following table presents the Company's total revenue by category (in thousands):

| | For Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Revenue: | | | |
| Subscription and services | $ 109,174 | $ 82,919 | $ 61,339 |
| Payments | 71,263 | 53,808 | 37,460 |
| Product and other | 2,189 | 2,294 | 2,570 |
| Total revenue | $ 182,626 | $ 139,021 | $ 101,369 |

The following table presents the Company's total revenue by geography based on the billing address of the customer (in thousands):

| | For Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| United States | $ 147,195 | $ 114,877 | $ 84,822 |
| Other | 35,431 | 24,144 | 16,547 |
| Total | $ 182,626 | $ 139,021 | $ 101,369 |

F-31

Table of Contents

Substantially all of the Company's assets were attributable to operations in the United States as of December 31, 2017 and 2016.

## 13. PROFIT SHARING PLAN

The Company has a 401(k) profit sharing plan (the "401(k) Plan") that covers all eligible employees.  Each participant may elect to contribute up to the maximum limit by federal law.  The Company makes a safe harbor contribution at 100% of the first 3% of eligible salary deferral, plus 50% of the next 2% of salary deferral. Charles Schwab Bank is the trustee of the 401(k) Plan.  Employer contributions totaled $2,477,000, $2,073,000, and $1,743,000 for the years ended December 31, 2017, 2016, and 2015, respectively.

## 14. RELATED-PARTY TRANSACTIONS

The Company had no material related party transactions for the years ended December 31, 2017, 2016 and 2015, respectively.

## 15. SUBSEQUENT EVENTS

On February 19, 2018, the Company completed the acquisition of FitMetrix, Inc. ("FitMetrix"), a privately-held company, for an aggregate cash purchase price of $15.5 million, subject to customary adjustments, of which $1.6 million has been held back and placed in escrow for a period of 18 months to satisfy potential indemnification claims. FitMetrix, a MINDBODY platform partner at the time of acquisition, specializes in innovative performance tracking integrations with fitness studio equipment and wearables. The FitMetrix technology helps enable business owners to increase retention in the group and personal training environments and provide wellness seekers with an engaging, more interactive fitness experience. The initial purchase price accounting is not yet complete.  The Company is in the process of completing a purchase price allocation and expects to include it the Company's consolidated financial statements for the quarterly period ending March 31, 2018. Pro forma results of operations have not been presented because the acquisition was not material to the Company's results of operations.

F-32

Table of Contents

**Exhibit Index**

| Exhibit Number | Description | Incorporated by Reference | | | |
|---|---|---|---|---|---|
| | | Form | File No. | Exhibit | Filing Date |
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant. | 10-Q | 001-37453 | 3.1 | August 7, 2015 |
| 3.2 | Amended and Restated Bylaws of the Registrant. | 10-Q | 001-37453 | 3.2 | August 7, 2015 |
| 4.1 | Form of common stock certificate of the Registrant. | S-1/A | 333-204068 | 4.1 | June 8, 2015 |
| 4.2 | Amended and Restated Investors' Rights Agreement among the Registrant and certain holders of its capital stock, dated as of February 10, 2014, as amended | S-1 | 333-204068 | 4.2 | May 11, 2015 |
| 10.1+ | Form of Indemnification Agreement between the Registrant and each of its directors and executive officers. | S-1/A | 333-204068 | 10.1 | June 8, 2015 |
| 10.2+ | MINDBODY, Inc. 2015 Equity Incentive Plan and related form agreements. | S-1/A | 333-204068 | 10.2 | June 8, 2015 |
| 10.3*+ | MINDBODY, Inc. 2015 Employee Stock Purchase Plan and related form agreements. | | | | |
| 10.4+ | MINDBODY, Inc. 2009 Stock Option Plan and related form agreements. | S-1/A | 333-204068 | 10.4 | June 8, 2015 |
| 10.5+ | MINDBODY, Inc. Executive Bonus Plan. | S-1/A | 333-204068 | 10.5 | June 8, 2015 |
| 10.6+ | Employment Agreement between the Registrant and Richard Stollmeyer. | S-1/A | 333-204068 | 10.6 | June 8, 2015 |
| 10.7+ | Employment Agreement between the Registrant and Michael Mansbach | 8-K | 001-37453 | 10.1 | June 19, 2017 |
| 10.8+ | Employment Agreement between the Registrant and Brett White. | S-1/A | 333-204068 | 10.8 | June 8, 2015 |
| 10.9+ | Employment Agreement between the Registrant and Kunal Mittal. | 10-Q | 001-37453 | 10.3 | November 10, 2016 |
| 10.10+ | Amendment No. 1 to Employment Agreement between the Registrant and Kunal Mittal. | 10-Q | 001-37453 | 10.4 | November 10, 2016 |
| 10.11+ | Employment Agreement between the Registrant and Bradford Wills. | S-1/A | 333-204068 | 10.11 | June 8, 2015 |
| 10.12*+ | Separation Agreement and General Release between the Registrant and Bradford Wills | | | | |
| 10.13+ | Employment Agreement between the Registrant and Kimberly Lytikainen. | S-1/A | 333-204068 | 10.12 | June 8, 2015 |
| 10.14*+ | Employment Agreement between the Registrant and Mark Baker | | | | |
| 10.15 | Loan and Security Agreement between the Registrant and Silicon Valley Bank, dated as of January 12, 2015, as amended. | S-1 | 333-204068 | 10.14 | May 11, 2015 |
| 10.16 | Second Amendment to Loan and Security Agreement between the Registrant and Silicon Valley Bank, dated as of January 29, 2016. | 10-Q | 001-37453 | 10.5 | November 10, 2016 |
| 10.17 | Third Amendment to Loan and Security Agreement between the Registrant and Silicon Valley Bank, dated as of January 12, 2018 | 8-K | 001-37453 | 10.1 | January 18, 2018 |
| 10.18 | Agreements for Lease of Real Property among the Registrant, Tank Farm Office Park, LLC and the other parties therein. | S-1 | 333-204068 | 10.15 | May 11, 2015 |
| 10.19 | Modification Agreements between the Registrant and Tank Farm Office Park, LLC. | 10-K | 001-37453 | 10.18 | March 1, 2017 |
| 10.20 | SLO Tech Campus Triple Net Lease between the Registrant and SLO Tech Campus, LLC, dated as of October 11, 2013. | S-1 | 333-204068 | 10.16 | May 11, 2015 |
| 10.21*+ | MINDBODY, Inc. Outside Director Compensation Policy | | | | |

Table of Contents

| | |
|---|---|
| 21.1* | List of subsidiaries of the Registrant |
| 23.1* | Consent of Deloitte & Touche LLP, Independent Registered Public Accounting Firm. |
| 24.1* | Power of Attorney (included on signature page) |
| 31.1* | Certification of Principal Executive Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Principal Financial Officer Pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1** | Certification of Principal Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2** | Certification of Principal Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

| | |
|---|---|
| + | Indicates management contract or compensatory plan. |
| * | Filed herewith. |
| ** | Furnished herewith. The certifications attached as Exhibit 32.1 and Exhibit 32.2 that accompany this Annual Report on Form 10-K are deemed furnished and not filed with the Securities and Exchange Commission and are not to be incorporated by reference into any filing of MINDBODY, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date of this Annual Report on Form 10-K, irrespective of any general incorporation language contained in such filing. |

EX-10.3 2 exhibit103_12-31x2017.htm EXHIBIT 10.3

**Exhibit 10.3**

### MINDBODY, INC.

### 2015 EMPLOYEE STOCK PURCHASE PLAN

1. <u>Purpose</u>. The purpose of the Plan is to provide employees of the Company and its Designated Companies with an opportunity to purchase Common Stock through accumulated Contributions. The Company intends for the Plan to have two components: a Code Section 423 Component ("<u>423 Component</u>") and a non-Code Section 423 Component ("<u>Non-423 Component</u>"). The Company's intention is to have the 423 Component of the Plan qualify as an "employee stock purchase plan" under Section 423 of the Code. The provisions of the 423 Component, accordingly, will be construed so as to extend and limit Plan participation in a uniform and nondiscriminatory basis consistent with the requirements of Section 423 of the Code. In addition, this Plan authorizes the grant of an option to purchase shares of Common Stock under the Non-423 Component that does not qualify as an "employee stock purchase plan" under Section 423 of the Code; such an option will be granted pursuant to rules, procedures or sub-plans adopted by the Administrator designed to achieve tax, securities laws or other objectives for Eligible Employees and the Company. Except as otherwise provided herein, the Non-423 Component will operate and be administered in the same manner as the 423 Component.

2. <u>Definitions</u>.

(a) "<u>Administrator</u>" means the Board or any Committee designated by the Board to administer the Plan pursuant to Section 14.

(b) "<u>Affiliate</u>" means any entity, other than a Subsidiary, in which the Company has an equity or other ownership interest.

(c) "<u>Applicable Laws</u>" means the requirements relating to the administration of equity-based awards under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Common Stock is listed or quoted and the applicable laws of any foreign country or jurisdiction where options are, or will be, granted under the Plan.

(d) "<u>Board</u>" means the Board of Directors of the Company.

(e) "<u>Change in Control</u>" means the occurrence of any of the following events:

(i) A change in the ownership of the Company which occurs on the date that any one person, or more than one person acting as a group ("<u>Person</u>"), acquires ownership of the stock of the Company that, together with the stock held by such Person, constitutes more than fifty percent (50%) of the total voting power of the stock of the Company; provided, however, that for purposes of this subsection, the acquisition of additional stock by any one Person, who is considered to own more than fifty percent (50%) of the total voting power of the stock of the Company will not be considered a Change in Control. Further, if the stockholders of the Company immediately before such change in ownership continue to retain immediately after the change in ownership, in substantially the same proportions as their ownership of shares of the Company's voting stock immediately prior to the change in ownership, direct or indirect beneficial ownership of fifty percent (50%) or more of the total voting power of the stock of the Company or of the ultimate parent entity of the Company, such event shall not be considered a Change in Control under this subsection (i). For this purpose, indirect beneficial ownership shall include, without limitation, an interest resulting from ownership of the voting securities of one or more corporations or other business entities which own the Company, as the case may be, either directly or through one or more subsidiary corporations or other business entities; or

(ii) A change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by Directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election. For

1

purposes of this subsection (ii), if any Person is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered a Change in Control; or

(iii) A change in the ownership of a substantial portion of the Company's assets which occurs on the date that any Person acquires (or has acquired during the twelve (12) month period ending on the date of the most recent acquisition by such person or persons) assets from the Company that have a total gross fair market value equal to or more than fifty percent (50%) of the total gross fair market value of all of the assets of the Company immediately prior to such acquisition or acquisitions; provided, however, that for purposes of this subsection (iii), the following will not constitute a change in the ownership of a substantial portion of the Company's assets: (A) a transfer to an entity that is controlled by the Company's stockholders immediately after the transfer, or (B) a transfer of assets by the Company to: (1) a stockholder of the Company (immediately before the asset transfer) in exchange for or with respect to the Company's stock, (2) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the Company, (3) a Person, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all the outstanding stock of the Company, or (4) an entity, at least fifty percent (50%) of the total value or voting power of which is owned, directly or indirectly, by a Person described in this subsection (iii)(B)(3). For purposes of this subsection (iii), gross fair market value means the value of the assets of the Company, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets.

For purposes of this definition, persons will be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the Company.

Notwithstanding the foregoing, a transaction will not be deemed a Change in Control unless the transaction qualifies as a change in control event within the meaning of Code Section 409A, as it has been and may be amended from time to time, and any proposed or final Treasury Regulations and Internal Revenue Service guidance that has been promulgated or may be promulgated thereunder from time to time.

Further and for the avoidance of doubt, a transaction will not constitute a Change in Control if: (i) its sole purpose is to change the state of the Company's incorporation, or (ii) its sole purpose is to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transaction.

(f) "Code" means the U.S. Internal Revenue Code of 1986, as amended. Reference to a specific section of the Code or U.S. Treasury Regulation thereunder will include such section or regulation, any valid regulation or other official applicable guidance promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such section or regulation.

(g) "Committee" means a committee of the Board appointed in accordance with Section 14 hereof.

(h) "Common Stock" means the Class A common stock of the Company.

(i) "Company" means MINDBODY, Inc., a Delaware corporation, or any successor thereto.

(j) "Compensation" means an Eligible Employee's base straight time gross earnings, commissions (to the extent such commissions are an integral, recurring part of compensation) and payments for overtime, but exclusive of payments for bonus compensation, equity compensation and other similar compensation. The Administrator, in its discretion, may, on a uniform and nondiscriminatory basis, establish a different definition of Compensation for a subsequent Offering Period.

(k) "Contributions" means the payroll deductions and other additional payments that the Company may permit to be made by a Participant to fund the exercise of options granted pursuant to the Plan.

2

(l) "Designated Company" means any Subsidiary or Affiliate that has been designated by the Administrator from time to time in its sole discretion as eligible to participate in the Plan. For purposes of the 423 Component, only the Company and its Subsidiaries may be Designated Companies, provided, however that at any given time, a Subsidiary that is a Designated Company under the 423 Component shall not be a Designated Company under the Non-423 Component.

(m) "Director" means a member of the Board.

(n) "Eligible Employee" means any individual who is a common law employee providing services to the Company or a Designated Company and is customarily employed for at least 20 hours per week and more than 5 months in any calendar year by the Employer, or any lesser number of hours per week and/or number of months in any calendar year established by the Administrator (if required under applicable local law) for purposes of any separate Offering or for Eligible Employees participating in the Non-423 Component. For purposes of the Plan, the employment relationship will be treated as continuing intact while the individual is on sick leave or other leave of absence that the Employer approves or is legally protected under Applicable Laws. Where the period of leave exceeds 3 months and the individual's right to reemployment is not guaranteed either by statute or by contract, the employment relationship will be deemed to have terminated 3 months and 1 day following the commencement of such leave. The Administrator, in its discretion, from time to time may, prior to an Enrollment Date for all options to be granted on such Enrollment Date in an Offering, determine (for each Offering under the 423 Component, on a uniform and nondiscriminatory basis or as otherwise permitted by Treasury Regulation Section 1.423-2) that the definition of Eligible Employee will or will not include an individual if he or she: (i) has not completed at least 2 years of service since his or her last hire date (or such lesser period of time as may be determined by the Administrator in its discretion), (ii) customarily works not more than 20 hours per week (or such lesser period of time as may be determined by the Administrator in its discretion), (iii) customarily works not more than 5 months per calendar year (or such lesser period of time as may be determined by the Administrator in its discretion), (iv) is a highly compensated employee within the meaning of Section 414(q) of the Code, or (v) is a highly compensated employee within the meaning of Section 414(q) of the Code with compensation above a certain level or is an officer or subject to the disclosure requirements of Section 16(a) of the Exchange Act, provided the exclusion is applied with respect to each Offering under the 423 Component in an identical manner to all highly compensated individuals of the Employer whose Employees are participating in that Offering under the 423 Component. Each exclusion shall be applied with respect to an Offering in a manner complying with U.S. Treasury Regulation Section 1.423-2(e)(2)(ii). Such exclusions may be applied with respect to an Offering under the Non- 423 Component without regard to the limitations of Treasury Regulation Section 1.423-2.

(o) "Employer" means the employer of the applicable Eligible Employee(s).

(p) "Enrollment Date" means the first Trading Day of each Offering Period.

(q) "Exchange Act" means the U.S. Securities Exchange Act of 1934, as amended, including the rules and regulations promulgated thereunder.

(r) "Exercise Date" means the first Trading Day on or after February 21 and August 21 of each Purchase Period. Notwithstanding the foregoing, the first Exercise Date under the Plan will be February 22, 2016.

(s) "Fair Market Value" means, as of any date and unless the Administrator determines otherwise, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the New York Stock Exchange, NASDAQ Global Select Market, the NASDAQ Global Market or the NASDAQ Capital Market of The NASDAQ Stock Market, its Fair Market Value will be the closing sales price (or the closing bid, if no sales were reported) for such stock as quoted on such exchange or system on the date of determination, as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value will be the mean between the high bid and low asked prices for the Common Stock on the date of determination (or if no bids and asks were reported on that date, as applicable, on the last Trading Day such bids and asks were reported), as reported in *The Wall Street Journal* or such other source as the Administrator deems reliable;

(iii) In the absence of an established market for the Common Stock, the Fair Market Value thereof will be determined in good faith by the Administrator; or

(iv) For purposes of the Enrollment Date of the first Offering Period under the Plan, the Fair Market Value will be the initial price to the public as set forth in the final prospectus included within the registration statement on Form S-1 filed with the Securities and Exchange Commission for the initial public offering of the Common Stock (the "Registration Statement").

(t) "Fiscal Year" means the fiscal year of the Company.

(u) "New Exercise Date" means a new Exercise Date if the Administrator shortens any Offering Period then in progress.

(v) "Offering" means an offer under the Plan of an option that may be exercised during an Offering Period as further described in Section 4. For purposes of the Plan, the Administrator may designate separate Offerings under the Plan (the terms of which need not be identical) in which Eligible Employees of one or more Employers will participate, even if the dates of the applicable Offering Periods of each such Offering are identical and the provisions of the Plan will separately apply to each Offering. To the extent permitted by U.S. Treasury Regulation Section 1.423-2(a)(1), the terms of each Offering need not be identical provided that the terms of the Plan and an Offering together satisfy U.S. Treasury Regulation Section 1.423-2(a)(2) and (a)(3).

(w) "Offering Periods" means the periods of approximately 24 months during which an option granted pursuant to the Plan may be exercised, (i) commencing on the first Trading Day on or after February 21 and August 21 of each year and terminating on the first Trading Day on or after February 21 and August 21, approximately 24 months later; provided, however, that the first Offering Period under the Plan will commence with the first Trading Day on or after the date on which the Securities and Exchange Commission declares the Company's Registration Statement effective and will end on the first Trading Day on or after August 21, 2017, and provided, further, that the second Offering Period under the Plan will commence on February 22, 2016. The duration and timing of Offering Periods may be changed pursuant to Sections 4 and 20.

(x) "Parent" means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(y) "Participant" means an Eligible Employee that participates in the Plan.

(z) "Plan" means this MINDBODY, Inc. 2015 Employee Stock Purchase Plan.

(aa) "Purchase Period" means the approximately 6-month period commencing after one Exercise Date and ending with the next Exercise Date, except that the first Purchase Period of any Offering Period will commence on the Enrollment Date and end with the next Exercise Date. Unless the Administrator provides otherwise, the Purchase Period will have the same duration and coincide with the length of the Offering Period.

(bb) "Purchase Price" means an amount equal to 85% of the Fair Market Value of a share of Common Stock on the Enrollment Date or on the Exercise Date, whichever is lower; provided however, that the Purchase Price may be determined for subsequent Offering Periods by the Administrator subject to compliance with Section 423 of the Code (or any successor rule or provision or any other Applicable Law, regulation or stock exchange rule) or pursuant to Section 20.

4

(cc) "Subsidiary" means a "subsidiary corporation," whether now or hereafter existing, as defined in Section 424(f) of the Code.

(dd) "Trading Day" means a day on which the national stock exchange upon which the Common Stock is listed is open for trading.

(ee) "U.S. Treasury Regulations" means the Treasury regulations of the Code. Reference to a specific Treasury Regulation or Section of the Code shall include such Treasury Regulation or Section, any valid regulation promulgated under such Section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such Section or regulation.

3. Eligibility.

(a) First Offering Period. Any individual who is an Eligible Employee immediately prior to the first Offering Period will be automatically enrolled in the first Offering Period.

(b) Subsequent Offering Periods. Any Eligible Employee on a given Enrollment Date subsequent to the first Offering Period will be eligible to participate in the Plan, subject to the requirements of Section 5.

(c) Non-U.S. Employees. Eligible Employees who are citizens or residents of a non-U.S. jurisdiction (without regard to whether they also are citizens or residents of the United States or resident aliens (within the meaning of Section 7701(b)(1)(A) of the Code)) may be excluded from participation in the Plan or an Offering if the participation of such Eligible Employees is prohibited under the laws of the applicable jurisdiction or if complying with the laws of the applicable jurisdiction would cause the Plan or an Offering to violate Section 423 of the Code. In the case of the Non-423 Component, an Eligible Employee may be excluded from participation in the Plan or an Offering if the Administrator has determined that participation of such Eligible Employee is not advisable or practicable.

(d) Limitations. Any provisions of the Plan to the contrary notwithstanding, no Eligible Employee will be granted an option under the Plan (i) to the extent that, immediately after the grant, such Eligible Employee (or any other person whose stock would be attributed to such Eligible Employee pursuant to Section 424(d) of the Code) would own capital stock of the Company or any Parent or Subsidiary of the Company and/or hold outstanding options to purchase such stock possessing 5% or more of the total combined voting power or value of all classes of the capital stock of the Company or of any Parent or Subsidiary of the Company, or (ii) to the extent that his or her rights to purchase stock under all employee stock purchase plans (as defined in Section 423 of the Code) of the Company or any Parent or Subsidiary of the Company accrues at a rate, which exceeds $25,000 worth of stock (determined at the Fair Market Value of the stock at the time such option is granted) for each calendar year in which such option is outstanding at any time, as determined in accordance with Section 423 of the Code and the regulations thereunder.

4. Offering Periods. The Plan will be implemented by overlapping Offering Periods with a new Offering Period commencing on the first Trading Day on or after February 21 and August 21 each year, or on such other date as the Administrator will determine; provided, however, that the first Offering Period under the Plan will commence with the first Trading Day on or after the date upon which the Company's Registration Statement is declared effective by the Securities and Exchange Commission and end on the first Trading Day on or after August 21, 2017 (subject to Section 29), and provided, further, that the second Offering Period under the Plan will commence on February 22, 2016. The Administrator will have the power to change the duration of Offering Periods (including the commencement dates thereof) with respect to future Offerings without stockholder approval if such change is announced prior to the scheduled beginning of the first Offering Period to be affected thereafter; provided, however, that no Offering Period may last more than 27 months.

5. Participation.

5

(a) <u>First Offering Period</u>. An Eligible Employee will be entitled to continue to participate in the first Offering Period pursuant to Section 3(a) only if such individual submits a subscription agreement authorizing Contributions in a form determined by the Administrator (which may be similar to the form attached hereto as <u>Exhibit A</u>) to the Company's designated plan administrator (i) no earlier than the effective date of the Form S-8 registration statement with respect to the issuance of Common Stock under this Plan and (ii) no later than 10 business days following the effective date of such S-8 registration statement or such other period of time as the Administrator may determine (the "<u>Enrollment Window</u>"). An Eligible Employee's failure to submit the subscription agreement during the Enrollment Window will result in the automatic termination of such individual's participation in the first Offering Period.

(b) <u>Subsequent Offering Periods</u>. An Eligible Employee may participate in the Plan pursuant to Section 3(b) by (i) submitting to the Company's stock administration office (or its designee), on or before a date determined by the Administrator prior to an applicable Enrollment Date, a properly completed subscription agreement authorizing Contributions in the form provided by the Administrator for such purpose, or (ii) following an electronic or other enrollment procedure determined by the Administrator.

6. <u>Contributions</u>.

(a) At the time a Participant enrolls in the Plan pursuant to Section 5, he or she will elect to have Contributions (in the form of payroll deductions or otherwise, to the extent permitted by the Administrator) made on each pay day during the Offering Period in an amount not exceeding 15% of the Compensation, which he or she receives on each pay day during the Offering Period; provided, however, that should a pay day occur on an Exercise Date, a Participant will have any payroll deductions made on such day applied to his or her account under the subsequent Purchase Period or Offering Period. The Administrator, in its sole discretion, may permit all Participants in a specified Offering to contribute amounts to the Plan through payment by cash, check or other means set forth in the subscription agreement prior to each Exercise Date of each Purchase Period. A Participant's subscription agreement will remain in effect for successive Offering Periods unless terminated as provided in Section 10 hereof.

(b) In the event Contributions are made in the form of payroll deductions, such payroll deductions for a Participant will commence on the first pay day following the Enrollment Date and will end on the last pay day prior to the Exercise Date of such Offering Period to which such authorization is applicable, unless sooner terminated by the Participant as provided in Section 10 hereof; provided, however, that for the first Offering Period, payroll deductions will commence on the first pay day on or following the end of the Enrollment Window.

(c) All Contributions made for a Participant will be credited to his or her account under the Plan and Contributions will be made in whole percentages only. A Participant may not make any additional payments into such account.

(d) A Participant may discontinue his or her participation in the Plan as provided in Section 10. If permitted by the Administrator, as determined in its sole discretion, for an Offering Period, a Participant may decrease the rate of his or her Contributions (but not increase the rate) during the Offering Period by (i) properly completing and submitting to the Company's stock administration office (or its designee), on or before a date determined by the Administrator prior to an applicable Exercise Date, a new subscription agreement authorizing the change in Contribution rate in the form provided by the Administrator for such purpose, or (ii) following an electronic or other procedure prescribed by the Administrator. If a Participant has not followed such procedures to change the rate of Contributions, the rate of his or her Contributions will continue at the originally elected rate throughout the Offering Period and future Offering Periods (unless terminated as provided in Section 10). The Administrator may, in its sole discretion, limit the nature and/or number of Contribution rate changes that may be made by Participants during any Offering Period, and may establish such other conditions or limitations as it deems appropriate for Plan administration. Any change in payroll deduction rate made pursuant to this Section 6(d) will be effective as of the first full payroll period following 5 business days after the date on which the change is made by the Participant (unless the Administrator, in its sole discretion, elects to process a given change in payroll deduction rate more quickly). A Participant may not any changes in his or her Contribution rate during the 5 Trading Days immediately preceding an Exercise Date of a Purchase Period.

6

(e) Notwithstanding the foregoing, to the extent necessary to comply with Section 423(b)(8) of the Code and Section 3(d), a Participant's Contributions may be decreased to 0% at any time during a Purchase Period. Subject to Section 423(b)(8) of the Code and Section 3(d) hereof, Contributions will recommence at the rate originally elected by the Participant effective as of the beginning of the first Purchase Period scheduled to end in the following calendar year, unless terminated by the Participant as provided in Section 10.

(f) Notwithstanding any provisions to the contrary in the Plan, the Administrator may allow Eligible Employees to participate in the Plan via cash contributions instead of payroll deductions (i) if payroll deductions are not permitted under applicable local law, (ii) if the Administrator determines that cash contributions are permissible under Section 423 of the Code, or (iii) for Participants participating in the Non-423 Component.

(g) At the time the option is exercised, in whole or in part, or at the time some or all of the Common Stock issued under the Plan is disposed of (or any other time that a taxable event related to the Plan occurs), the Participant must make adequate provision for the Company's or Employer's federal, state, local or any other tax liability payable to any authority including taxes imposed by jurisdictions outside of the U.S., national insurance, social security or other tax withholding obligations, if any, which arise upon the exercise of the option or the disposition of the Common Stock (or any other time that a taxable event related to the Plan occurs). At any time, the Company or the Employer may, but will not be obligated to, withhold from the Participant's compensation the amount necessary for the Company or the Employer to meet applicable withholding obligations, including any withholding required to make available to the Company or the Employer any tax deductions or benefits attributable to sale or early disposition of Common Stock by the Eligible Employee. In addition, the Company or the Employer may, but will not be obligated to, withhold from the proceeds of the sale of Common Stock or any other method of withholding the Company or the Employer deems appropriate to the extent permitted by U.S. Treasury Regulation Section 1.423-2(f).

7. <u>Grant of Option</u>. On the Enrollment Date of each Offering Period, each Eligible Employee participating in such Offering Period will be granted an option to purchase on each Exercise Date during such Offering Period (at the applicable Purchase Price) up to a number of shares of Common Stock determined by dividing such Eligible Employee's Contributions accumulated prior to such Exercise Date and retained in the Eligible Employee's account as of the Exercise Date by the applicable Purchase Price; provided that in no event will an Eligible Employee be permitted to purchase during each Purchase Period more than 2,500 shares of Common Stock (subject to any adjustment pursuant to Section 18) and provided further that such purchase will be subject to the limitations set forth in Sections 3(d) and 13. The Eligible Employee may accept the grant of such option (i) with respect to the first Offering Period by submitting a properly completed subscription agreement in accordance with the requirements of Section 5 on or before the last day of the Enrollment Window, and (ii) with respect to any subsequent Offering Period under the Plan, by electing to participate in the Plan in accordance with the requirements of Section 5. The Administrator may, for future Offering Periods, increase or decrease, in its absolute discretion, the maximum number of shares of Common Stock that an Eligible Employee may purchase during each Purchase Period of an Offering Period. Exercise of the option will occur as provided in Section 8, unless the Participant has withdrawn pursuant to Section 10. The option will expire on the last day of the Offering Period.

8. <u>Exercise of Option</u>.

(a) Unless a Participant withdraws from the Plan as provided in Section 10, his or her option for the purchase of shares of Common Stock will be exercised automatically on the Exercise Date, and the maximum number of full shares subject to the option will be purchased for such Participant at the applicable Purchase Price with the accumulated Contributions from his or her account. No fractional shares of Common Stock will be purchased; any Contributions accumulated in a Participant's account, which are not sufficient to purchase a full share will be treated in accordance with the Company's then-current stock administration policies. Any other funds left over in a Participant's account after the Exercise Date will be returned to the Participant. During a Participant's lifetime, a Participant's option to purchase shares hereunder is exercisable only by him or her.

(b) If the Administrator determines that, on a given Exercise Date, the number of shares of Common Stock with respect to which options are to be exercised may exceed (i) the number of shares of Common Stock that

7

were available for sale under the Plan on the Enrollment Date of the applicable Offering Period, or (ii) the number of shares of Common Stock available for sale under the Plan on such Exercise Date, the Administrator may in its sole discretion (x) provide that the Company will make a pro rata allocation of the shares of Common Stock available for purchase on such Enrollment Date or Exercise Date, as applicable, in as uniform a manner as will be practicable and as it will determine in its sole discretion to be equitable among all Participants exercising options to purchase Common Stock on such Exercise Date, and continue all Offering Periods then in effect or (y) provide that the Company will make a pro rata allocation of the shares available for purchase on such Enrollment Date or Exercise Date, as applicable, in as uniform a manner as will be practicable and as it will determine in its sole discretion to be equitable among all participants exercising options to purchase Common Stock on such Exercise Date, and terminate any or all Offering Periods then in effect pursuant to Section 19. The Company may make a pro rata allocation of the shares available on the Enrollment Date of any applicable Offering Period pursuant to the preceding sentence, notwithstanding any authorization of additional shares for issuance under the Plan by the Company's stockholders subsequent to such Enrollment Date.

9. <u>Delivery</u>. As soon as reasonably practicable after each Exercise Date on which a purchase of shares of Common Stock occurs, the Company will arrange the delivery to each Participant of the shares purchased upon exercise of his or her option in a form determined by the Administrator (in its sole discretion) and pursuant to rules established by the Administrator. The Company may permit or require that shares be deposited directly with a broker designated by the Company or to a designated agent of the Company, and the Company may utilize electronic or automated methods of share transfer. The Company may require that shares be retained with such broker or agent for a designated period of time and/or may establish other procedures to permit tracking of disqualifying dispositions of such shares. No Participant will have any voting, dividend, or other stockholder rights with respect to shares of Common Stock subject to any option granted under the Plan until such shares have been purchased and delivered to the Participant as provided in this Section 9.

10. <u>Withdrawal</u>.

(a) A Participant may withdraw all but not less than all the Contributions credited to his or her account and not yet used to exercise his or her option under the Plan at any time by (i) submitting to the Company's stock administration office (or its designee) a written notice of withdrawal in the form determined by the Administrator for such purpose (which may be similar to the form attached hereto as <u>Exhibit B</u>), or (ii) following an electronic or other withdrawal procedure determined by the Administrator. All of the Participant's Contributions credited to his or her account will be paid to such Participant promptly after receipt of notice of withdrawal and such Participant's option for the Offering Period will be automatically terminated, and no further Contributions for the purchase of shares will be made for such Offering Period. If a Participant withdraws from an Offering Period, Contributions will not resume at the beginning of the succeeding Offering Period, unless the Participant re-enrolls in the Plan in accordance with the provisions of Section 5.

(b) A Participant's withdrawal from an Offering Period will not have any effect upon his or her eligibility to participate in any similar plan that may hereafter be adopted by the Company or in succeeding Offering Periods that commence after the termination of the Offering Period from which the Participant withdraws.

11. <u>Termination of Employment</u>. Upon a Participant's ceasing to be an Eligible Employee, for any reason, he or she will be deemed to have elected to withdraw from the Plan and the Contributions credited to such Participant's account during the Offering Period but not yet used to purchase shares of Common Stock under the Plan will be returned to such Participant, or, in the case of his or her death, to the person or persons entitled thereto, and such Participant's option will be automatically terminated. Unless determined otherwise by the Administrator in a manner that, with respect to an Offering under the 423 Component, is permitted by, and compliant with, Section 423 of the Code, a Participant whose employment transfers between entities through a termination with an immediate rehire (with no break in service) by the Company or a Designated Company shall not be treated as terminated under the Plan; however, no Participant shall be deemed to switch from an Offering under the Non-423 Component to an Offering under the 423 Component or vice versa unless (and then only to the extent) such switch would not cause the 423 Component or any Option thereunder to fail to comply with Section 423 of the Code.

8

12. Interest. No interest will accrue on the Contributions of a participant in the Plan, except as may be required by Applicable Law, as determined by the Company, and if so required by the laws of a particular jurisdiction, shall, with respect to Offerings under the 423 Component, apply to all Participants in the relevant Offering, except to the extent otherwise permitted by U.S. Treasury Regulation Section 1.423-2(f).

13. Stock.

(a) Subject to adjustment upon changes in capitalization of the Company as provided in Section 18 hereof, the maximum number of shares of Common Stock that will be made available for sale under the Plan will be 783,136 shares of Common Stock, plus an annual increase to be added on the first day of each Fiscal Year beginning with the 2016 Fiscal Year equal to the least of (i) 783,136 shares of Common Stock, (ii) a number of shares of Common Stock equal to 1% of the outstanding shares of all classes of the Company's common stock on the last day of immediately preceding Fiscal Year, or (iii) an amount determined by the Administrator.

(b) Until the shares of Common Stock are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), a Participant will have only the rights of an unsecured creditor with respect to such shares, and no right to vote or receive dividends or any other rights as a stockholder will exist with respect to such shares.

(c) Shares of Common Stock to be delivered to a Participant under the Plan will be registered in the name of the Participant or in the name of the Participant and his or her spouse.

14. Administration. The Plan will be administered by the Board or a Committee appointed by the Board, which Committee will be constituted to comply with Applicable Laws. The Administrator will have full and exclusive discretionary authority to construe, interpret and apply the terms of the Plan, to designate separate Offerings under the Plan, to designate Subsidiaries and Affiliates as participating in the 423 Component or Non-423 Component, to determine eligibility, to adjudicate all disputed claims filed under the Plan and to establish such procedures that it deems necessary for the administration of the Plan (including, without limitation, to adopt such procedures and sub-plans as are necessary or appropriate to permit the participation in the Plan by employees who are foreign nationals or employed outside the U.S., the terms of which sub-plans may take precedence over other provisions of this Plan, with the exception of Section 13(a) hereof, but unless otherwise superseded by the terms of such sub-plan, the provisions of this Plan shall govern the operation of such sub-plan). Unless otherwise determined by the Administrator, the Employees eligible to participate in each sub-plan will participate in a separate Offering or in the Non-423 Component, unless such designation would cause the 423 Component to violate the requirements of Section 423 of the Code. Without limiting the generality of the foregoing, the Administrator is specifically authorized to adopt rules and procedures regarding eligibility to participate, the definition of Compensation, handling of Contributions, making of Contributions to the Plan (including, without limitation, in forms other than payroll deductions), establishment of bank or trust accounts to hold Contributions, payment of interest, conversion of local currency, obligations to pay payroll tax, determination of beneficiary designation requirements, withholding procedures and handling of stock certificates that vary with applicable local requirements. The Administrator also is authorized to determine that, to the extent permitted by U.S. Treasury Regulation Section 1.423-2(f), the terms of an option granted under the Plan or an Offering to citizens or residents of a non-U.S. jurisdiction will be less favorable than the terms of options granted under the Plan or the same Offering to employees resident solely in the U.S. Every finding, decision and determination made by the Administrator will, to the full extent permitted by law, be final and binding upon all parties.

15. Transferability. Neither Contributions credited to a Participant's account nor any rights with regard to the exercise of an option or to receive shares of Common Stock under the Plan may be assigned, transferred, pledged or otherwise disposed of in any way (other than by will, the laws of descent and distribution) by the Participant. Any such attempt at assignment, transfer, pledge or other disposition will be without effect, except that the Company may treat such act as an election to withdraw funds from an Offering Period in accordance with Section 10 hereof.

16. Use of Funds. The Company may use all Contributions received or held by it under the Plan for any corporate purpose, and the Company will not be obligated to segregate such Contributions except under Offerings or

9

for Participants in the Non-423 Component for which Applicable Laws require that Contributions to the Plan by Participants be segregated from the Company's general corporate funds and/or deposited with an independent third party. Until shares of Common Stock are issued, Participants will have only the rights of an unsecured creditor with respect to such shares.

17. <u>Reports</u>. Individual accounts will be maintained for each Participant in the Plan. Statements of account will be given to participating Eligible Employees at least annually, which statements will set forth the amounts of Contributions, the Purchase Price, the number of shares of Common Stock purchased and the remaining cash balance, if any.

18. <u>Adjustments, Dissolution, Liquidation, Merger or Change in Control</u>.

(a) <u>Adjustments</u>. In the event that any dividend or other distribution (whether in the form of cash, Common Stock, other securities, or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, or exchange of Common Stock or other securities of the Company, or other change in the corporate structure of the Company affecting the Common Stock occurs, the Administrator, in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan, will, in such manner as it may deem equitable, adjust the number and class of Common Stock that may be delivered under the Plan, the Purchase Price per share and the number of shares of Common Stock covered by each option under the Plan that has not yet been exercised, and the numerical limits of Sections 7 and 13.

(b) <u>Dissolution or Liquidation</u>. In the event of the proposed dissolution or liquidation of the Company, any Offering Period then in progress will be shortened by setting a New Exercise Date, and will terminate immediately prior to the consummation of such proposed dissolution or liquidation, unless provided otherwise by the Administrator. The New Exercise Date will be before the date of the Company's proposed dissolution or liquidation. The Administrator will notify each Participant in writing or electronically, prior to the New Exercise Date, that the Exercise Date for the Participant's option has been changed to the New Exercise Date and that the Participant's option will be exercised automatically on the New Exercise Date, unless prior to such date the Participant has withdrawn from the Offering Period as provided in Section 10 hereof.

(c) <u>Merger or Change in Control</u>. In the event of a merger or Change in Control, each outstanding option will be assumed or an equivalent option substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the option, the Offering Period with respect to which such option relates will be shortened by setting a New Exercise Date on which such Offering Period shall end. The New Exercise Date will occur before the date of the Company's proposed merger or Change in Control. The Administrator will notify each Participant in writing or electronically prior to the New Exercise Date, that the Exercise Date for the Participant's option has been changed to the New Exercise Date and that the Participant's option will be exercised automatically on the New Exercise Date, unless prior to such date the Participant has withdrawn from the Offering Period as provided in Section 10 hereof.

19. <u>Amendment or Termination</u>.

(a) The Administrator, in its sole discretion, may amend, suspend, or terminate the Plan, or any part thereof, at any time and for any reason. If the Plan is terminated, the Administrator, in its discretion, may elect to terminate all outstanding Offering Periods either immediately or upon completion of the purchase of shares of Common Stock on the next Exercise Date (which may be sooner than originally scheduled, if determined by the Administrator in its discretion), or may elect to permit Offering Periods to expire in accordance with their terms (and subject to any adjustment pursuant to Section 18). If the Offering Periods are terminated prior to expiration, all amounts then credited to Participants' accounts that have not been used to purchase shares of Common Stock will be returned to the Participants (without interest thereon, except as otherwise required under Applicable Laws, as further set forth in Section 12 hereof) as soon as administratively practicable.

10

(b) Without stockholder consent and without limiting Section 19(a), the Administrator will be entitled to change the Offering Periods or Purchase Periods, designate separate Offerings, limit the frequency and/or number of changes in the amount withheld during an Offering Period, establish the exchange ratio applicable to amounts withheld in a currency other than U.S. dollars, permit Contributions in excess of the amount designated by a Participant in order to adjust for delays or mistakes in the Company's processing of properly completed Contribution elections, establish reasonable waiting and adjustment periods and/or accounting and crediting procedures to ensure that amounts applied toward the purchase of Common Stock for each Participant properly correspond with Contribution amounts, and establish such other limitations or procedures as the Administrator determines in its sole discretion advisable that are consistent with the Plan.

(c) In the event the Administrator determines that the ongoing operation of the Plan may result in unfavorable financial accounting consequences, the Administrator may, in its discretion and, to the extent necessary or desirable, modify, amend or terminate the Plan to reduce or eliminate such accounting consequence including, but not limited to:

(i) amending the Plan to conform with the safe harbor definition under the Financial Accounting Standards Board Accounting Standards Codification Topic 718 (or any successor thereto), including with respect to an Offering Period underway at the time;

(ii) altering the Purchase Price for any Offering Period or Purchase Period including an Offering Period or Purchase Period underway at the time of the change in Purchase Price;

(iii) shortening any Offering Period or Purchase Period by setting a New Exercise Date, including an Offering Period or Purchase Period underway at the time of the Administrator action;

(iv) reducing the maximum percentage of Compensation a Participant may elect to set aside as Contributions; and

(v) reducing the maximum number of Shares a Participant may purchase during any Offering Period or Purchase Period.

Such modifications or amendments will not require stockholder approval or the consent of any Participants.

20. Notices. All notices or other communications by a Participant to the Company under or in connection with the Plan will be deemed to have been duly given when received in the form and manner specified by the Company at the location, or by the person, designated by the Company for the receipt thereof.

21. Conditions Upon Issuance of Shares. Shares of Common Stock will not be issued with respect to an option unless the exercise of such option and the issuance and delivery of such shares pursuant thereto will comply with all applicable provisions of law, domestic or foreign, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, and the requirements of any stock exchange upon which the shares may then be listed, and will be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an option, the Company may require the person exercising such option to represent and warrant at the time of any such exercise that the shares are being purchased only for investment and without any present intention to sell or distribute such shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned applicable provisions of law.

22. Code Section 409A. The Plan is intended to be exempt from the application of Code Section 409A, and, to the extent not exempt, is intended to comply with Code Section 409A and any ambiguities herein will be interpreted to so be exempt from, or comply with, Code Section 409A. In furtherance of the foregoing and notwithstanding any provision in the Plan to the contrary, if the Administrator determines that an option granted under the Plan may be subject to Code Section 409A or that any provision in the Plan would cause an option under the Plan to be subject to

11

Code Section 409A, the Administrator may amend the terms of the Plan and/or of an outstanding option granted under the Plan, or take such other action the Administrator determines is necessary or appropriate, in each case, without the Participant's consent, to exempt any outstanding option or future option that may be granted under the Plan from or to allow any such options to comply with Code Section 409A, but only to the extent any such amendments or action by the Administrator would not violate Code Section 409A. Notwithstanding the foregoing, the Company shall have no liability to a Participant or any other party if the option to purchase Common Stock under the Plan that is intended to be exempt from or compliant with Code Section 409A is not so exempt or compliant or for any action taken by the Administrator with respect thereto. The Company makes no representation that the option to purchase Common Stock under the Plan is compliant with Code Section 409A.

23. Term of Plan. The Plan will become effective upon the earlier to occur of its adoption by the Board or its approval by the stockholders of the Company. It will continue in effect for a term of 20 years, unless sooner terminated under Section 19.

24. Stockholder Approval. The Plan will be subject to approval by the stockholders of the Company within 12 months after the date the Plan is adopted by the Board. Such stockholder approval will be obtained in the manner and to the degree required under Applicable Laws.

25. Governing Law. The Plan shall be governed by, and construed in accordance with, the laws of the State of California (except its choice-of-law provisions).

26. No Right to Employment. Participation in the Plan by a Participant shall not be construed as giving a Participant the right to be retained as an employee of the Company or a Subsidiary or Affiliate, as applicable. Furthermore, the Company or a Subsidiary or Affiliate may dismiss a Participant from employment at any time, free from any liability or any claim under the Plan.

27. Severability. If any provision of the Plan is or becomes or is deemed to be invalid, illegal, or unenforceable for any reason in any jurisdiction or as to any Participant, such invalidity, illegality or unenforceability shall not affect the remaining parts of the Plan, and the Plan shall be construed and enforced as to such jurisdiction or Participant as if the invalid, illegal or unenforceable provision had not been included.

28. Compliance with Applicable Laws. The terms of this Plan are intended to comply with all Applicable Laws and will be construed accordingly.

29. Automatic Transfer to Low Price Offering Period. To the extent permitted by Applicable Laws, if the Fair Market Value of the Common Stock on any Exercise Date in an Offering Period is lower than the Fair Market Value of the Common Stock on the Enrollment Date of such Offering Period, then all participants in such Offering Period will be automatically withdrawn from such Offering Period immediately after the exercise of their option on such Exercise Date and automatically re-enrolled in the immediately following Offering Period as of the first day thereof.

12

**<u>EXHIBIT A</u>**

**MINDBODY, INC.**

**2015 EMPLOYEE STOCK PURCHASE PLAN**

**SUBSCRIPTION AGREEMENT**

Original Application                                                                                                          Offering Date:

Change in Payroll Deduction Rate

1. I hereby elect to participate in the MINDBODY, Inc. 2015 Employee Stock Purchase Plan (the "<u>Plan</u>") and subscribe to purchase shares of the Company's Common Stock in accordance with this Subscription Agreement and the Plan. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Plan.

2. I hereby authorize payroll deductions from each paycheck in the amount of     % of my Compensation on each payday (from 1 to 15%) during the Offering Period in accordance with the Plan. (Please note that no fractional percentages are permitted.)

3. I understand that said payroll deductions will be accumulated for the purchase of shares of Common Stock at the applicable Purchase Price determined in accordance with the Plan. I understand that if I do not withdraw from an Offering Period, any accumulated payroll deductions will be used to automatically exercise my option and purchase Common Stock under the Plan.

4. I understand that the Company may elect to terminate, suspend or modify the terms of the Plan at any time. I agree to be bound by such termination, suspension or modification regardless of whether notice is given to me of such event, subject in any case to my right to timely withdraw from the Plan in accordance with the Plan withdrawal procedures then in effect.

5. I have received a copy of the complete Plan and its accompanying prospectus. I understand that my participation in the Plan is in all respects subject to the terms of the Plan.

6. I understand that if I am a U.S. taxpayer participating in an offering under the Section 423 Component of the Plan and I dispose of any shares received by me pursuant to the Plan within two (2) years of the Offering Date (the first Trading Day of the Offering Period during which I purchased such shares) or one (1) year of the Exercise Date, I will be treated for U.S. federal income tax purposes as having received ordinary income at the time of such disposition in an amount equal to the excess of the fair market value of the shares at the time such shares were purchased by me over the price that I paid for the shares. <u>I hereby agree to notify the Company in writing within thirty (30) days after the date of any disposition of my shares and I will make adequate provision for U.S. federal, state, foreign or other tax withholding obligations, if any, which arise upon the disposition of the Common Stock</u>. The Company may, but will not be obligated to, withhold from my compensation the amount necessary to meet any applicable withholding obligation including any withholding necessary to make available to the Company any tax deductions or benefits attributable to sale or early disposition of Common Stock by me. If I dispose of such shares at any time after the expiration of the two (2)-year and one (1)-year holding periods, I understand that I will be treated for U.S. federal income tax purposes as having received income only at the time of such disposition, and that such income will be taxed as ordinary income only to the extent of an amount equal to the lesser of (a) the excess of the fair market value of the shares at the time of such disposition over the purchase price which I paid for the shares, or

13

(b) 15% of the fair market value of the shares on the first day of the Offering Period. The remainder of the gain, if any, recognized on such disposition will be taxed as capital gain.

7. I acknowledge that, regardless of any action taken by the Company or, if different, my employer (the "Employer") with respect to any or all income tax, social security, payroll tax, fringe benefit, or other tax-related items related to my participation in the Plan and legally applicable to me ("Tax-Related Items"), the ultimate liability for all Tax-Related Items is and remains my responsibility and may exceed the amount actually withheld by the Company or the Employer. Furthermore, I acknowledge that the Company and/or the Employer (i) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the options under the Plan, including the grant of such options, the purchase and sale of shares of Common Stock acquired under the Plan and/or the receipt of any dividends on such shares, and (ii) do not commit to and are under no obligation to structure the terms of the grant of options or any aspect of my participation in the Plan to reduce or eliminate my liability for Tax-Related Items or achieve any particular tax result. Further, if I am or become subject to Tax-Related Items in more than one jurisdiction, I acknowledge that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

8. Prior to the purchase of shares of Common Stock under the Plan or any other relevant taxable or tax withholding event, as applicable, I agree to make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all Tax-Related Items. In this regard, I authorize the Company and/or the Employer, or their respective agents, at their discretion, to satisfy any withholding obligations with regard to all Tax-Related Items by one or a combination of the following: (1) withholding from my wages or Compensation paid to me by the Company and/or the Employer; or (2) withholding from proceeds of the sale of the shares of Common Stock purchased under the Plan either through a voluntary sale or through a mandatory sale arranged by the Company (on my behalf pursuant to this authorization). Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable maximum rates, in which case I will receive a cash refund of any over-withheld amount not remitted to tax authorities on my behalf and will have no entitlement to the Common Stock equivalent. Finally, I agree to pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold as a result of my participation in the Plan that cannot be satisfied by the means previously described. The Company may refuse to purchase shares of Common Stock under the Plan on my behalf and/or refuse to issue or deliver the shares or the proceeds of the sale of shares if I fail to comply with my obligations in connection with the Tax-Related Items.

9. The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means. I hereby consent to receive such documents by electronic delivery and agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

10. The Subscription Agreement is governed by the internal substantive laws but not the choice of law rules of California. For purposes of any action, lawsuit or other proceedings brought to enforce the Subscription Agreement, relating to it, or arising from it, the parties hereby submit to and consent to the sole and exclusive jurisdiction of the state courts of San Luis Obispo County, California, or the United States District Court for the Central District of California, and no other courts, where this grant is made and/or to be performed.

11. Notwithstanding any provision of this Subscription Agreement, I understand that if I am working or resident in a country other than the United States, my participation in the Plan also shall be subject to the Additional Terms and Conditions for Non-U.S. Participants set forth in Appendix A attached hereto and any special terms and conditions for my country set forth in Appendix B attached hereto. Further, I understand that if I relocate to one of the countries included in Appendix B, the special terms and conditions for such country will apply to me to the extent the Company determines that the application of such terms and conditions is necessary or advisable for legal or administrative reasons. Appendix A and Appendix B constitute part of this Subscription Agreement.

14

12. The provisions of the Subscription Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions nevertheless shall be binding and enforceable.

13. I acknowledge that a waiver by the Company of breach of any provision of the Subscription Agreement shall not operate or be construed as a waiver of any other provision of the Subscription Agreement, or of any subsequent breach by me or any other participant.

14. The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding my participation in the Plan, or my acquisition or sale of the underlying shares of Common Stock. I am hereby advised to consult with my own personal tax, legal and financial advisors regarding my participation in the Plan before taking any action related to the Plan.

15. I hereby agree to be bound by the terms of the Plan. The effectiveness of this Subscription Agreement is dependent upon my eligibility to participate in the Plan.

Employee's ID Number:    _____

Employee's Address:    _____

_____

_____

15

I UNDERSTAND THAT MY PARTICIPATION UNDER THE TERMS OF THIS SUBSCRIPTION AGREEMENT WILL REMAIN IN EFFECT THROUGHOUT SUCCESSIVE OFFERING PERIODS UNLESS TERMINATED BY ME OR IF I CEASE TO BE AN ELIGIBLE EMPLOYEE.

Dated: _____          _____

                                                 Signature of Employee


16

**APPENDIX A**

**MINDBODY, INC.**

**2015 EMPLOYEE STOCK PURCHASE PLAN**

**ADDITIONAL TERMS AND CONDITIONS FOR NON-U.S. PARTICIPANTS**

Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the MINDBODY, Inc. 2015 Employee Stock Purchase Plan.

1. Terms of Plan Participation for Non-U.S. Participants. I understand that this Appendix A contains additional terms and conditions that, together with the Plan and the Subscription Agreement, govern my participation in the Plan if I am working or resident in a country other than the United States. I further understand that my participation in the Plan also will be subject to any terms and conditions for my country set forth in Appendix B attached hereto.

2. Conversion of Payroll Deductions. I understand that if my payroll deductions or Contributions under the Plan are made in any currency other than U.S. dollars, such payroll deductions or Contributions will be converted to U.S. dollars on or prior to the Exercise Date using a prevailing exchange rate in effect at the time such conversion is performed, as determined by the Administrator. I understand and agree that neither the Employer nor the Company (nor any Parent, Subsidiary or Affiliate of the Company) will be liable for any foreign exchange rate fluctuation between my local currency and the U.S. dollar that may affect the amount of my Contributions, the value of the options granted to me under the Plan or the value of any amounts due to me under the Plan, including the amount of proceeds due to me upon the sale of any shares of Common Stock acquired under the Plan.

3. Nature of Grant. By electing to participate in the Plan, I acknowledge, understand and agree that:

(a) the Plan is established voluntarily by the Company and it is discretionary in nature;

(b) all decisions with respect to future grants of options under the Plan, if any, will be at the sole discretion of the Company;

(c) the grant of options under the Plan shall not create a right to employment or be interpreted as forming an employment contract with the Company, the Employer, or any other Parent, Subsidiary or Affiliate, and shall not interfere with the ability of the Company or the Employer, as applicable, to terminate my employment (if any);

(d) I am voluntarily participating in the Plan;

(e) the options granted under the Plan and the shares of Common Stock underlying such options, and the income and value of same, are not intended to replace any pension rights or compensation;

(f) the options granted under the Plan and the shares of Common Stock underlying such options, and the income and value of same, are not part of my normal or expected compensation for any purpose, including, but not limited to, calculating any severance, resignation, termination, redundancy, dismissal, end-of-service payments, bonuses, long-service awards, pension or retirement benefits or similar payments;

(g) unless otherwise agreed with the Company, the options granted under the Plan and the shares of Common Stock underlying such options, and the income and value of same, are not granted as consideration for, or in connection with, the service I may provide as a director of a Subsidiary or Affiliate;

(h) the future value of the shares of Common Stock underlying the options granted under the Plan is unknown, indeterminable and cannot be predicted with certainty;

17

(i) the shares of Common Stock that I acquire under the Plan may increase or decrease in value, even below the Purchase Price;

(j) no claim or entitlement to compensation or damages shall arise from the forfeiture of options granted to me under the Plan as a result of the termination of my status as an Eligible Employee (for any reason whatsoever, and whether or not later found to be invalid or in breach of employment laws in the jurisdiction where I am employed or the terms of my employment agreement, if any) and, in consideration of the grant of options under the Plan to which I otherwise am not entitled, I irrevocably agree never to institute a claim against the Company, the Employer, or any other Parent, Subsidiary or Affiliate, waive my ability, if any, to bring such claim, and release the Company, the Employer, and any other Parent, Subsidiary or Affiliate from any such claim that may arise; if, notwithstanding the foregoing, any such claim is allowed by a court of competent jurisdiction, I shall be deemed irrevocably to have agreed not to pursue such claim and I agree to execute any and all documents necessary to request dismissal or withdrawal of such claim;

(k) in the event of the termination of my status as an Eligible Employee (for any reason whatsoever, whether or not later found to be invalid or in breach of employment laws in the jurisdiction where I am employed or the terms of my employment agreement, if any), my right to participate in the Plan and any options granted to me under the Plan, if any, will terminate effective as of the date that I no longer am actively employed by the Company or one of its Parents, Subsidiaries or Affiliates and, in any event, will not be extended by any notice period mandated under the employment laws in the jurisdiction in which I am employed or the terms of my employment agreement, if any (*e.g.*, active employment would not include a period of "garden leave" or similar period pursuant to the employment laws in the jurisdiction in which I am employed or the terms of my employment agreement, if any); the Company shall have the exclusive discretion to determine when I no longer am actively employed for purposes of my participation in the Plan (including whether I still may be considered to be actively employed while on a leave of absence); and

(l) the grant of the option to purchase shares of Common Stock under the Plan and the benefits evidenced by the Subscription Agreement do not create any entitlement not otherwise specifically provided for in the Plan, or provided by the Company in its discretion, to have such rights or benefits transferred to, or assumed by, another company nor to be exchanged, cashed out or substituted for, in connection with a sale of substantially all of the Company's assets or a merger of the Company in which the Company is not the surviving corporation.

4. <u>Data Privacy</u>**.**

(a) *I hereby explicitly and unambiguously consent to the collection, use and transfer, in electronic or other form, of my personal data as described in the Subscription Agreement and any other Plan materials ("<u>Data</u>") by and among, as applicable, the Employer, the Company and its Parents, Subsidiaries and Affiliates for the exclusive purpose of implementing, administering and managing my participation in the Plan. I understand that Data may include certain personal information about me, including, but not limited to, my name, home address, email address and telephone number, date of birth, social insurance number, passport number or other identification number, salary, nationality, job title, any shares of Common Stock or directorships held in the Company, details of all options granted under the Plan or any other entitlement to shares of Common Stock awarded, canceled, exercised, vested, unvested or outstanding in my favor.*

(b) *I understand that Data will be transferred to such stock plan service provider as may be designated by the Company from time to time (the "<u>Designated Broker</u>"), which is assisting the Company with the implementation, administration and management of the Plan. I understand that the recipients of Data may be located in the United States or elsewhere, and that a recipient's country of operation (e.g., the United States) may have different data privacy laws and protections than my country. I understand that I may request a list with the names and addresses of any potential recipients of Data by contacting my local human resources representative.*

(c) *I authorize the Company, the Designated Broker and any other possible recipients which may assist the Company (presently or in the future) with implementing, administering and managing the Plan to receive, possess, use, retain and transfer Data, in electronic or other form, for the sole purpose of implementing, administering and*

*managing my participation in the Plan. I understand that Data will be held only as long as is necessary to implement, administer and manage my participation in the Plan. I understand that I may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing my local human resources representative. Further, I understand that I am providing the consents herein on a purely voluntary basis. If I do not consent, or if I later seek to revoke my consent, my employment status or career with the Company or the Employer will not be affected; the only consequence of refusing or withdrawing my consent is that the Company would not be able to grant me options under the Plan or other equity awards, or administer or maintain such awards. Therefore, I understand that refusing or withdrawing my consent may affect my ability to participate in the Plan. For more information on the consequences of my refusal to consent or withdrawal of consent, I understand that I may contact my local human resources representative.*

(d) *Finally, upon request of the Company or the Employer, I agree to provide an executed data privacy consent form to the Company and/or the Employer (or any other agreements or consents that may be required by the Company and/or the Employer) that the Company and/or the Employer may deem necessary to obtain from me for the purpose of administering my participation in the Plan in compliance with the data privacy laws in my country, either now or in the future. I understand and agree that I will not be able to participate in the Plan if I fail to provide any such consent or agreement requested by the Company and/or the Employer.*

5. <u>Compliance with Law</u>. Notwithstanding any other provision of the Plan or the Subscription Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the shares of Common Stock, the Company shall not be required to deliver any shares issuable upon purchase of shares under the Plan prior to the completion of any registration or qualification of the shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("<u>SEC</u>") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable. I understand that the Company is under no obligation to register or qualify the shares of Common Stock with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the shares. Further, I agree that the Company shall have unilateral authority to amend the Plan and the Subscription Agreement without my consent to the extent necessary to comply with securities or other laws applicable to issuance of shares.

6. <u>Language</u>. If I have received the Subscription Agreement or any other document related to the Plan translated into a language other than English and if the meaning of the translated version is different than the English version, the English version will control.

7. <u>Insider Trading</u>. By participating in the Plan, I agree to comply with the Company's policy on insider trading (to the extent that it is applicable to me). Further, I acknowledge that my country also may have laws or regulations governing insider trading and that such laws or regulations may impose additional restrictions on my ability to participate in the Plan (*e.g.*, acquiring or selling shares of Common Stock) and that I am solely responsible for complying with such laws or regulations.

8. <u>Imposition of Other Requirements</u>. The Company reserves the right to impose other requirements on my participation in the Plan and on any shares of Common Stock purchased under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require me to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

19

## APPENDIX B

## MINDBODY, INC.

### 2015 EMPLOYEE STOCK PURCHASE PLAN

### COUNTRY-SPECIFIC PROVISIONS FOR NON-U.S. PARTICIPANTS

Capitalized terms used but not otherwise defined herein shall have the meaning given to such terms in the MINDBODY, Inc. 2015 Employee Stock Purchase Plan.

*Terms and Conditions*

I understand that this Appendix B includes additional terms and conditions that govern the options to purchase shares of Common Stock granted to me under the Plan if I work or reside in one of the countries listed below. If I am a citizen or resident of a country other than the one in which I currently am working (or if I am considered as such for local law purposes), or if I transfer employment or residence to another country after enrolling in the Plan, I acknowledge and agree that the Company, in its discretion, will determine the extent to which the terms and conditions herein will be applicable to me.

*Notifications*

This Appendix B also includes information regarding securities laws, exchange controls and certain other issues of which I should be aware with respect to my participation in the Plan. The information is based on the securities, exchange control and other laws in effect in the respective countries as of January 2017. Such laws are often complex and change frequently. As a result, the Company recommends that I do not rely on the information in this Appendix B as the only source of information relating to the consequences of my participation in the Plan because the information included herein may be out of date at the time that I acquire shares of Common Stock under the Plan or subsequently sell such shares.

In addition, the information contained herein is general in nature and may not apply to my particular situation and the Company is not in a position to assure me of any particular result. Accordingly, I am advised to seek appropriate professional advice as to how the relevant laws in my country may apply to my individual situation.

Finally, if I am a citizen or resident of a country other than the one in which I currently am working or residing (or if I am considered as such for local law purposes), or if I transfer employment or residence to another country after options have been granted to me under the Plan, the information contained herein may not be applicable to me in the same manner.

### ALL EUROPEAN ECONOMIC AREA COUNTRIES

*Terms and Conditions*

Securities Law Restriction

If I reside and/or work in a country located in the European Economic Area ("EEA"), my participation in the Plan may be limited as a result of applicable securities laws. Specifically, contributions from all Plan participants residing and/or working in the EEA will be limited to less than an aggregate amount of €5 million on an annual basis. It is also possible that certain other equity awards in the EEA will count against this €5 million threshold. If Plan participants in the EEA elect to contribute more than this amount during any year, contribution rates will be prorated to ensure that this threshold is not exceeded. If my participation will be prorated, I understand that I will receive a notice from the Company explaining the proration.

20

**AUSTRALIA**

*Notifications*

<u>Australian Offer Document</u>

This offer of options is intended to comply with the provisions of the Corporations Act 2001, ASIC Regulatory Guide 49 and ASIC Class Order CO 14/1000. Additional details are set forth in the Offer Document for the offer of options to Australian resident employees, which will be provided to me with this Subscription Agreement.

<u>Exchange Control Information</u>

Exchange control reporting is required for cash transactions exceeding AUD10,000 and for international fund transfers. If an Australian bank is assisting with the transaction, the bank will file the report on my behalf.

**UNITED KINGDOM**

*Terms and Conditions*

<u>Responsibility for Taxes</u>

The following provisions supplement Sections 7 and 8 of the Subscription Agreement:

Without limitation to Sections 7 and 8 of the Subscription Agreement, I agree that I am liable for all Tax-Related Items and hereby covenant to pay all such Tax-Related Items, as and when requested by the Company or, if different, the Employer or by Her Majesty's Revenue & Customs ("HRMC") (or any other tax authority or any other relevant authority). I also agree to indemnify and keep indemnified the Company and, if different, the Employer against any Tax-Related Items that they are required to pay or withhold on my behalf or have paid or will pay to HMRC (or any other tax authority or any other relevant authority).

Notwithstanding the foregoing, if I am a director or executive officer of the Company (within the meaning of Section 13(k) of the Exchange Act), I understand that I may not be able to indemnify the Company for the amount of any income tax not collected from or paid by me within ninety (90) days of the end of the U.K. tax year in which the event giving rise to the Tax-Related Items occurs as it may be considered to be a loan and therefore, the amount of any uncollected income tax may constitute a benefit to me on which additional income tax and national insurance contributions ("NICs") may be payable. I will be responsible for reporting any income tax due on this additional benefit directly to HMRC under the self-assessment regime and for reimbursing the Company or the Employer (as applicable) for the value of any employee NICs due on this additional benefit, which the Company and/or the Employer may recover from me by any of the means referred to in Section 8 of the Subscription Agreement.

21

**EXHIBIT B**

**MINDBODY, INC.**

**2015 EMPLOYEE STOCK PURCHASE PLAN**

**NOTICE OF WITHDRAWAL**

The undersigned participant in the Offering Period of the MINDBODY, Inc. 2015 Employee Stock Purchase Plan that began on _____, _____ (the "Offering Date") hereby notifies the Company that he or she hereby withdraws from the Offering Period. He or she hereby directs the Company to pay to the undersigned as promptly as practicable all the payroll deductions credited to his or her account with respect to such Offering Period. The undersigned understands and agrees that his or her option for such Offering Period will be automatically terminated. The undersigned understands further that no further payroll deductions will be made for the purchase of shares in the current Offering Period and the undersigned will be eligible to participate in succeeding Offering Periods only by delivering to the Company a new Subscription Agreement.

Name and Address of Participant:

_____

_____

_____

Signature:

_____

Date: _____

22

EX-10.12 3 exhibit1012_12-31x2017.htm EXHIBIT 10.12

**Exhibit 10.12**

## SEPARATION AGREEMENT AND GENERAL RELEASE

This Separation Agreement and General Release ("Agreement") is made by and between Bradford L. Wills ("Executive") and MINDBODY, Inc. (the "Company") (collectively referred to as the "Parties" or individually referred to as a "Party").

### RECITALS

WHEREAS, Executive signed an Executive Employment Agreement with the Company on May 30, 2015, which superseded all prior employment agreements and/or offer letters by and between the Parties (the "2015 Employment Agreement");

WHEREAS, Executive signed an Employee Confidentiality Non-Disclosure and Assignment of Inventions Agreement with the Company on May 29, 2013 (the "Confidentiality Agreement");

WHEREAS, Executive holds outstanding equity awards covering common stock of the Company as set forth on Exhibit A (the "Equity Awards"), pursuant to the Company's 2009 Stock Option Plan and/or the Company's 2015 Equity Incentive Plan (each, a "Plan") and the equity awards agreements thereunder (each Equity Award agreement together with the Plans are collectively referred to herein as the "Stock Agreements");

WHEREAS, Executive's employment with the Company ceased effective December 31, 2017 (the "Separation Date"); and

WHEREAS, the Parties wish to resolve any and all disputes, claims, complaints, grievances, charges, actions, petitions, and demands that the Executive may have against the Company and any of the Releasees as defined below, including, but not limited to, any and all claims arising out of or in any way related to Executive's employment with or separation from the Company.

NOW, THEREFORE, in consideration of the mutual promises made herein, the Company and Executive hereby agree as follows:

### COVENANTS

1.      Consideration. In consideration of Executive's execution and non-revocation of this Agreement and Executive's fulfillment of all of its terms and conditions, including Executive's on-going obligations referenced in Section 11 herein, the Company agrees to pay Executive a total of Three Hundred Sixty-One Thousand Seventy-Six Dollars ($361,076.00), less applicable withholdings (the "Sum"). The Sum will be paid on January 31, 2018. Executive acknowledges that without this Agreement, Executive is otherwise not entitled to the consideration listed in this Section 1.

2.      Stock. The Equity Awards will continue to be subject to the Stock Agreements. Executive further acknowledges that Executive may exercise any outstanding vested stock options at any time within his applicable post-termination exercise period for each stock option (which is set forth on Exhibit A). If Executive does not exercise any vested stock options after the end of the applicable post-termination exercise period, then any such unexercised stock options will terminate. All unvested stock options and restricted stock units will immediately forfeit on the Separation Date. Executive acknowledges and agrees that the Equity Awards as set forth on Exhibit A reflect all of his outstanding equity awards from the Company.

3.      Benefits. Executive's health insurance benefits shall cease on December 31, 2017, subject to Executive's right to continue Executive's health insurance under COBRA, provided Executive timely elects

continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), within the time period prescribed pursuant to COBRA. Executive's participation in all benefits and incidents of employment, including, but not limited to, vesting in stock options and restricted stock units, and the accrual of bonuses, vacation, and paid time off, ceased as of the Separation Date. The Company will provide Executive with a COBRA notice within the time provided by law.

4.      <u>Payment of Salary and Receipt of All Benefits</u>. Executive acknowledges and represents that, other than the consideration set forth in this Agreement, the Company has paid or provided all salary, wages, bonuses, accrued vacation/paid time off, premiums, leaves, housing allowances, relocation costs, interest, severance, outplacement costs, fees, reimbursable expenses, commissions, stock, stock options, vesting, and any and all other benefits and compensation due to Executive.

5.      <u>Release of Claims</u>. Executive agrees that the foregoing consideration represents settlement in full of all outstanding obligations owed to Executive by the Company and its current and former officers, directors, employees, agents, investors, attorneys, shareholders, administrators, affiliates, benefit plans, plan administrators, professional employer organization or co-employer, insurers, trustees, divisions, and subsidiaries, and predecessor and successor corporations and assigns, (collectively, the "Releasees"). Executive, on Executive's own behalf and on behalf of Executive's respective heirs, family members, executors, agents, and assigns, hereby and forever releases the Releasees from, and agrees not to sue concerning, or in any manner to institute, prosecute, or pursue, any claim, complaint, charge, duty, obligation, demand, or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that Executive may possess against any of the Releasees arising from any omissions, acts, facts, or damages that have occurred up until and including the Effective Date of this Agreement, including, without limitation:

a.    any and all claims relating to or arising from Executive's employment relationship with the Company and the termination of that relationship;

b.    any and all claims relating to, or arising from, Executive's right to purchase, or actual purchase of shares of stock of the Company, including, without limitation, any claims for fraud, misrepresentation, breach of fiduciary duty, breach of duty under applicable state corporate law, and securities fraud under any state or federal law;

c.    any and all claims for wrongful discharge of employment, termination in violation of public policy, discrimination, harassment, retaliation, breach of contract (both express and implied), breach of covenant of good faith and fair dealing (both express and implied), promissory estoppel, negligent or intentional infliction of emotional distress, fraud, negligent or intentional misrepresentation, negligent or intentional interference with contract or prospective economic advantage, unfair business practices, defamation, libel, slander, negligence, personal injury, assault, battery, invasion of privacy, false imprisonment, conversion, and disability benefits;

d.    any and all claims for violation of any federal, state, or municipal statute, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Equal Pay Act, the Fair Labor Standards Act, the Fair Credit Reporting Act, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Employee Retirement Income Security Act of 1974, the Worker Adjustment and Retraining Notification Act, the Family and Medical Leave Act, the Sarbanes-Oxley Act of 2002, Immigration Reform and Control Act, the California Family Rights Act, the California Labor Code, the California Workers' Compensation Act, and the California Fair Employment and Housing Act;

e.    any and all claims for violation of the federal or any state constitution;

f.   any and all claims arising out of any other laws and regulations relating to employment or employment discrimination;

g.   any claim for any loss, cost, damage, or expense arising out of any dispute over the nonwithholding or other tax treatment of any of the proceeds received by Executive as a result of this Agreement; and

h.   any and all claims for attorneys' fees and costs.

Executive agrees that the release set forth in this section shall be and remain in effect in all respects as a complete general release as to the matters released. This release does not extend to any obligations incurred under this Agreement. This release does not release claims that cannot be released as a matter of law, including any Protected Activity (as defined below). Any and all disputed wage claims that are released herein shall be subject to binding arbitration as noted herein, except as required by applicable law. This release does not extend to any right Executive may have to unemployment compensation benefits or any right to indemnity under the Company's certificate of incorporation, bylaws, any indemnity policy applicable to Executive (including without limitation the right to coverage under any insurance policies applicable to directors and officers), or applicable law, whichever is greater.

6.      Acknowledgment of Waiver of Claims under ADEA. Executive acknowledges that Executive is waiving and releasing any rights Executive may have under the Age Discrimination in Employment Act of 1967 ("ADEA"), and that this waiver and release is knowing and voluntary. Executive agrees that this waiver and release does not apply to any rights or claims that may arise under the ADEA after the Effective Date of this Agreement. Executive acknowledges that the consideration given for this waiver and release is in addition to anything of value to which Executive was already entitled. Executive further acknowledges that Executive has been advised by this writing that: (a) Executive should consult with an attorney prior to executing this Agreement; (b) Executive has twenty-one (21) days within which to consider this Agreement; (c) Executive has seven (7) days following Executive's execution of this Agreement to revoke this Agreement; (d) this Agreement shall not be effective until after the revocation period has expired; and (e) nothing in this Agreement prevents or precludes Executive from challenging or seeking a determination in good faith of the validity of this waiver under the ADEA, nor does it impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law. In the event Executive signs this Agreement and returns it to the Company in less than the 21-day period identified above, Executive hereby acknowledges that Executive has freely and voluntarily chosen to waive the time period allotted for considering this Agreement. Executive acknowledges and understands that revocation must be accomplished by a written notification to the person executing this Agreement on the Company's behalf that is received prior to the Effective Date. The Parties agree that changes, whether material or immaterial, do not restart the running of the 21-day period.

7.      California Civil Code Section 1542. Executive acknowledges that Executive has been advised to consult with legal counsel and is familiar with the provisions of California Civil Code Section 1542, a statute that otherwise prohibits the release of unknown claims, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Executive, being aware of said code section, agrees to expressly waive any rights Executive may have thereunder, as well as under any other statute or common law principles of similar effect.

8.      No Pending or Future Lawsuits. Executive represents that Executive has no lawsuits, claims, or actions pending in Executive's name, or on behalf of any other person or entity, against the Company or any

Page 3 of 9

of the other Releasees. Executive also represents that Executive does not intend to bring any claims on Executive's own behalf or on behalf of any other person or entity against the Company or any of the other Releasees.

9.        Application for Employment. Executive understands and agrees that, as a condition of this Agreement, Executive shall not be entitled to any employment with the Company, and Executive hereby waives any right, or alleged right, of employment or re-employment with the Company.

10.        Confidentiality. Subject to paragraph 13 governing Protected Activity, Executive agrees to maintain in complete confidence the existence of this Agreement, the contents and terms of this Agreement, and the consideration for this Agreement (hereinafter collectively referred to as "Separation Information"). Except as required by law, Executive may disclose Separation Information only to Executive's immediate family members, the Court in any proceedings to enforce the terms of this Agreement, Executive's attorney(s), and Executive's accountant(s) and any professional tax advisor(s) to the extent that they need to know the Separation Information in order to provide advice on tax treatment or to prepare tax returns, and must prevent disclosure of any Separation Information to all other third parties. Executive agrees that Executive will not publicize, directly or indirectly, any Separation Information.

11.        Trade Secrets and Confidential Information/Company Property. Executive reaffirms and agrees to observe and abide by the terms of the Confidentiality Agreement, specifically including the provisions therein regarding nondisclosure of the Company's trade secrets and confidential and proprietary information, and nonsolicitation of Company employees. Executive further reaffirms and agrees to observe and abide by the ongoing non-solicitation obligations in Section 9 of the 2015 Employment Agreement. Executive's signature below constitutes Executive's certification under penalty of perjury that Executive has returned all documents and other items provided to Executive by the Company (with the exception of a copy of the Employee Handbook and personnel documents specifically relating to Executive), developed or obtained by Executive in connection with Executive's employment with the Company, or otherwise belonging to the Company.

12.        Litigation Cooperation. Executive agrees to cooperate with and make himself readily available to the Company and its attorneys, without additional compensation and as the Company may reasonably request, to assist it in any matter regarding the Company, including, but not limited to, giving truthful testimony in any litigation or potential litigation involving the Company, over which Executive has knowledge or information. Notwithstanding the foregoing, the Company will reimburse Executive for actual and pre-approved reasonable expenses incurred by Executive in connection therewith. Subject to paragraph 13 governing Protected Activity, Executive agrees that Executive will not knowingly encourage, counsel, or assist any attorneys or their clients in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints by any third party against any of the Releasees, unless under a subpoena or other court order to do so or as related directly to the ADEA waiver in this Agreement. Executive agrees both to immediately notify the Company upon receipt of any such subpoena or court order, and to furnish, within three (3) business days of its receipt, a copy of such subpoena or other court order. If approached by anyone for counsel or assistance in the presentation or prosecution of any disputes, differences, grievances, claims, charges, or complaints against any of the Releasees, Executive shall state no more than that Executive cannot provide counsel or assistance.

13.        Protected Activity Not Prohibited. Executive understands that nothing in this Agreement shall in any way limit or prohibit Executive from engaging in any Protected Activity. For purposes of this Agreement, "Protected Activity" shall mean filing a charge, complaint, or report with, or otherwise communicating, cooperating, or participating in any investigation or proceeding that may be conducted by, any federal, state or local government agency or commission, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board ("Government Agencies"). Executive understands that in connection with such Protected Activity, Executive is permitted to disclose documents or other information as permitted by law, and without giving notice to, or receiving authorization from, the Company. Notwithstanding the foregoing, Executive agrees

to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company confidential information under the Confidentiality Agreement to any parties other than the Government Agencies. Executive further understands that "Protected Activity" does not include the disclosure of any Company attorney-client privileged communications. Any language in the Confidentiality Agreement regarding Executive's right to engage in Protected Activity that conflicts with, or is contrary to, this paragraph is superseded by this Agreement. In addition, pursuant to the Defend Trade Secrets Act of 2016, Executive is notified that an individual will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that (i) is made in confidence to a federal, state, or local government official (directly or indirectly) or to an attorney *solely* for the purpose of reporting or investigating a suspected violation of law, or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if (and only if) such filing is made under seal. In addition, an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the individual's attorney and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

14.    Nondisparagement. Executive agrees to refrain from any disparagement, defamation, libel, or slander of any of the Releasees, and agrees to refrain from any tortious interference with the contracts and relationships of any of the Releasees. Executive shall direct any inquiries by potential future employers to the Company's human resources department.

15.    Breach. In addition to the rights provided in the "Attorneys' Fees" section below, the Company and Executive acknowledge and agree that any material breach of this Agreement, unless such breach constitutes a legal action by Executive challenging or seeking a determination in good faith of the validity of the waiver herein under the ADEA, or of any provision of the Confidentiality Agreement shall entitle the non-breaching party immediately to recover and/or cease providing the consideration provided to Executive under this Agreement and to obtain damages, except as provided by law.

16.    No Admission of Liability. Executive understands and acknowledges that this Agreement constitutes a compromise and settlement of any and all actual or potential disputed claims by Executive. No action taken by the Company hereto, either previously or in connection with this Agreement, shall be deemed or construed to be (a) an admission of the truth or falsity of any actual or potential claims or (b) an acknowledgment or admission by the Company of any fault or liability whatsoever to Executive or to any third party.

17.    Costs. The Parties shall each bear their own costs, attorneys' fees, and other fees incurred in connection with the preparation of this Agreement.

18.    ARBITRATION. THE PARTIES AGREE THAT ANY AND ALL DISPUTES ARISING OUT OF THE TERMS OF THIS AGREEMENT, THEIR INTERPRETATION, EXECUTIVE'S EMPLOYMENT WITH THE COMPANY OR THE TERMS THEREOF, OR ANY OF THE MATTERS HEREIN RELEASED, SHALL BE SUBJECT TO ARBITRATION IN SAN LUIS OBISPO COUNTY, BEFORE JUDICIAL ARBITRATION & MEDIATION SERVICES ("JAMS"), PURSUANT TO ITS EMPLOYMENT ARBITRATION RULES & PROCEDURES ("JAMS RULES"). THE ARBITRATOR MAY GRANT INJUNCTIONS AND OTHER RELIEF IN SUCH DISPUTES. THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH CALIFORNIA LAW, INCLUDING THE CALIFORNIA CODE OF CIVIL PROCEDURE, AND THE ARBITRATOR SHALL APPLY SUBSTANTIVE AND PROCEDURAL CALIFORNIA LAW TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO ANY CONFLICT-OF-LAW PROVISIONS OF ANY JURISDICTION. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH CALIFORNIA LAW, CALIFORNIA LAW SHALL TAKE PRECEDENCE. THE DECISION OF THE ARBITRATOR SHALL BE FINAL, CONCLUSIVE, AND BINDING ON THE PARTIES TO THE ARBITRATION. THE PARTIES AGREE THAT THE PREVAILING PARTY IN ANY ARBITRATION SHALL BE ENTITLED TO INJUNCTIVE RELIEF IN ANY COURT OF COMPETENT

JURISDICTION TO ENFORCE THE ARBITRATION AWARD. THE PARTIES TO THE ARBITRATION SHALL EACH PAY AN EQUAL SHARE OF THE COSTS AND EXPENSES OF SUCH ARBITRATION, AND EACH PARTY SHALL SEPARATELY PAY FOR ITS RESPECTIVE COUNSEL FEES AND EXPENSES; PROVIDED, HOWEVER, THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY, EXCEPT AS PROHIBITED BY LAW. THE PARTIES HEREBY AGREE TO WAIVE THEIR RIGHT TO HAVE ANY DISPUTE BETWEEN THEM RESOLVED IN A COURT OF LAW BY A JUDGE OR JURY. NOTWITHSTANDING THE FOREGOING, THIS SECTION WILL NOT PREVENT EITHER PARTY FROM SEEKING INJUNCTIVE RELIEF (OR ANY OTHER PROVISIONAL REMEDY) FROM ANY COURT HAVING JURISDICTION OVER THE PARTIES AND THE SUBJECT MATTER OF THEIR DISPUTE RELATING TO THIS AGREEMENT AND THE AGREEMENTS INCORPORATED HEREIN BY REFERENCE. SHOULD ANY PART OF THE ARBITRATION AGREEMENT CONTAINED IN THIS PARAGRAPH CONFLICT WITH ANY OTHER ARBITRATION AGREEMENT BETWEEN THE PARTIES, THE PARTIES AGREE THAT THIS ARBITRATION AGREEMENT SHALL GOVERN.

19.    Tax Consequences. The Company makes no representations or warranties with respect to the tax consequences of the payments and any other consideration provided to Executive or made on Executive's behalf under the terms of this Agreement. Executive agrees and understands that Executive is responsible for payment, if any, of local, state, and/or federal taxes on the payments and any other consideration provided hereunder by the Company and any penalties or assessments thereon. Executive further agrees to indemnify and hold the Releasees harmless from any claims, demands, deficiencies, penalties, interest, assessments, executions, judgments, or recoveries by any government agency against the Company for any amounts claimed due on account of (a) Executive's failure to pay or delayed payment of federal or state taxes, or (b) damages sustained by the Company by reason of any such claims, including attorneys' fees and costs.

20.    Section 409A. It is intended that this Agreement comply with, or be exempt from, Code Section 409A and the final regulations and official guidance thereunder ("Section 409A") and any ambiguities herein will be interpreted to so comply and/or be exempt from Section 409A. Each payment and benefit to be paid or provided under this Agreement is intended to constitute a series of separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations. The Company and Executive will work together in good faith to consider either (i) amendments to this Agreement; or (ii) revisions to this Agreement with respect to the payment of any awards, which are necessary or appropriate to avoid imposition of any additional tax or income recognition prior to the actual payment to Executive under Section 409A. In no event will the Releasees reimburse Executive for any taxes that may be imposed on Executive as a result of Section 409A.

21.    Authority. The Company represents and warrants that the undersigned has the authority to act on behalf of the Company and to bind the Company and all who may claim through it to the terms and conditions of this Agreement. Executive represents and warrants that Executive has the capacity to act on Executive's own behalf and on behalf of all who might claim through Executive to bind them to the terms and conditions of this Agreement. Each Party warrants and represents that there are no liens or claims of lien or assignments in law or equity or otherwise of or against any of the claims or causes of action released herein.

22.    Severability. In the event that any provision or any portion of any provision hereof or any surviving agreement made a part hereof becomes or is declared by a court of competent jurisdiction or arbitrator to be illegal, unenforceable, or void, this Agreement shall continue in full force and effect without said provision or portion of provision.

23.    Attorneys' Fees. Except with regard to a legal action challenging or seeking a determination in good faith of the validity of the waiver herein under the ADEA, in the event that either Party brings an action to enforce or effect its rights under this Agreement, the prevailing Party shall be entitled to recover its costs and expenses, including the costs of mediation, arbitration, litigation, court fees, and reasonable attorneys' fees incurred in connection with such an action.

24.    Entire Agreement. This Agreement represents the entire agreement and understanding between the Company and Executive concerning the subject matter of this Agreement and Executive's employment with and separation from the Company and the events leading thereto and associated therewith, and supersedes and replaces any and all prior agreements and understandings concerning the subject matter of this Agreement and Executive's relationship with the Company, with the exception of Section 9 of the 2015 Employment Agreement, the Confidentiality Agreement and the Stock Agreements, except as otherwise modified or superseded herein.

25.    No Oral Modification. This Agreement may only be amended in a writing signed by Executive and the Company's Chief Executive Officer.

26.    Governing Law. This Agreement shall be governed by the laws of the State of California, without regard for choice-of-law provisions. Executive consents to personal and exclusive jurisdiction and venue in the State of California.

27.    Effective Date. Executive understands that this Agreement shall be null and void if not executed by **January 1, 2018**. Executive acknowledges that he was provided at least 21 calendar days to consider this Agreement. Executive has seven (7) days after that Party signs this Agreement to revoke it. This Agreement will become effective on the eighth (8th) day after Executive signed this Agreement, so long as it has been signed by the Parties and has not been revoked by either Party before that date (the "Effective Date").

28.    Counterparts. This Agreement may be executed in counterparts and each counterpart shall be deemed an original and all of which counterparts taken together shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned.  The counterparts of this Agreement may be executed and delivered by facsimile, photo, email PDF, or other electronic transmission or signature.

29.    Voluntary Execution of Agreement. Executive understands and agrees that Executive executed this Agreement voluntarily, without any duress or undue influence on the part or behalf of the Company or any third party, with the full intent of releasing all of Executive's claims against the Company and any of the other Releasees. Executive acknowledges that:

(a)    Executive has read this Agreement;

(b)    Executive has been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of Executive's own choice or has elected not to retain legal counsel;

(c)    Executive understands the terms and consequences of this Agreement and of the releases it contains;

(d)    Executive is fully aware of the legal and binding effect of this Agreement; and

(e)    Executive has not relied upon any representations or statements made by the Company that are not specifically set forth in this Agreement.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement on the respective dates set forth below.


BRADFORD L. WILLS, an individual


Dated: <u>December 31, 2017</u>      <u>/s/ Bradford L. Wills</u>
                                    Bradford L. Wills




MINDBODY, INC.


Dated: <u>December 31, 2017</u>    By  <u>/s/ Rick Stollmeyer</u>
                                    Rick Stollmeyer
                                    Chief Executive Officer


Page 8 of 9

Exhibit A

Equity Awards of Stock Options and RSUs

Stock Options

| Plan | Grant No. | Grant Date | NSO/ISO* | Strike Price | Total Shares Granted | Outstanding and Vested as of 12.31.17 | Unvested as of 12.31.17 | Post-Termination Exercise Period from Separation Date (in months) |
|---|---|---|---|---|---|---|---|---|
| 2009 Stock Option Plan ("2009 Plan") | 11138311 | 5/14/2014 | ISO | $9.936 | 4,428 | 1,563 (1) | 1,303 | 3 |
| 2009 Plan | 1113831N1 | 5/14/2014 | NSO | $9.936 | 8,072 | 0 (2) | 0 | 3 |
| 2009 Plan | 15151 | 9/20/2014 | ISO | $10.616 | 3,568 | 0 (3) | 2,083 | 3 |
| 2009 Plan | 1515N1 | 9/20/2014 | NSO | $10.616 | 8,932 | 260 (4) | 0 | 3 |
| 2009 Plan | 15461 | 2/15/2015 | ISO | $14.476 | 5,529 | 0 | 5,529 | 3 |
| 2009 Plan | 1546N1 | 2/15/2015 | NSO | $14.476 | 19,471 | 520 (5) | 1,764 | 3 |
| 2009 Plan | 17231 | 5/22/2015 | ISO | $14.496 | 5,208 | 0 | 5,208 | 3 |
| 2009 Plan | 1723N1 | 5/22/2015 | NSO | $14.496 | 44,792 | 16,223 (6) | 12,500 | 3 |
| 2015 Equity Incentive Plan ("2015 Plan") | 815 | 3/21/2016 | NSO | $13.91 | 24,344 | 10,650 | 13,694 | 3 |
| 2015 Plan | 862 | 2/21/2017 | NSO | $25.15 | 30,697 | 0 | 30,697 | 3 |

(1)  1,562 shares previously exercised by Executive, and not included in this total.
(2)  8,072 shares previously exercised by Executive, and not included in this total.
(3)  1,485 shares previously exercised by Executive, and not included in this total.
(4)  8,672 shares previously exercised by Executive, and not included in this total.
(5)  17,187 shares previously exercised by Executive, and not included in this total.
(6)  16,069 shares previously exercised by Executive, and not included in this total.

Restricted Stock Units

| Plan | Grant Date | RSUs Unvested and Outstanding |
|---|---|---|
| 2015 Plan | 03/21/2016 | 8,096 |
| 2015 Plan | 2/21/2017 | 13,608 |

Page 9 of 9

EX-10.14 4 exhibit1014_12-31x2017.htm EXHIBIT 10.14

**Exhibit 10.14**

**MINDBODY, INC.**
4051 Broad Street, Suite 220
San Luis Obispo, CA 93401

Mark Baker
c/o MINDBODY, Inc.

   **Re:**   **EXECUTIVE EMPLOYMENT AGREEMENT**

Dear Mark:

   Your employment with MINDBODY, Inc., a Delaware corporation (the "***Company***"), shall be governed by the following terms and conditions (this "***Agreement***"):

   1.   **Duties and Scope of Employment.**

   (a) **Term.** Your anticipated start date is expected to be February 7th, 2018 and this Agreement will be effective as of your actual start date (the "***Effective Date***") and will continue through the three (3) year anniversary of the Effective Date (the "***Initial Term Expiration Date***" and such period, the "***Initial Term***"); provided that upon the Initial Term Expiration Date, and each subsequent three (3) year anniversary of such date, if applicable, the term of your employment under this Agreement will automatically be extended by three (3) years (each such extension, an "***Additional Term***"), unless either party hereto provides the other party with written notice at least ninety (90) days before the Initial Term Expiration Date, or such subsequent three (3) year anniversary of such date, if applicable, of such party's decision not to extend the term of employment under this Agreement any further. Notwithstanding the foregoing provisions of this paragraph, (a) if a Change in Control occurs when there are fewer than twelve (12) months remaining during the Initial Term or an Additional Term, the term of this Agreement will extend automatically through the date that is twelve (12) months following the effective date of the Change in Control, or (b) if an initial occurrence of an act or omission by the Company constituting the grounds for Good Reason (as defined below) has occurred (the "***Initial Grounds***"), and the expiration date of the Company cure period (as such term is used in the Good Reason definition) with respect to such Initial Grounds could occur following the expiration of the Initial Term or an Additional Term, then unless otherwise agreed to by you and the Company in writing, the term of this Agreement will extend automatically through the date that is thirty (30) days following the expiration of such cure period, but such extension of the term shall only apply with respect to the Initial Grounds. If you become entitled to benefits under Section 6(b) during the term of this Agreement, the Agreement will not terminate until all of the obligations of the parties hereto with respect to this Agreement have been satisfied. Notwithstanding the forgoing, your employment under this Agreement may be terminated at any time before or after the Initial Term Expiration Date or during any Additional Term, in accordance with Section 5 below. For avoidance of doubt, the decision by either party not to extend the term of employment under this Agreement will not by itself constitute a termination of employment by the Company without Cause (as defined below) or grounds for your resignation for Good Reason (as defined below), and unless determined otherwise by you or the

Company, after such non-renewal, your employment will continue on an at-will basis outside of this Agreement and you will not be eligible for any severance under this Agreement.

(b)    **Position and Responsibilities.** For the term of your employment under this Agreement (the "***Employment Period***"), the Company agrees to employ you in the position of Chief Revenue Officer. You will report to the President of the Company. You will perform the duties and have the responsibilities and authority customarily performed and held by an employee in your position or as otherwise may be assigned or delegated to you by the President.

(c)    **Obligations to the Company.** During the Employment Period, you shall perform your duties faithfully and to the best of your ability and will devote your full business efforts and time to the Company. During the Employment Period, without the prior written approval of the Company's Board of Directors (the "***Board***"), you shall not render services in any capacity to any other person or entity and shall not act as a sole proprietor or partner of any other person or entity or own more than five percent (5%) of the stock of any other corporation, except that stock or other equity that you hold as a passive investment in a non-competitive company will be exempt from this limitation. Notwithstanding the foregoing, you may serve on corporate boards of a non-competitive company, civic or charitable boards or committees, deliver lectures, fulfill speaking engagements, teach at educational institutions, or manage personal or family investments without such advance written consent; provided that, with respect to corporate boards, you notify the Board in advance and such positions are not in conflict with the interests of the Company, and with respect to such other activities, they do not individually or in the aggregate materially interfere with the performance of your duties under this Agreement. You shall comply with the Company's policies and rules, as they may be in effect from time to time and provided to you during the Employment Period.

(d)    **No Conflicting Obligations.** You represent and warrant to the Company that you are under no obligations or commitments, whether contractual or otherwise, that are inconsistent with your obligations under this Agreement. In connection with your employment, you shall not knowingly use or disclose any trade secrets or other proprietary information or intellectual property in which you or any other person has any right, title or interest and to the best of your knowledge, your employment during the Employment Period will not infringe or violate the rights of any other person. You represent and warrant to the Company that you have returned all property and confidential information belonging to any prior employer.

2.    **Cash and Incentive Compensation.**

(a)    **Base Salary.** The Company shall pay you as compensation for your services a base salary at a gross annual rate of $320,000, less all required tax withholdings and other applicable deductions, in accordance with the Company's standard payroll procedures. The annual compensation specified in this subsection (a), together with any modifications in such base compensation that the Company may make from time to time, is referred to in this Agreement as your "***Base Salary***." Your Base Salary will be subject to review and adjustments that will be made based upon the Company's normal performance review practices. Effective

as of the date of any change to your Base Salary, the Base Salary as so changed shall be considered the new Base Salary for all purposes of this Agreement.

(b) **Cash Incentive Bonus.** You will be eligible to receive incentive payments under the Company's Executive Bonus Plan or other applicable bonus plan in use by the Company (the "***Cash Bonus***"), paid after the close of the applicable performance period based upon performance of the Company relative to financial and other performance goals as reasonably established by, and in the sole discretion of, the Board or any Compensation Committee of the Board (the "***Committee***"), as applicable. For 2018, the target amount for your Cash Bonus will be 70% of your Base Salary (your "***Target Bonus***"), but pro-rated based on the portion of 2018 that you were employed by the Company, less all required tax withholdings and other applicable deductions. Your Target Bonus for any subsequent year may be adjusted up or down, as determined in the sole discretion of the Board or the Committee, as applicable. Except as otherwise set forth in the applicable bonus plan, you shall not earn a Cash Bonus, unless you are employed by the Company on the date when such Cash Bonus is actually paid by the Company. In addition, the Board and/or the Committee reserves the right to pay discretionary bonuses in its sole discretion.

(c) **Relocation**. The Company will reimburse you for reasonable costs for your relocation to the San Luis Obispo area, including, but not limited to, the moving of your household goods, transportation costs of moving you and your family and other reasonable and documented relocation costs, up to a maximum of $50,000 (collectively, the "***Relocation Payment***"). The Company anticipates that you will be fully moved in by August 31st, 2018 and all relocation costs must be incurred during calendar year 2018. Reimbursement requests should be submitted on a rolling basis and expenses will be paid on a rolling basis. However, all reimbursements must be submitted no later than March 15, 2019. Any portion of the Relocation Payment that is determined by the Company to be taxable will be subject to regular withholdings. Eligible relocation costs must be documented in accordance with Company's customary practices. If prior to the six (6) month anniversary of the Effective Date, you voluntarily resign from the Company other than for Good Reason or the Company terminates your employment for Cause, you will be required to immediately repay the Company the gross pre-tax value of the Relocation Payment.

(d) **Equity Awards.** It will be recommended at the next regularly scheduled meeting of the Board or the Committee, as applicable, after your start date that you be granted (i) 26,615 Restricted Stock Units ("***RSUs***") and (ii) a stock option covering 34,298 shares (the "***Option***"). If approved, (A) the RSUs will vest and settle over an approximate four-year annual vesting schedule, with one-fourth (1/4th) of the RSUs vesting on each annual Company vesting date, subject to you continuing to provide services to the Company through the relevant vesting dates, (B) the Option will vest as to twenty-five percent (25%) of the shares subject to the Option one (1) year after the vesting commencement date, and as to one forty-eighth (1/48th) of the shares subject to the Option monthly thereafter subject to you continuing to provide services to the Company through the relevant vesting dates and (C) the exercise price per share of the Option will be equal to the fair market value per share on the date the Option is granted. The term of the Option shall be ten (10) years, subject to earlier expiration in the event of the

- 3 -

termination of your services to the Company. Participation in MINDBODY's 2015 Equity Incentive Plan (the "***Plan***") is subject to the Plan and any amendments thereto, and conditioned upon your execution of a restricted stock unit agreement (the "***RSU Agreement***") and a stock option agreement (the "***Option Agreement***").  The terms and conditions of the RSUs are governed by the Plan and the RSU Agreement. The terms and conditions upon which the Option may be exercised, including, if at all, after termination of your employment, are governed by the Plan and the Option Agreement. Should the Equity provision above not be approved by the Executive Compensation Committee, Executive shall retain the right to resign from the Company. Such a resignation shall be a Resignation without Good Reason as described further below in section 22.

You will continue to be eligible to receive awards of stock options, restricted stock, restricted stock units, stock appreciation rights, performance units and performance shares or other equity awards ("***Awards***") pursuant to any plans or arrangements the Company may have in effect from time to time. The Board or the Committee will determine in its discretion whether you will be granted any such Awards and the terms of any such Award in accordance with the terms of any applicable plan or arrangement that may be in effect from time to time.

3.    **Paid Time Off and Employee Benefits.** During the Employment Period, you shall be eligible to participate in the Company's executive time off plan. During the Employment Period, you shall be eligible to participate in the employee benefit plans maintained by the Company and generally available to similarly situated employees of the Company, subject in each case to the generally applicable terms and conditions of the plan in question and to the determinations of any person or committee administering such employee benefit plan. The Company reserves the right to cancel or change the employee benefit plans and programs it offers to its employees at any time.

4.    **Business Expenses.** The Company will reimburse you for your necessary and reasonable business expenses incurred in connection with your duties hereunder upon presentation of an itemized account and appropriate supporting documentation, all in accordance with the Company's generally applicable policies.

5.    **Termination.**

(a)    **Employment at Will.** Your employment shall be "at will," meaning that either you or the Company shall be entitled to terminate your employment at any time and for any reason, with or without Cause or notice. Any contrary representations that may have been made to you shall be superseded by this Agreement. This Agreement shall constitute the full and complete agreement between you and the Company on the "at-will" nature of your employment, which may only be changed in an express written agreement signed by you and a duly authorized officer of the Company.

(b)    **Rights Upon Termination.** Except as expressly provided in Section 6, upon the termination of your employment, you shall only be entitled to the accrued but unpaid base salary compensation, any earned but unpaid Cash Bonus for the fiscal year preceding the fiscal year in which such termination of employment occurs and other benefits earned and the

- 4 -

reimbursements described in this Agreement or under any Company-provided plans, policies, and arrangements for the period preceding the effective date of the termination of employment.

6. **Termination Benefits.**

(a) **Termination Without Cause, Resignation for Good Reason or Termination on Account of Death or Disability Unrelated to a Change in Control**. If outside of the Change in Control Period, the Company (or any parent or subsidiary or successor of the Company) terminates your employment with the Company without Cause, you resign from your employment for Good Reason, or your employment terminates on account of your death or disability (each, a "*Qualifying Termination*"), then, in each case, subject to Section 7 you will be entitled to:

(i) receive continuing payments of severance pay at a rate equal to your Base Salary, as then in effect, for six (6) months from the date of such termination of employment (the *Continuation Period*"). Severance payments under this subsection (i) will be reduced by all required tax withholdings and other applicable deductions and will be paid in accordance with the Company's regular payroll procedures commencing on the Release Deadline (as defined in Section 7(a)); provided that the first payment shall include any amounts that would have been paid to you if payment had commenced on the date of your separation from service;

(ii) if you timely elect continuation coverage pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("*COBRA*") for you and your eligible dependents, within the time period prescribed pursuant to COBRA, the Company will reimburse you for the COBRA premiums for such coverage (at the coverage levels in effect immediately prior to your termination of employment) for you and your covered dependents until the earliest of (A) six (6) months from the date of such termination of employment, (B) the expiration of your continuation coverage under COBRA or (C) the date when you receive substantially equivalent health insurance coverage in connection with new employment or self-employment; provided that such benefits shall be taxable to you to the extent advisable under Section 105(h) of the Code; and

(iii) Notwithstanding Section 6(a)(ii), if the Company determines in its sole discretion that it cannot provide the COBRA benefit without potentially violating, or being subject to an excise tax under, applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company will in lieu thereof provide you a taxable payment, payable on the same schedule as payments under Section 6(a)(i), in an aggregate amount equal to the six (6) months of the COBRA premium that you would be required to pay to continue your group health coverage in effect on the termination of employment date (which amount will be based on the premium for the first month of COBRA coverage), which payments will be made regardless of whether you elect COBRA continuation coverage. For the avoidance of doubt, the taxable payments in lieu of COBRA reimbursements may be used for any purpose, including, but not limited to continuation coverage under COBRA, and will be subject to all applicable tax withholdings.

(b)    **Termination Without Cause, Resignation for Good Reason or Termination on Account of Death or Disability in Connection with a Change in Control**. If during the Change in Control Period, you experience a Qualifying Termination, then subject to Section 7, you will be entitled to the benefits as provided in Section 6(a) and additionally 100% of the then-unvested shares subject to Awards shall immediately vest. If, however, an outstanding Award is to vest, and/or the number of shares or amount of the Award to vest is to be determined based on the achievement of performance criteria, then the Award will vest as to then-outstanding shares the number of shares or the amount of the Award assuming the performance criteria had been achieved at 100% of target levels for the relevant performance period(s).

(c)    **Termination for Cause or Resignation without Good Reason**. If your employment with the Company (or any parent or subsidiary or successor of the Company) terminates voluntarily by you without Good Reason, or for Cause by the Company, then (i) all vesting will terminate immediately with respect to your outstanding Awards; (ii) all payments of compensation by the Company to you hereunder will terminate immediately (except as to amounts already earned); and (iii) you will only be eligible for severance benefits in accordance with the Company's established policies, if any, as then in effect.

(d)    **Exclusive Remedy**. In the event of a termination of your employment with the Company (or any parent or subsidiary or successor of the Company), the provisions of this Section 6 are intended to be and are exclusive and in lieu of any other rights or remedies to which you or the Company may otherwise be entitled, whether at law, tort or contract, in equity, or under this Agreement, except to the extent explicitly preserved hereunder. You will be entitled to no severance or other benefits upon termination of employment with respect to acceleration of award vesting or severance pay other than those benefits expressly set forth in this Section 6.

7.    **Conditions to Receipt of Severance; No Duty to Mitigate**.

(a)    **Separation Agreement and Release of Claims**. The receipt of any termination benefits pursuant to Section 6 will be subject to you signing and not revoking a standard separation agreement and release of claims with the Company (the "*Release*") and provided that such Release becomes effective and irrevocable no later than sixty (60) days following your "separation from service" (within the meaning of Section 409A) (such 60th day, the "*Release Deadline*"). The Release will not include (i) a non-compete covenant or (ii) other restrictive covenants that are not legal under applicable law. If the Release does not become effective and irrevocable by the Release Deadline, you will forfeit any rights to termination benefits under this Agreement. In no event will termination benefits be paid or provided until and unless the Release becomes effective and irrevocable by the Release Deadline.

(b)    **Nonsolicitation**. The receipt of any termination benefits pursuant to Section 6 will be subject to you not violating the provisions of Section 9. In the event you breach the provisions of Section 9, all continuing payments and benefits to which you may otherwise be entitled pursuant to Section 6 will immediately cease.

(c)    **Section 409A**.

- 6 -

(i)    Notwithstanding anything to the contrary in this Agreement, no Deferred Payments (as defined below) will be paid or otherwise provided until you have a "separation from service" within the meaning of Section 409A. Similarly, no severance payable to you, if any, pursuant to this Agreement that otherwise would be exempt from Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(9) will be payable until you have a "separation from service" within the meaning of Section 409A. Notwithstanding anything to the contrary in this Agreement, if you are a "specified employee" within the meaning of Section 409A at the time of your separation from service (other than due to death), then the termination benefits to be paid or provided to you, if any, pursuant to this Agreement that, when considered together with any other termination benefits, are considered deferred compensation not exempt under Section 409A (together, the "***Deferred Payments***") that are payable within the first six (6) months following your separation from service, will become payable on the first payroll date that occurs on or after the date six (6) months and one (1) day following the date of your separation from service. All subsequent Deferred Payments, if any, will be payable in accordance with the payment schedule applicable to each payment or benefit. Notwithstanding anything herein to the contrary, if you die following your separation from service, but prior to the six (6) month anniversary of the separation from service, then any payments delayed in accordance with this paragraph will be payable in a lump sum at the time of your death and all other Deferred Payments will be payable in accordance with the payment schedule applicable to each payment or benefit. Each payment and benefit payable under this Agreement is intended to constitute a separate payment for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations.

(ii)    The foregoing provisions are intended to comply with, and the COBRA reimbursements are intended to be exempt from, the requirements of Section 409A so that none of the severance payments and benefits to be provided hereunder will be subject to the additional tax imposed under Section 409A, and any ambiguities or ambiguous terms herein will be interpreted to so comply and, with respect to the COBRA reimbursements, to so be exempt. You and the Company agree to work together in good faith to consider amendments to this Agreement and to take such reasonable actions which are necessary, appropriate or desirable to avoid imposition of any additional tax or income recognition prior to actual payment to you under Section 409A.

(d)    **Confidential Information Agreement**. Your receipt of any payments or benefits under Section 6 will be subject to you continuing to comply with the terms of Confidentiality Agreement (as defined in Section 11(a)).

(e)    **No Duty to Mitigate**. You will not be required to mitigate the amount of any payment contemplated by this Agreement, nor will any earnings that you may receive from any other source reduce any such payment.

8.    **Definitions**.

(a)    "***Cause***" means (i) your conviction of, or plea of *nolo contendere* to, a felony (but excluding negligent driving offenses or driving offenses solely related to the speed limit) and which has an adverse effect on the business or affairs of the Company; (ii) your gross and willful misconduct; (iii) your unauthorized and intentional use or disclosure of any

- 7 -

proprietary information or trade secrets of the Company or any other party to whom you owe an obligation of nondisclosure as a result of your relationship with the Company; (iv) your willful breach of any material obligations under any material written agreement or covenant with the Company; (v) your refusal to perform your employment duties after you have received a written demand of performance from the Company that specifically sets forth the factual basis for the Company's belief that you have refused to perform your duties and have failed to cure such non-performance to the Company's reasonable satisfaction within thirty (30) business days after receiving such notice; or (vi) your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation. No termination for Cause shall be effective unless you are given written notice from the Board of the condition that could constitute Cause and, if capable of being cured, at least thirty (30) days to cure the condition.

(b) "**_Change in Control_**" has the same defined meaning as shall be set forth in the Company's 2015 Equity Incentive Plan.

(c) "**_Change in Control Period_**" means the period that commences upon a Change in Control and ends on the one (1) year anniversary following a Change in Control.

(d) "**_Code_**" means the Internal Revenue Code of 1986, as amended.

(e) "**_Good Reason_**" means your resignation within thirty (30) days following the expiration of any Company cure period (discussed below) following the occurrence of one or more of the following, without your express written consent: (i) a material reduction of your duties, authority or responsibilities without your prior consent; provided, however, that any change in reporting structure shall not be considered Good Reason; (ii) a material reduction in your Base Salary (except where there is a reduction applicable to the management team generally, not to exceed 15% of the aggregate base salary); or (iii) a material change in the geographic location of your primary work facility or location; provided, that a relocation of less than thirty (30) miles from your then-present work location will not be considered a material change in geographic location. You will not resign for Good Reason without first providing the Company with written notice of the acts or omissions constituting the grounds for Good Reason within ninety (90) days of the initial existence of the grounds for Good Reason and a reasonable cure period of thirty (30) days following the date the Company receives such notice during which such condition must not have been cured.

9.      **Non-Solicitation.** To the fullest extent permitted under applicable law, during the period commencing on the date of this Agreement and continuing until the first anniversary of the date when your employment terminated for any reason, you shall not directly or indirectly, personally or through others, solicit, recruit or attempt to solicit or recruit (on your own behalf or on behalf of any other person or entity) either (i) any employee or any consultant of the Company or any of the Company's affiliates or (ii) the business of any customer of the Company or any of the Company's affiliates on whom you called or with whom you became acquainted during your employment, if you are using confidential or proprietary information of the Company to effectuate the solicitation of any such customer. You represent that you (i) are familiar with the foregoing covenant not to solicit, and (ii) are fully aware of your obligations

- 8 -

hereunder, including, without limitation, the reasonableness of the length of time, scope and geographic coverage of these covenants.

10.    **Golden Parachute**.

(a)    Anything in this Agreement to the contrary notwithstanding, if any payment or benefit you would receive from the Company or otherwise ("***Payment***") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code; and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "***Excise Tax***"), then such Payment shall be equal to the Reduced Amount. The "***Reduced Amount***" shall be either (x) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax; or (y) the largest portion, up to and including the total, of the Payment, whichever amount, after taking into account all applicable federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in your receipt, on an after-tax basis, of the greater amount of the Payment. Any reduction made pursuant to this Section 10(a) shall be made in accordance with the following order of priority: (i) stock options whose exercise price exceeds the fair market value of the optioned stock ("***Underwater Options***") (ii) Full Credit Payments (as defined below) that are payable in cash, (iii) non-cash Full Credit Payments that are taxable, (iv) non-cash Full Credit Payments that are not taxable (v) Partial Credit Payments (as defined below) and (vi) non-cash employee welfare benefits. In each case, reductions shall be made in reverse chronological order such that the payment or benefit owed on the latest date following the occurrence of the event triggering the excise tax will be the first payment or benefit to be reduced (with reductions made pro-rata in the event payments or benefits are owed at the same time). "***Full Credit Payment***" means a payment, distribution or benefit, whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise, that if reduced in value by one dollar reduces the amount of the parachute payment (as defined in Section 280G of the Code) by one dollar, determined as if such payment, distribution or benefit had been paid or distributed on the date of the event triggering the excise tax. "***Partial Credit Payment***" means any payment, distribution or benefit that is not a Full Credit Payment. Notwithstanding the foregoing, to the extent the Company submits any payment or benefit payable to you to the Company's stockholders for approval in accordance with Treasury Regulation Section 1.280G-1 Q&A 7, the foregoing provisions shall not apply following such submission and such payments and benefits will be treated in accordance with the results of such vote, except that any reduction in, or waiver of, such payments or benefits required by such vote will be applied without any application of discretion by you and in the order prescribed by this Section. In no event shall you have any discretion with respect to the ordering of payment reductions.

(b)    A nationally recognized certified public accounting firm selected by the Company (the "***Accounting Firm***") shall perform the foregoing calculations related to the Excise Tax. If a reduction is required pursuant to Section 10(a), the Accounting Firm shall administer the ordering of the reduction as set forth in Section 10(a). The Company shall bear all expenses with respect to the determinations by such accounting firm required to be made hereunder.

- 9 -

(c)    The Accounting Firm engaged to make the determinations hereunder shall provide its calculations, together with detailed supporting documentation, to you and the Company a within fifteen (15) calendar days after the date on which your right to a Payment is triggered. Any good faith determinations of the Accounting Firm made hereunder shall be final, binding, and conclusive upon you and the Company.

11.    **Pre-Employment Conditions.**

(a)    **Confidentiality Agreement.** As a condition to joining the Company, you are required to sign the Company's standard Employee Confidentiality, Non-Disclosure and Assignment of Inventions Agreement (the "***Confidentiality Agreement***"). You will be bound by the Confidentiality Agreement during the Employment Term and thereafter in accordance with its terms.

(b)    **Right to Work.** For purposes of federal immigration law, you will be required, if you haven't already, to provide to the Company documentary evidence of your identity and eligibility for employment in the United States.

12.    **Successors.**

(a)    **Company's Successors.** This Agreement shall be binding upon any successor (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets. For all purposes under this Agreement, the term "***Company***" shall include any successor to the Company's business or assets that become bound by this Agreement.

(b)    **Your Successors.** This Agreement and all of your rights hereunder shall inure to the benefit of, and be enforceable by, your personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

13.    **Arbitration**.

(a)    **Arbitration**. In consideration of your employment with the Company, its promise to arbitrate all employment-related disputes, and your receipt of the compensation, pay raises and other benefits paid to you by the Company, at present and in the future, you agree that any and all controversies, claims, or disputes with anyone (including the Company and any employee, officer, director, shareholder or benefit plan of the Company in their capacity as such or otherwise) arising out of, relating to, or resulting from your employment with the Company or termination thereof, including any breach of this Agreement, will be subject to binding arbitration under the Federal Arbitration Act and pursuant to the Arbitration Rules set forth in California Code of Civil Procedure Section 1280 through 1294.2, including Section 1281.8 (the "***Act***"), and California law, and shall be brought in your individual capacity, and not as a plaintiff, representative, or class member in any purported class, collective, or representative proceeding. Notwithstanding the foregoing, you understand that you may bring a proceeding as a Private Attorney General as permitted by law. For the avoidance of doubt, the Federal

- 10 -

Arbitration Act governs this Agreement and shall apply with full force and effect, notwithstanding the application of procedural rules set forth under the Act and California law.

(b)  **Dispute Resolution**. Disputes that you agree to arbitrate, and thereby agree to waive any right to a trial by jury, include any statutory claims under local, state, or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Sarbanes Oxley Act, the Worker Adjustment and Retraining Notification Act, the Fair Labor Standards Act, the California Fair Employment and Housing Act, the Family and Medical Leave Act, the California Family Rights Act, the California Labor Code, claims relating to employment status, classification, and relationship with the Company, claims of harassment, discrimination, and wrongful termination, breach of contract and any statutory or common law claims, except as prohibited by law. You also agree to arbitrate any and all disputes arising out of or relating to the interpretation or application of this agreement to arbitrate, but not disputes about the enforceability, revocability, or validity of this agreement to arbitrate or any portion hereof of the class, collective and representative proceeding waiver herein. You agree that nothing in this agreement constitutes a waiver of your rights under Section 7 of the National Labor Relations Act. You further understand that this Agreement to arbitrate also applies to any disputes that the Company may have with you.

(c)  **Procedure**. You agree that any arbitration will be administered by the Judicial Arbitration & Mediation Services, Inc. ("*JAMS*"), pursuant to its Employment Arbitration Rules & Procedures (the "*JAMS Rules*"), which are available at http://www.jamsadr.com/rules-employment-arbitration/. The arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication, motions to dismiss and demurrers, prior to any arbitration hearing applying the standards set forth under the California Code of Civil Procedure. You agree that the arbitrator shall issue a written decision on the merits. The arbitrator shall have the power to award any remedies available under applicable law, and the arbitrator shall award attorneys' fees and costs to the prevailing party, where provided by applicable law. You agree that the decree or award rendered by the arbitrator may be entered as a final and binding judgment in any court having jurisdiction thereof. The Company will pay for any administrative or hearing fees charged by the administrator or JAMS, and all arbitrator's fees, except that you shall pay any filing fees associated with any arbitration that you initiate, but only so much of the filing fee as you would have instead paid had you filed a complaint in a court of law. You agree that the arbitrator shall administer and conduct any arbitration in accordance with California law, including the California Code of Civil Procedure and the California Evidence Code, and that the arbitrator shall apply substantive and procedural California law to any dispute or claim, without reference to the rules of conflict of law. To the extent that the JAMS Rules conflict with California law, California law shall take precedence. The decision of the arbitrator shall be in writing. Any arbitration under this Agreement shall be conducted in San Luis Obispo County, California.

(d)  **Remedy**. Except as provided by the Act and this Agreement, arbitration shall be the sole, exclusive, and final remedy for any dispute between you and the Company.

- 11 -

**Accordingly, except as provided by the Act and this Agreement, neither you nor the Company will be permitted to pursue court action regarding claims that are subject to arbitration**. Notwithstanding, the arbitrator will not have the authority to disregard or refuse to enforce any lawful Company policy, and the arbitrator will not order or require the Company to adopt a policy not otherwise required by law which the Company has not adopted.

(e)    **Administrative Relief**. You are not prohibited from pursuing an administrative claim with a local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment, including, but not limited to, the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission, the National Labor Relations Board, or the Workers' Compensation Board. However, you may not pursue court action regarding any such claim, except as permitted by law.

(f)    **Voluntary Nature of Agreement**. You acknowledge and agree that you are executing this Agreement voluntarily and without any duress or undue influence by the Company or anyone else. You further acknowledge and agree that you have carefully read this Agreement and that you have asked any questions needed for you to understand the terms, consequences and binding effect of this Agreement and fully understands it, including that *YOU ARE WAIVING YOUR RIGHT TO A JURY TRIAL*. Finally, you agree that you have been provided an opportunity to seek the advice of an attorney of your choice before signing this Agreement.

14.    **Miscellaneous Provisions.**

(a)    **Indemnification.** If the Board designates you as a Section 16 officer, the Company shall indemnify you to the maximum extent permitted by applicable law and the Company's Bylaws with respect to your service and you shall also be covered under a directors and officers liability insurance policy paid for by the Company to the extent that the Company maintains such a liability insurance policy now or in the future.

(b)    **Headings**. All captions and section headings used in this Agreement are for convenient reference only and do not form a part of this Agreement.

(c)    **Notice.** Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid. In your case, mailed notices shall be addressed to you at the home address that you most recently communicated to the Company in writing. In the case of the Company, mailed notices shall be addressed to its corporate headquarters, and all notices shall be directed to the attention of its Secretary.

(d)    **Modifications and Waivers.** No provision of this Agreement shall be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by you and by an authorized officer of the Company (other than you). No waiver by either party of any breach of, or of compliance with, any condition or provision of this

- 12 -

Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

(e) **Entire Agreement.** This Agreement supersedes any existing employment agreement and/or offer letter in its entirety. No other agreements, representations or understandings (whether oral or written and whether express or implied) which are not expressly set forth in this Agreement have been made or entered into by either party with respect to the subject matter hereof. This Agreement and the Confidentiality Agreement contain the entire understanding of the parties with respect to the subject matter hereof.

(f) **Withholding Taxes.** All payments made under this Agreement shall be subject to reduction to reflect taxes or other charges required to be withheld by law.

(g) **Choice of Law and Severability.** This Agreement shall be interpreted in accordance with the laws of the State of California without giving effect to provisions governing the choice of law. If any provision of this Agreement becomes or is deemed invalid, illegal or unenforceable in any applicable jurisdiction by reason of the scope, extent or duration of its coverage, then such provision shall be deemed amended to the minimum extent necessary to conform to applicable law so as to be valid and enforceable or, if such provision cannot be so amended without materially altering the intention of the parties, then such provision shall be stricken and the remainder of this Agreement shall continue in full force and effect. If any provision of this Agreement is rendered illegal by any present or future statute, law, ordinance or regulation (collectively, the "*Law*") then that provision shall be curtailed or limited only to the minimum extent necessary to bring the provision into compliance with the Law. All the other terms and provisions of this Agreement shall continue in full force and effect without impairment or limitation.

(h) **No Assignment.** This Agreement and all of your rights and obligations hereunder are personal to you and may not be transferred or assigned by you at any time. The Company may assign its rights under this Agreement to any entity that assumes the Company's obligations hereunder in connection with any sale or transfer of all or a substantial portion of the Company's assets to such entity.

(i) **Acknowledgment**. You acknowledge that you have the opportunity to discuss this matter with and obtain advice from his private attorney, have had sufficient time to, and have carefully read and fully understand all the provisions of this Agreement, and are knowingly and voluntarily entering into this Agreement.

(j) **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[Signature Page Follows]*

- 14 -

After you've had an opportunity to review this Agreement, please feel free to contact me if you have any questions or comments. To indicate your acceptance of this Agreement, please sign and date this letter in the space provided below and return it to me.

Very truly yours,

MINDBODY, INC.

By: /s/ Jeff Harper
(Signature)

SVP, People & Culture

ACCEPTED AND AGREED:

Mark Baker

/s/ Mark A. Baker
(Signature)

1/13/2018
Date

- 15 -

EX-10.21 5 exhibit1021_12-31x2017.htm EXHIBIT 10.21

**Exhibit 10.21**

**MINDBODY, INC.**

**OUTSIDE DIRECTOR COMPENSATION POLICY**

Adopted and approved May 22, 2015, Originally effective as of June 18, 2015, and Amended and Restated as of December 14, 2017

MINDBODY, Inc. (the "**Company**") believes that the granting of compensation to the members of the Board of Directors (the "**Board**," and members of the Board, the "**Directors**") represents an effective tool to attract, retain and reward Directors who are not employees of the Company (the "**Outside Directors**"). This Outside Director Compensation Policy (the "**Policy**") is intended to formalize the Company's policy regarding grants of equity to its Outside Directors. Unless otherwise defined herein, capitalized terms used in this Policy will have the meaning given such term in the Company's 2015 Equity Incentive Plan (the "**Plan**"). Each Outside Director will be solely responsible for any tax obligations incurred by such Outside Director as a result of the equity awards such Outside Director receives under this Policy.

1

1. **<u>CASH RETAINERS</u>**

*Annual Cash Retainers*

No Outside Director will receive fees or other compensation on a per-meeting basis for attendance at meetings of the Board or its committees.

Each Outside Director will be eligible for the following annual cash retainers for certain Board and/or committee service:

| | | |
|---|---|---|
| Board Member | $32,000 | |
| Lead Independent Director (additional) | $15,000 | |
| Chairperson (additional) | $20,000 | |
| Committee Awards: | <u>Chair</u> | <u>Member</u> |
| Audit | $20,000 | $7,500 |
| Compensation | $10,500 | $5,000 |
| Nominating and Corporate Governance | $6,500 | $3,000 |

*Payment*

Each annual cash retainer under this Policy will be paid quarterly in arrears on a prorated basis to each Outside Director who has served in the relevant capacity at any point during the immediately preceding Company fiscal quarter, and such payment shall be made no later than thirty (30) days following the end of the applicable Company fiscal quarter.

*Election for Cash Retainers to be Paid in Stock*

Each Outside Director may elect that payment of the cash retainers under this Policy be settled in the form of fully-vested Restricted Stock under the Plan. An election under this paragraph must be made in an open trading window under the Company's Insider Trading Policy by notification to the Company's Chief Legal Officer and such election must occur no later than one month prior to the end of the Company fiscal quarter in which the relevant cash retainer otherwise is to be paid (the "**Election Deadline**") for the election to be effective with respect to such cash retainer. An election shall remain in effect for cash retainers payable thereafter unless otherwise changed by the Outside Director in an open trading window by notification to the Company's Chief Legal Officer prior to the Election Deadline for the applicable cash retainer. Each payment in the form of fully vested Restricted Stock shall (i) be made on the last day of the applicable fiscal quarter and (ii)

cover a number of Shares equal to the U.S. dollar amount of the applicable cash retainer payment, *divided by* the Fair Market Value of a Share on the last market trading day of the applicable Company fiscal quarter, rounded down to the nearest whole Share. For clarity, absent any election under this paragraph, cash retainers shall be paid in cash.

## 2. <u>EQUITY COMPENSATION</u>

Outside Directors will be entitled to receive all types of Awards (except Incentive Stock Options) under the Plan (or the applicable equity plan in place at the time of grant), including discretionary Awards not covered under this Policy. All grants of Awards to Outside Directors pursuant to this Policy will be automatic and nondiscretionary, except as otherwise provided herein, and will be made in accordance with the following provisions:

(a)    <u>No Discretion</u>. No person will have any discretion to select which Outside Directors will be granted any Awards under this Policy or to determine the number of Shares to be covered by such Awards.

(b)    <u>Initial Awards</u>. Subject to Section 11 of the Plan, each person who first becomes an Outside Director automatically will be granted an award of equity that may include Options, Restricted Stock Units or other form of Award, or a mix of different forms of Award with a total Value of $350,000 (an "**Initial Award**") (with the number of Shares subject thereto determined based on that total Value, but rounded down to the nearest whole Share), which will become effective on the date the person first becomes an Outside Director, whether through election by the stockholders of the Company or appointment by the Board to fill a vacancy; provided, however, that a Director who is an Employee (an "**Inside Director**") who ceases to be an Inside Director, but who remains a Director, will not receive an Initial Award. Unless otherwise determined by the Board and/or the Compensation Committee, the Initial Award shall be in the form of Restricted Stock Units. Subject to Section 4 below and Section 14 of the Plan, each Initial Award will vest as to one-fourth (1/4) of the shares subject to the Initial Award on each anniversary of the date of grant, in each case subject to the Outside Director continuing to be a Service Provider through the applicable vesting date.

(c)    <u>Annual Awards</u>. Subject to Section 11 of the Plan, on the date of each annual meeting of the Company's stockholders (an "**Annual Meeting**"), each Outside Director automatically will be granted an Award with a total Value equal to $180,000, subject to pro-ration as set forth in the following paragraph (an "**Annual Award**") (with the number of Shares subject thereto determined based on that total Value, but rounded down to the nearest whole Share); provided, however, that an Annual Award will not be granted to any Outside Director who is not continuing as a Director following the applicable Annual Meeting. Unless otherwise determined by the Board and/or the Compensation Committee, the Annual Award and/or any Pro Rata Annual Award (as defined below) shall be in the form of Restricted Stock Units.

If as of the date of an Annual Meeting, an Outside Director had not been an Outside Director as of the previous Annual Meeting, then he or she will not be granted a full Annual Award and instead will be granted a pro-rated Annual Award ("**Pro Rata Annual Award**") with a total Value equal to the result of (x) $180,000 *multiplied by* (y) a fraction (i) the numerator of which is the

3

number of months he or she has served as an Outside Director (including any portions of a month) since he or she first became an Outside Director (such number not to exceed twelve (12) and (ii) the denominator which is twelve (12); provided that the number of Shares subject to the Pro Rata Annual Award will be rounded down to the nearest whole Share.

Subject to Section 4 below and Section 14 of the Plan, each Annual Award will vest in full on the earlier of (i) the day prior to the next Annual Meeting held after the date of grant or (ii) the first anniversary of the date of grant, in each case subject to the Outside Director continuing to be a Service Provider through the applicable vesting date.

(d)    Value. For purposes of this Policy, "**Value**" means (i) with respect to any award of RSUs, the Fair Market Value of the Shares subject thereto on the grant date of the award, or such other methodology the Board or the Compensation Committee of the Board (the "**Compensation Committee**") may determine prior to the grant of the RSUs becoming effective, as applicable (ii) with respect to any award of stock options, the grant date fair value of such award as determined in accordance with ASC Topic 718 and the methods for determining stock-based compensation as set forth in the Company's audited financial statements, or such other methodology the Board or the Compensation Committee may determine prior to the grant of the stock options.

## 3.  TRAVEL EXPENSES

Each Outside Director's reasonable, customary and documented travel expenses to Board and Board committee meetings will be reimbursed by the Company.

## 4.  ADDITIONAL PROVISIONS

All provisions of the Plan not inconsistent with this Policy will apply to Awards granted to Outside Directors.

## 5.  ADJUSTMENTS

In the event that any dividend or other distribution (whether in the form of cash, Shares, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase, or exchange of Shares or other securities of the Company or other change in the corporate structure of the Company affecting the Shares occurs, the Administrator, in order to prevent diminution or enlargement of the benefits or potential benefits intended to be made available under this Policy, will adjust the number of Shares issuable pursuant to Awards granted under this Policy.

## 6.  REVISIONS

The Board or the Compensation Committee, in their respective discretion, may change and otherwise revise the terms of Awards granted under this Policy, including, without limitation, the number of Shares subject thereto, for Awards of the same or different type granted on or after the date the Board or the Compensation Committee determines to make any such change or revision.

EX-21.1 6 exhibit_211x12-31x2017.htm EXHIBIT 21.1

**Exhibit 21.1**

The following is a list of subsidiaries of MINDBODY, Inc. as of December 31, 2017:

| Name of Subsidiary | Jurisdiction of Organization |
| --- | --- |
| MINDBODY AUSTRALIA PTY LTD | Australia |
| MINDBODY, LTD. | United Kingdom |

EX-23.1 7 exhibit_231x12-31x2017.htm EXHIBIT 23.1

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the incorporation by reference in Registration Statement Nos. 333-216348, 333-209957, 333-205125 on Form S-8 and Registration Statement No. 333-218159 on Form S-3ASR of our reports dated March 1, 2018, relating to the consolidated financial statements of MINDBODY, Inc. and subsidiaries (the "Company") and the effectiveness of the Company's internal control over financial reporting, appearing in this Annual Report on Form 10-K of the Company for the year ended December 31, 2017.

/s/ DELOITTE & TOUCHE LLP

San Jose, California
March 1, 2018

EX-31.1 8 exhibit_311x12-31x2017.htm EXHIBIT 31.1

**Exhibit 31.1**

**CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER**
**PURSUANT TO**
**EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a),**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Richard Stollmeyer, certify that:

1. I have reviewed this Annual Report on Form 10-K of MINDBODY, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    March 1, 2018               By:    /s/ Richard Stollmeyer
                                            Richard Stollmeyer
                                            Chief Executive Officer
                                            (Principal Executive Officer)

EX-31.2 9 exhibit_312x12-31x2017.htm EXHIBIT 31.2

**Exhibit 31.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO**
**EXCHANGE ACT RULES 13a-14(a) AND 15d-14(a),**
**AS ADOPTED PURSUANT TO**
**SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, Brett White, certify that:

1. I have reviewed this Annual Report on Form 10-K of MINDBODY, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 1, 2018

By: /s/ Brett White

Brett White

Chief Financial Officer and Chief Operating Officer

(Principal Financial Officer)

EX-32.1 10 exhibit_321-12x31x2017.htm EXHIBIT 32.1

**Exhibit 32.1**

### CERTIFICATION OF PRINCIPAL EXECUTIVE OFFICER
### PURSUANT TO 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

I, Richard Stollmeyer, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of MINDBODY, Inc. for the fiscal year ended December 31, 2017 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of MINDBODY, Inc.

Date:  March 1, 2018

By:    /s/ Richard Stollmeyer

Richard Stollmeyer

Chief Executive Officer

(Principal Executive Officer)

EX-32.2 11 exhibit_322x12-31x2017.htm EXHIBIT 32.2

**Exhibit 32.2**

**CERTIFICATION OF PRINCIPAL FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

I, Brett White, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report on Form 10-K of MINDBODY, Inc. for the fiscal year ended December 31, 2017 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of MINDBODY, Inc.

Date:  March 1, 2018

By:   /s/ Brett White

Brett White

Chief Financial Officer and Chief Operating Officer

(Principal Financial Officer)