# EXHIBIT 18

8-K 1 d696874d8k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 8-K

### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported)**

**January 24, 2019**

# MINDBODY, Inc.
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **001-37453** | **20-1898451** |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**4051 Broad Street, Suite 220
San Luis Obispo, California 93401**
**(Address of principal executive offices, including zip code)**

**(877) 755-4279**
**(Registrant's telephone number, including area code)**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☒    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

☐    Emerging growth company

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

**Item 8.01    Other Events.**

As previously announced, on December 23, 2018, MINDBODY, Inc., a Delaware corporation (the "Company" or "MINDBODY"), entered into an Agreement and Plan of Merger (the "Merger Agreement") with Torreys Parent, LLC, a Delaware limited liability company ("Parent"), and Torreys Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of Parent ("Merger Sub"), providing for the merger of Merger Sub with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent. On January 23, 2019, the Company filed with the Securities and Exchange Commission (the "SEC") a definitive proxy statement (the "Definitive Proxy Statement") with respect to the special meeting of MINDBODY stockholders scheduled to be held on February 14, 2019 in connection with the Merger (the "Special Meeting").

### *Litigation Related to the Merger*

In connection with the Merger, after the Definitive Proxy Statement was filed, four stockholder class action lawsuits have been filed:

(i)    in the United States District Court of Delaware, captioned *Sabatini v. MINDBODY, Inc. et al.*, Case No. 1:19-cv-00138-UNA (the "Sabatini Complaint");

(ii)   in California Superior Court of San Luis Obispo County, captioned *Schmit v. MINDBODY, Inc. et al.*, Case No. 19CV-0043 (the "Schmit Complaint");

(iii)  in the United States District Court of Central District of California, captioned *Tran v. MINDBODY, Inc. et al.*, Case No. 2:19-cv-00638 (the "Tran Complaint"); and

(iv)   in the Court of Chancery of Delaware, captioned *Ryan v. MINDBODY, Inc. et al.*, Case No. 2019-0061 (the "Ryan Complaint," and together with the Sabatini Complaint, Schmit Complaint, and Tran Complaint, the "Complaints")

The Complaints generally allege, among other things, that MINDBODY and the members of its Board of Directors purportedly omitted material information from the Proxy Statement and that the Merger and the process that led to it was procedurally and substantively flawed. The Complaints also allege claims against the members of the Company's Board of Directors and, in the case of the Ryan Complaint, Vista Equity Partners Management, LLC. The Complaints seek, among other things, additional disclosure of facts relating to the Merger and/or injunctive relief. Additional similar lawsuits may be filed in the future. The Company believes that the plaintiffs' allegations in the Complaints lack merit and will vigorously defend against these and any subsequently filed similar actions. If additional similar complaints are filed, absent new or different allegations that are material, the Company will not necessarily disclose such additional filings. The foregoing description is qualified in its entirety by reference to the Complaints which are attached hereto as Exhibits 99.1, 99.2, 99.3 and 99.4 and incorporated by reference herein.

### Additional Information and Where to Find It

In connection with the proposed Merger, MINDBODY has filed with the Securities and Exchange Commission (the "SEC") and furnished to its stockholders a definitive proxy statement on Schedule 14A, as well as other relevant documents concerning the proposed transaction. Promptly after filing its definitive proxy statement with the SEC, MINDBODY mailed the definitive proxy statement and a proxy card to each stockholder of MINDBODY entitled to vote at the special meeting relating to the proposed transaction. The proxy statement contains important information about the proposed Merger and related matters. STOCKHOLDERS AND SECURITY HOLDERS OF MINDBODY ARE URGED TO READ THESE MATERIALS (INCLUDING ANY AMENDMENTS OR SUPPLEMENTS THERETO) AND ANY OTHER RELEVANT DOCUMENTS IN CONNECTION WITH THE MERGER THAT MINDBODY WILL FILE WITH THE SEC WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT MINDBODY AND THE TRANSACTION. This communication is not a substitute for the proxy statement or for any other document that MINDBODY may file with the SEC and send to its stockholders in connection with the proposed Merger. The proposed Merger will be submitted to MINDBODY's stockholders for their consideration. Before making any voting decision, stockholders of MINDBODY are urged to read the proxy statement regarding the Merger and any other relevant documents filed with the SEC, as well as any amendments or supplements to those documents, because they will contain important information about the proposed Merger.

Stockholders of MINDBODY are able to obtain a free copy of the proxy statement, as well as other filings containing information about MINDBODY and the proposed transaction, without charge, at the SEC's website (http://www.sec.gov). Copies of the proxy statement, and the filings with the SEC that will be incorporated by reference therein can also be obtained, without charge, by contacting MINDBODY's Investor Relations at (888) 782-7155, by email at IR@mindbodyonline.com, or by going to MINDBODY's Investor Relations page on its website at investors.mindbodyonline.com and clicking on the link titled "Financials & Filings" to access MINDBODY's "SEC Filings."

**Participants in the Solicitation**

MINDBODY and certain of its directors, executive officers and employees may be deemed to be participants in the solicitation of proxies in respect of the proposed Merger. Information regarding the interests of MINDBODY's directors and executive officers and their ownership of Company Common Stock is set forth in MINDBODY's definitive proxy statement on Schedule 14A filed with the SEC on January 23, 2019, in connection with the proposed Merger, MINDBODY's proxy statement on Schedule 14A filed with the SEC on April 5, 2018, and certain of its Current Reports on Form 8-K. Other information regarding the participants in the proxy solicitation and a description of their direct and indirect interests in the proposed Merger, by security holdings or otherwise, are contained in the proxy statement and may be contained in other relevant materials to be filed with the SEC in connection with the proposed Merger. Free copies of this document may be obtained as described in the preceding paragraph.

**Notice Regarding Forward-Looking Statements**

This communication, and any documents to which MINDBODY refers you in this communication, contains not only historical information, but also forward-looking statements made pursuant to the safe-harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements represent MINDBODY's current expectations or beliefs concerning future events, including but not limited to the expected completion and timing of the proposed transaction, expected benefits and costs of the proposed transaction, management plans and other information relating to the proposed transaction, strategies and objectives of MINDBODY for future operations and other information relating to the proposed transaction. Without limiting the foregoing, the words "believes," "anticipates," "plans," "expects," "intends," "forecasts," "should," "estimates," "contemplate," "future," "goal," "potential," "predict," "project," "projection," "target," "seek," "may," "will," "could," "should," "would," "assuming," and similar expressions are intended to identify forward-looking statements. You should read any such forward-looking statements carefully, as they involve a number of risks, uncertainties and assumptions that may cause actual results to differ significantly from those projected or contemplated in any such forward-looking statement. Those risks, uncertainties and assumptions include (i) the risk that the proposed transaction may not be completed in a timely manner or at all, which may adversely affect MINDBODY's business and the price of the common stock of MINDBODY, (ii) the failure to satisfy any of the conditions to the consummation of the proposed transaction, including the adoption of the merger agreement by the stockholders of MINDBODY and the receipt of certain regulatory approvals, (iii) the occurrence of any event, change or other circumstance or condition that could give rise to the termination of the merger agreement, (iv) the effect of the announcement or pendency of the proposed transaction on MINDBODY's business relationships, operating results and business generally, (v) risks that the proposed transaction disrupts current plans and operations and the potential difficulties in employee retention as a result of the proposed transaction, (vi) risks related to diverting management's attention from MINDBODY's ongoing business operations, (vii) the outcome of any legal proceedings that may be instituted against MINDBODY related to the merger agreement or the proposed transaction, (viii) unexpected costs, charges or expenses resulting from the proposed transaction, and (ix) other risks described in MINDBODY's filings with the SEC, such as its Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K. Forward-looking statements speak only as of the date of this communication or the date of any document incorporated by reference in this document. Except as required by applicable law or regulation, MINDBODY does not assume any obligation to update any such forward-looking statements whether as the result of new developments or otherwise.

**Item 9.01.    Financial Statements and Exhibits.**

| Exhibit No. | Description |
|---|---|
| 99.1 | Complaint, Sabatini v. MINDBODY, Inc. et al., Case No. 1:19-cv-00138-UNA, filed on January 24, 2019 |
| 99.2 | Complaint, Schmit v. MINDBODY, Inc. et al., Case No. 19CV-0043, filed on January 24, 2019 |
| 99.3 | Complaint, Tran v. MINDBODY, Inc. et al., Case No. 2:19-cv-00638, filed on January 28, 2019 |
| 99.4 | Complaint, Ryan v. MINDBODY, Inc. et al., Case No. 2019-0061, filed on January 29, 2019 |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**MINDBODY, INC.**

By:  /s/ Brett White

**Brett White**
**Chief Financial Officer and Chief Operating**
**Officer**

Date: January 29, 2019

EX-99.1 2 d696874dex991.htm EX-99.1

**Exhibit 99.1**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ERIC SABATINI, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | CLASS ACTION |
| MINDBODY, INC., RICK STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, and GRAHAM SMITH, | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on December 24, 2018 (the "Proposed Transaction"), pursuant to which MINDBODY, Inc. ("MINDBODY" or the "Company") will be acquired by affiliates of Vista Equity Partners.

2. On December 23, 2018, MINDBODY's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Torreys Parent, LLC ("Parent") and Torreys Merger Sub, Inc. ("Merger Sub," and together with Parent and Vista Equity Partners, "Vista"). Pursuant to the terms of the Merger Agreement, MINDBODY's stockholders will receive $36.50 per share in cash for each share of MINDBODY common stock they hold.

3. On January 23, 2019, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission (the "SEC") in connection with the Proposed Transaction.

4. The Proxy Statement, which scheduled a stockholder vote on the Proposed Transaction for February 14, 2019, omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of MINDBODY common stock.

9. Defendant MINDBODY is a Delaware corporation and maintains its principal executive offices at 4051 Broad Street, Suite 220, San Luis Obispo, California 93401. MINDBODY's common stock is traded on the NasdaqGM under the ticker symbol "MB." MINDBODY is a party to the Merger Agreement.

2

10. Defendant Rick Stollmeyer is Chief Executive Officer and Chairman of the Board of the Company.

11. Defendant Katherine Blair Christie is a director of the Company.

12. Defendant Court Cunningham is a director of the Company.

13. Defendant Gail Goodman is a director of the Company.

14. Defendant Cipora Herman is a director of the Company.

15. Defendant Eric Liaw is a director of the Company.

16. Defendant Adam Miller is a director of the Company.

17. Defendant Graham Smith is a director of the Company.

18. The defendants identified in paragraphs 10 through 17 are collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

19. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of MINDBODY (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

20. This action is properly maintainable as a class action.

21. The Class is so numerous that joinder of all members is impracticable. As of December 20, 2018, there were approximately 45,515,580 shares of MINDBODY common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

3

22. Questions of law and fact are common to the Class, including, among others, whether defendants violated the 1934 Act and whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

23. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

24. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

25. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

***Background of the Company and the Proposed Transaction***

26. MINDBODY is the leading technology platform for the fitness, beauty, and wellness services industries.

27. Local entrepreneurs worldwide use MINDBODY's integrated software and payments platform to run, market, and grow their businesses.

4

28. Consumers use MINDBODY to more easily find, engage, and transact with fitness, wellness, and beauty providers in their local communities.

29. On December 23, 2018, MINDBODY's Board caused the Company to enter into the Merger Agreement.

30. Pursuant to the terms of the Merger Agreement, MINDBODY's stockholders will receive $36.50 per share in cash for each share of MINDBODY common stock they hold.

31. According to the press release announcing the Proposed Transaction:

MINDBODY, Inc. (NASDAQ: MB) today announced that it has entered into a definitive agreement to be acquired by Vista Equity Partners ("Vista"), a leading investment firm focused on software, data and technology-enabled businesses.

Under the terms of the agreement, Vista will acquire all outstanding shares of MINDBODY common stock for a total value of approximately $1.9 billion. MINDBODY shareholders will receive $36.50 in cash per share, representing a 68% premium to the unaffected closing price as of December 21, 2018. . . .

MINDBODY's Board of Directors unanimously approved the deal and recommended that stockholders vote their shares in favor of the transaction. Closing of the transaction is subject to customary closing conditions, including the approval of MINDBODY stockholders and antitrust approval in the United States. The transaction is expected to close in the first quarter of 2019 and is not subject to a financing condition.

***The Proxy Statement Omits Material Information, Rendering It False and Misleading***

32. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction, which scheduled a stockholder vote on the Proposed Transaction for February 14, 2019.

33. As set forth below, the Proxy Statement omits material information with respect to the Proposed Transaction.

5

34. The Proxy Statement omits material information regarding the Company's financial projections and the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, Qatalyst Partners LP ("Qatalyst").

35. With respect to the Company's financial projections, the Proxy Statement fails to disclose: (i) all line items used to calculate Adjusted EBITDA; (ii) the "Analyst Projections"; and (iii) a reconciliation of all non-GAAP to GAAP metrics.

36. With respect to Qatalyst's Discounted Cash Flow Analysis, the Proxy Statement fails to disclose: (i) the individual inputs and assumptions underlying the range of discount rates of 9.0% to 11.0%; (ii) Qatalyst's basis for applying a range of multiples of enterprise value to next-twelve-months estimated unlevered free cash flow of 20.0x to 30.0x; (iii) MINDBODY's cash net of the face value of outstanding convertible debt and financing obligations; and (iv) the number of fully-diluted shares of MINDBODY common stock used by Qatalyst in the analysis.

37. With respect to Qatalyst's Selected Companies Analysis, the Proxy Statement fails to disclose the Analyst Projections used by Qatalyst in the analysis.

38. With respect to Qatalyst's Selected Transactions Analysis, the Proxy Statement fails to disclose the Analyst Projections used by Qatalyst in the analysis.

39. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

40. The omission of the above-referenced material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) Background of the Merger; (ii) Recommendation of the Board of Directors and Reasons for the Merger; (iii) Opinion of Qatalyst Partners LP; and (iv) Management Projections.

41. The omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

**COUNT I**

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated
Thereunder Against the Individual Defendants and MINDBODY**

42. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

43. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. MINDBODY is liable as the issuer of these statements.

44. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

45. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

46. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

47. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

48. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

49. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

**COUNT II**

**Claim for Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants**

50. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

51. The Individual Defendants acted as controlling persons of MINDBODY within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of MINDBODY and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

52. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

8

53. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy Statement.

54. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

55. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to file a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

9

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: January 24, 2019

**RIGRODSKY & LONG, P.A.**

By:   */s/ Gina M. Serra*
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
300 Delaware Avenue, Suite 1220
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: sdr@rl-legal.com
Email: bdl@rl-legal.com
Email: gms@rl-legal.com

**OF COUNSEL:**

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
Email: rm@maniskas.com

*Attorneys for Plaintiff*

10

EX-99.2 3 d696874dex992.htm EX-99.2

**Exhibit 99.2**

**ELECTRONICALLY
FILED
1/24/2019 1:47 PM**

SAN LUIS OBISPO SUPERIOR COURT

BY _____
Carol L. McGuirk, Deputy Clerk

**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

SUPERIOR COURT OF CALIFORNIA

SAN LUIS OBISPO COUNTY

| | |
|---|---|
| JOSEPH SCHMIT, on behalf of himself and all others similarly situated, | CASE NO.: 19CV-0043 |
| Plaintiff, | JUDGE |
| vs. | DEPT.: |
| MINDBODY, INC., RICK STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, and GRAHAM SMITH, | CLASS ACTION COMPLAINT FOR: (1) BREACH OF FIDUCIARY DUTY |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff, Joseph Schmit ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants, and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1. Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of MINDBODY, Inc. ("MINDBODY" or the "Company"), against MINDBODY, the Company's Board of Directors (the "Board" or the "Individual Defendants, and collectively with MINDBODY, the "Defendants"), for breaches of fiduciary duty as a result of

- 1 -
CLASS ACTION COMPLAINT

Defendants' efforts to sell the Company to affiliates of Vista Equity Partners, LLC, including Torreys Parent, LLC ("Parent") and Torreys Merger Sub, Inc. ("Merger Sub," collectively with Vista Equity Partners, LLC and Parent, "Vista") as a result of an unfair process for an unfair price, and to enjoin a proposed stockholder vote on a proposed cash transaction valued at approximately $1.9 billion (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in a December 26, 2018, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, MINDBODY will become an indirect wholly-owned subsidiary of Vista, and MINDBODY stockholders will receive $36.50 in cash for each share of MINDBODY common stock they own.

3. Thereafter, on January 24, 2019, MINDBODY filed a Definitive Proxy Statement on Schedule DEFM14A (the "Definitive Proxy") with the SEC in support of the Proposed Transaction.

4. In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia,* (i) agreeing to sell MINDBODY without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or Vista without regard for MINDBODY public stockholders. Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to MINDBODY stockholders.

5. Next, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits with little thought to the Company's public stockholders. For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the

- 2 -
CLASS ACTION COMPLAINT

merger consideration. Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Transaction. Notably, Defendant Rick Stollmeyer stands to receive a near—$100 million payday as a result of the consummation of the Proposed Transaction.

6. Additionally, it appears that an insufficient market check was conducted by the Board. As stated in the Definitive Proxy, representatives of the Company's financial advisor attempted to contact fifteen potentially interested parties during its initial market check, however during the go-shop period after the execution of the Merger Agreement fifty-one additional potentially interested counter parties were contacted. The Definitive Proxy does not indicate why these fifty-one additional parties were not contacted during the sales process.

7. In further violation of their fiduciary duties, Defendants caused to be filed the materially deficient Definitive Proxy on January 24, 2019 with SEC in an effort to solicit stockholders to vote their MINDBODY shares in favor of the Proposed Transaction. The Definitive Proxy is materially deficient and deprives MINDBODY stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction. As detailed below, the Definitive Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for MINDBODY, provided by MINDBODY to the Company's financial advisor Qatalyst Partners LP ("Qatalyst") for use in its financial analyses; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, Qatalyst.

8. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff and the Class. This action seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' breach of fiduciary duties.

- 3 -

CLASS ACTION COMPLAINT

**PARTIES**

9. Plaintiff is a citizen of California and, at all times relevant hereto, has been an MINDBODY stockholder at all times.

10. Defendant MINDBODY operates a cloud-based business management software and payments platform for the small and medium-sized businesses in the wellness services industry. MINDBODY is incorporated under the laws of the State of Delaware and has its principal place of business at 4051 Broad Street, Suite 220, San Luis Obispo, CA 93401. Shares of MINDBODY common stock are traded on the NasdaqGM under the symbol "MB."

11. Defendant Rick Stollmeyer ("Stollmeyer") has been a Director of the Company at all relevant times. In addition, Stollmeyer is a Co-Founder of the Company, and has served as the Chief Executive Officer ("CEO") and Chairman of the Board of MINDBODY since the Company's founding in 2004.

12. Defendant Katherine Blair Christie ("Christie") has been a director of the Company at all relevant times. In addition, Christie serves as the Chair of the Board's Compensation Committee and as a member on the Board's Nominating and Governance Committee.

13. Defendant Court Cunningham ("Cunningham") has been a director of the Company at all relevant times. In addition, Cunningham serves as a member on the Board's Nominating and Governance Committee.

14. Defendant Gail Goodman ("Goodman") has been a director of the Company at all relevant times. In addition, Goodman serves as the chair of the Board's Nominating and Governance Committee and as a member on the Board's Compensation Committee. Goodman is also designated as the "Lead Director" by the Company.

15. Defendant Cipora Herman ("Herman") has been a director of the Company at all relevant times. In addition, Herman serves as a member on the Board's Audit Committee and is designated as a "Financial Expert" by the Company.

- 4 -
CLASS ACTION COMPLAINT

16. Defendant Eric Liaw ("Liaw") has been a director of the Company at all relevant times. In addition, Liaw serves as a member on the Board's Audit Committee.

17. Defendant Adam Miller ("Miller") has been a director of the Company at all relevant times. In addition, Miller serves as a member on the Board's Compensation Committee.

18. Defendant Graham Smith ("Smith") has been a director of the Company at all relevant times. In addition, Smith serves as the Chair of the Board's Audit Committee, as a member on the Board's Nominating and Governance Committee and is designated as a "Financial Expert" by the Company.

19. Defendants identified in ¶¶ 10—18 are collectively referred to as the "Individual Defendants."

20. Non-Party Vista Equity Partners, LLC is an American a private equity and venture capital firm specializing in investments in middle and large market management and leveraged buyouts, growth and acquisition financings, recapitalizations, restructurings, spinouts, divestitures, special situations, and going private transactions.

21. Non-Party Parent is a wholly owned subsidiary of Vista created to effectuate the Proposed Transaction.

22. Non-Party Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

23. This Court has personal jurisdiction over the Defendants inasmuch as Defendants' principal place of business is in California, directly or by agents transact business in California, caused tortious injury in California and by an act or omission outside the State while regularly doing and/or soliciting business, engaging in other persistent course of conduct in the State, and/or deriving substantial revenue from goods or manufactured products used or consumed in California.

24. Venue is proper in this Court inasmuch as the Defendants' principal place of business is in this County and it regularly transacts business in this County and there are multiple defendants with no single venue applicable, and thus can be sued for damages in this County.

- 5 -
CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action as a class action individually and on behalf of all holders of MINDBODY common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

26. Class actions are certified when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court. Cal. Civ. Proc. Code § 382. The California Supreme Court has stated that a class should be certified when the party seeking certification has demonstrated the existence of a "well-defined community of interest" among the members of the proposed class. *Richmond v. Dart Indus., Inc.*, 29 Cal.3d 462, 470 (1981); *see also Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 704 (1967).

27. Class actions are especially valuable in a context such as this one, in which individual damages may be modest. It is well settled that a plaintiff need not prove the merits of the action at the class certification stage.

28. Rather, the decision of whether to certify a class is "essentially a procedural one" and the appropriate analysis is whether, assuming the merits of the claims, they are suitable for resolution on a class-wide basis.

> As the focus in a certification dispute is on what types of questions common or individual are likely to arise in the action, rather than on the merits of the case, in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.

*Sav-On Drug Stores, Inc. v. Superior Court,* 34 Cal.4th 319, 327 (2004) (citations omitted).

- 6 -
CLASS ACTION COMPLAINT

29. This action is properly maintainable as a class action because, *inter alia:*

    a.    The Class is so numerous that joinder of all members is impracticable. As of January 2, 2019, there were over 47 million shares of common stock outstanding. MINDBODY stock is publicly traded on the NASDAQ and Plaintiff believes that there are hundreds if not thousands of holders of such shares. Moreover, the holders of these shares are geographically dispersed throughout the United States;

    b.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. These common questions include, *inter alia:* (i) whether the Individual Defendants have engaged in self-dealing, to the detriment of MINDBODY public stockholders; (ii) whether the Proposed Transaction is unfair to the Class, in that the price is inadequate and is not the fair value that could be obtained under the circumstances; and (iii) whether the Class is entitled to injunctive relief and/or damages as a result of the wrongful conduct committed by Defendants;

    c.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. The claims of Plaintiff are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

- 7 -
CLASS ACTION COMPLAINT

d.   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

e.   Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## THE INDIVIDUAL DEFENDANTS' FIDUCAIRY DUTIES

30. By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with MINDBODY and owe the Company the duties of due care, loyalty, and good faith.

31. By virtue of their positions as directors and/or officers of MINDBODY, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause MINDBODY to engage in the practices complained of herein.

32. Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company. To diligently comply with these duties, directors of a corporation must:

a.   act with the requisite diligence and due care that is reasonable under the circumstances;

b.   act in the best interest of the company;

c.   use reasonable means to obtain material information relating to a given action or decision;

d.   refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

- 8 -
CLASS ACTION COMPLAINT

e.    avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f.    disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

33. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of MINDBODY, are obligated to refrain from:

a.    participating in any transaction where the directors' or officers' loyalties are divided;

b.    participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public stockholders; and/or

c.    unjustly enriching themselves at the expense or to the detriment of the Company or its stockholders.

34. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to MINDBODY, Plaintiff and the other public stockholders of MINDBODY, including their duties of loyalty, good faith, and due care.

35. As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their MINDBODY common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

*Company Background*

36. MINDBODY operates a cloud-based business management software and payments platform for the small and medium-sized businesses in the wellness services industry.

- 9 -
CLASS ACTION COMPLAINT

37. The Company's platform enables businesses to run, market, and build scheduling and online booking, performance tracking, staff management, client relationship management, integrated payment processing, retail point-of-sale, purchase tracking, inventory, hardware integration, analytics and reporting, branded Web, mobility, social integration, client acquisition dashboard, security and compliance, and integration with other cloud-based partners for yoga, Pilates, indoor cycling, group and personal training, boutique fitness, salons, spas, and integrative health businesses.

38. The Company offers its software platform to its subscribers as a subscription-based service. It also connects consumers with businesses through its MINDBODY app, a consumer-facing mobile application that allows consumers to discover, evaluate, book, and pay for wellness services; MINDBODY Network, a fee-based platform that connects its customers with local consumers through the MINDBODY app and third-party partner applications, or Websites; and MINDBODY API Platform and Partner Ecosystem, a platform focuses in areas, such as marketing automation, accounting, loyalty, mobile, and social interactions.

39. MINDBODY sells its subscriptions through a direct sales team primarily in San Luis Obispo, California; the United Kingdom; and Australia. MINDBODY, Inc. was founded in 2001 and is headquartered in San Luis Obispo, California.

40. The Company's most recent financial performance press release before the announcement of the Proposed Transaction indicated sustained and solid financial performance. For example, in November 26, 2018 press release announcing its 2018 Q3 Financial results, the Company highlighted such financial milestones as an increase in total revenue of 37% year-on-year, a 44% increase in subscription and services revenue year-on-year, and a 24% increase in payments revenue year-on-year.

41. Speaking on these positive results, Company Chief Operating Officer ("COO") and Chief Financial Officer ("CFO") Brett White noted on the Company's positive financial results as follows, "In the third quarter we delivered the highest average monthly subscription revenue for new subscribers in the history of both the MINDBODY and Booker platforms," White continued, "As the newly formed Beauty and Wellness team ramps, we expect to continue to grow our target market customer base, increase our platform partnerships and expand our consumer brand into 2019."

- 10 -
CLASS ACTION COMPLAINT

42. The Press Release went on to comment on a strong future outlook for MINDBODY, with Company CEO Defendant Stollmeyer noting that the Company, "achieved multiple successes in Q3," and is, "in a unique strategic position" for future long-term growth opportunities.

43. These positive results are not an anomaly, but rather, are indicative of a trend of continued financial success by MINDBODY. For example, in a July 31, 2018, press release announcing the Company's Financial 2018 Q2 financial results, MINDBODY reported such positive a 40% increase in revenue year-on-year.

44. Speaking on these results, White stated, "We delivered strong revenue growth in the second quarter, driven by the continued shift of our subscriber base into higher priced software tiers."

45. Clearly, based upon these positive financial results, the Company is likely to have tremendous future success and should command a much higher consideration than the amount contained within the Proposed Transaction.

46. Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused MINDBODY to enter into the Proposed Transaction for insufficient consideration.

***The Flawed Sales Process***

47. As detailed in the Definitive Proxy, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Vista.

48. First, it appears that an insufficient market check was conducted by the Board. As stated in the Definitive Proxy, representative of Qatalyst attempted to contact fifteen potentially interested parties during its initial market check, however during the go-shop period after the execution of the Merger Agreement fifty-two additional potentially interested counter parties were contacted. The Definitive Proxy is silent as to why no outreach was made to these fifty-two additional potentially interested parties during the sales process prior to the execution of the merger agreement.

- 11 -
CLASS ACTION COMPLAINT

49. Finally, the Definitive Proxy is unclear as to the nature of specific confidentiality and/or non-disclosure agreements MINDBODY entered into with Vista and various other third parties throughout the sales process and Go-Shop period, if any such agreements were different from one another, and the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in any such agreements, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid.

50. It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

***The Proposed Transaction***

51. On December 24, 2018, MINDBODY issued a press release announcing the Proposed Transaction. The press release stated, in relevant part:

**SAN LUIS OBISPO, Calif., Dec. 24, 2018 (GLOBE NEWSWIRE)** — MINDBODY, Inc. (NASDAQ: MB) today announced that it has entered into a definitive agreement to be acquired by Vista Equity Partners ("Vista"), a leading investment firm focused on software, data and technology-enabled businesses.

Under the terms of the agreement, Vista will acquire all outstanding shares of MINDBODY common stock for a total value of approximately $1.9 billion. MINDBODY shareholders will receive $36.50 in cash per share, representing a 68% premium to the unaffected closing price as of December 21, 2018.

"MINDBODY's purpose is to help people lead healthier, happier lives by connecting the world to fitness, beauty and wellness," said Rick Stollmeyer, Co-Founder and CEO of MINDBODY. "We are thrilled to provide immediate liquidity to our shareholders at a significant premium to market prices and to leverage Vista's resources and deep expertise to accelerate our growth while achieving that purpose more effectively than ever before."

"MINDBODY's position as the leading technology platform for the fitness, beauty and wellness industries makes it an ideal addition to the Vista family of companies," said Brian Sheth, Co-Founder and President of Vista. "We look forward to partnering with Rick and the entire MINDBODY team to deliver innovation to customers that will help grow their businesses and to consumers who depend on MINDBODY to strengthen their health and well-being."

- 12 -
CLASS ACTION COMPLAINT

MINDBODY's Board of Directors unanimously approved the deal and recommended that stockholders vote their shares in favor of the transaction. Closing of the transaction is subject to customary closing conditions, including the approval of MINDBODY stockholders and antitrust approval in the United States. The transaction is expected to close in the first quarter of 2019 and is not subject to a financing condition.

The definitive agreement for the transaction includes a 30 day "go-shop" period, which permits MINDBODY's Board of Directors and financial advisors to actively initiate, solicit, encourage and potentially enter negotiations with other parties that make alternative acquisition proposals. MINDBODY will have the right to terminate the merger agreement to enter into a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this 30 day "go-shop" will result in a superior proposal, and MINDBODY does not intend to disclose developments with respect to the solicitation process unless and until the Board of Directors makes a determination requiring further disclosure.

Qatalyst Partners is serving as the exclusive financial advisor to MINDBODY, and Cooley LLP is serving as legal advisor to MINDBODY. Vista's legal advisor is Kirkland & Ellis LLP.

### *The Inadequate Merger Consideration*

52. Significantly, the Company's financial prospects and opportunities for future growth establish the inadequacy of the merger consideration.

53. First, the compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company. The proposed valuation does not adequately reflect the intrinsic value of the Company. Moreover, the valuation does not adequately take into consideration how the Company is performing, considering key financial improvements and increases in the revenue position of the Company in recent quarters.

54. For example, the Company has traded as high as $45.50 per share within the past fifty-two weeks, *a value that is more than 24.65% greater than the consideration contained in the Proposed Transaction*, indicating that Plaintiff and other MINDBODY public stockholders are receiving little premium, if any, for their MINDBODY stock.

- 13 -
CLASS ACTION COMPLAINT

55. Moreover, according to *MarketBeat.com* as recently as early November 2018, financial analysts at JPMorgan Chase & Co. gave a price target for MINDBODY of $48.00 per share, or an amount that is more than 31.50% greater than the consideration contained in the Proposed Transaction. Similarly, in the same time frame, financial analysts at Imperial Capital gave a price target for the Company at $42.00 per share.

56. Additionally, MINDBODY's future success is extremely likely, given the consistent positive financial results it has posted over the past several quarters. Obviously, the opportunity to invest in such a company on the rise is a great coup for Vista, however it undercuts the investment of Plaintiff and all other public stockholders.

57. Moreover, post-closure, MINDBODY stockholders will be frozen out of any ownership of the Company, forever foreclosing them from reaping the likely future benefits of MINDBODY's continued financial success.

58. Clearly, while the deal will be beneficial to Vista it comes at great expense to Plaintiff and other public stockholders of the Company.

59. It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Vista at the expense of MINDBODY stockholders, which clearly indicates that MINDBODY stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Mechanisms***

60. The Merger Agreement contains certain provisions that unduly benefit Vista by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that is especially onerous and impermissible. Notably, in the event of termination, the merger agreement requires MINDBODY to pay up to $57,168,000 to Vista, if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, MINDBODY must pay this termination fee even if it consummates any Alternative Acquisition Agreement (as defined in the Merger Agreement) *within one year following the termination* of the Merger Agreement. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

- 14 -
CLASS ACTION COMPLAINT

61. The Merger Agreement also contains a "No Solicitation" provision that restricts MINDBODY from considering alternative acquisition proposals by, *inter alia*, constraining MINDBODY's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from, after the brief go-shop period, directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an unsolicited bona fide *"Alternative Acquisition Agreement"* if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

62. Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide Vista information in order to match any other offer, thus providing Vista access to the unsolicited bidder's financial information and giving Vista the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Vista.

63. Finally, the Definitive Proxy also indicates that certain directors, executive officers, and other officers of MINDBODY have entered into irrevocable proxy voting agreements requiring them to vote their shares of MINDBODY stock in favor of the Proposed Transaction, thereby making the deal that much more likely. Notably, while the Definitive Proxy indicates the existence of such voting agreements, no information regarding the actual amount of MINDBODY stock that is pledged thereunder is given in the document, leaving Plaintiff and all other MINDBODY stockholders in the dark regarding the actual value of their vote regarding the Proposed Transaction.

64. These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

- 15 -
CLASS ACTION COMPLAINT

65. Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

***Additional Potential Conflicts of Interest***

66. The breakdown of the benefits of the deal indicate that MINDBODY insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of MINDBODY.

67. Certain insiders stand to receive massive financial benefits as a result of the Proposed Transaction. Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction.

68. Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement

69. The consideration being granted to Company insiders from such holdings are reflected below:

| Name | Shares (#)(1) | Shares ($) | Company Options (#)(2) | Company Options ($) | Company RSUs (#)(3)(4) | Company RSUs ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Richard Stollmeyer | 529,251 | 19,317,661.50 | 1,267,340 | 33,413,157.46 | 146,644 | 5,352,506.00 | 58,083,324.96 |
| Michael Mansbach | 3,705 | 135,232.50 | 133,464 | 1,470,194.80 | 74,285 | 2,711,402.50 | 4,316,829.80 |
| Brett White | 19,074 | 696,201.00 | 348,832 | 6,943,415.41 | 95,424 | 3,482,976.00 | 11,122,592.41 |
| Kimberly Lytikainen | — | — | 84,436 | 1,098,710.15 | 41,101 | 1,500,186.50 | 2,598,896.65 |
| Mark Baker | 300 | 10,950.00 | 34,298 | 104,608.90 | 26,615 | 971,447.50 | 1,087,006.40 |
| Katherine Blair Christie | 19,987 | 729,525.50 | 60,000 | 1,320,240.00 | 4,609 | 168,228.50 | 2,217,994.00 |
| Court Cunningham | 3,234 | 118,041.00 | — | — | 14,314 | 522,461.00 | 640,502.00 |
| Gail Goodman | 22,513 | 821,724.50 | — | — | 17,136 | 625,464.00 | 1,447,188.50 |
| Cipora Herman | 14,423 | 526,439.50 | — | — | 14,043 | 512,569.50 | 1,039,009.00 |
| Eric Liaw | 7,996 | 291,854.00 | — | — | 4,609 | 168,228.50 | 460,082.50 |
| Adam Miller | 9,328 | 340,472.00 | — | — | 15,280 | 557,720.00 | 898,192.00 |
| Graham Smith | 29,987 | 1,094,525.50 | 70,000 | 1,541,680.00 | 4,609 | 168,228.50 | 2,804,434.00 |

- 16 -
CLASS ACTION COMPLAINT

70. Relatedly, certain employment agreements with several MINDBODY executives, are entitled to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant each director or officer entitled to them large lump sum payments, compensation not shared by MINDBODY's common stockholders, and will be paid out as follows:

| Name | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(3) | Total ($)(4) |
|---|---|---|---|---|
| Richard Stollmeyer | $880,671 | $40,981,156 | $ 22,786 | $41,884,613 |
| Michael Mansbach | $425,000 | $ 5,313,897 | $ 17,740 | $ 5,756,637 |
| Brett White | $641,250 | $11,043,053 | $ 122,882 | $11,807,185 |
| Mark Baker | $171,200 | $ 2,633,222 | $ 7,595 | $ 2,812,017 |
| Kimberly Lytikainen | $138,502 | $ 2,241,416 | $ 0 | $ 2,379,918 |

71. Thus, while the Proposed Transaction is not in the best interests of MINDBODY stockholders, it will produce lucrative benefits for the Company's officers and directors.

**The Materially Misleading and/or Incomplete Definitive Proxy**

72. On January 24, 2019, the Board caused to be filed with the SEC a materially misleading and incomplete Definitive Proxy that, in violation their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction, thus furthering their breaches of fiduciary duty.

_Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction_

73. Specifically, the Definitive Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Proxy fails to disclose:

a.    The Definitive Proxy fails to disclose sufficient information regarding the number and nature of all confidentiality agreements entered into between MINDBODY and any interested third party, including Vista, during the sales process (including the go-shop period), if their terms differed from one another, and if they contained "don't-ask, don't-waive" or standstill provisions, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid; and

- 17 -
CLASS ACTION COMPLAINT

b.    The Definitive Proxy fails to disclose the reasoning for the failure to perform a proper market check for potentially interested third parties during the negotiations with Vista regarding the Proposed Transaction, specifically, why Qatalyst and/or the Board waited until the Go-Shop period to contact the additional fifty-two potentially interested counterparties.

*Omissions and/or Material Misrepresentations Concerning MINDBODY's Financial Projections*

74. The Definitive Proxy fails to provide material information concerning financial projections provided by MINDBODY's management and relied upon by Qatalyst in its analyses. The Definitive Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Definitive Proxy indicates that in connection with the rendering of Qatalyst's fairness opinion, Qatalyst "reviewed certain forward-looking information relating to MINDBODY prepared by senior management of MINDBODY, including the Management Projections." Accordingly, the Definitive Proxy should have, but fails to provide, certain information in the projections that MINDBODY management provided to the Board and Qatalyst. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [ ] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

75. The Definitive Proxy fails to provide material information concerning the financial projections prepared by MINDBODY management. Specifically, the Definitive Proxy provides several non-GAAP financial metrics, including Non-GAAP Gross Profit, Non-GAAP Operating Income, and adjusted EBTIDA, but fails to disclose a reconciliation of all non-GAAP to GAAP metrics.

- 18 -
CLASS ACTION COMPLAINT

76. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

77. Without accurate projection data presented in the Definitive Proxy, Plaintiff and other stockholders of MINDBODY are unable to properly evaluate the Company's true worth, the accuracy of Qatalyst's financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction. As such, the Board has breached their fiduciary duties by failing to include such information in the Definitive Proxy.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Qatalyst*

78. In the Definitive Proxy, Qatalyst describes its respective fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

79. With respect to the *Discounted Cash Flow Analysis*, the Definitive Proxy fails to disclose the following:

    a.      the specific inputs and assumptions used to calculate the discount rate range of 9.0% to 11.0%, including:

         i.     the weighted average cost of capital for MINDBODY.

    b.      The specific inputs and assumptions used to calculate the range of multiples of enterprise value to next-twelve-months estimated unlevered free cash flow of 20.0x to 30.0x;

- 19 -
CLASS ACTION COMPLAINT

80. With respect to the *Selected Companies Analysis*, the Definitive Proxy fails to disclose the following:

    a.       The calendar year 2019 estimated revenue for each selected comparable companies; and

    b.       The calendar year 2019 estimated revenue for MINDBODY.

81. With respect to the *Selected Transactions Analysis*, the Definitive Proxy fails to disclose the following:

    a.       The total value of each selected transaction;

    b.       The date each selected transaction closed;

    c.       The LTM Revenue for each selected transaction target company; and

    d.       The NTM Revenue for each selected transaction target company.

82. These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

83. Without the omitted information identified above, MINDBODY's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests. Moreover, without the key financial information and related disclosures, MINDBODY's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests. As such, the Board has breached their fiduciary duties by failing to include such information in the Definitive Proxy.

**FIRST COUNT**

**Claim for Breach of Fiduciary Duties**

**(Against the Individual Defendants)**

84. Plaintiff repeats all previous allegations as if set forth in full herein.

85. The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

- 20 -
CLASS ACTION COMPLAINT

86. By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in MINDBODY.

87. As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of MINDBODY by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of MINDBODY to its public stockholders.

88. Indeed, Defendants have accepted an offer to sell MINDBODY at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

89. Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

90. The Individual Defendants dominate and control the business and corporate affairs of MINDBODY, and are in possession of private corporate information concerning MINDBODY's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public stockholders of MINDBODY which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

91. By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

92. As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of MINDBODY's assets and have been and will be prevented from obtaining a fair price for their common stock.

- 21 -
CLASS ACTION COMPLAINT

93. Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

94. Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class, and against the Defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representatives and Plaintiff's counsel as Class counsel;

B. Enjoining the Proposed Transaction;

C. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D. Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

E. Directing the Individual Defendants to exercise their fiduciary duties to commence a sale process that is reasonably designed to secure the best possible consideration for MINDBODY and obtain a transaction which is in the best interests of MINDBODY and its stockholders;

F. Directing defendants to account to Plaintiff and the Class for damages sustained because of the wrongs complained of herein;

G. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

H. Granting such other and further relief as this Court may deem just and proper.

- 22 -
CLASS ACTION COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: January 24, 2019                                    **BRODSKY & SMITH, LLC**

By: _____
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Blvd., Ste. 900
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*

- 23 -
CLASS ACTION COMPLAINT

EX-99.3 4 d696874dex993.htm EX-99.3

**Exhibit 99.3**

David E. Bower (SBN 119546)
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (213) 446-6652
Fax: (212) 202-7880

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA TRAN,<br><br>    Plaintiff,<br><br>    v.<br><br>MINDBODY, INC., RICK STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, and GRAHAM SMITH,<br><br>    Defendants. | Civil Action No. 2:19-cv-638<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>1. **Violations of § 14(a) of the Exchange Act and Rule 14a-9**<br><br>2. **Violations of § 20(a) of the Exchange Act** |

Plaintiff Gina Tran ("Plaintiff"), by and through her undersigned attorneys, brings this action against Mindbody, Inc. ("Mindbody" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Mindbody, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a)

---

1

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition of Mindbody by Torreys Parent, LLC ("Parent") and Torreys Merger Sub, Inc. ("Merger Sub"), which are affiliates of Vista Equity Partners Management, LLC and funds associated therewith (together "Vista") (the "Proposed Transaction").

## NATURE OF THE ACTION

1. On December 23, 2018, Mindbody entered into an Agreement and Plan of Merger (the "Merger Agreement") pursuant to which Vista will acquire all outstanding shares of Mindbody common stock for $36.50 in cash per share (the "Merger Consideration"), representing a total value of approximately $1.9 billion. Upon consummation of the Proposed Transaction, Mindbody's common stock will no longer be publicly traded and its common stockholders will be divested of their interest in the surviving corporation.

2. On January 23, 2019, in order to convince Mindbody's public common shareholders to vote in favor of the Proposed Transaction, Defendants authorized the filing of a materially incomplete and misleading Definitive Proxy Statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

3. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Mindbody; and (ii) the valuation analyses performed by Mindbody's financial advisor, Qatalyst Partners LP ("Qatalyst Partners"), in support of its fairness opinion.

4. The special meeting of Mindbody's shareholders to vote on the Proposed Transaction is scheduled for February 14, 2019 at 9:00 a.m. (Pacific Time) (the "Shareholder Vote"). It is therefore imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote so Mindbody shareholders can properly exercise their corporate voting rights and determine whether to give up their interest in Mindbody in exchange for the Merger Consideration.

2

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

5. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman,* 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

8. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, Mindbody's principal executive offices are located in this District.

3

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

**PARTIES**

9. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Mindbody common stock.

10. Defendant Mindbody is a public company incorporated under the laws of Delaware with principal executive offices located at 4051 Broad Street, Suite 220, San Luis Obispo, California 93401. Mindbody's common stock is traded on the Nasdaq under the ticker symbol "MB."

11. Defendant Rick Stollmeyer is, and has been at all relevant times, a director of the Company. Defendant Stollmeyer is also a co-founder of the Company and its Chief Executive Officer and Chairman of the Board.

12. Defendant Katherine Blair Christie is, and has been at all relevant times, a director of the Company.

13. Defendant Court Cunningham is, and has been at all relevant times, a director of the Company.

14. Defendant Gail Goodman is, and has been at all relevant times, a director of the Company.

15. Defendant Cipora Herman is, and has been at all relevant times, a director of the Company.

16. Defendant Eric Liaw is, and has been at all relevant times, a director of the Company.

17. Defendant Adam Miller is, and has been at all relevant times, a director of the Company.

18. Defendant Graham Smith is, and has been at all relevant times, a director of the Company.

4

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

19. The defendants identified in paragraphs 11 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Mindbody, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.    Background of the Company and the Proposed Transaction**

20. Mindbody is a technology platform for the fitness, wellness and beauty services industries. According to the Company's website, local entrepreneurs worldwide use Mindbody's integrated software and payments platform to run, market and build their businesses. Consumers use Mindbody to more easily find, engage and transact with providers in their local communities.

21. On December 23, 2018, the Board caused the Company to enter into the Merger Agreements with Vista.

22. Pursuant to the terms of the Merger Agreement, Vista, upon the terms and subject to the conditions set forth in the Merger Agreement, will acquire Mindbody for $36.50 in cash per share for a total transaction value of approximately $1.9 billion.

23. According to the December 24, 2018 press release announcing the Proposed Transaction:

> **MINDBODY Enters into Definitive Agreement to be Acquired by Vista Equity Partners for $1.9 Billion**
>
> *Vista Equity Partners to acquire all outstanding MINDBODY common stock for $36.50 per share*
>
> **SAN LUIS OBISPO, Calif., Dec. 24, 2018 (GLOBE NEWSWIRE) —** MINDBODY, Inc. (NASDAQ: MB) today announced that it has entered into a definitive agreement to be acquired by Vista Equity Partners ("Vista"), a leading investment firm focused on software, data and technology-enabled businesses.

5

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

Under the terms of the agreement, Vista will acquire all outstanding shares of MINDBODY common stock for a total value of approximately $1.9 billion. MINDBODY shareholders will receive $36.50 in cash per share, representing a 68% premium to the unaffected closing price as of December 21, 2018.

"MINDBODY's purpose is to help people lead healthier, happier lives by connecting the world to fitness, beauty and wellness," said Rick Stollmeyer, Co-Founder and CEO of MINDBODY. "We are thrilled to provide immediate liquidity to our shareholders at a significant premium to market prices and to leverage Vista's resources and deep expertise to accelerate our growth while achieving that purpose more effectively than ever before."

"MINDBODY's position as the leading technology platform for the fitness, beauty and wellness industries makes it an ideal addition to the Vista family of companies," said Brian Sheth, Co-Founder and President of Vista. "We look forward to partnering with Rick and the entire MINDBODY team to deliver innovation to customers that will help grow their businesses and to consumers who depend on MINDBODY to strengthen their health and well-being."

MINDBODY's Board of Directors unanimously approved the deal and recommended that stockholders vote their shares in favor of the transaction. Closing of the transaction is subject to customary closing conditions, including the approval of MINDBODY stockholders and antitrust approval in the United States. The transaction is expected to close in the first quarter of 2019 and is not subject to a financing condition.

The definitive agreement for the transaction includes a 30 day "go-shop" period, which permits MINDBODY's Board of Directors and financial advisors to actively

6

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

initiate, solicit, encourage and potentially enter negotiations with other parties that make alternative acquisition proposals. MINDBODY will have the right to terminate the merger agreement to enter into a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this 30 day "go-shop" will result in a superior proposal, and MINDBODY does not intend to disclose developments with respect to the solicitation process unless and until the Board of Directors makes a determination requiring further disclosure.

Qatalyst Partners is serving as the exclusive financial advisor to MINDBODY, and Cooley LLP is serving as legal advisor to MINDBODY. Vista's legal advisor is Kirkland & Ellis LLP.

## II. The Proxy Omits Material Information

24. On January 23, 2019, Defendants filed a materially incomplete and misleading Proxy with the SEC. The special meeting of Mindbody stockholders to vote on the Proposed Transaction is less than 3 weeks away. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

25. First, the Proxy fails to provide sufficient information regarding financial projections for Mindbody.

26. Specifically, the *Opinion of Qatalyst Partners LP* section of the Proxy states that Qatalyst Partners "utilized both the consensus of third-party research analysts' projections ("Analyst Projections") and the Management Projections," in connection with valuation analyses. Proxy at 37. Indeed, Qatalyst Partners' *Selected Companies Analysis* and *Selected Transactions Analysis* **both** based on the Analyst Projections.

7

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

27. However, the Proxy fails to disclose the Analyst Projections.

28. Accordingly, it appears that Defendants selectively excised a set of projections that that Board reviewed, considered, and approved for Qatalyst Partners' use in connection with preparing its fairness opinion.

29. The omission of the Analyst Projections renders the *Opinion of Qatalyst Partners LP* section of the Proxy and Qatalyst Partners' financial analyses materially incomplete and misleading. Indeed, the Analyst Projections were a fundamental input underlying **two of the three** valuation analyses that are being touted to Plaintiff and Mindbody's Company's common shareholders.

30. If a proxy statement discloses financial projections and valuation information, such **projections must be complete and accurate.** The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—**but it may not choose half-truths.**

31. Without the Analyst Projections, Plaintiff and Mindbody's common shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Qatalyst Partners' fairness opinions in determining whether to vote their shares in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to Plaintiff and the Company's common shareholders.

32. Second, the Proxy fails to provide sufficient information regarding Qatalyst Partners' valuation analyses.

33. With respect to Qatalyst Partners' *Discounted Cash Flow Analysis,* the Proxy is materially misleading and incomplete because it fails to disclose: (i) the inputs and assumptions underlying the selection of the range of discount rates from

8

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

9.0% to 11.0% (*i.e.*, the components of Mindbody's weighted average cost of capital); (ii) the inputs and assumptions underlying the selection of the 20.0x to 30.0x terminal multiples; and (iii) Mindbody's cash net of the face value of outstanding convertible debt and financing obligations, as of December 31, 2018. *See* Proxy at 38.

34. These key inputs are material to Mindbody shareholders, and their omission renders the summary of Qatalyst Partners' *Discounted Cash Flow Analysis* incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions,* 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> *There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….* This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. *This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion **unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices.*** The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

9

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

*Id.* at 1577-78 (emphasis added). Without the above-mentioned information, Mindbody shareholders cannot evaluate for themselves the reliability of Qatalyst Partners' *Discounted Cash Flow Analysis,* make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of an unreasonable judgment by Qatalyst Partners, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

35. With respect to Qatalyst Partners' *Selected Transactions Analysis* is also materially misleading. In particular, in connection with its analysis of the LTM Revenue Multiples, Qatalyst Partners fails to provide a rational basis for its selection of a representative range of 6.0x to 10.0x when twenty of the thirty selected SaaS transactions provided have LTM Revenue Multiples well above the low end of the selected representative range and nearly one third of the transactions are at, or well-exceed, the highest end of Qatalyst Partners' selected range. *See* Proxy at 40. Additionally, Qatalyst Partners' selection of a representative range of 5.0x to 8.5x relative to the given NTM Revenue Multiples is similarly lacking in rational support. Notably, just nine of the thirty SaaS transactions have NTM Revenue Multiples near or below Qatalyst Partners' low end of the representative range. *See* Proxy at 40-41. Without further justification from Qatalyst Partners in light of these observed anomalies, Plaintiff and Mindbody's other public shareholders are unable to determine whether the implied range of per share values for Mindbody stock are accurate and reliable. The failure to include this crucial information in the *Selected Transactions Analysis* further renders the Proxy materially misleading.

36. Defendants' failure to provide the foregoing material information renders the statements in the Proxy false and/or materially misleading

10

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

37. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote her shares in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

38. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

39. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

40. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

41. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

11

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

42. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for Mindbody; and (ii) the valuation analyses performed by Qatalyst Partners in support of its fairness opinion.

43. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

44. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Qatalyst Partners reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Qatalyst Partners, as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering

12

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Qatalyst Partners' analyses in connection with their receipt of the fairness opinions, question Qatalyst Partners as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

45. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

46. Mindbody is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

47. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

13

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

48. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

49. The Individual Defendants acted as controlling persons of Mindbody within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Mindbody, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

50. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

51. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

52. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

14

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

55. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

/ / /

/ / /

/ / /

15

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

D. Granting such other and further relief as this Court may deem just and proper

<b><u>JURY DEMAND</u></b>

Plaintiff demands a trial by jury on all issues so triable.

DATED: January 28, 2019

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Miles D. Schreiner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
    mschreiner@monteverdelaw.com

*Counsel for Plaintiff*

Respectfully submitted,
*/s/ David E. Bower*
David E. Bower

David E. Bower SBN 119546
**MONTEVERDE & ASSOCIATES PC**
600 Corporate Pointe, Suite 1170
Culver City, CA 90230
Tel: (310) 446-6652
Fax: (212) 202-7880
Email: dbower@monteverdelaw.com

*Counsel for Plaintiff*

16

<b>COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934</b>

EX-99.4 5 d696874dex994.htm EX-99.4

**Exhibit 99.4**

EFiled: Jan 29 2019 09:27AM EST
Transaction ID 62905846
Case No. 2019-0061-



## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| PHILIP RYAN, JR. and DONALD FRIEDMAN, on behalf of themselves and all other similarly situated stockholders of MINDBODY, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> MINDBODY, INC., RICHARD L. STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, GRAHAM SMITH, VISTA EQUITY PARTNERS MANAGEMENT, LLC, TORREYS PARENT, LLC, TORREYS MERGER SUB, INC., and INSTITUTIONAL VENTURE PARTNERS XIII, L.P., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)  C.A. No.:<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### VERIFIED CLASS ACTION COMPLAINT

Plaintiffs Philip Ryan, Jr. and Donald Friedman ("Plaintiffs"), individually and on behalf of all other similarly situated holders of Class A common stock ("Class A") of MINDBODY, Inc. ("MINDBODY" or the "Company"), bring the following Verified Class Action Complaint (the "Complaint") against MINDBODY's board

of directors (the "Board"), including its Chairman, Chief Executive Officer ("CEO") and co-founder Richard L. Stollmeyer ("Stollmeyer"), for breaches of fiduciary duties in connection with MINDBODY's proposed merger (the "Merger") with affiliates of Vista Equity Partners Management, LLC ("Vista"), against whom Plaintiffs also bring this complaint for aiding and abetting the Board's breaches of fiduciary duties. Plaintiffs also seek determinations pursuant to 8 *Del. C.* § 111 that (a) under MINDBODY's Amended and Restated Certificate of Incorporation (the "Certificate") the Class B common stock ("Class B") of Stollmeyer and Institutional Venture Partners XIII, L.P. ("IVP") has automatically converted to Class A stock, and (b) the claim by Stollmeyer, Vista and the MINDBODY Board that the Board has authority to approve Stollmeyer and senior management receiving different consideration for their stock violates the Certificate and any attempt to have Stollmeyer and others receive different consideration would violate the Certificate.

The allegations of the Complaint are based on the knowledge of Plaintiffs as to themselves, and on information and belief, including the investigation of counsel and review of publicly available information as to all other matters.

2

**NATURE OF THE ACTION**

1. This stockholder class action (the "Action") challenges MINDBODY's take-private by Vista for the unfair price of $36.50 per share in cash (the "Merger Consideration"). The sale process culminating in the Merger was irreparably tainted by the conflicts of Stollmeyer and management, who ran the sale process with MINDBODY's conflicted financial advisor, Qatalyst Partners LP ("Qatalyst"), which has lucrative ties to Vista and no prior relationship with MINDBODY. Now the Board is soliciting stockholders to approve the Merger based on materially misleading and incomplete disclosures in MINDBODY's January 23, 2019 Definitive Proxy Statement (the "Proxy"). The Proxy also represents that Stollmeyer and IVP hold 10 vote per share Class B stock, which would provide most of the votes needed to approve the Merger. However, through Defendants' actions, these shares have automatically converted into one vote per share Class A stock.

2. By October 2018, Stollmeyer had decided to take MINDBODY private, which he had only taken public in 2015. On information and belief, he was aware that IVP wanted to exit its investment in MINDBODY. Stollmeyer met with behemoth private equity firm Vista in October 2018 to discuss Vista's investment strategy and interest in MINDBODY. He also met with two other financial sponsors. The Proxy does not provide the reason for or the dates of his contacts with these three financial sponsors. There is no indication that the MINDBODY Board had suggested or authorized Stollmeyer to canvas potential financial partners for a management led buy-out. Stollmeyer knew, based on Vista's track record of retaining management teams of the companies it acquires, that if Vista took MINDBODY private, it would continue to employ Stollmeyer after the transaction closed, and allow him to retain a significant equity interest in the private company.

3

3. The Board correctly and immediately recognized senior management's conflicts and formed a three-member transaction committee of non-management directors (the "Transaction Committee" or "Committee") on October 30, 2018 that purposefully excluded Stollmeyer. However, the Transaction Committee's authority was limited to recommending a financial advisor. Moreover, the Transaction Committee allowed Stollmeyer and senior management to direct the sale process. For example, the Transaction Committee instructed *Stollmeyer* to contact Qatalyst and one other potential advisor. The Proxy does not indicate who recommended Qatalyst, which had no prior relationship with MINDBODY, but had done multiple transactions involving Vista. On information and belief, Vista suggested Qatalyst to Stollmeyer who suggested Qatalyst to the Transaction Committee and MINDBODY Board. The Proxy states that on November 14, 2018, the Transaction Committee and certain undisclosed members of the Board authorized MINDBODY to engage Qatalyst. However, the Transaction Committee was not empowered to retain a financial advisor and the Proxy acknowledges that it was a meeting of the Committee, not the Board. Then, management, and not the Transaction Committee, met with Qatalyst and decided which potential bidders to contact.

4

4. On November 26, 2018, almost a month after the formation of the Transaction Committee, the Board gave "authority to the Transaction Committee to advise, direct and oversee management of MINDBODY in the review and negotiation of strategic alternatives . . . ." Thus, it was conflicted management, not the Transaction Committee, who would review and negotiate strategic alternatives. The Committee had only an advisory and oversight role. Consequently, the Transaction Committee never took an active role in the sale process, never interfaced with Vista or any other party and never gave management forward-looking direction.

5. On December 23, 2018, the MINDBODY Board accepted Vista's revised offer to acquire MINDBODY for $36.50 per share and authorized the execution of the Agreement and Plan of Merger (the "Merger Agreement"). The December 24, 2018 Joint Vista/MINDBODY press release and the Proxy proclaim that the $36.50 price was a 68% premium over the closing price of MINDBODY Class A stock on December 21, 2018. However, that disclosure is misleading because it fails to include facts relevant to evaluating the market price and 68% premium claim.

6. First, during October-December, the stock markets suffered a substantial decline. Second, on November 6, the week after the Transaction Committee's formation, management caused MINDBODY to reduce its projected revenue for the 2018 fiscal year, and to project net income losses for Q4 2018 that

5

were double MINDBODY's Q3 2018 net income losses and analysts' projections. Predictably, upon the news, MINDBODY's stock price plummeted to $26.18. Stollmeyer blamed the guidance on the costs of integrating MINDBODY's acquisitions, which confused analysts because Stollmeyer had previously touted the integration's success.

7. As a condition of Vista's execution of the Merger Agreement, Stollmeyer and IVP, a late stage investment capital and venture firm that first invested in MINDBODY in 2012, executed irrevocable proxies directing the holder to vote all MINDBODY shares they beneficially owned in favor of the Merger, constituting approximately 32.1% of MINDBODY's outstanding voting power and 6.6% of MINDBODY's total outstanding shares (the "Irrevocable Proxies"). Vista's desire for a voting and support agreement, the links between the Irrevocable Proxies and the Merger Agreement, and the terms of the Irrevocable Proxies that go beyond a proxy that merely enables Stollmeyer and IVP to vote their shares, demonstrate that a transfer of the Class B shares of Stollmeyer and IVP occurred, which automatically converted those shares into Class A shares pursuant to the Certificate. The Irrevocable Proxies are a share lock-up that, combined with termination fees and other defensive measures, effectively precludes alternative bids. At the time IVP executed its Irrevocable Proxy, it was ripe for liquidating its MINDBODY investment for which it had a three-to-five-year investment horizon. The Merger would provide a liquidation event, from which IVP would receive more than $96 million on its $21.4 million investment. However, the Proxy does not disclose IVP's desire to exit its MINDBODY investment.

6

8. When Vista and MINDBODY jointly announced the Merger, Vista announced that it "look[ed] forward to partnering with Rick and the entire MINDBODY team . . . ." A week later, Stollmeyer sent a letter to employees (the "Employee Letter"),[1] in which he wrote that he was "excited to continue serving [MINDBODY] and all of you for years to come," and that "Vista has committed to keeping our pay and benefits unchanged for at least a year." However, on January 23, 2019, MINDBODY issued the Proxy, which states that Vista and management have ***no*** agreements concerning post-Merger employment or compensation. This is patently inconsistent with the Joint Press Release and Employee Letter.

9. Contrary to Section 6.20 of the Merger Agreement, which provides for *No Employment Discussions*, the Proxy states that prior to the closing of the Merger, Vista ***may***, with authorization of the MINDBODY Board, discuss with management their post-Merger employment and compensation, equity participation or ownership or their receipt of different Merger consideration than other stockholders. The Proxy does not describe what discussions have occurred or whether discussions are ongoing.

---

1  *See* MINDBODY January 2, 2019 Schedule 14A.

7

10. Moreover, under Article IV, D.2.(c) of MINDBODY's Certificate, the Board cannot authorize different consideration for management's shares—class votes by both the Class A stock and Class B stock are required. The terms of the Merger Agreement and statements in the Proxy indicate that Stollmeyer and senior management will ultimately receive different consideration in violation of the Certificate.

11. As detailed below, the Proxy also contains misleading and incomplete disclosures concerning Qatalyst's conflicts and remuneration from Vista, the Irrevocable Proxies and other subjects.

12. Defendants are rushing to complete the Merger. A preliminary proxy statement was filed on January 9, 2019, just 17 days after the December 23, 2018 Merger Agreement was signed, and the definitive Proxy was issued just two weeks later on January 23, 2019 for a special stockholders meeting on February 14, 2019 (the "Special Meeting"). The rapid timing is intended to (i) prevent the already remote possibility of an alternative bid and opposition to the Merger by stockholders, (ii) make it impracticable for stockholders to create a factual and legal record for enjoining the Merger, and (iii) limit opportunity for opposition to the Merger by stockholders, including Luxor Capital ("Luxor"). According to a January 11, 2019 Schedule 13D (the "Luxor 13D"), Luxor owns 8,930,755 shares of MINDBODY's Class A stock (18.59%), including 2,634,769 shares issuable upon conversion of Convertible Notes. Luxor believes the Merger significantly undervalues MINDBODY's shares and Luxor intends to communicate with MINDBODY's stockholders.

8

13. On information and belief, the conditions to the closing of the Merger have been or will be accepted on or shortly after February 14, 2019 and the parties intend to close the Merger on or shortly after February 14, 2019.

**PARTIES**

14. Plaintiffs are and were at all relevant times beneficial owners of MINDBODY Class A common stock.

15. Defendant MINDBODY is a Delaware corporation headquartered in San Luis Obispo, California. MINDBODY operates a cloud-based business management software and payments platform for small and medium-sized businesses in the wellness services industry. MINDBODY has two classes of common stock: (1) Class A stock, which has one vote per share and trades on the NASDAQ under the ticker symbol "MB;" and (2) Class B stock, which has ten votes per share, is not publicly traded, and is convertible at any time at the option of the holder into one share of Class A stock.

16. Defendant Stollmeyer co-founded MINDBODY in 2001, and has been MINDBODY's CEO and Chairman since October 2004. On information and belief, Stollmeyer will be employed at the post-Merger entity as its CEO. As of the January 18, 2019 record date (the "Record Date") for the Special Meeting, Stollmeyer held 264,618 Class A shares and options and 1,543,952 Class B shares and options, including shares owned by family members and/or subject to a proxy to Stollmeyer.

9

17. Defendant Katherine Blair Christie ("Christie") has been a Company director since March 2015. As of January 2, 2019, she held 19,987 shares of Class A stock and 60,000 Class B options.

18. Defendant Court Cunningham ("Cunningham") has been a Company director since June 2017. Cunningham was a member of the Transaction Committee.

19. Defendant Gail Goodman ("Goodman") has been a Company director since April 2016, and MINDBODY's lead independent director since June 2017. Goodman was a member of the Transaction Committee.

20. Defendant Cipora Herman ("Herman") has been a Company director since October 2016.

21. Defendant Eric Liaw ("Liaw") has been a Company director since February 2014, and was Chairman of the Transaction Committee. Liaw is a general partner of IVP, and has served in various roles at IVP since March 2011, including as IVP's Board representative. As of January 18, 2019, IVP held 1,039,349 Class A shares and 1,602,683 Class B shares, which comprised 24.6% of MINDBODY's voting power.

10

22. Defendant Adam Miller ("Miller") has been a Company director since February 2017.

23. Defendant Graham Smith ("Smith") has been a Company director since January 2015. He held 29,987 Class A Shares and 70,000 Class B options on January 18, 2019.

24. Defendants Christie, Cunningham, Goodman, Herman, Liaw, Miller and Smith are collectively referred to herein as the "Director Defendants." Stollmeyer and the Director Defendants are referred to as the "Individual Defendants."

25. Defendant Vista is a private equity firm headquartered in San Francisco, California with more than $46 billion in cumulative capital commitments. Vista invests in companies that are generally past the venture stage of their lifecycle. Vista markets itself as "exclusively invest[ing] in software, data, and technology-enabled organizations led by world-class management teams."

26. Defendant Torreys Parent, LLC ("Parent"), a Delaware limited liability company, is a wholly owned subsidiary of Vista.

27. Defendant Torreys Merger Sub, Inc. ("Merger Sub"), a Delaware corporation, is a wholly owned direct subsidiary of Parent.

28. Defendants Vista, Parent and Merger Sub are collectively referred to as the "Vista Defendants."

11

29. Defendant IVP is a Delaware limited partnership. As venture capital firms who invested in MINDBODY earlier have liquidated or reduced their investments, IVP has ended up as holding 67.5% of the Company's outstanding Class B stock and 24.6% of its total voting power (including 1,039,349 shares of Class A). The Individual Defendants, the Vista Defendants, and IVP are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Stollmeyer and IVP Become MINDBODY's Most Powerful Stockholders*

30. Stollmeyer co-founded MINDBODY in 2001. He left his job, withdrew from graduate school, took a second mortgage out on his house, and trouble-shot and improved MINDBODY software from his garage for the next few years. In 2005, MINDBODY Online was launched, and MINDBODY thereafter received multiple rounds of venture capital funding.

31. IVP invests in later stage technology companies. According to IVP's website, "[We] partner with exceptional entrepreneurs." It specializes in "helping management teams . . . ." IVP asserts that:

> Our firm works hard to help CEOs mitigate the daunting risks and challenges that inevitably appear during the rapid growth phases of a company's life.

12

It develops "strong working relationships with the world's most talented entrepreneurs." MINDBODY is identified as one of IVP's portfolio companies and Stollmeyer is identified as one of the entrepreneurs it partners with. Thus, while IVP invests in companies, its relationship and loyalties are with the CEO and management.

32. In October 2012, IVP made its initial MINDBODY investment. IVP purchased 1,762,015 shares of Series F Redeemable Convertible Preferred Stock for $16.4 million. IVP made a second MINDBODY investment in February 2014, and purchased 147,580 shares of Series G Redeemable Convertible Preferred Stock for $5 million.

33. In March 2015, MINDBODY was reincorporated in Delaware. In June 2015, it held its initial public offering ("IPO") pursuant to a June 24, 2015 prospectus (the "Prospectus"), and offered 7,150,000 Class A shares for $14 per share. MINDBODY also re-classified its 31,967,544 pre-existing shares, including its Series F and Series G Redeemable Convertible Preferred Stock, into Class B shares with 10 votes per share. IVP received 3,205,365 Class B shares for its 1,909,595 shares of Series F and Series G Redeemable Convertible Preferred Stock. Immediately following the IPO, there were 31,967,544 Class B shares outstanding, representing 97.8% of MINDBODY's voting power. The Prospectus (p. 41) acknowledged that the dual class structure would concentrate voting power in the existing stockholders, including officers, directors and employees. According to the Prospectus (pp. 143-144), Stollmeyer held 10.2% of MINDBODY's voting power

13

and 8.6% of the Class B after the IPO (including 595,894 shares issued under options and shares for which he held proxies). Because future transfers would convert Class B shares into one vote per share Class A stock, the Prospectus recognized that if Stollmeyer retained his Class B stock, he would control a significant block of the voting power of MINDBODY.

34. At the time of the IPO, MINDBODY had five venture capital firms who had converted their holdings into Class B stock: entities affiliated with Bessemer Venture Partners, entities affiliated with Catalyst Investors, IVP, W Capital Partners III, L.P. ("W Capital Partners") and entities affiliated with J.P. Morgan. At the time of the IPO, a majority of the MINDBODY Board consisted of Stollmeyer, another officer, Liaw of IVP and representatives of Bessemer and Catalyst. These officers and entities held a majority of the Company shares before the IPO and a majority of its Class B shares and voting power after the IPO. Thus, the provisions of the Certificate regarding the Class A and Class B stockholders were drafted and approved by these Class B holders, while the Class A holders had no participation in drafting those provisions. Therefore, those provisions must be interpreted in favor of the Class A holders and against the Class B holders.

14

35. According to the Proxy, as of January 18, 2019, IVP was the only non-management, pre-IPO investor still holding Class B shares (1,602,683 shares of Class B and 1,039,349 Class A shares). Of the other venture investors, only W Capital Partners still has any investment in the Company (168,642 Class A shares). On information and belief, IVP and W Capital Partners want to exit their investments in MINDBODY. Because IVP held onto Class B shares while other pre-IPO investors converted them and the number of outstanding Class B shares fell, IVP's voting power increased without IVP spending a dime. As of January 18, 2019, IVP's voting power had increased from 9.8% in 2015 to 24.6%.

36. *Bloomberg* and *S&P Capital IQ* indicate IVP has a three-to-five-year investment horizon. Based on its 2012 and 2014 investments, IVP would be looking to exit its MINDBODY stake by October 2018. Accordingly, in October 2018, when the Proxy discloses that Stollmeyer and Vista began discussing MINDBODY's take-private, IVP was highly motivated and well-positioned as a Class B stockholder with over 24% of MINDBODY's voting power to press for that outcome.

37. Stollmeyer also continued to hold Class B shares after MINDBODY's IPO, and his voting power increased substantially. He also held an increased number of Class B options. As of January 18, 2019, his potential voting power had increased from 10.2% in 2015 to 19.8%.

15

***MINDBODY Makes a Historic Acquisition in***
***April 2018 and Expects Significant Returns in 2019***

38. MINDBODY has primarily grown through acquisitions. It made two acquisitions in Q1 2018, including its historically largest acquisition when it acquired Booker Software, Inc. ("Booker"), a cloud-based business management company for salons and spas, in April 2018 (the "Booker Acquisition"). The costs of integrating Booker into MINDBODY's business were significant, but Stollmeyer repeatedly characterized the costs as investments that would spur MINDBODY's profitability and strong growth in 2019 and thereafter.

39. MINDBODY acquired FitMetrix, Inc. ("FitMetrix") for $15 million on February 19, 2018 (the "FitMetrix Acquisition"). FitMetrix is a company that integrates fitness studio equipment and wearables with performance tracking technology.

40. MINDBODY acquired Booker for approximately $150 million on April 2, 2018. The Booker Acquisition added (1) 10,000 salons and spas to the MINDBODY marketplace, as well as (2) "Frederick," which is marketing software for wellness businesses. On the date the Booker Acquisition closed, MINDBODY's stock price closed at $37.50 per share.

41. On May 8, 2018, MINDBODY held its Q1 2018 earnings call, which was the first quarterly earnings call following the Booker Acquisition. On the call, MINDBODY announced guidance for Q2 below street expectations, and downwardly revised guidance for the full fiscal year. Stollmeyer and MINDBODY's Chief Financial Officer ("CFO") Brett T. White ("White") attributed the guidance, which included non-GAAP net income losses, to integration costs related to the FitMetrix and Booker Acquisitions. They characterized these costs as "investments" that they were front-loading, and for which they expected positive returns to MINDBODY in 2019. Stollmeyer explained:

16

We're significantly investing both in Booker and FitMetrix to set the stage for a much greater growth to come . . . . [W]e're layering in the significant OpEx to get that done quickly so that we can exit 2018 with a truly unified and aligned business, capable of returning to profitability and growing strongly for years to come.

42. White reiterated Stollmeyer's message. He stated that management intended MINDBODY to "return to profitability in 2019."

43. On July 31, 2018, MINDBODY held its Q2 2018 earnings call. Stollmeyer reported "solid progress on our integration, strong early adoption of Frederick and FitMetrix, continued success in target market subscriber growth and rapid expansion of our consumer brand." He re-iterated management's expectation that MINDBODY's acquisitions would "fuel strong growth in the target market customer base in 2019 . . . to open a new chapter in our growth story."

44. Stollmeyer also assured investors, in response to analyst questioning, that MINDBODY's guidance for non-GAAP net income losses was the result of integration costs and not concerns with MINDBODY's growth. Stollmeyer explained: "[W]e're in the sweet spot of adoption of fitness. There's no end in sight for fitness growth. The market is still growing."

45. Stollmeyer also emphasized:

17

We're still very bullish on where this is going to take us in 2019. We just want to be cautious for the balance of the year . . . . MINDBODY and Booker united . . . is going to fuel much greater growth in the periods ahead . . . . There's no one in the world that has our go-to-market capabilities now in any of our target markets and nobody has the strength of our products . . . . [W]e're very excited about our long-term growth prospects. We're excited to return to profitability in 2019 . . . .

46. White reiterated Stollmeyer's message. He stated: "We remain on target to return to non-GAAP profitability in 2019 . . . we've done a lot of heavy lifting on the integration."

### *MINDBODY's Stock Price Declines*

47. For the bulk of 2018, MINDBODY's stock price closed at or above $36.50, including at $41.25 as recently as October 5, 2018. During the second week of October 2018, the entire market suffered huge losses, due to investor fears surrounding rising bond yields and escalating trade tensions with China. On October 10, the Dow Jones and S&P 500 posted their largest losses in eight months. MINDBODY's stock price dropped from $41.25 on October 5 to $34.37 on October 10, a 16.6% loss. Then MINDBODY's stock price fell 7.3% further and closed at $31.86 on October 11, 2018 upon news that MINDBODY's online customer data had been hacked. But the next day, MINDBODY's stock had already rebounded to MINDBODY's pre-hack position and closed at $33, where it traded for the next few weeks.

18

***Stollmeyer Meets with Vista and Initiates a Conflict-Ridden***
***Sale Process to Take MINDBODY Private***

48. The Proxy states that "[i]n October 2018," Stollmeyer and Vista discussed Vista's investment strategy and interest in MINDBODY. It does not disclose who initiated that discussion, the date it took place, or how or why that discussion took place. Stollmeyer knew that if Vista took MINDBODY private, it would likely take Stollmeyer and his management team with it, as Vista is known for keeping management teams intact. Vista markets itself as "exclusively invest[ing] in . . . organizations led by world-class management teams." Out of the at least twenty companies that Vista acquired between 2017 and 2018, it kept senior management aboard at seventeen of them, and of the three management teams that were let go, at least two worked at companies that Vista integrated into companies it already owned and were already being managed, a circumstance that would not apply to Vista's acquisition of MINDBODY. Additionally, in an "FAQ" MINDBODY sent to employees on December 26 after the Merger's announcement on December 24, MINDBODY identified Vista as having a "track record of helping management teams drive profitable growth[.]"

49. The Proxy (p. 26) says that Stollmeyer "[d]uring this time period" also had meetings with "two other financial sponsors." The Proxy does not disclose who initiated these meetings, when in October they occurred, why the meetings were held, or what occurred at the meetings. Stollmeyer's meeting with three financial sponsors in the same month is clear evidence he was seeking a financial partner for a management led buyout of MINDBODY.

19

50. Stollmeyer convened the Board on October 26, 2018. The Proxy states (p. 26) that at the meeting, "in response . . . to Vista's inquiry" and "recent transactions between SaaS software companies and financial sponsors," the Board "determined that it should engage a financial advisor to provide a financial and strategic market update and a preliminary evaluation of MINDBODY's market situation and potential strategic opportunities." In the Employee Letter he sent to MINDBODY employees on December 31, however, Stollmeyer said that in October "the Board of Directors *and I agreed to explore the possibility of taking MINDBODY private,* because we realized that *the right acquirer could enable us to be even more successful* in the years ahead." (Emphases added). The agreement by Stollmeyer and the Board to pursue going private was hardly a "preliminary evaluation," of the Company's "market situation and potential strategic opportunities," as the Proxy claims. By October 26, Stollmeyer had already approached three private equity firms about taking the Company private. The Board discussed creating a Transaction Committee, not for the purpose of having the Committee evaluate strategic opportunities, but only for the Committee to recommend a potential financial advisor to the Board.

20

51. On October 30, 2018, the Board established the Transaction Committee made up of Liaw from IVP as Chairman, Cunningham and Goodman. The Proxy states (p. 26) that the Transaction Committee excluded Stollmeyer due to the Board's "preference for any Transaction Committee to be comprised solely of independent directors . . . ." The Board's exclusion of Stollmeyer from the Transaction Committee establishes that the Board knew that Stollmeyer had a conflict with respect to the going private transaction. The designation of Liaw of IVP as Chairman meant that a venture equity firm that might be looking for an exit strategy would lead the Transaction Committee.

52. The Proxy (p. 26) acknowledges that the Board formed the Transaction Committee only "for the limited purpose of reviewing the potential engagement of a financial advisor to assist MINDBODY with evaluating potential strategic alternatives and evaluating candidates for this role, ***including Qatalyst Partners***." (Emphasis added). Qatalyst had no prior relationship with MINDBODY, but had lucrative ties to Vista. Among other things, just two months prior on September 12, 2018, Vista closed a large investment that Qatalyst advised it on and paid Qatalyst $7 million in fees. In a further admission that Stollmeyer and management had a self-interest in the going private transaction, the Transaction Committee requested and received from MINDBODY's outside counsel, "guidelines concerning management neutrality." However, some memo from counsel could not change that senior management was not neutral about going private; it was self-interested.

21

53. Despite the Board's purposeful exclusion of Stollmeyer from the Transaction Committee, the Transaction Committee let Stollmeyer control the retention of a financial advisor. The Proxy states (p. 27) that following the Transaction Committee's October 31, 2018 meeting, it was Stollmeyer who reached out to potential advisors, including Qatalyst.

***Management Announces Poor Q4 2018 Guidance and Its Stock Price
Plummets Below the Value of the Merger Consideration***

54. On November 6, 2018, the week after the Board initiated the sale process and formed the Transaction Committee, Stollmeyer and senior management caused MINDBODY to announce reduced projections for the full fiscal year and projected net income losses for Q4 that were ***double*** MINDBODY's net income losses for Q3 as well as analysts' projections:

<u>Reduced Guidance for 2018</u>

|  | Total Revenue (in millions) | | Net Income Losses (in millions) | |
|---|---|---|---|---|
| Prior Guidance | $ | 246 to $250 | $ | (7.5) to $(4.5) |
| New Guidance | $ | 244 to $246.2 | $ | (7.5) to $(6) |

<u>Guidance for Q4 Net Income Losses</u>

|  | Net Income Losses (in millions) | |
|---|---|---|
| Q3 2018 Performance | $ | (2.5) |
| Q4 2018 Projections | $ | (5) to $(3.5) |

22

55. Predictably, on this news, MINDBODY's stock price plummeted 22% from $33.59 on November 5, 2018 to $26.18 on November 7, 2018.

56. On MINDBODY's November earnings call, Stollmeyer blamed the reduced full year and Q4 2018 guidance on costs related to the FitMetrix and Booker Acquisitions. Analysts were confused by this explanation because Stollmeyer and White had previously stated the integration was going well, and that they had conservatively built integration costs into their full year projections. Indeed, a JMP Securities LLC ("JMP") analyst asked Stollmeyer on the call: "We had the Analyst Day on September 19, and one of your slides was the integration is working. So I mean, at what point did you realize that the results were going to be disappointing?"

57. Stollmeyer answered JMP's question by stating that on Analyst Day, management was looking at the two months leading up to late August 2018. He had had no credible explanation for why management expected integration costs to double from Q3 to Q4.

58. After purporting to answer JMP's question, Stollmeyer invited CFO White to respond. White blamed the Q4 2018 and full year guidance on the elongated deployment of MINDBODY's branded-mobile application due to new mobile application guidelines on the Apple App Store. But White's explanation also appears fabricated, considering the new Apple App Store guidelines were rolled out in May 2018, and neither Stollmeyer nor his management team flagged the issue on the July 31, 2018 Q2 earnings call.

23

59. On information and belief, there was a far more cynical reason for management's revised guidance. Because management would ultimately be employed and compensated by, and have a substantial equity interest in, the post-going private company, it was in management's interest to reduce the price. Vista would pay to the level that would produce greater post-Merger returns.

***The Board Belatedly Changes the Transaction Committee's Purported
Authority but Lets Management Continue Running the Sale Process***

60. The Proxy states that on November 14, 2018, "the Transaction Committee held a telephonic meeting." The Proxy (p. 27) says that at that meeting, the Transaction Committee and the Board authorized MINDBODY to engage Qatalyst as the Company's advisor. However, the Proxy had just admitted the Transaction Committee was only empowered to recommend a financial advisor to the Board, and that the November 14 meeting was a meeting of the Transaction Committee, not the Board.

61. On November 17, 2018, before Qatalyst had entered into an engagement letter with MINDBODY, Qatalyst met with the Company's senior management. Together, they picked which potentially interested parties to reach out to, and *subsequently* presented the list to the Transaction Committee on November 18. The Proxy is silent on whether the Transaction Committee approved, or even commented on, the list. Given that the Transaction Committee only had the limited authority to recommend a financial advisor to MINDBODY, the Committee was "an ambassador without portfolio." It had a title but no power to run the sale process.

24

62. The Proxy claims that on November 26, 2018, almost a month after the Transaction Committee's formation, the Board executed a unanimous written consent that purported to effect a belated and limited extension of the Transaction Committee's authority as follows:

> [T]o advise, direct and oversee management of MINDBODY in the review and negotiation of strategic alternatives, to evaluate indications of interest related thereto, to initiate solicitations of indications of interest, to meet on a regular basis with the management of MINDBODY concerning such activities, and to make recommendations to the Board of Directors with respect to the foregoing[.]

63. The November 26, 2018 Board consent establishes that prior to that date, the Transaction Committee had no authority to advise, direct or oversee management of MINDBODY in the conduct of the sale process. The Proxy does not explain the timing, rational or purpose of the consent. Apparently, having allowed conflicted management to control the sale process thus far, the Board belatedly tried to give the impression that the Transaction Committee was running the show. But it was too little, too late. Management had already controlled critical phases of the sale process, and would continue to dominate the process.

25

64. The Proxy indicates that the Transaction Committee still only had an advisory and oversight role, not control of the sale process. The Transaction Committee never retained its own counsel or financial advisor. It was management who conducted the review and negotiation of "strategic alternatives." The Transaction Committee did not take an active role in the sale process. Neither did the Board. Rather, the Board, at meetings on November 28 and December 7, 2018, and the Transaction Committee, at meetings on December 3 and December 14, 2018, merely received "updates" from management on the status of management's activities in arranging a going private transaction.

65. The Proxy indicates that (1) between November 19, 2018 and December 2018, Qatalyst contacted the parties that it had identified with management; (2) between November 27 and December 18, 2018, MINDBODY management conducted presentations; (3) on December 15, 2018, Qatalyst opened up a virtual data room; and (4) between December 17 and December 19, 2018, management engaged in various diligence calls. No Director Defendant ever interfaced with any prospective acquirer. Instead, conflicted management controlled the process in tandem with a conflicted financial advisor.

26

*The Board Approves the Merger Agreement*

66. On December 18, 2018, Vista delivered an opening bid to acquire MINDBODY for $35 per share and demanded an exclusivity agreement by 11:59 p.m. on December 19, 2018. The Proxy reveals that among the "ancillary deal documents" Vista sent MINDBODY along with its offer and draft merger agreement was "a voting and support agreement to be executed by certain stockholders of MINDBODY." Yet, Vista's offer was made after the stock markets and MINDBODY's stock price had sharply declined. Q4 2018 was a terrible quarter for the stock market, due to investor concerns over rising bond yields, the trade dispute with China and a partial government shutdown. Indeed, December was the worst December for the stock market since the Great Depression. On December 3, 2018, the first trading day of the month, the Class A stock closed at $28.03. By December 19, 2018, it closed at $23.70. December 20 and 21, 2018 brought a further two-day plunge to the stock markets and MINDBODY's stock, which declined to $21.72. The week ending December 21, 2018 was the worst week for stocks since the 2008-2009 financial crisis. In that week, the Class A stock fell from $24.98 to $21.72 ($3.26), a 13% decline in a single week.

67. The Transaction Committee held a meeting on December 19, 2018 (with senior management and Qatalyst present) and decided not to respond to Vista's proposal, but to tell other potential bidders they had only 24 to 48 hours to make a bid. The Proxy states that at the December 19 meeting:

> Representatives of Qatalyst Partners informed the Transaction Committee that Party A and Party B were still engaged in diligence, that representatives of Qatalyst Partners had indicated to Party A and Party B the highly competitive nature and timing of the process, and that in order to be competitive in such process, those parties would need to give an indication of value within the next 24-48 hours.

27

The Proxy also says Qatalyst reported that Party C "was still relatively early in its due diligence process." The Transaction Committee directed Qatalyst to communicate to all potential bidders "the competitive nature of the process, accelerated timeline, and the need for prompt indications of interest." The Proxy does not disclose why the timeline was being "accelerated" or why indications of interest were suddenly required within 24 to 48 hours.

68. On December 20, 2018, the Board held a meeting with Qatalyst and senior management present to discuss Vista's bid. Not surprisingly, potential bidders withdrew or gave indications that they could not produce bids on "a timeline that would be competitive with Vista." The Board instructed management to have Qatalyst seek a $40.00 per share offer from Vista.

69. Basically, the Transaction Committee and the Board allowed Vista (with the support of Qatalyst and senior management) to dictate and accelerate the sale process to advantage itself and discourage other bidders. The directors acquiesced in the Vista/Stollmeyer scheme to truncate any semblance of a fair sale process and substitute an illusory thirty-day go-shop.

28

70. The next day, at a Board meeting that management and Qatalyst attended, Qatalyst said that Vista had increased its offer to $36.50 per share, but relayed Vista's instruction that the offer was the highest price it would pay. The Director Defendants thereafter excused Qatalyst and management from the meeting, and continued discussing Vista's offer. This, once again, indicates that they knew that management had conflicting incentives with respect to Vista's offer. However, the Proxy does not say Stollmeyer left the meeting. The Board decided to pursue Vista's $36.50 per share offer without requesting a price increase, and directed "MINDBODY management" to negotiate terms of the definitive agreements.

71. Like the rest of the market, MINDBODY's stock price declined sharply on December 21, 2018, closing at $21.72 per share.

72. On December 23, 2018, the Board held a meeting (with senior management in attendance) at which Qatalyst advised that other bidders needed time to complete due diligence and submit bids. Nevertheless, Qatalyst delivered its "fairness" opinion that Vista's $36.50 per share take private offer was fair to MINDBODY's public stockholders and the Board voted unanimously in favor of the Merger Agreement.

### The Irrevocable Proxies

73. As a condition to the Vista Defendants' execution of the Merger Agreement, Stollmeyer and IVP executed the Irrevocable Proxies requiring Stollmeyer and IVP vote their MINDBODY shares in favor of the Merger and not transfer any shares. According to MINDBODY's December 26, 2018 8-K, the

29

Irrevocable Proxies represented 31.8% of MINDBODY's voting power and 34.6% of MINDBODY's voting power taking into account restricted stock units and options on an as-converted basis, even though Stollmeyer and IVP owned only 6.6% of MINDBODY's outstanding shares.

74. According to the Proxy, as of January 18, 2019, there were only 2,372,938 shares of Class B still outstanding. IVP held 1,602,683 Class B shares (67.5%) along with 1,039,349 Class A shares (2.3%). Stollmeyer held 505,905 Class B shares of record, controlled 11,400 Class B shares held by record of relatives, held an irrevocable proxy for 65,128 Class B shares and held 961,519 Class B options for a total of 1,543,346 outstanding issuable Class B shares. He also held 23,346 Class A shares, 157,001 Class A options, an irrevocable proxy for 49,079 Class A shares of other stockholders and 35,192 Class A shares issuable for restricted stock units vesting within 60 days. Other directors and officers held 303,811 Class B options. The Class B shares and exercisable options of Stollmeyer and other MINDBODY officers and directors represent 50.8% of the fully diluted Class B stock.

75. As described by the Proxy, the Irrevocable Proxies require that Stollmeyer's 517,305 outstanding Class B shares and 23,346 Class A outstanding shares be voted in favor of the Merger, representing 5,196,396 votes. Similarly, according to the Proxy, IVP's 1,602,683 outstanding Class B shares and 1,039,349 outstanding Class A shares (a total of 17,066,179 votes) must, pursuant to its

30

Irrevocable Proxy, be voted in favor of the Merger. Together, the Irrevocable Proxies represent, according to the Proxy, a minimum of approximately 22.3 million of the approximately 69.4 million votes of the Company's outstanding shares, approximately 32% of the outstanding voting power. However, Stollmeyer also holds 961,519 exercisable Class B options and 157,001 exercisable Class A options, representing a potential additional 9,772,191 votes, as well as the 65,128 Class B shares Stollmeyer holds an irrevocable proxy over, representing 651,280 votes. According to the Proxy, with all those additional votes, Stollmeyer and IVP would hold approximately 46.2% of the voting power and the Irrevocable Proxies represent a share lock-up that rendered any post-signing market check illusory and would foreordain the outcome of the stockholder vote on the Merger. However, if the Class B held by Stollmeyer and IVP has converted into Class A, their shares will carry far fewer votes.

### *Vista and Stollmeyer Disclose that Vista Has Agreed to Employ Management Post-Merger*

76. The December 24, 2018 Joint Press Release touted the Merger Consideration as a 68% premium to MINDBODY's per share closing price of $21.72 on December 21. But this characterization of the Merger Consideration was disingenuous and self-serving. The week of December 21 was the market's worst week since the 2008 financial crisis, and December 21 was the second consecutive trading day that the Dow Jones and S&P 500 traded deep in the red due to fears stirred by trade disputes, rising interest rates and a partial government shutdown.

31

77. In the Joint Press Release, Vista confirmed that it would employ management post-Merger. Vista stated, "We look forward to partnering with Rick [Stollmeyer] and the entire MINDBODY team . . . ."

78. In his December 31, 2018 Employee Letter, Stollmeyer re-iterated that Vista agreed to employ him at the post-Merger entity, and wrote that he was "excited to continue serving [MINDBODY] and all of you for years to come." Stollmeyer also indicated that he had discussed compensation with Vista, as he assured MINDBODY employees that "Vista has committed to keeping our pay and benefits unchanged for at least a year."

### *Stollmeyer Chills an Already Ineffective Go-Shop*

79. Upon the Merger Agreement's execution, a thirty-day go-shop period ensued under Section 5.3 of the Merger Agreement during which MINDBODY could solicit and negotiate alternative acquisition proposals until January 22, 2019 (the "Go-Shop"). But the Go-Shop was never likely to attract a third-party bidder.

80. *First*, the Irrevocable Proxies of Stollmeyer and IVP combined with the classified Board and other defensive measures render any alternative bid highly impracticable if not impossible.

32

81. *Second*, almost 1/3 of the already relatively short Go-Shop period was eaten up by the holidays. The first nine days of the thirty-day Go-Shop fell between Christmas Eve and New Year's Day, when most businesses operate with reduced hours. The first full day of the Go-Shop fell on Christmas Eve, when even the stock market closed early. The likelihood that a potential bidder would come forward during this time was low, as was the likelihood that Qatalyst, which was running the Go-Shop, was pounding the pavement to drum up another bidder.

82. *Third*, private equity players do not often bid against one another during a Go-Shop, so a financial sponsor was unlikely to come forward with a higher offer. And because Stollmeyer made it publicly known in the middle of the Go-Shop that he was unlikely to approve an offer by a strategic bidder, no reasonable strategic bidder was likely to waste their time in the middle of the holidays to quickly conduct the diligence that would be necessary to make an alternative proposal that would be rejected. Indeed, when Stollmeyer sent the Employee Letter on December 31, he wrote: "I [am] convinced that going private now is our best path forward, and that Vista is an ideal partner." Strategic parties understood that as MINDBODY's CEO, Chairman and co-founder with significant voting power, Stollmeyer has a significant influence on the Company and the Board.

33

83. *Fourth*, the Go-Shop's effectiveness was undermined by Qatalyst, who ran it. Qatalyst has no financial incentive to generate a higher offer, which would jeopardize Qatalyst's advisory fees under its current engagement with MINDBODY. Indeed, the Proxy is silent on whether Qatalyst will get paid if MINDBODY engages in a transaction with a party other than Vista. Qatalyst also has disincentive to generate a higher offer due to its lucrative ties to Vista, which Qatalyst does not want to jeopardize by interfering with Vista's discounted acquisition of MINDBODY.

### *The Proxy Is Materially Misleading and Incomplete*

84. The Proxy contains numerous misleading partial disclosures that, if not corrected, will render the stockholder vote on the Merger uninformed.

### *Misleading Partial Disclosures Concerning Management Employment, Equity Investment and Different Consideration*

85. Under a heading titled "Arrangements with Parent," the Proxy (p. 44) states:

> **As of the date of this proxy statement**, none of our executive officers has entered into any agreement with Parent or any of its affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one of more of its affiliates. **Except as approved by the Board of Directors**, from the date of the Merger Agreement, to the earlier termination of the Merger Agreement or the **Effective Time**, Parent and Merger Sub covenant not to, and covenant to not permit any of their subsidiaries or respective affiliates to, authorize, **make or enter into, any arrangements or understandings (formal or informal, binding or otherwise) with any such executive officer of MINDBODY** (1) regarding any continuing employment or consulting relationship with the Surviving Corporation, (2) **pursuant to which any executive officer would be entitled to receive consideration of a different amount**

34

**or nature than MINDBODY stockholders**, or (3) pursuant to which any such executive officer (directly or indirectly) would agree to provide equity investment to finance any portion of the Merger. Prior to and following the closing of the Merger, however, certain of our executive officers may have discussions, and following the closing of the Merger, may enter into agreements with, Parent or Merger Sub, their subsidiaries or their respective affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates. (Emphases added).

86. The first sentence of this disclosure does not reveal whether there have been discussions between Vista and MINDBODY's senior management concerning these subjects. Moreover, the statements in the Joint Press Release and Employee Letter plainly indicate employment discussions have occurred. This disclosure also suggests that agreements regarding employment or equity participation may occur after the date of the Proxy.

87. The second and third sentences of the Proxy's disclosure regarding "Arrangements with Parent" indicate that (i) the Board may approve an executive officer receiving "consideration of a different amount or nature than MINDBODY stockholders," and (ii) prior to the closing of the Merger, MINDBODY's executive officers may have discussions with Vista concerning employment and equity participation and receipt of different consideration for their shares than other stockholders.

35

88. Section 6.20 of the Merger Agreement reads:

6.20 *No Employment Discussions.* Except as approved by the Board of Directors Company, at all times during the period commencing with the execution and delivery of this Agreement and **continuing until** the earlier to occur of the termination of this Agreement pursuant to Article VIII and **the Effective Time**, Parent and Merger Sub will not, and will not permit any of their Subsidiaries or controlled Affiliates to authorize, **make or enter into, or commit or agree to enter into, any formal or informal arrangements or other understandings (whether or not binding) with any executive officer of the Company** (i) regarding any continuing employment or consulting relationship with the Surviving Corporation from and after the Effective Time; or (ii) **pursuant to which any such individual would be entitled to receive consideration of a different amount or nature than the Per Share Price in respect of such holder's shares of Company Common Stock**; or (iii) pursuant to which such individual would agree to provide, directly or indirectly, equity investments to Parent, Merger Sub or the Company to finance any portion of the Merger. (Emphases added).

89. The Proxy's disclosure concerning Section 6.20 and no discussions with management is materially misleading and incomplete. First, the Proxy indicates that the Merger Agreement authorizes the Board to permit executive officers to receive consideration for their stock of a different amount or nature than MINDBODY stockholders. This violates Article IV D.2.(c) of the Certificate, which provides, in pertinent part:

(c) Equal Treatment in a Change of Control or any Merger Transaction. In connection with any Change of Control Transaction, shares of Class A Common Stock and Class B Common Stock shall be treated equally, identically and ratably, on a per share basis, with respect to any consideration into which such shares are converted or any

36

consideration paid or otherwise distributed to stockholders of the Corporation, unless different treatment of the shares of each such class is approved by the affirmative vote of the holders of a majority of the outstanding shares of Class A Common Stock and by the affirmative vote of the holders of a majority of the outstanding shares of Class B Common Stock, each voting separately as a class.

Any different consideration for shares of executive officers would require separate class votes by the Class A and Class B stockholders and cannot be authorized by the Board.

90. Second, the Proxy indicates that the restriction on executive officers receiving different consideration for their shares will only apply until the Effective Time of the Merger. These Proxy references and the provisions of Section 6.20 of the Merger Agreement indicate that at or after the Effective Time, Stollmeyer and other senior managers may receive different consideration for their shares. That would violate the Certificate's equal treatment provision.

91. Third, the Proxy (p. 9) represents that:

If the proposal to adopt the Merger Agreement is approved, the shares of common stock held by MINDBODY directors and executive officers will be treated in the same manner as outstanding shares of common stock held by all other stockholders.

This statement is inconsistent with the Proxy's later statements that the Board can authorize disparate consideration or that such disparate treatment might occur at or after the Effective Time.

37

92. Fourth, while Section 6.20 of the Merger Agreement indicates there are to be No Employment Discussions prior to the closing of the Merger, the Proxy says that executive officers and Vista may have such discussions. The stockholders are entitled to know (i) whether discussions are or are not permitted, (ii) what, if any, discussions have occurred and (iii) what, if any, discussions the Board has authorized.

93. It is simply not credible that Stollmeyer would agree to a private equity buyout and agree to vote his shares for it without some understanding of post-Merger employment and equity participation. Similarly, other members of senior management would require some assurance about employment and equity participation. Public statements by Vista and Stollmeyer demonstrate that there is an understanding about employment and partnership. Having travelled down the road of partial disclosure concerning employment, different consideration and equity participation, Stollmeyer and the other directors are required to provide the stockholders with full and accurate information on these subjects.

***Misleading Disclosure Concerning the Irrevocable Proxies***

94. The Proxy describes the Irrevocable Proxies, but does not explain how they came into being. According to the Proxy, Vista provided "a voting and support agreement," not irrevocable proxies. The Proxy says that at the December 20, 2018 Board meeting, Qatalyst and Cooley LLP provided a summary of various aspects of

38

Vista's proposal, including "the structure of the proposed voting and support agreements." The Proxy reflects no discussion or approval of irrevocable proxies at any Transaction Committee or Board meeting. It does not disclose that Defendants employed the Irrevocable Proxies in an attempt to avoid the conversion of Class B shares while requiring these shares to be voted for the Merger. Regardless of whether this attempt to avoid conversion was successful (and it was not), the MINDBODY directors were required to give a full and accurate summary of the origins and reasons for the Irrevocable Proxies. Moreover, if there was a conversion of Class B stock as a result of the Merger Agreement, Irrevocable Proxies and other circumstances, then the Proxy's various disclosures regarding voting power are inaccurate.

95. The Proxy summarizes Vista's representations and warranties, including "the absence of any stockholder or management arrangements related to the Merger." This refers to Section 4.12 of the Merger Agreement, where Vista represented that:

4.12 *Stockholder and Management Arrangements.* As of the date hereof, neither Parent or Merger Sub nor any of their respective Affiliates is a party to any Contract, or has authorized, made or entered into, or committed or agreed to enter into, any formal or informal arrangements or other understandings (whether or not binding) with any stockholder (other than any existing limited partner of the Guarantors or any of their Affiliates), director, officer, employee or other Affiliate of the Company Group (a) relating to (i) this Agreement or the Merger; or (ii) the

39

Surviving Corporation or any of its Subsidiaries, businesses or operations (including as to continuing employment) from and after the Effective Time; or (b) pursuant to which any (i) such holder of Company Common Stock would be entitled to receive consideration of a different amount or nature than the Per Share Price in respect of such holder's shares of Company Common Stock; (ii) such holder of Company Common Stock has agreed to approve this Agreement or vote against any Superior Proposal; or (iii) such stockholder, director, officer, employee or other Affiliate of the Company other than the Guarantors has agreed to provide directly or indirectly, equity investment to Parent, Merger Sub or the Company to finance any portion of the Merger.

96. This representation and the Proxy's description of it are false. As of the date of the Merger Agreement, Vista had "authorized, made or entered into, or committed or agreed to enter into, any formal or informal arrangements or other understandings (whether binding or not binding)" with several MINDBODY stockholders (Stollmeyer, his relatives and IVP) and a MINDBODY director, officer and employee (Stollmeyer) pursuant to which "such holder of Company Common Stock has agreed to approve this Agreement or vote against any Superior Proposal." Recital D of the Merger Agreement affirmed that:

> **Prior to** the execution and delivery of this Agreement, and **as a condition to** the willingness of Parent and Merger Sub to enter into this Agreement, certain stockholders of the Company **have executed** Irrevocable Proxies ("**Irrevocable Proxies**") in connection with the Merger. (Emphases added).

40

97. Vista's submission of a voting and support agreement, the Irrevocable Proxies' cross-reference of the Merger Agreement and the repeated references in the Irrevocable Proxies stating they are a condition to the Merger Agreement further prove the existence of a voting arrangement or understanding and the falsity of the representations in the Proxy and the Merger Agreement that there was no such arrangement.

***Failure to Disclose IVP's Interest in Exiting Its Investment in MINDBODY***

98. The Proxy does not disclose that IVP wanted to sell its MINDBODY stock. Selling in a going private merger would be more profitable for IVP than selling in the thin market for MINDBODY's Class A stock. The facts and circumstances create a reasonable inference that in the fall of 2018, IVP was interested in exiting its MINDBODY stock investment. First, IVP is a late stage venture capital fund with a three-to-five-year investment horizon and its MINDBODY investment had exceeded that period. Second, it is a reasonable inference that Stollmeyer would not have pursued going private if the Company's largest stockholder with 24.4% of the voting power did not want to sell its shares. Third, it is reasonable to infer that Liaw would not have been appointed Chair of the Transaction Committee if IVP was opposed to selling its shares.

41

***Misleading Partial Disclosure Concerning Qatalyst's Retention***

99. The Proxy (p. 26) indicates that there was a discussion between Stollmeyer and Vista on some unspecified date in October, which led to a discussion at an October 26, 2018 Board meeting of the creation of a Transaction Committee. According to the Proxy, on October 30, 2018, the Board "delegated authority to the Transaction Committee for the limited purpose of reviewing the potential engagement of a financial advisor to assist MINDBODY . . . and evaluating candidates for this role, including Qatalyst Partners." The Proxy does not disclose whether it was Stollmeyer or someone else who suggested Qatalyst. The Proxy then says that:

> The Transaction Committee also determined that MINDBODY management should contact Qatalyst Partners and one other potential financial advisor (in each case, based on historical experience with the financial advisor . . . ).

100. Thus, Stollmeyer, not the Transaction Committee, contacted Qatalyst. The Proxy does not identify the other financial advisor.

101. The Proxy (p. 42) concedes that during the two-year period prior to Qatalyst's December 23, 2018 fairness opinion, Qatalyst did not receive any compensation from MINDBODY for services as a financial advisor. Qatalyst's website, which lists assignments back to May 2008, does not reflect any representation of MINDBODY except in the pending transaction with Vista. The Proxy is misleading because MINDBODY had no "historical experience" with Qatalyst. On information and belief, the "historical experience" referred to was Vista's historical experience and Vista suggested that MINDBODY retain Qatalyst.

42

102. The Proxy (p. 27) represents that at a November 14, 2018 Transaction Committee meeting:

On the basis of Qatalyst Partners' knowledge and deal experience in the SaaS industry and its reputation as a driver of higher valuations in a competitive auction process, and taking into account the conflict disclosure by Qatalyst Partners, the Transaction Committee, as well as the Board of Directors (represented by a quorum thereof) authorized MINDBODY to engage Qatalyst Partners as its exclusive financial advisor in connection with a process to evaluate potential strategic transactions.

103. The Proxy did not reveal that Qatalyst's "knowledge and deal experience" included numerous deals involving Vista. Nor does the Proxy summarize "the conflict disclosure by Qatalyst."

### *Misleading Partial Disclosure Concerning Qatalyst's Prior Dealings with Vista*

104. On page 42, the Proxy contains the following statement:

Other than as set forth below, during the two-year period prior to the date of Qatalyst Partners' opinion, no material relationship existed between Qatalyst Partners or any of its affiliates and MINDBODY or *Parent* pursuant to which compensation was received by Qatalyst Partners or its affiliates, other than a fee of approximately $7 million received by an affiliate of Qatalyst Partners in connection with acting as financial advisor to *Vista, an affiliate of Parent*, in connection with Vista's acquisition of iCIMS, Inc. Qatalyst Partners and/or its affiliates may in the future provide investment banking and other financial services to MINDBODY, *Parent or Vista and their respective affiliates* for which Qatalyst Partners would expect to receive compensation. (Emphases added).

43

105. This disclosure misleadingly limits the description of fees Qatalyst has received to fees from a material relationship with "Parent," which the Proxy defines as Torreys Parent, LLC, an entity that was only formed on December 18, 2018. In contrast, Qatalyst discloses the possibility of potential future compensation from "Parent or Vista and their respective affiliates." The Proxy's disclosure does not include compensation Qatalyst has received from affiliates of Vista in the past two years, including Apptio, Inc. ("Apptio"), Lithium Technologies, Inc. ("Lithium") and Spredfast, Inc. ("Spredfast"). Nor does the Proxy disclose compensation Qatalyst received in June 2016 from Ping Identity ("Ping"), after Vista's acquisition of Ping.

106. On May 30, 2017, Vista announced an agreement for its acquisition of Lithium. According to Qatalyst's website, it served as financial advisor to Lithium for the transaction. On August 1, 2017 Vista and Lithium confirmed that upon completion of the transaction on July 28, 2017:

> Lithium is now a portfolio company of Vista . . . .

107. On information and belief, Qatalyst was paid compensation by Lithium after the close of the transaction, when Lithium was a portfolio company of Vista.

44

108. On September 4, 2018, Vista and Lithium Technologies LLC announced that Lithium had entered into a merger agreement to acquire Spredfast. In the press release, Alan Kline, Principal at Vista, stated:

> We are thrilled to welcome Spredfast to our portfolio of high-performing software companies.

109. Qatalyst's website reveals that it served as financial advisor to Spredfast, which was "Acquired by Lithium Technologies/Vista Equity Partners." The merger closed on October 2, 2018. On information and belief, upon the merger, Lithium, a Vista affiliate, assumed the liabilities of Spredfast, including the obligation to pay Qatalyst compensation for serving as financial advisor.

110. On November 11, 2018, Apptio and Vista announced "a definitive agreement [for Apptio] to be acquired by an affiliate of Vista Energy Partners . . . ." The press release stated that "Qatalyst Partners is serving as the exclusive financial advisor to Apptio . . . ." The December 10, 2018 Apptio proxy statement stated:

> **Qatalyst Partners provided Apptio with financial advisory services in connection with the proposed Merger for which it will be paid approximately $29 million, $3 million of which was payable upon the delivery of its opinion (regardless of the conclusion reached in the opinion), and the remaining portion of which will be paid upon, and subject to, the consummation of the Merger. Apptio has also agreed to reimburse Qatalyst Partners for its expenses incurred in performing its services. Apptio has also agreed to indemnify Qatalyst Partners and its affiliates, their respective members, directors, officers, partners, agents and employees and any person controlling Qatalyst Partners or any of its affiliates against certain liabilities, including liabilities under federal securities law, and certain expenses related to or arising out of Qatalyst Partners' engagement.** (Emphasis in original).

45

111. Section 2.4 of the Apptio merger agreement provided that at the effective time of the merger, all liabilities of Apptio (which would include the obligations (1) to pay Qatalyst $26 million in compensation, (2) to pay Qatalyst's expenses and (3) to indemnify Qatalyst, would become liabilities of Apptio as the surviving corporation). Under Section 2.7 (a)(i), Apptio will become wholly-owned by a Vista affiliate. On December 23, 2018, when Qatalyst was rendering its fairness opinion on the MINDBODY Merger, it was expecting to receive $26 million from an affiliate of Vista after consummation of the Apptio merger. The Apptio merger closed on January 10, 2019.

112. The Proxy is materially misleading and incomplete because it limits the disclosure of Qatalyst compensation to Parent. The Proxy is further misleading in disclosing Qatalyst's $7 million fee from "Vista, an affiliate of Parent" for the iCIMS, Inc. transaction, while not disclosing fees received from affiliates of Vista. Having traveled down the road of partial disclosure concerning Qatalyst's involvement in Vista-related transactions and compensation Qatalyst received from Vista and its affiliates, the MINDBODY directors were required to give a complete and accurate account, including Qatalyst's involvement in the Lithium, Spredfast and Apptio transactions and receipt of compensation from those companies after they became affiliates of Vista.

46

*Qatalyst Was Not Properly Retained and Did Not*
*Function as an Independent Financial Advisor*

113. As discussed above, Qatalyst had significant ties to Vista and Vista likely suggested to Stollmeyer that Qatalyst be engaged as the financial advisor for MINDBODY. The Proxy (p. 26) admits that the Transaction Committee's authority was only "to initially meet with potential financial advisors" and "make a recommendation to the Board . . . ." Its authority was "for the limited purpose" of reviewing and evaluating candidates.

114. The Proxy (p. 27) claims that at a November 14, 2018 meeting, the Transaction Committee authorized MINDBODY to retain Qatalyst as its exclusive financial advisor, but the Committee had no power to "authorize" anything. As the Proxy acknowledges, it could only make a recommendation.

115. The Proxy further claims that "the Board of Directors (represented by a quorum thereof) authorized MINDBODY to engage Qatalyst." However, as the Proxy states "[o]n November 14, 2018, the Transaction Committee held a telephonic meeting." It was not a Board meeting. In short, the Transaction Committee could not and the Board did not authorize the retention of Qatalyst.

47

***The Merger Fails to Maximize Stockholder Value for MINDBODY Stockholders***

116. Q4 2018 was an especially inopportune time to sell MINDBODY. MINDBODY had not yet realized the returns of the FitMetrix and Booker Acquisitions, which management repeatedly stated would be delivered in 2019 and fuel a period of greater growth. Extending the sale process until at least the end of Q1 2019 would have enabled other bidders to complete their due diligence and submit bids and likely yielded a significantly higher price for MINDBODY. Stollmeyer touts MINDBODY as having what "no one in the world has" in terms of "go-to-market capabilities," the "strength of our products," and "our brand of overlaps."

117. Q4 2018 was also an inopportune time to sell MINDBODY because November and December were the worst months in 2018 for the stock market, and December was the worst December since the Great Depression. Indeed, CNBC reported that "[f]or the first time ever, the S&P 500 [would] end the year with a loss after being positive for the first three quarters." Postponing the sale process until the market recovered would have likely yielded a higher price.

118. The $36.50 per share Merger Consideration is less than a value-maximizing price when viewed under a number of different metrics. MINDBODY's stock price closed above $36.50 per share for most of the 2018 fiscal year. The Merger Consideration is an 11.5% discount to MINDBODY's closing price on October 5, 2018, before political chaos spooked investors. The Merger

48

Consideration is a paltry 8.6% premium to MINDBODY's $33.59 per share closing price the day before the November 6, 2018 earnings call when management issued highly questionable guidance that caused MINDBODY's stock price to plummet. Further, MINDBODY's stock price was trading at a discount in the weeks leading up to the Q3 2018 call. Luxor, which owns 8,930,755 shares of Class A stock representing 18.9% of all MINDBODY's Class A stock, has concluded that the Merger undervalues the stock and is opposing the Merger.[2] In 2019, MINDBODY will realize the rewards of the FitMetrix and Booker Acquisitions, which would likely have caused MINDBODY's stock price to rise.

## CLASS ACTION ALLEGATIONS

119. Plaintiffs bring this Action pursuant to Court of Chancery Rule 23, individually and on behalf of other holders of MINDBODY's Class A stock (except Defendants herein and any person(s), firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) (the "Class") who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein.

---

[2]  The Proxy (pp. 90-91) represents that Luxor owns only 6,295,986 shares of Class A stock (13.8%). The Proxy claims its information is from the Luxor 13D, but it is actually from earlier SEC filings. The Proxy fails to disclose that the Luxor 13D states that the Merger undervalues MINDBODY's shares. Having referenced the Luxor 13D and purported to recite information therefrom, the Individual Defendants were required to give a fair and accurate account of its contents.

49

120. This Action is properly maintainable as a class action.

121. The Class is so numerous that joinder of all members is impracticable. The Company has hundreds, if not thousands, of stockholders scattered throughout the United States. As of January 18, 2019, there were 45,643,595 shares of Class A stock outstanding.

122. There are questions of law and fact common to the Class, including, *inter alia*, the following:

A. Whether the Class B shares of Stollmeyer and IVP have converted to Class A shares;

B. Whether Defendants have violated the equal treatment provision of the Certificate;

C. Whether the Board implemented a reasonable sale process to maximize stockholder value for Plaintiffs and the Class;

D. Whether the Individual Defendants breached their fiduciary duties owed to Plaintiffs and other members of the Class, including their duty to make full and accurate material disclosures to the Class and their duty to maximize stockholder value in a change-of-control transaction;

E. Whether the Vista Defendants aided and abetted the Individual Defendants' breaches of fiduciary duties; and

50

F. Whether Plaintiffs and the Class are entitled to equitable relief, damages, or other relief as a result of Defendants' wrongful conduct.

123. Plaintiffs are committed to prosecuting the Action and have retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the claims of other members of the Class, and Plaintiffs have the same interests as the other members of the Class. Accordingly, Plaintiffs are adequate representatives of the Class.

124. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class, which would as a practical matter be dispositive of the interest of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

125. Defendants have acted or refused to act on grounds generally applicable to and causing injury to the Class, therefore making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

51

**COUNT I (Against All Defendants)**

**Transfer of Voting Control Has Converted the Class B
Shares of Stollmeyer and IVP into Class A Shares**

126. Plaintiffs incorporate each allegation set forth above as if fully set forth herein.

127. Article IV D.3.(b)(i) of MINDBODY's Certificate provides that Class B shares shall be automatically converted into Class A shares upon a Transfer of Class B shares. Transfer is defined in Article V of the Certificate, which says in pertinent part:

"**Transfer**" of a share of Class B Common Stock shall mean any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law. **A** "Transfer" shall also include, without limitation . . . (ii) the transfer of, or entering into a binding agreement with respect to, Voting Control over a share of Class B Common Stock by proxy or otherwise subsequent to the Effective Date; *provided*, that the following shall not be considered a "**Transfer**" . . . (b) the grant of a proxy to officers or directors of the Corporation at the request of the Board of Directors of the Corporation in connection with actions to be taken at an annual or special meeting of stockholders . . . . (Emphases in original).

Article V also defines Voting Control:

"**Voting Control**" with respect to a share of Class B Common Stock means the exclusive power (whether directly or indirectly) to vote or direct the voting of such share of Class B Common Stock by proxy, voting agreement, or otherwise. (Emphasis in original).

52

128. Defendants' attempt to mischaracterize the Irrevocable Proxies as merely the grant of a proxy to directors (*i.e.*, Cunningham and Goodman) at the request of the Board for actions at a special meeting of stockholders is too cute by half. There was a transfer of and a binding agreement with respect to Voting Control of the Class B shares of Stollmeyer and IVP.

129. Section 1.2 of the Merger Agreement includes a definition of Irrevocable Proxies and references a Recital which cross-references the Irrevocable Proxies:

> D. Prior to the execution and delivery of this Agreement, and as a condition to the willingness of Parent and Merger Sub to enter into this Agreement, certain stockholders of the Company have executed Irrevocable Proxies ("Irrevocable Proxies") in connection with the Merger.

130. The Irrevocable Proxies begin by cross-referencing the Merger Agreement:

> Reference is made to the Agreement and Plan of Merger (the "Merger Agreement") that is being entered into as of the date hereof by and among Torreys Parent, LLC, a Delaware limited liability company ("Parent"), Torreys Merger Sub, Inc., a Delaware corporation and a wholly owned subsidiary of Parent ("Merger Sub"), and MINDBODY, Inc., a Delaware corporation (the "Company"). Capitalized terms used herein and not defined shall have the meanings ascribed to them in the Merger Agreement. Pursuant to the Merger Agreement, at the Effective Time, the Merger Sub will be merged with and into the Company, with the Company surviving (the "Merger").

53

131. The Irrevocable Proxies then again acknowledge that they are interrelated to the Merger Agreement:

This Irrevocable Proxy (a) is irrevocable to the fullest extent permitted by law, (b) is coupled with an interest and is granted to the Proxy, in her or his capacity as a director of the Company **in order to obtain the Vote (as defined below) and as a condition and inducement to Parent's willingness to enter into the Merger Agreement**, and (c) is granted at the request of the Board of Directors of the Company in connection with actions to be taken at a Company under the Merger Agreement include the obligations to duly call, give notice of, convene and hold the Company Stockholder meeting as promptly as reasonably practicable following the mailing of the Proxy Statement to the Company Stockholders for the purpose of obtaining the Requisite Stockholder Approval. (Emphasis Added).

Then the Irrevocable Proxies say yet again that the proxies are part of the consideration for Vista entering into the Merger Agreement:

As a condition and inducement to Parent's willingness to enter into the Merger Agreement, the Stockholder hereby irrevocably (to the fullest extent permitted by law) instructs the Proxy to, and the Proxy shall, from and after the date hereof until the Expiration Date, at every annual or special meeting of the stockholders of the Company [vote for the Merger Agreement and against any action that would be contrary to the Merger.]

132. The Irrevocable Proxies then have the "Stockholder" go beyond a Proxy, providing:

The Stockholder hereby irrevocably and unconditionally agrees not to take any action that would reasonably be expected to result in any conversion of Company Class B Stock, including the Shares, to Company Class A Stock.

54

Next, the Irrevocable Proxies again go beyond just granting a Proxy: the Stockholder agrees not to transfer the Shares or "enter into any agreement relating thereto." Furthermore, the Stockholder is required to "take, or cause to be taken, all actions and to do, or cause to be done, all things necessary to effectuate the intent of this Irrevocable Proxy." The Irrevocable Proxy then specifies a series of particular things the Stockholder agrees not to do, including Transfer shares, enter into a voting agreement or grant a proxy or agree or commit to such actions.

133. The Certificate provides for automatic conversion of Class B shares if there is **any** transfer or other disposition of the share of **any** legal or beneficial interest therein. Transfer is specifically defined to include a transfer of the power to vote a Class B share by proxy, voting agreement or otherwise and entering into a binding agreement with respect to the voting of Class B shares by proxy, voting agreement or otherwise.

134. The Merger Agreement and Irrevocable Proxies reflect that there were arrangements entered into with respect to the voting of the Class B shares of Stollmeyer and IVP. The proviso merely clarifies a proxy that simply authorizes the officers or directors the Board has designated to vote on matters where the Board is soliciting proxies for an annual or special meeting. For example, the revocable proxy for the Company's May 17, 2018 annual meeting would not constitute a transfer of

55

voting power of Class B shares. In contrast, as the Merger Agreement and Irrevocable Proxies establish, "the transfer of, or entering into a binding agreement with respect to, Voting Control" over the Class B shares of Stollmeyer and IVP "by proxy or otherwise." It was a condition to the Merger Agreement that Stollmeyer and IVP agree that all their shares would be voted in favor of the Merger Agreement. The Irrevocable Proxies contained agreements beyond the mere granting of a revocable proxy to directors. Vista indirectly gained the power to direct the voting of those Class B shares in favor of the Merger Agreement, by proxy, voting agreement or otherwise.

135. Vista proposed a "voting and support agreement" where it would control the voting shares of Stollmeyer and IVP. The Irrevocable Proxies are merely a different route to that same result.

136. The Irrevocable Proxies track provisions generally found in voting and support agreements entered into among acquirers and directors, officers, and stockholders of targets. Such an agreement cross-references the Merger Agreement, which cross-references the voting agreement. They provide, just like the Irrevocable Proxies do, that the voting agreement is a condition for the Merger Agreement. Like the Irrevocable Proxies, these voting and support agreements contain restrictions on the transfer of shares and restrict the voting provisions to votes relevant to the Merger.

56

137. Because of the transfer of Voting Control, the Class B shares of Stollmeyer and IVP automatically converted into Class A shares. Consequently, those shares are only entitled to one vote per share, not ten votes per share, at the Special Meeting to consider the Merger Agreement, Merger and all other matters that are subject to a stockholder vote. The Proxy is materially misleading because it represents that Stollmeyer and IVP still hold Class B shares having 10 votes per share.

138. Pursuant to 8 *Del. C.* § 111(a)(1),(3)(4)(5) and (6) and §225(b) and §227(a), the Court should declare that the Stollmeyer and IVP Class B shares have automatically converted to Class A shares and have one vote per share, and that the vote on the Merger Agreement, as well as the Merger are invalid and ineffective and award appropriate equitable and other relief. Plaintiffs and the Class have no adequate remedy at a law.

## COUNT II

### For Violation of the Equal Treatment Provision
### Against Stollmeyer, the Director Defendants and MINDBODY

139. Plaintiffs incorporate each allegation set forth above as if fully set forth herein.

57

140. The Certificate is a contract among MINDBODY and its directors, officers and stockholders. The Certificate at Article IV D.2.(c) contains an equal treatment provision which requires that "[i]n connection with any Change of Control Transaction," shares of Class A and Class B stock shall "be treated equally, identically and ratably, on a per share bases, with respect to any consideration" unless different treatment is approved by separate class votes of the Class A and Class B. Section 6.20 of the Merger Agreement and page 44 of the Proxy Statement assert that the Board has the power to authorize consideration of a different amount or nature than MINDBODY stockholders. This violates the equal treatment provision.

141. Section 6.20 and the Proxy indicate that the restrictions on Vista with respect to different merger consideration for executive officers will only continue to the Effective Time of the Merger. However, the equal treatment provision of Article IV D.2.(c) does not expire at the Effective Time of the Merger. Equal treatment applies "[i]n connection with any Change of Control Transaction." The provision applies "with respect to any consideration into which such shares are converted or **any** consideration **paid** or **otherwise distributed** to stockholders." For example, the equal treatment provision would apply to shares of the private company's stock distributed to Stollmeyer in exchange for the cash merger consideration for his Class B stock.

142. Provisions of the Merger Agreement, statements in the Proxy and other documents and the economic rationale of management led buy-outs support a reasonable inference that there is an intention and plan and/or that in fact Stollmeyer will end up with different treatment for his Class B shares than other MINDBODY stockholders will receive for their Class A shares. This violates the Certificate.

58

143. Pursuant to 8 *Del. C.* §111(a)(2) and (b), the Court should declare that the purported authority of the Board to grant disparate consideration and the payment or distribution of different consideration are in breach of the Certificate, and are invalid and award Plaintiffs equitable or other relief. Plaintiffs and the Class have no adequate relief at law.

## COUNT III

### For Breaches of Fiduciary Duties Against Stollmeyer

144. Plaintiffs incorporate each allegation set forth above as if fully set forth herein.

145. As a MINDBODY director and officer, Stollmeyer owes Plaintiffs and all other MINDBODY stockholders fiduciary duties of loyalty and care. As a result, in connection with the Company's sale, Stollmeyer had an obligation to maximize stockholder value and refrain from benefitting himself at the expense of MINDBODY's common stockholders.

146. Stollmeyer initiated and timed the going private process for his own self-interest at an inopportune time for MINDBODY's public stockholders. Without Board authorization, he met with Vista and two other financial sponsors to pursue his going private plan. He deliberately and improperly injected himself into and controlled the going private process, including the engagement of Qatalyst.

59

147. Stollmeyer also steered the sale to his preferred private equity bidder, Vista, and engaged his preferred and conflicted financial advisor. On information and belief, he participated in every Transaction Committee and Board meeting concerning the going private Merger and the Proxy fails to give a full and fair summary of his role. He structured the process to discourage other prospective acquirers. He was involved in negotiations with Vista.

148. Stollmeyer further breached his fiduciary duties by issuing materially incomplete and misleading disclosures in the Proxy. He is breaching his fiduciary duties by acting in violation of the Certificate.

149. Stollmeyer engaged in this conduct for his own benefit, as he has announced that he will continue in his current position as CEO of the post-Merger entity and expects to obtain a substantial interest in the private company.

150. The delay in fixing the equity interest of Stollmeyer and other senior management in the private company until after the Merger is an effort to conceal their self-interest from the stockholders and circumvent the equal consideration provision of the Certificate.

151. Plaintiffs and the Class have no adequate remedy at law for Stollmeyer's breaches of his fiduciary duties.

60

## COUNT IV

### For Breaches of Fiduciary Duties Against the Director Defendants

152. Plaintiffs repeat and re-allege all previous allegations as if fully set forth herein.

153. As MINDBODY directors, the Board members owe Plaintiffs and other public stockholders of MINDBODY the fiduciary duties of loyalty and care. As a result, in connection with the sale of the Company, they had an obligation to maximize stockholder value. They likewise were required to protect the Class A stockholders from Stollmeyer and senior management, who had a self-interest in going private.

154. In breach of these obligations, the Director Defendants failed to safeguard the best interests of MINDBODY's Class A stockholders by allowing a sale of the Company through a fatally flawed process dominated by Stollmeyer and a conflicted financial advisor that resulted in an unfair price for MINDBODY's Class A stockholders. The Director Defendants deliberately ignored the conflicts of interest of Stollmeyer and failed to empower a committee of disinterested and independent directors to control the process. Instead, they limited the power of the Transaction Committee, appointed an IVP representative as Chairman when IVP was predisposed to liquidating its position in MINDBODY, and relied on status reports from the conflicted management and banker, rather than actively controlling

61

the sale process. They sanctioned manipulations of the corporate machinery in an (unsuccessful) effort to evade and vitiate the protections the Certificate provides for the Class A stockholders. Indeed, they have violated the Certificate. The Director Defendants approved the Merger before the market recovered from the worst December fall-out since the Great Depression, and before MINDBODY realized the profits from the FitMetrix and Booker Acquisitions.

155. Additionally, the Director Defendants breached their fiduciary duties by failing to make full, fair and accurate disclosure of all material facts to MINDBODY stockholders in soliciting votes in favor of the Merger. Further, they have breached their fiduciary duties by permitting violations of the Certificate.

156. Plaintiffs and the Class have no adequate remedy at law for the Director Defendants' breaches of his fiduciary duties.

## COUNT V

### For Aiding and Abetting by the Vista Defendants

157. Plaintiffs repeat and re-allege all previous allegations as if fully set forth herein.

158. As alleged in detail herein, the Individual Defendants have breached their fiduciary duties to Plaintiffs and the other members of the Class. The Vista Defendants have aided and abetted those breaches. From Vista's first contact with Stollmeyer in October 2018, the fix was in. On information and belief, Vista steered

62

Stollmeyer to Qatalyst so it would end up "negotiating" with a financial firm that had received and would receive tens of millions in fees from Vista deals. Along with Stollmeyer and Qatalyst, Vista orchestrated a fundamentally flawed going private process, that tilted the playing field toward Vista. It joined with Stollmeyer and Qatalyst to manipulate and accelerate the sale process in an unfair manner. Vista knowingly and actively conspired with Stollmeyer in a Transfer of Voting Control of his Class B shares but then engaged in a cover-up which sought to hide the transfer by disguising it (unsuccessfully) as a "proxy." Vista has also knowingly and actively conspired with Stollmeyer to conceal discussions of employment, compensation and disparate Merger consideration. It has knowingly participated with Stollmeyer in a plan to violate the Certificate's equal treatment requirement by hiding Stollmeyer's different consideration and equity interest in the private company until after the Merger.

159. The Vista Defendants created and exploited the conflicts of Stollmeyer, management and Qatalyst. They conspired with Stollmeyer to steer the transaction to Vista and to avoid paying a value-maximizing price to MINDBODY's Class A stockholders. They knew it was improper for the Director Defendants to allow Stollmeyer to control the process but exploited Stollmeyer's control.

63

160. As experienced acquirers of public companies, the Vista Defendants had actual and constructive knowledge that it was improper for Stollmeyer to steer the transaction to Vista and exclude and deter other potential bidders. They also had active and constructive knowledge that it was improper for the Individual Defendants to fail to maximize value and ignore the conflicts of Stollmeyer and Qatalyst. They plainly knew that Stollmeyer was advancing his interests at the expense of the public stockholders.

161. Section 6.3 of the Merger Agreement required MINDBODY to provide the Vista Defendants with a reasonable opportunity to review and comment on the Proxy, and MINDBODY was required to consider in good faith all comments reasonably proposed by the Vista Defendants. The Vista Defendants therefore had the opportunity to review the Proxy before it was filed. They knew that the Proxy contained materially incomplete, false and misleading disclosures concerning its discussions and understandings with Stollmeyer and management concerning their post-Merger employment, compensation and equity interests. They also knew the disclosures concerning the Irrevocable Proxies and Qatalyst's retention and conflicts were materially misleading and incomplete. However, the Vista Defendants failed to correct these false and misleading disclosures, despite their ability to do so, and thereby knowingly participated in and exploited the Individual Defendants' breaches of fiduciary duties in order to benefit from the distorted account relayed by the Proxy. The Vista Defendants thereby knowingly participated in the Individual Defendants' breaches of their fiduciary duty of disclosure.

64

162. Plaintiffs and the Class have no adequate remedy at law for the Vista Defendants' conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and in favor of the Class and against all Defendants as follows:

A. Declaring that this Action is properly maintainable as a class action, and certifying Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

B. Declaring that the Stollmeyer and IVP Class B shares have automatically converted to Class A shares and have one vote per share;

C. Declaring that MINDBODY, Stollmeyer and the Director Defendants have violated the Certificate;

D. Declaring that Stollmeyer and the other Individual Defendants have breached their fiduciary duties owed to Plaintiffs and the Class;

E. Declaring that the Vista Defendants aided and abetted the Individual Defendants' breaches of fiduciary duties,

F. Declaring that the vote on the Merger Agreement and the Merger itself are invalid and void;

G. Awarding final injunctive relief against the Merger;

H. Awarding appropriate equitable relief;

65

I. Awarding damages or equivalent equitable relief to Plaintiffs and the Class;

J. Awarding Plaintiffs the costs and disbursements of this Action, including reasonable attorneys' and experts' fees; and

K. Granting such other and further equitable relief as this Court may deem just, proper and equitable.

Dated: January 29, 2019

**PRICKETT, JONES & ELLIOTT, P.A.**

*/s/ Michael Hanrahan*

Michael Hanrahan (Del. No. 941)
Paul A. Fioravanti, Jr. (Del. No. 3808)
Kevin H. Davenport (Del. No. 5327)
Eric J. Juray (Del. No. 5765)
Jason W. Rigby (Del. No. 6458)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

OF COUNSEL:

**KESSLER TOPAZ MELTZER & CHECK, LLP**

Lee D. Rudy
J. Daniel Albert
Stacey A. Greenspan
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

*Attorneys for Plaintiffs*

**SCHALL LAW FIRM**
Brian Schall
1880 Century Park East
Los Angeles, CA 90067
(424) 303-1964

66

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| PHILIP RYAN, JR. and | ) | |
| DONALD FRIEDMAN, on behalf | ) | |
| of themselves and all other | ) | |
| similarly situated stockholders of | ) | |
| MINDBODY, Inc., | ) | C.A. No.: |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| MINDBODY, INC., RICHARD L. | ) | |
| STOLLMEYER, KATHERINE | ) | |
| BLAIR CHRISTIE, COURT | ) | |
| CUNNINGHAM, GAIL | ) | |
| GOODMAN, CIPORA HERMAN, | ) | |
| ERIC LIAW, ADAM MILLER, | ) | |
| GRAHAM SMITH, VISTA | ) | |
| EQUITY PARTNERS | ) | |
| MANAGEMENT, LLC, | ) | |
| TORREYS PARENT, LLC, | ) | |
| TORREYS MERGER SUB, INC., | ) | |
| and INSTITUTIONAL VENTURE | ) | |
| PARTNERS XIII, L.P., | ) | |
| Defendants. | | |

**VERIFICATION TO CLASS ACTION**
**COMPLAINT AND AFFIDAVIT PURSUANT TO RULE 3(aa) and 23(aa)**

Attached hereto is the Verification to Class Action Complaint and Affidavit Pursuant to Rule 3(aa) and 23(aa) of Philip Ryan, Jr.

Dated: January 29, 2019

OF COUNSEL:


**KESSLER TOPAZ MELTZER & CHECK, LLP**
Lee D. Rudy
J. Daniel Albert
Stacey A. Greenspan
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**SCHALL LAW FIRM**
Brian Schall
1880 Century Park East
Los Angeles, CA 90067
(424) 303-1964

**PRICKETT, JONES & ELLIOTT, P.A.**

*/s/ Michael Hanrahan*
Michael Hanrahan (Del. No. 941)
Paul A. Fioravanti, Jr. (Del. No. 3808)
Kevin H. Davenport (Del. No. 5327)
Eric J. Juray (Del. No. 5765)
Jason W. Rigby (Del. No. 6458)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

*Attorneys for Plaintiffs*

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

PHILIP RYAN, JR., on behalf of
himself and all other similarly
situated stockholders of
MINDBODY, Inc.,

              Plaintiff,

    v.

MINDBODY, INC., RICHARD L.
STOLLMEYER, KATHERINE
BLAIR CHRISTIE, COURT
CUNNINGHAM, GAIL
GOODMAN, CIPORA HERMAN,
ERIC LIAW, ADAM MILLER,
GRAHAM SMITH, VISTA
EQUITY PARTNERS
MANAGEMENT, LLC, TORREYS
PARENT, LLC, TORREYS
MERGER SUB, INC., and
INSTITUTIONAL VENTURE
PARTNERS XIII, L.P.,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No.:

**VERIFICATION TO CLASS ACTION**
**COMPLAINT AND AFFIDAVIT PURSUANT TO RULE 3(aa) and 23(aa)**

STATE OF NEW JERSEY        )
                          )    :SS.
COUNTY OF MORRIS           )

I, PHILIP RYAN, JR., being duly sworn, make this my affidavit and state on this 28 day of January, 2019 that:

1. I am a beneficial owner of MINDBODY, Inc. Class A common stock at the time of the wrongs complained of in the foregoing Verified Class Action Complaint ("Complaint").

2. I am a plaintiff in this matter.

3. I have read the Complaint and have authorized its filing.

4. The facts alleged in the Complaint are true and correct to the best of my knowledge, information and belief.

5. In accordance with Delaware Chancery Court Rule 23(aa), I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except for:

(a) such damages or other relief as the Court may award to members of the class;

(b) such fees, costs or other payments as the Court expressly approves to be paid to or on behalf of me; or

-2-

(c) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

/s/ Philip E. Ryan, Jr.
PHILIP RYAN, JR.

SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this 28th day of January, 2019 by Philip Ryan, Jr.

/s/ Lori Ann Prisco
Notary Public
My Commission Expires: 2. 16. 2020



-3-

**EFiled: Jan 29 2019 09:27 AM EST**
**Transaction ID 62905846**
**Case No. 2019-0061-**



# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| PHILIP RYAN, JR. and DONALD FRIEDMAN, on behalf of themselves and all other similarly situated stockholders of MINDBODY, Inc., | ) ) ) ) ) ) | C.A. No.: |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) ) |  |
| MINDBODY, INC., RICHARD L. STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, GRAHAM SMITH, VISTA EQUITY PARTNERS MANAGEMENT, LLC, TORREYS PARENT, LLC, TORREYS MERGER SUB, INC., and INSTITUTIONAL VENTURE PARTNERS XIII, L.P., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. |  |  |

## VERIFICATION TO CLASS ACTION
## COMPLAINT AND AFFIDAVIT PURSUANT TO RULE 3(aa) and 23(aa)

Attached hereto is the Verification to Class Action Complaint and Affidavit Pursuant to Rule 3(aa) and 23(aa) of Donald Friedman.

Dated: January 29, 2019

OF COUNSEL:


**KESSLER TOPAZ MELTZER & CHECK, LLP**
Lee D. Rudy
J. Daniel Albert
Stacey A. Greenspan
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**SCHALL LAW FIRM**
Brian Schall
1880 Century Park East
Los Angeles, CA 90067
(424) 303-1964

**PRICKETT, JONES & ELLIOTT, P.A.**

*/s/ Michael Hanrahan*
Michael Hanrahan (Del. No. 941)
Paul A. Fioravanti, Jr. (Del. No. 3808)
Kevin H. Davenport (Del. No. 5327)
Eric J. Juray (Del. No. 5765)
Jason W. Rigby (Del. No. 6458)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

*Attorneys for Plaintiffs*

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| DONALD FRIEDMAN, on behalf of himself and all other similarly situated stockholders of MINDBODY, Inc., | ) ) ) ) ) | |
| Plaintiff, | ) | C.A. No.: |
| | ) ) | |
| v. | ) ) | |
| MINDBODY, INC., RICHARD L. STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, GRAHAM SMITH, VISTA EQUITY PARTNERS MANAGEMENT, LLC, TORREYS PARENT, LLC, TORREYS MERGER SUB, INC., and INSTITUTIONAL VENTURE PARTNERS XIII, L.P., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**VERIFICATION TO CLASS ACTION**
**COMPLAINT AND AFFIDAVIT PURSUANT TO RULE 3(aa) and 23(aa)**

STATE OF CONNECTICUT          )

                                     ) :SS. Old Greenwich

COUNTY OF FAIRFIELD          )

I, DONALD FRIEDMAN, do hereby depose and say on this day of 24th January, 2019 that:

1. I am a beneficial owner of MINDBODY, Inc. Class A common stock at the time of the wrongs complained of in the foregoing Verified Class Action Complaint ("Complaint").

2. I am a plaintiff in this matter.

3. I have read the Complaint and have authorized its filing.

4. The facts alleged in the Complaint are true and correct to the best of my knowledge, information and belief.

5. In accordance with Delaware Chancery Court Rule 23(aa), I have not received, been promised or offered, and will not accept any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action except for:

(a) such damages or other relief as the Court may award to members of the class;

(b) such fees, costs or other payments as the Court expressly approves to be paid to or on behalf of me; or

(c) reimbursement, paid by my attorneys, of actual and reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

                                          /s/ Donald R. Friedman
                                          DONALD FRIEDMAN

SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this 24 day of January, 2019.

                                          /s/ Michael J. MCIntosh
                                          Notary Public

                                          My Commission Expires: April 30, 2020

```
Michael J McIntosh
Notary Public-Connecticut
My Commission Expires
April 30, 2020
```

-2-

**EFiled: Jan 29 2019 09:27AM EST**
**Transaction ID 62905846**
**Case No. 2019-0061-**



SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(A)
OF THE RULES OF THE COURT OF CHANCERY

  The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1. Caption of Case:  *Philip Ryan, Jr. and Donald Friedman, Plaintiffs, v. MINDBODY, Inc., Richard L. Stollmeyer, Katherine Blair Christie, Court Cunningham, Gail Goodman, Cipora Herman, Eric Liaw, Adam Miller, Graham Smith, Vista Equity Partners Management, LLC, Torreys Parent, LLC, Torreys Merger Sub, Inc., and Institutional Venture Partners XIII, L.P., Defendants.*

2. Date Filed: January 29, 2019    Michael Hanrahan (DE Bar No. 941)
               Paul A. Fioravanti, Jr. (DE Bar No. 3808)

3. Name and address of counsel for plaintiff(s):  Kevin H. Davenport (DE Bar No. 5327)
                     Eric J. Juray (DE Bar No. 5765)
                     Jason W. Rigby (DE Bar No. 6458)
                     Prickett, Jones & Elliott, P.A.
                     1310 King Street

4. Short statement and nature of claim asserted:  Wilmington, Delaware 19801

Individual and class action alleging breach of fiduciary duty by MINDBODY, Inc.'s CEO and Board of Directors in connection with proposed sale, breaches of the MINDBODY, Inc. certificate of incorporation and aiding and abetting claims.

5. Substantive field of law involved (check one):

☐ Administrative law    ☐ Labor law    ☐ Trusts, Wills and Estates

☐ Commercial law     ☐ Real Property   ☐ Consent trust petitions

☐ Constitutional law    ☐ 348 Deed Restriction ☐ Partition

☒ Corporation law     ☐ Zoning     ☐ Rapid Arbitration (Rules 96,97)

☐ Trade secrets/trade mark/or other intellectual property    ☐ Other

6. Related cases, including any Register of Wills matters (this requires copies of all documents in this matter to be filed with the Register of Wills):

  None.

7. Basis of court's jurisdiction (including the citation of any statute(s) conferring jurisdiction):
10 *Del. C.* § 341; 8 *Del. C.* §§ 111, 225, 227

8. If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought.

9. If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here ___. (If #9 is checked, a Motion to Expedite <u>must</u> accompany the transaction.)

10. If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause. ☒

                     */s/ Michael Hanrahan* (Bar ID No. 941)
                     Signature of Attorney of Record & Bar ID

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| PHILIP RYAN, JR. and DONALD FRIEDMAN, on behalf of themselves and all other similarly situated stockholders of MINDBODY, Inc., | ) ) ) ) ) ) | C.A. No.: |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) |  |
| MINDBODY, INC., RICHARD L. STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, GRAHAM SMITH, VISTA EQUITY PARTNERS MANAGEMENT, LLC, TORREYS PARENT, LLC, TORREYS MERGER SUB, INC., and INSTITUTIONAL VENTURE PARTNERS XIII, L.P., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

**STATEMENT OF GOOD CAUSE**

I, Michael Hanrahan, am a director of the firm Prickett, Jones & Elliott, P.A. and a member in good standing of the Bar of the State of Delaware. With my firm, I am counsel to Plaintiffs Philip Ryan, Jr. and Donald Friedman in this this action. We respectfully submit that this action should not be assigned to a Master in the first instance, as this action concerns breaches of fiduciary duty and breaches of a certificate of incorporation by a board of directors in connection with the proposed sale of a Delaware corporation.

Dated: January 29, 2019

**PRICKETT, JONES & ELLIOTT, P.A.**

*/s/ Michael Hanrahan*

Michael Hanrahan (Del. No. 941)
Paul A. Fioravanti, Jr. (Del. No. 3808)
OF COUNSEL:                                  Kevin H. Davenport (Del. No. 5327)
                                             Eric J. Juray (Del. No. 5765)
                                             Jason W. Rigby (Del. No. 6458)
**KESSLER TOPAZ MELTZER & CHECK, LLP**       1310 N. King Street
Lee D. Rudy                                  Wilmington, Delaware 19801
J. Daniel Albert                             (302) 888-6500
Stacey A. Greenspan
280 King of Prussia Road
Radnor, Pennsylvania 19087                   *Attorneys for Plaintiffs*
(610) 667-7706

**SCHALL LAW FIRM**
Brian Schall
1880 Century Park East
Los Angeles, CA 90067
(424) 303-1964

EFiled: Jan 29 2019 09:27AM EST
Transaction ID 62905846
Case No. 2019-0061-



Writer's Direct Dial:
(302) 888-6335

Writer's Fax
(302) 477-7061

**PRICKETT, JONES & ELLIOTT**
A PROFESSIONAL ASSOCIATION
**1310 N. KING STREET
WILMINGTON, DELAWARE 19899
TEL: (302) 888-6500
FAX: (302) 658-8111
http://www.prickett.com**

Writer's E-Mail Address
EJJuray@prickett.com

January 29, 2019

**Via E-filing**

Register in Chancery
Leonard L. Williams Justice Center
500 North King Street, Suite 11400
Wilmington, Delaware 19801

  **Re: *Philip Ryan, Jr. and Donald Friedman v. MINDBODY, Inc. et al.***

Dear Sir/Madam:

  Enclosed please find a Verified Class Action Complaint ("Complaint") and related suit papers for filing in the above-referenced action. Please have the Register's office in the county where this case is assigned issue a summons to the defendants as follows:

  1. Service on defendant MINDBODY, Inc. will be made by serving its Delaware registered agent: The Corporation Trust Company, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

  2. Service on defendants Richard L. Stollmeyer, Katherine Blair Christie, Court Cunningham, Gail Goodman, Cipora Herman, Eric Liaw, Adam Miller and Graham Smith, who were directors of MINDBODY, Inc. at the time of the wrongs complained of in the Complaint, will be pursuant to 10 *Del. C.* § 3114. The Registered Agent for MINDBODY, Inc. is The Corporation Trust Company, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Register in Chancery
January 29, 2019
Page 2

3. Service on defendant Vista Equity Partners Management, LLC will be made by serving its Delaware registered agent: The Corporation Trust Company, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

4. Service on defendant Torreys Parent, LLC will be made by serving its Delaware registered agent: The Corporation Trust Company, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

5. Service on defendant Torreys Merger Sub, Inc. will be made by serving its Delaware registered agent: The Corporation Trust Company, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

6. Service on defendant Institutional Venture Partners XIII, L.P. will be made by serving its Delaware registered agent: The Corporation Trust Company, Inc., Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Pursuant to Court of Chancery Rule 4(c), Kevin Dunn, President of Brandywine Process Servers, Ltd., or any adult employee of Brandywine Process Servers, Ltd., will serve as special process server and will serve the Summons, Complaint and other suit papers requiring service upon the defendants named in the Complaint.

Register in Chancery
January 29, 2019
Page 3

 Please contact my assistant, Caitlin E. Whetham (cewhetham@prickett.com or 302-888-6323) when the summonses are ready for service. Thank you for your assistance.

Very truly yours,

*/s/ Eric J. Juray*

(DE Bar No. 5765)

Words: 335

EFiled: Jan 29 2019 09:27AM EST
Transaction ID 62905846
Case No. 2019-0061-



**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| PHILIP RYAN, JR., and DONALD FRIEDMAN, on behalf of themselves and all other similarly situated stockholders of MINDBODY, Inc., <br><br> Plaintiffs, <br><br> v. <br><br> MINDBODY, INC., RICHARD L. STOLLMEYER, KATHERINE BLAIR CHRISTIE, COURT CUNNINGHAM, GAIL GOODMAN, CIPORA HERMAN, ERIC LIAW, ADAM MILLER, GRAHAM SMITH, VISTA EQUITY PARTNERS MANAGEMENT, LLC, TORREYS PARENT, LLC, TORREYS MERGER SUB, INC., and INSTITUTIONAL VENTURE PARTNERS XIII, L.P., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  C.A. No.: |

**STATEMENT UNDER COURT OF CHANCERY RULE 4(d)(c)**
**REGARDING SERVICE UNDER 10 _DEL. C._ § 3114**

Pursuant to Court of Chancery Rule 4(d)(c) and 10 _Del. C._ § 3114, Plaintiffs, by and through their attorneys, Prickett, Jones & Elliott, P.A., state as follows:

1. Richard L. Stollmeyer, Katherine Blair Christie, Court Cunningham, Gail Goodman, Cipora Herman, Eric Liaw, Adam Miller and Graham Smith, served as executive officers and/or as members of the Board of Directors of MINDBODY, Inc., a Delaware corporation, at the time of the wrongs complained of in the Verified Class Action Complaint in this action. The principal place of business for MINDBODY, Inc. outside the State of Delaware is:

> MINDBODY, Inc.
> 4051 Broad Street
> Suite 220
> San Luis Obispo, California 93401

2. The Registered Agent for MINDBODY, Inc. is: The Corporation Trust Company, 1209 N. Orange Street, Wilmington, Delaware 19801.

3. The addresses outside the State of Delaware for defendants as listed on MINDBODY, Inc.'s 2018 Annual Franchise Tax report filed with the Delaware Secretary of State are as follows:

> Richard L. Stollmeyer
> c/o MINDBODY, Inc.
> 4051 Broad Street
> Suite 220
> San Luis Obispo, California 93401
>
> Katherine Blair Christie
> c/o MINDBODY, Inc.
> 4051 Broad Street
> Suite 220
> San Luis Obispo, California 93401

2

Court Cunningham
c/o MINDBODY, Inc.
4051 Broad Street
Suite 220
San Luis Obispo, California 93401

Gail Goodman
c/o MINDBODY, Inc.
4051 Broad Street
Suite 220
San Luis Obispo, California 93401

Cipora Herman
c/o MINDBODY, Inc.
4051 Broad Street
Suite 220
San Luis Obispo, California 93401

Eric Liaw
c/o MINDBODY, Inc.
4051 Broad Street
Suite 220
San Luis Obispo, California 93401

Adam Miller
c/o MINDBODY, Inc.
4051 Broad Street
Suite 220
San Luis Obispo, California 93401

Graham Smith
c/o MINDBODY, Inc.
4051 Broad Street
Suite 220
San Luis Obispo, California 93401

3

Dated: January 29, 2019

OF COUNSEL:

KESSLER TOPAZ MELTZER & CHECK, LLP
Lee D. Rudy
J. Daniel Albert
Stacey A. Greenspan
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**SCHALL LAW FIRM**
Brian Schall
1880 Century Park East
Los Angeles, CA 90067
(424) 303-1964

PRICKETT, JONES & ELLIOTT, P.A.

*/s/ Michael Hanrahan*
Michael Hanrahan (Del. No. 941)
Paul A. Fioravanti, Jr. (Del. No. 3808)
Kevin H. Davenport (Del. No. 5327)
Eric J. Juray (Del. No. 5765)
Jason W. Rigby (Del. No. 6458)
1310 N. King Street
Wilmington, Delaware 19801
(302) 888-6500

*Attorneys for Plaintiffs*

Words: 279

4