**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Case No. 1:19-cv-08331-VEC<br><br>ORAL ARGUMENT REQUESTED |

**CO-LEAD PLAINTIFFS' OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii

I.    INTRODUCTION ................................................................................................... 1

II.    FACTS ................................................................................................................... 3

        A.    The Secret Negotiations .................................................................................. 3

        B.    The Fraudulent Statements Begin with Mindbody's 3Q18 Results ...................... 5

        C.    Defendants Rigged the Deal Process in Favor of Vista ...................................... 7

III.    LEGAL STANDARDS GENERALLY APPLICABLE TO THE MOTION .................... 8

IV.    LEAD PLAINTIFFS STRONGLY PLEAD FRAUD CLAIMS ....................................... 8

        A.    Scienter is Alleged Due to Defendants' Motive and Opportunity. ...................... 10

                1.    Defendant Stollmeyer's Motives .............................................................. 10

                        (a)    Non-Pecuniary Motives ................................................................. 10

                        (b)    Pecuniary Motives ........................................................................ 13

                2.    Defendant White's Motives ...................................................................... 17

                3.    Defendant Liaw's Motives ....................................................................... 18

                 4.    Additional Allegations of Motive and Conscious Disregard .................... 19

        B.    Allegations Related to the Fraudulent Guidance Cut .......................................... 22

                1.    Conscious Misbehavior and Knowledge .................................................. 22

                          (a)    Allegations the Motion Ignores ..................................................... 23

                          (b)    Other Allegations Strongly Supporting Scienter ............................ 26

                2.    False and Misleading Statements and Omissions ..................................... 28

                          (a)    Statements Cutting the Guidance .................................................. 28

                          (b)    Statements Justifying the Guidance Cut ....................................... 32

                          (c)    Statements Touting the Merger and "Premium" ........................... 34

C.  Allegations Related to the Deal Process ............................................................ 35

   1.  The Undisclosed True Origin's of the Merger ........................................ 36

   2.  The Sham "Customary Go-Shop" Process ............................................. 37

   3.  Vista's Disparate Access to Diligence .................................................. 38

   4.  Undisclosed Discussions About Post-Merger Employment .................... 39

   5.  Qatalyst's Undisclosed Relationships With Vista ................................. 39

D.  The "Highest Price" Assurance ............................................................ 40

E.  Omission of 4Q18 Results and Other Omissions .................................................. 43

   1.  Duty to Update ...................................................................... 43

   2.  Delaware Law Disclosure Duty ................................................ 44

   3.  Materiality ............................................................................ 45

   4.  Additional Omissions and Defendant Liaw's Liability ............................ 48

F.  Actionable Conduct ............................................................ 48

V.  LEAD PLAINTIFFS STRONGLY PLEAD ACTIONABLE § 14(a) CLAIMS ............. 49

VI.  PLAINTIFFS HAVE ADEQUATELY ALLEGED § 20(a) CLAIMS ........................... 50

VII.  CONCLUSION ............................................................................. 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ........................................................................30

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) .....................................................................34

*In re AOL Inc.*,
  CA No. 11204-VCG, 2018 WL 1037450 (Del. Ch. 2018) ................................10, 35

*In re AOL Time Warner, Inc. Securities & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) .....................................................................31

*In re APAC Teleservice, Inc. Sec. Litig.*,
  No. 97-cv-9145 (BSJ), 1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999) ...................29

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................. 8

*In re Avon Sec. Litig.*,
  No. 19-cv-01420 (CM), 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ......24, 26, 34

*In re Bank of Am. Corp. Sec., Derive, & Emp. Ret. Income Sec. Act (ERISA)*
  *Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) .....................................................................44

*Baum v. Harman Int'l Indus., Inc.*,
  408 F. Supp. 3d 70 (D. Conn. 2019) ..................................................................40, 49

*In re Bear Stearns Co., Inc. Sec., Deriv., & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011) .....................................................................30

*Beck v. Dobrowski*,
  559 F.3d 680 (7th Cir. 2009) ..................................................................................49

*Bertuglia v. City of N.Y.*,
  839 F. Supp. 2d 703 (S.D.N.Y. 2012) ...................................................................9, 45

*Blum v. Semiconductor Packaging Materials Co., Inc.*,
  No. 97-7078, 1998 WL 254035 (E.D. Pa. May 5, 1998) .........................................44

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) .....................................................................35

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
    866 F. Supp. 2d 223 (S.D.N.Y. 2012)....................................................................................50

*Brown v. Brewer*,
    No. 06cv-3731 (GHK) (SHX), 2010 WL 2472182 (C.D. Cal. June 17, 2010) ......................50

*Burkle v. OTK Assocs.*, *LLC*,
    2 F. Supp. 3d 519 (S.D.N.Y. 2014) .......................................................................9, 35, 45, 46

*Buxbaum v. Deutsche Bank A.G.*,
    No. 98-cv-8460 (JGK), 2000 WL 33912712 (S.D.N.Y. Mar. 7, 2000)...................................35

*Caiola v. Citibank, N.A., N.Y.*,
    295 F.3d 312 (2d Cir. 2002)...................................................................................................36

*Chen v. Select Income REIT*,
    No. 18-cv-10418 (GBD) (KNF), 2019 WL 6139014 (S.D.N.Y. 2019)...................................37

*Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*,
    364 F. Supp. 3d 253 (S.D.N.Y. 2019).....................................................................................14

*Christine Asia Co. v. Ma*,
    718 F. App'x 20 (2d Cir. 2017) ..............................................................................................20

*City of Providence v. Aeropostale, Inc.*,
    No. 11-cv-7132 (CM) (THK), 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .................28, 29

*Dekalb Cty. Pension Fund v. Transocean Ltd.*,
    36 F. Supp. 3d 279 (S.D.N.Y. 2014), *aff'd*, 817 F.3d 393 (2d Cir. 2016) ..............................49

*In re Dole Food Co., Inc. S'holder Litig.*,
    CA No. 8703-VCL, 2015 WL 5052214 (Del. Ch. Aug. 27, 2015) ...........................................1

*In re Dollar Thrifty S'holder Litig.*,
    14 A.3d 573 (Del. Ch. 2010)......................................................................................................1

*In re Duane Reade Inc. Sec. Litig.*,
    No. 02-cv-6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003)................................30

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..............................................................................................46, 47

*In re El Paso Corp. S'holder Litig.*,
    41 A.3d 432 (Del.Ch. 2012)........................................................................................................1

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)........................................................................................41

iv

*In re EZCorp, Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016)..................................................................................37

*Fortson v. Winstead, McGuire, Sechrest & Minick*,
  961 F.2d 469 (4th Cir.1992) ...............................................................................................44

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017)..................................................................................49

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)..................................................................................29

*Giunta v. Dingman*,
  893 F.3d 73 (2d Cir. 2018).................................................................................................8, 11

*Gross v. GFI Grp., Inc.*,
  310 F. Supp. 3d 384 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019)........................31

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  725 F. Supp. 712 (S.D.N.Y. 1989) ......................................................................................44

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)..................................................................................48

*I.M. v. United States*,
  362 F. Supp. 3d 161 (S.D.N.Y. 2019)..................................................................................15

*IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*,
  No. 11-cv-22, 2012 WL 928402 (D. Vt. Mar. 19, 2012).......................................................40

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
  Scotland Grp., PLC*,
  783 F.3d 383 (2d Cir. 2015)............................................................................................37, 38

*In re IBM Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998)...........................................................................................29, 43

*Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*,
  620 F.3d 137 (2d Cir. 2010)..................................................................................................34

*In re ITT Educ. Servs., Sec. Litig.*,
  34 F. Supp. 3d 298 (S.D.N.Y. 2014)....................................................................................32

*J.I. Case Co. v. Borak*,
  377 U.S. 426 (1964)..............................................................................................................49

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)....................................................................................................... *passim*

*Kalnit v. Eichler*,
    264 F.3d 131, 140 (2d Cir. 2001)................................................................................12

*In re Lehman Bros. Sec. & ERISA Litig.*,
    799 F. Supp. 2d 258 (S.D.N.Y. 2011)........................................................................45

*Levitt v. J.P. Morgan Sec., Inc.*,
    710 F.3d 454 (2d Cir. 2013)......................................................................................44

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)......................................................................................50

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019)...........................................................................................8, 48

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)......................................................................................................8

*McMahan & Co. v. Wherehouse Ent'mt, Inc.*,
    900 F.2d 576 (2d Cir. 1990).................................................................33, 34, 35, 39

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..........................................................................29, 38, 39

*Milman v. Box Hill Sys. Corp.*,
    72 F. Supp. 2d 220 (S.D.N.Y. 1999)..........................................................................32

*Milstein v. Werner*,
    57 F.R.D. 515 (S.D.N.Y. 1972) ................................................................................15

*In re N. Telecom Ltd. Sec. Litig.*,
    116 F. Supp. 2d 446 (S.D.N.Y. 2000)........................................................................44

*In re Nasdaq Market-Makers Antitrust Litig.*,
    894 F. Supp. 703 (S.D.N.Y. 1995) ...........................................................................15

*Nguyen v. New Link Genetics Corp.*,
    297 F. Supp. 3d 472 (S.D.N.Y. 2018)........................................................................16

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
    840 F. Supp. 243 (S.D.N.Y. 1993) ...........................................................................29

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)........................................................................34

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................................. *passim*

vi

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)........................................................................31, 41, 42

*Patel v. L-3 Commc'n Holdings Inc.*,
  No. 14-cv-6038 (VEC), 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)...................................24

*Phillips v. LCI Int'l, Inc.*,
  190 F.3d 609 (4th Cir. 1999) ................................................................12

*In re PLX Tech. Inc. S'holders Litig.*,
  CA No. 9880-VCL, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018), *aff'd*,
  211 A.3d 137 (Del. 2019) ....................................................................44

*Plymouth Cnty., Ret. Ass'n v. Schroeder*,
  576 F. Supp. 2d 360 (E.D.N.Y. 2008) ....................................................35

*In re Regeneron Pharm., Inc. Sec. Litig.*,
  No. 03-cv-3111 (RWS), 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) .....................................33

*Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)......................................................9

*Revlon v. MacAndrews & Forbes Holdings, Inc.*,
  506 A.2d 173 (Del. 1986) .......................................................................4

*In re RJR Nabisco, Inc. S'holders Litig.*,
  CA No. 10389, 1989 WL 7036 (Del. Ch. Jan. 31, 1989) ....................................12, 14

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)...............................................................12,

*S.E.C. v. Life Partners Holdings, Inc.*,
  41 F. Supp. 3d 550 (W.D. Tex. 2013).................................................17, 18, 22

*S.E.C. v. Pentagon Cap. Mgmt. PLC*,
  725 F.3d 279 (2d Cir. 2013)...............................................................48

*S.E.C. v. Tambone*,
  597 F.3d 436 (1st Cir. 2010)..............................................................45

*In re Salix Pharm., Ltd.*,
  No. 14-cv-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..............................19

*Salman v. United States*,
  137 S. Ct. 420 (2016)........................................................................12

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)...............................................25, 26, 27, 28

*SEC v. Capital Gains Research Bureau, Inc.*,
  375 U.S. 180 (1963)..................................................................................................22

*SEC v. North Am. Research & Dev. Corp.*,
  424 F.2d 63 (2d Cir. 1970)........................................................................................12

*SEC v. Rio Tinto PLC*,
  No. 17-cv-7994 (AT), 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019)......................35

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010).......................................................................24

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019).......................................................................50

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010)................................................................................31, 32

*Sodhi v. Gentium, S.p.A.*,
  No. 14-cv-287 (JPO), 2015 WL 273724 (S.D.N.Y. Jan. 22, 2015).........................40

*Sodhi v. Gentium, S.p.A.*,
  No. 17-cv-287(JPO) (S.D.N.Y. filed Sept. 2, 2014), ECF No. 19 (*available at*
  2014 WL 4828213) ...................................................................................................40

*In re Symbol Techs., Inc. Sec. Litig.*,
  No. 05-cv-3923 (DRH) (AKT), 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013).........28

*In re Synthes, Inc. S'holder Litig.*,
  50 A.3d 1022 (Del. Ch. 2012).......................................................................14, 18, 19

*Szulik v. Tagliaferri*,
  966 F. Supp. 2d 339 (S.D.N.Y. 2013).......................................................................22

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).......................................................................16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*,
  531 F.3d 190, 195 (2d Cir. 2008)................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................... *passim*

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993)..........................................................................................43

*In re Toys "R" Us, Inc. S'holder Litig.,*
  877 A.2d 975, 1005 (Del. Ch. 2005).........................................................................17

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
676 F. Supp. 458 (S.D.N.Y. 1987) ...............................................................................29

*United States v. Bongiorno*,
05-cr-3390 (SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006)..............................................22

*United States. v. Caraway*,
473 F. App'x 88 (2d Cir. 2012) .....................................................................................9

*United States v. Cean*,
771 F. App'x 81 (2d Cir. 2019) ....................................................................................15

*United States v. Kelley*,
551 F.3d 171 (2d Cir. 2009)..........................................................................................22

*United States v. Ojai Valley Cmty. Hosp. Inc.*,
No. 17-cv-6972 (JGB), 2018 WL 6177257 (C.D. Cal. 2018) ..................................14

*United States v. Shields*,
2014 WL 4744617 (N.D. Cal. Sept. 23, 2014) .......................................................22

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009)...........................................................................20

*Varljen v. H.J. Meyers, Inc.*,
No. 97-cv-6742 (DLC), 1998 WL 395266 (S.D.N.Y. July 14, 1998) ....................................16

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).........................................................................................9

*In re Wellcare Mgmt. Grp., Inc. Sec. Litig.*,
964 F. Supp. 632 (N.D.N.Y. 1997)................................................................................16

*Wilson v. Great Am. Indus., Inc.*,
855 F.2d 987, 994 (2d Cir. 1988)...............................................................................40, 44

*Wilson v. LSB Indus., Inc.*,
No. 15-cv-7614 (RA), 2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017)....................................29

**Statutes**

15 U.S.C. § 78u-4(b)(2) ................................................................................................50

15 U.S.C. § 78t(a) ........................................................................................................50

15 U.S.C. § 78u–4(b) ...................................................................................................9

15 U.S.C. § 78u-5(b)(1)(E) ..........................................................................................32

**Other Authorities**

Atkins, Paul, Remarks to the 'SEC Speaks in 2008' Program of the Practicing
Law Institute (Feb. 8, 2008)..................................................................................................46

Jacobs, Arnold, *Disclosure and Remedies Under the Securities Laws* § 3:31
(2009) ...................................................................................................................................31

17 C.F.R. § 240.10b–5 ................................................................................................................48

Fed. R. Evidence 201 ...................................................................................................................14

Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd. file this opposition to Defendants Richard L. Stollmeyer, Brett White, Eric Liaw (the "Individual Defendants"), and MINDBODY, Inc.'s ("Mindbody") motion to dismiss.  ECF No. 35.[1]

## I.      INTRODUCTION

This case arises out of a deal to take Mindbody private.  The AC alleges that Defendants ruthlessly manipulated Mindbody's stock price as part of a scheme to defraud investors into selling their shares on the cheap.  Defendants issued intentionally misleading guidance to depress Mindbody's stock price, negotiated a corrupt deal using conflicted bankers, and hid key facts from investors when pitching the deal.  The AC seeks to recover on behalf of a Class of investors and does more than enough to plead particularized facts to overcome Defendants' Motion.

Circularly, Defendants tout the supposed deal "premium" as evidence that the deal was good (MtD 1), despite the AC's core allegation that this "premium" reflected Defendants' intentional depression of Mindbody's stock price.  Defendants also point to the fact that investors voted to approve the Merger (MtD 10), but this ignores that the AC alleged that Defendants intentionally hid key information from shareholders about the deal to induce them to sell.

Defendants' leading thematic attack on the AC is a vague attempt to discredit the allegations by referring to the claims as "extraordinary" and "inventive," while ignoring the legions of cases and even statutes (*e.g.*, § 14(a)/(e) of the Exchange Act) that have recognized the risks of shareholders being ripped off through mergers – as occurred here.[2]

---

[1] Unless otherwise noted, terms are defined as in the Amended Complaint ("AC").  ECF No. 22.  The AC is cited as "¶__."  Defendants' motion to dismiss brief ("Motion") is cited as "MtD __."  ECF No. 36.  Exhibits to John Del Monaco's declaration are cited as "MtD Ex. __."  ECF No. 37.

[2] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *26, n. 13 (Del. Ch. Aug. 27, 2015) (describing research that conflicted buyouts correlate with lowered guidance and other acts to reduce "apparent performance" before deal announcement); *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 597 (Del. Ch. 2010) (deals require scrutiny because managers "harbor personal motivations," *e.g.*, preferring certain deals); *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del.Ch. 2012) (sales have "enormous implications" for managers and "human

Defendants also antagonistically say the AC depends on "[c]obbling together a narrative" built on "suspicion." MtD 1–2. In truth, it presents well-pleaded facts, many from Defendants' own emails and texts, to plausibly allege Defendants' fraud—and yes—the facts are suspicious. Defendants' criticism of "kitchen sink" pleading (MtD 2) ignores that the Court must consider the AC "in its entirety," and review facts "collectively" not "individual allegations . . . in isolation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

Knowing they cannot run from the facts, Defendants spend much of their Motion advocating for a license to defraud—effectively arguing: "So what if we did?" Defendants argue their statements about guidance cannot be actionable because they are "forward-looking." MtD 13–15. Of course, the safe harbors they rely on do not protect intentionally misleading statements or omissions of presently known facts. Similarly, Defendants argue against materiality—effectively saying, "if we did it, it wasn't a big deal." But at best, they raise factual disputes and, in some instances, they have all but admitted that their statements were material.

This corrupt deal fleeced the public and enriched those involved. Vista saved about $624 million buying Mindbody at $36.50, instead of the roughly $49.50 where it had first indicated interest. ¶¶96, 170. For every $1 in deal price Defendant and CEO Stollmeyer gave up, Vista saved $26. ¶370. Even if Vista gave Stollmeyer a small cut of what it saved as a tip for his help, this would hugely enrich him. He knew this—and he started the deal process in secrecy, looking out for his own interests; met with CEOs of Vista companies, no doubt to confirm Vista wouldn't stiff him; hired a deeply conflicted investment bank; falsely cut guidance and gave false reasons for doing so; issued false proxies; scuttled the go-shop; and hid that results were a "massive beat" to guidance. All the while he expected—in his own words—"compelling

---

motivations, including but [not] limited to greed, can inspire [them] to be less than faithful").

incentives" from Vista, which included: selling his existing shares; getting post-Merger equity equal to or greater than his pre-deal holdings; getting compensation tied to *Vista*'s return on investment; and escaping the public markets he disliked with a partner he was in "love" with.

The other participants also made off well.  Defendant White received similar benefits to Stollmeyer, and Defendant Liaw was able to liquidate his funds' investments in Mindbody around its target exit date, which he knew would otherwise be difficult to do, while fishing for a side agreement with "bells and whistles."  Finally, the conflicted investment bank received an astounding $31 million for closing the deal, compared to $2 million for its fairness opinion.

## II.    FACTS

Mindbody provides software that assists wellness businesses in their operations.  ¶48.  It earns revenue both through subscriptions and fees for payment processing.  ¶51.  In 1Q18, Mindbody acquired FitMetrix for $15.5 million and Booker for $150 million, which expanded the services Mindbody offered and the businesses it served.  ¶¶55, 58.  At the close of 1Q18, Mindbody's founder and CEO, Defendant Stollmeyer, said the integration of these businesses (the "Integration") had "set the stage" for "much greater growth."  ¶63.

At the close of 2Q18, Defendants said the Integration would be complete by 2019, that the work had been "front-loaded," and they had "confidence" for the second half of 2018 because "a lot of heavy lifting" was done.  ¶¶66–73.  On Investor Day, September 18, 2018, they said the Integration was "going well," Stollmeyer presented a slide stating "***The Integration is Working***," and the Chief Strategy Officer ("CSO") said the Booker integration was "going well," and boasted the "acquisitions position us . . . better than anyone else."  ¶¶74–84.  This was true.

### A.    The Secret Negotiations

Stollmeyer had long been interested in a deal with Vista, a private equity ("PE") fund. Prior to Mindbody's 2015 IPO, Vista offered to buy it, so that it "didn't have to go public."  ¶86.

3

Another round of discussions started and fizzled in 2017. *Id.* Without telling the Board and prompted by Jeff Chang, an investment banker from Qatalyst, Stollmeyer renewed negotiations with Vista on August 7, 2018. ¶88. Qatalyst and Chang had deep ties to Vista. ¶87. Qatalyst was founded by a Vista alumnus and had worked on many Vista deals. *Id.* In August 2018, Chang was ***working for Vista*** on another deal, which earned Qatalyst a $7 million fee. *Id.*

On August 7, 2018, Stollmeyer told Chang he was interested in selling Mindbody to a PE fund, if it would employ him. ¶88. Thus, from the start, he was serving his own interests.[3] On August 23, 2018, Stollmeyer met with Vista Principal, Monti Saroya, and Vista VP, Nicolas Stahl, to discuss Mindbody's business and Stollmeyer's "goals." ¶89. On September 19, 2018, Stollmeyer was invited to attend Vista's CXO Summit in October where he met Saroya and Vista's CEO. ¶199. Afterwards, he texted that the presentation was "***mind blowing***." ¶90.

By October 16, 2018, negotiations continued, without the Board, as Saroya told Stollmeyer that Vista was willing to buy Mindbody at "***a substantial premium to [its] recent trading range***." ¶95. Given the recent price of $41.25 and typical premiums of at least 20%, this meant a price above ***$49.50***. ¶96. The next day, Stollmeyer told Defendant White (Mindbody's CFO) about his negotiations and stated that he wanted to use Qatalyst for the deal. ¶97. He also said he would "***lean into an acquirer***" who saw his "capabilities" and "potential," and would "***not support the sale at this time in any other circumstance***" – again, disregarding his duties. Stollmeyer also told White not to even "hint" at the sale to any Board member, until he gave permission. ¶98. White replied his "***lips are sealed***." *Id.*

Stollmeyer had a clear antipathy to investors and thought the deal would free him (in his own words) from the "***shackles of public market investors***." ¶91. Stollmeyer and Defendant

---

[3] Especially in a transaction to sell the company, fiduciaries, like Stollmeyer, have a duty to maximize shareholder value over personal goals. *Revlon v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del. 1986).

Liaw discussed a strategy of "***throw[ing] the public investors under the bus***" in pitching the deal to suitors and complained of how "frustrating" public markets were. ¶102. A sale to Vista also offered Stollmeyer enormous financial benefits. It gave him a unique opportunity to liquidate his stock for about ***$58 million***. ¶¶11, 262–77. He would keep his job and also receive future compensation based on Vista's return on equity—meaning a lower deal price paid to investors would result in higher post-closing pay for him. *Id.* ***At the same time***, he stood to receive equity equal to or greater than his pre-deal position. *Id.* His motives were partially documented in a text he sent to his personal wealth advisors on the day the deal was announced, stating (¶155):

> ***Vista's in love with me (and me with them).*** No retirement in my headlights. However, I will likely sell most or all of my stock. It ***will be incumbent upon them to provide compelling incentives.*** Let's meet . . . to talk about how to allocate the inbound cash.

White shared many of the same incentives, including the financial benefits and a continued position at Mindbody. ¶¶282–87. Liaw served on the Board, by nomination of Institutional Venture Partners ("IVP"), and its investment strategy called for it to exit its position within a proscribed time period and a merger gave it an opportunity to liquidate. ¶¶290–96.

Defendants finally brought the deal to the Board on October 26, 2018, (more than three months after Stollmeyer began negotiating) and a few members formed a transaction committee (the "Committee"). Per Stollmeyer's suggestion, Qatalyst's Chang was hired to run the deal, an egregious decision, given Qatalyst's conflicts and Chang's contemporaneous work *for* Vista.

## B.    The Fraudulent Statements Begin with Mindbody's 3Q18 Results

The fraud began on November 6, 2018, when Mindbody released its 3Q18 results before the public had been notified about a possible deal with Vista. In the results, Defendants issued intentionally misleading guidance (the "Cut"), and false justifications (the "Justifications") for it. This was done to artificially depress Mindbody's stock price and set the stage for a lowball offer

5

by Vista.  ¶¶104–09.  Contrary to their prior assurances, they falsely stated the Integration was faltering and that it caused major operating challenges the last two quarters.  ¶107.  They specifically attributed the Cut to issues related to "revenue;" not expenses.  ¶109.  Given Booker was 10x bigger than FitMetrix, this conveyed that the Cut was caused by Booker sales.  *See* ¶19.

Mindbody's stock price dropped *about 20%* ($6.45) to close at $26.18 on November 7, 2018.  ¶110.  This was what Stollmeyer expected; he texted Chang, "*[w]e're not surprised by the after-market reaction.  I'm fine.*"  ¶118.  Many facts show the Cut was fraudulent:

*(a)* The day after the Cut, Stollmeyer admitted that the guidance was lower than his real estimates, internally telling Mindbody's Chief Technology Officer that "*We are resetting street expectations to position ourselves up for future beat and raises.*"  ¶119.  Thus, Stollmeyer was confessing that the Cut intentionally set expectations too low, though his explanation as to why he was doing this was also a lie.  Later, during a deposition, Stollmeyer testified that "*[i]t's much better to guide a bit below what you're expecting and then beat those expectations.*"  ¶131.  This did not merely suggest caution, it admits he guided too low to engineer market responses.

*(b)* Three days before the Cut, a financial planning and analysis ("FP&A") manager texted Mindbody's senior finance manager that: "*we are on track to hit our forecast*" and explained "*I do not know of anything in the flash [revenue report] that would materially change our assumptions for the preceding months*" meaning that Mindbody was, at that time, poised to continue the growth it had been experiencing, in line with its prior guidance.  ¶120.

*(c)* A former Mindbody Sales Manager said Booker's sales quotas increased each quarter from 3Q18 to 2Q19 *and were met each time*.  ¶123.  Yet, the Cut was blamed on Booker sales.

*(d)* On January 8, 2019, White emailed Vista that preliminary 4Q18 revenue was $68.3 million, "about $0.3m above *forecast*," meaning that internal revenue forecasts were $68 million.

¶121.  This was in the middle of the original guidance range of $66.8 to $70.8 million, and *well above the downward guidance*, which set the top of the range at $67 million.  *Id.*

(e) Just a week before the Cut, Stollmeyer sent talking points in support of the deal to Liaw stating that the *Integration was "proceeding well."*  ¶101.  This and the other assurances of the Integration's success are at odds with the Justification and the supposed ongoing issues.

(f)  On October 19, 2018, Mindbody's CSO said Stollmeyer's draft 3Q18 presentation was "shortchanging" the payments platform.  ¶116.  Similarly, White emailed that Stollmeyer "doesn't want to talk [about] payments," and wanted to "*thro[w] Booker under the bus*."  ¶115.

### C.        Defendants Rigged the Deal Process in Favor of Vista

The deal process was rigged to reduce the chances of anyone topping Vista's offer to purchase Mindbody.  Qatalyst excluded logical buyers, purportedly based on whether Stollmeyer "want[ed] to work for" them.  ¶¶139, 145.  A former employee explained that Vista conducted a business review of Mindbody by early 3Q18 and was given an "all access pass."  ¶99.  In November, Mindbody responded to Vista's diligence requests by providing over a thousand documents.  ¶¶24, 141.  Other suitors were not allowed to see documents until December 15, 2018, and even then were only given limited access.  ¶142.  While Qatalyst had estimated that suitors would need 4–5 weeks of diligence, they were given *just three days* to review a small set of documents before Vista made its December 18, 2018, offer.  ¶140.  As Defendants expected, the offer confirmed that Vista would retain and provide equity to management.  ¶144.

The next day, Qatalyst rushed the other bidders, telling them there was a "need for prompt indications of interest," despite just beginning diligence.  ¶146.  Five of the seven bidders dropped out of the process.  *Id.*  On December 23, 2018, and before the two remaining suitors finished diligence, Qatalyst delivered its opinion that Vista's offer was fair and the Board approved the Merger with Vista at $36.50 per share.  ¶147-48.  Defendants published an

7

announcement, touting the deal price as a "premium" to the prior day's stock price and 30-day average, and omitting that Mindbody's stock price was artificially depressed by the Cut.  ¶149.

Defendants told investors that the deal was subject to a "customary" go-shop, where the offer could be topped.  ¶159.  The go-shop had restrictive terms and a short 30-day term running over Christmas.  *Id.*  Rather than shopping, Defendants took lengthy vacations where cell service was "spotty" and declined meetings until Stollmeyer returned on January 14, 2019.  ¶¶164–66.

By January 5, 2019, Defendants knew the actual 4Q18 results were a "***massive beat***" and "exceeded consensus pretty meaningfully."  ¶¶186, 195.  On January 8, 2019, Vista was given the results.  The next day, the proxy was published touting the "premium," but omitting the 4Q18 results.  ¶¶185–86.  White stated internally that releasing the results was the "right thin[g] to do" (¶195) and Mindbody told Vista they wanted to, but they never did so.  ¶198.

After several more proxies were released, which continued to hide the real story of the Merger, shareholders eventually voted on the deal on February 14, 2019.  Even with Defendants' deception, the Merger only received the support of 55% of the publicly traded shares.  ¶205.  The next day, the deal closed, costing investors hundreds of millions of dollars.  ¶206.

## III.   LEGAL STANDARDS GENERALLY APPLICABLE TO THE MOTION

In reviewing the Motion, the Court must "accept all factual allegations . . . as true," *Tellabs,* 551 U.S. at 322, and draw "all reasonable inferences in the [Plaintiff's] favor," *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  Complaints must merely be "plausible," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), though fraud claims must meet higher standards.

## IV.   LEAD PLAINTIFFS STRONGLY PLEAD FRAUD CLAIMS

Securities fraud claims require a material misrepresentation, omission, or fraudulent conduct; scienter; reliance; economic loss; and a securities transaction.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); *Lorenzo v. SEC*, 139 S. Ct. 1094, 1102 (2019).  The

Motion only challenges falsity (or actionable conduct), scienter, and materiality. The unchallenged elements need not be addressed herein. *See generally Bertuglia v. City of N.Y.*, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012); *U.S. v. Caraway*, 473 F. App'x 88, 89 (2d Cir. 2012).

**Materiality**. "Materiality is a mixed question of law and fact" and allegations can only be dismissed as immaterial where "they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Burkle v. OTK Assocs.*, LLC, 2 F. Supp. 3d 519, 522 (S.D.N.Y. 2014) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985)). Analyzing materiality requires reviewing allegations "together and in context." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (citations omitted).

**Pleading Fraud.** The PSLRA requires the AC to plead fraud with particularity and allege a "strong inference" of scienter. 15 U.S.C. § 78u–4(b). However, courts must still take all facts pleaded as true, and take the facts "collectively," rather than assessing if "any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 323–24. A "strong inference" is one that is "cogent and at least as compelling as any opposing inference." *Id.* This means that the inference "need not be irrefutable," nor a "smoking gun," nor even "the most plausible of competing inferences." *Id.* In sum, *a tie goes to the plaintiff*. *City of Pontiac Gen. Empls.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

Mindbody is imputed with the scienter of its management, including the Individual Defendants. ¶¶262–63; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, Inc., 531 F.3d 190, 195 (2d Cir. 2008) (corporate scienter pled based on scienter of "someone whose intent could be imputed;" imputing scienter based on motives). Defendants do not dispute this.

Scienter can be shown by alleging either (1) that defendant had the "motive and opportunity to commit fraud," *or* (2) "strong circumstantial evidence of conscious misbehavior

9

or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Defendants do not contest they had an "opportunity" to defraud and opportunity is well-pleaded.  ¶¶278–81, 288–89, 297.

**Roadmap**.  The following subsection describes allegations of motive common to all the fraud allegations.  The remaining subsections address each of the allegations of fraud, including other allegations of scienter especially relevant to each claim, as well as falsity and materiality.

### A.    Scienter is Alleged Due to Defendants' Motive and Opportunity.

Defendants were motivated to *(1)* close a privatization and *(2)* specifically, close a deal with Vista.  Defendants furthered both goals by making the Vista deal look attractive—by promoting the "premium" and presenting the deal process as legitimate.  ¶¶104, 114, 118.  A legitimate process matters because many believe where there was a fair process, the deal price functions as persuasive evidence of fair value.  *See In re AOL Inc.*, 2018 WL 1037450, at *8 (Del. Ch. 2018).  Defendants also furthered the second goal by rigging the deal to favor Vista.

#### 1.    Defendant Stollmeyer's Motives

Defendants attempt to downplay the strong allegations of Stollmeyer's motives by reviewing them in isolation and subjecting them to unfounded evidentiary standards.  This tack is of no avail—the overwhelmingly strong inference is that Stollmeyer had the motive to defraud.

##### (a)    Non-Pecuniary Motives

The AC strongly alleged that Stollmeyer had a striking antipathy toward public markets, which motivated him to close a privatization and favor a deal with a PE firm like Vista.  ¶267.

For example, an email by Liaw to Stollmeyer noted that a proposed presentation to a potential *publicly traded* acquirer, would cause that bidder to "freak out," because Stollmeyer said he wanted to be "***free[d] from the shackles of public market investors***," ¶91; MtD Ex. 28.  The Motion tries to spin this as a salesman's pitch, but the context suggests the exact opposite.  If Stollmeyer were trying to woo the suitor, falsely expressing antipathy would make no sense; in

10

Liaw's words, it would make them "freak out."  While the allegation stands either way, Plaintiff submits that scaring off this bidder likely was Stollmeyer's goal.  The PSLRA does not change the rule that all factual inferences shall be made in plaintiff's favor, including the inference that Stollmeyer's statements expressed his real views.  *See Giunta*, 893 F.3d at 79.

Similarly, Stollmeyer and Liaw discussed pitching suitors by "***throw[ing] the public investors under the bus*** and complain[ing] about how *frustrating* it is that they only care about things every 90 days."  ¶102; MtD Ex. 27.  Defendants now run from this statement, insinuating it was merely a lie they planned to tell suitors.  MtD 42.  Again, plaintiffs are entitled to all factual inferences, including that defendants' statements express their views.  *See Giunta*, 893 F.3d at 79.  More importantly, Defendants simply ignore that Stollmeyer stated ***to Liaw*** (not to the suitor) that the "under the bus" line was "***completely authentic.***"  MtD Ex. 27.

Stollmeyer's animosity was also seen in his statements that he wanted to "move more quickly ***out of the public eye***," to "improve our business ***away from the turmoil of the public markets***," and celebrating "saying goodbye to the public markets."  ¶¶101, 183, 186.  Again, Stollmeyer now retroactively asserts these statements were not his real views.  MtD 42.

Based solely on Qatalyst contacting some public firms about the deal, Defendants ask the Court to infer that Stollmeyer was willing to sell to a public firm, and say this disproves his animosity.  *Id.*  The requested inference cannot trump Defendants' own statements.  Further, that the conflicted Qatalyst tried to paper the appearance of legitimacy by adding public firms to its call list, does not suggest a genuine willingness to engage those parties.  Even a willingness to sell to a public firm would cast no doubt on Stollmeyer's motives.  Running a division or subsidiary of a public firm offers greater distance from "frustrating" investors, the "public eye," and the "turmoil of public markets," than running a free-standing company.  ¶¶101, 102, 183.

11

By quoting *Kalnit v. Eichler*, which held a particular motive "defie[d] economic reason," Defendants insinuate that economic goals supersede other motives.  MtD 42 (quoting 264 F.3d 131, 140 (2d Cir. 2001)).  People often prioritize non-pecuniary goals.  *Kalnit* did not compare non-economic and economic motives; it merely found a particular economic motive made "no sense."  *264 F.3d at 140*.  There is nothing novel about non-economic desires motivating fraud.  *See, e.g.*, *SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970) (securities law would be "frustrated" if those who act on "non-pecuniary motives" were outside its reach); *Salman v. United States*, 137 S. Ct. 420, 427-28 (2016) ("personal benefit" prong of insider trading test satisfied by non-pecuniary benefits, like helping a friend); *cf. In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge. . . .  Indeed, any human emotion may cause a director to place his own interests [first]").[4]

*Additionally*, Stollmeyer was motivated by "love" for Vista.  By October, he was texting about how much he "like[d]" Vista and how "mind blowing" and "inspiring" its presentations were.  The day the Merger was announced, he texted his financial advisors that "Vista's in love with me (and me with them)," and he publicly boasted that Vista was the "ideal" partner.  ¶268.

Defendants' response amounts to arguing that Stollmeyer's love *may not have motivated him*.  The far stronger inference is that this love would have played a role in his decisions to design a deal process that favored a buyout from Vista.  That this motive would have swayed his behavior is further emphasized by his efforts to design a self-serving deal process.  *E.g.*, ¶272.

---

[4] Defendants' out-of-circuit law offers them no support.  MtD 38, 40 (citing *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999).  In *Phillips*, defendants sold shares, but the Motion fabricates the connection between that fact and its holding that the complaint—based only on the "public record"—did not plead facts showing motive.  190 F.3d at 621.  The AC details Defendants' motives to depress the price, through emails, text messages, etc., and *Phillips* recognized defendants' "*could* have been motivated" to depress the price, despite being netsellers.  *Id.* at 623.

When coupled with Stollmeyer's antipathy to the public markets, there is a strong inference that he saw an opportunity to exit the public markets with someone he loved and acted on that motivation, including by depressing the price of Mindbody to facilitate the deal.

Defendants also respond that *some* of his statements expressed a degree of "enthusiasm" not reaching the level of "love." MtD 43-44. This fact does not detract from the allegations.

### (b)    Pecuniary Motives

Stollmeyer would receive enormous pecuniary benefits through the Merger. The Motion improperly seeks to interpose factual disputes about the details of these benefits, and in the process, misses the big picture regarding just how rich Stollmeyer's expected benefits were. Stollmeyer knew he could liquidate his position and texted his financial advisors the day the deal was announced that "I will likely sell most or all of my stock." ¶155. Defendants acknowledge this sale was a motive, but argue it cuts against inferring scienter, because a higher price would have increased his profits. *See* MtD 37–38. This ignores four major issues:

**First**, the Motion ignores that Stollmeyer expected that he would eat his cake, have it too, and likely get even more cake. Not only did he get to sell his shares, he also received equity in the post-Merger entity, and would have expected to actually increase his equity post-Merger.

Vista invited management to "partner" in its offer letter (a clear euphemism for giving them equity) and there is no reason to doubt Stollmeyer was aware of the industry norms regarding PE deals, especially given Qatalyst's experience. ¶¶144, 269–71. Defendants do not deny that Stollmeyer expected these benefits, and instead deny that specific "agreements" had been reached (MtD 40–41), which has no bearing on his motive. Stollmeyer recorded his expectation of benefits in a text to his financial advisors the day the Merger was announced, writing: "*It will be incumbent upon them to provide compelling incentives*." ¶155.

13

On December 21, 2018, Qatalyst presented a slide deck showing that management should expect to receive 10% of the post-Merger equity. ¶¶270–71. If Stollmeyer retained his same percent of management equity, his position would increase from 3.76% to 7.27%. *Id.* Without challenging the well-pled fact that Qatalyst projected management to receive 10%, Defendants point to academic research about equity pools in general to argue that Stollmeyer would "***only***" expect to receive roughly his pre-Merger shareholdings back after the Merger. Thus, there seems to be no dispute that Stollmeyer would have expected to at least receive post-Merger equity equal to what he held pre-Merger. Thus, ***whatever the deal price***, he would come out ahead. Selling his position and then getting it back again post-closing. The stronger conclusion is that he expected an increase based on his specific pre-deal holdings and Qatalyst's presentation, which is more compelling than Defendants' data. If his equity increased to 7.27%, as the AC alleged, he could expect to instantly profit from selling his shares and nearly double his equity.

**Second**, the Merger provided Stollmeyer a valuable opportunity to liquidate all of his Mindbody stock without a public backlash and corresponding price decline. The Motion's only real response is a Delaware case, which declined to find a motive based on the ability to liquidate, in the absence of some "exigency" incentivizing the sale. *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1036 (Del. Ch. 2012). This holding does not cast doubt as to the presence of this motive, but merely suggests it alone may not be enough. Regardless, *Synthes* is inapposite because Stollmeyer has recognized this motive. In a post-Merger interview,[5] Stollmeyer complained about how, even after Mindbody's IPO, his "capital [was] locked inside

---

[5] Alejandro Cremades, *Rick Stollmeyer on Selling For $1.9 Billion the Company That He Created Out of His Own Garage*, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage. Taking notice of this podcast to rebut Defendants' response to well-pled allegations is appropriate, since it is "capable of accurate and ready determination" with "sources whose accuracy cannot be reasonably be questioned." Fed. R. Evidence 201; *see Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y. 2019) (taking notice of TV interview); *United States v. Ojai Valley Cmty. Hosp. Inc.*, 2018 WL 6177257, at *1, n. 1 (C.D. Cal. 2018) (taking notice of podcast).

14

the business," and how he could "sell tiny bits of it," but it was "kind of like sucking through a very small straw." He lamented: "I'm in my 50s now, and I've got kids in college." He even explained why he could not sell his position without a Merger, making the same argument as in ¶275, stating that if he sold even a small amount, investors would "challenge" why he was selling, and ask if it signaled he did not "believe in" the company. And, when announcing the Merger, he stated, "[we] are thrilled to provide immediate liquidity to our shareholders." ¶150.

**Third**, a reduced merger price would increase Stollmeyer's payout due to the PE compensation model. ¶274. As the AC stated, research by a credible academic found that PE firms "***invariably*** give guidance early in the process as to what their typical compensation package for the CEO and senior management looks like," and that the primary measure used in setting management's pay in a PE-run firm is "Multiple of Invested Capital." [6] *Id.* Thus, a higher deal price would result in a higher cost of "invested capital" for the PE firm, which meant that Stollmeyer's pay, tied to the return on the PE firm's invested capital, would be lower. *Id.*

The Motion's only substantive response to this argument notes that it is not *certain* that Stollmeyer expected this measure of compensation from Vista. MtD 40. This sets the burden too high. By citing research about the usual (or "invariable") practices, the AC has alleged that it is "at least as compelling as any opposing inference." *Tellabs,* 551 U.S. at 324 (recognizing the allegation need not be "irrefutable" or a "smoking gun"). The inference is strengthened by Stollmeyer's email to his financial advisors stating he expected "***compelling incentives***." ¶155.

---

[6] Defendants falsely refer to the research as "unpublished." MtD 40; *but see* Guhan Subramanian, *Go-Shops Revisited*, 133 Harv. L. Rev. 1215 (Published Feb. 10, 2020). Research is often used to explain common practice. *See In re Nasdaq Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 713 (S.D.N.Y. 1995) (finding price-fixing conspiracy pleaded where complaint used academic research about market to bolster inference of scheme); *Milstein v. Werner*, 57 F.R.D. 515, 523 (S.D.N.Y. 1972) (crediting a study by management consultants regarding "compensation practices" to assess typical practices); *I.M. v. United States*, 362 F. Supp. 3d 161, 194 (S.D.N.Y. 2019) (holding "a reasonable jury could . . . credit the academic articles Plaintiffs cite"); *cf. United States v. Cean*, 771 F. App'x 81, 83 (2d Cir. 2019) (summary order) (industry practices are relevant to assessing foreseeability).

15

**Fourth**, Stollmeyer knew that a deal with Vista would make him more likely to keep his lucrative position as CEO, because: (1) they "loved" him and, as a result, he saw "no retirement in [his] headlights" (¶156); (2) Vista has a practice of retaining CEOs, which he would have seen at the CXO conference (¶90); and (3) a PE deal would be less likely to make his role redundant than a deal with a competitor. Stollmeyer stated he would "lean into" an acquirer who saw his "potential" and would "not support a sale" if it meant "an automatic exit" for him. ¶¶97, 272.

Defendants respond that compensation related goals are ordinarily not ***alone*** enough to find motive. MtD 40. Such motives, however, can ***bolster*** the inference of scienter. *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 499 (S.D.N.Y. 2018) (allegations about "stock sales and executive compensation establish . . . a strong inference of scienter"); *In re Wellcare Mgmt. Grp., Inc. Sec. Litig.*, 964 F. Supp. 632, 639 (N.D.N.Y. 1997) ("the Court will not disregard, as irrelevant, allegations that incentive compensation" motivated the fraud). Further, cases that deprioritize employment as a motive do so because the allegations are too general. But the specific factual context of the Merger, and Stollmeyer's express admissions, make the allegations here far more compelling than in the typical case. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 295 (S.D.N.Y. 2008) (recognizing that, "standing alone," the prospect of compensation is too "generalized" to sustain scienter, but crediting such allegations since they were specific to the alleged scheme); *Varljen v. H.J. Meyers, Inc.*, 1998 WL 395266, at *5 (S.D.N.Y. 1998) (allegations were "sufficiently concrete" to meet the scienter pleading requirements where they showed how the scheme would improve Defendant's commissions).

Considering these four factors, Defendants' alternative inference regarding Stollmeyer's motive does not pass muster—and certainly is not more likely than the motive alleged in the AC.

Defendants' cite cases, where a manager's investment in the firm, created an "alignment"

16

of incentives with shareholders, promoting legitimate deal making. MtD 36–38. For example, *In re Toys "R" Us, Inc. Shareholder Litigation*, held that a CEO's shareholdings gave him an incentive to maximize value, when choosing between selling the company or just a division. 877 A.2d 975, 1005 (Del. Ch. 2005). But Stollmeyer was not (and did not expect to be) in the position of other shareholders (*i.e.*, that of a net-seller), rather he expected to sell his shares and receive equity post-Merger. *See supra* at 13–14. Further, these cases do not address the other motives alleged in the AC. Defendants also analogize to cases holding that insider purchases during the period when a stock was inflated do not support an inference of scienter. MtD 37–38. The analogy does not map to this case for the reasons just discussed—(1) Stollmeyer expected to sell and receive equity, and (2) had other motives not addressed by these cases.

That a higher price **might** have offered even more value (*but see supra* at 15 (discussing PE compensation)), does not undercut the strength of this motive. Here, the analogy to insider trading is helpful—it has never been suggested that trading fails to support scienter, merely because the trader did not sell at the peak. *Cf. S.E.C. v. Life Partners Holdings, Inc.*, 41 F. Supp. 3d 550, 561 (W.D. Tex. 2013) ("a reasonably smart fellow . . . would want to sell at an opportune, but perhaps not *the most* opportune, time, if only to avoid more suspicion").

### 2.    Defendant White's Motives

Defendant White's motives were largely the same as Stollmeyer's pecuniary motives. He expected to retain his lucrative position as CFO in a deal with Vista (¶283); expected to retain or increase his equity position (¶284); expected his future compensation to be tied to Vista's return on investment, (¶285); and he would receive an immediate payout through the liquidation of his pre-Merger equity (¶286). Defendants' responses to these well-pleaded motives are no more availing as to White than they were as to Stollmeyer. *See* Section IV(A)(1).

17

### 3.    Defendant Liaw's Motives

Defendant Liaw served on the Mindbody Board by IVP's nomination.  The AC alleged—and the Motion does not dispute—that he was motivated to act in IVP's interest.  ¶¶290–96.  IVP intended to liquidate its position in Mindbody and the Merger—even at a suboptimal price—offered it a unique opportunity to do so.  *Id.*  Defendants do not deny the existence of this motive.  Instead, they argue this motive was weaker than IVP's incentive to receive a high share price.  In support, they cite a Delaware case describing how "exigent" or "idiosyncratic" needs could motivate a liquidation below fair value.  MtD 38 (quoting *Synthes*, 50 A.3d at 1036).  Notably, Defendants' case held that such "exigency" could occur due to economic necessity (*e.g.*, a "margin call") but also that "the world is diverse enough" for other "exigent" motives for a sale to exist, and it gave the example of a mogul selling a "less sexy" business to fund a "cool" one.  *Synthes*, 50 A.3d at 1036.  IVP's motives are far more concrete than that example.

The "exigency" standard is easily met, due to IVP's target exit date for its investment.  The AC alleged both that: (1) Defendant Liaw has testified that when making an investment IVP would look at a proposed exit; and that (2) an IVP document listed the exit date as 2018, when the Merger Closed.  ¶291.  The Motion does not challenge the existence of an exit date, and instead responds that the document only states the "estimated" date.  MtD 39 (citing MtD Ex. 26).  This ignores that the document says: "est. / actual exit."  MtD Ex. 26.  More importantly, there is no dispute that there was a target exit date and it would be absurd to list an "estimate" that did not correspond to the target.  The strongest inference is that IVP had a2018 exit target.

Defendants also argue this exit date would not have been enough to motivate IVP to sell at a suboptimal price.  MtD 39.  They ignore the allegations that Liaw recognized the problem IVP would face without a liquidity event like a merger: Liaw testified how a sale of shares by IVP could lead others to short Mindbody and drive down the price.  ¶294.  This effect would

18

have been dramatic if IVP, one of Mindbody's largest shareholders, began exiting its position—making it rational for IVP to accept a haircut to make a clean, and still very profitable exit.

Additionally, *Synthes* considers only whether the motive to liquidate is alone sufficient, not whether it may be compelling in conjunction with others. Here, IVP had an additional motive in favoring liquidation. Namely, by participating in the deal, IVP had an opportunity to negotiate for a "side agreement," which Liaw proposed and which, in his own words, provided "bells and whistles for IVP as the largest Class B (super-voting class) shareholder." ¶295. IVP sought to leverage its position to receive additional benefits, ***that would not exist without a merger***. Contrary to the Motion's contention, it is irrelevant whether IVP actually achieved these "bells and whistles" – the bells and whistles could still serve as motive.

IVP was also trying to leverage its Class B shares, which had extra voting rights, and would automatically convert into Class A shares within a few years of the deal. ¶¶295, 39. The ability to leverage concessions due to these shares served as additional motivation to close a deal sooner rather than later, especially since there was no guarantee another opportunity would arise. ¶¶276, 295–96.[7] The Motion argues the conversion date was too far out to be "exigent," but the benefit of trading these shares is an additional motive to the exigent need to exit the fund (MtD 38–39), and *Synthes* certainly did not imply all motives must involve exigency.

### 4.      Additional Allegations of Motive and Conscious Disregard

In addition to the direct allegations of motive, the AC alleged many facts that indirectly show Defendants were acting on wrongful motives. Courts often credit unusual or suspicious behavior as indicia of scienter. *E.g.*, *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at \*15 (S.D.N.Y. Apr. 22, 2016) (collecting cases about "unusual or suspicious" resignations as support

---

[7] Stollmeyer and White shared this motive; they both held blocks of Class B shares. ¶¶276, 287.

for scienter); *Novak,* 216 F.3d at 308 (noting that being "engaged in deliberately illegal behavior" supports inference of scienter, and referring to the "knowing sale of a company's stock at an unwarranted discount" as an example of such illegal conduct.); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 603 (S.D.N.Y. 2009) (director's identification of "poor corporate governance" supported scienter); *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23-24 (2d Cir. 2017) (crediting secret meetings as indicia of scienter).

Stollmeyer's secret meetings with Vista support scienter. ¶¶85–99. Defendants dismiss these meetings as mere "networking," (MtD 5), but ignore the incriminating details about these meetings. Stollmeyer indicated that his interest in a sale turned on the buyer retaining him and the discussions focused on his "goals." ¶¶88–89. When he told a select few executives of Mindbody of the possible deal, Stollmeyer said it would not be an "automatic exit" for them, that he would "lean into" an acquirer who saw his potential and that he would "not support a sale" otherwise. ¶97. He instructed them not to mention or even "hint" at these meetings with anyone, including the Board, which belies that he was merely "networking." ¶98. White responded: "My lips are sealed." *Id.* Asking secrecy from the Board of others defies innocent explanation.

The decision to retain Qatalyst was also highly suspect. Their dramatic conflicts—ranging from being founded by a former Vista employee to Chang's contemporaneous work for Vista on another deal—should have immediately disqualified them. ¶87. Stollmeyer's push to retain Qatalyst in a deal with Vista demonstrates his brazen disregard for investors. Also suspicious was the decision to design an engagement that further conflicted Qatalyst by paying it just $2 million for its fairness opinion, ***but $31 million if a deal closed***. ¶¶176–78.

By the time of the Cut, negotiations were ongoing and the Committee had formed. ¶103. Choosing to announce the Cut, which was sure to depress Mindbody's stock price, without

20

mentioning these talks, shows a desire to maximize the stock drop, rather than inform investors.

On the day of the Cut, Qatalyst's Chang emailed Stollmeyer noting that it had been a "difficult" day but that he "knows there are much brighter days ahead." MtD Ex. 32. Absurdly, Defendants suggest this is exculpating because Chang did not overtly say, "that their 'scheme' was working." MtD 46. The AC's interpretation is stronger. Of course, committing fraud and sinking the price of the company Stollmeyer founded led to a stressful day–but that he "knows there are much brighter days ahead" affirmatively confirms that he knows a plan is in the works behind the scenes (indeed, *he* is working on it). Stollmeyer's response affirmed all was going according to plan, he said: "We're not surprised by the aftermarket reaction. I'm fine." ¶118.

The corrupt deal process supports scienter. The list of potential buyers to engage with was manipulated to fit Stollmeyer's employment goals. ¶139 (rejecting payment companies), ¶145 (rejecting Japanese companies). Vista was given prompt access to expansive diligence (¶141), but others were not given access until December 15, 2018, were only shown a fraction of the documents, and were given significantly less time than Vista to review financial and other diligence and make an offer . ¶142. After Vista bid, other bidders were needlessly rushed and dropped out of the process, only days after receiving access to diligence. ¶146. Defendants' sham go-shop is also indicative of the scheme. *See* Section IV(C)(2).

By January 9, 2019, Defendants knew the 4Q18 results were a "massive beat" (¶132), but chose not to disclose that, and instead touted a "premium" reflecting deflation caused by the Cut. ¶186. On January 24, 2019, White admitted internally that disclosure was "the right thin[g] to do" and on January 31, 2019, (¶195) counsel for Mindbody emailed Vista that Mindbody would "prefer to do a pre-announcement" (¶198), but the information was not released. The decision not to disclose the results—which would have revealed the deal was unfair—supports scienter.

21

Defendants say that the presence of some positive statements during the 3Q18 results call weighs against scienter.  MtD 46.  This continues their apparent theory that securities laws are only concerned with especially sloppy frauds.  *But see SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (§ 10(b) should be read "flexibly to effectuate its . . . purposes."); *United States v. Bongiorno*, 2006 WL 1140864, at *5 (S.D.N.Y. May 1, 2006) ("fraud" covers "ingenious efforts").  A completely negative call would have been odd and suspicious, and could have ruined morale and relations with Mindbody's customers, vendors and lenders.  *Cf. United States v. Kelley*, 551 F.3d 171, 176 (2d Cir. 2009) ("a scheme to defraud may well include later efforts to avoid detection.") (citation omitted); *Szulik v. Tagliaferri*, 966 F. Supp. 2d 339, 366 (S.D.N.Y. 2013) (effort to "cover[] their tracks" support scienter); *United States v. Shields*, 2014 WL 4744617, at *4 (N.D. Cal. Sept. 23, 2014) (lies "designed to lull investors into a false sense that their investments are safe" can be actionable); *Life Partners,* 41 F. Supp. 3d at 561.

### B.  Allegations Related to the Fraudulent Guidance Cut

The AC strongly alleged that the statements announcing the Cut and Justifications were intentionally false and misleading.  *E.g.*, ¶¶210, 212.  They were made to mislead investors, did not comport with the actual expected performance, provided a dishonest account of why the Cut occurred, and conveyed other false information about the condition of Mindbody.

#### 1.  Conscious Misbehavior and Knowledge

Before the fraud, Defendants assured investors that the Integration was going as planned. ¶¶61–84.  When releasing 2Q18 results, Stollmeyer said "a lot of the heavy lifting" was already done and that he felt "very confident where we sit right now and the path ahead."  ¶¶69, 72.  On September 19, 2018, at Mindbody's Investor Day event, its CSO said the Integration was "going well."  ¶77.  Among other positive comments about the Integration, Stollmeyer presented a slide

22

stating: "The Integration is Working."  ¶78.  *Just a week before the Cut*, Stollmeyer emailed Liaw saying the Integration was "proceeding well."  ¶¶20, 101.

On November 6, 2018, Stollmeyer announced the Cut, which caused about a 20% drop in its stock price.  ¶¶105, 110.  Defendants blamed the Cut on the Integration, which they said had "introduced greater operational challenges than expected."  ¶106.  Given that Booker was 10x bigger than FitMetrix ($150 million v. $15.5 million), this meant they were primarily blaming Booker.  ¶¶3, 124.  Defendants clarified that it was "steady course" in terms of costs, but that the guidance reflected a "pulling back" on revenue.  ¶¶107–09.  Thus, the Cut was mostly attributed to worse than expected Booker revenue.  ¶¶16, 109.  The Motion does not deny this.  Defendants described the supposed issue as a "continu[ation]" of issues that already existed, and stated that the Integration had introduced "greater operational challenges than expected" in 3Q18-4Q18 and that in 2Q18-3Q18 Mindbody did not meet its own growth expectations.  ¶¶106–08.

The question before the Court about the Cut is whether—taking all inferences in the AC's favor and with consideration of Defendants' motives—the AC presents a strong inference that Defendants intentionally put out false guidance.  In other words, whether it is more likely that: *(1)* the dramatic change in tune, from even just days before the Cut, reflected Mindbody's real forecasts, expectations, and the condition of the Integration; or *(2)* that the Cut and Justifications were intentionally misleading.  A tie goes to Plaintiffs.  *See supra* at 8 (legal standards).

Defendants' respond to just a select few of the many allegations that they knowingly and intentionally defrauded the market regarding their 4Q18 guidance.  MtD 44–50.  It is easiest to begin with the points they have conceded, and then move on to the points they address.

### (a)   Allegations the Motion Ignores

Just *three days* before the Cut, a FP&A manager text messaged Mindbody's senior finance manager stating, "*we are on track* to hit our forecast," and explained, "*I do not know of*

23

***anything in the flash [revenue report] that would materially change our assumptions for the preceding months***." ¶¶19(a), 120, 301.  This is ***unopposed*** proof that the reduction in guidance was at odds with the actual forecasts available within Mindbody.  The only possible scienter issue remaining in the case is whether Defendants knew Mindbody's actual forecasts.[8]  But here too, there is no dispute.  The AC alleged that:

> The Company's high-level performance information, such as its projections, sales quotas and performance toward those quotas, and the overall status of the [Integration] are . . . so significant . . . to Mindbody's operations that the information either was actually known to the Individual Defendants, or those Defendants were reckless in not knowing this information. Additionally, Defendants Stollmeyer and White ***demonstrated their knowledge*** of these topics by choosing to speak at length regarding these topics during Mindbody's earnings calls, Investor day event, and in . . . filings.

¶310.  Finding scienter based on common sense inferences is appropriate.  *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (stating that "it would be absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market"); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 483 (S.D.N.Y. 2010) (holding scienter was adequately alleged, since it was "highly plausible" that officers knew of real test results, when they chose to talk about those results).  Defendants do not respond to this allegation and do not deny that Defendants knew this information, instead, while ignoring many well-pled facts, they challenge the substance of that information.

Equally compellingly, the AC explained that on January 8, 2019, White emailed Vista stating preliminary 4Q18 revenue came in at $68.3 million, "about $0.3m ***above forecast***," meaning that ***internal revenue forecasts*** were $68 million, firmly in the middle of the original

---

[8] Even if they did not, this fact is enough to establish Mindbody's scienter.  ¶262 (alleging Mindbody was imputed with the scienter of its "management level employees"); *Patel v. L-3 Commc'n Holdings Inc.*, 2016 WL 1629325, at *12–14 (S.D.N.Y. Apr. 21, 2016) (finding scienter imputed by a non-defendant "management level" employee below the corporate level).  Mindbody's senior finance manager, certainly is a "management level" employee.

24

range of $66.8 to $70.8 million, and above the *top* of the range set by the Cut.  ¶¶19(c), 121, 306.
This is *unopposed* proof that the internal forecasts exceeded the guidance.

On top of smoking guns, the AC also alleges confessions.  Just two days after the Cut,
Stollmeyer told Mindbody's newly hired[9] Chief Technology Officer that "[w]e are resetting
street expectations to position ourselves up for future beat and raises."  ¶119.  This did not tell
the whole truth about the scheme, but admitted that Stollmeyer knew contemporaneously with
the Cut that Defendants already anticipated beating the guidance (meaning they *knew* guidance
should be higher but gave the market lowered expectations anyway).  This is consistent with
White's admission that the revenue forecast was $68 million, well above the top of the Guidance
set by the Cut.  Defendants have no response to this.  Similarly, in a deposition, following the
Merger, Stollmeyer has stated that it is "much better to guide a bit below what you're expecting
and then beat those expectations."  ¶¶18, 131.  Here, Stollmeyer was not merely saying, if one
has to choose, that it is better to err on the side of caution—he is admitting to guiding below his
"expectations," in order to manipulate investors and control their reactions.  This appears to be a
failed cover up—a deponent preparing to justify his wrongful conduct, but actually admitting to
that very conduct.  *Scholastic,* 252 F.3d at 72-73 (noting the relevance of post-class period
disclosures, if they shed light on activities during that period).

Defendants failed to address several other significant allegations.  For example, despite
the indication in the October 17th email that Stollmeyer already had notable plans for
Mindbody's guidance, he waited until the night before the Cut to convene the audit committee to
consider, what was referred to as a "substantial guide down."  ¶¶113, 302.  Additionally,

---

[9] It makes sense that Stollmeyer would have wanted to reassure a newly hired executive that the Cut did not signal that the executive had just joined a faltering company.

Stollmeyer waited until the morning of the earnings call, where he announced the reduced guidance, to add in new negative information about supposed challenges.  ¶117.

### (b)      Other Allegations Strongly Supporting Scienter

CW-2 worked as a Regional Sales Manager from September 2018 until late 2019, overseeing a sales team of twelve and responsible for a substantial aspect of the Booker sales vertical (across all regions).  ¶123.  CW-2 stated his impression that the Booker integration was going well throughout 2018 and that Booker performed very well during his tenure at Mindbody. *Id.*  He also provided information that completely undermines the Justification, explaining that ***sales quotas for Booker were increased each quarter from 3Q18 until 2Q19 and these quotas were <u>met each time</u>***.  *Id.*  CW-2 added that the 3Q18 guidance "was a surprise" because sales goals were consistently being met.  *Id.*  This is dispositive; it shows that, contrary to the Justification, expected revenue for Booker was not cut in 4Q18, but was increased, and that Booker had not underperformed in 3Q18, but had met its increased quotas.

Defendants argue CW-2 cannot be credited because he did not have contact with the Individual Defendants.  MtD 49.  However, this notion is "contrary to law." *Avon*, 2019 WL 6115349, at *21.  Rather, CW's should be credited where they are described with "sufficient particularity to support the probability [they] would possess the information alleged." *Novak*, 216 F.3d at 314).  CW-2 speaks to the true situation within Mindbody.  There is no dispute that Defendants knew the true situation (*supra* at 23–24), and thus CW-2's statements strongly show scienter.  Next, Defendants assert that CW-2 did not know how other sales teams were performing.  MtD 49.  This merely rewrites the pleadings.  CW-2's statement was not limited to his team – he described sales quotas and performance *for Booker*, not for his team.  That he was a sales manager overseeing a team selling Booker is certainly enough to "support the probability" that he would know about sales targets and performance for Booker in general.

*Novak*, 216 F.3d at 314.  Finally, Defendants point to CW-2's impressions that Booker was performing well and argue this is not sufficient.  MtD 49–50.  However, these allegations should be considered along with the other allegations, including his highly concrete statements regarding Booker's sales targets and performance.

CW-3's allegations also support the inference that the Justification was false.  CW-3 worked in Mindbody's finance department from pre-2018 and left during 3Q18, and participated in weekly FP&A meetings, including a weekly meeting headed by White.  ¶125.  He explained that 3Q18 "forecasted very solid" and was "on track" when he left Mindbody.  ¶126.  Defendants point out that CW-3's mid-Q3 departure means his information predates the alleged fraud (MtD 49–50).  However, his information still strongly supports the inference that the Justification— which, included allegations of poor 3Q results—was false.  *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (holding that "[p]re-class data is relevant" and that "[a]n information that sheds light on whether [the] statements were false . . . is relevant").

The AC also alleged that an email from Stollmeyer on October 17, 2018, to White and others supports scienter.  Stollmeyer notes Vista's interest and states that Vista saw a drop in Mindbody's price as an "opportunity."  He then said that Vista had "no idea what we are about to report or guide."  ¶113.  This indicates Stollmeyer was relating the forthcoming downward guidance to the prior "opportunity," as to suggest that the Cut would also present Vista with an "opportunity."  Defendants argue this could also be read as indicating that "Vista's interest" could "change," after learning of Mindbody's performance.  MtD 44–45.  Given the context of Vista's perception that a price drop was an "opportunity," the AC's conclusion is stronger.

Defendants respond to another October 17, 2018, message chain where White and another Mindbody employee discuss a "creative way to guide."  ¶115.  Defendants read this

27

email as suggesting that White was seeking to avoid downward guidance. MtD 45. However, White is merely expressing concern with not making the payments business look bad, not a desire to avoid a decline in Mindbody's stock. His comments show a concern with how the market will judge the payment business after the Cut, given that Stollmeyer "doesn't want to talk about payments." ¶115. However, the Motion strategically omits mentioning the key part of the conversation: White states that Stollmeyer's plan involved "throwing Booker under the bus." *Id.*

On October 19, 2018, Mindbody's CSO stated that Stollmeyer was "shortchanging . . . payments" where there was "a huge story to it we can sell to our team and investors." ¶116. The Motion responds that these statements do not "say anything" about Mindbody's guidance (MtD 45–46), but this is missing the point. This email further demonstrates that Mindbody executives thought Stollmeyer's messaging was misleading, supporting an inference of scienter.

The fact that the 4Q18 results were a "massive beat" to the Cut also supports the inference the Cut was a fraud. ¶132. This bolsters the other allegations, since it is far more likely to beat guidance that is intentionally too low, than guidance that was accurately set. *Id.*

### 2. False and Misleading Statements and Omissions

#### (a) Statements Cutting the Guidance

Defendants brazenly argue for a license to defraud, by claiming that even if these statements were intentionally misleading they cannot be liable. To make this argument, they overstate the limited protection provided to certain forward-looking statements by the PSLRA safe harbor and "bespeaks caution" doctrine (the "Safe Harbors"). MtD 13–15.

Defendants' theory that the Safe Harbors give them immunity cannot be true, since courts often find guidance statements to be actionable. *E.g.*, *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (guidance statements actionable given undisclosed facts); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *6 (E.D.N.Y. Dec.

28

5, 2013) (finding "revenue projection statements" actionable); *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at \*8 (S.D.N.Y. Nov. 19, 1999) ("[L]iability may follow where management intentionally fosters a mistaken belief concerning . . . earnings prospects.") (citation omitted); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) ("projections of future performance may be actionable . . . if . . . the speaker does not genuinely or reasonably believe them."); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 252 (S.D.N.Y. 1993) (similar); *In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 676 F. Supp. 458, 466-69 (S.D.N.Y. 1987) (similar).

As the Motion states, the Safe Harbors ensure that "officials need not be clairvoyant" (MtD 13–14 (citing *Novak*, 216 F.3d at 309)), but they do not protect intentional fraud, and Defendants cite no cases to the contrary. Permitting such would fly in the face of what the securities laws intend—to stop fraud. More specifically, Defendants' assertion that the Safe Harbors protect their statements fails for at least **four** reasons.

**First**, the Safe Harbors do not apply to the Cut because Defendants omitted to disclose known facts required in order for the statements not to be misleading. The Safe Harbors do not protect material omissions. *See Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at \*3 (S.D.N.Y. Mar. 2, 2017); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("Since these allegations relate to omissions of material information, the PSLRA safe harbor provision cannot insulate the challenged statements"). Moreover, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). It was materially misleading to make the Cut statements without also disclosing that the Cut was inconsistent with the information available within the company. *See Aeropostale*, 2013 WL 1197755, at \*12–13 (holding that "Plaintiff does not need to rely on

29

the falsity of [the] financial projections [themselves] in order to show that [defendants] fail to disclose facts that impacted the reliability of those statements").

**Second**, the Safe Harbors do not apply because the Cut was false and misleading as a matter of present fact. While guidance statements convey forward-looking information, they also convey a present fact: in Stollmeyer's words, guidance "communicat[es] our expectations." ¶131. The Cut did not merely turn out to be false—it was false when made because it did not convey management's real expectations. *See* Section IV(B)(1). Where "a statement contains both forward and backward-looking aspects, the two must be severed and analyzed separately." *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 192 (D. Conn. 2014); *In re Bear Stearns Co., Inc. Sec., Deriv., & ERISA Litig.,* 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (similar).

**Third**, the PSLRA safe harbor does not apply based on the provision itself, which does not apply if a statement is (a) material, (b) made with knowledge that it is false or misleading, and (c) not accompanied by meaningful cautionary language. MtD 13–14 (citing *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). All three elements are easily satisfied here.

**(a)** The Cut statements were material. They conveyed information that investors would find essential in assessing Mindbody's value, immediately led to a decline in Mindbody's stock price of about 20%, and Stollmeyer himself referred to it as a "*substantial* guide down." ¶¶110, 117. The Motion argues materiality by claiming that forward-looking statements accompanied by cautionary language directly addressing the relevant risk are immaterial. MtD 25–26 (citing *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 353, 361 (2d Cir. 2002)). This does nothing to move the ball; Defendants' ineffective cautionary language is addressed below.[10]

---

[10] Defendants also claim guidance is "immaterial opinio[n]." MtD 25–26 (quoting *In re Duane Reade Inc. Sec. Litig.,* 2003 WL 22801416, at \*7 (S.D.N.Y. Nov. 25, 2003). But *Duane Reade* merely found specific statements were immaterial. A rule that guidance is immaterial would contravene the cases finding otherwise (*see supra* at 28–

**(b)** The Cut was known to be misleading when made.  *See* Section IV(B)(1).

**(c)** The Cut was not accompanied by meaningful cautionary language.  Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor."  *Slayton*, 604 F.3d at 773.  Defendants contend that they are in the clear because they disclosed some uncertainties about the Integration.  MtD 14.  Mentioning these uncertainties did nothing to disclose the risk that Defendants may issue lower than expected guidance to drive down the share price to secure an unfair Merger, and did not even mention the anticipated Merger, even though the transaction Committee had already been formed.

The PSLRA does not protect intentional fraud because "no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made."  *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (explaining that both Safe Harbors could not apply) (citation omitted); *Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384, 393 (S.D.N.Y. 2018), *aff'd*, 784 F. App'x 27 (2d Cir. 2019) (the "safe harbor does not insulate a defendant from liability if a statement was knowingly false when made") (citation omitted); Arnold S. Jacobs, *Disclosure and Remedies Under the Securities Laws* § 3:31, at 3-152 to 3-153 (2009) (recognizing that a "quick reading" of the PSLRA could permit actual fraud if defendants added cautionary language, but urging that courts "should avoid this bizarre result by classifying any cautionary statement as not 'meaningful,' when the statement's maker has actual knowledge of its falsity.").

The Second Circuit has further endorsed this result by holding that assessing whether disclosures are meaningful, "requires an inquiry into what the defendants knew because in order

---

29), and would make the Safe Harbors' cautionary language requirement a near nullity.  Even as opinion, the Cut would be actionable since it misstated the real expectations and omitted material facts.  *See infra* 34 (discussing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175 (2015).

31

to determine what risks the defendants faced, we must ask of what risks were they aware."

*Slayton*, 604 F.3d at 771; *see also In re ITT Educ. Servs., Sec. Litig.*, 34 F. Supp. 3d 298, 305

(S.D.N.Y. 2014) (the safe harbor is "dependent on what the defendant knows at the time of the

statement" and "cautionary language is meaningful only when it discloses the known risks of the

statement's falsity.") (citing *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004)).

**Fourth**, the PSLRA's safe harbor cannot apply because all the misstatements and

omissions were part of a scheme to privatize Mindbody.  Thus, they were made "in connection

with a going private transaction," and such statements are excluded from the safe harbor.  15

U.S.C. § 78u-5(b)(1)(E).  The AC alleged this.  ¶334.  The Motion did not deny it.  At most

"bespeaks caution" could apply, but it does not "protect" those who "knew their statements were

false."  *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999).

### (b) Statements Justifying the Guidance Cut

Defendants falsely claimed that the Cut was the result of "recent acquisitions [which]

have introduced greater operational challenges than expected in the back half of the year."  ¶209;

*see also* ¶¶211, 213, 214, 215.  More specifically, they blamed the Cut on worse "revenue" and

in the context of the Integration, where Booker was 10x bigger, this essentially meant they

blamed the Cut on Booker sales.  ¶109.

Defendants respond with a string of law about pleading falsity (MtD 15), but falsity was

adequately pled.  ¶¶209–17.  The Integration was going well.  *See* Sections IV(B)(1)(b).  By

blaming the Integration, Defendants were falsely conveying that (i) the Cut reflected the true

business conditions within Mindbody, when it did not; (ii) that the Integration was going worse

than previously expected, when it was not; and (iii) more specifically, that the Cut reflected

lower than previously expected revenue from Booker, when Booker was meeting its increasing

sales quotas.  Section IV(B)(1)(b).  The statements were false when made, both when considered

32

literally and when properly considered "by the ability of the material to accurately inform rather than mislead." *McMahan & Co. v. Wherehouse Ent'mt, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

Defendants argue that their statements were not false, because they had previously disclosed that the Integration was a large project. MtD 15. This misses the point. The AC does not contend the Integration was not a large project and therefore this disclosure does nothing to cure the well-pleaded falsity. Likewise, Defendants' focus on the literal truth of the fact that Mindbody had hired additional sales reps (*id.*), does not cure their misleading statements.

The Justification falsely asserted that performance had been poor in 2Q and 3Q. *See* Section IV(B)(1)(b). Defendants claim that the statement that Mindbody "did not meet [its] own growth expectations in the second and third quarters" (¶211), is true because it did not hit the "midpoint" of 3Q18 guidance. MtD 16. Placing within guidance is placing within guidance— there is no assumption that a company will hit its midpoint. Furthermore, even if Mindbody had missed its macro-level targets, it was misleading to make this assertion while blaming Booker sales for the downward guidance, without disclosing that sales quotas for Booker were increased each quarter from 3Q18 until 2Q19 *and these quotas were met each time.* ¶123.

Finally, Defendants argue several statements are protected by the Safe Harbors because they describe challenges Mindbody would face in Q4. MtD 16 (citing ¶211 ("We expect this to . . . continue to lag the expectations."); ¶213 ("[W]e still have some operational challenges")). But these statements are actionable as "historical or current fact." *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005). Defendants say issues would "continue" and "still" existed, conveying they existed in the past. *E.g.*, ¶¶106–07. "[W]hen an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a

33

representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (citations omitted).

### (c)    Statements Touting the Merger and "Premium"

The statements describing the Merger price as a "premium" were false and misleading. *See* ¶¶149, 180, 185, 218–19, 225, 230–31, 250.  Defendants' argue that this disclosure was a "mathematical matter." MtD 17.  However, disclosures are "measured not by literal truth, but by the ability of the material to accurately inform rather than mislead." *McMahan*, 900 F.2d at 579. While the Merger price was a literal "premium" to the December 21, 2018 market price, the statement was misleading for what it failed to disclose and "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 (S.D.N.Y. 2005) (citations omitted).  Namely, that the "premium" was measured against the intentionally reduced Mindbody's stock price that followed the downward guidance.  *See* Section IV(B)(1).

Defendants also misled by characterizing the "premium" as "significant" and the deal price as "Highly Attractive for Shareholders."  ¶¶218, 250.  Defendants label these as opinions. MtD 17–18.  But misleading opinions are actionable.  It is "irrelevant" if they believed the opinion, the "inquiry" is whether "omitted facts 'conflict with what a reasonable investor would take from the statement.'"  *Avon*, 2019 WL 6115349, at *17 (quoting *Omnicare*, 575 U.S. at 189).  These statements falsely conveyed that the "premium" was meaningful (*i.e.*, "significant") and, thus, that Mindbody's stock price was not artificially deflated.  Defendants also argue that because the law is not concerned with "subtle disagreements over adjectives," their descriptions of the premium as "significant" and the deal price as "attractive" were puffery.  MtD 18 (quoting *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F.  Supp. 2d 277, 298 (S.D.N.Y. 2013)); *but see Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)

("characterizations of . . . risk-management system" as "robust" were actionable); *SEC v. Rio Tinto PLC*, 2019 WL 1244933, at *15 (S.D.N.Y. Mar. 18, 2019) (calling coal basin "world-class" was not puffery and actionable).  The AC does not quibble with word choice, but with the propensity to mislead.  *See McMahan,* 900 F.2d 576.  These were not mere expressions of optimism, but specific assertions about one of the most important events in Mindbody's history.

Defendants' statements regarding the rationale for the sale to Vista are also actionable for the same reasons as the "premium."  ¶¶81, 185, 225.  They misleadingly convey a false impression regarding the Merger, without disclosing that the Merger rides on the heels of the manipulative reduction in Mindbody's share price.

### C.      Allegations Related to the Deal Process

Defendants hid key information that casts doubt on the deal process.  Process disclosures matter to investors because the persuasiveness of the deal price as evidence of fair value depends on the reliability of the sale process.  *See AOL*, 2018 WL 1037450, at *8.  Facts about process also affect trading prices because they inform investor predictions about what will result if they reject the deal.  Defendants contest materiality by ignoring these simple connections between process and valuation.  *E.g.*, MtD 31–33.  Their arguments come nowhere near alleging that "reasonable minds could not differ on the question."  *Burkle*, 2 F. Supp. 3d at 522.

The process allegations directly involve Defendants, both as alleged below and since they were participants in the deal process (*e.g.*, Liaw as Committee chair).  Therefore, their scienter is well pled.  They knew of their own acts.  *Novak*, 216 F.3d at 308.  And, they were involved in the transaction.  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 764–65 (S.D.N.Y. 2017); *Buxbaum v. Deutsche Bank A.G.*, 2000 WL 33912712, *19 (S.D.N.Y. Mar. 7, 2000); *Plymouth Cnty., Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 382–83 (E.D.N.Y. 2008).

35

### 1.      The Undisclosed True Origin's of the Merger

Defendants misled investors by describing the Merger as a result of ordinary corporate practices, hiding Stollmeyer's secret dealings.  On January 2, 2019, Stollmeyer stated that "[i]n October, *our Board* . . . and I agreed to explore . . . the possibility of taking Mindbody private;" he did not mention any earlier meetings or work outside a process that had been "agreed to" by the Board.  ¶227.  The proxies stated "the [B]oard . . . frequently reviews," strategic alternatives "with Mindbody management" and "[a]s *part of this process*, from time to time" management had discussions with participants in relevant industries.  ¶¶237, 246.  It also stated that in October 2018 "representatives of Vista and Mr. Stollmeyer discussed Vista's investment strategy and the firm's interest in learning more about Mindbody's approach to [its] industries."  *Id.*

**First**, Defendants conveyed that the Merger emerged from a Board supervised process in the ordinary course of Mindbody's operations.  ¶¶227, 237, 246.  In truth, it emerged from secret meetings, that began with Stollmeyer prioritizing his employment, focused on his "goals," and was not even "hinted" at to Mindbody's Board.  ¶¶88-98.  ***Defendants have no response.***

**Second**, Defendants omitted key facts, such as Stollmeyer's August and September 2018 meetings with Qatalyst and Vista, and that by October he received an indication of interest from Vista, with a price range.  *Id.*; *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak," one has a "duty to be both accurate and complete").  The Motion's sole response contends that they eventually disclosed the truth on February 7, 2019.  MtD 22–23.  Thus, Defendants concede this statement was false when made, ***rendering them liable*** to investors who sold before the supposed correction.[11]  Even the later disclosure omitted material

---

[11] Defendants say it is "fundamental" that a supplemental proxy "moots claims regarding those disclosures."  MtD 18–19 n.11 (citing *Chen v. Select Income REIT*, 2019 WL 6139014, at *12 (S.D.N.Y. 2019)).  *Chen* noted how

36

facts, such as Vista's October indication of interest (¶95); that negotiations were hidden from the Board (¶¶98–99); and that Vista's interest dated back to before the 2015 IPO (¶86).

**Additionally**, the proxies stated the transaction Committee was "established" on October 30, 2018, by the Board, who appointed members "[b]ased upon experience." ¶239. In truth, Liaw formed the Committee by emailing selected Board members. ¶103. The Motion responds that "the Board *formally* established" the Committee. MtD 24. It was misleading to state the Board "established" the Committee, when it merely "formally" ratified what already existed and it was wrong to say the Board did so "based upon experience," without disclosing they ratified "based upon" the Committee Liaw already formed. By misrepresenting the origins of the Committee, Defendants were overstating its legitimacy and understating Liaw's influence.

### 2.    The Sham "Customary Go-Shop" Process

The go-shop was a sham, but this did not stop Defendants from touting the so-called "customary go-shop" when the deal was announced and in the proxies (including after the close of the go-shop) as one of the reasons they approved the Merger. ¶¶159–68, 223-24, 235-36, 246, 252–53. Defendants argue their statements were immaterial, because "customary" is a "soft adjective." MtD 21. Defendants conveyed concrete information: that the go-shop would meet customary market practices and would not be a sham. *See In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016) (statement about "industry best practices" was not puffery). Statements are only puffery where they are "so obviously unimportant to a reasonable investor that reasonable minds could not [disagree]." *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389–90 (2d Cir. 2015).

---

claims to enjoin a deal (*i.e.*, prospective relief) were mooted, it did not state retrospective damage claims by those who sold are mooted by later disclosure.

Defendants' other defense—that terms of the go-shop were disclosed—ignores the AC. MtD 21.  The restrictive terms, *i.e.*, matching rights, the short 30-day term spanning holidays, and a "closed" term (¶¶160–62), did not directly mean it was a sham.  Rather, as the AC alleged, by touting the "customary go-shop," Defendants were "assuring investors that they would make up for these weaknesses" by shopping "with as much rigor as possible."  ¶163.  They did the opposite.  White took vacation until January 4, 2019 and Stollmeyer took vacation where phone service was "spotty" until January 14, 2019.  ¶165.  On January 6, Stollmeyer told White about a suitor that felt Mindbody was "worth a lot more than $36.59."  ¶166.  That day, White recorded their effort to run the clock, texting Stollmeyer: "I assume that we will be declining any go-shop management discussion until you return, correct?"  *Id.*  When Stollmeyer returned there were only ***ten days*** to "get the whole shebang done"[12] – both receiving and accepting a higher bid.

### 3.    Vista's Disparate Access to Diligence

Defendants falsely gave the impression that parties were treated equally in the diligence process.  Proxy materials stated that "8 parties received data room access." ¶254.  This omitted that Vista had been given earlier access to far more documents (¶144), and, according to CW-1, Vista received an "all access pass" by early 3Q18.  ¶99.[13]  During the go-shop, when Defendants said all parties received access to the same data room (¶247), Qatalyst instead put together a plan where even parties signing NDAs were only given access to an "initial limited data room," and only received the full data room for "confirmatory diligence" after making bids.  ¶164.  This plan for disparate treatment strongly demonstrates that the process was rigged in favor of Vista and violated the duty to "tell the whole truth" upon choosing to speak. *Meyer*, 761 F.3d at 250.

---

[12] ¶161 (quoting *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 119 (Del. Ch. 2007) (describing concern with the challenge of closing a deal in the time allotted by a 45-day "closed" term go-shop)).

[13] Defendants note CW-1 was lied to about *why* Vista was given "access" when he was told it was a shareholder (MtD 49), but this subterfuge about Vista's access does not discredit CW-1.

####         4.         Undisclosed Discussions About Post-Merger Employment

On August 7, 2018, Stollmeyer told Chang, who was working for Vista, that he would be interested in a sale if the buyer would hire him. ¶88. The August 23, 2018, meeting between Vista and Stollmeyer focused on Stollmeyer's "goals." ¶89. In his October 17, 2018, email to White, Stollmeyer said the sale would not be an "automatic exit" for management and that he would "not support the sale" otherwise. ¶97. On December 24, 2018, Stollmeyer texted his financial advisor "[no] retirement in my headlights . . . [i]t will be incumbent on them to provide compelling incentives." ¶155. Contrary to these events, the proxies misleadingly stated that when the Merger agreement was signed on December 23, 2018, "Vista and Mindbody had not engaged in any [management] employment or retention-related discussions." ¶¶241, 246.

Defendants *only* response is that on February 7, 2019, they corrected the proxies. MtD 25. The "correction" deleted the words "employment . . . discussions," and added that they had not discussed employment "terms." ¶260. This proves the prior statement was false, and Defendants are, *at least,* liable to those Class members who had already sold their stock. Further, the "correction" omitted all facts regarding the discussions, which materially affect assessments of Stollmeyer's interests and the deal's legitimacy. Defendants insinuate the omissions were acceptable, because the "corrections" only denied discussions of employment "terms." MtD 25. But, they chose to speak on the issue and hyper-literalism cannot cure deceit. *See McMahan,* 900 F.2d at 579; *Meyer,* 761 F.3d at 250.

####         5.         Qatalyst's Undisclosed Relationships With Vista

The proxies state Qatalyst had earned $7 million working for Vista on the iCIMS deal. ¶¶243, 246. However, Defendants hid the severity of Qatalyst's conflicts and assured investors that, besides that deal, in two years prior "no material relationship existed" between Qatalyst and Vista. *Id.* This was misleading and omitted to disclose that (1) Vista had worked on at least four

39

other deals involving Vista in the prior two years, three of which involved Chang, (2) Qatalyst was co-founded by a Vista alumni, and (3) the brother of another Qatalyst co-founder sold a business to Vista just over two years before the fairness opinion was issued.  ¶¶87, 244.

Defendants' leading citation showcases the AC's strength.  MtD 32 (citing *Sodhi v. Gentium, S.p.A.*, 2015 WL 273724, at \*7 (S.D.N.Y. Jan. 22, 2015)).  There, plaintiff did not allege omitted facts; instead it claimed the proxy was incomplete for lack of a description of whatever dealings *might* exist.  Am. Compl. ¶74(c), *Sodhi v. Gentium, S.p.A.*, No. 17-cv-287(JPO) (S.D.N.Y. filed Sept. 2, 2014), ECF No. 19 (*available at* 2014 WL 4828213).  *Sodhi* held that without "some basis for believing" there was an undisclosed conflict, plaintiff's claim failed.  *Sodhi*, 2015 WL 273724, at \*7.  The AC alleges far more than "some basis" to believe there was material undisclosed information.  ¶87; *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*, 2012 WL 928402 at \*13 (D. Vt. Mar. 19, 2012) ("[T]he failure to disclose even potential conflicts" may be actionable under securities law) (quoting *Kahn v. Wien*, 842 F. Supp. 667, 677 (E.D.N.Y. 1994)); *Wilson v. Great Am. Indus., Inc.,* 855 F.2d 987, 994 (2d Cir. 1988), 855 F.2d at 994 (the "inquiry is not whether an actual conflict . . . existed, but rather whether full disclosure of potential conflicts of interest has been made."); *e.g., Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 91 (D. Conn. 2019) (finding failure to disclose relationship actionable, even where the proxy was literally accurate).

### D.      The "Highest Price" Assurance

In the proxies, Defendants said their support for the deal was informed by the belief that the Merger price was the "highest price Vista was willing to pay" and the "highest price per share value reasonably obtainable as of the date of the Merger Agreement."  ¶233.  Vista's willingness to pay more was material, including because it spoke to (a) the likelihood of a topping offer if investors voted against the Merger and (b) a sophisticated party's valuation of

40

Mindbody.  The Merger price was $36.50.  ¶149.  On October 15, 2018, Vista gave Stollmeyer a "direct indication of interest," and the following day Stollmeyer emailed White to say:

> Vista is very enthused about us, would pay a substantial premium to [Mindbody's] *recent trading range* and see the stock correction as [an] opportunity. They have no idea what we are about to report or guide.

¶95.  Mindbody traded as high as $41.25 in the first half of October, far above the $36.50 Merger price.  ¶96.  This email proves Defendants knew Vista's willingness to pay a "substantial premium," leaving no question of their scienter.  Defendants argue they cannot be liable since the "highest price" statements are opinions.  MtD 19.  This argument fails for two reasons.

**<u>First</u>**, statements of opinion are actionable where Defendants did not "actually hold[] the stated belief."  *Omnicare,* 575 U.S. at 184.  Defendants' argument hinges on reinterpreting the substantial premium quote—contrary to the rule that well-pled allegations should be interpreted in plaintiff's favor.  *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 92 (S.D.N.Y. 2006) ("Even under the PSLRA, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all inferences are drawn in favor of the pleader.").  In any event, Defendants reinterpretation is implausible.

Defendants contend that the "recent trading range" Stollmeyer referred to should be read in reference to the "stock correction" Vista saw as an opportunity.  MtD 19 n.12.  First, there is no reason to prefer this interpretation since there is no limiting language—the "opportunity" clause and the "premium" clause are conjoined only by the word "and."  ¶95.  It is more likely the "range" refers to the prices over a 30-day period; Mindbody itself used a 30-day period when discussing the "premium" to its investors in the Merger proxies.  ¶185.  But even accepting the concept that the "range" was tied to the "correction," offers Defendants no support.  They state:

41

> [T]he 'stock correction' referred to in Stollmeyer's email occurred
> from October 5, 2018, when the stock traded at $41.25 per share,
> to October 11, 2018, when it traded as low as $31.86 per share.

MtD 19 n.12. Even accepting this, does not alter the AC's conclusion, that Vista was expressing

interest at a premium to $41.25. When one refers to a "premium" to a price "range," they are

most naturally understood as offering to pay an amount above that range—here, above $41.25.

Reaching further, Defendants arbitrarily assert that the "range" was really the period from

the bottom of the "correction" to the price on October 16, 2018—leading to a range of $31.86 to

$34.59. *Id.* Even crediting this baseless interpretation, Defendants' theory *still makes no sense*.

Using this contorted range, they argue the Merger price was a "6% premium over $34.59

per share." *Id.* But that would be far below what could be called a "substantial" premium. The

AC alleged that average premiums exceed 20%. ¶96. In fact, in soliciting investors to accept the

Merger, Defendants published a presentation showing the premiums for other transactions in its

industry, ranging from 69% to 7%.[14] Meaning 6% was below even the lowest comparable deal.

Thus, even accepting Defendants' "trading range," they still knew Vista's $36.50 offer was not a

"substantial premium" to that range, and stated otherwise while failing to disclose the truth.

**Second**, even if they genuinely believed the fact that the Merger price was the highest

price obtainable, it was still misleading to withhold the information in Stollmeyer's email to

White. *Omnicare*, 575 U.S. at 189 (holding opinion statements are actionable where they

conflict with what "a reasonable investor would take from the statement"). Where a fiduciary

discloses to those he serves that he believes a deal price is the best another was willing to pay,

those served by the fiduciary would expect the disclosure of material information to the contrary,

within that fiduciary's possession, regardless of the literal accuracy of the fiduciaries' statement.

---

[14] Mindbody DEF14A, at 3 (Jan. 29, 2019), https://www.sec.gov/Archives/edgar/data/1458962/
000119312519023950/d680429ddefa14a.htm.

42

On January 6, 2019, Stollmeyer emailed White that another suitor had indicated interest and said they feel Mindbody was "worth a lot more than $36.59." ¶166. This occurred during the go-shop. It was misleading to tout the "highest price" language without disclosing this indication by another bidder that it concluded Mindbody was worth "a lot more."

### E.      Omission of 4Q18 Results and Other Omissions

Defendants misled investors by failing to disclose the actual 4Q18 results or that these results were a "massive beat" and "exceeded consensus pretty meaningfully." Scienter is undeniably pled as to these omissions, since Defendants undeniably knew of the undisclosed material facts. *See* ¶¶306–10; *Novak*, 216 F.3d at 307. The failure to disclose this information violated two distinct affirmative disclosure duties and was material. [15]

#### 1.      Duty to Update

Defendants had a duty to update their guidance. A "duty" arises when "disclosure is necessary to make prior statements not misleading." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993); *IBM Corp.*, 163 F.3d at 110 ("A duty to update may exist when a statement . . . becomes misleading because of a subsequent event."). Defendants failed to meet this duty when they knowingly failed to disclose that earnings were a "massive beat" against the prior issued guidance – information that they had *over a month before the vote*. ¶186.

Defendants point to generic cases (none involving mergers) about "pre-announc[ing] earnings" (MtD 29–31), but ignore cases addressing the scenario here: misleading guidance prior to a merger. For example, Defendants argue "there is no obligation to pre-announce results." MtD 30 (quoting *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000)).

---

[15] Without explaining its relevance, and in conflict with the law cited in this Section, Defendants claim disclosing this information would have exposed them to liability. MtD 30 n.16. However: (1) no facts in the AC support this theory; (2) even if *sloppy* disclosure posed risks, this has no bearing on their duties, they had options to accurately disclose the material information they possessed; and (3) Companies often issue preliminary unaudited results.

43

However, the case Defendants cite has been recognized as inapposite to situations involving mergers. *See In re Bank of Am. Corp. Sec., Derive, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 304 (S.D.N.Y. 2010) ("*BoA*") (finding defendants' failure to update investors on changes to the company's financial condition prior to a merger to be actionable). In *BoA*, defendants pointed to *Telecom,* as Defendants do here, but *BoA* distinguished it because it did not arise in a merger context. *Id.*; *see also Blum v. Semiconductor Packaging Materials Co., Inc.*, 1998 WL 254035, at *2 (E.D. Pa. May 5, 1998) (finding duty to update where events could fundamentally change the company); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 747–48 (S.D.N.Y. 1989) (describing duty to update in merger context where there is a "sharp break" from "prior public positions."); *cf. Wilson*, 855 F.2d at 991 (prior financial statements were "rendered misleading" due to subsequent performance).

### 2.   Delaware Law Disclosure Duty

The AC alleged that under Delaware law the Defendants had a duty to disclose all material information. ¶245. Delaware law imposes a "duty" requiring "directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action." *BoA*, 757 F. Supp. 2d at 339 (quoting *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)); *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *29 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019) (when stockholders are necessary for approving a transaction, such as a merger, "directors must disclose truthfully to stockholders 'all facts that are material to the stockholders' consideration of the transaction'").

It is well established that breaching a disclosure duty imposed by state law is actionable under the securities laws. *See Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 468 (2d Cir. 2013) (noting that "duty to disclose may be established by state or federal law.") (quoting *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991)); *accord Fortson v. Winstead, McGuire, Sechrest &*

44

*Minick*, 961 F.2d 469, 472 (4th Cir.1992) ("the [affirmative] duty to disclose material facts arises only when there is some basis outside the securities laws, such as state law, for finding a fiduciary . . . relationship."); *S.E.C. v. Tambone*, 597 F.3d 436, 448 (1st Cir. 2010) (similar).

Defendants ***do not contest*** the existence of this duty or its relevance to securities claims, and therefore concede its applicability.  *See Bertuglia,* 839 F. Supp. 2d at 737.  The failure to disclose the 4Q18 results, or even to disclose that the prior guidance was substantially beat, runs in contravention of Defendants' duties under Delaware law and constitutes actionable omissions.

### 3.      Materiality

Defendants try to avoid liability for breaching their disclosure duties by arguing that the 4Q18 results were immaterial as a matter of law.  They do not approach proving that "reasonable minds could not differ" as to the importance of the omissions.  *Burkle*, 2 F. Supp. 3d at 522.

Defendants claim that "Mindbody's Q4 revenue *modestly* beat its guidance" (MtD 30), is laughable, given that Stollmeyer himself called the results a "***massive*** beat."  ¶132.  White said the results "***exceeded consensus pretty meaningfully***," and that "***the right thin[g] to do*** is to publicly release this information . . . so the shareholders have the information before they vote." ¶195.  Similarly, counsel for Mindbody wrote to Kirkland (defense counsel here and Vista's counsel in the Merger), stating that "Mindbody would prefer to do a pre-announcement," further indicating they thought the information was important for shareholders to have before they vote. ¶198; *see generally In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 281 n.143 (S.D.N.Y. 2011) (defendants' prior views that something was material provide "some evidence that a reasonable investor also would have considered it important") (emphasis added).

Ignoring their own statements, Defendants rely on misconstruing an SEC staff bulletin. MtD 30–31 (citing SEC Staff Accounting Bulletin ("SAB 99")).  Defendants say that SAB 99 means that, because the revenue beat was not more than 5% above guidance, the Court should

find it to be immaterial as a matter of law.  As a threshold matter, SAB 99 cannot convert a

factual issue into a legal one and does not suggest "reasonable minds[16] could not differ" as to the

omission's importance.  *Burkle*, 2 F. Supp. 3d at 522.

The Second Circuit has referred to SAB 99 as "persuasive" and as "a starting place," but

had never endorsed the concept of a numeric threshold for materiality.  *ECA, Local 134 IBEW*

*Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198, 204 (2d Cir. 2009).

Defendants misleadingly and selectively quote SAB 99, ***omitting the underlined text***:

> One rule of thumb in particular suggests that the misstatement or
> omission of an item that falls under a 5% threshold is not material
> in the absence of particularly egregious circumstances, such as
> self-dealing or misappropriation by senior management. The staff
> reminds registrants and the auditors of their financial statements
> that exclusive reliance on this or any percentage or numerical
> threshold has no basis in the accounting literature or the law. . . .
> The staff has no objection to such a "rule of thumb" as an initial
> step in assessing materiality. But quantifying, in percentage terms,
> the magnitude of a misstatement is only the beginning of an
> analysis of materiality; it cannot appropriately be used as a
> substitute for a full analysis of all relevant considerations.

1999 WL 1123073, at *2.  Most deceptively, Defendants state that SAB 99 "delineates a set of

nine qualitative factors to assess whether such 'egregious circumstances' exist."  MtD 30–31.  In

truth these "nine factors" are merely nine bullet points that follow the statement "among the

considerations that may well render material a quantitatively small misstatement of a financial

statement item are: [list]."  1999 WL 1123073, at *3–4.  With this in mind, there are three

additional reasons SAB 99 does not support dismissal, and actually supports materiality.

**First**, several of the bullet points describing qualitative factors apply to the present

---

[16] Notably, in the words of one SEC Commissioner, the "SEC allowed the waters to be muddied" with SAB 99, which "does not necessarily represent the views of the [SEC]," was not issued by formal rule making by the SEC or its commissioners, and the only reflects the views of the SEC staff when issued, and since then "a lot has changed." Remarks by Commissioner Paul S. Atkins to Practicing Law Institute (Feb. 8, 2008), www.sec.gov/news/speech/2008/spch020808psa.htm.

situation.  For example, one of those bullet points asks whether the misstatement "masks a change in earnings."  *Id.*  Indeed, the failure to disclose Mindbody's better than expected 4Q18 revenue does just that.  Another asks whether the misrepresentation "concerns a segment . . . of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability."  Here, the omission did not concern a mere segment, but concerned the entirety of Mindbody's performance.  And yet another asks whether the misstatement "hides a failure to meet analysts' consensus expectations."  *Id.*  Here it did precisely that—it hid that Mindbody performed far above analyst expectations.  ¶195.[17]

**Second**, immediately after the bullet points, SAB 99 states "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  1999 WL 1123073, at *4.  The approximate 20% price move following the Cut (¶110), strongly suggests the market would view the undisclosed results as important.

**Third**, SAB 99 makes room for other factors to weigh on materiality.  Many other facts support materiality including: the context of the omissions occurring prior to the Merger, the fact that the omitted information varied from the substantial Cut, that the 4Q18 results were shared with Vista prior to the Merger, and Defendants' view the beat was "massive" and "substantial."

Finally, Defendants' view of SAB 99 leads to absurd results.  If they were right, a firm that beat guidance by 4% would not normally need to ever disclose its results, not in its 10-Q or 10-K, since the results would be "immaterial" barring "egregious circumstances."  MtD 30.

---

[17] Defendants argue this bullet only applies when underperformance is hidden.  MtD 31.  This overtechnical reading ignores the advisory nature of the list.  The point of the bullet is clear: variance from analyst expectations supports materiality.  Defendants suggest that a special rule about guidance beats might make sense because, markets punish even small misses, which could lead some to issue low guidance.  *Id.*  But no such rule exists, and the prospect of the SEC indulging executives in engineering market reaction is implausible and unsupported.  Even if a concern with market reaction was reasonable, at most, this could support widening guidance ranges, not guiding too low.

### 4.    Additional Omissions and Defendant Liaw's Liability

In addition to statements that were misleading due to omission, and the omission of the 4Q18 results, Defendants are also liable for their other material omissions prior to the Merger. For example, it was an actionable to omit the higher price Vista had offered to pay (Section IV(D)), or Qatalyst conflicts (Section IV(C)(5)), or that Booker met increasing sales targets in 3Q18 and 4Q18 (Section IV(B)), or the terms of employment negotiations (Section IV(C)(4)).

Defendants argue that Liaw escapes liability under Rule 10b-5(b) because he did not make a statement, consistent with *Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011). While Defendant Liaw did not make any false statements during the Class Period, he is liable for his material omissions. *See Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 (S.D.N.Y. 2012) (*Janus* implies that each party is "liable for their own omissions."). For example, Liaw failed to disclose the 4Q18 results, was privy to the "massive beat," and had a duty to disclose this information as a director. *See* Section IV(E)(2).

### F.    Actionable Conduct

Rule 10b–5(c) makes it unlawful to engage in any "act, practice, or course of business" that "operate[s] . . . as a fraud." 17 C.F.R. § 240.10b–5. Defendants' conduct operated as a fraudulent scheme. *Lorenzo*, 139 S. Ct. at 1102. Rules 10b-5(a)/(c) are "expansive" and "capture a wide range of conduct." *Id*. at 1101, 1102. Defendants misled investors and artificially deflated Mindbody's stock price to maximize the odds of a take-private merger and to favor Vista, by putting out the Cut, Justifications, false process information, hiding Vista's higher indication of interest, and hiding the 4Q18 results. This "course of conduct" is actionable regardless of whether any statement is actionable. *S.E.C. v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013) (noting that 10b-5(b) "was the only subsection at issue in *Janus*" and that "fraudulent activities independently satisfy the requirements of scheme liability").

48

Defendants ***do not contest*** their liability under 10b-5(a) and (c) beyond denying that Liaw

engaged in the scheme (and contesting scienter generally).  MtD 28.  These claims must proceed

against Defendants Stollmeyer and White.  Defendants deny Liaw's involvement, but the AC

alleges he was involved in the Merger and acted for Mindbody in the discussions – thus

furthering the fraudulent course of conduct – so this claim should proceed against Liaw as well.

## V.     LEAD PLAINTIFFS STRONGLY PLEAD ACTIONABLE § 14(a) CLAIMS

The "purpose of § 14(a) is to prevent management . . . from obtaining authorization for

corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case

Co. v. Borak*, 377 U.S. 426, 431 (1964).  A § 14(a) claim must allege "(1) the proxy . . .

contained a material misrepresentation or omission, which (2) caused plaintiff's injury, and (3)

that the proxy . . . was an essential link in the . . . transaction."  MtD 12 (quoting *In re JP

Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005)).  The first element is

addressed below; Defendants do not challenge the second or third element.

The statements and omissions addressed in Section IV are actionable under § 14(a) if

they occurred in or were omitted from a proxy.  *E.g.,* Sections IV(B)(2)(c)–IV(E); ¶¶225–61.

There is no scienter requirement in § 14(a) claims, meaning that Defendants are liable

upon a showing of a materially misleading statement or omission.  Courts have held that § 14(a)

requires "negligence."  *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 36 F. Supp. 3d 279, 283

(S.D.N.Y. 2014), *aff'd*, 817 F.3d 393 (2d Cir. 2016).  However, the Second Circuit has firmly

established that "[a]s a matter of law, the preparation of a proxy . . . containing materially false

or misleading statements or omitting a material fact is sufficient to satisfy the . . . negligence

standard."  *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 560

(S.D.N.Y. 2017) (quoting *Wilson*, 855 F.2d at 995); *Baum,* 408 F. Supp. 3d at 91 (the preparation

of materially false proxy is negligent as "a matter of law.") (citation omitted); *see also Beck v.*

49

*Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed [it] in perfect good faith"); *Brown v. Brewer*, 2010 WL 2472182, at \*24–25 (C.D. Cal. June 17, 2010) (similar).

By misinterpreting the pleading rules set by *Rombach v. Chang*, Defendants say § 14(a) requires a showing of scienter. *See* MtD 35 (citing 355 F.3d 164, 170 (2d Cir. 2004)). But *Rombach* merely held that cases that sound in fraud must "state with particularity the facts giving rise to a strong inference that the defendant acted with ***the required state of mind***." 355 F.3d at 176. Pleading rules cannot inject a new state of mind requirement in § 14(a). The PSLRA's pleading requirement "does not apply," since "negligence is not a state of mind; it is a failure . . . to come up to the specified standard of care." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 239 (S.D.N.Y. 2012) (complaint sounded in fraud, triggering Rule 9(b) particularized pleadings, but sustaining § 14(a) claims pleading only negligence); *see* U.S.C. § 78u-4(b)(2) (requiring particular pleadings of "***the required*** state of mind"). Even if more were required it would be satisfied here, where scienter is also pled.

## VI.    PLAINTIFFS HAVE ADEQUATELY ALLEGED § 20(a) CLAIMS

Control person claims must show a primary violation, control, and culpable participation. *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 415 (S.D.N.Y. 2019); 15 U.S.C. § 78t(a). The primary violations are well pled (*see* Sections IV–V) and Defendants do not deny the Individual Defendants were control persons or culpable participants. *See* MtD 50; ¶¶314–20.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny the Motion. Lead Plaintiffs request any dismissal be without prejudice, to permit amendment to cure any deficiency. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("without . . . a ruling," plaintiffs may not be in a position to weigh the "practicality" or "means" of amending).

DATED:  April 3, 2020                    LABATON SUCHAROW LLP

                                          By: */s/ Carol C. Villegas*

                                          Carol C. Villegas
                                          David J. Schwartz
                                          Jake Bissell-Linsk
                                          140 Broadway, 34th Floor
                                          New York, NY  10005
                                          Telephone: (212) 907-0700
                                          Fax: (212) 818-0477
                                          cvillegas@labaton.com
                                          dschwartz@labaton.com
                                          jbissell-linsk@labaton.com

                                          ***Lead Counsel for Lead Plaintiffs Walleye Trading
                                          LLC and Walleye Opportunities Master Fund Ltd.,
                                          and Lead Counsel for the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2020, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by email to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Carol C. Villegas*

Carol C. Villegas
