**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE MINDBODY, INC. SECURITIES
LITIGATION

Index No. 1:19-cv-08331-VEC

**ORAL ARGUMENT REQUESTED**

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

---

Patrick Gibbs
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5535

Sarah M. Lightdale
Brian M. French
Daniel P. Roy III
COOLEY LLP
55 Hudson Yards, 44th Floor
New York, New York 10001
(212) 479-6374

*Attorneys for Defendant Eric Liaw*

Matthew Solum, P.C.
John Del Monaco
Ian C. Spain
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Defendants MINDBODY, Inc.,*
*Richard L. Stollmeyer, and Brett White*

# TABLE OF CONTENTS

**Page**

I.    PLAINTIFFS HAVE FAILED TO PLEAD A MISSTATEMENT. ...................................1

    A.    The Guidance Statements ....................................................1

    B.    The Integration Statements ...................................................4

    C.    The Premium Statements ....................................................5

    D.    The Value Statement..........................................................6

    E.    The Process Statements ......................................................7

    F.    The Background Statements .................................................8

    G.    The Transaction Committee Statements .................................9

II.   PLAINTIFFS FAIL TO PLEAD THAT LIAW MADE AN ACTIONABLE MISSTATEMENT OR OMISSION...................................................................9

III.  PLAINTIFFS HAVE FAILED TO PLEAD AN OMISSION.........................................10

    A.    Preliminary, Unaudited Q4 Revenue ....................................10

    B.    Qatalyst's Business Dealings with Past or Future Vista Acquisitions..................13

IV.   PLAINTIFFS HAVE FAILED TO PLEAD SCIENTER....................................................14

    A.    Plaintiffs Have Not Adequately Alleged Motive and Opportunity. .....................14

        1.    Stollmeyer ................................................................14

        2.    White.......................................................................19

        3.    Liaw ........................................................................19

    B.    Plaintiffs Have Not Adequately Pled Conscious Misbehavior or Recklessness. ................21

V.    PLAINTIFFS' SECTION 14(a) CLAIM FAILS AS A MATTER OF LAW. .................23

VI.   PLAINTIFFS' 10B-5(a) AND (c) CLAIM CANNOT STAND........................................24

CONCLUSION.....................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004).......................................................................24

*In re APAC Teleservice, Inc. Sec. Litig.*,
  1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999)..............................................................2

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)..........................................................................6

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)..........................................................6, 23

*In re Bank of America Corp. Sec., Deriv. & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010).......................................................................11

*Baum v. Harman Int'l Indus., Inc.*,
  408 F. Supp. 3d 70 (D. Conn. 2019).........................................................................13

*Blum v. Semiconductor Packaging Materials Co.*,
  1998 WL 254035 (E.D. Pa. May 5, 1998)..............................................................10, 11

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  866 F. Supp. 2d 223 (S.D.N.Y. 2012).......................................................................24

*Burkle v. OTK Assocs.*,
  2 F. Supp. 3d 519 (S.D.N.Y. 2014) .........................................................................13

*Chiarella v. United States*,
  445 U.S. 222 (1980).................................................................................................10

*Christine Asia Co. Ltd. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017) ...............................................................................22

*City of Providence v. Aeropostale*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ............................................................2

*In re Columbia Pipeline, Inc.*,
  405 F. Supp. 3d 494 (S.D.N.Y. 2019)...................................................................5, 24

*Dura Pharma., Inc. v. Broudo*,
  544 U.S. 336 (2005)..................................................................................................9

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009).................................................................................8, 15

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017)..........................................................................25

*In re Eventbrite, Inc. Sec. Litig.*,
   2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ...............................................................5

*In re EZCorp, Inc. Sec. Litig.*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016)............................................................................7

*Fezzani v. Bear, Stearns & Co.*,
   384 F. Supp. 2d 618 (S.D.N.Y. 2004)..........................................................................25

*Fortson v. Winstead, McGuire, Sechrest & Minick*,
   961 F.2d 469 (4th Cir. 1992) .......................................................................................10

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018)............................................................................2

*Gissin v. Endres*,
   739 F. Supp. 2d 488 (S.D.N.Y. 2010)............................................................................5

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
   725 F. Supp. 712 (S.D.N.Y. 1989) ..............................................................................11

*IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*,
   2012 WL 928402 (D. Vt. Mar. 19, 2012) ....................................................................13

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
   Scot. Grp. PLC*,
   783 F.3d 383 (2d Cir. 2015)...........................................................................................8

*In re IBM Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)...........................................................................................2

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)...................................................................................20, 21

*In re Lehman Bros. Sec. and ERISA Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011)..........................................................................12

*Levitt v. J.P. Morgan Sec., Inc.*,
   710 F.3d 454 (2d Cir. 2013).........................................................................................10

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019).................................................................................................25

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   277 F. Supp. 3d 500 (S.D.N.Y. 2017)..........................................................................24

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   2011 WL 536437 (S.D.N.Y. Feb. 9, 2011)................................................................25

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014).....................................................................................3

*In re N.Y. Cmty. Bancorp, Inc., Sec. Litig.*,
   448 F. Supp. 2d 466 (E.D.N.Y. 2006) .....................................................................22

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018).......................................................................18

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*,
   840 F. Supp. 243 (S.D.N.Y. 1993) ...........................................................................2

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................................7

*Ramzan v. GDS Holdings Ltd.*,
   2020 WL 1689772 (S.D.N.Y. Apr. 7, 2020)...............................................................21

*Red Oak Fund, L.P. v. Digirad Corp.*,
   2013 WL 5740103 (Del. Ch. Oct. 23, 2013) .............................................................12

*In re RJR Nabisco, Inc. S'holders Litig.*,
   1989 WL 7036 (Del. Ch. Jan. 31, 1989) ..................................................................16

*Salman v. United States*,
   137 S. Ct. 420 (2016)..............................................................................................16

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).......................................................................................23

*SEC v. Lee*,
   720 F. Supp. 2d 305 (S.D.N.Y. 2010).......................................................................25

*SEC v. N. Am. Research & Dev. Corp.*,
   424 F.2d 63 (2d Cir. 1970).......................................................................................16

*SEC v. Rio Tinto PLC*,
   2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ...........................................................25

*SEC v. Tambone*,
   597 F.3d 436 (1st Cir. 2010)....................................................................................10

*Sgalambo v. McKenzie*,
   739 F. Supp. 2d 453 (S.D.N.Y. 2010).......................................................................23

*Skeen v. Jo-Ann Stores, Inc.*,
   750 A.2d 1170 (Del. 2000) ......................................................................................12

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)..................................................................21

*Stein v. Tangoe, Inc.*,
2014 WL 12767210 (D. Conn. Sept. 30, 2014) .......................................7

*In re Symbol Techs. Inc. Sec. Litig.*,
2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ............................................2

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................18

*Thesling v. Bioenvision, Inc.*,
374 F. App'x 141 (2d Cir. 2010) ............................................................10

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
676 F. Supp. 458 (S.D.N.Y. 1987) ...........................................................2

*United States v. Schiff*,
602 F.3d 152 (3d Cir. 2010)...................................................................10

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009).....................................................21

*Varljen v. H.J. Meyers, Inc.*,
1998 WL 395266 (S.D.N.Y. 1998)..........................................................18

*In re WEBMD Health Corp. Sec. Litig.*,
2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) .................................................2

*In re Wellcare Mgmt. Grp., Inc. Sec. Litig.*,
964 F. Supp. 632 (N.D.N.Y. 1997) .........................................................18

*Weller v. Scout Analytics, Inc.*,
230 F. Supp. 3d 1085 (N.D. Cal. 2017) ....................................................7

*Wilson v. Great Am. Indus., Inc.*,
855 F.2d 987 (2d Cir. 1988).............................................................11, 13

*Wilson v. LSB Indus., Inc.*,
2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ............................................3

**Statutes**

15 U.S.C. § 78u-5(a)(1) ............................................................................3

**Other Authorities**

Alejandro Cremades, *Rick Stollmeyer on Selling For $1.9 Billion the Company That He Created Out of His Own Garage*, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage ........................................................................................................................... 17

Staff Accounting Bulletin No. 99,
    1999 WL 1123073 ........................................................................................................... 13

William Ciconte, III, et al., *Does the midpoint of range earnings forecasts represent managers' expectations?*, 19 Rev. Acct. Stud. 628 (2014),
    http://ssrn.com/abstract=2061440 ......................................................................... 4, 22

Plaintiffs' Opposition does not change anything; there remain several independent grounds requiring dismissal.[1]  First, the opening bookend of the supposedly fraudulent scheme— the reduced Q4 2018 forward-looking guidance issued in November 2018—does not violate the securities laws.  Plaintiffs have not alleged any facts demonstrating that any Individual Defendant believed that guidance to be false at the time it was issued.  To the contrary, the only factual allegations in the AC, including the documents referenced therein, contradict that notion.

Second, Plaintiffs offer no basis to hold that a decision not to pre-release unaudited revenue violates the securities laws, the other bookend of the alleged scheme.  Indeed, issuing a partial financial picture would itself likely violate the federal securities laws.

Third, Plaintiffs cannot cure the defects in their scienter allegations.  Plaintiffs focus on an alleged motive—that Defendants desired a take-private with Vista—that is irrelevant.  The inquiry is whether any Defendant—who all held substantial Mindbody stock—intended to intentionally depress Mindbody's stock price.  No such logical reason has been alleged.

Defendants do not ask for a "license to defraud," as Plaintiffs contend,[2] but seek proper application of federal securities law, which compels dismissal of baseless lawsuits like this one.[3]

# I.    PLAINTIFFS HAVE FAILED TO PLEAD A MISSTATEMENT.

## A.    The Guidance Statements

Plaintiffs advance various challenges to the applicability of the PSLRA Safe Harbor to

---

[1]    This reply uses the definitions in the Motion.  Citations and quotations are omitted unless otherwise indicated.

[2]    Plaintiffs criticize the argument that their theory is "inventive" by referencing a supposed "legion of cases" involving alleged breaches of fiduciary duty by management teams in M&A transactions.  (Dkt. No. 39, "Opp." at 1.)  But Plaintiffs cannot recast (weak) allegations that senior management did not maximize shareholder value into a supposed scheme to harm Mindbody's shareholders who sold in the lead up to the Vista acquisition.

[3]    Aside from the fundamental flaws exposed by this motion, Plaintiffs should consider the wisdom of pursuing this case in light of recent events.  Companies that are dependent on social interaction like massage, acupuncture, salon and spa treatments, and group fitness, like Mindbody and its customers, have been particularly devastated by the pandemic.  Mindbody, one of the largest employers in central California, recently laid off more than one-third of its workforce, making the costs of continuing to defend this lawsuit even more unjustified.  And the idea that Plaintiffs were shortchanged rings especially hollow given that, but for the Merger, Mindbody's stock price would likely be a small fraction of what the putative class members received.

the Guidance Statements.[4]   None has merit.   Plaintiffs first mischaracterize Defendants'
argument as turning the PSLRA into a "license to defraud."  (Opp. at 28.)  Not so.  The opening
brief recognized the Safe Harbor's limits—it applies where the statements were accompanied by
adequate cautionary language, the statements were immaterial, or the plaintiff fails to prove
actual knowledge the statements were false.  (Mot. at 13.)  Those parameters are satisfied here.

Plaintiffs then try to escape the Safe Harbor by arguing that the Guidance Statements
were false when made because they supposedly "did not convey management's real
expectations."  (Opp. at 30.)[5]   The PSLRA, however, requires that Plaintiffs plead "actual
falsity," subject to the "*strong* inference" requirement that their allegations be more than
"'merely plausible or reasonable' but 'cogent and at least as compelling as any opposing
inference.'"   *See In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *7 (S.D.N.Y.
Jan. 2, 2013).  All that Plaintiffs have alleged is that:  (i) before the Q4 guidance, one Mindbody
FP&A manager stated in an email that Mindbody was "on track to hit [its] forecast" (Opp. at 23);
and (ii) two months after the Q4 guidance, Mindbody possessed an "internal revenue forecast"
for $68 million (*id.* at 24-25).  It is unclear from the FP&A manager's alleged email, however,

---

[4]   This reply categorizes the alleged misstatements and omissions the same as in the Motion.  (*See* Dkt. No. 36,
"Mot." at 12-13.)  Plaintiffs use their own terms but do not raise any issue with Defendants' categorizations.

[5]   Notably, Plaintiffs fail to identify a single instance of a court finding that conservative guidance was actionable.
(Opp. at 28-29.)  Most of Plaintiffs' cases do not even deal with application of the Safe Harbor's conditions.
*See In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (inactionable opinions); *In re Symbol Techs.
Inc. Sec. Litig.*, 2013 WL 6330665, at *14-15 (E.D.N.Y. Dec. 5, 2013) (Safe Harbor did not apply because
defendants had entered a consent decree prohibiting future securities fraud violations and cautionary language
was "merely boilerplate"); *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *8 (S.D.N.Y.
Nov. 19, 1999) (statements were not forward-looking); *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840
F. Supp. 243 (S.D.N.Y. 1993) (applying law superseded by the PSLRA); *In re Union Carbide Corp. Consumer
Prods. Bus. Sec. Litig.*, 676 F. Supp. 458 (S.D.N.Y. 1987) (same).  Plaintiffs' remaining cases are best read as
limited to circumstances where, unlike here, a company expressly conditions overstated guidance on statements
that a disclosed problem has been resolved, knowing that it has not been.  *City of Providence v. Aeropostale*,
2013 WL 1197755, at *13-14 (S.D.N.Y. Mar. 25, 2013) (analogizing to a case where plaintiffs were "not
relying on the falsity of . . . financial projections and estimates" but on the failure to disclose known problems);
*see also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 299 (S.D.N.Y. 2018) (guidance actionable
where defendants failed to disclose the existence of a negative impact, not for improperly estimating its effect).

what type of forecast is referenced (e.g., revenue, profit, etc.), what time period it applies to, and even whether the forecast is for the company, a business unit, or something else.  Plaintiffs also never connect this email to Stollmeyer (the CEO) or White (the CFO), as would be necessary to show these individuals' alleged actual knowledge.  Likewise, Plaintiffs do not allege that the internal revenue forecast discussed in January 2019 even existed when the Q4 guidance was issued, whether it changed, or whether it was the only forecast.[6]

Plaintiffs also argue that Defendants "carry the burden of demonstrating that they are protected by the meaningful cautionary language prong of the safe harbor."  (Opp. at 31.)  True; that burden has more than been met.  (Mot. at 14-15.)  Rather than identify a true inadequacy in the cautionary language, Plaintiffs argue that Defendants failed to warn of their alleged scheme.  (Opp. at 31.)  That circular logic is unavailing since Plaintiffs have not alleged any such scheme.

As a final salvo, Plaintiffs reach for an exclusion to the Safe Harbor for statements "made in connection with a going-private transaction."  (Opp. at 32.)  This stretches the exclusion past its breaking point—the Guidance Statements preceded the Vista Transaction by many weeks.  In any case, Plaintiffs do not contest that the Safe Harbor applies to forward-looking statements made in connection with quarterly and annual financial reporting, 15 U.S.C. § 78u-5(a)(1), nor do they deny that the Guidance Statements were made in connection with Mindbody's quarterly reporting—placing them squarely within the Safe Harbor (*see* AC ¶¶ 210, 212; Exs. 14, 22).  Plaintiffs' effort to argue otherwise is devoid of legal support, because there is none.[7]

---

[6]   In a semantic exercise, Plaintiffs also contend that the Safe Harbor does "not protect material omissions."  (Opp. at 29.)  According to Plaintiffs, the Guidance Statements were contradicted by "information available within the company."  (*Id.*)  This is just a variation of their "falsity" argument—which fails because Plaintiffs do not allege that such information existed, let alone that Stollmeyer or White were aware of it.

[7]   Plaintiffs also cite cases that stand for the unremarkable proposition that partial disclosures can be misleading.  One example relates to whether statements regarding environmental monitoring activities were misleading for allegedly failing to disclose that the company was aware of, and reported to authorities, "existing problems" with its compliance.  *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014); *see also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *2-3 (S.D.N.Y. Mar. 2, 2017) (statements regarding estimated project

B.      **The Integration Statements**

Attempting to show that the Integration Statements were false, Plaintiffs rely heavily on anonymous, unquoted allegations from CW-2 and CW-3 (Opp. at 26-27), yet they never address the fundamental flaws in anonymous witness allegations (*see* Mot. at 48), nor in these allegations specifically (*see* Mot. at 49-50).  Plaintiffs do not explain how allegations that CW-2 and CW-3 thought that Mindbody's Q3 guidance "was a surprise" or that, at some point in Q3, that quarter's forecast was "on track" bear upon statements about something else entirely:   Q4 guidance.  (*See* Opp. at 26-27.)  Even if these allegations were somehow relevant, Plaintiffs fail to explain why this Court should find these allegations indicative of the Company's actual performance when they are plainly contradicted by other events, such as the fact that Mindbody missed its Q3 forecast.  (Mot. at 5, 50; Ex. 15 at 1.)[8]

Plaintiffs' contention that it is supposedly "dispositive" that Booker's sales quotas were allegedly increasing on a quarter-over-quarter basis is just as hollow.  (Opp. at 26.)  That is entirely consistent with the fact that under the challenged Q4 guidance, revenue was still projected to grow $1.2 to $3.2 million over the prior quarter.  (*See* Mot. at 49.)

Equally unavailing is the claim that, over six weeks before Mindbody issued its Q4 guidance, Mindbody said that the "Integration was going well."  (Opp. at 3; *id.* at 32.)  But Mindbody, at the same time, told investors that the integration would likely depress 2018 revenues and generate "strong growth" in 2019.  (Mot. at 3 n.3; Ex. 3 at 2; Mot. at 3-4 (quoting

---

costs were misleading because they did not disclose that no engineering analysis had been performed and that the estimates were without a reasonable basis).  None of these cases supports Plaintiffs' claims.

[8]   Plaintiffs argue that Q3 '18 revenue, which was "within guidance," was not a miss because "there is no assumption that a company will hit its midpoint."  (Opp. at 33.)  Plaintiffs offer no support for this position. They are wrong.  Failing to "meet or exceed" analyst expectations for earnings "may result in severe penalties such as a plummeting stock price."  William Ciconte, III, et al., *Does the midpoint of range earnings forecasts represent managers' expectations?*, 19 Rev. Acct. Stud. 628 (2014), http://ssrn.com/abstract=2061440, at 2 (hereinafter "Ciconte Study").  Here, analysts, including Jefferies, reported that Mindbody experienced a "Q3

Ex. 7 at 49-50).)  Mindbody also stated that it began experiencing "near-term friction" with the integration process by the end of Q2, which led to reduced 2018 guidance.  (Mot. at 3; Ex. 4 at 5, 10.)  Based on this, research analysts projected that integration challenges would depress Q3 and Q4 growth in 2018.  (Mot. at 4; Ex. 5 at 1; Ex. 6 at 1.)  Thus, Mindbody informed investors of anticipated challenges with the integration, experienced those problems, revised its guidance downward after Q2 '18, underperformed in Q3 '18, and lowered its guidance again for Q4 '18. (*See* Mot. at 3-5.)  *See also In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *12 n.6 (N.D. Cal. Apr. 28, 2020) ("[P]ositive statements about a recent acquisition are inactionable because '[w]hen one company acquires another, it is to be expected that the acquiring company will characterize the acquisition in a positive light.'  Merging companies always predict that they will be able to integrate their teams and that this integration will bring a positive result.  For this reason, reasonable investors know better than to rely on these statements.").[9]

### C.  The Premium Statements

Plaintiffs do not contest that the premium calculation was mathematically correct. Instead, Plaintiffs quibble that the calculation was "misleading" because there was no disclosure that the premium had been measured against "the intentionally reduced Mindbody's [sic] stock price."  (Opp. at 34.)  That is unavailing; the securities laws impose no obligation to engage in self-flagellation.  *See In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 524 (S.D.N.Y. 2019).[10]

---

miss" of analyst expectations, which were the same as the midpoint of Mindbody's guidance range, that contributed to a "stock hit after hours."  (*See, e.g.*, Ex. 15 at 1.)

[9]  Plaintiffs incorrectly argue that the forward-looking Integration Statements were statements of "historical or current fact" because the integration problems Mindbody had previously suffered allegedly "continue[d]" and "still existed."  (Opp. at 33.)  As discussed, the backward-looking parts of the Integration Statements were true as a matter of historical fact, and Plaintiffs do not contest that the forward-looking parts are de jure inactionable. (*See* Mot. at 16.)  Indeed, statements about expectations for the future "satisf[y the] safe harbor."  *Gissin v. Endres*, 739 F. Supp. 2d 488, 506-07 (S.D.N.Y. 2010).

[10]  Plaintiffs' only argument that the Rationale Statements are actionable is based on the same false premise that Defendants were obliged to disclose Plaintiffs' hypothesized scheme.  (Opp. at 36.)  It too must fail.

Plaintiffs also misstate the law in challenging the description of the premium as "significant." Plaintiffs contend that "[i]t is 'irrelevant' if [Defendants] believed the opinion, the 'inquiry' is whether 'omitted facts conflict with what a reasonable investor would take from the statement.'" (Opp. at 34 (quoting *In re Avon Sec. Litig.*, 2019 WL 6115349, at \*17 (S.D.N.Y. Nov. 18, 2019)).) Wrong. Where defendants make statements that they "honestly believe[] to be true, and where there is no reckless disregard for truth, then that is not securities fraud." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018).[11]

### D.     The Value Statement

Plaintiffs argue that Defendants did not "actually hold[] the stated belief" about the "highest price Vista was willing to pay" based on the allegation that, two months prior to the Merger Agreement, Vista had "indicated a willingness to pay a 'substantial premium to [Mindbody's] recent trading range,' as of October 16, 2018." (AC ¶ 234; *see also* Opp. at 40-42.)[12] But that alone does not create a plausible inference about what the Board believed two months later, after a sales process where only Vista bid, and after the Board negotiated Vista's original offer up and Vista stated that $36.50 was its best and final offer. (*See* Proxy at 31.)

Next, Plaintiffs contend that the statement was misleading because Mindbody did not disclose that, in January 2019, "another suitor had indicated interest and said they feel [sic]

---

[11]   Plaintiffs further argue that Defendants "still knew Vista's $36.50 offer was not a 'substantial premium'" to the range in which Mindbody stock traded in mid-October and that Defendants "stated otherwise while failing to disclose the truth." (Opp. at 42.) But Defendants never stated that $36.50 represented a "substantial premium" to the mid-October trading range. (*See* App'x at 5-6 (collecting Premium Statements).) Moreover, Mindbody's historical stock price was publicly available and any investor could have used it as a comparator. (Mot. at 18.)

[12]   Plaintiffs maintain that Vista's statement should be read to infer a willingness to pay a premium over the pre-correction stock price of $41.25 as of October 5, 2018. (Opp. at 41-42.) That is implausible. When a buyer says that it sees a price drop as an opportunity, the only "range" it makes sense to be referring to is the one *after* the price drop—here, the range from October 11 to October 16 of $31.86 to $34.59 per share, both below the Merger price. (Mot. at 19 n.12.) And it would make no sense for Defendants to conceal Vista's alleged willingness to pay as much as $49.50 per share. (*See* AC ¶ 96.) Selling Mindbody for $13 per share more than the Merger price would have increased Defendants' respective profits on that transaction by over $25 million (Stollmeyer), approximately $6 million (White), and over $34 million (IVP). (*See* Mot. at 37.)

Mindbody was 'worth a lot more than $36.59.'"  (Opp. at 42-43.)  Here, another's alleged belief

about Mindbody's "worth" is, at most, the sort of immaterial "fact cutting the other way" that

*Omnicare* holds need not be disclosed; "[a] reasonable investor does not expect that *every* fact

known to an issuer supports its opinion statement."  *Omnicare, Inc. v. Laborers Dist. Council*

*Const. Indus. Pension Fund*, 575 U.S. 175, 189-90 (2015).  (*See also* Opp. at 42.)[13]

### E.    The Process Statements

Plaintiffs also fail to resuscitate their Process Statement claims.[14]  Plaintiffs no longer

contest the accuracy of the Process Statements description of the Go-Shop terms, nor do they

dispute that the Go-Shop terms were "customary."  (Opp. at 37-38.)  Instead, Plaintiffs now

argue that calling the Go-Shop customary misleadingly implied that Mindbody would conduct

the Go-Shop with extraordinary rigor.  (Opp. at 38.)  This strained reading is untenable.  *See,*

*e.g.*, *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1093-94 (N.D. Cal. 2017) (dismissing

claim based on "an unreasonable reading of the plain language of the Press Release").[15]

Plaintiffs' contention that "Vista had been given earlier access to far more documents"

than other bidders (Opp. at 38) does not state a claim.  By restating their allegations, Plaintiffs

seek to obscure that the AC incorporates a document directly refuting their claim—all parties

were granted access to the same "initial limited data room," and only actual bidders (e.g., Vista)

---

[13]   In supplementing its proxy, Mindbody did in fact publicly disclose that certain investors believed the Merger price "significantly undervalue[d]" Mindbody.  (Feb. Supp. at 10 (disclosing allegation by Luxor that "the Merger Consideration significantly undervalues the Company").)  Luxor, a large institutional shareholder, also filed its own proclamation that it "believe[d] that the Proposed Merger significantly undervalue[d] the Shares" and that it intended to "engage in discussions" with Mindbody regarding that belief.  (Ex. 21 at Item 4.)

[14]   Plaintiffs' other criticisms of the "Deal Process" (Opp. at 35-40) are addressed elsewhere in this reply.

[15]   *See also Stein v. Tangoe, Inc.*, 2014 WL 12767210, at *11 (D. Conn. Sept. 30, 2014) (dismissing claim premised on alleged misstatements regarding company's organic growth rate where there was no one definition of organic growth and "[a]lleging merely that the Defendants used a different definition of the term is insufficient to render their disclosures misstatements").  Plaintiffs' authority does not suggest otherwise.  In *In re EZCorp, Inc. Securities Litigation*, the alleged misstatements falsely implied compliance with a regulatory regime when the plaintiffs had alleged a very different reality.  181 F. Supp. 3d 197, 206 (S.D.N.Y. 2016).

were granted access to broader materials for "confirmatory diligence."  (AC, Ex. H.)[16]

### F.     The Background Statements

Plaintiffs argue that the Background Statements were false and misleading because they did not specifically discuss alleged contacts among Stollmeyer, Qatalyst, and Vista in August and September 2018.  (Opp. at 36.)  Plaintiffs broadly maintain that "[p]rocess disclosures matter."  (Opp. at 35.)  But they do not argue that information about the alleged preliminary interactions was material.  (Mot. at 34.)  Aside from employing self-serving labels and characterizations, Plaintiffs have offered no facts actually demonstrating that these dealings constituted "negotiations."  (*Id.*)  Rather, Plaintiffs have at most alleged that the Background Statements did not include immaterial details about contacts that occurred months before the sales process even started.  That cannot be the basis of a securities claim.

Plaintiffs' efforts to identify additional actionable omissions in the Background Statements also fail.  (Opp. at 36-37.)  Plaintiffs abandon their claim that communications prior to Vista's October 16 "indication of interest" were negotiations.  (*See* Mot. at 23; Opp. at 36-37.) And Plaintiffs' claim that "negotiations were hidden from the Board" (Opp. at 37) fails because it relies on misreading an email in which Stollmeyer says he planned to personally inform each member of the Board about Vista's indication of interest (*see* AC, Ex. D).[17]

Finally, faced with the February Supplement's disclosure of the immaterial facts

---

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, which Plaintiffs also cite, held the alleged statements to be "inactionable puffery."  783 F.3d 383, 392 (2d Cir. 2015).

[16]   Plaintiffs also fail to rehabilitate the holes in CW-1's hearsay allegations, namely that Plaintiffs have not and cannot allege that Vista was a shareholder of Mindbody.  Plaintiffs concoct an argument that CW-1 "was lied to about *why* Vista was given 'access' when he was told it was a shareholder" (Opp. at 38 n.13), but the AC offers no support for that claim.  Plaintiffs' shifting story underscores that "vague," unsupported statements from confidential witnesses are inherently unreliable and entitled to no weight.  (Mot. at 48-49.)

[17]   Plaintiffs also offer no defense for their claim that Vista's purported interest in acquiring Mindbody prior to its IPO in 2015 is material, likely because it is "obviously unimportant."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009); Mot. at 33.

Plaintiffs allege were previously omitted, Plaintiffs characterize the February Supplement as a corrective disclosure proving falsity.[18]   (Opp. at 36 n.11.)   This argument vitiates Plaintiffs' theory, as it begs the obvious question of why Defendants made "corrective disclosures" during a period they were allegedly engaged in a fraudulent scheme to depress Mindbody's stock price.[19]

### G.     The Transaction Committee Statements

Plaintiffs claim that it was false and misleading to state that the Transaction Committee members were selected "[b]ased upon experience" (Opp. at 37), but ignore that the Transaction Committee members each held extensive and relevant experience (*see* Mot. at 6 n.5; 2018 Proxy at 9-10).  Plaintiffs' allegations do not plausibly suggest that this experience was not the basis for their positions on the Transaction Committee.  (Opp. at 37.)  Plaintiffs also fail to explain the basis for their criticism that the Proxy did not disclose that communications preceded the formal Board action that established the Transaction Committee on October 30, 2018.  (Opp. at 37.)  The Proxy did disclose as much, including that the Board discussed forming the Transaction Committee on October 26, 2018, i.e., prior to establishing that committee.  (*See* Mot. at 24.)

## II.     PLAINTIFFS FAIL TO PLEAD THAT LIAW MADE AN ACTIONABLE MISSTATEMENT OR OMISSION.

Plaintiffs concede that "Liaw did not make any false statements."   (Opp. at 48.) Following this about-face, Plaintiffs now pursue a "pure omission" case against Liaw, based upon the nondisclosure of Mindbody's preliminary and unaudited Q4 revenue.  (*Id.*)  Pure omissions are generally not actionable under the federal securities laws; but in rare cases, a duty

---

[18]   As previously noted (Mot. at 18 n.11), Plaintiffs focus the bulk of their claims on Mindbody's Preliminary Proxy, while eliding Mindbody's definitive and supplemental disclosures that totaled over 450 pages and disclosed seven complaints criticizing the Merger.  (*See* Proxy (207 pages of disclosure); Ex. 18 (disclosing four stockholder complaints across 138 pages); Jan. Supp. (37 page disclosure); Feb. Supp. (disclosing 83 pages, including two additional stockholder complaints and Luxor's complaint related to its 220 Demand).)

[19]   The February Supplement says that "[n]othing in the Supplemental Disclosures shall be deemed an admission of the legal necessity or materiality under applicable laws of any of the disclosures set forth herein."  (Feb. Supp. at 4.)  To the extent they now treat this Supplement as a corrective disclosure, Plaintiffs have not pled that the disclosure impacted Mindbody's stock price.  *Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).

to disclose may arise (i) "expressly pursuant to an independent statute or regulation," *Thesling v. Bioenvision, Inc.*, 374 F. App'x 141, 143 (2d Cir. 2010), or (ii) where there is a fiduciary-type "relationship of trust and confidence" such that one party has a direct duty to its counterparty to disclose material information in connection with a transaction, *Chiarella v. United States*, 445 U.S. 222, 230 (1980). Plaintiffs argue neither. Instead, they seek to unlock a vast new category of "pure omission" federal securities liability—premised not on the narrow *Chiarella* duty between counterparties but on the entire diffuse body of the 50 states' corporate fiduciary duty laws.[20] According to Plaintiffs, if they merely allege that Delaware, or any state, imposes a duty to disclose in a given situation, then that adequately pleads their claim for violation of Rule 10b-5. (*See* Opp. at 44-45.) Plaintiffs cite no authority for this proposition, and Defendants are aware of none.[21] Instead, Plaintiffs' cases all concern claims against direct counterparties and/or their confederates—i.e., the *Chiarella* situation.[22] Here, Plaintiffs had no interaction with Liaw.

## III.   PLAINTIFFS HAVE FAILED TO PLEAD AN OMISSION.

### A.   Preliminary, Unaudited Q4 Revenue

Despite their protestations to the contrary (Opp. at 43-44), Plaintiffs' authority makes clear that "disclosure of an ordinary earnings forecast does not trigger any duty to update." *Blum v. Semiconductor Packaging Materials Co.*, 1998 WL 254035, at *2 (E.D. Pa. May 5, 1998). (*See also* Mot. at 29-30.) In fact, *Blum* held that "the failure to mention in the press release that fourth quarter earnings would be below expectations, while the fourth quarter was still in

---

[20]   *Cf. United States v. Schiff*, 602 F.3d 152, 165 (3d Cir. 2010) ("[I]mporting this type of fiduciary obligation into the federal securities laws also appears to encroach into conduct traditionally left to state corporation law.").

[21]   Plaintiffs suggest that a footnote in *Levitt v. J.P. Morgan Securities, Inc.*, 710 F.3d 454 (2d Cir. 2013) supports their position (Opp. at 44), but there the Second Circuit merely noted, without adopting, a single 30-year-old out-of-circuit holding—in an aiding and abetting case, at that—in the course of declining to reach the inapposite question of whether market manipulation gives rise to an actionable duty to disclose. 710 F.3d at 468 n.9.

[22]   *See Levitt*, 710 F.3d at 456-57 (claims against counterparties' broker); *SEC v. Tambone*, 597 F.3d 436, 448 (1st Cir. 2010) (claims against counterparties and associated professionals); *Fortson v. Winstead, McGuire, Sechrest & Minick*, 961 F.2d 469, 472 (4th Cir. 1992) (same).

progress, cannot state a cause of action for stock fraud."  1998 WL 254035, at *2.

*In re Bank of America Corp. Securities, Derivative & ERISA Litigation*, 757 F. Supp. 2d

260 (S.D.N.Y. 2010) ("*BoA*") is not to the contrary.[23]  That case concerned whether a duty to

provide updated quarterly results arose when a proxy stated that the motivation for the

transaction was the "'unprecedented' economic climate" of the 2008 financial crisis and its effect

on the performance of the merging banks and where, at the time of the earnings announcement

and proxy, Merrill Lynch was aware of "historically large losses" that, for just the month of

October, were approximately $7 billion—$2 billion more than its loss for the entire third quarter.

*Id.* at 304-05.  Nothing of the type is alleged here.  There was no rapidly developing crisis in the

fitness and wellness industry in late 2018, and the "Reasons for the Merger" in the Proxy made

no reference to Mindbody's recent performance.  (*See* Proxy at 33-35.)  Moreover, even *BoA*

addressed only the disclosure of full monthly financial results, 757 F. Supp. 2d at 306, not

disclosure of a partial, unaudited subset of those results.[24]  Plaintiffs have not identified a single

case requiring premature disclosure of unaudited revenue (or any partial financial results).[25]

In fact, Mindbody could not pre-release its unaudited estimates of Q4 revenue.  Doing so

without the full financial results (including expenses, profit, etc.) would make disclosure of

Mindbody's quarterly revenue alone misleading and would likely constitute an impermissible

partial disclosure.  (*See* Mot. at 30 n.16 (collecting relevant statutes and regulations).)

---

[23]  Neither of Plaintiffs' other cases even discusses a duty to update financial guidance with actual results prior to a scheduled earnings release.  *See Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) (finding that where a proxy stated that the parent had "reduced" the losses of a subsidiary, that "affirmative statement" generated a duty to disclose the results from the half-year period preceding the proxy); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 748-49 (S.D.N.Y. 1989) (finding a potential duty to disclose that one of the parties had changed its mind and was "considering resort to the right to terminate the deal").

[24]  *BoA* also held that scienter was not adequately pled on this issue.  *Id.* at 325-26.  Its holding regarding negligence is inapposite because negligence was not pled here.  (*See infra* Part V.)

[25]  Plaintiffs have not identified any instances of a company pre-announcing unaudited financial results prior to a merger vote.  Nor, despite expansive searching, are Defendants aware of one.

Importantly, Plaintiffs do not meaningfully challenge this point.[26]

Plaintiffs are also wrong in their characterization of Delaware disclosure law.  (Opp. at 44-45 (citing AC ¶ 245).)  The only cases on point hold that when a stockholder vote is pending, there is not a duty to release preliminary quarterly revenue that might become available.  *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1173-74 (Del. 2000) (finding "more current financial statements" were not material); *Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103, at *14-15 (Del. Ch. Oct. 23, 2013) (dismissing disclosure claim based on nondisclosure of quarterly results prior to a stockholder vote because "[n]o other provision of the federal securities laws, Delaware law, or [the company's] governing documents mandates an earlier deadline").

Plaintiffs' argument that the Q4 preliminary revenue was "material"—a separate element of their claim (*see* Mot. at 28-29)—is likewise erroneous (*see* Opp. at 45-47).  The handful of statements in internal emails where Stollmeyer and White reacted to the initial Q4 revenue figures have no import.  In contrast with the lone case cited by Plaintiffs, there is no allegation that Mindbody possessed an internal benchmark that classified the divergence between revenue guidance and actual revenue as being "material."  *See In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 281 n.143 (S.D.N.Y. 2011) (noting that "private parties can not define their disclosure obligations under the federal securities laws").[27]

Plaintiffs' criticisms of Defendants' reliance on SAB 99 are baseless.  Far from "selectively and misleadingly" quoting SAB 99, Defendants acknowledged that SAB 99 is

---

[26]   Furthermore, Mindbody told investors that it did "not assume any obligation to update [the Q4 guidance] to reflect events that occur or circumstances that exist after the date on which they were made."  (Ex. 14, Ex. 99.1 at 4.)   Accordingly, no investor could reasonably expect to be informed ahead of Mindbody's regularly scheduled earnings release that unaudited revenue could be 1.9% (or 3.5%) higher than guidance.  (*See* Mot. at 31.)

[27]   At most, Plaintiffs allege that White initially—and prior to a meeting of Mindbody's Audit Committee—remarked that disclosing the revenue was the "right thin[g] to do." (*See* AC, Ex. K.)  That falls short of alleging that Stollmeyer or White viewed the results as altering the total mix of information available to shareholders.

"internal guidance" (Mot. at 30) and offered it as a guideline for evaluating the immateriality of

Mindbody's Q4 revenue (along with applicable caselaw).[28]

###    B.    Qatalyst's Business Dealings with Past or Future Vista Acquisitions

Plaintiffs also argue that Mindbody had a duty to disclose Qatalyst's alleged actual and

potential conflicts of interest.  (Opp. at 39-40.)  But other than Qatalyst's "work[] *for* Vista on

the iCIMS deal," which Plaintiffs admit was disclosed (Opp. at 39), Plaintiffs fail to allege a

viable conflict that required disclosure.  Plaintiffs identify no caselaw, and Defendants are aware

of none, providing that working on the opposite side of a transaction from a party presents a

conflict in a future transaction where the party is again on the other side, much less that such

information is material or required to be disclosed.[29]  Under Plaintiffs' interpretation, Mindbody

had an obligation to disclose Qatalyst's work on deals opposite each of the over 50 parties that

were solicited throughout the deal process.[30]  Such disclosures would have left stockholders less

informed, not more, by burying in a sea of immaterial disclosures the actually material disclosure

of Qatalyst's potential conflict as a result of its prior work for Vista in the iCIMS transaction.

An equally absurd result would obtain if companies, as Plaintiffs urge (Opp. at 39-40; AC

---

[28]    As Plaintiffs concede, the SEC considers it a "'rule of thumb' as an initial step in assessing materiality." SAB 99, 1999 WL 1123073, at *2.  Moreover, Plaintiffs' claim that Defendants "most deceptively . . . state[d]" that the SAB lays out nine qualitative factors is at odds with their own consideration of those same factors. (Opp. at 46.)  Plaintiffs are also mistaken in claiming that Defendants' interpretation leads to absurd results because "a firm that beat guidance by 4% would not normally need to ever disclose its results, not in its 10-Q or 10-K." (Opp. at 47.)  Absent the merger, Mindbody would have disclosed its Q4 financial results consistent with the time periods and substantive reporting requirements of federal law.  (*See* Mot. at 30 n.16.)

[29]    *See Great Am. Indus.*, 855 F.2d at 989, 994 (undisclosed conflict was "long-standing business relationship" between director, secretary, and general counsel of acquired company and three board members of acquiring company, including its president and chairman); *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 90-91 (D. Conn. 2019) (undisclosed conflict was that financial advisor was performing undisclosed work as an investment manager for affiliate of the acquirer); *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*, 2012 WL 928402, at *13 (D. Vt. Mar. 19, 2012) (dismissing claim based on alleged conflicts).

[30]    Qatalyst also publicly discloses all of its deals, *see* http://www.qatalyst.com/index.php/q-deals2, including the four transactions Plaintiffs criticize here.  As established by Plaintiffs' own authority, this public information "dissipated and counteracted" any alleged "misleading effect" of not disclosing these details, which, regardless, were still immaterial.  *See Burkle v. OTK Assocs.*, 2 F. Supp. 3d 519, 524 (S.D.N.Y. 2014) (cited by Opp. at 9).

¶ 87(a)), were required to disclose the prior employers of their financial advisors' employees.[31]

## IV.   PLAINTIFFS HAVE FAILED TO PLEAD SCIENTER.

### A.   Plaintiffs Have Not Adequately Alleged Motive and Opportunity.

Plaintiffs can plead scienter by alleging particularized facts establishing a plausible motive and opportunity to defraud.  (Mot. at 35.)  In their Opposition, Plaintiffs conceive of supposed motivations for the conduct of each Defendant, but primarily argue that Defendants were "motivated to (1) close a privatization and (2) specifically, close a deal with Vista."  (Opp. at 10.)  But Plaintiffs' threadbare and contradictory allegations do not support an inference that the Individual Defendants possessed such motivations.  Even if they did support that inference, Plaintiffs face an even more fundamental problem:  Plaintiffs' proffered motive is untethered to the fraud alleged here, which is that Defendants chose to intentionally depress Mindbody's stock price, causing harm to shareholders who sold during the alleged scheme.  The Individual Defendants could readily achieve the supposed goal of closing a privatization with Vista without needing to depress Mindbody's stock price.  None of Plaintiffs' allegations suggests otherwise.[32] And, of course, the Individual Defendants' substantial holdings of Mindbody stock provided an incentive to act consistent with the interests of all shareholders.  (Mot. at 36-38.)

#### 1.   Stollmeyer

##### a.   Alleged Non-Pecuniary Motives

As for Stollmeyer's supposed "non-pecuniary" motives, Plaintiffs argue that he disliked public markets, was afraid of losing his job, and liked Vista.  (*See* Opp. at 10-13.)  As discussed,

---

[31]  Plaintiffs' identification of a supposed omission in Mindbody's failure to disclose that Brian Cayne, a co-founder of Qatalyst who played no role in the subject transaction, worked for Vista prior to founding Qatalyst (*see* AC ¶ 87(a)) also falls flat in view of this information being available on Qatalyst's website.  *See* http://www.qatalyst.com/index.php/team2.

[32]  On the contrary, Plaintiffs allege that Vista expressed an interest in paying a substantial acquisition premium *before* the alleged decision to reduce Q4 guidance.  (*Compare* AC ¶¶ 95-96 (Vista expressed intent to pay a substantial premium in mid-October), *with* AC ¶ 117 (decision to lower guidance on November 5).)

however, these supposed motivations are inapposite here. A dislike of public markets could make a privatization attractive, but it would not plausibly create an incentive to fraudulently depress someone's stock, nor would it logically provide an incentive to favor Vista over other financial sponsors or private equity firms. Likewise, a CEO could believe that a privatization might provide better job security, but there is a logical gap between that incentive and fraudulently depressing the CEO's company's stock price.

Plaintiffs also fail to adequately allege that Stollmeyer possessed these "non-pecuniary" motivations. Their efforts in this regard rest upon obvious distortions of the record and ultimately call for this Court to make implausible inferences contrary to the PSLRA. Plaintiffs posit that an email discussion between Stollmeyer and Liaw about how best to pitch Mindbody to potential acquirers actually reflects a scheme to "scar[e] off" a particular public company bidder. (*See* Opp. at 10-12.) Nonsense. Liaw was providing advice on how to *avoid* "freak[ing] out" a potential bidder, the very opposite of Plaintiffs' interpretation. (Ex. 28 at MB0017602.) Likewise, Stollmeyer's responses to Liaw do not credibly suggest a desire to funnel a transaction to Vista at a discount. (Ex. 27.) Rather, they reflect legitimate brainstorming about marketing the "business opportunity" and "tailor[ing] the emphasis for various audiences at various stages"—a conversation that would be illogical if the strategy were as Plaintiffs allege. (*Id.*)

Plaintiffs' only "response" is to argue that they are entitled to "all factual inferences." (Opp. at 11.) That is wrong. To adequately plead scienter, Plaintiffs must present facts supporting a "strong inference" that is "more than merely plausible or reasonable" but must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *ECA*, 553 F.3d at 198. Even if one *could* infer an improper motive from Stollmeyer and Liaw's emails regarding how best to pitch potential acquirers on Mindbody—and the emails do not support

that—such an inference is far less plausible than reading the emails to demonstrate an effort to pursue a sale process that would generate the highest possible price.

Plaintiffs repeat this exercise with other documents.  For instance, Plaintiffs cannot dispute that Qatalyst contacted numerous public companies during the sales process (*see* Mot. at 42-43), undermining Plaintiffs' theory that the Individual Defendants were single-mindedly pursuing a privatization.  So instead, Plaintiffs cavalierly argue for an inference that this effort was only carried out to "paper the appearance of legitimacy."  (Opp. at 11.)  Plaintiffs do not make any allegations, however, that provide a basis for one.[33]

Plaintiffs' efforts to establish that Stollmeyer was in love with Vista, which supposedly "played a role in his decisions to design a deal process that favored a buyout from Vista" (Opp. at 12), is also based on mischaracterizations.  Plaintiffs misleadingly reference a text message that Stollmeyer sent *after* execution of the Merger Agreement.  Of course, a text sent months later does not justify an inference that Stollmeyer possessed an intent months earlier to defraud Mindbody stockholders in favor of a buyout from Vista.  And even if the Court were to credit Plaintiffs' theory that Stollmeyer was focused on a privatization—it should not—the AC would still fail to allege that Stollmeyer did not have similarly positive views of the six other financial sponsors Qatalyst included in the initial bidding process, much less that Stollmeyer wanted to sell Mindbody and his own shares at a discount to benefit Vista.  (*See* AC ¶ 90.)[34]

---

[33] Equally baseless is Plaintiffs' interpretation of Stollmeyer's October 17, 2018 statement to White, Mansbach, and Lytikainen that Vista had "no idea what we are about to report or guide." (Opp. at 27.)  Plaintiffs posit that this reflects that Stollmeyer viewed the reduction of guidance as an "opportunity" for Vista to take advantage of a lower stock price. (*Id.*)  But that statement, read properly, indicates that Vista's interest could change after the Company reported Q3 earnings a few weeks later.  Plaintiffs' reading is further undermined by their blatant attempts to misrepresent other parts of it:  Plaintiffs suggest that the email shows Stollmeyer attempting to keep information about Vista private from the Board (Opp. at 4, 20, 36), when Stollmeyer expressly stated that he "plan[ned] to socialize this possibility to the Board Directors individually over the next week" (AC, Ex. D).

[34] Plaintiffs' non-pecuniary motive cases are inapposite.  *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63 (2d Cir. 1970), involved SEC enforcement actions against defendants for selling unregistered securities in violation of Section 5.  *Salman v. United States*, 137 S. Ct. 420 (2016), involved insider trading.  *In re RJR Nabisco, Inc.*

b.      Alleged Pecuniary Motives

Plaintiffs also contend that they have identified actionable pecuniary motives possessed by Stollmeyer—namely, that Stollmeyer would financially benefit from a sale of Mindbody by achieving liquidity and that he would reap a windfall from the new equity he acquired through the acquisition.  (Opp. at 13-17.)  Neither supposed motive is adequately pled.[35]

Plaintiffs predicate this need-for-liquidity theory on snippets of statements that Stollmeyer made on a podcast following disclosure of the Merger, while ignoring the statements in the same podcast that firmly eviscerate their case:

- "We were working hard to create a competitive process because the board agreed on two things.  That was, 1) that if we're going to consider selling the company, we want to get top dollar for it.  2) we want to have options…. It's like if you're going to sell your house, you don't want to show it to just one interested party."[36]

- "There was no promise or discussion [about my employment or compensation]."[37]

In any event, Mindbody's SEC filings demonstrate that Stollmeyer did not have a cash need:[38]

| Year | Salary | Cash Bonus | Value of Stock Sold | **TOTAL** |
|------|--------|------------|---------------------|-----------|
| 2017 | $500,000 | $449,099 | $5.89 million | **$6.8 million** |
| 2018 | $530,000 | ~$530,000 | $8.51 million | **$10.1 million** |

Even if Stollmeyer had a desire to generate liquidity through a sale of the company, that would not itself create a plausible inference that Stollmeyer had an incentive to engage in a scheme to

---

*S'holders Litig.*, 1989 WL 7036 (Del. Ch. Jan. 31, 1989), held that alleged non-greed motivations were not sufficient to enjoin a transaction.  None supports finding Stollmeyer's supposed affection for Vista to generate a strong inference that he was motivated to defraud shareholders *and* leave millions of dollars on the table.

[35]  The AC makes no mention of a liquidity motivation for Stollmeyer, so Plaintiffs' attempt to inject that theory now (Opp. at 14 n.5) should be rejected for that reason alone.

[36]  Alejandro Cremades, *Rick Stollmeyer on Selling For $1.9 Billion the Company That He Created Out of His Own Garage*, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage.

[37]  *Id.*

[38]  Stollmeyer's salary and bonus levels are drawn from the 2018 Proxy at 36 (2017) and at 39 (2018).  The values of Stollmeyer's stock sales are derived from his publicly available SEC Form 4 filings for 2017 and 2018.

depress the stock price before the liquidity event.  To the contrary, for every additional dollar paid to acquire Mindbody, Stollmeyer stood to earn nearly two million dollars.  (Mot. at 37.)

Plaintiffs also assert that Stollmeyer expected to receive a financial benefit from selling to Vista at a below-market price.  (Opp. at 13-14.)  The AC's allegations do not create a plausible inference that Stollmeyer was driven by such an anticipated financial benefit.  Plaintiffs have not alleged the existence of an agreement between Stollmeyer and Vista, and they do not argue otherwise.  (*See id.*)  Consequently, Plaintiffs also fail to allege any specific terms of an agreement that would support their theory that Stollmeyer had an incentive to facilitate a lower acquisition price.  Nor do Plaintiffs include in their AC any alleged discussions between Stollmeyer and Vista regarding any financial benefits that were promised to Stollmeyer.

The best that Plaintiffs can muster is a lone text between Stollmeyer and his financial advisors *after* the announcement of the transaction.  (Opp. at 16.)  In reality, that text contradicts Plaintiffs' theories:  it shows that Stollmeyer did not have an agreement with Vista at the time of the Merger Agreement, and indeed Vista had not even proposed incentives necessary to keep Stollmeyer on as CEO.  (*See* AC, Ex. F (following the signing of the Merger Agreement, Stollmeyer wrote:  "It will be incumbent upon [Vista] to provide compelling incentives").)[39]

---

[39] Plaintiffs try to make up for these gaps with generic allegations that can be made against every leader whose company is involved in a going-private transaction.  Specifically, Plaintiffs charge that Stollmeyer possessed a purported awareness of executive compensation "industry norms," while also generally alleging that senior management typically receives guidance that compensation packages will be set using a Multiple of Invested Capital metric.  (Opp. at 13, 15.)  The same can be said in every take-private.  Such generalized allegations are no substitute for the particularized allegations of scienter demanded by the PSLRA.

The cases Plaintiffs cite regarding compensation do not help them.  In *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472 (S.D.N.Y. 2018), a "strong inference" that certain alleged misstatements were made with scienter was found based on large, opportune sales of stock—the opposite of Plaintiffs' argument here that Stollmeyer intentionally left money on the table.  *In re Wellcare Mgmt. Grp., Inc. Sec. Litig.*, 964 F. Supp. 632, 639 (N.D.N.Y. 1997), required scienter to be supported by "more than just" allegations that the defendants stood to receive additional bonuses if profits were fraudulently increased.  In *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 295 (S.D.N.Y. 2008), the plaintiffs alleged a "concrete and particularized benefit . . . to protect compensation they had already received, and secure further compensation."  The plaintiffs in *Varljen v. H.J. Meyers, Inc.*, 1998 WL 395266, at *5 (S.D.N.Y. 1998), laid out a concrete, detailed scheme that the defendants engaged in by making an equity investment of $500,000, an unsecured loan of $1,059,548, a

### 2.      White

To the extent there ever was one, the Opposition erases any question that Plaintiffs have not adequately alleged scienter on the part of White.  Plaintiffs devote a single paragraph to White, tersely arguing that his "motives were largely the same as Stollmeyer's pecuniary motives."  (Opp. at 17.)  Plaintiffs make no argument with respect to White because they have none.  As explained in the opening brief, Plaintiffs have failed to allege a plausible theory that White possessed a motive to engage in the alleged fraud.  (Mot. at 36-42.)  And White had every reason to maximize the sale price of Mindbody.  For every additional dollar paid to acquire Mindbody, White stood to gain nearly half a million dollars.  (Mot. at 37.)

### 3.      Liaw

Plaintiffs have utterly failed to plead that Liaw acted with scienter.  The fundamental deficiency in their theory of Liaw's motive is that it fails to answer this basic question:  If Liaw could have lawfully obtained $49.50 per share from Vista, why would he have instead committed fraud to receive $36.50 per share from Vista?  It is no help to claim that IVP wanted to sell its Mindbody stake on a particular schedule (*see* Opp. at 18-19), because Plaintiffs do not allege that it would have taken any longer to secure the higher price they speculate Vista would have paid. Nor is it even responsive to claim that selling to Vista enabled IVP to avoid an open-market sale, to seek an unspecified side agreement, or to outrun the conversion of IVP's super-voting stock to common stock scheduled for three and a half years off.  (*See id.*)  At bottom, Plaintiffs posit that Liaw had two choices—take $49.50 per share from Vista or take $36.50 per share from Vista— and knowingly chose the latter, sacrificing over 26% of his firm's Mindbody investment in the process.  The far more "cogent and compelling" inference is that Liaw supported the Merger

---

$450,000 deposit, and a $200,000 prepayment.  Here, Plaintiffs make no concrete allegations and rely entirely on conclusory allegations and conjecture.

because he believed Vista's $36.50 per share offer represented the best available price.

In any event, Plaintiffs fail to adequately plead facts to show Liaw's alleged "motives." (Mot. at 36-39.)  Plaintiffs begin by pretending that "there is no dispute that [IVP had] a target exit date" for its Mindbody investment (Opp. at 18), but Defendants' opening brief expressly disputed the adequacy of that allegation.[40]  (Mot. at 39.)  The IVP document on which it rests says "est." exit date—undisputedly meaning "estimated."[41]  "Estimated" and "target" are not synonymous, and Plaintiffs may not blue-pencil the documents underlying their own allegations to avoid dismissal.  Plaintiffs next declare that it would have been "rational" for IVP to accept a 26% "haircut" in exchange for avoiding an open-market sale of its shares (Opp. at 18-19), but they never allege, much less plead particularized facts showing, that an open-market sale would have resulted in anywhere near a 26% discount.[42]

Plaintiffs' opposition brief confirms that they are asking this Court to hypothesize that Liaw intentionally perpetrated a fraud that worked dramatically and unmistakably against his own interests, to the tune of tens of millions of dollars.  The PSLRA does not permit this.[43]

---

[40]   Plaintiffs also misleadingly state that "Defendants do not deny" that "IVP intended to liquidate its position in Mindbody and the Merger—even at a suboptimal price—offered it a unique opportunity to do so."  (Opp. at 18.)  It is true that, upon being offered a 68% premium for its shares, IVP was willing to liquidate its position.  But if Plaintiffs intend to imply that IVP was motivated to accept "a suboptimal price," Defendants' opening brief emphatically disputed that allegation (*see, e.g.*, Mot. at 36-39), and so does this one.

[41]   Nor is there any mystery as to why the IVP presentation refers to "est. / actual exit."  (*See* Opp. at 18.)  Some entries refer to investments IVP had already exited (with "actual" exit dates), while others refer to then-current IVP investments (with only "estimated" exit dates).  (*See* Ex. 26.)

[42]   Nor can Plaintiffs explain why the conversion of IVP's super-voting shares several years in the future would possibly drive Liaw to immediately unload IVP's shares for tens of millions of dollars below market value.  (*See id.* at 19.)  Most mystifying of all, however, is Plaintiffs' insistence that Liaw would sacrifice 26% of IVP's investment for the mere "opportunity" to seek so-called "bells and whistles" in the deal—regardless of what they were (which Plaintiffs never say), or whether they were secured.  (*Id.*)

[43]   Grasping at straws, Plaintiffs float a series of sundry allegations that they characterize as "indirectly show[ing]" Defendants were acting on wrongful motives."  (Opp. at 19.)  This contravenes the basic principle that motive cannot be pled circumstantially.  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (a sufficient pleading of motive requires the allegation of "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged").  To the extent Plaintiffs intended to argue that these allegations establish circumstantial evidence of conscious misbehavior or recklessness, they are addressed in the following section.

**B.      Plaintiffs Have Not Adequately Pled Conscious Misbehavior or Recklessness.**

Plaintiffs try to lower the bar by arguing that if they adequately plead a misstatement or omission, then conscious misbehavior and recklessness should be presumed.  (*See, e.g.*, Opp. at 43 ("Scienter is undeniably pled as to these omissions, since Defendants undeniably knew of the undisclosed material facts.").)  "This is a fundamental misstatement of the law. . . . [A]dequately pleading falsity is not a substitute for adequately pleading *scienter*.  Accepting plaintiffs' 'buy one get one free' approach to the law would obviate Section 10(b)'s requirement to allege *scienter* and Rule 9 and the PSLRA's requirement to plead allegations of fraud with particularity."  *Ramzan v. GDS Holdings Ltd.*, 2020 WL 1689772, at *5 (S.D.N.Y. Apr. 7, 2020). Plaintiffs must plead conduct that "is highly unreasonable and which represents an extreme departure from the standards of ordinary care" to satisfy the pleading standard.  *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009).  Even "circumstantial evidence of actual knowledge" of falsity is insufficient to satisfy the heightened pleading standard where "the circumstantial evidence supporting an inference of non-fraudulent intent is more compelling."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).

Plaintiffs maintain that they have "strongly alleged" that the Guidance and Integration Statements "were intentionally false and misleading" and that this supports inferring scienter under a theory of "conscious misbehavior and knowledge."  (Opp. at 22.)  That is wrong for the reasons discussed above.[44]  Plaintiffs also argue that alleged "secret meetings" between

---

[44]   Namely, Plaintiffs have failed to plead actual falsity with respect to the Guidance Statements, let alone that any discrepancy between internal forecasts in guidance, if such a discrepancy even existed, was inconsistent with industry norms related to earnings guidance such that it would constitute the requisite "extreme departure from the standards of ordinary care."  *Kalnit*, 264 F.3d at 142.  Nor do Plaintiffs identify any case in which a court has held that a company's issuance of conservative earnings guidance is tantamount to fraud.

Plaintiffs' characterize as "confessions" Stollmeyer's statements that it is "much better to guide below what you're expecting and then beat those expectations" and that the Q4 guidance was designed to "position [Mindbody] for future beat and raises."  (Opp. at 25.)  But these purported "confessions" are simply Stollmeyer

Stollmeyer and Vista "support scienter." (Opp. at 20.) But Stollmeyer's meetings were fully disclosed (*see* Mot. at 6, 23; Feb. Supp. at 24; AC, Ex. D), and in any event, the AC admits that these meetings were preliminary and "general." (*See* Mot. at 23.) Plaintiffs identify no cases where the mere existence of "secret meetings" is found probative of scienter.[45]

Plaintiffs' remaining contentions of "indirect" evidence of motive merely comprise a list of allegations with no indication of how these allegations show an "extreme departure" from standards of ordinary care, nor citations to any precedent finding similar allegations at strongly probative of scienter. (*See* Opp. at 20-21.) For example, that Mindbody and White's initial preference was to release Mindbody's preliminary Q4 revenue figures (*see* Opp. at 21; AC ¶¶ 195, 198) weighs heavily *against* an inference that they desired to conceal that information.[46]

The few cases Plaintiffs rely on are factually inapposite and, in fact, highlight the large gulf between well-pled allegations of scienter and those presented by Plaintiffs. For example, Plaintiffs' primary argument is that Mindbody's Q4 revenue guidance allegedly differed from its internal projections. But the Second Circuit has made clear that to plead scienter based on the alleged existence of internal financial reports that contradict public statements, "a plaintiff needs

---

remarking on truths known to anyone who understands the market. "[R]esearchers find that investors reward (penalize) firms for meeting or beating (missing) analyst earnings expectations." Ciconte Study at 9.

[45] Plaintiffs' sole case involving a "secret meeting" did not find that the secrecy supported a strong inference of scienter. (Opp. at 20.) There, the court found that scienter could be inferred where the individual defendants were not present at a meeting, but other senior executives were. *Christine Asia Co. Ltd. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017). It was the individual defendants' knowledge of what was discussed at the meeting, not the alleged secrecy of the meeting, that supported an inference of scienter. *Id.* Here, Plaintiffs identify no basis outside of the purported secrecy of Stollmeyer's meetings with Vista for inferring scienter. (*See* Opp. at 20.)

[46] By way of further example, Plaintiffs argue that the retention of Qatalyst was "highly suspect" (*see* Opp. at 20), but they ignore that the Transaction Committee hired Qatalyst, not Stollmeyer (*see* Mot. at 6). And while they emphasize Qatalyst's fee structure, Plaintiffs neither plead nor argue that structure was unusual or contrary to industry standards. (*See* Opp. at 20.) Similarly, Plaintiffs argue that not immediately informing investors that Mindbody had begun a strategic review process was suspicious, but identify no basis for that conclusion and ignore that such a disclosure might have led to a further reduction in Mindbody's stock. *See In re N.Y. Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 474 (E.D.N.Y. 2006) (stock declined following disclosure that company "was seeking strategic alternatives"). Plaintiffs also erroneously argue that Vista was given differential access to diligence despite the AC demonstrating that this is not true. (*See supra* Part I.E.)

to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).  Here, Plaintiffs allege none of this information.

As a further contrast, in *Avon*, the court found that "it [was] absurd to suggest that Avon's senior management was unaware of a widespread delinquency problem in the company's single largest market" where there were well-pled allegations that senior management was, in fact, receiving regular updates on debt and delinquencies, that the company had been seeing an increase in delinquencies, but that the defendants had nevertheless represented that their "risk-based approach" to managing their debt was "very successful."  2019 WL 6115349, at *19-20. Here, Mindbody warned of the integration issues, had previously revised downward its guidance due to those issues, and had nevertheless underperformed that reduced guidance, leading to a cautious approach regarding its Q4 guidance.  (Mot. at 3-5.)  Plaintiffs' repetition of references to the integration "going well" (Opp. at 3, 22, 26, 32) does not change that reality.[47]

## V.   PLAINTIFFS' SECTION 14(a) CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' failure to plead that any of the alleged statement or omissions are actionable defeats their Section 14(a) claim.  Plaintiffs' failure to adequately plead scienter also dooms their Section 14(a) claim.  Plaintiffs protest that their Section 14(a) claim adequately states a claim grounded in negligence.  (Opp. at 49-50.)  But Plaintiffs do not, and cannot, contest that their

---

[47]   Similarly, in *Sgalambo v. McKenzie*, the court held that the complaint had "identifie[d] specific reports or documents" that made it "highly plausible" the defendants knew of the negative test results they allegedly concealed. 739 F. Supp. 2d 453, 481-83 (S.D.N.Y. 2010).  Here, in contrast, Plaintiffs only allege "a set of unspecified contrary facts" that "must have been available to someone, somewhere inside [the company]" and that are belied by the actual record.  *See id.* at 481-82.  For example, while Plaintiffs argue that "3Q18 guidance," which Mindbody missed, "'was a surprise' because sales goals were consistently being met," they fail to identify with specificity what those sales goals were or that there were specific internal projections that were inconsistent with the Company's guidance.  (Opp. at 26; *see supra* Part I.A.)

Section 14(a) claim is premised on allegedly fraudulent conduct.  (*See* Mot. at 35 n.20.)[48]

Plaintiffs also fail to plead that any alleged misstatement or omission was material.  (*See* Mot. at 25-26, 28-35.)   A Section 14(a) claim must allege "a substantial likelihood that a reasonable shareholder would consider [the alleged misstatement or omission] important in deciding how to vote." *Columbia Pipeline*, 405 F. Supp. 3d at 506.  Here, Plaintiffs have neither alleged nor argued that their (or any putative class member's) voting decisions were impacted by any alleged misstatement or omission.  They cannot.  Plaintiffs (and the putative class) sold their shares before the Merger vote.  (AC ¶¶ 1, 37-38, 336.)  For similar reasons, this Court has held that "no class member who lacked voting rights ha[d] standing to assert a 14(a) claim." *In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 241 (S.D.N.Y. 2004).[49]

## VI.   PLAINTIFFS' 10B-5(a) AND (c) CLAIM CANNOT STAND.

Plaintiffs inexplicably argue that certain Defendants have not contested their Rule 10b-5(a) and (c) claim.  (Opp. at 48-49.)  In reality, Defendants moved to dismiss all of Plaintiffs' claims.  (Dkt. No. 35.)  And Plaintiffs' Rule 10b-5(a) and (c) claim is based on the same alleged misconduct underlying Plaintiffs' other claims.   (*See* AC ¶¶ 347-48, 356, 366.)   These allegations, which "merely repackage the misrepresentation allegations," are foreclosed as a matter of law.  *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 519-20 (S.D.N.Y. 2017) (claim not sufficiently pled "where the scheme-liability allegations merely

---

[48]   Confronted with substantial authority holding that Section 14(a) claims premised on fraud must adequately plead scienter (*see* Mot. at 35 (collecting cases)), Plaintiffs attempt to recast those cases as a "misinterpret[ation]" of the Second Circuit's holding in *Rombach v. Chang* (Opp. at 50).  But Plaintiffs offer no authority supporting their argument.  In fact, the only case Plaintiffs' rely upon held that the Section 14(a) claims were pled in fraud and subject to "the heightened pleading standards of Rule 9(b)" because "when a plaintiff's factual assertions in a Section 14(a) claim are premised on fraudulent conduct, they are subject to heightened pleading requirements . . . even if they disclaim reliance on a fraud theory." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 239 (S.D.N.Y. 2012).

[49]   To the extent Plaintiffs could have argued that only the heightened requirements of Rule 9(b), and not those of the PSLRA, should apply to the Section 14(a) claim, they have not made, and thus waived, that argument.

repackage the misrepresentation allegations").  And Defendants' opening brief demonstrated that none of the alleged misstatements is actionably false or misleading (Mot. at 12-26), that none of the alleged omissions is actionable (*id.* at 28-35), and that scienter was not adequately pled as to any Defendant (*id.* at 35-50), all of which precludes a Rule 10b-5(a) and (c) claim.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 2011 WL 536437, at *5 (S.D.N.Y. Feb. 9, 2011).[50]

Finally, given Plaintiffs' concession that Liaw neither made nor disseminated false information (Opp. at 48, 49), they must allege with particularity that Liaw was "involved in some other form of fraud" to state a Rule 10b-5(a) or (c) claim against him.  *Lorenzo*, 139 S. Ct. at 1103.  To plead "some other form of fraud," Plaintiffs "must allege the performance of an inherently deceptive act that is distinct from an alleged misstatement."  *SEC v. Rio Tinto PLC*, 2019 WL 1244933, at *15 (S.D.N.Y. Mar. 18, 2019).[51]  Plaintiffs do not plead, with particularity or otherwise, that Liaw committed any such act.  At most, Plaintiffs state Liaw "was involved in the Merger and acted for Mindbody in the discussions" (Opp. at 49), but the same could be said of any corporate director doing her job.

## **CONCLUSION**

For all of the reasons stated herein, all claims should be dismissed.

---

[50]   *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), is not to the contrary.  That case addresses the narrow issue of whether an individual who disseminates false statements they did not themselves make, with the requisite scienter, can be liable under Rules 10b-5(a) and (c).  *Id.* at 1101.  It does not alter the elements of a manipulative scheme claim—elements that Plaintiffs have not adequately pled.

[51]   Examples include wash sales, matched orders, rigged prices, bribery, bid-rigging, and creating sham entities.  *See, e.g.*, *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 471-72 (S.D.N.Y. 2017); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010); *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 641 (S.D.N.Y. 2004).

Respectfully submitted,

Dated:  May 4, 2020

*/s/ Matthew Solum*

Matthew Solum, P.C.
John Del Monaco
Ian C. Spain
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:       (212) 446-4900
ian.spain@kirkland.com

*Attorneys for Defendants MINDBODY, Inc.,*
*Richard L. Stollmeyer, and Brett White*

Patrick Gibbs
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5535

Sarah M. Lightdale
Brian M. French
Daniel P. Roy III
COOLEY LLP
55 Hudson Yards, 44th Floor
New York, New York 10001
(212) 479-6374

*Attorneys for Defendant Eric Liaw*