# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

601 Lexington Avenue
New York, NY 10022
United States

Matthew Solum, P.C.
To Call Writer Directly:
+1 212 446 4688
matthew.solum@kirkland.com

+1 212 446 4800

www.kirkland.com

Facsimile:
+1 212 446 4900

August 24, 2020

**VIA CM/ECF**

Judge Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 443
New York, NY 10007

> Re:    *In re Mindbody, Inc. Sec. Litig.*, No. 1:19-cv-08331-VEC

Dear Judge Caproni:

I write on behalf of Defendants in the above-captioned action.[1]  Pursuant to Your Honor's Individual Practice 2.A, we write to call the Court's attention to the Fifth Circuit's recent decision in *Heinze v. Tesco Corp.*, No. 19-20298, 2020 WL 4814094 (5th Cir. Aug. 19, 2020), a copy of which is attached to this letter.

In *Heinze*, the Fifth Circuit affirmed the dismissal of a securities claim premised upon a supposedly flawed merger proxy statement, holding among other things that a "statement that Tesco shareholders would receive a 'significant' 19% premium" was not misleading because "[a] reasonable shareholder would have relied on the actual quantity of the premium to assess its significance, rather than the adjective 'significant.'" 2020 WL 4814094, at *3.  The court also rejected the plaintiff's criticism of the company's forward-looking projections, explaining that the securities laws are focused on discouraging "unduly *optimistic* representations of a company's worth," not conservative forecasts.  *See id.* at *5.  The court also recognized the principle that "pure-omission claims" that are "untethered to any specific false or misleading representation . . . are not cognizable" under Section 14(a).  *Id.* at *6.  Defendants respectfully submit that this decision is relevant to issues presented in Defendants' Motion to Dismiss (Dkt. No. 35) and the accompanying memoranda of law (Dkt. No. 36; Dkt. No. 42), including (i) whether the Premium Statements were false or misleading because they described Mindbody's 68% acquisition premium as "significant" (Dkt. No. 36 at 17-18; Dkt. No. 42 at 5-6); (ii) whether Mindbody's Q4 guidance was false or misleading in light of the allegation that there was a

---

[1]    Counsel for Defendant Eric Liaw joins in this notice.

Beijing   Boston   Chicago   Dallas   Hong Kong   Houston   London   Los Angeles   Munich   Palo Alto   Paris   San Francisco   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

The Honorable Valerie E. Caproni
August 24, 2020
Page 2

subsequent indication that revenue exceeded the guidance (Dkt. No. 36 at 29-31; Dkt. No. 42 at 10-13); and (iii) whether Plaintiffs can state a "pure omission" claim against Eric Liaw (Dkt. No. 40 at 9-10).

We thank the Court for its consideration of this matter.

Respectfully submitted,

*/s/ Matthew Solum*
Matthew Solum, P.C.

cc:     All Counsel of Record (via CM/ECF)

2020 WL 4814094
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

Norman HEINZE, Plaintiff-Appellant,

v.

TESCO CORPORATION; Fernando
R. Assing; John P. Dielwart; R. Vance
Milligan; Douglas R. Ramsay; Rose M.
Robeson; Elijio V. Serrano; Michael
W. Sutherlin; Nabors Industries,
Limited, Defendants-Appellees.
Norman Heinze, Plaintiff-Appellant,

v.

Tesco Corporation; Michael W.
Sutherlin; Fernando R. Assing; John P.
Dielwart; R. Vance Milligan; Douglas
R. Ramsay; Rose M. Robeson; Elijio
V. Serrano, Defendants-Appellees.

No. 19-20298
|
FILED August 19, 2020

Appeal from the United States District Court for the Southern
District of Texas, [Alfred H. Bennett](), U.S. District Judge

**Attorneys and Law Firms**

[Miles Dylan Schreiner](), Monteverde & Associates, P.C., New
York, NY, [Thomas Emerson Bilek](), Bilek Law Firm. L.L.P.,
Houston, TX, for Plaintiff-Appellant.

[Gerard Pecht](), Norton Rose Fulbright US, L.L.P., Houston,
TX, [Peter Andrew Stokes](), Norton Rose Fulbright US, L.L.P.,
Austin, TX, for Defendants-Appellees Tesco Corporation,
Fernando R. Assing, John P. Dielwart, [R. Vance Milligan](),
Douglas R. Ramsay, Rose M. Robeson, Elijio V. Serrano,
Michael W. Sutherlin.

[Alan J. Stone](), Milbank, L.L.P., New York, NY, [Brian
Frederick Antweil](), Katten Muchin Rosenman, L.L.P.,
Houston, TX, for Defendant-Appellee Nabors Industries,
Limited.

Before [OWEN](), Chief Judge, and [SOUTHWICK]() and
[OLDHAM](), Circuit Judges.

**Opinion**

[ANDREW S. OLDHAM](), Circuit Judge:

 **\*1**  Norman Heinze brings this putative class action on
behalf of himself and other former shareholders of Tesco
Corporation against Tesco, former members of Tesco's board
of directors, and Nabors Industries, Ltd. Heinze alleges that
the defendants' omissions from a proxy statement led Tesco
shareholders to approve an all-stock acquisition by Nabors.
The district court dismissed all claims against all defendants,
and Heinze appealed. We hold that Heinze failed to state a
claim upon which relief can be granted. Therefore, we affirm.

I.

Tesco provided certain technologies related to the drilling,
servicing, and completion of wells for the upstream energy
industry. On July 6, 2017, Tesco received an acquisition offer
from Nabors, a company that provides drilling and drilling-
related services for oil and gas wells. Nabors proposed an all-
stock acquisition with an exchange ratio of 0.62 Nabors shares
for each outstanding share of Tesco common stock.

On July 12, Tesco engaged J.P. Morgan Securities LLC to
analyze the offer. During July and August 2017, Tesco and
J.P. Morgan contacted various parties who were potentially
interested in acquiring Tesco. None expressed an interest in
doing so. Based on the lack of interest from third parties,
Tesco's board focused on negotiations with Nabors.

On August 3, Tesco's board met to consider the Nabors
proposal. The board determined that the 0.62 ratio was
insufficient. Later that night, Nabors proposed a new ratio
of 0.66 Nabors shares for each outstanding share of Tesco
common stock. Tesco's board rejected that offer the following
day.

Over the next several days, the two companies continued
negotiating. On August 8, Nabors revised its proposal to 0.68
Nabors shares for each outstanding share of Tesco common
stock. On August 9, the Tesco board considered the offer
and determined that it was acceptable. On August 13, J.P.
Morgan presented its oral opinion to the Tesco board that the
proposed transaction would provide Tesco shareholders with

fair consideration. Tesco and Nabors signed the agreement that evening and publicly announced the transaction the following morning on August 14. The transaction valued Tesco at $4.62 per share, which represented a 19% premium over Tesco's closing price on the last trading day before the transaction's announcement.

Because Tesco was incorporated under Alberta law, the Court of Queen's Bench of Alberta had to approve the transaction. On October 18, the Alberta court issued an interim order approving a special meeting of Tesco shareholders and requiring a two-thirds majority vote of common shares, stock options, and restricted stock units represented at the meeting. Dissenting shareholders had the right under Alberta law to obtain an alternate payment based on a judicial valuation of their shares by the Alberta court. The interim order also called for the dissemination of a Schedule 14A proxy statement. Tesco filed its final proxy statement on October 26. At the special meeting on December 1, Tesco's shareholders approved the transaction with the required voting majority. The Alberta court approved it too.

**\*2**  Norman Heinze brought claims on behalf of himself and all other former Tesco shareholders against Tesco, former members of Tesco's board of directors, and Nabors.[1] He alleged that the defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and SEC Rule 14a-9. Specifically, Heinze alleged that the defendants made a number of omissions in the proxy statement that rendered the proxy statement misleading. The district court granted the defendants' Rule 12(b)(6) motion and dismissed all claims against all defendants. Heinze timely appealed.

[1]    Initially, Heinze and another plaintiff named Leonard Panella sought to block the transaction. After the transaction consummated, the plaintiffs from Panella's suit dismissed themselves, leaving Heinze as the only remaining plaintiff. Heinze then amended his complaint to seek damages. We review Heinze's amended complaint.

II.

We review *de novo* a district court's grant of a Rule 12(b)(6) motion to dismiss. *See [Whitley v. BP, P.L.C.](#)*, 838 F.3d 523, 526 (5th Cir. 2016). We "accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *[In re Great Lakes Dredge & Dock Co.](#)*, 624 F.3d 201, 210 (5th Cir. 2010). But we "do not accept as true

'conclusory allegations, unwarranted factual inferences, or legal conclusions.' " *[Ibid.](#)* (quoting *[Ferrer v. Chevron Corp.](#)*, 484 F.3d 776, 780 (5th Cir. 2007)).

To withstand a motion to dismiss, a complaint must allege "more than labels and conclusions," as "a formulaic recitation of the elements of a cause of action will not do." *[Bell Atl. Corp. v. Twombly](#)*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). It must state a "plausible claim for relief," rather than facts "merely consistent with" liability. *[Ashcroft v. Iqbal](#)*, 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *[Twombly](#)*, 550 U.S. at 557, 127 S.Ct. 1955).

The heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") apply to this case. Heinze's amended complaint alleges that the defendants "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading." [15 U.S.C. § 78u-4(b)(1)(B)](#). Therefore, the PSLRA says the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *[Id.](#)* § 78u-4(b)(1). If the complaint fails to meet these requirements, "the court shall, on the motion of any defendant, dismiss the complaint." *[Id.](#)* § 78u-4(b)(3)(A).

Heinze has two causes of action. The first arises under Section 14(a) of the 1934 Act. He claims that the proxy statement was misleading because it omitted certain material facts. The second arises under Section 20(a) of the 1934 Act. He claims that the individual defendants are liable for any violations of Section 14(a) committed by people they controlled. We examine Heinze's allegations in turn and conclude that he failed to state a claim upon which relief can be granted.

III.

We start with Section 14(a) of the 1934 Act, which makes it unlawful for any person "to solicit or to permit the use of his name to solicit any proxy or consent or authorization" in violation of the rules of the Securities and Exchange Commission ("SEC"). [15 U.S.C. § 78n(a)](#). Heinze alleges that the defendants violated SEC Rule 14a-9, which states:

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

**\*3**  17 C.F.R. § 240.14a-9(a).

The text of SEC Rule 14a-9 makes it clear that vague allegations about the gestalt of a proxy statement will not suffice. Even for omission-based claims, the plaintiff must identify specific "statements therein" that are rendered "false or misleading" by the alleged omissions. This requirement accords with the PSLRA, which requires the complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

Heinze's amended complaint identifies the following parts of the proxy statement as allegedly misleading: (A) the statement on page 37 that Tesco shareholders would receive a "significant" 19% premium over Tesco's closing price on the last day of trading before the transaction's announcement; (B) the table on page 43 containing Tesco management's projections for revenue and Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") in 2017 and 2018; and (C) the summary on pages 44–48 of the results of J.P. Morgan's fairness opinion. We examine these statements in turn.

### A.

Heinze first claims that it was misleading to state on page 37 of the proxy statement that Tesco shareholders would receive a "significant" 19% premium. For a statement to be actionable under SEC Rule 14a-9, it must be "material." *See* 17 C.F.R. § 240.14a-9(a). A statement is material only if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1090, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (quoting *TSC Indus., Inc. v.*

*Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

In this case, the proxy statement specifically informed shareholders that they would receive a 19% premium over Tesco's closing price on the last day of trading before the transaction's announcement. Heinze doesn't dispute the factual accuracy of that calculation. Instead, he argues that it was misleading to describe the premium as "significant."

A reasonable shareholder would have relied on the actual quantity of the premium to assess its significance, rather than the adjective "significant." *Cf. City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 172 (3d Cir. 2014) (holding at the motion to dismiss stage that the adjective "spectacular" was a vague and general statement of optimism that was not misleading). The use of the word "significant" was therefore immaterial. With respect to this statement, Heinze has failed to allege a "plausible claim." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937.

### B.

Heinze next alleges that the table on page 43 of the proxy statement was misleading. That table contains Tesco management's projections for revenue and EBITDA in 2017 and 2018:

| | 2017E | 2018E |
|---|---|---|
| | (US dollars in millions) | |
| Revenue—Base Case | $ 172.7 | $ 222.2 |
| EBITDA—Base Case | $ (19.5) | $ 2.5 |
| Revenue—Growth Case[(1)] | $ 172.1 | $ 262.6 |
| EBITDA—Growth Case[(1)] | $ (19.4) | $ 22.0 |

A footnote states that the "Growth Case" was "contingent upon and assumes favorable market conditions and takes into account other assumptions related to successful entry into several offshore contracts for tubular services and additional product sales." The table is followed by several paragraphs of language cautioning that the projections are based on assumptions that "may not prove to be accurate."

**\*4**  Heinze argues that the revenue and EBITDA projections were rendered misleading by the following four omissions from the proxy statement.

*Projections of Unlevered Free Cash Flows*. Heinze alleges that the defendants omitted projections of unlevered free cash flows for fiscal years 2017–2022. He claims that these projections were important for two reasons. First, they "reflected the widely-held expectation amongst industry observers that growth in oil prices will accelerate significantly

starting in 2019." Heinze alleges that without the cash-flow projections, Tesco shareholders were left with an unduly pessimistic view of Tesco's future growth potential. Second, Heinze claims that the cash-flow projections were essential to a proper valuation of Tesco. Without the projections, Heinze alleges, Tesco shareholders lacked a complete picture of Tesco's worth.

*Projections for 2019 and Beyond*. Separate from his allegations about the projections of unlevered free cash flows, Heinze also alleges that the defendants omitted projections for revenue, EBITDA, and other metrics for the years 2019 and beyond. He alleges that these projections also reflected the "widely-held expectation" that "growth in oil prices will accelerate significantly starting in 2019." Hence, their omission also left Tesco shareholders with an unduly pessimistic view of Tesco's future growth potential.

*Implied Per Share Equity Value Ranges for the "Growth Case" Projection*. Page 47 of the proxy statement includes two estimates by J.P. Morgan (using two different methodologies) of the implied per share equity value of Tesco. Each of those estimates presents *one* range with a low and a high estimate. Heinze notes that the revenue and EBITDA projections on page 43 of the proxy statement include *two* ranges of estimates— for the "Base Case" and "Growth Case"—and he questions why J.P. Morgan did not likewise provide *two* ranges for its estimates of Tesco's per share equity value. Heinze speculates that "[p]resumably, the 'implied per share equity value' ranges contained on page 47 of the Proxy were calculated utilizing the significantly lower 'Base Case' projections." In Heinze's view, the omission of the "Growth Case" ranges left Tesco shareholders with yet another unduly pessimistic view of Tesco's future growth potential.

*Details of J.P. Morgan's Transactions Analysis*. Heinze alleges that the defendants failed to disclose the details of J.P. Morgan's transactions analysis comparing the Nabors-Tesco transaction with the publicly available financial terms of similar transactions. The proxy statement disclosed the existence of the transactions analysis and presented J.P. Morgan's conclusion that the transaction was fair. But Heinze alleges that, by omitting the specific transactions analyzed by J.P. Morgan, the defendants prevented shareholders from realizing how much more compensation they could have been offered.

Heinze alleges that these four omissions, taken together, rendered Tesco management's revenue and EBITDA

projections for 2017 and 2018 misleading. There are two fundamental problems with this allegation.

1.

First, Heinze fails to identify how the four allegedly omitted pieces of information were "necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). Heinze does not dispute that page 43 of the proxy statement accurately reflected the projections. Nor does he dispute the accuracy of the assumptions underlying those projections with any specificity.

**\*5**  Instead, Heinze vaguely alleges that the projections were misleading because they failed to demonstrate the full extent of Tesco's future growth potential. His only allegation in support of that claim is his prophecy of oil prices increasing from 2019–2022:

> **This oil price recovery was (at the time the Merger was announced) and still is expected to accelerate significantly between 2019 and 2021/2022, the same years that the omitted Tesco Cash Flow Projections and the Later Year Projections span.** ... By including *only* the projections associated with years in which oil prices are expected to be *lower* and omitting projections for years during which oil prices are expected to be significantly *higher*, the table of projections set forth on page 43 of the Proxy presented a truncated, incomplete, misleading, and unduly pessimistic picture of Tesco's financial outlook.

(Emphases in original.) Heinze's amended complaint includes a table with the following predictions about future oil prices: $51.00/barrel in 2019, $55.00/barrel in 2020, and $65.00/barrel in 2021.

Nothing in our law requires projections to be based on such rank speculation. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015) (holding in the context of a claim under Section 11 of the Securities Act of 1933 that whether a statement is "misleading" is determined from "the perspective of a reasonable investor"); *cf. James* 4:13–14. The principal appellate case upon which Heinze relies, *Campbell v. Transgenomic, Inc.*, 916 F.3d 1121 (8th Cir. 2019), considered an allegation that a proxy statement *overstated* the *acquiring* company's worth by omitting its expenses. *Id.* at 1124. Even if that case bound the Fifth Circuit—which it does not—it would suggest only that

unduly *optimistic* representations of a company's worth can be misleading. If anything, *Campbell* cautions against making the sorts of speculative predictions that Heinze claims Tesco should have made.

The defendants' alleged failure to communicate a more bullish forecast in this case doesn't come close to rendering the revenue and EBITDA projections for 2017 and 2018 misleading. In *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004), we upheld the dismissal of a misleading-omission claim. We did so because the failure to include already-existing trends in natural gas prices was not materially misleading when the statement included cautionary language about the volatility of oil and natural gas prices. *Id.* at 216. That case arose under Section 11 of the Securities Act of 1933, which contains language about omission-based claims that is virtually identical to the language in SEC Rule 14a-9, 17 C.F.R. § 240.14a-9(a). If a company has no obligation to provide *already existing* information about commodity price trends, then the defendants in this case certainly had no obligation to include additional *projections* based on potentially inaccurate assumptions about *future* price trends.[2]

[2]     Heinze cites other Fifth Circuit cases that also do not help him because they pre-date the PSLRA and deal with very different facts. *See Rubinstein v. Collins*, 20 F.3d 160, 168–70 (5th Cir. 1994) (reversing a dismissal of an omission-based claim alleging that the defendants made "various optimistic projections" but refused to disclose "material, firm-specific adverse facts that affect[ed] the validity or plausibility of that prediction"); *First Va. Bankshares v. Benson*, 559 F.2d 1307, 1312 (5th Cir. 1977) (affirming a jury verdict finding defendants liable for "doctoring" records to present "inflate[d] assets and income").

**\*6** Without a viable claim alleging that the projections are misleading, Heinze is left with only a pure-omission theory that is untethered to any specific false or misleading representation in the proxy statement. Such pure-omission claims are not cognizable. The texts of Section 14(a) and SEC Rule 14a-9 do not provide a freestanding cause of action to challenge any and all material omissions from proxy statements. Instead, they allow an omission-based claim only if the proxy statement "omits to state any material fact necessary in order to make the *statements therein* not false or misleading." 17 C.F.R. § 240.14a-9(a) (emphasis added). Without an affirmatively false or misleading statement "therein," there can be no claim. *See, e.g., Montanio v. Keurig*

*Green Mountain, Inc.*, 237 F. Supp. 3d 163, 178 (D. Vt. 2017) ("Merely asking for more detail or background regarding a particular decision is insufficient."); *Greenthal v. Joyce*, No. 4:16-CV-41, 2016 WL 362312, at \*5 (S.D. Tex. Jan. 29, 2016) ("Here, Plaintiff does not allege that the information in the proxy statement is misleading; Plaintiff simply requests additional information."); *Hysong v. Encore Energy Partners LP*, No. 11-781, 2011 WL 5509100, at \*8 (D. Del. Nov. 10, 2011) ("A plaintiff 's desire to know information that may be material, as the plaintiff repeatedly seeks in his Complaint, is not enough to state a claim under Section 14(a) under ordinary pleading requirements."); *cf. Omnicare*, 575 U.S. at 194, 135 S.Ct. 1318 (holding that Section 11 of the Securities Act of 1933 "is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading"); *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp.*, 537 F.3d 527, 541–42 (5th Cir. 2008) (holding pure-omission claims likewise are not actionable under Section 10(b) of the 1934 Act and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5).

2.

There is a second fundamental problem with Heinze's claim about the revenue and EBITDA projections for 2017 and 2018: the projections are protected by the PSLRA's safe harbor. In an omission-based claim such as this one, the safe harbor provides that a defendant covered by the statute cannot be held liable for a forward-looking statement that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).

The district court's order granting the defendants' motion to dismiss held that the "pure omission of more forward-looking statements" is covered by the safe harbor. The defendants echo this framing of the issue on appeal, claiming that three of the allegedly omitted projections (regarding unlevered cash flows, other financial metrics, and per share equity values for the "growth case") are covered by the safe harbor. Heinze argues that this can't be right because the text of the safe harbor covers only forward-looking *statements*, not *omissions*. We agree with Heinze that the text of the safe harbor provision deals with forward-looking statements that were actually made rather than forward-looking statements

that were omitted. Because pure-omission claims are not actionable, it would not make sense to have a safe harbor for omissions. But we disagree with Heinze's assertion that the safe harbor is inapplicable.

The only forward-looking and allegedly misleading statement in the proxy is the table on page 43 containing Tesco's projections of revenue and EBITDA for 2017 and 2018. Those figures are expressly prefaced as "forecasts" and "projections" in the proxy statement. They are followed by several paragraphs of cautionary language, including a warning stating that the projections are based on "assumptions that are inherently uncertain" and "may not prove to be accurate." The factors listed in the cautionary paragraphs that could affect the accuracy of the assumptions include commodity price volatility, market trends, changes in the regulatory environment, and changes in foreign exchange rates. The reader is then directed to two additional provisions entitled "Cautionary Note Regarding Forward-Looking Statements" and "Risk Factors," which contain several *additional* pages of factors that can affect the accuracy of projections, including terrorist attacks, natural disasters, pandemic diseases, cybersecurity incidents, and the ability to recruit and retain employees. Finally, there is also a warning stating that "the projected results may not be realized, and actual results may differ."

**\*7** Heinze argues that instead of beginning our analysis with the text of the statute, we should look as "an initial matter" to the "legislative history," which he claims "was intended to encourage companies to fully disclose their projections." Of course, when "a statute's text is clear, courts should not resort to legislative history." *Hoyt v. Lane Constr. Corp.*, 927 F.3d 287, 294 (5th Cir. 2019) (quoting *Adkins v. Silverman*, 899 F.3d 395, 403 (5th Cir. 2018)); *see also, e.g.*, *Ali v. Barr*, 951 F.3d 275, 282 (5th Cir. 2020); *Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 949–50 (5th Cir. 2019). We find that the legislative history cited by Heinze is irrelevant in light of the statute's unambiguous text. And in all events, we fail to see how legislative history discussing the importance of protecting companies from liability for the projections they make has anything to say about their liability for allegedly omitted projections.

The projections of revenue and EBITDA for 2017 and 2018 are clearly identified as forward-looking statements and are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ. They therefore fall comfortably within the safe harbor. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).[3]

[3]    Heinze suggests for the first time on appeal that one of the defendants—Nabors—is not covered by the statute. But he failed to preserve that argument in the district court and raises it here in only a perfunctory manner, so we decline to consider it. *See United States ex rel. Drummond v. BestCare Lab'y Servs., L.L.C.*, 950 F.3d 277, 285 (5th Cir. 2020).

C.

The final statement that's allegedly misleading is the summary of J.P. Morgan's fairness opinion on pages 44–48 of the proxy. Heinze doesn't dispute that this statement correctly summarizes J.P. Morgan's analysis. Nor does he dispute the accuracy of J.P. Morgan's assumptions or calculations with any specificity.

Instead, Heinze reiterates his vague and speculative assertion that the proxy statement should've offered a more bullish picture of Tesco's financial future that included Heinze's prophecy of ever-rising oil prices. He also reiterates his pure-omission theory in a slightly different form. Specifically, he alleges that the defendants had a duty to disclose the four allegedly omitted pieces of information (regarding projections of unlevered cash flows, other financial projections, per share equity value ranges for the "growth case," and J.P. Morgan's transactions data) because J.P. Morgan had access to them. We reject these arguments here for the same reasons we rejected them with respect to the revenue and EBITDA projections for 2017 and 2018. *See supra* Part III.B.

IV.

Heinze's second cause of action arises under Section 20(a) of the 1934 Act. It alleges that the individual defendants are liable for any violations described in the first cause of action committed by a person they controlled. *See* 15 U.S.C. § 78t(a). Because Heinze has failed to state a predicate claim under Section 14(a) and SEC Rule 14a-9, he has also failed to state a claim under Section 20(a). *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996).

## V.

Finally, Heinze argues that the district court erred in not granting him leave to further amend his complaint. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). "Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Pervasive Software Inc. v. Lexware GmbH*, 688 F.3d 214, 232 (5th Cir. 2012) (quoting *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)). When the district court provides no explanation for denying leave to amend, we can affirm if the futility of amendment is "readily apparent" and the record reflects "ample and obvious grounds for denying leave to amend." *Ibid.* (quoting *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 426 (5th Cir. 2004)).

**\*8** Heinze already had one opportunity to amend his complaint. He makes "only a general request for leave to amend" and has not identified how amendment would cure the defects identified above. *Ibid.* We therefore hold that amendment would be futile and that the district court did not abuse its discretion in denying leave to amend.

\* \* \*

The district court's judgment is AFFIRMED.

**All Citations**

--- F.3d ----, 2020 WL 4814094

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.