# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LEONARD J. PANELLA, | § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 4:17-cv-02904 |
| v. | § § | JURY TRIAL DEMAND |
| TESCO CORPORATION, FERNANDO R. ASSING, JOHN P. DIELWART, R. VANCE MILLIGAN, DOUGLAS R. RAMSAY, ROSE M. ROBESON, ELIJIO V. SERRANO, MICHAEL W. SUTHERLIN, and NABORS INDUSTRIES LTD., | § § § § § § § | |
| Defendants. | § | |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE SECURITIES EXCHANGE ACT OF 1934**

Lead Plaintiff Norman Heinze ("Plaintiff"), by and through his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action is brought as a class action by Plaintiff on behalf of himself and the other former public holders of the common stock of Tesco Corporation ("Tesco" or the "Company") against Tesco, the former members of Tesco's board of directors (collectively, the "Board" or "Individual Defendants"), and Nabors Industries Ltd. ("Nabors" and together with Tesco and the Board, "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the merger between Tesco and Nabors (the "Merger").

2.      Tesco is a company headquartered in Houston, Texas.  Pursuant to the Merger that was announced on August 14, 2017, and completed on December 15, 2017, the Company is now a wholly owned subsidiary of Nabors.  Tesco is a global leader and provider of highly engineered technology-based solutions for drilling, servicing, and completion of wells for the upstream energy industry.  The Company seeks to improve the way wells are drilled by delivering safer and more efficient solutions that add value by reducing the costs of drilling for and producing oil and natural gas.  Tesco's operations consist of top drives and automated pipe handling equipment sales and rentals; aftermarket sales and services; and tubular services, including related products and accessories sales.

3.      In early 2014, the U.S. reduced its dependence on international oil sources by 50%.  As a result, the domestic oil and natural gas industry experienced considerable growth.[1]

4.      In May 2014, Tesco developed and implemented a Five-Year Strategy that was designed to "achieve significant growth and shareholder return by the end of the decade."[2]  In particular, the Company sought to expand its tubular services business, which had just achieved a record revenue of $224.1 million and was continuing its trend in revenue growth.[3]

5.      But in late 2014, the oil industry suffered as oil prices declined significantly and North America continued its move towards energy independence.[4]

6.      In response, Tesco management implemented several strategies to reduce costs and overhead while also exploring alternative revenue streams that would help the Company

---

[1]  *Oil And Gas Boom 2014: Jobs, Economic Growth And Security*, Forbes (Feb. 20, 2014), *available at* https://www.forbes.com/sites/davidblackmon/2014/02/20/oil-gas-boom-2014-jobs-economic-growth-and-security/#7ac0e1085717.

[2]  *2014 Annual Report*, at *3 Tesco Corporation, *available at* http://ir.tescocorp.com/ phoenix.zhtml?c=118467&p=irol-reportsannual.

[3]  *Id.* at 4.

[4]  *Oil and Gas Reality Check 2015*, Deloitte, *available at* https://www2.deloitte.com/global/en/pages/ energy-and-resources/articles/oil-gas-reality-check.html.

endure the unfavorable economic conditions. The plan worked. The oil industry stabilized in late 2016, and Tesco's financial outlook improved every quarter in 2017.

7.      It is against this backdrop of economic revitalization that Nabors sought to acquire Tesco. On July 6, 2017, Nabors made an initial offer to acquire Tesco at an exchange ratio of 0.62 of a Nabors share for each share of Tesco common stock.

8.      On August 3, 2017, the Board determined and communicated to Nabors that the 0.62 exchange ratio was insufficient. Less than two weeks later, Nabors and the Company announced they had entered into an Agreement and Plan of Merger ("Merger Agreement"). Pursuant to the Merger Agreement, Nabors, through its wholly owned subsidiary, Nabors Maple Acquisition Ltd. ("Merger Sub"), would acquire all of the outstanding shares of Tesco in an all-stock transaction in which Tesco's shareholders would receive 0.68 shares of Nabors common stock in exchange for each share of Tesco common stock they owned (the "Merger Consideration"). Based on the exchange ratio and the closing share price of Nabors' common stock on August 11, 2017 (the last trading day prior to the execution of the Merger Agreement), the Merger Consideration had an implied value of $4.62 per Tesco common share.

9.      The Merger Consideration grossly undervalued Tesco common stock. Indeed, shortly before the Merger was announced, analysts had set price targets for Tesco common shares significantly above the $4.62 implied value of the Merger Consideration, including: a price target of $9.00 per share by FBR Capital Markets as of August 9, 2017, and a price target of $8.00 per share by Capital One Securities, Inc. as of August 8, 2017. Furthermore, Tesco common shares closed at $4.75, *above the implied value of the Merger Consideration*, on August 2, 2017, a mere two weeks before the Merger was announced.

10.     While Tesco had strong prospects as a standalone business, the Board consented to the Merger that not only failed to adequately compensate Tesco shareholders but also caused Nabors and its pre-Merger shareholders to be the primary beneficiaries of Tesco's substantial upside.    Pursuant to the Merger Agreement, it was estimated that pre-Merger Nabors shareholders would own approximately **90%** of the combined company, while former Tesco shareholders would only own approximately **10%**.  In other words, Tesco shareholders had their ownership percentage and voting power significantly diluted as a result of the Merger.

11.     On October 26, 2017, Defendants solicited Tesco shareholders to approve the unfair Merger by filing a Schedule 14A Definitive Proxy Statement (the "Proxy") (attached as Exhibit 2 hereto) with the SEC and causing the Proxy to be disseminated to the Company's shareholders.  As set forth in detail below, the Proxy omitted several categories of material valuation information that, if disclosed, would have alerted Tesco shareholders that the Merger Consideration undervalued their shares.  The omission of such information (discussed in detail below) rendered certain sections of the Proxy discussing Tesco's projections, future prospects, the value of Tesco shares, and the analyses performed by Tesco's financial advisor, materially incomplete and misleading.  Specifically, the table of Tesco management projections set forth on page 43 of the Proxy and the summaries of the valuation analyses performed by J.P. Morgan Securities LLC ("J.P. Morgan") on page 46-47 of the Proxy provided a materially misleading picture of Tesco's valuation and future financial prospects, and made the Company appear less valuable than it actually was.

12.     The misleading Proxy was an essential link necessary to consummate the Merger, and Tesco shareholders suffered economic loss as a result of the Merger, as the Merger

4

Consideration they received significantly undervalued their shares by approximately $3.38 per share (based upon pre-Merger price targets).

13.     On December 1, 2017, a majority of Tesco shareholders voted to approve the Merger without access to the material information that was omitted from the Proxy, and on December 15, 2017, the Merger was completed.

14.     In violation of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9, Defendants solicited and/or permitted the use of their names to solicit proxies from Tesco shareholders in favor of the unfair Merger by disseminating the materially incomplete and misleading Proxy.  Tesco's former shareholders were thus prevented from fairly exercising their corporate suffrage rights and casting an informed vote on the Merger.

15.     Specifically, and as set forth in greater detail below, the following four categories of information were omitted from the Proxy: (i) the unlevered free cash flows that Tesco is expected to generate during fiscal years 2017 through 2022 (the "Tesco Cash Flow Projections"); (ii) Tesco projections (including for Revenue and EBITDA) for years *beyond 2018* (the "Later Year Projections"); (iii) implied per share equity value ranges derived by utilizing the significantly higher "Growth Case" projections prepared by Tesco management (the "Growth Case Share Value Ranges"); and (iv) the analysis (or a summary thereof) J.P. Morgan performed whereby it "compared the proposed financial terms of the Arrangement with the publicly available financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration received for such companies" (the "Transactions Analysis").

16.     All four categories of information were reviewed and relied upon by the Board when deciding to approve the Merger Agreement.  The Board therefore knew such information existed and knew or should have known that such information had been omitted from the Proxy.

5

Indeed, as directors of the Company, each Board member had a duty to carefully review the Proxy before it was disseminated to the Company's shareholders to ensure it did not omit any material information or contain any material misstatements, and to correct such omissions or misstatements. Each Board member was therefore negligent in allowing the materially incomplete and misleading Proxy to be disseminated to the Company's shareholders.

17. Nabors' directors and senior executive officers who were involved in negotiating the Merger were also undoubtedly aware of the existence of and/or reviewed the Later Year Projections and the Tesco Cash Flow Projections. Indeed, the Proxy notes various meetings between senior executives and directors of Nabors and representatives of Tesco during which Tesco's financial prospects and/or valuation issues were discussed. *See* Proxy at 34-36. The Proxy also identifies the following senior executives or directors of Nabors as being involved in such discussions: Anthony G. Petrello, Nabors' Chairman, President, and Chief Executive Officer; Dennis Smith, Vice President (Corporate Development and Investor Relations) of Nabors; William Restrepo, the Chief Financial Officer of Nabors; John Yearwood, a member of Nabors' board of directors; Joseph Walker, then Senior Counsel from Nabors; Julia Wright, Vice President and General Counsel at Nabors; Bernardo Pettenatti, Senior Business Analyst (Corporate Development and Investor Relations); and Will Speicher, Project Manager (Corporate Development and Investor Relations).

18. Further, the Proxy notes that "in connection with Nabors' due diligence review of TESCO, TESCO presented certain prospective, unaudited financial information regarding its business, which is referred to as the 'TESCO Business Management Case', to Nabors. The TESCO Business Management Case also was provided to Nabors' financial advisors, Intrepid, for use in connection with its financial analysis." Proxy 42. Additionally, on May 19, 2017, a

6

due diligence meeting was held among Messrs. Assing, Boone, and Kelly from Tesco and Messrs. Restrepo, Smith, and Joseph Walker, then Senior Counsel, from Nabors. Between May 19, 2017, and May 31, 2017, Tesco produced diligence materials to a virtual data room. Subsequent due diligence communications occurred on June 1, 2, 14, 26, and 30, 2017. The general focus of these diligence efforts was related to corporate organization, senior management, certain contractual relationships, financial results and prospects, and operations.

19. At least certain of the above-referenced individuals from Nabors reviewed the Proxy statement before the date that Tesco shareholders voted to approve the Merger. Indeed, the Merger Agreement expressly gave Nabors the right to review or comment on the Proxy and submit comments for incorporation into the Proxy. The above-referenced individuals who reviewed the Proxy on behalf of Nabors were negligent in allowing the Proxy to be disseminated to Tesco shareholders with the above-referenced material omissions and misleading statements. The negligence of these individuals is imputed to Nabors.

20. Further, Nabors permitted the use of its name to solicit Tesco's shareholders' proxies in support of the Merger, and there was a substantial connection between the use of Nabors' name and the solicitation effort. Indeed, Nabors' name appears throughout the Proxy, and Nabors had a direct and significant interest in ensuring that Tesco shareholders voted in favor of the Merger.

21. The Tesco Cash Flow Projections and the Later Years Projections were necessary for Tesco shareholders to have a complete and accurate view of the value of their shares and the Company's future prospects and to assess the fairness of the Merger Consideration. The failure to disclose such information rendered the sections of the Proxy described in detail below materially incomplete and misleading.

7

22.     In addition, the Proxy omitted an entire valuation analysis (i.e., the Transactions Analysis).  The Opinion of TESCO's Financial Advisor section of the Proxy clearly indicates that J.P. Morgan conducted a Transactions Analysis, as it states that J.P. Morgan "(c) compared the proposed financial terms of the [Merger] with the publicly available *financial terms of certain transactions* involving companies J.P. Morgan deemed relevant *and the consideration received* for such companies," in connection with preparing its fairness opinion.  *See* Proxy at 45.  Likewise, the *Fairness Opinion of J.P Morgan* states that "[i]n connection with preparing our opinion, we have … (iii) compared the proposed financial terms of the [Merger] with the publicly available *financial terms of certain transactions* involving companies we deemed relevant *and the consideration paid* for such companies."  *See* Proxy at Annex F-1.  However, the "Fairness Opinion" is merely a two-page letter from J.P. Morgan to the Board, that contains none of J.P. Morgan's valuation analyses.  The "Fairness Opinion" provided Tesco shareholders with nothing other than an unsupported conclusion, qualified by a gauze of protective language designed to insulate J.P. Morgan from liability.

23.     Furthermore, the Proxy notes that Tesco management prepared *two* "cases" of projections, referred to as the "Base Case" and the "Growth Case."  Proxy at 43.  However, the summaries of J.P. Morgan's valuation analyses on page 47 of the Proxy only provide *one* implied per share equity value range for each analysis.  The implied per share equity value ranges included in the Proxy were presumably calculated using the *significantly lower Base Case projections*.  However, J.P. Morgan and other bankers that provide fairness opinions routinely derive implied per share equity value ranges utilizing *all* of the "cases" of projections they receive from a company's management.  Here, the Proxy fails to disclose any implied per share equity value range utilizing the significantly higher Growth Case projections, which, if disclosed,

8

would have alerted Tesco shareholders that their shares were worth much more and that the Merger Consideration was unfair. The omission of the Growth Case Share Value Ranges rendered the summary of J.P. Morgan's valuation analyses on pages 46-48 of the Proxy incomplete and misleading.

24. If the Tesco Cash Flow Projections, the Later Year Projections, the Growth Case Share Value Ranges, and the Transactions Analysis had been disclosed, Tesco shareholders would have realized that the Merger Consideration undervalued their shares and that the table of Tesco projections on page 43 of the Proxy and the summaries of J.P. Morgan's valuation analyses and implied per share equity value ranges set forth on pages 46-47 of the Proxy provided a materially incomplete and misleading picture of Tesco's valuation and future financial prospects, and made the Company appear less valuable than it actually was.

25. In sum, the Proxy, which recommended that Tesco shareholders vote in favor of the Merger and was an essential link in the accomplishment of the unfair Merger, omitted material financial information which resulted in the financial information that was included in the Proxy providing an incomplete and inaccurate valuation picture of Tesco and the Company's common shares. Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9 promulgated thereunder, by soliciting or permitting the use of their names to solicit proxies from Tesco shareholders to vote in favor of the Merger. As a result, Tesco shareholders were injured and suffered financial loss. Plaintiff, on behalf of himself and the Class, seeks to recover damages resulting from Defendants' violations of the Exchange Act.

### JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

9

violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

27.     Personal jurisdiction exists over each Defendant either because each Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with Texas as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Tesco maintains its primary place of business in this District; (iii) Nabors maintains executive and administrative offices in this District; (iv) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (v) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

29.     Plaintiff was, at all relevant times, a Tesco shareholder.

30.     Defendant Tesco is a Canadian corporation and maintains its headquarters at 11330 Clay Road, Suite 350, Houston, Texas, 77041.  As a result of the Merger, Tesco is now a wholly owned subsidiary of Nabors.

31.     Defendant Michael W. Sutherlin ("Sutherlin") was, at all relevant times, a director of Tesco and was also the Chairman of the Board.

32.     Defendant Fernando R. Assing ("Assing") was, at all relevant times, a director of

10

Tesco and was also the President and Chief Executive Officer of the Company.

33.     Defendant John P. Dielwart ("Dielwart") was, at all relevant times, a director of the Company.

34.     Defendant R. Vance Milligan ("Milligan") was, at all relevant times, a director of the Company.

35.     Defendant Douglas R. Ramsay ("Ramsay") was, at all relevant times, a director of the Company.

36.     Defendant Rose M. Robeson ("Robeson") was, at all relevant times, a director of the Company.

37.     Defendant Elijio V. Serrano ("Serrano") was, at all relevant times, a director of the Company.

38.     The parties in paragraphs 31 through 37 are referred to herein as the "Individual Defendants" or the "Board."

39.     Defendant Nabors is a Bermuda exempted company and maintains its headquarters at Crown House, 4 Par-La-Ville Road, Second Floor, Hamilton, HM08, Bermuda. Nabors maintains executive offices in Houston, Texas, and holds its annual shareholders meeting in Houston.  Nabors also designated its offices in Houston, Texas, as the place to send it all notices relating to the Merger Agreement.  As a result of the Merger, Tesco is now a wholly owned subsidiary of Nabors.  Nabors, together with Tesco and the Board, are collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other former public shareholders of Tesco who were harmed by Defendants'

actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

41. This action is properly maintainable as a class action because:

a. the Class is so numerous that joinder of all members is impracticable. As of October 31, 2017, there were 46,756,282 shares of Tesco common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of former public shareholders of Tesco will be ascertained through discovery;

b. there are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i) whether Defendants misrepresented or omitted material information concerning the Merger in the Proxy in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9;

ii) whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

iii) whether Plaintiff and other members of the Class suffered damages as a result of being compelled to vote for the Merger based on the materially false, incomplete, and misleading Proxy.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

12

d.       Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class;

e.       the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.       Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.       a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

<b>FURTHER SUBSTANTIVE ALLEGATIONS</b>

## I.       Background to the Merger

42.       Tesco was organized under the laws of Alberta, Canada, on December 1, 1993, through the amalgamation of Shelter Oil and Gas Ltd., Coexco Petroleum Inc., Forewest Industries Ltd., and Tesco.  The Company is a global leader and provider of highly engineered technology-based solutions for drilling, servicing, and completion of wells for the upstream energy industry.  The Company seeks to improve the way wells are drilled by delivering safer and more efficient solutions that add value by reducing the costs of drilling for, and producing, oil and natural gas.  Tesco's operations consist of top drives and automated pipe handling equipment sales and rentals; aftermarket sales and services; and tubular services, including related products and accessories sales.

13

43. In early 2014, the U.S. oil and natural gas industry experienced considerable growth after reducing its dependence on international oil sources by 50%.[5]

44. In May 2014, Tesco developed and implemented a Five-Year Strategy that was designed to "achieve significant growth and shareholder return by the end of the decade."[6]

45. However, beginning in late 2014 and continuing through to early 2017, the oil industry suffered as oil prices declined significantly[7] and North America continued its move towards energy independence.[8]

46. In response, Tesco took measures to reduce costs and transitioned from a primarily North American company to a more globally focused enterprise. As a result, Tesco will be able to capitalize on the Company's position in foreign markets, which left "significant growth opportunities in spite of the [then] current economic conditions."[9]

47. In late 2016, the U.S. oil industry began to stabilize. Tesco prepared to exploit the recovery and continued to "invest in initiatives that should quicken [the Company's] return to profitability."[10]

48. When the oil industry stabilized during the fourth quarter of 2016, Tesco sought to take advantage of the increases in North American oil prices by increasing its North American oil rig count during 2017.[11]

---

[5] *Oil And Gas Boom 2014: Jobs, Economic Growth And Security*, Forbes (Feb. 20, 2014).

[6] Tesco Corporation 2014 Annual Report, at p. 3.

[7] *U.S. Energy Information Administration.*

[8] *Oil and Gas Reality Check 2015*, Deloitte.

[9] Form 10-K, Tesco Corp. (March 4, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1022705/000102270516000054/teso-12312015x10kq4.htm.

[10] Form 10-K, Tesco Corp. (November 7, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1022705/000102270516000093/teso10qq32016.htm.

[11] Form 10-K, Tesco Corp. (March 3, 2017), *available at* https://www.sec.gov/Archives/edgar/data/1022705/000102270517000011/teso-12312016x10kq4.htm.

14

49.     After enduring unfavorable marketplace conditions from late 2014 to early 2017, the Company reported positive financial results for the 2017 First Quarter ("Q1 2017") on May 9, 2017. Revenue, Adjusted EBITDA, and GAAP net income (loss) all improved both on the quarter and year-over-year.[12] Revenue in Q1 2017 was $20.1 million, a $1.3 million, or 7%, increase from the fourth quarter of 2016 and a $3.5 million, or 21%, increase from the first quarter of 2016. *Id.* Notably, the "sequential increase in revenue was primarily from higher sales of new products and aftermarket services as well as land tubular services in the U.S."

50.     Furthermore, revenue from product sales increased by $1.7 million, or 42%, for Q1 2017, as compared to same time period during 2016, and revenue from aftermarket sales and services increased by $3.1 million, or 53%, for the same time period.[13] As a result, products operating loss decreased by $38.3 million, or 98%, for Q1 2017, as compared to 2016. *Id.*

51.     The Company's financial outlook continued to improve and the Company reported positive financial results for the 2017 Second Quarter ("Q2 2017") on August 8, 2017. Revenue, Adjusted EBITDA, and GAAP net income (loss) all simultaneously improved for both the quarter and year-over-year. Tesco reported revenue of $40.1 million in Q2 2017, up from $36.7 million, or 9%, in the Q1 2017, and up from $33.6 million, or 19%, in the second quarter of 2016. Defendant Assing highlighted the Company's strong performance and growth prospects:

> **Our business continues to improve** and the second quarter results reflect the benefit of the stronger U.S. land market and growing CDS sales as customers continue to recognize the benefits of drilling automation. Despite some new product shipping delays to the third quarter, **revenue and EBITDA both improved sequentially**.

---

[12]  Press Release: Tesco Corporation Reports First Quarter 2017 Results, Tesco Corp. (May 9, 2017), *available at* http://ir.tescocorp.com/phoenix.zhtml?c=118467&p=irol-newsArticle&ID=2271142.

[13]  Form 10-Q, Tesco Corp. (May 9, 2017), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/1022705/000102270517000018/teso10qq12017.htm.

> **During the second quarter, we continued to experience growth and improved profitability from several key initiatives**, primarily CDS™ Evolution adoption and CDS sales. **Customer interest in automated land tubular service offerings continues to increase and is expected to accelerate as our cementing accessories are deployed.**
>
> As market uncertainty and pricing pressure increases in a lower-for-longer environment, it will be more important to continue to gain market share through technology deployments. **As we look ahead to the third and fourth quarters, we see opportunities that have the potential to generate revenue and EBITDA improvements while keeping cash levels near current levels.** The approximate $8.4 million invested in working capital and capital expenditures in the first half of 2017 positions us to continue to grow revenue in the second half of 2017 and to get closer to our goal of reaching breakeven EBITDA.
>
> **Tesco has invested in and remains well positioned in key international markets** and sustained international activity and market share gains will be key to offset any potential North America market slow down. **We continue to benefit from our strong balance sheet** and will continue to pursue additional opportunities to invest our cash to fund growth and incremental profitability to outperform the market.[14]

52.    Notably, with respect to the Company's tubular services segment, "[r]evenue in the second quarter of 2017 was $20.6 million, a 24% increase from the first quarter of 2017 of $16.6 million and a 58% increase from the second quarter of 2016 of $13.0 million." *Id.*

53.    In sum, Tesco weathered the difficult economic climate from late 2014 to late 2016, and once the oil and gas industry stabilized in early 2017, Tesco's financial condition and future outlook significantly improved. Nevertheless, less than one week after announcing the Company's optimistic Q2 2017 results, the Board agreed to the Merger with Nabors, whereby the Company's shareholders were significantly shortchanged and received inadequate consideration for their shares.

---

[14] Press Release: Tesco Corporation Reports Second Quarter 2017 Results, Tesco Corp. (August 8, 2017), *available at* http://ir.tescocorp.com/phoenix.zhtml?c=118467&p=irol-newsArticle&ID=2292431.

## II.   The Merger Announcement

54.    Despite the Company's bright standalone prospects, on August 14, 2017, Tesco and Nabors issued a joint press release announcing that they had entered into the Merger Agreement, whereby Nabors, through Merger Sub, would acquire all of Tesco's outstanding shares in an all-stock transaction for 0.68 shares of Nabors common stock.  Accordingly, each share of Tesco had an implied value of $4.62 per share.

55.    The Merger Consideration significantly undervalued the Company and failed to properly account for and value its strong growth prospects.  In fact, the Merger Consideration represented a *53% discount* to Tesco's 52-week high trading price of $9.65 per share, and the implied value of $4.62 per share was well below the price targets analysts had set for the Company around the time the Merger was announced.  Tesco's stock price closed above the implied value of the Merger Consideration a mere two weeks before the Merger was announced.

56.    The Merger Consideration's inadequacy was further illustrated when the Company reported its Third Quarter 2017 results on November 7, 2017.  Tesco reported revenue of $40.5 million in the third quarter of 2017, up from $40.1 million in the second quarter of 2017, and *up from $30.4 million, or 33%*, in the third quarter of 2016.[15]

57.    Simply stated, the Board agreed to accept Merger Consideration that undervalued Tesco shareholders' shares.  And, as set forth in detail below, Defendants then negligently allowed a Proxy to be disseminated to the Company's shareholders that omitted several categories of material information that would have alerted Tesco shareholders to the fact that the Merger Consideration was grossly inadequate.  As a result of the Proxy's material omissions, the Proxy presented a materially incomplete and misleading picture of Tesco's valuation and future

---

[15]  Press Release: Tesco Corporation Reports Third Quarter 2017 Results, Tesco Corp. (Nov. 7, 2017), *available at* http://ir.tescocorp.com/phoenix.zhtml?c=118467&p=irol-newsArticle&ID=2314825.

financial prospects, and made the Company appear less valuable than it actually was. *See* Summary of Initial Findings of M. Travis Keath, CFA, CPA/ABV ("Keath Findings") (attached as Exhibit 1 hereto).

**III.     Defendants Authorized the Proxy to Be Disseminated to Tesco's Shareholders, Which Provided a Materially Incomplete and Misleading Picture of Tesco's Valuation and Future Financial Prospects and Made the Company Appear Less Valuable Than It Actually Was**

58.     On October 26, 2017, Defendants solicited Tesco shareholders to vote in favor of the Merger by causing the materially incomplete and misleading Proxy to be filed with the SEC and disseminated to the Company's shareholders. The Proxy, which recommended that Tesco shareholders vote in favor of the Merger, omitted and misrepresented material information about the intrinsic value of the Company and its future prospects, and caused Tesco's shareholders to be misled when they voted in favor of the Merger without access to the below-referenced material information that was necessary for them to make an informed decision regarding whether to approve the Merger.

59.     Specifically, as noted above, the Proxy omitted four categories of material information: (i) the unlevered free cash flows that Tesco is expected to generate during fiscal years 2017 through 2022 (the Tesco Cash Flow Projections); (ii) Tesco projections (including for Revenue and EBITDA) for years *beyond 2018* (the Later Year Projections); (iii) implied per share equity value ranges derived by utilizing the significantly higher "Growth Case" projections prepared by Tesco management (the Growth Case Share Value Ranges); and (iv) the analysis (or a summary thereof) J.P. Morgan performed whereby it "compared the proposed financial terms of the Arrangement with the publicly available financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration received for such companies" (the Transactions Analysis).

60. The omission of these four categories of information, both individually and collectively, rendered the portions of the Proxy that purported to provide shareholders with information regarding the value of their shares, the value of Tesco, and the Company's future prospects incomplete and misleading. Such portions include: (i) the "Opinion of TESCO's Financial Advisor" section on pages 46-47 of the Proxy, which includes an incomplete summary of only two of the valuation analyses J.P. Morgan performed in support of its so-called fairness opinion (a Public Trading Multiples Analysis and a Discounted Cash Flow ("DCF") Analysis) and also sets forth "implied per share equity value" ranges purporting to represent the per share value of Tesco common shares; and (ii) the table of "Certain Prospective Financial Information Prepared by TESCO" that appears on page 43 of the Proxy, which only provides projections for Revenue and EBITDA for fiscal years 2017 and 2018, and does not include the Tesco Cash Flow Projections or the Later Year Projections.

**A.      The Proxy Omitted Tesco's Unlevered Free Cash Flow Projections and the Later Year Projections, Which Caused the Summary of the Tesco Projections on Page 43 of the Proxy and the Summary of J.P. Morgan's Valuation Analyses on Pages 46-47 of the Proxy to Provide an Incomplete, Inaccurate, and Misleading Picture of Tesco's Actual Value and Future Prospects.**

**1.      The Significance of Projections for Years 2019 and Beyond**

61. The Proxy failed to disclose the unlevered free cash flows that Tesco is expected to generate during fiscal years 2017 through 2022 (i.e., the Tesco Cash Flow Projections). The Tesco Cash Flow Projections were based upon financial projections prepared by the management of Tesco, and therefore represented management's view of the cash flows the Company was expected to generate. Indeed, in preparing its valuation analyses, J.P. Morgan assumed that the financial projections Tesco management provided it with were reasonably prepared based on assumptions reflecting the best available estimates and judgments by Tesco management as to the expected future results of operations and financial condition of Tesco, and J.P. Morgan

19

expressed no view as to such projections or the assumptions on which they were based. Proxy at 45.

62. Making matters worse, the Proxy also omitted the Tesco Later Year Projections (i.e. projections for 2019 and beyond for EBITDA, Revenue, and/or other metrics). The Proxy makes it clear that projections for Tesco beyond 2018 existed. Indeed, the Proxy notes that J.P. Morgan utilized "projected EBITDA of TESCO *for the year ending December 31, 2019*" in connection with its Public Trading Multiples Analysis. Proxy at 46. Furthermore, the Proxy notes that J.P. Morgan's DCF Analysis was based upon cash flow projections that *went out to 2022*, which were "based upon financial projections prepared by the management of TESCO." Proxy at 47.

63. Nevertheless, without explanation, Defendants withheld from Tesco's shareholders these Tesco financial projections for years 2019 and beyond (i.e., the Tesco Cash Flow Projections and the Later Year Projections). Page 43 of the Proxy only disclosed an incomplete and misleading excerpt of Tesco's Revenue and EBITDA projections for fiscal years 2017-2018. While projections for years beyond 2018 existed, Defendants inexplicably omitted those later year projections from the Proxy.

64. The Tesco Cash Flow Projections and the Later Year Projections were material to Tesco's shareholders because, based on the years the projections spanned, they accounted for the expected strong financial performance and growth in the oil and gas industry and, therefore, they must indicate that Tesco is more valuable than indicated by the truncated Revenue and EBITDA projections for 2017 and 2018 disclosed on page 43 of the Proxy.

65. Based on the years the Tesco Cash Flow Projections spanned (2017-2022) (*see* Proxy at 47) and the years the Later Year Projections spanned (2019 and beyond, *see* Proxy at

20

47), both categories of projections had to have reflected the widely-held expectation amongst industry observers that growth in oil prices will accelerate significantly starting in 2019. Thus, both categories of projections must indicate that Tesco was worth more than indicated by the inexplicably truncated Revenue and EBITDA projections set forth on page 43 of the Proxy, which only run *through 2018*.

66. As a provider of technology-based solutions for drilling, servicing, and completion of oil wells, Tesco's financial prospects are highly correlated with the outlook for oil prices. Tesco acknowledged the significant impact oil prices have on its projections and future prospects in its SEC filings. The Proxy notes that in preparing its projections, Tesco management "made assumptions and estimates regarding, among other things, commodity price (oil and gas trends, volatility, and resulting potential activity fluctuations…." Proxy at 43. The Company also noted the direct correlation between oil prices and its financial results/projections in its most recent Annual Report, explaining: "Our revenues and operating results are directly related to the level of worldwide oil and gas drilling and production activities and the profitability and cash flows of "E&P" companies and drilling contractors, which are affected by current and anticipated oil and gas prices."

67. Since collapsing in 2015 and 2016, oil prices had just begun to recover as of the time the Merger was announced.

68. **This oil price recovery was (at the time the Merger was announced) and still is expected to accelerate significantly between 2019 and 2021/2022, the same years that the omitted Tesco Cash Flow Projections and the Later Year Projections span**. By omitting both the Tesco Cash Flow Projections and the Later Year Projections (i.e., forecasted financial metrics beyond 2018), the projections set forth on page 43 of the Proxy *stopped just before*

***growth in oil prices was expected to accelerate*** according to industry experts and observers, including investment research and financial publishing firm Value Line, as shown in Figure 2. By including ***only*** the projections associated with years in which oil prices are expected to be ***lower*** and omitting projections for years during which oil prices are expected to be significantly ***higher***, the table of projections set forth on page 43 of the Proxy presented a truncated, incomplete, misleading, and unduly pessimistic picture of Tesco's financial outlook.  *See* Keath Findings ¶¶ 24-25.

**Figure 2: Historical and Forecast Oil Prices**
**Value Line Investment Survey**

|  | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Price of Oil ($Bbl., U.S. Refiners' Cost) | $ 101.00 | $ 100.47 | $ 92.23 | $ 48.41 | $ 40.63 | $ 48.06 | $ 48.50 | $ 51.00 | $ 55.00 | $ 65.00 |
| Annual Growth | n/a | -0.5% | -8.2% | -47.5% | -16.1% | 18.3% | 0.9% | 5.2% | 7.8% | 18.2% |

Source: Value Line Investment Survey: Selection & Opinion. June 2, 2017, p. 2939.

69.     Multiple other industry observers and experts anticipate that U.S. oil production and oil prices will continue to significantly accelerate during 2019 and beyond.  In fact, the International Energy Agency ("IEA") expects the United States to overtake Russia as the world's largest oil producer by 2023, accounting for most of the global growth in petroleum supplies. U.S. crude production is expected to reach a record of 12.1 million barrels a day in 2023, with significantly higher production output in 2019-2022.[16]   And both the IEA and other industry analysts have recently indicated they believe oil prices are likely to reach $100 a barrel in 2019.

70.     Simply stated, the Proxy omitted financial projections (the Tesco Cash Flow Projections and the Later Year Projections) that would have informed Tesco shareholders that the Company's future prospects were particularly strong starting in 2019 and beyond, and that the Merger Consideration undervalued their shares in light of the Company's future prospects.

---

[16]  Sarah Kent and Timothy Puko, *U.S. Will Be the World's Largest Oil Producer by 2023*, Says IEA, WALL STREET JOURNAL (March 5, 2018).

**2. The Tesco Cash Flow Projections Were Also Material Because They Were Necessary for Tesco Shareholders to Properly Assess the Fair Value of Their Shares**

71. In addition to the fact that the Tesco Cash Flow Projections were material because they spanned the years during which oil prices are expected to significantly accelerate, the Cash Flow Projections were also material to Tesco shareholders for two additional reasons: (i) under sound corporate finance theory, the value of stock should be premised on a company's cash flow projections, and Revenue and EBITDA projections *are not* a sufficient substitute for cash flow projections; and (ii) the discounted cash flow (DCF) analysis is widely-regarded as the most important valuation methodology, and shareholders cannot properly assess the legitimacy and accuracy of the implied per share ranges generated in a DCF analysis without unlevered free cash flow projections.

72. Investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest. Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that Tesco's shareholders needed to assess when determining whether to vote in favor of the Merger was clear—was the Merger Consideration fair compensation given Tesco's expected unlevered free cash flow projections? Without the Tesco Cash Flow Projections, the Company's shareholders were unable answer this question and assess the fairness of the Merger Consideration.

73. Defendants implicitly acknowledged the materiality of cash flow projections by disclosing Nabors' projected Cash Flow from Operations for the fiscal years 2017 through 2019. *See* Proxy at 39. However, the Proxy failed to provide Tesco's shareholders with *any* cash flow projections for Tesco, even though such projections: clearly existed; were relied upon by

23

Defendants and J.P. Morgan in assessing Tesco's value and the Merger Consideration; could have been easily disclosed; and needed to be disclosed in order to prevent the Tesco Business Management Case Projections on page 43 of the Proxy and the summary of J.P. Morgan's DCF Analysis on page 47 of the Proxy from providing an incomplete and misleading picture of Tesco's value.

74.     In other words, the Proxy inexplicably included significantly *less* information regarding Tesco's value and prospects than Nabors', as summarized in Figure 1:

**Figure 1: Comparison of Projections**
**TESCO vs. Nabors**

|        | Forecast Runs Through | Cash Flow Included? |
|--------|-----------------------|---------------------|
| Tesco  | 2018                  | No                  |
| Nabors | 2019                  | Yes                 |

Source: Merger Proxy, pp. 39, 43

75.     Furthermore, the DCF valuation methodology is of fundamental importance when determining corporate value.  Simply stated, the DCF analysis has primacy among corporate valuation techniques.[17,18,19]  It forms the basis for all other valuation techniques and is the very core of modern corporate finance.  Both academicians and practitioners alike acknowledge this

---

[17] "Discounted cash flow (DCF) forms the core of finance….  Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." "Developing an Automated discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*.  Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.

[18] "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built.  To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation.  This is why so much of this book focuses on discount cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11.

[19] "In finance theory, present value models [also referred to as discounted cash flow models] are considered the fundamental approach to equity valuation." CFA® Program Curriculum 2015 • Level II • "Volume 4: Equity." CFA Institute, 2014. 22.

principle.  Because the DCF analysis is of such fundamental importance in the determination of

corporate value, it follows that the financial projections used to conduct such analyses (i.e., the

Tesco Cash Flow Projections) are material to shareholders.

76.     The DCF method estimates the value of a business based on its projected future

free cash and then discounts the projections to their present value estimate.[20]  First, an estimate is

made of the future free cash flows of the corporation over a set period of time.  Second, a value

of the corporation's free cash flows in perpetuity after this discrete period is forecasted.  This

second value is known as a terminal value, and it is typically calculated by applying a perpetual

growth rate to the estimated cash flow in the first year of this period.  Finally, the cash flows

derived in the first two steps are discounted back at an appropriate discount rate to arrive at a

present value of all of the future cash flows of the corporation.[21]

77.     Professor Steven M. Davidoff specifically identified these three fundamental DCF

inputs and explained (in one of the most thorough law review articles regarding the fundamental

flaws with banker's valuation analyses) that, in a discounted cash flow analysis, the inputs "can

significantly affect the final valuation."  *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576

(2006).  As Professor Davidoff explains:

> There is substantial leeway to determine each of [the three central inputs], and any
> change ***can markedly affect the discounted cash flow value***.  For example, a
> change in the discount rate by one percent on a stream of cash flows in the
> billions of dollars can change the discounted cash flow value by tens if not
> hundreds of millions of dollars… This issue arises not only with a discounted
> cash flow analysis, but with each of the other valuation techniques.  This dazzling
> variability makes it difficult to rely, compare, or analyze the valuations
> underlying a fairness opinion ***unless full disclosure is made of the various inputs***

---

[20]  *Discounted Cash Flow (DCF)*, Investopedia, *available at* https://www.investopedia.com/
terms/d/dcf.asp.

[21]  *See* Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. at 1574 n.73 (collecting sources and
outlining the methodology for conducting a DCF analysis).

*in the valuation process, the weight assigned for each, and the rationale
underlying these choices*. The substantial discretion and lack of guidelines and
standards also makes the process vulnerable to manipulation to arrive at the
"right" answer for fairness. This raises a further dilemma in light of the
conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

78.     Here, Tesco shareholders were *only* provided with the discount rate, which, as
noted above, is a highly subjective number a banker utilizes that, if changed even 1 or 2
percentage points, can *significantly* alter the resulting valuation. As a result of the omission of
the Tesco Cash Flow Projections, Tesco shareholders were materially misled about the fairness
of the Merger Consideration, and they were unbale to assess the legitimacy of the implied per
share value ranges that was disclosed on page 47 of the Proxy.

79.     A reasonable shareholder would find the critical input underlying the DCF
analysis (i.e., the Tesco Cash Flow Projections) material. Without the Tesco Cash Flow
Projections, Tesco shareholders were unable to assess the legitimacy of the implied per share
equity value ranges set forth on page 47 of the Proxy and were unable to recognize that those
ranges did not accurately reflect the value of their shares. Tesco shareholders were forced to
blindly rely upon J.P. Morgan's DCF Analysis and the implied range of values the analysis
rendered without the benefit of the material information that served as the foundation for the
analysis - the Tesco Cash Flow Projections. The summary of J.P. Morgan's DCF Analysis on
page 47 of the Proxy was therefore incomplete and provided a misleading valuation picture of
the Company.

80.     Furthermore, with respect to DCF analyses, disclosure of the unlevered free cash
flow projections is particularly important because the terminal year can have the largest effect on

26

the final valuation as compared to any other year.[22]   In nearly all DCF models, the cash flow from the terminal year has a far larger effect than that of any other single year in the discrete forecast period.  In fact, DCF analyses in which the terminal value comprises 50% or more of a company's overall value are commonplace.[23]   Keath Findings ¶ 22.   Here, no cash flow projections at all were disclosed for Tesco, and the range of terminal values of Tesco that J.P. Morgan calculated were also not disclosed.  *See* Proxy at 47.

81.     Moreover, Revenue and EBITDA projections (both individually and taken together) are not a sufficient proxy or substitute for unlevered free cash flow projections, as the metrics differ significantly from each other.  Therefore, providing solely Revenue and EBITDA projections, while withholding free cash flow projections, provides shareholders with a materially incomplete and misleading picture of a company's value and future prospects.[24,25,26,27]

Keath Findings ¶¶ 17-18, 24-25.

---

[22] *Terminal Value Calculations in a Financial Model*, Corality, *available at* http://www.corality.com/tutorials/estimating-terminal-value ("An estimate of terminal value is critical in financial modelling as it accounts for a large percentage of the project value in a discounted cash flow valuation.").

[23] *Terminal Value*, Macabacus, *available at* http://macabacus.com/valuation/dcf/terminal-value (indicating that the shorter the length of the projections, the greater an impact on the DCF analysis because "the terminal value can constitute approximately *75% of the value in a 5-year DCF* and 50% of the value in a 10-year DCF.").

[24] "We use a discounted cash flow (DCF) approach to arrive at our intrinsic value estimates because it allows us to separate economic reality from accounting-based noise."  Morningstar's Approach to Equity Analysis and Security Valuation."  *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*.  Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 305.

[25] "The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does….  Financial managers are frequently misled when they focus on the accounting definition of profit…."  Copeland, Thomas.  *Financial Theory and Corporate Policy*. 3rd ed. 24.

[26] "[A]ccounting earnings is useful for valuation only when earnings is a good proxy for the expected long term cash flow of the company.  Not all companies generate the same cash flow for each dollar of earnings, however, so earnings approaches are generally only useful for very rough value approximations.  They fail as a comprehensive management tool….  Furthermore, the DCF approach is strongly supported by research into how the stock markets actually value companies….  [T]he DCF approach … provides a more sophisticated and reliable picture of a company's value than the accounting approach."  Copeland, Tom.  "Cash Is King."  *Valuation Measuring and Managing the Value of Companies*. 2nd ed.70.

82.     Because EBITDA in particular is sometimes misunderstood to be equivalent to cash flow, it is important to emphasize that the two are not the same and should not be treated as if they were.  Shannon Pratt, a longtime valuation practitioner and author, points out "this error is not a minor matter."[28]

83.     As Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder.  Too many investors focus on earnings before interest, taxes, depreciation, and amortization.  That makes sense, only if you think capital expenditures are funded by the tooth fairy."[29]  Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls.  EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understand a company's value.[30]  As a result of these material differences between EBITDA and unlevered free cash flows, many experts recognize unlevered free cash flows as a much more accurate measure when it comes to analyzing the expected performance of a company.  Simply put, the Tesco Cash Flow Projections were material to Tesco shareholders, and their omission caused the truncated Revenue and EBITDA projections disclosed on page 43 of the Proxy to provide a materially incomplete and misleading picture of Tesco's valuation and future financial prospects.

---

[27] "This discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset.  We just discount the cash flows….  Notice that it is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share." [Emphasis in original.] Brealey, Richard, Stewart Myers, and Franklin Allen.  "The Value of Common Stocks." *Principles of Corporate Finance*. 10th ed. New York: McGraw-Hill Irwin, 2011. 80.

[28] "Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow.  This error is not a minor matter…."  Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." *Cost of Capital*. 16.

[29] Elizabeth MacDonald, *The Ebitda folly*, Forbes (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.

[30] Cody Boyte, *Why EBITDA is Not Cash Flow*, Axial Forum (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/.

84.      Accordingly, Defendants' failure to disclose the Tesco Cash Flow Projections rendered the EBITDA and Revenue projections disclosed on page 43 of the Proxy misleading, because those projections, standing alone and without unlevered free cash flow projections, failed to provide a complete and accurate picture of Tesco's standalone value and its future prospects.

**B.      The Proxy Omitted Implied Per Share Equity Value Ranges Based Upon Tesco's Growth Case Scenario, Rendering the Summaries of J.P. Morgan's Analyses Incomplete and Misleading**

85.      The Proxy also omitted implied per share equity value ranges based upon Tesco's Growth Case Scenario projections.  Critically, while the Proxy discloses that Tesco management prepared *two* "cases" of projections, a "Base Case" and a "Growth Case," Proxy at 43, page 47 of the Proxy only sets forth implied per share equity value ranges for *one* case of projections.

86.      The summary of J.P. Morgan's DCF Analysis fails to disclose whether J.P. Morgan utilized the Base Case or the Growth Case projections that were developed by Tesco's management.  This piece of information (i.e., whether the implied per share equity values JP Morgan derived in its DCF Analysis were calculated utilizing the Base Case or the Growth Case projections) was material to Tesco's shareholders.  Indeed, the difference between the "Base Case" and "Growth Case" projections is significant.  For 2018, the Base Case projected revenues of $222.2 million and EBITDA of $2.5 million; conversely, the Growth Case projected revenues of 262.6 million, and EBITDA of $22 million.  Proxy at 43.

87.      Presumably, the "implied per share equity value" ranges contained on page 47 of the Proxy were calculated utilizing the significantly lower "Base Case" projections.  The average shareholder would not know this, however, and would thus not know whether the implied per share equity value ranges were calculated utilizing Tesco's "Base Case" or "Growth Case" projections.  The summary of J.P. Morgan's DCF analysis on page 47 of the Proxy is inherently

misleading because it fails to affirmatively disclose which "case" of projections the implied per

share equity value range is based upon, and the "cases" differ significantly from each other.

88.     Furthermore, it is common practice for financial advisors that are provided with

multiple "cases" of management projections to calculate implied per share value ranges utilizing

*each* of the cases provided by management.  Thus, J.P. Morgan presumably calculated implied

per share equity value ranges for Tesco utilizing *both* the Base Case and the Growth Case.

Indeed, J.P. Morgan routinely calculates implied share price ranges utilizing *each of the cases* it

receives from a company's management.  For example, J.P. Morgan did so in connection with

the recent mergers involving the following companies: Bob Evans Farms, Inc.;[31] Xactly

Corporation;[32] Olin Corporation;[33] MAKO Surgical Corp.;[34] and ExactTarget, Inc.[35]

89.     However, the Growth Case Share Value Ranges were omitted from the Proxy,

which further rendered the summaries of J.P. Morgan's valuation analyses on page 47 of the

Proxy incomplete and misleading.  Indeed, withholding a higher valuation range while disclosing

a lower range provides an incomplete and misleading overall valuation picture.  Further, the

Growth Case projections presumably reflect the more likely "case" based upon Tesco's recent

---

[31]  Bob Evans Farms, Inc. DEFM14A at 60, https://www.sec.gov/Archives/edgar/data/33769/
000119312517346362/d481438ddefm14a.htm (calculating implied equity value per share ranges using
both Base Case Projections and Sensitivity Case Projections).

[32] Xactly Corporation DEFM14A at 46, https://www.sec.gov/Archives/edgar/data/1322554/
000119312517217331/d413349ddefm14a.htm (calculating implied equity value range using both Original
Base Case and Lower Growth Case).

[33] Olin Corporation DEFM14A at 119, https://www.sec.gov/Archives/edgar/data/74303/
000119312515292592/d921503ddefm14a.htm (calculating implied enterprise value reference ranges
using both Base Case and Upside Case).

[34] Mako Surgical Corp. DEFM14A at 29-30, https://www.sec.gov/Archives/edgar/data/1411861/
000157104913001098/t1300603-def14a.htm (calculating equity value range using Case A (base case) and
Case B (more aggressive) projections).

[35] ExactTarget, Inc. Schedule 14D-9 at 29, https://www.sec.gov/Archives/edgar/data/1420850/
000119312513255538/d548389dsc14d9.htm (calculating implied equity value range using both Case A
and Case B projections).

strong financial performance and industry expert's expectations for strong growth in the industry from 2019 to 2021/2022.

      **C.     The Proxy Omitted J.P. Morgan's Transactions Analysis, Rendering the Summary of J.P. Morgan's Analyses on Pages 46-47 of the Proxy Incomplete and Misleading**

90.     The Proxy also omitted an entire valuation analysis—J.P. Morgan's Transactions Analysis.  A Transactions Analysis is routinely performed by bankers rendering fairness opinions, and the disclosure of such an analysis in merger proxy statements, including proxy statements for mergers where J.P. Morgan served as the financial advisor, is commonplace. Here, based upon the pricing multiples and premiums observed in connection with other similar transactions in the industry, the omitted Transactions Analysis likely indicated that the Merger Consideration and premium obtained for Tesco shareholders were insufficient.

91.     The Proxy clearly indicates that J.P. Morgan performed a Transactions Analysis. Page 45 states that "[i]n arriving at its opinions, J.P. Morgan, among other things: … (c) compared the proposed financial terms of the Arrangement with the publicly available financial terms of *certain transactions* involving companies J.P. Morgan deemed relevant and the consideration received for such companies."  Likewise, Annex F of the Proxy (*Fairness Opinion of J.P. Morgan*), states, "[i]n connection with preparing our opinion, we have … (iii) compared the proposed financial terms of the Transaction with the publicly available financial terms of *certain transactions* involving companies we deemed relevant ***and the consideration paid*** for such companies."  *See* Proxy at Annex F-1.  However, the Proxy failed to disclose this routinely disclosed, material valuation analysis to Tesco shareholders.

92.     Examinations of precedent merger and acquisition transactions are a near-ubiquitous component in fairness opinions rendered for publicly traded companies, and the

31

absence of further discussion here is conspicuous and problematic. The information taken from such analyses must consist of at least one of two categories of observations: (i) pricing multiples, and/or (ii) merger premiums.

93. A Transactions Analysis like the one omitted from the Proxy is routinely performed by bankers that provide fairness opinions, and is sometimes referred to as a "Premiums Analysis" if the banker looks at premiums associated with the selected transactions as opposed to pricing multiples.

94. The omission of any summary of the Transactions Analysis, including the pricing multiples and/or premiums J.P. Morgan observed in connection with its Transactions Analysis, is of particular concern here. That is because such information likely suggested that the Merger Consideration was inadequate and/or that Tesco was undervalued in the Merger.

95. The overwhelming majority of merger and acquisition transactions occur at a price reflecting a premium to the pre-announcement public trading price of the target company. This means that the pricing multiples resulting from an acquisition target's transaction price are *commensurately higher* than the pricing multiples calculated based on its public trading price. Keath Findings ¶ 30. In other words, if J.P. Morgan looked at pricing multiples in connection with the omitted Transactions Analysis, such multiples would likely have been higher than the pricing multiples it observed in connection with its Public Trading Multiples Analysis summarized on page 46-47 of the Proxy, and higher multiples result in higher implied value ranges. *Id*.

96. While the Proxy contained a summary of J.P. Morgan's *Public Trading Multiples* analysis, in which J.P. Morgan examined the pricing multiples of six publicly traded companies it "judged to be analogous to TESCO", no corresponding information was disclosed with respect

to the pricing multiples observed by J.P. Morgan in connection with its examination of precedent merger and acquisition transactions for its Transactions Analysis.

97. The omission of the Transactions Analysis caused the summary of J.P. Morgan's valuation analyses on pages 44-48 of the Proxy to be incomplete and misleading. Indeed, the overall mix of information regarding Tesco's valuation and the implied per share value of Tesco shares was distorted by presenting TESCO's shareholders with pricing multiples that **tend to be lower** (i.e., those based on public trading prices disclosed on page 46 of the Proxy) and withholding pricing multiples that **tend to be higher** (i.e., those based on acquisition prices like the ones that appear in a transactions analysis). *Id*.

98. Furthermore, even if J.P. Morgan looked at premiums instead of pricing multiples in connection with its omitted Transactions Analysis, that still means material information was withheld from Tesco shareholders. Defendants touted in the Proxy that the Merger Consideration provided shareholders with a "Significant Premium," and cited the premium as one of the primary reasons why the Board agreed to the Merger and recommended shareholders approve it. Proxy at 37. The touting of the premium led reasonable shareholders to believe that the premium compared favorably to the premiums obtained in connection with comparable transactions like the ones J.P. Morgan reviewed in connection with its omitted Transactions Analysis; indeed, why would a director soliciting a shareholder's vote in favor of a merger describe the premium as "significant" and cite it is a primary reason to support the Merger unless the premium was in fact "significant" as compared to the premiums obtained in similar transactions? The mere obtaining of a premium for a target company's shareholders in connection with a merger is something that every board of directors is expected to do. Indeed, for change of control transactions that occurred during the third quarter of 2016, the median

premium was 32.8% and the average premium was 47.3% for domestic and international transactions.[36] Furthermore, change of control transactions in the oil and gas extraction industry experienced even higher premiums, with a *median premium of 44.0% and average premium of 66.5%.*[37]

99.     By comparison, the misleadingly touted "significant" premium obtained for Tesco shareholders was only 19% compared to Tesco's closing price on the last trading day prior to the announcement of the Merger, and the Merger Consideration failed to provide *any premium at all* compared to Tesco's trading price a mere two weeks before the Merger was announced.  In other words, the Proxy misled Tesco shareholders by stating they had received a "significant premium," Proxy at 37, and shareholders were unable to recognize that the premium was actually far from "significant" and was inadequate, because the Proxy omitted the Transactions Analysis.

100.    From a reasonable shareholder's perspective, the relevant question is how does the premium obtained compare to the premium other shareholders received in connection with similar transactions.  Tesco shareholders were unable to answer this question, because the Proxy omitted the Transactions Analysis J.P. Morgan performed, which specifically looked at the "financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration received for such companies."  Proxy at 45.  And, based upon the median and mean premiums obtained in recent transactions (both across the spectrum of industries and in Tesco's industry), it appears that the Transactions Analysis that J.P. Morgan performed, looking at the "financial terms" of certain such transactions, likely indicated that the premium Tesco shareholders received was inadequate.

---

[36]  Control Premium Study 3rd Quarter 2016, MERGERSTAT, at p. 5, available at https://www.bvresources.com/docs/default-source/sample-reports/control-premium-study-quarterly-report.pdf.

[37]  *Id.* at 6-7.

101.    Based on the foregoing, the section of the Proxy summarizing J.P. Morgan's valuation analyses on pages 46-47, and the statement touting the "significant premium" Tesco shareholders received on page 37, were rendered misleading as a result of the omission of the Transactions Analysis and/or a summary of J.P. Morgan's comparison of "the proposed financial terms of the Arrangement with the publicly available financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration received for such companies." Proxy at 45. Simply stated, it is inherently misleading to summarize valuation analyses that make a merger look favorable or fair, while withholding a valuation analysis that makes a merger look unfavorable and unfair.

D.      Summary of the Proxy's Material Omissions

102.    In sum, the Proxy omitted four categories of material information: (i) the unlevered free cash flows that Tesco is expected to generate during fiscal years 2017 through 2022 (i.e., the Tesco Cash Flow Projections); (ii) Tesco projections (including for Revenue and EBITDA) for years *beyond 2018* (i.e., the Later Year Projections); (iii) implied per share equity value ranges derived by utilizing the significantly higher "Growth Case" projections prepared by Tesco management; and (iv) the analysis (or a summary thereof) J.P. Morgan performed whereby it "compared the proposed financial terms of the Arrangement with the publicly available financial terms of certain transactions involving companies J.P. Morgan deemed relevant and the consideration received for such companies" (i.e., the Transactions Analysis).

103.    The omission of these categories of information, both individually and collectively, rendered the portions of the Proxy that purported to provide shareholders with information regarding the value of their shares, the value of Tesco, and the Company's future prospects incomplete and misleading. The misleading portions of the Proxy include the

35

"Opinion of TESCO's Financial Advisor" section on pages 46-47 of the Proxy, which includes an incomplete summary of only two of the valuation analyses J.P. Morgan performed in support of its so-called fairness opinion (a Public Trading Multiples Analysis and a Discounted Cash Flow Analysis) *but omits the Transactions Analysis*, and which sets forth "implied per share equity value" ranges purporting to represent the per share value of Tesco common shares, *but does not disclose that those ranges were derived utilizing the "Base Case" rather than the "Growth Case" projections, and also does not disclose any ranges derived from the significantly higher Growth Case projections*. The table of "Certain Prospective Financial Information Prepared by TESCO" that appears on page 43 of the Proxy was also rendered misleading as a result of the above-refenced omissions, because the table only provides projections for Revenue and EBITDA for fiscal years 2017 and 2018, and does not include the Tesco Cash Flow Projections or the Later Year Projections, which must account for the expected significant acceleration in oil prices and growth in the industry from 2019 and beyond.

104. If a Proxy discloses valuation information, it must be complete and accurate. With regard to future events, projections, and other metrics regarding future valuation, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Here, Defendants elected to selectively disclose only certain valuation information regarding Tesco, including an incomplete and limited table of projections for only certain financial metrics (Revenue and EBITDA) and for only two years (2017 and 2018). The Proxy also selectively disclosed summaries of only certain of the valuation analyses J.P. Morgan performed in support of its so-called "fairness opinion", but completely omitted the analysis J.P. Morgan performed whereby it "compared the proposed financial terms of the Arrangement with the publicly available financial terms of certain transactions involving

companies J.P. Morgan deemed relevant and the consideration received for such companies" (i.e., the Transactions Analysis). The Proxy also only disclosed the implied per share equity value ranges calculated utilizing one "case" of projections, even though Tesco management prepared two cases of projections. Defendants, by electing to disclose certain, cherry-picked valuation information and projections, assumed an obligation to provide Tesco shareholders with the above-referenced material information that was omitted from the Proxy. Such omissions rendered the Proxy materially incomplete and misleading, in violation of Section 14(a)/Rule 14a-9.

105. Indeed, the Proxy's cherry-picked, selective disclosure of *only certain* Tesco projections and *only certain* of J.P. Morgan's valuation analyses presented an incomplete, misleading, and unduly pessimistic picture of the Company's financial outlook and prospects, and made the Company appear less valuable than it actually was. Keath Findings ¶ ¶ 24-25, 30-32.

106. The materially incomplete and misleading Proxy was an essential link in consummating the unfair Merger, which caused Plaintiff and the Class to suffer financial loss in that they received less than fair value for their Tesco shares. Consequently, Plaintiff and the Class have been harmed, as their Tesco shares were undervalued in the Merger and they retained an unreasonably low percentage of the post-Merger combined company. Plaintiff, on behalf of the Class, seeks to hold Defendants accountable for the financial loss and damages they suffered, which were caused by Defendants' violations of the Exchange Act and Rule 14a-9.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and
Rule 14a-9 Promulgated Thereunder)**

107.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

108.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

109.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

110.     Defendants issued the Proxy and/or permitted the use of their names in the Proxy with the intention of soliciting Tesco shareholders' support for the Merger. Each Defendant reviewed and authorized the dissemination of the Proxy, which omitted the above-referenced material information, which in turn rendered the above-referenced sections of the Proxy materially incomplete and misleading because such sections provided a misleading valuation picture of Tesco. The Proxy contained untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.

38

111. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Tesco, were aware of the omitted information but failed to ensure such information was included in the Proxy, in violation of Section 14(a) and Rule 14a-9. The Individual Defendants knew or were negligent in not knowing that the Proxy was materially misleading and omitted or misstated the above-referenced material information. The Individual Defendants reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger; indeed, the Proxy states that J.P. Morgan reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by J.P. Morgan as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company, including the omitted Tesco Cash Flow Projections and Later Year Projections.

112. The Individual Defendants knew or were negligent in not knowing that the material information identified above had been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review J.P. Morgan's valuation analyses, question J.P. Morgan as to its derivation of fairness, and to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. The text of the Proxy urged shareholders to "carefully read" it, yet Defendants failed to do so themselves.

113. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to

notice the material omissions in the Proxy upon reviewing it, which the Individual Defendants were required to do carefully. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Proxy.

114.  Tesco is deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

115.  Nabors is also liable for the Individual Defendants' and Tesco's violations of the Exchange Act as Tesco's successor entity.

116.  Nabors is further liable for the above-referenced material omissions and misleading statements in the Proxy because it "permit[ed] the use of [its] name to solicit any proxy or consent or authorization in respect of any security", in violation of Section 14(a)(1) of the Exchange Act. There was a substantial connection between the use of Nabors' name and the solicitation effort. Furthermore, Nabors was aware of the material omissions and misleading statements in the Proxy, as its executive officers and/or directors were provided with or had access to the above-referenced omitted Tesco Cash Flow Projections and Later Year Projections prior to approving the Merger Agreement. Furthermore, pursuant to the Merger Agreement, Nabors was provided with reasonable opportunity to review or comment on the Proxy statement and submit comments for incorporation into the Proxy.

117.  The above-referenced information that was omitted from the Proxy was material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such omissions were not corrected prior to the vote on the Merger and rendered the above-refenced sections of the Proxy materially incomplete and misleading.

118.  As a direct and proximate result of the dissemination of the materially incomplete and misleading Proxy that Defendants used to obtain shareholder approval of the Merger,

Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

119. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

120. The Individual Defendants acted as controlling persons of Tesco within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Tesco, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete, false, and misleading.

121. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

122. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act

41

violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly involved in preparing this document.

123. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy describes the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

124. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

125. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (i.e., the difference between the value they received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

42

B.      Awarding Plaintiff and the Class compensatory and/or rescissory damages sustained as a result of Defendants' wrongdoing, including but not limited to pre-judgment and post-judgment interest;

C.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  April 6, 2018.

Respectfully submitted,


_____/s/ Thomas E. Bilek_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Attorneys for Lead Plaintiff and Liaison Counsel for the Class*


Juan E. Monteverde
Miles D. Schreiner
**MONTEVERDE & ASSOCIATES PC**
350 Fifth Avenue, Suite 4405
New York, NY  10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
        mschreiner@monteverdelaw.com

*Attorneys for Lead Plaintiff and Lead Counsel for the Class*

43