USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/25/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
                                                             :          19-CV-8331 (VEC)
IN RE MINDBODY, INC.                                         :
SECURITIES LITIGATION                                        :          OPINION AND ORDER
                                                             :
------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

        In this securities class action, Plaintiffs allege that Defendant Mindbody, Inc.

("Mindbody" or "Company") and certain corporate insiders falsely depressed the Company's

stock prices by announcing an unwarranted negative outlook for fourth quarter 2018, in order to

facilitate a proposed privatization on the cheap in early 2019.  The Amended Complaint asserts

misleading statements and omissions and deceptive conduct in violation of Section 10(b) of the

Securities and Exchange Act and Rule 10b–5(b) promulgated thereunder, as well as misleading

proxy materials that allegedly mischaracterized the merger offer and process.  The Court finds

that Plaintiffs have plausibly alleged material misstatements or omissions based on (i)

Defendants' failure to disclose Mindbody's better-than-predicted fourth quarter earnings ahead

of the shareholder vote on privatization, when they knew that negative guidance had caused

share prices to plunge by 20% and that the gloomy guidance turned out to be inaccurate, and  (ii)

Defendants' statements in the proxy materials that Mindbody did not discuss the retention of

executives with the buyer prior to the signing of the merger agreement.  As set forth below,

Defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

        For purposes of Defendants' motion to dismiss, the Court "accepts as true all well-

pleaded factual allegations in the complaint, draws all reasonable inferences in favor of the

nonmoving party, and considers, in addition to the complaint, and written instruments attached,

statements incorporated by reference, and public disclosure documents filed with the SEC."

*Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019).

## I.     Mindbody's Business

Mindbody, a Delaware corporation, is a software company that provides business management and payment software to approximately 67,000 fitness and beauty businesses, such as gyms and yoga studios.  Am. Comp. (Dkt. 22) ¶¶ 39, 50.  During all relevant times, Defendants Richard Stollmeyer, Brett White, and Eric Liaw served as Mindbody's CEO, CFO, and member of the board of directors, respectively.  *Id.* ¶¶ 40–42.  Prior to its privatization on February 15, 2019, Mindbody's Class A common stock was publicly traded on the NASDAQ; Class B stock was privately held, primarily by insiders, and had ten votes per share.  *Id.* ¶¶ 39, 206.

Mindbody has three sources of revenue.  First, 64% of its revenue comes from software subscription fees.  *Id.* ¶ 51.  Mindbody also takes a cut of payments processed on its platforms, *e.g.*, transactions between a fitness studio and the studio's customers, which makes up 35% of its income.  *Id.*  The remaining 1% comes from sales of various physical products, such as payment systems and heart-rate monitors.  *Id.*

In the first half of 2018, Mindbody acquired two technology companies, FitMetrix, which helps gyms track customers' data and performance across locations, and Booker (and its product, Frederick), which was a competitor that serviced primarily salons and spas.  *Id.* ¶¶ 55-56, 58.  Those acquisitions necessitated significant integration efforts throughout the remainder of 2018 in order to merge the disparate software platforms and customer service and sales teams.  *See id.* ¶¶ 69, 213.

Mindbody anticipated that integration efforts would be immense and would persist until 2019.  During the Company's 1Q18 earnings call in May 2018, Stollmeyer described the integration effort as a "nontrivial matter," and said that, even though efforts "will begin almost immediately," the hope was to "exit 2018 with a truly unified and aligned business, capable of returning to profitability and growing strongly for years to come."  *Id.* ¶¶ 63–64, 69; Monaco Decl., Ex. 2 (Dkt. 37-2) at 8.

The following quarter, Mindbody provided a mixed outlook.  During the 2Q18 earnings call in late July, Stollmeyer reported "solid progress on [Mindbody's] integration. . . ."  Am. Compl. ¶¶ 66–67.  Despite "substantial progress," however, he cautioned that integration remained a "massive project that touche[d] every aspect of [Mindbody's] business" and that would affect the "outlook for the balance of the year."  *Id.* ¶ 69; Monaco Decl., Ex. 4 (Dkt. 37-4) at 5.  Because of the anticipated "slight net reduction in sales productivity during this integration period," Mindbody lowered its projected 2018 revenue by $1 million.  Monaco Decl., Ex. 4 (Dkt. 37-4) at 5.. ("[W]e have lowered the midpoint of our full year revenue guide by $1 million or 40 basis points of our expected revenue for the year.").  According to Stollmeyer, the Company remained "very bullish on where [the integration] is going to take us in 2019" but "want[ed] to be cautious for the balance of" 2018.  *Id.* at 10.  Similarly, CFO White expressed "confidence for the second half of the year," noting that Mindbody had "done a lot of heavy lifting on the integration."  *Id.* at 12.  Stollmeyer reiterated Mindbody's "objective [] to enter 2019 a fully integrated company."  *Id.* ("So there's still work to be done and -- but we're pleased with the early results.").

On September 18, 2018, Mindbody gave another update on the progress of integration to investors.  Am. Compl. ¶ 74.  The Company reported progress and expressed optimism but

again noted that further work needed to be done.  Monaco Decl., Ex. 7 (Dkt. 37-7) at 23 ("We've already worked to integrate Frederick functionality into MINDBODY and Booker.  In Booker, on July 1, we integrated the first aspect . . . . We'll do the same with MINDBODY in the coming months.").  Chief Strategy Officer Josh McCarter, in commenting on the firm's M&A strategy, touted Mindbody's demonstrated ability to integrate new businesses, including Booker.  *Id.* at 47.  Stollmeyer noted the "magnitude" of the Booker integration but reiterated Mindbody's effort "to frontload that work in '18, so that [it] can enter the New Year in '19 . . . with strong growth." *Id.* at 49–50.

On November 6, 2018, Mindbody reported its 3Q18 earnings and again reduced its revenue guidance for the remainder of the year, citing unexpected operational challenges, including with the Booker integration.  Am. Compl. ¶¶ 105–06.  The 4Q18 guidance, which had previously been $66.8 to $70.8 million, was reduced to $65 to $67 million.  *Id.* ¶ 105. Stollmeyer stated in Mindbody's press release that Mindbody's "recent acquisitions have introduced greater operational challenges than expected in the back half of the year."  Monaco Decl., Ex. 14, Ex. 99.1 (Dkt. 37-14) at 1.  The press release also indicated that the revenue outlook had been "updated to reflect the acquisitions of FitMetrix and Booker."  *Id.* at 2.

Mindbody's statements during the earnings call for 3Q18 struck a similar note. Stollmeyer stated that the Company had failed to meet growth expectations in the second and third quarters of 2018 and said that the growth would likely continue to lag behind expectations in the fourth quarter.  Monaco Decl., Ex. 22 (Dkt. 37-22) at 5.  According to Stollmeyer, the "growth challenges [were] all operational" and that Mindbody was executing "plans to resolve these challenges," including by hiring 51 additional sales specialists.  *Id.*  When asked to expound on the operational growth challenges, Stollmeyer cited the difficulty of scaling sales

and marketing in the subscriber business, noting that Mindbody had two separate sales teams and that the onboarding of new sales representatives had been slower than expected; he also noted Mindbody's use of two different Salesforce platforms, and a delay in the deployment of its mobile apps. *Id.* at 8. Similarly, White stated that the revised guidance "took into account the current ramping trend of [Mindbody's] go-to-market teams as well as the elongated deployment time for [its] branded mobile apps." *Id.* at 7. In response to a question about increased costs, White cited the addition of the 50 sales personnel but otherwise indicated that "it's kind of a steady course and speed on the expense side."[1] *Id* at 8.

During the call, Stollmeyer and White were asked about their prior optimism regarding integration. *Id.* at 11. Stollmeyer responded that the last update, which had been on September 18, 2018, concerned results as of the end of August, and at that point, Mindbody was optimistic about the newly formed go-to-market teams and the milestones that had been reached. *Id* at 12. The operational difficulties surrounding the sales teams and the integration reportedly did not become apparent until October. *Id.* White further explained that the biggest surprise from the third quarter was "the delay and the elongated deployment [of Mindbody's applications] to the Apple App Store." *Id.* He noted that Apple had implemented a new rule in May that Mindbody "had very little data on" and that created a longer timeline than anticipated. *Id.*

Mindbody's stock price fell approximately 20% on the negative news, dropping from $32.63 to $26.18 on November 7, 2018. Am. Comp. ¶ 110. After the steep drop, Stollmeyer

---

[1]     Plaintiffs cite statements from two confidential witnesses (CWs) who purport to contradict the dour outlook offered by Stollmeyer and White. First, CW-2 was a regional sales manager, whose "impression" was that Booker was performing "very well" and that sales quotas were increased and met each quarter from 3Q18 to 2Q19. Am. Compl. ¶ 123. CW-2 allegedly oversaw a team of 12 sales representatives responsible for Booker sales across all regions. *Id.* Second, CW-3 was a member of Mindbody's finance department who left Mindbody at some undisclosed point during 3Q18 but reportedly saw no negative signs prior to his departure. *Id.* ¶ 125. CW-3 allegedly participated in weekly meetings headed by White; he told Plaintiffs that material drops in forecasts would have been discussed during those meetings and that, prior to his departure, he was not aware of anything suggesting a poor fourth quarter. *Id.* ¶ 126.

said that he was "not surprised by the after-market reaction" and that he was "fine." *Id.* ¶ 118.

He also reassured Mindbody's newly-hired chief technology officer that Mindbody was

"resetting street expectations to position [itself] for future beat and raises" and that the Company

has "a strong year of growth planned for 2019." *Id.* ¶ 119.

Two months later, on January 5, 2019, Stollmeyer told senior management that the

preliminary revenue for 4Q18 was a "massive beat" against the "consensus midpoint of $66

million." *Id.* ¶ 186.  On January 8, 2019, White sent an email stating that preliminary revenue

was $68.3 million for the quarter, above the guidance range given during the 3Q18 earnings call

and beating an internal forecast.  *Id.* ¶ 121.  Those results were not disclosed prior to Mindbody's

privatization on February 15, 2019.  *Id.* ¶¶ 198, 206.

## II.    The Privatization

According to Plaintiffs, Defendants purposely gave a grim fourth quarter forecast in order

to drive down the Company's share prices in anticipation of taking Mindbody private.  On

August 7, 2018, Stollmeyer allegedly began having discussions with non-party Qatalyst Partners

LP ("Qatalyst"), an investment bank, about the possibility of selling Mindbody to a private

equity fund.  *Id.* ¶ 88.  Stollmeyer reportedly told Qatalyst that he would only be interested in

such a sale if he and the current management would be retained by the post-merger entity.  *Id.* ¶

88.  Qatalyst soon connected Stollmeyer with a principal at Vista Equity Partners ("Vista")—the

private equity firm that would eventually purchase Mindbody in February 2019.  *Id.* ¶¶ 43–45,

88–89.  The content of Stollmeyer's initial discussions with Vista, however, is not alleged in the

complaint.  On October 8 and 9, 2018, Stollmeyer attended a conference hosted by Vista, at

which he met Vista's founder and CEO, Robert Smith.  *Id.* ¶ 90.  Afterwards, Stollmeyer texted

Mindbody's president that the Vista presentation was "mind blowing" and "inspiring" and that he liked Smith and others at Vista.  *Id.* .

On October 17, 2018, Stollmeyer told White, along with the president and general counsel of Mindbody, that he had "receive[d] a direct expression of interest from Vista yesterday" and that the "conversation [was] progressing rapidly."  *Id.*, Ex. D.  Stollmeyer also reported that Vista was "very enthused" and "would pay a substantial premium to recent trading range,"[2] noting that Vista "ha[d] no idea what [Mindbody was] about to report or guide" for fourth quarter 2018.  *See id.*  Stollmeyer argued that a sale to a private equity fund was the best option to achieve the Company's vision and suggested that they find a buyer "who sees our current capabilities, gets our huge potential, and has the resources to accelerate our results over the 3 year planning window, and expedite the full realization of [] our Vision and Purpose."  *Id.* He also indicated that such a sale would not be an "automatic exit" from the Company for any of the principals.  *Id.*  Stollmeyer emphasized, setting the statement off with asterisks, that he "would not support the sale of MB at this time in any other circumstance."  *Id.*  He ended the email with a request to keep Vista's interest a secret until he could approach the members of the board.  *Id.*

On October 28, 2018, Stollmeyer sent to the directors a list of talking points in support of the sale to Vista.  Am. Compl. ¶ 101.  The talking points expressed a preference to "move more quickly out of the public eye and have a partner to work with that share[d] the vision."[3] Defendant Liaw, who was on the board, suggested that Stollmeyer pitch the sale to potential

---

[2]     According to Plaintiffs, Mindbody's stock reached as high as $41.25 in the first half of October.  *Id.* ¶ 96.

[3]     Those talking points noted that integration was "complex but proceeding well," and that "full realization of the synergies will take 1–2 years."  Am. Compl. ¶ 101.

buyers by "throw[ing] the public investors under the bus and complain[ing] about how frustrating it is that they only care about things every 90 days." *Id.* ¶ 102. Liaw then led the formation of an ad hoc committee to review potential transactions, with himself serving as the committee chairman.[4] *Id.* ¶ 103.

After interviewing a number of potential financial advisors, Liaw's committee retained Qatalyst to advise on the privatization.[5] *Id.* ¶ 137. Qatalyst allegedly produced a list of potential buyers, one of which was rejected by Stollmeyer because he did not "want to work for a [p]ayments company." *Id.* ¶ 139. Plaintiffs also allege that Defendants, by setting an accelerated timeline, allowed Vista to capitalize on its head start and to submit an offer before other buyers could complete their due diligence. *Id.* ¶ 146.

Vista offered, on December 18, 2018, to acquire Mindbody for $35 per share. *Id.* ¶ 144. The offer letter described Vista as "seek[ing] to invest in and partner with superior management teams," which, Plaintiffs argue, was an assurance that it would retain Mindbody's management and offer equity in the post-privatization entity. *Id.* Defendants counteroffered with $40 per share; Vista gave a "best offer" of $36.50. *Id.* ¶ 147. According to an internal email, Liaw "personally thought that Vista would come up to $38," but "the rest of the possible field [was]

---

[4]     Plaintiffs allege that Liaw was uniquely interested in Mindbody's privatization because he was nominated to the board by Institutional Venture Partners (IVP), a private equity fund with a large investment in Mindbody. Am. Compl. ¶¶ 42, 47. IVP's alleged practice is to attempt to exit its investments between three to five years. *Id.* ¶ 47.

[5]     Plaintiffs allege that Qatalyst should not have been selected to advise the privatization because of its connections with Vista, most of which are attenuated. They allege that: (a) Qatalyst was co-founded by a former Vista employee; (b) a brother of Qatalyst's founder sold his company to Vista in 2016; (c) Vista had retained Qatalyst for a deal and paid it $7 million in September 2018; (d) Qatalyst had previously advised companies that were acquired by Vista, one in 2017 and one in early 2019; and (e) Qatalyst played an unspecified role in two other transactions with Vista. Am. Compl. ¶ 88. The transaction in which Vista retained and paid Qatalyst was disclosed to shareholders prior to the merger vote. Definitive Proxy Statement (Dkt. 37-1) at 42.

far behind." *Id.*   On December 23, 2018, Qatalyst issued a fairness opinion, and Mindbody's board approved the acquisition. *Id.*

Mindbody and Vista announced the proposed privatization on December 24, 2018, with Mindbody touting the "significant premium" that shareholders would receive. *Id.* ¶ 149.  The announcement presented the $36.50 per share offer as a "68% premium to the unaffected closing price as of December 21, 2018," which was $21.72. *Id.*

On December 26, 2018, Mindbody filed a Form 8-K, which disclosed the merger agreement. *Id.* ¶ 157.  The agreement contained a so-called "go-shop" period, which allowed Mindbody to seek, consider, and accept another offer within the next 30 days. *Id.* ¶¶ 160–61.  During that period, Stollmeyer heard from a potential buyer, who, according to Stollmeyer, thought that Mindbody was "worth a lot more than" what Vista was offering. *Id.*, Ex. I.  Stollmeyer connected the potential buyer with Qatalyst and approved the signing of non-disclosure agreements (NDAs), which would have enabled the buyer to access a data room with Mindbody's documents for due diligence purposes. *Id.*  The Amended Complaint does not allege whether the potential buyer ever executed an NDA; according to Mindbody's proxy materials, Vista was the only company to make an offer.  Definitive Proxy Statement (Dkt. 37-1) at 33.

Mindbody also filed proxy materials on December 26, 2018, again describing Vista's offer as a "68% premium" over the pre-announcement share price.  Am. Compl. ¶ 180.  The materials included a letter from Stollmeyer, who claimed that "partnering with Vista is our best option for shareholders, and a fantastic option to foster value for you and long-term growth for Mindbody." *Id.* ¶ 181.  A week later, on January 2, 2019, Mindbody filed additional materials with the SEC, including a letter that was addressed to Mindbody's employees and emphasized

the advantages of going private.  *Id.* ¶ 182-83 ("We will be free to improve our business away from the turmoil of the public markets, and we will be able to achieve our Purpose much more effectively.").

On January 9, 2019, four days after Stollmeyer learned that Mindbody had significantly beaten the 4Q18 revenue guidance, the Company filed a preliminary proxy statement, reiterating the 68% premium without disclosing the positive revenue data.  *Id.* ¶ 185-86.  The statement also said that accepting Vista's offer was "in the best interests of the Company and its shareholders." *Id.*  On January 23, 2019, Mindbody issued its definitive proxy statement, which largely tracked the preliminary statement.  *Id.* ¶ 193.  The definitive statement also failed to disclose Mindbody's most recent earnings results.  *Id.*

The proxy statements raised the issue of post-acquisition employment and other potential misalignments between the interests of the executives and the shareholders.  Both the preliminary and definitive proxy statements claimed that "Vista and Mindbody had not engaged in any employment or retention-related discussions with regard to Mindbody management," even though Stollmeyer—allegedly—had months prior conveyed to Qatalyst that he would only support a sale to a private equity fund that agreed to retain existing management, and Vista had signaled its willingness to do so in its offer letter.  *See* Preliminary Proxy Statement (Dkt. 37-17) at 32; Definitive Proxy Statement (Dkt. 37-1) at 32.  Two weeks after the definitive proxy statement, on February 7, 2019, Mindbody filed supplemental proxy materials that revised the employment statement to reflect that "certain of [Mindbody's] executive officers may already have had, or may have discussions, and following the closing of the Merger, may enter into agreements . . . regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation."  Supp. Proxy Statement (Dkt. 37-16) at 5.  Although the

supplemental disclosures alerted shareholders to the possibility of discussions of post-acquisition employment and equity for Mindbody's executives, it did not mention that Stollmeyer already had at least one such discussion prior to the signing of the merger agreement.

With respect to Mindbody's 4Q18 earnings, Defendant White, on January 29, 2019, emailed the Company's audit committee, pointing out that the 4Q18 revenue had "exceeded consensus pretty meaningfully ($68.3m actual vs $66m consensus)."  Am. Compl., Ex. K.  White thought that the "right thin[g] to do is to publicly release this information via 8K no later than Feb 7th so the shareholders have the information before they vote."  *Id.*  In response to White's email, Defendant Liaw responded that he "agree[d] with [the] approach," although he also asked whether the disclosure was obligatory and whether Mindbody should instead reconfirm its 2019 projections, which would be "more material to future value."  *Id.*  Despite White's suggestion, 4Q18 revenue was not disclosed to shareholders before they voted on February 14, 2019.  *See* Am. Compl. ¶¶ 203, 204.

On February 14, 2019, approximately 80% of the voting power of the Company voted in favor of going private.  *Id.* ¶ 205.  The transaction closed the next day, and each share of common stock was converted to $36.50.  *Id.* ¶ 206.  Mindbody's stock was then deregistered and ceased to be publicly traded as of February 26, 2019.  *Id.*

## III.    Procedural History

On November 7, 2019, the Court granted Walleye Trading LLC's and Walleye Opportunities Master Fund Ltd.'s motion to be appointed as co-lead plaintiffs in this litigation. Dkt. 16.  Plaintiffs then filed an Amended Complaint with four counts under federal securities law.  Count I alleges a violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b–5(b) (17 C.F.R. § 240.10b–5(b)).  Count II alleges so-called "scheme liability," which is

premised on deceptive conduct apart from misrepresentations or omissions. *See* 17 C.F.R.

§ 240.10b–5(a), (c). Count III alleges material misrepresentations or omissions in the proxy

materials filed in connection with the February 14 shareholder vote, in violation Section 14(a) of

the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 promulgated thereunder (17 C.F.R.

§ 240.14a-9). Count IV seeks to hold the individual defendants liable as "control persons" under

Section 20(a) of the Exchange Act. 15 U.S.C. § 78t.

Defendants have now moved to dismiss all claims for failure to plead a material

misstatement or omission and failure to allege a strong inference of scienter. *See* Defs.' Br. (Dkt.

38).

## DISCUSSION

On a Rule 12(b)(6) motion to dismiss, the court asks "whether the complaint contains

'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"

*Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009)).

"To satisfy the pleading standard for a misleading statement or omission under Rule 9(b),

a complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2)

identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent.'" *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,

794 F.3d 297, 305 (2d Cir. 2015). Similarly, pursuant to the Private Securities Litigation Reform

Act (PSLRA), claims alleging violations of the Exchange Act "must specify 'the reason or

reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall state with particularity all facts

on which that belief is formed.'" *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)(B)).

The PSLRA further requires, "in any private action arising under [the Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).

The same set of misleading statements or omissions underlies all of Plaintiffs' claims, with the caveat that only the statements or omissions that appear in the proxy materials pertain to Count III.  They fall into seven general categories:

1. Defendants' negative 4Q18 guidance, which Plaintiffs allege was unwarranted and contradicted by contemporaneous data, and a related failure to disclose that Mindbody's share price was artificially depressed, Am. Compl. ¶¶ 209–21;

2. Failure to disclose in Mindbody's proxy materials that it had significantly exceeded 4Q18 revenue expectations, *id.* ¶¶ 227–34, 249–51;

3. Misrepresentations or omissions in Mindbody's Form 8-K and proxy materials that the "go-shop" period under the merger agreement was shorter than customary and insufficiently rigorous, *id.* ¶¶ 222–26.

4. Misrepresentations in the proxy materials regarding the origins of the Vista deal, including Vista's early interest, Stollmeyer's involvement, and Liaw's role in forming the transaction committee, *id.* ¶¶ 237–40, 256–57;

5. Misrepresentations or omissions in the proxy materials concerning Mindbody's executives' personal interests in the privatization, including post-acquisition retention and equity participation, and related negotiations with Vista, *id.* ¶¶ 190, 202;

6. Failure to disclose in the proxy materials the full scope of Qatalyst's relationship to Vista and its conflicts of interest, *id.* ¶¶ 244, 260–61;

7. Failure to disclose in the proxy materials that other potential buyers did not receive the same access to Mindbody's data as Vista, *id.* ¶¶ 247–48, 252–55.

For the reasons explained below, the Court finds that Plaintiffs have alleged actionable statements in categories 2 and 5 only.  Because Plaintiffs have identified some actionable misstatements or omissions, including in Defendants' proxy materials, the motion to dismiss

Counts I, III, and IV is granted in part and denied in part.  Count II is dismissed for failure to plead any deceptive conduct or scheme other than the making of false or misleading statements.

## I.      Count I: Misleading Statements or Omissions

Count I alleges that the statements and omissions discussed above violate Section 10(b) of the Exchange Act and Rule 10b–5 (b) promulgated thereunder.  Under Rule 10b–5(b), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b–5(b).  To state a claim, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."  *Blanford*, 794 F.3d at 305.  Here, Defendants challenge the first two elements—material misstatements and scienter.

To plausibly allege a misstatement or omission of material fact, the plaintiff must first plead that a statement of fact was false or misleading at the time the statement was made.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).  Under the PSLRA and Rule 9(b) pleading requirements, the plaintiff must explain, with particularity, why the statement of fact was false and the basis for the plaintiff's belief that the omitted fact was known at the time of the statement.  *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173, 175 (2d Cir. 2020) ("In assessing Plaintiffs' falsity arguments, we consider whether Plaintiffs have met the heightened pleading standards in [PSLRA] and Federal Rule of Civil Procedure 9(b).").

An opinion statement is not actionable unless the speaker disbelieved the statement at the time it was made, the opinion contained "one or more embedded factual statements that can be proven false," or the opinion "implied facts that can be proven false." *Id.* at 175 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) (explaining that a speaker who expresses belief that his conduct is lawful implies that he has consulted the law—which would be an actionable factual statement if untrue)).

"The materiality of a misstatement depends on whether there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (cleaned up). Similarly, the materiality of an omission depends on "whether there is a substantial likelihood that the disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 37 (2d Cir. 2017) (cleaned up). At bottom, a fact is material "if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." *See Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010).

"To meet the scienter requirement in a 10b–5 action under the PSLRA, a plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Blanford*, 794 F.3d at 305 (quoting 15 U.S.C. § 78u–4(b)(2)(A)). The plaintiff must generally allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). "[I]f Plaintiffs cannot make the 'motive' showing, then . . . the strength of the

circumstantial allegations must be correspondingly greater." *JP Morgan Chase Co.*, 553 F.3d at 198–99 (cleaned up).  Plaintiffs may advance a circumstantial case of scienter by pleading that defendants "(1) benefitted in a concrete and personal way from the purported fraud[,] (2) engaged in deliberately illegal behavior[,] (3) knew facts or had access to information suggesting that their public statements were not accurate[,] or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (citation omitted).  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007)).  "For an inference of scienter to be strong, a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id.* (emphasis in original) (cleaned up).

As explained below, Plaintiffs have failed to plead an actionable misstatement or omission as to the majority of the allegedly false and misleading statements.

### A.  Misleading 4Q18 Guidance

Plaintiffs allege that Mindbody, via Stollmeyer and White, misrepresented expected revenue for fourth quarter 2018 when it guided investor expectations downwards on November 6, 2018.  In particular, Stollmeyer and White stated that 4Q18 revenue was expected to be $65 to $67 million, rather than the $66.8 to $70.8 million previously announced, due to various operational challenges, including unforeseen integration difficulties, slowed onboarding of sales personnel, and delayed deployment of Mindbody's software to the Apple App Store.  Forward-looking statements containing embedded or implicit factual assertions are not actionable unless the plaintiff has alleged particular facts supporting a strong inference that "defendants (1) did not genuinely believe the . . . statement, (2) actually knew that they had no reasonable basis for

16

making the statement, or (3) were aware of undisclosed facts tending to seriously undermine the accuracy of the statement." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 775 (2d Cir. 2010).  In other words, "the scienter requirement for forward-looking statements is stricter than for statements of current fact," in that it requires "actual knowledge." *Id.* at 773.  Viewing all of Plaintiffs' allegations as to scienter "holistically," *id.* at 775, Plaintiffs have failed to plead facts to support a strong inference that Defendants actually expected revenue would be higher than what they announced.

First, Plaintiffs rely on Defendants' earlier public statements that integration was going well, in order to support an inference that the professed integration issues discussed in November 2018 were pretextual.  As late as September 18, 2018, Defendants publicly expressed, in somewhat vague terms, what is best described as cautious optimism about the progress of integration.  *See* Monaco Decl., Ex. 7 (Dkt. 37-7) at 47 ("Integration's going well.").  Even if the Court accepts that the integration had proceeded without a hitch up to that point, which is not at all clear,[6] that does not contradict or undermine Defendants' claim that integration issues emerged in October.  *See* Monaco Decl., Ex. 22 (Dkt. 37-22) at 5.  Indeed, as noted in the September statement, Mindbody had not yet begun integrating the Frederick software into Mindbody's platforms, an effort that was set to occur in the "coming months."  Monaco Decl., Ex. 7 (Dkt. 37-7) at 23.  In other words, Defendants' somewhat optimistic statements pre-October are not probative of the extent of obstacles that could have emerged during a later phase of the integration process.

---

[6]     Contrary to Plaintiffs' suggestion, Mindbody consistently cited the magnitude of the challenge of integrating Booker, referring to it as a "massive project that touche[d] every aspect of [Mindbody's] business" and that will affect the "outlook for the balance of" 2018.  *See, e.g.*, Am. Compl. ¶ 69.  Accordingly, it was not misleading for Stollmeyer to refer to the past and ongoing challenge of integration, particularly when Mindbody also lowered its projected revenue for the year during the 2Q18 earnings call.

To be sure, Stollmeyer also sent an internal email dated October 28, 2018, which indicated that integration was "complex but proceeding well." Am. Compl. ¶ 101. That statement, however, further observed that "full realization of the synergies will take 1–2 years." *Id.* The somewhat vague and qualified statement that things were going "well," while acknowledging complexities and a long time horizon, does not support a strong inference that Mindbody was not experiencing short-term obstacles and delays in the integration process as of November 2018.

Next, Plaintiffs point to White's statement on January 8, 2019, two months after the downward revision, as proof that Mindbody did not, in fact, anticipate reduced revenue for 4Q18 when it provided lower guidance. In an email to Vista, White implied that Mindbody had, at some point, an internal forecast showing that the expected revenue for 4Q18 would be $68 million, which was higher than the revised guidance that had been provided on November 6, 2018. Am. Compl. ¶ 121. That January email, which is not contextualized by any other facts, is not sufficient to plead with particularity actual knowledge. For instance, the Amended Complaint fails to allege when that forecast had been created, whether that forecast was based on data that became available after the revised guidance, whether White or Stollmeyer received that forecast prior to November 6, 2018, or whether there were other competing forecasts that were less optimistic. Thus, the existence of an undated internal forecast of $68 million is "merely consistent with, rather than suggestive of," wrongdoing. *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 121 (2d Cir. 2013) (citation omitted).

Similarly, the November 3 text message from an unnamed finance manager to a senior manager is not compelling evidence that Defendants disbelieved their own guidance or had actual knowledge of facts that would have significantly undermined that guidance. The text

message is notable for its uncertainty. It indicated that Mindbody had "minimally beat" the forecast in October, which, according to the finance manager, suggested that Mindbody was "on track to hit [its] forecast" for November and December. Am. Compl. ¶ 120. The finance employee went on to state, however, that there was an open "question" as to whether Mindbody's "assumptions for month 2 and 3 need to be revised," noting only that he "d[id] not know of anything in the flash [revenue report] that would materially change [those] assumptions." *Id.* A single finance employee's lack of knowledge of possible reasons—which he or she concedes could exist—that could have prompted a revision of Mindbody's fourth quarter guidance does not support a strong inference that Mindbody's CEO or CFO knowingly misguided investors. *See Abramson*, 965 F.3d at 175 ("[R]easonable investors understand that opinions sometimes rest on a weighing of competing facts and . . . a statement of opinion does not imply false information to a reasonable investor simply because there is some fact cutting the other way that the speaker omitted."). Moreover, the Amended Complaint does not plead that the manager, who does not appear to occupy a senior role, was in a position to evaluate the progress of Mindbody's software integration, ramp-up of sales personnel, or roll-out of applications to the Apple App Store, all of which were reasons proffered for the revised guidance. Accordingly, the much more compelling inference is that Mindbody's CEO and CFO had access to information that the unnamed finance manager did not.

Next, Plaintiffs rely on CWs whose knowledge is limited and whose allegations are vague and conclusory. "A complaint may rely on information from confidential witnesses if they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *See Blanford*, 794 F.3d at 305 (citation omitted). Here, CW-2 was a regional sales manager

"responsible for a substantial aspect of the Booker sales," whose "impression" was that the "integration of Booker had been going well throughout 2018" and that the sales quotas of which he was aware had been consistently met from 3Q18 to 2Q19.  Am. Compl. ¶ 123.  Due to the nature of his role, CW-2 lacked insight into the Company as a whole, and while his sales quotas were consistently being met, he had no apparent knowledge as to whether the quotas themselves reflected reduced expectations, nor did he have direct knowledge of the technical challenges that Mindbody was experiencing, including the delayed rollout of the Apple apps.  Meanwhile, CW-3 occupied an unspecified position in Mindbody's finance department, although the Amended Complaint alleges that he was a "key member."  *Id.* ¶ 125.  Even accepting that he was privy to finance meetings where changes to sales forecasts would have been discussed, CW-3 left Mindbody prior to the end of 3Q18 and therefore is in no position to opine on whether Mindbody had encountered unforeseen obstacles in October 2018.  *Id.* ¶ 126.

Finally, Plaintiffs point to a chat message from White, who sought advice on "a creative way to guide 2019" as it pertains to the next version of Mindbody's payment platform ("Payments 2.0").  *Id.* ¶ 115; Monaco Decl., Ex. 30 (Dkt. 37-30).  That allegation is wholly irrelevant, as it has nothing to with integration or other operational challenges or the guidance for 4Q18.  Nor do Plaintiffs allege that anything misleading was actually said about the payment platform that affected Mindbody's share price prior to the merger.  To the extent that Plaintiffs are arguing that Defendants purposely avoided talking about the success of Mindbody's payments business, they have not pleaded with particularity any facts about payment revenues or growth that should have been disclosed but were not.  *See* Monaco Decl., Ex. 31 (Dkt. 37-31) (Mindbody's chief strategy officer suggesting highlighting payments without having accessed relevant data).

In sum, although Plaintiffs have put forth a collection of innuendos, the allegations taken together do not support a strong inference of a knowing or reckless effort to artificially depress Mindbody's share price in November 2018.[7]  The facts as alleged provide no basis from which the Court can infer that integration was not posing an unexpected short term challenge for Mindbody at that time.  Furthermore, Plaintiffs have alleged no facts suggesting that Mindbody did not have genuine difficulty onboarding a large group of sales personnel or deploying its apps to the Apple store.  Indeed, the delay in the Apple rollout was cited by White during the earnings call as the most significant change since Mindbody's earlier statements, and Plaintiffs have offered no reason to doubt that White's statements on that subject were accurate.  Monaco Decl., Ex. 22 (Dkt. 37-22) at 12 ("I think relative to Q3 results, the big surprise was the delay and the elongated deployment to the Apple App Store.").  Because Plaintiffs have not alleged falsity or that Defendants disbelieved their own guidance for 4Q18 or had actual knowledge of the falsity of their supporting facts, the Court dismisses Count I to the extent that it relies on Defendants' statements that forecast 4Q18 revenue and Defendants' proffered reasons for that forecast. Additionally, because Plaintiffs have not adequately pleaded that the share price was artificially depressed, there can be no violation in failing to disclose that nonexistent fact.

### B.  Failure to Disclose that Mindbody Outperformed 4Q18 Guidance

Plaintiffs allege that every statement made by Defendants between December 24, 2018, and February 14, 2019, about Vista's offer or Mindbody's share price was materially misleading

---

[7]      The Court notes that Plaintiffs' allegations that Defendants had a financial interest in driving down Mindbody's stock, despite their own substantial holdings, due to the potential equity that the executive defendants would acquire post-acquisition, is speculative and largely irrelevant for purposes of the November statements.  Vista had not yet made an offer to acquire Mindbody, nor is there any allegation that Defendants were assured of post-acquisition equity, let alone an assurance of post-acquisition equity in an amount that would make financial sense for them to depress the value of their current holdings.  In that context, driving down Defendants' own shares in early November 2018 would have been incredibly premature and would have made no economic sense.  *See Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent." (cleaned up)).

because each statement failed to disclose that the 4Q18 guidance was erroneous and, therefore, that the share price was significantly undervalued as a result of that disproven prediction. *See* Am. Compl. ¶¶ 218–51. Although Plaintiffs have not adequately alleged that Mindbody's share price was intentionally suppressed in November 2018, by January 5, 2019, Defendants knew that the negative revenue guidance, which had led to a 20% drop in Mindbody's share price in November, had turned out to be wrong. The subsequent failure to disclose in the proxy materials that Mindbody's shares were likely undervalued is an actionable omission because Defendants' statements about Vista's 68% "premium" implied that Mindbody had no non-public information that would materially affect its share price.

First, as to scienter, there is no serious question that, accepting the well-pleaded allegations as true, Defendants had actual knowledge of the preliminary 4Q18 results, realized their significance, and then deliberately withheld the information from shareholders prior to their vote on the Vista acquisition. As previously explained, scienter may be established by allegations of strong circumstantial evidence of "conscious misbehavior or recklessness," such as defendants' knowledge of information suggesting that their public statements were not accurate. *See Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212, 215 (2d Cir. 2020) ("[I]n determining whether the Complaint adequately alleges facts giving rise to a strong inference that Defendants acted recklessly, we focus on Defendants' degree of knowledge and the seriousness of the impact that results from their conduct."). By January 5, 2019, Stollmeyer had concluded, in internal communications, that revenue for 4Q18 was a "massive beat" against the "consensus midpoint of $66 million." Am. Compl. ¶ 186. Three days later, White sent an email to Vista stating that the preliminary revenue for the quarter was $68.3 million, above the guidance range given during the November earnings call. *Id.* ¶ 121. By January 23, 2019, seven out of the eight

Mindbody board members had received a presentation regarding the 4Q18 results. *Id.* ¶ 194. To his partial credit, at that time White recognized that the revenue figure should be disclosed and, on January 24, 2019, emailed the audit committee (headed by Liaw) his recommendation that the information be disclosed. *Id.* ¶ 195. Despite White's recognition that the information should be disclosed, Defendants never followed through, knowingly allowing shareholders to vote to privatize without understanding that the Company had performed much better than its officers had publicly predicted—conduct that is, at a minimum, reckless.

Indeed, Liaw's response to White's suggestion indicates that Defendants were reluctant to disclose 4Q18 results because the information could have been utilized by "Luxor . . . to attempt to bolster their position." Am. Compl., Ex. K. "Luxor" appears to be a reference to a hedge fund that had a large holding of Mindbody stock and was opposed to the proposed privatization. *See* Defs.' Br. at 10 n.8 (citing Monaco Decl., Ex. 21 (Dkt. 37-21) at 9, 13). The email exchange between White and Liaw, therefore, supports a plausible (and compelling) inference that Defendants recognized that public disclosure of 4Q18 revenues could result in an increase in the Company's share price, thereby reducing the premium Vista was paying. That would have likely increased opposition to the Vista deal; in response, Defendants elected not to disclose information in order to weaken (or, at least, avoid strengthening) the opposition. And in so doing, Defendants intentionally deprived shareholders of the opportunity to make their own informed decision about the true value of Mindbody stock and the wisdom *vel non* of voting in favor of the acquisition.[8]

---

[8]     The Court agrees with Defendants that Plaintiffs have not made a strong showing of motive, which could have been an alternative basis for alleging scienter had it been plead with greater specificity. Defendants argue persuasively that the individual defendants did not have a financial incentive to sell Mindbody on the cheap because they owned millions of shares of Mindbody and would not have wanted to short-change themselves. *See* Am.

Defendants offer an innocent explanation for the nondisclosure that is far less cogent and compelling, at least at this stage of the litigation.  They argue that the results were merely "preliminary" and should not have been disclosed because there were "unaudited."  Defs.' Br. at 29.  Defendants' proxy materials, however, contained *pro forma* revenue figures for all of 2019 through 2023, which, compared to the revenue from a recently completed quarter, would have been subject to far greater uncertainty.  *See, e.g.*, Definitive Proxy Statement (Dkt. 37-1) at 42.  Moreover, the Company regularly released quarterly results that were not audited.[9]  *See* Monaco Decl., Ex. 14 (Dkt. 37-14) at 11 (publicly disclosing unaudited 3Q18 revenue via press release and Form 8-K)).  Clearly, any concern about releasing preliminary data was not the driving force behind the withholding of information from shareholders and, indeed, appears pretextual.  Furthermore, White's email suggesting that the preliminary figures be released via a Form 8-K indicates that previewing unaudited revenue figures is not beyond the Company's normal practice.  Stollmeyer's and White's behavior also suggests that they found the revenue data to be reliable.  Stollmeyer did not appear to qualify his conclusion in any way when he declared the results a "massive beat," and White found the results sufficiently reliable that he alerted Vista.  Why the preliminary figures were good enough for Vista, who was the buyer, but not good

---

Compl. ¶ 170.  Plaintiffs attempt to rebut that argument by pointing out that, because Mindbody's executives were likely to receive equity in the privatized entity, short-changing Mindbody on the front end would be compensated on the back end because the privatized entity would retain the discount and would pass the benefits on to the equity participants, including Stollmeyer and White.  That theory could have been plausible if Plaintiffs had alleged that Stollmeyer and White knew they were likely to retain or expand their existing equity, such that short-changing Mindbody made mathematical sense despite their large stock holdings.  In its current form, however, the Amended Complaint lacks sufficient information to make a compelling case of personal motive.

[9]        The Court certainly understands that fourth quarter results are typically rolled into a company's annual financial statements, which are typically audited.  That would not, however, have prevented the Company from announcing its fourth quarter unaudited results, so long as the announcement had appropriate caveats.

enough for the shareholders, who were the sellers, lacks a reasonable and good faith explanation.[10]

Defendants' argument that it had no duty to update its guidance from November is misplaced. *See* Defs.' Br. at 29–30. The duty at issue is not an ongoing duty to update stemming from the November guidance but a new duty not to omit material information, which arose once Defendants decided to compare Mindbody's share price to Vista's offer.[11] *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole truth, even when there is no existing independent duty to disclose information on the issue or topic." (cleaned up)). Although Defendants' statement that Vista's offer amounted to a 68% premium over Mindbody's share price as of December 21, 2018, was technically true, "[t]he literal truth of an isolated statement is insufficient." *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010). Rather, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). "For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective" actors. *Id.*

---

[10] Defendants cite, in a footnote, a litany of regulations pertaining to the filing of Forms 10-Q to suggest that sharing preliminary 4Q18 results could have subjected Defendants to "potential legal exposure." Defs.' Br. at 30 n.16. Defendants do not identify any specific legal requirement that would have been impossible to comply with had Defendants chosen to disclose revenue data in advance of the shareholder vote (particularly if accompanied by appropriate cautionary language) nor any instance of any company or executive facing liability under such circumstances. Moreover, Defendants' conduct suggests that fear of legal exposure was not the actual reason behind the omission.

[11] For that reason, cases that do not involve defendants repeating disproven predictions are distinguishable. *See, e.g.*, *In re Duane Reade Inc. Sec. Litig.*, No. 02-CV-6478, 2003 WL 22801416, at *7 (S.D.N.Y. Nov. 25, 2003) (finding no duty to correct prior statements that proved to be incorrect because overly optimistic projections were not being repeated or relied upon by defendants).

Here, the 68% measuring stick would only have been informative to shareholders if the Defendants believed that the December share price was an accurate reference point.  By invoking the ratio of Mindbody's share price to Vista's offer, Defendants impliedly warranted that, to their knowledge, the share price as of December 21, 2018, was not undervalued.  If that implied factual assertion were untrue, there would be a "substantial likelihood" that a reasonable investor would be misled by the comparison.  Because Mindbody's share price had recently fallen by at least 20% based on negative guidance that Defendants knew had turned out to have been incorrect, Defendants knew that the Company's share price was likely undervalued prior to the privatization.  *See United States v. Regan*, 937 F.2d 823, 829 (2d Cir.) (holding that deflated stock price is material), *amended*, 946 F.2d 188 (2d Cir. 1991).

The failure to disclose 4Q18 revenue was material because the updated revenue amounts would likely have led the market to correct its valuation of Mindbody's shares.  As alleged in the Amended Complaint, Defendants' negative guidance on November 6, 2018, caused a 20% drop in Mindbody's share price the following day, even though the midpoint of the guidance only decreased by $2.8 million, dropping from $68.8 million to $66 million.  Am. Compl. ¶ 110.  Mindbody's share price did not recover, dropping to $21.72 as of December 21, 2018.  *Id.* ¶ 149.  Mindbody's 4Q18 revenue then outperformed the revised midpoint by $2.3 million, recovering approximately 80% of the $2.8 million downward revision.  If Mindbody had announced in November that it was revising its guidance by $0.5 million, rather than $2.8 million, investors likely would not have reacted to the news nearly as harshly.  In fact, Mindbody reduced its guidance for the year by $1 million during its 2Q18 earnings call, and analysts remained cautiously optimistic.  *See id.* ¶ 73; Monaco Decl., Ex. 4 (Dkt. 37-4) at 5.  Under these circumstances, the Court cannot conclude that the undisclosed fourth quarter revenue was "so

26

obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."[12]  *See ECA*, 553 F.3d at 197 (cautioning against Rule 12(b)(6) dismissal on materiality because it "is a mixed question of law and fact").

In sum, the Court finds that the failure to disclose Mindbody's positive 4Q18 performance when discussing Mindbody's share price and Vista's acquisition price is actionable under Rule 10b–5, to the extent that such statements were made on or after January 5, 2019.[13] The omission was material because the unexpectedly positive performance—which Defendants

---

[12]   Because Plaintiffs have adequately alleged that Defendants misled investors by failing to disclose facts that would likely have increased the share price or otherwise would have signaled to investors that the market was undervaluing Mindbody's stock, it follows that Defendants' other statements that depend on that misrepresentation or omission are also actionable if made after January 5, 2019.  Thus, Defendants' statement that Vista's offer was the "highest price per share" that Vista was willing to pay was misleading because Defendants knew that Vista had been willing to pay a higher price when Mindbody shares were trading higher, prior to the distortion caused by the incorrect guidance.  *See* Am. Compl. ¶¶ 233–34.  In contrast, opinion statements touting Vista's offer prior to January 5, 2019, are not actionable because Plaintiffs have not alleged that, when those statements were made, Defendants disbelieved their own opinions or that their opinions contained any disprovable fact.

[13]   Defendant Liaw's argument that he is not liable under Rule 10b–5 because he did not personally make any false statements is misplaced.  Plaintiffs' argument against Liaw is premised on an omission theory that seeks to borrow a disclosure obligation from state law.  Specifically, Plaintiffs rely on a fiduciary duty imposed on corporate directors under Delaware law, which requires directors to disclose material information.  *See* Pls.' Br. (Dkt. 39) at 44, 48.  Here, Liaw was directly aware of the 4Q18 earnings, no later than January 8, 2019, when White asked Liaw whether the results should be disclosed.

Notwithstanding that Defendants may have waived the argument by not contesting the applicability of Delaware disclosure obligations in their opening brief, their argument that a Rule 10b–5 violation cannot be premised on a violation of an obligation arising from state law is without merit.  Although dicta, the Second Circuit has pointed out that "courts have found that '[f]iduciary relationships and their concomitant duty to disclose may be established by state or federal law.'"  *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 467 n.9 (2d Cir. 2013) (citing *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991)).  The Supreme Court has indicated the same.  In *Santa Fe Indus., Inc. v. Green*, the Supreme Court explained that a breach of fiduciary duty could be "held violative of Rule 10b-5" if it "included some element of deception."  *See* 430 U.S. 462, 474–75 n.14 (1977) (holding that alleged nondisclosure did not violate Rule 10b–5(b) because disclosure was not required by Delaware law and because the nondisclosed fact was not material).  Additionally, the case that Defendants rely on, *Chiarella v. United States*, recognized that a duty of disclosure for Rule 10b–5 purposes can arise from a "fiduciary [relationship] or other similar relation of trust and confidence."  *See* 445 U.S. 222, 227 (1980) ("That the relationship between a corporate insider and the stockholders of his corporation gives rise to a disclosure obligation is not a novel twist of the law.").  Here, the disclosure obligation under Delaware law arises from the fiduciary relationship between the directors of a company and the company's shareholders, and Plaintiffs have adequately pleaded that the omission of Mindbody's 4Q18 revenue from the proxy materials was misleading.  *See Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("The duty of disclosure is, and always has been, a specific application of the general fiduciary duty owed by directors.  The duty of disclosure obligates directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action.").  Accordingly, holding Liaw to a duty of "complete candor," which requires him to "disclose all material facts when seeking stockholder action," falls with the Supreme Court's instruction in *Santa Fe* and *Chiarella*.

internally described as "massive" and "meaningful"—was substantially likely to affect
shareholders' assessment of share value, which had been pummeled by negative expectations
about 4Q18 revenues, and Defendants undoubtedly became aware of the over-performance no
later than January 5, 2019.

### C.  Misleading Go-Shop Period

Plaintiffs claim that Defendants misled investors by claiming that the merger agreement
contained a "customary" go-shop period during which Mindbody could consider competing
offers.  Specifically, they allege that a "customary" period is longer than the 30 days provided for
in the merger agreement, and that the already-short period was further truncated by (i) the
holiday season and (ii) the requirement that Mindbody accept a competing offer within the
period.  Am. Compl. ¶¶ 160–61.  According to Plaintiffs, the average length of a go-shop period
is 37 days.  *Id.* at 48 n.14.  Plaintiffs also allege that Defendants failed to conduct a robust
process, as Stollmeyer and White took a holiday during the go-shop period.  *Id.* ¶ 165.  Neither
the representation that the go-shop period was "customary" nor the failure to disclose Stollmeyer
and White's holiday schedules is actionable under Rule 10b–5.

Plaintiffs have not adequately pleaded that the statements regarding the go-shop period
were false.  Even accepting that the average go-shop period is 37 days, Plaintiffs certainly cannot
argue that every period must be exactly 37 days to be fairly described as "customary."  Rather,
within some reasonable range, whether the period was customary is a matter of opinion, and
Plaintiffs have not pleaded that Defendants disbelieved their own opinion as to industry custom,
or that the period deviated so far beyond the normal range that Defendants must have known it
was contrary to industry practice.  *See In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d
Cir. 2000) ("[T]o plead recklessness, a plaintiff must allege conduct which is highly

unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." (citation omitted)).

The only objective facts—the coincidence of the holiday season and the requirement that Defendants accept a competing offer within the go-shop period—were either obvious to investors, who could access a calendar, or disclosed in the merger agreement, which was publicly filed as part of Mindbody's Form 8-K. Plaintiffs have not alleged any material omission, for instance, that a prospective buyer was deterred or that a better offer was ignored due to Defendants' holiday schedule.

To the extent that Count I is premised on misrepresentations or omissions concerning the merger agreement's go-shop period, it is dismissed for failure to plead falsity, materiality, and scienter.

### D.  Misrepresentations or Omissions Regarding the Origins of the Vista Deal

Plaintiffs allege that Defendants' proxy materials failed to disclose Vista's early interest in acquiring Mindbody, which predated Mindbody going public; the extent of Stollmeyer's discussions with Vista prior to October 2018; and Liaw's role in forming the transaction committee. Am. Compl. ¶¶ 237–40, 256–57. None of those misrepresentations or omissions is actionable.

First, Plaintiffs allege that Vista was interested in acquiring Mindbody in 2015, prior to Mindbody's IPO. *Id.* ¶ 257. Vista had reportedly told Mindbody that the latter "didn't have to go public." *Id.* Accepting that as true, the Court cannot conceive of why Mindbody's apparent *rejection* of Vista's offer (if there was one) in 2015 would be material to shareholders deciding in 2019 whether to sell to Vista, particularly if the innuendo being urged is that Stollmeyer was

29

overly friendly with Vista.  Plaintiffs offer no explanation why the alleged omission was material.

Next, Plaintiffs allege that Defendants failed to disclose the extent of Stollmeyer's discussions with Vista prior to informing Mindbody's board of Vista's interest.  *Id.* ¶¶ 238, 257–59.  In the preliminary proxy statement, Defendants stated that, prior to October 2018, discussions with Vista did not "progress[] beyond preliminary phases."  *Id.* ¶ 237.  Mindbody's supplemental proxy materials filed on February 7, 2019, provided greater detail and disclosed that Stollmeyer had a meeting with Qatalyst in early August 2018, which led to a meeting with Vista on August 7, 2018, and Stollmeyer's attendance at Vista's October conference.  *Id.* ¶ 256.  Plaintiffs claim that both the preliminary and supplemental disclosures are deficient because Stollmeyer's early talks with Vista progressed beyond having a general discussion and had instead become a "negotiation."  *See id.* ¶ 257.  Plaintiffs do not explain, however, what they mean by "negotiation" or how Stollmeyer's actions prior to October exceeded the bounds of propriety.  Instead, Plaintiffs rely on Stollmeyer's statements to others at Mindbody that he enjoyed meeting with Vista's representatives at the October conference and Vista's expression of interest on October 16, 2018, in acquiring Mindbody as evidence that Stollmeyer had already begun negotiating the sale of Mindbody without the board's knowledge.  *See id.* ¶¶ 89–96.  Without any specific allegation as to what took place during the supposedly inappropriate meetings, Plaintiffs have not adequately pleaded falsity with particularity.

Plaintiffs also argue that Defendants misled investors by suggesting that the transaction committee selected Qatalyst, when, in fact, it had been selected by Stollmeyer.  *Id.* ¶ 259.  As the Amended Complaint alleges, the committee interviewed several candidates before selecting Qatalyst.  *Id.* ¶ 137.  The fact that Stollmeyer may have recommended Qatalyst does not

contradict Defendants' statement that the ultimate selection was made by the committee.[14] Accordingly, Plaintiffs have not alleged that Defendants' statement regarding the process surrounding the selection of Qatalyst was misleading.

Finally, Plaintiffs allege that Liaw's "central" role in forming the relevant committee should have been disclosed because he had a unique interest in privatization as a way to exit IVP's investment in Mindbody.  *See* Am. Compl. ¶ 240.  Given that the composition of the committee—including Liaw's influence as the chairman of the committee—was disclosed in the preliminary proxy statement, *id.* ¶ 239, Plaintiffs have not explained why the additional fact that Liaw may have spearheaded the formation of the committee would have further utility to a reasonable investor.  Nor was Defendants' statement that the transaction committee was formed by the board of directors misleading, as Liaw was a member of the board and his involvement could be reasonably inferred.[15]

Because Plaintiffs failed to plead falsity and materiality, the Court finds that they have not alleged actionable misrepresentations or omissions as to the origins of the Vista deal and Mindbody's pre-merger process.

### E.  Misrepresentations or Omissions Regarding Mindbody Management's Personal Interests and Discussions with Vista

According to Plaintiffs, Defendants misrepresented the extent to which Mindbody and Vista had discussed employment and other incentives for Mindbody's management, so that Defendants could portray themselves as neutral arbiters of Vista's proposal.  Am. Compl. ¶ 261.

---

[14]    Defendants also amended their disclosures on February 7, 2019, to reflect that Stollmeyer had a prior relationship with Qatalyst and that Qatalyst introduced him to Vista.  Am. Compl. ¶ 256.

[15]    Additionally, the only alleged significance of Liaw's involvement is that IVP allegedly has an undifferentiated interest in exiting its investments sooner rather than later.  Plaintiffs have not, however, pleaded a strong inference that IVP would seek to leave early at the cost of millions of dollars.  *See* Am. Compl. ¶ 170 (alleging that IVP owned over two million shares of Mindbody stock).

Both the preliminary and definitive proxy statements indicated that "[a]t the time of the signing of the Merger Agreement, Vista and MINDBODY had not engaged in any employment or retention related discussions with regard to MINDBODY management."  *See* Definitive Proxy Statement (Dkt. 37-1) at 32; Preliminary Proxy Statement (Dkt. 37-17) at 32.  According to Defendants' revised proxy materials dated February 7, 2019,[16] "Vista and Mindbody had not" "discussed the terms of postclosing employment or equity participation for Mindbody management" "[a]t the time of the signing of the Merger Agreement," which, as compared to the earlier version, seems to draw a distinction between having a discussion about employment and discussing terms of employment.  *See* Am. Comp. (Dkt. 22) ¶ 260.  The revision also stated that, after the signing of the merger agreement, "certain of [Mindbody's] executive officers may already have had, or may have discussions . . . regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation."  *Id.*  Defendants also stated that certain executives "may enter into agreements" with the post-merger entity and its affiliates "following the closing of the Merger."  *Id.*  The Court agrees with Plaintiffs that both versions are materially misleading because it can be reasonably inferred that Stollmeyer discussed retention of management with Vista as early as August 2018, approximately four months before the merger agreement was signed in December 2018.

Plaintiffs have adequately alleged that Defendants' denial of any pre-signing discussion of post-merger opportunities for Mindbody's management was false and misleading.  Accepting the truth of Plaintiffs' non-conclusory allegations, Stollmeyer told Qatalyst in early August 2018 that his condition for selling Mindbody to a private equity fund was the retention of existing

---

[16]    The value of a revision to a proxy statement is reduced when the changes are made close in time to the proposed shareholder action.  *See Samuel M. Feinberg Testamentary Tr. v. Carter*, 652 F. Supp. 1066, 1076 (S.D.N.Y. 1987).

management.  Am. Compl. ¶ 88.  The fact that Stollmeyer told White and others on October 17,

2018, that a sale to Vista "would not be an automatic exit for any us or our princip[als]" suggests

either that Stollmeyer expected Qatalyst to have conveyed his personal demand to Vista or that

he had received some form of assurance from Vista.[17]  *See* Am. Compl., Ex. D (Stollmeyer

proclaiming that he "would not support the sale of MB at this time in any other circumstance").

That understanding is further confirmed by Vista's offer letter, which made a point of

emphasizing its interest in "partner[ing] with superior management teams."  *See* Am. Compl.

¶ 144.  Any lingering doubt that Stollmeyer had some sort of early discussion with Vista about

post-employment prospects is erased by his email and text message dated December 24, 2018—

the very day that the deal was announced and only a day after the board's approval—proclaiming

that he was not headed towards retirement despite the acquisition.  *See id.* ¶¶ 155–56 & Ex. F

("Vista's in love with me (and me with them).  No retirement in my headlights.").

     While none of those allegations, standing alone, would be sufficient to plead falsity with

particularity, together they paint a compelling picture of a CEO who minimized and hid the

extent to which he made his own employment prospects a top priority.  Even if Stollmeyer only

communicated through Qatalyst, the proxy materials' statement that no discussion had occurred

would remain misleading.  Similarly, even if Stollmeyer and Vista's gentleman's agreement

reached only the fact of retention without discussing specific terms, a hyper-technical and

evasive distinction between an "employment discussion" and a "discussion of employment

terms" would also have been misleading.  Because Stollmeyer was undoubtedly aware of his

---

[17]    Stollmeyer's rejection of a prospective buyer because he did not want to work for a payments company also supports an inference that post-merger employment was top-of-mind and likely shaped his interactions with Vista. Am. Compl. ¶ 139.

own discussions with Vista, scienter is also adequately pleaded, leaving materiality the sole issue in dispute.

There is a substantial likelihood that the timing of Stollmeyer's discussions with Vista about post-employment opportunities would have influenced a shareholder's assessment of Vista's offer, including Defendants' recommendation that the deal was in the best interests of the shareholders.  The fact that Stollmeyer, acting as Mindbody's CEO, immediately raised the topic of his own employment in the initial stages of a merger transaction—and indeed appeared to condition his approval on the retention of existing management—could have suggested to shareholders that his priorities were misplaced, and that his evaluation of the benefits to shareholders was less than rigorous.  *See Mendell v. Greenberg*, 927 F.2d 667, 675 (2d Cir.) ("[T]he motivation of a controlling shareholder for favoring a course proposed in a proxy statement must be disclosed when there is a substantial likelihood that its disclosure will have a significant bearing on a reasonable shareholder's assessment of the recommended course of action."), *amended*, 938 F.2d 1528 (2d Cir. 1990).[18]  If disclosed, Stollmeyer's preoccupation with his own employment prospects could have signaled to shareholders that they should be skeptical about Mindbody's deal process and the Company's decision-making and its recommendation regarding the merger, all of which could have been clouded by management's personal motivations.  *See Kahn v. Wien*, 842 F. Supp. 667, 677–78 (E.D.N.Y.) ("[W]here a corporate director has a personal stake in a corporate decision or has a special relationship with a party whose interests may be adverse to those of the shareholders, [those facts] must be disclosed so that shareholders are alerted to the possible impairment of the director's judgment and know to put the director's recommendations in perspective."), *aff'd*, 41 F.3d 1501 (2d Cir. 1994).

---

[18]     Although *Mendell* involved a Section 14(a) claim, the materiality standard is the same as under Rule 10b–5.  *See Beaumont v. Am. Can Co.*, 797 F.2d 79, 84 (2d Cir. 1986).

For those reasons, Plaintiffs have adequately alleged that Defendants' representation that no employment discussions had taken place prior to the merger signing was materially misleading in violation of Rule 10b–5.

## F. Omissions Regarding Qatalyst's Alleged Conflicts of Interest and Ties to Vista

Defendants disclosed that Qatalyst had a financial incentive to complete the merger, as $31 million of its $33 million fee was due only upon consummation of the deal. Definitive Proxy Statement (Dkt. 37-1) at 42. The proxy statement also disclosed that Vista paid Qatalyst $7 million in connection with Vista's acquisition of another company. *Id.* Beyond those actual or potential conflicts, the proxy statement represented that Qatalyst and Vista had no other "material relationship." *Id.* Plaintiffs fail to plead a securities law violation based on Defendants' failure to disclose far more attenuated connections between Qatalyst and Vista.

According to Plaintiffs, Defendants should have disclosed that (i) Qatalyst was co-founded by a former Vista employee; (ii) the brother of Qatalyst's founder sold his company to Vista in 2016; (iii) Qatalyst advised companies that were acquired by Vista, one in 2017 and one in early 2019; and (iv) Qatalyst played an unspecified role in two other transactions with Vista. Am. Compl. ¶ 87. The Second Circuit has held that "[t]he relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made." *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 994 (2d Cir. 1988). Alerting shareholders to actual or potential conflicts of interest serves the purpose of warning "the stockholders to give more careful scrutiny to the terms of the merger than they might to one recommended by an entirely disinterested" party. *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 384 n.6 (1970). The materiality standard still applies, however: only potential or actual conflicts that a reasonable investor would consider significant must be disclosed. *See Baum v. Harman Int'l*

*Indus., Inc.*, 408 F. Supp. 3d 70, 91 (D. Conn. 2019) (finding omitted conflict material); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 244–45 (S.D.N.Y. 2000) ("Whether a potential conflict must be disclosed is governed by the general materiality standard set forth above, namely would the undisclosed potential conflict have assumed actual significance in the deliberations of a reasonable shareholder." (citation omitted)).

In this case, Plaintiffs have not pleaded sufficient facts from which the Court can infer that Qatalyst had an actual conflict of interest. Although Plaintiffs allege that a former Vista employee, Brian Cayne, co-founded Qatalyst, they do not allege that Cayne has any financial interest in Vista. *See* Am. Compl. ¶ 87. Similarly, Plaintiffs allege that the brother of Qatalyst's founder once sold a company to Vista, but that connection is yet another degree removed, and the Amended Complaint does not allege that the brother is affiliated with or has any interest in Vista. *Id.* Plaintiffs next allege that Qatalyst represented two of Vista's counterparties but do not explain how that relationship could have caused Qatalyst to have an interest in Vista or divided loyalties in the Mindbody transaction. Finally, Plaintiffs identified two transactions in which Qatalyst's role is unknown, an allegation that lacks sufficient particularity to state a claim for misrepresentation or omission.

Even if some of the omitted relationships were "potential" conflicts of interest, Plaintiffs have not alleged why they would be material to shareholders when Defendants had already disclosed the two far more significant conflicts—direct compensation from Vista to Qatalyst for a past transaction and $31 million in additional compensation if the Mindbody merger succeeded. Those two conflicts, the significance of which dwarfs the far more attenuated connections between Vista and Qatalyst about which Plaintiffs complain, would have put any reasonable investor on notice as to potential bias in Qatalyst's fairness opinion. In comparison,

the omitted connections are nothing but a "nonparty's peripheral involvement," which do not

implicate any personal stake in the transaction or any "special relationship" that would render

Qatalyst's "interests adverse to those of the shareholders." *See Reeve*, 108 F. Supp. 2d at 245

(rejecting plaintiffs' argument that Deutsche Bank's fairness opinion was rendered suspect by

potential conflict of interest).

In other words, Plaintiffs' have failed to plead with particularity any significant

connection between Qatalyst and Vista that was omitted from the proxy materials.  The

omissions are, frankly, small potatoes compared to the actual or potential conflicts that

Defendants did disclose, including the fact that Qatalyst stood to lose $31 million in

compensation if Mindbody's shareholders rejected the acquisition.  For those reasons, Count I is

dismissed to the extent it is premised on any misrepresentation or omission pertaining to

Qatalyst's undisclosed connections with Vista.

### G.  Misstatements or Omissions Regarding Vista's Alleged Preferential Treatment

Plaintiffs' final set of allegations claim that Defendants gave Vista preferential treatment

during the deal process, including by giving Vista greater access to Mindbody's data rooms and

allowing Vista to have a head start vis-à-vis other potential buyers.  The Court finds that

Plaintiffs have not pleaded unequal access to data rooms or any materially misleading statements

about the fairness of the deal process.

Defendants' proxy materials stated that "[e]ach party that executed a confidentiality

agreement with Mindbody during the Go Shop Period that requested access was granted access

to the same electronic data room populated by Mindbody with the same documents to which

Vista was provided access."  Definitive Proxy Statement (Dkt. 37-1) at 32.  According to

Plaintiffs, that statement is misleading because prospective buyers could access a limited data

room only after signing an NDA and a full data room only after submitting an offer.  Am. Compl. ¶ 164.  Plaintiffs do not allege, however, that Vista was allowed to follow a different process or was subject to fewer or less stringent requirements before being granted access. Rather, it appears that Vista ultimately accessed more documents only because it went further in the process than any other buyer by submitting the only bid.  *See* Definitive Proxy Statement (Dkt. 37-1) at 32 (noting that no other offers were received).

Next, Plaintiffs allege that Vista had an unfair, early start relative to other bidders, including by having physical access to Mindbody's corporate campus.  Am. Compl. ¶ 99. Absent a misleading statement to the contrary, there is no duty under federal securities law to disclose that a potential buyer received preferential treatment during the bidding process.  *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 517 (S.D.N.Y. 2019) ("That's not a legitimate disclosure . . . . That is self-flagellation.").  Plaintiffs attempt to locate a duty to disclose by pointing to Defendants' assurance that the deal process was "rigorous and fulsome," a vague opinion statement that is not incompatible with Vista having an early start; in short, it is not an actionable misstatement.  *See* Am. Compl. ¶ 254.  Furthermore, no reasonable investor would have thought that Vista and other potential buyers started the process at the same time—the proxy statement specifically stated that Vista began discussing the acquisition prior to the formation of the transaction committee, which thereafter began soliciting other buyers.  *See id.* ¶¶ 237, 239.  In other words, the fact that Vista had early access was disclosed.

For those reasons, the Court dismisses Count I to the extent that it is premised on alleged misstatements or omissions regarding the preferential treatment *vel non* of Vista.

*        *        *

In sum, in Count I, Plaintiffs have pleaded actionable statements or omissions based on Defendants' failure to disclose 4Q18 revenue figures post-January 5, 2019, because the omission implied that Defendants possessed no undisclosed information that would have tended to increase the Mindbody share price and decrease the premium Vista's offer represented. Additionally, Plaintiffs have pleaded actionable misstatements based on Defendants' denials of employment discussions with Vista prior to the signing of the merger agreement. Count I is dismissed in all other respects.

## II.  **Count II: Deceptive Scheme**

Count II alleges so-called "scheme liability," which is premised on deceptive conduct that is independent of misrepresentations or omissions. *See* 17 C.F.R. § 240.10b–5 (a), (c). "To state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016). Unlike a misrepresentation or omission claim under Rule 10b–5(b), scheme liability claim is aimed at "inherently deceptive conduct" and does not require a misleading statement or omission. *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 160–61 (S.D.N.Y. 2012). Subsections (a) and (c) of Rule 10b–5, however, cannot "be used as a back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b–5." *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011). "[W]here the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the [plaintiff's] attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'" *Id*.

Here, the entire "conduct" or "scheme" complained of is the dissemination of misleading information:

> (a) disseminating negative false and misleading information about Mindbody for the purpose of depressing its stock price; (b) failing to disseminate truthful information for the purposes of maintaining an artificially depressed stock price; and (c) disseminating the negative information within the 3Q18 Disclosures (regardless of the falsity of that information), while omitting the material information that Mindbody was in merger negotiations including for the purpose of reducing Mindbody's stock price.

Am. Compl. ¶ 356.  Count II is, therefore, dismissed because it is indistinguishable from the misstatements and omissions alleged under Count I.

## III.     Count III: Misleading Proxy Materials

Count III alleges that Defendants' proxy materials were materially misleading in violation of Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9.  Section 14(a) makes it "unlawful for any person" "to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any" registered security "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78n(a).  Pursuant to Rule 14a–9, "[w]hen a corporation issues a proxy statement it must not contain any false or misleading statements respecting any material fact, or omit stating material facts necessary to make the statements in it not false or misleading."  *Mendell*, 927 F.2d at 675 (citing 17 C.F.R. § 240.14a–9(a)).  Defendants seek to dismiss Count III, as they do Count I, for lack of material misstatements or omissions and for lack of scienter; Plaintiffs argue that they have pleaded materiality and that the scienter requirement does not apply because Section 14(a) requires only negligence.  *See Wilson*, 855 F.2d at 995 ("Liability can be imposed for negligently drafting a proxy statement.").

40

Materiality for purposes of Section 14(a) is indistinguishable from the Section 10(b) standard. *See Beaumont v. Am. Can Co.*, 797 F.2d 79, 84 (2d Cir. 1986) ("For an omitted fact to be material under Rule 14a–9, there must be a substantial likelihood that a reasonable shareholder would have considered the fact important in deciding how to vote."); *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 291 (S.D.N.Y. 2010) ("[T]he test of materiality under 14a–9 and 10b–5 is the same." (citation omitted)). Accordingly, for the same reasons that Defendants' post-January 5, 2019, statements or omissions about Mindbody's share price and Defendants' misstatements about Stollmeyer's pre-signing employment discussions were material for purposes of the claim in Count I, those same statements or omissions—as reflected in the proxy filings—are material for purposes of the claim in Count III.[19]

Courts in this circuit have diverged on the pleading requirements for the requisite mental state in Section 14(a) claims, namely whether plaintiffs are subject to the scienter requirement and the heightened pleading standards under the PSLRA and Rule 9(b) even though negligence is sufficient for liability.[20] This Court need not resolve that question because, as discussed in

---

[19]     In a letter providing supplemental authority, Defendants cite a distinguishable case from the Fifth Circuit, which rejected Section 14(a) liability for an "alleged failure to communicate a more bullish forecast" and which held that a characterization of a 19% premium as "significant" was not actionable because shareholders could evaluate the significance of the premium amount on their own. *See Heinze v. Tesco Corp.*, No. 19-20298, 2020 WL 4814094, at *3–5 (5th Cir. Aug. 19, 2020). Here, liability is not premised on Defendants' failure to communicate a more bullish forecast in November 2018 but their failure to disclose an existing fact in 2019, when Mindbody's earnings were known to have beaten projections. Additionally, *Heinze* did not involve a case in which the premium figure was itself misleading. *See id.* Similarly, *Heinze*'s holding that Section 14(a) liability cannot be imposed for a pure omission without a misleading statement is inapposite, because the proxy materials here contain misleading statements as to Mindbody's share price and Defendants' employment discussions. *Id.* at *6.

[20]     *See, e.g.*, *Columbia Pipeline*, 405 F. Supp. 3d at 506–07 ("While there is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a) . . . when plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, . . . even if they disclaim reliance on a fraud theory." (cleaned up)); *In re Bank of Am.*, 757 F. Supp. 2d at 321–22 ("[F]or the purpose of scrutinizing plaintiffs' Section 14(a) claim, I look to whether plaintiffs

relation to Count I, Plaintiffs have adequately alleged, at minimum, conscious misbehavior or recklessness as to undisclosed information relevant to the value of Mindshare's shares post-January 5, 2019, and the existence of pre-signing employment discussions.

Accordingly, Count III, as with Count I, survives Defendants' motion to dismiss to the extent it is premised on Defendants' failure to disclose Mindbody's 4Q18 revenue after January 5, 2019, and Defendants' misrepresentations as to Stollmeyer's pre-signing, employment discussions with Vista.  Although Defendant Liaw argues that he did not personally make any false statements, Liaw, as a member of the board of directors, solicited a proxy via a statement containing misleading statements or omissions, putting him squarely within the ambit of Section 14(a).  *See* Definitive Proxy Statement (Dkt. 37-1) at 11 ("The Board of Directors is furnishing this proxy statement and form of proxy card to the holders of shares of common stock in connection with the solicitation of proxies to be voted at the Special Meeting."); *In re Bank of Am.*, 757 F. Supp. 2d at 293 ("[T]he BofA Directors solicited proxies, and fall within the plain language of Section 14(a).").

## IV.    Count IV: Control Person Liability

Count IV seeks to hold the individual defendants liable as "control persons" under Section 20(a) of the Exchange Act.  15 U.S.C. § 78t.  Defendants seek to dismiss this claim solely on the ground that no primary violation had been adequately pleaded.  Defs.' Br. at 50.  Because the Court finds that primary violations have been alleged under Counts I and III, the motion to dismiss Count IV is accordingly denied.

---

adequately alleged negligence.  The Section 10(b) claims must, of course, adequately allege scienter."); *Bond Opportunity Fund v. Unilab Corp.*, No. 99-CV-11074, 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) ("[U]nder the standards imposed by the PSLRA, Plaintiffs must plead with particularity facts that give rise to a strong inference of negligence."), *aff'd*, 87 F. App'x 772 (2d Cir. 2004).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to Count II, and GRANTED in part and DENIED in part as to Counts I, III, and IV.  Defendants' answer is due on or before **October 16, 2020**.  Defendants' motion to redact names of non-parties in their opposition brief and selected portions of certain exhibits because they contain sensitive personal or commercial information that is not relevant to the substance of the pending motion is GRANTED.

The Clerk of Court is respectfully directed to terminate docket entries 34 and 35.


**SO ORDERED.**

Date:   **September 25, 2020**
        **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

43