KANVMINC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: MINDBODY, INC.                    19 CV 8331 (VEC)
SECURITIES LITIGATION

                                         (REMOTE TELECONFERENCE)
------------------------------x


                                         New York, N.Y.
                                         October 23, 2020
                                         10:30 a.m.

Before:

                HON. VALERIE E. CAPRONI,

                                         District Judge

                        APPEARANCES

LABATON & SUCHAROW
      Attorneys for Plaintiff
BY:   CAROL C. VILLEGAS
      JAKE E. BISSELL-LINSK

KIRKLAND & ELLIS
      Attorneys for Defendants
BY:   MATTHEW O. SOLUM

COOLEY LLP
      Attorneys for Eric Liaw
BY:   SARAH M. LIGHTDALE
      BRIAN M. FRENCH

KANVMINC

(Remote teleconference)

THE COURT:  Let me just remind you of the rules of the telephone conference.

Please identify yourself each time before you speak. When you hear the bell that indicates someone has come or left, please stop talking long enough for me to make sure that I still have a court reporter on the line.  And if you're in an area where there's ambient noise, please make sure you mute your phone when you're not talking.

So we're down -- the case is now limited to the company's failure to disclose that their fourth quarter 2018 results were better than they had anticipated, and failure to disclose -- do I still have the court reporter?

THE COURT REPORTER:  Yes, your Honor.

THE COURT:  Okay.

And failure to disclose that there had been discussions between Mr. Stollmeyer and Mr. White about -- discussions about after-merger employment discussions.

So it looks like the critical-path item right now in terms of getting this case going in discovery is whether I should bifurcate class certification discovery from merits discovery.

So who's going to talk on behalf of the plaintiffs, Ms. Villegas or Mr. Bissell-Linsk?

MS. VILLEGAS:  I'll be speaking on behalf of the

KANVMINC

plaintiffs, your Honor.  This is Carol Villegas.

THE COURT:  Terrific.

MS. VILLEGAS:  Thank you, your Honor.

We believe there is a really good reason why discovery should not be bifurcated.  And that's that there is a real fact question as to when the class period should begin.  And we should really resolve that issue before having to define the class and seek certification.

And so I just want to explain why it's very likely that the class period would start earlier.

You identified the two categories of false statements that we have:  Defendants' failure to disclose Mindbody's better-than-predicted fourth quarter earnings when the depressed guidance turned out to be inaccurate, and defendants' statements about the retention of the executive.

Now, on that first category, we know the defendants' knowledge of the massive fourth quarter earnings beat as of January 5th, 2019.  But it's very plausible that discovery will reveal that they had this information days earlier, even going back to January 1 of that year, a day after the quarter closed. And we say that it's even possible and very likely that as of the date that they filed the proxy, on December 26, 2018, touting the 68 percent premium to the stock price, that as of that date, some or all of the defendants knew of the massive beat because there were only five days to go in the quarter.

And if we can show that, your Honor, then we have false statements on December 26, 2018 with the proxy materials.

So that's why we think this case is more like *Liquidity Services*. We cited that case in our letter, which denied bifurcation and noted that the determination of the class period was an issue in denying bifurcation; and that case proceeded on parallel tracks with merits and class discovery proceeding together.

So we think we should be able to explore these important fact issues before seeking certification. It's going to help us determine the class period. And otherwise we're just going to be back here after merits discovery seeking to reopen the class period we certified. We don't think that's efficient.

And our position is why limit it there? Does it really make sense to carve documents, redact for relevancy on the issue, redact whole pages that defendants would later have to produce to us in merits discovery? We don't think that's efficient. It doesn't make sense. It's going to lead to more disputes over discovery, not less, when we could be proceeding on parallel tracks and not fighting about what fits into this bucket or what fits into that bucket.

And so what we are proposing is a class certification motion that's filed 30 days after substantial completion of the document production. To be honest, I would really prefer 60

KANVMINC

days to give us more time to review the documents, but we would, of course, defer to your Honor on this and would work as quickly as you want us to.

At that point, after we get the discovery, we can file our class certification motion, and we can be briefing class certification while we continue with merits discovery; so we parallel track fact depositions with the expert depositions on class certification happening simultaneously. And that's the schedule we propose. And we think it makes a lot of sense for this case.

THE COURT: Okay.

Mr. Solum?

MR. SOLUM: Thank you, your Honor.

Good morning. Matt Solum.

The plaintiffs' approach is speculative, meaning it's based solely on their notion that maybe there might be discovery out there upon which they could change the nature of their allegations and expand the class. That's exactly opposite of how this is supposed to run, meaning we're supposed to move forward with class certification early in the process. We're down to two categories of alleged misstatements on the fourth quarter preliminary revenue.

Just so the Court has it in mind -- and I know the Court, of course, issued its decision -- the guidance for that fourth quarter of 2018 was 65 to $67 million. The plaintiffs

KANVMINC

allege that the board -- most of the board, all but one -- were aware of the preliminary revenue figures in mid January.  And on that basis, they allege misstatements as of the preliminary proxy and I suppose the final proxy on January 29th, 2019.  And it's that class that I think they've pled based on the remaining statements in the case, and that class that should be the subject of class certification.

Early in the process we had proposed bifurcation so that we can determine if, in fact, there is even a class action that could proceed here, because I think there are real fundamental issues around the class, given that the stock traded -- and this is not unusual -- at around the deal price as soon as the deal was announced.  And so it traded -- the deal price here was $36.50, and I think it traded within a dime or so of that price throughout the period.

And I guess the plaintiffs' view is that if additional information had been released, that the stock price would have traded at some further elevated level.  I don't know how they are going to be able to show that; but, of course, I don't want to get ahead of myself, and we'll see what their expert says in class discovery.

We looked at the *CBS* case and thought it was a good guide for how to move this forward.  I'm a little surprised to see the plaintiffs advancing this proposition that we should have merits discovery, document discovery, completed; and only

KANVMINC

then talk about class certification, because maybe they'll be able to expand the class. Again, that's the exact opposite way that the federal rules contemplate. And it's the opposite way the class actions are supposed to run, in securities cases or otherwise. And so --

THE COURT: I'm sorry to interrupt you, Mr. Solum, but it seems to me that this case is different from *CBS*. *CBS* barely got past a 12(b)(6) motion. And they got past on a very limited statement that there's real question of whether the plaintiff is going to be able to -- hopefully I'm saying the same thing I said to the parties in the *CBS* case, that they've got a tough road to hoe to get through class certification. I don't know what the particulars of these plaintiffs are or why you think they are going to have difficulties getting past class certification. This one seems -- strikes me as not as iffy as *CBS* is.

MR. SOLUM: Let me, if I could, maybe just address that head-on, your Honor.

THE COURT: Okay.

MR. SOLUM: The plaintiffs attack statements regarding the proposed acquisition. The vote was, of course, February 14th; the acquisition was announced on Christmas Eve Eve. I'm not sure what it is about holidays in this case, but it's Christmas Eve Eve, and then the vote was on Valentine's Day the following year.

On December 23rd, there was an announcement.  As part of that announcement, they announced -- the company announced the premium of the acquisition as compared to the unaffected stock price, 68 percent.

THE COURT:  Right.

MR. SOLUM:  I take it based on the comments just a moment ago that the plaintiffs want to show that the company may have had a view on the preliminary revenue for the fourth quarter, even before the quarter was over.  So even before the end of December, that the company had a view that it might beat that 65 to $67 million guidance by a million dollars, which is what it ultimately -- I guess the preliminary results suggested -- beat it by.  It came in at 68; so a million dollars above that fairly narrow band of 65 to $67 million.

And I take it that the plaintiffs' view then will be that if that number -- the 68 million -- had been disclosed in connection with the 68 percent premium, that somehow -- and that's where it breaks down for me, your Honor.  I can't tell if they are saying that the stock would have traded some other price.  Because these are parties -- these are a class of folks who sold before the deal was voted upon on February 14th.  And the stock, as is very common in deals, it rose up to that deal price, $36.50, and traded at or around that deal price all the way through February 14th.  So it continued to trade at or around that deal price when the preliminary proxy was issued on

January 9th; it traded at or around that price when the final proxy was issued on January 29th; and continued to trade at or around that price all the way through February 14th.

And so what I really struggle with, your Honor -- and they haven't alleged -- and they got a whole bunch of discovery and I want to go back to that in just a moment. But they have not alleged that anyone knew about the preliminary revenue for the fourth quarter before the quarter was over. And I understand the theory that sometimes you want to get discovery of that which you don't know, and you just go on fishing expeditions and you find stuff, and maybe that can help expand your class.

But I don't understand from a class certification perspective what their theory of damages is, because the stock was going to -- I mean, I don't know if they think the stock would have traded at 38 bucks or 39 bucks or 40 bucks above the deal price because the company happened to have an additional million dollars of revenue for a particular quarter. It just doesn't -- I don't quite get it.

And so that's what I really struggle with, your Honor, in this instance as to why I think they are going to have a real issue with class certification. It's not the typical case where we are coming in and we're saying it's a typical stock drop, where it's dropped by 25 percent or 30 percent; and we're going to say, Gosh, we don't really know if the 25 or 30

KANVMINC

percent drop is the result of the additional information that came out.  We sort of attack it that way, which, you know, you might see sometimes in a typical 10b-5 or stock-drop case.

The issue here is the stock always traded at or around the $36.50.  And there might have been arbitrage (unintelligible) who would jump in and out and sort of making some guesses about whether it was going to go up or down, but it was right around that price.

And so I don't understand why an additional million dollars of revenue on a preliminary basis, setting aside what the guidance would be, and the company had disclosed full five-year projections of what they thought the revenue would be, but why that would change the price of the stock in this case.  And that damages component is one that is to be assessed at the class cert. stage.  I should have touched on that, your Honor, because I think that's the directive from the *Comcast* case.

THE COURT:  Yes.

MR. SOLUM:  That's the real rub of it, I think, from my perspective, your Honor.

THE COURT:  All right.

So let me ask you this:  My concern about anytime discovery is bifurcated is that it is close to a guarantee that the parties and I are going to end up on the phone a lot with discovery disputes over whether a particular discovery falls

into the merits bucket or the class certification bucket.

So how can you give me comfort that that would not happen in this case?

MR. SOLUM:  I think your Honor may have touched on it at the top of the hearing, meaning what we're really talking about are two categories of statements and the impact that those two categories of statements would have had on the stock price.  That latter piece, the price impact, is expert discovery, meaning it's not -- it's not discovery that we have in our files, that the company has in its files; it's just expert discovery where the plaintiffs are going to need some expert to come in and explain to me and to the Court why it is they have a damages thesis based on the non -- alleged nondisclosure of those issues.

In terms of the disclosures themselves, the plaintiffs have already pled -- they've already pled their case effectively; meaning they have said that there were these various contacts between Stollmeyer and White, the then-CEO and CFO of the company, and Vista, leading up to the acquisition. And they say that they weren't adequately disclosed in the preliminary proxy, the final proxy, or the supplemental disclosures that went out on February 7th.  So they've disclosed that.

I just went back, in preparing for the hearing, to look at their complaint, or amended complaint, on page 1, this

KANVMINC

is the preamble, even before you get to paragraph 1, where they explain all the information they already have, meaning the conference call transcripts, news articles, press releases, public statements from the company, and then interviews with former Mindbody employees, and then they go on.

They've also gotten documents filed in the other case, the Delaware case, that have been referenced in those pleadings. And we had a whole trial on the merits in Delaware where there was discovery that was produced back and forth; but that discovery was, of course, much broader because it involved the fair value of the company as opposed to just the price impact of the two categories of statements that are at issue here.

So I think they have already gotten the discovery that would go to the statements at issue. And then the price impact discovery, I think, is expert discovery, meaning their plaintiffs will have some expert, I guess, who will come in and explain why there was a price impact based on the statements at issue.

THE COURT: Tell me again what was the deal price?

MR. SOLUM: $36.50, your Honor. It was originally 35, but the board negotiated up to $36.50.

THE COURT: And the stock was trading at where in the -- in the January time frame?

MR. SOLUM: Yes. I'm sorry, your Honor.

KANVMINC

At or around $36.50.

So I think here I had someone pull the open and close. So, for example, on the preliminary proxy, it came out January 9th. I think it opened at $36.51; I think it traded up to $36.59, so within a dime.

I think when the final proxy came out, it was same thing, 36, maybe 38 was the open, and it closed $36.32, so within a couple dimes there. And then likewise when the supplemental disclosures came you out on February 7th, it opened at $36.44 and closed at $36.53; so all trading right around that $36.50 level.

THE COURT: Right. Okay.

Ms. Lightdale, do you want to add anything, or Mr. French?

MS. LIGHTDALE: I apologize, your Honor. I was on mute.

No, I think Mr. Solum captured it adequately.

I did just want to underscore Mr. Solum's comment that the plaintiffs have received extensive discovery from the parallel Delaware action here, and that is reflected in their amended complaint.

THE COURT: Thanks.

All right. Ms. Villegas.

MS. VILLEGAS: Yes, your Honor.

I would like to address some of the points that

KANVMINC

Mr. Solum made.

On the price impact point, you know, I'm not sure what Mr. Solum doesn't understand.  I think our case is pretty simple.  We're alleging that the deal price was deflated.  So even though it might have traded at this range of $36.50 a share, the whole point is that the market didn't have the information to properly value the company.

And, you know, I would just quote from your Honor's --

THE COURT:  I'm sorry.

MS. VILLEGAS:  Yes?

THE COURT:  Let me just interrupt you for a second.

So your theory is that the deal would not have gone through at $36.50 a share had this added information been disclosed, because then the deal premium would have been smaller than what they were touted.

MS. VILLEGAS:  Well, I think part of our theory, as your Honor correctly said in the order, is that -- on page 23, that defendants recognize that the public disclosure of the four two revenues could result in an increase in the company's share price.  So whether the deal is going to go through or not, I don't know.  Maybe Vista would have increased their offer to top the new share price.  But the whole point is -- and our damages model would show, is that the fair value of Mindbody stock wasn't reflected in the stock price as it was.  And we would have an expert --

THE COURT:  Wait a minute.  I'm sorry.  So you're going to -- I'm sorry to interrupt you.

So you're going to have an expert who would say even with a proposed merger out there at $36.50, the share price would have been above $36.50?  The arbs were voted against the merger going through?

MS. VILLEGAS:  Well, it's hard to say what would have happened, because this is all over; the merger has occurred.

But I guess the point that we're making is that in determining damages in a seller case, like this one, what we would do is have an expert determine what the fair value of Mindbody stock was at that time.  And so you would take the fair value, and then the corresponding price that the seller sold at, and you would subtract those two numbers, and you would get your damages.

So, in other words, an expert would be able to look at the four two beat, and they would be able to value what the company's share price should have been based on the fair value of the company.

THE COURT:  Right.  Okay.  Well, I'm definitely not an economist and I'm not an expert on these things.  But it strikes me that if the market knows that if the merger goes through, that it's going through at $36.50, you've got to be a fool to pay more than $36.50.  Because you're going to get merged out of existence and get $36.50 when the merger goes

through.  So unless you're voting against, unless you think that the market is going to -- the shareholders are going to vote against the merger, once the merger is announced -- maybe I'm wrong, but it seems to me that the merger is announced at a particular price, the market tends to congregate around that price, assuming the market agrees that the merger is going to go through.

MS. VILLEGAS:  I would agree with that, your Honor.

But the point here is that that price is deflated. And if the market had learned about the four two beat, our argument is that the company would be valued at more, the stock price would have gone up, Vista would have had to top the offer that they made.  So, in other words, it would have affected the merger price, and it would have affected what people were going to receive in the merger.

THE COURT:  That's what I thought your theory was.

MS. VILLEGAS:  Yes.

THE COURT:  They would have had to increase the merger price.  Okay.

But why does that -- so I get your theory.  But why do you need merits discovery before you have -- before you certify or don't certify the class?

MS. VILLEGAS:  So I think you made this point earlier today when we were talking about *CBS*.

That was a weak case.  And I understood why you did

that there and why class certification should have come first. But we don't think there's going to be a barrier in certifying this class, especially just given the damages model I just discussed and the price impact issues that we talked about.

So in terms of discovery, we think it's going to be more efficient to have discovery proceeding together.  I agree with you, your Honor, I think there are going to be a lot of disputes about what's merits and what's not.

And on the point that Mr. Solum made about us receiving discovery from the Delaware action, it's not entirely accurate.  What we received from the Delaware action are documents that ended up on a public docket.  We haven't had formal discovery here.

As you know, the PSLRA stay has been in place.  And the purpose of the PSLRA stay was to make sure that only meritorious claims survived, and that defendants wouldn't be burdened with expensive discovery on a claim that hasn't been tested.  Our claim has survived; and we think that from a policy perspective we should be entitled to discovery and to move forward with this case to try to prove our claim now.

So we're asking the Court to allow us to move forward with discovery.  And if the Court does decide to have class certification come first, what we would ask for is that defendants produce to us all the documents that were produced in the Delaware action.  They haven't done that, and we don't

have access to them yet.  The only thing we had access to was what was publicly available on a docket, documents that plaintiffs in the Delaware action attached to their pleadings and other information like that.  So it's not accurate to say we have a fulsome record.  We don't.

And on that last point I would just say that the Delaware defendants and the Delaware action, even though it arises out of the same core set of facts, we have different burdens.  So I don't know what they asked for in discovery.  Maybe we would need other things.  Maybe we would need more.  And maybe we would need more for class certification.

So that's why I think at the end of the day, it's more efficient to just let us proceed together.

THE COURT:  All right.

Mr. Solum, I'm going to give you the last word.

MR. SOLUM:  Thank you, your Honor.  I appreciate the Court's patience.  Just briefly.

I think on the damages theory, the idea that this information, if it was disclosed, would have led to a higher price because it would mean that the bidder -- the acquirer would have been bid more as a result of this information, even though I think the plaintiffs plead the bidder, in fact, knew of the information, I just think is speculative.  And I think, look, I don't want to go too far down the path of arguing the class cert. motion before it's briefed or before I've seen

their expert report such as it is, but I haven't seen a class certified on the basis of the notion that a bidder would have bid more without any real showing of that.

On the nature of the discovery, the discovery --

THE COURT:  Of course, they are not -- I'm sorry.  Let me just interrupt.

They are not going to know that until they do discovery; that is, they are not going to know whether Vista would have increased -- had the share price gone up because the market knew that they were going to beat their fourth quarter estimates, that would have reduced the premium that Vista was paying, and maybe Vista would have increased the bid; because maybe they would not have been confident that the merger would have gone through if the premium had only been 40 percent.  But how are they going to know that until they do discovery?

MR. SOLUM:  I think on that, your Honor, if they're predicating the theory of the case on the notion that a Vista witness is going to come in and say they would have bid more than $36.50, then, you know, I think if that's really their theory, that a Vista witness, for them to proceed with their case, needs to come in and say, Yes, I would have bid more than $36.50 if these results had come out, the stock would trade somewhere else, I guess we'll see it.

The problem I have, just to unpack that a bit, your Honor, the stock was trading at 22, $23.  22, 23.

I guess the plaintiffs' theory now is that if additional revenue had come out, it would have traded somewhere else.  I don't know if that's 23 or 24 or something else. There are a bunch of problems with that, including that the stock trades typically, I think -- and again, I'm not an economist either, and so we haven't put in expert reports, but generally, people look at forward-looking revenue projections, not historical figures.  And so I'll be curious to see if they are able to get an expert who will say that the stock would have traded higher than the 22 to 23 bucks on the basis of the additional million bucks revenue, as opposed to asking the real question, which is what was the projection for 2019 for Mindbody, a company that's in the gym business.

So there we'll see what they come up with.  I guess if their theory then is it would have traded at some higher price, 23, 24, and therefore, Vista would have bid more, and their case is predicated on the notion that Vista would say that it bid more, that's their case to prove, meaning their requirement for class cert. is that they are able to show on a classwide basis why they are able to proceed, not that they get discovery to try and figure out whether they have a claim.

This is just a question of do they have a damages theory.  And if it's based on the notion that a Vista witness is going to say, Yes, if the stock was trading at above higher, we wouldn't have paid more, because we pay based on premiums,

KANVMINC

even though most private equity firms pay on what's called IRR, internal rate of return, based on a real assessment of the financial performance of the company, I think that may be case-dispositive for the plaintiffs just to say it directly, your Honor.

I think on the discovery piece, on the Delaware piece, the Delaware action is much broader than this action.  I haven't seen their discovery requests, but I would think on the two narrow categories of documents or statements that are still at issue here, that's much narrower than what's at issue in the Delaware action.

The case here is not what's the company worth on a fair value basis as of the closing, which is the issue in the Delaware case.  The case is, I think, about what's the price impact as a result of a supposed or alleged misstatements.  And so we can -- to the extent we get to merits discovery, that's, I guess, from my perspective, a big "if."  I think it doesn't start with the Delaware case, I think it starts with a discovery request.  We can respond to it and see what's at issue.

But, again, I don't --

THE COURT:  Sorry.  So --

MR. SOLUM:  -- want to manufacture a discovery dispute before we even get there.

THE COURT:  Yes.  Well, I see them.  They are coming

KANVMINC

my way.

But they are not, because while I appreciate your arguments, Mr. Solum, I'm not going to bifurcate discovery in this case.  I think it's a recipe for endless disputes.  And let's just proceed with discovery on a normal path.

So with that -- and I'm sorry I'm going to rush you, because I've got an 11 o'clock that involves someone that's in a prison, so I actually have to be on the phone reasonably close to on time.

So the plaintiff has proposed a discovery schedule.  And I want to make sure that it is reasonable, given the world of COVID that we are all living in and will be living in through most of 2021.

They are proposing initial disclosures in two weeks.  They are disclosing that you can negotiate and present to me a protective order in three weeks, and that fact discovery can be completed by August the 6th.

Is that reasonable, Ms. Villegas?

MS. VILLEGAS:  I believe it's reasonable for us, your Honor.  But defendants are the ones that are going to have to be producing the documents.  So we're willing to work with them if they need more time on that.

THE COURT:  Mr. Solum?

MR. SOLUM:  I think that's all fine, your Honor.

The one piece of it is I still think we need to have

class certification decided early in the case, not after all the document discovery has concluded.

THE COURT:  Why?  If I'm not bifurcating discovery, why does that make sense?

MR. SOLUM:  Because the federal rules say that class certification is supposed to happen earlier rather than later in class cases so that we don't arrive at just this issue, your Honor, where all of discovery has concluded before you even get to class certification, meaning --

THE COURT:  So when are you proposing that the motion for class certification be filed?

MR. SOLUM:  We had proposed it, your Honor, December. We're amenable to pushing that back a month or two, but it needs to happen early in the process consistent with the federal rules.

THE COURT:  The federal rules don't require any particular timing of class certification.

So let me say, here's what I'm going to do:  I'm not bifurcating.  I'm going to direct the parties to meet and confer again and see if you can agree on a schedule to get yourselves now through the end of discovery, including class certification.

Meet and confer.  If you can't reach an agreement, I'm going to set up another conference.

And I apologize for cutting this one short.  And I

KANVMINC

would only do it -- I would not do it if I didn't have a prison on the next call that I need to be on on time.

So meet and confer and get back to me by next Friday if you've reached an agreement.  If you haven't reached an agreement, given the fact that I'm not going to bifurcate discovery, send me a letter next week with what each side's proposal is.  If I need a conference at that point, I will schedule it.

MR. SOLUM:  Understood, your Honor.  Thank you.

MS. VILLEGAS:  Thank you, your Honor.

THE COURT:  Thank you, all.

*     *     *