# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE MINDBODY, INC.<br>SECURITIES LITIGATION | Judge Valerie E. Caproni<br><br>No. 1:19-cv-08331-VEC<br><br>CLASS ACTION<br><br><u>JURY TRIAL DEMANDED</u> |

### [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................ 2

    A.    The Secret Negotiations and Defendants' Motives for a Corrupt Deal ................. 3

    B.    The Fraudulent Statements Begin ........................................................................... 7

    C.    Defendants Rigged the Deal Process in Favor of Vista ....................................... 12

    D.    Defendants Pitched the Privatization to Investors and Solicited their Votes ........ 14

II.   JURISDICTION AND VENUE ................................................................................. 18

III.  PARTIES .................................................................................................................... 19

    A.    Plaintiffs ............................................................................................................... 19

    B.    Defendants ............................................................................................................ 19

    C.    Additional Key Players ......................................................................................... 20

IV.   SUBSTANTIVE ALLEGATIONS ............................................................................ 21

    A.    Mindbody's Business ............................................................................................ 21

    B.    Mindbody's 2018 Growth was Marked by Two Significant Acquisitions ........... 23

        (1)    The FitMetrix Acquisition .......................................................................... 23

        (2)    The Booker Acquisition .............................................................................. 24

    C.    The Acquisitions and Related Integrations were Touted as Successes ................. 25

        (1)    1Q18 Earnings Call .................................................................................... 25

        (2)    2Q18 Earnings Call .................................................................................... 26

        (3)    2018 Investor Day ...................................................................................... 28

    D.    The Corrupt Origins of the Privatization .............................................................. 31

    E.    The Board is Finally Informed of the Negotiations .............................................. 36

    F.    Defendants Sandbagged Mindbody in the 3Q18 Earnings Call ........................... 37

        (1)    The Content of Mindbody's 3Q18 Earnings Call ....................................... 37

i

(2)    The Reaction to Mindbody's 3Q18 Earnings Call .................................... 39

(3)    Defendants Knew the 4Q18 Guidance Was Misleading .......................... 40

G.    Vista was Arbitrarily Favored in the Rushed and Inept Negotiation .................... 48

H.    The Misleading Announcement of the Proposed Privatization ........................... 52

I.    The Terms of the Merger Agreement .................................................................. 54

(1)    Structure of the Merger ....................................................................... 54

(2)    The Go-Shop Provision ......................................................................... 55

(3)    The Vote Required ................................................................................ 58

(4)    Appraisal Rights .................................................................................. 60

(5)    Qatalyst's Unreasonable Fees .............................................................. 60

J.    Mindbody Continued to Mislead Investors While Continuing to Publish
Proxy Materials ................................................................................................... 61

(1)    December 26, 2018, Proxy Materials ..................................................... 61

(2)    January 2, 2019, Proxy Materials .......................................................... 62

(3)    January 4, 2019 Mindbody's Actual 4Q18 Results ................................. 63

(4)    January 9, 2019, Preliminary Proxy Statement ....................................... 65

(5)    January 23, 2019, Definitive Proxy Statement ....................................... 66

(6)    January 29, 2019, Proxy Materials ........................................................ 66

(7)    February 7, 2019, Proxy Materials ........................................................ 67

K.    The Shareholders Vote and the Transaction Closes ........................................... 68

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS DURING THE CLASS PERIOD ...................................................... 69

A.    November 6, 2018 (The 3Q18 Disclosures) ...................................................... 70

D.    January 4, 2019 and Thereafter (Omission of 4Q18 Results) .............................. 76

E.    January 9, 2019 (Preliminary Proxy Statement) ................................................. 76

F.    January 23, 2019 (Definitive Proxy Statement) ................................................. 78

ii

G.      January 29, 2019 (Proxy Materials).................................................... 78

H.      February 7, 2019 (Definitive Additional Materials)............................ 78

VI.     ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER........... 79

     A.      Motive, Opportunity, and Corrupt Behavior........................................ 80

           (1)     Defendant Stollmeyer ............................................................ 80

                 (i)     Defendant Stollmeyer was Motivated to Defraud ........................ 80

                 (ii)    Defendant Stollmeyer Had the Opportunity to Defraud .............. 86

           (2)     Defendant White .................................................................... 87

                 (i)     Defendant White was Motivated to Defraud ............................... 87

                 (ii)    Defendant White had the Opportunity to Defraud ....................... 88

           (3)     Defendant Liaw.................................................................... 88

                 (i)     Defendant Liaw was Motivated to Defraud................................. 88

                 (ii)    Defendant Liaw had the Opportunity to Defraud ........................ 90

     B.      Defendants Knew Material Undisclosed Information, Including Information Contradicting the False and Misleading Statements........................ 90

           (1)     Mindbody's 4Q18 Guidance....................................................... 90

           (2)     Post-Merger Employment Discussions..................................... 91

            (3)     Mindbody 4Q18 Results ........................................................... 91

     C.      Suspicious Conduct................................................................ 91

VII.    CONTROL PERSON ALLEGATIONS................................................ 92

VIII.   LOSS CAUSATION................................................................ 94

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE MARKET PRESUMPTIONS .................................... 96

X.      NO SAFE HARBOR ................................................................ 98

XI.     CLASS ACTION ALLEGATIONS ................................................ 99

XII.    COUNTS.............................................................................. 102

A.    Count I: Violation of § 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants ............................................ 102

B.    Count II: Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereunder Against Mindbody and the Individual Defendants ...................................................................................... 103

C.    Count III: Violations of Section 14(a) of the Exchange Act ............................. 105

D.    Count IV: Violation of Section 20(a) of the Exchange Act Against the Individual Defendants ...................................................................................... 107

XIII.   PRAYER FOR RELIEF ................................................................................................. 108

XIV.   JURY DEMAND .......................................................................................................... 109

Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based on personal knowledge as to Lead Plaintiffs and Lead Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Lead Plaintiffs' attorneys (*i.e.*, "Lead Counsel").

The investigation included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Mindbody, Inc. ("Mindbody"[1] or the "Company"), conference call transcripts, news articles, press releases and other public statements by the Company, analyst reports about the Company, interviews with former Mindbody employees, secondary sources about typical M&A practices, other publicly available sources, discovery produced by Defendants and third parties in this Action, and consultation with individuals with expertise in damages.  Additionally, Defendants reviewed documents filed in *In re Mindbody Inc., Stockholder Litigation*, No. 2019-0042-KSJM (Del. Ch.) (the "DE Action"), including text messages and emails from Mindbody insiders, deposition transcripts, admissions in briefing, and allegations in the verified amended complaint in the DE Action.

Discovery in this action has yielded substantial evidentiary support for the allegations herein, though these allegations are not an exhaustive recounting of the facts discovered.   Lead Plaintiffs believe that as discovery continues additional evidentiary support will emerge, especially through the depositions of the key actors, including the Individual Defendants.

This action (the "Action") is brought against Defendants Richard L. Stollmeyer, Brett White, and Eric Liaw (together, the "Individual Defendants"), and Defendant Mindbody.

---

[1] Every reference to Mindbody has been capitalized as "Mindbody," even when quoting sources that capitalized each letter of the Company's name.

## I.    INTRODUCTION

1.    Defendants ruthlessly manipulated Mindbody's share price as part of an egregious scheme to defraud investors into selling their shares on the cheap.  Defendants deceived investors about the value of Mindbody stock in order to pave the way for Vista Equity Partners ("Vista") to acquire the Company (the "Privatization").  Their scheme served their personal interests, but cost public shareholders hundreds of millions of dollars.  Lead Plaintiffs represent a Class of investors who were injured when they sold their shares between November 6, 2018, when the fraud began, and February 14, 2019, the day before the Privatization closed.

2.    Mindbody provides software that assists wellness businesses (*e.g.*, gyms, yoga studios, and spas) in their operations.  It provides a mobile phone application that consumers use to reserve services or classes, as well as tools for payment processing, marketing, and business analytics.  Mindbody primarily earns revenue through subscription fees paid by wellness businesses and through payment processing fees paid by consumers using its booking platform.

3.    In 1Q18,[2] Mindbody completed two significant acquisitions.  It bought FitMetrix, Inc. ("FitMetrix") for $15.5 million and Booker Software Inc. ("Booker") for $150 million. Together, these acquisitions expanded the number of wellness businesses served by Mindbody and expanded the services that Mindbody could provide.  At the close of 1Q18, Mindbody laid out its plan to integrate FitMetrix and Booker into its business, which Mindbody's founder and CEO, Defendant Stollmeyer, said would "set the stage" for "much greater growth."

4.    At the close of 2Q18, Defendants reported that the integration would be complete by the start of 2019, that the work had been "front-loaded," and that they had "confidence" in the second half of the year because Mindbody was already done with "a lot of heavy lifting on the

---

[2] Quarters are described herein in the format #QYY, where # is the quarter number and YY is the year.

2

integration."  The tune remained the same in the Company's September 18, 2018 Investor Day

presentation.  Investors were told the "integration [was] going well."  Defendant Stollmeyer

presented a slide stating: "**The Integration is Working**."  Mindbody's Chief Strategy Officer

("CSO"), Josh McCarter, explained that the Booker integration was "going well," and boasted

that the "acquisitions position us favorably for this, in fact, better than anyone else in the world."

By all accounts, these positive statements were true.

A.    **The Secret Negotiations and Defendants' Motives for a Corrupt Deal**

5.    Defendant Stollmeyer had long been interested in a deal with Vista, a private

equity ("PE") fund.  Prior to Mindbody's initial public offering in 2015, Vista had offered to buy

Mindbody so that it "didn't have to go public."  In 2017, Stollmeyer was again negotiating with

Vista, but those discussions fizzled because the stock "was then trading at an all-time high."

Then, in the summer of 2018, without permission from Mindbody's board of directors (the

"Board"), he again began to secretly negotiate with Vista.

6.    On August 7, 2018, Defendant Stollmeyer was prompted by Jeff Chang, an

investment banker from Qatalyst Partners LP ("Qatalyst") to renew negotiations with Vista.

Qatalyst and Chang had deep ties to Vista.  Qatalyst was founded by a former Vista employee

and had worked on numerous deals with Vista.  In fact, while Qatalyst and Chang would purport

to represent Mindbody throughout the deal process, Chang himself at the same time in August

2018 was **working on behalf of Vista** in its acquisition of iCIMS Inc., a deal that closed in

September 2018, earning Qatalyst a $7 million fee.

7.    During their August 7, 2018 meeting, Stollmeyer told Chang that he was

interested in selling Mindbody to a PE fund, if they would agree to employ him in the post-

merger entity.  Thus, even from this early stage, Stollmeyer was clearly serving his own interests

3

in these negotiations, rather than the interest of shareholders.[3]  On August 23, 2018, Stollmeyer

met with Saroyan and Vista Vice President, Nicolas Stahl, at Mindbody to discuss Mindbody's

business and Stollmeyer's "goals."  On September 19, 2018, Stollmeyer received an invitation

from a Vista representative to attend Vista' CXO Summit in October.  Stollmeyer attended the

CXO Summit and met with both Saroya and Vista founder and CEO Robert Smith.  Afterwards,

he texted Mike Mansbach, President of Mindbody, that Vista's presentation was "**mind blowing.**"

8.      By October 16, 2018, the discussions had clearly crossed into serious negotiations,

as Mr. Saroya told Stollmeyer that Vista was willing to acquire Mindbody at **"a substantial**

**premium to [Mindbody's] recent trading range."**  Based on Mindbody's recent trading price

(of $41.25) and typical deal premiums, this implied a price of at least **$49.50 per share**.

9.      The next day, Stollmeyer told Defendant White and two other senior Mindbody

managers, about his covert negotiations, and advised them that he wanted to use Qatalyst as the

investment bank for the potential deal.  He also said that a sale would not be an "automatic exit"

for him and that he would "**lean into an acquirer**" who saw his "capabilities" and "potential,'

and that he would "**not support the sale . . . at this time in any other circumstances**."  He told

these individuals that they should not discuss or even "hint" at the sale with any Board member,

until he gave them permission—further demonstrating that his earlier negotiations were

intentionally kept secret.  White, who was in on the scheme, replied that his "**lips are sealed**."

---

[3] It has long been understood that the fiduciaries trusted with shareholders' money have a duty to maximize the sale price of the corporation, rather than pursuing other personal goals in the sale process. *See generally Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).  While the claims here sound in federal securities laws governing misstatements and omissions, rather than Delaware law breaches of fiduciary duty, the breaches present in the sale of Mindbody speak to Defendants' corrupt behavior and fraudulent intent.

10.    Stollmeyer had a variety of personal interests in a proposed sale to Vista, ranging from a potentially huge financial payday ████████████████████████████████████ ████████ as well as the benefits of securing himself a continued role as CEO, but moving that role from one where he answered to public investors (who he had an astounding antipathy towards) to one where he answered to a business partner who he "was in love with."

11.    As to his direct financial benefits, through the deal with Vista Stollmeyer had the opportunity to cash out his existing equity position – immediately earning around $58 million – only to be recapitalized with a large stake in the post-Merger company.  In other words, he would sell his shares, and then on top of that, get new shares in the new company.  This situation essentially meant that he would profit from a deal – whatever the price – since, even if he sold his shares too cheaply in the deal, that sale would be a windfall – since he would be compensated with an equity stake in the newly privatized company.  He recognized as much in a text message that he sent to his financial advisors the very same day the Privatization was announced:

> Vista's in love with me (and me with them).  No retirement in my headlights.  However, I will likely sell most or all of my stock.  It will be incumbent upon them to provide compelling incentives.  Let's meet after the holidays to talk about how to allocate the inbound cash.

12.    This influx of cash was particularly important to Stollmeyer given his pre-Merger financial condition.  In a post-Merger interview[4], Stollmeyer complained about how, even after Mindbody's IPO, his "capital [was] locked inside the business," and how he could "sell tiny bits of it," but it was "kind of like sucking through a very small straw."  He even explained why he could not sell his position without a Merger, stating that if he sold even a small amount, public

---

[4] Alejandro Cremades, Rick Stollmeyer on Selling For $1.9 Billion the Company That He Created Out of His Own Garage, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage

investors would "challenge" why he was selling, and ask if it signaled he did not "believe in" the company.

13.     While that statement alone clearly showed that Defendant Stollmeyer would view a liquidity event as a meaningful financial benefit, ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████

14.     And, when announcing the Merger, Defendant Stollmeyer stated, "[we] are thrilled to provide immediate **liquidity** to our shareholders," himself included. ████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████

15.     He also agreed to stay on as Vista's CEO, which serves as a unique benefit to him—beyond merely continuing his employment—as it allowed him to continue to guide the Company he founded, outside of the scrutiny of the public investors for whom he had great

disdain. He demonstrated this disdain repeatedly, stating that through Privatization he would be freed from the "**shackles of public market investors**." Stollmeyer and Defendant Liaw discussed a strategy of "**throw[ing] the public investors under the bus**" in pitching the acquisition to prospective buyers, and "**complain[ing] about how frustrating it is that they only care about things every 90 days**."

16.    Defendant White shared many of the same incentives as Stollmeyer. He could expect to receive significant financial benefits while continuing in his positions at Mindbody.

17.    Defendant Liaw, served on the Board through nomination by Institutional Venture Partners XIII, L.P. ("IVP"), an investment firm that had significant shareholding in Mindbody. IVP's investment strategy called for it to "exit" its Mindbody position within a proscribed time period, which gave it a unique interest in pushing for a Privatization to liquidate its position.

18.    These conflicted parties finally brought the proposed deal to the Board's attention, and the Board discussed the possibility of going private on October 26, 2018. Following this, several members of the Board formed a transaction committee (the "Committee"). However, Stollmeyer continued to lead the negotiation process and pushed the Company to retain the deeply conflicted Chang (of Qatalyst) to represent Mindbody. This was an egregious decision, given Chang's contemporaneous work for Vista.

**B.    The Fraudulent Statements Begin**

19.    The fraudulent statements began on November 6, 2018, when Mindbody released its 3Q18 results and held the corresponding earnings call (together the "3Q18 Disclosures"). At this point, the public had not been given any information about the possibility of Mindbody being acquired. Defendants kept this material information secret throughout the earnings call and instead used the 3Q18 Disclosures to artificially depress the price of Mindbody' stock, in order to set the stage for Vista to acquire the Company with a lowball offer.

7

20. In accordance with this plan, Defendants issued downward 4Q18 guidance and blamed this reduction on the acquisition of FitMetrix and Booker. Throughout the earnings call they falsely claimed—contrary to their prior assurances—the struggling integrations would cause Mindbody to miss its prior 4Q18 guidance, requiring a reduction in guidance.

21. In response, and as expected, Mindbody's stock price plummeted $6.45 from its November 6, 2018 closing price, to close at $26.18 on November 7, 2018, **a decline of approximately 20 percent**. This was the reaction that Defendant Stollmeyer was hoping for, and he later sent a text message to Qatalyst's Chang, to state **"We're not surprised by the after-market reaction. I'm fine.**" Numerous facts strongly demonstrate that this negative news was part of a scheme to manipulate Mindbody's stock price.

8



25.     The day after the 3Q18 earnings call, Stollmeyer admitted that the reduced guidance was intended to be lower than the Company's true estimates, internally telling Mindbody's Chief Technology Officer that **"We are resetting street expectations to position ourselves up for future beat and raises."**  Thus, Stollmeyer was literally confessing to the fact that downward guidance was intentionally too low, though his explanation as to why he was doing this was also a lie.  Later, during a deposition in the DE Action, Stollmeyer would testify that **"[i]t's much better to guide a bit below what <u>you're expecting</u> and then beat those expectations."**  Here, Stollmeyer was not merely saying, if one has to choose, it is better to err on the side of caution—he is admitting to guiding below his "expectations," in order to manipulate investors and control their reactions. ████████████████████

█████████████████████████████████████████████████████████

████████████████████████████

26.     On November 3, 2018, just three days **before** the earnings call, financial planning and analysis manager ███████ text messaged Mindbody's senior finance manager ███ ███████ : "We minimally beat in October - that tells me **we are on track to hit our forecast**. . . .  The question is - did the assumptions we saw in month 1 cause us to think our assumptions for month 2 and 3 need to be revised - **I do not know of anything in the flash**[5] **[revenue report] that would materially change our assumptions for the preceding months.**"

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████

27.     According to a former Sales Manager for Mindbody, who worked for the Company from 2017, Booker "performed very well during his tenure" and that sales quotas for Booker were increased each quarter from 3Q18 until 2Q19 and were met each time.  This former employee added that the 3Q18 guidance "was a surprise" to him because sales goals were consistently being met.  This is particularly noteworthy given that Mindbody's explanation of the downward guidance essentially blamed the reduction on Booker sales.

28.     The alleged issues with the integration were also fabrications.  Just a week before the 3Q18 disclosures, Defendant Stollmeyer sent talking points in support of the sale to Defendant Liaw and another Board member stating that the **integration was "proceeding well**."  And the concept that the issues had been ongoing for "two quarters" was directly at odds with

---

[5] A "flash" revenue report is an accounting term that describes a summary of the key operational and financial outcomes of a business.

the statements over those past two quarters and during the September 18, 2018 Investor Day event, stating the "Integration is Working."

29.    A multitude of other facts also demonstrate that the guidance was intentionally misleading.  For example, on October 19, 2018, Mindbody's  Chief Strategy Officer ("CSO") complained that Stollmeyer's draft 3Q18 presentation was "shortchanging" the success of Mindbody's payments platform—and Mindbody's Senior Director of Investor Relations told Defendant White that Defendant Stollmeyer "doesn't want to talk [about] payments," and instead wanted to "**thro[w] Booker under the bus**."  It was also highly suspicious that Stollmeyer waited until the night before the 3Q18 earnings call to convene the Company's Audit Committee to "alig[n] around a substantial guide down for the quarter."

30.    As discussed below, during the fourth quarter, Defendants became aware of the fact that Mindbody was going to have a "**massive beat**" both against the lowered guidance and even against the previous analyst expectations.  Defendants never revealed this information to investors during the Class Period.  This and the many other egregious facts surrounding the Privatization, including (a) Stollmeyer breaching his duties by prioritizing his employment over a fair deal process, (b) the use of an obviously conflicted investment bank, (c) and the rushed and corrupt deal process (described below).

11

C.    **Defendants Rigged the Deal Process in Favor of Vista**[6]

31.    Just four days after the 3Q18 earnings call, the Defendants were back to work on the next steps of their fraudulent scheme, by pushing forward with the Privatization negotiations in ways that favored reaching a deal with Vista.

32.    Qatalyst left logical buyers off its list of potential acquirers. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[6] The prior complaint in this Action alleged several categories of false statements about the deal process, such as representing the "go shop" as "customary," which have not been alleged as false and misleading in this complaint, given the Court's September 25, 2020, motion to dismiss order (ECF No. 52). The overall deficiency of the deal process remains relevant for understanding the overall context of Defendants' wrongful conduct.

████████████████████████████████████████████████████████
██████████

[8] A "Payments company" is one that earns its revenue by payment processing fees. Here, Stollmeyer is stating *his* preference as to what type of company he wants to work for—regardless of what is best for investors.

██████████████████████████████████████

██████████████████████████████████████

████████████████████

34.     More generally, Vista had a jump start on all other potential bidders—first, because it had long been in secret negotiations with Stollmeyer, but also due to unequal treatment throughout the negotiation process.  In late November, Mindbody responded to diligence requests from Vista by promptly populating a data room with over a thousand documents.  In contrast, the other potential bidders were not permitted to review Mindbody's documents until December 15, and were only given limited access even then—with four potential bidders only allowed to access 35 documents, another only allowed to access 36 documents; and yet another being denied access to review diligence documents at all.  With the exception of Vista, Mindbody did not provide financial projections or models to the potential bidders until December 17, 2018.

35.     Crucially, Qatalyst made clear to Defendant Stollmeyer and the Transaction Committee that any potential buyer would need four to five weeks of diligence before submitting a bid.  Yet, other potential bidders had **just three days** to review documents and conduct diligence before Vista made an offer to purchase Mindbody at $35.00 per share, on December 18, 2018.  Vista's offer letter stated that it had "completed substantially all business diligence," which was only possible due to its head-start.  The offer letter further made clear that Vista would not only be retaining management, but would also provide equity incentives through partnering with senior management, like Stollmeyer and White.

36.     Even after Vista made its first offer, Stollmeyer and Qatalyst continued to run interference with other bids.  On December 19, 2019, just four days after first being given access

13

to diligence materials, Qatalyst informed the other potential bidders, without reason, of the "competitive nature of the process, accelerated timeline, and the need for prompt indications of interest." Five of the seven bidders subsequently dropped out of the bidding process.

37.    On December 23, 2018 and before the two remaining potential bidders finished their due diligence, Qatalyst delivered its fairness opinion and the Board approved a Merger Agreement with Vista at $36.50 per share.

### D.    Defendants Pitched the Privatization to Investors and Solicited their Votes

38.    On December 24, 2018, Christmas Eve, Mindbody and Vista announced that management had agreed to a merger whereby the Company would be acquired by Vista for $36.50 per share. Mindbody touted the proposed Privatization by referencing the "*68% premium*" to the trading price on December 21, 2018, which it also called a "*significant premium*." However, touting this premium was misleading because Defendants continued to conceal that Mindbody's false 3Q18 Disclosures had artificially depressed the stock price.

39.    **Two days later Defendants filed a Form 8-K continuing to tout the "*significant premium*"** and boasting that the deal would be subject to a "customary 30-day 'go-shop' period," in which Mindbody would continue to attempt to find superior bids. However, this go-shop was too short, ran over the holidays, and included a highly restrictive "closed" term that required Mindbody to actually accept a superior offer (not merely receive one) within that short period. However, most egregiously, the go-shop was illusory because Stollmeyer and White disrupted the go-shop process. Instead of shopping the Company, they took long vacations where "cell service was spotty." In fact, White text messaged Stollmeyer to say: "**I assume that we will be declining any go shop management discussion until you return, correct?**"

14

40.     After the announcement of the Privatization, Defendants filed numerous proxies. All the while, Defendants were internally discussing the terrific 4Q18 results.

42.     The next day, January 5, 2019, Stollmeyer emailed senior management stating that 4Q18 results were expected to be $68.3 million, which were in his own words, **"a massive beat against the Street's consensus midpoint of $66M,"** and well above the false guidance range of $65-$67 million.

44.     On January 8, 2019, Vista was informed of the "strong" results. The next day, Defendants filed Mindbody's Preliminary Proxy, which continued to tout the *"premium"* as a basis for approving the Privatization.

15

45.    The Preliminary Proxy also failed to accurately describe the talks that had occurred at that point regarding the post-closing employment and incentives that would be given to Defendants White and Stollmeyer.  It stated that as of the execution of the merger agreement *"Vista and Mindbody had not engaged in any employment or retention-related discussions with regard to Mindbody management."*  In truth, as Mindbody would later disclose, such discussions clearly had occurred.  This was important, because it hid important details about Defendants' motives in the Privatization process from public investors.

46.    On January 18, 2019, all but one Board member received **"a presentation regarding . . . fourth quarter 2018 actuals."**

47.    Yet, on January 23, 2019, Defendants issued the Final Proxy, once again touting the *"premium,"* without disclosing the substantial guidance beat.

16



50.     No doubt, realizing that the path of least resistance would be simply to withhold the results, Defendants chose not to release the results, despite their recognition that it was the right thing to do.  But while the public was not shown the results, Vista was given that information.  On January 31, 2019, Mindbody's counsel wrote to Vista's counsel, stating that "Mindbody would prefer to do a pre-announcement rather than a full earnings release."  But no release was made.

51.     Instead of releasing these accurate results, Defendants continued to issue proxy materials touting the merger premium.  Defendants' failure to disclose their actual 4Q18 results constituted a material omission in light of their duty — imposed on directors of Delaware corporations — to disclose all material information to investors before the Merger.  Additionally, Defendants statements touting the merger premium as significant and other wise indicating the deal price was good, were materially misleading in light of the failure to disclose the actual 4Q18 results.

52.     Misled by Defendants fraudulent scheme, investors voted to approve the merger on February 14, 2019.  Even with Defendants deception, the Privatization only received the

17

support of 55% of the publicly traded shares.  The next day, on February 15, 2019, the

Privatization closed, completing Defendants fraudulent scheme, and costing investors hundreds

of millions of dollars in value.

## II.    JURISDICTION AND VENUE

53.    The claims alleged herein arise under the Securities Exchange Act of 1934 (the

"Exchange Act") and the rules promulgated thereunder.  Counts I-II asserted herein may be

referred to as "§ 10(b) Claims" and they arise under Section 10(b) of the Exchange Act (15

U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

Count III asserted herein arises pursuant to Section 14(a) of the Exchange Act (15 U.S.C. §

78n(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. §240.14a-9).  Count IV

asserted herein arises pursuant to Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) ("§

20(a)").

54.    Venue is proper in this district pursuant to Section 27 of the Exchange Act (15

U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged Exchange

Act violations or the effects of the violations have occurred in this judicial district.  Many of the

acts charged herein, including the preparation and/or dissemination of materially false and/or

misleading information, occurred in substantial part in this judicial district.  Mindbody transacts

business in this district, and the Company has an office located within this judicial district.

55.    This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

56.    In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ, a

national exchange within the United States.

### III.    PARTIES

#### A.    Plaintiffs

57.    Walleye Trading LLC is a sophisticated institutional investor who sold Mindbody Class A common stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged herein.  Walleye Trading LLC held Mindbody shares as of January 18, 2019, the record date for the shareholder meeting in which the Privatization was voted on.

58.    Walleye Opportunities Master Fund Ltd. is a sophisticated institutional investor who sold Mindbody Class A common stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged herein.  Walleye Opportunities Master Fund Ltd. held Mindbody shares as of January 18, 2019, the record date for the shareholder meeting in which the Privatization was voted on.

#### B.    Defendants

59.    Defendant Mindbody is a Delaware corporation headquartered in San Luis Obispo, California.  Mindbody is a rapidly growing software company that operates a cloud-based business management software and payments platform for small and medium-sized businesses in the wellness services industry.  Throughout the Class Period, the Company's Class A common stock was listed on the NASDAQ under the ticker symbol "MB."  The Company's Class B common stock was not publicly traded and was predominately held by insiders.  The Class B common stock had ten votes per share and was convertible, at the option of the holder of that share or upon certain conditions, into one share of Class A stock.  Additionally, under Mindbody's certificate of incorporation, the Class B shares were set to automatically convert into Class A shares in June, 2022—*i.e.*, on the 7th Anniversary of that certificate being filed with the Secretary of State of the State of Delaware in June of 2015.

19

60.     Defendant Richard L. Stollmeyer ("Stollmeyer") co-founded Mindbody in 2001, and has served as the Company's Chairman and CEO since 2004.  Stollmeyer was retained by Vista to continue leading Mindbody after the Privatization.

61.     Defendant Brett White ("White") has served as the Chief Financial Officer ("CFO") and Chief Operating Officer ("COO") of Mindbody since 2013.  White was retained by Vista to continue working as Mindbody's CFO and COO after the Privatization.

62.     Defendant Eric Liaw ("Liaw") has served on the Board since February 2014. Liaw is also a general partner of the venture capital firm, Institutional Venture Partners XIII, L.P. ("IVP"), and he served on the Board through nomination by IVP, which was a significant investor in Mindbody.  Liaw was also the Chairman of the transaction Committee and a member of the Audit Committee.

C.     **Additional Key Players**

63.     Vista Equity Partners ("Vista") is a private equity firm headquartered in San Francisco, California.  Vista markets itself as "exclusively invest[ing] in software, data, and technology-enabled organizations led by world-class management teams."

64.     Monti Saroya is a Principal at Vista, since joining the firm in 2008.  Saroya was Stollmeyer and Mindbody's primary contact at Vista.

65.     Qatalyst Partners LP ("Qatalyst") is a San Francisco technology investment bank that provides strategic and financial advice to clients participating in mergers, acquisitions, IPOs, and other transactions.  Qatalyst was engaged by Mindbody to provide financial advice in connection with the proposed Merger.  On December 23, 2018, Qatalyst rendered its fairness opinion of the Merger.

66.     Jeff Chang, an investment banker from Qatalyst, began at the company in 2011. Chang was Stollmeyer and Mindbody's primary contact at Qatalyst.  Chang had previously

20

assisted in several company sales to Vista, including Apptio's, Lithium Technologies, and Ping Identity.

67.     Institutional Venture Partners ("IVP") is a private equity firm out of California, which focuses on later-stage venture capital and growth equity investments.  IVP began investing in Mindbody in 2012, invested over $20 million in Mindbody prior to the Company's 2015 IPO, and nominated Liaw to the Board.  IVP invested through an entity called Institutional Venture Partners XIII, L.P.  This investment was made as part of a fixed-life investment fund, which seeks to exit its investments between three to five years.

## IV.    SUBSTANTIVE ALLEGATIONS[9]

### A.    Mindbody's Business

68.     Mindbody was founded in 2001 and quickly became a leader in the software-as-a-service industry.  Mindbody provides cloud-based business management software for companies in the wellness services industry, such as salons, spas, gyms, and workout studios.

69.     In doing so, Mindbody's integrated software and payment platforms assist wellness business owners to run, market, and build their businesses, while engaging consumers by aggregating available classes and appointments, and enabling rapid discovery, booking, and payment.  In effect, the platform facilitates a two-sided marketplace: the wellness service providers and the customers that the providers service.  Consumers primarily interact with Mindbody through a mobile phone application.

70.     Mindbody serves over 67,000 fitness, beauty and wellness businesses, reaching approximately 35 million customers located in over 130 countries and territories.  Mindbody's clients vary from local businesses to global brands, such as PURE Yoga, OrangeTheory Fitness,

---

[9] Unless otherwise noted all **bold** text has been added for emphasis and all text in ***bold and italics*** signifies false statements.

and drybar.  Mindbody also engages with technology partners that provide innovative wellness programming, such as ClassPass.

71.     Mindbody's revenues come from three segments: (1) Subscription and Services revenue, which is "generated primarily from sales of subscriptions to the Company's cloud-based business management software for the fitness, beauty and wellness services industries"; (2) Payments revenue, which is generated "from revenue share arrangements with third-party payment processors on transactions between its customers who utilize the Company's payments platform and their consumers"; and (3) Products and Other revenue, which includes "various point-of-sale system products, heart-rate monitors, and physical gift cards to its customers."  In the last 10-Q filed by Mindbody, on November 8, 2018, Mindbody reported that in the three months ended September 30, Subscription and Services represented approximately 64% of revenues, Payments, 35%, and Product and Other, 1%.

72.     Throughout the Company's history, Mindbody has consistently, and successfully, invested in its technology, with the release of Mindbody Online in 2005, Mindbody Finder in 2009, and both Mindbody Express and Mindbody Connect in 2013.

73.     Mindbody also has a history of successfully acquiring Companies as it expanded. For example, in February 2015, Mindbody acquired Fitness Mobile Apps, which provides application software services and development.  In September 2016, Mindbody bought HealCode, which develops online tools for the fitness and wellness sector, servicing customer engagement and marketing.  In March 2017, Mindbody announced that it had acquired Lymber Wellness, which specialized in yield management solutions for class and appointment-based

22

businesses.  As an indication of the acquisitions' success, Stollmeyer called 2017 the "most successful year in Mindbody history."[10]

**B.      Mindbody's 2018 Growth was Marked by Two Significant Acquisitions**

74.      In early 2018, Mindbody undertook two important and successful acquisitions. These acquisitions are particularly relevant to this Action, because Defendants would later mislead investors about the value of the Company by falsely stating that these acquisitions were driving performance problems.

**(1)      The FitMetrix Acquisition**

75.      On February 19, 2018, the Company acquired FitMetrix, a creator of performance tracking solutions designed to help wellness businesses increase retention, and provide wellness seekers with a more engaging and interactive fitness experience.  FitMetrix's technology is integrated with workout equipment so that it can provide real-time feedback to consumers about their fitness activity and goals.  The FitMetrix deal was announced on February 20, 2018. Mindbody paid $15.5 million to buy the privately owned company.

76.      FitMetrix had been one of Mindbody's platform partners since 2015.  The partnership enabled Mindbody's clients (*e.g.*, gyms) to help consumers track their fitness performance across multiple locations.  It allowed businesses to track and respond to data about their customers, while allowing customers to track their own performance.

77.      The press release announcing the deal stated that through FitMetrix "[s]tudios can track, rank, display and instantly reward their clients based on real-time results and create customized workouts using these metrics."  This product allowed consumers to expect "highly

---

[10] Even after the Privatization, Mindbody continued to demonstrate its appetite for acquisitions by purchasing Bowtie.ai, an artificial intelligence driven company that provides revenue services for businesses, in May 2019.

interactive and personalized workouts that, through tracking, help them attain a better understanding of their personal health."  This was important because, as Mindbody also stated, "[i]nteractive engagement is the future of fitness."

### (2)    The Booker Acquisition

78.    On March 13, 2018, the Company acquired Booker for $150 million.  Booker was a leading cloud-based business management platform for salons and spas.  According to Mindbody's press release, the acquisition added "approximately 10,000 salons and spas to the Mindbody marketplace, combining Mindbody's leadership in boutique fitness studios and its vast consumer network with Booker's leadership in high-value salons and spas."  Defendant Stollmeyer stated that Mindbody's intention with the acquisition was "to rapidly expand our wellness and beauty platform by delivering more value to customers, consumers and partners alike."

79.    Prior to being acquired, Booker operated as a competitor to Mindbody, by providing a platform assisting wellness businesses (in particular, salons and spas), across many aspects of their operations, including by assisting with booking clients, staff management, and point of sale.

80.    One of Booker's core products was an automation software marketing tool called "Frederick."  Frederick adds additional software to automate certain aspects of marketing, through analyzing historical client data.  For example, Frederick can analyze prior transactions to help businesses understand their true capacity, so that they can more effectively determine pricing and marketing strategies.  Stollmeyer stated that "By joining forces, Mindbody and Booker will be able to expand the capabilities of our products to deliver more value to our customers, engage with more consumers in our marketplace and expand our leadership in wellness and beauty."

24

C.      **The Acquisitions and Related Integrations were Touted as Successes**

81.     Following the acquisitions of FitMetrix and Booker, Defendants assured the market it was successfully integrating the newly acquired companies and that Mindbody's overall outlook was extremely strong.

(1)      **1Q18 Earnings Call**

82.     On May 8, 2018, Mindbody held the earnings call for its 1Q18 results, which was the first earnings call after the FitMetrix and Booker acquisitions.  During the earning call, Defendant Stollmeyer described the acquisitions as "pivotal" and reaffirmed that the acquisitions would "add substantial capabilities to [Mindbody's] platform."

83.     Defendant Stollmeyer also stated that the Company is "**significantly investing both in Booker and FitMetrix to set the stage for a much greater growth to come**."  In the same earnings call, Defendant Stollmeyer further emphasized his focus of successfully integrating the two acquisitions, calling it a "nontrivial matter."  He assured investors that "in the months ahead" they would "deeply integrate Frederick into Mindbody" and that Mindbody would "invest over the next few quarters to get these integrations right, to focus our teams and prepare ourselves for really magnificent out-years."[11]  In fact, Stollmeyer stated that the Company had "**already blended Booker revenue streams and [Mindbody] revenue streams**," and was "creating a beauty and wellness team that will sell both Booker and [Mindbody]."

84.     Mindbody also created an "integration management office" which had a "deep amount of leadership focus."  Stollmeyer explained that "**back-end integration and technology will begin almost immediately**," while the Company will also have the "**opportunity to integrate mobile app experiences on the front end**."  He also described a "call to action to get

_____

[11] "Out-year" is a term for the year beyond a current fiscal year.

fitness studios integrated on to our payments rails," so that Mindbody could earn lucrative payment processing revenue from those studios.  Stollmeyer concluded his remarks, during the earnings call, by commending the Mindbody team for the "exceptional effort" they were "putting forth to **successfully integrate** and accelerate Booker and FitMetrix under the Mindbody platform."

85.    Analysts spoke highly of Mindbody and its recent acquisitions.  For example, Craig-Hallum stated that "[w]e like the Booker acquisition, a lot" and the firm "endorse[d]" the management's decision to "fully integrate the Booker business in with the core."  Jefferies added that "we agree that integration plans/investments make strategic sense and should strengthen MB as the leading platform for fitness, wellness & beauty industries."  J.P. Morgan further stated that "we see [Mindbody] as a very well-established [software] provider that can capitalize on a strong competitive position to drive long-term growth and cash flow."

### (2)    2Q18 Earnings Call

86.    On July 31, 2018, during the earnings call for 2Q18, Defendants continued to describe the Company's strong prospects and success with integrating FitMetrix and Booker.

87.    Defendant Stollmeyer stated that "Q2 marks our first quarter post Booker acquisition, and we are pleased to **report solid progress on our integration**, strong early adoption of Frederick and FitMetrix, continued success in target market subscriber growth and rapid expansion of our consumer brand."  He went on to say that "[r]apid integration of Booker and FitMetrix is an important priority this year, and the Mindbody team made **substantial progress in their first 100 days.**"

88.    Defendant Stollmeyer stated that the Company was "extremely pleased" with how FitMetrix was doing "just in the first few months," and stated it had "strong quarter-on-quarter

26

growth from Q1 to Q2, and of course, fantastic growth year-on-year." He said that the integration of Frederick was "**also ramping up beautifully**."

89.     In addition to the fact that "substantial progress" had already been achieved, Defendant Stollmeyer added that while the "integration of Booker, Frederick and FitMetrix" is a "massive project that touches every aspect of our business," it was being "**front-load[ed].**" In other words, while these integrations were substantial projects, the heavy lifting to complete those projects was apparently being completed early in the overall integration process. He further stated that the "**objective is to enter 2019 a fully integrated company** with the most capable go-to-market and most powerful suite of products of anyone in the industry, in fitness, beauty or wellness." With regards to the integration, Defendant Stollmeyer said he was "**feeling very confident where we sit right now and the path ahead**."

90.     Defendant Stollmeyer described an example of how the integrated Company was already achieving positive results:

> [W]e've taken the best of the salon, spa and integrative health team from Mindbody and the Booker team and combined them, and we're going to be growing that team into parity with our fitness team in the quarters ahead. So their focus -- they can sell either Booker or Mindbody. . . . [T]his team can sell both products, and what we're doing right now with Booker is we're greatly strengthening the product.

91.     While Mindbody did recognize, as anyone would expect, that there were "near term" costs and frictions associated with the integration, Defendant Stollmeyer provided no basis to believe that the integration was facing unplanned or unanticipated issues. He also assured investors that they were already taking a "cautious" approach to setting expectations "for the balance of the year," implying that, if anything, their overwhelmingly positive rhetoric was actually a conservative assessment of how well things were truly going.

27

92.     Defendant White provided similar assurances that the integration efforts were on track.  He stated that the Company was on track to meet its 2019 financial goals and that he had "confidence for the second half of the year," because Mindbody had already done "**a lot of heavy lifting on the integration.**"  More specifically, he stated:

> [The] management teams and the sales teams are clear on the go-to-market going forward.  We have most of the go-to-market pieces in place.  We've got the sales, the new sales headcount ramping.  We've got, of course, July to reference for our sales velocity.  So **we're confident in the guidance that we've given**, and the business is doing well.

93.     While analysts were cautious in their assessment of the Company's integration efforts, they also commended the Company's plans.  For example, on July 31, 2018, Jefferies stated that the "deal [for Booker] looks strategically sound with potential to significantly raise ARPS for Booker customers over time, and core MB fitness reps are performing well."  Jefferies added that "overall progress [on the integration] has been positive since closing the deal," and any "friction from integrating Booker [will] improve over time."  J.P. Morgan touted the upcoming release of Payments 2.0, stating that it is "very attractive as it has the potential to improve the economics in the core domestic markets as the company looks to upsell into the Booker customer base."  On September 9, 2018, Jefferies also stated that Mindbody's acquisition of "Booker is early in reaching scale."

### (3)    2018 Investor Day

94.     On September 18, 2018, after the close of trading, Mindbody held its annual Investor Day event.  During the event, John Davi, Senior Vice President of Product Management, provided another impressively positive update on the integration:

> **We've already worked to integrate Frederick functionality into Mindbody and Booker**.  In Booker, on July 1, we integrated the first aspect, a teaser of Frederick functionality in curating and sending highly customized e-mails to your consumer base.  We'll do the same with Mindbody in the coming months, an expansion upon our marketing effort.

28

*   *   *

**We also integrated Frederick basic functionality in the Accelerate tier**, along with 2-way SMS to make sure that the basics of messaging and communicating with the business were part of that Accelerate product.

95.    Defendant Stollmeyer added that Frederick will get "more and more blended in" with the Mindbody app, web, and Promote system.  Chief Strategy Officer, Josh McCarter provided additional assurances of the integration with regards to Frederick – "[b]ut ultimately, anything that we own is going to have a better integration and a better experience within Mindbody."

96.    Booker, in fact, had taken a huge step forward under Mindbody, as it had begun to sell a Booker-branded mobile app, which was "a highly demanded piece of functionality from the Booker customer base."  Mr. Davi added that "We think integrating that and delivering that to consumers through a branded mobile app experience, through inventory integration in Mindbody.io and the Mindbody app will help drive consumers' expectation of online booking functionality and just being a customer in the way that you book salon and spa services."

97.    Josh McCarter, Chief Strategy Officer, went on to say that the "**Integration's going well.  We've shown that we know how to do that at scale and that we can bring on teams and integrate them in meaningful ways.**"

98.    During the Presentation, Defendant Stollmeyer presented slides boasting of the successful integration of Booker and FitMetrix.  Most notably, he presented a full-page slide that simply read "**The Integration is Working.**"

99.    The presentation also included a slide titled "M&A Timeline," with the subtitle "Track Record of Successful Acquisitions."  This slide listed both FitMetrix and Booker, firmly showing that they were already being judged as successful.

29

100.    Stollmeyer recognized that although there is a lot of work to do when acquiring a significant competitor like Booker, as he did in the last earnings call, he "promised," that the Company is "going to frontload that work in '18, so that we can enter the New Year in '19, first of all, with strong growth and secondly, with a positioning ready in case opportunities come."

101.    Stollmeyer went on to explain how the Company was well positioned within the wellness industry in light of the acquisitions.  Specifically, he stated:

**Right now, our acquisitions position us favorably for this, in fact, better than anyone else in the world.  By acquiring Booker, Frederick, and FitMetrix in the last - well, in the first half of the year, we now are positioned to grow our marketplace more quickly and to accelerate in all of our key markets.  We're going to dive into our product innovations.**

102.    The customer panel also expressed that the integration was going well.  For example, Aaron Stead, VP and GM of Salon, Spa & IH, passionately stated that:

From the very beginning of our interactions in the process of merging the 2 companies, Booker and Mindbody, I enjoyed every interaction.  The men and women of Mindbody are so passionate to the cause.  And we saw such a natural synergy between our core values at Booker and our company purpose at Booker. It's a very natural, "all part of the same family" interaction.  And from the very beginning, that was a yes for me.

103.    Mindbody also expressed optimism about integrating Booker onto Payments 2.0, which was the Company's new payments platform that streamlines the process for new customers, all in one screen.  McCarter stated that the Company is "really excited about the Payments 2.0 platform because we do believe it's going to bring additional opportunities to monetize payments on the Booker platform."

104.    Following the Investor Day event, analysts were pleased with Mindbody.  On September 18, 2018, J.P. Morgan gave Mindbody an "Overweight" rating with a price target of $48.00 per share.  Specifically, J.P. Morgan stated that "[l]ooking at the acquisition integration timeline we see payment 2.0 and inventory integration as two major milestones coming down the

30

pike in 2019." On September 19, 2018, both Jefferies and Roth Capital Partners gave Mindbody a "Buy" rating and a price target of $48.00 per share. Jefferies stated that the "**Booker integration is progressing well**" and added that Mindbody is "making the right investments that will extend & solidify its lead," including investing into the "Booker integration." Roth noted that "what was glaringly obvious is that integration of marketing and customer retention should be the biggest catalyst of [average revenue per subscriber] expansion in 2019."

### D.      The Corrupt Origins of the Privatization

105.    Defendant Stollmeyer began to secretly engage in discussions about a possible sale of Mindbody to Vista, without the knowledge of Mindbody's Board.

106.    In fact, Defendant Stollmeyer had long been eyeing a sale to Vista. He was told by Monti Saroya, Vista Principal, that Vista was interested in purchasing Mindbody as early as 2015, prior to the Company's IPO in June. Stollmeyer would later testify that "[Vista] said they would buy us then, we didn't have to go public." Stollmeyer indeed stated that the "Vista Team ha[d] been closely following the [Mindbody] story for **many years**." In 2017, Defendant Stollmeyer and Vista again discussed the potential sale of Mindbody to Vista but talks soon ended because the stock "was then trading at an all-time high."

107.    These discussions picked back up in August 2018, when Qatalyst "prompted" Stollmeyer and Vista to begin negotiations. Notably, Qatalyst was badly conflicted from the start of this process. Its relationships with and work for Vista were sprawling, and included the following:

(a)      Qatalyst was co-founded by a former Vista employee, Brian Cayne, meaning that the ties between the two companies literally date back to Qatalyst's formation.

31

(b)     The brother of another Qatalyst's founder and its executive chairman, Frank Quattrone, was the co-founder of CVent, a company that was sold to Vista in late November of 2016.

(c)     Qatalyst (and in particular, Jeff Chang) worked for Vista on its investment in and "partnership" with iCIMS Inc.  The deal was first announced in August 2018 and it closed on September 2018.  Qatalyst's fee was reported to be $7 million.  This was the only relationship with Vista that Qatalyst disclosed in its written fairness opinion, and in that letter it referred to the relationship as "material."  Remarkably this means the same Qatalyst banker that was working for Mindbody was contemporaneously working on a material matter for Vista.

(d)     Qatalyst (and in particular, Jeff Chang) advised Apptio, Inc., in Vista's acquisition of the Company.  Its work on that transaction began in September 2018 and the transaction closed in January 2019 for $1.94 billion.  Qatalyst received a fee for its work on this transaction, though the amount of that fee was not publicly disclosed.

(e)     Qatalyst (and in particular, Jeff Chang) advised on the acquisition of Lithium Technologies, Inc. by Vista.  The transaction was announced in May 2017.  The terms of the deal were not announced publicly and it is unknown whether Qatalyst worked for Lithium or for Vista.

(f)     Qatalyst advised on the acquisition of Spredfast Inc. by Vista.  The transaction was announced September 4, 2018.  The terms of the deal were not announced publicly and it is unknown whether Qatalyst worked for Spredfast or for Vista.

(g)     Qatalyst (and in particular, Jeff Chang) advised on the acquisition of Ping Identity.  The transaction was announced on June 1, 2016, though it closed sometime thereafter.

The terms of the deal were not announced publicly and it is unknown whether Qatalyst worked for Ping Identity or for Vista.

108.    On August 7, 2018, Defendant Stollmeyer met with Chang, where Defendant Stollmeyer informed Chang that he was interested in selling Mindbody to a private equity fund **if** they would agree to employ Defendant Stollmeyer and his management team in the post-merger entity.  Thus, from even this stage in the negotiation, Defendant Stollmeyer was putting his personal interests ahead of the interests of stockholders, in flagrant violation of his duties— management's personal interest are not allowed to infect the process leading up to the sale of a public company.   Just hours after meeting with Defendant Stollmeyer, Chang emailed both Saroya and Defendant Stollmeyer discussing the recent meeting.  Chang also wrote: "I know you all have met before but thought a direct thread might be helpful to get you, Brian [Sheth of Vista], and Rick [Stollmeyer] together some time in the future."  (*See* Exhibit A).

109.    On August 23, 2018, Defendant Stollmeyer met with Saroya and Vista Vice President, Nicolas Stahl, at Mindbody to discuss Mindbody's business and, more specifically, "Rick's goals," referring of course to Defendant  Stollmeyer's self-interested goals.

110.    Although he was not yet part of Vista's "family" of companies, Defendant Stollmeyer was invited to attend Vista's October 8-9, 2018 CXO Summit in Carlsbad, California. At Vista's CXO Summit, it became clear that Defendant Stollmeyer was infatuated with Vista and the prospect of a merger.  He met with both Saroya and Vista founder, Chairman, and CEO Robert Smith.  Defendant Stollmeyer proceeded to text Saroya that the "[p]resentations are very impressive."  He also texted Mike Mansbach, President of Mindbody, that Vista's presentation was "mind blowing" and "inspiring," (*See* Exhibit B) and "[o]n top of it all.  I actually like them. From Robert Smith on down.  You would too." (*See* Exhibit C).

111. Defendant Stollmeyer specifically sought a sale of Mindbody to Vista because it would allow him to continue leading Mindbody, while reaping direct financial benefits, and escape the criticism of shareholders and analysts, or as he later stated, it would "**free[] [him] from the shackles of public market investors.**"

112. Shortly after the conference, Vista stated internally that they "ha[d] built a strong relationship with the CEO [Stollmeyer]."

113. Following the conference, Defendant Stollmeyer took the next steps in seeking a merger with Vista, meeting with two CEOs of Vista's portfolio companies, Reggie Aggarwal of Cvent, Inc., and Andre Durand of Ping Identity.  Defendant Stollmeyer sought to learn more about Vista's reputation of retaining and compensating the target companies' management. Specifically, on October 11, 2018, Chang wrote to Defendant Stollmeyer informing him that he had reached out to two former clients of Chang and Qatalyst's, including the CEO of Ping, who still works at the company since it was acquired by Vista in 2016.  Chang believed this would be "beneficial," and "serve a dual purpose," given Defendant Stollmeyer's intent to continue to work at Mindbody after the Company's sale. Chang added that he had "a few other folks I am happy to introduce you to as well in the event you would like further 'references.'"

114. In the same email to Defendant Stollmeyer, Chang stated that:

[W]ith regard to our discussion re: Vista: please let me know if and when in the coming weeks/months they ask you for more information that is **\*not\*** in the public domain.  At that point I would strongly advise that we get together to discuss next steps because it is at that juncture they will use their ability to move quickly to their advantage.

115. By October 17, 2018, it was clear that the discussions between Mindbody and Vista had become a negotiation when, significantly, Defendant Stollmeyer emailed only Defendant White, Mansbach, and Kimberly Lytikainen, General Counsel of Mindbody, that

34

"**conversation [with Vista] is progressing rapidly.**"  Defendant Stollmeyer went on to say that he:

> **[D]id in fact receive a direct expression of interest from Vista yesterday (via Monti Saroyan) [sic], although I have not conveyed that to Jeff Chang or anyone else.  Vista is very enthused about us, would pay a substantial premium to [Mindbody's] recent trading range and see the stock correction as [an] opportunity.  They have no idea what we are about to report or guide.**

(*See* Exhibit D).

116.    Given that Mindbody's 30-day volume weighted moving average prior to Vista's October 16, 2018 indication of interest was $38.46 and given that it traded as high as $41.25 per share in the first half of October, Vista's offer of a "substantial premium" meant that, at an absolute minimum, it was prepared to pay at least $41.25 per share.  Average premiums in M&A transactions typically exceed 20%,[12] meaning that a "substantial premium," would imply a **deal price of at least $49.50 per share.**

117.    In the October 17, 2018 email, Defendant Stollmeyer further stated that "**Jeff and Qatalyst would be our best choice to advise as we explore the possibility of taking [Mindbody] private in 2019**."  In the same email, Defendant Stollmeyer went on to say that "a sale to PE or synergistic strategic may be our best path forward," because it "**would not be an automatic 'exit' for any of us or our principles**.  Rather, we would lean into an acquirer who sees our current capabilities, gets our huge potential, and has resources to accelerate our results."  Outrageously, regardless of what might be best for Mindbody's shareholders, he stated: "**\*\*I would not support the sale of [Mindbody] at this time in any other circumstance.\*\***"  (Asterisks for emphasis in original email).  (*See* Exhibit D).

---

[12] Jens Kengelbach & Alexander Roos, Boston Consulting Grp., *Riding the Next Wave in M&A* (June 7, 2011) (finding an average deal premium of 26% between 1990 and 2010 in a sample of approximately 26,000 transactions); FactSet, *US M&A News and Trends* (January 2018) (reporting median deal premiums in excess of 20% throughout 2016 and 2017).

118.    It was Defendant Stollmeyer's intention to keep these negotiations and plans for Privatization secret from the rest of the Board and the public shareholders.  In the email, Defendant Stollmeyer explicitly informed Defendant White, Mansbach, and General Counsel Lytikainen that they should not discuss the sale of Mindbody with any members of the Board:

> I plan to socialize this possibility to the Board Directors individually over the next week.  **Please do not hint or otherwise discuss with them or anyone else until I have a chance to do so and give you the green light**.

Defendant White responded the next day, October 18, 2018, that his "**lips are sealed**."  (*Id*.)

### E.    The Board is Finally Informed of the Negotiations

119.    The Board did not meet to discuss the possibility of going private until October 26, 2018, when it convened a telephonic meeting "in response . . . to Vista's initial inquiry to learn more about [Mindbody's] business," to discuss whether the Company should "engage a financial advisor to" evaluate Mindbody's "market situation and potential strategic opportunities" and whether to create a strategic transaction committee.

120.    On October 28, 2018, Defendant Stollmeyer sent talking points in support of the sale of Mindbody to directors, Defendant Liaw and Gail Goodman, acknowledging that the integration is "proceeding well," that the Company is not in need of capital, and that he wished to move "out of the public eye."  Specifically, his talking points included:

- We believe more than ever that our [total addressable market] is enormous and is ripe for the taking.  That's why we went out and bought Booker, Frederick and FitMetrix in 2018.

- **Integration of these acquisitions is complex but proceeding well.**  Full realization of the synergies will take 1-2 years.

- While **we actually don't need capital to invest** (we have 5 years on our debt), **we would like to be able to move more quickly out of the public eye and have a partner to work with that shares the vision**.

36

121.    Defendant Liaw was on board with the sale from the get-go, wanting to liquidate IVP's position in Mindbody.  In offering advice to Defendant Stollmeyer on how to best position the Company for sale, he responded that "**you can throw the public investors under the bus and complain about how frustrating it is that they only care about things every 90 days**." Defendant Stollmeyer replied that Defendant Liaw's "**suggested approach . . . makes sense**" and that he would tell prospective buyers that "**[w]e have never been better positioned to realize our vision**."

122.    Defendant Liaw emailed Defendant Stollmeyer and Board members Goodman, and Cunningham to form an "ad hoc strategy committee," ostensibly to review potential transactions.  The Committee was led by Defendant Liaw, who assumed the position of Chairman of the Committee notwithstanding IVP's unique interests.  Mindbody's proxy would later state that the Committee was formed on October 30, 2018, by the Board—which seems to misstate the true origins of the committee, and understate Defendant Liaw's central role, not just as head of the Committee, but also as its founder.

**F.    Defendants Sandbagged Mindbody in the 3Q18 Earnings Call**

123.    On November 6, 2018, after the close of trading, Mindbody released its 3Q18 results and held an earnings call about its performance (*i.e.*, the "3Q18 Disclosures").  The Defendants used the 3Q18 Disclosures as an opportunity to manipulate Mindbody's share price downward, in order to set the stage for Vista to make a low-ball offer, which would look appealing compared to Mindbody's artificially depressed share price.

**(1)    The Content of Mindbody's 3Q18 Earnings Call**

124.    Mindbody announced that in 3Q18 it had earned $63.8 million in revenue, which was squarely within the revenue guidance of $63-$65 million the Company had given the prior quarter.  In 3Q18 they had also given full year guidance of $246-$250 million.  Investors could

therefore calculate 4Q18 guidance by subtracting the full year guidance of $246-$250 million, from the actual revenue in the first three quarters of $179.2 million.  This calculation meant that 4Q18 was guided at $66.8-$70.8 million.  However, the Company shocked the market by adjusting this guidance downward to a range of $65-$67 million.

125.    Immediately after disclosing this reduced guidance, Mindbody's 8-K stated that this update "*reflect[ed] the acquisition of FitMetrix and Booker*."  Throughout the 3Q18 Disclosures, Mindbody falsely blamed the supposed decrease in 4Q18 expectations on the integration of these acquisitions.  In the press release for Mindbody's 3Q18 results, Defendant Stollmeyer stated that "*recent acquisitions have introduced greater operational challenges than expected in the back half of the year*."

126.    In the 3Q18 earnings call, Defendant Stollmeyer purported to provide some clarity on the situation, stating that:

> [W]e have faced significant operating challenges in the past 2 quarters.  The combined effects of our recent acquisitions, go-to-market reorganization and expanding consumer and partner initiatives have made Mindbody a considerably more complex business to operate than it was just 6 months ago, and we did not meet our own growth expectations in the second and third quarters.  *We expect this to continue lagging a bit in Q4 as we communicated on our last call -- or continue to lag the expectations we communicated in our last call.*

127.    While vague in many respects—this statement does provide some specific false information about the supposed issues with the integration causing the decreased guidance were a continuation of issues from the past two quarters and caused by not meeting "growth expectations."

128.    During the Q&A portion of the earnings call, Defendant White similarly described certain costs the Company was facing as it grew and completed the integrations of Booker and FitMetrix—but firmly stated "it's kind of a steady course and speed on the expense side."  In other words, Defendant White was not blaming the downward guidance on rising or

higher than previously expected expenses.  Rather, he said the Company was "*pulling back on the revenue*" and that it had "*tapped the brakes on the revenue a little bit here in Q4.*"  Thus, Defendant White clarified—falsely—that the reduction in expected performance was the result of slower expectations for revenue, not some other issue.

### (2)    The Reaction to Mindbody's 3Q18 Earnings Call

129.    Following the negative 3Q18 Disclosures, Mindbody stock fell $6.45 from its November 6, 2018 closing price of $32.63, to close at $26.18 on November 7, 2018, a decline of approximately 20%.

130.    Unsurprisingly, analysts were quick to voice their contempt at the abrupt change in the Company's outlook.  For example, on November 7, 2018, JP Morgan stated that the integration issues were "much bigger than [they had] anticipated at the time of the deal."  They added that it will now "[m]ost likely . . . take a couple of quarters for changes and new sales hiring to meaningfully contribute."  Similarly, Jefferies noted that the "Market disappointment is understandable after: 1) unclear signals after Booker acquis. was first announced; 2) $1M lower FY18 rev guide after Q2; and 3) low Q4 rev guide after Q3."  In addition, analysts at Roth Capital Partners added that the 4Q guidance was underwhelming and that the "Booker integration, especially with Salon and Spa conversions, remains challenged."  Roth also stated that they "are disappointed that integration of Booker is taking longer than expected."  UBS stated that they are "worried that gains in Salon & Spa may take longer than we initially thought as Mindbody struggles with the integration."

131.    Following the release of the 4Q18 guidance, the analyst consensus on Mindbody's performance was set at essentially the mid-point.  Prior to the guidance, analyst consensus for revenue was at $68.1 million – $0.7 million below the midpoint of Mindbody's $66.8 to $70.8

million guidance range.  After the downward guidance, analyst consensus was reduced to $66.1 million, which was essentially the midpoint of the revised $65-$67 million guidance range.

### (3)    Defendants Knew the 4Q18 Guidance Was Misleading

132.    The issuance of lowered guidance prior to the announcement of the negotiations with Vista was part of a manipulative scheme or device employed by Defendants to achieve their wrongful goals.  Doing so, was intended to, and in fact did, lower Mindbody's stock price, to pave the way for the Privatization.

133.    Defendant Stollmeyer obviously knew that the lowered market price could be used to push for a deal with Vista.  His October 17, 2018, email to Defendant White, Mansbach, and General Counsel Lytikainen stated that Vista had seen a prior dip in Mindbody's stock price as an "opportunity" and then in the very next sentence schemed: "**They have no idea what we are about to report or guide**."  From this, it is clear that Defendant Stollmeyer himself saw the downward guidance as connected to the offer from Vista.

134.    The history of Mindbody's internal forecasts and related discussions provides decisive evidence that the guidance was false and misleading, and that Defendants omitted to disclose information necessary to make that information not misleading.  Prior to, at the time of, and after issuing the 4Q18 guidance, Mindbody's actual expectations exceeded even the top of the publicly stated guidance range.

135.    On October 17, 2018, Defendant White asked Senior Director of Investor Relations Nicole Gunderson to see if she had "a creative way to guide 2019" on the November 6, 2018 earnings call.  Gunderson replied that even though the Company would begin to realize the value of its new Payments 2.0 platform—which would be expected to have a dramatically positive impact on performance—**Stollmeyer** "**doesn't want to talk [about] payments**," **and wanted to guide below the Wall Street expectations by "throwing Booker under the bus.**"

40



139.    On November 3, 2018, just three days before the earnings call, ▮▮▮▮▮▮ text messaged Mindbody's senior finance manager ▮▮▮▮▮▮ stating:

> The philosophy is to forecast for the quarter not the month.  We use the first month to identify if there is anything material that would affect the quarter.  We minimally beat in October – that tells me **we are on track to hit our forecast**. . . .  The question is – did the assumptions we saw in month 1 cause us to think our assumptions for month 2 and 3 need to be revised – **I do not know of anything in the flash[14] [revenue report] that would materially change our assumptions for the preceding months.**  (*See* Exhibit 5).

---

[13] Exhibits marked A-K to this Complaint were previously filed in support of the Amended Complaint, at ECF Nos. 22-1 through 22-11.  Exhibits marked 1 - 21 to this Complaint are new exhibits, recently obtained through discovery, and are being filed simultaneously herewith.  In some instances images within those exhibits are in low resolution, as that is how they were produced.

[14] A "flash" revenue report is an accounting term that describes a summary of the key operational and financial outcomes of a business.

41



142.    On November 5, 2018, Defendant Stollmeyer revised both the Company's November 6, 2018, press release and the 3Q18 earnings call script to focus less on the positives from Payments and more on the supposed challenges faced by the acquisitions.  Suspiciously, Defendant Stollmeyer waited until the night before the earnings call to convene the Audit Committee (which includes Defendant Liaw), Defendant White, Mansbach, and Lytikainen, "to review our latest Q4 forecasts, and align[] around a **substantial guide down for the quarter**." (*See* Exhibit E.)  It was highly unusual to not include the Audit Committee earlier, given the substantial reduction to guidance.



144.    The fact that the downward guidance was intentionally made to decrease the share price so that Vista's offer would have the appearance of a "premium" is further confirmed by Defendant Stollmeyer's admission that he expected, and was not bothered by, the negative price reaction: Notwithstanding the fact that the share price fell approximately **20%**, Defendant Stollmeyer text messaged Qatalyst's Chang on the same day as the 3Q18 earnings call, saying **"We're not surprised by the after-market reaction.  I'm fine."**

145.    On November 7, 2018, Defendant Stollmeyer explained to Mindbody's newly-hired Chief Technology Officer: that **"We are resetting street expectations to position ourselves up for future beat and raises.  We have a strong year of growth planned in 2019."** At this time the proposed Vista acquisition was still secret.



147.    On January 8, 2019, Defendant White emailed Vista that Preliminary 4Q18 revenue came in at $68.3 million, "about $0.3m above forecast," indicating that internal forecasts were still set at $68 million at that time.  (*See* Exhibit J).

148.    Additionally, statements from confidential witnesses strongly demonstrate that the downward guidance and associated explanation was inconsistent with the true situation Mindbody was facing, and inconsistent with the Company's internal projections.

149.    CW-2[15] worked as a Regional Sales Manager for Mindbody from September 2018 until late 2019, and prior to that had worked for Mindbody as a Sales Specialist since early 2017. CW-2's role included oversight of a sales team of twelve that was responsible for a substantial aspect of the Booker sales vertical (across all regions).  It was CW-2's impression that the integration of Booker had been going well throughout 2018.  CW-2 explained that Booker performed very well during his tenure at Mindbody.  CW-2 further explained that sales quotas

---

[15] A prior complaint in this action relied upon another confidential witness who was referred to as CW-1. ECF No. 22. For consistency, this Second Amended Compliant retains the numbering used to refer to CW-2 and CW-3, despite the removal of CW-1.  The previous allegations attributed to CW-1 were merely removed due to overall changes to the pleadings, and do not in any way imply that the prior allegations were not reasonably pled.

for Booker were increased each quarter from 3Q18 until 2Q19 and these quotas were met each time.  CW-2 added that the 3Q18 guidance "was a surprise" to him because sales goals were consistently being met.

150.   Notably, Defendants had lowered *revenue* guidance and attributed to downward guidance to its acquisitions.  The Booker acquisition was ten times bigger than the FitMetrix acquisition.  Defendants also described the cause of the downward guidance as a continuation of issues from the prior two quarters.  However, according to CW-2, Mindbody had raised and met its sales goals for Booker during 3Q18 and 4Q18.

151.   CW-3 worked for Mindbody as a key member of its finance department.  He started at Mindbody prior to 2018 and left during 3Q18.  According to CW-3, he participated in FP&A team meetings every Thursday, and another weekly meeting headed by Defendant  White and attended by the FP&A and accounting teams.  CW-3 reiterated that any material drop in sales forecasting would have been discussed with him because he was part of the FP&A team.  Though CW-3 was not part of all financial discussions, CW-3 was part of the discussion that rolled up to his FP&A team meetings, where any material change in forecasting would have been discussed.

152.   CW-3 recalled that "3rd quarter [2018] forecasted very solid" and was "on track" for Mindbody when he left the Company.  CW-3 stated that there was also "nothing to suggest a poor 4th quarter" at the end of his tenure.  CW-3 did not hear concerns about negative guidance being discussed for 3Q2018 and 4Q2018, nor did he hear about a drop in sales forecasts when he left.  CW-3 also stated that there was "little tolerance for missing forecasts," and that he would be surprised if the Company was caught off guard by a drop in sales, due to Mindbody's focus

44

on monitoring sales, revenues, and expenses, adding that there were approximately 10-12 analysts or finance department managers "really monitoring" and "looking into the numbers."

153. ███████████████████████████████████████████████████████████

███████████ it was deeply misleading to come to the market with downward guidance without, **at least**, explaining that the announcement contradicted this material information—*i.e.,* that the Company was, in reality, forecasting results well above the reduced guidance.

154. Knowing that the evidence of this manipulative behavior is striking, Defendants have sought to offer innocent explanations for the downward guidance – but in each case these retroactive explanations amount to essentially admitting to manipulating the market price, as part of a what Defendants hope to spin as a sort of benevolent fraud.

155. Defendant Stollmeyer has now testified under oath, that he makes a practice of guiding below actual expectations because "**[i]t's much better to guide a bit below what you're expecting and then beat those expectations.**'" Regardless of his spin about why he might do this, this is an **admission** by Defendant Stollmeyer of the fact that he was willing to— and in fact did—intentionally put out guidance that was not his best estimate, for the explicit purpose of engineering investor reactions. Of course, Defendant Stollmeyer knew full well that guidance was supposed to align with the Company's actual views, as he also testified as to the definition of guidance, which he said refers to "**communicating our expectations within a range of revenue and bottom line results.**"

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████



157.    As explained in greater depth in Section IV(J)(3), less than two months after the downward guidance, the Defendants were aware that the Company's fourth quarter 2018 results had materially exceeded not only the downward guidance, but also the earlier estimates.  As Defendant Stollmeyer stated internally, the actual 4Q18 performance was a "**massive beat against the Street's consensus**."  While the fact that the Company beat guidance, standing alone, would not support the inference that this guidance was false—in the context of the many other facts supporting the inference that the guidance was intentionally false and misleading, the actual performance further supports the inference that the guidance was intentionally false and misleading when made.[16]

158.    Similarly, as later discussed, even after insiders knew of this "massive beat" they did not disclose this information to investors.  This too provides additional support for the

---

[16] For example, the fact that actual performance exceeded estimates provides circumstantial support and corroborates the other allegations that internally Mindbody was expecting to outperform the downward guidance.

inference that the lowered guidance was intentionally misleading, since this demonstrates Defendants' willingness to hide truthful information from investors, and in particular, truthful information on the topic of Mindbody's 4Q18 performance.

159.    The timing of the downward guidance also raises substantial suspicions that the downward guidance was intentionally too low.  The fact that Defendant Stollmeyer had originally engaged in the negotiations in secret supports the inference that he was intentionally manipulating the deal process.  In the same vein, the other corrupt aspects of the deal process similarly support the inference of intentional misconduct.

160.    In addition to the fact that the guidance was false and misleading, and omitted to disclose material information about Mindbody's true forecasts, Defendants also misled the market by falsely attributing the downward guidance to Mindbody's ongoing integration of Booker and FitMetrix.  The key point here, is not that Defendants misled by implying that there were **zero** hiccups in the integration of those companies.  Rather, Defendants misled the market because they ***blamed*** the reduction in guidance on those integrations – when in truth, the Company's performance was forecasted to be **above** the downward guidance, rendering it highly misleading to claim the downward guidance was made due to integration issues.  Thus, the most relevant information – in assessing the falsity of their present tense assertion that the integrations caused a reduction of guidance – is that the company's forecasts were above the guidance range.  It is also relevant that other facts corroborate that the supposed integration issues requiring a downward adjustment to guidance were fabrications.

161.    As previously described, the Company had assured the market in its two prior earnings calls that integration was proceeding well.  Furthermore, at Mindbody's Investor Day, which occurred during 3Q18, investors were assured that the integration was going well.  The

conclusion that the downward guidance was intentionally misleading is heightened by the even more preposterous statements in the 3Q18 Disclosures that the challenges had been present for the "past two quarters," which covered the period in which Mindbody was assuring investors that the integration was proceeding well and according to plan.

162.    Similarly, internal communications at Mindbody ten days prior to its Investor Day event confirm that management believed the acquisitions were a success: Defendant Stollmeyer stated to management on September 9, 2018 that "**[o]ur acquisitions, including Booker/Frederick and FitMetrix improve our market position further**."

163.    Even more astoundingly, just a little more than a week before the downward guidance, on October 28, 2018, Defendant Stollmeyer sent talking points in support of the sale to Defendant Liaw and Goodman, which stated that the **integration was "proceeding well**."  It makes absolutely no sense that he would appear before investors, just nine days later, describing a substantial guide down due to supposed integration issues.

### G.    Vista was Arbitrarily Favored in the Rushed and Inept Negotiation

164.    After the downward guidance, Defendants continued their fraudulent scheme by conducting a deal process that arbitrarily favored Vista and failed to provide any hope that investors would receive a fair value for their shares through the merger process.

165.    Running a deal process that had at least the outside semblance of impartiality was a necessary component of the fraudulent scheme.  Certain practices—such as the retention of a financial advisor, the solicitation of interest from various parties, and a go-shop period—are such mainstays of modern M&A practice, that their exclusion would have been an obvious red flag to investors that the deal with Vista was sour.  Thus, while Defendant Stollmeyer would likely have preferred to simply rush forward with Vista, it was necessary for him to manufacture a record

that could at least temporarily hide his scheme, in order to ensure they would receive shareholder approval.

166. Defendant Stollmeyer—not the Committee—contacted potential financial advisors to work on the transaction. This gave him considerable opportunity to tilt the scales so that the Company would decide to hire Qatalyst and Mr. Chang, with whom he already had an ongoing relationship. On November 14, 2018, the Committee interviewed Qatalyst and other potential financial advisors. Within days Qatalyst was retained by Mindbody, notwithstanding its substantial conflicts of interest, which was supposedly were disclosed to the Board.[17]

167. Once retained, Qatalyst contacted several potential counterparties and members of the Committee were provided with occasional updates on the status of communications. By allowing the heavily conflicted Qatalyst to run this critical component of the process, Qatalyst was able to reduce the likelihood of a true competitor to Vista surfacing.

168. For example, Qatalyst produced a list of potential acquirers, yet left off logical financial buyers, like SoftBank or Tamesek, as well as logical strategic buyers, like InterActiveCorp and Daily Burn. McCarter recommended that Mindbody engage with Global Payments because they were "making a push" into Mindbody's software as a service "vertical," meaning "they would possibly be a good one if we're trying to push valuation up." Yet, Defendant Stollmeyer shot down the idea because he "**[didn't] want to work for a Payments company.**" It would be hard to overstate the magnitude of this totally self-serving decision, which prioritized Defendant Stollmeyer's personal employment preferences over a deal process that would maximize shareholder returns.

---

[17] The proxies used to support the deal state that Qatalyst was selected after "taking into account the conflict disclosure by Qatalyst Partners."



170.    On November 14, 2018, Qatalyst made clear to Defendant Stollmeyer and the Committee that any potential buyer would need four to five weeks of diligence before submitting a bid.  Notwithstanding this fact, the timeline for entertaining potential acquirers other than Vista and approving the merger was needlessly fast-tracked.

171.    In late November, Qatalyst's Jeff Chang provided Defendants Stollmeyer, White, and Liaw a list of Vista's diligence requests.  Immediately, Defendants Stollmeyer and White used that list to populate a dataroom for Vista so that they could review documents.

172.    In contrast, all other potential bidders were permitted to review only a fraction of documents compared to Vista, if any at all, **and** not until December 15, 2018 at the earliest.  Four of the other potential bidders received access to only 35 documents.  Another potential bidder received access to 36 documents, and yet another potential bidder was not granted access to review diligence documents at all.  While Vista had already "completed substantially all business diligence" by December 18, 2018—other investors were not shown the Company's financial projections or models until December 17, 2018.

173.    Defendant Stollmeyer continued his near exclusive conversations with Vista, in particular, Saroya.  On December 17, 2018, Defendant Stollmeyer and Saroya spoke again about

50

Mindbody's business.  They spoke again the next day, when Defendant Stollmeyer told Saroya that "Square Scheduler [is] not a relevant competitor" of Mindbody's, and "[o]rganic growth in Higher Price Tiers [is] better than your team has modeled."  In other words, Defendant Stollmeyer relayed to Saroya that the Company's subscribers in the higher-priced tiers were better than Vista had modeled after conducting diligence.

174.    On December 18, Vista, who had been in discussions with the Company about a potential transaction for at least one month longer than any other potential acquirer, submitted an offer to acquire the Company for $35.00 per share.  At that time, Vista had already "completed substantially all business diligence," just three days after other bidders received limited access to the data room.  The offer letter noted that Vista's offer was "definitive" and could provide an equity commitment for the full purchase price without a contingency on financing.  The offer letter further made clear that Vista would not only be retaining management, but would also provide them with equity in the post-Privatization Mindbody: Vista "seeks to invest in and partner with superior management teams."  By "partnering" with Vista, Defendant Stollmeyer, and management had the opportunity to participate in the equity upside of the post-closing entity.  In fact, management was expected to receive 10% equity in post-closing Mindbody.

175.    Once Vista made the offer, Defendant Stollmeyer continued to interfere with other potential bids – when Recruit Holdings Co., Ltd. ("Recruit") asked for additional information, he told the head of Investment Relations that "**we'd like to hold off on sharing our marketplace analysis on this until we have price on the table**."  Defendant Stollmeyer later admitted he did not want to work for a Japanese company, like Recruit.  Once again, this reveals that Defendant Stollmeyer was focused on his personal employment goals, not satisfying his obligations as a fiduciary.

176.    The next day, December 19, 2018, just four days following the other bidders' initial investigation into the Company's documents and notwithstanding Qatalyst's previous four to five week diligence recommendation, the Transaction Committee instructed Qatalyst to inform to the other potential bidders, without reason, of the supposed, "**competitive nature of the process, accelerated timeline, and the need for prompt indications of interest**."  This resulted in five of the seven potential acquirers dropping out of the bidding process.  According to Qatalyst, the two remaining bidders were either unable to produce a competitive bid on "a timeline that would be competitive with Vista" or wished to conduct additional due diligence.

177.    On December 20, 2018, the Company made a counter offer of $40.00 per share to Vista's previously proposed purchase price.  The next day, Vista rejected the Company's proposal but made its best offer to purchase Mindbody at $36.50 per share.  Defendant Liaw privately emailed his colleagues at IVP stating that he "personally thought Vista would come up to $38," but "the rest of the possible field is far behind."

178.    Just three days later, on December 23, 2018 and significantly before the two remaining potential bidders finished their due diligence, Qatalyst delivered its fairness opinion and the Board approved the Merger with Vista.  This secured Vista's position as the most likely acquirer of the Company.  While a topping bidder could emerge, they would need to pay a breakup fee in order to outbid Vista.[18]

**H.    The Misleading Announcement of the Proposed Privatization**

179.    On December 24, 2018, Christmas Eve, Mindbody and Vista issued a press release announcing that management had agreed to a merger whereby the Company would be

---

[18] Literally, the target of a merger pays the breakup fee.  But functionally, because the ultimate acquirer is buying the target, this means the acquirer loses that value, and therefore the acquirer has to debit the breakup fee against their pre-breakup fee valuation.  As a result, a breakup fee is an additional amount the would-be acquirer has to be willing to pay, before it can make a bid.

acquired by Vista for $1.9 billion (the "Privatization Announcement"). Mindbody touted the

"***significant premium***" that shareholders would receive as a result of the Merger. Specifically,

Mindbody stated that "***shareholders will receive $36.50 in cash per share, representing a 68%***

***premium to the unaffected closing price as of December 21, 2018***," of $21.72 per share.

180.   The Privatization Announcement was misleading because it touted the offer as a

"premium" without disclosing that the supposed premium was measured in relation to

Mindbody's market price, which was artificially depressed by false and misleading statements in

Mindbody's 3Q18 earnings release.

181.   Defendants misled shareholders as to the "significant premium" they would

receive as a result of the Merger. However, Defendants failed to inform investors that this

supposed "premium" was actually a slight discount to the 30-day closing price average in the

period just before the 3Q18 Disclosures—which average was $36.63. Moreover, the $36.50 deal

price was, in fact, an 18.2% discount to Mindbody's 52-week high ($44.60 per share), a 16.8%

discount to Mindbody's stock price in late September ($43.85 per share), and an 11.5% discount

to Mindbody's $41.25 in early October. Defendants also failed to disclose that on October 16,

2018, Vista indicated that it would "pay a substantial premium to [Mindbody's] recent trading

range" of $38.46 to $41.25 per share.

182.   The December 21, 2018, share price that the Company based its supposed

"premium" off of did not reflect the actual value of the Company at the time, and any statement

that the Merger consideration was a "premium" was therefore misleading.

183.   Based on the publicly available (and misleading) information, analysts

recommended the deal. However, "on the flip side," J.P. Morgan found the transaction to be at

an "**attractive acquisition price**," for Vista. UBS also noted that the "**multiple offered by**

**Vista is a 26% discount to the SaaS group at 7.8x**,” implying it was not a particularly high

price for the Company.

184.    The same day that the deal was announced, Defendant Stollmeyer wrote to two of

his financial advisors in a text message:

> Vista's in love with me (and me with them).  No retirement in my headlights.
> However, I will likely sell most or all of my stock.  It will be incumbent upon
> them to provide compelling incentives.  Let's meet after the holidays to talk about
> how to allocate the inbound cash.

(*See* Exhibit F).

185.    Also on the day that the deal was announced, Defendant Stollmeyer responded to

an email from a venture capitalist congratulating him on the deal, by stating: “Vista loves me and

wants us to step on the gas.  No retirement in my headlights :).”  (*See* Exhibit G).

**I.        The Terms of the Merger Agreement**

186.    On December 26, 2018, Mindbody filed a Form 8-K, attaching the Agreement

and Plan of Merger (“Merger Agreement”), which described the Privatization in detail.  The

Merger Agreement is incorporated by reference herein, and several of its key terms are described

below.

**(1)        Structure of the Merger**

187.    Through the Privatization, Mindbody would merge with Torreys Merger Sub, Inc.

(“Merger Sub”), which was owned by Torreys Parent, LLC (“Parent”), which was itself affiliated

with and controlled by Vista.  If completed, Mindbody stock would no longer be outstanding,

publicly traded, and would be cancelled and delisted from NASDAQ.  Shareholders' common

stock would be “automatically converted into the right to receive cash in an amount equal to

$36.50, without interest thereon.”

**(2)    The Go-Shop Provision**

188.    The agreement permitted what Mindbody referred to as a "***customary 30-day*** 'go-shop' period." Go-shop periods allow a target company to, for a certain period of time, consider unsolicited offers as well as actively solicit bids for the target. An illusory go-shop can give investors the false impression that the deal process was more robust than it actually was, and can be used to try to provide a façade of legitimacy for an otherwise corrupt negotiation process. Market practices have arisen regarding what constitutes a legitimate go-shop. Here, the go-shop was not legitimate.

189.    First, the 30-Day period was short. This period was set to run from December 23, 2018, until January 22, 2019. Market practices around the time of the negotiation, typically called for a shopping period of more than 30 days.[19] But, more importantly, the timing of this 30 day period, which ran through the holiday season, meant that it was actually an exceptionally compressed timeline.

190.    Second, the go-shop provision required Mindbody to accept a competing proposal during the period. This is referred to as a "closed" go-shop. In contrast, an "open" go shop allows the company to continue negotiations with those bidders whom it has already engaged with during the go-shop period, after that period runs. As one Delaware court put it, the combination of a short period and closed term is problematic because it "essentially require[s] the bidder to get the whole shebang done within the 45-day window." *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 119 (Del. Ch. 2007). In this case, the window was even smaller, at 30 days.

191.    Third, the go-shop provided Vista with matching rights, meaning that it had a privileged opportunity to meet any other bidder's terms. This is not by itself off-market, but is

_____

[19] On average, a go-shop period is 37 days. Presutti, Richard, et al., "*Private Equity Buyer/Public Target M&A Deal Study: 2015-17 Review and Comparative Analysis,*" Schulte Roth & Zabel (Sept. 17, 2018).

considered an acquirer friendly adjustment because it discourages other bidders from spending the necessary time and resources to make a competing offer—since Vista can always match. When combined with the other acquirer friendly adjustments, it further showcases how weak the go-shop was.

192.    In light of these weak terms, if the go-shop was to be anything but illusory, Mindbody's management needed to engage in the most rigorous shopping period they possibly could.  In other words, because the written terms of the go-shop were so weak, by calling the go-shop "customary," Mindbody was assuring investors that they would make up for these weaknesses by executing the shopping period with as much rigor as possible.

193.    However, on December 24, 2018, Qatalyst emailed Defendants Stollmeyer and White to discuss the proposed go-shop plan. (*See* Exhibit H).  Even at this early stage they were making plans to limit the information provided to other bidders.  Under the plan, even those parties executing NDAs were only going to be given access to an "initial limited data room," which was the data room Vista was given "with some subtractions."  Even more astoundingly, the full data room would only be provided to bidders for "confirmatory diligence," not for the purpose of making bids.

194.    Instead of running a robust go-shop process, both Defendants Stollmeyer and White went on vacation.  Defendant White was out until January 4, 2019 with no access to email. Defendant Stollmeyer was out all the way until January 14, 2019, in a location where the "cell service was spotty."  Meaning that by the time he returned, there would only be ten days left— and in particular ten days left to (as the Delaware Chancery court puts it) "get the whole shebang done."

195.    Incredibly, on January 6, 2019, Defendant White text messaged Defendant Stollmeyer: "**I assume that we will be declining any go shop management discussion until you return, correct?**"  This all but assured a competing bid would not arise.  This was all the more astounding because on that very same day Defendant Stollmeyer text messaged Defendant White saying that he had heard from another potential party that the other potential party felt Mindbody was "worth a lot more than $36.59."  (*See* Exhibit I).  Notwithstanding this, Stollmeyer simply deferred this potential party to the highly conflicted Jeff Chang of Qatalyst.

196.    Even when Defendant Stollmeyer returned, he attended the Super Bowl on February 3, 2019, with both Saroya and Aggarwal, further indicating that he was firmly committed to Vista well before the Privatization closed:



(Defendant Stollmeyer is center; Aggarwal is to Stollmeyer's left; and Saroya is to Stollmeyer's right.)

197.    Documents produced in the DE Action further show that Mindbody management sabotaged the already illusory go-shop by providing less diligence to go-shop participants than

57

was provided to Vista and all of Vista's financing sources and by delaying providing diligence to another potential bidder, effectively running the clock on the go-shop.

### (3)    The Vote Required

198.    The Merger Agreement explained that the deal would only go forward if it was approved by "a majority of the voting power of the outstanding shares of Company Class A Stock and Company Class B Stock (voting together as one class)." The Merger Agreement also explained that Defendant Stollmeyer and IVP would execute irrevocable proxies to vote all Mindbody shares they beneficially owned in favor of the Merger.

199.    As of the Record Date[20] there were purportedly 45,643,595 shares of Class A common stock and purportedly 2,372,938 shares of Class B common stock outstanding and entitled vote at the Special Meeting.[21] The following chart shows the shareholdings and voting power of insiders and IVP as of the Record Date, including options and restricted stock units:

---

[20] The Record Date was eventually set to be January 18, 2019, but was not yet publicly set at the time of the Deal Announcement or the December 26, 2018 Form 8-K disclosure attaching the Merger Agreement.

[21] There was a dispute, in a suit consolidated into the DE Action, regarding whether certain of the Class B Shares converted into Class A shares prior to the vote. That matter was settled and the core count was ratified as accurate.

| Share Count and Voting Power Including Options & RSUs[22] | | | |
|---|---|---|---|
| Name | Class A Shares | Class B Shares | % of Voting Power |
| IVP | 1,039,349 | 1,602,683 | 24.6% |
| Defendant Stollmeyer | 264,618 | 1,543,952 | 19.8% |
| Michael Mansbach | 59,923 | 0 | <1% |
| Defendant White | 138,702 | 165,874 | 2.5% |
| Kimberly Lytikainen | 51,487 | 7,937 | <1% |
| Mark Baker | 15,527 | 0 | <1% |
| Katherine Blair Christie | 19,987 | 60,000 | <1% |
| Court Cunningham | 3,234 | 0 | <1% |
| Gail Goodman | 22,513 | 0 | <1% |
| Cipora Herman | 14,423 | 0 | <1% |
| Defendant Liaw | 7,996 | 0 | <1% |
| Adam Miller | 12,885 | 0 | <1% |
| Graham Smith | 29,987 | 70,000 | 1.0% |
| Totals | 1,680,631 | 3,450,446 | 47.9% |

200.    The following chart shows the shareholdings and voting power of insiders and

IVP as of the Record Date, excluding options and restricted stock units:

| Share Count and Voting Power | | | |
|---|---|---|---|
| Name | Class A Shares | Class B Shares | % of Voting Power[23] |
| IVP | 1,039,349 | 1,602,683 | 24.6% |
| Defendant Stollmeyer[24] | 72,425 | 582,433 | 9.0% |
| Michael Mansbach | 3,705 | 0 | <1% |
| Defendant White | 19,074 | 0 | <1% |
| Kimberly Lytikainen | 0 | 0 | <1% |
| Mark Baker | 300 | 0 | <1% |
| Katherine Blair Christie | 19,987 | 0 | <1% |
| Court Cunningham | 3,234 | 0 | <1% |
| Gail Goodman | 22,513 | 0 | <1% |
| Cipora Herman | 14,423 | 0 | <1% |
| Defendant Liaw | 7,996 | 0 | <1% |
| Adam Miller | 9,328 | 0 | <1% |
| Graham Smith | 29,987 | 0 | <1% |
| Totals | 1,242,321 | 2,185,116 | 33.3% |

[22] This chart is reproduced from page 90 of the Final Proxy, and is subject to the footnotes therein.

[23] Calculated assuming 45,643,595 Class A shares outstanding and 2,372,938 Class B shares outstanding, for a total of 69,372,975 votes.

[24] Includes shares that Stollmeyer held through proxies and shares owned by his spouse.

59

201. Thus, even if all insiders and insider-affiliates voted in favor of the Privatization, the vote total would not reach the 50% total needed to close the transaction. This meant that the deal could not be completed without receiving at least some votes from shareholders that were not affiliated with insiders ("Unaffiliated Shareholders").

### (4) Appraisal Rights

202. The Merger Agreement states that shareholders who "neither voted in favor of the Merger nor consented thereto in writing and who shall have properly and validly exercised their statutory rights of appraisal in respect of such shares of Company Common Stock in accordance with Section 262 of the DGCL" will not have their shares converted into the right to receive $36.50 per share ("Dissenting Shareholders"). A Dissenting Shareholder is entitled to receive payment of the appraised value of such dissenting shares in accordance with the provisions of Section 262 of the DGCL.

203. To seek appraisal a shareholder must: (1) submit a written demand for appraisal to Mindbody before the vote on the Merger Agreement; (2) not vote in favor of the proposal to adopt the Merger Agreement; (3) continue to hold shares of Mindbody common stock through the Privatization; and (4) strictly comply with all other procedures for exercising appraisal rights.

204. If properly exercised, a shareholder is entitled to receive payment in cash of the 'fair value' of the shares of common stock, together with interest to be paid on the amount determined to be fair value, if any, as determined by the court.

### (5) Qatalyst's Unreasonable Fees

205. The Merger Agreement called for the Company to obtain a written fairness opinion from Qatalyst about the Privatization. Ultimately, the fees that Qatalyst received were unreasonably large, and further contributed to its many other conflicts.

206.     The Company agreed to pay Qatalyst approximately $33 million in fees for its work on the transaction.  Of this amount, it received $2 million for rendering its fairness opinion and the rest only if the deal closed.  Thus, Qatalyst had an enormous interest in providing an opinion that would maximize the odds of the deal closing.

207.     Additionally, Mindbody had also agreed to indemnify Qatalyst Partners and its affiliates, their respective members, directors, officers, partners, agents and employees and any person controlling Qatalyst Partners or any of its affiliates against certain liabilities, including liabilities under federal securities law, and certain expenses related to or arising out of Qatalyst Partners' engagement.  This meant that Qatalyst would face limited legal risks if it succumbed to the conflict of interest and issued a flattering fairness opinion in order to maximize its chances of earning over $30 million in fees.

**J.     Mindbody Continued to Mislead Investors While Continuing to Publish Proxy Materials**

208.     After the Merger Announcement, Mindbody filed numerous misleading proxy statements in order to persuade shareholders to accept the Privatization.  There were several common themes across these proxy materials.  Defendants continued to falsely tout the supposed "premium" as a reason to accept the deal, despite clear evidence that the intentionally false 3Q18 Disclosures significantly understated the value of the Company.  Defendants also falsely described the employment discussions Stollmeyer had with Vista about post-Merger employment.

**(1)     December 26, 2018, Proxy Materials**

209.     On December 26, 2018, Defendants filed certain proxy materials with the SEC.[25] This document included a highly positive letter from Defendant Stollmeyer to Mindbody

---

[25] Mindbody had not yet filed its preliminary proxy, but under SEC filing rules they are still considered "Additional" proxy materials.

employees.  Here again, he touted the deal premium, stating: "Vista has agreed to acquire all outstanding Mindbody common stock for $36.50 per share, *representing an approximately 68% premium compared to the closing price of our stock as of December 21, 2018*."

210.    Moreover, Stollmeyer stated that "partnering with Vista is our best option for shareholders, and a fantastic option to foster value for you and long-term growth for Mindbody." Stollmeyer also described Vista as an "ideal partner."

**(2)    January 2, 2019, Proxy Materials**

211.    On January 2, 2019, Defendants filed additional proxy materials with the SEC. The document included a letter from Defendant Stollmeyer to Mindbody employees.

212.    In the letter, he swooned over Vista, and openly denigrated Mindbody's shareholders—both attitudes consistent with the fraudulent scheme to favor a deal with Vista over treating public investors fairly.  Specifically, he said: "Vista is an ideal partner.  By going private and joining the Vista Family, we will have access to their exceptional resources and operating expertise."  And then betraying his true motivations, he added: "We will be free to improve our business away from the turmoil of the public markets, and we will be able to achieve our Purpose much more effectively."

213.    He also seemingly recognized the disruption that would be caused by the timing of the Privatization Announcement, just before Christmas Eve.  In answering a written Q&A question, asking "Did you announce this on Christmas Eve intentionally?"  He replied "Hardly. We could not control the timing of the deal coming together, and SEC regulations required us to publicly announce it the next business day.  Unfortunately, that turned out to be December 24th." Regardless of whether this was true or not, it highlights that a 30-day go shop, beginning just before Christmas, was obviously not designed to truly solicit other bids.

62

(3)    **January 4, 2019 Mindbody's Actual 4Q18 Results**





_____

[26] Liaw was specifically referring to Luxor, who filed suits consolidated into the DE Action seeking appraisal and alleging breaches of fiduciary duty. In sum, Luxor thought the deal was bad and Liaw was recognizing that Luxor's view – that the deal was bad – would be supported by issuing the 4Q18 results.

64



219.    Defendants simply chose not to release the results—despite their recognition that it was the right thing to do.  But while the public was not shown the results, Vista was given that information.  On January 31, 2019, Mindbody's counsel, Cooley, wrote to Vista's counsel, Kirkland and Ellis, stating that "**Mindbody would prefer to do a pre-announcement rather than a full earnings release for [4Q18].**"  (*See* Exhibit K).  The complete text of the email is as follows:

> Hi K&E team,
>
> Since Mindbody would prefer to do a pre-announcement rather than a full earnings release for Q418, please find the attached alternative pre-announcement for review. We are reviewing simultaneously, but can you please let us know your thoughts? We are happy to discuss if Vista has different views on the approach.

220.    Yet, Mindbody never made a pre-announcement of its actual 4Q18.  In other words, Mindbody recognized that the market was being misled and wanted to come forward with accurate information about its 4Q18 performance before moving forward with the deal, but then ultimately, after reaching out to Vista, decided not to do so.

### (4)    January 9, 2019, Preliminary Proxy Statement

221.    Defendants filed the Preliminary Proxy Statement on January 9, 2019.  The Preliminary Proxy continued the same song, touting the Merger as "*in the best interests of the Company and its stockholders,*" representing a premium to approximately: "*(1) 68% to the*

*closing price of Mindbody's Class A common stock on December 21, 2018, the last full trading day prior to public announcement of Mindbody's entry into the Merger Agreement; and (2) 42% to the 30-day volume weighted average price, ending on December 21, 2018.*"  The Preliminary Proxy further stated that the "Board of Directors unanimously recommends" that shareholders vote for the Privatization.

222.    The Preliminary Proxy also failed to accurately describe the talks that had occurred at that point regarding the post-closing employment and incentives that would be given to Defendant White and Stollmeyer.  It stated that as of the execution of the merger agreement "*Vista and Mindbody had not engaged in any employment or retention-related discussions with regard to Mindbody management*."

223.    In truth, as Mindbody would later disclose, such discussions clearly had occurred. This was important, because it hid from investors important details about Defendants' motives in the Privatization process.

### (5)    January 23, 2019, Definitive Proxy Statement

224.    On January 23, 2019, Defendants issued the Definitive Proxy Statement (the "Final Proxy").  This proxy reiterated all the false and misleading statements and omissions found in the Preliminary Proxy.  *See* Section IV(J)(4).  The Final Proxy stated that the shareholders meeting to vote on the proposed Privatization would occur on February 14, 2019.  It also falsely described the diligence material provided to parties as part of the go-shop process.

### (6)    January 29, 2019, Proxy Materials

225.    On January 29, 2019, Defendants filed additional Proxy materials.  Therein, Defendants disclosed a Slide Presentation to ISS and a demand for books and records under § 220 by a shareholder, and the Company's response to that demand.

66

226.   The January 29, 2019 additional Proxy materials were false and misleading for the reason described in Section IV(J)(4), having repeated those statements.  For example, the Slide Presentation attempted to convince investors why the $36.50 Merger consideration was a good deal for shareholders, all the while failing to disclose the known 4Q actual results and the fact that the "premium" over the December 21, 2018 share price reflects a premium over an already artificially depressed share price.

### (7)    February 7, 2019, Proxy Materials

227.   On February 7, 2019, just one week later, Defendants filed additional proxy materials, but continued to withhold the better-than-guided 4Q18 performance.  These proxy materials, disclosed **for the first time** that interactions between both Stollmeyer and Vista, and Stollmeyer and Qatalyst, did not begin "[i]n October 2018" as the Preliminary Proxy had said, clarifying that:

> In the first half of August 2018, as part of Qatalyst Partners' customary coverage of software companies, a representative of Qatalyst Partners had a meeting with Mr. Stollmeyer.  Following this meeting, Qatalyst Partners reached out to Vista, Party A, and Party B as typical outreach to connect strategic companies, including Mindbody, to such parties.
>
> Separately, on August 7, 2018, a representative of Vista emailed Mr. Stollmeyer, offering to meet for lunch, which took place on September 4, 2018, and at which Mr. Stollmeyer provided the representative of Vista with a general overview of Mindbody and its approach to the fitness, beauty and wellness services industries as was typical for Mr. Stollmeyer to present to potential investors.
>
> On September 19, 2018, Mr. Stollmeyer received an invitation from the representative of Vista to attend an annual "meet and greet" conference hosted by Vista bringing together hundreds of executives in the technology sector, including from Vista's portfolio companies.

228.   The February 7, 2019, proxy materials also disclosed that certain Mindbody senior executives had been engaging in discussions to secure post-Merger employment and equity in the post-Merger entity once the Company was taken private:

Later that evening, Mindbody and Vista executed the Merger Agreement and related agreements in connection with the transactions contemplated by the Merger Agreement.  At the time of the signing of the Merger Agreement, Vista and Mindbody had not ~~engaged in any employment or retention related discussions with regard to Mindbody management~~ discussed the terms of post-closing employment or equity participation for Mindbody management.  Prior to (but after the signing of the Merger Agreement) and following the closing of the Merger, however, certain of our executive officers may already have had, or may have discussions, and following the closing of the Merger, may enter into agreements with, Parent or Merger Sub, their subsidiaries or their respective affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates.

229.    This correction, while revealing, still failed to fully disclose any significant information about what deals Defendants had obtained for themselves or what sort of negotiations had actually occurred.  Further, while framed in the negative, the correction makes clear that Defendants had engaged in discussions with Vista about their post-closing employment and equity participation.  For that reason, the filing remains misleading and/or incomplete as to the Defendants' employment at post-Merger Mindbody.

230.    Crucially, like the prior proxy materials, the February 7, 2019 Supplemental Proxy Materials **still failed to inform** Mindbody shareholders that the Company's fourth quarter results had "meaningfully" exceeded estimates notwithstanding that this was thoroughly known to the Defendants well before February 7, 2019.

K.    **The Shareholders Vote and the Transaction Closes**

231.    On February 14, 2019, Mindbody held the shareholders' meeting where investors would vote on the proposed Privatization.  The votes cast were as follows:

| Results of Shareholder Vote | | | |
|---|---|---|---|
|  | **Votes For** | **Votes Against** | **Abstentions** |
| Class A Shares | 25,322,274 | 7,323,772 | 317,074 |
| Class B Shares | 23,090,180 | 7,500 | 0 |

232. Therefore, based on Mindbody's count of the votes, 35,272,888 shares representing 56,060,800 votes, or approximately 80% of the voting power of the Company Common Stock, voted in favor of the Privatization. However, a substantial number of those votes came from the Class B shares held by insiders. Looking just at Class A shares—there were a total of 45,643,595 Class A Shares outstanding on the Record Date, meaning that only 55% of Class A shares voted in favor of the Privatization. Altogether then, the Privatization received enough votes to close, but was far from popular with Unaffiliated Shareholders.

233. The next day, on February 15, 2019, the Merger closed. As a result, Merger Sub merged into Mindbody, which as the surviving company, became a wholly-owned subsidiary of the Parent, Torreys Parent, LLC, an affiliate of Vista. Additionally, shareholders then exchanged their shares for the merger consideration of $36.50, which was less than the fair value of those shares. Finally, on February 26, 2019, Mindbody Class A common stock was deregistered pursuant to the Exchange Act and ceased to be publicly traded.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

234. Throughout the Class Period, Defendants made a variety of false and misleading statements and omissions. These statements were either made in press releases on behalf of Mindbody, in SEC filings on behalf of Mindbody, or during events in which Individual Defendants were speaking on behalf of Mindbody. Many of these statements are attributable to the Individual Defendants, either because those statements were spoken by the Individual Defendant, attributed to the Individual Defendant or because the Individual Defendant signed the document containing the statement. Statements in ***bold and italics*** are alleged to be false and misleading.

69

235.    In addition to the specific statements addressed below, under Delaware law, Defendants had an affirmative obligation to disclose all material information in relation to the Privatization.  Defendants' omissions regarding the true 4Q18 forecasts, the 4Q18 actual results, and the truth regarding Stollmeyer's employment discussions constituted a violation of this duty. This omitted information was material and critical to evaluating the Privatization that was the subject of the shareholder meeting, in which investors were called to participate, as it spoke directly to the fairness of the deal and managements' motives and incentives.  The failure to disclose the information runs in direct contravention of their duties under Delaware law and constitutes actionable omissions under the federal securities laws.

236.    In addition to being false and misleading for the reasons described below, the statements described in this Section were part of Defendants' fraudulent scheme to manipulate Mindbody's stock price downward.  Defendants intentionally put out negative news about the progress of the integration, as part of a scheme to make Vista's acquisition of Mindbody more appealing.  Defendants intentionally withheld information from investors, including positive information about the acquisitions of Booker and FitMetrix, information about the merger negotiations, and truthful information about Mindbody's financial outlook, as part of a scheme to manipulate Mindbody's stock price and make Vista's offer appear attractive.  At all points in time during the Class Period, Defendants kept secret and omitted to disclose information as part of their fraudulent scheme.

A.    **November 6, 2018 (The 3Q18 Disclosures)**

237.    On November 6, 2018, after the close of markets, Mindbody published a press release associated with its 3Q18 earnings release.  The press release quoted Defendant Stollmeyer as stating "***Our recent acquisitions have introduced greater operational challenges than expected in the back half of the year.***"

70

238.    The press release also stated:

*For the fourth quarter 2018, Mindbody expects to report:*

- *Revenue for the fourth quarter of 2018 in the range of $65.0 million to $67.0 million, representing 31% to 35% growth over the fourth quarter of 2017.*

- Non-GAAP net loss for the fourth quarter of 2018 in the range of $(5.0) million to $(3.5) million and weighted average shares outstanding for the fourth quarter of approximately 47.9 million shares.

*The outlook has been updated to reflect the acquisitions of FitMetrix and Booker.*

239.    On November 6, 2018, after the close of markets, Mindbody hosted an earnings call associated with its 3Q18 earnings release.  During the earnings call, Defendant Stollmeyer stated:

Personally, I'm enormously thankful to our talented and hardworking team who have devoted themselves to the realization of our vision.  And at the same time, we must acknowledge that *we have faced significant operating challenges in the past 2 quarters.*  The combined effects of our recent acquisitions, go-to-market reorganization and expanding consumer and partner initiatives have made Mindbody a considerably more complex business to operate than it was just 6 months ago, and we did not meet our own growth expectations in the second and third quarters.  *We expect this to continue lagging a bit in Q4 as we communicated on our last call -- or continue to lag the expectations we communicated in our last call.*

240.    During the earnings call, Defendant White issued downward guidance stating that:

*For the fourth quarter, we expect revenue to be in the range of $65 million to $67 million or 31% to 35% growth over the fourth quarter of last year.  We expect non-GAAP net loss in the range of $5 million to $3.5 million*, and the weighted average shares outstanding for the quarter were approximately 47.9 million shares.

241.    During the earnings call, Defendant Stollmeyer responded to an analyst question about the cause of the downward guidance.  The exchange was as follows:

[Analyst] Rick, I'm curious if you can just comment a little more on these operational growth challenges that you called out.  And then for Brett, the loss estimate for Q4 is double that of what Street's expecting at the high end.  Can you

71

just give us a sense of when incremental costs are coming into that model that perhaps we weren't all estimating?

[Stollmeyer]: Sure.  ***So I'll talk about the growth challenges on the first side. This is really about go-to-market.  It's about our ability to scale our sales and marketing efforts across 3 dimensions simultaneously.  First and foremost, our go-to-market on the subscriber side, we now have 2 separate sales teams, fitness and beauty and wellness.  We hired 50 additional reps, as I mentioned, in the tail end of Q2, and it's taking a bit longer than expected to get them up to speed. This is the largest amount of sales reps we've hired in one group.  It's the first time we've done it across 2 different teams.  And of course, we still have some operational challenges around, for example, the 2 instances in Salesforce, which we're working to resolve.  The other one is a resolution of our branded mobile app deferral issue that Brett talked about.  It's unclear whether we're going to get that resolved in Q4, and we went ahead and factored that into our guidance.***

242.    During the earnings call, an analyst asked if the downward performance reflects a fading market opportunity, and Defendant Stollmeyer reiterated the false narrative that the Company was facing issues caused by the acquisitions, stating:

That's correct.  It's definitely not a lack of market opportunity.  As I mentioned, actually, boutique fitness in the North America, which is our most penetrated vertical, is our strongest growing vertical.  And lead generation has significantly inflected up in recent quarters.  So no, the opportunity is as big as ever.  It's multiple times greater than what we currently have in every vertical.  And there's -- the only thing standing between us and that is execution.  ***And as I said, the team has been -- we've been humbled by the last couple of quarters in dealing with the magnitude of integrating these businesses and ramping up growth at the same time.***

243.    During the earnings call, Defendants White and Stollmeyer responded to an analyst question about the cause of the downward guidance.  The exchange was as follows:

[Analyst]: Okay.  And then last one for me.  And we had the Analyst Day on September 19, and one of your slides was the integration is working.  So I mean, at what point did you realize that the results were going to be disappointing?

[Stollmeyer]: ***Well, at that point, we were looking at results that were end of August, remember.  We were looking at the prior 2 months, and we were meeting our milestones.  The formation of the 2 go-to-market teams, some important product milestones were coming together.  The general vibe amongst the teams, the ability for our leadership to work together, from a former Booker's and Frederick's and FitMetrix folks, the other subtleties around how***

*quickly sales team efficiency was ramping were things that we really started realizing in October.* And yes, I mean, Brett, do you want to speak about that?

[White]: *Yes. I think relative to Q3 results, the big surprise was the delay and the elongated deployment to the Apple App Store. And that was a new rule that they rolled out in May. So we had very little data on which to understand what the new timeline was around deploying the apps. And the -- our customers have to go through several steps on their own that we really can't help them with, like obtaining a DUNS number, obtaining a developer account, to deploy the app. And so we didn't know, in the middle of September, how many of those apps were actually going to get deployed and that we did, in fact, have a backlog challenge.*

244.    Defendants' statements described above in this subsection, about Mindbody's 4Q18 guidance, were false and misleading because they misleadingly guided below the Company's true expectations. Reasonable investors interpret guidance as a fair indication of the true expected performance by the Company, but the stated guidance did not reflect the true expectations for Mindbody and was therefore false. Put differently, providing revenue guidance of $65-$67 million would reasonably convey that Mindbody's actual forecasted performance was somewhere within the stated guidance range, when in reality Mindbody was forecasting revenue above the top of that range.

245.    Defendants statements described above, in this subsection, about the Integration of Booker and FitMetrix, were false and misleading because they misleading attributed the reduced guidance to integration issues, conveying that the integration was facing hardships that were expected to cause Mindbody to miss its reduced guidance. In reality, the lower guidance did not reflect the true expectations for Mindbody's performance, and therefore the reduced guidance was not and could not have been caused by issues with the Integration.

246.    Defendants' statements described above in this subsection, failed to disclose material information that made this guidance highly misleading, such as the fact that the Company's internal projections did not warrant the downward guidance and the fact that Booker

73

and FitMetrix were not causing internal expectations to lag their prior guidance or otherwise requiring reduced guidance.

247.    At all points in time during the Class Period, Defendants kept secrets and omitted to disclose their fraudulent scheme to depress Mindbody's price and push through a deal with Vista at unfairly low prices, while engaging in acts in furtherance of that scheme (including the issuance of misleading guidance, issuing proxies in favor of the merger, executing the merger agreement, organizing the shareholder vote, and withholding the companies actual 4Q18 results), even though many of those acts were themselves deceptive and were certainly deceptive in the context of the deceptive scheme.

**B.**    **December 24, 2018 (The Privatization Announcement)**

248.    On December 24, 2018, Mindbody announced the proposed Privatization by issuing a press release.  The press release stated:

> Under the terms of the agreement, Vista will acquire all outstanding shares of Mindbody common stock for a total value of approximately $1.9 billion. ***Mindbody shareholders will receive $36.50 in cash per share, representing a 68% premium to the unaffected closing price as of December 21, 2018.***

249.    The press release quoted Defendant Stollmeyer as stating:

> ***We are thrilled to provide immediate liquidity to our shareholders at a significant premium to market prices*** and to leverage Vista's resources and deep expertise to accelerate our growth while achieving that purpose more effectively than ever before.

250.    The statements described above, in this subsection, were part of Defendants' fraudulent scheme.  By touting the offer as a "68% premium" and a "significant premium," Defendants intended to make Vista's offer look highly attractive, when they knew that the stated "premium" was a premium to the Mindbody stock price, which was artificially depressed by the 3Q18 Disclosures.  Defendants also failed to disclose that the Company was expecting to

74

outperform the guidance it had provided as part of the 3Q18 Disclosures. At all points in time during the Class Period, Defendants kept secret and omitted to disclose their fraudulent scheme.

251. The statements described above, in this subsection, were false and misleading because they described the supposed premium that investors would receive, without disclosing that the stock price reflected materially incorrect information about Mindbody's financial condition which affirmed the stock price as representative of Mindbody's valuation, without disclosing that the stock price had been artificially depressed by the 3Q18 Disclosures. The statements were also false and misleading because they had falsely attributed the supposed operational problems to Mindbody's acquisition of FitMetrix and Booker and did not disclose that the downward guidance Mindbody had provided was not supported by Defendants' internal projections for the Company, both at the time of the 3Q18 Disclosures and at the time the statements described in this subsection were made.

C.      **December 26, 2018 (Form 8-K and Proxy Materials)**

252. On December 26, 2018, Mindbody filed a Form 8-K with the SEC attaching the Privatization Announcement press release discussed in the prior subsection. The 8-K was signed by Defendant White. The statements in that press release were false and misleading for the reasons stated in the prior subsection.

253. On December 26, 2018, Mindbody filed a Schedule 14A, this filing constituted proxy materials and was designated by Mindbody as "Definitive Additional Materials." This filing included a letter from Defendant Stollmeyer, this letter stated that:

> **Why now?**
>
> *As a public company, one of the responsibilities of our board and management team is to maximize shareholder value. We decided that partnering with Vista is our best option for shareholders, and a fantastic option to foster value for you and long-term growth for Mindbody. Vista has agreed to acquire all outstanding Mindbody common stock for $36.50 per share, representing an*

75

*approximately 68% premium compared to the closing price of our stock as of December 21, 2018.*

254.    The statement in the prior paragraph was false and misleading for the reasons stated in paragraphs 250-251.

## D.    January 4, 2019 and Thereafter (Omission of 4Q18 Results)

255.    By January 4, 2019, Defendants knew of but failed to disclose Mindbody's 4Q18 results, despite knowing such disclosure was the right thing to do given the results were a "big beat" compared to Mindbody's guidance.  By failing to disclose this information, Defendants violated their duty to disclose and committed actionable omissions under the federal securities laws.

## E.    January 9, 2019 (Preliminary Proxy Statement)

256.    On January 9, 2019, Mindbody filed a Schedule 14A, this filing constituted proxy materials and was designated by Mindbody as the "Preliminary Proxy Statement."  This filing was previously defined as the Preliminary Proxy.

257.    The Preliminary Proxy included a letter signed by Defendant Stollmeyer.  This letter stated:

> If the Merger is completed, you will be entitled to receive $36.50 in cash, without interest thereon and less any applicable withholding taxes, for each share of Class A common stock and Class B common stock (together, "common stock") that you own (unless you have properly exercised your appraisal rights), *which represents a premium of approximately: (1) 68% to the closing price of Mindbody's Class A common stock on December 21, 2018, the last full trading day prior to public announcement of Mindbody's entry into the Merger Agreement; and (2) 42% to the 30-day volume weighted average price, ending on December 21, 2018.*

258.    The Preliminary Proxy stated in reaching the determination to recommend the Privatization, the Board considered:

*[T]he current and historical trading price of Mindbody's Class A common stock, including that the Per Share Merger Consideration constituted a premium of:*

- *approximately 68% to $21.72, the closing price of Mindbody's Class A common stock on December 21, 2018, the last full trading day prior to public announcement of Mindbody's entry into the Merger Agreement; and*

- *approximately 42% to the 30-day volume weighted average price of $25.68, ending on December 21, 2018;*

259. The Preliminary Proxy stated in reaching the determination to recommend the Privatization, the Board considered:

*[T]he belief that the Per Share Merger Consideration represented the highest price that Vista was willing to pay (based on specific instruction from Vista) and the highest price per share value reasonably obtainable as of the date of the Merger Agreement;*

260. The statements in the prior three paragraphs were false and misleading because they represented to investors that the premium and comparisons between the Merger price and Mindbody's market price were meaningful and could be relied upon when judging the merger, despite their knowledge that the market price was artificially lowered by (a) the falsely issued 4Q18 guidance, and (b) the failure to disclose the actual 4Q18 results, which were a "massive beat," to Mindbody's guidance.  Defendants actually knew that Mindbody had exceeded the guidance it had issued in the 3Q18 Disclosures and actually knew that Mindbody's market price did not reflect its performance.

261. The Preliminary Proxy also stated that:

Later that evening, Mindbody and Vista executed the Merger Agreement and related agreements in connection with the transactions contemplated by the Merger Agreement. *At the time of the signing of the Merger Agreement, Vista and Mindbody had not engaged in any employment or retention-related discussions with regard to Mindbody management.*

262.   The statement described in the prior paragraph was false and misleading because Vista and Mindbody's executives had engaged in discussions about post-closing employment and incentives.

**F.   January 23, 2019 (Definitive Proxy Statement)**

263.   On January 23, 2019, Mindbody filed a Schedule 14A, this filing constituted proxy materials and was designated by Mindbody as the "Definitive Proxy Statement." This filing was previously defined as the Final Proxy. The Final Proxy reiterated the same false and misleading statements as the Preliminary Proxy as described in Section V(E), and those statements were false and misleading for the reasons described in that Section.

**G.   January 29, 2019 (Proxy Materials)**

264.   On January 29, 2019, Mindbody filed a Schedule 14A, this filing constituted proxy materials and was designated by Mindbody as "Definitive Additional Materials." This proxy material included a slide presentation by Mindbody to Institutional Shareholder Services Inc. by the Company on January 29, 2019.

265.   The slide deck included a slide titled "***Why $36.50 Per Share is Highly Attractive for Shareholders,***" which stated that the "***$36.50 offer price implies a 68% 1-day premium.***"

266.   The statements in the prior paragraph were false and misleading for the reasons stated in paragraphs 250-51.

**H.   February 7, 2019 (Definitive Additional Materials)**

267.   On February 7, 2019, Mindbody filed a Schedule 14A, this filing constituted proxy materials and was designated by Mindbody as "Definitive Additional Materials." This filing included supplemental disclosures to the previously filed proxy materials, specifically revising previously disclosed information regarding the background of the Merger.

268.    The February 7, 2019 Proxy Materials disclosed that certain Mindbody senior executives had been engaging in discussions to secure post-Merger employment and equity in the post-Merger entity once the Company was taken private:[27]

> Later that evening, Mindbody and Vista executed the Merger Agreement and related agreements in connection with the transactions contemplated by the Merger Agreement. ***At the time of the signing of the Merger Agreement, Vista and Mindbody*** had not ~~engaged in any employment or retention related discussions with regard to Mindbody management~~ ***discussed the terms of post-closing employment or equity participation for Mindbody management. Prior to (but after the signing of the Merger Agreement) and following the closing of the Merger, however, certain of our executive officers may already have had, or may have discussions, and following the closing of the Merger, may enter into agreements with, Parent or Merger Sub, their subsidiaries or their respective affiliates regarding employment with, or the right to purchase or participate in the equity of, the Surviving Corporation or one or more of its affiliates.***

269.    Although the statements in the prior paragraphs disclose more information than previous proxy materials, they were still false and misleading because they fail to disclose material information about what discussions had occurred and what employment or other incentives were planned or discussed by Defendants and Vista.

## VI.    ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER

270.    Mindbody had the scienter of its management level employees, including the Individual Defendants.

271.    At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein.  The Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with reckless disregard for the truth or falsity of those statements and omissions.  The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of

---

[27] Strikethroughs in the original, indicating text cut from prior filings.

scienter.  Furthermore, each of the Individual Defendants had the motive and opportunity to commit the fraud.

272.    Prior to and during the Class Period, Defendants' corrupt actions provide additional proof of their scienter.  The many egregious and corrupt decisions strongly support the inference and directly demonstrate that Defendants were acting corruptly, putting their self-interest above their legal obligations, and with the intent to defraud.

### A.    Motive, Opportunity, and Corrupt Behavior

273.    In addition to the specific allegations of motive, opportunity and corrupt behavior described below, the scienter of each of the Individual Defendants is mutually reinforcing, insofar as their recklessness and fraudulent intent can be inferred from the fact that they knew of each other's wrongful acts, but continued to work in concert.

### (1)    Defendant Stollmeyer

#### (i)    *Defendant Stollmeyer was Motivated to Defraud*

274.    Defendant Stollmeyer was motivated to defraud investors because he wanted to close the Privatization and his fraud made that more likely.  Specifically, he had and was acting on the following incentives.

275.    **First**, Stollmeyer had an incredible antipathy toward the public markets and saw the Privatization as a way to end his tenure as the CEO and a Chairman of a publicly traded company.  Stollmeyer had long wanted to "be freed from the shackles of public market investors." In deciding how to best take the Company private, Stollmeyer text messaged Liaw that he agreed with the suggested approach to "throw the public investors under the bus and complain about how frustrating it is that they only care about things every 90 days."  On October 28, 2018, Stollmeyer sent talking points in support of the sale of Mindbody to directors, Liaw and Goodman, setting that "we would like to be able to move more quickly out of the public eye."

80

Similarly, in a letter to Mindbody employees on January 2, 2019, he stated that, once the deal closed, "We will be free to improve our business away from the turmoil of the public markets, and we will be able to achieve our Purpose much more effectively."  As the deal was progressing, on January 5, 2019, Stollmeyer celebrated that Mindbody was "saying goodbye to the public markets (for now)." ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

276.    **Second**, Stollmeyer was enamored with Vista and was deeply committed to closing a deal specifically with them.  Since 2015, and even prior to Mindbody's IPO, Stollmeyer had discussed with Vista the possibility of selling the Company.  In August 2018, Stollmeyer' commitment to sell the Company to Vista was clear, and by early October of 2018, he was infatuated with Vista, text messaging Mansbach that the CXO Summit was "mind blowing" and "inspiring."  He would later text message his two of his financial advisors that "Vista's in love with me (and me with them)," as well as text message another individual that "Vista loves me and wants us to step on the gas. No retirement in my headlights :)."  Clearly recognizing the strength of this "love," just days after the CXO conference, Vista stated internally that they "ha[d] built a strong relationship with the CEO [Stollmeyer]."  Defendant Stollmeyer would continue to swoon over Vista, stating in a letter to employees, filed with the SEC on January 2, 2019, that: "Vista is an ideal partner.  By going private and joining the Vista Family, we will have access to their exceptional resources and operating expertise."

277.    **Third**, the Privatization offered Stollmeyer an opportunity to increase or retain his equity ownership in Mindbody.  Private equity acquirers typically offer the members of

management that they retain substantial equity in the companies they buy.[28]  Research suggests that management is typically given more equity in the post-closing entity than owned prior to closing.  In the letter making its bid to buy Mindbody, Vista indicated that it wanted to "invest in and partner with" Mindbody's management, a clear indication that they would be offering substantial equity to the post-Privatization management.

278.    Furthermore, Qatalyst (who Defendant Stollmeyer had been working with throughout the negotiations and who had considerable history with Vista), presented a slide deck on December 21, 2018, showing that management could expect to receive up to 10% of the equity in the post-Privatization Company.  Under any reasonable assumption, this would mean that Stollmeyer's position in the Company would actually dramatically increase following the Privatization.  As the following table illustrates, he could expect his total equity in the Company to increase from 3.96% to 7.65%, using the reasonable assumption that his percentage of the equity held by management would remain the same.

| Illustration of Stollmeyer's Expected Increase in Equity | | |
|---|---|---|
| | Pre-Privatization[29] | Post-Privatization |
| Percent of Mindbody Equity Held by Management | 5.18% | 10% (per Qatalyst) |
| Percent of Management Equity Held by Stollmeyer | 72.66% | |
| Stollmeyer's Total Equity Percent | 3.76% | 7.27% |

279.    This increase would be worth tens of millions of dollars to Defendant Stollmeyer. As a rough comparison, Stollmeyer was set to receive $58 million for his 3.96% equity stake in

---

[28] Research suggests that CEOs receive an average of 3.8% of the fully diluted equity in their company's following private equity deals.  Jon Herzog & John LeClaire, *2018 Rollover Survey: Rollover and Incentive Equity Terms in Middle Market Private Equity*, Goodwin Procter LLP (May 16, 2018), https://www.goodwinlaw.com/- /media/files/publications/rolloversurvey_2018_rd6_aq.pdf.

[29] The numbers in this column are based on the data in the Final Proxy stating that (1) management held (or held the equivalent of) 2,489,045 shares; (2) Stollmeyer held (or held the equivalent) 1,808,570 shares; and (3) there were 48,016,533 shares outstanding.

Mindbody through the Privatization—even at the lowball per-share value paid as part of the Privatization, a post-closing equity stake of 7.27% would be worth over $100 million.

280.    **Fourth**, Stollmeyer would retain his lucrative and personally satisfying position as CEO of the Company through the Privatization.  While he allegedly did not execute any agreements prior to closing the deal, he was all but assured to remain on as CEO in a deal with Vista.  Early in his negotiations with Vista, Stollmeyer had determined that Vista was "in love" with him.  On October 17, 2018, Stollmeyer emailed Defendant White confessing that the Privatization would:

> [N]ot be an automatic 'exit' for any of us or our principles.  Rather, we would lean into an acquirer who sees our current capabilities, gets our huge potential, and has the resources to accelerate our results. . . .  **I would not support the sale of [Mindbody] at this time in any other circumstance.**

The second sentence of that email is clearly referring to running the deal process to select an acquirer who would retain Stollmeyer.  In fact, the word "rather," leaves no doubt as to this interpretation, as it indicates the sentence is related to the prior sentence about the possibility of Stollmeyer exiting through a transaction.  Then the final sentence makes clear that he would only support a transaction if the acquirer saw his capabilities and potential.

281.    In the December 24, 2018, Privatization Announcement press release, Vista confirmed that they were retaining Stollmeyer, which they almost certainly would not have confirmed without first engaging in lengthy negotiations with Stollmeyer about the terms that would be needed to retain him.  On that same day, Stollmeyer sent a letter to employees which repeatedly made statements implying he would be staying with the Company—including by stating "I look forward to continuing on this journey with you," and "Currently there are no planned management changes."  He also indicated that Vista had "committed" to not decrease salaries or bonuses for a period of at least one year following the closing.

83

282. **Fifth**, Stollmeyer could expect that Vista would tie his post-closing compensation to Vista's own financial performance. As one recent study wrote "the PE firm will invariably give guidance early in the process as to what their typical compensation package for the CEO and senior management looks like" and "PE buyers will invariably tie management's post-buyout compensation to their own financial return."[30] The primary measure of return used in setting management's pay, in company's owned by PE firms, is the "Multiple of Invested Capital" ("MOIC") measure.[31] Under this measure, a higher deal price will result in a higher cost of "invested capital" for the PE firm, which means that compensation tied to the return on the PE firm's invested capital will be lower. Thus, Defendant Stollmeyer had an incentive to keep the Privatization price lower, as a lower privatization price would mean higher MOIC-based compensation down the road.

283. **Sixth**, Stollmeyer stood to receive an enormous immediate payout if the Privatization closed. Through the Privatization he would receive a payout of at approximately $58 million for his substantial equity position in Mindbody. Some of this value came in the form of accelerated vesting of equity awards. Additionally, the Privatization provided him a mechanism to liquidate this position at a huge profit. Without such a transaction, insider—especially a CEO/Founder/Chairman like Stollmeyer—face a major issue when trying to sell shares, as any selling activity is perceived as a negative signal that drives down the share price. Thus, the Privatization provided Stollmeyer a mechanism to liquidate his shares, and to receive accelerated vesting of certain of his equity interest in the Company.

---

[30] Subramanian, Guhan & Zhao, Annie, *Go-Shops Revisited*, Harv. L. Rev. (forthcoming 2019), https://ssrn.com/abstract=3328202.

[31] *Id.*

284.    The opportunity for immediate liquidity was particularly important to Stollmeyer given his pre-Merger financial condition.  In a post-Merger interview,[32] Stollmeyer complained about how, even after Mindbody's IPO, his "capital [was] locked inside the business," and how he could "sell tiny bits of it," but it was "kind of like sucking through a very small straw."  He even explained why he could not sell his position without a Merger, stating that if he sold even a small amount, investors would "challenge" why he was selling, and ask if it signaled he did not "believe in" the company.



And, when announcing the Merger, he stated, "[we] are thrilled to provide immediate **liquidity** to our shareholders," himself included.

---

[32] Alejandro Cremades, *Rick Stollmeyer on Selling For $1.9 Billion The Company That He Created Out of His Own Garage*, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████

287.    **Seventh**, Stollmeyer had a substantial portion of his Mindbody position in the form of Class B shares.  Those shares were set to automatically convert into Class A shares—and lose the 10 votes per share benefits they otherwise carried—by June 2022.  This created an additional unusual incentive for Stollmeyer.  He and the other Class B holders held a significant non-monetary asset, in the form of these voting rights, and could leverage that asset to receive favorable terms (for their own personal benefit) in a privatization, especially in a deal with a party that was friendly to them (*e.g.*, a deal with Vista).  In other words, Vista may have been willing to offer (or reward) Stollmeyer with lucrative benefits (through his post-Privatization employment), because he could make any proposed offer significantly more likely.  This is particularly significant, given that (without the Class B super-votes) the Privatization would not have received sufficient support to close.

288.    Stollmeyer himself described the value of these super-voting rights—testifying that they "mattered greatly to me."  While the Class B shares still had some time until they converted, waiting until they were set to convert would likely have made any such arrangement far more suspicious.  Investors seeing a deal just before the Class B shares were set to expire, would certainly have had additional suspicions about the transaction.

**(ii)    *Defendant Stollmeyer Had the Opportunity to Defraud***

289.    As explained herein, and especially in Section VII, Stollmeyer had enormous control over the Company and as a result had the opportunity to defraud investors.

86

290.    Stollmeyer had the unique opportunity to drive the Company's stock down. Because of Stollmeyer's position of CEO and Chairman, he was able to dictate the information received by the public.  For example, on just the night before the November 6, 2018, earnings call, Stollmeyer revised both the Company's press release and the earnings call script to focus less on the positives from Payments and more on the challenges faced by the acquisitions.  The gist of Stollmeyer's revisions were incorporated into both public documents without opposition. Stollmeyer was directly responsible for the statements he made to the public about Mindbody's 4Q18 guidance, within Mindbody's Proxies, and was fully able to speak to the market to convey any of the information he chose not to disclose.

**(2)    Defendant White**

**(i)    *Defendant White was Motivated to Defraud***

291.    Defendant White was motivated to defraud investors because he wanted to close the Privatization and his fraud made that more likely.  Specifically, he had and was acting on the following incentives.

292.    **First**, White would retain his lucrative and personally satisfying position as CFO and Chief Operations Officer of the Company through the Privatization.

293.    **Second**, the Privatization offered White an opportunity increase or retain his equity ownership in Mindbody, for essentially the same reason explained in Paragraphs ¶ 282.

294.    **Third**, White could expect his post-closing employment to include compensation tied to Vista's return on investment, and therefore had an incentive to keep the Privatization price low, as explained in ¶ 282.

295.    **Fourth,** through the Privatization he would receive a payout of at least $11.1 million for his substantial equity position in Mindbody.  Without such a transaction, insiders— especially a CFO like White—face a major issue when trying to sell shares, as any selling

activity is perceived as a negative signal that drives down the share price.  Thus, the Privatization provided White a mechanism to liquidate his shares, and to receive accelerated vesting of his equity awards.

296.  **Fifth**, White had the same incentives as the other Class B insider-shareholders to monetize the value of those shares before they converted into Class A shares, as explained in ¶ 287.

### (ii)     *Defendant White had the Opportunity to Defraud*

297.  As explained herein, and especially in Section VII, White had enormous control over the Company and as a result had the opportunity to defraud investors.

298.  White was strongly positioned to act on the opportunity to issue lowered guidance and push the Merger through given his position as CFO.

### (3)     Defendant Liaw

### (i)     *Defendant Liaw was Motivated to Defraud*

299.  Defendant Liaw was motivated to defraud investors because he wanted to close the Privatization and his fraud made that more likely.  Specifically, he had and was acting on the following incentives.

300.  Defendant Liaw served on Vista through nomination by IVP, an investment firm that had a significant shareholding in Mindbody.  IVP began investing in Mindbody in 2012 and made another investment in 2014.  Those investments were converted into Series B stock when Mindbody went public.  Therefore, by August of 2018, IVP's investment was already at least three years old, with portions of the investment dating back even farther.

301.  As Defendant Liaw has testified, when making an investment IVP, would look at a proposed exit or investment horizon for the investment.  Bloomberg has reported that IVP typically utilized a three-to-five year investment horizon.  In fact, an August 6, 2018 internal

presentation from a Partners Meeting states that IVP's target exit date for its Mindbody investment was "2018."

302. Therefore, IVP had a unique interest in exiting its position in IVP. The Privatization offered just such an exit opportunity, and created a strong incentive for it to accept a sub-optimal deal, since even a sub-optimal deal would provide an exit. Thus, wrongful behavior alleged herein, which increased the likelihood of the Privatization occurring, was beneficial to IVP, which benefit served as a powerful motivation for Defendant Liaw.

303. Additionally, as a large shareholder, IVP would struggle to dispose of its shares through open market sales, because doing so would be perceived by the market as a negative signal and because doing so would increase the supply of Mindbody stock. Defendant Liaw understood this, and has testified that if "public market investors" saw an "indicator" that IVP was looking to sell, this "might lead some investors to take a short position in the stock." In other words, Liaw understood that many would expect a sale by IVP to depress Mindbody's stock price.

304. Beyond allowing IVP to exit its position in Mindbody, the Privatization also offered IVP the opportunity to secure other benefits. For example, as part of the negotiation, Liaw received a proposed side agreement, which he circulated to IVP's CFO Tracy Hogan. He told IVP's CFO that in the agreement there were "some bells and whistles for IVP as the largest Class B (super-voting class) shareholder."

305. Additionally, IVP and Liaw, had the same incentives as the other Class B insider-shareholders to monetize the value of those shares before they converted into Class A shares, as explained in ¶ 287.

(ii)    *Defendant Liaw had the Opportunity to Defraud*

306.    As explained herein, and especially in Section VII, Liaw had enormous control over the Company and, as a result, had the opportunity to defraud investors. In particular, his role as the Chairman of the Committee gave him a significant opportunity to control the negotiation process, as did his role as the director nominee of one of Mindbody's shareholders with the greatest voting control over the Company.

**B.    Defendants Knew Material Undisclosed Information, Including Information Contradicting the False and Misleading Statements**

307.    The Company's high-level performance information, such as its projections, sales quotas and performance toward those quotas, and the overall status of the integration of FitMetrix and Booker, are matters that are so significant and **core to Mindbody's operations** that the information either was actually known to the Individual Defendants, or those Defendants were reckless in not knowing this information. Additionally, Defendants Stollmeyer and White demonstrated their knowledge of these topics by choosing to speak at length regarding these topics during Mindbody's earnings calls, Investor day event, and in other public filings.

**(1)    Mindbody's 4Q18 Guidance**

90



### (2) Post-Merger Employment Discussions

311.    Defendant Stollmeyer undeniably knew of his own discussions with Vista regarding post-Merger employment.

### (3) Mindbody 4Q18 Results



### C.    Suspicious Conduct

Various additional suspicious circumstances bolster the conclusion that Defendants acted with scienter.  Among those circumstances are (a) Defendant Stollmeyer's shocking disdain for public investors, (b) the decision to hire a deeply conflicted investment bank and then further conflict that bank with a payment structure that would massively incentivize them to close a Merger, even if the deal was not in the best interest for shareholders; (c) the decision to tout a lousy go shop as a key deal term and for Defendants White and Stollmeyer to go on vacation in locations with weak connectivity during that already weak go shop, (d) the suspicious nature of Stollmeyer keeping the deal a secret from the Board and swearing others to secrecy; (e) the decision not to disclose Vista's earlier much higher

"indication of interest" in the Merger proxies, (f) the decision not to issue the 4Q18 results ███

████████████████████████ (g) the recognition by Stollmeyer that he would lean into an

acquirer that he prefers, (h) the blatant removal of potential bidders from early outreach merely

based on Stollmeyer's personal employment preferences; and, last but not least, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

## VII.    CONTROL PERSON ALLEGATIONS

314.    The Individual Defendants, by virtue of their senior positions at Mindbody,

directly participated in the management and oversight of the Company, were directly involved in

the day-to-day operations of the Company at the highest levels, and were privy to confidential,

proprietary information concerning the Company and its business, operations, growth, financial

statements, and financial condition, as alleged herein.  Defendant Liaw has testified that "in the

ordinary course" the members of the Board would formally approve SEC filings before they are

actually filed with the SEC, typically conducting such confirmation by email.

315.    Defendant Stollmeyer was one of Mindbody's largest shareholders, served as the

Company's CEO, and was the Chairman of the Board.  He clearly possessed unmatched control

over the Company.  Defendant White was the Company's CFO and its chief operating officer.

He clearly had considerable control over the Company.  Defendant Liaw served on the Board as

the nominee of one of Mindbody's largest shareholders and led the Committee.  He too clearly

had considerable control over the Company.

316.    Due to their involvement in the sale of Mindbody to Vista, Individual Defendants

were active and culpable participants in the fraudulent scheme alleged herein.  For example,

Defendant Stollmeyer, as Chairman and CEO, was heavily involved in the negotiations with Vista as well as the dissemination of information through Proxy Materials. Defendant Liaw sat not only on the Board, but also served as Chairman of the Committee, he has testified that he reviewed and made edits to the misleading Final Proxy. Defendants Stollmeyer and Liaw both voted on the Privatization. White was influential in the negotiation process, serving as the Company's CFO, and corresponding with Defendant Stollmeyer about the Privatization during the negotiations.

317. Due to their involvement in the 3Q18 earnings release, including as active participants in the earnings call, Defendants Stollmeyer and White were participants in the false and misleading statements and omissions alleged in relation to that earnings release. Due to the nature of the fraud related to the 3Q18 earnings release, which falsely described the financial situation within the Company, Defendant White was clearly involved, as he was Mindbody's CFO.

318. As alleged in Section V, the Individual Defendants made the false statements and omissions alleged, and/or were signatories of the documents containing those statements and omissions, and as such were clearly in control of and participating in the wrongdoing related to those documents. Defendants were also culpable participants in the wrongdoing because they provided credibility to Mindbody's public disclosures by appearing in public events on behalf of Mindbody while the conduct alleged herein occurred; and/or did not act to prevent the wrongful conduct alleged herein, despite an ability to do so.

319. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Mindbody, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by Mindbody, the Committee,

93

and the Board during the Class Period.  The Individual Defendants were undoubtedly provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the facts specified herein had not been disclosed to, and were being concealed from, the public, and that the representations which were being made were then materially false and/or misleading.

320.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating materially false and misleading statements and/or concealing material information.  Each of the Individual Defendants were culpable for this deceit insofar as they acted, or omitted to act, in furtherance of the scheme with scienter.

## VIII.   LOSS CAUSATION

321.    Defendants' conduct resulted in Class Members, including Lead Plaintiffs, selling their shares of Mindbody stock for less than the fair value of that stock, which caused them to suffer injury and out of pocket loss.

322.    Additionally, Defendants' false and misleading statements and omissions depressed the price of Mindbody's stock.  As a result, Class Members selling their shares received less than the fair value of those shares.

323.    Additionally, the false depression of Mindbody's stock price had the result of making it less likely that there would be a bid that topped Vista's offer, because the supposed "premium," and depressed market price could be expected to deter other bidders.  This further injured investors.

324.   Additionally, Defendants' made false and misleading statements and omissions in the proxy materials, as described in Sections V(E)-(H), which proxy materials were an essential link in the accomplishment of the Privatization.  For the avoidance of doubt, the proxy materials were also rendered false and misleading by their reference to the supposed "premium," while failing to disclose that the market price had been depressed by false statements and omissions.

325.   Additionally, Defendants' false and misleading statements and omissions made the Privatization more likely to close, made the Privatization look more reasonable than it was (including by depressing the stock price), and otherwise induced Class Members to sell their shares for less than fair value.

326.   According to data on Bloomberg, on the day before the start of the Class Period, Mindbody's stock closed at $33.59 and in the 60 days prior to the Class Period Mindbody's stock had an average closing price of $36.61.  The closing price of Mindbody's stock on each date during the Class Period ranged from $21.72 per share to $36.86 per share.

327.   The fair value of Mindbody stock exceeded $36.50.  While an expert could conduct a comprehensive valuation of the stock upon the receipt of relevant information through discovery, the following publicly available information strongly establishes that the true valuation exceeded $36.50: (a) Vista's stated willingness to pay a premium to Mindbody's recent trading range, implying a willingness to pay a price of at least $49.50; (b) the deal process was inadequate and corrupted in the many ways detailed herein, implying that a robust deal process would have reached a higher price; (c) despite the corrupt deal process another potential bidder indicated that they believed Mindbody was "worth a lot more than $36.59;" (d) the Company's 3Q18 performance exceeded both the guidance stated during the 3Q18 earnings release and the prior analyst expectations, which performance implies a higher valuation was warranted; (d) the

95

analysts thought that the Privatization was a good deal for Vista; and (e) that the $36.50 deal price was a 18.2% discount to Mindbody's 52-week high as of the Privatization Announcement $44.60 per share, a 16.8% discount to Mindbody's stock price in late September 2018 ($43.85 per share), and a 11.5% discount to Mindbody's $41.25 in early October 2018.

328.    In addition to the damages just described, Defendants' conduct resulted in Class Members, including Lead Plaintiffs, suffering lost opportunity damages, which damages are obtainable where, like here, there is non-speculative evidence that a fraud disrupted investors ability to achieve a better result than they achieved due to the fraud.  Here, one better outcome than the Merger was a Merger at the price implied by Vista's direct indication of interest at a premium to Mindbody's then-recent trading range, which indication of interest implied a willingness to pay a price of at least $49.50.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE* AND FRAUD-ON-THE MARKET PRESUMPTIONS

329.    To the extent that reliance is an element of the claims asserted in this Action, Lead Plaintiffs are entitled to a presumption of reliance.

330.    Lead Plaintiffs and Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose, including under Delaware law disclosure duties.

331.    Lead Plaintiffs and Class members are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     Mindbody's Class A stock was actively traded on the NASDAQ, an informationally efficient market, under the ticker symbol "MB," throughout the Class Period;

(d)     Mindbody's Class A stock traded at high volumes during the Class Period;

(e)     Throughout the Class Period, Mindbody's Class A stock was registered with the SEC and Mindbody filed periodic public reports with the SEC;

(f)     Mindbody communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(g)     Mindbody was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, and each of these reports was publicly available and entered the public marketplace;

(h)      the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Mindbody's Class A stock; and

(i)     without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class sold Mindbody Class A stock between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had not yet been revealed.

332.    As a result of the foregoing, the market for Mindbody's stock promptly digested current information regarding Mindbody from publicly available sources and reflected such information in Mindbody's stock price.

333.   Lead Plaintiffs are not only entitled to a presumption that they relied on the market price when deciding whether to and how to vote their Mindbody Class A stock, whether to sell their Mindbody Class A stock, or whether to seek appraisal, Lead Plaintiffs also, in fact, did rely on that market price when engaging in those activities.

334.   For the avoidance of doubt, Plaintiffs are also entitled to invoke the doctrine established by *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970), which holds that where misleading or otherwise defective proxy materials are distributed to investors as part of a merger—in which minority shareholder support would required to close that Merger— shareholders are excused from any obligation to proof reliance or transaction causation.

## X.   NO SAFE HARBOR

335.   The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

336.   The Privatization was a "going private" transaction under the SEC rules governing such transactions and, therefore, the statements made in connection with the Transaction are not subject to the PSLRA's safe harbor.  *See* 15 U.S.C.A. § 78u-5(b)(E). Furthermore, even if the statements were not covered by this exemption, the statements at issue would not be protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

337.   First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions and, therefore, are not protected by the Safe Harbor.  Second, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied

98

by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

338.    Lead Plaintiffs bring this federal securities Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all owners and former owners of Mindbody publicly traded Class A common stock who sold their shares during the period from November 6, 2018 through February 14, 2019, inclusive (the "Class Period"), and were damaged thereby, except as excluded below (the "Class").

339.    Excluded from the Class Are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants and the directors and officers of Mindbody during the Class Period; (iii) any person who was an officer or director of Mindbody during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(iv) of this paragraph, in their capacities as such.

340.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Mindbody had approximately 45.4 million Class A common shares outstanding.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

341.    While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and

99

other members of the Class may be identified from records maintained either by Mindbody or by other customary means and may be notified of the pendency of this action by mail, using a form of notice as is customary in securities class actions.

342.    Lead Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

343.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

344.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)    whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)    whether Mindbody and the Individual Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)    whether Mindbody and the Individual Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

100

(e)    whether Mindbody and the Individual Defendants knew or recklessly disregarded that their statements were materially false and misleading;

(f)    whether Mindbody and the Individual Defendants acted with negligence in making statements or omissions that were materially false and misleading;

(g)    whether the Defendants engaged in a fraudulent scheme;

(h)    whether the Defendants engaged in a manipulative conduct;

(i)    whether Mindbody and the Individual Defendants acted with the intent to defraud Class members regarding the true value of Mindbody's stock;

(j)    whether Mindbody and the Individual Defendants' fraudulent conduct depressed the price of Mindbody stock during the Class Period;

(k)    whether the Individual Defendants were controlling persons of Mindbody;

(l)    whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(m)    whether and to what extent the shareholders of Mindbody suffered losses and/or experienced injury due to acts and omissions alleged herein.

345.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    COUNTS

### A.    Count I: Violation of § 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

346.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

347.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Lead Plaintiffs and the Class, against Mindbody and the Individual Defendants.

348.    Mindbody and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

349.    Mindbody and the Individual Defendants made materially false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

350.    Mindbody and the Individual Defendants made materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased Mindbody securities during the Class Period.

351.    Mindbody and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiffs and members of the Class; (ii) artificially deflate and maintain the prices of Mindbody's stock; and (iii) cause Lead Plaintiffs and members

of the Class to sell their Mindbody's stock at prices less than they would have absent the artificial deflation.

352.   Mindbody and the Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

353.   In ignorance of the materially false and misleading nature of Mindbody and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or omissions or upon the integrity of the market price for Mindbody's stock, Lead Plaintiffs and other members of the Class sold Mindbody's stock at artificially deflated prices during the Class Period.  But for the fraud, Lead Plaintiffs and members of the Class would not have sold Mindbody's stock at such artificially deflated prices.  By selling Mindbody's stock at these artificially deflated and artificially maintained prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

354.   By virtue of the foregoing, Mindbody and the Individual Defendants are liable to Lead Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**B.    Count II: Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5(a) and (c) Promulgated Thereunder Against Mindbody and the Individual Defendants**

355.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

103

356.    This Count is brought under the provisions of Rule 10b-5(a) and (c).  Accordingly, Lead Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

357.    During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and the Class; (ii) artificially deflate the market price of Mindbody's stock; and (iii) cause Lead Plaintiffs and Class members to sell Mindbody stock at artificially deflated prices.

358.    Defendants manipulative conducted included, but was not limited to, (a) disseminating negative false and misleading information about Mindbody for the purpose of depressing its stock price; (b) failing to disseminate truthful information for the purposes of maintaining an artificially depressed stock price; and (c) disseminating the negative information within the 3Q18 Disclosures (regardless of the falsity of that information), while omitting the material information that Mindbody was in merger negotiations including for the purpose of reducing Mindbody's stock price.

359.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud and manipulate, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a manipulation, fraud and deceit upon Lead Plaintiffs and the Class in connection with their sale of Mindbody's stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

360. Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included the intentionally misleading 3Q18 earnings release, which understated the Company's financial prospectus and falsely indicated that the integration of FitMetrix and Booker were causing these illusory performance issues, in order to induce investors to sell their shares to less than their true value, in furtherance of the Privatization.

361. Lead Plaintiffs and the Class reasonably relied upon the integrity of the market in which Mindbody's stock traded.

362. During the Class Period, Lead Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Lead Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have sold Mindbody's stock (or if they had, would not have done so at the artificially deflated prices paid for such securities) or approved the merger.

363. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their sale of Mindbody stock during the Class Period.

364. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiffs and the Class for damages suffered in connection with their sale of Mindbody stock during the Class Period.

### C. Count III: Violations of Section 14(a) of the Exchange Act

365. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

366.    SEC Rule 14a-9,17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

367.    Defendants prepared, reviewed and/or disseminated the false and misleading Proxy Statement which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

368.    As stated herein, and in particular in Sections V(D)-(H) the Proxy Statement contained untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, which the Proxy Statement was an essential link in the consummation of the Merger.  The Defendants have also failed to correct the Proxy Statement and the failure to update and correct false statements is also a violation of § 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

369.    The written communications made by the Defendants described herein constitute violations of Rule 14a-9 and §14(a) because such communications are materially false and/or misleading and were provided in at least a negligent manner.

370.    As a direct result of the Defendants' fraudulent and/or negligent preparation, review and dissemination of the false and/or misleading Proxy Statement, members of the Class were deprived of their right to be presented with accurate proxy materials while asked to vote on the Privatization, were caused to vote in favor of the Privatization, were caused to not exercise

106

their appraisal rights, and were caused to sell their shares for less than the fair value of those shares.

371.    At all times relevant to the dissemination of the materially false and/or misleading Proxy Statement, Defendants were aware of and/or had access to the true facts concerning the process involved in selling Mindbody and Mindbody's true value, which was far greater than the $36.50 per share Mindbody's shareholders received.  Thus, as a direct and proximate result of the dissemination of the false and/or misleading Proxy Statement Defendants used to obtain shareholder approval of and thereby consummate the Merger, Lead Plaintiffs and the class have suffered damage and actual economic losses (*i.e.*, the difference between the price Mindbody shareholders received and Mindbody's true value at the time of the Merger) in an amount to be determined at trial.

372.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.  In addition, a reasonable investor would view a full and accurate disclosure as having significantly altered the "total mix" of information made available in the Proxy Statement and in other information reasonably available to shareholders.

373.    By reason of the misconduct detailed herein, the Defendants are liable pursuant to § 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

### D.    Count IV: Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

374.    Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

375.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of Lead Plaintiffs and the Class, against the Individual Defendants.

376. As alleged above, Mindbody violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as well as Section 14(a) of the Exchange Act and 14a-9 promulgated thereunder, by making materially false and misleading statements and omitting material information in connection with the purchase of Mindbody's stock.

377. This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period. Thus, Mindbody is primarily liable under Section 10(b) of the Exchange Act.

378. As set forth above, the Individual Defendants were controlling persons of Mindbody during the Class Period, due to their senior executive positions with the Company, positions on the Board, and significant control over the Company's stock. Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations. The Individual Defendants also were culpable participants in the conduct alleged herein.

## XIII. PRAYER FOR RELIEF

379. WHEREFORE, Lead Plaintiffs respectfully pray for judgment against the Defendants as follows:

A. Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Labaton Sucharow LLP as lead class counsel pursuant to Rule 23(g);

B. Determining and declaring that Defendants violated the Exchange Act, as charged in Counts I-IV, by reason of the acts, omissions and, status of control alleged herein;

C.      Awarding Lead Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon; and

D.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by Lead Plaintiffs' consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XIV.  JURY DEMAND

380.    Lead Plaintiffs demand a trial by jury of all issues so triable.

DATED:  February 24, 2021

Respectfully submitted,

*/s/ Carol C. Villegas*

Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
dschwartz@labaton.com
jbissell-linsk@labaton.com

*Counsel for Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd, and Lead Counsel for the Class*

109