# Labaton Sucharow

**Carol C. Villegas**
Partner
212 907 0824 direct
212 907 0700 main
212 883 7524 fax
cvillegas@labaton.com

**New York Office**
140 Broadway
New York, NY 10005

February 24, 2021

The Honorable Valerie E. Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 443
New York, NY 10007

RE:          *In re Mindbody, Inc. Securities Litigation*, No. 1:19-cv-08331-VEC

Dear Judge Caproni:

I write on behalf of Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd. ("Plaintiffs") seeking leave to amend the Amended Class Action Complaint (the "AC") (ECF No. 22), with the Proposed Second Amended Complaint ("PSAC").[1]

## I.      Background

This securities fraud action involves a going-private merger transaction whereby Vista, a private equity fund, purchased Mindbody, a publicly traded company, from its shareholders. Plaintiffs allege that Defendants artificially depressed the Mindbody's  stock price prior the merger, and ultimately defrauded investors into selling their shares for less than fair value.

The AC explained that prior to November 6, 2018, Defendant Stollmeyer had engaged in serious merger talks with Vista.  Then, Defendants issued 4Q18 guidance that was lower than their true expectations for Mindbody, and falsely attributed the reduced guidance to issues with the integration of two recent acquisitions, in order to drive down Mindbody's stock price.  Later, despite learning that Mindbody had beaten its 4Q18 guidance, Defendants chose not to disclose these results.  Instead, they issued proxies that (a) misleadingly touted the merger "premium," despite knowing that this premium was misleading in light of the false guidance and 4Q18 results and (b) falsely denied that Defendant Stollmeyer had engaged in any discussions with Vista about post-Merger employment, when he had engaged in at least some discussions.

On September 25, 2020, the Court partially denied Defendants' motion to dismiss by sustaining claims regarding (a) the "failure to disclose" Mindbody's 4Q18 results and related misstatements; and (b) statements denying that there had been employment discussions between Stollmeyer and Vista.  ECF No. 52 at 1, 27 n.13 ("MtD Order").  However, the Court held the AC had not pled the other claims sufficiently to meet the applicable heightened pleading rules.

Now, through discovery, Plaintiffs have ample evidence to support the claim that Defendants issued false 4Q18 guidance, and so Plaintiffs seek to allege claims based on that evidence.  Additionally, the PSAC introduces new allegations showing that Defendants learned of the 4Q18 results by no later than January 4, 2019, slightly earlier than alleged by the AC.

---

[1] **Exhibit A** is a blackline comparing the AC to the PSAC, **Exhibit B** is a copy of the PSAC, Exhibit C includes exhibits A-K to the PSAC (which were filed as exhibits to the AC), and Exhibit D includes exhibits 1-21 to the PSAC.

**Labaton**
**Sucharow**

February 24, 2021
Page 2

## II.    The Motion to Amend is Appropriate Under the Applicable Standards[2]

Courts should "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Motions to amend are to be "granted liberally" and may "***only***" be denied in a narrow set of circumstances such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Pearlstein v. BlackBerry Ltd.*, 2017 WL 4082306, at *2 (S.D.N.Y. Sept. 13, 2017) (emphasis added) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)).

## III.    Amendment is Not Futile

In considering if amendment is futile, "courts conduct an inquiry comparable to the analysis governing motions to dismiss."  *Id.* at *2 (citation omitted).[3]

### a.  The Fraudulent 4Q18 Guidance

The MtD Order held that Plaintiffs "failed to plead facts to support a strong inference that Defendants actually expected revenue would be higher than what they announced."  MtD Order at 17.  The PSAC now meets the pleading standard by adding the following allegations.

**First**, Plaintiffs now have documentary evidence showing that in the weeks and days before the 4Q18 guidance was issued, contemporaneously with the issuance of that guidance, and throughout the rest of 4Q18, Mindbody's internal forecasts consistently documented the expectation that Mindbody would achieve results **above the top** of the publicly stated guidance range. *E.g.*, Ex. B ¶¶ 132-63.  The guidance range was $66-67 million, whereas internal forecasts at the time that guidance was issued were at $68.1 million.  The internal forecasts were Mindbody's "best" estimate of expected performance (*id.* ¶ 156 (Goodman Dep.), were spot on with the ultimate 4Q18 results ($68.3 million), and were known to Defendants.  *Id.* ¶¶ 132-63.

The PSAC also alleges other new evidence showing that Defendants knew the publicly issued guidance was inconsistent with the true internal expectations within Mindbody.  For example, the AC referenced a November 3, 2018, text message stating that after October, (*i.e.*, one-third of the way through the quarter) "we are on track to hit our forecast" and there was nothing "that would materially change our assumptions for the preceding months."  However, that text takes on new meaning now that those internal forecasts are undeniably known to be above the guidance range, and the PSAC now alleges that the text came from Mindbody's Senior Finance Manager Kyle Hearhart, was sent to Financial Planning and Analysis Manager Craig Heinle, and then the message was forwarded directly to Defendant White.  *Id.* ¶¶ 139-40.

---

[2] The PSAC makes a variety of revisions to update the pleadings or otherwise conform the allegations to the MtD Order, but the changes justifying amendment are those related to the 4Q18 guidance, motives, and the 4Q18 results.

[3] As discovery progresses, Plaintiffs expect to continue finding evidence of Defendants fraud.  Some of the most important sources of information – such as the depositions of the Individual Defendants has not yet occurred. However, the pleadings are sufficiently strong at this stage to survive a motion to dismiss.

# Labaton Sucharow

February 24, 2021
Page 3

These allegations are sufficient to plead a strong inference that Defendants' guidance was false and misleading. *In City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) (guidance statements actionable given undisclosed facts); *In re Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *6 (E.D.N.Y. Dec. 5, 2013) (finding "revenue projection statements" actionable); *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *8 (S.D.N.Y. Nov. 19, 1999) ("[L]iability may follow where management intentionally fosters a mistaken belief concerning . . . earnings prospects.") (citation omitted). Furthermore, it is well accepted that scienter is well pled where there is evidence that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

Regardless of Defendants' expectations, these allegations strongly demonstrate that it was misleading to disclose the reduced guidance without revealing that the forecasts exceeded that guidance. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) ("once a company speaks on an issue or topic, there is a duty to tell the whole truth."); *Aeropostale*, 2013 WL 1197755, at *12–13 ("Plaintiff does not need to rely on the falsity of financial projections [themselves] in order to show that [defendants] fail to disclose facts that impacted the reliability of those statements") (citation omitted). Additionally, Defendants blamed the reduced guidance on the ongoing integrations, when the integrations clearly were not the cause of the downward revision, since the internal forecasts indicated the reduced guidance did not reflect the real expectations. *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (statements are judged "by the ability of the material to accurately inform rather than mislead.").

**Second**, the MtD Order rejected allegations of Defendant Stollmeyer's motive to issue false guidance. New evidence shows that — consistent with his statements in a podcast that his wealth was locked in Mindbody and his liquidity was constrained by his inability to sell shares, absent a merger, without garnering shareholder backlash (*id.* ¶ 284)— Stollmeyer was seriously cash constrained in ways that would have motivated him to jump on even a suboptimal deal. In early 2018 he notified his personal financial advisors that he was generating greater than expected cash outlays due to various personal expenses, ███████████████, and investments, ███████████████ to try to free up cash and used a line of personal credit to cover his expenses. *Id.* ¶¶ 285-86. As Stollmeyer would later write to his financial advisors, the Merger finally gave him the ability to move from "wealthy on paper" to "wealthy in practice." *Id*. *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1036 (Del. Ch. 2012) (recognizing need for liquidity as cognizable motive).[4]

Similarly, the AC had pled that Stollmeyer also possessed unique motives to favor taking Mindbody private because of his antipathy to public investors and disdain for serving as a public CEO. New evidence supports this motive, including a text message Stollmeyer sent to Defendant White, after learning of the 4Q18 results, stating: "One question: should we plan on a last Earnings Call? **My script: 'here's our big beat.  Adios mutha fuckahs.'**" (sic). *Id.* ¶ 216. Of course, no such earnings call was ever held, and the public investors he described using such

---

[4] After the MtD Order, a Delaware Chancery court opinion held that the alleged motive regarding Stollmeyer's liquidity constraints, along with allegations regarding Stollmeyer's future employment prospects, "land a powerful one-two punch." *In re Mindbody, Inc.*, 2020 WL 5870084, at *16 (Del. Ch. Oct. 2, 2020).

# Labaton Sucharow

February 24, 2021
Page 4

vulgarity were left in the dark about the results. *See SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970) (securities law would be "frustrated" if those who act on "non-pecuniary motives" were outside its reach); *In re Tesla, Inc. Sec. Litig.,* 477 F. Supp. 3d 903, 930 (N.D. Cal. 2020) (inference of scienter supported by Elon Musk's stated desire to "burn the shorts" by rapidly causing Tesla's price to spike).

**Third**, the PSAC details an email chain in which the 4Q18 results are discussed by White, Liaw and others. *Id.* ¶ 218. White states that disclosing the 4Q18 results would be the "right thing to do," but Liaw notes that it may "bolster" the position of shareholders opposed to the deal, and then they discuss the possibility of the Merger failing as a result. *Id.* Next, they scheme about how they could reaffirm 2019 forecasts in hopes of moving votes "into the 'yes' column" to offset the effect of disclosing the higher-than-guided 4Q18 results. *Id.* Then, White suggests they could give "2019 revenue guidance based on the 2019 forecast . . . **haircutting it for a beat in raise . . . [because] that would definitely move votes to 'yes.'"** *Id.* ¶ 218(g).

The context here is important. The notion that they would be both setting up a "beat and raise" and trying to move votes to "yes" is nonsensical. If the Company privatized there would be no future earnings calls to announce the "beat and raise." Rather, it clear that White was using the phrase "haircut[] for a beat and raise" as euphemism, for issuing guidance below true expectations to manipulate shareholders into voting yes, by making Mindbody look worse. This mirrors the allegations that the 4Q18 guidance was intentionally depressed to set the stage for the Merger, and supports the inference that Defendants had previously done exactly what they were plotting to do in these emails (*i.e.*, "haircut" guidance to manipulate investors). *See Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 126 (E.D.N.Y. 2011) ("attempt to conceal the problem" was indicative of scienter); *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23-24 (2d Cir. 2017) (crediting secret meetings as indicia of scienter); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) ("unusual or suspicious" circumstances support for scienter).

### b. The 4Q18 Results

The MtD Order sustained claims based on the non-disclosure of the 4Q18 results in violation of affirmative duties to disclose and based on certain misstatements. MtD Order at 1, 27 n.13. The PSAC would add allegations that Defendants actually learned of the 4Q18 results on January 4, 2019 – earlier than the date the Court previously found to be actionable. *Id.* ¶ 214. The claims were already held to be well pled, and there is no basis to believe that this modest amendment to enlarge those claims would be futile.

## IV.    The Time is Ripe to Amend

The proposed amendment is based on material produced in discovery and testimony from depositions. In this complex securities class action, Defendants and third parties have produced tens of thousands of documents, with the earliest of that production being received less than three months ago. Plaintiffs subsequently began diligently reviewing those documents – prioritizing review of those documents necessary to prepare for depositions. It has been less than three months since the receipt of those documents. The request to amend is timely and reasonable. *Cano v. DPNY, Inc.*, 287 F.R.D. 251, 260 (S.D.N.Y. 2012) (rejecting contention that delay of seven months was "inordinate delay," where discovery was still ongoing); *Dilworth v. Goldberg*,

# Labaton Sucharow

February 24, 2021
Page 5

914 F.Supp.2d 433 (S.D.N.Y. 2012) (similar); *see generally Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ("Mere delay . . . does not provide a basis for a district court to deny the right to amend" (citations omitted)).

Permitting amendment based on information obtained in discovery is common practice. *E.g.*, *Kirk v. Metro Transp. Auth.*, 2001 WL 258605, at * 17 (S.D.N.Y. Mar.14, 2001) (permitting amendment "to plead facts learned in discovery"); *Walker v. Fitzpatrick*, 2019 WL 1208150, at *4 (N.D.N.Y. Mar. 14, 2019), *aff'd,* 814 F. App'x 620 (2d Cir. 2020) (same). The common practice of amending based on discovery extends to securities cases. *E.g., In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548, at *2–3 (S.D.N.Y. Mar. 22, 2012) (granting leave to amend securiites complaint based on discovery and noting that "[c]ourts routinely grant leave to amend when a plaintiff seeks to refine the complaint to reflect evidence obtained during discovery"); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 129 (S.D.N.Y. 2013) (permitting post-discovery amendment to revive securities claims); *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 790 & n.3 (N.D. Cal. 2005) (same).

## V.      Amendment Would Not Cause Prejudice or Undue Delay

Amendment may be prejudicial if it would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of Am.*, *N.A.*, 626 F.3d 699, 725–26 (2d Cir. 2010) (quotations omitted). Amendment would not delay discovery. Defendants have not yet taken any depositions and Plaintiffs are willing to continue discovery on the existing schedule, including in coordination with Delaware litigation about the Merger (as Defendants have requested), so that fact discovery can still close on May 21, 2021. ECF No. 65. Amendment may justify a slight delay in Plaintiffs' motion for Class Certification (ECF Nos. 68-69), but this would not "significantly delay" resolution of the case. *AEP,* 626 F.3d at 725.[5]

The Second Circuit is most hesitant to permit amendment where "doing so unfairly surprises the non-movant and impedes the fair prosecution of the claim." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000). But here, the amendment relates entirely to claims that were pled in the AC — which fully apprised Defendants of those claims. Lead Counsel previewed that such amendment may be requested in the October 23, 2020 hearing. ECF No. 62, Hr'g Tr. at 4:9-11 (C. Villegas stating that exploring the facts will help Plaintiffs "determine the class period"). Further, in an October 8, 2020, meet and confer, Plaintiffs' counsel told Defendants' that Plaintiffs would seek to amend if evidence supported doing so.

## VI.      Conclusion

The PSAC presents significant new allegations, plead non-futile claims, and do not otherwise raise issues that weigh against the rule that leave to amend shall be freely granted.

---

[5] To the extent that the Court deems the potential delay in Class Certification as a reason to deny leave to amend, Lead Plaintiffs are prepared to move for class certification on March 1, 2021, and can then move to amend the class definition if and when the PSAC is sustained, which Lead Plaintiffs submit would be less efficient, but would also not amount to undue prejudice or otherwise raise any issues of sufficient severity to warrant denying leave to amend.

**Labaton Sucharow**

February 24, 2021
Page 6

By: */s/ Carol C. Villegas*
Carol C. Villegas
140 Broadway, 34th Floor
New York, NY  10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com

***Lead Counsel for Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd., and Lead Counsel for the Class***