**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Index No. 1:19-cv-08331-VEC |

**MEMORANDUM OF LAW IN OPPOSITION TO LEAD PLAINTIFFS' MOTION
SEEKING LEAVE TO AMEND THE AMENDED CLASS ACTION COMPLAINT**

Patrick Gibbs
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5535

Sarah M. Lightdale
Brian M. French
Daniel P. Roy III
COOLEY LLP
55 Hudson Yards, 44th Floor
New York, New York 10001
(212) 479-6374

*Attorneys for Defendant Eric Liaw*

Matthew Solum, P.C.
John Del Monaco
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Defendants MINDBODY, Inc.,
Richard L. Stollmeyer, and Brett White*

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...........................................................................................................1

BACKGROUND ..............................................................................................................................3

      A.    Overview.................................................................................................................3

      B.    Mindbody Underperforms Throughout 2018.........................................................4

      C.    Mindbody Misses Its Previously Reduced Q3 Revenue Guidance and
           Slightly Reduces Its Q4 Guidance ........................................................................5

      D.    Stollmeyer's Liquidity ...........................................................................................7

      E.    Procedural History .................................................................................................9

LEGAL STANDARDS ..................................................................................................................10

ARGUMENT .................................................................................................................................12

I.      LEAD PLAINTIFFS ARE PROCEDURALLY BARRED FROM ADDING
        BACK THEIR DISMISSED CLAIM...............................................................................12

II.     LEAD PLAINTIFFS' MOTION TO AMEND IS FUTILE ............................................13

      A.    Safe Harbor 1: Lead Plaintiffs' Amendment Fails Because the Guidance
           Statements Are Protected Under the PSLRA Safe Harbor for Forward-
           Looking Statements with Meaningful Cautionary Statements ..............................14

      B.    Safe Harbor 2: Lead Plaintiffs' Proposed Amendment Falls within the
           Safe Harbor Because There is No Allegation the Q4 Guidance Statements
           Were Knowingly False, or Otherwise Made with Scienter ..................................16

           1.    There is Nothing Inherently False or Misleading About Forward
                 Guidance That Is More Conservative Than an Internal Projection ..........16

           2.    Lead Plaintiffs Have Not Alleged Scienter.................................................19

      C.    Case Law Does Not Support Lead Plaintiffs' Theory of Securities Fraud............24

CONCLUSION................................................................................................................................25

———

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allaire Corp. v. Okumus*,
   433 F.3d 248 (2d Cir. 2006)........................................................................................3

*In re APAC Teleservice, Inc. Sec. Litig.*,
   1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999).........................................................25

*Arfa v. Mecox Lane Ltd.*,
   2012 WL 697155 (S.D.N.Y. Mar. 5, 2012),
   *aff'd*, 504 Fed. Appx. 14 (2d Cir. 2012) ................................................................25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007).............................................................................4, 7, 19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................11

*Cantore v. City of N.Y.*,
   2017 WL 11501442 (S.D.N.Y. Sept. 15, 2017).....................................................13

*City of Hialeah Emps.' Ret. Sys. v. FEI Co.*,
   289 F. Supp. 3d 1162 (D. Or. 2018) ......................................................................16

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .......................................................25

*Colbert v. Rio Tinto PLC*,
   824 F. App'x 5 (2d Cir. 2020) ..................................................................................4

*In re Duane Reade Inc. Sec. Litig.*,
   2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003),
   *aff'd sub nom. Nadoff v. Duane Reade, Inc.*,
   107 F. App'x 250 (2d Cir. 2004) ............................................................................24

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase
   Co.*,
   553 F.3d 187 (2d Cir. 2009).....................................................................................19

*Emps' Ret. Sys. of Gov't of the V.I. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)......................................................................................25

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)......................................................................................................19

*Foman v. Davis*,
   371 U.S. 178 (1962)......................................................................................................10

*Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*,
   615 F. Supp. 2d 218 (S.D.N.Y. 2009)...........................................................................14

*In re Gen. Elec. Co. Sec. Litig.*,
   2012 WL 90191 (S.D.N.Y. Jan. 11, 2012) ...................................................................14

*In re Gen. Motors LLC Ignition Switch Litig.*,
   257 F. Supp. 3d 372 (S.D.N.Y. 2017),
   *modified on reconsideration*, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017)..............13

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020),
   *aff'd*, 2021 WL 745310 (2d Cir. Feb. 26, 2021) ........................................................16

*Harris v. AmTrust Fin. Servs., Inc.*,
   135 F. Supp. 3d 155 (S.D.N.Y. 2015) (Caproni, J.),
   *aff'd*, 649 F. App'x 7 (2d Cir. 2016)....................................................................11, 12

*Holbrook v. Trivago N.V.*,
   2019 WL 948809 (S.D.N.Y. Feb. 26, 2019),
   *aff'd sub nom. Shetty v. Trivago N.V.*,
   796 F. App'x 31 (2d Cir. 2019) .....................................................................................24

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)...........................................................................................20

*Kuwait Inv. Office v. Am. Int'l Grp.*,
   128 F. Supp. 3d 792 (S.D.N.Y. 2015)............................................................................11

*McCarthy v. Dun & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007)...........................................................................................10

*McCauley v. City of Chicago*,
   671 F.3d 611 (7th Cir. 2011) .........................................................................................11

*MDB LLC v. Hussain*,
   2016 WL 1267793 (S.D.N.Y. Mar. 29, 2016) (Caproni, J.).........................................10

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006).........................................................................................................11

*Nguyen v. MaxPoint Interactive, Inc.*,
   234 F. Supp. 3d 540 (S.D.N.Y. 2017)............................................................................24

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)........................................................................................10

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................................12

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015),
  *aff'd sub nom. Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).........................................................................................15

*In re Sierra Wireless, Inc. Sec. Litig.*,
  482 F. Supp. 2d 365 (S.D.N.Y. 2007)..........................................................................14

*Slayton v. Am. Express Co.*,
  604 F.3d 758 (2d Cir. 2010)...........................................................................13, 14, 16, 20

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008)..........................................................................................4

*Stern v. Gen. Elec. Co.*,
  924 F.2d 472 (2d Cir. 1991)..........................................................................................12

*In re Symbol Techs., Inc. Sec. Litig.*,
  2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) .............................................................25

*TechnoMarine SA v. Giftports, Inc.*,
  758 F.3d 493 (2d Cir. 2014).........................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................................4, 11, 19

*Tung v. Bristol-Myers Squibb Co.*,
  412 F. Supp. 3d 453 (S.D.N.Y. 2019).........................................................................19

**Statutes**

15 U.S.C. § 77z-2(c)(1)(B)(ii) ......................................................................................13

15 U.S.C. § 78u-4(b)...............................................................................................11, 19

15 U.S.C. § 78u-5(c)(1) ................................................................................................14

**Rules**

Fed. R. Civ. P. 9(b) .......................................................................................................11

Fed. R. Civ. P. 41(b) ...............................................................................................12, 13

Rule 15(a)(2)...................................................................................................................10

**Other Authorities**

Alejandro Cremades, *Rick Stollmeyer on Selling For $1.9 Billion The Company That He Created Out of His Own Garage*, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage ................................................................................................. 7, 23

Baruch Lev, *How to Win Investors Over*, Harvard Business Review (Nov. 2011) ....................... 16

Beth McKenna, *Stitch Fix Stock Plunges on Earnings Release: 6 Metrics You Should See*, THE MOTLEY FOOL (March 9, 2021), https://www.fool.com/investing/2021/03/09/stitch-fix-stock-plunges-on-earnings-release-6-met/ ................................................................................................. 6

John R. Graham et al., *The Economic Implications of Corporate Financial Reporting* J. Acct. & Econ. 3, 29 (2005) ................................................................................. 17

Leigh Salvo, *Internal Forecasts, Guidance and Consensus Considerations*, Gilmartin Group (May 17, 2019), https://gilmartinir.com/internal-forecasts-guidance-and-consensus-considerations/ ................................................................................. 17

William Ciconte, III, et al., *Does the Midpoint Range Earnings Forecasts Represent Managers' Expectations?*, 19 Rev. Account. Stud. 628 (2013), http://bear.warrington.ufl.edu/tucker/2013-2_management_range_forecasts.pdf ................................................................................. 17

Defendants Mindbody, Inc. ("Mindbody" or the "Company"), Richard L. Stollmeyer, Brett White, and Eric Liaw respectfully submit this memorandum of law in opposition to Lead Plaintiffs' motion for leave to amend the Amended Class Action Complaint ("FAC") and file the Proposed Second Amended Complaint ("PSAC").

## PRELIMINARY STATEMENT

On September 25, 2020, the Court dismissed with prejudice five of the seven categories of misstatements alleged in the FAC.  (Dkt. No. 52 at 13 (the "Opinion").)  In a desperate attempt to tack on two additional months to the class period, Lead Plaintiffs now attempt to revive one such previously dismissed category:  "that Mindbody, via Stollmeyer and White, misrepresented expected revenue for fourth quarter 2018 when it guided investor expectations downwards on November 6, 2018."  (Op. at 16.)  Lead Plaintiffs try to plead around the vast body of discovery now in their possession by cherry-picking and miscasting snippets of documents and testimony.[1]  Most egregiously, Lead Plaintiffs omit the deposition testimony of two former independent Mindbody directors—members of Mindbody's Audit Committee and nonparties to this Action—that conclusively establishes that the decision to reduce Q4 2018 revenue guidance was based on legitimate, good-faith business judgment.[2]  Even with these tactics, Lead Plaintiffs' effort fails for two independent reasons.

---

[1]  Lead Plaintiffs have received over 400,000 pages of discovery material, and as of filing their motion seeking leave to amend, had already participated in the deposition of three former independent directors of Mindbody as well as Stollmeyer's financial advisor.  From that immense volume of information they have come forward with a small set of new documents and the testimony of only one former director who was not on the Audit Committee.  The other two former directors Lead Plaintiffs deposed before filing their motion were members of Mindbody's Audit Committee, which oversaw the Q4 guidance decision and cogently described why the Q4 guidance revision was appropriate, but their depositions are not even mentioned in the PSAC.  Similarly, the PSAC omits entirely the testimony of Stollmeyer's financial advisor regarding Stollmeyer's personal finances and personal liquidity.

[2]  Defendants do not intend to reargue the motion to dismiss, but are compelled to note that the testimony of these witnesses also puts the lie to Lead Plaintiffs' theory that the decision not to release the Company's preliminary Q4 revenue ahead of the shareholder vote was improper and intended to deceive investors.  Plaintiffs fastidiously avoided citing or relying on the testimony of the Audit Committee members in the PSAC because those directors made clear that the decision not to pre-release preliminary revenue figures made eminent sense, especially in light of the headwinds facing the company in the then-upcoming year, 2019.

For starters, Lead Plaintiffs' Q4 guidance claim is barred *de jure*. Under this Court's rules, Lead Plaintiffs were required to address pleading defects in response to Defendants' motion to dismiss the FAC through an amendment. They failed to do so. Accordingly, the Court's subsequent dismissal of Lead Plaintiffs' Q4 guidance claim was with prejudice. This claim therefore is foreclosed as a matter of law.

The proposed amended claim should also be rejected as futile. Lead Plaintiffs' contention that they have cured the fundamental pleading defect in their Q4 guidance claim rests principally on their new allegation that there were internal revenue forecasts that were slightly higher than the revenue guidance issued to the market in Q4. Lead Plaintiffs posit that this minimal difference gives rise to a securities law claim for intentional fraud. That is wrong.

The PSLRA "safe harbor" protects the "forward looking" Q4 guidance from the very type of hindsight attack leveled here. That the guidance was accompanied by meaningful disclosures provides a complete shield. Additionally, Lead Plaintiffs have failed to allege Defendants had actual knowledge that the Q4 guidance was false or misleading. Contrary to Lead Plaintiffs' premise, there is nothing inherently false or misleading about revenue guidance that differs (slightly) from an internal forecast. As recognized by a host of authorities (cited below), it is a market norm for public companies to set guidance more conservatively than internal forecasts. Not only are there robust authorities contradicting Lead Plaintiffs' premise, but also a research analyst covering Mindbody stock published a report explaining to investors how this market practice applied to Mindbody. Following a standard practice well understood by investors is the antithesis of an attempt to misstate or mislead.

Nor does the PSAC do anything to address the fatal deficiencies this Court identified with Lead Plaintiffs' scienter allegations. Essentially all of Lead Plaintiffs' new allegations pertain only to Stollmeyer and make zero logical sense. Lead Plaintiffs suggest that Stollmeyer

possessed a desire for financial liquidity and had an antipathy to public markets that motivated him to engineer a sale of the Company. But the notion that these alleged motivations would cause him to *lower* the Company's Q4 guidance is a complete non sequitur. Lead Plaintiffs do not and cannot logically explain how reducing guidance would achieve Stollmeyer's supposed goal of facilitating the sale of Mindbody.

In short, even with their selective pleading efforts, Lead Plaintiffs have come forward with no new allegations that reasonably suggest that Mindbody's Q4 revenue guidance was false, let alone intentionally false. The proposed amended claim would therefore be futile, and, respectfully, the motion should be denied.[3]

### BACKGROUND[4]

In the interest of efficiency, Defendants briefly summarize only the relevant factual background below. Defendants refer to their motion to dismiss the FAC for a full recitation of the background. (*See* Dkt. No. 36 at 2-10 ("MTD Br.").)

### A.    Overview

This case centers on the February 2019 acquisition of Mindbody (a software company that caters to small businesses like gyms and salons and had never turned an annual profit), in which stockholders received $36.50 per share, or a 68% premium to the pre-announcement

---

[3]    Lead Plaintiffs also seek to add new allegations that Defendants learned of Mindbody's preliminary, unaudited Q4 2018 revenue results on January 4, 2019 rather than January 5, 2019, as originally pled. (*Compare* PSAC ¶ 312, *with*, FAC ¶ 306.) In the event the Court denies leave with respect to the Q4 guidance claim, this aspect of the proposed amendment should also be denied. In that instance, the proposed amendment would be meaningless given that changing the date Mindbody became aware of its Q4 performance would have no practical effect on Plaintiffs' claims, which necessarily begin with the first alleged misstatement following awareness of Mindbody's preliminary, unaudited Q4 2018 revenue. Because that first subsequent alleged misstatement remains the Preliminary Proxy that was filed on January 9, 2019 (PSAC ¶ 256), this proposed amendment is irrelevant. (*See* Op. 27-28 (finding that "the failure to disclose Mindbody's positive 4Q18 performance **when discussing Mindbody's share price and Vista's acquisition price** is actionable under Rule 10b-5, to the extent that **such statements were made on or after January 5, 2019**.").) All emphasis is supplied and citations are omitted, unless otherwise indicated.

[4]    Defendants contest the veracity of many of Lead Plaintiffs' allegations as many of them are flatly contradicted by the record evidence, and recite those allegations here solely for purposes of this motion. *See, e.g.*, *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006).

trading price.  Parroting the same fanciful narrative invented by a former Mindbody shareholder in a parallel Delaware litigation, Lead Plaintiffs attempt to construct federal securities law claims based on the theory that Defendants intentionally deflated the stock of Mindbody to allow Vista to purchase the Company at a discount.  Lead Plaintiffs propose a putative class comprised of shareholders who sold their stock in the lead up to the acquisition, purportedly at a price that was fraudulently depressed.  Through their proposed amendment, Lead Plaintiffs seek to extend the class period back to early November 2018, based on their previously dismissed claim that Defendants intentionally issued fraudulently low Q4 revenue guidance to depress Mindbody's stock price and pave the way for the Company's acquisition by affiliates of Vista.

**B.      Mindbody Underperforms Throughout 2018**

At all relevant times, Stollmeyer was Mindbody's Chairman and CEO, White was its CFO and COO, and Liaw served on the Board and the Audit Committee.  (PSAC ¶¶ 60-62.) Liaw is a general partner of nonparty IVP, a private equity investment firm that held a large stake in Mindbody before the Vista acquisition on February 15, 2019 (the "Merger").  (*Id.* ¶ 62.)

When reporting financial results, Mindbody disclosed a variety of performance metrics and also issued forward-looking guidance.  (Ex. 1 ("Earnings Release").)[5]  Mindbody's forward guidance, like the guidance of other public companies, included a range of potential revenue

---

[5]    References to "Ex. _" are to exhibits accompanying the declaration of John Del Monaco.  Under the PSLRA, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

The Court may also take judicial notice of analyst reports and press coverage. *Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 10 n.5 (2d Cir. 2020) ("Thus, we can take notice of the fact that there was such coverage and reports by investment analysts in April 2012, several months before the November SEC filing in question"); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.") (emphasis in original).  The exhibits cited herein consist of SEC filings, call transcripts, historic stock price data, publicly available analyst reports and press coverage, and various documents that are expressly incorporated into the PSAC by reference.

-4-

outcomes for the future quarter or year. (Ex. 2 at 78:5-8 ("Stollmeyer Tr.".) The Audit Committee oversaw Earnings Releases and Quarterly/Annual Reports. (*See* Ex. 3 at 2-5.), and was comprised of independent directors—Liaw, Cipora Herman and Graham Smith (the committee chair). (Ex. 4 at 22 ("2018 Proxy").)

During the Company's Q2 earnings call, Stollmeyer reported that there had been "solid progress on . . . integration" of the two companies Mindbody acquired earlier in 2018, noting that the integration would "fuel strong growth in the target market [and] customer base in 2019." (Ex. 5 at 5.) Stollmeyer also stated that the integration was "a massive project that touches on every aspect of our business" and that "as we drive and accelerate the pace of integration, we are experiencing some near-term friction." (*Id.* at 5; *see also* PSAC ¶¶ 89-91.) Mindbody accordingly "lowered the midpoint of [its] full year revenue guide by $1 million" and the high end by $2 million. (Ex. 5 at 5, 10.) Mindbody also issued Q3 revenue guidance of $63-$65 million, with an implied guidance range of $67.6-$69.6 million for Q4 2018.[6] (Ex. 6 at 2.)

Following these disclosures, JPMorgan highlighted that issues with integration, as well as with the implementation of Mindbody's planned update to its payments platform, would "likely hinder growth for the next two quarters" and thus "we . . . tweak[ed] down second-half growth." (Ex. 7 at 1.) Jefferies also noted that issues integrating Mindbody and Booker sales representatives "might reduce sales force productivity." (Ex. 8 at 1.)

### C.   Mindbody Misses Its Previously Reduced Q3 Revenue Guidance and Slightly Reduces Its Q4 Guidance

On November 6, 2018, Mindbody announced Q3 revenue of $63.8 million, missing the midpoint of the already lowered guidance number communicated at the end of Q2. (Ex. 9, Ex.

---

[6]   Mindbody's implied guidance range can be determined by comparing its full year guidance range of $246-250 million to its actual first half results of $115.4 million and its Q3 guidance of $63-65 million. (Ex. 6 at 2, 6.)

99.1 at 1; Ex. 5 at 5, 10; *see* Ex. 10 at 1 (Q3 revenue "missed" Jefferies and Street estimates); AC ¶ 105 (revenue came in below $64 million guidance mid-point).)

Concurrent with its announcement of the Q3 miss, Mindbody reduced its Q4 revenue guidance from its prior implied guidance range by $2.6 million, to $65-67 million (a range still above the revenue reported for Q3). (Ex. 10, Ex. 99.1 at 2.) Mindbody's prior implied Q4 guidance had a midpoint that was *higher* than its revised internal forecast of $67.8 million based on the cumulative impact of its documented and disclosed integration problems. (*See* PSAC Ex. 7 at 2 (identifying that the internal forecast that excluded the potential addition of uncertain revenue related to Mindbody's Branded Mobile App was $67.8 million).) The decision on the revised Q4 guidance range came after the Audit Committee met with management to review the latest Q4 forecasts and their associated risks, including the downward trend in Mindbody's forecasting over the course of the year, and "aligned around a substantial guide down for the quarter." (PSAC, Ex. E.). Against the backdrop of missing the previously reduced Q3 guidance, the guidance range that was ultimately determined to be appropriate for Q4 was between 95.9% and 98.8% of the internal revenue forecast. This reduced guidance was an effort to avoid repeating the prior quarter's miss. *See, e.g.*, Beth McKenna, *Stitch Fix Stock Plunges on Earnings Release: 6 Metrics You Should See*, THE MOTLEY FOOL, (March 9, 2021), https://www.fool.com/investing/2021/03/09/stitch-fix-stock-plunges-on-earnings-release-6-met/.

As of November 6, 2018, Mindbody had not retained a financial advisor, let alone decided to embark on a sale process (PSAC ¶ 166–67), and Vista had not made an offer to acquire Mindbody (PSAC ¶ 174). (*See also* Op. at 21 n.7.)

D.    **Stollmeyer's Liquidity**

The PSAC alleges that, in early 2018, Stollmeyer[7] communicated with his UBS financial advisors about managing payments for certain personal expenditures, including a home renovation project.[8]  (*See* PSAC Ex. 18).  Stollmeyer allegedly contacted his financial advisors regarding the timing of his 10b5-1 plan sales, which historically comprised about 80% of his income.[9]  The PSAC erroneously states that this communication concerned a "need[] to amend his financial plan."  (PSAC ¶ 285.)  In reality, Stollmeyer had extended his 10b5-1 plan in November of 2017.  (Ex. 11; Ex. 12 at CM/ECF 2.)[10]  And the email referenced by Lead Plaintiffs actually concerns an inquiry about the timing of the sales within that particular month. (*See* Ex. 11 at UBS00001364; *see also* PSAC Ex. 18 (explaining that "[t]he first trade starts of the 10b5-1 plan should trade today for 17,739 shares.  The remaining trades will occur on the 1st of every month.  The lateness of the first trade revolves around the cooling off period.").)  The 17,739 shares Stollmeyer sold each month during 2018 via his 10b5-1 plan was *exactly the same* as his sales each month in 2017.  (*See, e.g.*, Ex. 12.)

Stollmeyer told UBS that he was "completely comfortable digging into my LOC [Line of Credit] *in H1* to cover all the above [expenditures]."  (PSAC Ex. 18.)  H1 refers to the first half of 2018 (*i.e.*, January to June 2018).  Stollmeyer went on to explain that, "[i]n the back half of

---

[7]    Stollmeyer grew up in a small business family and served as a submarine officer in the U.S. Navy.  Alejandro Cremades, *Rick Stollmeyer on Selling For $1.9 Billion The Company That He Created Out of His Own Garage*, https://alejandrocremades.com/rick-stollmeyer-on-selling-for-1-9-billion-the-company-that-he-created-out-of-his-own-garage ("Cremades Podcast").  After the Navy, Stollmeyer started Mindbody out of his garage and built the business into an anchor of the San Luis Obispo, CA, community.  *Id.*

[8]    Stollmeyer also anticipated wanting to invest in his son's commercial drone company, Inspired Flight, a local medical device startup, and had made a "short term loan to a friend."  (*See* PSAC Ex. 18.)  The total of those other investments and loans was $450,000.  (*Id.*)

[9]    In 2017, Stollmeyer earned $949,099 in salary and bonus compensation and made over $5.4 million from 10b5-1 plan sales of Mindbody stock.  (2018 Proxy; *see, e.g.*, Ex. 12).

[10]    While not directly cited in the PSAC, Plaintiffs' allegations regarding Stollmeyer's "new financial plan" clearly refer to his November 25, 2017 10b5-1 plan (PSAC ¶ 285; PSAC Ex. 18), and that document is therefore incorporated by reference.  *See ATSI*, 493 F.3d at 98.

2018 it should all pay down rapidly." (*Id.*)  Documents incorporated by the PSAC demonstrate that Stollmeyer's Line of Credit was in fact paid down.  As of January 18, 2019, Stollmeyer had no balance on his Line of Credit, with ██████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████[11]

The exhibits attached to the PSAC also show that Stollmeyer's expenditures were inconsequential relative to his income.  On February 2, 2019, Stollmeyer emailed UBS to discuss his post-Merger financial plan.  He noted that he and his wife "will not buy yachts, planes or expensive second and third homes.  Instead, we will stay liquid and live a debt and risk free life filled with rich, meaningful experiences, and robust giving back."  (PSAC Ex. 20.)  Thus, as Stollmeyer navigated his planned transition from "wealthy on paper," *i.e.*, his pre-Merger status of having $50-plus million in Mindbody stock, options, and RSUs, to "actually wealthy," *i.e.*, having liquid assets equivalent to the post-tax value of his Mindbody holdings, Stollmeyer and his wife's focus were on "reduc[ing] the complexity and stress of our lives, avoid[ing] legal hassles and protect[ing] our wealth" so that they would be in a position "to lead our children to their best self sustainable, happy lives" and to "be prepared to take care of our parents and siblings."  (*Id.*)

That Stollmeyer's top priority was not his own liquidity is further reinforced by his post-Merger conduct.  In a call with UBS that was memorialized in a March 28, 2019 email, well after the Merger closed, Stollmeyer described how he and Vista were still "in the process of working on [Stollmeyer's] comp agreement and the equity pool for the company."  (PSAC Ex. 21.)

---

[11]  Stollmeyer's cash holdings are the sum of the $290,000 he held in his UBS accounts after the transfers discussed in Exhibit 18, coupled with the $500,000 he was transferring to other bank accounts at Chase and Pacific Western.  (PSAC Ex. 19.)

While Vista typically set an equity pool that only included the "top 20 people," Stollmeyer sought to expand the pool to "the top 100." (*Id.*)

## E.    Procedural History

Plaintiffs initiated this action on September 6, 2019, subsequently filing the FAC on December 20, 2019. On February 18, 2020, Defendants moved to dismiss the FAC, because, among other things, Lead Plaintiffs failed to adequately plead that Defendants intentionally misled investors by issuing lower 4Q18 guidance. (MTD Br. at 22.) Lead Plaintiffs filed their Opposition on April 3, requesting that "any dismissal be without prejudice, to permit amendment to cure any deficiency." (Dkt. No. 39 at 50 ("MTD Opp'n").) On September 25, 2020, the Court dismissed five of the seven categories of misstatement alleged in the FAC, including the misstatements regarding the Q4 guidance (the "Guidance Statements"). The Court held that Lead Plaintiffs failed to plead facts supporting "a strong inference that Defendants actually expected revenue would be higher than what they announced" (Op. at 17), concluding that Lead Plaintiffs' theory that Defendants intentionally drove down the stock for a potentially larger payout with post-merger equity was "speculative" and "made no economic sense" (*id.* at 21 n.7).

Despite this ruling, Lead Plaintiffs sought expansive discovery pertaining to their dismissed claims. (Ex. 13.) In an effort to cooperate and avoid wasteful discovery disputes, and in consideration of the fact that the Court had already prejudicially dismissed those claims, Defendants agreed to supply all documents previously produced in the related Delaware proceedings.[12] Defendants further agreed to assist in coordinating with non-parties, including Vista, Qatalyst, UBS, and former Board members to facilitate similar reproductions of all documents from the Delaware proceedings. Mindbody, Stollmeyer, and White eventually

---

[12] *Luxor Capital Partners, LP vs MINDBODY, Inc.*, C.A. No. 2019-0293-KSJM (Del. Ch.), *Philip Ryan, Jr. v. MINDBODY, Inc.*, C.A. No. 2019-0061-KSJM (Del. Ch.), *In re MINDBODY, Inc. Stockholders Litigation*, C.A. No. 2019-0442-KSJM (Del. Ch.), and *Luxor Capital Partners, LP, et al. v. Mindbody, Inc.*, C.A. No. 2019-0070-JTL (Del. Ch.) (collectively, the "Delaware Actions").

produced 230,000 pages of discovery material on December 8, 2020.[13] (Ex. 14.) Liaw produced 78,000 pages on December 4 and 6, 2020. (Ex. 15.) Vista produced 98,000 pages. (Ex. 16.) Qatalyst produced 44,000 pages on January 10, 2021. (Ex. 17.) UBS provided 2,400 pages on January 4, 2021. (Ex. 18.) Defendants also invited Lead Plaintiffs to participate in the depositions scheduled in the Delaware Actions, which Lead Plaintiffs accepted. At the time Lead Plaintiffs filed the PSAC, four depositions had been completed. (*See* Ex. 19; Ex. 22).

On February 19, 2021, Lead Plaintiffs submitted a letter motion seeking an extension of deadlines for class certification briefing while they moved to amend the FAC (Dkt. No. 68), which was granted on February 22, 2021 (Dkt. No. 69). Lead Plaintiffs filed their motion for leave to amend on February 24. (Dkt. No. 71.)

## LEGAL STANDARDS

Under Rule 15(a)(2), leave to amend should only be granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15(a)(2) does not require that leave be granted *carte blanche*— leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."[14] *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)) (quotations omitted). A proposed amendment is futile if it would fail to cure prior deficiencies in the complaint or adequately state a claim. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

---

[13] As discovery remains ongoing in Delaware, Defendants made small incremental productions on December 21, 2020 and February 9, 2021, totaling about 400 additional pages of material. (Ex. 14.) None of that material is relied upon in the PSAC.

[14] "Ultimately, 'the grant or denial of an opportunity to amend is within the discretion of the District Court.'" *MDB LLC v. Hussain*, 2016 WL 1267793, at *10 (S.D.N.Y. Mar. 29, 2016) (Caproni, J.) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Lead Plaintiffs' proposed amendment must satisfy the standards of the PSLRA, the "most stringent pleading requirement in American civil law." *McCauley v. City of Chicago*, 671 F.3d 611, 625 (7th Cir. 2011); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("As a check against abusive litigation by private parties, Congress enacted the [PSLRA] . . . . Exacting pleading requirements are among the control measures Congress included in the PSLRA."). To adequately state a viable, non-futile claim, "[a] claim must raise more than the 'mere possibility of misconduct . . . .'" *Kuwait Inv. Office v. Am. Int'l Grp.*, 128 F. Supp. 3d 792, 802 (S.D.N.Y. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 168 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 649 F. App'x 7 (2d Cir. 2016). However, the Court should not accept "legal conclusions, naked assertions, mere conclusory statements or implausible inferences" alleged in the PSAC. *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires Plaintiffs to plead "the circumstances constituting fraud . . . with particularity." *Tellabs*, 551 U.S. at 319 (quoting Fed. R. Civ. P. 9(b)). Congress recognized that, in the context of securities fraud, even that heightened standard is insufficient to deter misconduct and enacted the PSLRA to rein in "abuses of the class-action vehicle in litigation involving nationally traded securities" that were "injur[ing] the entire U.S. economy." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (quotations omitted). Thus, securities fraud claims "must satisfy two layers of heightened pleading requirements: first, a complaint alleging securities fraud must satisfy Rule 9(b) of the Federal Rules of Civil Procedure, and, second, private securities fraud class actions must satisfy the pleading requirements set forth in PSLRA, 15 U.S.C. § 78u-4(b)(1)." *Harris*, 135 F. Supp. 3d at 169.

The "PSLRA specifically requires a complaint to demonstrate that the defendant made '[m]isleading statements [or] omissions . . . of a material fact' and acted with the '[r]equired state of mind' (the 'scienter requirement')." *Id.* (quotations omitted). The PSAC must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" with "specificity why and how" each statement is allegedly misleading, and must also "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." *Rombach v. Chang*, 355 F.3d 164, 172, 174, 176 (2d Cir. 2004) (quotations omitted). Lead Plaintiffs have once again failed to meet these standards.

## ARGUMENT

### I.  LEAD PLAINTIFFS ARE PROCEDURALLY BARRED FROM ADDING BACK THEIR DISMISSED CLAIM

Lead Plaintiffs' claim regarding the Q4 Guidance Statements were dismissed and their attempt to replead that claim is barred under established case law and the Federal Rules. In their Opposition to the Motion to Dismiss the FAC, Lead Plaintiffs did not seek further amendment of their complaint and instead requested that any dismissal be granted without prejudice. (MTD Opp'n at 50.) Notably, their Opposition was filed on April 3, 2020, when they were already able to review and incorporate the substantial number of public documents available through the related Delaware actions into their pleadings.

The Court, however, went on to dismiss the Q4 guidance claim without specifically indicating the dismissal was without prejudice. (Op. at 43.) As such, the law treats the Court's dismissal of the Q4 guidance claim as with prejudice. Fed. R. Civ. P. 41(b) ("Unless the dismissal order states otherwise, a dismissal . . . operates as an adjudication on the merits."); *see also Stern v. Gen. Elec. Co.*, 924 F.2d 472, 477 n.7 (2d Cir. 1991) ("A district court's dismissal under rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without

prejudice.").[15]   Consequently, Lead Plaintiffs are barred from attempting to replead the Q4 guidance claim now.  Fed. R. Civ. P. 41(b).

## II.   LEAD PLAINTIFFS' MOTION TO AMEND IS FUTILE

Lead Plaintiffs' motion to amend should also be dismissed because the newly added claim relating to forward-looking guidance fails to state a claim.  The PSLRA provides "safe harbors" for forward-looking statements.  15 U.S.C. § 77z-2(c)(1)(B)(ii).  Under the PSLRA, a forward-looking statement is not actionable if either (1) it is "identified as a forward-looking statement, and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," *or* (2) if "the plaintiff fails to prove that the forward-looking statement . . . was . . . made or approved by [an executive] officer with actual knowledge by that officer that the statement was false or misleading."  *Id.*; *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010) ("The safe harbor is written in the disjunctive.").

If a statement falls under either safe harbor, then that statement is protected and cannot be an actionable statement for a securities claim.  Here, Lead Plaintiffs' proposed amendment falls into **both** of these prongs of the safe harbor.  First, the Guidance Statements are protected as forward-looking statements accompanied by meaningful cautionary statements.  Second, the Guidance Statements were not knowingly false.  Nor were they otherwise made with scienter.

---

[15]   *See also Cantore v. City of N.Y.*, 2017 WL 11501442, at *5 n.8 (S.D.N.Y. Sept. 15, 2017) ("Because this Court's dismissal order did not state that the dismissal was without prejudice, the dismissal is presumed to be with prejudice.") (quotations omitted); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 396-97 (S.D.N.Y. 2017), *modified on reconsideration*, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017) ("[W]hile the Court was silent on the issue in its Opinion, the law deems such silence to mean dismissal with prejudice.").

**A.    Safe Harbor 1:  Lead Plaintiffs' Amendment Fails Because the Guidance Statements Are Protected Under the PSLRA Safe Harbor for Forward-Looking Statements with Meaningful Cautionary Statements**

The proposed amendment fails for the independent reason that Lead Plaintiffs have not adequately alleged that the Guidance Statements were false or that Defendants intentionally made false statements.  The Guidance Statements are plainly forward-looking statements.  *See In re Gen. Elec. Co. Sec. Litig.*, 2012 WL 90191, at *22 (S.D.N.Y. Jan. 11, 2012) ("projections . . . are indisputably forward-looking statements").  As Defendants argued in their Motion to Dismiss, the Guidance Statements were identified as such and accompanied by detailed disclaimers and risk disclosures addressing the various risks Mindbody faced, especially with regard to the integration of companies it had recently acquired.  (S*ee* MTD Br. at 14-15.)  Lead Plaintiffs have not pled any new facts to challenge the Guidance Statements as forward-looking statements accompanied by meaningful cautionary language.  Accordingly, "[b]ecause each forward-looking . . . statement cited by plaintiffs as false or misleading was accompanied by meaningful cautionary language, the statements are considered immaterial under the PSLRA safe harbor."  *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 381-82 (S.D.N.Y. 2007); *see also Fort Worth Emp'rs Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) ("These detailed disclaimers and risk disclosures indisputably satisfy the PSLRA safe harbor, and immunize from liability all of the alleged misrepresentations.").  Generally, forward-looking statements are not actionable under the PSLRA and the "bespeaks caution" doctrine when they are "identified and accompanied by meaningful cautionary language." *Slayton*, 604 F. 3d at 765; 15 U.S.C. § 78u-5(c)(1).

Here, the statement regarding the Q4 guidance was accompanied by meaningful cautionary language.  The statements regarding Mindbody's Q4 guidance were made in Mindbody's November 6, 2018 earnings press release (PSAC ¶ 238; Ex. 9, Ex. 99.1 at 2) and

during Mindbody's earnings call that same day (PSAC ¶ 240; Ex. 9 at 7).  The press release cautioned that both it and the accompanying earnings conference call "contain forward-looking statements, including, among others, current estimates of fourth quarter and full year 2018 revenue, non-GAAP net loss and weighted average shares outstanding . . . ." (Ex. 9, Ex. 99.1 at 3.)  The release further described some of the "risks and uncertainties" that could impact the guidance, including "our ability to successfully integrate Booker and FitMetrix; our ability to achieve expected synergies and efficiencies of operations between MINDBODY and Booker and FitMetrix; our ability to realize the market opportunities provided by our acquisitions of Booker and FitMetrix," among other factors specifically related to the integration of the acquisitions, as well as other risks and uncertainties that could impact the guidance.  (*Id.*)  The press release specifically informed investors that Mindbody's "actual results could differ materially from the results expressed or implied by these forward-looking statements." (*Id.*)  Nicole Gunderson, the Head of Investor Relations, also highlighted in the November 6, 2018 earnings call that "[o]ur remarks today will include forward-looking statements, including . . . projected financial results for Q4 2018 and full year 2018 and beyond" and referred listeners to "today's press release" for an articulation of the various risks related thereto.  (Ex. 20 at 4.)  These statements fully and meaningfully conveyed the possibility that the actual results could differ from the guidance. Indeed, warnings that convey "substantive information about the risk that ultimately materialized" are meaningful and "not mere boilerplate." *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 536 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). The statements regarding the revised Q4 guidance are therefore inactionable as a matter of law.

-15-

**B.      Safe Harbor 2:  Lead Plaintiffs' Proposed Amendment Falls within the Safe Harbor Because There is No Allegation the Q4 Guidance Statements Were Knowingly False, or Otherwise Made with Scienter**

Separate and independent from the above argument, Lead Plaintiffs' proposed amendment also fails to adequately allege knowing falsity, and thus is foreclosed by the PSLRA safe harbor.  Lead Plaintiffs' also, relatedly, fail to allege the element of scienter.

**1.      There is Nothing Inherently False or Misleading About Forward Guidance That Is More Conservative Than an Internal Projection**

In dismissing Lead Plaintiffs' original Q4 guidance claim, the Court indicated that Lead Plaintiffs could theoretically have stated a claim based on the Q4 guidance by pleading "facts about payments revenues or growth that should have been disclosed but were not."  (Op. at 20); *Slayton*, 604 F.3d at 775 (A statement is actionable only when "defendants . . .  were aware of *undisclosed facts* tending to seriously undermine the accuracy of the statement").  Despite ample access to a large discovery record, Lead Plaintiffs make no new allegations regarding Mindbody's challenges with the integrations.  Instead, they can only muster the allegation that Mindbody's Q4 guidance was slightly lower than its internal projections for that quarter.  (Mot. at 2-3.)  But such an argument turns "an expression of 'present belief' in a forward-looking statement [into] a 'present fact'" and would amount to "an end-run around the PSLRA's safe harbour provision." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 389 (S.D.N.Y. 2020), *aff'd*, 2021 WL 745310 (2d Cir. Feb. 26, 2021) (quoting *City of Hialeah Emps.' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018)).  Further there is nothing inherently false or misleading about conservative guidance, much less when a company has just missed its prior quarter guidance.  On the contrary, the market expects companies to guide below their internal projections.  Lead Plaintiffs have thus failed to allege the guidance was knowingly false.

Guidance conveys how a company expects to perform in "real world" conditions where its business plan faces some setback.  Baruch Lev, *How to Win Investors Over*, Harvard Business

Review (Nov. 2011), https://hbr.org/2011/11/how-to-win-investors-over ("Guidance tends to skew negative (towards warning). . ."); Leigh Salvo, *Internal Forecasts, Guidance and Consensus Considerations*, Gilmartin Group (May 17, 2019), https://gilmartinir.com/internal-forecasts-guidance-and-consensus-considerations/ ("Be realistic, not optimistic, in determining your [guidance] range.")  As academic literature recognizes, guidance accounts for challenges that uses up some of the company's cushion.  *See* John R. Graham et al., *The Economic Implications of Corporate Financial Reporting*, 40 J. Acct. & Econ. 3, 29 (2005) ("The market might assume that not delivering earnings means that there are potentially serious problems at the firm (because the firm apparently is so near the edge that it cannot produce the dollars to hit earnings, and hence must have already used up its cushion)."); William Ciconte, III, et al., *Does the Midpoint Range Earnings Forecasts Represent Managers' Expectations?*, 19 Rev. Account. Stud.           628           (2013),           http://bear.warrington.ufl.edu/tucker/2013-2_management_range_forecasts.pdf, at 3-4 (finding that "the upper bound [of management guidance] rather than the midpoint appears to be the central location of . . . actual earnings").

"In contrast, internal forecasts are higher and typically reserved for determining management compensation."  Graham, et al., 40 J. Acc. & Econ. 3, 28 (CFOs did not view compensation as a first-order reason to manage guidance as they often had internal earnings targets); *see also id.* at 28 n.5 ("External targets are lower than internal targets because firms prefer that external targets are not a stretch to obtain.").

But the difference between guidance and internal forecasts is not just found in academic literature.  The Court can take judicial notice of a Mindbody research report relating to this very case, which explains how guidance correlates with a company forecast.  (Ex. 21 at 1.)  For example, in early 2019, a research analyst at JMP explained how one could use Mindbody's 2019 revenue projection ($304 million) disclosed in the Preliminary Proxy to calculate the

-17-

revenue guidance the Company would likely have issued for 2019. Notably, the analyst did not conclude that 2019 guidance would likely have a midpoint of $304 million, or even that the range would include $304 million. Rather, the analyst told investors that the $304 million revenue forecast "would likely have led to guidance in a range of around $280-290M in order to provide *some cushion and room to beat and raise* throughout the year." (*Id.*). That is, JMP estimated that the guidance range for 2019 would be 92% to 95% of the $304 million revenue forecasted in the Company's projections.[16] This analysis further establishes that there is nothing inherently false or misleading about issuing guidance that is not identical to a future projection.

Deposition testimony incorporated into the PSAC further corroborates this market practice. Stollmeyer testified in an earlier deposition that "guidance" was "communicating our expectations within a range of revenue and bottom line results." (Stollmeyer Tr. 78:5-8.) In contrast, the "board approved plan" was intended to "set up a structure under which the leadership of the company has to perform well to [] receive their full compensation . . . *[it is] designed to stretch us a bit*." (Stollmeyer Tr. 77:15, 78:21-24; 79:1-3.)

Likewise, independent director Gail Goodman echoed this approach in her deposition testimony.[17] Based on her experience as a CEO and her participation in a CEO mentoring group with other public company CEOs, Goodman testified: "You need . . . room for execution . . . . You're forecasting, which means things can go wrong." (Ex. 22 176:7-11 ("Goodman Tr.").) Goodman also explained that, "[g]uidance better be below forecast. You need room for things to

---

16  Notably, Mindbody's guidance for Q4 2018 was closer to the $67.8 million internal forecast figure alleged in the PSAC. (*See* PSAC Ex. 7 at 2.) Mindbody's guidance range was $65-67 million (PSAC ¶ 124), which is 95.9% to 98.8% of the $67.8 million internal forecast.

17  Goodman did not serve on Mindbody's Audit Committee, which oversaw the issuance of guidance, so it is unsurprising that she had limited insight into the Company's guidance decision-making. (*See* Goodman Tr. 229:10-14 ("I think you're deposing members of the audit committee. Can I ask that you refer that question [regarding the quarterly review process] to them.") 179:17-21, 230:14-16.)

change, so it is again customary to guide with some margin of error against your current forecast. It would be foolhardy not to do so." (*Id.* 174:15-22).

In sum, the issuance of guidance was consistent with industry norms and market expectations, and thus Lead Plaintiffs have failed to allege the guidance was knowingly false.

### 2.   Lead Plaintiffs Have Not Alleged Scienter

Nor does the proposed amendment plausibly allege that the Q4 guidance was made with scienter.  Scienter is an intent "to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)).  To establish scienter, Lead Plaintiffs must allege sufficient facts showing "that the defendants had both motive and opportunity to commit the [alleged] fraud." *ATSI*, 493 F.3d at 99; *see also Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 458-59 (S.D.N.Y. 2019).  The PSLRA also requires Lead Plaintiffs to "plead 'with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind.'" *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(1)).  "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* (quoting *Tellabs*, 551 U.S. at 309).

Once again, Lead Plaintiffs' allegations do not come close.  As explained above, Lead Plaintiffs have not pled that Defendants had actual knowledge that the Guidance Statements were false.  First and foremost, they were not false.  But even if the Court holds that guidance must exactly match internal forecasting, it is clear that Defendants did not believe that to be so when they made the Guidance Statements, so they were not knowingly false.[18]  As a result, Plaintiffs

---

[18]   Plaintiffs' misleading Q4 guidance theory continues to have no applicability to Liaw under the PSAC's allegations.  In its Opinion and Order, the Court correctly noted that Plaintiffs' allegations in the FAC only served to articulate this claim against Defendants Stollmeyer and White. *See* Op. at 16 ("Plaintiffs allege that Mindbody, *via Stollmeyer and White*, misrepresented expected revenue for fourth quarter 2018.").  The

have failed to plead scienter. (*See* Op. at 17 (holding that the scienter requirement for the Guidance Statements "requires 'actual knowledge'" of falsity) (quoting *Slayton*, 604 F.3d at 773).)

Nor have Lead Plaintiffs alleged a plausible motive to issue materially false and misleading guidance. The proposed amendment is also bereft of any allegation suggesting that any member of the Audit Committee possessed a motive to mislead investors through false guidance.

Lead Plaintiffs only attempt to ascribe a motive to Stollmeyer—a purported desire to liquidate his Mindbody stock and his purported antipathy to the public markets motivated him to pursue a sale of the Company.[19] But that lone effort also fails for two independent reasons.

### a. Lead Plaintiffs Have Not Alleged Stollmeyer Faced Liquidity Issues

For starters, Lead Plaintiffs' allegations do not plausibly establish that Stollmeyer had liquidity issues, much less issues that would conceivably motivate him, one of Mindbody's largest shareholders (PSAC ¶ 315), to sell tens of millions of dollars in stock at a discount. (Op. at 21 n.7 (citing *Kalnit v. Eichler*, 264 F.3d 131, 140–41 (2d Cir. 2001)).) To support the claim that Stollmeyer had an immediate and pressing need for cash, the PSAC cobbles together a set of personal expenditures that Stollmeyer discussed in a February 19, 2018 email (*i.e.*, one year before the transaction) to his UBS advisors and suggests Stollmeyer was tapping a line of credit to pay for those expenses. (PSAC Ex. 18.)

These allegations suffer from a threshold time period mismatch—a similar flaw to the one the Court previously identified as a basis for dismissing the FAC's allegations regarding

---

revisions in the PSAC do not change this, as the PSAC does not add any new information regarding Defendant Liaw's role in the issuance of the Q4 guidance.

[19] Lead Plaintiffs do not even attempt to allege a motive for White or Liaw, much less one that could surmount the fact that, through their personal or employer's stock holdings, they possessed a motive to maximize the value of their investments that was directly aligned with the interests of Mindbody stockholders. (Op. at 21 n.7.)

-20-

Mindbody's internal forecasts. (*See* Op. at 18 ("For instance, the Amended Complaint fails to allege when that forecast was created, whether that forecast was based on data that became available after the revised guidance, whether White or Stollmeyer received that forecast prior to November 6, 2018, or whether there were other competing factors that were less optimistic.").) Here, Lead Plaintiffs' attempt to plead a liquidity motivation as of November 6, 2018 relies on an email from February 20, 2018 (PSAC Ex. 18) and subsequent emails from January 18, 2019 to March 28, 2019 (PSAC Exs. 19-21), none of which speak directly to Stollmeyer's financial condition as of November 6, 2018, despite Lead Plaintiffs' access to an extensive discovery record including the deposition of Stollmeyer's financial advisor at UBS. The far stronger inference from the allegations and documents incorporated in the PSAC is that Stollmeyer had access to substantial financial resources that were more than adequate to satisfy his expenditures.

In any event, documents incorporated into the PSAC show that the outlays identified by Lead Plaintiffs could not reasonably conceivably have influenced Stollmeyer to seek a below market deal. In the same February 2018 email identifying the expenditures, Stollmeyer noted that he was "completely comfortable with digging onto my LOC in H1 to cover all of the above," because these expenses were only temporary and would "all pay down rapidly." (PSAC Ex. 18.) Fast forwarding to the more relevant time period, shortly after the Merger was announced but prior to closing (and prior to Stollmeyer receiving the transaction payment that Plaintiffs say Stollmeyer was desperate to receive), the incorporated documents demonstrate that by then Stollmeyer had a *$0 balance* on ███████████████████. (PSAC Ex. 19).

Lead Plaintiffs' allegation that Stollmeyer "changed" his 10b5-1 plan to address his supposed liquidity issues is likewise refuted by other material this Court can properly consider. Public SEC filings readily establish that Stollmeyer never changed the amount of shares he sold

under his 10b5-1 plan.  (Ex. 12).  The fact that Stollmeyer put in place a 10b5-1 for the following year, 2019, thus does not support Lead Plaintiffs' motive theory.

Lead Plaintiffs' exhibits purporting to show supposed post-Merger liquidity needs also cut against the Plaintiffs' thesis.  Stollmeyer's February 2, 2019 email makes no reference to **any** pressing financial commitment.   In fact, Stollmeyer made clear that his family would avoid "yachts, planes, or expensive second and third homes" and would instead live a "debt and risk free life" so that they would be "prepared to take care of our parents and siblings."  (PSAC Ex. 20).  The March 2019 email does not suggest that Stollmeyer was desperate for liquidity or a high potential payout down the road; his efforts to see that ███████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████ .  (PSAC Ex. 21).  And the fact that Stollmeyer had *still* not finalized his own compensation months after the Merger only bolsters the Court's conclusion that driving down the price of his own shares in early November 2018 "would have been incredibly premature and would have made no economic sense."  (Op. at 21.)

> b.    *Lead Plaintiffs' Liquidity Motive Is Nonsensical*

But even if the PSAC did adequately allege a liquidity motive (which it does not), Lead Plaintiffs' allegations still fail to connect that motive to the allegedly fraudulent Q4 guidance. (*See* Op. at 21 n.7 ("In that context, driving down Defendants' own shares in early November 2018 would have been incredibly premature and would have made no economic sense.").)  In other words, Lead Plaintiffs contend that Stollmeyer's supposed liquidity issues motivated him to seek a sale, but there is a glaring logical gap between that supposed goal and the act of reducing Q4 revenue guidance.   Lead Plaintiffs' allegations do not explain how reducing guidance would facilitate a sale.

Lead Plaintiffs never once allege that a sale could not be completed unless the Company's stock price was first reduced. On the contrary, the PSAC alleges that Vista had communicated to Stollmeyer that it was willing to pay "a substantial premium to [Mindbody's] recent trading range" as of mid-October 2018 (*i.e.*, prior to the guidance reduction). (PSAC ¶¶ 8, 115, 181; *id.* Ex. D.) Lead Plaintiffs' theory becomes even more illogical when considering that Mindbody conducted a sale process involving multiple bidders shortly after it reduced its Q4 guidance. (*See* Cremades Podcast ("We were working hard to create a competitive process because the board agreed on two things. [One, I]f we're going to consider selling the company, we want to get top dollar for it [and two] we want to have options . . . . It's like if you're going to sell your house, you don't want to show it to just one interested party.").)

Nor does Lead Plaintiffs' alternate theory that Stollmeyer had "undeniable antipathy" towards investors (PSAC ¶ 216) have any merit. Again, even accepting Lead Plaintiffs' interpretation of Stollmeyer's comment about what he might consider saying to investors in a final earnings call, there is no logical connection between that comment and an intentional effort to depress Mindbody's stock price. That is, even if there was antipathy to public shareholders (which there was not), that does not translate to engineering a sale of the Company at a below market price. This one-off comment does not and cannot support a credible inference that Stollmeyer had a motive to intentionally issue materially false and misleading Q4 guidance.

Finally, Lead Plaintiffs contend that a comment by White from January 2019 email regarding "haircutting" the 2019 revenue guidance for a "beat and raise" supports an inference of scienter with respect to the issuance of Q4 guidance months earlier. (PSAC ¶¶ 48, 218.) That is also wrong. In the email, White and the Audit Committee discussed whether the Company should do an early release of the preliminary Q4 revenue results ahead of the shareholder vote. (*See* PSAC Ex. 17 at 2.) Liaw remarked that the Company could consider affirming the 2019

revenue forecast disclosed in the proxy in conjunction with releasing the preliminary Q4 revenue results, as the former was "more material to future value." (*Id*.) He noted that this more complete picture (which would have shown headwinds facing the company in 2019) would likely cause shareholders to view the Vista acquisition more favorably. (*Id.*) White then observed that the Company could issue guidance based on the forecast, which would involve a "*haircut*[]" in line with the Company's standard "beat and raise" approach. (*Id.* at 1.) Liaw responded: "I can't read tone, but I wouldn't do that." (*Id.*) Notably, the Company ultimately opted to not release the preliminary Q4 revenue or 2019 guidance. (PSAC ¶ 219.)

Lead Plaintiffs maintain that this exchange demonstrates that Mindbody viewed guidance as a tool "to manipulate shareholders." (*See* Mot. at 4.) But the email does not support such an inference. Quite the opposite: the most plausible reading is that the participants recognized that guidance was not a tool to achieve a desired outcome. Indeed, Lead Plaintiffs do not and cannot allege that Mindbody issued 2019 guidance ahead of the shareholder vote.

### C.    Case Law Does Not Support Lead Plaintiffs' Theory of Securities Fraud

Where plaintiffs bring their claims on the basis of expected or future predicted results, their claims fail. *See, e.g.*, *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) ("Plaintiffs' argument that because sales were down at the end of the first quarter, the impending final results for the second quarter must have been apparent throughout the quarter (including after the first three weeks) mimics the typical type of "fraud by hindsight" theory that courts have been unwilling to entertain."); *see also Holbrook v. Trivago N.V.*, 2019 WL 948809, at *19-20 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) (argument that defendant had to disclose that business unit was "well on its way" to massive decline was impermissible fraud-by-hindsight); *Nguyen v. MaxPoint Interactive, Inc.*,

234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017) ("A company, however, has no general 'obligation to disclose the results of a quarter in progress.'") (quoting *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 Fed. Appx. 14 (2d Cir. 2012)).

Lead Plaintiffs cite a few cases involving instances where defendants allegedly made untrue factual statements in support of, and as the basis for, their earnings guidance.  None lends support to the theory of guidance fraud here.  In *City of Providence v. Aeropostale, Inc.*, the defendant company failed to disclose that there were significant and continuing *past and present* problems with its product lines, and its cautionary language failed to reflect that.  2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013).  Similarly, the "revenue projection statements" in *In re Symbol Technologies, Inc. Securities Litigation* were actionable not because they differed from internal expectations but because they were based upon "inflated sales calculations and artificially reduced inventory levels."  2013 WL 6330665, at *6 (E.D.N.Y. Dec. 5, 2013).  While the decision in *In re APAC Teleservice, Inc. Securities Litigation* does not directly concern guidance statements, the representations regarding the company's ability to win over customers was clearly contradicted by *the ongoing experience* of its customers.  1999 WL 1052004, at *8 (S.D.N.Y. Nov. 19, 1999).  Finally, this is not *Blanford*, where the defendants had concealed an elaborate scheme of phony sales to make false claims regarding the company's sales figures. *Emps' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

## CONCLUSION

For all of the reasons stated herein, the motion seeking leave to amend should be denied with respect to the previously dismissed claims.

-25-

Respectfully submitted,

Dated:  March 12, 2020

/s/ Matthew Solum
_____

Matthew Solum, P.C.
John Del Monaco
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
ian.spain@kirkland.com

*Attorneys for Defendants MINDBODY, Inc.,*
*Richard L. Stollmeyer, and Brett White*

_____

Patrick Gibbs
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(650) 843-5535

Sarah M. Lightdale
Brian M. French
Daniel P. Roy III
COOLEY LLP
55 Hudson Yards, 44th Floor
New York, New York 10001
(212) 479-6374

*Attorneys for Defendant Eric Liaw*