# EXHIBIT 2

Case 1:19-cv-08331-VEC   Document 88-2   Filed 03/12/21   Page 2 of 51

Deposition of Richard L. Stollmeyer          PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

- - -

PHILIP RYAN, JR. and DONALD FRIEDMAN,     )
on behalf of themselves and all other     )
similarly situated stockholders of        )
MINDBODY, Inc.,                           )
                                          )
                         Plaintiffs,      )   Civil Action
                                          )
        vs.                               ) No. 2019-0061-AGB
                                          )
MINDBODY, INC., RICHARD L. STOLLMEYER,    )
KATHERINE BLAIR CHRISTIE, COURT           )
CUNNINGHAM, GAIL GOODMAN, CIPORA          )
HERMAN, ERIC LIAW, ADAM MILLER,           )
GRAHAM SMITH, VISTA EQUITY PARTNERS       )
MANAGEMENT, LLC, TORREYS PARENT, LLC,     )
TORREYS HERMAN SUB, INC., and             )
INSTITUTIONAL VENTURE                     )
PARTNERS XIII, L.P.                       )
                                          )
                         Defendants.      )
_____)


--o0o--

WEDNESDAY, APRIL 10, 2019

--o0o--

DEPOSITION OF

RICHARD L. STOLLMEYER

--o0o--


Reported by:  Victoria L. Valine, CSR, RMR, CRR, RSA
              CSR License No. 3036

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

APPEARANCES:

FOR PLAINTIFFS:

> PRICKETT, JONES & ELLIOTT, P.A.
> Attorneys at Law
> BY:  Bruce E. Jameson, Esq.
> 1310 King Street
> Wilmington, Delaware  19801
> 302.888.6532   Fax:  302.447.7066
> BEJameson@Prickett.com

FOR DEFENDANTS RICHARD L. STOLLMEYER, KATHERINE BLAIR
CHRISTIE, GAIL GOODMAN, COURT CUNNINGHAM, ERIC LIAW,
CIPORA HERMAN, ADAM MILLER, GRAHAM SMITH, and
INSTITUTIONAL VENTURE PARTNERS XIII, L.P.:

> COOLEY LLP
> Attorneys at Law
> BY:  Patrick E. Gibbs, Esq.
>      William Grosswendt, Esq.
> 3175 Hanover Street
> Palo Alto, California  94304-1130
> 650.843.5535   Fax:  650.849.7400
> PGibbs@Cooley.com

FOR DEFENDANTS MINDBODY, INC., VISTA EQUITY PARTNERS
MANAGEMENT, LLC, TORREYS PARENT, LLC, and TORREYS MERGER
SUB, INC.:

> KIRKLAND & ELLIS LLP
> Attorneys at Law
> BY:  Matthew Solum, Esq.
>      Ian Spain, Esq.
> 601 Lexington Avenue
> New York, New York  10022
> 212.446.4688   Fax:  212.446.6460
> Matthew.Solum@Kirkland.com

Also Present:

> Douglas Johnston
> General Counsel
> MINDBODY, Inc.
> 4051 Broad, Suite 220
> San Luis Obispo, California  93401
> 805.459.5379

"CONFIDENTIAL" – COUNSEL'S EYES ONLY

INDEX

EXAMINATION BY COUNSEL

Page No.

Examination by Mr. Jameson                          6

Examination by Mr. Solum                           85

--o0o--

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 5 of 51

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

EXHIBITS

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| Exhibit 1 | MINDBODY, Inc. Amended and Restated Certificate of Incorporation | 19 |
| Exhibit 2 | Action By Unanimous Written Consent of the Board of Directors of MINDBODY, Inc. | 20 |
| Exhibit 3 | E-mail Dated April 3, 2017 From Courtney Mathes to Rick Stollmeyer, Brett White, Kimberly Lytikainen, Nicole Blue Shirt Group, cc MINDBODY - Voting Power 50 | 34 |
| Exhibit 4 | E-mail Thread | 50 |
| Exhibit 5 | Minutes of Telephonic Meeting of the Board of Directors, December 20, 2018 | 52 |
| Exhibit 6 | E-mail Thread | 55 |
| Exhibit 7 | Irrevocable Proxy - December [ ], 2018 | 60 |
| Exhibit 8 | Minutes of Telephonic Meeting of the Board of Directors, December 21, 2018 | 66 |
| Exhibit 9 | Minutes of Telephonic Meeting of the Board of Directors, December 23, 2018 | 67 |
| Exhibit 10 | Irrevocable Proxy Signed by Richard L. Stollmeyer | 69 |
| Exhibit 11 | E-mail Thread | 75 |
| Exhibit 12 | Action by Written Consent of the Stockholders of MINDBODY, Inc. | 79 |

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

- - -

PHILIP RYAN, JR. and DONALD FRIEDMAN,   )
on behalf of themselves and all other   )
similarly situated stockholders of      )
MINDBODY, Inc.,                         )
                                        )
                         Plaintiffs,    )   Civil Action
                                        )
        vs.                             ) No. 2019-0061-AGB
                                        )
MINDBODY, INC., RICHARD L. STOLLMEYER,  )
KATHERINE BLAIR CHRISTIE, COURT         )
CUNNINGHAM, GAIL GOODMAN, CIPORA        )
HERMAN, ERIC LIAW, ADAM MILLER,         )
GRAHAM SMITH, VISTA EQUITY PARTNERS     )
MANAGEMENT, LLC, TORREYS PARENT, LLC,   )
TORREYS HERMAN SUB, INC., and           )
INSTITUTIONAL VENTURE                   )
PARTNERS XIII, L.P.                     )
                                        )
                         Defendants.    )
_____)

--o0o--

        BE IT REMEMBERED, that on Wednesday, April 10,

2019, commencing at the hour of 9:35 a.m., thereof, at

the Courtyard Marriott, 1605 Calle Joaquin Road, San

Luis Obispo, California, before me, Victoria L. Valine,

Certified Shorthand Reporter of the State of California,

there personally appeared:

                RICHARD L. STOLLMEYER

called as a witness by the Plaintiffs, who, being by me

first duly sworn, was thereupon examined and

interrogated as hereinafter set forth.

                --o0o--

Deposition of Richard L. Stollmeyer          PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 6

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

EXAMINATION

BY MR. JAMESON:

Q.  Good morning, Mr. Stollmeyer.

A.  Good morning.

Q.  We met briefly off the record.  But just for the record purposes I'm Bruce Jameson.  I'm counsel for Mr. Friedman and Mr. Ryan who are the plaintiffs in the lawsuit we're here for today.

You understand that, right?

A.  Yes, I do.

Q.  My job today is to ask you questions.  As part of my responsibility to represent Mr. Ryan and Mr. Friedman's interest in this lawsuit --

A.  Sure.

Q.  Do you understand that?

A.  Yes.

Q.  Have you ever been deposed before?

A.  Yes.

Q.  Approximately how many times?

A.  I've been deposed once and that was about 15 years ago.

Q.  In connection with what?

A.  It was another matter.

Q.  Do you remember the outlines of the matter?

A.  I do.

Page 7

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q.  What were they?

A.  The outlines of the matter are we had a business partnership relationship with MINDBODY back in 2002 to 2004 range, and there was a possible litigation out of that.

Q.  I'm sorry, you said we had a relationship with MINDBODY?

A.  No.  MINDBODY had -- there was a -- the deposition pertained to a claim of a business partner against MINDBODY.

Q.  So was this a suit between MINDBODY and somebody who it had entered into a contract with?

A.  This was -- yes.

Q.  Okay.  Do you remember who the other party was?

A.  I do.

Q.  Who was that?

A.  Called JEM Financial.

Q.  Did they sue MINDBODY or did MINDBODY sue JEM?

A.  They were suing MINDBODY, but we settled.

Q.  Do you remember where the case was?  What court?

A.  Yes, I do.

Q.  Where was it?

A.  It was in the L.A. district, like Santa

Page 8

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Monica, whatever region of L.A. that is.

Q.  All right.  So you've been deposed at least once -- that's the only other time you've been deposed, right?

A.  Yes.

Q.  You've been deposed before you know generally how the process works.  I'm sure your counsel have explained to you how the process works.

The only thing I would ask is to try to wait until I finish my question before you answer, simply because the woman sitting to our left has to take down everything we say and it's hard if we both talk at the same time.

A.  That makes sense.

Q.  As I told you before we came on the record if you need a break at any time, let me know we can take a break.  That's not a problem.

A.  Right.

Q.  Have you ever testified as a witness at a trial before?

A.  Yes.

Q.  And what trial did you testify as a witness at?

A.  When I was in the Navy -- I was an officer in the Navy.  One of my fellow officers was charged with a

Page 9

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

DUI and I was asked to testify as a character witness.

Q.  Approximately how long ago was that?

A.  That was 1991.

Q.  A long time ago.

A.  Yes.

Q.  Was that a military proceeding or was it a civil lawsuit of some kind?

A.  No.  It was a -- it was in court.  It was in -- it was in -- you know, he had been arrested for a DUI, and he asked me to testify as a character witness.

Q.  Have you ever been -- you personally, a party to a litigation, either a plaintiff or a defendant?

A.  Only in the case I just mentioned.

Q.  That was the JEM case?

A.  That's right.

Q.  And what was the nature of the claim against you in the JEM case, that is you personally as opposed to MINDBODY?

A.  Well, we had entered into a business partnership whereby we were going to build integration between an accounting system and our core software -- this is back in the pre-SAS days -- and she was an accountant who was selling accounting services on top of the software, and we were a very young company, I mean just out of the garage, and we were struggling to build

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 10

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

the product that she needed.

She was frustrated that we hadn't built it. She thought we had failed in the relationship. So her suit was for her cost, energy in pursuing this partnership.

Q.   Okay.  So she sued both MINDBODY and you personally?

A.   Yes.

Q.   And who is "she" in the prior suit?

A.   Joan Manning, CPA.

Q.   She was affiliated with JEM Financial?

A.   She was JEM Financial.  It was an LLC and she was the principal member, I guess.

MR. JOHNSTON:  Bruce, I mentioned before off the record that we'd like an agreement that we preserve all objections except as to form for trial.

MR. JAMESON:  I agree.

MR. SOLUM:  And that if an objection is made by counsel from Cooley or counsel from Kirkland that can be treated as an objection by all so hopefully we don't have to issue the same objection.

MR. JAMESON:  I agree with that, too.

BY MR. JAMESON:

Q.   When you're working at MINDBODY, what's your usual mode of communication as to e-mail, texting, or

Page 11

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

face-to-face, or phone calls?

A.   I'd say I use all of the above, and pretty frequently.

Q.   And in terms of your e-mails that you get, how do you organize e-mails that you send and receive in the course of a day?

A.   Well, I have a folder system in which I route -- I get a lot of e-mails, some of them -- a great many of them are junk e-mails, and so I have a system of sorting those.

Those that are very important, such as from my own senior executives or from the board of directors are funneled into a high priority folder to make sure that I respond to them more quickly.

Q.   And so your folder system, is it by matter or is it by priority, or is it a combination of both?

A.   By sender.  So if I got an e-mail from Gail Goodman, who was my lead independent director, it would sort right into a high priority folder.

Q.   So the folders that you keep are by the sender?

A.   That's right.  If I'm cc'd, however that goes into a folder that is a lower priority.  I get cc'd on a lot of things and I'll try to catch up to those in a week.

Page 12

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

But it's not something I'm going to jump on. Everybody on my team knows, if you want my response to something, if it's urgent, you should text or call me, or contact my EA.

If it's something you want a response on within a day, you should address me directly.  If it's something that's informational, cc me.

Q.   Do you have rules set up that automatically sort your e-mails into those folders?

A.   I do, yeah.  Thanks to Alec.

Q.   It is a wonderful thing.

In terms of when you use text messages, what do you use text messages for?

You indicated before if something is urgent, you encourage people to text you.  What else do you use texts for generally?

A.   Well, there's personal.  My friends and family for sure text me, but for business related matters the only people that would text me would either be executives of the company, my EA, or board directors could text me.

Q.   And do you have a system for maintaining and organizing text messages that you either send or receive?

A.   No.  Sadly I don't.  That's not nearly as

Page 13

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

organized and that's starting to become almost as frequent as e-mail.

Q.   Do you have a practice of deleting text messages on any regular basis or is there any way -- any system you use to try to eliminate the number of text messages that you retain?

A.   No.  Not an organized fashion, no.

Q.   What about with respect to e-mail, do you have any sort of a system for deleting or eliminating e-mails so you don't get too many of those?

A.   We have a tool now called Clutter that flags e-mails that are likely to be spam, and then you get an informational e-mail from the system administrator saying these are the e-mails that we've routed to Clutter for you.  Then of course there's the usual spam filters.

Q.   With respect to, you know, electronic documents, such as Word documents or Excel documents, how do you maintain those?  What's your organizational structure?

A.   The vast majority are kept in DocuSign or now we're going to a system called SharePoint because we're moving to kind of a pure Microsoft model.

Historically it's been DocuSign -- excuse me -- what's the system we use?  I'm going to look at it

Deposition of Richard L. Stollmeyer                     PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 14

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

because I'll see it right away. It's not DocuSign. Dropbox. I knew it started with a D.

Q. You just eliminated some questions. Because I had some if you were using DocuSign as your --

A. Yeah, that would have been weird.

Q. And then finally, with respect to -- do you keep paper files of any kind?

A. Very rarely. I usually -- any documents -- paper documents, if there's any sensitivity to the matter goes into a shred system, but it's rare that I would see something printed.

Q. If you receive something in paper -- well, do you scan it or do you have someone scan it or is it just so rare you get paper that it doesn't happen?

A. The only time I'm going to see paper that's of importance is because I need to sign it. If it needs a wet signature.

Q. How do you -- what's your general practice if you want to take notes regarding something?

Do you do it electronically or on paper?

How do you typically take notes?

A. Generally, I'll do it electronically. I have a Notes feature that I use on my phone.

I will also occasionally, my calendar items, you know I'll have a calendar item that says this

Page 15

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

meeting and I'll create a notes calendar item and note in that as well.

Q. And the note feature that you use on your phone is that Outlook Notes or is that a different note of some type?

A. It's the native Notes App that comes with your iPhone.

Q. And with respect to those notes, do you have some organizational system that you follow to either organize them or regularly sort them or delete them, anything like that?

A. No.

Q. You're aware that we served on behalf of the plaintiffs in this case, a request for documents from the parties to this case, correct?

A. Yeah.

Q. Did you see a copy of the written request that we sent?

A. I don't recall.

Did I see a copy of your written request? I'm not sure I did.

Q. Correct. We sent a written request asking you and the other defendants in the case to produce documents.

As you sit here today, you don't recall seeing

Page 16

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

that request?

A. I don't recall seeing it, but I'm aware of it because I know that we were providing all documents related.

Q. And in -- what was your role in connection with providing documents in response to that request that we sent?

A. So I met with our own counsel to ensure that we had a complete list of documents, and also understood that everything that I had recorded on any of my devices would be retained in case it was needed.

Q. Did you have your phone imaged, or did you have --

A. We did, yeah.

Q. Did you either provide or review any records you had for any paper records that you would have had relating to the topics in this lawsuit?

A. I don't recall any material paper documents other than the official deal documents that I executed that would pertain to this.

Q. During the course of the negotiations that led up to Vista's acquisition of MINDBODY, did you maintain any paper file during that period of time?

A. No. I'm not a big fan of paper.

Q. The company's current certificate of

Page 17

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

incorporation, are you familiar with it in general terms?

A. Yes.

Q. Okay. And that's the certificate that creates the Class A and Class B shares, correct?

A. Yes.

Q. And has the provision that creates 10 votes for the Class B versus one vote for the Class A, correct?

A. I believe that's true.

Q. Okay. Were you involved in the process of approving that certificate?

A. Yes.

Q. And what was your role in that?

A. Well, I believed that prior to going public that it was in the interest of our shareholders that the founders and early investors in the business had the ability to have a significant say in the future of the business -- at least for a period of time.

And so with the advice of counsel and in consultation with our board of directors, we created this super voting Class B stock, and we even put it on at a sunset under the principle that if we hadn't made the case to our public investors after a period of years that we're the right leadership team, then we should go

Page 18

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

to a one-to-one vote.

I believe the period was seven years in which it would expire post-IPO.

MR. SOLUM: I just want to put something on the record. I don't think that the witness testified to any advice that he was provided by counsel, but I want to be clear on the record that the company is not waiving any attorney/client privilege or attorney work product to the extent applicable by proffering up Mr. Stollmeyer for this deposition.

MR. JAMESON: That's fine.

BY MR. JAMESON:

Q. And was the super voting stock something -- an idea that originated with you or with someone else, do you remember?

A. Do you mean the idea of it?

Q. Yes.

A. Yeah. The idea was mine originally.

Q. When the amended restated certificate, which is the current certificate of the company, when that was being prepared, did you review drafts of it?

A. I don't recall reviewing drafts. I know I reviewed the final version.

Q. Okay. Did you ultimately approve it?

A. Yes.

Page 19

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q. And that certificate was approved prior to the time that the IPO occurred, correct?

A. Correct.

Q. Did you approve that certificate both as a director and a stockholder?

MR. SOLUM: Objection, to the extent that calls for a legal conclusion. You can answer if you know.

THE WITNESS: I don't know.

BY MR. JAMESON:

Q. Do you recall -- let's start with this.

Do you recall approving it as a director?

MR. SOLUM: Same objection.

THE WITNESS: Yeah. I would need to review the document to remember.

MR. JAMESON: Let's mark this as Stollmeyer Exhibit 1.

(Deposition Exhibit 1 marked.)

BY MR. JAMESON:

Q. Mr. Stollmeyer, you can take as much as time as you want to take a look at that. Initially I'm going to point you to the last page and ask you whether you recall signing that document.

A. Okay. I'm ready.

Q. Referring to the last page of Mr. Stollmeyer

Page 20

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Exhibit 1, do you see there, there's a conformed signature indicated?

A. Yes, I do.

Q. Do you recall signing that version of the certificate?

A. Yes, I do.

Q. Okay. And before I was asking you about the form of a certificate that was approved on a pre-IPO basis, is this the form of certificate that was approved prior to the IPO that remains in effect today for the company?

A. Well, the date on this is the 24th day of June. We went public on the 19th day of June. So that might have to do with the technicality of how an IPO closes, but I recall executing this, and I recall it being concomitant with going public.

MR. JAMESON: Let's mark this as Stollmeyer 2.

(Deposition Exhibit 2 marked.)

MR. SOLUM: As that's being marked, I'd just like to designate the entirety of the transcript as confidential pursuant to the protective order.

BY MR. JAMESON:

Q. Again, Mr. Stollmeyer, you can take as much time as you need to look at this. The first question I'm going to have for you is to ask you whether this is

Page 21

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

the written consent of the board of directors that approved the certificate that we looked at as Exhibit 1.

MR. GIBBS: I'm not sure we're looking at the same thing. What you handed us was an e-mail chain.

MR. JAMESON: Oh, I'm sorry. It wasn't the action for written consent?

MR. GIBBS: Nope.

MR. SOLUM: No.

MR. JAMESON: I'm sorry. Hand those back to me. My apologies.

MR. GIBBS: I marked it.

MR. JAMESON: That's okay.

I apologize. I don't think I have extra copies of that, then.

BY MR. JAMESON:

Q. If you want to let your counsel take a look at that --

A. Sure.

Q. -- since that's the only copy I have.

A. So your question was whether that was our vote to approve this, is this the --

Q. Correct. I'll refer you to paragraph 3 on page 3, if that's helpful.

A. Okay.

MR. JAMESON: Here, if you want to look at

Deposition of Richard L. Stollmeyer              PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 22

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

that -- look at my copy for now.

THE WITNESS: Okay.

BY MR. JAMESON:

Q. So having looked at section 3 of that, does that help you remember whether that was the board resolution that approved the form of certificate that created the Class A and Class B shares?

A. I believe it is.

Q. And if you look at the last page where the signatures are, are those DocuSign signatures?

A. Yes.

Q. And is that generally how documents at MINDBODY get approved is using DocuSign by the board of directors?

A. In nearly every case, except in rare cases where wet signatures are required.

Q. Okay. And just, if you would, generally describe for me the process of how DocuSign works. When you execute something by DocuSign, what do you get and how do you do it?

A. You get an e-mail notification which you click through to then see the proposed document that you are being asked to review and approve.

Then you review it. Occasionally, there are initials to be placed on different pages. And a final

Page 23

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

signature electronically.

Q. So that's the board resolution.

Do you recall there being a stockholder resolution to approve the certificate, separate and apart from the board resolution?

A. I don't.

Q. And just to make sure, do you recall whether or not you approved the certificate as a stockholder as opposed to the director approval that's in Exhibit 2?

A. I don't recall.

Q. I may already know the answer to this, but just to make sure.

Do you recall whether or not stockholder approval of the certificate was obtained before or after the IPO happened?

A. I don't.

Q. If you would, let's look back at Exhibit 1 for a moment, which is the certificate itself.

A. Mmmm-hmmm.

Q. If you could turn to page 2 of that exhibit, and specifically I'm looking at -- it's article 4, section D-3.

A. D-3, got it.

Q. I'm sorry. It actually carries over to page 3. It's subsection small B where it says

Page 24

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

"automatic conversion."

Do you see where I'm at?

A. Yes.

Q. Okay. Now, this is the section that provides for the automatic transfer of the Class B shares into Class A shares under certain circumstances, correct?

A. Yes.

Q. And after the IPO, did you keep track on a regular basis of how many Class B shares had been converted?

A. Yes.

Q. And approximately how often did you check on that?

A. Once a quarter a member of our legal team would provide a report what shares had been sold or distributed, typically by the most effect of that would be the VCs, the institutional investors pre-IPO who were typically selling shares.

Q. Okay. And why was that information that -- well, why was that information that you tracked?

A. What --

Q. Why was that information that you tracked?

A. Oh, because it mattered greatly to me, the voting power of the company.

Q. And why did the voting power matter to you?

Page 25

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A. Because that's how we ensure the founders of the company have a significant say in the future of the company.

Q. Now, going back to the certificate provision itself, sections A through D on page 3 that we're looking at create exceptions, if you will, for transfers, for taxes, for estate planning purposes to permitted transferees, correct? Is that what they do?

MR. SOLUM: Objection as to form. You can answer.

THE WITNESS: Yes. I mean without reading every word of it, that seems to be the focus of it.

BY MR. JAMESON:

Q. And just take a moment, if you would, and look at them, and tell me if there are any other, you know, purposes to those exceptions other than estate planning mechanics that occur to you.

MR. SOLUM: Same objection.

THE WITNESS: Well, the principle at play is that the super voting rights are attached to an individual and/or entity.

So if the individual or entity transfers their shares, except for the cases of the exceptions mentioned here, then we don't want that super voting right to move to the acquirer of those shares.

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 12 of 51

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 26

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

So that's the principle at work, I believe, in these sections.

BY MR. JAMESON:

Q.  And I'm sorry, maybe I'm being dense, but you said the -- did you say the principally of play is --

A.  Principle.

Q.  I'm sorry.  Principle.

A.  The principle is that the super voting right pertains to the individual or institution who owned the shares prior to IPO.

Q.  All right.  And the idea is you wanted the super majority voting rights to stay with the original holder of the shares and not go with it to some subsequent holder?

A.  Correct.

MR. SOLUM:  Objection as to form.

BY MR. JAMESON:

Q.  And why was that an objective?

MR. SOLUM:  Objection as to form.  You can answer.

THE WITNESS:  Because the purpose of the super voting shares are to ensure that the founders and early investors of the company -- long-term investors, had -- had a significant voice in the future direction of the company.  Until such time as they sold their shares.

Page 27

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

BY MR. JAMESON:

Q.  Now if you look -- the slide which exists in all four -- I'm just going to look at subpart capital A, sub B romanette 1, then capital A.

If you look about halfway through that section there's italicized language that says "provided further," do you see that?

A.  Yes.

Q.  Then it goes on I'm just going to read after that phrase.  "In the event such Class B stockholder no longer has sole dispositive power and exclusive voting control with respect to the shares of Class B common stock held by such trust, each share of Class B common stock then held by such trust shall automatically convert --" then it goes on to say, "Class A stock."

Do you see that language?

A.  Yes, I do.

Q.  All right.  So looking at that language, is it your understanding that if the Class B stockholder had to get approval of a permitted transferee, then he or she would not have the sole dispositive power?

MR. SOLUM:  Objection. Hypothetical. Calls for speculation.  Objection as to form.

You can answer.

THE WITNESS:  Yeah.  I don't know.

Page 28

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

BY MR. JAMESON:

Q.  Now, let me draw your attention down to romanette 2 that's down towards the bottom of the page just before C.

A.  Okay.

Q.  And -- I'm sorry.  Give me one moment.  I'm sorry.  Strike that.

Instead, let me ask you to flip over to the definitions, which are -- it's actually 1, 2, 3, 4 pages back from where we are.  I want to refer you to the definition of "transfer."

Let me know when you're there.

A.  I'm not seeing the definition.

Q.  So it's on the page that has Article 6 --

A.  Here it is.

Q.  -- right in the middle?

A.  Yep.  Got it.

Q.  Right above that there's the definition of the word "transfer."

I'd like you to look down -- the language I'm going to ask you about is in romanette 2 which starts about four lines down in that definition.  I'll just read it initially.  So romanette 2 says -- well, let me paraphrase it so we have a complete record.

This is the beginning with the second sentence

Page 29

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

of the definition "a transfer --"

MR. SOLUM:  I don't mean to interrupt.  It's in the record.  I think it's marked as an exhibit.

MR. JAMESON:  I know.  I want a context for purposes of his understanding my question.

"A transfer shall also include, without limitation --" now I'm skipping to romanette 2 -- "the transfer of or entering into a binding agreement with respect to voting control over a share of Class B common stock by proxy or otherwise subsequent to the effective date."

Do you see that?

THE WITNESS:  Yes.

BY MR. JAMESON:

Q.  Okay.  Now, the word "proxy" in that provision, is referring to proxies or transfers that are binding agreements with respect to voting control over the shares, right?

A.  Yes.

Q.  And subparagraph B also refers to -- I'm sorry -- I'm sorry.

If you look at the next subparagraph, which is subparagraph B, it refers to the grant of proxies to officers or directors of the corporation.

Do you see that?

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 13 of 51

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 30

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A. Yes.

Q. And goes on to say, "at the request of the board of directors of the corporation."

Do you see that?

A. Yes.

Q. Now, in that provision that is subpart B that we just looked at does not refer to proxies that transfer or are a binding agreement with respect to voting control, right?

MR. SOLUM: Objection as to form.

THE WITNESS: Yeah. I'm not sure I understand your question.

BY MR. JAMESON:

Q. Well, the concept of voting control was picked up in subpart A, romanette 2 that we looked at before, but the concept of voting control is not picked up in subpart B of the definition of transfer, correct?

MR. SOLUM: Objection.

MR. GIBBS: Are you just asking him whether the words are in that other provision?

MR. JAMESON: Well, I'm asking ---

MR. GIBBS: Or are you asking for his interpretation of the document?

MR. JAMESON: -- his understanding.

MR. GIBBS: If he has one.

Page 31

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

MR. JAMESON: If he has one.

THE WITNESS: I'm not a lawyer and this is a particularly complex paragraph. So I'd go to a whiteboard and try to start tracking it out.

BY MR. JAMESON:

Q. But as you sit here right now, we can at least agree the words "voting control" do not appear in subpart B, right?

A. Let me read it.

Q. Sure.

A. I do not see the words "voting control" in subpart B.

Q. Okay. And are you able to tell me whether or not the concept of voting control applies to subpart B based on your understanding of this provision?

MR. SOLUM: Objection.

THE WITNESS: I cannot.

BY MR. JAMESON:

Q. All right. You can set that document aside.

Now, do you recall ever telling either family members or employees of MINDBODY that -- not to convert the Class B shares to Class A?

A. I do not.

Q. Did you hold -- put it this way, post-IPO, but before the Vista transaction, did you hold proxies for

Page 32

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

any employee shares?

A. I did.

Q. Okay. Approximately how many, do you know?

A. I don't recall the number. It's in public documents.

Q. And how did you come to have those proxies?

A. So in the period of pre-IPO period where we were bringing in a greater and greater amounts of outside investor capital, we were diluting the voting power of the company, and we were also granting stock to employees.

So what the cofounders of the business, Bob Murphy and I did, was create a structure by which we could increase equity grants to employees and incentives, but retain the voting control ourselves -- the voting rights of those shares -- I should say, the proxy rights.

Q. And were those proxies generally irrevocable or did they terminate at some point?

A. I don't recall.

Q. Did you -- again, talking about the period post-IPO, but prior to the Vista transaction, did you have communications with other holders of the Class B shares regarding their intentions to convert the shares?

A. Can you restate the period that you're asking

Page 33

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

about?

Q. Sure. Post-IPO --

A. Yep.

Q. -- prior to the Vista transaction.

A. The only conversations I recall are reminding my ex-wife that if she sold shares, she was losing the super voting rights.

Q. And why did you tell her that?

A. Just so she was aware of it.

Q. Do you recall telling your father that as well?

A. I don't. My father didn't own that many shares.

Q. And you say, "just so she was aware," what was the context of the discussion?

Why did that come up in the discussion with your wife?

A. This is my ex-wife.

Q. Your ex-wife, sorry.

A. We are in a good relationship, and she was letting me know that she intended to sell shares for liquidity, and so -- and she wanted to know whether I had any objection to that.

I said no, I don't. It's your right to do that. Just be aware that when that happens, you're

Page 34

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

losing super voting rights on those shares that you sell -- or that you convert in preparation for sale.

Q. And do you recall having discussions like that with any of the MINDBODY employees?

A. I can't recall specifics, but I probably did, yeah. These are early employees who care about the future of the company.

Q. Did you ever have any discussions with IVP regarding its intentions to convert any of its Class B shares?

A. No. One of our understandings with our venture capital investors was that their plans to distribute or not distribute were their business and not ours, and the only time that I would be aware of their intention is after they had already decided to do something -- had already done it.

Q. Did you become aware in -- sometime in 2017 that IVP had converted a significant part of its Class B shares?

A. Yes.

Q. Okay.

MR. JAMESON: Let's mark this as Stollmeyer 3, please.

(Deposition Exhibit 3 marked.)

MR. JAMESON: I'll give you the right document

Page 35

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

this time.

THE WITNESS: Mmmm-hmmm.

BY MR. JAMESON:

Q. Do you recall receiving this e-mail, Mr. Stollmeyer?

A. I do.

Q. And again, did anything about IVP's conversion either concern you or cause you to look at the status of the Class B voting power more closely when that happened?

A. No. We were tracking it closely, and Courtney Mathes was our SEC attorney in-house -- or SEC expert attorney, I should say, this was her job to keep me informed, as well as our general counsel and CFO of any significant movement in voting rights.

Q. If you look at bullet point 3, it reflects down there that the collective voting power of Rick -- I assume that's a reference to you -- IVP and J.P. Morgan continues to decline, as of March 31 these holders had just over 52 percent of the total voting power.

Do you see that?

A. Yes.

Q. Did there come a time when -- well, other than you, IVP, and J.P. Morgan, were there other Class B holders out there at this point in time?

A. Sure.

Page 36

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q. And collectively, do you know -- again, talking about March 31 of 2017, if the three of you held 52 percent, approximately how much voting power would the Class B collectively hold at that point?

A. I don't recall, but it would be significant.

Q. Did there ever come a time when the Class B voting power dropped below 50 percent?

A. In total?

Q. In total.

A. I don't recall.

Q. If it had dropped below -- if the aggregate Class B voting power dropped below 50 percent of the total voting power, was that something that would have concerned you?

MR. SOLUM: Objection. Hypothetical. Calls for speculation.

Answer if you can.

THE WITNESS: No. No.

I think I held -- I believe that it inevitably would as part of the normal course of business as Class B shareholders converted, and eventually the Class B, as a group, would drop below 50 percent, and as we added additional Class A shareholders.

BY MR. JAMESON:

Q. I think you said your recollection is that all

Page 37

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

of the Class B essentially would convert after seven years, or any that was left?

A. There was an automatic conversion timeline. I believe it's seven years.

Q. Okay.

A. It's in the documents. Yeah.

Q. Did you have -- at the time that the Class B shares were issued back about the time of the IPO, did you have any expectations or estimates as to how quickly Class B holders might convert their shares to A?

A. I didn't.

Q. Do you recall discussing that with anyone or having anyone else who, you know, expressed a view on that point?

A. No.

Q. Prior to the transaction with Vista, were you familiar with Vista?

A. Yes.

Q. How were you familiar with them?

A. I first became aware of them when they purchased Active Network, which is an internet company that acts in the fitness space. I forget what year that was. That was before we went public.

Q. That was before MINDBODY went public?

A. Correct.

Deposition of Richard L. Stollmeyer              PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 38

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q. And after you became aware of them as a result of the Active Network, did you have regular communications with them?

A. No.

Q. Did you have any communications with them?

A. No. I think I first met them circa 2013, 2014, somewhere in that timeframe.

The Active acquisition, I think, was a couple years before that.

Q. And how did you meet them in 2013 or '14?

A. They reached out. They expressed interest in the company.

Q. And --

A. As a CEO, I feel it's my duty to meet with potential investors.

Q. What was that initial meeting? Was it an in-person meeting? Was it a telephone call?

A. I don't recall.

Q. What were the topics of discussion in the initial meeting you had with them in 2013 or 2014?

MR. GIBBS: Objection to form.

THE WITNESS: Informational. In these kinds of meetings, typically the other party is letting us know what their -- what their investment thesis is, what kind of companies they like to invest in or buy, what

Page 39

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

other companies they may have bought, and then we talk a bit about our strategy and philosophy but only in terms of public information.

BY MR. JAMESON:

Q. Now, do you remember there being a sort of initial single meeting with Vista, or was this something where there were a series of communications with them?

A. I think there were probably e-mail or phone communications, and then there was at least one face-to-face. There might have been a couple of face-to-face meetings before the IPO, but, you know, we've had many such meetings with other entities. Vista was only just one of them.

Q. So did you have face-to-face meetings with Vista in the 2013 to 2014 timeframe?

A. I don't recall.

Q. Who at Vista were you communicating with in 2013 or 2014?

A. Monti Saroya.

Q. Is he still with Vista today?

A. Yes, he is.

Q. And so after that initial communication in 2013 or 2014, did you have any sort of regular communications with Vista from that point forward?

A. No. The next time I recall communication was

Page 40

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

right as we were getting ready to go public.

Q. And what was the communication you remember with them right as you were going public?

A. They said they would buy us then, we didn't have to go public.

Q. Obviously, that didn't happen at that time, right?

A. Right.

Q. Why not?

A. Because we didn't want to be bought by a private equity firm. We wanted to go public. We felt that was a better outcome for our shareholders.

Q. Who did you -- well, who made the suggestion to you that Vista would be interested in buying MINDBODY at the time of the IPO?

A. Well, there were numerous bankers -- investment bankers orbiting around us at the time and multiple of them had identified Vista and other private equity firms as potential acquirers of the business -- in other words, as alternatives to going public.

Q. Okay. Did you have any direct communications with anyone at Vista about the possibility of them buying MINDBODY instead of MINDBODY doing its IPO?

A. Yes.

Q. Who?

Page 41

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A. Monti Saroya.

Q. And approximately how many communications did you have with him on that topic?

A. I believe there was one phone call.

Q. So would it be fair to say it was a nonstarter in your mind?

A. Yeah. I told him look, I'm flattered Monti, but we are going public and we're -- we're very clear about our path forward.

Q. After that phone call, and then after the IPO occurred, when was the next time you had any communications with Vista?

A. Well, there's another branch of Vista that invests in public companies so in every earning cycle during the period of investor relations which is after the earnings call, you typically for the next three to four weeks, we would meet with various public investors, among those is Vista.

Q. And when you were dealing with that branch of Vista, that is the branch that deals with public companies, were you dealing with Monti Saroya still or was that someone else?

A. Saroya, S-A-R-O-Y-A.

Q. Saroya. Thank you.

A. Typically it would be a different person or

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 42

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

persons. I don't remember all their names and I don't recall whether Monti was in any of those meetings.

Q. And how frequent were those meetings?

A. Multiple times per year during the earnings cycles. I don't recall specific dates.

Q. Other than those communications that were tied to earnings calls, did you have other communications with Vista in between the period that the IPO occurred and before the communications regarding the transaction where Vista bought MINDBODY happened?

MR. SOLUM: Objection as to form.

THE WITNESS: So I had -- I don't think Monti and I spoke for about a year and a half. And in August of last year, at the prompting of Catalyst Investors, who was vying to be an investment banker for us, I reopened communications with several potential acquirers.

BY MR. JAMESON:

Q. So this is August of 2018?

A. Yeah. And I had one phone call with Monti Saroya.

Q. Prior to August of 2018, did you have communications with Vista, other than the ones you testified to before that, you know, sort of were associated with earnings calls?

Page 43

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A. Not that I recall.

Q. So in August of 2018, you reopened communications with several investors, one of whom was Vista, correct?

A. Yes.

Q. What was the first communication you had with Vista in that context?

A. You mean what did we talk about, or what was the form of it, or --

Q. Well, who did you talk with first?

A. Monti Saroya by telephone.

Q. And what was the substance of the discussion in that telephone call?

A. Just informational, what's going on at Vista, and how are things at MINDBODY.

Q. Okay. Did he understand why you were -- well, did you call him or did he call you?

A. He -- I believe Jeff Chang of Catalyst made an e-mail reintroduction, because we hadn't spoken in some time, and he and I exchanged a brief e-mail which set up a phone call time.

Q. Okay. And was there a purpose for the meeting stated to Vista or for the telephone call, I should say, was there a purpose of the telephone call that was stated to Vista?

Page 44

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A. Just to catch up.

Q. Did Vista understand that you were reaching out to others in addition to Vista?

A. I don't know.

Q. In that conversation, did Vista understand that you might be interested in a transaction involving MINDBODY?

A. I don't think --

MR. GIBBS: Objection to form. Go ahead.

THE WITNESS: Yeah. I don't know what they understood.

BY MR. JAMESON:

Q. Based on the substance of the telephone call that you had with Vista, do you think they understood that you were considering a transaction?

MR. GIBBS: Same objection.

THE WITNESS: At that point I was not considering a transaction.

BY MR. JAMESON:

Q. What were you considering at the time you had that call with Vista?

A. That it's important to maintain relationships with potential acquirers. That's part of my fiduciary duty.

Q. And what was Catalyst doing for MINDBODY at

Page 45

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

that point in time, again we're talking about August of 2018?

MR. SOLUM: Objection. Asked and answered.

THE WITNESS: I believe they were maintaining a relationship with us.

BY MR. JAMESON:

Q. And what specifically did Catalyst -- well, strike that.

Did Catalyst give you a specific purpose for reintroducing you to Vista?

MR. SOLUM: Objection. Asked and answered. You can answer again.

THE WITNESS: The advice of Jeff Chang -- and by the way, other investment bankers, was that we maintain contact with potential future acquirers in case we ever decided to do a transaction.

BY MR. JAMESON:

Q. So after the August communication, when was the next time you had a communication with Vista?

A. In September.

Q. And what was -- what led to that communication?

A. Monti invited -- he reached out to me and invited me to a gathering of executives in October.

Q. What was the purpose of the gathering?

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 46

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A.  Informational.  It's one of these networking events, you get to meet a lot of different impressive executives.

Q.  Where was it?

A.  In Carlsbad, California.

Q.  Did you spend any time talking with Monti at that event?

A.  Very briefly.  He was very busy at that event.

Q.  And what -- to the extent you did talk with him, what did you talk to him about?

A.  Just how things are going at MINDBODY, how things are going at Vista.

Q.  Following that event, when was the next time you talked to anybody at Vista?

A.  He reached out to me in the week that followed and expressed a serious interest in acquiring MINDBODY, circa third week of October.

Q.  All right.  As close as you can remember, what exactly did he say?

A.  We think you're running a great company.  We think you're undervalued.  We think you would do better as part of the Vista portfolio.

MR. SOLUM:  Can I just ask for one clarification, you said in the week that followed and then you said the third week of October.  I don't mean

Page 47

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

to press, but I just want to clarify on the record here.

THE WITNESS:  Yeah.  I'm fuzzy on precise dates.  I believe we have records of all of this.

MR. SOLUM:  Fair enough.

THE WITNESS:  You guys have records of the communication dates already.

In my memory the meeting in Carlsbad was first half of October, the conversation where he expressed interest was at the middle of October.

BY MR. JAMESON:

Q.  Okay.

MR. SOLUM:  Fair enough.  Apologies for interrupting.

THE WITNESS:  Yeah.

MR. JAMESON:  No.  That's fine.

BY MR. JAMESON:

Q.  With respect to the meeting you recall in the middle of October where he expressed interest in doing something with MINDBODY, how long was that conversation?

A.  Probably 10 minutes.

Q.  Was it by telephone --

A.  Yes.

Q.  -- in-person -- by telephone.

And what was the end result of that conversation?

Page 48

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A.  I said well, Monti we're flattered.  The company is not for sale.  We're in a quiet period right now.  Let's talk after our next earnings call.

Q.  Now, at that point in time, had you personally become interested in, perhaps, a transaction that would take the company private?

A.  Yes, I had.

Q.  Why?

A.  Because the company had experienced a significant amount of friction in the third quarter with the recent acquisitions we had made.

Our revenue for the third quarter had been disappointing, although that wasn't yet public information.

Our forecast for the balance of the year and our view of how we started to think about 2019, also wasn't rosy.  And so that's when I started thinking we should at least take a look at what's out there.

You know, what level of interest is there, what price tag might somebody be willing to pay.

Q.  You indicated that the forecast for the balance of the year was not rosy -- again, we're talking about the balance of 2018, right?

A.  Correct.

Q.  Okay.  And why was that not a rosy forecast?

Page 49

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A.  We had multiple revenue streams that came in in Q3 disappointing that resulted in us missing street expectations, and it was looking clearer that we were going to have to guide down against the implied prior Q4 guide, and we understood that that would likely, you know, be quite painful for stockholders.

Q.  You'll have to help me, explain you would have to guide down against the implied prior Q4 guide?

A.  That's right.  Because what we did before -- what you do is you guide the quarter ahead and you guide the full year.

So when you're guiding Q3, you guide Q3 and the full year, which is a simple arithmetic to determine what the Q4 guide is.

Q.  By "guide" that's just the projected -- your projections for how the company --

A.  Exactly.  In the earnings call, our Chief Financial Officer issues guidance on revenue and bottom line.

MR. SOLUM:  And Bruce, we've been going a little over an hour.  Is it okay if we take a break right now?

MR. JAMESON:  Yeah.  Let's -- that's fine.  Take a five-minute break now?

THE WITNESS:  Sure.

Page 50

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

MR. SOLUM: Okay.

(Off the record at 10:37 a.m. Back on the record at 10:47 a.m.)

--o0o--

MR. JAMESON: I'm going to hand you what we've marked as Exhibit 4 during the break.

(Deposition Exhibit 4 marked.)

BY MR. JAMESON:

Q. The second page of this exhibit is the e-mail we just looked at and marked as Exhibit 3. The first page appears to be some responsive e-mails to that.

If you would, I'd like to refer you to your e-mail on April 4, 2017 at 6:21 a.m. Do you see it, it's about the middle of the first page?

A. Yes.

Q. And you're asking for information about if you -- if you exercised all of your Class B options, how much would they cost and what would the total voting power be. Do you see that?

A. Yes.

Q. Was there a reason you were asking that question at this point in time?

A. I was just curious.

Q. So it was just general curiosity?

A. Mmmm-hmmm.

Page 51

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q. You can set that aside.

There were a series of board meetings, December 20 through 23 where the Vista deal was being considered.

Do you recall that?

A. Yes.

Q. Where were you physically located while those were occurring?

A. All over the place. Running the company, we've got offices in multiple countries.

Q. So Vista's proposal came in on December 18 if I remember correctly, I believe it was. Where were you when Vista's offer was received?

A. Was that a Wednesday or a Thursday?

Q. I'll tell you --

A. I can look on my calendar if that's helpful. I can answer precisely.

Q. It's a Tuesday.

A. Tuesday, December 18th I was in the office.

Q. And what about Wednesday, December 19th?

A. Also in the office.

Q. And then the first board meeting to consider or at least discuss the Vista offer was December 20. Where were you on that day?

A. I believe I was in the office.

Page 52

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q. Okay. And -- I'll just mark this as Exhibit 5 to make this easier.

A. I want to be clear the 20th or the 21st I was with a group of MINDBODY employees to go down and have a customer visit in Irvine. We rented a Sprinter van and went down together and went back. It was an all-day event. I think that was a Thursday or Friday.

And so for the record I want to make sure we clarify that later. That would be the only day that week I believe I wasn't in the office.

(Deposition Exhibit 5 marked.)

Q. All right. Mr. Stollmeyer, we marked as Exhibit 5, minutes from the board of directors meeting on December 20, 2018.

Do you see that?

A. Yes.

Q. I want to refer you to the last full paragraph on the first page where it references the fact that there was a summary of certain points -- certain aspects of Vista's offer provided including the structure of the proposed voting and support agreements.

That's in the next-to-last line.

A. Mmmm-hmmm.

Q. Do you see that?

A. Yes.

Page 53

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q. And what were the voting and support agreements that were being proposed by Vista in connection with this offer?

A. I believe those were agreements that would assure that the board is voting for the deal if we don't -- unless we decide otherwise.

Q. Was it the board -- I'm just trying to refresh your memory. I can pull out documents if you want.

Was it the board or was it the Class B stockholders?

A. Well, I think we, the board, could only speak to the Class B represented on the board, and that would be IVP and MINDBODY -- or IVP and me.

Q. Ultimately in the deal, was there a voting support agreement entered into?

A. Well, no. No.

What we did is we created an irrevocable proxy that aligned my vote with the vote of the board.

Q. And why was it that the discussions transitioned from a voting in support agreement to irrevocable proxy?

MR. GIBBS: Objection to form.

THE WITNESS: You're asking why did we, the board, want it?

Well, we, the board --

Page 54

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

BY MR. JAMESON:

Q.  No.  I --

A.  Go ahead.

Q.  Let me ask --

A.  Yeah.

Q.  -- a clearer question.

A.  Yes.

Q.  Initially Vista proposed a voting in support agreement.  I thought I understood your last answer to be only if there was no such agreement because irrevocable proxies were ultimately signed.

Is that --

A.  That's right.

MR. SOLUM:  Objection.

BY MR. JAMESON:

Q.  And all I'm asking is why did -- why in the end of the deal was there no voting in support agreement and instead irrevocable proxies?

MR. GIBBS:  Objection to form.

THE WITNESS:  So my understanding was that the acquirer wanted assurance that they engage with us, and that if we did not receive a superior offer, that the board would support the deal.

And most importantly for them, that the significant voting rights on the -- represented on the

Page 55

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

board in the form of Eric Liaw and myself would support the deal.

We also understood that if we pledged our voting rights, that that could constitute a transfer and we weren't going to transfer.

BY MR. JAMESON:

Q.  All right.  Let's try this.  Let's mark this as Exhibit 6.

(Deposition Exhibit 6 marked.)

Q.  Mr. Stollmeyer, Exhibit 6 is a December 21, 2018 e-mail string.  You're reflected, at least on the top of the page, as having received the last e-mail in the string.

I'd like to refer you down to the e-mail from Jamie Leigh that's at the bottom of the page and the four bulleted points down there.

Do you see those?

A.  Yeah.

Q.  Do you see number 3 says, "irrevocable proxy Cooley draft, in lieu of a voting agreement."

Do you see that?

A.  Yes.

Q.  All I'm trying to understand is one, is it your understanding that ultimately an irrevocable proxy was used instead of a voting agreement as had been

Page 56

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

proposed by Vista?

A.  That was our counter.  Vista had asked for a voting agreement.  We weren't willing to give one.

Q.  And why was it that MINDBODY was not willing to give a voting agreement?

A.  Because that would constitute conversion of Series B to Series A rights for those of us that participated in that agreement.

Q.  So where did the concept of an irrevocable proxy come from?

A.  Counsel.

MR. GIBBS:  Objection to form.  I'm sorry.  Go ahead.

THE WITNESS:  Counsel.

BY MR. JAMESON:

Q.  Was it the intention that the irrevocable proxy would accomplish the same thing that Vista wanted from the voting agreement?

MR. GIBBS:  Objection to form.

THE WITNESS:  It certainly doesn't give them precisely what they want.  What they wanted was a pledge of our vote.

Instead what we said is look we, the board, in effect, will decide in the end on the deal.  And -- as a majority.  And as it was, it ended up being unanimity to

Page 57

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

vote for the deal.

BY MR. JAMESON:

Q.  When you say "we, the board," who gave the irrevocable proxy?

A.  IVP and myself.

Q.  And -- so the board did not bring up the proxy, correct?

MR. SOLUM:  Objection as to form and to the extent you're asking for a legal conclusion.

You can answer.

THE WITNESS:  My understanding of the agreement is that it was an agreement for IVP and myself, IVP as represented by Eric Liaw, to grant an irrevocable proxy to Gail Goodman, our lead independent director, to vote for the deal providing the board still supported the deal, which is a pretty big proviso.

BY MR. JAMESON:

Q.  And how did that differ from the voting agreement that Vista requested?

MR. GIBBS:  Objection to form.

THE WITNESS:  It didn't pledge to vote for the deal.  It gave the board the right to -- if the majority of the board felt the deal was not in the interest of the shareholders that we could still back out.

Or most importantly, if we received a superior

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 58

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

offer, in the go-shop.

BY MR. JAMESON:

Q.  Right.  So as you understand it -- and again, obviously, we can read the document --

A.  Yeah.

Q.  -- but as you understand it, the irrevocable proxy only granted power to vote your shares in favor of the Vista deal if the board of directors of MINDBODY approved it; is that your understanding?

A.  Correct.

Q.  And I should be clear, when I say "approved it," approved the Vista deal?

A.  Correct.

Q.  Okay.

A.  And if no deal happened, then the proxy went away.

Q.  Now, the December 20 board meeting was by telephone, correct?

A.  Yes.

Q.  Was there also any sort of online meeting set up, you know, for example, GoToMeeting or something like that?

A.  Oh, yeah.  We use a tool in most of our board meetings -- most meetings called Zoom.  So there's video conferencing, we can get eye-to-eye contact video as

Page 59

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

well as voice.

Q.  So with Zoom is it everybody can see everybody else on the computer screen?

A.  In most cases.  Sometimes people are traveling so they're calling in via cellphone, they might be in an airport terminal or someplace where video is not practical.

Q.  Do you have the ability to review documents with Zoom?

A.  Sure.  Yeah.

Q.  And does that -- is that typically done?  That is do they provide the documents via a Zoom feed essentially for directors to review?

A.  Certainly not a detailed document.  A detailed document would have been provided by e-mail, most likely, or possibly through BoardVantage, which is a place where board documents are shared.

And the -- what you might have on a visual in a Zoom meeting would be like a slide deck, you know, with high points or something like that.

Q.  Had you received the Vista proposal either prior to or at the December 20 meeting?

A.  Yes.

Q.  How did you receive it?

A.  I received a copy of it via e-mail.

Page 60

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

MR. JAMESON:  Let's mark this as Exhibit 7 -- is it 7?

THE COURT REPORTER:  Yes, it is.

(Deposition Exhibit 7 marked.)

BY MR. JAMESON:

Q.  Mr. Stollmeyer, what we've marked as Exhibit 7 is a draft of the irrevocable proxy.  If you would, in several places, I'll refer you to the beginning of the second paragraph, it notes that, "the stockholder, as a condition and inducement to Parent's willingness to enter into the merger agreement --" and "Parent" is a reference to a Vista entity, correct?

A.  Yes.

Q.  Okay.  And so the execution of this document was a condition required by Vista, correct --

MR. SOLUM:  Objection as to form.

BY MR. JAMESON:

Q.  -- in connection with the Vista transaction?

MR. SOLUM:  Misstates the record.  This document was never signed.

You can answer if you know.

THE WITNESS:  Are we looking at an unexecuted draft?

MR. JAMESON:  This is a draft, right.

MR. SOLUM:  I don't even know which draft this

Page 61

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

is.

THE WITNESS:  I'm sorry.  I was misled.  I thought we were looking at an executed document.

BY MR. JAMESON:

Q.  No.  This is a draft.  I said it was a draft upfront.

A.  I'm sorry.  I missed that.

I'll need to study this and compare the language, I'm not a lawyer.

Q.  Forget the language.

Was Vista requiring the execution of the irrevocable proxy as a condition to this deal?

A.  No.  Vista had asked for a voting agreement and we offered an irrevocable proxy in lieu of that.

Q.  But ultimately did Vista require the irrevocable proxy as a condition to it going forward with the deal?

A.  I don't know because we didn't -- we didn't execute a different agreement.  The agreement we executed had the irrevocable proxy in it.  So I don't know whether we would have gone forward without it.

Q.  And -- we'll come back.

And again, recognizing that this is a draft and you're not sure which draft this is, can you turn over to page 2408, which is the second page of the

Deposition of Richard L. Stollmeyer        PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 62

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

exhibit.

A. 2408? Okay. Got it.

Q. 2408 in the bottom right-hand corner?

A. Yeah.

Q. It's page 2 of the numbered pages. The first full paragraph on that page the last sentence which says, "the stockholder hereby irrevocably and unconditionally agrees not to take any action that would reasonably be expected to result in any conversion of company Class B stock, including the shares to company Class A stock."

Do you see that?

A. Yes.

Q. Do you recall who proposed that language for the irrevocable proxy?

A. I don't.

Q. Did you have any discussions with anyone -- other than counsel, I don't want to get into your discussions with counsel -- regarding that provision?

A. No.

Q. You ultimately signed an irrevocable proxy, right?

A. Yes.

Q. And we'll look at it in a minute, but do you recall whether that language ultimately ended up in the

Page 63

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

final form of the irrevocable proxy?

A. I'll need to see it to give you a good answer to that, but I'll just comment that I -- what I made sure I was comfortable with was the final form. I didn't get heavily involved in the making of the sausage.

Q. All right.

A. I was much more focused on the economics and the substantive terms of the deal.

Q. So did you have -- did you provide any input on the specific terms that went into the irrevocable proxy?

A. Only that I wanted assurance that this did not constitute conversion.

Q. All right.

A. And that if a deal wasn't done, that I recovered my voting rights.

Q. But let me go back. The actual language, is that -- is it fair to say the lawyers drafted the language?

A. Yes.

Q. Okay.

A. As an all done.

Q. And did you have any specific -- well, did you provide any specific provisions that went into the

Page 64

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

irrevocable proxy?

A. No. I simply provided objectives.

Q. Did you have any discussions with either Ms. Goodman or Mr. Cunningham regarding the actual provisions of the irrevocable proxy?

A. Not detail, but the fact that we were going to execute this proxy and the understanding of what it functionally required of them, we had that general conversation.

Q. All right. And -- but did you discuss any of the specific terms of the proxy and what they meant?

A. No. Just the -- to ensure that they had read it and understood it, and that we understood the purpose of it. But we didn't go through it line-by-line.

Q. Okay. Did either of Ms. Goodman or Mr. Cunningham express any concerns about any of the provisions of the irrevocable proxy to you?

A. Not to my recollection.

Q. And just to round out sort of physical location, you told me before you might have been in Irvine one day, but in the December 20 to December 23 period, you were generally in California, though; is that fair?

MR. SOLUM: Can you tell me how this relates to the 225 issues?

Page 65

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

MR. JAMESON: Yes. It relates --

MR. SOLUM: I've let this go on for quite some time about who was where, when, whether things were by telephone and what not.

The witness has a lot of things to do. He's respectful of the process, as are we, but how does this relate to the limited issues that are going to be tried next month?

MR. JAMESON: It relates to the process that led to the irrevocable proxy and how the terms were reviewed, when they were reviewed, who reviewed them, and who suggested them.

MR. SOLUM: How does where he was relate to any of this?

MR. JAMESON: Well, it goes to the question of when did he review it? How did he review it? Did he have the opportunity?

MR. SOLUM: He's already talked to all that.

MR. JAMESON: I understand.

MR. SOLUM: Let's move on.

MR. JAMESON: We are.

BY MR. JAMESON:

Q. When the irrevocable proxy concept was suggested to Vista, did they have concerns with it that you knew of?

Page 66
"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A.  No.

MR. GIBBS:  Objection to form.

THE WITNESS:  I know of no concerns that they expressed.  During that time I had no direct communication with Vista.

MR. JAMESON:  Let's mark this as Exhibit 8.

(Deposition Exhibit 8 marked.)

BY MR. JAMESON:

Q.  Mr. Stollmeyer, I've given you what we've marked as Exhibit 8 simply for reference.  They are the minutes of the December 21 board meeting.  You attended that meeting by telephone, correct?

A.  Correct.

Q.  All right.  And I've read through these and did not see any reference to either the voting in support agreement or to the irrevocable proxies.  You're welcome to read it and confirm that.

My question ultimately to you is:  Was there any discussion of the irrevocable proxies or the voting in support agreement at the December 21 board meeting?

A.  Not to my recollection.

Q.  And if there's not any such discussion reflected in the December 21 minutes, is that a good indication that there probably was no such discussion?

A.  That's correct.

Page 67
"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q.  All right.  So we're done with Exhibit 8.

A.  Okay.

MR. JAMESON:  Let's mark this as Exhibit 9.

(Deposition Exhibit 9 marked.)

BY MR. JAMESON:

Q.  And Mr. Stollmeyer, Exhibit 9 are the minutes of the December 23, 2018 board meeting.

A.  Yes.

Q.  If you look at the second page, there's a signature there for Jamie Leigh, is that a DocuSign type signature?

A.  I believe so.

Q.  And to the extent that applies to these minutes, is it safe to assume these are the official minutes from the meeting?

A.  I believe so.

Q.  If you would, I'd like you to look at annex A which is the resolution of the board of directors of MINDBODY.

A.  Okay.

Q.  Look at the third whereas clause where it says, "prior to the execution and delivery of the merger agreement as a condition to its willingness to enter into the merger agreement, parent has required certain stockholders of the company, set forth on Exhibit C, to

Page 68
"CONFIDENTIAL" - COUNSEL'S EYES ONLY

enter into irrevocable proxies."

Do you see that language?

A.  Yes.

Q.  Going back to our prior discussion, was it the case that ultimately Vista required execution of the irrevocable proxies as a condition of the merger agreement?

A.  I believe it's stated right there.

Q.  And you agree that was the case, right, that was a Vista requirement?

A.  Yes.

Q.  To your understanding, does Vista have the ability to enforce the irrevocable proxy?

MR. GIBBS:  Objection to form.

THE WITNESS:  I don't know.

BY MR. JAMESON:

Q.  You have no understanding one way or the other?

A.  Well, we entered into an agreement.

Q.  Right.

And my question is:  Assume everything else, the agreement got approved and so on, and for some reason you advised Ms. Goodman not to vote pursuant to the irrevocable proxy, or she chose not to, would Vista have the ability to enforce that agreement to your

Page 69
"CONFIDENTIAL" - COUNSEL'S EYES ONLY

understanding?

MR. SOLUM:  Objection.

MR. GIBBS:  Objection to form.

MR. SOLUM:  Hypothetical.  Calls for speculation.  Calls for a legal conclusion.  But you can answer.

THE WITNESS:  I don't know.

MR. SOLUM:  You can answer.

MR. JAMESON:  I didn't see you on the expert witness list.

THE WITNESS:  We can trade seats if you want.

MR. SOLUM:  That one limiting question, I might have more.

MR. JAMESON:  I'll tell you what, let's take a 10-minute break to let me -- based on what he's done I think I can organize some stuff and I think efficiency-wise it will be good to do that.

I really think I'll be able to wrap up in short order.

MR. SOLUM:  Okay.  Let's go off the record.

(Off the record at 11:18 a.m.  Back on the record at 11:32 a.m.)

--o0o--

MR. JAMESON:  Let's mark this as 10.

(Deposition Exhibit 10 marked.)

Page 70

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

BY MR. JAMESON:

Q. Mr. Stollmeyer, I've marked as Exhibit 10 what I believe to be the final form of the irrevocable proxy bearing your signature.

Can you confirm that's your signature on the last page?

A. Yes.

Q. So this is the final form of the proxy as it was ultimately approved and signed by you, right?

A. It appears to be.

Q. And if you would, take a look at the second paragraph on the first page. I'll refer you to the first sentence where it says, "the undersigned stockholder of the company as a condition and inducement of parent's willingness to enter into the merger agreement."

Do you see that?

A. Yes.

Q. That was the language we were discussing before in the draft I had shown you, right?

A. I don't know. Yes.

Q. You'll agree that language ultimately did make it into the final form of proxy, correct?

A. The language is in this document.

Q. All right. And if you would turn over to the

Page 71

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

second page, first full paragraph, the last sentence says, "the stockholder hereby irrevocably and unconditionally agrees not to take any action that would reasonably be expected to result in conversion of company Class B stock including shares to company Class A stock."

Do you see that?

A. Yes.

Q. That particular provision doesn't relate to the proxy voting the shares, does it?

MR. GIBBS: Objection to form.

THE WITNESS: I don't know.

BY MR. JAMESON:

Q. In the course of either negotiating the terms of the irrevocable proxy or discussions you had regarding the negotiations, do you know why this provision was put into the proxy?

MR. GIBBS: Objection to form.

MR. SOLUM: I'm also just going to counsel the witness not to disclose any attorney/client information. So to the extent you discussed that issue with Cooley or if Cooley discussed that issue with you, if you can exclude that from your answer, please.

THE WITNESS: Yeah. In that case, then, I have no comment.

Page 72

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

BY MR. JAMESON:

Q. Okay. And recognizing you're not a lawyer, but if you were to take that sentence out of the irrevocable proxy, would that in any way impair Ms. Goodman's or Mr. Cunningham's ability to vote the shares on your behalf?

MR. GIBBS: Objection.

MR. SOLUM: Objection. Hypothetical. Calls for speculation.

THE WITNESS: I don't know.

MR. SOLUM: And seems to call for a legal conclusion.

BY MR. JAMESON:

Q. Do you recall reading that particular sentence in the irrevocable proxy before you signed it?

A. I read the entire document before I signed it.

Q. Do you recall reading that particular sentence -- let me ask a different question.

Do you have any memory, as you sit here today, of reading that particular sentence when you read it and prepared to sign the irrevocable proxy?

A. No.

Q. Do you have any recollection as you sit here today regarding the reasons why that sentence was included in the irrevocable proxy?

Page 73

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

MR. SOLUM: Same instructions as before.

THE WITNESS: Yeah.

MR. SOLUM: And exclude discussions with counsel.

THE WITNESS: No.

BY MR. JAMESON:

Q. So let me ask it this way.

Do you have a recollection of discussing that particular sentence, but it was only with counsel, or is it that you have no recollection of discussing that particular sentence?

A. I have no recollection of discussing that particular sentence.

Q. Thank you.

Was there time sensitivity for getting the Vista transaction done, in your view?

A. Yes.

Q. And what were the time sensitivity?

A. First and foremost that their offer had a time limit on it, that it was a very favorable offer that the board and I unanimously were pleased with.

That, despite substantial effort, there were no other inbound offers from the multiple parties we had met with over the previous seven weeks, and we were concerned about the macroeconomic environment.

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 24 of 51

Deposition of Richard L. Stollmeyer      PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 74

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

The markets were quite ominous at that point. Tech stocks in general, and our stock in particular, had taken a huge hit starting in October, and it was just going down, down, down, down.

And there was a lot of rumbling that we were entering into a real recession. And in that kind of environment, historically, stocks like ours can take -- can be disproportionately hurt.

So our feeling was if we pause this process, try to give multiple weeks for other parties to catch up, we might miss a unique opportunity.

Q. Aside from the macroeconomic factors that you just identified, was there anything specific to MINDBODY itself that, in your mind, required that the deal be done quickly?

A. Well, I don't know about quickly. It's that when you have a deal that is favorable on the table, it's best to act in a timely fashion.

We also knew, the board and I together knew, that we were going to have to guide down for 2019, meaning that the February earnings call we would have to tell the world that -- to lower their expectations of our 2019 performance which would undoubtedly hurt the stock.

Q. I want to talk for just a minute about the

Page 75

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

communications you had with ISS. You can set that document aside.

A. Sure.

Q. You participated in at least one call with ISS, correct?

A. Correct.

Q. Did you participate in more than one call with them? Just the one?

A. Just the one.

Q. The documents reflect that that call occurred on January 29, 2019 --

A. That sounds accurate.

Q. -- is that consistent with your recollection?

A. Yes.

MR. JAMESON: Let's mark this as Exhibit 11.

(Deposition Exhibit 11 marked.)

BY MR. JAMESON:

Q. Mr. Stollmeyer, I've handed you Exhibit 11 which is an e-mail string, but the one I'm most interested in is the one in the middle of the first page from Bob Marese to you and others that has a summary of ISS questions.

Do you see that?

A. Yes.

Q. What was -- what were the most important

Page 76

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

questions, if you can characterize any, that ISS had on its mind when you had the call with them?

A. Well, you know, these are the things that they wanted to understand. So most important, let me take a moment and read all of them.

I think the third question was probably the most important one. ISS's concern is, you know, would the stock, under its own natural trading, be likely to exceed 36.50 in the foreseeable future?

And I think that was a -- that was an important question. And our opinion was, probably not.

You know, what inspired the board -- the question to Gail, what inspired the board to initiate a process in October?

Yeah. I think those are the most important.

Q. Okay. Do you agree that Mr. Marese's summary here is a fair summary of questions that ISS raised?

A. Yeah. To the best of my recollection.

Q. What's the -- the second bullet point says, "have results versus plan/guidance been previously disclosed."

Can you explain to me what that discussion was?

A. I think that pertains to who knew what our results were. About this time they would have been

Page 77

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

asking about Q4.

And the answer is nobody outside of the company because we hadn't -- it wasn't in the proxy, and -- because we hadn't closed the year yet, and we hadn't gotten yet to our earnings call for end of year.

Q. And then the first bullet point, can you explain to me what the discussion was relating to the first bullet point which says "guidance in proxy above street consensus. Please explain how this would impact achieving plan goals."

A. Well, I think it's a misuse of words. We didn't guide in the proxy. A guide would be an official notification of future results.

What we shared in the proxy was the board-approved plan for 2019. And our guidance would have been below that plan.

You don't ever guide right on plan, you've got to give yourself some room in case anything goes wrong in the operation of the business.

Q. So, I'm sorry. Help me understand the distinction you're drawing between the guidance or guide is the term -- you use the term "guide" and "guidance" basically --

A. Yeah.

Q. -- the same way?

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 25 of 51

Deposition of Richard L. Stollmeyer          PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 78

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A.  Yes.

Q.  Okay.  So explain to me the difference as you perceive it as "guide" or "guidance" and what the board-approved plan was.

A.  So in our earnings release and on our earnings call, we will issue guidance.  This is communicating our expectations within a range of revenue and bottom line results.

As a matter of practice, public companies will not guide right at their board plan because to do so would set up equivalent chances of missing or beating.

And when you miss your guidance, you get severely punished by investors.  Your stock will take a serious hit.  So it's very bad for shareholders.

It's much better to guide a bit below what you're expecting and then beat those expectations.

Q.  And so -- so the board plan is what?  Sort of the optimistic scenario?

I'm just trying to understand what the board plan is and how it differs from guidance?

A.  The board plan is designed to -- to set up a structure under which the leadership of the company has to perform well to -- to receive their full compensation.

So it's designed with the interest of

Page 79

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

shareholders at heart.  It's not a lay-up, but it's also not wildly out of reach.  So it's designed to stretch us a bit.

And that's always created in close concert with the independent directors so that we are inducing our executives to lean forward and perform their best, but not setting expectations so high that they have no chance of hitting their bonuses.  It's very different than guidance.

Q.  I understand.  Thank you.

MR. JAMESON:  Let's mark this as Exhibit 12.

(Deposition Exhibit 12 marked.)

BY MR. JAMESON:

Q.  Mr. Stollmeyer, I'll -- you can look at it, but I believe this is a -- you know, what was intended to be an action by written consent of the stockholders of MINDBODY approving the Certificate of Incorporation back around the IPO time, but take a look at it and see if you recognize it as such.

A.  It doesn't have a date on it.  Do you know what date it was executed?

Q.  I do not.  In fact -- let me just to be clear.  This is how it was produced to us.

If you look at the last two pages the second to last page indicates that signature pages follow, but

Page 80

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

then when you go to the next page, at least as we received it, you see Exhibit D and not signature pages.

At the same time, I note there is, in the header of the document on all pages, a DocuSign envelope ID, and so I -- what I'd really like to do is have you help me determine whether this was something actually executed by the stockholders or not if you can tell from looking at the document?

A.  Yeah.  I cannot tell.

Q.  All right.  And basically I'm going on make a request of your counsel.

MR. JAMESON:  We've looked and can't find an executed version of this consent in the document production.  So we would request a copy of the executed version of the stockholder consent if one exists.

MR. SOLUM:  We'll take it under advisement.

BY MR. JAMESON:

Q.  Having seen this, going back to our discussion earlier today, does this at all refresh your memory as to whether or not you were asked to approve the Certificate of Incorporation as a stockholder in addition to as a director?

A.  Well, this is one of the many documents we executed in and around the IPO, you know, that set up the new public company.

Page 81

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

And I haven't reviewed it in detail, but it feels authentic in terms of the headlines, one of the elements we had to be dealing with and we needed to resolve.

Q.  Let me ask you to look at section 2, which is on page 2.

A.  Yep.

Q.  Which is titled, "Restatement of Certificate of Incorporation Prior to Closing of the Public Offering."

A.  Yes.

Q.  But then if you go down the third -- I'm sorry, it's the first resolved further clause towards the bottom of the page it says, "resolve further that the post-IPO certificate is hereby approved, adopted, and confirmed, and shall be effective immediately prior to the closing of the public offering following its filing with the Secretary of the State of Delaware."

Do you see that?

A.  Yes.

Q.  And I realize that there's not a certificate attached to this, but I was just -- do you understand that just looking at this document to be the certificate that created the A and B shares that we looked at earlier?

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 82

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

A.  Oh, you mean -- are we referring to the post-IPO certificate?

Q.  Yes.

A.  I believe so.

Q.  Are you a party to certain restricted stock agreements governing stock of the employees?

A.  Do you mean currently?

Q.  Yes.

A.  No.

Q.  Before the Vista transaction, were you?

A.  When you say "a party," I was part of the board of directors who authorized the creation of equity pools that allowed for award of restricted stock units.

Q.  Are those restricted stock agreements publicly available, to your knowledge?

A.  I believe so.  I believe that's all public. As a public company, I believe they would be.

Q.  But you believe they were publicly available?

A.  The amount of stock that the company allocates to employees and awards to employees is an important dilutional impact to shareholders -- stockholders, excuse me, so I believe that would be part of our public filings.

Q.  Did you have -- in connection with the Vista transaction, did you have authority to vote shares of

Page 83

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

certain employees pursuant to terms of the restricted stock agreements?

A.  No.

Q.  Did the board have that authority?

A.  No.

Q.  Did you have -- were there separate agreements with any of the MINDBODY employees that enabled either you or the board to vote their shares as a proxy in the Vista transaction?

A.  Only those that were created, and we spoke about previously about an hour ago --

Q.  Right.

A.  -- those were well before this time period.

Q.  Those were the only agreements that you know of that would have granted either you or the board of directors to vote the employees' shares?

A.  I believe so.

Q.  When you were preparing for today's deposition, did you review any of the transcripts of other depositions that occurred in this case?

A.  No.

Q.  What did you do to prepare for today?

A.  I had a brief meeting with these gentlemen here yesterday just to talk about the form of this, rules of the road, how this works.

Page 84

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q.  Approximately how long did you meet with them?

A.  About an hour.

Q.  Did you review any documents in preparing for today?

A.  Yes.  They had a -- a binder of disclosure documents.

Q.  Other than the documents your counsel provided you, did you review any other documents to prepare for today?

A.  No.

Q.  Did you discuss this deposition with anyone other than your counsel?

A.  No.

Q.  Hang on one minute.

In the documents I saw that there was an Australian company called TDM Capital that opposed the deal.

Did you talk to them?

A.  Yes.

Q.  Did they tell you why they opposed the deal?

A.  They had a similar point of view of Luxor. They were long-term holders, had taken a concentrated position on MINDBODY, they believed that our marketplace concept would eventually create a much more valuable company.

Page 85

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

Q.  Who did you talk to at TDM Capital?

A.  A guy named Andrew Simon and Hamish -- I forget his last name.  They live in Sydney, Australia.

Q.  Did you have one communication with them or more than one?

A.  We had a couple calls during the go-shop period.  I encouraged them to participate in the go-shop.

Q.  Are they a company that would be a likely acquirer of MINDBODY -- or would have been prior to Vista's acquiring?

A.  I think it would be a pretty big check for them to write, but I think if they teamed up with others.

I mentioned to them that Luxor had a similar opinion, they might want to talk to Luxor.

MR. JAMESON:  I have no further questions. True to my word.

MR. SOLUM:  Could I just ask one?

THE WITNESS:  Yes.

EXAMINATION

BY MR. SOLUM:

Q.  Did TDM vote in favor of the deal?

A.  I believe they did.

MR. SOLUM:  That's all I have.  Thank you.

Deposition of Richard L. Stollmeyer                PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

Page 86

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

MR. JAMESON:  Nobody else?

MR. GIBBS:  Nobody else.

(Whereupon the matter concluded at 11:58 a.m.)

--o0o--

"CONFIDENTIAL" - COUNSEL'S EYES ONLY

REPORTER'S CERTIFICATION

I, VICTORIA L. VALINE, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name:

Dated:  April 10, 2019.


_____

VICTORIA L. VALINE, CSR #3036

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 29 of 51

Deposition of Richard L. Stollmeyer     PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

## WORD INDEX

**< 1 >**
**1** 4:4  19:17, 18  20:1  21:2  23:17  27:4  28:9
**10** 1:16  4:19  5:15  17:7  47:20  69:24, 25  70:2  87:19
**10:37** 50:2
**10:47** 50:3
**10022** 2:19
**10-minute** 69:15
**11** 4:22  75:15, 16, 18
**11:18** 69:21
**11:32** 69:22
**11:58** 86:3
**12** 4:23  79:11, 12
**1310** 2:5
**14** 38:10
**15** 6:20
**1605** 5:17
**18** 51:11
**18th** 51:19
**19** 4:4
**19801** 2:6
**1991** 9:3
**19th** 20:13  51:20

**< 2 >**
**2** 4:6  20:17, 18  23:9, 20  28:3, 9, 21, 23  29:7  30:15  62:5  81:5, 6
**20** 4:6, 13  51:3, 23  52:14  58:17  59:22  64:21
**2002** 7:4
**2004** 7:4
**2013** 38:6, 10, 20  39:15, 18, 23
**2014** 38:7, 20  39:15, 18, 23
**2017** 4:8  34:17  36:2  50:13
**2018** 4:13, 15, 17, 19  42:19, 22  43:2  45:2  48:23  52:14  55:11  67:7

**2019** 1:16  5:16  48:16  74:20, 23  75:11  77:15  87:19
**2019-0061-AGB** 1:6  5:6
**20th** 52:3
**21** 4:17  55:11  66:11, 20, 23
**212.446.4688** 2:20
**212.446.6460** 2:20
**21st** 52:3
**220** 2:24
**225** 64:25
**23** 4:19  51:3  64:21  67:7
**2408** 61:25  62:2, 3
**24th** 20:12
**29** 75:11

**< 3 >**
**3** 4:8, 8  21:22, 23  22:4  23:25  25:5  28:9  34:22, 24  35:15  50:10  55:19
**302.447.7066** 2:6
**302.888.6532** 2:6
**3036** 1:25  87:22
**31** 35:18  36:2
**3175** 2:12
**34** 4:8
**36.50** 76:9

**< 4 >**
**4** 4:11  23:21  28:9  50:6, 7, 13
**4051** 2:24

**< 5 >**
**5** 4:12  52:1, 11, 13
**50** 4:10, 11  36:7, 12, 22
**52** 4:12  35:19  36:3
**55** 4:14

**< 6 >**
**6** 3:4  4:14  28:14  55:8, 9, 10
**6:21** 50:13
**60** 4:15

**601** 2:19
**650.843.5535** 2:13
**650.849.7400** 2:13
**66** 4:15
**67** 4:17
**69** 4:19

**< 7 >**
**7** 4:15  60:1, 2, 4, 6
**75** 4:22
**79** 4:23

**< 8 >**
**8** 4:15  66:6, 7, 10  67:1
**805.459.5379** 2:25
**85** 3:5

**< 9 >**
**9** 4:17  67:3, 4, 6
**9:35** 5:16
**93401** 2:25
**94304-1130** 2:13

**< A >**
**a.m** 5:16  50:2, 3, 13  69:21, 22  86:3
**ability** 17:18  59:8  68:13, 25  72:5
**able** 31:13  69:18
**accomplish** 56:17
**accountant** 9:23
**accounting** 9:21, 23
**accurate** 75:12
**achieving** 77:10
**acquirer** 25:25  54:21  85:10
**acquirers** 40:19  42:17  44:23  45:15
**acquiring** 46:16  85:11
**acquisition** 16:22  38:8
**acquisitions** 48:11
**act** 74:18
**Action** 1:5  4:6, 23  5:5  21:6  62:8  71:3  79:16  87:15, 16
**Active** 37:21  38:2, 8

**acts** 37:22
**actual** 63:18  64:4
**ADAM** 1:9  2:9  5:9
**added** 36:23
**addition** 44:3  80:22
**additional** 36:23
**address** 12:6
**administer** 87:5
**administrator** 13:13
**adopted** 81:15
**advice** 17:20  18:6  45:13
**advised** 68:23
**advisement** 80:16
**affiliated** 10:11
**aggregate** 36:11
**ago** 6:21  9:2, 4  83:11
**agree** 10:17, 22  31:7  68:9  70:22  76:16
**agreement** 10:15  29:8  30:8  53:15, 20  54:9, 10, 17  55:20, 25  56:3, 5, 8, 18  57:12, 12, 19  60:11  61:13, 19, 19  66:16, 20  67:23, 24  68:7, 19, 22, 25  70:16
**agreements** 29:17  52:21  53:2, 4  82:6, 14  83:2, 6, 14
**agrees** 62:8  71:3
**ahead** 44:9  49:10  54:3  56:13
**airport** 59:6
**Alec** 12:10
**aligned** 53:18
**all-day** 52:6
**allocates** 82:19
**allowed** 82:13
**alternatives** 40:20
**Alto** 2:13
**Amended** 4:4  18:19
**amount** 48:10  82:19
**amounts** 32:8
**Andrew** 85:2
**annex** 67:17
**answer** 8:10  19:7  23:11  25:10  26:20  27:24  36:17  45:12

Everest Court Reporting LLC
215-341-3616  transcripts@everestdepo.com
Page: 28

51:*17*  54:*9*  57:*10*
60:*21*  63:*2*  69:*6, 8*
71:*23*  77:*2*
**answered**  45:*3, 11*
**anybody**  46:*14*
**apart**  23:*5*
**apologies**  21:*10*  47:*12*
**apologize**  21:*13*
**App**  15:*6*
**appear**  31:*7*
**APPEARANCES**  2:*1*
**appeared**  5:*20*
**appears**  50:*11*  70:*10*
**applicable**  18:*9*
**applies**  31:*14*  67:*13*
**approval**  23:*9, 14*
27:*20*
**approve**  18:*24*  19:*4*
21:*21*  22:*23*  23:*4*
80:*20*
**approved**  19:*1*  20:*8,*
*9*  21:*2*  22:*6, 13*  23:*8*
58:*9, 11, 12*  68:*22*
70:*9*  81:*15*
**approving**  17:*12*
19:*12*  79:*17*
**Approximately**  6:*19*
9:*2*  24:*12*  32:*3*  36:*3*
41:*2*  84:*1*
**APRIL**  1:*16*  4:*8*
5:*15*  50:*13*  87:*19*
**arithmetic**  49:*13*
**arrested**  9:*9*
**article**  23:*21*  28:*14*
**aside**  31:*19*  51:*1*
74:*12*  75:*2*
**asked**  9:*1, 10*  22:*23*
45:*3, 11*  56:*2*  61:*13*
80:*20*
**asking**  15:*22*  20:*7*
30:*19, 21, 22*  32:*25*
50:*16, 21*  53:*23*
54:*16*  57:*9*  77:*1*
**aspects**  52:*19*
**associated**  42:*25*
**assume**  35:*17*  67:*14*
68:*21*
**assurance**  54:*21*
63:*13*

**assure**  53:*5*
**attached**  25:*20*  81:*22*
**attended**  66:*11*
**attention**  28:*2*
**attorney**  18:*8, 8*
35:*11, 12*  71:*20*
87:*16*
**Attorneys**  2:*4, 11, 17*
**August**  42:*13, 19, 22*
43:*2*  45:*1, 18*
**Australia**  85:*3*
**Australian**  84:*16*
**authentic**  81:*2*
**authority**  82:*25*  83:*4*
**authorized**  82:*12*
87:*4*
**automatic**  24:*1, 5*
37:*3*
**automatically**  12:*8*
27:*14*
**available**  82:*15, 18*
**Avenue**  2:*19*
**award**  82:*13*
**awards**  82:*20*
**aware**  15:*13*  16:*2*
33:*9, 25*  34:*14, 17*
37:*20*  38:*1*
**aware,**  33:*14*

**< B >**
**back**  7:*3*  9:*22*  21:*9*
23:*17*  25:*4*  28:*10*
37:*8*  50:*2*  52:*6*
57:*24*  61:*22*  63:*18*
68:*4*  69:*21*  79:*18*
80:*18*
**bad**  78:*14*
**balance**  48:*15, 22, 23*
**banker**  42:*15*
**bankers**  40:*16, 17*
45:*14*
**based**  31:*15*  44:*13*
69:*15*
**basically**  77:*23*  80:*10*
**basis**  13:*4*  20:*9*  24:*9*
**bearing**  70:*4*
**beat**  78:*16*
**beating**  78:*11*
**beginning**  28:*25*  60:*8*

**behalf**  1:*3*  5:*3*  15:*13*
72:*6*
**BEJameson@Prickett.
com**  2:*7*
**believe**  17:*10*  18:*2*
22:*8*  26:*1*  36:*19*
37:*4*  41:*4*  43:*18*
45:*4*  47:*3*  51:*12, 25*
52:*10*  53:*4*  67:*12, 16*
68:*8*  70:*3*  79:*15*
82:*4, 16, 16, 17, 18, 22*
83:*17*  85:*24*
**believed**  17:*15*  84:*23*
**best**  74:*18*  76:*18*
79:*6*
**better**  40:*12*  46:*21*
78:*15*
**big**  16:*24*  57:*16*
85:*12*
**binder**  84:*5*
**binding**  29:*8, 17*  30:*8*
**bit**  39:*2*  78:*15*  79:*3*
**BLAIR**  1:*8*  2:*8*  5:*8*
**Blue**  4:*9*
**Board**  4:*6, 12, 17, 19*
11:*12*  12:*20*  17:*21*
21:*1*  22:*5, 13*  23:*2, 5*
30:*3*  51:*2, 22*  52:*13*
53:*5, 7, 9, 11, 12, 18,*
*24, 25*  54:*23*  55:*1*
56:*23*  57:*6, 15, 22, 23*
58:*8, 17, 23*  59:*17*
66:*11, 20*  67:*7, 18*
73:*21*  74:*19*  76:*12,*
*13*  78:*10, 17, 19, 21*
82:*12*  83:*4, 8, 15*
**board,**  57:*3*
**board-approved**
77:*15*  78:*4*
**BoardVantage**  59:*16*
**Bob**  32:*12*  75:*21*
**bonuses**  79:*8*
**bottom**  28:*3*  49:*18*
55:*15*  62:*3*  78:*7*
81:*14*
**bought**  39:*1*  40:*10*
42:*10*
**branch**  41:*13, 19, 20*
**break**  8:*16, 17*  49:*21,*

*24*  50:*6*  69:*15*
**Brett**  4:*9*
**brief**  43:*20*  83:*23*
**briefly**  6:*5*  46:*8*
**bring**  57:*6*
**bringing**  32:*8*
**Broad**  2:*24*
**Bruce**  2:*5*  6:*6*  10:*14*
49:*20*
**build**  9:*20, 25*
**built**  10:*2*
**bullet**  35:*15*  76:*19*
77:*6, 8*
**bulleted**  55:*16*
**business**  7:*3, 9*  9:*19*
12:*18*  17:*17, 19*
32:*12*  34:*13*  36:*20*
40:*19*  77:*19*
**busy**  46:*8*
**buy**  38:*25*  40:*4*
**buying**  40:*14, 23*

**< C >**
**calendar**  14:*24, 25*
15:*1*  51:*16*
**California**  2:*13, 25*
5:*18, 19*  46:*5*  64:*22*
87:*4*
**call**  12:*3*  38:*17*  41:*4,*
*10, 16*  42:*20*  43:*13,*
*17, 17, 21, 23, 24*
44:*13, 21*  48:*3*  49:*17*
72:*11*  74:*21*  75:*4, 7,*
*10*  76:*2*  77:*5*  78:*6*
**Calle**  5:*17*
**called**  5:*22*  7:*18*
13:*11, 22*  58:*24*
84:*16*
**calling**  59:*5*
**calls**  11:*1*  19:*7*
27:*22*  36:*15*  42:*7, 25*
69:*4, 5*  72:*8*  85:*6*
**capital**  27:*3, 4*  32:*9*
34:*12*  84:*16*  85:*1*
**care**  34:*6*
**Carlsbad**  46:*5*  47:*7*
**carries**  23:*24*
**case**  7:*21*  9:*13, 14, 17*
15:*14, 15, 23*  16:*11*
17:*24*  22:*15*  45:*15*

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 31 of 51
Deposition of Richard L. Stollmeyer
PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

68:*5*, *9*  71:*24*  77:*18*  83:*20*

**cases**  22:*15*  25:*23*  59:*4*

**Catalyst**  42:*14*  43:*18*  44:*25*  45:*7*, *9*

**catch**  11:*24*  44:*1*  74:*10*

**cause**  35:*8*

**cc**  4:*10*  12:*7*

**cc'd**  11:*22*, *23*

**cellphone**  59:*5*

**CEO**  38:*14*

**certain**  24:*6*  52:*19*, *19*  67:*24*  82:*5*  83:*1*

**certainly**  56:*20*  59:*14*

**Certificate**  4:*4*  16:*25*  17:*4*, *12*  18:*19*, *20*  19:*1*, *4*  20:*5*, *8*, *9*  21:*2*  22:*6*  23:*4*, *8*, *14*, *18*  25:*4*  79:*17*  80:*21*  81:*8*, *15*, *21*, *23*  82:*2*

**CERTIFICATION**  87:*1*

**Certified**  5:*19*  87:*3*

**certify**  87:*5*, *14*

**CFO**  35:*13*

**chain**  21:*4*

**chance**  79:*8*

**CHANCERY**  1:*1*  5:*1*

**chances**  78:*11*

**Chang**  43:*18*  45:*13*

**character**  9:*1*, *10*

**characterize**  76:*1*

**charged**  8:*25*

**check**  24:*12*  85:*12*

**Chief**  49:*17*

**chose**  68:*24*

**CHRISTIE**  1:*8*  2:*8*  5:*8*

**CIPORA**  1:*8*  2:*9*  5:*8*

**circa**  38:*6*  46:*17*

**circumstances**  24:*6*

**Civil**  1:*5*  5:*5*  9:*7*

**claim**  7:*9*  9:*16*

**clarification**  46:*24*

**clarify**  47:*1*  52:*9*

**Class**  17:*5*, *5*, *8*, *8*, *22*  22:*7*, *7*  24:*5*, *6*, *9*  27:*10*, *12*, *13*, *15*, *19*

29:*9*  31:*22*, *22*  32:*23*  34:*9*, *18*  35:*9*, *23*  36:*4*, *6*, *12*, *21*, *22*, *23*  37:*1*, *7*, *10*  50:*17*  53:*9*, *12*  62:*10*, *11*  71:*5*, *6*

**clause**  67:*21*  81:*13*

**clear**  18:*7*  41:*8*  52:*3*  58:*11*  79:*22*

**clearer**  49:*3*  54:*6*

**click**  22:*21*

**client**  18:*8*  71:*20*

**close**  46:*18*  79:*4*

**closed**  77:*4*

**closely**  35:*9*, *10*

**closes**  20:*15*

**Closing**  81:*9*, *17*

**Clutter**  13:*11*, *15*

**cofounders**  32:*12*

**collective**  35:*16*

**collectively**  36:*1*, *4*

**combination**  11:*16*

**come**  32:*6*  33:*16*  35:*22*  36:*6*  56:*10*  61:*22*

**comes**  15:*6*

**comfortable**  63:*4*

**commencing**  5:*16*

**comment**  63:*3*  71:*25*

**common**  27:*12*, *13*  29:*9*

**communicating**  39:*17*  78:*6*

**communication**  10:*25*  39:*22*, *25*  40:*2*  43:*6*  45:*18*, *19*, *22*  47:*6*  66:*5*  85:*4*

**communications**  32:*23*  38:*3*, *5*  39:*7*, *9*, *24*  40:*21*  41:*2*, *12*  42:*6*, *7*, *9*, *16*, *23*  43:*3*  75:*1*

**companies**  38:*25*  39:*1*  41:*14*, *21*  78:*9*

**company**  9:*24*  12:*20*  18:*7*, *20*  20:*11*  24:*24*  25:*2*, *3*  26:*23*, *25*  32:*10*  34:*7*  37:*21*  38:*12*  46:*20*  48:*2*, *6*, *9*  49:*16*  51:*9*  62:*10*,

*10*  67:*25*  70:*14*  71:*5*, *5*  77:*3*  78:*22*  80:*25*  82:*17*, *19*  84:*16*, *25*  85:*9*

**company's**  16:*25*

**compare**  61:*8*

**compensation**  78:*24*

**complete**  16:*9*  28:*24*

**complex**  31:*3*

**computer**  59:*3*

**concentrated**  84:*22*

**concept**  30:*14*, *16*  31:*14*  56:*9*  65:*23*  84:*24*

**concern**  35:*8*  76:*7*

**concerned**  36:*14*  73:*25*

**concerns**  64:*16*  65:*24*  66:*3*

**concert**  79:*4*

**concluded**  86:*3*

**conclusion**  19:*7*  57:*9*  69:*5*  72:*12*

**concomitant**  20:*16*

**condition**  60:*10*, *15*  61:*12*, *16*  67:*23*  68:*6*  70:*14*

**conferencing**  58:*25*

**CONFIDENTIAL**  1:*1*  2:*1*  3:*1*  4:*1*  5:*1*  6:*1*  7:*1*  8:*1*  9:*1*  10:*1*  11:*1*  12:*1*  13:*1*  14:*1*  15:*1*  16:*1*  17:*1*  18:*1*  19:*1*  20:*1*, *21*  21:*1*  22:*1*  23:*1*  24:*1*  25:*1*  26:*1*  27:*1*  28:*1*  29:*1*  30:*1*  31:*1*  32:*1*  33:*1*  34:*1*  35:*1*  36:*1*  37:*1*  38:*1*  39:*1*  40:*1*  41:*1*  42:*1*  43:*1*  44:*1*  45:*1*  46:*1*  47:*1*  48:*1*  49:*1*  50:*1*  51:*1*  52:*1*  53:*1*  54:*1*  55:*1*  56:*1*  57:*1*  58:*1*  59:*1*  60:*1*  61:*1*  62:*1*  63:*1*  64:*1*  65:*1*  66:*1*  67:*1*  68:*1*  69:*1*  70:*1*  71:*1*  72:*1*  73:*1*  74:*1*  75:*1*  76:*1*  77:*1*  78:*1*  79:*1*  80:*1*  81:*1*

82:*1*  83:*1*  84:*1*  85:*1*  86:*1*  87:*1*

**confirm**  66:*17*  70:*5*

**confirmed**  81:*16*

**conformed**  20:*1*

**connection**  6:*22*  16:*5*  53:*3*  60:*18*  82:*24*

**consensus**  77:*9*

**Consent**  4:*6*, *23*  21:*1*, *6*  79:*16*  80:*13*, *15*

**consider**  51:*22*

**considered**  51:*4*

**considering**  44:*15*, *18*, *20*

**consistent**  75:*13*

**constitute**  55:*4*  56:*6*  63:*14*

**consultation**  17:*21*

**contact**  12:*4*  45:*15*  58:*25*

**context**  29:*4*  33:*15*  43:*7*

**continues**  35:*18*

**contract**  7:*12*

**control**  27:*12*  29:*9*, *17*  30:*9*, *14*, *16*  31:*7*, *11*, *14*  32:*15*

**conversation**  44:*5*  47:*8*, *19*, *25*  64:*9*

**conversations**  33:*5*

**conversion**  24:*1*  35:*7*  37:*3*  56:*6*  62:*9*  63:*14*  71:*4*

**convert**  27:*15*  31:*21*  32:*24*  34:*2*, *9*  37:*1*, *10*

**converted**  24:*10*  34:*18*  36:*21*

**COOLEY**  2:*9*  10:*19*  55:*20*  71:*21*, *22*

**copies**  21:*14*

**copy**  15:*17*, *20*  21:*19*  22:*1*  59:*25*  80:*14*

**core**  9:*21*

**corner**  62:*3*

**corporation**  29:*24*  30:*3*

**correct**  15:*15*, *22*  17:*5*, *9*  19:*2*, *3*  21:*22*  24:*6*  25:*8*  26:*15*

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 32 of 51

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

30:*17*  37:*25*  43:*4*
48:*24*  57:*7*  58:*10, 13,*
*18*  60:*12, 15*  66:*12,*
*13, 25*  70:*23*  75:5, *6*
**correctly**  51:*12*
**cost**  10:*4*  50:*18*
**Counsel**  2:*23*  3:*2*
6:*6*  8:*7*  10:*19, 19*
16:*8*  17:*20*  18:*6*
21:*16*  35:*13*  56:*11,*
*14*  62:*18, 19*  71:*19*
73:*4, 9*  80:*11*  84:*7,*
*12*
**COUNSEL'S**  1:*1*  2:*1*
3:*1*  4:*1*  5:*1*  6:*1*  7:*1*
8:*1*  9:*1*  10:*1*  11:*1*
12:*1*  13:*1*  14:*1*  15:*1*
16:*1*  17:*1*  18:*1*  19:*1*
20:*1*  21:*1*  22:*1*  23:*1*
24:*1*  25:*1*  26:*1*  27:*1*
28:*1*  29:*1*  30:*1*  31:*1*
32:*1*  33:*1*  34:*1*  35:*1*
36:*1*  37:*1*  38:*1*  39:*1*
40:*1*  41:*1*  42:*1*  43:*1*
44:*1*  45:*1*  46:*1*  47:*1*
48:*1*  49:*1*  50:*1*  51:*1*
52:*1*  53:*1*  54:*1*  55:*1*
56:*1*  57:*1*  58:*1*  59:*1*
60:*1*  61:*1*  62:*1*  63:*1*
64:*1*  65:*1*  66:*1*  67:*1*
68:*1*  69:*1*  70:*1*  71:*1*
72:*1*  73:*1*  74:*1*  75:*1*
76:*1*  77:*1*  78:*1*  79:*1*
80:*1*  81:*1*  82:*1*  83:*1*
84:*1*  85:*1*  86:*1*  87:*1*
**counter**  56:*2*
**countries**  51:*10*
**couple**  38:*8*  39:*10*
85:*6*
**course**  11:*6*  13:*15*
16:*21*  36:*20*  71:*14*
**COURT**  1:*1, 8*  2:*8*
5:*1, 8*  7:*22*  9:*8*  60:*3*
**Courtney**  4:*8*  35:*10*
**Courtyard**  5:*17*
**CPA**  10:*10*
**create**  15:*1*  25:*6*
32:*13*  84:*24*

**created**  17:*21*  22:*7*
53:*17*  79:*4*  81:*24*
83:*10*
**creates**  17:*4, 7*
**creation**  82:*12*
**CRR**  1:*25*
**CSR**  1:*25, 25*  87:*22*
**CUNNINGHAM**  1:*8*
2:*8*  5:*8*  64:*4, 16*
**Cunningham's**  72:*5*
**curiosity**  50:*24*
**curious**  50:*23*
**current**  16:*25*  18:*20*
**currently**  82:*7*
**customer**  52:*5*
**cycle**  41:*14*
**cycles**  42:*5*

**< D >**
**D-3**  23:*22, 23*
**date**  20:*12*  29:*11*
79:*20, 21*  87:*17*
**Dated**  4:*8*  87:*19*
**dates**  42:*5*  47:*3, 6*
**day**  11:*6*  12:*6*  20:*12,*
*13*  51:*24*  52:*9*  64:*21*
**days**  9:*22*
**deal**  16:*19*  51:*3*
53:*5, 14*  54:*17, 23*
55:*2*  56:*24*  57:*1, 15,*
*16, 22, 23*  58:*8, 12, 15*
61:*12, 17*  63:*9, 16*
74:*14, 17*  84:*17, 20*
85:*23*
**dealing**  41:*19, 21*
81:*3*
**deals**  41:*20*
**December**  4:*13, 15,*
*17, 19*  51:*3, 11, 19, 20,*
*23*  52:*14*  55:*10*
58:*17*  59:*22*  64:*21,*
*21*  66:*11, 20, 23*  67:*7*
**decide**  53:*6*  56:*24*
**decided**  34:*15*  45:*16*
**deck**  59:*19*
**decline**  35:*18*
**defendant**  9:*12*
**Defendants**  1:*12*  2:*8,*
*15*  5:*12*  15:*23*

**definition**  28:*11, 13,*
*18, 22*  29:*1*  30:*17*
**definitions**  28:*9*
**DELAWARE**  1:*1*
2:*6*  5:*1*  81:*18*
**delete**  15:*10*
**deleting**  13:*3, 9*
**delivery**  67:*22*
**dense**  26:*4*
**deposed**  6:*17, 20*  8:*2,*
*3, 6*
**DEPOSITION**  1:*18*
7:*9*  18:*10*  19:*18*
20:*18*  34:*24*  50:*7*
52:*11*  55:*9*  60:*4*
66:*7*  67:*4*  69:*25*
75:*16*  79:*12*  83:*19*
84:*11*
**depositions**  83:*20*
**describe**  22:*18*
**Description**  4:*3*
**designate**  20:*20*
**designed**  78:*21, 25*
79:*2*
**despite**  73:*22*
**detail**  64:*6*  81:*1*
**detailed**  59:*14, 14*
**determine**  49:*13*  80:*6*
**devices**  16:*10*
**differ**  57:*18*
**difference**  78:*2*
**different**  15:*4*  22:*25*
41:*25*  46:*2*  61:*19*
72:*18*  79:*8*
**differs**  78:*20*
**diluting**  32:*9*
**dilutional**  82:*21*
**direct**  40:*21*  66:*4*
**direction**  26:*24*  87:*11*
**directly**  12:*6*
**director**  11:*18*  19:*5,*
*12*  23:*9*  57:*15*  80:*22*
**Directors**  4:*7, 12, 17,*
*19*  11:*12*  12:*20*
17:*21*  21:*1*  22:*14*
29:*24*  30:*3*  52:*13*
58:*8*  59:*13*  67:*18*
79:*5*  82:*12*  83:*16*
**disappointing**  48:*13*

49:*2*
**disclose**  71:*20*
**disclosed**  76:*21*
**disclosure**  84:*5*
**discuss**  51:*23*  64:*10*
84:*11*
**discussed**  71:*21, 22*
**discussing**  37:*12*
70:*19*  73:*8, 10, 12*
**discussion**  33:*15, 16*
38:*19*  43:*12*  66:*19,*
*22, 24*  68:*4*  76:*22*
77:*7*  80:*18*
**discussions**  34:*3, 8*
53:*19*  62:*17, 19*  64:*3*
71:*15*  73:*3*
**dispositive**  27:*11, 21*
**disproportionately**
74:*8*
**distinction**  77:*21*
**distribute**  34:*13, 13*
**distributed**  24:*16*
**district**  7:*25*
**document**  19:*15, 23*
22:*22*  30:*23*  31:*19*
34:*25*  58:*4*  59:*14, 15*
60:*14, 20*  61:*3*  70:*24*
72:*16*  75:*2*  80:*4, 8,*
*13*  81:*23*
**documents**  13:*18, 18,*
*18*  14:*8, 9*  15:*14, 24*
16:*3, 6, 9, 18, 19*
22:*12*  32:*5*  37:*6*
53:*8*  59:*8, 12, 17*
75:*10*  80:*23*  84:*3, 6,*
*7, 8, 15*
**DocuSign**  13:*21, 24*
14:*1, 4*  22:*10, 13, 18,*
*19*  67:*10*  80:*4*
**doing**  40:*23*  44:*25*
47:*18*
**DONALD**  1:*3*  5:*3*
**Douglas**  2:*23*
**draft**  55:*20*  60:*7, 23,*
*24, 25*  61:*5, 5, 23, 24*
70:*20*
**drafted**  63:*19*
**drafts**  18:*21, 22*
**draw**  28:*2*

**drawing**  77:2*1*
**drop**  36:*22*
**Dropbox**  14:*2*
**dropped**  36:*7, 11, 12*
**DUI**  9:*1, 10*
**duly**  5:*23*  87:*4, 9*
**duty**  38:*14*  44:*24*

**< E >**
**EA**  12:*4, 20*
**earlier**  80:*19*  81:*25*
**early**  17:*17*  26:*22*
 34:*6*
**earning**  41:*14*
**earnings**  41:*16*  42:*4,
7, 25*  48:*3*  49:*17*
 74:*21*  77:*5*  78:*5, 5*
**easier**  52:*2*
**economics**  63:*8*
**effect**  20:*10*  24:*16*
 56:*24*
**effective**  29:*10*  81:*16*
**efficiency-wise**  69:*17*
**effort**  73:*22*
**either**  9:*12*  12:*19, 23*
 15:*9*  16:*15*  31:*20*
 35:*8*  59:*21*  64:*3, 15*
 66:*15*  71:*14*  83:*7, 15*
**electronic**  13:*17*
**electronically**  14:*20,
22*  23:*1*
**elements**  81:*3*
**eliminate**  13:*5*
**eliminated**  14:*3*
**eliminating**  13:*9*
**ELLIOTT**  2:*4*
**ELLIS**  2:*17*
**E-mail**  4:*8, 11, 14, 22*
 10:*25*  11:*17*  13:*2, 8,
13*  21:*4*  22:*21*  35:*4*
 39:*8*  43:*19, 20*  50:*9,
13*  55:*11, 12, 14*
 59:*15, 25*  75:*19*
**e-mails**  11:*4, 5, 8, 9*
 12:*9*  13:*9, 12, 14*
 50:*11*
**employee**  32:*1*  87:*16*
**employees**  31:*21*
 32:*11, 14*  34:*4, 6*

 52:*4*  82:*6, 20, 20*
 83:*1, 7, 16*
**enabled**  83:*7*
**encourage**  12:*15*
**encouraged**  85:*7*
**ended**  56:*25*  62:*25*
**energy**  10:*4*
**enforce**  68:*13, 25*
**engage**  54:*21*
**ensure**  16:*8*  25:*1*
 26:*22*  64:*12*
**enter**  60:*11*  67:*23*
 68:*1*  70:*15*
**entered**  7:*12*  9:*19*
 53:*15*  68:*19*
**entering**  29:*8*  74:*6*
**entire**  72:*16*
**entirety**  20:*20*
**entities**  39:*12*
**entity**  25:*21, 22*  60:*12*
**envelope**  80:*4*
**environment**  73:*25*
 74:*7*
**EQUITY**  1:*9*  2:*15*
 5:*9*  32:*14*  40:*11, 19*
 82:*12*
**equivalent**  78:*11*
**ERIC**  1:*9*  2:*8*  5:*9*
 55:*1*  57:*13*
**Esq**  2:*5, 11, 12, 18, 18*
**essentially**  37:*1*  59:*13*
**estate**  25:*7, 16*
**estimates**  37:*9*
**event**  27:*10*  46:*7, 8,
13*  52:*7*
**events**  46:*2*
**eventually**  36:*21*
 84:*24*
**Everybody**  12:*2*  59:*2,
2*
**exactly**  46:*19*  49:*17*
**EXAMINATION**  3:*2,
4, 5*  6:*1*  85:*21*
**examined**  5:*23*
**example**  58:*21*
**exceed**  76:*9*
**Excel**  13:*18*
**exceptions**  25:*6, 16, 23*
**exchanged**  43:*20*

**exclude**  71:*23*  73:*3*
**exclusive**  27:*11*
**excuse**  13:*24*  82:*22*
**execute**  22:*19*  61:*19*
 64:*7*
**executed**  16:*19*  61:*3,
20*  79:*21*  80:*7, 13, 14,
24*
**executing**  20:*15*
**execution**  60:*14*
 61:*11*  67:*22*  68:*5*
**executives**  11:*12*
 12:*20*  45:*24*  46:*3*
 79:*6*
**exercised**  50:*17*
**Exhibit**  4:*3, 4, 6, 8, 11,
12, 14, 15, 15, 17, 19,
22, 23*  19:*17, 18*  20:*1,
18*  21:*2*  23:*9, 17, 20*
 29:*3*  34:*24*  50:*6, 7, 9,
10*  52:*1, 11, 13*  55:*8,
9, 10*  60:*1, 4, 6*  62:*1*
 66:*6, 7, 10*  67:*1, 3, 4,
6, 25*  69:*25*  70:*2*
 75:*15, 16, 18*  79:*11,
12*  80:*2*
**EXHIBITS**  4:*1*
**exists**  27:*2*  80:*15*
**expectations**  37:*9*
 49:*3*  74:*22*  78:*7, 16*
 79:*7*
**expected**  62:*9*  71:*4*
**expecting**  78:*16*
**experienced**  48:*9*
**expert**  35:*11*  69:*9*
**expire**  18:*3*
**explain**  49:*7*  76:*22*
 77:*7, 9*  78:*2*
**explained**  8:*8*
**express**  64:*16*
**expressed**  37:*13*
 38:*11*  46:*16*  47:*8, 18*
 66:*4*
**extent**  18:*9*  19:*6*
 46:*9*  57:*9*  67:*13*
 71:*21*
**extra**  21:*13*
**ex-wife**  33:*6, 18, 19*
**EYES**  1:*1*  2:*1*  3:*1*
 4:*1*  5:*1*  6:*1*  7:*1*  8:*1*

 9:*1*  10:*1*  11:*1*  12:*1*
 13:*1*  14:*1*  15:*1*  16:*1*
 17:*1*  18:*1*  19:*1*  20:*1*
 21:*1*  22:*1*  23:*1*  24:*1*
 25:*1*  26:*1*  27:*1*  28:*1*
 29:*1*  30:*1*  31:*1*  32:*1*
 33:*1*  34:*1*  35:*1*  36:*1*
 37:*1*  38:*1*  39:*1*  40:*1*
 41:*1*  42:*1*  43:*1*  44:*1*
 45:*1*  46:*1*  47:*1*  48:*1*
 49:*1*  50:*1*  51:*1*  52:*1*
 53:*1*  54:*1*  55:*1*  56:*1*
 57:*1*  58:*1*  59:*1*  60:*1*
 61:*1*  62:*1*  63:*1*  64:*1*
 65:*1*  66:*1*  67:*1*  68:*1*
 69:*1*  70:*1*  71:*1*  72:*1*
 73:*1*  74:*1*  75:*1*  76:*1*
 77:*1*  78:*1*  79:*1*  80:*1*
 81:*1*  82:*1*  83:*1*  84:*1*
 85:*1*  86:*1*  87:*1*
**eye-to-eye**  58:*25*

**< F >**
**face-to-face**  11:*1*
 39:*10, 11, 14*
**fact**  52:*18*  64:*6*
 79:*22*
**factors**  74:*12*
**failed**  10:*3*
**fair**  41:*5*  47:*4, 12*
 63:*19*  64:*23*  76:*17*
**familiar**  17:*1*  37:*17,
19*
**family**  12:*17*  31:*20*
**fan**  16:*24*
**fashion**  13:*7*  74:*18*
**father**  33:*10, 12*
**favor**  58:*7*  85:*23*
**favorable**  73:*20*
 74:*17*
**Fax**  2:*6, 13, 20*
**feature**  14:*23*  15:*3*
**February**  74:*21*
**feed**  59:*12*
**feel**  38:*14*
**feeling**  74:*9*
**feels**  81:*2*
**fellow**  8:*25*
**felt**  40:*11*  57:*23*

**fiduciary** 44:*23*
**file** 16:*23*
**files** 14:*7*
**filing** 81:*18*
**filings** 82:*23*
**filters** 13:*16*
**final** 18:*23* 22:*25*
63:*1, 4* 70:*3, 8, 23*
**finally** 14:*6*
**Financial** 7:*18* 10:*11, 12* 49:*18*
**financially** 87:*15*
**find** 80:*12*
**fine** 18:*11* 47:*15* 49:*23*
**finish** 8:*10*
**firm** 40:*11*
**firms** 40:*19*
**first** 5:*23* 20:*24* 37:*20* 38:*6* 43:*6, 10* 47:*7* 50:*10, 14* 51:*22* 52:*18* 62:*5* 70:*12, 13* 71:*1* 73:*19* 75:*20* 77:*6, 8* 81:*13*
**fitness** 37:*22*
**five-minute** 49:*24*
**flags** 13:*11*
**flattered** 41:*7* 48:*1*
**flip** 28:*8*
**focus** 25:*12*
**focused** 63:*8*
**folder** 11:*7, 13, 15, 19, 23*
**folders** 11:*20* 12:*9*
**follow** 15:*9* 79:*25*
**followed** 46:*15, 24*
**Following** 46:*13* 81:*17*
**forecast** 48:*15, 21, 25*
**foregoing** 87:*6, 8, 12*
**foremost** 73:*19*
**foreseeable** 76:*9*
**forget** 37:*22* 61:*10* 85:*3*
**form** 10:*16* 20:*8, 9* 22:*6* 25:*9* 26:*16, 19* 27:*23* 30:*10* 38:*21* 42:*11* 43:*9* 44:*9* 53:*22* 54:*19* 55:*1* 56:*12, 19* 57:*8, 20*

60:*16* 63:*1, 4* 66:*2* 68:*14* 69:*3* 70:*3, 8, 23* 71:*11, 18* 83:*24*
**forth** 5:*24* 67:*25* 87:*7*
**forward** 39:*24* 41:*9* 61:*16, 21* 79:*6*
**founders** 17:*17* 25:*1* 26:*22*
**four** 27:*3* 28:*22* 41:*17* 55:*16*
**frequent** 13:*2* 42:*3*
**frequently** 11:*3*
**friction** 48:*10*
**Friday** 52:*7*
**FRIEDMAN** 1:*3* 5:*3* 6:*7*
**Friedman's** 6:*13*
**friends** 12:*17*
**frustrated** 10:*2*
**full** 49:*11, 13* 52:*17* 62:*6* 71:*1* 78:*23*
**functionally** 64:*8*
**funneled** 11:*13*
**further** 81:*13, 14* 85:*17* 87:*14*
**further,** 27:*7*
**future** 17:*18* 25:*2* 26:*24* 34:*7* 45:*15* 76:*9* 77:*13*
**fuzzy** 47:*2*

**< G >**
**GAIL** 1:*8* 2:*8* 5:*8* 11:*17* 57:*14* 76:*13*
**garage** 9:*25*
**gathering** 45:*24, 25*
**General** 2:*23* 14:*18* 17:*1* 35:*13* 50:*24* 64:*8* 74:*2*
**generally** 8:*6* 12:*16* 14:*22* 22:*12, 17* 32:*18* 64:*22*
**gentlemen** 83:*23*
**getting** 40:*1* 73:*15*
**Gibbs** 2:*11* 21:*3, 7, 11* 30:*19, 22, 25* 38:*21* 44:*9, 16* 53:*22* 54:*19* 56:*12, 19* 57:*20* 66:*2* 68:*14*

69:*3* 71:*11, 18* 72:*7* 86:*2*
**Give** 28:*6* 34:*25* 45:*9* 56:*3, 5, 20* 63:*2* 74:*10* 77:*18*
**given** 66:*9* 87:*13*
**go** 17:*25* 26:*13* 31:*3* 40:*1, 5, 11* 44:*9* 52:*4* 54:*3* 56:*12* 63:*18* 64:*14* 65:*2* 69:*20* 80:*1* 81:*12*
**goals** 77:*10*
**goes** 11:*22* 14:*10* 27:*9, 15* 30:*2* 65:*15* 77:*18*
**going** 9:*20* 12:*1* 13:*22, 25* 14:*15* 17:*15* 19:*21* 20:*16, 25* 25:*4* 27:*3, 9* 28:*21* 40:*3, 20* 41:*8* 43:*14* 46:*11, 12* 49:*4, 20* 50:*5* 55:*5* 61:*16* 64:*6* 65:*7* 68:*4* 71:*19* 74:*4, 20* 80:*10, 18*
**Good** 6:*3, 4* 33:*20* 63:*2* 66:*23* 69:*17*
**GOODMAN** 1:*8* 2:*8* 5:*8* 11:*18* 57:*14* 64:*4, 15* 68:*23*
**Goodman's** 72:*5*
**go-shop** 58:*1* 85:*6, 8*
**GoToMeeting** 58:*21*
**gotten** 77:*5*
**governing** 82:*6*
**GRAHAM** 1:*9* 2:*9* 5:*9*
**grant** 29:*23* 57:*13*
**granted** 58:*7* 83:*15*
**granting** 32:*10*
**grants** 32:*14*
**great** 11:*8* 46:*20*
**greater** 32:*8, 8*
**greatly** 24:*23*
**Grosswendt** 2:*12*
**Group** 4:*10* 36:*22* 52:*4*
**guess** 10:*13*

**guidance** 49:*18* 76:*20* 77:*8, 15, 21, 22* 78:*3, 6, 12, 20* 79:*9*
**guide** 49:*4, 5, 8, 8, 10, 10, 12, 14, 15* 74:*20* 77:*12, 12, 17, 21, 22* 78:*3, 10, 15*
**guiding** 49:*12*
**guy** 85:*2*
**guys** 47:*5*

**< H >**
**half** 42:*13* 47:*8*
**halfway** 27:*5*
**Hamish** 85:*2*
**Hand** 21:*9* 50:*5*
**handed** 21:*4* 75:*18*
**Hang** 84:*14*
**Hanover** 2:*12*
**happen** 14:*14* 40:*6*
**happened** 23:*15* 35:*9* 42:*10* 58:*15*
**happens** 33:*25*
**hard** 8:*12*
**header** 80:*4*
**headlines** 81:*2*
**heart** 79:*1*
**heavily** 63:*5*
**held** 27:*13, 14* 36:*2, 19*
**help** 22:*5* 49:*7* 77:*20* 80:*6*
**helpful** 21:*23* 51:*16*
**hereinafter** 5:*24*
**HERMAN** 1:*9, 10* 2:*9* 5:*9, 10*
**high** 11:*13, 19* 59:*20* 79:*7*
**Historically** 13:*24* 74:*7*
**hit** 74:*3* 78:*14*
**hitting** 79:*8*
**hold** 31:*24, 25* 36:*4*
**holder** 26:*13, 14*
**holders** 32:*23* 35:*18, 24* 37:*10* 84:*22*
**hopefully** 10:*20*
**hour** 5:*16* 49:*21* 83:*11* 84:*2*

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

**huge**  74:*3*
**hurt**  74:*8, 23*
**Hypothetical**  27:*22*
 36:*15*  69:*4*  72:*8*

**< I >**
**Ian**  2:*18*
**ID**  80:*5*
**idea**  18:*14, 16, 18*
 26:*11*
**identified**  40:*18*
 74:*13*
**imaged**  16:*12*
**immediately**  81:*16*
**impact**  77:*9*  82:*21*
**impair**  72:*4*
**implied**  49:*4, 8*
**importance**  14:*16*
**important**  11:*11*
 44:22  75:*25*  76:*4, 7,*
 *11, 15*  82:*20*
**importantly**  54:*24*
 57:*25*
**impressive**  46:*2*
**inbound**  73:*23*
**incentives**  32:*15*
**include**  29:*6*
**included**  72:*25*
**including**  52:*20*
 62:*10*  71:*5*
**Incorporation**  4:*5*
 17:*1*  79:*17*  80:*21*
 81:*9*
**increase**  32:*14*
**independent**  11:*18*
 57:*14*  79:*5*
**INDEX**  3:*1*
**indicated**  12:*14*  20:2
 48:*21*
**indicates**  79:*25*
**indication**  66:*24*
**individual**  25:*21, 22*
 26:*9*
**inducement**  60:*10*
 70:*14*
**inducing**  79:*5*
**inevitably**  36:*19*
**information**  24:*19, 20,*
 *22*  39:*3*  48:*14*  50:*16*
 71:*20*

**informational**  12:*7*
 13:*13*  38:*22*  43:*14*
 46:*1*
**informed**  35:*13*
**in-house**  35:*11*
**initial**  38:*16, 20*  39:*6,*
 *22*
**Initially**  19:*21*  28:*23*
 54:*8*
**initials**  22:*25*
**initiate**  76:*13*
**in-person**  38:*17*
 47:*23*
**input**  63:*10*
**inspired**  76:*12, 13*
**institution**  26:*9*
**INSTITUTIONAL**
 1:*11*  2:*9*  5:*11*  24:*17*
**instructions**  73:*1*
**integration**  9:*20*
**intended**  33:*21*  79:*15*
**intention**  34:*15*  56:*16*
**intentions**  32:*24*  34:*9*
**interest**  6:*13*  17:*16*
 38:*11*  46:*16*  47:*9, 18*
 48:*19*  57:*23*  78:*25*
**interested**  40:*14*  44:*6*
 48:*5*  75:*20*  87:*15*
**internet**  37:*21*
**interpretation**  30:*23*
**interrogated**  5:*24*
**interrupt**  29:*2*
**interrupting**  47:*13*
**invest**  38:*25*
**investment**  38:*24*
 40:*17*  42:*15*  45:*14*
**investor**  32:*9*  41:*15*
**investors**  17:*17, 24*
 24:*17*  26:*23, 23*
 34:*12*  38:*15*  41:*17*
 42:*14*  43:*3*  78:*13*
**invests**  41:*14*
**invited**  45:*23, 24*
**involved**  17:*11*  63:*5*
**involving**  44:*6*
**iPhone**  15:*7*
**IPO**  19:*2*  20:*10, 14*
 23:*15*  24:*8*  26:*10*
 37:*8*  39:*11*  40:*15, 23*

 41:*10*  42:*8*  79:*18*
 80:*24*
**Irrevocable**  4:*15, 19*
 32:*18*  53:*17, 21*
 54:*11, 18*  55:*19, 24*
 56:*9, 16*  57:*4, 14*
 58:*6*  60:*7*  61:*12, 14,*
 *16, 20*  62:*15, 21*  63:*1,*
 *11*  64:*1, 5, 17*  65:*10,*
 *23*  66:*16, 19*  68:*1, 6,*
 *13, 24*  70:*3*  71:*15*
 72:*4, 15, 21, 25*
**irrevocably**  62:*7*  71:*2*
**Irvine**  52:*5*  64:*21*
**ISS**  75:*1, 5, 22*  76:*1,*
 *17*
**ISS's**  76:*7*
**issue**  10:*21*  71:*21, 22*
 78:*6*
**issued**  37:*8*
**issues**  49:*18*  64:*25*
 65:*7*
**it,**  58:*12*
**italicized**  27:*6*
**item**  14:*25*  15:*1*
**items**  14:*24*
**its**  34:*9, 9, 18*  40:*23*
 67:*23*  76:*2, 8*  81:*17*
**IVP**  34:*8, 18*  35:*17,*
 *23*  53:*13, 13*  57:*5, 12,*
 *13*
**IVP's**  35:*7*

**< J >**
**J.P**  35:*17, 23*
**Jameson**  2:*5*  3:*4*  6:*2,*
 *6*  10:*17, 22, 23*  18:*11,*
 *12*  19:*10, 16, 19*
 20:*17, 22*  21:*5, 9, 12,*
 *15, 25*  22:*3*  25:*13*
 26:*3, 17*  27:*1*  28:*1*
 29:*4, 14*  30:*13, 21, 24*
 31:*1, 5, 18*  34:*22, 25*
 35:*3*  36:*24*  39:*4*
 42:*18*  44:*12, 19*  45:*6,*
 *17*  47:*10, 15, 16*
 49:*23*  50:*5, 8*  54:*1,*
 *15*  55:*6*  56:*15*  57:*2,*
 *17*  58:*2*  60:*1, 5, 17,*
 *24*  61:*4*  65:*1, 9, 15,*

 *19, 21, 22*  66:*6, 8*
 67:*3, 5*  68:*16*  69:*9,*
 *14, 24*  70:*1*  71:*13*
 72:*1, 13*  73:*6*  75:*15,*
 *17*  79:*11, 13*  80:*12,*
 *17*  85:*17*  86:*1*
**Jamie**  55:*15*  67:*10*
**January**  75:*11*
**Jeff**  43:*18*  45:*13*
**JEM**  7:*18, 19*  9:*14,*
 *17*  10:*11, 12*
**Joan**  10:*10*
**Joaquin**  5:*17*
**job**  6:*11*  35:*12*
**Johnston**  2:*23*  10:*14*
**JONES**  2:*4*
**JR**  1:*3*  5:*3*
**jump**  12:*1*
**June**  20:*13, 13*
**junk**  11:*9*

**< K >**
**KATHERINE**  1:*8*
 2:*8*  5:*8*
**keep**  11:*20*  14:*7*
 24:*8*  35:*12*
**kept**  13:*21*
**Kimberly**  4:*9*
**kind**  9:*7*  13:*23*  14:*7*
 38:*25*  74:*6*
**kinds**  38:*22*
**King**  2:*5*
**KIRKLAND**  2:*17*
 10:*19*
**knew**  14:*2*  65:*25*
 74:*19, 19*  76:*24*
**know**  8:*6, 16*  9:*9*
 13:*17*  14:*25*  16:*3*
 18:*22*  19:*8, 9*  23:*11*
 25:*15*  27:*25*  28:*12*
 29:*4*  32:*3*  33:*21, 22*
 36:*1*  37:*13*  38:*24*
 39:*11*  42:*24*  44:*4, 10*
 48:*19*  49:*6*  58:*21*
 59:*19*  60:*21, 25*
 61:*18, 21*  66:*3*  68:*15*
 69:*7*  70:*21*  71:*12, 16*
 72:*10*  74:*16*  76:*3, 7,*
 *12*  79:*15, 20*  80:*24*

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

83:*14*
**knowledge** 82:*15*
**knows** 12:*2*

**< L >**
**L.A** 7:*25* 8:*1*
**L.P** 1:*11* 2:*9* 5:*11*
**language** 27:*6, 16, 18*
 28:*20* 61:*9, 10* 62:*14,*
*25* 63:*18, 20* 68:*2*
 70:*19, 22, 24*
**Law** 2:*4, 11, 17*
**lawsuit** 6:*8, 13* 9:*7*
 16:*17*
**lawyer** 31:*2* 61:*9*
 72:*2*
**lawyers** 63:*19*
**lay-up** 79:*1*
**lead** 11:*18* 57:*14*
**leadership** 17:*25*
 78:*22*
**lean** 79:*6*
**led** 16:*21* 45:*21*
 65:*10*
**left** 8:*11* 37:*2*
**legal** 19:*7* 24:*14*
 57:*9* 69:*5* 72:*11*
**Leigh** 55:*15* 67:*10*
**letting** 33:*21* 38:*23*
**level** 48:*19*
**Lexington** 2:*19*
**LIAW** 1:*9* 2:*8* 5:*9*
 55:*1* 57:*13*
**License** 1:*25*
**lieu** 55:*20* 61:*14*
**limit** 73:*20*
**limitation** 29:*7*
**limited** 65:*7*
**limiting** 69:*12*
**line** 49:*19* 52:*22*
 78:*7*
**line-by-line** 64:*14*
**lines** 28:*22*
**liquidity** 33:*22*
**list** 16:*9* 69:*10*
**litigation** 7:*4* 9:*12*
**little** 49:*21*
**live** 85:*3*
**LLC** 1:*10, 10* 2:*15,*

*15* 5:*10, 10* 10:*12*
**LLP** 2:*9, 17*
**located** 51:*7*
**location** 64:*20*
**long** 9:*2, 4* 47:*19*
 84:*1*
**longer** 27:*11*
**long-term** 26:*23*
 84:*22*
**look** 13:*25* 19:*21*
 20:*24* 21:*16, 25* 22:*1,*
*9* 23:*17* 25:*14* 27:*2,*
*3, 5* 28:*20* 29:*22*
 35:*8, 15* 41:*7* 48:*18*
 51:*16* 56:*23* 62:*24*
 67:*9, 17, 21* 70:*11*
 79:*14, 18, 24* 81:*5*
**looked** 21:*2* 22:*4*
 30:*7, 15* 50:*10* 80:*12*
 81:*24*
**looking** 21:*3* 23:*21*
 25:*6* 27:*18* 49:*3*
 60:*22* 61:*3* 80:*8*
 81:*23*
**losing** 33:*6* 34:*1*
**lot** 11:*8, 24* 46:*2*
 65:*5* 74:*5*
**lower** 11:*23* 74:*22*
**Luis** 2:*25* 5:*18*
**Luxor** 84:*21* 85:*15,*
*16*
**Lytikainen** 4:*9*

**< M >**
**machine** 87:*10*
**macroeconomic** 73:*25*
 74:*12*
**maintain** 13:*19*
 16:*22* 44:*22* 45:*15*
**maintaining** 12:*22*
 45:*4*
**majority** 13:*21* 26:*12*
 56:*25* 57:*22*
**making** 63:*5*
**MANAGEMENT**
 1:*10* 2:*15* 5:*10*
**Manning** 10:*10*
**March** 35:*18* 36:*2*
**Marese** 75:*21*
**Marese's** 76:*16*

**mark** 19:*16* 20:*17*
 34:*22* 52:*1* 55:*7*
 60:*1* 66:*6* 67:*3*
 69:*24* 75:*15* 79:*11*
**marked** 19:*18* 20:*18,*
*19* 21:*11* 29:*3* 34:*24*
 50:*6, 7, 10* 52:*11, 12*
 55:*9* 60:*4, 6* 66:*7, 10*
 67:*4* 69:*25* 70:*2*
 75:*16* 79:*12*
**marketplace** 84:*23*
**markets** 74:*1*
**Marriott** 5:*17*
**material** 16:*18*
**Mathes** 4:*8* 35:*11*
**matter** 6:*23, 24* 7:*2*
 11:*15* 14:*10* 24:*25*
 78:*9* 86:*3*
**mattered** 24:*23*
**matters** 12:*18*
**Matthew** 2:*18*
**Matthew.Solum@Kirkl**
**and.com** 2:*20*
**mean** 9:*24* 18:*16*
 25:*11* 29:*2* 43:*8*
 46:*25* 82:*1, 7*
**meaning** 74:*21*
**meant** 64:*11*
**mechanics** 25:*17*
**meet** 38:*10, 14* 41:*17*
 46:*2* 84:*1*
**Meeting** 4:*12, 15, 17*
 15:*1* 38:*16, 17, 20*
 39:*6* 43:*22* 47:*7, 17*
 51:*22* 52:*13* 58:*17,*
*20* 59:*19, 22* 66:*11,*
*12, 20* 67:*7, 15* 83:*23*
**meetings** 38:*23* 39:*11,*
*12, 14* 42:*2, 3* 51:*2*
 58:*24, 24*
**member** 10:*13* 24:*14*
**members** 31:*21*
**memory** 47:*7* 53:*8*
 72:*19* 80:*19*
**mentioned** 9:*13*
 10:*14* 25:*23* 85:*15*
**MERGER** 2:*15*
 60:*11* 67:*22, 24* 68:*6*
 70:*15*

**messages** 12:*12, 13,*
*23* 13:*4, 6*
**met** 6:*5* 16:*8* 38:*6*
 73:*24*
**Microsoft** 13:*23*
**middle** 28:*16* 47:*9,*
*18* 50:*14* 75:*20*
**military** 9:*6*
**MILLER** 1:*9* 2:*9*
 5:*9*
**mind** 41:*6* 74:*14*
 76:*2*
**MINDBODY** 1:*4, 7*
 2:*15, 24* 4:*4, 7, 10, 23*
 5:*4, 7* 7:*3, 7, 8, 10, 11,*
*19, 19, 20* 9:*18* 10:*6,*
*24* 16:*22* 22:*13*
 31:*21* 34:*4* 37:*24*
 40:*14, 23, 23* 42:*10*
 43:*15* 44:*7, 25* 46:*11,*
*16* 47:*19* 52:*4* 53:*13*
 56:*4* 58:*8* 67:*19*
 74:*13* 79:*17* 83:*7*
 84:*23* 85:*10*
**mine** 18:*18*
**minute** 62:*24* 74:*25*
 84:*14*
**Minutes** 4:*12, 15, 17*
 47:*20* 52:*13* 66:*11,*
*23* 67:*6, 14, 15*
**misled** 61:*2*
**missed** 61:*7*
**missing** 49:*2* 78:*11*
**Misstates** 60:*19*
**misuse** 77:*11*
**Mmmm-hmmm**
 23:*19* 35:*2* 50:*25*
 52:*23*
**mode** 10:*25*
**model** 13:*23*
**moment** 23:*18* 25:*14*
 28:*6* 76:*5*
**Monica** 8:*1*
**month** 65:*8*
**Monti** 39:*19* 41:*1, 7,*
*21* 42:*2, 12, 20* 43:*11*
 45:*23* 46:*6* 48:*1*
**Morgan** 35:*17, 23*
**morning** 6:*3, 4*

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

move  25:24  65:20
movement  35:14
moving  13:23
multiple  40:18  42:4
49:1  51:10  73:23
74:10
Murphy  32:13

< N >
name  85:3  87:18
named  85:2
names  42:1
native  15:6
natural  76:8
nature  9:16
Navy  8:24, 25
nearly  12:25  22:15
need  8:16  14:16
19:14  20:24  61:8
63:2
needed  10:1  16:11
81:3
needs  14:16
negotiating  71:14
negotiations  16:21
71:16
neither  87:14
Network  37:21  38:2
networking  46:1
never  60:20
New  2:19, 19  80:25
next-to-last  52:22
Nicole  4:9
nonstarter  41:5
Nope  21:7
normal  36:20
note  15:1, 3, 4  80:3
notes  14:19, 21, 23
15:1, 4, 6, 8  60:9
notification  22:21
77:13
number  13:5  32:4
55:19
numbered  62:5
numerous  40:16

< O >
o0o  1:15, 17, 20  3:7
5:14, 25  50:4  69:23

86:4
oaths  87:5
Obispo  2:25  5:18
objection  10:18, 20,
21  19:6, 13  25:9, 18
26:16, 19  27:22, 23
30:10, 18  31:16
33:23  36:15  38:21
42:11  44:9, 16  45:3,
11  53:22  54:14, 19
56:12, 19  57:8, 20
60:16  66:2  68:14
69:2, 3  71:11, 18
72:7, 8
objections  10:16
objective  26:18
objectives  64:2
obtained  23:14
Obviously  40:6  58:4
occasionally  14:24
22:24
occur  25:17
occurred  19:2  41:11
42:8  75:10  83:20
occurring  51:8
October  45:24  46:17,
25  47:8, 9, 18  74:3
76:14
offer  51:13, 23  52:20
53:3  54:22  58:1
73:19, 20
offered  61:14
Offering  81:10, 17
offers  73:23
office  51:19, 21, 25
52:10
officer  8:24  49:18
officers  8:25  29:24
offices  51:10
official  16:19  67:14
77:12
Oh  21:5  24:23
58:23  82:1
Okay  7:14  10:6
17:4, 11  18:24  19:24
20:7  21:12, 24  22:2,
17  24:4, 19  28:5
29:15  31:13  32:3
34:21  37:5  40:21
43:16, 22  47:11

48:25  49:21  50:1
52:1  58:14  60:14
62:2  63:22  64:15
67:2, 20  69:20  72:2
76:16  78:2
ominous  74:1
once  6:20  8:3  24:14
ones  42:23
one-to-one  18:1
online  58:20
operation  77:19
opinion  76:11  85:16
opportunity  65:17
74:11
opposed  9:17  23:9
84:16, 20
optimistic  78:18
options  50:17
orbiting  40:17
order  20:21  69:19
organizational  13:19
15:9
organize  11:5  15:10
69:16
organized  13:1, 7
organizing  12:23
original  26:12
originally  18:18
originated  18:14
outcome  40:12
outlines  6:24  7:2
Outlook  15:4
outside  32:9  77:2
owned  26:9

< P >
P.A  2:4
Page  3:3  4:3  19:22,
25  21:23  22:9  23:20,
25  25:5  28:3, 14
50:9, 11, 14  52:18
55:12, 15  61:25, 25
62:5, 6  67:9  70:6, 12
71:1  75:20  79:25
80:1  81:6, 14
pages  22:25  28:9
62:5  79:24, 25  80:2,
4
painful  49:6
Palo  2:13

paper  14:7, 9, 12, 14,
15, 20  16:16, 18, 23, 24
paragraph  21:22
31:3  52:17  60:9
62:6  70:12  71:1
paraphrase  28:24
PARENT  1:10  2:15
5:10  60:11  67:24
Parent's  60:10  70:15
part  6:11  34:18
36:20  44:23  46:22
82:11, 22
participate  75:7  85:7
participated  56:8
75:4
particular  71:9
72:14, 17, 20  73:9, 11,
13  74:2
particularly  31:3
parties  15:15  73:23
74:10
partner  7:9
PARTNERS  1:9, 11
2:9, 15  5:9, 11
partnership  7:3  9:20
10:5
party  7:14  9:11
38:23  82:5  87:16
party,  82:11
path  41:9
Patrick  2:11
pause  74:9
pay  48:20
people  12:15, 19  59:4
perceive  78:3
percent  35:19  36:3, 7,
12, 22
perform  78:23  79:6
performance  74:23
period  16:23  17:19,
24  18:2  32:7, 7, 21,
25  41:15  42:8  48:2
64:22  83:13  85:7
permitted  25:8  27:20
person  41:25
personal  12:17
personally  5:20  9:11,
17  10:7  48:4
persons  42:1

**pertain** 16:*20*
**pertained** 7:*9*
**pertains** 26:*9* 76:*24*
**PGibbs@Cooley.com** 2:*14*
**PHILIP** 1:*3* 5:*3*
**philosophy** 39:*2*
**phone** 11:*1* 14:*23* 15:*4* 16:*12* 39:*8* 41:*4*, *10* 42:*20* 43:*21*
**phrase** 27:*10*
**physical** 64:*19*
**physically** 51:*7*
**picked** 30:*14*, *16*
**place** 51:*9* 59:*17* 87:*7*
**placed** 22:*25*
**places** 60:*8*
**plaintiff** 9:*12*
**Plaintiffs** 1:*5* 2:*3* 5:*5*, *22* 6:*7* 15:*14*
**plan** 76:*20* 77:*10*, *15*, *16*, *17* 78:*4*, *10*, *17*, *20*, *21*
**planning** 25:*7*, *16*
**plans** 34:*12*
**play** 25:*19* 26:*5*
**please** 34:*23* 71:*23* 77:*9*
**pleased** 73:*21*
**pledge** 56:*21* 57:*21*
**pledged** 55:*3*
**point** 19:*22* 32:*19* 35:*15*, *24* 36:*4* 37:*14* 39:*24* 44:*17* 45:*1* 48:*4* 50:*22* 74:*1* 76:*19* 77:*6*, *8* 84:*21*
**points** 52:*19* 55:*16* 59:*20*
**pools** 82:*13*
**portfolio** 46:*22*
**position** 84:*23*
**possibility** 40:*22*
**possible** 7:*4*
**possibly** 59:*16*
**post-IPO** 18:*3* 31:*24* 32:*22* 33:*2* 81:*15* 82:*2*

**potential** 38:*15* 40:*19* 42:*16* 44:*23* 45:*15*
**Power** 4:*10* 24:*24*, *25* 27:*11*, *21* 32:*10* 35:*9*, *16*, *19* 36:*3*, *7*, *12*, *13* 50:*19* 58:*7*
**practical** 59:*7*
**practice** 13:*3* 14:*18* 78:*9*
**precise** 47:*2*
**precisely** 51:*17* 56:*21*
**pre-IPO** 20:*8* 24:*17* 32:*7*
**preparation** 34:*2*
**prepare** 83:*22* 84:*8*
**prepared** 18:*21* 72:*21*
**preparing** 83:*18* 84:*3*
**pre-SAS** 9:*22*
**Present** 2:*22*
**preserve** 10:*15*
**press** 47:*1*
**pretty** 11:*2* 57:*16* 85:*12*
**previous** 73:*24*
**previously** 76:*20* 83:*11*
**price** 48:*20*
**PRICKETT** 2:*4*
**principal** 10:*13*
**principally** 26:*5*
**principle** 17:*23* 25:*19* 26:*1*, *6*, *7*, *8*
**printed** 14:*11*
**prior** 10:*9* 17:*15* 19:*1* 20:*10* 26:*10* 32:*22* 33:*4* 37:*16* 42:*22* 49:*4*, *8* 59:*22* 67:*22* 68:*4* 81:*9*, *16* 85:*10* 87:*8*
**priority** 11:*13*, *16*, *19*, *23*
**private** 40:*11*, *18* 48:*6*
**privilege** 18:*8*
**probably** 34:*5* 39:*8* 47:*20* 66:*24* 76:*6*, *11*
**problem** 8:*17*
**proceeding** 9:*6*

**proceedings** 87:*6*, *8*, *10*
**process** 8:*7*, *8* 17:*11* 22:*18* 65:*6*, *9* 74:*9* 76:*14*
**produce** 15:*23*
**produced** 79:*23*
**product** 10:*1* 18:*9*
**production** 80:*14*
**proffering** 18:*9*
**projected** 49:*15*
**projections** 49:*16*
**prompting** 42:*14*
**proposal** 51:*11* 59:*21*
**proposed** 22:*22* 52:*21* 53:*2* 54:*8* 56:*1* 62:*14*
**protective** 20:*21*
**provide** 16:*15* 24:*15* 59:*12* 63:*10*, *25*
**provided** 18:*6* 27:*6* 52:*20* 59:*15* 64:*2* 84:*7*
**provides** 24:*4*
**providing** 16:*3*, *6* 57:*15*
**provision** 17:*7* 25:*4* 29:*16* 30:*6*, *20* 31:*15* 62:*19* 71:*9*, *17*
**provisions** 63:*25* 64:*5*, *17*
**proviso** 57:*16*
**proxies** 29:*16*, *23* 30:*7* 31:*25* 32:*6*, *18* 54:*11*, *18* 66:*16*, *19* 68:*1*, *6*
**Proxy** 4:*15*, *19* 29:*10*, *15* 32:*17* 53:*17*, *21* 55:*19*, *24* 56:*10*, *17* 57:*4*, *7*, *14* 58:*7*, *15* 60:*7* 61:*12*, *14*, *16*, *20* 62:*15*, *21* 63:*1*, *12* 64:*1*, *5*, *7*, *11*, *17* 65:*10*, *23* 68:*13*, *24* 70:*3*, *8*, *23* 71:*10*, *15*, *17* 72:*4*, *15*, *21*, *25* 77:*3*, *8*, *12*, *14* 83:*8*
**public** 17:*15*, *24* 20:*13*, *16* 32:*4* 37:*23*, *24* 39:*3* 40:*1*, *3*, *5*, *11*,

*20* 41:*8*, *14*, *17*, *20* 48:*13* 78:*9* 80:*25* 81:*9*, *17* 82:*16*, *17*, *22*
**publicly** 82:*14*, *18*
**pull** 53:*8*
**punished** 78:*13*
**purchased** 37:*21*
**pure** 13:*23*
**purpose** 26:*21* 43:*22*, *24* 45:*9*, *25* 64:*13*
**purposes** 6:*6* 25:*7*, *16* 29:*5*
**pursuant** 20:*21* 68:*23* 83:*1*
**pursuing** 10:*4*
**put** 17:*22* 18:*4* 31:*24* 71:*17*

**< Q >**
**Q3** 49:*2*, *12*, *12*
**Q4** 49:*4*, *8*, *14* 77:*1*
**quarter** 24:*14* 48:*10*, *12* 49:*10*
**question** 8:*10* 20:*24* 21:*20* 29:*5* 30:*12* 50:*22* 54:*6* 65:*15* 66:*18* 68:*21* 69:*12* 72:*18* 76:*6*, *11*, *13*
**questions** 6:*11* 14:*3* 75:*22* 76:*1*, *17* 85:*17*
**quickly** 11:*14* 37:*9* 74:*15*, *16*
**quiet** 48:*2*
**quite** 49:*6* 65:*2* 74:*1*

**< R >**
**raised** 76:*17*
**range** 7:*4* 78:*7*
**rare** 14:*10*, *14* 22:*15*
**rarely** 14:*8*
**reach** 79:*2*
**reached** 38:*11* 45:*23* 46:*15*
**reaching** 44:*2*
**read** 27:*9* 28:*23* 31:*9* 58:*4* 64:*12* 66:*14*, *17* 72:*16*, *20* 76:*5*
**reading** 25:*11* 72:*14*,

*17, 20*
**ready** 19:*24* 40:*1*
**real** 74:*6*
**realize** 81:*21*
**really** 69:*18* 80:*5*
**reason** 50:*21* 68:*23*
**reasonably** 62:*9* 71:*4*
**reasons** 72:*24*
**recall** 15:*19, 25* 16:*2, 18* 18:22 19:*11, 12, 23* 20:*4, 15, 15* 23:*3, 7, 10, 13* 31:20 32:*4, 20* 33:5, *10* 34:*3, 5* 35:*4* 36:*5, 10* 37:*12* 38:*18* 39:*16, 25* 42:*2, 5* 43:*1* 47:*17* 51:*5* 62:*14, 25* 72:*14, 17*
**receive** 11:*5* 12:*24* 14:*12* 54:22 59:*24* 78:23
**received** 51:*13* 55:*12* 57:*25* 59:*21, 25* 80:*2*
**receiving** 35:*4*
**recession** 74:*6*
**recognize** 79:*19*
**recognizing** 61:*23* 72:2
**recollection** 36:*25* 64:*18* 66:*21* 72:*23* 73:8, *10, 12* 75:*13* 76:*18*
**record** 6:*5, 6* 8:*15* 10:*15* 18:*5, 7* 28:*24* 29:*3* 47:*1* 50:*2, 3* 52:8 60:*19* 69:*20, 21, 22* 87:*9, 12*
**recorded** 16:*10*
**records** 16:*15, 16* 47:*3, 5*
**recovered** 63:*17*
**refer** 21:*22* 28:*10* 30:*7* 50:*12* 52:*17* 55:*14* 60:*8* 70:*12*
**reference** 35:*17* 60:*12* 66:*10, 15*
**references** 52:*18*
**Referring** 19:*25* 29:*16* 82:*1*
**refers** 29:*20, 23*

**reflect** 75:*10*
**reflected** 55:*11* 66:*23*
**reflects** 35:*15*
**refresh** 53:7 80:*19*
**regarding** 14:*19* 32:*24* 34:*9* 42:*9* 62:*19* 64:*4* 71:*16* 72:*24*
**region** 8:*1*
**regular** 13:*4* 24:*9* 38:2 39:*23*
**regularly** 15:*10*
**reintroducing** 45:*10*
**reintroduction** 43:*19*
**relate** 65:*7, 13* 71:*9*
**related** 12:*18* 16:*4*
**relates** 64:*24* 65:*1, 9*
**relating** 16:*17* 77:*7*
**relations** 41:*15*
**relationship** 7:*3, 6* 10:*3* 33:*20* 45:*5*
**relationships** 44:*22*
**relative** 87:*15*
**release** 78:*5*
**remains** 20:*10*
**remember** 6:*24* 7:*14, 21* 18:*15* 19:*15* 22:*5* 39:*5* 40:*2* 42:*1* 46:*18* 51:*12*
**REMEMBERED** 5:*15*
**reminding** 33:*5*
**rented** 52:*5*
**reopened** 42:*16* 43:*2*
**report** 24:*15*
**Reported** 1:*25*
**Reporter** 5:*19* 60:*3* 87:*4*
**REPORTER'S** 87:*1*
**represent** 6:*12*
**represented** 53:*12* 54:*25* 57:*13*
**request** 15:*14, 17, 20, 22* 16:*1, 6* 30:*2* 80:*11, 14*
**requested** 57:*19*
**require** 61:*15*
**required** 22:*16* 60:*15* 64:*8* 67:*24* 68:*5* 74:*14*

**requirement** 68:*10*
**requiring** 61:*11*
**resolution** 22:*6* 23:*2, 4, 5* 67:*18*
**resolve** 81:*4, 14*
**resolved** 81:*13*
**respect** 13:*8, 17* 14:*6* 15:*8* 27:*12* 29:*9, 17* 30:*8* 47:*17*
**respectful** 65:*6*
**respond** 11:*14*
**response** 12:*2, 5* 16:*6*
**responsibility** 6:*12*
**responsive** 50:*11*
**restate** 32:*25*
**Restated** 4:*4* 18:*19*
**Restatement** 81:*8*
**restricted** 82:*5, 13, 14* 83:*1*
**result** 38:*1* 47:*24* 62:*9* 71:*4*
**resulted** 49:*2*
**results** 76:*20, 25* 77:*13* 78:*8*
**retain** 13:*6* 32:*15*
**retained** 16:*11*
**revenue** 48:*12* 49:*1, 18* 78:*7*
**review** 16:*15* 18:*21* 19:*14* 22:*23, 24* 59:*8, 13* 65:*16, 16* 83:*19* 84:*3, 8*
**reviewed** 18:*23* 65:*11, 11, 11* 81:*1*
**reviewing** 18:*22*
**RICHARD** 1:*7, 19* 2:*8* 4:*21* 5:*7, 21*
**Rick** 4:*8* 35:*16*
**right** 6:*9* 8:*2, 4, 18* 9:*15* 11:*19, 22* 14:*1* 17:*25* 25:*24* 26:*8, 11* 27:*18* 28:*16, 18* 29:*18* 30:*9* 31:*6, 8, 19* 33:*24* 34:*25* 40:*1, 3, 7, 8* 46:*18* 48:*2, 23* 49:*9, 22* 52:*12* 54:*13* 55:*7* 57:*22* 58:*3* 60:*24* 62:*22* 63:*7, 15* 64:*10* 66:*14* 67:*1* 68:*8, 9, 20* 70:*9, 20,*

*25* 77:*17* 78:*10* 80:*10* 83:*12*
**right-hand** 62:*3*
**rights** 25:*20* 26:*12* 32:*16, 17* 33:*7* 34:*1* 35:*14* 54:*25* 55:*4* 56:*7* 63:*17*
**RMR** 1:*25*
**Road** 5:*17* 83:*25*
**role** 16:*5* 17:*14*
**romanette** 27:*4* 28:*3, 21, 23* 29:*7* 30:*15*
**room** 77:*18*
**rosy** 48:*17, 22, 25*
**round** 64:*19*
**route** 11:*8*
**routed** 13:*14*
**RSA** 1:*25*
**rules** 12:*8* 83:*25*
**rumbling** 74:*5*
**running** 46:*20* 51:*9*
**RYAN** 1:*3* 5:*3* 6:*7, 12*

**< S >**
**Sadly** 12:*25*
**safe** 67:*14*
**sale** 34:*2* 48:*2*
**San** 2:*25* 5:*17*
**Santa** 7:*25*
**Saroya** 39:*19* 41:*1, 21, 23, 24* 42:*21* 43:*11*
**S-A-R-O-Y-A** 41:*23*
**sausage** 63:*6*
**saw** 84:*15*
**saying** 13:*14*
**says** 14:*25* 23:*25* 27:*6* 28:*23* 55:*19* 62:*7* 67:*22* 70:*13* 71:*2* 76:*19* 77:*8* 81:*14*
**scan** 14:*13, 13*
**scenario** 78:*18*
**screen** 59:*3*
**seats** 69:*11*
**SEC** 35:*11, 11*
**second** 28:*25* 50:*9* 60:*9* 61:*25* 67:*9* 70:*11* 71:*1* 76:*19*

Deposition of Richard L. Stollmeyer    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

79:*24*

**Secretary** 81:*18*

**section** 22:*4* 23:*22* 24:*4* 27:*5* 81:*5*

**sections** 25:*5* 26:*2*

**see** 14:*1, 11, 15* 15:*17, 20* 20:*1* 22:*22* 24:*2* 27:*7, 16* 29:*12, 25* 30:*4* 31:*11* 35:*20* 50:*13, 19* 52:*15, 24* 55:*17, 19, 21* 59:*2* 62:*12* 63:*2* 66:*15* 68:*2* 69:*9* 70:*17* 71:*7* 75:*23* 79:*18* 80:*2* 81:*19*

**seeing** 15:*25* 16:*2* 28:*13*

**seen** 80:*18*

**sell** 33:*21* 34:*2*

**selling** 9:*23* 24:*18*

**send** 11:*5* 12:*23*

**sender** 11:*17, 21*

**senior** 11:*12*

**sense** 8:*14*

**sensitivity** 14:*9* 73:*15, 18*

**sent** 15:*18, 22* 16:*7*

**sentence** 28:*25* 62:*6* 70:*13* 71:*1* 72:*3, 14, 18, 20, 24* 73:*9, 11, 13*

**separate** 23:*4* 83:*6*

**September** 45:*20*

**series** 39:*7* 51:*2* 56:*7, 7*

**serious** 46:*16* 78:*14*

**served** 15:*13*

**services** 9:*23*

**set** 5:*24* 12:*8* 31:*19* 43:*20* 51:*1* 58:*20* 67:*25* 75:*1* 78:*11, 21* 80:*24* 87:*7*

**setting** 79:*7*

**settled** 7:*20*

**seven** 18:*2* 37:*1, 4* 73:*24*

**severely** 78:*13*

**share** 27:*13* 29:*9*

**shared** 59:*17* 77:*14*

**shareholders** 17:*16* 36:*21, 23* 40:*12*

57:*24* 78:*14* 79:*1* 82:*21*

**SharePoint** 13:*22*

**shares** 17:*5* 22:*7* 24:*5, 6, 9, 15, 18* 25:*23, 25* 26:*10, 13, 22, 25* 27:*12* 29:*18* 31:*22* 32:*1, 16, 24, 24* 33:*6, 13, 21* 34:*1, 10, 19* 37:*8, 10* 58:*7* 62:*10* 71:*5, 10* 72:*6* 81:*24* 82:*25* 83:*8, 16*

**Shirt** 4:*9*

**short** 69:*19*

**Shorthand** 5:*19* 87:*3, 10*

**shown** 70:*20*

**shred** 14:*10*

**sign** 14:*16* 72:*21*

**signature** 14:*17* 20:*2* 23:*1* 67:*10, 11* 70:*4, 5* 79:*25* 80:*2*

**signatures** 22:*10, 10, 16*

**Signed** 4:*19* 54:*11* 60:*20* 62:*21* 70:*9* 72:*15, 16*

**significant** 17:*18* 25:*2* 26:*24* 34:*18* 35:*14* 36:*5* 48:*10* 54:*25*

**signing** 19:*23* 20:*4*

**similar** 84:*21* 85:*15*

**similarly** 1:*4* 5:*4*

**Simon** 85:*2*

**simple** 49:*13*

**simply** 8:*10* 64:*2* 66:*10*

**single** 39:*6*

**sit** 15:*25* 31:*6* 72:*19, 23*

**sitting** 8:*11*

**situated** 1:*4* 5:*4*

**skipping** 29:*7*

**slide** 27:*2* 59:*19*

**small** 23:*25*

**SMITH** 1:*9* 2:*9* 5:*9*

**software** 9:*21, 24*

**sold** 24:*15* 26:*25*

33:*6*

**sole** 27:*11, 21*

**Solum** 2:*18* 3:*5* 10:*18* 18:*4* 19:*6, 13* 20:*19* 21:*8* 25:*9, 18* 26:*16, 19* 27:*22* 29:*2* 30:*10, 18* 31:*16* 36:*15* 42:*11* 45:*3, 11* 46:*23* 47:*4, 12* 49:*20* 50:*1* 54:*14* 57:*8* 60:*16, 19, 25* 64:*24* 65:*2, 13, 18, 20* 69:*2, 4, 8, 12, 20* 71:*19* 72:*8, 11* 73:*1, 3* 80:*16* 85:*19, 22, 25*

**somebody** 7:*12* 48:*20*

**someplace** 59:*6*

**sorry** 7:*6* 21:*5, 9* 23:*24* 26:*4, 7* 28:*6, 7* 29:*21, 21* 33:*19* 56:*12* 61:*2, 7* 77:*20* 81:*13*

**sort** 11:*19* 12:*9* 13:*9* 15:*10* 39:*5, 23* 42:*24* 58:*20* 64:*19* 78:*17*

**sorting** 11:*10*

**sounds** 75:*12*

**space** 37:*22*

**Spain** 2:*18*

**spam** 13:*12, 15*

**speak** 53:*11*

**specific** 42:*5* 45:*9* 63:*11, 24, 25* 64:*11* 74:*13*

**specifically** 23:*21* 45:*7*

**specifics** 34:*5*

**speculation** 27:*23* 36:*16* 69:*5* 72:*9*

**spend** 46:*6*

**spoke** 42:*13* 83:*10*

**spoken** 43:*19*

**Sprinter** 52:*5*

**start** 19:*11* 31:*4*

**started** 14:*2* 48:*16, 17*

**starting** 13:*1* 74:*3*

**starts** 28:*21*

**STATE** 1:*1* 5:*1, 19* 81:*18* 87:*4*

**stated** 43:*23, 25* 68:*8*

**status** 35:*8*

**stay** 26:*12*

**stock** 17:*22* 18:*13* 27:*13, 14, 15* 29:*10* 32:*10* 62:*10, 11* 71:*5, 6* 74:*2, 24* 76:*8* 78:*13* 82:*5, 6, 13, 14, 19* 83:*2*

**stockholder** 19:*5* 23:*3, 8, 13* 27:*10, 19* 60:*9* 62:*7* 70:*14* 71:*2* 80:*15, 21*

**stockholders** 1:*4* 4:*23* 5:*4* 49:*6* 53:*10* 67:*25* 79:*16* 80:*7* 82:*21*

**stocks** 74:*2, 7*

**STOLLMEYER** 1:*7, 19* 2:*8* 4:*9, 21* 5:*7, 21* 6:*3* 18:*10* 19:*16, 20, 25* 20:*17, 23* 34:*22* 35:*5* 52:*12* 55:*10* 60:*6* 66:*9* 67:*6* 70:*2* 75:*18* 79:*14*

**strategy** 39:*2*

**streams** 49:*1*

**Street** 2:*5, 12* 49:*2* 77:*9*

**stretch** 79:*2*

**Strike** 28:*7* 45:*8*

**string** 55:*11, 13* 75:*19*

**structure** 13:*20* 32:*13* 52:*20* 78:*22*

**struggling** 9:*25*

**study** 61:*8*

**stuff** 69:*16*

**SUB** 1:*10* 2:*16* 5:*10* 27:*4*

**subparagraph** 29:*20, 22, 23*

**subpart** 27:*3* 30:*6, 15, 17* 31:*8, 12, 14*

**subscribed** 87:*18*

**subsection** 23:*25*

**subsequent** 26:*14* 29:*10*

**substance** 43:*12*

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

44:*13*
**substantial** 73:*22*
**substantive** 63:*9*
**sue** 7:*19, 19*
**sued** 10:*6*
**suggested** 65:*12, 24*
**suggestion** 40:*13*
**suing** 7:*20*
**suit** 7:*11* 10:*4, 9*
**Suite** 2:*24*
**summary** 52:*19*
 75:*21* 76:*16, 17*
**sunset** 17:*23*
**super** 17:*22* 18:*13*
 25:*20, 24* 26:*8, 12, 21*
 33:*7* 34:*1*
**superior** 54:*22* 57:*25*
**support** 52:*21* 53:*1,*
 *15, 20* 54:*8, 17, 23*
 55:*1* 66:*16, 20*
**supported** 57:*16*
**Sure** 6:*14* 8:*7* 11:*13*
 12:*18* 15:*21* 21:*3, 18*
 23:*7, 12* 30:*11* 31:*10*
 33:*2* 35:*25* 49:*25*
 52:*8* 59:*10* 61:*24*
 63:*4* 75:*3*
**sworn** 5:*23* 87:*9*
**Sydney** 85:*3*
**system** 9:*21* 11:*7, 9,*
 *15* 12:*22* 13:*5, 9, 13,*
 *22, 25* 14:*10* 15:*9*

**< T >**
**table** 74:*17*
**tag** 48:*20*
**take** 8:*11, 16* 14:*19,*
 *21* 19:*20, 21* 20:*23*
 21:*16* 25:*14* 48:*6, 18*
 49:*21, 24* 62:*8* 69:*14*
 70:*11* 71:*3* 72:*3*
 74:*7* 76:*4* 78:*13*
 79:*18* 80:*16*
**taken** 74:*3* 84:*22*
 87:*6*
**talk** 8:*12* 39:*1* 43:*8,*
 *10* 46:*9, 10* 48:*3*
 74:*25* 83:*24* 84:*18*
 85:*1, 16*
**talked** 46:*14* 65:*18*

**talking** 32:*21* 36:*2*
 45:*1* 46:*6* 48:*22*
**taxes** 25:*7*
**TDM** 84:*16* 85:*1, 23*
**team** 12:*2* 17:*25*
 24:*14*
**teamed** 85:*13*
**Tech** 74:*2*
**technicality** 20:*14*
**telephone** 38:*17*
 43:*11, 13, 23, 24*
 44:*13* 47:*21, 23*
 58:*18* 65:*4* 66:*12*
**Telephonic** 4:*12, 15,*
 *17*
**tell** 25:*15* 31:*13*
 33:*8* 51:*15* 64:*24*
 69:*14* 74:*22* 80:*7, 9*
 84:*20*
**telling** 31:*20* 33:*10*
**term** 77:*22, 22*
**terminal** 59:*6*
**terminate** 32:*19*
**terms** 11:*4* 12:*12*
 17:*2* 39:*2* 63:*9, 11*
 64:*11* 65:*10* 71:*14*
 81:*2* 83:*1*
**testified** 8:*19* 18:*5*
 42:*24*
**testify** 8:*22* 9:*1, 10*
**testifying** 87:*9*
**testimony** 87:*12*
**text** 12:*3, 12, 13, 15,*
 *18, 19, 21, 23* 13:*3, 5*
**texting** 10:*25*
**texts** 12:*16*
**Thank** 41:*24* 73:*14*
 79:*10* 85:*25*
**Thanks** 12:*10*
**thereof** 5:*16*
**thesis** 38:*24*
**thing** 8:*9* 12:*11* 21:*4*
 56:*17*
**things** 11:*24* 43:*15*
 46:*11, 12* 65:*3, 5*
 76:*3*
**think** 18:*5* 21:*13*
 29:*3* 36:*19, 25* 38:*6,*
 *8* 39:*8* 42:*12* 44:*8,*
 *14* 46:*20, 21, 21*

 48:*16* 52:*7* 53:*11*
 69:*16, 16, 18* 76:*6, 10,*
 *15, 24* 77:*11* 85:*12, 13*
**thinking** 48:*17*
**third** 46:*17, 25* 48:*10,*
 *12* 67:*21* 76:*6* 81:*12*
**thought** 10:*3* 54:*9*
 61:*3*
**Thread** 4:*11, 14, 22*
**three** 36:*2* 41:*16*
**Thursday** 51:*14* 52:*7*
**tied** 42:*6*
**time** 8:*3, 13, 16* 9:*4*
 14:*15* 16:*23* 17:*19*
 19:*2, 20* 20:*24* 26:*25*
 34:*14* 35:*1, 22, 24*
 36:*6* 37:*7, 8* 39:*25*
 40:*6, 15, 17* 41:*11*
 43:*20, 21* 44:*20* 45:*1,*
 *19* 46:*6, 13* 48:*4*
 50:*22* 65:*3* 66:*4*
 73:*15, 18, 19* 76:*25*
 79:*18* 80:*3* 83:*13*
 87:*7*
**timeframe** 38:*7* 39:*15*
**timeline** 37:*3*
**timely** 74:*18*
**times** 6:*19* 42:*4*
**titled** 81:*8*
**today** 6:*8, 11* 15:*25*
 20:*10* 39:*20* 72:*19,*
 *24* 80:*19* 83:*22* 84:*4,*
 *9*
**today's** 83:*18*
**told** 8:*15* 41:*7* 64:*20*
**tool** 13:*11* 58:*23*
**top** 9:*23* 55:*12*
**topic** 41:*3*
**topics** 16:*17* 38:*19*
**TORREYS** 1:*10, 10*
 2:*15, 15* 5:*10, 10*
**total** 35:*19* 36:*8, 9,*
 *13* 50:*18*
**track** 24:*8*
**tracked** 24:*20, 22*
**tracking** 31:*4* 35:*10*
**trade** 69:*11*
**trading** 76:*8*
**transaction** 31:*25*
 32:*22* 33:*4* 37:*16*

 42:*9* 44:*6, 15, 18*
 45:*16* 48:*5* 60:*18*
 73:*16* 82:*10, 25* 83:*9*
**transcribed** 87:*11*
**transcript** 20:*20*
 87:*12*
**transcripts** 83:*19*
**transfer** 24:*5* 28:*11,*
 *19* 29:*1, 6, 8* 30:*8, 17*
 55:*4, 5*
**transferee** 27:*20*
**transferees** 25:*8*
**transfers** 25:*7, 22*
 29:*16*
**transitioned** 53:*20*
**traveling** 59:*4*
**treated** 10:*20*
**trial** 8:*20, 22* 10:*16*
**tried** 65:*7*
**true** 17:*10* 85:*18*
 87:*12*
**trust** 27:*13, 14*
**try** 8:*9* 11:*24* 13:*5*
 31:*4* 55:*7* 74:*10*
**trying** 53:*7* 55:*23*
 78:*19*
**Tuesday** 51:*18, 19*
**turn** 23:*20* 61:*24*
 70:*25*
**two** 79:*24*
**type** 15:*5* 67:*10*
**typically** 14:*21* 24:*16,*
 *18* 38:*23* 41:*16, 25*
 59:*11*

**< U >**
**ultimately** 18:*24*
 53:*14* 54:*11* 55:*24*
 61:*15* 62:*21, 25*
 66:*18* 68:*5* 70:*9, 22*
**unanimity** 56:*25*
**Unanimous** 4:*6*
**unanimously** 73:*21*
**unconditionally** 62:*8*
 71:*3*
**undersigned** 70:*13*
**understand** 6:*9, 15*
 30:*11* 43:*16* 44:*2, 5*
 55:*23* 58:*3, 6* 65:*19*

Deposition of Richard L. Stollmeyer                PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

**76**:*4*  **77**:*20*  **78**:*19*  **79**:*10*  **81**:*22*
**understanding**  27:*19*  29:*5*  30:*24*  31:*15*  54:*20*  55:*24*  57:*11*  58:*9*  64:*7*  68:*12, 17*  69:*1*
**understandings**  34:*11*
**understood**  16:*9*  44:*11, 14*  49:*5*  54:*9*  55:*3*  64:*13, 13*
**undervalued**  46:*21*
**undoubtedly**  74:*23*
**unexecuted**  60:*22*
**unique**  74:*11*
**units**  82:*13*
**upfront**  61:*6*
**urgent**  12:*3, 14*
**use**  11:*2*  12:*12, 13, 15*  13:*5, 25*  14:*23*  15:*3*  58:*23*  77:*22*
**usual**  10:*25*  13:*15*
**usually**  14:*8*

**< V >**
**Valine**  1:*25*  5:*18*  87:*3, 22*
**valuable**  84:*24*
**van**  52:*5*
**various**  41:*17*
**vast**  13:*21*
**VCs**  24:*17*
**VENTURE**  1:*11*  2:*9*  5:*11*  34:*12*
**version**  18:*23*  20:*4*  80:*13, 15*
**versus**  17:*8*  76:*20*
**Victoria**  1:*25*  5:*18*  87:*3, 22*
**video**  58:*24, 25*  59:*6*
**view**  37:*13*  48:*16*  73:*16*  84:*21*
**visit**  52:*5*
**VISTA**  1:*9*  2:*15*  5:*9*  31:*25*  32:*22*  33:*4*  37:*16, 17*  39:*6, 12, 15, 17, 20, 24*  40:*14, 18, 22*  41:*12, 13, 18, 20*  42:*8, 10, 23*  43:*4, 7, 14, 23, 25*  44:*2, 3, 5,*

*14, 21*  45:*10, 19*  46:*12, 14, 22*  51:*3, 23*  53:*2*  54:*8*  56:*1, 2, 17*  57:*19*  58:*8, 12*  59:*21*  60:*12, 15, 18*  61:*11, 13, 15*  65:*24*  66:*5*  68:*5, 10, 12, 24*  73:*16*  82:*10, 24*  83:*9*
**Vista's**  16:*22*  51:*11, 13*  52:*20*  85:*11*
**visual**  59:*18*
**voice**  26:*24*  59:*1*
**vote**  17:*8*  18:*1*  21:*20*  53:*18, 18*  56:*22*  57:*1, 15, 21*  58:*7*  68:*23*  72:*5*  82:*25*  83:*8, 16*  85:*23*
**votes**  17:*7*
**Voting**  4:*10*  17:*22*  18:*13*  24:*24, 25*  25:*20, 24*  26:*8, 12, 22*  27:*11*  29:*9, 17*  30:*9, 14, 16*  31:*7, 11, 14*  32:*9, 15, 16*  33:*7*  34:*1*  35:*9, 14, 16, 19*  36:*3, 7, 12, 13*  50:*18*  52:*21*  53:*1, 5, 14, 20*  54:*8, 17, 25*  55:*4, 20, 25*  56:*3, 5, 18*  57:*18*  61:*13*  63:*17*  66:*15, 19*  71:*10*
**vs**  1:*6*  5:*6*
**vying**  42:*15*

**< W >**
**wait**  8:*9*
**waiving**  18:*8*
**want**  12:*2, 5*  14:*19*  18:*4, 6*  19:*21*  21:*16, 25*  25:*24*  28:*10*  29:*4*  40:*10*  47:*1*  52:*3, 8, 17*  53:*8, 24*  56:*21*  62:*18*  69:*11*  74:*25*  85:*16*
**wanted**  26:*11*  33:*22*  40:*11*  54:*21*  56:*17, 21*  63:*13*  76:*4*
**way**  13:*4*  31:*24*  45:*14*  68:*17*  72:*4*  73:*7*  77:*25*

**WEDNESDAY**  1:*16*  5:*15*  51:*14, 20*
**week**  11:*25*  46:*15, 17, 24, 25*  52:*10*
**weeks**  41:*17*  73:*24*  74:*10*
**weird**  14:*5*
**welcome**  66:*17*
**Well**  9:*19*  11:*7*  12:*17*  14:*12*  15:*2*  17:*15*  20:*12*  24:*20*  25:*19*  28:*23*  30:*14, 21*  33:*11*  35:*13, 22*  40:*13, 16*  41:*13*  43:*10, 16*  45:*7*  48:*1*  53:*11, 16, 25*  59:*1*  63:*24*  65:*15*  68:*19*  74:*16*  76:*3*  77:*11*  78:*23*  80:*23*  83:*13*
**went**  20:*13*  37:*23, 24*  52:*6, 6*  58:*15*  63:*11, 25*
**we're**  6:*8*  13:*22, 22*  17:*25*  21:*3*  25:*5*  41:*8, 8*  45:*1*  48:*1, 2, 22*  67:*1*
**wet**  14:*17*  22:*16*
**we've**  13:*14*  39:*12*  49:*20*  50:*5*  51:*10*  60:*6*  66:*9*  80:*12*
**WHEREOF**  87:*17*
**White**  4:*9*
**whiteboard**  31:*4*
**wife**  33:*17*
**wildly**  79:*2*
**William**  2:*12*
**willing**  48:*20*  56:*3, 4*
**willingness**  60:*10*  67:*23*  70:*15*
**Wilmington**  2:*6*
**witness**  5:*22*  8:*19, 22*  9:*1, 10*  18:*5*  19:*9, 14*  22:*2*  25:*11, 19*  26:*21*  27:*25*  29:*13*  30:*11*  31:*2, 17*  35:*2*  36:*18*  38:*22*  42:*12*  44:*10, 17*  45:*4, 13*  47:*2, 5, 14*  49:*25*  53:*23*  54:*20*  56:*14, 20*  57:*11, 21*  60:*22*  61:*2*

**65**:*5*  **66**:*3*  **68**:*15*  **69**:*7, 10, 11*  **71**:*12, 20, 24*  **72**:*10*  **73**:*2, 5*  **85**:*20*  **87**:*17*
**witnesses**  87:*8*
**woman**  8:*11*
**wonderful**  12:*11*
**Word**  13:*18*  25:*12*  28:*19*  29:*15*  85:*18*
**words**  30:*20*  31:*7, 11*  40:*20*  77:*11*
**work**  18:*8*  26:*1*
**working**  10:*24*
**works**  8:*7, 8*  22:*18*  83:*25*
**world**  74:*22*
**wrap**  69:*18*
**write**  85:*13*
**Written**  4:*6, 23*  15:*17, 20, 22*  21:*1, 6*  79:*16*
**wrong**  77:*18*

**< X >**
**XIII**  1:*11*  2:*9*  5:*11*

**< Y >**
**yeah**  12:*10*  14:*5*  15:*16*  16:*14*  18:*18*  19:*14*  27:*25*  30:*11*  34:*6*  37:*6*  41:*7*  42:*20*  44:*10*  47:*2, 14*  49:*23*  54:*5*  55:*18*  58:*5, 23*  59:*10*  62:*4*  71:*24*  73:*2*  76:*15, 18*  77:*24*  80:*9*
**year**  37:*22*  42:*4, 13, 14*  48:*15, 22*  49:*11, 13*  77:*4, 5*
**years**  6:*21*  17:*24*  18:*2*  37:*2, 4*  38:*9*
**Yep**  28:*17*  33:*3*  81:*7*
**yesterday**  83:*24*
**York**  2:*19, 19*
**young**  9:*24*

**< Z >**
**Zoom**  58:*24*  59:*2, 9, 12, 19*

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

**WORD LIST**

**< 1 >**
**1**  (*8*)
**10**  (*9*)
**10:37**  (*1*)
**10:47**  (*1*)
**10022**  (*1*)
**10-minute**  (*1*)
**11**  (*4*)
**11:18**  (*1*)
**11:32**  (*1*)
**11:58**  (*1*)
**12**  (*3*)
**1310**  (*1*)
**14**  (*1*)
**15**  (*1*)
**1605**  (*1*)
**18**  (*1*)
**18th**  (*1*)
**19**  (*1*)
**19801**  (*1*)
**1991**  (*1*)
**19th**  (*2*)

**< 2 >**
**2**  (*14*)
**20**  (*8*)
**2002**  (*1*)
**2004**  (*1*)
**2013**  (*6*)
**2014**  (*5*)
**2017**  (*4*)
**2018**  (*12*)
**2019**  (*8*)
**2019-0061-AGB**  (*2*)
**20th**  (*1*)
**21**  (*5*)
**212.446.4688**  (*1*)
**212.446.6460**  (*1*)
**21st**  (*1*)
**220**  (*1*)
**225**  (*1*)
**23**  (*4*)
**2408**  (*3*)
**24th**  (*1*)
**29**  (*1*)

**< 3 >**

**3**  (*13*)
**302.447.7066**  (*1*)
**302.888.6532**  (*1*)
**3036**  (*2*)
**31**  (*2*)
**3175**  (*1*)
**34**  (*1*)
**36.50**  (*1*)

**< 4 >**
**4**  (*6*)
**4051**  (*1*)

**< 5 >**
**5**  (*4*)
**50**  (*5*)
**52**  (*3*)
**55**  (*1*)

**< 6 >**
**6**  (*6*)
**6:21**  (*1*)
**60**  (*1*)
**601**  (*1*)
**650.843.5535**  (*1*)
**650.849.7400**  (*1*)
**66**  (*1*)
**67**  (*1*)
**69**  (*1*)

**< 7 >**
**7**  (*5*)
**75**  (*1*)
**79**  (*1*)

**< 8 >**
**8**  (*5*)
**805.459.5379**  (*1*)
**85**  (*1*)

**< 9 >**
**9**  (*4*)
**9:35**  (*1*)
**93401**  (*1*)
**94304-1130**  (*1*)

**< A >**
**a.m**  (*7*)
**ability**  (*5*)

**able**  (*2*)
**accomplish**  (*1*)
**accountant**  (*1*)
**accounting**  (*2*)
**accurate**  (*1*)
**achieving**  (*1*)
**acquirer**  (*3*)
**acquirers**  (*4*)
**acquiring**  (*2*)
**acquisition**  (*2*)
**acquisitions**  (*1*)
**act**  (*1*)
**Action**  (*10*)
**Active**  (*3*)
**acts**  (*1*)
**actual**  (*2*)
**ADAM**  (*3*)
**added**  (*1*)
**addition**  (*2*)
**additional**  (*1*)
**address**  (*1*)
**administer**  (*1*)
**administrator**  (*1*)
**adopted**  (*1*)
**advice**  (*3*)
**advised**  (*1*)
**advisement**  (*1*)
**affiliated**  (*1*)
**aggregate**  (*1*)
**ago**  (*4*)
**agree**  (*6*)
**agreement**  (*30*)
**agreements**  (*9*)
**agrees**  (*2*)
**ahead**  (*4*)
**airport**  (*1*)
**Alec**  (*1*)
**aligned**  (*1*)
**all-day**  (*1*)
**allocates**  (*1*)
**allowed**  (*1*)
**alternatives**  (*1*)
**Alto**  (*1*)
**Amended**  (*2*)
**amount**  (*2*)
**amounts**  (*1*)
**Andrew**  (*1*)
**annex**  (*1*)
**answer**  (*17*)

**answered**  (*2*)
**anybody**  (*1*)
**apart**  (*1*)
**apologies**  (*2*)
**apologize**  (*1*)
**App**  (*1*)
**appear**  (*1*)
**APPEARANCES**  (*1*)
**appeared**  (*1*)
**appears**  (*2*)
**applicable**  (*1*)
**applies**  (*2*)
**approval**  (*3*)
**approve**  (*6*)
**approved**  (*13*)
**approving**  (*3*)
**Approximately**  (*7*)
**APRIL**  (*5*)
**arithmetic**  (*1*)
**arrested**  (*1*)
**article**  (*2*)
**aside**  (*4*)
**asked**  (*8*)
**asking**  (*12*)
**aspects**  (*1*)
**associated**  (*1*)
**assume**  (*3*)
**assurance**  (*2*)
**assure**  (*1*)
**attached**  (*2*)
**attended**  (*1*)
**attention**  (*1*)
**attorney**  (*6*)
**Attorneys**  (*3*)
**August**  (*6*)
**Australia**  (*1*)
**Australian**  (*1*)
**authentic**  (*1*)
**authority**  (*2*)
**authorized**  (*2*)
**automatic**  (*3*)
**automatically**  (*2*)
**available**  (*2*)
**Avenue**  (*1*)
**award**  (*1*)
**awards**  (*1*)
**aware**  (*8*)
**aware,**  (*1*)

Case 1:19-cv-08331-VEC    Document 88-2    Filed 03/12/21    Page 44 of 51

Deposition of Richard L. Stollmeyer                    PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

**< B >**
back  (*16*)
bad  (*1*)
balance  (*3*)
banker  (*1*)
bankers  (*3*)
based  (*3*)
basically  (*2*)
basis  (*3*)
bearing  (*1*)
beat  (*1*)
beating  (*1*)
beginning  (*2*)
behalf  (*4*)
BEJameson@Prickett.
com  (*1*)
believe  (*27*)
believed  (*2*)
best  (*3*)
better  (*3*)
big  (*3*)
binder  (*1*)
binding  (*3*)
bit  (*3*)
BLAIR  (*3*)
Blue  (*1*)
Board  (*51*)
board,  (*1*)
board-approved  (*2*)
BoardVantage  (*1*)
Bob  (*2*)
bonuses  (*1*)
bottom  (*6*)
bought  (*3*)
branch  (*3*)
break  (*6*)
Brett  (*1*)
brief  (*2*)
briefly  (*2*)
bring  (*1*)
bringing  (*1*)
Broad  (*1*)
Bruce  (*4*)
build  (*2*)
built  (*1*)
bullet  (*4*)
bulleted  (*1*)
business  (*11*)
busy  (*1*)

buy  (*2*)
buying  (*2*)

**< C >**
calendar  (*4*)
California  (*7*)
call  (*24*)
Calle  (*1*)
called  (*6*)
calling  (*1*)
calls  (*10*)
capital  (*6*)
care  (*1*)
Carlsbad  (*2*)
carries  (*1*)
case  (*16*)
cases  (*3*)
Catalyst  (*5*)
catch  (*3*)
cause  (*1*)
cc  (*2*)
cc'd  (*2*)
cellphone  (*1*)
CEO  (*1*)
certain  (*6*)
certainly  (*2*)
Certificate  (*25*)
CERTIFICATION  (*1*)
Certified  (*2*)
certify  (*2*)
CFO  (*1*)
chain  (*1*)
chance  (*1*)
CHANCERY  (*2*)
chances  (*1*)
Chang  (*2*)
character  (*2*)
characterize  (*1*)
charged  (*1*)
check  (*2*)
Chief  (*1*)
chose  (*1*)
CHRISTIE  (*3*)
CIPORA  (*3*)
circa  (*2*)
circumstances  (*1*)
Civil  (*3*)
claim  (*2*)
clarification  (*1*)

clarify  (*2*)
Class  (*39*)
clause  (*2*)
clear  (*5*)
clearer  (*2*)
click  (*1*)
client  (*2*)
close  (*2*)
closed  (*1*)
closely  (*2*)
closes  (*1*)
Closing  (*2*)
Clutter  (*2*)
cofounders  (*1*)
collective  (*1*)
collectively  (*2*)
combination  (*1*)
come  (*6*)
comes  (*1*)
comfortable  (*1*)
commencing  (*1*)
comment  (*2*)
common  (*3*)
communicating  (*2*)
communication  (*11*)
communications  (*16*)
companies  (*5*)
company  (*34*)
company's  (*1*)
compare  (*1*)
compensation  (*1*)
complete  (*2*)
complex  (*1*)
computer  (*1*)
concentrated  (*1*)
concept  (*6*)
concern  (*2*)
concerned  (*2*)
concerns  (*3*)
concert  (*1*)
concluded  (*1*)
conclusion  (*4*)
concomitant  (*1*)
condition  (*7*)
conferencing  (*1*)
CONFIDENTIAL
 (*88*)
confirm  (*2*)
confirmed  (*1*)

conformed  (*1*)
connection  (*5*)
consensus  (*1*)
Consent  (*7*)
consider  (*1*)
considered  (*1*)
considering  (*3*)
consistent  (*1*)
constitute  (*3*)
consultation  (*1*)
contact  (*3*)
context  (*3*)
continues  (*1*)
contract  (*1*)
control  (*10*)
conversation  (*5*)
conversations  (*1*)
conversion  (*7*)
convert  (*7*)
converted  (*3*)
COOLEY  (*5*)
copies  (*1*)
copy  (*6*)
core  (*1*)
corner  (*1*)
corporation  (*2*)
correct  (*26*)
correctly  (*1*)
cost  (*2*)
Counsel  (*21*)
COUNSEL'S  (*87*)
counter  (*1*)
countries  (*1*)
couple  (*3*)
course  (*5*)
COURT  (*8*)
Courtney  (*2*)
Courtyard  (*1*)
CPA  (*1*)
create  (*4*)
created  (*6*)
creates  (*2*)
creation  (*1*)
CRR  (*1*)
CSR  (*3*)
CUNNINGHAM  (*5*)
Cunningham's  (*1*)
curiosity  (*1*)
curious  (*1*)

**current**  (2)
**currently**  (1)
**customer**  (1)
**cycle**  (1)
**cycles**  (1)

**< D >**
**D-3**  (2)
**date**  (5)
**Dated**  (2)
**dates**  (3)
**day**  (7)
**days**  (1)
**deal**  (25)
**dealing**  (3)
**deals**  (1)
**December**  (19)
**decide**  (2)
**decided**  (2)
**deck**  (1)
**decline**  (1)
**defendant**  (1)
**Defendants**  (5)
**definition**  (6)
**definitions**  (1)
**DELAWARE**  (4)
**delete**  (1)
**deleting**  (2)
**delivery**  (1)
**dense**  (1)
**deposed**  (5)
**DEPOSITION**  (17)
**depositions**  (1)
**describe**  (1)
**Description**  (1)
**designate**  (1)
**designed**  (3)
**despite**  (1)
**detail**  (2)
**detailed**  (2)
**determine**  (2)
**devices**  (1)
**differ**  (1)
**difference**  (1)
**different**  (7)
**differs**  (1)
**diluting**  (1)
**dilutional**  (1)
**direct**  (2)

**direction**  (2)
**directly**  (1)
**director**  (6)
**Directors**  (18)
**disappointing**  (2)
**disclose**  (1)
**disclosed**  (1)
**disclosure**  (1)
**discuss**  (3)
**discussed**  (2)
**discussing**  (5)
**discussion**  (11)
**discussions**  (8)
**dispositive**  (2)
**disproportionately**  (1)
**distinction**  (1)
**distribute**  (2)
**distributed**  (1)
**district**  (1)
**document**  (19)
**documents**  (26)
**DocuSign**  (10)
**doing**  (3)
**DONALD**  (2)
**Douglas**  (1)
**draft**  (10)
**drafted**  (1)
**drafts**  (2)
**draw**  (1)
**drawing**  (1)
**drop**  (1)
**Dropbox**  (1)
**dropped**  (3)
**DUI**  (2)
**duly**  (3)
**duty**  (2)

**< E >**
**EA**  (2)
**earlier**  (2)
**early**  (3)
**earning**  (1)
**earnings**  (10)
**easier**  (1)
**economics**  (1)
**effect**  (3)
**effective**  (2)
**efficiency-wise**  (1)
**effort**  (1)

**either**  (14)
**electronic**  (1)
**electronically**  (3)
**elements**  (1)
**eliminate**  (1)
**eliminated**  (1)
**eliminating**  (1)
**ELLIOTT**  (1)
**ELLIS**  (1)
**E-mail**  (23)
**e-mails**  (9)
**employee**  (2)
**employees**  (12)
**enabled**  (1)
**encourage**  (1)
**encouraged**  (1)
**ended**  (2)
**energy**  (1)
**enforce**  (2)
**engage**  (1)
**ensure**  (4)
**enter**  (4)
**entered**  (4)
**entering**  (2)
**entire**  (1)
**entirety**  (1)
**entities**  (1)
**entity**  (3)
**envelope**  (1)
**environment**  (2)
**EQUITY**  (7)
**equivalent**  (1)
**ERIC**  (5)
**Esq**  (5)
**essentially**  (2)
**estate**  (2)
**estimates**  (1)
**event**  (5)
**events**  (1)
**eventually**  (2)
**Everybody**  (3)
**exactly**  (2)
**EXAMINATION**  (5)
**examined**  (1)
**example**  (1)
**exceed**  (1)
**Excel**  (1)
**exceptions**  (3)
**exchanged**  (1)

**exclude**  (2)
**exclusive**  (1)
**excuse**  (2)
**execute**  (3)
**executed**  (8)
**executing**  (1)
**execution**  (4)
**executives**  (5)
**exercised**  (1)
**Exhibit**  (53)
**EXHIBITS**  (1)
**exists**  (2)
**expectations**  (6)
**expected**  (2)
**expecting**  (1)
**experienced**  (1)
**expert**  (2)
**expire**  (1)
**explain**  (5)
**explained**  (1)
**express**  (1)
**expressed**  (6)
**extent**  (6)
**extra**  (1)
**ex-wife**  (3)
**EYES**  (87)
**eye-to-eye**  (1)

**< F >**
**face-to-face**  (4)
**fact**  (3)
**factors**  (1)
**failed**  (1)
**fair**  (6)
**familiar**  (3)
**family**  (2)
**fan**  (1)
**fashion**  (2)
**father**  (2)
**favor**  (2)
**favorable**  (2)
**Fax**  (3)
**feature**  (2)
**February**  (1)
**feed**  (1)
**feel**  (1)
**feeling**  (1)
**feels**  (1)
**fellow**  (1)

| | | | |
|---|---|---|---|
| felt  *(2)* | funneled  *(1)* | Hand  *(2)* | Incorporation  *(5)* |
| fiduciary  *(1)* | further  *(4)* | handed  *(2)* | increase  *(1)* |
| file  *(1)* | further,  *(1)* | Hang  *(1)* | independent  *(3)* |
| files  *(1)* | future  *(7)* | Hanover  *(1)* | INDEX  *(1)* |
| filing  *(1)* | fuzzy  *(1)* | happen  *(2)* | indicated  *(3)* |
| filings  *(1)* | | happened  *(4)* | indicates  *(1)* |
| filters  *(1)* | **< G >** | happens  *(1)* | indication  *(1)* |
| final  *(7)* | GAIL  *(6)* | hard  *(1)* | individual  *(3)* |
| finally  *(1)* | garage  *(1)* | header  *(1)* | inducement  *(2)* |
| Financial  *(4)* | gathering  *(2)* | headlines  *(1)* | inducing  *(1)* |
| financially  *(1)* | General  *(7)* | heart  *(1)* | inevitably  *(1)* |
| find  *(1)* | generally  *(7)* | heavily  *(1)* | information  *(7)* |
| fine  *(3)* | gentlemen  *(1)* | held  *(4)* | informational  *(5)* |
| finish  *(1)* | getting  *(2)* | help  *(4)* | informed  *(1)* |
| firm  *(1)* | Gibbs  *(22)* | helpful  *(2)* | in-house  *(1)* |
| firms  *(1)* | Give  *(9)* | hereinafter  *(1)* | initial  *(4)* |
| first  *(20)* | given  *(2)* | HERMAN  *(5)* | Initially  *(3)* |
| fitness  *(1)* | go  *(16)* | high  *(4)* | initials  *(1)* |
| five-minute  *(1)* | goals  *(1)* | Historically  *(2)* | initiate  *(1)* |
| flags  *(1)* | goes  *(7)* | hit  *(2)* | in-person  *(2)* |
| flattered  *(2)* | going  *(32)* | hitting  *(1)* | input  *(1)* |
| flip  *(1)* | Good  *(6)* | hold  *(3)* | inspired  *(2)* |
| focus  *(1)* | GOODMAN  *(8)* | holder  *(2)* | institution  *(1)* |
| focused  *(1)* | Goodman's  *(1)* | holders  *(5)* | INSTITUTIONAL  *(4)* |
| folder  *(5)* | go-shop  *(3)* | hopefully  *(1)* | instructions  *(1)* |
| folders  *(2)* | GoToMeeting  *(1)* | hour  *(4)* | integration  *(1)* |
| follow  *(2)* | gotten  *(1)* | huge  *(1)* | intended  *(2)* |
| followed  *(2)* | governing  *(1)* | hurt  *(2)* | intention  *(2)* |
| Following  *(2)* | GRAHAM  *(3)* | Hypothetical  *(4)* | intentions  *(2)* |
| forecast  *(3)* | grant  *(2)* | | interest  *(9)* |
| foregoing  *(3)* | granted  *(2)* | **< I >** | interested  *(5)* |
| foremost  *(1)* | granting  *(1)* | Ian  *(1)* | internet  *(1)* |
| foreseeable  *(1)* | grants  *(1)* | ID  *(1)* | interpretation  *(1)* |
| forget  *(3)* | great  *(2)* | idea  *(4)* | interrogated  *(1)* |
| form  *(32)* | greater  *(2)* | identified  *(2)* | interrupt  *(1)* |
| forth  *(3)* | greatly  *(1)* | imaged  *(1)* | interrupting  *(1)* |
| forward  *(5)* | Grosswendt  *(1)* | immediately  *(1)* | invest  *(1)* |
| founders  *(3)* | Group  *(3)* | impact  *(2)* | investment  *(4)* |
| four  *(4)* | guess  *(1)* | impair  *(1)* | investor  *(2)* |
| frequent  *(2)* | guidance  *(11)* | implied  *(2)* | investors  *(11)* |
| frequently  *(1)* | guide  *(18)* | importance  *(1)* | invests  *(1)* |
| friction  *(1)* | guiding  *(1)* | important  *(8)* | invited  *(2)* |
| Friday  *(1)* | guy  *(1)* | importantly  *(2)* | involved  *(2)* |
| FRIEDMAN  *(3)* | guys  *(1)* | impressive  *(1)* | involving  *(1)* |
| Friedman's  *(1)* | | inbound  *(1)* | iPhone  *(1)* |
| friends  *(1)* | **< H >** | incentives  *(1)* | IPO  *(14)* |
| frustrated  *(1)* | half  *(2)* | include  *(1)* | Irrevocable  *(40)* |
| full  *(6)* | halfway  *(1)* | included  *(1)* | irrevocably  *(2)* |
| functionally  *(1)* | Hamish  *(1)* | including  *(3)* | Irvine  *(2)* |

**ISS**  *(5)*
**ISS's**  *(1)*
**issue**  *(4)*
**issued**  *(1)*
**issues**  *(3)*
**it,**  *(1)*
**italicized**  *(1)*
**item**  *(2)*
**items**  *(1)*
**its**  *(8)*
**IVP**  *(9)*
**IVP's**  *(1)*

**< J >**
**J.P**  *(2)*
**Jameson**  *(88)*
**Jamie**  *(2)*
**January**  *(1)*
**Jeff**  *(2)*
**JEM**  *(6)*
**Joan**  *(1)*
**Joaquin**  *(1)*
**job**  *(2)*
**Johnston**  *(2)*
**JONES**  *(1)*
**JR**  *(2)*
**jump**  *(1)*
**June**  *(2)*
**junk**  *(1)*

**< K >**
**KATHERINE**  *(3)*
**keep**  *(4)*
**kept**  *(1)*
**Kimberly**  *(1)*
**kind**  *(5)*
**kinds**  *(1)*
**King**  *(1)*
**KIRKLAND**  *(2)*
**knew**  *(5)*
**know**  *(47)*
**knowledge**  *(1)*
**knows**  *(1)*

**< L >**
**L.A**  *(2)*
**L.P**  *(3)*
**language**  *(14)*
**Law**  *(3)*

**lawsuit**  *(4)*
**lawyer**  *(3)*
**lawyers**  *(1)*
**lay-up**  *(1)*
**lead**  *(2)*
**leadership**  *(2)*
**lean**  *(1)*
**led**  *(3)*
**left**  *(2)*
**legal**  *(5)*
**Leigh**  *(2)*
**letting**  *(2)*
**level**  *(1)*
**Lexington**  *(1)*
**LIAW**  *(5)*
**License**  *(1)*
**lieu**  *(2)*
**limit**  *(1)*
**limitation**  *(1)*
**limited**  *(1)*
**limiting**  *(1)*
**line**  *(3)*
**line-by-line**  *(1)*
**lines**  *(1)*
**liquidity**  *(1)*
**list**  *(2)*
**litigation**  *(2)*
**little**  *(1)*
**live**  *(1)*
**LLC**  *(7)*
**LLP**  *(2)*
**located**  *(1)*
**location**  *(1)*
**long**  *(4)*
**longer**  *(1)*
**long-term**  *(2)*
**look**  *(29)*
**looked**  *(7)*
**looking**  *(9)*
**losing**  *(2)*
**lot**  *(5)*
**lower**  *(2)*
**Luis**  *(2)*
**Luxor**  *(3)*
**Lytikainen**  *(1)*

**< M >**
**machine**  *(1)*
**macroeconomic**  *(2)*

**maintain**  *(4)*
**maintaining**  *(2)*
**majority**  *(4)*
**making**  *(1)*
**MANAGEMENT**  *(3)*
**Manning**  *(1)*
**March**  *(2)*
**Marese**  *(1)*
**Marese's**  *(1)*
**mark**  *(11)*
**marked**  *(21)*
**marketplace**  *(1)*
**markets**  *(1)*
**Marriott**  *(1)*
**material**  *(1)*
**Mathes**  *(2)*
**matter**  *(8)*
**mattered**  *(1)*
**matters**  *(1)*
**Matthew**  *(1)*
**Matthew.Solum@Kirkl**
**and.com**  *(1)*
**mean**  *(8)*
**meaning**  *(1)*
**meant**  *(1)*
**mechanics**  *(1)*
**meet**  *(5)*
**Meeting**  *(23)*
**meetings**  *(9)*
**member**  *(2)*
**members**  *(1)*
**memory**  *(4)*
**mentioned**  *(4)*
**MERGER**  *(6)*
**messages**  *(5)*
**met**  *(4)*
**Microsoft**  *(1)*
**middle**  *(5)*
**military**  *(1)*
**MILLER**  *(3)*
**mind**  *(3)*
**MINDBODY**  *(46)*
**mine**  *(1)*
**minute**  *(3)*
**Minutes**  *(10)*
**misled**  *(1)*
**missed**  *(1)*
**missing**  *(2)*
**Misstates**  *(1)*

**misuse**  *(1)*
**Mmmm-hmmm**  *(4)*
**mode**  *(1)*
**model**  *(1)*
**moment**  *(4)*
**Monica**  *(1)*
**month**  *(1)*
**Monti**  *(11)*
**Morgan**  *(2)*
**morning**  *(2)*
**move**  *(2)*
**movement**  *(1)*
**moving**  *(1)*
**multiple**  *(6)*
**Murphy**  *(1)*

**< N >**
**name**  *(2)*
**named**  *(1)*
**names**  *(1)*
**native**  *(1)*
**natural**  *(1)*
**nature**  *(1)*
**Navy**  *(2)*
**nearly**  *(2)*
**need**  *(6)*
**needed**  *(3)*
**needs**  *(1)*
**negotiating**  *(1)*
**negotiations**  *(2)*
**neither**  *(1)*
**Network**  *(2)*
**networking**  *(1)*
**never**  *(1)*
**New**  *(3)*
**next-to-last**  *(1)*
**Nicole**  *(1)*
**nonstarter**  *(1)*
**Nope**  *(1)*
**normal**  *(1)*
**note**  *(4)*
**notes**  *(8)*
**notification**  *(2)*
**number**  *(3)*
**numbered**  *(1)*
**numerous**  *(1)*

**< O >**
**o0o**  *(9)*

oaths  (1)
Obispo  (2)
objection  (38)
objections  (1)
objective  (1)
objectives  (1)
obtained  (1)
Obviously  (2)
occasionally  (2)
occur  (1)
occurred  (5)
occurring  (1)
October  (8)
offer  (8)
offered  (1)
Offering  (2)
offers  (1)
office  (4)
officer  (2)
officers  (2)
offices  (1)
official  (3)
Oh  (4)
Okay  (38)
ominous  (1)
once  (3)
ones  (1)
one-to-one  (1)
online  (1)
operation  (1)
opinion  (2)
opportunity  (2)
opposed  (4)
optimistic  (1)
options  (1)
orbiting  (1)
order  (2)
organizational  (2)
organize  (3)
organized  (2)
organizing  (1)
original  (1)
originally  (1)
originated  (1)
outcome  (1)
outlines  (2)
Outlook  (1)
outside  (2)
owned  (1)

< P >
P.A  (1)
Page  (30)
pages  (7)
painful  (1)
Palo  (1)
paper  (10)
paragraph  (7)
paraphrase  (1)
PARENT  (5)
Parent's  (2)
part  (7)
participate  (2)
participated  (2)
particular  (8)
particularly  (1)
parties  (3)
partner  (1)
PARTNERS  (6)
partnership  (3)
party  (5)
party,  (1)
path  (1)
Patrick  (1)
pause  (1)
pay  (1)
people  (3)
perceive  (1)
percent  (5)
perform  (2)
performance  (1)
period  (14)
permitted  (2)
person  (1)
personal  (1)
personally  (5)
persons  (1)
pertain  (1)
pertained  (1)
pertains  (2)
PGibbs@Cooley.com
  (1)
PHILIP  (2)
philosophy  (1)
phone  (9)
phrase  (1)
physical  (1)
physically  (1)

picked  (2)
place  (3)
placed  (1)
places  (1)
plaintiff  (1)
Plaintiffs  (6)
plan  (10)
planning  (2)
plans  (1)
play  (2)
please  (3)
pleased  (1)
pledge  (2)
pledged  (1)
point  (16)
points  (3)
pools  (1)
portfolio  (1)
position  (1)
possibility  (1)
possible  (1)
possibly  (1)
post-IPO  (6)
potential  (5)
Power  (15)
practical  (1)
practice  (3)
precise  (1)
precisely  (2)
pre-IPO  (3)
preparation  (1)
prepare  (2)
prepared  (2)
preparing  (2)
pre-SAS  (1)
Present  (1)
preserve  (1)
press  (1)
pretty  (3)
previous  (1)
previously  (2)
price  (1)
PRICKETT  (1)
principal  (1)
principally  (1)
principle  (6)
printed  (1)
prior  (18)
priority  (4)

private  (3)
privilege  (1)
probably  (6)
problem  (1)
proceeding  (1)
proceedings  (3)
process  (8)
produce  (1)
produced  (1)
product  (2)
production  (1)
proffering  (1)
projected  (1)
projections  (1)
prompting  (1)
proposal  (2)
proposed  (6)
protective  (1)
provide  (5)
provided  (6)
provides  (1)
providing  (3)
provision  (9)
provisions  (3)
proviso  (1)
proxies  (12)
Proxy  (49)
public  (25)
publicly  (2)
pull  (1)
punished  (1)
purchased  (1)
pure  (1)
purpose  (6)
purposes  (4)
pursuant  (3)
pursuing  (1)
put  (4)

< Q >
Q3  (3)
Q4  (4)
quarter  (4)
question  (15)
questions  (6)
quickly  (4)
quiet  (1)
quite  (3)

Deposition of Richard L. Stollmeyer          PHILIP RYAN, JR. & DONALD FRIEDMAN v. MINDBODY, INC., et. al.

**< R >**
**raised** (*1*)
**range** (*2*)
**rare** (*3*)
**rarely** (*1*)
**reach** (*1*)
**reached** (*3*)
**reaching** (*1*)
**read** (*10*)
**reading** (*4*)
**ready** (*2*)
**real** (*1*)
**realize** (*1*)
**really** (*2*)
**reason** (*2*)
**reasonably** (*2*)
**reasons** (*1*)
**recall** (*38*)
**receive** (*6*)
**received** (*6*)
**receiving** (*1*)
**recession** (*1*)
**recognize** (*1*)
**recognizing** (*2*)
**recollection** (*9*)
**record** (*18*)
**recorded** (*1*)
**records** (*4*)
**recovered** (*1*)
**refer** (*8*)
**reference** (*4*)
**references** (*1*)
**Referring** (*3*)
**refers** (*2*)
**reflect** (*1*)
**reflected** (*2*)
**reflects** (*1*)
**refresh** (*2*)
**regarding** (*8*)
**region** (*1*)
**regular** (*4*)
**regularly** (*1*)
**reintroducing** (*1*)
**reintroduction** (*1*)
**relate** (*3*)
**related** (*2*)
**relates** (*3*)
**relating** (*2*)
**relations** (*1*)

**relationship** (*5*)
**relationships** (*1*)
**relative** (*1*)
**release** (*1*)
**remains** (*1*)
**remember** (*11*)
**REMEMBERED** (*1*)
**reminding** (*1*)
**rented** (*1*)
**reopened** (*2*)
**report** (*1*)
**Reported** (*1*)
**Reporter** (*3*)
**REPORTER'S** (*1*)
**represent** (*1*)
**represented** (*3*)
**request** (*9*)
**requested** (*1*)
**require** (*1*)
**required** (*6*)
**requirement** (*1*)
**requiring** (*1*)
**resolution** (*5*)
**resolve** (*2*)
**resolved** (*1*)
**respect** (*9*)
**respectful** (*1*)
**respond** (*1*)
**response** (*3*)
**responsibility** (*1*)
**responsive** (*1*)
**restate** (*1*)
**Restated** (*2*)
**Restatement** (*1*)
**restricted** (*4*)
**result** (*4*)
**resulted** (*1*)
**results** (*4*)
**retain** (*2*)
**retained** (*1*)
**revenue** (*4*)
**review** (*12*)
**reviewed** (*5*)
**reviewing** (*1*)
**RICHARD** (*6*)
**Rick** (*2*)
**right** (*53*)
**right-hand** (*1*)
**rights** (*11*)

**RMR** (*1*)
**Road** (*2*)
**role** (*2*)
**romanette** (*6*)
**room** (*1*)
**rosy** (*3*)
**round** (*1*)
**route** (*1*)
**routed** (*1*)
**RSA** (*1*)
**rules** (*2*)
**rumbling** (*1*)
**running** (*2*)
**RYAN** (*4*)

**< S >**
**Sadly** (*1*)
**safe** (*1*)
**sale** (*2*)
**San** (*2*)
**Santa** (*1*)
**Saroya** (*7*)
**S-A-R-O-Y-A** (*1*)
**sausage** (*1*)
**saw** (*1*)
**saying** (*1*)
**says** (*12*)
**scan** (*2*)
**scenario** (*1*)
**screen** (*1*)
**seats** (*1*)
**SEC** (*2*)
**second** (*9*)
**Secretary** (*1*)
**section** (*5*)
**sections** (*2*)
**see** (*34*)
**seeing** (*3*)
**seen** (*1*)
**sell** (*2*)
**selling** (*2*)
**send** (*2*)
**sender** (*2*)
**senior** (*1*)
**sense** (*1*)
**sensitivity** (*3*)
**sent** (*3*)
**sentence** (*12*)
**separate** (*2*)

**September** (*1*)
**series** (*4*)
**serious** (*2*)
**served** (*1*)
**services** (*1*)
**set** (*12*)
**setting** (*1*)
**settled** (*1*)
**seven** (*4*)
**severely** (*1*)
**share** (*2*)
**shared** (*2*)
**shareholders** (*8*)
**SharePoint** (*1*)
**shares** (*37*)
**Shirt** (*1*)
**short** (*1*)
**Shorthand** (*3*)
**shown** (*1*)
**shred** (*1*)
**sign** (*2*)
**signature** (*9*)
**signatures** (*3*)
**Signed** (*7*)
**significant** (*8*)
**signing** (*2*)
**similar** (*2*)
**similarly** (*2*)
**Simon** (*1*)
**simple** (*1*)
**simply** (*3*)
**single** (*1*)
**sit** (*4*)
**sitting** (*1*)
**situated** (*2*)
**skipping** (*1*)
**slide** (*2*)
**small** (*1*)
**SMITH** (*3*)
**software** (*2*)
**sold** (*3*)
**sole** (*2*)
**Solum** (*50*)
**somebody** (*2*)
**someplace** (*1*)
**sorry** (*16*)
**sort** (*10*)
**sorting** (*1*)
**sounds** (*1*)

| | | | |
|---|---|---|---|
| space  *(1)* | suit  *(3)* | thinking  *(1)* | |
| Spain  *(1)* | Suite  *(1)* | third  *(7)* | **< U >** |
| spam  *(2)* | summary  *(4)* | thought  *(3)* | ultimately  *(11)* |
| speak  *(1)* | sunset  *(1)* | Thread  *(3)* | unanimity  *(1)* |
| specific  *(7)* | super  *(9)* | three  *(2)* | Unanimous  *(1)* |
| specifically  *(2)* | superior  *(2)* | Thursday  *(2)* | unanimously  *(1)* |
| specifics  *(1)* | support  *(10)* | tied  *(1)* | unconditionally  *(2)* |
| speculation  *(4)* | supported  *(1)* | time  *(42)* | undersigned  *(1)* |
| spend  *(1)* | Sure  *(19)* | timeframe  *(2)* | understand  *(15)* |
| spoke  *(2)* | sworn  *(2)* | timeline  *(1)* | understanding  *(12)* |
| spoken  *(1)* | Sydney  *(1)* | timely  *(1)* | understandings  *(1)* |
| Sprinter  *(1)* | system  *(12)* | times  *(2)* | understood  *(8)* |
| start  *(2)* | | titled  *(1)* | undervalued  *(1)* |
| started  *(3)* | **< T >** | today  *(11)* | undoubtedly  *(1)* |
| starting  *(2)* | table  *(1)* | today's  *(1)* | unexecuted  *(1)* |
| starts  *(1)* | tag  *(1)* | told  *(3)* | unique  *(1)* |
| STATE  *(5)* | take  *(23)* | tool  *(2)* | units  *(1)* |
| stated  *(3)* | taken  *(3)* | top  *(2)* | upfront  *(1)* |
| status  *(1)* | talk  *(12)* | topic  *(1)* | urgent  *(2)* |
| stay  *(1)* | talked  *(2)* | topics  *(2)* | use  *(10)* |
| stock  *(21)* | talking  *(5)* | TORREYS  *(6)* | usual  *(2)* |
| stockholder  *(12)* | taxes  *(1)* | total  *(5)* | usually  *(1)* |
| stockholders  *(9)* | TDM  *(3)* | track  *(1)* | |
| stocks  *(2)* | team  *(3)* | tracked  *(2)* | **< V >** |
| STOLLMEYER  *(24)* | teamed  *(1)* | tracking  *(2)* | Valine  *(4)* |
| strategy  *(1)* | Tech  *(1)* | trade  *(1)* | valuable  *(1)* |
| streams  *(1)* | technicality  *(1)* | trading  *(1)* | van  *(1)* |
| Street  *(4)* | telephone  *(11)* | transaction  *(15)* | various  *(1)* |
| stretch  *(1)* | Telephonic  *(3)* | transcribed  *(1)* | vast  *(1)* |
| Strike  *(2)* | tell  *(10)* | transcript  *(2)* | VCs  *(1)* |
| string  *(3)* | telling  *(2)* | transcripts  *(1)* | VENTURE  *(4)* |
| structure  *(4)* | term  *(2)* | transfer  *(10)* | version  *(4)* |
| struggling  *(1)* | terminal  *(1)* | transferee  *(1)* | versus  *(2)* |
| study  *(1)* | terminate  *(1)* | transferees  *(1)* | Victoria  *(4)* |
| stuff  *(1)* | terms  *(11)* | transfers  *(3)* | video  *(3)* |
| SUB  *(4)* | testified  *(3)* | transitioned  *(1)* | view  *(4)* |
| subparagraph  *(3)* | testify  *(3)* | traveling  *(1)* | visit  *(1)* |
| subpart  *(7)* | testifying  *(1)* | treated  *(1)* | VISTA  *(66)* |
| subscribed  *(1)* | testimony  *(1)* | trial  *(3)* | Vista's  *(5)* |
| subsection  *(1)* | text  *(10)* | tried  *(1)* | visual  *(1)* |
| subsequent  *(2)* | texting  *(1)* | true  *(3)* | voice  *(2)* |
| substance  *(2)* | texts  *(1)* | trust  *(2)* | vote  *(16)* |
| substantial  *(1)* | Thank  *(4)* | try  *(6)* | votes  *(1)* |
| substantive  *(1)* | Thanks  *(1)* | trying  *(3)* | Voting  *(53)* |
| sue  *(2)* | thereof  *(1)* | Tuesday  *(2)* | vs  *(2)* |
| sued  *(1)* | thesis  *(1)* | turn  *(3)* | vying  *(1)* |
| suggested  *(2)* | thing  *(4)* | two  *(1)* | |
| suggestion  *(1)* | things  *(7)* | type  *(2)* | **< W >** |
| suing  *(1)* | think  *(27)* | typically  *(7)* | wait  *(1)* |

**waiving**  (*1*)
**want**  (*23*)
**wanted**  (*8*)
**way**  (*7*)
**WEDNESDAY**  (*4*)
**week**  (*6*)
**weeks**  (*3*)
**weird**  (*1*)
**welcome**  (*1*)
**Well**  (*35*)
**went**  (*8*)
**we're**  (*13*)
**wet**  (*2*)
**we've**  (*8*)
**WHEREOF**  (*1*)
**White**  (*1*)
**whiteboard**  (*1*)
**wife**  (*1*)
**wildly**  (*1*)
**William**  (*1*)
**willing**  (*3*)
**willingness**  (*3*)
**Wilmington**  (*1*)
**witness**  (*51*)
**witnesses**  (*1*)
**woman**  (*1*)
**wonderful**  (*1*)
**Word**  (*5*)
**words**  (*5*)
**work**  (*2*)
**working**  (*1*)
**works**  (*4*)
**world**  (*1*)
**wrap**  (*1*)
**write**  (*1*)
**Written**  (*8*)
**wrong**  (*1*)

**< X >**
**XIII**  (*3*)

**< Y >**
**yeah**  (*28*)
**year**  (*10*)
**years**  (*6*)
**Yep**  (*3*)
**yesterday**  (*1*)
**York**  (*2*)
**young**  (*1*)

**< Z >**
**Zoom**  (*5*)