# EXHIBIT 22

**Page 1**

IN THE COURT OF CHANCERY
OF THE STATE OF DELAWARE

_____

IN RE MINDBODY, INC. STOCKHOLDER
LITIGATION

C.A. No. 2019-0442-KSJM

_____

December 18, 2020
9:40 a.m.

*** HIGHLY CONFIDENTIAL ***

VIDEOCONFERENCE DEPOSITION of
GAIL GOODMAN, pursuant to Notice, held at
█████████████████████████ ████
███████ before Wayne Hock, a Notary
Public of the State of New York.

Page 2

APPEARANCES:

FRIEDLANDER & GORRIS, P A
Attorneys for Plaintiffs
1201 North Market Street
Wilmington, Delaware 19801
BY:   CHRISTOPHER FOULDS, ESQ
cfoulds@friedlandergorris com
(via videoconference)
-and-
BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
500 Delaware Avenue
Wilmington, Delaware 19801
BY:   CHRISTOPHER ORRICO, ESQ
christopher orrico@blbglaw com
(via videoconference)
ANDREW BLUMBERG, ESQ
andrew blumberg@blbglaw com
(via videoconference)

LABATON SUCHAROW LLP
Attorneys for Class Plaintiffs
140 Broadway
New York, New York 10005

BY:   JAKE BISSELL-LINSK, ESQ
jbissell-linsk@labaton com
(via videoconference)
CAROL VILLEGAS, ESQ
cvillegas@labaton com
(via videoconference)

Page 4

A P P E A R A N C E S: (Continued)

ALSO PRESENT:

GAYLE ASHTON, Videographer
(via videoconference)
DOUGLAS JOHNSTON
(via videoconference)

*    *    *

Page 3

A P P E A R A N C E S: (Continued)

KIRKLAND & ELLIS LLP
Attorneys for MINDBODY
RICK STOLLMEYER
BRETT WHITE
601 Lexington Avenue
New York, New York 10022
BY:   JOHN P  DEL MONACO, ESQ
john delmonaco@kirkland com
(via videoconference)
COURTNEY CARVILL,  ESQ
courtney carvill@kirkland com
(via videoconference)
MATTHEW SOLUM, ESQ
matthew solum@kirkland com
(via videoconference)

COOLEY LLP
Attorneys for Witness
55 Hudson Yards
New York, New York 10001
BY:   SARAH LIGHTDALE, ESQ
slightdale@cooley com
(via videoconference)
ELIZABETH WRIGHT, ESQ
ewright@cooley com
(via videoconference)
CODY MARDEN, ESQ
cmarden@cooley com
(via videoconference)

Page 5

THE VIDEOGRAPHER: Good morning.
We are now on the record.

This is the videographer
speaking, Gail Ashton, with Veritext.

Today's date is December 18,
2020 and the time is 9:40 a.m.

We are here to take the remote
video deposition of Gail Goodman in
the matter of In Re Mindbody, Inc.
Stockholder litigation.

Will counsel please introduce
themselves for the record.

MR. FOULDS: This is Christopher
Foulds from Friedlander and Gorris
here in Delaware on behalf of the lead
plaintiffs in the consolidated
Delaware action.

MS. LIGHTDALE: Good morning,
Sarah Lightdale of Cooley LLP in New
York for the witness, Gail Goodman.

MR. DEL MONACO: Good morning,
it's John Del Monaco from Kirkland and
Ellis.  I represent Mindbody, Rick
Stollmeyer, and Brett White.  Also

2 (Pages 2 - 5)

with me today is my partner, Matt Solum, and our colleague, Courtney Carvill.

MR. BISSELL-LINSK: And good morning, this is Jake Bissell-Linsk from Labaton for the plaintiffs in the federal action. With me is Carol Villegas.

THE VIDEOGRAPHER: Would the court reporter Wayne Hock please swear in the witness.

G A I L G O O D M A N, having been first duly sworn by a Notary Public of the State of New York, upon being examined, testified as follows:

EXAMINATION BY

MR. FOULDS:

Q. Ms. Goodman, again I'm Chris Foulds on behalf of the lead plaintiffs in the Delaware action. We met briefly before the recording started.

You've been deposed before; correct?

A. Yes.

Q. How many times?

A. This will be my third.

Q. So just to go over the instructions very briefly, the way this works is I'm going to ask the questions and you're going to answer them; okay?

A. Understood.

Q. As the reporter said before this, we can't talk over each other, so I'm going to do my best not to cut you off and I would ask that you could wait until my question is finished or at least when you think it's finished; okay?

A. It sounds good.

Q. Great.

It's also very important that you give verbal answers, because the court reporter cannot transcribe head nodding or shaking.

Understood?

A. I do understand.

Q. Some of the other attorneys here may be making objections from time to

time, but you should always answer the question unless you're specifically instructed by your counsel not to answer.

Do you understand that?

A. Yes.

Q. Okay.

And if anything I say you don't understand, please do let me know and I will do my best to rephrase.

Is that fair?

A. Yes.

Q. Okay.

And if you need a break at any time, also please do let us know. We'll just finish the question and answer that's pending and then we can take a break.

Okay?

A. Yes.

Q. Okay. Great.

So why don't we start off with where you went to college.

A. My undergraduate was at the University of Pennsylvania in Philadelphia and my MBA was at the Tuck School of

Business at Dartmouth.

Q. And then skipping ahead a little bit, you became the CEO of Constant Contact; is that right?

A. Correct.

Q. Okay.

And how long were you the CEO at Constant Contact?

A. Two months shy of seventeen years.

Q. And I heard somewhere that Constant Contact was endorsed by Rush Limbaugh; is that right?

A. Yes, that is true. That is sort of as a paid -- pay to play endorsement technique, so I can't say that Rush endorsed us spontaneously.

Q. Fair enough.

And if I use the term "SAAS," I guess it's an acronym, do you understand what that means?

A. I do.

Q. And what does that mean?

A. It's software as a service.

Page 10

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Please continue.

A. It's a technique of delivering software over the Internet in contrast with what we used to call on premise where someone installed software on their laptop or servers.

Q. Okay.

And if I refer to SAAS as SAAS, you'll follow what I'm saying?

A. That is the correct way to do it.

Q. Okay.

And at Constant Contact, did you or the company ever experience what some have called the low -- excuse me, the long slow SAAS ramp of death?

A. This is one of my presentations to a software conference called The Business of Software. It really -- and yes, definitely experiences it and can talk more to it if you'd like.

Q. And you also wrote a book, I believe; is that right?

A. Yes.

Page 11

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And it was called Engagement Marketing; is that right?

A. Correct.

Q. Just out of curiosity, how did you manage to write a book while you were the CEO of Constant Contact?

A. With a lot of help.

Q. Okay.

And at some point Constant Contact was sold; correct?

A. Correct.

Q. Do you recall the year?

A. It closed in February of 2016.

Q. Okay.

And to whom or to what was Constant Contact sold?

A. We were sold to another public company, Endurance International Group.

Q. So it was a strategic sale as opposed to a financial buyer; is that right?

A. Correct.

Q. And during that negotiation process, did you ever discuss your future

Page 12

G. Goodman -- HIGHLY CONFIDENTIAL

employment with any potential bidders?

A. Not until after the deal was inked.

Q. When you say, "the deal was inked," do you mean after the board approved the sale?

A. Correct. And the sale was publicly announced.

Q. Did you actually continue in future employment with the resulting company?

A. No, I did not.

Q. Was there a go shop in that transaction?

A. There was.

Q. How long was the go shop?

A. I did not specifically recall the length of that go shop.

Q. In that process, was there a data room?

A. There was.

Q. And who controlled who got access to the data room?

MR. DEL MONACO: I object to the

Page 13

G. Goodman -- HIGHLY CONFIDENTIAL

form.

THE WITNESS: The data room was managed by our general counsel and legal team. The decisions about what to place in each suitor's data room was a joint decision of the deal team, which included our outside advisors who were Morgan Stanley and the management team of the company.

Q. Was there a special committee that was formed for purposes of the Constant Contact sale transaction?

MS. LIGHTDALE: I object to the form.

THE WITNESS: You'll find this surprising, but I don't remember.

Q. How long was the sale process for the Constant Contact sale?

A. So we had two different periods of strategic exploration. We had been approached actually by Endurance and an additional suitor and initiated a process and then both of those suitors backed away for reasons having to do with their own

4 (Pages 10 - 13)

Page 14

G. Goodman -- HIGHLY CONFIDENTIAL

situations, not us. And then there was a six-month pause and then one of them showed back up and then we reinitiated with the other and started a process where we approached maybe a dozen other people.

So the final process was that I'll call it the second approach. I believe the second approach started in August and ended with a deal announcement on December 1.

Q. Thank you.

So after the Constant Contact sale to endurance in 2016, what did you do for employment after that?

A. So initially I took a bit of a break to refresh, and then I have been doing what I would call a portfolio of different things: Public company boards, private company boards, nonprofit work, and then about almost two years ago joined another start-up called Pepperlane.

Q. And at what point did you join the board of Mindbody?

A. May of 2016.

Page 15

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And how did you come to be on the board of Mindbody?

A. Rick and I had known each other from a partnership between Mindbody and Constant Contact. Rick had expressed interest in me joining the board for some years before the sale of Constant Contact, but I did not feel I could dedicate the time to outside boards when I was at Constant Contact. And so when the sale happened, Rick re-approached me and then I went through an interview process and was asked to join.

Q. And just going back to the Constant Contact sale, do you remember what the code name was?

A. Wow. I do not remember the code name.

Q. Okay.

So how many times prior to -- and when you say --

MR. FOULDS: Let me back up. Withdrawn.

Q. When you say, "Rick," you mean

Page 16

G. Goodman -- HIGHLY CONFIDENTIAL

Rick Stollmeyer?

A. I do.

Q. And how many times had you met with Mr. Stollmeyer prior to his invitation for you to join the board?

A. Prior to the one -- so there were multiple invitations for me to join the board, so let me be super, super clear about that.

It was a small number of times, less than five, more than two. I can't be certain if it's three or four. And we had met in the context of the partnership. I think it was our second meeting was a lunch where -- this is before he had gone public. That was the first time he suggested he would like me to consider joining the board. And then we had stayed in touch. Again, I can't tell you exactly how many conversations we had, but it wasn't more than five.

Q. How many times had you actually met in person with Rick Stollmeyer prior to your actually joining the board of

Page 17

G. Goodman -- HIGHLY CONFIDENTIAL

Mindbody?

A. So not counting the interview process or counting the interview process?

Q. Counting the interview process.

A. So I met him once before the interview process and I believe during the interview process, I went out for two days and so if you call that one meeting, I would say two meetings in person.

Q. And since then, how many times have you met in person with Mr. Stollmeyer unconnected to attending any Mindbody board meetings?

MR. DEL MONACO: I'm just going to object to the form.

THE WITNESS: So during the time that I was on the board, if Rick was in Boston for business, we would meet for a coffee or a cocktail. Again, I'm having trouble getting the exact number, but it was two or three times outside of the context of a board meeting or Mindbody Bold, which I guess is also board-related

5 (Pages 14 - 17)

Page 18

G. Goodman -- HIGHLY CONFIDENTIAL
activities. But Mindbody had an annual conference, board members were invited to attend and the vast majority of us did, so I'll call that board context. So just a few times when he was traveling to Boston on business.

Q. Just for the court reporter's benefit, you said, "Bold," B O L D?

A. Yes.

Q. Have you ever met his family?

A. I have met his wife.

Q. And in what context did you meet his wife?

A. Just before the first board meeting, I brought my husband out with me to San Luis Obispo to do a weekend of exploring the area before I did -- there was a two-day onboarding where I was learning the business and then the board meeting. One of those days Rick and his wife took us wine tasting.

Q. So you've never met any other member of his family; correct?

Page 19

G. Goodman -- HIGHLY CONFIDENTIAL
A. Not that I recall.

Q. Have you ever been to his house?

A. I have not.

Q. Has he ever been to your house, any of your houses?

A. I only own one.
No.

Q. Okay.
Jumping ahead to 2018, which board committees were you serving on?

A. Nominating and governance, and compensation.

Q. And nominating and governance is one committee?

A. Correct.

Q. And did you serve as the chair of either of those committees?

A. I was the chair of nominating and governance.

Q. And what was the role, generally speaking, of the nominating and governance committee?

A. We had two primary roles. Nominating, which is looking at the

Page 20

G. Goodman -- HIGHLY CONFIDENTIAL
composition of the board, deciding whether to expand the board and, if so, actually recruiting new board members, interviewing them, and running them through some selection or screening process.
And the second was looking at the governance of the company and making sure that we were doing everything to ensure that we were protecting the interests of shareholders and other constituents. The bulk of that was reviewing committee charters and making sure we were following all of the appropriate board review procedures.

Q. Okay.
And did your role on the nominating and corporate governance committee or otherwise also involve succession planning for executives?

A. That was, yeah, more directly involved in the compensation committee owned succession planning, and I was involved with that.

Q. And in 2018, do you recall how

Page 21

G. Goodman -- HIGHLY CONFIDENTIAL
many board members there were at Mindbody?

A. I'm counting on my fingers for a moment.
I believe seven. Maybe eight. Hang on. Seven.

Q. And at any point in time during 2018 was there any discussion at the board level of expanding the board?

A. We were always on the lookout for additional board members, but it was not a priority item in 2018.

Q. Okay.
And in 2018, was there ever any discussion of any board members being replaced?

A. Not to my recollection.

Q. Would you consider yourself to be friends with Mr. Stollmeyer?

A. Yes.

Q. In terms of the relationship between Mr. Stollmeyer and other members of the board, was it your view that he was particularly close to any other board members?

6 (Pages 18 - 21)

Page 22

G. Goodman -- HIGHLY CONFIDENTIAL

A. Rick is very much a relationship builder and I believe he would characterize his relationship with all the board members as close, and I don't think there was a particular board member that he was closer to.

Q. Were you ever aware in 2018 or the first half of 2019 that Mr. Stollmeyer was family friends with any other board members?

MR. DEL MONACO: I object to the form.

MS. LIGHTDALE: Objection to form.

THE WITNESS: I was not aware.

Q. One of the board members was named -- I hope I'm pronouncing this correctly -- Eric Liaw; is that right?

A. Yes.

Q. And do you know for whom Mr. Liaw worked full time?

A. Yes, a venture capital firm called IVP. I think it's Institutional Venture Partners.

Page 23

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And do you know what IVP is?

A. It is an investment firm that invests in both private and public companies.

Q. And are you aware of the vehicle through which IVP invested in Mindbody?

A. Not off the top of my head.

Q. Were you aware at any point in 2018 or the first half 2019 that IVP had a target date for exiting its investment in Mindbody?

MR. DEL MONACO: Objection to the form.

MS. LIGHTDALE: Objection to form.

MR. DEL MONACO: Foundation.

THE WITNESS: I was not aware of that.

Q. Okay.

In 2018, prior to August of 2018, were you aware of any discussions that Mr. Stollmeyer was having respecting the potential sale of the company?

MR. DEL MONACO: I object to the

Page 24

G. Goodman -- HIGHLY CONFIDENTIAL

form.

THE WITNESS: It was the normal course for us to be thinking about strategic direction and alternatives, so -- but I don't recall any specific conversation about potential sale of the company prior to that August.

Q. So prior to August of 2018, it's fair to say that you were not aware that Vista Equity Partners had previously discussed with Mr. Stollmeyer the possibility of engaging in an acquisition?

MR. DEL MONACO: I object to the form.

THE WITNESS: I actually don't believe that it is true that that happened. I am -- you know, it is normal course, as a public company's CEO, to meet with both bankers and private equity companies. As a public company CEO, they called on me and on occasion I met with a variety, not specifically Vista, to understand their views of the market, their views

Page 25

G. Goodman -- HIGHLY CONFIDENTIAL

of our business, and to relationship build. So it would not surprise me if Rick had such a relationship building meeting, but I'm not specifically aware of those.

Q. So prior to August of 2018, are you aware of any discussion Mr. Stollmeyer had with Vista Equity Partners?

MR. DEL MONACO: Objection to the form.

THE WITNESS: No.

Q. Do you know what Vista Equity Partners is?

A. I do.

Q. And what is it?

A. They are a private equity firm.

Q. Have you ever had any interactions with Vista Equity Partners?

A. Prior to the Mindbody acquisition, I had not.

Q. While you were a member of the compensation committee, did Mr. Stollmeyer ever express to you any frustration with his ability to sell Mindbody stock?

7 (Pages 22 - 25)

Page 26

G. Goodman -- HIGHLY CONFIDENTIAL

A.    Not that I recall.

Q.    Do you know what a 10b5-1 plan is?

A.    Yes, I'm very familiar.

Q.    What is it?

A.    So it is an advanced plan to sell stock where you set in advance both the shares and the target prices that you anticipate -- that you will sell stock at regardless of what's happening in the market. It is a way to separate a public company's CEO from any timing of stock sale relative to near term or inside needs.

Q.    In 2018, did Mr. Stollmeyer have a 10b5-1 plan in place?

A.    I believe so. I remember he put -- actually, let me be clear.

I remember he put one in place for '19, but I don't recall whether he had one in '18. But I presume so. It was standard practice.

Q.    But you have no actual knowledge if Mr. Stollmeyer had a 10b5-1 plan in

Page 27

G. Goodman -- HIGHLY CONFIDENTIAL

place in 2018; correct?

A.    Correct. I have no memory. I may have known it at some time.

Q.    Fair enough.

So in 2018, did you ever approve Mr. Stollmeyer's 10b5-1 plan?

A.    It was not board practice to approve the 10b5-1 plan.

Q.    So the answer is you did not approve; correct?

A.    Correct.

MR. DEL MONACO: I object to the form.

Q.    Did Mr. Stollmeyer ever express to you any concern that he might have if his capital was locked inside of Mindbody?

A.    Not that I recall.

Q.    Do you recall at any point in 2018 or 2019 that Mr. Stollmeyer expressed a concern that he was not able to sell as much Mindbody stock as he would have liked pursuant to his 10b5-1 plan?

A.    I do not recall a conversation of that nature.

Page 28

G. Goodman -- HIGHLY CONFIDENTIAL

Q.    Do you recall any conversations with Mr. Stollmeyer in 2018 respecting his ability to sell Mindbody stock?

A.    I do not recall any conversation of that nature.

Q.    So he never told you, it's fair to say, that selling stock through his 10b5-1 plan was like sucking through a straw?

MR. DEL MONACO: Objection to the form.

THE WITNESS: No, he did not.

I do recall a conversation well before '18 with some frustration that investors were giving him a hard time about selling. One of the things we shared in common was having been a public company CEO. I believe my advice to him was just have a thick skin.

Q.    Okay.

So the same question as before or similar question as before.

Prior to 2018, had Mr.

Page 29

G. Goodman -- HIGHLY CONFIDENTIAL

Stollmeyer ever expressed any concern that he was not able to sell as much Mindbody stock as he would have liked?

A.    Not that I recall.

Q.    And in 2018, what was your awareness of Mr. Stollmeyer's financial situation?

MR. DEL MONACO: I object to the form.

THE WITNESS: I was not aware of any of his personal financial situation.

Q.    So it's fair to say, correct, that Mr. Stollmeyer never expressed to you that he was dipping into a line of credit in 2018?

MR. DEL MONACO: I object to the form.

THE WITNESS: I was not aware of that. He never expressed that to me.

Q.    Did you know that Mr. Stollmeyer had a line of credit in 2018?

A.    I was not aware.

Q.    Were you aware of the fact that

8 (Pages 26 - 29)

Page 30

G. Goodman -- HIGHLY CONFIDENTIAL Mr. Stollmeyer had a mortgage?

A. I was not aware of his personal financial situation.

Q. I'm sorry, the answer's no?

A. No.

Q. Let me try that one again, because I think I may have engaged in a double negative.

In 2018, you were not aware that Mr. Stollmeyer had a mortgage; correct?

A. Correct.

Q. In 2018, you were not aware that Mr. Stollmeyer was engaged in a home renovation project; correct?

A. I believe we discussed over dinner one night that there was some renovations going on, but I don't recall the specifics.

Q. So in 2018 or the first part --

MR. FOULDS: Withdrawn.

Q. So in 2018 or the first half of 2019, you were not aware of the cost of any home renovation project that Mr. Stollmeyer was engaged in?

Page 31

G. Goodman -- HIGHLY CONFIDENTIAL

A. I was not aware.

Q. Were you aware of any outside investments that Mr. Stollmeyer was making in 2018 or the first half of 2019?

A. I was not aware.

Q. Were you aware of any angel investing that Mr. Stollmeyer was engaged in in 2018 or 2019?

A. I was not aware.

Q. Were you aware of any assets that Mr. Stollmeyer was purchasing in 2018 or 2019?

MR. DEL MONACO: I object to the form.

THE WITNESS: I was not aware. I'm not even sure what you're referring to, to be honest.

Q. Sure.

So were you aware that Mr. Stollmeyer had committed to purchase one or more Teslas?

A. I was not aware.

Q. Were you aware that Mr. Stollmeyer had committed to invest in his

Page 32

G. Goodman -- HIGHLY CONFIDENTIAL son's start-up company?

A. I was not aware.

Q. Were you aware that Mr. Stollmeyer was going to purchase the house next door to his in 2018 or 2019?

A. I was not aware.

Q. Were you aware that Mr. Stollmeyer was flying on private jets?

MR. DEL MONACO: I object to the form.

THE WITNESS: I was not aware.

Q. Let me ask a clarifying question to one of my prior questions.

Did Mr. Stollmeyer ever express to you that selling his Mindbody stock through a 10b5-1 plan was like sucking through a very small straw?

MR. DEL MONACO: I object to the form.

THE WITNESS: He did not.

Q. Did Mr. Stollmeyer or anyone else ever press to you that he no longer wanted his personal wealth tied up in Mindbody stock?

Page 33

G. Goodman -- HIGHLY CONFIDENTIAL

MS. LIGHTDALE: Objection to form.

MR. DEL MONACO: Same objection.

THE WITNESS: He did not.

Q. Can you tell us anything at all that you know about Mr. Stollmeyer's desire to sell any Mindbody stock while you were a director at Mindbody?

MR. DEL MONACO: I object to the form.

THE WITNESS: There was no conversation at the board or committee level about his desire to sell stock that I recall.

Q. In 2018, were you aware of any plan by Mr. Stollmeyer to retire?

A. In August of 2018, late August, Rick and I had a conversation about him desiring to end his tenure as CEO in late 2019. So he was looking to continue to be involved with Mindbody but to get -- to step back from the CEO role by the end of 2019. He expressed a desire for that, yes.

9 (Pages 30 - 33)

Page 34

G. Goodman -- HIGHLY CONFIDENTIAL

Q. At any other point in time, other than that instance, did you ever discuss with Mr. Stollmeyer any plans that he had for retiring?

MR. DEL MONACO: I object to the form.

THE WITNESS: Yes, Rick and I were in an ongoing conversation about his longevity. As part of succession planning, it is an obligation of the board to understand the CEO mindset in terms of how long he wanted to be in the role, so that was an ongoing conversation. It was in August that he let us know that he was beginning to see the end of his tenure in sight.

Q. And when you say, "it was in August," you mean August of 2018; correct?

A. Correct.

Q. In 2018, did Mindbody have a need to raise any money?

MR. DEL MONACO: I object to the form.

THE WITNESS: We had done a

Page 35

G. Goodman -- HIGHLY CONFIDENTIAL

convertible debt offering in 2018 -- I think it was in 2018 -- that had given us the cash we needed on our balance sheet for the foreseeable future. I do not remember the exact date of that convertible debt offering.

Q. At any point subsequent to the convertible debt offering, was Mindbody in need of raising any money?

A. No.

Q. And were you familiar with Mindbody's capital structure?

A. Broadly, yes.

Q. And were you aware that there were two different classes of shares?

A. I was.

Q. And do you know who held -- well, let me just ask, do you recall what the classes were called?

A. I believe it was A and B.

Q. And do you know what the difference between the A shares and the B shares was?

A. The B shares were multiple

Page 36

G. Goodman -- HIGHLY CONFIDENTIAL

voting, I believe ten to one, but I'm not entirely sure.

Q. So in other words, the class B shares for each share had ten votes; correct?

A. Correct.

Q. And the class A shares had one vote per share?

A. Correct.

Q. And do you know who held the class B shares?

MR. DEL MONACO: I object to the form.

THE WITNESS: I recall it was Rick and some trust associated with his family and IVP.

Q. And are you familiar with the term "sunset" in the context of high growth shares?

A. I am.

Q. And what is a sunset?

A. It is the date in which those shares convert to class A shares and lose their multiple voting power.

Page 37

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And respecting the class B shares at Mindbody, was there a sunset?

A. There was.

Q. And do you recall what the date for the sunset was?

A. I have a recollection that it was 2020 or 2021, but I am not specifically sure.

Q. And was there any planning done at the board level respecting the consequences of the sunset occurring in the future?

MS. LIGHTDALE: Objection to form.

THE WITNESS: We were cognizant of it and discussed it. The plan was to make sure that we were close to our largest shareholders. The extent of the plan was get close to your largest shareholders.

Q. I'm sorry, what do you mean by, "get close to your largest shareholders?"

A. Make sure you have a good working relationship.

10 (Pages 34 - 37)

Page 38

G. Goodman -- HIGHLY CONFIDENTIAL

Q. When you say good working with relationship with your largest shareholders, do you mean a good relationship with the class B holders or other stockholders?

A. I meant the largest class A public shareholders.

Q. Understood.

Were there any other discussions that the board had respecting the sunset of the class B shares?

A. Not to my recollection.

Q. And what specifically can you recall about any discussions of the sunset?

A. I'm on multiple public boards so I'm having trouble trying to remember which ones were which boards.

I cannot at this stage specifically recall the conversations at the Mindbody with relation to the sunset clause, I'm sorry.

Q. It's okay.

How many boards were you on in

Page 39

G. Goodman -- HIGHLY CONFIDENTIAL

2018?

A. Two public, one private, and two nonprofit. Five.

Q. So going to August of 2018, at that time what did you know about any contacts that Mr. Stollmeyer was having with any potential bidders of the company?

A. In August of 2018, I was not aware of any contacts.

Q. And in August of 2018, what were you aware of Mr. Stollmeyer --

MR. FOULDS: Withdrawn.

Q. In August of 2018, what was the extent of your knowledge that any contacts Mr. Stollmeyer was having with any investment bankers concerning the potential sale of Mindbody?

MR. DEL MONACO: I object to the form.

THE WITNESS: In August of 2018, I was not aware of any specific conversation.

Q. In August of 2018, were you aware of any nonspecific conversations?

Page 40

G. Goodman -- HIGHLY CONFIDENTIAL

A. It was not unusual for Rick to meet with bankers. It was normal course of business. I certainly did that as well as a public company CEO. Bankers were frequent visitors wanting to stay abreast of the company and the helpful as a way to build relationships for the future. Certainly Centerview Partners was an active participant at Mindbody, having helped us with the Booker acquisition and I believe the FitMetrix acquisition, so Rick was definitely as normal course of business meeting with investment bankers and financial advisors.

Q. Were you aware in August of 2018 that Mr. Stollmeyer had met with an investment bank called Qatalyst?

MR. DEL MONACO: I object to the form.

THE WITNESS: I became aware of that in early September.

Q. But to place this temporally, if I can do this grammatically, you were not aware in August of 2018 that Mr.

Page 41

G. Goodman -- HIGHLY CONFIDENTIAL

Stollmeyer had any conversations with Qatalyst; correct?

A. Correct.

Q. And you said you became aware in early September of 2018; is that right?

A. Correct.

Q. And what do you recall about the circumstances in which you became aware that Mr. Stollmeyer had been talking to Qatalyst in August of 2018?

A. On September 5 of 2018 at a board dinner prior to a board meeting, Rick shared with us that he had had conversations with multiple parties about what it might look like if the company were private and what a go private transaction could look like, and that he was beginning to think that might be a good strategic tact for Mindbody.

Q. I think you said he had had conversations with multiple parties.

Do you recall who the parties were?

A. I honestly don't remember

11 (Pages 38 - 41)

Page 42

G. Goodman -- HIGHLY CONFIDENTIAL
exactly what I learned that night versus in subsequent conversations, so to be clear, I know the parties were Qatalyst and Vista, but I don't recall specifically if this is that evening that I learned that or later.

Q. And you said that this occurred at a dinner on September 5 of 2018?

A. Correct.

Q. What did you do to prepare for your deposition today?

A. So I had two meetings with counsel, you know, with essentially the lawyers that are on this call, and we reviewed documents from board meetings, we reviewed the proxy, the background to the merger, the complaint at hand, and various e-mails.

Q. And you said lawyers that were on this call.

Can you identify them?

A. Yeah.

So for me it was Sarah and Liz and occasionally Cody. And there might

Page 43

G. Goodman -- HIGHLY CONFIDENTIAL
have been one other from Cooley, but they were not a primary driver.

And from Kirkland, it was John and Courtney. Again, there may have been some others who joined us from time to time.

Q. And John is this dashing looking fellow here, John Del Monaco?

A. Yes. I'm not sure I'd agree with dashing.

Q. Do you know why --

MR. FOULDS: Well, let me back up.

Q. Who invited Kirkland and Ellis lawyers to your deposition prep?

MR. DEL MONACO: I just object to the form and also I caution the witness not to disclose anything you've learned from lawyers, any lawyer communications.

THE WITNESS: Thank you.

I am not aware of how that was coordinated.

Q. Did you invite any lawyers from

Page 44

G. Goodman -- HIGHLY CONFIDENTIAL
Kirkland and Ellis to your deposition prep?

MR. DEL MONACO: I object to the form.

THE WITNESS: Me specifically, no.

I am getting close to the need for a restroom break.

MR. FOULDS: This is a perfect time for me, if that's okay with you.

THE WITNESS: It is.

MR. FOULDS: Terrific.

Back in five or whenever we get back.

THE VIDEOGRAPHER: The time is 10:26.

We are going off the record.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are back on the record.

The time is 10:35.

Q. Ms. Goodman, going back to your deposition preparation, did anyone ever tell you why lawyers from Kirkland and

Page 45

G. Goodman -- HIGHLY CONFIDENTIAL
Ellis were attending your deposition preparation?

A. No.

MS. LIGHTDALE: Objection to form.

And I'd ask the witness not to divulge any privileged information.

Q. And do you know who Kirkland and Ellis represents in this case?

A. Yes.

Q. And who do they represent?

A. The company, Mindbody, Rick Stollmeyer, Brett White, the CFO.

Q. Going back to your deposition preparation, you said I believe you reviewed the proxy, some board materials, e-mails, and the complaint; is that correct?

A. Correct.

Q. Any other documents that you reviewed in preparation for today?

A. The -- yes, just the presentations associated with the transaction, such as those with Qatalyst.

12 (Pages 42 - 45)

Page 46

G. Goodman -- HIGHLY CONFIDENTIAL

Q.    And have you read the opinion issued by Vice Chancellor McCormick in the Delaware litigation?

A.    I have not.

Q.    Do you consider Kirkland and Ellis to be your lawyer?

A.    I do not.

Q.    Did you think it was strange at all that Kirkland and Ellis was attending your deposition prep?

MS. LIGHTDALE: Objection to form.

MR. DEL MONACO: Same objection.

THE WITNESS:  No.

Q.    Okay.

Going back to the September 5 dinner, can you tell us specifically, the best you can, what Mr. Stollmeyer told you about any potential sale of the company?

A.    What I recall was a general conversation about whether, given some of the need for strategic investment in the business, it might make sense to consider a go private transaction where we could

Page 47

G. Goodman -- HIGHLY CONFIDENTIAL

make -- it's not just the investments but a significant transition from a SAAS revenue stream to a consumer revenue stream; whether those would be easier to do not as a public company, and he was beginning to think about that and wanted to get our input and guidance.

Q.    Do you recall anything else about what he said?

A.    I recall there being a robust conversation amongst the board members about what was happening in the private equity SAAS market at that point. It was a very robust time for SAAS transactions in the private equity world and a general feeling among the board that it would make sense for Rick to I think the words we used were get smarter on the topic and have a few more introductory meetings.

Q.    And you mentioned something to the effect of SAAS versus a consumer revenue stream? Can you describe the difference between those two?

A.    Yes.

Page 48

G. Goodman -- HIGHLY CONFIDENTIAL

So we had built Mindbody selling software to fitness studios and gyms and charging them a software as a service fee, a SAAS fee, then adding a revenue stream on top of that which was payments, so they would charge their consumers and we would take a slice of that.  So at this time the vast majority of our revenue was a combination of SAAS license fees and payments.

We had begun to build a direct-to-consumer business using the Mindbody application, which was a way for consumers to find classes near them or studios near them and book a class or a private training session.  When the consumers booked through our application, that -- we could, in some cases, we were taking a fee from that.

There was a significant strategic opportunity for us to shift the business to being this consumer marketplace for fitness and beauty.  It was not without significant risk, however,

Page 49

G. Goodman -- HIGHLY CONFIDENTIAL

to the SAAS revenue stream, and so how to balance the strategic opportunity with the risk to the current revenue stream was a substantive board debate and discussion in this time frame.

Q.    And are you familiar with the term "Payments 2.0?"

A.    Yes.

Q.    And what is Payments 2.0?

A.    There was a significant re-platforming -- I can explain that term if you need me to -- technology investment going on.  Yes, you'd like that explained.

So when you build software, you build it with a certain set of technology at any given moment.  A year, two years, three years later, almost always the technology used to build it has improved dramatically and you need to unfortunately rewrite the very software you're currently selling on to the newer or more modern platforms.  Typically that's called re-platforming.

It's investment that enables the

13 (Pages 46 - 49)

Page 50

G. Goodman -- HIGHLY CONFIDENTIAL next level of growth and capability. It is unfortunately, from the customer perspective, often invisible investment. In other words, it doesn't necessarily get them new features. It gets them a new baseline that then allows features to be built.

The Payments 2.0 was a re-platforming exercise that was under way at Mindbody in this time frame first for the Mindbody software stack and then eventually we were going to also use it for Booker.

Q. Going back to an earlier question, you mentioned an investment, but Mindbody did not require any additional capital for that investment; correct?

A. That is correct.

MS. LIGHTDALE: Objection to form.

THE WITNESS: So the balance here is always -- was not doing a cash for that but how much profitability -- you know, you have revenue, how much

Page 51

G. Goodman -- HIGHLY CONFIDENTIAL operating expense do you layer in and how much profit is therefore lapsed. And so the decision at a board level and at a senior leadership level is always how much of our revenue do we want to spend to accelerate the delivery of new capabilities to the marketplace versus deliver profit.

Q. And were you ever concerned at all that the public markets would not necessarily be able to understand the benefits of that investment?

A. We were very concerned that our -- again, we put it in time frame. In the fall, so this is starting in September and moving through, we were in the midst of a strategic review of the business; where our biggest growth opportunities were, our biggest investment needs. And as we're going through that review, we're finding more and more investment needs that had urgency for investment now but deferred revenue growth. So we were looking into the future and very concerned about

Page 52

G. Goodman -- HIGHLY CONFIDENTIAL whether we would deliver to the street expectations on profitability if we made what we felt were the best strategic investments for the long term of the company, and this was the balancing act and crucial strategy discussion going on at the board at this time.

Q. Did you believe that the investments would eventually pay off?

A. Absolutely. But the timing differential between investments and revenue is often difficult for public markets to absorb.

Q. And respecting the strategic review that was going on in the fall of 2018, what did you view as being the timing differential that you just mentioned?

A. So that is not a simple question because we had I believe five different investment areas, each of which had a different time horizon for return, so it is not a single answer.

Q. If you don't mind, can we go

Page 53

G. Goodman -- HIGHLY CONFIDENTIAL through each of the time and you can assign a time differential to it into your own --

A. I remember there was five and we were trying to get them to get it down to two. Let me see if I can do this.

So Payments 2.0 was definitely at the top of the stack. Again, I'm having trouble remembering exactly which meeting in the fall I learned which thing. It is all a -- combined in my head now. But we were -- Payments 2.0 was definitely taking longer to deliver than anticipated. Software is -- software forecasted timing and delivery timing is often off.



Is this the level of specificity

14 (Pages 50 - 53)

Page 54

G. Goodman -- HIGHLY CONFIDENTIAL
you were interested in?

Q. Yes.



And you see this reflected in the financial forecasts that were

Page 55

G. Goodman -- HIGHLY CONFIDENTIAL
associated with the deal. We zeroed at -- you know, we build in those investments to be clear.

I don't think I can go to the specificity in the next two, but international, internationalization of our product was a very large investment.



I'm struggling for what the fifth one was.

Q. Let me know if I got this wrong. You wanted to boil it down to -- from five to two? Did I remember that right?

Page 56

G. Goodman -- HIGHLY CONFIDENTIAL
A. Yes.

This is now a little bit later in the fall as we're working on the strategic plan and the 2019 plan for the company. It is very hard for -- for you to have five major areas of focus, and so we were pushing the executive team to at least prioritize these five and make sure we fully funded the most important ones.

Q. Okay.

But just to reiterate, you did have confidence that each of these initiatives would eventually pay off; correct?

A. Absolutely.

Q. Okay.

Are you familiar with the term "customer acquisition cost?"

A. Yes.

Q. And are you familiar with the term -- with the concept of the lifetime revenue per customer?

A. Yes, it's often called lifetime value and taken at the gross margin

Page 57

G. Goodman -- HIGHLY CONFIDENTIAL
revenue, so there's lifetime revenue and lifetime value.

Q. And are you aware of a helpful heuristic for comparing lifetime value with the customer acquisition cost?

A. Yes.

Q. And what is that?

A. A ratio of CAC to LTV, so a customer acquisition cost to lifetime value, is often used in the SAAS market.

Q. And is the goal to have the lifetime value exceed the customer acquisition cost?

A. Yes.

Q. And for the two areas that you boiled down from five, at what point did you believe that the lifetime value would exceed the customer acquisition cost?

MS. LIGHTDALE: Objection to form. Foundation.

THE WITNESS: This is the challenge. None of these initiatives were -- except international were unique to -- were able to be

15 (Pages 54 - 57)

Page 58

G. Goodman -- HIGHLY CONFIDENTIAL

simplified to CAC to LTV. What Payments 2.0 had the highest potential to do was to grow LTV, no question. But we had not gotten to the level of specifically modeling that impact.

The consumer business was on a completely different set of metrics. Those weren't software as a service metric, that was direct revenue from the consumer side.

I don't recall whether we got the Booker enterprise work to a CAC to LTV metric. But obviously where that would impact is if we were able to capture more enterprises, those have a much lifetime value. They also have a much higher CAC, a much longer sales cycle, much more costly to sell to. I don't recall the specifics of how those metrics matched.

Q.   And do you recall in September of 2018 that there was an analyst day that Mindbody held?

A.   I do.

Page 59

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   And did you attend the analyst day?

A.   The analyst day was at the Bold conference and was going in parallel to some of the presentations at Bold. I was at Bold and I did come in and out of the analyst day, but I was not there for the entirety of it.

Q.   And you mentioned Booker a few times.

Can you just tell us what Booker is?

A.   So Booker was a company that Mindbody acquired in I believe it was April of 2018.

Q.   You also mentioned FitMetrix.

Can you tell us what that is briefly?

A.   That was another company we acquired a little earlier, I can't remember the exact date, but late Q1, I think.

Q.   And so is it fair to say that in 2018 Mindbody was working on integrating

Page 60

G. Goodman -- HIGHLY CONFIDENTIAL

Booker and FitMetrix?

A.   It is very fair to say that.

Q.   And are you aware that at the analyst day there was a slide that was presented that said the integration was working?

A.   I am.

Q.   So going back again to the September 5 dinner, there was a board meeting the following day; is that right?

A.   Correct.

Q.   And were all the board members in attendance at the dinner prior to the September 6 board meeting?

A.   Yes.

Actually, let me say that's how I remember it, but I couldn't swear to it. We always made all the dinners so I assume everybody was there.

Can I correct something from earlier?

Q.   Absolutely.

A.   There were eight board members. We had this board meeting at Adam's and I

Page 61

G. Goodman -- HIGHLY CONFIDENTIAL

didn't have him on the list.

Q.   And that was in Santa Monica, California?

A.   Correct.

Q.   Were you aware of what the trading price of Mindbody stock was in September of 2018?

A.   At the time I was certainly aware of it. As a board member, I paid attention to the stock price. I cannot tell you sitting here today what it was.

Q.   But when you had the discussion on September 5 about a potential go private transaction, did you expect that the purchase price would be higher than the current trading price?

A.   The conversation on September 5 was incredibly early, very general, and not deal-specific. There was zero conversation of valuation.

Q.   And at the dinner did Mr. Stollmeyer mention the parties to whom he was in discussions about a potential acquisition of Mindbody?

16 (Pages 58 - 61)

Page 62

G. Goodman -- HIGHLY CONFIDENTIAL

MR. DEL MONACO: Objection to the form.

MS. LIGHTDALE: Objection to form.

THE WITNESS: I don't specifically recall which dialogues were at which meetings from two years ago. So I was generally aware in this time frame that there were three PE firms he had been introduced to. Whether I learned that at the dinner, at a board meeting, or at a subsequent conversation I cannot be sure.

(Whereupon, a document entitled Schedule 14A was marked Exhibit 1 for identification.)

Q.   I have attempted to pre-mark an exhibit, if you can try to open it up.

A.   There it is. It looks like the proxy.

Q.   Yes.

I'm going to ask you what it is.

And do you recall the issuance of a proxy statement in connection with

Page 63

G. Goodman -- HIGHLY CONFIDENTIAL
the Mindbody acquisition by Vista?

A.   I do.

Q.   And does this look like this is at least one of the proxies that was issued?

A.   It does.

Q.   And if you turn to page thirty-five of two hundred seven, which should be in the bottom right-hand corner.

A.   Yes. Scrolling. I don't know if there's a way to jump to it, so I'll just scroll. It will take me a minute to scroll.

Thirty-five, you said?

Q.   Two hundred seven.

MS. LIGHTDALE: Since there are internal numbers in the document as well that don't match what you just said, perhaps you could give us description make sure we're all literally on the same page.

MR. FOULDS: Oh, sure, I'm sorry.

What I see here in the bottom right-hand corner is like what appears

Page 64

G. Goodman -- HIGHLY CONFIDENTIAL
to be a fraction of two hundred seven.

Do you guys not see that?

MS. LIGHTDALE: Yes, I see that in the bottom right-hand corner. Then there's also a number that comes up as you are scrolling through the document electronically, and then there's also a number on the bottom of the page. They're different.

MR. FOULDS: I'm referring to the one in the bottom right-hand corner that says thirty-five of two hundred seven and it's described as the background of the merger. It's also page twenty-six in the middle of the page sort of seven-eighths of the way down.

MS. LIGHTDALE: Are you with us?

THE WITNESS: I am with us.

Q.   And did you review the section entitled Background of the Merger prior to the issuance of the proxy statement?

A.   I did.

Q.   Did you make any changes to the

Page 65

G. Goodman -- HIGHLY CONFIDENTIAL
background of the merger prior to the issuance of the proxy statement?

A.   Not to I recall.

Q.   Did you review any other sections of the proxy other than the background of the merger?

A.   Yes.

Q.   Which other parts did you review?

A.   I may not get all the exact wording, but there was like a rationale for the merger, I read that part. I read the -- there's a Qatalyst section on their opinion. I remember reading that part.

I may have read others, but those are the parts that I recall.

Q.   And you'll see in the background of the merger in this Exhibit Number 1 that there's nothing about September.

Do you see that?

A.   Yes.

Q.   Do you know why there's nothing about September?

A.   As of September, there was no

17 (Pages 62 - 65)

Page 66

G. Goodman -- HIGHLY CONFIDENTIAL
active process to sell the company, and so the true process began when this narrative begins.

Q. While I'm loading another exhibit, going back to the September 6 board meeting, do you recall any discussion at the board meetings of any potential acquisition of Mindbody?

A. As I said earlier, the conversations over this period have blended to a point where I can't be sure exactly which conversation happened when. But it is traditional -- not traditional. We always had executive sessions and I would not be surprised if we revisited that during the executive session.

Q. Okay.

And if it occurred in the executive session, it would be reflected in the minutes; is that right?

A. All the details of executive sessions did not always make it into the minutes.

Q. Was there a policy on which

Page 67

G. Goodman -- HIGHLY CONFIDENTIAL
details were included and which were not included?

A. Typically anything that was definitive as opposed to discussions would make it into the minutes.

Q. Okay.

And when you say, "definitive," what do you mean by that?

A. More than just "a huh, that was interesting" dialogue but a "we should do," "we will do," it's definitive. "A huh, what did you think of that" is just a discussion.

Q. And so at the September 6 board meeting, just to be clear, you don't have any recollection that Mr. Stollmeyer actually discussed any potential acquisition of Mindbody; is that right?

A. That's correct, I do not recall.

Q. Okay.

As of the September 6 board meeting, did the board determine to do anything respecting any potential acquisition of Mindbody?

Page 68

G. Goodman -- HIGHLY CONFIDENTIAL

A. The board instructed Rick to, first of all, keep us in the loop on any conversations as he went forward. Second, to continue to have introductory meetings to learn about where the interest might be and what a private transaction might look like. But we did not initiate or instruct Rick at this point to begin a process to sell the company, simply to have introductory meetings.

Q. At any point in time in 2018 or 2019 did you ever consider whether or not Mr. Stollmeyer might have a conflict respecting the sale of the company?

MS. LIGHTDALE: I'm going to object to the form. Calls for a legal conclusion.

THE WITNESS: Yeah, I am not sure how to answer that, you know. I'm not exactly sure what you're trying to get at, so I'm not sure how to answer it.

MR. FOULDS: I'm going to ask that the counsel stop coaching the

Page 69

G. Goodman -- HIGHLY CONFIDENTIAL
witness.

Q. Are you familiar with the term "conflict," Ms. Goodman?

A. I am.

Q. Okay.

What is your understanding of the word "conflict?"

A. So to me a conflict is when interests diverge.

Q. So using that definition, at any point in time in 2018 or 2019 did you ever consider whether or not Mr. Stollmeyer might have a conflict respecting the sale of the company?

A. I was aware that Rick was highly aligned with shareholders on maximizing share price; that there was no question that because of his strong share ownership, he and the public shareholders had a lot of alignment around maximizing shareholder returns. Also aware, as is true of any public company situation, that there was other constituents Rick was particularly connected with. In this

18 (Pages 66 - 69)

Page 70

G. Goodman -- HIGHLY CONFIDENTIAL case, Rick is very connected to our customers, so he is entirely attuned to the owners of these fitness studios.

You know, that is why he started the company, it is his passion. He is also very committed to the team we built. And so certainly I was aware that, in thinking about any potential future transaction, Rick would have multiple constituents in his head, not just the shareholders. I'm not sure I saw that as a conflict as much as a reality of the way CEOs go into these kinds of transactions, having been in that situation myself.

Q. Other than the constituents that you just mentioned, do you believe that Mr. Stollmeyer had any potential conflicts respecting the acquisition of Mindbody?

A. Again, in the humans can't separate personal consequences from professional consequences, I was well aware that in the back of his mind what does this mean for me had to be present. It would be naïve for that not to be true.

Page 71

G. Goodman -- HIGHLY CONFIDENTIAL But I believed Rick to be prioritizing the various constituencies I've listed before.

Q. So following the September 6 meeting, what did you do to guard against any potential personal conflicts that Mr. Stollmeyer may have had respecting the potential acquisition of Mindbody?

A. We did a number of things. We certainly instructed Rick to keep us well informed of any progress he made talking to private equity firms. And then -- and now we're moving much further forward when we went from exploratory conversations to actual conversations, you know, indications of interest, we educated Rick or counsel educated Rick, because I have idea how this falls in the privilege thing, on the importance of his neutrality in that process. So we made very sure that he was aware of his obligations to act in a neutral way in the process.

Q. You mentioned neutrality.

What specific instructions or guidelines were provided to Mr. Stollmeyer

Page 72

G. Goodman -- HIGHLY CONFIDENTIAL respecting neutrality?

A. So these were provided by counsel, so I always get worried about privilege.

MR. DEL MONACO: I would just chime in here to caution the witness not to reveal legal advice that was provided to Rick. You could talk about the process and generally what you understood, but as far as the substance of the communications, for now that's privileged.

THE WITNESS: What I generally understood was, you know, he was instructed to run a fair and open process, he was instructed not to have conversation about his personal employment or future during the course of the actual process, and, you know, generally told to really make sure we kept records of everything that was going on.

Q. Did you ever come up with any policies or guidelines respecting Mr.

Page 73

G. Goodman -- HIGHLY CONFIDENTIAL Stollmeyer's communications with individual bidders?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I'm not sure what that would look like. So no, I guess the answer's no. I'm not sure what you mean. Actually, I have no idea what you mean.

Q. Fair enough.

Can you think of any other neutrality guidelines other than the ones that you mentioned respecting Mr. Stollmeyer's interactions with potential bidders?

A. No, I cannot.

(Whereupon, a document entitled Schedule 14A was marked Exhibit 2 for identification.)

Q. I think I have successfully introduced Exhibit Number 2, with the miracle of the Internet.

A. I am refreshing.

Here it is. I have it open.

19 (Pages 70 - 73)

Page 74

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And do you recognize this document?

A. It looks like the updated proxy from January.

Q. And did you review this updated proxy prior to its issuance?

A. Yes.

Q. And did you make any changes to this proxy prior to its issuance?

A. I don't think so.

Q. And respecting both Exhibits Number 1 and Number 2, did you approve of the issuance of both of these proxies?

A. I did.

MS. LIGHTDALE: Could we go off the record for a moment, please.

MR. FOULDS: Sure.

THE VIDEOGRAPHER: The time is 11:15.

We are going off the record.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are back on the record.

The time is 11:17.

Page 75

G. Goodman -- HIGHLY CONFIDENTIAL

(Whereupon, a document entitled Schedule 14A was marked Exhibit 2A for identification.)

Q. Okay.

I have now successfully marked Exhibit 2A, as in apple.

Can you tell us what this is?

A. It is a disclosure of shareholder litigation.

Q. Do you recall seeing this document before it was issued?

A. I saw all filings before they were issued, but do I recall it? Not specifically. I'm certain I did.

Q. If you look at again on the bottom right-hand corner, page four of eighty-three --

A. Yes, I'm there.

Q. And there's a section titled Supplemental Disclosure to Proxy Statement.

Do you see that?

A. I do.

Q. Okay.

Page 76

G. Goodman -- HIGHLY CONFIDENTIAL

And at the September 6 meeting or any time before that, do you recall Mr. Stollmeyer detailing what interactions he had with Vista?

MR. DEL MONACO: I object to the form.

THE WITNESS: Not in detail, no.

Q. How about in general terms?

A. He did share with us in general terms at the September 5/6 time frame that he had had meetings with Vista.

Q. How many meetings?

A. Again, not in detail so not that specific.

Q. Did he say whether it was more than one?

A. I don't recall.

Q. Did he say what was discussed at those meetings?

A. I recall him sharing that they shared trends in software as a service go private transactions, and that is again a general recollection and not a specific one.

Page 77

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Do you know whether Mr. Stollmeyer discussed any non-public information about Mindbody with Vista prior to December of 2018?

A. Wait, what was the beginning of that phrase?

MR. FOULDS: I'm sorry, can I ask the court reporter to read it back.

I have it here. I can do it.

Q. Do you know whether Mr. Stollmeyer discussed any non-public information about Mindbody with Vista prior to December of 2018?

A. I do not know, but I would be shocked, appalled, and disappointed if he had.

Q. What are KPIs?

A. KPIs are key performance indicators.

Q. And did you believe, while you were a board member of Mindbody, that it was important that there be a clear expression of what the KPIs are and how they're being tracked?

20 (Pages 74 - 77)

Page 78

G. Goodman -- HIGHLY CONFIDENTIAL

A.   Yes.

Q.   And did you believe that it was important that KPIs be shown consistently?

A.   Are you discussing internal or external?

Q.   Let's start with both.

A.   So we rarely varied our external operating metrics, which are also another word for KPIs, and I thought it was very important that we keep those consistent for public shareholders.

Internally, we had a very -- a much broader metrics dashboard with deeper and more granular KPIs that we watched for the business and those I had more comfort fluctuating because we were exploring new areas of the business that we needed to track.

Q.   And why did you think it was very important that Mindbody keep KPIs consistent for public shareholders?

A.   So my experience in the public market is that first analysts are covering way too many companies to be intimately

Page 79

G. Goodman -- HIGHLY CONFIDENTIAL

familiar with each company in their coverage portfolio.

Second, you really need to help them understand where the company has been and where the company is going in a way that is straightforward for their ability to model and to predict -- and to create a forecast of both revenue and earnings. And that if you moved your metrics around, you created undue burden and confusion for analysts.

(Whereupon, an e-mail dated August 20, 2018 was marked Exhibit 3 for identification.)

Q.   And I believe I have now successfully marked Exhibit Number 3.

A.   I'm pulling it up.

I see it.

Q.   And it's marked MBOD 5301.

Do you recall what the pending discussion is here that you were referring to?

A.   I do.

Q.   And what was it?

Page 80

G. Goodman -- HIGHLY CONFIDENTIAL

A.   The conversation I had had with Rick about his time frame for succession.

Q.   Okay.

And just backing up to we're clear, the discussion you had with Rick was that he was planning on retiring at the end of '19; do I have that right?

A.   That's not exactly right.  The discussion was he wanted the board to know that he would like us to begin to find a successor so that, if possible, he could move out of the CEO role, and this was now eighteen months from now.  So it was not an "I must;" "I should."  That would have created a disclosable event.  It was a, "hey, I'm beginning to think," and that was of course something I was informing the other board members of.

Q.   And did Mr. Stollmeyer tell you what the reason was?

A.   Yes.  He was tired.  Running a public company is exhausting.  As someone who ran one for eight years, I was well aware of that.

Page 81

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   Any other reason?

A.   I think he also expressed that the growing scale and complexity of the company was -- he was not a hundred percent convinced he was the right guy for the next stage of growth.  Again, recall that there are now major growth vectors, prioritization of resources, we had had a mishire on the CTO role.  He was just generally getting concerned that he was not the right guy for the next role.

Q.   And when you say the mishire for the CTO role, could you elaborate on that briefly?

A.   Yes, so we had hired someone to run the software engineering and technology bide of the business that didn't work out.

Q.   And was Mr. Stollmeyer concerned at all that, if he ceased being the CEO, that it would be detrimental to Mindbody?

MR. DEL MONACO: Objection. Foundation.

THE WITNESS:  I think he had

21 (Pages 78 - 81)

Page 82

G. Goodman -- HIGHLY CONFIDENTIAL

confidence in his and our, the board's ability to find a leader for the next round of Mindbody that would allow him to add his strategic input. He was very interested in staying on the board, staying a strategic advisor, speaking, he had some thought of writing a book. So I think he was planning to stay involved enough to add value and not concerned about what it would do to Mindbody.

Q. And to the extent you can remember, was it his intention to remain on the board of Mindbody in the event that he were to retire as CEO?

A. It was very much his desire to stay active with Mindbody, including a board member.

Q. Thank you.

And when you talked to Mr. Smith, what did you rely to him, if anything, in addition to what you've already told us?

A. Discussed with each board member

Page 83

G. Goodman -- HIGHLY CONFIDENTIAL

what were the right actions for us as a board to take both in terms of looking at internal candidates and beginning to create an external succession planning role.

Q. And did you embark upon looking for a new CEO in the fall of 2018?

A. We began a process of interviewing outside search firms to develop a list of potential external candidates, and we began a process of developing and testing two internal candidates.

Q. And who were the two internal candidates?

A. Mike Mansbach and Josh McCarter.

Q. And just for time purposes, Mike Mansbach was the president; correct?

A. Yes.

Q. And Josh McCarter was what?

A. He had been the CEO of Booker and was running the Booker business as the general manager, but I don't know what his exact internal title was.

Page 84

G. Goodman -- HIGHLY CONFIDENTIAL

(Whereupon, a document entitled Minutes of A Meeting of the Board of Directors was marked Exhibit 4 for identification.)

Q. And I think I have now successfully marked, fingers crossed, Exhibit Number 4.

A. I have it open.

Q. Perfect.

So these are labeled the minutes of the meeting of the board of directors dated September 6, 2018.

Do you see that?

A. I do.

Q. And can you find anywhere here where it talks about any potential acquisition of Mindbody?

A. I do not see anything.

Q. And do you see anything in here about Mr. Stollmeyer's desire to retire?

A. I do not.

Hang on, let me just see if I talk about succession planning.

Q. And did you talk about

Page 85

G. Goodman -- HIGHLY CONFIDENTIAL

succession planning at the September 6, 2018 meeting?

A. I will reiterate that I'm having trouble remembering exactly which dialogue happened at exactly which meeting in this whole time frame. This was very much on my mind as the lead independent director that we needed to begin a succession planning process when your CEO tells you they're contemplating an end time, so I'm sure that there was dialogue in this time frame, but which specific meeting I cannot tell you.

Q. I may have misheard you so I apologize, but I believe you said earlier today that Mr. Stollmeyer was targeting a retirement date of the end of '19; is that right?

A. You keep calling it a retirement date and I'm resisting that because he was not that specific and he was not calling it retirement. He was simply saying that he was thinking that he was, in a perfect world, would step back from the CEO world

22 (Pages 82 - 85)

Page 86

G. Goodman -- HIGHLY CONFIDENTIAL
by the end of '19.

Q. By the end of '19, I'm sorry?

A. By the end of 2019.
And it was if possible, so it was never a hard date, it was never an I must, it was very much a this is in my head and you guys should be thinking about succession planning.

Q. Do you believe that there was any connection between Mr. Stollmeyer's desire to step back from the CEO role and his discussions about a potential going private transaction?

A. I do not.

Q. Were you aware that Mr. Stollmeyer was frustrated with dealing with stockholders in a public company?

A. Yes.

Q. Did Mr. Stollmeyer, after the September 6 meeting --

MR. FOULDS: Withdrawn.

Q. At what point did you become aware, if ever, that Mr. Stollmeyer would be meeting with representatives of Vista?

Page 87

G. Goodman -- HIGHLY CONFIDENTIAL

MR. DEL MONACO: I object to the form.

THE WITNESS: Yeah, I'm not exactly sure how to answer this.
At which meeting; when? I'm not sure what you're asking.

Q. Let me go back.
Do you believe that Mr. Stollmeyer's frustration dealing with stockholders at the company motivated him in any way to prefer a private equity buyout?

MS. LIGHTDALE: Objection to form.

THE WITNESS: Yes.

Q. And why is that?

A. So Rick was very excited about the opportunities presented by the things we've talked about before: Payments, international, consumer marketplace, but felt he couldn't invest as much as he would have liked to because of the public -- potential public market reaction to a significant pullback in profitability.

Page 88

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Let me just ask this question again. I apologize.
Do you believe that Mr. Stollmeyer's frustration in dealing with stockholders at the company motivated him in any way to prefer a private equity buyout over a merger with another public company?

A. No.

Q. Why is that?

A. So I think Rick was motivated to find a place where Mindbody could unrestrainedly invest in the tremendous opportunity he saw for the company going forward. I don't think he had a preference for where that might be, but I do think we all suspected at the board level that a private equity company would be more willing to tolerate negative earnings for a period in return for future growth. That is almost exactly what the private equity firms advertise as why you should work with them.

Q. Okay.

Page 89

G. Goodman -- HIGHLY CONFIDENTIAL
In October of 2018, were you aware that Mr. Stollmeyer had met with Vista in October, 2018?

A. I am aware, yes.

Q. And do you recall where he met with Vista in October of 2018?

A. I don't, but I will let you know that I am having -- I am not exactly sure when I learned what in that time frame, so I cannot be like totally specific about which day I learned what thing. But I do recall that he attended Vista's CXO conference and at that conference had meetings with members of the Vista team.

Q. Did you know, before he attended the CXO conference, that he would be attending the CXO conference?

A. I do not remember when I knew.

Q. Do you know who he met with at the CXO conference?

A. I know now but I don't recall that I knew the specific names at the time, more would they be meaningful to me.

Q. You say you know now, because

23 (Pages 86 - 89)

Page 90

G. Goodman -- HIGHLY CONFIDENTIAL

you read the complaint?

A. Correct.

Q. But other than by virtue of reading the complaint --

MR. FOULDS: Withdrawn.

Q. Before reading the complaint, you did not know who he met with?

A. I do not recall if I new. I suspect he mentioned the names but I didn't retain those names.

Q. Were you aware that Mr. Stollmeyer reported to Mike Mansbach on --

MR. FOULDS: Withdrawn.

Q. Are you aware Mr. Stollmeyer reported to Mike Mansbach while Mr. Stollmeyer was attending the Vista conference that the Vista presentations are mind-blowing?

A. I was not aware of that until I read the complaint.

Q. And I believe before you used the phrase "what's in it for me."

Do you recall that?

A. Yes.

Page 91

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And were you aware that Mr. Stollmeyer was present at a presentation at the CXO conference which had a slide entitled The Math: What's in It For Me, question mark?

A. I was not aware at the time but have read about it in the complaint.

Q. So prior to reviewing the complaint, you were not aware that Mr. Stollmeyer was present at a presentation where he was informed by Vista about what would be it for him; correct?

MS. LIGHTDALE: Objection to form.

THE WITNESS: That is correct. But I was aware he was at a private equity conference and every private equity firm has that slide. That is not unusual. It is, I would call it, customary.

Q. Do you know whether Mr. Stollmeyer, in speaking with any other private equity firm, was informed about potential wealth creation for himself?

Page 92

G. Goodman -- HIGHLY CONFIDENTIAL

A. I do not know. Once again, it is quite customary and I would not be the least bit surprised if they did.

Q. Do you know whether, in speaking with any public company potential bidders, Mr. Stollmeyer was informed of potential wealth creation for himself?

A. I am not aware.

Q. In October of 2018, were you aware about how Vista typically compensates the executives of the companies that it buys in situations where Vista retained the executives?

A. I was not specifically aware of Vista but generally aware of PE practices.

Q. And what was your understanding of PE practices?

A. My general understanding, having met as a public company with a number of PE firms is, first of all, they often required the CEO to roll over -- reinvest some of the dollars they would have gotten in the buyout to hold their dollars in the business and then, if they employ them,

Page 93

G. Goodman -- HIGHLY CONFIDENTIAL

they of course compensate them but they refresh their equity, so there is an incremental opportunity to earn equity value.

Q. And in terms of the refreshed equity compensation, do you know how that equity compensation is actually calculated?

A. I don't understand what you're asking.

Q. Well, if a CEO stays on after his or her company is purchased by a private equity firm, do you know what the typical practice is for compensating the CEO in terms of the equity value that they receive?

A. So if I were negotiating a deal, I would insist on an equity pool of at least twenty percent for me, my executive team, and my employees. I know PE firms don't like to go as deep into the management team as I believe they should. And as a CEO myself, I would insist on equity, you know, in the high single

24 (Pages 90 - 93)

Page 94

G. Goodman -- HIGHLY CONFIDENTIAL
digits to low teens.

Q.   And do you know in what form that equity compensation would be, which to say stock grants or options or something else?

A.   It is generally stock options.

Q.   And do you know how the strike price of the options is generally determined for an executive who stays on after his or her company is purchased by a private equity fund?

A.   I actually don't.

Q.   Do you believe that --

MS. LIGHTDALE: We've been going for a little bit over an hour.  I know it's also getting close to lunchtime.

Chris, why don't you just let us know what you're thinking about timing here, and if Ms. Goodman can tell us what kind of break she's going to need.

MR. FOULDS: I can ask questions all day.  It's really up to Ms. Goodman and obviously the court

Page 95

G. Goodman -- HIGHLY CONFIDENTIAL
reporter.

THE WITNESS:  I can go a little while longer.  At some point I'm going to want like a solid like half an hour to go get some food, twenty minutes to go get some food.

MR. FOULDS: Absolutely.

Should we keep going for another fifteen; is that fine?

THE WITNESS:  It's whatever works for others.  I'm fine with that.

Q.   So during the process that led to the sale of Mindbody to Vista, I think it's fair to say that you did not ask how Mr. Stollmeyer would be compensated if indeed Vista kept him on after the sale; is that right?

A.   That is right.

Q.   And at some point in time in October of 2018 did you become aware that Vista made an indication of interest to Mr. Stollmeyer for the purchase of Mindbody?

A.   I am aware.

Page 96

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   And how did you learn of that?

A.   From Rick.

Q.   And what did he tell you about the indication of interest?

A.   That they had expressed an indication of interest at a premium to our current stock price.  Pretty much standard operating language for this sort of approach.

Q.   Did he say anything else about the indication of interest?

A.   I believe he thought they were very serious, that they were very interested.

Q.   Anything else?

A.   I'm having trouble remembering the specifics again.  Many conversations happened in this time frame.  But I think that's the gist of the initial dialogue.

Q.   So you can't remember anything else specifically that he said about the indication of interest in October of 2018?

A.   I cannot.

Q.   And how did he inform you of the

Page 97

G. Goodman -- HIGHLY CONFIDENTIAL
indication of interest in October of 2018?

A.   Telephone call.

Q.   Do you recall how he set up the telephone call with you?

A.   I don't recall the specifics of that.

Q.   Do you recall whether it was one phone call or two?

A.   I don't recall.  I'm sorry.

Q.   Did he say why he was calling you instead of writing you an e-mail?

A.   Not that I recall.

(Whereupon, an e-mail dated October 18, 2018 was marked Exhibit 5 for identification.)

Q.   I've just marked hopefully Exhibit Number 5.

A.   I see it.

Q.   Okay.

And this is MBOD 14120.

Can you tell us what that is?

A.   It is a calendar invite.

Q.   And it's to you and it says, "Rick to call Gail."

25 (Pages 94 - 97)

Page 98

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Do you see that?

A. Yes.

Q. And to the best of your recollection, was this the date to the call where Mr. Stollmeyer discussed with you Vista's indication of interest?

A. I don't -- I actually don't think it was. As you see, it says, "Rick will confirm this call one hour before." I think we missed each other. You'll notice that this was 10:00 p.m. Eastern; I'm in Eastern time. And he was trying to catch me between two things I don't think it happened then. I think it happened -- I was headed out for a short vacation. I don't think I learned about this until after the vacation.

Q. Understood.

So just to be clear, there's calendar invite for a call with Rick but, to the best of your recollection, that call did not take place on the 18th of October?

A. That is what I'm saying, yes.

Page 99

G. Goodman -- HIGHLY CONFIDENTIAL

Q. At any point it time in 2018 or 2019, did Mr. Stollmeyer ever express to you that he did not want to work for any particular type of acquirer?

A. No.

Q. Okay.

When you eventually did talk to Mr. Stollmeyer in October of 2018 about Vista's indication of interest, did he describe the type of transaction that he was interested in pursuing?

A. That he was interested in -- that he here at Vista or Rick?

Q. Mr. Stollmeyer.

A. At this time he is getting intrigued by the idea of what the company could do in the hands of a private equity investor, but very cognizant that a sale process should include strategic and private equity, and we discussed starting a process that involved a complete market check of interest.

Q. But it is true that he preferred a private equity deal; right?

Page 100

G. Goodman -- HIGHLY CONFIDENTIAL

MS. LIGHTDALE: Objection to form.

THE WITNESS: He believed that -- and I think the board concurred that it was the more likely outcome and the outcome that would let us pursue all of our strategic growth initiatives.

Q. And he said that on your initial phone call?

A. I am going to reiterate that, in this time period, all of these things have blurred together and so I do not recall what happened in which conversation.

(Whereupon, a text message dated October 24, 2018 was marked Exhibit 6 for identification.)

Q. I've just marked Exhibit Number 6.

A. I see it.

Q. Okay.

And can you just tell us what this is?

A. An e-mail from Rick to me on the

Page 101

G. Goodman -- HIGHLY CONFIDENTIAL

24th of October in 2018.

Q. Do you think it's an e-mail or a text message?

A. Oh, I don't know. You tell me. It's from -- oh, it's got text up at the top. It is a text message.

Q. Okay.

Well, you'll see here it says, "hi, Gail, in Lyft next thirty minutes."

And then what does the next sentence say?

A. "Topic is initiating process to take company private."

Q. So on the call -- well, I should ask.

He says he will call you about 10:00.

Do you see that?

A. I do.

Q. And do you believe that this call occurred?

A. I do.

Q. And you'll see here in the second sentence it says the topic of the

26 (Pages 98 - 101)

Page 102

G. Goodman -- HIGHLY CONFIDENTIAL

call is initiating a process to take the company private; correct?

A.   Correct.

Q.   And it doesn't say to merge with another public company; correct?

A.   That is correct.

Q.   Just to the extent you can remember -- and I know you have your standing caveat about things blurring together -- but to the extent you can remember, what specifically did he say to you on this call?

A.   That it was time to -- a time to initiate an M&A process; is that given Vista's indication of interest and their seriousness, we needed to start a process.

Q.   And anything else?

A.   Not that I specifically recall.

Q.   Did he describe at all whatever interactions he had with Vista up until this point?

MR. DEL MONACO: I object to the form.

THE WITNESS:  With my usual

Page 103

G. Goodman -- HIGHLY CONFIDENTIAL

caveat, sometime in this time period I got familiar with the conversations he had and how he had developed that relationship.

Q.   And what conversations had he had with Vista up to this point?

A.   So he had had multiple meetings to familiarize Vista with the business, with the metrics of the business, and publicly available information, but also the excitement he had about future growth options.

Q.   Did you discuss this phone call with other board members prior to the next board meeting?

A.   I don't recall, but I wouldn't be surprised.  I was the lead independent director at this time and we just had an indication of interest in someone buying our company, so at this point it's all hands on deck, what are we going to do, how are we going to run this fair and open process, so I would not be surprised if over the next day or two I had a few phone

Page 104

G. Goodman -- HIGHLY CONFIDENTIAL

calls but honestly don't remember the sequence.

Q.   So other than not being surprised, do you recall actually having phone calls with other board members prior to the next board meeting about a potential take private transaction?

A.   I object to the characterization of the take private, and no, I don't specifically recall.

Q.   Well, I don't know what you're objecting to because in his text message to you says, "process to take the company private."

So did you have any conversations with any other board members prior to the next board meeting about initiating the process to take the company private?

A.   I don't specifically recall any conversations, but again, I suspect they happened.  This is two years later and it's hard for me to recall individual conversations.

Page 105

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   And prior to the next board meeting --

MR. FOULDS: Withdrawn.

Q.   At any point did Mr. Stollmeyer express the view that a sale to a private equity firm or a public company would not be an automatic exit for any members of management?

A.   Throughout the course of this time frame, as a board and as a management team, Rick was seeking to understand what was the sequence, what was the typical practice, what did that mean for whom all the way through.  So I recall having conversations about what happened -- I sold to a public company, so what happens when you sell to a public company, what happens when you do a private equity transaction.  I just don't recall when exactly those conversations happened, but he was very concerned about retaining his team and keeping his team excited.  Because again, in either scenario, he felt he would need to deliver on these growth

27 (Pages 102 - 105)

Page 106

G. Goodman -- HIGHLY CONFIDENTIAL opportunities.

Q. So is it fair to say that he intended to stay on in his CEO role subsequent to any transaction regardless of who the buyer was?

A. What I will say is, as he had gotten into the conversations with Vista in particular, his excitement about his ability to fully realize the Mindbody vision had grown. And so I was feeling from him just a ton more excitement and energy. So in August he was tired; by mid October, I think his view to what he could do and the support he would get to do it. So remember, he was wondering if he really had the right skills and expertise to take the company to the next level. I think Vista had been giving him confidence that they had mentoring and coaching that could help him do that. So I think his view what his future would be in the different scenarios was changing.

I think he also understood that it wouldn't necessarily be his decision,

Page 107

G. Goodman -- HIGHLY CONFIDENTIAL it would be the acquirer's decision and that starting an M&A process, I do recall a conversation, I just don't recall when it was, a lot of things were out of his hands; that the board was going to take the best offer for our shareholders, not what Rick wanted, and not really take into consideration his future job prospects. So he was well aware that by initiating an M&A process, he was going to lose substantial control of that outcome.

MR. FOULDS: I'm just going to introduce this document and then we can take a break, if that's okay.

THE WITNESS: Sure.

MR. FOULDS: Just give me one moment.

(Whereupon, an e-mail dated October 18, 2018 was marked Exhibit 7 for identification.)

Q. You mentioned talking to Mr. Stollmeyer in sum and substance about the difference between selling to a public company and a private equity firm.

Page 108

G. Goodman -- HIGHLY CONFIDENTIAL

Do you recall that?

A. I do.

Q. And you mentioned that there were some differences.

What were those differences?

A. So there are differences at many levels. I don't know how to start there. There definitely are differences in the way -- in the perspective of the buyer in terms of what they are interested in learning about and how their evaluation process works. There are differences in terms of valuation methodology that they typically use. There are differences in post-merger realities.

So how would you like me to proceed?

Q. Is there any difference in compensation?

A. Typically in strategic transactions, the premium paid is higher because the acquirer sees something in the transaction where, you know, the famous one plus one equals three as opposed to a

Page 109

G. Goodman -- HIGHLY CONFIDENTIAL private equity transaction where they're just valuing future growth of a standalone business. So no question that if you can get a strategic buyer, you typically get a higher premium. And the board was very interested in exploring whether there was a potential strategic out there that would pay that higher premium.

In terms of post-merger integration and compensation, we actually didn't discuss that. I think it is often that, you know, a public company's CEO finds themselves in a less interesting job because they're now the general manager of a division or something, but we did not discuss that.

Q. But it's fair to say that Mr. Stollmeyer did prefer selling to a private equity firm than another public company; correct?

A. I don't want to comment to Rick's preference because I really don't know what was in his head, but he was fully cognizant that it was much more

28 (Pages 106 - 109)

Page 110

G. Goodman -- HIGHLY CONFIDENTIAL likely that we were going to find a financial sponsor than a strategic and so he was busy understanding how financial sponsors would view the company, how he could best position the company to get a good offer from a financial sponsor, so we were clearly spending more time on the probable outcome than the possible outcome.

Q. And this really is before lunch. I've gotten Exhibit 7 to post, I believe.

A. Should it be there? There it is.

Q. Okay.

So this is an e-mail that you were not on. It's MB 26668.

A. Okay.

Q. It's an e-mail from Mr. -- the root e-mail -- excuse me, the second e-mail from the bottom is from Rick to Mr. White, Mansbach, and Kimberly Lytikainen, if I'm pronouncing that correctly.

A. Close enough. Close as I'm going to get.

Page 111

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And take a moment to read it.

A. I'm going to start all way from the bottom.

(Reviewing).

Got it. I have read it.

Q. Okay. Great.

So very quickly, were you aware that Mr. Stollmeyer instructed other members of management not to inform the board about Vista's indication of interest?

MR. DEL MONACO: I object to the form.

THE WITNESS: Again, I don't see this as that. I see this as please let me have the first conversation.

Q. The question though is were you aware that Mr. Stollmeyer told other members of management please do not enter or otherwise discuss with the board or anyone else?

A. Until I have a chance to do that, I was not aware.

Q. Okay. Great.

Page 112

G. Goodman -- HIGHLY CONFIDENTIAL

And were you aware that Mr. Stollmeyer would not support the sale of Mindbody unless the acquirer retained management?

MS. LIGHTDALE: Objection to form.

MR. DEL MONACO: I object to form.

THE WITNESS: I don't read this as saying that. I read this as saying he wants to sell to someone who will support the full vision and purpose of the company.

Q. If you look on like the -- if you don't count the "woo hoo" as a paragraph, one, two, three, four paragraphs up from on the first page, the second sentence, it says, "this would not be automatic exit for any of us."

Do you see that?

A. Correct.

Q. And then he says, "rather, we would lean into an acquirer who sees our current capabilities."

Page 113

G. Goodman -- HIGHLY CONFIDENTIAL

Do you see that?

A. I do.

Q. And then the paragraph below that, he says, "I would not support the sale of Mindbody at this time under any other circumstances."

Do you see that?

A. I do.

Q. So is it fair to say that Mr. Stollmeyer --

MR. FOULDS: Withdrawn.

THE WITNESS: I would like to say I read this as he would not a support a sale of Mindbody to anyone who doesn't see out current capabilities, get our huge potential, and have the resources to accelerate our results over the three-year planning window. I do not see it as employ us. In no way does it say it.

Q. Well, the second sentence says, "this would not be an automatic exit for any of us;" right?

A. Yeah. It doesn't say it's a

29 (Pages 110 - 113)

Page 114

G. Goodman -- HIGHLY CONFIDENTIAL guaranteed job for any of us either. I think he's trying to keep his team focused.

Q. And did Mr. Stollmeyer inform you that Vista would pay a substantial premium to the recent trading range?

A. I believe so.

Q. And when did he tell you that?

A. In that call on October 24.

Q. And do you know what the recent trading range was?

A. I don't recall.

Q. Okay.

And did Mr. Stollmeyer inform you that Vista would see the spot correction as an opportunity?

A. I really don't recall the specifics.

MR. FOULDS: We'll break for lunch.

MS. LIGHTDALE: What time should we return?

MR. FOULDS: I'm happy to do -- whatever you prefer.

Page 115

G. Goodman -- HIGHLY CONFIDENTIAL

MS. LIGHTDALE: I think does 12:45 Eastern work for you, Gail?

THE WITNESS: It does, yes.

MS. LIGHTDALE: And for the court reporter and the videographer, is that adequate?

THE VIDEOGRAPHER: The time is 12:14.

We are going off the record.

(Lunch recess taken at p.m.)

Page 116

G. Goodman -- HIGHLY CONFIDENTIAL

A F T E R N O O N   S E S S I O N

December 18, 2020

12:49 p.m.

THE VIDEOGRAPHER: We are back on the record.

The time is 12:49.

G A I L   G O O D M A N, having been previously duly sworn by a Notary Public of the State of New York, upon being examined, testified as follows:

EXAMINATION CONTINUED BY MR. FOULDS:

Q. Ms. Goodman, a couple of general questions.

Number one: What is the purpose of keeping board minutes?

A. It's a very general question.

I'm trying to figure out exactly how to -- so I think board minutes are there to keep a record of the key discussions and decisions that are made by a board of directors.

Q. Okay.

Page 117

G. Goodman -- HIGHLY CONFIDENTIAL

And going back to the proxy and specifically the background of the merger section, what is purpose of the background of the merger section in the proxy?

A. I think its purpose -- so I am in no way a securities lawyer -- I'll preface it with that -- but my understanding is that the background of the merger is designed to inform shareholders who are voting on the merger about the M&A process and -- so they can assess the quality of the process.

Q. Okay.

And during the sale process, did you ever consider whether or not Mr. Stollmeyer had any personal financial interests that might diverge from the public stockholders?

A. I think I said before we, as a board, were cognizant that Rick had multiple constituencies in mind and his own personal future always in the back and that that was something we needed to kind of actively put our thumbs on the scale to

30 (Pages 114 - 117)

Page 118

G. Goodman -- HIGHLY CONFIDENTIAL
make sure we balanced.

Q. And did you ever have any concerns during the process that Mr. Stollmeyer's personal interests were interfering with a fair and neutral sale process?

A. None at all.

Q. After reading the complaint, do you have any such concerns?

A. None at all.

Q. If we go back to Exhibit Number 1.

A. Okay.

Q. Thirty-five of two hundred seven again, the background of the merger section.

A. I am there.

Q. Okay.
And if you take a look up through October 26 of 2018, do you see anywhere any description of Vista's expression of interest?

A. Not specifically.

Q. And do you understand what your

Page 119

G. Goodman -- HIGHLY CONFIDENTIAL
fiduciary duties were respecting providing disclosures to stockholders?

A. I believe so.

Q. And what were those?

A. It is my duty to provide a fair, accurate, and complete view of the process the board followed prior to a transaction.

Q. So up through October 26 here, do you see anywhere that it says that Vista would pay a substantial premium to the recent trading range?

A. I do not.

Q. And do you see anywhere where it says that Vista would see the stock correction as an opportunity?

A. I do not.

Q. Okay.
Do you see anywhere where it states that Mr. Stollmeyer expressed to other members of management that a sale of Mindbody would not be an automatic exit for any members of management?

A. I do not.

Q. Do you think that's something

Page 120

G. Goodman -- HIGHLY CONFIDENTIAL
the stockholders would have wanted to know before voting on the transaction?

MR. DEL MONACO: I object to form.

THE WITNESS: I believe that the three comments you just made were all lacked specificity and actionable -- they were precursors to a process that was complete, fulsome, open, and fair. But there was no offer on the table from Vista at all. An indication of interest is a long way from an offer, and so I wouldn't have had a problem with it being in, but I don't think it was meaningful in shareholders evaluating the incredible deal that was on the table for them. And I think Rick's comment about exit in that e-mail was -- had nothing to do with anything other than making sure his management team kept their head in the game.

Q. Do you think that stockholders would have wanted to know that Vista would

Page 121

G. Goodman -- HIGHLY CONFIDENTIAL
pay a substantial premium to the recent trading range?

MR. DEL MONACO: I object to the form.

THE WITNESS: I don't think that's anything other than boilerplate how you start a conversation. There's no specificity in that, no number was ever mentioned, and we have no guarantee that they would have hit any particular number until we ran a process, got an offer, validated that offer against the market.

Q. Okay.
Mr. Stollmeyer calls it a direct expression of interest.

A. Correct.

Q. And is it your testimony today that a direct expression of interest does not need to be disclosed?

MR. DEL MONACO: I object to the form.

THE WITNESS: A direct expression of interest at this stage

31 (Pages 118 - 121)

Page 122

G. Goodman -- HIGHLY CONFIDENTIAL
is not again sitting in October of 2018, is not a disclosable event. It is not an offer, it is not concrete. In my experience as a public company CEO, I had two of these that started with a direct expression of interest. They all said substantial premium to current stock price and neither one of them got to close and, had we disclosed it, it would have created havoc in the public markets that would have been quite detrimental to our public shareholders.

Q.   I understand.

But the difference here is that there actually was a deal with Vista.

A.   There was not at that moment a deal with Vista. There was an approach.

Q.   I understand that.

But when the proxy came out in January of 2019, there was a deal with Vista; right?

A.   And the proxy details the process by which that deal came to being,

Page 123

G. Goodman -- HIGHLY CONFIDENTIAL
that piece of information, that indication of interest that started the ball rolling in October was not material to the offer on the table.

Q.   Okay.

What do you understand the word "material" to mean?

A.   The offer was not better or worse or fairer or not fairer because the ball got started off with an approach.

Q.   Okay.

You just made a hand movement there, I'm sorry.

A.   I talk with my hands.

I'll keep my hands down and say it is clear in the proxy that Rick had had meetings with multiple private equity firms, they're called financial sponsors A -- Vista A and B. So it's clear to shareholders that, prior to conducting a process, conversations had happened. That's interesting. It clearly shows what initiated the process. But the specifics of Vista was the first one to put their

Page 124

G. Goodman -- HIGHLY CONFIDENTIAL
hand up and say they're interested, it might have been interested but I don't think it changed the quality of the deal. Shareholders are looking at the quality of the deal and the quality of the process that went into the deal. I don't believe that that is material to either of those.

Q.   And jumping forward a few months, you were the one from the board who met with ISS; right?

A.   I was.

Q.   And did you tell ISS that Vista's initial direct expression of interest contemplated that Vista would pay a substantial premium to the recent trading range?

A.   I don't recall them asking about this time period, so I don't believe that it came up.

Q.   And the same question for the seeing the stock correction as an opportunity.

Did you tell ISS that Vista's initial direct expression of interest

Page 125

G. Goodman -- HIGHLY CONFIDENTIAL
contemplated that Vista would see the stock correction as an opportunity?

A.   I did not actually see that e-mail until today, so I was unaware and therefore did not share.

Q.   Is it your testimony that a Mindbody stockholder wouldn't want to know that Vista's direct indication of interest was at a higher price than the actual deal?

MS. LIGHTDALE: Objection to form.

MR. DEL MONACO: Same objection.

THE WITNESS:  I don't think we know that. I think that is not known. There was no concrete number on the table. I don't believe your statement to be true.

Q.   Okay.

In October of 2018, were you familiar with Mindbody's recent trading range?

A.   I was.

Q.   And was Mindbody's recent

32 (Pages 122 - 125)

Page 126

G. Goodman -- HIGHLY CONFIDENTIAL

trading range higher or lower than the deal price?

A. I'm trying to remember exactly. I believe it was -- I'm sorry, I'm not remembering exactly. I know that over the summer it was considerably higher. There were two corrections. And I just don't remember in October exactly where it was. I think it was in the 30s, which is around the range of the deal.

(Whereupon, a document entitled Minutes of A Telephonic Meeting of the Board of Directors was marked Exhibit 8 for identification.)

Q. I've just marked another exhibit, Number 8.

A. Got it.

Q. It's MB 125.

Can you tell us what this is?

A. This is the minutes of the October 26 board meeting.

Q. And can you find anywhere in these minutes where it states that the board of directors determined that it

Page 127

G. Goodman -- HIGHLY CONFIDENTIAL

should engage a financial advisor to provide a financial and strategic market update and preliminary evaluation of Mindbody's market situation and potential strategic opportunities?

A. No. It is not detailed there.

Q. Is there any description at all of the Mindbody board's determination that it should engage a financial advisor?

A. No.

Q. Do you recall whether that happened at the October 26 meeting?

A. In executive session, I recall we discussed that it was a time to interview financial advisors.

Q. So throughout the day you've caveated things by saying you can't really keep things straight in terms of time.

How are you so sure that you did discuss this in executive session on October 26?

A. I admit my memory has been refreshed by the prep session, which shows that a day or so later we established the

Page 128

G. Goodman -- HIGHLY CONFIDENTIAL

transaction committee and scheduled the interviews with both Centerview and Qatalyst.

Q. Were there any other documents that refreshed your recollection that you went over in your dep prep?

A. The sequence of events starts to be extremely well documented at this point forward because we are initiating a process, and so seeing those presentations from Centerview, Qatalyst, and then the Qatalyst updates did refresh my recollection.

Q. Any other e-mails that you saw that refreshed your recollection?

A. Not that I can specifically remember at this time.

Q. You'll see in the October 26 minutes of the executive session there's someone named Avina there.

Do you see that?

A. Yes.

Q. And do you know who I guess Mr. Avina is?

Page 129

G. Goodman -- HIGHLY CONFIDENTIAL

A. It is.

He is outside counsel from Cooley.

Q. And he is outside counsel to --

A. Mindbody.

Q. And do you know whether Mr. Avina had any past relationship with Mr. Stollmeyer?

MS. LIGHTDALE: Objection to form.

THE WITNESS: Prior to being company counsel? I don't know.

Q. And do you know how long Mr. Avina was company counsel?

A. I don't.

Q. And you mentioned I believe that in a few days a transaction committee was formed; right?

A. Correct.

Q. And who were the counsel to the transaction committee?

A. We worked with both Mr. Avina and Kimberly Lytikainen.

Q. Lytikainen.

David Feldman Worldwide

800-642-1099          A Veritext Company          www.veritext.com

Page 130

G. Goodman -- HIGHLY CONFIDENTIAL

A. Lytikainen, general counsel.

Q. Understood.

But this transaction committee never hired separate counsel from the company; correct?

A. Correct.

Q. Let's try that again.

A. That is correct.

Q. And did the board or the transaction committee ever engage in any sort of analysis of whether or not Cooley's past relationship with the company made it appropriate for Cooley to be advising the transaction committee?

A. Not that I know of.

Q. The process for approving board minutes, as the lead independent director, did you have any role in approving the minutes beyond your general role as board member?

A. No.

Q. And do you recall participating with Mr. Mansbach in developing a Mindbody three-year plan in or around October of

Page 131

G. Goodman -- HIGHLY CONFIDENTIAL

2018?

A. Yes.

Q. Was this one of the documents you reviewed during your dep prep?

A. We reviewed an e-mail with he and I scheduling a time to meet about it.

Q. Got it.

And do you recall that that was the path to five hundred million?

A. Yes.

Q. And what does the five hundred million signify there?

A. We were trying to take a top-down view to how we grow the company to a half billion in revenue.

Q. When you say, "top-down," what do you mean?

A. So when you do bottoms-up planning, it's like we have this many salespeople and here's the quota and it adds up and when you do top-down, it's if we're going to get to five hundred million, what does our growth rate need to be, what are our sources of growth, so

Page 132

G. Goodman -- HIGHLY CONFIDENTIAL

it's less of an operational plan to get you there and more of a modeling exercise to theorize how you might get there.

Q. Do you recall, after the October 26 board meeting --

MR. FOULDS: Withdrawn.

Q. Do you recall at any time in October of 2018 that the nominating and corporate governance committee was not only --

MR. FOULDS: Let me withdraw that, too.

Q. Do you recall at any point in time whether the nominating and corporate governance committee was engaging a search firm for a new member of the board of directors?

A. I recall the engagement. I can't remember whether comp or nom and gov was doing that work. That was Blair and I and I believe it was compensation, not nom and gov.

Q. Was Mindbody actively looking for a new board member?

Page 133

G. Goodman -- HIGHLY CONFIDENTIAL

A. No.

Q. So why were you considering the hiring of a recruiter for a board search in 2018?

A. So we wanted to develop a list of possible successors, both internal and external, and use the next twelve-plus months to get to know them. So we were internally specifically giving Mansbach and Josh some opportunities to show their skills and capabilities, and then we were contemplating hiring an outside search firm to develop a candidate list that we could get to know over time before we actually officially started a search.

Q. If you scroll down in the Exhibit Number 8 to 2554 again in the bottom right-hand corner.

A. I am not seeing anything in my bottom right-hand corner. So maybe you can just tell me a little bit which page it is or even the words on the page and I'll try to find it.

Q. The 2019 revenue plan. It's

34 (Pages 130 - 133)

Page 134

G. Goodman -- HIGHLY CONFIDENTIAL
right before the path to five hundred million.

A.   Yep.  I am there.  I see the high level assumptions and then a lot of numbers.

Which page are you on?

Q.   The 2019 revenue plan.

A.   There's a title page, there's assumptions, there's multiple levers drive ARPS growth.

Q.   The page right above the Mindbody three-year plan, the path to five hundred.

A.   Let me find that.

Got it.

Q.   Okay.  Great.

So you'll see over on the right-hand side there are words in the right-hand sort of margin with arrows pointing left on MB 2554.

A.   I see that.

Q.   And it describes payments volume growth re-inflects in H2.

Do you see that?

Page 135

G. Goodman -- HIGHLY CONFIDENTIAL

A.   I do.

Q.   And why was there a projected re-inflection in the second half of 2019?

A.   You recall earlier today I said we were hoping to deliver payments to data so it could drive revenue growth in the second half.  That's what you're seeing here; that revenue growth in payments was declining, there's an underlying assumption that we're delivering a new solution and that that will contribute to a re-acceleration of revenue growth.

Q.   And if you look just below that, it says, "mid 20s growth without an MB price increase."

Do you see that?

A.   I didn't.

Q.   And you'll see in FY 2019 at twenty-five percent?

A.   I do.

Q.   Do you see that?

And it says, "without an MB price increase."

Do you see that?

Page 136

G. Goodman -- HIGHLY CONFIDENTIAL

A.   Uh-huh.

Q.   Was there a plan in place for a Mindbody price increase in 2019?

A.   No, there was a plan for a Booker price increase but not a Mindbody price increase.

Q.   And do you know whether Mindbody increase its prices for the Mindbody product at any time in 2019?

A.   I don't.  I left the board when the transaction completed and was not with them through 2019.

Q.   Now, prior to the transaction being completed, I take it that Mindbody did not increase its prices for the Mindbody product?

A.   That is correct.

Q.   And if you look, it's actually the row right above that which is total revenue?

A.   Yes.

Q.   And you'll see the total revenue for Q4 '18 is sixty-seven thousand eight hundred fifty-eight.

Page 137

G. Goodman -- HIGHLY CONFIDENTIAL

Do you see that?

A.   Yes.

Q.   So it's 67.858 million; correct?

A.   Correct.

Q.   So at the time was this the best estimate of Q4 '18 projected revenue?

MR. DEL MONACO: I object to the form.

THE WITNESS:  This was the forecasting used for planning.

Q.   Okay.

Was there a better estimate than the one used for planning?

A.   When you're running a public company, you are doing daily updates to revenue forecasting.  At some point when you're doing planning, you've got to just kind of set the numbers and go.

So I do not know at this moment whether the flash forecasts that were running the company had moved from this number.  I can only tell you in arrears that this was the numbers we were using for our planning.

35 (Pages 134 - 137)

Page 138

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Understood.

And did the revenue projections take into account the projected Booker price increase?

A. For 2019, I believe so.

Q. As of October 26, did Mindbody's vision for the future include driving significant international expansion?

A. Yes.

Q. Did Mindbody's vision include becoming the marketplace for fitness and beauty?

A. Yes.

Q. And was it your view that pursuing Mindbody's vision would drive changes in Mindbody's revenue mix investment profile that would be difficult for the public markets to absorb?

A. Yes.

Q. And when you say, "difficult for the public markets to absorb," what do you mean?

A. So -- and I'm going to go on the investment side and then the revenue side,

Page 139

G. Goodman -- HIGHLY CONFIDENTIAL



And then the more speculative but also concerning on the revenue side was that, as we tried to push the marketplace, there was concern that we would lose software as a service revenue. The hope was that the marketplace revenue would grow fast enough to overcome that

Page 140

G. Goodman -- HIGHLY CONFIDENTIAL

risks, but we had really never done it before so we had no way of knowing that. So that was -- and built into that was a real recognition that our analysts really understood how to value a software as a service business and had no idea how to value a consumer marketplace, because we had established an analyst pool that was a software analyst pool, not a consumer marketplace pool.

So there was just a lot of factors built into being concerned about how to go after what our five hundred million vision and not harm our shareholders.

Q. So is it fair to say that there was a concern at the board level that the public market would not understand the true payoff of the investments that Mindbody was contemplating?

A. Yes.

Page 141

G. Goodman -- HIGHLY CONFIDENTIAL

evaluatory time horizons that sadly public investors have gotten a shorter and shorter time horizon.

Q. And let me just ask a question.

What time horizon were you -- are you referring to from other stockholders?

A. Again, my experience as a public company CEO and certainly with Mindbody was that shareholders are unnaturally concerned about next quarter and how that reacts to guidance and next twelve months. So the idea of a three to five-year investment is difficult for them to value into the stock, and any lack of performance against near-term expectations is harshly penalized.

Q. At this time in 2018, was it your impression that the market was inaccurately valuing Mindbody?

A. When you're an insider and you see all the growth potential, you often feel that way; if only they understood how this could connect to this, could connect

36 (Pages 138 - 141)

Page 142

G. Goodman -- HIGHLY CONFIDENTIAL
to that.

When you put on your harsh, cold, metrics-driven hat, the truth is we had slowing growth, we were below most software as a service companies in terms of a growth rate, and we weren't hitting the magic forty.

Do you know what I mean when I say, "the magic forty?"

Q. I think so, but you should go ahead.

A. So in order to be considered a growth company, there is a rule of forty, which is that your revenue growth percent plus your EBITDA margin percent ought to sum to forty. So twenty percent growth plus twenty percent EBITDA. But if you can deliver thirty percent growth, you only need to deliver ten percent EBITDA. And if you can deliver forty percent growth, you can afford to run at break even.

So this rule of forty was very much talked about in the public markets by

Page 143

G. Goodman -- HIGHLY CONFIDENTIAL
analysts and others and certainly every member of our board was well aware that we were struggling to hit the rule of forty.

Q. Okay.

So let me see if I can understand this.

Is it your view that, in the fall of 2018, the market was overvaluing Mindbody or undervaluing it?

A. Again, as we're moving through fall, the valuation is adjusting quite rapidly. As we keep missing a little on revenue and we're signaling these increased investments are coming, the market is responding to both of those, and so I always feel my companies are undervalued, but it might have been an accurate valuation. I certainly think at the board we were -- you know, we could see more potential than the markets could see.

Q. And that was also true in October of 2018, not just the fall, generally; correct?

Page 144

G. Goodman -- HIGHLY CONFIDENTIAL
A. Yes.

Q. I think I asked this before so I do apologize, but it was true that as of October of 2018, Mindbody did not need capital to invest because Mindbody had five years on its debt; right?

MR. DEL MONACO: I object to the form.

THE WITNESS: Mindbody was not worried about the cash to make these investments.

Q. And was it true that in October of 2018 Mindbody's board would like in the future be able to move more quickly out of the public eye?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I don't think we had a point of view about what we wanted to do. We were exploring what made sense for shareholders in the company.

(Whereupon, an e-mail dated October 26, 2018 was marked

Page 145

G. Goodman -- HIGHLY CONFIDENTIAL
Exhibit 9 for identification.)

Q. Why don't you take a look at, just to move this along, the exhibit I just marked, which is Exhibit 9.

A. Got it.

Q. You'll see this is an e-mail chain between you, Mr. Liaw, and Mr. Stollmeyer on October 26. And if you'll look at Mr. Liaw's e-mail right above the last e-mail, you'll see that the third bullet point says, "while we don't actually need capital to invest, we have five years on our debt. We would like to be able to move more quickly out of the public eye."

Do you see that?

A. Yes.

Q. Okay.

And you agreed with that?

A. Yes.

I think we need to be careful with the reading here. We'd like to be able to move more likely with our investment and out of the public eye was

37 (Pages 142 - 145)

Page 146

G. Goodman -- HIGHLY CONFIDENTIAL
going to enable that. So that is how I read that. We'd like to be able to move more quickly and I read that as in order to make these investments.

Q. In order to make these investments, you need to be out of the public eye?

A. Exactly. "We're boxed in our strategic" -- read that line above. "We are boxed in our strategic and operational flexibility with quarterly earnings constraints."

Q. Just out of curiosity, why was Mindbody boxed in with quarterly earnings constraints?

A. So once again, we work for the shareholders. Technically, we work for the long-term interests of the shareholders, but in reality, shareholders were becoming -- we were experiencing shareholders that were extremely short-term focused. I don't think we were the only company in the world to suggest that.

Page 147

G. Goodman -- HIGHLY CONFIDENTIAL
As we were sitting here in October of 2018, we knew we wanted our 2019 investment plan it reduce profitability over 2018, and growth was going to slow. So if we chose that path, shareholders were going -- the public markets were very likely to significantly reduce our value, and that would not be good for our shareholders. So that's what he's referring to, which is in order to hit the kinds of earnings numbers that deliver a return to our investors in the short term, we would have to choose not to invest for the long term. It's a typical board conversation and one that happens at many public board levels.

Q. But respecting the long-term holders, that shouldn't have been an issue; right?

A. Well, isn't that the crux of the challenge? How do you sort through your investor base to understand the time horizon that each of your investors are operating under. The report card you get

Page 148

G. Goodman -- HIGHLY CONFIDENTIAL
is very immediate and it's stock price.
And so while I would be thrilled to have a shareholder base that was willing to have the stock go down significantly in the short term because they believed in the long term, I have never seen that stockholder base, and we did not have that stockholder base at Mindbody.

Q. What would have happened if you had simply proceeded with the investment plan that may have reduced certain metrics over the short term?

MS. LIGHTDALE: Objection to form, if the question ended there. I'm not sure.

THE WITNESS: This is entirely conjecture.
Is that what you're asking me to do?

Q. Well, I'm just wondering -- what I'm hearing is that the board was concerned about what its short-term stockholders' interests were possibly to

Page 149

G. Goodman -- HIGHLY CONFIDENTIAL
the detriment of its long-term stockholders.

MS. LIGHTDALE: Is that a question there? The question is: Is that right?

MR. FOULDS: It's a question, yes.

MS. LIGHTDALE: Objection to form.
Gail, you can answer, if you can.

THE WITNESS: Like I said, it was -- this whole discussion of long-term shareholder value and interest is a nice sound bite but very difficult to figure out.
So what we were confident of is, if we guided to 2019, lower revenues -- slightly lower revenue growth and significantly lower earnings that the stock would go down significantly from where it was, and we did not feel that was in any of the shareholders' interests, because that's when your

38 (Pages 146 - 149)

Page 150

G. Goodman -- HIGHLY CONFIDENTIAL
long-term shareholders become short-term shareholders when they decide to strike a lot of your stock that they've lost confidence in.

So it's a very tricky balancing act between selling a vision and building confidence in near-term execution, and we were pretty certain there would be a big market correction when we guided to 2019 if we adopted the investment plan we wanted to. We never got a chance to see how that played out.

Q.    And moving on from that, at this time, which is to say in late October of 2018, what did Mr. Stollmeyer tell you about his future interactions with Qatalyst?

MR. DEL MONACO: I object to the form.

THE WITNESS:  I didn't understand.

His future interactions with Qatalyst?

Page 151

G. Goodman -- HIGHLY CONFIDENTIAL

MR. FOULDS: Let me be a little more direct.  I'm sorry.

Q.    Were you aware that Mr. Stollmeyer, on October 26, was invited to Qatalyst's fall retreat?

MS. LIGHTDALE: I'm going to object to the form.

THE WITNESS:  I'm aware at some point in this time frame that he's going to Qatalyst's retreat, but I don't know which day.

Q.    And do you know what he did at Qatalyst's retreat?

A.    Not specifically.

Q.    Do you know in a nonspecific way what he did at the Qatalyst retreat?

A.    It would be conjecture.

Q.    Were you aware that he went with his wife?

A.    No.

Q.    Were you aware that they received massages one morning?

A.    No.

Q.    Were you aware that they then

Page 152

G. Goodman -- HIGHLY CONFIDENTIAL
had an afternoon activity test?

A.    No.

Q.    Were you aware that the following morning they were scheduled for kayaking and paddleboarding?

A.    No.

Q.    And their afternoon activity for the next day was cooking class with chef Angela Tamura?

MS. LIGHTDALE: Objection to form, because I don't think there was a question.

THE WITNESS:  I was not aware.

Q.    Were you aware of that?

A.    I was not aware.

Q.    And at this point you hadn't hired Qatalyst; right?

A.    I'm sorry, what was the date of the conference?

Q.    The date of his invitation.

Let me share the document.

(Whereupon, an e-mail dated October 26, 2018 was marked Exhibit 10 for identification.)

Page 153

G. Goodman -- HIGHLY CONFIDENTIAL

Q.    It should have popped up. Exhibit Number 10.

A.    Okay.

Q.    So as of October 26, Mindbody had not hired Qatalyst; correct?

A.    That is correct.

Q.    And as of October 26, you did not know that Mr. Stollmeyer had been invited to the Qatalyst conference; correct?

A.    Not that I recall.

Q.    And prior to Mindbody hiring Qatalyst, were you aware that Mr. Stollmeyer had attended the Qatalyst conference?

A.    Not that I recall, but I may very well have been.

Q.    At any point in the sale process of Mindbody, did the board of directors chaperone Mr. Stollmeyer when he was talking to any investment bank?

MR. DEL MONACO: I object to the form.

THE WITNESS:  What was the --

David Feldman Worldwide
800-642-1099          A Veritext Company          www.veritext.com

Page 154

G. Goodman -- HIGHLY CONFIDENTIAL
did we chaperone?

Q.    Yes.

A.    No, nor would it have been appropriate or customary, nor would I have tolerated any of my board members trying to chaperone me. I'm kind of offended by the word, honestly.

MR. FOULDS: Let me rephrase it.

Q.    Given the fact that Mindbody had not yet hired a financial advisor, does it concern you at all that Mr. Stollmeyer was attending a retreat at Pebble Beach where he was receiving massages, tennis activities, kayak and paddleboarding, cooking classes, dinners with Billy Crystal, dinners with Alicia Keys?

A.    As a public company CEO, I was frequently invited to similar conferences, not by Qatalyst but by Morgan Stanley and Goldman Sachs and others. They are usually quite lavish, although I never went to any of them. It doesn't -- it doesn't overly concern me.

Q.    Okay.

Page 155

G. Goodman -- HIGHLY CONFIDENTIAL
It doesn't concern you that Mr. Stollmeyer went to a fall Qatalyst retreat while the board was considering which financial advisor to hire?

A.    Again, I'm having trouble remembering exactly the conversations at the time, but I think it's a nice opportunity to get to know a potential financial advisor and understand whether you can have a good working relationship with them. I suspect it was a chance for him to talk to other CEOs who had worked with them to get a sense of their style and process. It not only doesn't concern me, I think it's useful.

Q.    And on October 26 --

MR. FOULDS: Actually, withdrawn.

(Whereupon, an e-mail dated October 31, 2018 was marked Exhibit 11 for identification.)

(Whereupon, a document entitled Action By Unanimous Consent was marked Exhibit 12 for identification.)

Q.    I've just marked two more

Page 156

G. Goodman -- HIGHLY CONFIDENTIAL
exhibits and hopefully they appear in the right order. I believe the first one is Exhibit 11.

A.    I'm opening it.
Got it.

Q.    So this is a cover e-mail, it's MB 89777 from we're just going to call her Kimberly, the GC.

And if you look at her root e-mail, do you recall receiving this e-mail?

A.    I do.

Q.    And she says that she was sending out for DocuSign a UWC.
Is that a unanimous written consent?

A.    Correct.

Q.    To establish a special committee of the board, the ad hoc strategic transactions committee.
Do you see that?

A.    I do.

Q.    Okay.
Why the use of the word "ad hoc"

Page 157

G. Goodman -- HIGHLY CONFIDENTIAL
or the words "ad hoc?"

A.    It was not a permanent standing committee of the board. It was specifically created for this deal, potential deal process, and not intended to, should we not do a deal, stay forever.

Q.    And the next sentence says, "the limited purpose at this time is to review potential financial advisers to assist the company with evaluating strategic alternatives."
Do you see that?

A.    I do.

Q.    Why was there a limited purpose to the special committee, at least at this time?

A.    If you read the next sentence, it says, "we can expand the purpose as necessary."
At this point the next step was to talk to potential financial advisors. Part of that conversation was to get their advice on whether we should even start a process. So I think the thinking,

40 (Pages 154 - 157)

Page 158

G. Goodman -- HIGHLY CONFIDENTIAL
although I don't recall the exact conversation, was step one, let's get some advice on whether it's a good time, whether we think a deal will be successful, because the worst thing you can do is start a process like this, distract your management team at a crucial execution time if you don't think there's a likely successful outcome.

So step one was let's get the point of view from the financial advisors and choose one if we're convinced it does make sense to move forward.

Q. Okay.

At this point in time, which is to say in between Vista's initial indication of interest and October 30, who was overseeing Mr. Stollmeyer's interactions with Vista?

A. The board had clearly asked Rick to keep us well informed of his interactions with Vista.

Q. Okay.

And so between Vista's initial

Page 159

G. Goodman -- HIGHLY CONFIDENTIAL
indication of interest on the seventeenth and the board meeting on the -- excuse me, the formation of the committee on the thirtieth, did Mr. Stollmeyer meet with or otherwise talk to Vista?

A. Again, I'm not aware of -- I don't recall each and every interaction. But from the time that he told us, we were very clear with him that he should tread cautiously, give them no non-public information until we had an NDA in place, and keep us informed. So if he did have conversations, I'm sure we were aware of it, but I cannot tell you how many he had at this moment.

Q. If you'll look at Exhibit Number 12, you'll see the unanimous written consent to which the general counsel refers in her e-mail; is that right?

A. I do.

Q. And you'll see in the fourth paragraph down it says, "resolved further?"

Page 160

G. Goodman -- HIGHLY CONFIDENTIAL
A. Yes.

Q. So the board may determine as and when necessary to delegate additional authority to the committee.

So it's fair to say that the committee was not doing any of these five things at this time?

MS. LIGHTDALE: Objection to form.

THE WITNESS: Let me read that. Let me read the sentence.

(Reviewing).

Yeah, at this moment none of these things are happening and neither the management team nor the strategic transaction committee is doing any of those.

Q. Okay.

How did it come to be, if you go back to -- well, I'll just read it for you. If you find Exhibit 11, I'll just read it.

In this e-mail it says, "members proposed are" -- in the passive voice --

Page 161

G. Goodman -- HIGHLY CONFIDENTIAL
"Eric Liaw, as chair, Gail Goodman, and Court Cunningham."

A. Yes.

Q. Who proposed those members?

A. So there was a discussion in executive session at the board about who would be best to be on that committee. Eric clearly had the most relevant and recent deal experience. He was very familiar with recent M&A transactions in his role with IVP. And Court and I had both sold companies and had private equity and public buyers as part of our sale process. So as members of the board, we were the ones with the most direct and relevant experience.

Q. And when you say in executive session, you mean at the October 26, 2018 meeting?

A. Yes.

Q. And those are the minutes we went over before that don't specifically mention any acquisition, transaction, formation of a committee, hiring of

41 (Pages 158 - 161)

Page 162

G. Goodman -- HIGHLY CONFIDENTIAL

investment bankers; correct?

A.    Correct.

Q.    And what analysis, if any, did any member of the board, including yourself, do about any potential conflicts that Mr. Liaw may have faced in serving on the transaction committee?

A.    We were all very well aware of IVP's holdings in Mindbody, so that was well known.  But we felt confident that that aligned him with shareholders' interests in trying to get the best possible price for the stock.

And other than that, we did not think there were other conflicts.

Q.    Did you or, to your knowledge, anyone else ever consider whether or not IVP had a desire to sell its stake in Mindbody in the near term?

MS. LIGHTDALE: Objection to form.

THE WITNESS:  We were a public company.  They could have sold their stock at any time in the public

Page 163

G. Goodman -- HIGHLY CONFIDENTIAL

market, and so we were unaware of any plans to do that but for sure Eric would have let us know.

Q.    So it's fair to say Eric Liaw did not let you know that IVP had any intention of selling its stake in the near term?

MS. LIGHTDALE: Objection to form.

THE WITNESS:  Not that I recall.

Q.    And it's also fair to say that Mr. Liaw never told you that IVP had a target date for when it wanted to sell its Mindbody stake; correct?

MS. LIGHTDALE: Objection to form.

THE WITNESS:  That's correct.

Q.    So am I getting it right that at the October 26 meeting the board voted to form the ad hoc strategy committee or no, that's wrong?

A.    No, that is not correct.  We are voting to form the committee in this UWC. We discussed forming a committee.  We

Page 164

G. Goodman -- HIGHLY CONFIDENTIAL

talked about who might participate and then created it here.

Q.    Understood.

But at the October 26 meeting, the board did determine that it should engage a financial advisor; correct?

A.    It did determine that we should interview and decide whether to engage. It's a subtle difference but it's an important difference.  We are still very concerned about the distraction a process might have for the company.  Not a hundred percent convinced a process will end in a transaction.  So we are moving quite cautiously, and so one of the critical interview questions we had for both of the financial advisors that we interviewed was how to do a transaction without public exposure of that transaction which would cause risk to the company, how to do it with minimum extraction of the executive team which could cause risk to the company, and whether we should even start given what we thought the probability of

Page 165

G. Goodman -- HIGHLY CONFIDENTIAL

successful outcome was.  Those were all very important questions for you at this point.  We had not decided to start a process or hire an advisor.  We decided to interview advisors and determine whether to do it.

Q.    As of --

MR. FOULDS: I'll withdraw that.

(Whereupon, a document entitled Minutes of A Video Meeting was marked Exhibit 13 for identification.)

Q.    I've introduced another exhibit, Exhibit Number 13.

A.    Got it.

Q.    And this is MB 127.

These are minutes of a video meeting of the strategic transaction committee dated October 31, 2018; correct?

A.    Yep.

Q.    And you will see that at the bottom there's a closed session under number four?

A.    Correct.

Q.    Okay.

42 (Pages 162 - 165)

Page 166

G. Goodman -- HIGHLY CONFIDENTIAL

And the second sentence discusses the importance of establishing a process for fulfilling its responsibilities, meaning the committee's, that was independent and free of any influence from members of management or other directors who, depending on the circumstances, could have or could be viewed to have a potential conflict with respect to any specific financial advisor or potential strategic partner.

Do you see that?

A. I do.

Q. And then it says, "the committee then asked counsel to provide the committee with a sample form of written neutrality guidelines?"

A. Yes.

Q. "To serve as a framework for ensuring that management understood its role in any potential process."

Do you see that?

A. Yes.

Q. Okay.

Page 167

G. Goodman -- HIGHLY CONFIDENTIAL

And did you ever receive the neutrality guidelines?

A. I don't recall. I remember them being discussed. I don't specifically remember if I received them. I know they were given to management.

Q. They were given to management? Okay.

The neutrality guidelines were given to management so that --

MR. FOULDS: Withdrawn.

Q. What was the purpose of giving the neutrality guidelines to management?

A. This was the first time Rick or Brett had been through a process of this nature and we wanted to make very sure that they understood what their roles and responsibilities were, so certainly that equal access for all potential suitors, no discussion of future roles for them in the organization prior to a deal on the table, those sorts of things, just because -- I mean, we just wanted to make sure they really understood the right way to

Page 168

G. Goodman -- HIGHLY CONFIDENTIAL

proceed.

Q. You said equal access to all bidders.

Why is that important?

A. Because we want to get the best possible outcome, and so we want to have the most possible parties at the table. Had you been in these meetings, my frequent comment was a competitive process is our best friend, so we very much wanted a competitive process. The best way to move price is competition, period, hands down. We knew Vista was interested, but we definitely wanted more parties at the table, and so it was very important that we get some people caught up with where Vista's interest was.

Q. When you say, "equal access," you mean equal access to management; correct?

A. Correct.

Q. And you also mean equal access to information about the company; correct?

A. Correct.

Page 169

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Do you recall anything else that the neutrality guidelines said?

A. I don't.

Q. And is it your understanding that the neutrality guidelines were abided by management?

A. It is my understanding.

Q. Were you aware that Mr. Stollmeyer was text messaging with Monti Saroya at Vista from August through December?

MR. DEL MONACO: Objection to the form.

THE WITNESS: ███████████
███████████
███████████
███████████
███████████
███████████

Q. Do you know whether Mr. Stollmeyer was also text messaging with any other bidders?

A. Nobody was a bidder yet and I

43 (Pages 166 - 169)

Page 170

G. Goodman -- HIGHLY CONFIDENTIAL

know he had meetings with them but I don't know what form of e-mail, phone, or text he was using in communications with those folks.

Q. Fair point, and I thank you for that correction.

Do you know whether Mr. Stollmeyer text messaged with any other potential bidders other than Vista?

A. I do not know that. I do know he had meetings with them.

Q. And do you know when those meetings occurred?

A. October to early November. Mostly just the three that we had talked about in September. Obviously more potential suitors were added to the list and more meetings were had after we hired a financial advisor.

Q. And were you involved at all in --

MR. FOULDS: Well, let me break that down.

Q. Were you involved at all in

Page 171

G. Goodman -- HIGHLY CONFIDENTIAL

formulating the guidance that was provided by management to the market on November 7 of 2018?

A. The primary committee that worked on guidance was the audit committee, which I was not part of. So I was not deeply involved. I was informed.

Q. Were you informed at board meetings or through phone calls or e-mails, to the extent you can remember?

A. I cannot remember the specifics.

Q. But you are certain you were kept informed prior to the November 7 earnings call?

A. I'm certain because I always read the press release before it hit the wire, so at a minimum I knew what was coming. I don't recall if I knew before I saw the draft earnings. I just don't remember.

Q. And were you aware that Mr. White recommended a higher range of guidance than was ultimately disclosed to the market on November 7?

Page 172

G. Goodman -- HIGHLY CONFIDENTIAL

A. In some of the briefing documents I saw over this last week in preparation for this, I became aware of it. At the time I was not.

I'm getting close to needing at least a five-minute break.

MR. FOULDS: Let's do it now, if that's okay.

THE WITNESS: Fine with me.

THE VIDEOGRAPHER: The time is 2:01.

We are going off the record.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are back on the record.

The time is 2:10.

Q. Ms. Goodman, prior to the proxy being filed respecting the Vista acquisition of Mindbody, did you or anyone else at Mindbody tell Cooley about Vista's October direct indication of interest from Vista?

A. I'm trying to recall specifics, which is why I'm hesitating. I presume

Page 173

G. Goodman -- HIGHLY CONFIDENTIAL

they were aware of it, but I can't say I specifically recall informing them. It's what started it all. They had to know about it. But I don't know the specifics of how and when they were informed.

Q. Going back to the November 6 earnings announcement -- I said November 7 before; I apologize -- would your answers still be the same if I said November 6 instead of November 7?

A. Yes.

Q. Thank you so much.

And were you aware that the range of Q4 revenue guidance provided by management had a midpoint that was lower than management's own internal forecasts?

A. Yes.

MR. DEL MONACO: I object to the form.

THE WITNESS: Yes.

Q. You were aware. Okay.

And you were a proponent of lowering the guidance; is that correct?

A. I don't recall --

44 (Pages 170 - 173)

Page 174

G. Goodman -- HIGHLY CONFIDENTIAL

MS. LIGHTDALE: Objection to form.

THE WITNESS: I don't recall being actively in the dialogue of that, so I don't recall whether I had a strong point of view one way or the other.

Q. How were you made aware that the midpoint of the Q4 revenue guidance provided on the November 6 call was lower than management's projections?

MR. DEL MONACO: I object to the form.

THE WITNESS: Again, I don't -- I don't specifically recall how I was informed. Guidance better be below forecast. You need room for things to change, so it is again customary to guide with some margin for error against your current forecast. It would be foolhardy not to do so.

Q. And which are the public boards are you on right now?

A. Right now Shopify is my only

Page 175

G. Goodman -- HIGHLY CONFIDENTIAL

public board.

Q. So does Shopify give earnings guidance?

A. Not since the pandemic started, but prior to that, yes.

Q. And Shopify -- Shopify gives, prior to the pandemic --

MR. FOULDS: Withdrawn.

Q. Prior to the pandemic, Shopify gave earnings guidance that was lower than management's own internal forecast; is that right?

MS. LIGHTDALE: I object to the form.

THE WITNESS: I am not going to speak to things that happened at other public board meetings in this deposition. That could be I think inappropriate.

I can speak to my general experience and say at Constant Contact we regularly gave ourselves execution risk room in terms of guidance.

Q. Okay.

Page 176

G. Goodman -- HIGHLY CONFIDENTIAL

I'm only following up on Shopify because you said it's customary to do that.

In your experience, is that universal or something else?

A. So I know about my experience. I participated in a CEO peer mentoring group with other public company CEOs. All of them did it. You need again room for execution I'll call them wobbles. Revenue forecasting is not an exact science. You're forecasting, which means things can go wrong.

So speaking to my broad experience, let's leave a specific company out of this other than Constant Contact and Mindbody.

Q. Okay.

Well, in the interview that you gave back in 2016, which is available on YouTube with I guess it's a business software gentleman with a foreign accent --

A. Yeah.

Page 177

G. Goodman -- HIGHLY CONFIDENTIAL

Q. -- you did say, did you not, that a SAAS company should be able to predict its near-term future revenues with some level of accuracy; correct?

A. Yes, some level. The range gets very narrow.

Again, I'll look at Mindbody at this time. I believe our guidance range was like a million dollars. You look at a manufacturing company that builds things, their range is going to be much wider.

So the accuracy comes to the breadth of range, not to the certainty of where you're going to fall inside that range.

Q. Okay.

But is it accurate to say that management's best estimate of fourth quarter revenue should at least fall within the range of the guidance?

MR. DEL MONACO: I object to the form.

THE WITNESS: It is not uncommon for your current forecast to be

45 (Pages 174 - 177)

Page 178

G. Goodman -- HIGHLY CONFIDENTIAL
slightly above the high end of the range.

Q. And did anybody at Mindbody ever tell the market that its guidance was below its best estimate of its Q4 revenue forecast?

MS. LIGHTDALE: Objection to form.

THE WITNESS: No.

Q. Were you aware that internally at Mindbody management was saying things like a few hundred thousand makes a huge difference for the earnings announcement?

MR. DEL MONACO: I object to the form.

THE WITNESS: I was not aware.

Q. Do you know who Greg Heinle is?

A. Not off the top of my head.

Q. H -- let me just say, do you know anybody named Heinle, H E I N L E, at Mindbody?

A. Not off the top of my head. I am notoriously bad at names.

Q. I'm sorry, I didn't hear that?

Page 179

G. Goodman -- HIGHLY CONFIDENTIAL
A. I'm notoriously bad at remembering names.

Q. I think he was the head of FP and A. I could be wrong about that.

A. It does ring a bell.

Q. But just to be back and to be clear about this, you were not involved in deciding which range of guidance to provide on November 6 of 2018; correct?

A. Not that I recall.

Q. Were you aware that the Q4 '18 forecast left more cushion than Mindbody typically had in its forecasts?

MR. DEL MONACO: I object to the form.

THE WITNESS: I may have been, but I don't recall that at this moment. I was not on the audit committee and did not dive deeply into the guidance conversation. I relied on Graham and Cipora, who were extraordinarily experienced with public company guidance.

Q. Were you aware that the company

Page 180

G. Goodman -- HIGHLY CONFIDENTIAL
had October actuals at the time that it guided on November 6 of 2018?

A. If I recall correctly, we wanted to see that. There was enough fluctuation that we were waiting for that and that is why we pushed back earnings a bit.

Q. Isn't the point of giving an actual guidance range to provide some margin for error?

A. Yeah, and the more information you have the closer it could be, so sometimes that's a good path forward.

Q. Okay.
Did you have --
MR. FOULDS: Strike that.

Q. Did you participate at all in preparing the script that management uttered on the November 6 earnings call?

A. I was not involved in writing or reviewing the script.

Q. Do you know what happened to the stock price of Mindbody following immediately thereafter the November 6 earnings call?

Page 181

G. Goodman -- HIGHLY CONFIDENTIAL
A. The stock moved down.

Q. And were you -- I'm sorry, I cut you off.

A. I said I don't recall the percentage.

Q. Was it a significant percentage?

A. It was.

Q. And were you surprised by the size of the stock drop?

A. I honestly don't recall my state of mind, but we knew we were guiding down and we expected a reaction.

Q. You expected a negative reaction?

A. Yes.

Q. How large of a negative reaction did you expect?

A. We generally did not guess at that.

Q. Were you surprised, however, at the magnitude of the stock drop following the November 6 earnings announce.

A. I don't recall how I reacted at the time. I'm sorry.

46 (Pages 178 - 181)

Page 182

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   Do you recall what Mr. Stollmeyer's expectations were about where the stock price would move following the November 6 earnings announcement?

A.   I recall that he was worried about a reaction and he was actually worried about scaring away Vista, and so he was nervous about it. That's what I recall.

Q.   When you say he was nervous about scaring off Vista, when did he tell you that?

A.   Again, I'm having trouble remembering which conversations were where. It may actually be that we had that conversation after the earnings call, but it doesn't make a company look good to guide down and he was trying to look his best.

Q.   Well, I think we already went over Vista's initial indication of interest said that it saw the stock correction as an opportunity?

MR. DEL MONACO: Objection to the

Page 183

G. Goodman -- HIGHLY CONFIDENTIAL

form.

Q.   Correct?

A.   Again, I was not privy to that particular e-mail that you showed me today, and so I can't respond to that.

(Whereupon, a text message dated November 6, 2018 was marked Exhibit 14 for identification.)

Q.   I just marked another exhibit that I'll just go over very quickly, Exhibit Number 14.

A.   Okay.

Q.   And this is -- which I'll represent to you is a text message from Mr. Stollmeyer to Mr. Chang.

Do you know who Mr. Chang is?

A.   Accountant.

Q.   Okay.

And do you see there Mr. Stollmeyer said, we're not surprised by the aftermarket action."

Do you see that?

A.   Yes.

Q.   And did Mr. Stollmeyer ever

Page 184

G. Goodman -- HIGHLY CONFIDENTIAL

express the view that he was communicating to Mr. Chang about the aftermarket action prior to Qatalyst being retained?

A.   No.

Q.   Were you aware that Mr. Stollmeyer was text messaging with Mr. Chang prior to Qatalyst being retained?

A.   No.

Q.   Is that something you would have wanted to know?

A.   No.

Q.   Were you concerned at all that Mr. Stollmeyer might favor a particular financial advisor over another for his own personal interest?

A.   No.

Q.   Do you recall what the code name of the transaction was?

A.   Project Vandenberg.

Q.   Was that the only code name?

A.   That I recall, yes.

Q.   Do you know who came up with the code name Vandenberg?

A.   I believe it was Rick.

Page 185

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   And do you know what Vandenberg is?

A.   It was a military -- Rick is a military guy, he was a submarine commander, ex-military. It had some military reference. I don't remember the story.

Q.   Okay.

So you don't know why he picked a code name that starts with the letter V?

MR. DEL MONACO: Objection to form.

THE WITNESS: So I've read the complaint, so I understand your theory on this. It was not connected to the choice of Vista as a bidder. It was entirely related to the military history story he told us at the time but I do not remember.

Q.   Okay.

But you don't know the real reason why he chose it, you just remember the reason why he told you --

A.   He told us --

47 (Pages 182 - 185)

Page 186

G. Goodman -- HIGHLY CONFIDENTIAL

MS. LIGHTDALE: Objection to form.

Go ahead.

THE WITNESS: He did tell us the story. I admit I kind of let it in one ear and out the other. I am not a military history buff.

Q. And prior to hiring Qatalyst, were you made aware of any relationship that Qatalyst had in representing Vista previously?

A. When Qatalyst did their presentation for the board of directors, they shared with us transaction history data that showed they had both sold to and worked with Vista.

Q. So were you aware of any past relationships that Qatalyst had acting as a financial advisor to Vista prior to hiring Qatalyst?

A. I was aware of what they had disclosed in that presentation, which did reference a transaction. I'm not remembering it at the moment.

Page 187

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And did anybody at Qatalyst at that presentation or any time prior to Mindbody hiring Qatalyst inquire as to who the actual bankers were working on any prior deal in which Qatalyst was retained by Vista?

A. I'm sorry --

MR. DEL MONACO: Counsel, I think you misspoke. I think you said Qatalyst instead of Mindbody.

THE WITNESS: Can you untangle that question? I didn't follow it.

Q. Sure.

I'll start over.

Did anybody ever tell you at any time prior to Mindbody hiring Qatalyst who the actual bankers at Qatalyst were that worked on any prior deal where Vista had retained Qatalyst?

A. The specific individuals at Qatalyst who had worked with Vista?

Q. Correct.

A. I don't recall.

Q. In any meetings with Vista --

Page 188

G. Goodman -- HIGHLY CONFIDENTIAL

MR. FOULDS: Let me withdraw that.

Q. Did you attend any meetings with Vista?

A. No.

Q. Did any member of the transaction committee attend any meetings with Vista?

A. I don't believe so.

Q. Did any member of the transaction committee correspond directly with Vista throughout the sale process?

A. No. I would hope not. I did not and I would hope nobody else did.

Q. And why do you say that?

A. It needs to be a single point of negotiation communications and for us that was Qatalyst.

Q. Okay.

But Mr. Stollmeyer was communicating directly to Vista; correct?

A. As a representative of management representing the company, not as a deal negotiator.

Page 189

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Okay.

And as between -- just fast-forwarding to November 14, which you may remember is the date that Mindbody interviewed Centerview and Qatalyst, do you recall the discussion that was had as between Centerview and Qatalyst?

A. I do.

Q. And would you agree that Qatalyst may not provide the most strategic advice as between the two?

A. I recall that that was -- that we thought they were less strategic than Centerview.

Q. And what does that mean?

A. So on a spectrum between tactical deal execution and strategic advice, they were further over on strategic advice. Qatalyst seemed far better equipped on tackle deal execution.

Q. Okay.

A. Also useful when one gets you a higher price.

Q. Okay.

48 (Pages 186 - 189)

Page 190

G. Goodman -- HIGHLY CONFIDENTIAL

And what communications, if any, are you aware that Mr. Stollmeyer was having with Qatalyst at this point in time?

A.   In order to prepare for a presentation like both Centerview and Qatalyst did to the board, I was presuming that Rick had briefing conversations with both of them to set the stage to help them understand future prospects for the company so that they could present a full picture of what they felt was possible. So I presume Rick was interacting with both banks at this point, fairly intensely in the buildup to that presentation.

Q.   And you would expect that Mr. Stollmeyer would have had the same level of communications with both Centerview and Qatalyst leading up to the meeting where the transaction committee was going to choose between either of the two; correct?

A.   Some combination of Rick and Brett, yes.

Q.   And were you aware that Mr.

Page 191

G. Goodman -- HIGHLY CONFIDENTIAL

Stollmeyer was text messaging with Qatalyst the morning of the November 14 meeting?

A.   Not specifically, no.

(Whereupon, a text message dated November 14, 2018 was marked Exhibit 15 for identification.)

Q.   I just marked another exhibit, if you want to take a look at it, Ms. Goodman, and spend ten seconds on it.

A.   (Reviewing).

What's the number, is it fifteen?

Q.   It should be a text message, hopefully.

A.   I asked which exhibit number it was. I'm not sure if my screen is refreshed.

Q.   I think it's fifteen.

A.   Okay.

I see it.

Q.   So you were not aware that Mr. Stollmeyer was having communications with Qatalyst on November 14 about Qatalyst's

Page 192

G. Goodman -- HIGHLY CONFIDENTIAL

presentation; right?

A.   That is correct.

(Whereupon, a document entitled Materials For Discussion was marked Exhibit 16 for identification.)

Q.   I marked a new one, Exhibit 16. Let me know when you see it.

A.   I now have it up.

Q.   It's a bit hard to see, at least in my version, but in the bottom sort of left-hand quadrant it says, "materials for discussion" and then it says November 14 of 2018.

Do you see that?

A.   Yes.

Q.   In the top left it says Qatalyst?

A.   Yes.

Q.   And to the best of your recollection, is this the deck that Qatalyst presented on November 14, 2018?

A.   Yes.

Q.   And if you turn to -- and this is going to be the Bates number at the

Page 193

G. Goodman -- HIGHLY CONFIDENTIAL

bottom right-hand corner --

A.   Yeah.

Q.   -- starting with MB , if you go to 22817, it's also slide thirty-four, if that's easier. Actually, I'm going to refer to the next page, 22818.

A.   818, overview of potential strategic partners?

Q.   Exactly.

And you'll see here over on the left two-thirds down the page there's a company called ▮▮▮▮▮▮

Do you see that?

A.   I do.

Q.   Who is ▮▮▮▮▮▮

A.   They are a payment processor.

Q.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

A.   Yes, I believe they did.

Q.   If you keep going down to MB 22827 --

A.   Appendix, additional details?

Q.   Yes, additional detail on Vista

49 (Pages 190 - 193)

Page 194

G. Goodman -- HIGHLY CONFIDENTIAL Equity Partners.

A.   Yeah.

Q.   And then you go two more pages to MB 22989.

Do you see that?

A.   Uh-huh.

Q.   And it says, "summary of M&A approach?"

A.   Yes.

Q.   And if you go to one, two, three, four, five, six bullet points down.

Do you see that?

A.   Yes.

Q.   It says, "will leverage the above to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty of finish line."

Do you see that?

A.   Correct.

Q.   And do you believe that Vista, in fact, leveraged --

MR. FOULDS: Well, let me withdraw that.

Page 195

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   Do you believe that Vista engaged in any conduct that reduced the ability for other potential acquirers to be able to complete diligence and provide certainty of the finish line?

MR. DEL MONACO: Objection. Foundation.

THE WITNESS:  I believe Vista had a formula for trying to get an advantage in deals.  And actually, one of the reasons we were -- selected Qatalyst is they were clearly quite familiar with Vista's MO, as you see by this slide that they're presenting before we even start the process.  And they had specific suggestions for how to counter this, try to slow Vista down and let other people catch up.

But Vista did follow their MO and we did our best to slow it down and try to give other suitors have chance to come to the table.  I think we successfully did that.  The fact that none of them came across the

Page 196

G. Goodman -- HIGHLY CONFIDENTIAL finish line with a deal is unfortunate, but I don't think it was solely due to Vista's MO.  But it was good that we knew Vista's MO starting out because it allowed us to go to strategics before we started talking to PE firms and it allowed us to slow them down as much as we could, but they definitely have this MO, including the next line which is a short expiration window and a short period of time of exclusivity to get to signing.  There was an MO and we did experience this.  They were very accurate in predicting Vista's behavior.

Q.   This is November 14.

Do you know the date that the data room was made available to other bidders?

MR. DEL MONACO: I object to the form.

MR. FOULDS: Withdraw that.

Q.   This presentation is dated

Page 197

G. Goodman -- HIGHLY CONFIDENTIAL November 14, 2018.

Do you know the date the data room was available to any bidders?

A.   I don't remember off the top of my head.

Q.   Do you recall thinking at all that Vista made its bid in a remarkably short period of time after getting access to the data room?

A.   I do remember that.

Q.   Did you have any theories about how Vista was able to do that?

A.   I actually will let the Qatalyst presentation speak to their process.  They engage in significant background work and approach conversations well-educated, leveraging knowledge and product use and feedback from current portfolio companies.

Vista is a specialist in software as a service, which means they know exactly which metrics they care about, and they focus on the cap to LTV retention metrics -- we didn't talk about retention specifically that you mentioned

50 (Pages 194 - 197)

Page 198

G. Goodman -- HIGHLY CONFIDENTIAL
earlier, so they know exactly how to diligence a SAAS company. Other potential financial sponsors were less deeply familiar with SAAS businesses, so I think it was a combination of really getting to know Rick and the business in advance, I think they did that before their approach in October, and then being ready to pounce on the data they cared about. And they asked for more data than anybody else.

Q. And they were provided with more data than anybody else; right?

A. Yes, everybody's data room started the same and then, as information requests came in, we provided information, but the individuals as they asked.

Q. So are you aware of any situation where any potential bidder asked for information that was not provided?

MR. FOULDS: I apologize. Let me withdraw that and try again.

Q. Are you aware of any situation where any potential bidder asked for inside company of the company that had

Page 199

G. Goodman -- HIGHLY CONFIDENTIAL
been provided to Vista but was not then provided to that other bidder?

A. I am not aware of that.

Q. If that happened, would it have concerned you?

A. Yes, it would have.

Q. So as of November 14, the transaction committee had been formed but was still limited to choosing a financial advisor; correct?

A. Correct.

Q. And given the information that you got about how Vista may have attempt to truncate the process and reduce the ability for other potential acquirers to complete diligence, why did it then take almost another two weeks for this transaction committee to expand its mandate?

A. The transaction committee immediately began operating in a greater mandate. It took a couple of weeks for the documentation of that mandate to catch up.

Page 200

G. Goodman -- HIGHLY CONFIDENTIAL

Q. So what occurred at the transaction committee level between November 14 and November 26?

A. So we immediately began -- we hired Qatalyst. We reviewed the outreach plan for Qatalyst and approved them approaching strategics before PE firms to give the strategics a longer time horizon, and we began getting into just super regular communications about the deal process.

(Whereupon, a document entitled Action By Unanimous Consent was marked Exhibit 17 for identification.)

Q. Okay.

And who -- well, let me just flip to this for housekeeping. I just marked Exhibit 17.

A. It's coming up a little slowly.

Q. I'm sorry, I didn't hear you.

A. It's coming up a little slowly.

Q. Let me ask you a couple of more questions.

Are you aware that the data room

Page 201

G. Goodman -- HIGHLY CONFIDENTIAL
was originally populated based on Vista's diligence requests?

A. I might have been at the time, but I don't recall it.

Q. And were you aware that Mr. Stollmeyer had determined in late October that he wanted Mindbody to retain Qatalyst as opposed to Centerview?

A. I believe I was aware that he believed Qatalyst was the better choice for this job.

Q. In late October, 2018?

A. I'm sorry, I don't remember specifically when I learned it, but certainly I knew that going into the November 14 evaluation.

Q. And at the November 14 meeting, did the board break out into executive session without management?

A. I don't recall. It would have been our practice, and I suspect we did. The minutes should reflect that.

Q. And why would you have done that?

51 (Pages 198 - 201)

Page 202

G. Goodman -- HIGHLY CONFIDENTIAL

MS. LIGHTDALE: Objection to form.

THE WITNESS: It was our practice to always do exec session at the end without management to make sure all board members fully capable to say anything they wanted and that we had a chance to discuss whatever was on hand without an insider in the conversation.

Q. Why would there be a concern that an insider would be involved in the process?

A. This was true of every board meeting. We literally did this for every board meeting, so this was practice. It's good hygiene, I think, for boards do executive session without insiders and if anything, we had a heightened sense of good hygiene that we were starting an M&A process.

This has come up when you're ready.

Q. You've got it.

Page 203

G. Goodman -- HIGHLY CONFIDENTIAL

This hopefully is Exhibit 17?

A. It is.

Q. Okay. Great.

And just let me know what this is.

A. This is the unanimous written consent expanding the charter of the transaction committee to everything we anticipated at the beginning, advising and overseeing, the review and negotiation of strategic alternatives, evaluating any potential bids, determining, you know, when to solicit other bids, and having regular meetings about the process.

Q. Okay.

And I think you said before -- and I don't want to misconstrue what you said so I want to make this clearly -- I think you said before something to the effect of the transaction committee was already doing these six things that had been resolved here prior to this written consent being executed; is that right?

A. We were actually doing only

Page 204

G. Goodman -- HIGHLY CONFIDENTIAL

little I, advising, directing, and overseeing the process of outreach. We had no indications or specific proposal on the table. None of these other things were happening yet, but we were engaged with our new financial advisor and actively overseeing the process.

Q. And just going back to Qatalyst's past relationships with Vista and specifically Vista's retention of Qatalyst in a prior deal, that past relationship with Vista was considered a benefit in hiring Qatalyst in the deal process; correct?

A. The breadth of their experience, not necessarily that specific experience. But we were assured there were -- there was no conflict and we were pleased that they had a depth of experience selling companies. The highest multiple ever paid by a private equity firm for a SAAS company was paid by Vista and Qatalyst got it out of them. That's good news for our shareholders.

Page 205

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And I think you said -- let me make sure I've got this right -- I think you said something to the effect of we were advised that there was no conflict; is that right?

A. Those are the words I used, yes.

Q. And who advised you of that?

A. We probed during the presentation and they assured us that -- I think it even says it in the deck that we were looking at that they were free of conflicts when taking this engagement.

I can go back in the deck and find that, if you'd like.

Q. If you wouldn't mind.

A. I'm pretty sure it was in there, so let me see if I can --

MR. FOULDS: Have we been going for another hour, Sarah?

MS. LIGHTDALE: Unbelievably, no. I think it's only been about forty-five minutes.

THE WITNESS: It will take me a minute.

52 (Pages 202 - 205)

David Feldman Worldwide
800-642-1099                    A Veritext Company                    www.veritext.com

Page 206

G. Goodman -- HIGHLY CONFIDENTIAL

MR. FOULDS: I was going to suggest that we take a short break while Gail looks at the document.

MS. LIGHTDALE: Fine with me.

Is that okay with you, Gail?

THE WITNESS: Yes.

MR. FOULDS: So back in five?

THE WITNESS: I need to do the restroom break and the look.

THE VIDEOGRAPHER: The time is 2:54, and we are going off the record.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are back on the record.

The time is 3:01.

Q. What did you --

MR. FOULDS: Withdrawn.

Q. What did the board do to slow Vista down?

A. So prior to the actual offer coming in, we delayed the outreach to strategic -- sorry, to private equity firms, Vista amongst them. So we gave I think it was a two-week window for the

Page 207

G. Goodman -- HIGHLY CONFIDENTIAL

strategics. So we outreached to fifteen, I believe eight strategics and seven financial sponsors, and we gave a two-week window to try to spin up the strategics.

Q. And who actually picked the strategics that Qatalyst contacted during that two-week period?

A. So this was a group discussion started by Qatalyst, so Qatalyst presented their recommendations and then there was input from both management and the strategic transaction committee, really trying to, you know, maximize the potential but not waste time with anyone who might not just be a good prospect. And at the end I think we pretty up ended up at most of Qatalyst's recommendation.

(Whereupon, a document entitled Minutes of A Meeting of the Board of Directors was marked Exhibit 18 for identification.)

Q. So I've marked another exhibit, which is Exhibit Number 18.

Let me know when it comes up.

Page 208

G. Goodman -- HIGHLY CONFIDENTIAL

It's pretty large.

A. Two hundred forty-five pages. It is up.

Q. Okay.

And this is MB 133, minutes of the meeting of the board of directors, November 28, 2018.

If you turn -- let me just ask, do you recognize this document?

A. I definitely recognize the minutes. I don't know what's in the entire two hundred forty-five pages, but it looks familiar.

Q. So if you turn to page two, you'll see a number nine all the way at the bottom.

A. Yeah.

Q. And it talks about Mr. Boutros and Mr. Chang presented an update on Project Vandenberg, including an overview of potential strategic companies and financial sponsor participants, a summary of Qatalyst Partners' outreach, the strategic companies, and a summary of next

Page 209

G. Goodman -- HIGHLY CONFIDENTIAL

steps?

A. Yes.

Q. Okay.

And then if you scroll down, we will skip a few Bates numbers here, but if you scroll down to the Qatalyst deck which is actually -- you have to scroll down past number 164 on the bottom right, you'll eventually get to number 986, MB 986.

A. MB 986. Got it.

Q. And it says Qatalyst Partners and it is a deck of Qatalyst dated November 28, 2018.

Do you see that?

A. I do.

Q. Great.

If you go to the third page of that, which is MB 988 --

A. Yeah.

Q. You'll see the outreach summary.

Do you see that?

A. I do.

Q. Okay.

53 (Pages 206 - 209)

Page 210

G. Goodman -- HIGHLY CONFIDENTIAL

And are these the strategic companies to which Qatalyst made its initial outreach during the period between November 14 and November 28?

A.   Yes.

Q.   Why is ████ not on here?

A.   They were not on the strategic list.

Q.   And were they not on the strategic list?

A.   Qatalyst, with input from the company and the transaction committee, had built a set of screening criteria and we were looking for folks who would understand the business model, so software as a service sold in the S&B market. ████ is not strongly in that space.  And so I think we kept it to a limited group of folks because we did not want it to get public that we were in a process.  We did not want, you know -- so if you look at this group of strategics, these are all folks who had either heavy small business portfolios or heavy software as a service

Page 211

G. Goodman -- HIGHLY CONFIDENTIAL

portfolios or -- sorry, the third most important criteria was beauty and fitness. So one of those three things and some depth there.

So these were the ones we picked.  And we waited for the highest probability of engaging in a serious bid for the company.

Q.   And just for my benefit, when did the transaction committee actually participate in picking to whom Qatalyst would make its outreach?

A.   So sometime between the fourteenth and the twenty-eighth. Honestly, we were talking so frequently at this point, I'm not sure which meeting it was, but we were well informed and approved the list.

Q.   Was there a meeting in between the fourteenth and the twenty-eighth?

A.   I don't recall whether there was a formal meeting or just a series of conversations.

Q.   Would those conversations be in

Page 212

G. Goodman -- HIGHLY CONFIDENTIAL

the proxy?

MS. LIGHTDALE: Objection to form.

THE WITNESS:  I imagine so.

Q.   I'm sorry, were you --

A.   I imagine so.  I just don't remember the history of every meeting and interaction.  We were moving very quickly at this point.

Q.   So it's possible that there was no meeting in between November 14 and the twenty-eighth; right?

A.   No normal minuted meeting, it's possible.

Q.   And it's possible that there was no phone calls in between the fourteenth and the twenty-eighth; is that right?

A.   It seems unlikely.

Q.   Okay.

But it is possible?

A.   I suppose it's possible.

Q.   And do you recall any specific meeting or phone call in which you participated in deciding which strategics

Page 213

G. Goodman -- HIGHLY CONFIDENTIAL

would be contacted by Qatalyst prior to the November 28 meeting?

A.   Again, going back to my previous caveat of not remembering what happened at which meeting and which meeting was when, I one hundred percent signed off on the list of strategics.

Q.   Okay.

The initial list of strategics I want to be very clear?

A.   Correct.

Q.   So why isn't ████████████ on here?

A.   I'm trying to remember why we cut them from the list, but I really don't recall.

Q.   And do you actually recall cutting them from the list or are you supposing?

A.   I'm not specifically remembering that.  But if I apply the criteria, I remember.  They have no experience in software as a service or health, beauty, and fitness.  They do have a focus on the

54 (Pages 210 - 213)

Page 214

G. Goodman -- HIGHLY CONFIDENTIAL

S&B.

(Whereupon, a text message dated November 29, 2018 was marked Exhibit 19 for identification.)

(Whereupon, a text message dated November 29, 2018 was marked Exhibit 20 for identification.)

(Whereupon, a text message dated November 29, 2018 was marked Exhibit 21 for identification.)

Q. I've now introduced three more exhibits. Exhibit 19, we'll start with that one.

A. From Josh to Rick. It looks like it's a text. Okay.

Q. Okay.

And then if you look at the next exhibit.

A. I've got it.

Q. And this is Exhibit 20, a text message from Rick Stollmeyer to Josh McCarter dated November 29, '18.

And can you just read it?

A. "Qatalyst had them on the

Page 215

G. Goodman -- HIGHLY CONFIDENTIAL

list" -- this is referring to Global Payments -- "and we pulled them from early. Don't want to work for a payments company."

Q. And prior to reading our complain in preparation for your deposition, were you aware that Mr. Stollmeyer told Mr. McCarter that Qatalyst had ▮▮▮▮▮▮▮▮ on that list and they were pulled from early outreach because he didn't want to work for a payments company?

A. Prior to your complaint, I was unaware of this exchange.

Q. And is this something you would have wanted to know at the time you were considering which strategics to have Qatalyst make outreach to?

A. Yes.

Q. If you look at the next exhibit.

A. (Reviewing).

I see it.

Q. Did Mr. McCarter or anyone else ever express that you that ▮▮▮▮▮▮▮▮

Page 216

G. Goodman -- HIGHLY CONFIDENTIAL

was making a push into vertical SAAS so they would be possibly a good one if we're trying to push valuation up?

A. I was not involved in this exchange at the time, or I was unaware of it.

Q. So going back to the exhibit where he says, "don't want to work for a payments company."

Do you see that?

A. Yes.

Q. Did you know that Mr. Stollmeyer did not want to work for a payments company?

MR. DEL MONACO: Objection to the form.

THE WITNESS: I had not had a conversation with Rick about his feelings on this topic, so I was unaware.

MR. FOULDS: What was the nature of the objection, Mr. Del Monaco?

MR. DEL MONACO: Vague.

Q. Okay.

Page 217

G. Goodman -- HIGHLY CONFIDENTIAL

Were you aware that Mr. Stollmeyer --

MR. DEL MONACO: Assumes facts not in evidence.

Q. Were you aware that Mr. Stollmeyer ever expressed to anyone, "don't want to work for a payments company?"

A. I was not aware.

Q. Okay.

Were you aware more generally than the specific words I just gave you that someone did not want to work for a payments company?

A. I was not aware.

Q. And just based upon your own experience and layperson's reading of this, do you think that the line "don't want to work for a payments company" refers to anyone other than Stollmeyer?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I read that as referring to Mr. Stollmeyer.

55 (Pages 214 - 217)

Page 218

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And at this time were you continuing to work on succession planning?

A. Sometime in this rough period we made a decision as a team to continue to work with the internal candidates, Josh McCarter and Mike Mansbach, but to put the hiring of an outside search firm on hold.

Q. Why was that?

A. The feeling was we had enough on our plate making sure that the potential transaction process happened well; that if it happened, we didn't need -- that time and effort would have been wasted. If it didn't happen, we had time to catch up because we were on a slow roll of building a list of potential outside prospects. There was no urgency for that.

Q. And you said I think in sum and substance that you were focusing instead on the internal candidates rather than the external candidates?

A. Correct.

Q. Around this time period?

A. Correct.

Page 219

G. Goodman -- HIGHLY CONFIDENTIAL

(Whereupon, a document entitled Minutes of A Telephonic Meeting Was marked Exhibit 22 for identification.)

Q. I've just introduced another exhibit just for timing purposes for your own benefit, perhaps, and for the stockholders. And this is Exhibit 22, MB 165.

These are minutes of another strategic transaction committee; correct?

A. Correct.

Q. If you look at number two in the second sentence it says, "Messrs. Stollmeyer and White discussed with the committee the proposed timing for producing a draft of the company's 2019 internal operating plan and long-term financial plan as part of the company's customary annual financial outlook process, including projections, as would be customary for annual planning purposes at that time and the considerations related thereto."

Page 220

G. Goodman -- HIGHLY CONFIDENTIAL

Do you see that?

A. I do.

Q. Okay.

And was it typical in the third quarter earnings call at Mindbody to provide outlook for the following year?

A. No, it was typical to do that on the Q4 annual call.

Q. And when would the Q4 annual call have occurred for the fourth quarter of 2018?

A. Mid February.

Q. And so is it fair to say that, as of December 3, management had not yet produced a draft of the company's 2019 internal operating plan and long-term financial plan?

A. That is correct.

Q. Do you know when that plan was finalized?

A. I believe at this meeting we, you know, setting some context, because you asked about setting external guidance, it was typical for this board to do a plan

Page 221

G. Goodman -- HIGHLY CONFIDENTIAL

and budget by the end of December. We were rushing that so that it could be part of information we shared with potential suitors that are bidders in this process. And I believe we finalized and approved a plan very shortly after this meeting, like a week after this meeting, order of magnitude.

Q. Okay.

And between November 14 and December 3, what interactions, if any, did Mr. Stollmeyer have with any representative of Vista?

A. You said fourteenth to the third?

Q. You said I believe -- November 14 was the date that you hired Qatalyst.

A. Correct.

Q. And the date that you thought you began doing what eventually became Romanette number one in the November 26 consents.

A. Yes, yes, I was just making sure

56 (Pages 218 - 221)

Page 222

G. Goodman -- HIGHLY CONFIDENTIAL
I had clarity.

I am starting to get tired, I will confess.

I'm trying to remember when exactly we transitioned from outreach to -- we gave two weeks to the strategics before we outreached to the financial sponsors. I believe we're now at December 3 into financial sponsor outreach which would be coordinated through Qatalyst but they would be bringing Rick in for presentations and discussion.

So I'm not exactly sure what interactions happened in this time frame. I don't remember exactly.

Q. And during this point in time, did you and the order or the transaction committee have any policies or procedures reflecting Mr. Stollmeyer's direct communications with Vista in which he did not copy someone from Qatalyst?

A. So our instructions to Rick at this point was to coordinate through Qatalyst, that doesn't mean copies on

Page 223

G. Goodman -- HIGHLY CONFIDENTIAL
everything, but they're aware of what he's doing, what the intent is, et cetera. So my assumption at this point is that he is following that procedure.

(Whereupon, a document entitled Minutes of A Video Meeting was marked Exhibit 23 for identification.)

Q. Got it.

I've marked another exhibit. We're getting closer and closer to the approval.

Do you have Exhibit 23 up?

A. I do.

Q. And these are minutes of a video meeting of the board of directors December 7, 2018; correct?

A. Less than a week later.

Q. So you were ahead of the curve on Zoom.

And if you scroll down to MB 2315, let me know when you're there.

A. Yes.

Q. Thanks.

On the right-hand side three

Page 224

G. Goodman -- HIGHLY CONFIDENTIAL
bullets down it says, "BKR existing customer price increase starting March."

Do you see that?

A. Yes.

Q. And that's Booker?

A. Correct.

Q. Okay.

And if you look at the Q4 total revenue, which is maybe three quarters of the way down.

A. Correct.

Q. It says sixty-eight.

Do you see that?

A. I do.

Q. Okay.

And were you aware at this time that sixty-eight was higher than the guidance range provided by management on November 6 to stockholders?

A. Yes.

Q. Do you know whether the fourth quarter --

MR. FOULDS: Withdraw that.

Q. Do you know what date Vista

Page 225

G. Goodman -- HIGHLY CONFIDENTIAL
entered into a confidentiality agreement?

A. Not off the top of my head.

Q. Is that something that you would expect to be in the proxy?

A. Yes.

Q. Do you know why it was deleted from the proxy?

A. I would expect it to be in the Vandenberg update from Qatalyst for sure. It was too detailed for the proxy.

Q. So after whenever it was that Vista entered into a nondisclosure agreement with Mindbody, what procedures and policies did the board put in place to oversee what information was being provided to Vista?

A. So the strategic transaction committee was working with both Qatalyst and management to respond to information requests that were coming from all of the bidders. We heavily relied on Qatalyst as our expert to guide us on, you know, is this a fair thing for them to be asking, should we provide it, is what we have kind

57 (Pages 222 - 225)

Page 226

G. Goodman -- HIGHLY CONFIDENTIAL
of clean and polished enough, so there's a lot of interaction happening at this point with Qatalyst as they are in charge of the negotiation and they are guiding management and the board on what information to provide and when, mostly what information to provide, and whether the form of that information is I will say clean and polished enough for each of the bidders. So they're reviewing things before they go into the room and I would say the board is heavily relying on Qatalyst to be the filter here.

Q. And Mindbody did know its fourth quarter actual revenue prior to the stockholder vote; correct?

A. We had a preliminary unaudited number at that point.

Q. When you said, "unaudited," what's the significance of that?

A. So as a public company, your financial results should be audited by outside auditors prior to release. I don't know if it's legally required but it

Page 227

G. Goodman -- HIGHLY CONFIDENTIAL
certainly is what you do. And so at the time of the vote the audit for 2018 had not been completed, and so the numbers were unaudited.

Q. Okay.
And is that your understanding as to why the fourth quarter revenue numbers from 2018 were never disclosed to stockholders?

A. It was one of the factors.

Q. What were the other factors?

A. It is hard to look at a revenue number without the context of an explanation of what was behind the revenue and without a guide, so there was debate about the value of that data point given that it was both unaudited and not in the context of a full earnings disclosure.

Q. And did you participate in the decision not to disclose Mindbody's fourth quarter revenue?

A. I honestly can't recall the dialogue. I could easily have been in it, but I just don't remember.

Page 228

G. Goodman -- HIGHLY CONFIDENTIAL
Q. Okay.
You have no specific recollection of being involved?

A. I have no specific recollection of the conversation.

Q. You said that --
MR. FOULDS: Well, let me withdraw that.

Q. The third quarter actual revenue that Mindbody disclosed to the market in 2018, is it your position that number was audited?

A. The auditors do a review. It's not a full audit but the auditors do a review prior to releasing quarterly earnings, yes.

Q. Okay.
And what do they review it for?

A. Accuracy.

Q. Okay.
And you're saying that the auditors -- so if I'm understanding you --
MR. FOULDS: Let me withdraw that.

Page 229

G. Goodman -- HIGHLY CONFIDENTIAL
Q. The --
MR. FOULDS: Withdraw that again.

Q. Who were the auditors?

A. I'm trying to remember. I think it was PriceWaterhouseCoopers, but I can't swear to that. It was either that or Deloitte.

Q. What process do they go through?

A. Again, I was not on the audit committee so I'm not a hundred percent family with the quarterly revenue review process. I think you're deposing members of the audit committee.
Can I ask that you refer that question to them?

Q. Sure.
Just do you know what process the auditors go through in approving earnings results for any particular quarter?

A. So usually there's a -- let me speak from my Constant Contact experience.

58 (Pages 226 - 229)

Page 230

G. Goodman -- HIGHLY CONFIDENTIAL



I don't know what the process was like at Mindbody because I was not on the audit committee.

MR. FOULDS: Unfortunately, I'm having some technical difficulties.

Q. Are you aware whether or not Mr. Stollmeyer ever discussed with anyone from Vista, Vista's own models?

A. I am not aware.

Q. You previously mentioned that -- I apologize if you already answered this -- that Vista has its own models, for lack

Page 231

G. Goodman -- HIGHLY CONFIDENTIAL

of a better term, about the financial metrics that they really care about and that was what enabled Vista to move so quickly once it got access to Mindbody's internal information.

Do you recall that discussion?

MS. LIGHTDALE: Objection to form.

MR. DEL MONACO: Same objection.

THE WITNESS: Yes, that was the understanding we had from Qatalyst. I have no direct knowledge of that, but that was my understanding from Qatalyst.

Q. And then you also mentioned something, and this is the part that I didn't hear, about retention? It was the lifetime valuation retention? I'll let you speak.

A. Sure.

So in software as a service companies, there is a heavy focus on cohort retention. So what that means is all of the customers that joined up in

Page 232

G. Goodman -- HIGHLY CONFIDENTIAL

April of 2018, how many are still with us in May, June, July, August. It's how you predict the lifetime part of lifetime revenue. So if your average customer pays you a hundred bucks, the question is for how many months.

It's impossible to know how many months if they haven't left yet, but it is possible to forecast that based on the trend in monthly cohort retention.

Did all of that make sense?

Q. Yes, yes. You should be a professor.

A. I was going to make a joke. It's getting late in the day. This is not the place for jokes, so I retract.

(Whereupon, a document entitled Minutes of A Telephonic Meeting was marked Exhibit 24 for identification.)

Q. I just marked another exhibit.

A. Twenty-four?

Q. Twenty-four. This should be the board minutes from the seventeenth,

Page 233

G. Goodman -- HIGHLY CONFIDENTIAL

December 17.

A. I have it up.

Q. What I'm going to focus on -- and these are minutes of the telephonic meeting of the board of directors December 16, 2018 and number two, it talks about management projections?

A. Yes.

Q. And then the line I'm interested in is one, two, three, four, fourth down, really that sentence. "The board and management then discussed certain aspects of the long-term financial plan, and the board determined that the projections were the most current and predictive forecasts of the future financial performance of the company and approved both the company's preliminary 2019 internal operating plan and long-term financial plan."

Do you see that?

A. I do.

Q. Okay.

And then going back to something you said a bunch of questions ago about

59 (Pages 230 - 233)

Page 234

G. Goodman -- HIGHLY CONFIDENTIAL
the disclosure of the fourth quarter revenue, you said something to the effect of the context was important.

Do you remember that?

A.   I do.

Q.   And also that what you want is the guidance being disclosed at the same time.

Do you remember that?

A.   I do.

Q.   Okay.

And so this -- these minutes included the preliminary 2019 internal operating plan and long-term financial plan.

Do you see that?

A.   I do.

Q.   Okay.

And this information was actually disclosed to the stockholders; right?

A.   I believe so, yes.  Yes, yes, it was.  Yes, it was.

Q.   At this point from the

Page 235

G. Goodman -- HIGHLY CONFIDENTIAL
seventeenth through the date that Vista made its offer, what were you aware of respecting Mr. Stollmeyer's communications with Mr. Saroya?

A.   I'm again not able to put everything I knew in the context of the daily interactions.  As you can see now, I'm having board meetings every two or three days.  Qatalyst is coordinating everything.  Conversations are happening with I believe five active suitors at this point and we are relying on Qatalyst to coordinate that, so I am not in the detail of specific conversations Rick is having with any of the suitors.

Q.   And do you recall what date anyone was provided with access to the data room?

A.   I don't recall off the top of my head, no.  I do see these minutes mention that all participants in the company's process were granted access to the electronic records -- electronic data room.

Page 236

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   Do you know whether any of the strategic bidders were provided with access to the data room during the two-week period that you mentioned in November between the selection of Qatalyst as the financial advisor on the fourteenth and the twenty-sixth when the transaction committee's mandate was expanded?

A.   I don't recall.

Q.   What is the significance of organic growth and higher priced tiers?

A.   It means our largest customers, highest priced tiers means customers who are paying us the most.  Organic growth means we are growing that tier of customers not through M&A transactions but through our own efforts.

Q.   I missed the last couple of words, I'm sorry.

A.   Through our own efforts.

Q.   Got it.  Thank you.

And how significant is that or --

MR. FOULDS: Withdrawn.

Page 237

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   How significant was organic growth of higher priced tier respecting Mindbody?

A.   So to set some context,

The result of that is we

60 (Pages 234 - 237)

Page 238

G. Goodman -- HIGHLY CONFIDENTIAL
and high value customers was important.

Q. And were you aware that Mr. Stollmeyer was providing information via text message to Monti Saroya respecting the organic growth and higher priced tiers prior to the board approving the transaction is Vista on December 29?

A. I was not specifically aware of that.

(Whereupon, a text message dated December 18, 2018 was marked Exhibit 25 for identification.)

Q. And if you take a look at the exhibit that, with the miracle of the Internet, is now being stamped.

A. Twenty-four?

Q. It's spinning for me, but twenty-five.

A. There it is. I see it.

Q. And it's very short so I'll ask you what does this appear to be?

A. An exchange with Monti Saroya about two things: A competitor and the growth number his team has modeled.

Page 239

G. Goodman -- HIGHLY CONFIDENTIAL
Q. And were you ever provided with Vista's models?

A. The strategic transaction committee did not review Vista's model. I did not get that.

Q. And were you provided with any information about Vista's models?

A. Not to my recollection.

Q. What was the time on this Exhibit Number 25?

A. Like 2:55, 2:56 in the afternoon on December 18.

Q. So this is the day after the board had authorized Qatalyst to share a subset of the company's preliminary 2019 internal operating plan and long-term financial plan with all participants in the company's strategic transaction process; correct?

A. Yes.

(Whereupon, an e-mail dated December 18, 2018 was marked Exhibit 26 for identification.)

Q. And I've marked another exhibit.

Page 240

G. Goodman -- HIGHLY CONFIDENTIAL
Let me know when you get it.

A. I have it.

Q. This is Exhibit 26 and this is an e-mail from Cooley to you, excuse me, and various other board members and members of management.

And what's the time?

A. 9:26 p.m.

Q. On December 18; correct?

A. On December 18, yep.

Q. So this is approximately six hours, according to the time stamp, after Mr. Stollmeyer had text messaged Mr. Saroya regarding organic growth and higher priced tiers better than your team's model?

A. Correct.

Q. And the subject of the e-mail is attached is bid just in from Vista.

Do you see that?

A. I do.

Q. So is it fair to say that within a day of Vista getting access to the company's internal operating plan and

Page 241

G. Goodman -- HIGHLY CONFIDENTIAL
long-term financial plan, Vista made a bid?

A. Yes.

Q. And I think we went over this before, but don't you think it's remarkable that Vista was able to make a bid that quickly?

MS. LIGHTDALE: Objection to form.

MR. DEL MONACO: Same objection.

THE WITNESS: To Vista's credit, they had been contemplating the Mindbody business for months at this point and doing their own diligence and presumably modeling but I don't know that for certain. So I'm assuming the stuff in the data room they used as mostly confirmatory; let's make sure nothing we had was wrong. But I think our entire team was surprised to see except Qatalyst who said that's exactly what we were going to do, but we were a little breathtaken.

61 (Pages 238 - 241)

Page 242

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Okay.

And do you recall in Vista's bid letter whether or not Vista expressed any interest in retaining management?

A. In?

Q. Retaining management. Sorry.

A. I do not believe there was any specific reference to management, but a general reference to wanting the team to stay.

(Whereupon, a letter dated December 18, 2018 was marked Exhibit 27 for identification.)

Q. And is this -- I just marked another exhibit as twenty-seven.

Is this -- I'll let you tell me what it is.

A. It's the offer. It's the bid.

Q. And if you look at page four of the letter, which is Bates number QAT 1446 --

A. Yes.

Q. -- and you look at number three, there's a heading called

Page 243

G. Goodman -- HIGHLY CONFIDENTIAL

management.

A. Yeah.

Q. Is this the paragraph that you were referring to?

A. Yes.

Q. And so at this point the way you read this is there was an attention for the team management to stay on; correct?

MS. LIGHTDALE: Objection to form.

THE WITNESS: Actually, I read it as they're letting the management team know that they have no intention of letting them go, but I also read that our proposal is not contingent upon any individual signing an employment agreement. So they were not asking for certainty that the management team stays, but they're letting the management team know there's likely to be an opportunity for them to say. That's how I read this.

I'd share some commentary that

Page 244

G. Goodman -- HIGHLY CONFIDENTIAL

in the technology market, there is a war for talent that is extraordinary and the minute a deal like this is announced, headhunters start calling management teams, so this is Vista's attempt to say please don't take those calls.

Q. Okay.

And at this point there were still other potential private equity funds that were in the mix in terms of being potential acquirers of the company; correct?

A. That is correct.

Q. Do you recall which of those private equity funds?

A. Well, I know ▮▮▮▮▮▮▮

Page 245

G. Goodman -- HIGHLY CONFIDENTIAL

Q. ▮▮▮▮▮▮▮

A. I do.

(Whereupon, a letter dated December 21, 2018 was marked Exhibit 28 for identification.)

Q. I've just introduced another exhibit.

A. Okay.

Q. And you'll see this is an e-mail from George Boutros at Qatalyst.

And if you look at the e-mail all the way down, which is the first in time.

A. The "off to the races" message?

Q. Sorry, maybe I marked the wrong one.

Oh, all the way down it says, "message communicated. They are ready to go." Oh, yeah, "off to the races."

A. Yeah.

Q. What was the message that was communicated?

62 (Pages 242 - 245)

Page 246

G. Goodman -- HIGHLY CONFIDENTIAL

A.   I am not sure without a little more context.  There are multiple messages we're trying to get through to them. We're lowering the go shop breakup fee, we're negotiating exclusivity, we're telling them we want a higher price but I'm thinking in the timing here they're already up to 36.50, I'm trying to remember that, the date.

There's not enough context in this e-mail for me to be sure.  I'm sorry.

Q.   No problem.

And if you go back to the first page, Mr. Boutros writes two e-mails.  The first in time, which is the one that's further down the page, number two says, "we spoke with ███    We gave Eric a live update."

Do you see that?

A.   Yes.

Q.   But he doesn't actually say what the update was; correct?

A.   Correct.

Q.   And did Eric give you that

Page 247

G. Goodman -- HIGHLY CONFIDENTIAL

update?

A.   Yes.

Q.   And what was it?

A.   They couldn't get to the price range in the time frame that we were talking about.  So once we had the bid from Vista, Qatalyst was communicating to the other bidders that they needed -- that they needed to respond, that there was a bidder.  I don't think they told them who but they could figure that out.

There's also a subtle signaling here now about what kind of price range people would need to get into because there's an understanding that if H&F is doing a ton of work to get to a bid that is below our bid, it's not useful work. So Qatalyst is the expert at like trying to push people and get these bids up.  So I think what we are hearing is that they are not going to get to a price that's better than Vista before the Vista deal has expired.

So we've pushed back on one

Page 248

G. Goodman -- HIGHLY CONFIDENTIAL

Vista deadline, but Vista's starting to play hardball on their second deadline and we're all trying to find the way to the best outcome and the board's decision had been to really push hard and get to a you need to have something on the table by this time, and we're learning at this point that ███ is not going to get something to the table in the time frame and that Vista has put exclusivity back on the table, which is unfortunate, and that they want it get the deal done before Sunday.  It is Friday, the 21st of December, and they wanted it signed on Sunday.

Q.   Did you ever have a view of -- a personal view about the price that Vista would come up to?

A.   No.

Q.   Did any other member of the strategic committee have a personal view about the price that they thought Vista would come up to?

A.   I remember there was

Page 249

G. Goodman -- HIGHLY CONFIDENTIAL

speculation, but I can't remember who speculated what.  I know we countered at forty.

Q.   And did any other member of the transaction committee ever express to you that the rest of the possible field was far behind?

A.   I mean, Qatalyst was telling us that and we knew that.

Say your question again, I'm sorry?

Q.   I asked you if any other member of the transaction committee expressed that to you.

A.   I don't remember the specifics of that conversation.  I'm sorry.

Q.   I really try not to interrupt people.  I'm really sorry.

Qatalyst expressed that to you.

When was that?

A.   So we were getting regular updates from Qatalyst on where each and every potential suitor is; have they been in the data room, have they made a

63 (Pages 246 - 249)

Page 250

G. Goodman -- HIGHLY CONFIDENTIAL
follow-up call. So we're getting a ton of updates mostly on those one page sheets that they have of the -- that are progress updates and then we often did, you know, calls to go through those progress updates. So that's how I heard.

I just can't remember dates.

Q. Now, prior to reading our complaint, were you aware that Vista was provided with more documents than any other potential bidder?

A. I was.

MR. DEL MONACO: I object to form.

Go ahead.

THE WITNESS: Yes, I was.

Q. And was that because Vista asked for more documents?

A. Exactly.

Q. Any other reason?

A. Not to my knowledge.

Q. What did you understand "too far behind" to mean?

A. Had not done enough research,

Page 251

G. Goodman -- HIGHLY CONFIDENTIAL
modeling, and diligence to comfortably present an offer.

MR. BISSELL-LINSK: Chris, could I ask one quick question going back to a point that was just raised?

MR. FOULDS: Sure.

MR. BISSELL-LINSK: So you said that you countered at forty.

How did you decide to counter at forty? What was the process that went into that?

MR. DEL MONACO: I'm sorry, this isn't an SEC exam. I thought we were doing one questioner at a time, or are you guys tag teaming?

MR. BISSELL-LINSK: That's fine. The arrangement that we had is that I could request to intervene if there was a natural break in questioning if there is something on the same subject matter. It doesn't make a huge difference to me. I could circle back to it. I don't need to disturb the rhythm. I thought it was on point.

Page 252

G. Goodman -- HIGHLY CONFIDENTIAL
MR. DEL MONACO: You can do that here, but let's talk about that offline.

Go ahead, you can answer it again.

THE WITNESS: I'm sorry.

MR. BISSELL-LINSK: A moment ago you said that you had determined to counter at forty or that you did counter at forty.

How do you determine to counter at a $40 price?

THE WITNESS: So deal negotiation is a bit more art than science. We knew the history from Qatalyst's perspective on how much they had gotten bids up from Vista in the past, so we thought there was room to move up but not much. But in the spirit of it never hurts to ask, we went high knowing that we probably wouldn't get anywhere near there. We were hoping they would split the difference. That's how scientific it

Page 253

G. Goodman -- HIGHLY CONFIDENTIAL
was. And they came in a little below that.

MR. BISSELL-LINSK: Okay. Thank you.

Q. Okay.

Do you recall approving the transaction on December 23?

A. I do.

Q. And were you ever concerned that the go shop was only thirty days long?

A. We definitely wanted an opportunity to do a go shop and we wanted it as long as we could get it. Again, this is where Qatalyst understood very clearly what Vista's historic negotiating range was going to be, where we could push, where we couldn't push. And so actually we focused somewhat on being able to continue to shop after the go shop with a lower -- we tried to get a lower breakup fee post go shop. We felt there was really an outside chance that there was a strategic we were -- you know, who had been watching us that we were unaware of.

64 (Pages 250 - 253)

Page 254

G. Goodman -- HIGHLY CONFIDENTIAL

It would have had to have been an angle we hadn't really considered that could show up with an interest. We were aware that it might be hard for them to move quickly enough, particularly given that the go shop was starting over the holiday period. So we were cognizant of the whole range of time until close as an opportunity for them to show up; felt that if a strategic saw enough value to go higher, even the larger breakup fee would probably not be the inhibitor to them participating, so we were talking about using both the go shop and the post go shop time period if someone showed up who we saw a heavy strategic -- this was a big premium to the current stock price, so the only way someone was going to get above this price was a heavy strategic fit. We thought it would be very surprising if a financial sponsor showed up and beat this bid.

So we talked about all of that and I think we pushed a little on the go shop period, but knowing where we were

Page 255

G. Goodman -- HIGHLY CONFIDENTIAL

likely to make headway, I think we saved our negotiation for breakup fees and things of that nature in the negotiation.

Q.   And were you aware that the lower termination fee was only payable if the company entered into a definitive agreement for a superior transaction during the go shop period as opposed to a lower termination fee applying if any superior proposal is made during the go shop period?

A.   I'm not sure I focused on the wording at the time, so I'll say I don't recall.

Q.   And were you aware that Vista was provided with unlimited matching rights?

A.   No, I did not.

Q.   And did anyone at the board level or any advisors ever map out exactly the timing for what would need to occur given Vista's matching rights in order for the superior proposal to be successful?

A.   I recall talking through

Page 256

G. Goodman -- HIGHLY CONFIDENTIAL

timelines at the board in discussing how the go shop would work, and I just remember specifically how that timeline played out.

Q.   And after the board approved the transaction on December 23 but before the stockholder vote, what did you understand your fiduciary duties to be respecting any potential transaction?

A.   Certainly to ensure that we unearthed, engaged with any other potential bidders and gave them all the information they needed to present a higher bid to make sure that Mindbody and Vista continued to operate very separately until it was closed so we could one hundred percent maintain our ability to operate as a standalone company should the deal fall apart in any way, and then all of our fiduciary duties as a public company.

And I'm going to need a break soon.

MR. FOULDS: Can we do that now?

Page 257

G. Goodman -- HIGHLY CONFIDENTIAL

THE WITNESS:  We can do that now.

THE VIDEOGRAPHER: The time is 4:10.

We are going off the record.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are back on the record.

The time is 4:25.

Q.   Okay.

Ms. Goodman, I think you already talked about your understanding of your fiduciary duties.

After signing of the merger agreement on the twenty-third up until the vote in February of 2019, what was your understanding of what Mr. Stollmeyer's fiduciary duties were during the go shop period?

A.   To participate -- well, to participate in the go shop, interact with any interested parties as guided by Qatalyst, and run the company.

Q.   And are you aware of any

65 (Pages 254 - 257)

Page 258

G. Goodman -- HIGHLY CONFIDENTIAL
discussions Mr. Stollmeyer had with Vista after the signing of the merger agreement on the twenty-third and the stockholder vote in February of '19?

A.   I am not aware.

Q.   Just to be clear, and to make sure I was clear, you're not aware of any conversations that Mr. Stollmeyer had concerning his future employment with the resulting entity in the event that the stockholders approved the deal and Vista acquired Mindbody; correct?

A.   That is correct.

Q.   Is it your understanding that each party that executed a confidentiality agreement with Mindbody during the go shop period that requested access was granted access to the same electronic data room populated by Mindbody with the same documents to which Vista was provided access?

MR. DEL MONACO: I object to the form.

THE WITNESS:  We had a kind of

Page 259

G. Goodman -- HIGHLY CONFIDENTIAL
what I'll call a general information set that everyone was granted access to.  The incremental information Vista had asked for was only provided if a bidder also asked for that information.

Q.   Were you aware, prior to reading your complaint, that Mr. Stollmeyer went on vacation during the go shop period?

A.   I was aware.

Q.   And where did he go?

A.   I think it was Costa Rica.

Q.   Do you know when he planned that vacation?

A.   I don't know when he planned that vacation.

Q.   Okay.
Did you think it was concerning at all that Mr. Stollmeyer was on vacation during the thirty-day go shop that spanned the December holidays?

A.   I think it was important that Rick understand that if he needed to make himself available, even when he was on

Page 260

G. Goodman -- HIGHLY CONFIDENTIAL
vacation, he was going to make himself available, and that was clear.

Q.   Okay.
When you say, "that was clear," you mean somebody on the transaction committee expressed that to him?

A.   Again, I'm having trouble remembering exactly the specifics.  But it was my understanding that, if needed, because Brett also went on a vacation, that Brett or Rick would make themselves available to anyone who was interested.

Q.   Do you know whether there were any management meetings with any potential bidders while Mr. Stollmeyer was on vacation during the go shop period?

A.   I don't believe so.

Q.   You don't believe that you know or you don't believe that they occurred?

A.   I don't believe that they occurred.

Q.   And your understanding is that that's because no one asked to have a management meeting while he was on

Page 261

G. Goodman -- HIGHLY CONFIDENTIAL
vacation during the go shop period?

A.   Correct.

Q.   And what's your basis for that understanding?

A.   So we were getting updates from Qatalyst on their outreach and, you know, they have a process, outreach, NDA, management presentations, the data room access, and there were a few folks who were engaging, but nobody that was engaging with what Qatalyst assessed as serious intent.  And they were trying to stir up interest.

Q.   I see.
And are you aware of any potential bidder expressing to anyone that there just wasn't enough time to do the diligence they needed to put together a bid?

A.   I do believe that Qatalyst shared that with us, and I don't remember which bidder it was.

Q.   That was my next question.
From the board's approval of the

66 (Pages 258 - 261)

Page 262

G. Goodman -- HIGHLY CONFIDENTIAL
transaction on December 23, 2018 to the stockholder vote in February of 2019, were there any guidelines or procedures respecting Mr. Stollmeyer's interactions with Vista?

A.   The neutrality guidelines that we had discussed back in November were still in place.

Q.   And were you aware, prior to reading our complaint, that Mr. Stollmeyer went to the Super Bowl with a number of individuals affiliated with Vista?

A.   I don't -- I didn't recall it, but I would not be surprised that I knew.

Q.   And --

MR. FOULDS: I'll withdraw that.

Q.   When you said you were preparing for your deposition, the one thing that I didn't hear you read was the court's opinion in this case; is that right?

A.   That's correct.

Q.   Okay.
And are you aware that the court issued an opinion in this case?

Page 263

G. Goodman -- HIGHLY CONFIDENTIAL
A.   I was -- I'm not supposed to report what I hear from attorneys or I can in this case?

Q.   Just a yes or no.

MR. FOULDS: If that's okay, Sarah.

MS. LIGHTDALE: That's fine, and you can answer it yes or no.

THE WITNESS:  I received a brief verbal update.

Q.   Have you ever asked to see the opinion?

A.   No.

Q.   Do you plan to ask to see the opinion?

A.   No.

Q.   Why is that?

A.   I expected that this deposition was about what had happened in the past, not about what the legal proceedings, so I was preparing to share with you the past.

Q.   Got it.
Okay.
And then just to go over very

Page 264

G. Goodman -- HIGHLY CONFIDENTIAL
quickly, in 2018 and 2019 up until the stockholder vote on the deal, what electronic devices did you possess and/or use?

A.   A computer, an iPhone, and an iPad.

Q.   Okay.
And the computer's a laptop or a desktop?

A.   A laptop.

Q.   Do you have a desktop?

A.   I did not and I do not.

Q.   And did you ever lose any of these devices at any time that you didn't find?

A.   No.

Q.   Okay.
Going back to your deposition prep, were there any issues about which any of the Kirkland and Ellis attorneys were particularly concerned?

MR. DEL MONACO: Objection.
Chris, you know that's an improper question and I instruct the

Page 265

G. Goodman -- HIGHLY CONFIDENTIAL
witness not to divulge any information in response to that that would be protected by the common interest privilege and the attorney-client privilege.

Q.   Are there any documents that an attorney from Kirkland and Ellis showed you that refreshed your recollection?

A.   All the documents I was shown were provided by Cooley.

Q.   And did Mr. Del Monaco attend the entirety of the deposition prep session?

A.   The vast majority.  I can't remember if he was there for every moment.

Q.   And was there one session or two sessions?

A.   There were two.

Q.   And Mr. Del Monaco attended both of those?

A.   Yes.

Q.   Getting back to ISS and your meeting with ISS, I think we have already established that ISS was not informed

67 (Pages 262 - 265)

Page 266

G. Goodman -- HIGHLY CONFIDENTIAL about --

MR. FOULDS: Well, I'll withdraw that.

Q. Was ISS informed about the Q4 actuals for 2018?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I don't recall that coming up in the dialogue.

Q. Okay.

And do you know whether the Q4 actuals were provided to any bidders or potential bidders?

A. I don't know.

Q. Would you have expected that, if the Q4 actuals for 2018 were provided to Vista, that they would have been provided to any other potential bidders?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I would have -- so there was a set of financials that were -- that had a Q4 forecast in the data packet in the data room. I think

Page 267

G. Goodman -- HIGHLY CONFIDENTIAL consistency is important and I don't believe that the actuals were far off from what was in that data set, so I do think if a bidder was changing their bid based on the delta between those two numbers, they needed a bit of a more strategic frame for their bid.

Q. Do you think the Q4 actual number was something that what would be material to a stockholder in deciding how to vote for the Vista transaction?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I don't.

Q. Do you believe that the guidance provided on November 6 affected the company's stock price?

A. I do.

Q. So how do you square those two propositions?

A. I think you need to be more -- I'm not sure what you're trying to get to.

Q. Well, if, in fact, stockholders

Page 268

G. Goodman -- HIGHLY CONFIDENTIAL thought that the guidance was material such that it moved the stock price, why is it that stockholders would not have wanted no know that the Q4 actuals actually beat the guidance that moved the stock price?

A. The bid -- the deal that was on the table was a sixty-eight percent premium to the stock price on the day that we announced the deal and at a revenue multiple that was much higher than our current growth rate would have warranted. The beat on Q4 wasn't going to get anywhere near that valuation; it was not relevant. It was clearly a short-term -- it might have had a short-term impact on the stock price, but it wasn't relevant when evaluating the quality of this offer, which was quite high.

Q. Well, do you know whether any of the lenders that announced the deal or part of the deal wanted to know what the Q4 actuals were?

A. The offer from Vista was an all cash offer. It was not

Page 269

G. Goodman -- HIGHLY CONFIDENTIAL financing-contingent. And we were not privy to the financing conversation. I was not privy to the financing conversation. It was one of the reasons the deal was so attractive is it had no financing contingency.

Q. Are you aware that Cooley recommended that Mindbody issue a press release respecting the fourth quarter actuals?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I don't recall that, being aware of that.

Q. Okay.

Are you aware that Mr. White thought that disclosing the Q4 actuals was the right thing to do?

MS. LIGHTDALE: Objection to form.

THE WITNESS: I don't remember being aware of it, but I could have easily been at the time. I just don't recall.

68 (Pages 266 - 269)

Page 270

G. Goodman -- HIGHLY CONFIDENTIAL

Q. Is it your position that the Q4 actuals, had they been disclosed, would not have affected the calculation of the sixty-eight percent premium that you just described?

MS. LIGHTDALE: Objection to form.

THE WITNESS: Yeah, we're speculating on top of speculating here.

So you're sort of saying if we had gotten to Q4 earnings and we announced them, where would the stock price have been and then where would the premium have been? It's very hard to predict. What I'm suggesting is the stock price would not have gone up sixty-eight percent with the kind of beat we were talking about. So I'm saying there would still have been -- I can conjecture -- admittedly it's conjecture -- that this still would have been a very attractive offer for this company.

Page 271

G. Goodman -- HIGHLY CONFIDENTIAL

MR. FOULDS: Okay.

I believe that I am finished. I don't know how you guys want to proceed. I'm not party to whatever agreement you guys have with the federal folks, so I leave it to you guys.

MS. LIGHTDALE: You have that -- can we go off the record for a moment?

THE VIDEOGRAPHER: The time is 4:41.

We are going off the record.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are back on the record.

The time is 4:43.

EXAMINATION BY
MR. BISSELL-LINSK:

Q. Did Rick Stollmeyer stay with Mindbody after the merger?

MR. DEL MONACO: I object to the form.

THE WITNESS: He did.

Q. When did you first learn he

Page 272

G. Goodman -- HIGHLY CONFIDENTIAL

would be staying with the company post merger?

A. We did a closing dinner in I believe it was April. The deal closed in February and we all got together do a congratulatory dinner in I think it was April and that was when -- it could have been March -- that was when Rick shared with us that he was, in fact, staying.

Q. And did you have any discussions with Rick about whether he would be staying before the merger closed?

A. Not to my recollection.

Q. Did you have any discussions with anyone else about whether or not Rick would be staying with the company post merger?

A. There was some friendly board banter about how much Rick would like working for a boss. That did occur.

Q. And when was that conversation?

A. Well, it continued into that closing dinner, but it had happened earlier than that. I'm sorry, I cannot

Page 273

G. Goodman -- HIGHLY CONFIDENTIAL

specifically recall which meetings that happened at.

Q. Okay.

I'm going to refer you to the exhibit that Mr. Foulds marked as Exhibit 1. Let me know when you've had a chance to get that opened.

A. It's opened.

Q. It's not opened for me. It was. One moment.

All right.

Would you scroll to page thirty-two.

A. The one titled The Merger, Parties Involved in the Merger?

Q. The one that's forty-one of two hundred seven on the bottom right.

A. Thirty-two internal, I'm sorry.

Q. Do you see the third paragraph from the bottom of that page that begins with, "later that evening?"

A. I'm not quite there yet.

Q. No problem.

A. Let me just make sure I'm in the

69 (Pages 270 - 273)

Page 274

G. Goodman -- HIGHLY CONFIDENTIAL

right place.

"Later that evening," yes.

Q.   Can you take a moment and read that paragraph.

A.   (Reviewing).

I've read that paragraph.

Q.   Thank you.

So the last sentence, the second sentence in that paragraph, in your own words, what does that mean?

A.   In my mind, that means that at the time of signing the agreement there was no understanding between Rick or Brett and Vista about whether they were staying on and in what roles.

Q.   Okay.

And did you review this language before it was filed?

A.   I did.

Q.   And did you take any steps to verify the accuracy of that statement?

A.   I mean, I'm always making sure management tells me things are accurate, so yes, I guess we asked management if

Page 275

G. Goodman -- HIGHLY CONFIDENTIAL

that was accurate.

Q.   So --

A.   The whole document was accurate. They actually have to sign things that say it's accurate.  So I was relying on the executive team's review and signoff on this document to assure me that they believed it to be accurate.

Q.   So did you ask anyone about that paragraph specifically?

A.   I did not.

Q.   Okay.

Earlier today you talked about Rick's tenure and that you had indicated that he had mentioned that he may step down as CEO in 2019.

Is that a fair summary of your testimony?

A.   That he was considering he would like to, yes.

Q.   After the merger was announced, did you have any conversations with Rick about his tenure?

A.   At the closing dinner after the

Page 276

G. Goodman -- HIGHLY CONFIDENTIAL

close of the deal, he shared that he had renewed energy and was excited about executing the plan with Vista.

Q.   Okay.

Changing directions a little bit off this exhibit, as a director, did you monitor Mindbody's financial performance?

A.   Yes.

Q.   And what did you do to stay in informed about Mindbody's financial performance?

A.   I certainly read financial statements and financial disclosures and listened to the earnings calls, but more importantly asked questions about the underlying drivers of the business on the revenue side and hiring plans and cost structure on the expense side.

Q.   And within each quarter, did you receive information about its performance within that quarter?

A.   Rick and Brett would only inform us of intra-quarter financial updates if they were way off plan.

Page 277

G. Goodman -- HIGHLY CONFIDENTIAL

Q.   Did you receive any such update in the third quarter of 2018?

A.   At the September board meeting, we got some indication that there were some challenges with Q3.

Q.   And did you receive any similar updates during the fourth quarter of 2018?

MR. BISSELL-LINSK: Scratch that.

Q.   During the fourth quarter of 2018, did you receive any intra-quarter updates that they were way off the mark, as you said before?

A.   Not to my recollection.

Actually, can I retract that?

Q.   Of course.

A.   So there was -- again, a little technical.

So we were having an ongoing dialogue with Apple about the Mindbody branded application.

So one of the services we offered to our clients was the ability to have a mobile app for their fitness studio.  So if you were going to Orange

70 (Pages 274 - 277)

Page 278

G. Goodman -- HIGHLY CONFIDENTIAL Theory Fitness, you could download the Orange Theory Fitness app and sign in and reserve your spot in classes and things like that. We charged extra for that, and it was actually a very nice revenue stream for us.

We had been informed, I can't exactly remember when, but in early 2018 that we were in danger of having those applications delisted from the store because they were duplicative. So essentially fifty studios, their apps are exactly the same except for branding and there was some algorithm at Apple that decided this was not okay. I think they were solving for a different problem than ours, but we could never raise the issue up high enough for us to get beyond the Apple Store employees who were executing the rules.

And so there was significant risk to one of our revenue streams. And so all during this period, we were getting updates on the Apple conversation and, as

Page 279

G. Goodman -- HIGHLY CONFIDENTIAL part of Q4 -- so they stopped approving new apps, so we had -- and we couldn't recognize revenue until the application was live in the Apple Store. So there was a lot of updates on the Apple negotiation and the impending risk on that particular revenue point.

Q. And that business that you just described with Apple apps, was that a business that went to Booker revenue or a different stream of Mindbody revenue or did it not break out in any of those places?

A. It was a Mindbody revenue stream.

Q. Did you receive information about Mindbody's quarterly results before they were publicly announced?

A. In general, absolutely.

Q. And how did you receive those updates or that information?

A. We had a secure board portal in which the financial results and the press release were posted prior to earnings, and

Page 280

G. Goodman -- HIGHLY CONFIDENTIAL then we typically also had a board call after the audit committee had met and before earnings to do a quick overview of what was going to be announced.

Q. And for the third quarter of 2018, using that as an example, when did you receive that information as compared to when the announcement was?

A. So I'll be honest, I don't specifically remember for Q3, but typically it was a couple of days prior to announcement.

Q. And did you ever receive financial data within the quarter?

A. The same as the answer I had before. Occasionally -- if there was -- every time there was a board meeting we got an update on how things were looking. So if that was -- and most of those were mid quarter, so that was always a chance where we had to check in. And other than that, we would only hear if something was dramatically off.

Q. What is a flash report?

Page 281

G. Goodman -- HIGHLY CONFIDENTIAL

A. That was an internal Mindbody revenue forecasting report, as I understand it.

Q. And did you ever review a flash report?

A. I don't believe I ever did.

Q. Did you ever discuss analyst expectations for Mindbody's financial performance with the board?

A. Yes.

Q. In what context?

A. So when we were looking at the financial -- pre the quarterly earnings report, we would always see where we were coming in versus analyst expectations and when we said here's where we're going to guide, it would show us where the current analyst projections were versus that guide, so we understood when we were pleasing, disappointing, or surprising.

Q. You just referred to pre-quarterly earnings reports.

What is that a reference to?

A. The thing I had described

71 (Pages 278 - 281)

Page 282

G. Goodman -- HIGHLY CONFIDENTIAL

before, that a day or two before earnings we would get a presentation from Brett on what we were about to report and in that was always a where is it versus where we guided and where analysts have their models. That was a standard slide in that deck.

Q. If I refer to the term "an analyst consensus," do you know what that term means?

A. Yes.

Q. What does that term mean?

A. So as a public company, we had multiple analysts following us, writing reports, and projecting what our future out comes might be. The consensus is the average -- mean? Average of those projections.

Q. And did you ever discuss analyst consensus with other members of the board?

A. In this same context, it was a board presentation and yes, we discussed them.

Q. Were you aware of the analyst

Page 283

G. Goodman -- HIGHLY CONFIDENTIAL

consensus for Mindbody's quarter fourth 2018 results?

A. Yes, but I can't specifically recall it at this moment.

Q. Do you recall discussing that analyst consensus with anyone?

A. I don't recall.

Q. Did you participate in any discussions about where to set Mindbody's guidance ever?

A. On occasion.

Q. Do you recall any examples?

A. I can't bring any specific examples to mind.

Q. Just to ask, not to be redundant, did you discuss where to set Mindbody's guidance through the fourth quarter of 2018?

A. I was not involved in that discussion.

Q. Do you know what the process was generally for setting Mindbody's guidance?

A. Yes, generally Rick and Brett would have a recommendation that would be

Page 284

G. Goodman -- HIGHLY CONFIDENTIAL

based on the forecasts, their feelings of certainty around the forecasts. They would often have an upside opportunities and downside risks spreadsheet, right, so we think we're going to hit, I'll just use a round number, ten million but there's a half a million risk on the downside here and two hundred thousand upside there, some kind of ins and outs of what could happen between this moment when we were setting guidance and the time when we actually reported.

And they would bring that to the audit committee with a recommendation for where they were thinking we should guide. So they'd make a recommendation to the audit committee and it would be approved -- discussed and then approved, and sometimes altered, in that discussion at the audit committee.

Q. And do you know if the audit committee was given any information about Mindbody's financial expectations as part of that discussion other than the

Page 285

G. Goodman -- HIGHLY CONFIDENTIAL

recommendation of both Brett White or Rick Stollmeyer?

A. And where they thought the risks were and where the upside opportunities were? That is additional information that they were given.

Q. Was that additional information provided in any sort of report or written format or just conveyed by Stollmeyer and White?

A. It was usually in a presentation.

Q. What's the purpose of giving guidance?

A. A debate frequently had at many board meetings, by the way.

So it is -- setting guidance expectations helps ensure that public shareholders have an accurate view to the company's perspective on what's likely to happen. So otherwise, public shareholders are flying blind in many ways you risk them either under-forecasting or over-forecasting. It is not required that

72 (Pages 282 - 285)

Page 286

G. Goodman -- HIGHLY CONFIDENTIAL
a company give guidance, but it is very common practice.

Q. And did Mindbody customarily issue guidance in a range?

A. Yes.

Q. And what's the point of providing a range?

A. To give you some room to flex that risk, that downside risk.

Q. Are you familiar with the term "a beat and raise?"

A. Yes.

Q. And what is your understanding of that phrase?

A. So a beat and raise is when one of your metrics -- let's just use revenue as an example -- comes in above the guidance range; that's beating the range. And raising is then increasing the expectation for the next quarter or year. This could happen on revenue, it can happen in earnings. So beat the metric; raise for the next quarter or year.

Q. And in what context is that

Page 287

G. Goodman -- HIGHLY CONFIDENTIAL
phrase used?

A. Best practices.

Q. Have you heard of someone planning for a beat and raise?

A. Yes.

Q. And what would that mean?

A. That would mean setting your guidance range so that there is an opportunity to get ahead of it and then of course, once you're ahead of it, being able to raise for the next quarter.

Q. Earlier you said a beat and raise to be a best practice.

Why is that?

A. The shareholders love it.

Q. And why do shareholders love it?

A. Shareholders reward companies that do this with higher stock price.

Why do they love it? Wow. Good philosophical question. I think this is one of these self-reinforcing cycles. When a company beats and raise, the stock prices go up, the shareholders are happy; therefore, they want them to beat and

Page 288

G. Goodman -- HIGHLY CONFIDENTIAL
raise.

I think shareholders like it because the stock goes up.

Q. And in saying that shareholders like it, are you distinguishing between shareholders like strong results that beat expectations or that shareholders like the practice of a beat and raise?

A. I'm not sure there's a meaningful distinction between those two.

Q. Understood.

Shifting gears just slightly, did Mindbody announce guidance for the fourth quarter of 2018?

A. Yes.

Q. And do you know when that information was released?

A. That was the early November date, I think it was the seventh. It was Q3 earnings. We guided for -- yeah.

Actually, when you guide for Q3, you have an implied guide for Q4 because you have an annual guide.

Does that make sense?

Page 289

G. Goodman -- HIGHLY CONFIDENTIAL
Q. Yes.

A. So we obviously guided sort of twice to Q4. Like the Q2 earnings, when we guided to Q3, there's an implied guide and then there's an explicit guide at Q3.

Q. And so you released updated guidance for the fourth quarter of 2018 when you released your third quarter 2018 results?

A. Correct.

Q. Do you recall what that updated guidance was set at?

A. I want to say it was like sixty-six to sixty-seven, but it could have been sixty-six and a half. It was in that order of magnitude.

Q. Regardless of the specific numbers, was it an increase or a decrease from the previously implied guidance?

A. It was a decrease.

Q. Have you ever given information about Mindbody's internal expectations for the fourth quarter of 2018 before that guidance was released?

73 (Pages 286 - 289)

Page 290

G. Goodman -- HIGHLY CONFIDENTIAL

MR. DEL MONACO: I object to the form.

THE WITNESS: Their current forecast?

Q. Internal expectations.

A. Yes.

Q. In what context were you given that information?

A. Well, I'll also be specific that I don't recall it at the time, but I have seen documents in prep that reminded me that I saw them.

In the pre-earnings materials that Brett shared with the board.

Q. And when were those materials shared?

A. Again, I don't recall the specifics, but a few days before earnings.

Q. Do you recall what those forecasts were?

A. In preparation for this testimony, it was refreshed to me that we were right about sixty-eight million on the internal forecast.

Page 291

G. Goodman -- HIGHLY CONFIDENTIAL

Q. All right.

Could you please open what was previously marked as Exhibit 8. It will take me a moment as well.

A. I have it open.

Q. Is it correct that these are materials related to the October 26, 2018 board meeting?

A. They are.

Q. And if you'll scroll down to the fourth page, that's the cover page for a slide deck; correct?

A. Correct.

Q. Do you know what that slide deck was, or is?

A. The very first pass at the 2019 plan and the strategic growth path to five hundred million in revenue.

Q. Could you please scroll to page fourteen of the exhibit.

MS. LIGHTDALE: Jake, what's the Bates?

MR. BISSELL-LINSK: It's Bates number Mindbody 0002554.

Page 292

G. Goodman -- HIGHLY CONFIDENTIAL

THE WITNESS: I'm on it.

Q. Great.

Do you see the columns at the top and the see the columns labeled Q4 2018?

A. I do.

Q. And then you see the row labeled total revenue, it's in grey?

A. Correct.

Q. What does that number mean?

A. Sixty-seven million eight hundred fifty-eight thousand.

Q. And what is that number a reference to?

A. Total quarterly revenue.

Q. Is that actual revenue?

A. No, this is a forecasted revenue. We're just at the beginning of the quarter. It's October 26. We're in the first month of the quarter.

Q. And what does it mean to have forecasted revenue?

A. It means that the internal finance team has used various inputs,

Page 293

G. Goodman -- HIGHLY CONFIDENTIAL

inputs often from the sales team, inputs from their own modeling, and created their best view of where they think the quarter might come in.

Q. Do you recall whether Mindbody's internal fourth quarter 2018 internal forecasts were ever reduced from that number?

A. I don't recall.

Q. Did you ever discuss these forecasts with anyone?

A. Again, I don't recall.

Q. Okay.

Could you please open Exhibit 23 that was previously marked.

A. I'm in.

Q. Awesome.

Is it correct that these are minutes associated with the December 7, 2018 board meeting?

A. They are.

Q. And if you scroll down four pages, there is a slide -- the cover page to a slide deck; is that correct?

74 (Pages 290 - 293)

Page 294

G. Goodman -- HIGHLY CONFIDENTIAL

A.    Correct.

Q.    And what is that slide deck?

A.    Fiscal year '19 draft plan.

Q.    And are you familiar with this slide deck?

A.    I am.

Q.    Could you scroll to the last page in this exhibit.  Let me know when you're there.

A.    I am there.

Q.    All right.

Do you see the box marked Q4 '18-C?

A.    Yes.

Q.    And above that it says, "street consensus;" right?

A.    Correct.

Q.    And in the row marked revenue, there's a number.

What is that number?

A.    66.1 million.

Q.    And what is that a reference to?

A.    As we discussed before, the average of all of the street models of our

Page 295

G. Goodman -- HIGHLY CONFIDENTIAL

analysts.

Q.    And if you look a little bit lower on the page, there's a box that's labeled guidance and that lists revenue.

What is that a reference to?

A.    What we guided to for -- I assume that that is the Q4 guide we did on the Q3 earnings call.

Q.    Understood.

And then slightly lower on the sage page there's another box that says revenue and then there's a line that says consensus.

Do you see that?

A.    Yes.

Q.    And then underneath that there's a line that says forecast?

A.    I see it.

Q.    What is that a reference to?

A.    I would presume that to be the current state of our forecast at this moment in time, so December 7 we're now forecasting sixty-eight million, comparing that to the consensus from above at 66.1

Page 296

G. Goodman -- HIGHLY CONFIDENTIAL

and noting that we are 1.9 million above consensus.

Q.    Did you speak with anyone about that forecast number ever?

A.    I don't recall.

Q.    At some point in January did you learn that Mindbody beat its fourth quarter 2018 guidance?

A.    Yes.

Q.    And when did you first learn that fact?

A.    I do not recall, I'm sorry.

Q.    Do you recall how you learned of that fact?

A.    I'm sorry, I do not recall.  I'm really not stonewalling.  It's two years later.  I just don't remember.

Q.    Understood.

Do you recall discussing that fact with anyone?

A.    I don't recall that.

MS. LIGHTDALE: Jake, I appreciate that our agreement provides that you might have to engage in some

Page 297

G. Goodman -- HIGHLY CONFIDENTIAL

limited repetition to properly frame your questions, but at this point we're literally going over matters that we spent hours on earlier today. I ask that you please try to limit duplication in your questioning.

MR. BISSELL-LINSK: I am literally done with this line of questioning, so great timing.  We can move on.

Q.    So changing gears slightly, in approximate terms, what is your net worth?

A.



75 (Pages 294 - 297)

Page 298

G. Goodman -- HIGHLY CONFIDENTIAL

A.

Q. Did Mindbody's stock trade on the NASDAQ?

A. Yes. NASDAQ, New York Stock Exchange? NASDAQ, yes.

Q. Did Mindbody's stock generally increase after the release of good news?

A. Yes. Generally, but not always.

Q. Did Mindbody's stock price

Page 299

G. Goodman -- HIGHLY CONFIDENTIAL

generally decrease after the release of bad news?

A. Yes.

Q. Did Mindbody's stock price increase after the merger was announced?

A. Yes.

Q. And why do you think that was?

A. There was certainty in a stock outcome and, like many transactions, the stock immediately trade up to just a little bit underneath the offer price.

Q. After the merger was announced, did you want the deal to close?

A. Yes.

Q. And the merger -- did the merger require shareholder approval?

A. Yes.

Q. And did you engage in any conversations about how likely it was that the deal would close?

A. Yes.

Q. In what context did you have those discussions?

A. So the strategic transaction

Page 300

G. Goodman -- HIGHLY CONFIDENTIAL

committee was still actively working with Qatalyst to get the deal across the line, and that included the whole proxy process, the solicitation of proxies, and working with major shareholders to ensure they understood the deal and would vote in favor.

Q. Did you ever discuss whether Mindbody's trading price reflected --

MR. BISSELL-LINSK: Scratch that.

Q. When analyzing whether or not the merger was likely to close, did you ever consider Mindbody's stock price as a factor in that analysis?

A. Its current trading stock price or its historical?

Q. Its current trading price.

A. I do not remember that.

Q. If you were trying to predict if the merger was going to close, would the stock price be relevant to that analysis?

MS. LIGHTDALE: Objection to form.

THE WITNESS: So interestingly

Page 301

G. Goodman -- HIGHLY CONFIDENTIAL

enough.

Q. Okay. Was Mindbody covered by stock analysts?

A. Yes.

Q. And what did you think of the coverage?

A. There were some good analysts and there were some analysts that I didn't feel understood the business as well as I would like them to.

76 (Pages 298 - 301)

Page 302

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And you previously discussed meetings with ISS.

What was ISS' role in the merger process?

A. So ISS issues for shareholders who subscribe to their services a recommendation either for or against certainly your annual stock shares but also a vote like this. So they were going to issue a recommendation. They requested to talk to management and a board member prior to their issuing that recommendation, they had some questions, and that was the context.

Q. And was it important to have ISS' support, to you?

A. I think so.

Q. Why?

A. If we had not gotten ISS' support, we would have required a lot more communication with shareholders to make sure -- we would have had to answer why and there would have been many more conversations. It was a shortcut to

Page 303

G. Goodman -- HIGHLY CONFIDENTIAL

ensuring shareholders that the process was fulsome, that the price was good, that an independent third party had reviewed the deal and believed it was in the shareholders' best interest. That's helpful.

Q. So in your opinion, was ISS support a factor in persuading shareholders to support the deal?

A. I would presume so, but I have no direct knowledge.

MR. BISSELL-LINSK: That's all I have.

THE WITNESS: Thank you.

MR. DEL MONACO: That was welcomed.

I probably have twenty minutes or so, so maybe we take a five-minute break.

THE VIDEOGRAPHER: The time is 5:20.

We are going off the record.

(Whereupon a break was taken)

THE VIDEOGRAPHER: We are back on

Page 304

G. Goodman -- HIGHLY CONFIDENTIAL

the record. The time is 5:27.

EXAMINATION BY
MR. DEL MONACO:

Q. Ms. Goodman, good afternoon.

A. Good afternoon.

Q. You recognize you're still under oath; correct?

A. I do.

Q. I just have a couple of topics I want to cover with you.

First, did you support the decision to sell Mindbody to Vista at 36.50 a share?

A. I did.

Q. In your own words, can you tell us why you supported that decision?

A. As I came to understand the business, I believed that that premium, that stock price, was something we were unlikely to be able to deliver to shareholders as a standalone company for three-plus years given the investments we needed to make -- needed and wanted to make to realize our strategic vision and

Page 305

G. Goodman -- HIGHLY CONFIDENTIAL

the risk inherent in executing to our revenue plans.

So I truly believed for our shareholders it was delivering certainty at a very high valuation in a way that, as a standalone company, there was a chance we could get to but nowhere near the certainty.

Q. Now, you understand you're here having your deposition taken because some plaintiffs have filed lawsuits challenging that decision; right?

A. I do.

Q. And you've read the complaint that was filed by the plaintiffs in the Delaware case?

A. I have.

Q. You've read the complaint filed by the New York plaintiffs?

A. I don't think I read that complaint.

Q. You're familiar with the allegations they're making about the transaction?

77 (Pages 302 - 305)

Page 306

G. Goodman -- HIGHLY CONFIDENTIAL

A. I am.

Q. Okay. Anything in the complaint or your knowledge of the plaintiffs' allegations, as you understand them, change your mind about having supported the deal?

A. No.

Q. Anything that you were shown today, any documents, any questions you were asked today change your mind about your support for the deal?

A. No.

Q. I want to change gears and talk a little bit about Mr. Stollmeyer's financial situation. Do you remember being asked some questions about that during your earlier exam?

A. I do.

Q. And do you recall that the Delaware complaint has some allegations about Mr. Stollmeyer's financial commitments?

Page 307

G. Goodman -- HIGHLY CONFIDENTIAL

A. I do.

Q. At the time of the transaction, were you generally aware that Mr. Stollmeyer, as a human being, would have certain financial commitments, like a mortgage and the like?

MR. FOULDS: Objection.

THE WITNESS: Yes.

Q. And you testified earlier that you were on the compensation committee at Mindbody; right?

A. Correct.

Q. And at the time of the transaction were you aware that Mr. Stollmeyer had substantial stockholdings of Mindbody stock?

A. I was.

Q. At that time were you then aware that Mr. Stollmeyer's stock was a substantial portion of his net wealth?

MR. FOULDS: Objection.

Q. Net worth.

A. Yes, I was.

Q. And were you aware that there

Page 308

G. Goodman -- HIGHLY CONFIDENTIAL

are a variety of ways in which a CEO can monetize a stock position outside of engineering a sale of a company?

A. Yes.

Q. Changing gears again, you talked a little bit about your relationship with Mr. Stollmeyer. Do you remember that?

A. I do.

Q. And you testified earlier that Mr. Stollmeyer asked you to join Mindbody's board; right?

A. Yes.

Q. And at the time did Mr. Stollmeyer explain to you why he was extending the invitation to join Mindbody's board?

A. Yes. I had built a software as a service company, the same type of nature of company that Mindbody was, taken it public, and grown it to just about three hundred seventy-five million in revenue, so I was -- I was ahead of him, that

Page 309

G. Goodman -- HIGHLY CONFIDENTIAL

sounds funny, but I had experienced the growth curve that he was headed into and so I had seen issues and challenges with we talked about re-platforming somewhat earlier, re-platforming my technology, rebuilding my executive team, expanding internationally, and going public and managing the public markets. I think all of those pieces of experience Rick felt would be helpful to have in the boardroom.

Q. And I think you testified earlier that he asked you to join the board in the 2016 time period; is that right?

A. The time I ultimately said yes. He had asked prior.

Q. Right. And at that point in time when you said yes in 2016, prior to that can you tell us about your relationship with Mr. Stollmeyer, how you knew him?

A. Yep. So there was a business partnership between Mindbody and Constant

78 (Pages 306 - 309)

Page 310

G. Goodman -- HIGHLY CONFIDENTIAL

Contact, there was an integration of those two platforms. In fact, some of the revenue charts we looked at earlier today had a line that said Constant Contact. So we would -- Constant Contact would sell its software to Mindbody customers and, when a Mindbody customer bought the software, we would pay a revenue share to Mindbody. And we had hundreds of joint customers together.

Q. Other than that limited business relationship at the time with Mr. Stollmeyer, any other relationship to speak of between the two of you?

A. Well, from that relationship and getting to know each other in the context of partnership, we had developed what I'd call a lightweight mentoring relationship. So starting at a lunch where I described to him lessons learned in taking a company public, we began to have occasional calls where he would ask for advice and guidance on growth issues.

Q. And I think you testified

Page 311

G. Goodman -- HIGHLY CONFIDENTIAL

earlier that, before you joined the board, you came out to San Luis Obispo and interviewed with others.

Do I have that right?

A. Correct.

Q. Who did you interview with at Mindbody?

A. I'm going to have trouble remembering exactly. I do remember that I met the bulk of the executive team. So I met Brett White, I met the head of marketing, I head the chief human resource officer, I met Kimberly L. I'm trying to -- I don't believe I -- I think I did the board member interviews via phone, although if you refresh my mind and tell me a board member or two came down for those interviews, I wouldn't be surprised. I really don't recall exactly who.

Q. Got it.

And then after those interviews with the management and the board, you were offered formally an invitation to join as a director?

Page 312

G. Goodman -- HIGHLY CONFIDENTIAL

A. Correct.

Q. And at that time you took on the role of lead independent director; is that right?

A. No, it was sometime later that I took on the lead independent director.

Q. Okay.

And you testified earlier that you consider Mr. Stollmeyer to be a friend today; right?

A. Correct.

Q. During the sale process that you testified about earlier today, given that you consider whether Stollmeyer a friend, did that relationship deter you from telling Mr. Stollmeyer no at any point in time?

MR. FOULDS: Objection.

THE WITNESS: Not at all.

So Rick and I had a friendship, but I was not in any way afraid to push back on Rick. There certainly were some notably heated exchanges in the boardroom between Rick and I.

Page 313

G. Goodman -- HIGHLY CONFIDENTIAL

Q. And are you -- do you consider yourself a friend of other board members at Mindbody?

A. Yes.

Q. ████████████████████████
████████████████████████.

Do you remember part of your examination earlier you were asked questions about a company named ██████████?

A. I do.

Q. And you were shown a couple of exhibits that were text messages between Mr. Stollmeyer and Mr. McCarter?

A. I remember.

Q. And just for the record, I believe those exhibits were marked at Exhibits 20 and 21.

Do you recall, Ms. Goodman, that those texts occurred in the late November, 2018 time period?

A. I do.

Q. And in those text messages there was reference to I think as you described

79 (Pages 310 - 313)

Page 314

G. Goodman -- HIGHLY CONFIDENTIAL
Mr. Stollmeyer working as the CEO of a payments company.

Do you recall that?

A. Not wanting to work at a payments company, yes.

Q. At that time in November of 2018, had Mr. Stollmeyer already told you about his intent to transition out of the CEO role at Mindbody, if possible, by the end of 2019?

A. Yes.

MR. DEL MONACO: Can we go ahead and show the witness one more exhibit. I'll ask my colleague, Ms. Carvill, to post it into the portal. We're going to mark it I think as Exhibit 29, unless there's some reason not to. Actually, it's an Excel so I'm not sure we can officially mark it, meaning put it stamp on it, but it will be Exhibit 29.

(Whereupon, an Excel spreadsheet was marked Exhibit 29 for identification.)

Page 315

G. Goodman -- HIGHLY CONFIDENTIAL
Q. Just for the record, Exhibit 29 is an Excel spreadsheet. It bears the Bates number QAT-LX-41625.

Ms. Goodman, do you have that in front of you?

A. I do.

Q. And you'll see at the bottom, it's an Excel spreadsheet so you can see the different tabs.

A. Yes.

Q. And you're looking at that tab on your screen; right?

A. I am.

Q. And toward the top left of that Excel file you see a title for Project Vandenberg?

A. I do.

Q. And below that you see a column that's titled Date?

A. I do.

Q. And then there's a column titled Contact?

Page 316

G. Goodman -- HIGHLY CONFIDENTIAL
A. Yes.

Q. And then a column titled Vandenberg/QP Contact?

A. Yes.

Q. And then to the right of that a column titled Notes.

Do you see that?

A. Yes.

Q. And focusing in on the column titled Date, do you see that there are a series of entries starting with December 3 of 2018?

A. I do.

Q. And then if you carry over for each row, you'll see there's a contact name, then it looks like initials for the Vandenberg/QP contact, and then the notes pertaining to that contact; right?

A. Correct.

Q. And if you look at the December 3, 2018 entry, you'll see in the notes entry it says, "JC reached out about opportunity."

A. I do.

Page 317

G. Goodman -- HIGHLY CONFIDENTIAL
Q. And you understand that to mean Jeff Chang?

A. Yes.

Q. And then in the next row, the same date, there's a notation that says, "sent NDA?"

A. Yes.

Q. And then if we go to December 11 of 2018, there's a note entry that says, "Jeff reached out to check in?"

A. Correct.

Q. And then to round it out, there's a last entry for December 19, which has a notation that says, "passed?"

A. Correct.

Q. Having reviewed this tab of Exhibit 29, does that help you remember that, in fact, Qatalyst did reach out to ███████ in connection with the sale process?

MR. FOULDS: Objection.

THE WITNESS: Yes, it does refresh my memory on that.

Q. I want to change gears again and

80 (Pages 314 - 317)

Page 318

G. Goodman -- HIGHLY CONFIDENTIAL
talk a little bit about the diligence or rather the access to information provided to potential bidders during the initial phase of the sale process, so before the go shop.

Are you with me?

A. Yes.

Q. Do you remember you were asked questions by counsel today about whether different amounts of information or different types of information were made available to different parties during the sale process?

A. Yes.

Q. Can you tell us whether there was a protocol or process in place that the company used in terms of managing who would get access to information and which information parties would get access to?

A. What I recall is that all of this was managed through Qatalyst and that there was a kind of I'll call it boilerplate or a basic set of information that was general information that sort of

Page 319

G. Goodman -- HIGHLY CONFIDENTIAL
populated a room that somebody started and then they were able to request more information, and there would be a review with -- the company would organize it if it wasn't already ready, Qatalyst would review it, and then it would be placed in that database.

Q. By the way, at the time Mindbody was obviously a public company, so was there a lot of information in the public domain about Mindbody already?

A. There was quite a bit of public domain information about the company.

Q. And do you recall that parties that expressed serious interest or expressed a credible bid or made an indication of interest might be provided with information or different levels of information than perhaps someone who just signed an NDA?

MR. FOULDS: Objection.

THE WITNESS: We were clearly being thoughtful about who got what, when they got what, for a variety of

Page 320

G. Goodman -- HIGHLY CONFIDENTIAL
reasons. Certainly there were some folks on the strategic side who were also borderline competitors. We wouldn't want them to have too much information until afterwards. There was certainly an awareness that some of these PE or venture firms were also -- could be potentially interested in financing competitors, and so we'd be gathering information that would be helpful for that. And so we were really gauging their work effort based on whether they were accessing the existing information. So I remember Qatalyst giving us updates that basically said nobody's logged into the data room yet or somebody's logged in but they only looked at two items.

So we were able to carefully watch the data room and understand from that how much real work was going on.

Q. As a member of the strategic transaction committee, were you aware of

Page 321

G. Goodman -- HIGHLY CONFIDENTIAL
any instance in which a potential bidder was denied access to information that was given to Vista?

A. I am not aware of any such incident.

Q. Changing gears once more -- we're almost done -- during questioning by Walleye's counsel, you were asked about the company's internal forecasts?

A. Yes.

Q. And I think there might have been a suggestion through the questioning that the internal forecast should match one to one the guidance that's issued by a company.

Do you have any thoughts or reactions to that notion?

A. Yes.

Having been a public company and having run a public company for eight years, I think it is prudent for companies to guide in a way that gives them wiggle room beyond even the range, as we also guided to a range. That -- you know, they

81 (Pages 318 - 321)

Page 322

G. Goodman -- HIGHLY CONFIDENTIAL
also talk a lot about the midpoint of the range. We would -- our midpoint was always below our forecast and in many cases our -- the top of our range was below -- the top of our range was below our current forecast. And that all had to do with how much certainty and uncertainty we had in the last dollop of revenue, so it was rare that the guide was right on the current forecast.

Q. And taking you back to Q3 2018 heading into Q4 2018, do you recall any particular headwinds or question marks about the company's financial performance at that time?

A. Yeah, we had multiple things going on that were concerning. I mentioned the branded mobile app. You often see that abbreviated as ENA all through the documents, which had a potentially large swing.

We were also experiencing some sales execution issues, particularly on the Booker side of the house. We were

Page 323

G. Goodman -- HIGHLY CONFIDENTIAL
talking a lot about Booker's sales process and sales reliability during this time period. We were behind in hiring sales reps and trying to catch up quickly.

So we just had a number of headwinds that were concerning in terms of our ability to deliver the quarter.

Q. And now just wrapping up, you're aware of Ms. Goodman, that the plaintiffs in this case have alleged that the board of directors of Mindbody during the sale process at issue was a, quote unquote, supine board with respect to the oversight of Mr. Stollmeyer and Mr. White.

Are you aware of that allegation?

A. I did read that allegation, yes.

Q. I just want to hear what you think about that, whether you agree with that characterization.

A. I strongly disagree with that characterization. We were very active in this process, not just the strategic committee, by the way, the whole board

Page 324

G. Goodman -- HIGHLY CONFIDENTIAL
leaned in in terms of understanding who we were approaching, how we were doing the approach, we were thorough in guiding Rick and Brett as to their -- our expected neutrality for them and the guardrails for how they should be behaving with potential suitors. We hired what we believed to be kind of the data supported the best software as a service investment bank for selling a company available in the marketplace, and we were very attentive to the process. We were on calls and videos with frequency from the start to the end.

MR. DEL MONACO: Thank you. That's all the questions I have for now.

THE WITNESS: Thank you.

MS. LIGHTDALE: I have no questions for the witness.

I do want to make a confidentiality designation, but if there's any further questioning from any other attorney, we can do that first.

Page 325

G. Goodman -- HIGHLY CONFIDENTIAL
MR. FOULDS: I do have a few questions, if I may.

EXAMINATION BY
MR. FOULDS:

Q. When Mr. Bissell-Linsk was asking you about the beat and raise concept, I believe you said that that was a best practice.

Did I hear that right?

A. I did.

Q. And I think you also said something to the effect of that stockholders like it when companies beat the guidance; is that right?

A. Correct.

Q. Why do stockholders like it when companies beat the guidance?

A. They like the beat and the raise.

Because it indicates that the company's performing well and the general feeling that they're -- what's the right word -- I'm getting tired. I'm running out of words. That the company's on a

82 (Pages 322 - 325)

Page 326

G. Goodman -- HIGHLY CONFIDENTIAL

roll; right? There's a feeling of -- momentum is the word that I was looking for, that there was momentum.

Q. But you said they like the beat and the raise, but they like it when companies beat the guidance; right?

A. They do.

Q. Okay.

And how would you describe the company's fourth quarter 2018 actual beat of the prior guidance?

A. It was a good beat.

Q. Would you agree it was a massive beat?

A. No, I wouldn't use the word "massive."

Q. Did Mr. Stollmeyer ever tell you that his perception was that it was a massive beat?

A. I don't recall that.

Q. Did Mr. Stollmeyer ever express to you that the Q4 revenue was a massive beat against the street's consensus midpoint of sixty-six million?

Page 327

G. Goodman -- HIGHLY CONFIDENTIAL

A. I don't recall it, but I wouldn't -- it's not out of the question that he said that.

(Whereupon, an e-mail dated January 5, 2019 was marked Exhibit 30 for identification.)

Q. If you look at Exhibit Number 30, which I've just marked.

A. I see that.

Q. Okay.

And you see where he says, "our estimated Q4 revenue of 68.3 million reflects a plus thirty-seven percent growth year over year and a massive beat against the street's consensus midpoint of sixty-six million?"

A. I do see that.

Q. Okay.

And if you look down to the -- again the two paragraphs up, the woo hoo exclamation point, "in 2018, we assembled the juggernaut of the fitness, beauty, and wellness market and came together as hashtag one MB team?"

Page 328

G. Goodman -- HIGHLY CONFIDENTIAL

A. I see that.

Q. And then it says, "as we carry that momentum into 2019, I can't think of a better way to say good-bye to the public markets" and then in parentheses it says, "for now."

Do you see that?

A. I do.

Q. Okay.

So did Mr. Stollmeyer ever express to you that it was only a good-bye to the public markets for now?

A. Again, without recalling the specifics, it was well understood that a PE firm buys a company, grows it for a while, and then exits. That's how they make their money. They have only two exit paths: Another sale of the company to an entity or an IPO. So certainly that was one of the potential future paths for Mindbody.

Q. Was there ever any other analysis done at the Mindbody board level or management that you know of respecting

Page 329

G. Goodman -- HIGHLY CONFIDENTIAL

any expectation of any sort of exit price or exit multiple?

MS. LIGHTDALE: Objection to form.

THE WITNESS: For this transaction, yes, there was much analysis.

Q. I'm sorry, I'm talking about an exit multiple, which is to say --

A. For some future maybe never real transaction? You're talking about this parens?

Q. Yes, the return to the public market.

A. There was no discussion of what that multiple might be, or that timing or whether it would even happen.

Q. Okay.

So no one ever did any analysis of three years from now here's what we think the value of the company is going to be?

MS. LIGHTDALE: Objection to form.

83 (Pages 326 - 329)

Page 330

G. Goodman -- HIGHLY CONFIDENTIAL

THE WITNESS: We hundred one percent did that as it related to this transaction. So we did discounted cash flows, we did forward multiple analysis, and we did all of the appropriate financial analysis to evaluate this transaction, all of which looked at a future potential -- looked at our financial forecast against historical valuation multiples and discounted cash flows. It was not relative to a future IPO. It was just discounted today to understand what shareholders -- whether this deal was good for shareholders and whether their future expectations were -- we were beating their future expectations.

Q. Did Mr. Stollmeyer ever discuss with you that he thought that he could make as much money in the next three years as he had made in his entire time at Mindbody?

A. I do not recall that

Page 331

G. Goodman -- HIGHLY CONFIDENTIAL

conversation from that time period. I did see the allegation in your complaint.

Q. And during the sale process to Vista, can you tell us everything you did to push back or to say no to Rick Stollmeyer?

A. I do remember pushing back hard on his trip to India. I didn't feel it was appropriate for him to be out of the country when we were voting the deal. I kind of remember other things.

This was quite a bit of we would discuss any of this back and forth the weekend before the announcement on internal communication, what we said to the team, and I was active on the communications subcommittee. And as you can see from this particular internal e-mail, Rick is prone -- is very much a cheerleader. It's one of the things that makes him a wonderful CEO. You've laughed at the woo hoos, but you see enthusiasm in his communications. And we pushed back heavily on him over-conjecturing what the

Page 332

G. Goodman -- HIGHLY CONFIDENTIAL

future might look like with Vista. He very much wanted to paint a picture for employees that was upbeat and optimistic.

You might recall I discussed the war for talent in the tech industry and he was deeply concerned that he was going to lose team members that he needed to build the company going forward. So I definitely pushed back on I would say exactly the kind of language you see here prior to the close of the transaction.

Q. Okay.

And had Mindbody disclosed what Mr. Stollmeyer described as a -- is it your testimony that, had Mindbody disclosed what Mr. Stollmeyer described as a massive beat against the street's consensus midpoint of sixty-six million, that stockholders would not have wanted to hear that?

MS. LIGHTDALE: Objection to form.

THE WITNESS: That is not -- stockholders want to know as much as

Page 333

G. Goodman -- HIGHLY CONFIDENTIAL

they can possibly know all the time.

MR. FOULDS: Thank you. I'm done.

MS. LIGHTDALE: I said I have no questions for the witness.

The transcript contains this nonparty witness' personal financial information, so we are designating it highly confidential under the protective order.

If at some point the parties decide to engage in some finer parsing of designations within the transcript, that's fine, so long as at all times we maintain a highly confidential designation on any portion of the transcript that reflects Ms. Goodman's personal financial information.

Thank you.

(CONTINUED ON NEXT PAGE)

84 (Pages 330 - 333)

Page 334

G. Goodman -- HIGHLY CONFIDENTIAL

THE VIDEOGRAPHER: The time is 5:58.

We are going off the record.

This is the end of today's deposition of Gail Goodman.

(TIME NOTED: 5:58 p.m.)

_____ (Signature of witness)

Subscribed and sworn to before me this_____ day of_____, 2020.

_____

Page 335

\*   \*   \*

I N D E X

| WITNESS | EXAMINED BY | PAGE |
|---|---|---|
| G. Goodman | Mr. Foulds | 6, 325 |
| | Mr. Bissell-Linsk | 271 |
| | Mr. Del Monaco | 304 |

E X H I B I T S

| FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Document entitled Schedule 14A | 62 |
| Exhibit 2 | Document entitled Schedule 14A | 73 |
| Exhibit 2A | Document entitled Schedule 14A | 75 |
| Exhibit 3 | E-mail dated August 20, 2018 | 79 |
| Exhibit 4 | Document entitled Minutes of A Meeting of the Board of Directors | 84 |
| Exhibit 5 | E-mail dated October 18, 2018 | 97 |

Page 336

I N D E X (continued)

E X H I B I T S (continued)

| FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 6 | Text message dated October 24, 2018 | 100 |
| Exhibit 7 | E-mail dated October 18, 2018 | 107 |
| Exhibit 8 | Document entitled Minutes of A Telephonic Meeting of the Board of Directors | 126 |
| Exhibit 9 | E-mail dated October 26, 2018 | 144 |
| Exhibit 10 | E-mail dated October 26, 2018 | 152 |
| Exhibit 11 | E-mail dated October 31, 2018 | 155 |
| Exhibit 12 | Document entitled Action By Unanimous Consent | 155 |
| Exhibit 13 | Document entitled Minutes of A Video Meeting | 165 |
| Exhibit 14 | Text message dated November 6, 2018 | 183 |

Page 337

I N D E X (continued)

E X H I B I T S (continued)

| FOR ID | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | Text message dated November 14, 2018 | 191 |
| Exhibit 16 | Document entitled Materials for Discussion | 192 |
| Exhibit 17 | Document entitled Action By Unanimous Consent | 200 |
| Exhibit 18 | Document entitled Minutes of A Meeting of the Board of Directors | 207 |
| Exhibit 19 | Text message dated November 29, 2018 | 214 |
| Exhibit 20 | Text message dated November 29, 2018 | 214 |
| Exhibit 21 | Text message dated November 29, 2018 | 214 |
| Exhibit 22 | Document entitled Minutes of A Meeting of the Board of Directors | 219 |
| Exhibit 23 | Document entitled Minutes of A Video Meeting | 223 |

85 (Pages 334 - 337)

Page 338

I N D E X (continued)

E X H I B I T S (continued)

FOR ID    DESCRIPTION                PAGE

Exhibit 24  Document entitled
        Minutes of A Telephonic
        Meeting of the Board of
        Directors            232

Exhibit 25  Text message dated
        December 18, 2018        238

Exhibit 26  E-mail dated
        December 18, 2018        239

Exhibit 27  Letter dated
        December 18, 2018        242

Exhibit 28  Letter dated
        December 21, 2018        245

Exhibit 29  Excel spreadsheet        314

Exhibit 30  Letter dated
        January 5, 2019        327

\*   \*   \*

Page 339

CERTIFICATION BY REPORTER

I, Wayne Hock, a Notary Public of the State of New York, do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place;

That said witness was duly sworn before the commencement of the testimony, and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of December, 2020.

Page 340

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME:        IN RE: MINDBODY
DATE OF DEPOSITION:   December 18, 2020
WITNESS' NAME:     GAIL GOODMAN

PAGE/LINE(S)/  CHANGE      REASON

WITNESS
SUBSCRIBED AND SWORN TO
BEFORE ME THIS_____DAY
OF_____,2020
_____
NOTARY PUBLIC

MY COMMISSION EXPIRES_____
\*   \*   \*

David Feldman Worldwide
A Veritext Company

800-642-1099                www.veritext.com

**[& - 2019]**

Page 1

**&**

**&** 2:3,9 3:5

**0**

**0002554** 291:25

**1**

**1** 14:11 62:16
65:19 74:13
118:13 273:7
335:12
**1.9** 296:2
**10** 152:25 153:3
336:15
**100** 336:6
**10001** 3:16
**10005** 2:16
**10022** 3:8
**107** 336:8
**10:00** 98:12
101:18
**10:26** 44:17
**10:35** 44:22
**10b5-1** 26:3,17,25
27:7,9,23 28:9
32:17
**11** 155:21 156:4
160:22 317:9
336:17
**11:15** 74:20
**11:17** 74:25
**12** 155:24 159:18
336:19
**1201** 2:4
**125** 126:19
**126** 336:12
**127** 165:16
**12:14** 115:9
**12:45** 115:3
**12:49** 116:4,7
**13** 165:12,14
336:22

**133** 208:6
**14** 183:9,12 189:4
191:3,7,25 192:13
192:22 196:18
197:2 199:8 200:4
201:17,18 210:5
212:12 221:11,18
336:24 337:6
**140** 2:16
**14120** 97:21
**144** 336:14
**1446** 242:22
**14a** 62:16 73:19
75:3 335:13,15,17
**15** 191:8 337:5
**152** 336:16
**155** 336:18,21
**16** 192:6,7 233:7
337:7
**164** 209:9
**165** 219:10 336:23
**17** 200:15,19 203:2
233:2 337:9
**18** 1:8 5:6 26:22
28:15 53:19 97:15
107:20 116:3
136:24 137:7
179:12 207:21,24
214:23 238:12
239:13,23 240:10
240:11 242:13
294:14 335:24
336:8 337:12
338:10,12,14
340:4
**183** 336:25
**18th** 98:23
**19** 26:21 53:20,23
54:12,23 80:8
85:18 86:2,3
214:5,13 258:5

294:4 317:14
337:15
**191** 337:6
**192** 337:8
**19801** 2:5,10

**2**

**2** 73:19,22 74:13
335:14
**2.0** 49:8,10 50:9
53:8,13,17 58:3
139:5
**20** 53:24 54:12
79:14 214:8,21
313:19 335:19
337:17
**200** 337:11
**2016** 11:14 14:14
14:25 176:21
309:14,20
**2018** 19:10 20:25
21:8,12,14 22:8
23:10,21,22 24:9
25:7 26:16 27:2,6
27:20 28:3,25
29:6,17,23 30:10
30:13,20,22 31:5,9
31:12 32:6 33:16
33:18 34:19,21
35:2,3 39:2,5,9,11
39:14,21,24 40:16
40:25 41:6,11,12
42:9 52:17 58:23
59:16,25 61:8
68:12 69:12 77:5
77:14 79:14 83:8
84:13 85:3 89:2,4
89:7 92:10 95:21
96:23 97:2,15
99:2,9 100:17
101:2 107:20
118:21 122:3

125:21 131:2
132:9 133:5
141:19 143:9,24
144:5,14,25 147:3
147:5 150:17
152:24 155:20
161:19 165:19
171:4 179:10
180:3 183:8 191:7
192:14,22 197:2
201:13 208:8
209:15 214:4,7,10
220:12 223:17
227:3,9 228:12
232:2 233:7
238:12 239:23
242:13 245:7
262:2 264:2 266:6
266:17 277:3,8,11
278:9 280:7 283:3
283:19 288:15
289:8,9,24 291:8
292:6 293:7,21
296:9 313:22
314:8 316:13,22
317:10 322:12,13
326:11 327:22
335:19,24 336:6,8
336:14,16,18,25
337:6,16,18,20
338:10,12,14,16
**2019** 22:9 23:10
27:20 30:23 31:5
31:9,13 32:6
33:21,24 56:5
68:13 69:12 86:4
99:3 122:22
133:25 134:8
135:4,19 136:4,10
136:13 138:6
139:9 147:4

**[2019 - ability]**

149:19 150:11 219:18 220:16 233:19 234:14 239:16 257:17 262:3 264:2 275:17 291:17 314:11 327:6 328:4 338:19

**2019-0442**   1:6

**2020**   1:8 5:7 37:8 116:3 139:10 334:12 339:23 340:4,22

**2021**   37:8 54:13,23

**207**   337:14

**20s**   135:15

**21**   214:11 245:7 313:19 337:19 338:16

**214**   337:16,18,20

**219**   337:23

**21st**   248:14

**22**   219:4,9 337:21

**223**   337:25

**22817**   193:5

**22818**   193:7

**22827**   193:23

**22989**   194:5

**23**   223:8,13 253:8 256:7 262:2 293:15 337:24

**2315**   223:22

**232**   338:8

**238**   338:10

**239**   338:12

**24**   100:17 114:10 232:20 336:6 338:5

**242**   338:14

**245**   338:16

**24th**   101:2

**25**   238:13 239:11 338:9

**2554**   133:18 134:21

**26**   118:21 119:9 126:22 127:13,22 128:19 132:6 138:7 144:25 145:9 151:5 152:24 153:5,8 155:17 161:19 163:20 164:5 200:4 221:23 239:24 240:4 291:8 292:20 336:14,16 338:11

**26668**   110:17

**27**   242:14 338:13

**271**   335:7

**28**   208:8 209:15 210:5 213:3 245:8 338:15

**29**   214:4,7,10,23 238:8 314:17,22 314:24 315:2 317:18 337:16,18 337:20 338:17

**2:01**   172:12

**2:10**   172:17

**2:54**   206:12

**2:55**   239:12

**2:56**   239:12

**2a**   75:3,7 335:16

**3**

**3**   79:14,17 220:15 221:12 222:10 316:12,22 335:18

**30**   158:18 327:6,9 338:18

**304**   335:8

**30s**   126:10

**30th**   339:23

**31**   155:20 165:19 336:18

**314**   338:17

**325**   335:6

**327**   338:19

**358**   1:14

**36.50**   246:9 304:14

**3922**   339:25

**3:01**   206:16

**4**

**4**   84:4,8 335:20

**40**   252:13

**41625**   315:4

**4:10**   257:5

**4:25**   257:10

**4:41**   271:12

**4:43**   271:17

**5**

**5**   41:12 42:9 46:17 60:10 61:14,18 97:15,18 327:6 335:23 338:19

**5/6**   76:11

**500**   2:9

**5301**   79:20

**55**   3:15

**5:20**   303:22

**5:27**   304:2

**5:58**   334:3,7

**6**

**6**   60:15 66:6 67:15 67:22 71:4 76:2 84:13 85:2 86:21 100:17,20 173:7 173:10 174:11 179:10 180:3,19 180:24 181:23

182:5 183:8 224:20 267:18 335:6 336:5,25

**601**   3:7

**62**   335:13

**66.1**   294:22 295:25

**67.858**   137:4

**68.3**   327:13

**7**

**7**   107:21 110:12 171:3,14,25 173:8 173:11 223:17 293:20 295:23 336:7

**73**   335:15

**75**   335:17

**79**   335:19

**8**

**8**   126:15,17 133:18 291:4 336:9

**818**   193:8

**84**   335:22

**89777**   156:8

**9**

**9**   145:2,5 336:13

**97**   335:24

**986**   209:10,11,12

**988**   209:20

**9:26**   240:9

**9:40**   1:8 5:7

**a**

**a.m.**   1:8 5:7

**abbreviated**   322:20

**abided**   169:6

**ability**   25:25 28:4 79:7 82:3 106:10 194:17 195:4 199:16 256:18

277:23 323:8

**able** 27:21 29:3
  51:12 57:25 58:15
  144:15 145:15,24
  146:3 177:3
  194:18 195:5
  197:13 235:6
  241:7 253:19
  287:12 304:21
  319:3 320:20
**abreast** 40:6
**absolutely** 52:11
  56:16 60:23 95:8
  279:20
**absorb** 52:14
  138:19,22
**absorbing** 55:18
**accelerate** 51:7
  113:18
**acceleration**
  135:13
**accent** 176:24
**access** 12:24
  167:20 168:3,19
  168:20,23 197:9
  231:5 235:18,23
  236:4 240:24
  258:18,19,22
  259:3 261:10
  318:3,19,20 321:3
**accessing** 320:14
**account** 138:4
**accountant** 183:18
**accuracy** 177:5,13
  228:20 274:22
**accurate** 119:7
  143:19 177:18
  196:16 230:13
  274:24 275:2,4,6,9
  285:20

**accurately** 297:19
**acquired** 59:15,21
  258:13 301:3
**acquirer** 99:5
  108:23 112:4,24
**acquirer's** 107:2
**acquirers** 194:17
  195:4 199:16
  244:13
**acquisition** 24:13
  25:21 40:11,12
  56:19 57:6,10,14
  57:19 61:25 63:2
  66:9 67:19,25
  70:19 71:8 84:18
  161:24 172:20
**acronym** 9:21
**act** 52:6 71:22
  150:7
**acting** 186:19
**action** 5:18 6:8,22
  155:23 183:22
  184:3 200:14
  336:20 337:10
  339:18
**actionable** 120:8
**actions** 83:2
**active** 40:10 66:2
  82:18 235:12
  323:23 331:17
**actively** 117:25
  132:24 174:5
  204:8 300:2
**activities** 18:2
  154:15
**activity** 152:2,8
**actual** 26:24 71:15
  72:20 125:10
  180:9 187:5,18
  206:21 226:16
  228:10 267:10

292:17 326:11
**actuals** 180:2
  266:6,13,17 267:3
  268:5,23 269:11
  269:18 270:3
**ad** 156:20,25
  157:2 163:21
**adam's** 60:25
**add** 82:5,11
  140:23
**added** 170:18
  230:5
**adding** 48:5
**addition** 82:23
**additional** 13:23
  21:11 50:17 160:4
  193:24,25 285:6,8
**adds** 131:22
**adequate** 115:7
**adjusting** 143:12
**admit** 127:23
  186:6
**admittedly** 270:22
**adopted** 150:11
**advance** 26:8
  198:7
**advanced** 26:7
**advantage** 195:11
  301:11
**advertise** 88:23
**advice** 28:20 72:8
  157:24 158:4
  189:12,19,20
  310:23
**advised** 205:5,8
**advisers** 157:10
**advising** 130:15
  203:10 204:2
**advisor** 82:7 127:2
  127:10 154:11
  155:5,10 164:7

165:5 166:11
  170:20 184:15
  186:20 199:11
  204:7 236:7
**advisors** 13:8
  40:15 127:16
  157:22 158:12
  164:18 165:6
  255:21
**affiliated** 262:13
**afford** 142:22
**aforesaid** 339:8
**afraid** 312:22
**aftermarket**
  183:22 184:3
**afternoon** 152:2,8
  239:12 304:5,6
**ago** 14:21 62:9
  233:25 252:8
**agree** 43:10
  189:10 323:20
  326:14
**agreed** 145:20
**agreement** 225:2
  225:14 243:18
  255:8 257:16
  258:3,17 271:6
  274:13 296:24
**ahead** 9:3 19:10
  142:12 186:4
  223:19 250:16
  252:5 287:10,11
  308:25 314:13
**alarming** 237:19
**algorithm** 278:15
**alicia** 154:17
**aligned** 69:17
  162:12
**alignment** 69:21
**allegation** 323:17
  323:18 331:3

**allegations** 305:24 306:6,23
**alleged** 323:11
**allow** 82:4
**allowed** 196:6,8
**allows** 50:7
**altered** 284:20
**alternatives** 24:5 157:12 203:12
**amounts** 318:11
**analysis** 130:12 162:4 300:15,22 328:24 329:8,20 330:6,7
**analyst** 58:23 59:2 59:4,8 60:5 140:9 140:10 281:8,16 281:19 282:10,20 282:25 283:7
**analysts** 78:24 79:12 139:7 140:5 143:2 282:6,15 295:2 301:18,22 301:23
**analyzing** 300:12
**andrew** 2:12
**andrew.blumberg** 2:13
**angel** 31:7
**angela** 152:10
**angle** 254:2
**announce** 181:23 288:14
**announced** 12:9 244:5 268:10,21 270:14 275:22 279:19 280:5 299:6,13
**announcement** 14:10 173:8 178:14 182:5

280:9,13 331:15
**annual** 18:3 219:21,23 220:9 220:10 288:24 302:9
**answer** 7:8 8:2,4 8:16 27:10 52:24 68:20,23 87:5 149:11 252:5 263:9 280:16 302:23
**answer's** 30:5 73:8
**answered** 230:24
**answers** 7:19 173:9
**anticipate** 26:10
**anticipated** 53:14 203:10
**anybody** 178:4,21 187:2,16 198:11 198:13
**apart** 256:20
**apologize** 85:16 88:3 144:4 173:9 198:21 230:24
**app** 277:24 278:3 322:19
**appalled** 77:16
**appear** 156:2 238:22
**appears** 63:25
**appendix** 193:24
**apple** 75:7 277:20 278:15,20,25 279:5,6,10
**application** 48:14 48:18 277:21 279:4
**applications** 278:11

**apply** 213:22
**applying** 255:10
**appreciate** 296:24
**approach** 14:8,9 96:10 122:19 123:11 194:9 197:17 198:8 324:4
**approached** 13:22 14:6 15:12
**approaching** 200:8 324:3
**appropriate** 20:15 130:14 154:5 330:7 331:10
**approval** 223:12 261:25 299:17
**approve** 27:6,9,11 74:13
**approved** 12:7 200:7 211:19 221:6 233:18 256:6 258:12 284:18,19
**approving** 130:17 130:19 229:19 238:7 253:7 279:2
**approximate** 297:13
**approximately** 240:12
**apps** 278:13 279:3 279:10
**april** 59:16 232:2 272:5,8
**arbitrage** 301:10
**area** 18:19
**areas** 52:22 56:7 57:16 78:18
**arps** 134:11

**arrangement** 251:18
**arrears** 137:23
**arrows** 134:20
**art** 252:15
**ashton** 4:7 5:5
**asked** 15:14 144:3 158:21 166:16 169:18 191:17 198:11,17,19,24 220:24 249:13 250:18 259:5,6 260:24 263:12 274:25 276:16 298:12 306:12,18 308:12 309:13,17 313:9 318:9 321:9
**asking** 87:7 93:11 124:18 148:20 225:24 243:19 325:7
**aspects** 233:13
**assembled** 327:22
**assess** 117:13
**assessed** 261:12
**assets** 31:11
**assign** 53:3
**assist** 157:10
**associated** 36:16 45:24 55:2,19 293:20
**assume** 60:19 295:8
**assumes** 217:4
**assuming** 55:15 241:18
**assumption** 135:11 223:4
**assumptions** 134:5 134:10

**assure** 275:8

**assured** 204:18
205:10

**attached** 240:20

**attempt** 199:14
244:7

**attempted** 62:18

**attend** 18:4 59:2
188:4,8 265:12

**attendance** 60:14

**attended** 89:13,16
153:15 265:20

**attending** 17:13
45:2 46:10 89:18
90:17 154:13

**attention** 61:11
243:8

**attentive** 324:12

**attorney** 265:5,8
324:24

**attorneys** 2:4,15
3:6,15 7:24 263:3
264:21

**attractive** 269:6
270:24

**attuned** 70:3

**audit** 171:6 179:19
227:3 228:15
229:10,14 230:8
230:16 280:3
284:15,18,21,22

**audited** 226:23
228:13

**auditors** 226:24
228:14,15,23
229:4,19

**august** 14:10
23:21 24:8,9 25:7
33:18,18 34:15,19
34:19 39:5,9,11,14
39:21,24 40:16,25

41:11 79:14
106:13 169:11
232:3 335:19

**authority** 160:5

**authorized** 239:15

**automatic** 105:8
112:20 113:23
119:22

**available** 103:11
176:21 196:20
197:4 259:25
260:3,13 318:13
324:11

**avenue** 2:9 3:7

**average** 232:5
282:18,18 294:25

**avina** 128:21,25
129:8,15,23

**aware** 22:8,16
23:6,9,18,22 24:10
25:6,8 29:11,20,24
29:25 30:3,10,13
30:23 31:2,3,6,7
31:10,11,16,20,23
31:24 32:3,4,7,8
32:12 33:16 35:15
39:10,12,22,25
40:16,21,25 41:5,9
43:23 57:4 60:4
61:6,10 62:9
69:16,22 70:8,23
71:21 80:25 86:16
86:24 89:3,5
90:12,15,20 91:2,7
91:10,17 92:9,11
92:15,16 95:21,25
107:10 111:8,19
111:24 112:2
143:3 151:4,9,19
151:22,25 152:4
152:14,15,16

153:14 159:7,14
162:9 169:9,15
171:22 172:4
173:2,14,22 174:9
178:11,17 179:12
179:25 184:6
186:10,18,22
190:3,25 191:23
198:18,23 199:4
200:25 201:6,10
215:8 217:2,6,10
217:12,16 223:2
224:17 230:19,22
235:3 238:3,9
250:10 254:4
255:5,16 257:25
258:6,8 259:8,11
261:16 262:10,24
269:8,15,17,23
282:25 307:4,15
307:19,25 320:25
321:5 323:10,16

**awareness** 29:7
320:7

**awesome** 293:18

**b**

**b** 18:10 35:21,23
35:25 36:4,12
37:2 38:5,12
123:20 335:10
336:3 337:3 338:3

**back** 14:4 15:15
15:23 33:23 43:13
44:14,15,20,23
45:15 46:17 50:15
53:23 54:12 60:9
66:6 70:23 74:23
77:9 85:25 86:12
87:8 116:5 117:2
117:23 118:12
160:21 172:15

173:7 176:21
179:7 180:7 204:9
205:14 206:8,14
213:4 216:8
233:24 246:14
247:25 248:11
251:5,23 257:8
262:8 264:19
265:23 271:15
303:25 312:23
322:12 331:6,8,14
331:24 332:10

**backed** 13:24

**background** 42:17
64:15,22 65:2,7,18
117:3,4,9 118:16
197:16

**backing** 80:5

**bad** 178:24 179:2
299:3

**bain** 244:20

**balance** 35:4 49:3
50:22

**balanced** 118:2

**balancing** 52:6
150:6

**ball** 123:3,11

**bank** 40:18 153:22
324:10

**bankers** 24:20
39:17 40:3,5,14
162:2 187:5,18

**banks** 190:15

**banter** 272:20

**base** 147:23 148:4
148:8,9

**based** 201:2
217:17 232:10
267:6 284:2
320:13

**[baseline - board]**

**baseline** 50:7
**basic** 318:24
**basically** 320:17
**basis** 261:4
**bates** 192:25 209:6
242:21 291:23,24
315:4
**beach** 154:13
**bears** 315:3
**beat** 254:22 268:5
268:13 270:20
286:12,16,23
287:5,13,25 288:7
288:9 296:8 325:7
325:14,18,19
326:5,7,11,13,15
326:20,24 327:15
332:18
**beating** 286:19
330:18
**beats** 287:23
**beauty** 48:24
138:13 211:3
213:24 327:23
**becoming** 138:12
146:21
**began** 66:3 83:9
83:12 199:22
200:5,10 221:22
310:22
**beginning** 34:16
41:19 47:7 77:6
80:17 83:4 203:10
292:19
**begins** 66:4 273:21
**begun** 48:12
**behalf** 5:16 6:21
**behaving** 324:7
**behavior** 196:17
**believe** 10:24 14:9
17:7 21:5 22:3

24:17 26:18 28:19
30:16 35:21 36:2
40:12 45:16 52:9
52:21 57:18 59:15
70:17 77:21 78:3
79:16 85:16 86:10
87:9 88:4 90:22
93:23 94:14 96:13
101:21 110:12
114:8 119:4 120:6
124:7,19 125:18
126:5 129:17
132:22 138:6
156:3 177:9
184:25 188:10
193:21 194:22
195:2,9 201:10
207:3 220:22
221:6,17 222:9
230:12 234:23
235:12 242:8
260:18,19,20,21
261:21 267:3,17
271:3 272:5 281:7
311:15 313:18
325:8
**believed** 71:2
100:4 148:7
201:11 275:9
303:5 304:19
305:4 324:8
**bell** 179:6
**benefit** 18:10
204:14 211:10
219:8
**benefits** 51:13
53:23,24
**berger** 2:9
**bernstein** 2:9
**best** 7:12 8:10
46:19 52:4 98:4

98:22 107:7 110:6
137:6 161:8
162:13 168:6,11
168:12 177:19
178:6 182:20
192:20 195:21
248:5 287:3,14
293:4 303:6 324:9
325:9
**better** 54:20,22
123:9 137:13
174:17 189:21
201:11 231:2
240:16 247:23
328:5
**beyond** 53:24
130:20 140:24
278:19 321:24
**bid** 197:8 211:8
240:20 241:3,8
242:3,19 247:7,17
247:18 254:22
256:15 261:20
267:6,9 268:7
319:17
**bidder** 169:25
185:17 198:19,24
199:3 247:11
250:12 259:6
261:17,23 267:5
321:2
**bidders** 12:2 39:8
73:3,16 92:6
168:4 169:24
170:10 196:21
197:4 221:5
225:22 226:11
236:3 247:9
256:13 260:16
266:13,14,19
318:4

**bide** 81:18
**bids** 203:13,14
247:20 252:18
**big** 54:4,16 150:10
230:9 254:17
**biggest** 51:19,20
**billing** 230:3
**billion** 131:16
**billy** 154:16
**bissell** 2:17 6:5,6
251:4,8,17 252:8
253:4 271:19
277:9 291:24
297:8 300:11
303:13 325:6
335:7
**bit** 9:4 14:16 56:3
92:4 94:16 133:22
180:7 192:10
252:15 267:7
276:6 295:3
299:12 306:16
308:7 318:2
319:13 331:13
**bite** 149:16
**bkr** 224:2
**blair** 132:21
**blbglaw.com** 2:11
2:13
**blended** 66:12
**blind** 285:23
**blood** 339:18
**blowing** 90:19
**blumberg** 2:12
**blurred** 100:14
**blurring** 102:10
**board** 12:6 14:24
15:3,7 16:6,9,19
16:25 17:14,18,23
17:25 18:3,6,16,21
19:11 20:2,3,4,15

**[board - bullet]**

21:2,8,9,11,15,23
21:24 22:5,6,10,17
27:8 33:13 34:12
37:11 38:11 41:13
41:13 42:16 45:17
47:12,17 49:5
51:4 52:8 60:10
60:13,15,24,25
61:10 62:13 66:7
66:8 67:15,22,23
68:2 77:22 80:10
80:19 82:7,15,19
82:25 83:3 84:3
84:12 88:18 100:5
103:15,16 104:6,7
104:17,18 105:2
105:11 107:6
109:6 111:11,21
116:18,21,24
117:21 119:8
124:10 126:14,22
126:25 130:10,17
130:20 132:6,17
132:25 133:4
136:11 140:18
143:3,20 144:14
147:16,17 148:23
153:20 154:6
155:4 156:20
157:4 158:21
159:3 160:3 161:7
161:15 162:5
163:20 164:6
169:20 171:9
175:2,18 186:14
190:8 201:19
202:7,15,17
206:19 207:20
208:7 220:25
223:16 225:15
226:6,13 232:25

233:6,12,15 235:9
238:7 239:15
240:6 255:20
256:2,6 272:19
277:4 279:23
280:2,18 281:10
282:21,23 285:17
290:15 291:9
293:21 302:12
308:13,18 309:14
311:2,16,18,23
313:3 323:11,14
323:25 328:24
335:22 336:11
337:14,23 338:7
**board's** 82:2 127:9
248:5 261:25
**boardroom**
309:11 312:25
**boards** 14:19,20
15:10 38:17,19,25
174:23 202:18
**boil** 55:23
**boiled** 57:17
**boilerplate** 121:7
318:24
**bold** 17:24 18:10
59:4,6,7
**book** 10:23 11:6
48:16 82:9
**booked** 48:18
**booker** 40:11
50:14 53:24 54:16
58:13 59:10,12,14
60:2 83:22,23
136:6 138:4 224:6
279:11 322:25
**booker's** 54:16
323:2
**borderline** 320:4

**boss** 272:21
**boston** 17:19 18:7
**bottom** 63:10,24
64:5,9,12 75:17
110:21 111:4
133:19,21 165:22
192:11 193:2
208:17 209:9
273:18,21 315:8
**bottoms** 131:19
**bought** 54:21
310:8
**boutros** 208:19
245:13 246:15
**bowl** 262:12
**box** 294:13 295:4
295:12
**boxed** 146:10,11
146:15
**branded** 277:21
322:19
**branding** 278:14
**bravo** 169:18
244:18
**breadth** 177:14
204:16
**break** 8:14,17
14:17 44:9,19
74:22 94:21
107:15 114:20
139:11 142:22
170:23 172:7,14
201:19 206:3,10
206:13 251:20
256:23 257:7
271:14 279:13
303:20,24
**breakup** 246:5
253:21 254:12
255:3

**breathtaken**
241:25
**brett** 3:7 5:25
45:14 167:16
190:24 260:11,12
274:14 276:23
282:3 283:24
285:2 290:15
311:12 324:5
**brief** 263:10
**briefing** 172:2
190:9
**briefly** 6:22 7:6
59:19 81:15
**bring** 283:14
284:14
**bringing** 222:12
**broad** 176:15
**broader** 78:14
**broadly** 35:14
**broadway** 2:16
**brought** 18:17
**bucks** 232:6
**budget** 221:2
**buff** 186:8
**build** 25:3 40:8
48:12 49:15,16,19
55:3 332:8
**builder** 22:3
**building** 25:4
150:8 169:16
218:16
**builds** 177:11
**buildup** 190:16
**built** 48:2 50:8
70:7 140:4,13
210:14 308:20
**bulk** 20:12 311:11
**bullet** 145:12
194:12

**bullets** 224:2
**bunch** 233:25
  301:3
**burden** 79:11
**business** 9:2 10:20
  17:19 18:8,21
  25:2 40:4,14
  46:24 48:13,23
  51:18 58:7 78:16
  78:18 81:18 83:23
  92:25 103:9,10
  109:4 140:7
  176:22 198:7
  210:16,24 241:14
  276:17 279:9,11
  301:24 304:19
  309:24 310:12
**businesses** 198:5
**busy** 110:4
**buyer** 11:21 106:6
  108:10 109:5
**buyers** 161:14
**buying** 103:20
**buyout** 87:13 88:8
  92:24
**buys** 92:13 328:16
**bye** 328:5,12

        **c**

**c** 2:2 3:2 4:3
  294:14
**c.a.** 1:6
**cac** 57:9 58:2,13
  58:18
**calculated** 93:9
**calculation** 270:4
**calendar** 97:23
  98:21
**california** 61:4
**call** 10:5 14:8,18
  17:9 18:5 42:15
  42:21 91:20 97:3

97:5,9,25 98:6,10
98:21,23 100:11
101:15,17,22
102:2,13 103:14
114:10 156:8
171:15 174:11
176:11 180:19,25
182:17 212:24
220:6,9,11 250:2
259:2 280:2 295:9
310:19 318:23
**called** 10:16,19
  11:2 14:22 22:24
  24:22 35:20 40:18
  49:23 56:24
  123:19 193:13
  242:25
**calling** 85:20,22
  97:11 237:11
  244:5
**calls** 68:17 104:2,6
  121:16 171:10
  212:17 244:8
  250:6 276:15
  310:22 324:13
**candidate** 133:14
**candidates** 83:4
  83:12,14,16 218:6
  218:21,22
**cap** 197:23
**capabilities** 51:8
  112:25 113:17
  133:12
**capability** 50:2
**capable** 202:7
**capital** 22:23
  27:17 35:13 50:18
  144:6 145:13
  244:20
**capture** 58:16

**card** 147:25
**care** 197:22 231:3
**cared** 198:10
**careful** 145:22
**carefully** 320:20
**carol** 2:19 6:8
**carry** 316:15
  328:3
**carvill** 3:10 6:4
  314:15
**case** 45:10 70:2
  230:2 262:21,25
  263:4 305:17
  323:11 340:3
**cases** 48:19 322:5
**cash** 35:4 50:23
  144:11 268:25
  330:5,12
**catch** 98:13
  195:19 199:24
  218:15 323:5
**caught** 168:17
**cause** 164:21,23
**caution** 43:18 72:7
**cautiously** 159:11
  164:16
**caveat** 102:10
  103:2 213:5
**caveated** 127:18
**ceased** 81:21
**centers** 237:9
**centerview** 40:9
  128:3,12 189:6,8
  189:15 190:7,19
  201:9
**ceo** 9:4,8 11:7
  24:20,22 26:13
  28:19 33:20,23
  34:12 40:5 80:13
  81:21 82:16 83:8
  83:22 85:10,25

86:12 92:22 93:12
93:16,24 106:4
109:13 122:6
141:10 154:18
176:8 275:17
308:2 314:2,10
331:22
**ceos** 70:14 155:13
  176:9
**certain** 16:13
  49:16 75:15
  148:13 150:9
  171:13,16 233:13
  241:17 307:6
**certainly** 40:4,9
  61:9 70:8 71:10
  141:10 143:2,19
  167:19 201:16
  227:2 237:16
  256:11 276:13
  302:9 312:23
  320:2,7 328:20
**certainty** 177:14
  194:19 195:6
  243:19 284:3
  299:9 301:12
  305:5,9 322:8
**certification** 339:2
**certify** 339:5,16
**cetera** 223:3
**cfo** 45:14
**cfoulds** 2:6
**chain** 145:8
**chains** 54:17
**chair** 19:17,19
  161:2
**challenge** 57:23
  147:22
**challenges** 277:6
  309:4

**challenging** 305:12
**chance** 111:23 150:13 155:12 195:23 202:9 253:23 273:8 280:21 305:7
**chancellor** 46:3
**chancery** 1:2
**chang** 183:16,17 184:3,8 208:20 317:3
**change** 139:16 174:19 306:7,12 306:15 313:6 317:25 340:5
**changed** 124:4
**changes** 64:25 74:9 138:17
**changing** 106:23 267:5 276:6 297:12 308:6 321:7
**chaperone** 153:21 154:2,7
**characterization** 104:9 323:21,23
**characterize** 22:4
**charge** 48:7 226:4
**charged** 278:5
**charging** 48:4
**charter** 203:8
**charters** 20:13
**charts** 310:4
**check** 99:23 280:22 317:11
**cheerleader** 331:21
**chef** 152:9
**chief** 311:13

**chime** 72:7
**choice** 185:17 201:11
**choose** 147:14 158:13 190:22
**choosing** 199:10
**chose** 147:6 185:23
**chris** 6:20 94:18 251:4 264:24
**christopher** 2:6,11 5:14
**christopher.orrico** 2:11
**cipora** 179:22
**circle** 251:23
**circumstances** 41:9 113:7 166:9
**clarifying** 32:13
**clarity** 222:2
**class** 2:15 36:4,8 36:12,24 37:2 38:5,7,12 48:16 152:9
**classes** 35:16,20 48:15 154:16 278:4
**clause** 38:23
**clean** 226:2,10
**clear** 16:9 26:19 42:4 55:4 67:16 77:23 80:6 98:20 123:17,20 159:10 179:8 213:11 258:7,8 260:3,5
**clearly** 110:8 123:23 158:21 161:9 195:13 203:19 253:16 268:15 319:23

**client** 265:5
**clients** 277:23
**close** 21:24 22:5 37:18,20,23 44:8 94:17 110:24,24 122:10 172:6 230:6 254:9 276:2 299:14,21 300:13 300:21 332:12
**closed** 11:14 165:22 256:17 272:5,13
**closer** 22:7 180:12 223:11,11
**closing** 272:4,24 275:25
**cmarden** 3:20
**coaching** 68:25 106:20
**cocktail** 17:20
**code** 15:17,18 184:18,21,24 185:11
**cody** 3:20 42:25
**coffee** 17:20
**cognizant** 37:16 99:19 109:25 117:21 254:8
**cohort** 231:24 232:11
**cold** 142:4
**colleague** 6:3 314:15
**college** 8:22
**column** 315:21,24 316:3,7,10
**columns** 292:4,5
**combination** 48:10 190:23 198:6

**combined** 53:12
**come** 15:2 59:7 72:24 139:9 160:20 195:23 202:23 230:9 248:19,24 293:5
**comes** 64:6 177:13 207:25 282:17 286:18
**comfort** 78:16
**comfortably** 251:2
**coming** 143:15 171:19 200:20,22 206:22 225:21 266:10 281:16
**commander** 185:6
**commencement** 339:10
**comment** 109:22 120:19 168:10
**commentary** 243:25
**comments** 120:7
**commission** 340:24
**commitments** 306:25 307:6
**committed** 31:21 31:25 70:7
**committee** 13:11 19:15,23 20:13,19 20:22 25:23 33:13 128:2 129:18,22 130:4,11,15 132:10,16 156:19 156:21 157:4,16 159:4 160:5,7,17 161:8,25 162:8 163:21,24,25 165:19 166:15,17 171:5,7 179:20

**[committee - concerns]**

188:8,12 190:21
199:9,19,21 200:3
203:9,21 207:13
210:13 211:11
219:12,17 222:19
225:19 229:11,14
230:8,16 239:5
248:22 249:6,14
260:7 280:3
284:15,18,21,23
300:2 307:11
320:25 323:25
**committee's**  166:5
236:9
**committees**  19:11
19:18
**common**  28:18
265:4 286:3
**communicated**
245:21,25
**communicating**
184:2 188:22
247:8
**communication**
302:22 331:16
**communications**
43:21 72:12 73:2
170:4 188:18
190:2,19 191:24
200:11 222:21
235:4 331:18,24
**comp**  132:20
**companies**  23:5
24:21 78:25 92:13
142:6 143:17
161:13 197:19
204:21 208:22,25
210:3 231:23
287:18 321:22
325:14,18 326:7

**company**  10:15
11:19 12:12 13:10
14:19,20 20:8
23:24 24:8,22
28:19 32:2 39:8
40:5,7 41:16
45:13 46:20 47:6
52:6 56:6 59:14
59:20 66:2 68:10
68:15 69:15,23
70:6 79:2,5,6
80:23 81:5 86:18
87:11 88:6,9,15,19
92:6,20 93:13
94:11 99:17
101:14 102:3,6
103:21 104:14,19
105:7,17,18
106:18 107:25
109:20 110:5,6
112:14 122:5
129:13,15 130:6
130:14 131:15
137:16,22 141:10
142:14 144:23
146:24 154:18
157:11 162:24
164:13,21,24
168:24 176:9,16
177:3,11 179:24
179:25 182:18
188:24 190:12
193:13 198:3,25
198:25 204:23
210:13 211:9
215:5,13 216:10
216:15 217:9,15
217:20 226:22
233:18 244:13
255:7 256:19,22
257:24 270:25

272:2,17 282:14
286:2 287:23
304:22 305:7
308:4,21,22
310:21 313:10
314:3,6 318:18
319:5,10,14
321:16,20,21
324:11 328:16,19
329:22 332:9
**company's**  24:19
26:13 109:13
219:18,20 220:16
233:18 235:22
239:16,19 240:25
267:19 285:21
321:10 322:15
325:22,25 326:11
**compared**  280:8
**comparing**  57:5
295:24
**compensate**  93:2
**compensated**
95:16
**compensates**
92:12
**compensating**
93:15
**compensation**
19:13 20:22 25:23
93:7,8 94:4
108:20 109:11
132:22 298:16
307:11
**competition**
168:13
**competitive**
168:10,12
**competitor**  238:24
**competitors**  320:4
320:10

**complain**  215:7
**complaint**  42:18
45:18 90:2,5,7,21
91:8,10 118:9
185:15 215:14
250:10 259:9
262:11 305:15,19
305:22 306:4,23
331:3
**complete**  99:22
119:7 120:10
194:18 195:5
199:17
**completed**  136:12
136:15 227:4
**completely**  58:8
**complexity**  81:4
**composition**  20:2
**computer**  230:4
264:6
**computer's**  264:9
**concept**  56:22
325:8
**concern**  27:16,21
29:2 139:22
140:18 154:12,24
155:2,15 202:12
**concerned**  51:10
51:14,25 81:11,20
82:11 105:22
140:13 141:12
148:24 164:12
184:13 199:6
253:10 264:22
332:7
**concerning**  39:17
139:20 258:10
259:19 301:13
322:18 323:7
**concerns**  118:4,10

**conclusion**  68:18
**concrete**  122:4
  125:17 139:3
**concurred**  100:5
**conduct**  195:3
**conducting**  123:21
**conference**  10:19
  18:3 59:5 89:14
  89:14,17,18,21
  90:18 91:4,18
  152:20 153:10,16
**conferences**
  154:19
**confess**  222:4
**confidence**  56:13
  82:2 106:19 150:5
  150:8
**confident**  149:18
  162:11
**confidential**  1:10
  7:1 8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1

71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1

194:1 195:1 196:1
197:1 198:1 199:1
200:1 201:1 202:1
203:1 204:1 205:1
206:1 207:1 208:1
209:1 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1 262:1
263:1 264:1 265:1
266:1 267:1 268:1
269:1 270:1 271:1
272:1 273:1 274:1
275:1 276:1 277:1
278:1 279:1 280:1
281:1 282:1 283:1
284:1 285:1 286:1
287:1 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1

317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1,10,16
334:1
**confidentiality**
  225:2 258:16
  324:22
**confirm**  98:10
**confirmatory**
  241:19
**conflict**  68:14 69:4
  69:8,9,14 70:13
  166:10 204:19
  205:5
**conflicts**  70:18
  71:6 162:6,16
  205:13
**confusion**  79:11
**congratulatory**
  272:7
**conjecture**  148:19
  151:18 270:22,23
**conjecturing**
  331:25
**connect**  141:25,25
**connected**  69:25
  70:2 185:16
**connection**  62:25
  86:11 317:20
**consensus**  282:10
  282:17,21 283:2,7
  294:17 295:14,25
  296:3 326:24
  327:16 332:19
**consent**  155:23
  156:17 159:19
  200:14 203:8,24
  336:21 337:11

**consents** 221:24
**consequences**
  37:12 70:21,22
**consider** 16:18
  21:18 46:6,24
  68:13 69:13
  117:16 162:18
  300:14 312:10,15
  313:2
**considerably**
  126:7
**consideration**
  107:9 301:15
**considerations**
  219:24
**considered** 142:13
  204:13 254:3
**considering** 133:3
  155:4 215:18
  275:20
**consistency** 267:2
**consistent** 78:11
  78:22
**consistently** 78:4
**consolidated** 5:17
**constant** 9:4,9,13
  10:14 11:7,10,17
  13:13,19 14:13
  15:6,8,11,16
  175:22 176:17
  229:23 301:2
  309:25 310:5,6
**constituencies**
  71:3 117:22
**constituents** 20:12
  69:24 70:11,16
**constraints** 146:13
  146:16
**consultant** 298:12
**consumer** 47:4,22
  48:13,23 54:4,5

58:7,11 87:21
  140:8,10
**consumers** 48:7
  48:15,18
**contact** 9:5,9,13
  10:14 11:7,11,17
  13:13,19 14:13
  15:6,8,11,16
  175:22 176:17
  229:23 301:2
  310:2,5,6 315:25
  316:4,16,18,19
**contacted** 207:7
  213:2
**contacts** 39:7,10
  39:15
**contains** 333:7
**contemplated**
  124:15 125:2
**contemplating**
  85:11 133:13
  140:21 241:13
**context** 16:14
  17:23 18:6,14
  36:19 220:23
  227:14,19 234:4
  235:7 237:5 246:3
  246:11 281:12
  282:22 286:25
  290:8 299:23
  302:15 310:17
**contingency** 269:7
**contingent** 243:16
  269:2
**continue** 10:2
  12:10 33:21 68:5
  218:5 253:20
  298:8
**continued** 3:2 4:3
  116:13 256:16
  272:23 333:21

336:2,3 337:2,3
  338:2,3
**continuing** 218:3
**contrast** 10:4
**contribute** 135:12
**control** 107:12
**controlled** 12:23
**controversy**
  339:20
**conversation** 24:7
  27:24 28:5,14
  33:13,19 34:9,15
  39:23 46:22 47:12
  61:18,21 62:14
  66:13 72:18 80:2
  100:15 107:4
  111:17 121:8
  139:12 147:16
  157:23 158:3
  179:21 182:17
  202:11 216:19
  228:6 249:17
  269:3,5 272:22
  278:25 331:2
**conversations**
  16:21 28:2 38:21
  39:25 41:2,15,22
  42:3 66:11 68:4
  71:14,15 96:18
  103:3,6 104:17,22
  104:25 105:16,21
  106:8 123:22
  155:7 159:14
  182:15 190:9
  197:17 211:24,25
  235:11,15 258:9
  275:23 299:20
  302:25
**convert** 36:24
**convertible** 35:2,7
  35:9

**conveyed** 285:10
**convinced** 81:6
  158:13 164:14
**cooking** 152:9
  154:16
**cooley** 3:14 5:20
  43:2 129:4 130:14
  172:21 240:5
  265:11 269:8
**cooley's** 130:13
**cooley.com** 3:17
  3:19,20
**coordinate** 222:24
  235:14
**coordinated** 43:24
  222:11
**coordinating**
  235:10
**copies** 222:25
**copy** 222:22
**corner** 63:10,25
  64:5,12 75:17
  133:19,21 193:2
**corporate** 20:18
  132:10,15
**correct** 6:25 9:6
  10:11 11:4,11,12
  11:23 12:8 18:25
  19:16 27:2,3,11,12
  29:14 30:11,12,15
  34:19,20 36:6,7,10
  41:3,4,7 42:10
  45:19,20 50:18,19
  56:15 60:12,21
  61:5 67:20 83:19
  90:3 91:13,16
  102:3,4,6,7 109:21
  112:22 121:18
  129:20 130:6,7,9
  136:18 137:4,5
  143:25 153:6,7,11

**[correct - data]**                                                Page 13

156:18 162:2,3
163:15,18,23
164:7 165:19,24
168:21,22,24,25
173:24 177:5
179:10 183:3
187:23 188:22
190:22 192:3
194:21 199:11,12
204:15 213:12
218:23,25 219:12
219:13 220:19
221:20 223:17
224:7,12 226:17
239:20 240:10,18
243:9 244:14,15
246:23,24 258:13
258:14 261:3
262:22 289:11
291:7,13,14
292:10 293:19,25
294:2,18 304:8
307:13 311:6
312:2,12 316:20
317:12,16 325:16
**correction** 114:17
119:16 124:22
125:3 150:10
170:7 182:24
**corrections** 126:8
**correctly** 22:19
110:23 180:4
**correspond**
188:12
**cost** 30:23 56:19
57:6,10,14,19
276:18
**costa** 259:13
**costly** 58:19
**costs** 55:18

**counsel** 5:12 8:4
13:4 42:14 68:25
71:17 72:4 129:3
129:5,13,15,21
130:2,5 159:20
166:16 187:9
318:10 321:9
339:21
**count** 112:16
**counter** 195:18
251:10 252:10,11
252:12
**countered** 249:3
251:9
**counting** 17:3,4,5
21:3
**country** 331:11
**couple** 116:15
199:23 200:23
236:19 280:12
304:10 313:13
**course** 24:4,19
40:3,13 72:19
80:18 93:2 105:10
277:16 287:11
**court** 1:2 6:11
7:19 18:9 77:9
94:25 115:5 161:3
161:12 262:24
**court's** 262:20
**courtney** 3:10 6:3
43:5
**courtney.carvill**
3:11
**cover** 156:7
291:12 293:24
304:11
**coverage** 79:3
301:21
**covered** 301:17

**covering** 78:24
**create** 79:8 83:5
**created** 79:11
80:16 122:11
157:5 164:3 293:3
**creating** 54:5
**creation** 91:25
92:8
**credible** 319:17
**credit** 29:16,23
241:12
**criteria** 210:14
211:3 213:22
**critical** 164:16
**crossed** 84:7
**crucial** 52:7 158:8
**crux** 147:21
**crystal** 154:17
**cto** 81:10,14
**cunningham**
161:3
**curiosity** 11:5
146:14
**current** 49:4 61:17
96:8 112:25
113:16 122:9
139:7,8 174:21
177:25 197:19
233:16 254:18
268:12 281:18
290:4 295:22
300:16,18 322:7
322:11
**currently** 49:21
**curve** 223:19
309:3
**cushion** 179:13
**customarily** 286:4
**customary** 91:21
92:3 154:5 174:19
176:3 219:21,23

**customer** 50:3
56:19,23 57:6,10
57:13,19 224:3
232:5 237:15
310:8
**customers** 70:3
231:25 236:13,14
236:17 237:12,17
237:23 238:2
310:7,11
**cut** 7:12 181:3
213:16
**cutting** 213:19
**cvillegas** 2:19
**cxo** 89:13,17,18,21
91:4
**cycle** 58:19
**cycles** 287:22

**d**

**d** 6:13 18:10 116:8
335:4 336:2 337:2
338:2
**daily** 137:16 235:8
**danger** 278:10
**dare** 139:13
**darn** 230:6
**dartmouth** 9:2
**dashboard** 78:14
**dashing** 43:8,11
**data** 12:21,24 13:3
13:6 135:6 186:16
196:20 197:3,10
198:10,11,13,14
200:25 227:17
235:19,24 236:4
241:18 249:25
258:19 261:9
266:25,25 267:4
280:15 320:18,21
324:9

**[database - deleted]** Page 14

**database** 319:8
**date** 5:6 23:11
  35:6 36:23 37:5
  59:22 85:18,21
  86:6 98:5 152:19
  152:21 163:14
  189:5 196:19
  197:3 221:18,21
  224:25 235:2,17
  246:10 288:20
  315:22 316:11
  317:6 340:4
**dated** 79:13 84:13
  97:14 100:16
  107:19 144:24
  152:23 155:19
  165:19 183:8
  191:7 196:25
  209:14 214:4,7,10
  214:23 238:12
  239:22 242:12
  245:6 327:5
  335:18,23 336:5,7
  336:13,15,17,24
  337:5,15,17,19
  338:9,11,13,15,18
**dates** 250:8
**day** 18:20 58:23
  59:3,4,8 60:5,11
  89:12 94:24
  103:25 127:17,25
  151:12 152:9
  232:16 239:14
  240:24 259:21
  268:9 282:2
  334:11 339:23
  340:21
**days** 17:8 18:22
  129:18 235:10
  253:11 280:12
  290:19

**deadline** 248:2,3
**deal** 12:3,5 13:7
  14:10 55:2 61:20
  93:18 99:25
  120:17 122:17,19
  122:22,25 124:4,6
  124:7 125:11
  126:3,11 157:5,6,7
  158:5 161:10
  167:22 187:6,19
  188:25 189:18,21
  196:2 200:11
  204:12,14 244:4
  247:23 248:13
  252:14 256:20
  258:12 264:3
  268:7,10,21,22
  269:6 272:5 276:2
  299:14,21 300:3,7
  301:11 303:5,10
  306:8,13 330:15
  331:11
**dealing** 86:17
  87:10 88:5
**deals** 195:11
**death** 10:17
**debate** 49:5
  227:16 285:16
**debt** 35:2,7,9
  144:7 145:14
**debts** 298:4
**december** 1:8 5:6
  14:11 77:5,14
  116:3 169:12
  220:15 221:2,12
  222:10 223:17
  233:2,7 238:8,12
  239:13,23 240:10
  240:11 242:13
  245:7 248:15
  253:8 256:7

  259:22 262:2
  293:20 295:23
  316:12,22 317:9
  317:14 338:10,12
  338:14,16 339:23
  340:4
**decide** 150:4 164:9
  251:10 333:13
**decided** 165:4,5
  278:16
**deciding** 20:2
  179:9 212:25
  267:12
**decision** 13:7 51:4
  106:25 107:2
  218:5 227:21
  248:5 304:13,17
  305:13
**decisions** 13:5
  116:23
**deck** 103:22
  192:21 205:11,14
  209:7,14 282:8
  291:13,15 293:25
  294:3,6
**declining** 135:10
**decrease** 289:19
  289:21 299:2
**dedicate** 15:9
**deep** 93:22
**deeper** 78:14
**deeply** 171:8
  179:20 198:4
  332:7
**deferred** 51:23
**definitely** 10:21
  40:13 53:8,13
  108:9 168:15
  196:10 208:11
  253:12 332:10

**definition** 69:11
**definitive** 67:5,8
  67:12 255:7
**del** 3:9 5:22,23
  12:25 17:15 22:12
  23:13,17,25 24:14
  25:10 27:13 28:11
  29:9,18 31:14
  32:10,19 33:4,10
  34:6,23 36:13
  39:19 40:19 43:9
  43:17 44:4 46:14
  62:2 72:6 76:6
  81:23 87:2 102:23
  111:13 112:8
  120:4 121:4,22
  125:14 137:8
  144:8 150:20
  153:23 169:13
  173:19 174:13
  177:22 178:15
  179:15 182:25
  185:12 187:9
  195:7 196:22
  216:16,23,24
  217:4 231:10
  241:11 250:14
  251:13 252:2
  258:23 264:23
  265:12,20 271:22
  290:2 303:16
  304:4 314:13
  324:15 335:8
**delaware** 1:2 2:5,9
  2:10 5:16,18 6:22
  46:4 305:17
  306:23
**delayed** 206:22
**delegate** 160:4
**deleted** 225:7

delisted  278:11
deliver  51:9 52:2
  53:14 105:25
  135:6 139:4
  142:19,20,21
  147:13 304:21
  323:8
delivering  10:3
  135:11 305:5
delivery  51:8
  53:16
deloitte  229:8
delta  267:6
denied  321:3
dep  128:7 131:5
depending  166:8
deployed  53:21
deposed  6:24
deposing  229:13
deposition  1:12
  5:9 42:12 43:16
  44:2,24 45:2,15
  46:11 175:19
  215:8 262:19
  263:19 264:19
  265:13 305:11
  334:6 340:4
depth  204:20
  211:5
describe  47:23
  99:11 102:20
  326:10
described  64:14
  270:6 279:10
  281:25 310:20
  313:25 332:15,17
describes  134:23
description  63:21
  118:22 127:8
  335:11 336:4
  337:4 338:4

designating  333:9
designation
  324:22 333:17
designations
  333:14
designed  117:10
desire  33:8,14,24
  82:17 84:21 86:12
  162:19
desiring  33:20
desktop  264:10,12
detail  76:8,14
  193:25 235:14
detailed  127:7
  225:11
detailing  76:4
details  66:22 67:2
  122:24 193:24
deter  312:16
determination
  127:9
determine  67:23
  160:3 164:6,8
  165:6 252:12
determined  94:10
  126:25 201:7
  233:15 252:9
determining
  203:13
detriment  149:2
detrimental  81:22
  122:13
develop  83:11
  133:6,14
developed  103:4
  310:18
developing  83:13
  130:24
devices  264:4,15
dialogue  67:11
  85:5,12 96:20

174:5 227:24
  266:10 277:20
dialogues  62:7
difference  35:23
  47:24 107:24
  108:19 122:16
  164:10,11 178:14
  251:23 252:25
differences  108:5
  108:6,7,9,13,15
different  13:20
  14:19 35:16 52:21
  52:23 58:8 64:10
  106:22 278:17
  279:12 315:10
  318:11,12,13
  319:19
differential  52:12
  52:18 53:3
difficult  52:13
  138:18,21 141:15
  149:17
difficulties  230:18
digits  94:2
diligence  194:18
  195:5 198:3
  199:17 201:3
  241:15 251:2
  261:19 318:2
dinner  30:17
  41:13 42:9 46:18
  60:10,14 61:22
  62:12 272:4,7,24
  275:25
dinners  60:19
  154:16,17
dipping  29:16
direct  48:13 58:10
  121:16,20,24
  122:7 124:14,25
  125:9 151:3

161:16 172:22
  222:20 231:13
  303:12
directing  204:2
direction  24:5
directions  276:6
directly  20:21
  188:12,22 339:19
director  33:9 85:8
  103:19 130:18
  276:7 311:25
  312:4,7
directors  84:4,12
  116:24 126:14,25
  132:18 153:20
  166:8 186:14
  207:21 208:7
  223:16 233:6
  323:12 335:22
  336:12 337:14,23
  338:8
disagree  323:22
disappointed
  77:16
disappointing
  281:21
disclosable  80:16
  122:3
disclose  43:19
  227:21
disclosed  121:21
  122:11 171:24
  186:23 227:9
  228:11 234:8,21
  270:3 332:14,17
disclosing  269:18
disclosure  75:9,21
  227:19 234:2
disclosures  119:3
  276:14

**[discounted - earnings]**

**discounted**  330:4 330:12,14

**discuss**  11:25 34:4 103:14 109:12,17 111:21 127:21 202:9 281:8 282:20 283:17 293:11 300:9 330:20 331:14

**discussed**  24:12 30:16 37:17 54:6 67:18 76:19 77:3 77:12 82:25 98:6 99:21 127:15 163:25 167:5 219:16 230:20 233:13 262:8 282:23 284:19 294:24 302:2 332:5

**discusses**  166:3

**discussing**  78:5 256:2 283:6 296:20

**discussion**  21:8,15 25:8 49:5 52:7 61:13 66:8 67:14 79:22 80:6,10 149:14 161:6 167:21 189:7 192:5,13 207:9 222:13 231:7 283:21 284:20,25 329:16 337:8

**discussions**  23:22 38:10,15 61:24 67:5 86:13 116:23 258:2 272:11,15 283:10 299:24

**distinction**  288:11

**distinguishing** 288:6

**distract**  158:8

**distraction**  164:12

**disturb**  251:24

**dive**  179:20

**diverge**  69:10 117:18

**division**  109:16

**divulge**  45:8 265:2

**document**  62:15 63:18 64:7 73:18 74:3 75:2,12 84:2 107:14 126:12 152:22 155:22 165:10 192:4 200:13 206:4 207:19 208:10 219:2 223:6 232:18 275:4,8 335:12,14,16,20 336:9,19,22 337:7 337:9,12,21,24 338:5

**documentation** 199:24

**documented**  128:9

**documents**  42:16 45:21 128:5 131:4 172:3 250:11,19 258:21 265:7,10 290:12 306:11 322:21

**docusign**  156:15

**doing**  14:18 20:9 50:23 132:21 137:16,18 160:7 160:17 169:21 203:22,25 221:22 223:3 241:15 247:17 251:15

324:3

**dollars**  54:24 92:23,24 177:10 298:5

**dollop**  322:9

**domain**  319:12,14

**door**  32:6

**double**  30:9 54:10

**douglas**  4:8

**download**  230:3 278:2

**downside**  284:5,8 286:10

**dozen**  14:6

**draft**  171:20 219:18 220:16 294:4

**dramatically** 49:20 280:24

**drifted**  53:19

**drive**  134:10 135:7 138:16

**driven**  142:4

**driver**  43:3

**drivers**  276:17

**driving**  138:8

**drop**  181:10,22

**dropped**  244:21

**due**  196:4

**duly**  6:14 116:9 339:9

**duplication**  297:7

**duplicative**  278:12

**duties**  119:2 256:9 256:21 257:14,19

**duty**  119:6

|  e  |
| --- |

**e**  2:2,2 3:2,2 4:3,3 42:19 45:18 79:13 97:12,14 100:25 101:3 107:19

110:16,19,20,21 116:2,2 120:20 125:5 128:15 131:6 144:24 145:7,10,11 152:23 155:19 156:7,11,12 159:20 160:24 170:3 171:11 178:21,21 183:5 239:22 240:5,19 245:12,14 246:12 246:15 327:5 331:20 335:4,10 335:18,23 336:2,3 336:7,13,15,17 337:2,3 338:2,3,11

**ear**  186:7

**earlier**  50:15 54:6 59:21 60:22 66:10 85:16 135:5 198:2 272:25 275:14 287:13 297:5 306:19 307:10 308:11 309:6,13 310:4 311:2 312:9 312:14 313:9

**early**  40:22 41:6 61:19 170:15 215:4,11 278:9 288:19

**earn**  93:4

**earnings**  79:9 88:21 146:13,15 147:12 149:21 171:15,20 173:8 175:3,11 178:14 180:7,19,25 181:23 182:5,17 220:6 227:19 228:17 229:20

**[earnings - evening]**                                    Page 17

270:13 276:15 279:25 280:4 281:14,23 282:2 286:23 288:21 289:4 290:14,19 295:9

**easier** 47:5 193:6

**easily** 227:24 269:24

**eastern** 98:12,13 115:3

**ebitda** 142:16,18 142:20

**educated** 71:16,17 197:17

**effect** 47:22 203:21 205:4 234:3 325:13

**effort** 218:14 320:13

**efforts** 193:20 236:18,21

**eight** 21:5 60:24 80:24 136:24,25 207:3 224:13,18 268:8 270:5,19 290:24 292:12,13 295:24 321:21

**eighteen** 55:15,17 80:14 237:6

**eighth** 211:15,21 212:13,18

**eighths** 64:17

**eighty** 75:18

**either** 19:18 105:24 114:2 124:8 190:22 210:24 229:7 285:24 302:8

**elaborate** 81:14

**electronic** 235:24 235:24 258:19 264:4

**electronically** 64:8

**elizabeth** 3:18

**ellis** 3:5 5:24 43:15 44:2 45:2,10 46:7 46:10 264:21 265:8

**embark** 83:7

**employ** 92:25 113:21 339:21

**employees** 93:21 278:20 332:4

**employment** 12:2 12:11 14:15 72:19 243:18 258:10

**ena** 322:20

**enable** 146:2

**enabled** 231:4

**enables** 49:25

**ended** 14:10 148:16 207:17

**endorsed** 9:13,18

**endorsement** 9:16

**endurance** 11:19 13:22 14:14

**energy** 106:13 276:3

**engage** 127:2,10 130:11 164:7,9 197:16 296:25 299:19 333:13

**engaged** 30:8,14 30:25 31:8 195:3 204:6 256:12

**engagement** 11:2 132:19 205:13

**engaging** 24:13 132:16 211:8 261:11,12

**engineering** 81:17 308:4

**english** 55:10

**ensure** 20:10 256:11 285:19 300:6

**ensuring** 166:21 303:2

**enter** 111:20

**entered** 225:2,13 255:7

**enterprise** 54:15 58:13

**enterprises** 58:16

**enthusiasm** 331:23

**entire** 208:13 241:21 330:23

**entirely** 36:3 70:3 148:18 185:18

**entirety** 59:9 265:13

**entitled** 62:15 64:22 73:18 75:2 84:2 91:5 126:12 155:22 165:10 192:4 200:13 207:19 219:2 223:6 232:18 335:12,14,16,20 336:9,19,22 337:7 337:9,12,21,24 338:5

**entity** 258:11 328:20

**entries** 316:12

**entry** 316:22,23 317:10,14

**equal** 167:20 168:3,19,20,23

**equals** 108:25

**equipped** 189:21

**equity** 24:11,21 25:9,13,17,19 47:14,16 71:12 87:12 88:7,19,23 91:18,19,24 93:3,4 93:7,8,14,16,19,25 94:4,12 99:18,21 99:25 105:7,19 107:25 109:2,20 123:18 161:13 194:2 204:22 206:23 244:11,17

**eric** 22:19 161:2,9 163:3,5 246:18,25

**errata** 340:2

**error** 174:20 180:10

**esq** 2:6,11,12,17 2:19 3:9,10,12,17 3:18,20

**essentially** 42:14 278:13

**establish** 156:19

**established** 127:25 140:9 265:25

**establishing** 166:3

**estimate** 137:7,13 177:19 178:6

**estimated** 327:13

**et** 223:3

**evaluate** 330:8

**evaluating** 120:17 157:11 203:12 268:18

**evaluation** 108:12 127:4 201:17

**evaluatory** 141:2

**evening** 42:6 273:22 274:3

**event** 80:16 82:15
122:3 258:11
**events** 128:8
**eventually** 50:13
52:10 56:14 99:8
209:10 221:22
**everybody** 60:20
**everybody's**
198:14
**evidence** 217:5
**ewright** 3:19
**ex** 185:6
**exact** 17:21 35:6
59:22 65:11 83:25
158:2 176:12
**exactly** 16:20 42:2
53:10 66:13 68:21
80:9 85:5,6 87:5
88:22 89:9 105:21
116:20 126:4,6,9
146:9 155:7
193:10 197:22
198:2 222:6,14,16
241:23 250:20
255:21 260:9
278:9,14 311:10
311:20 332:11
**exam** 251:14
306:20
**examination** 6:18
116:13 271:18
304:3 313:9 325:4
**examined** 6:16
116:11 335:5
**example** 280:7
286:18
**examples** 283:13
283:15
**exceed** 57:13,19
**excel** 314:19,23
315:3,9,18 338:17

**exchange** 215:15
216:6 238:23
298:21
**exchanges** 312:24
**excited** 87:18
105:23 276:3
**excitement** 103:12
106:9,12
**exclamation**
327:22
**exclusivity** 196:13
246:6 248:11
**excuse** 10:16
110:20 159:3
240:5
**exec** 202:5
**executed** 203:24
258:16
**executing** 276:4
278:20 305:2
**execution** 150:9
158:9 175:23
176:11 189:18,21
322:24
**executive** 56:8
66:15,17,20,22
93:20 94:10
127:14,21 128:20
161:7,18 164:22
201:19 202:19
275:7 309:7
311:11
**executives** 20:20
92:12,14
**exercise** 50:10
132:3
**exhausting** 80:23
**exhibit** 62:16,19
65:19 66:6 73:19
73:22 75:3,7
79:14,17 84:4,8

97:15,18 100:17
100:19 107:21
110:12 118:12
126:15,17 133:18
145:2,4,5 152:25
153:3 155:21,24
156:4 159:17
160:22 165:12,13
165:14 183:9,10
183:12 191:8,9,17
192:6,7 200:15,19
203:2 207:21,23
207:24 214:5,8,11
214:13,19,21
215:21 216:8
219:4,7,9 223:8,10
223:13 232:20,22
238:13,15 239:11
239:24,25 240:4
242:14,16 245:8
245:10 273:6,7
276:7 291:4,21
293:15 294:9
314:14,17,22,24
315:2 317:18
327:6,8 335:12,14
335:16,18,20,23
336:5,7,9,13,15,17
336:19,22,24
337:5,7,9,12,15,17
337:19,21,24
338:5,9,11,13,15
338:17,18
**exhibits** 74:12
156:2 214:13
313:14,18,19
**existing** 224:2
320:15
**exit** 105:8 112:20
113:23 119:22
120:19 328:18

329:2,3,10
**exiting** 23:11
**exits** 328:17
**expand** 20:3
157:19 199:19
**expanded** 55:9
236:9
**expanding** 21:9
203:8 309:7
**expansion** 138:9
**expect** 61:15
181:18 190:17
225:5,9
**expectation**
286:21 329:2
**expectations** 52:3
141:17 182:3
281:9,16 284:24
285:19 288:8
289:23 290:6
330:17,19
**expected** 181:13
181:14 263:19
266:16 324:5
**expense** 51:2
276:19
**experience** 10:15
78:23 122:5 141:9
161:10,17 175:22
176:5,7,16 196:15
204:16,17,20
213:23 217:18
229:23 309:10
**experienced**
179:23 309:2
**experiences** 10:21
**experiencing**
140:25 146:21
322:23
**expert** 225:23
247:19

expertise  106:17
expiration  196:12
expired  247:24
expires  340:24
explain  49:12
  308:16
explained  49:14
explanation
  227:15
explicit  289:6
exploration  13:21
exploratory  71:14
exploring  18:19
  78:17 109:7
  144:21
exposure  164:20
express  25:24
  27:15 32:15 99:3
  105:6 184:2
  215:25 249:6
  326:22 328:12
expressed  15:6
  27:20 29:2,15,21
  33:24 81:3 96:6
  119:20 217:7
  242:4 249:14,20
  260:7 319:16,17
expressing  261:17
expression  77:24
  118:23 121:17,20
  121:25 122:7
  124:14,25
extending  308:17
extent  37:19 39:15
  82:13 102:8,11
  171:11
external  78:6,8
  83:5,11 133:8
  218:22 220:24
extra  278:5

extraction  164:22
extraordinarily
  179:23
extraordinary
  244:3
extremely  128:9
  146:22
eye  144:16 145:16
  145:25 146:8

**f**

f  116:2
faced  162:7
fact  29:25 154:10
  194:23 195:24
  267:25 272:10
  296:12,15,21
  310:3 317:19
factor  300:15
  301:14 303:9
factors  140:13
  227:11,12
facts  217:4
fair  8:11 9:19
  24:10 27:5 28:7
  29:14 59:24 60:3
  72:16 73:11 95:15
  103:23 106:3
  109:18 113:10
  118:6 119:6
  120:10 140:17
  160:6 163:5,12
  170:6 220:14
  225:24 240:23
  275:18
fairer  123:10,10
fairly  190:15
fall  51:16 52:16
  53:11 56:4 83:8
  143:9,12,24 151:6
  155:3 177:15,20
  256:20

falls  71:18
familiar  26:5
  35:12 36:18 49:7
  56:18,21 69:3
  79:2 103:3 125:22
  161:11 195:14
  198:5 208:14
  286:11 294:5
  305:23
familiarize  103:9
family  18:12,25
  22:10 36:17
  229:12
famous  108:24
far  72:11 189:20
  249:8 250:23
  267:3
fast  139:25 189:4
faster  139:14
favor  184:14
  300:8
features  50:6,7
february  11:14
  220:13 257:17
  258:5 262:3 272:6
federal  6:8 271:7
fee  48:4,5,20 246:5
  253:22 254:12
  255:6,10
feedback  197:19
  245:3
feel  15:9 53:22
  141:24 143:17
  149:23 301:24
  331:9
feeling  47:17
  106:11 218:10
  325:23 326:2
feelings  216:20
  284:2

fees  48:10 255:3
fellow  43:9
felt  52:4 87:22
  105:24 139:15
  162:11 190:13
  253:22 254:10
  309:10
fiduciary  119:2
  256:9,21 257:14
  257:19
field  249:7
fifteen  95:10
  191:14,20 207:2
  298:2
fifth  55:21
fifty  136:25
  278:13 292:13
  297:16,21,23
figure  116:20
  149:17 247:12
file  315:18
filed  172:19
  274:19 305:12,16
  305:19
filings  75:13
filter  226:14
final  14:7
finalized  220:21
  221:6
finance  292:25
financial  11:21
  29:7,12 30:4
  40:15 54:25 110:3
  110:4,7 117:17
  123:19 127:2,3,10
  127:16 154:11
  155:5,10 157:10
  157:22 158:12
  164:7,18 166:11
  170:20 184:15
  186:20 198:4

199:10 204:7 207:4 208:23 219:20,21 220:18 222:8,10 226:23 231:2 233:14,17 233:20 234:15 236:7 239:18 241:2 254:21 276:8,11,13,14,24 279:24 280:15 281:9,14 284:24 306:17,24 307:6 322:15 330:7,10 333:8,19

**financials** 266:23

**financing** 269:2,3 269:4,7 320:10

**find** 13:16 48:15 80:11 82:3 84:16 88:13 110:2 126:23 133:24 134:15 160:22 205:15 248:4 264:16

**finding** 51:21

**finds** 109:14

**fine** 95:10,12 172:10 206:5 251:17 263:8 333:15

**finer** 333:13

**fingers** 21:3 84:7

**finish** 8:16 194:19 195:6 196:2

**finished** 7:14,15 271:3

**firm** 22:23 23:3 25:17 91:19,24 93:14 105:7 107:25 109:20 132:17 133:14

204:22 218:8 328:16

**firms** 62:11 71:12 83:10 88:23 92:21 93:21 123:19 196:8 200:8 206:24 320:8

**first** 6:14 16:17 18:16 22:9 23:10 30:20,22 31:5 50:11 68:3 78:24 92:21 111:17 112:18 123:25 156:3 167:15 245:15 246:14,16 271:25 291:17 292:21 296:11 304:12 324:25

**fiscal** 294:4

**fit** 254:20

**fitmetrix** 40:12 59:17 60:2

**fitness** 48:3,24 70:4 138:12 211:3 213:25 237:9,10 277:24 278:2,3 327:23

**five** 16:12,22 39:4 44:14 52:21 53:5 55:24 56:7,9 57:17 63:9,15 64:13 118:15 131:10,12,23 134:2,13 135:20 140:14 141:14 144:7 145:14 160:7 172:7 194:12 205:23 206:8 208:3,13 235:12 238:19 291:18 297:21

303:19 308:24

**flash** 137:21 280:25 281:5

**flat** 237:18

**flex** 286:9

**flexibility** 146:12

**flip** 200:18

**flows** 330:5,12

**fluctuating** 78:17

**fluctuation** 180:5

**flying** 32:9 285:23

**focus** 56:7 197:23 213:25 231:23 233:4 237:7,10,22

**focused** 114:4 146:23 253:19 255:13

**focusing** 218:20 316:10

**folks** 170:5 210:15 210:20,24 261:10 271:7 301:10 320:3

**follow** 10:10 187:13 195:20 250:2

**followed** 119:8

**following** 20:14 60:11 71:4 152:5 176:2 180:23 181:22 182:4 220:7 223:5 282:15

**follows** 6:17 116:12

**food** 95:6,7

**foolhardy** 174:22

**forecast** 79:9 174:18,21 175:12 177:25 178:7 179:13 232:10

266:24 290:5,25 295:18,22 296:5 321:14 322:4,7,11 330:10

**forecasted** 53:15 292:18,23

**forecasting** 137:11 137:17 176:12,13 281:3 285:24,25 295:24

**forecasts** 54:25 137:21 173:17 179:14 233:16 284:2,3 290:21 293:8,12 321:10

**foreign** 176:23

**foreseeable** 35:5

**forever** 157:7

**form** 13:2,15 17:16 22:13,15 23:14,16 24:2,15 25:11 27:14 28:12 29:10,19 31:15 32:11,20 33:3,11 34:7,24 36:14 37:15 39:20 40:20 43:18 44:5 45:6 46:13 50:21 57:21 62:3,5 68:17 73:5 76:7 87:3,15 91:15 94:3 100:3 102:24 111:14 112:7,9 120:5 121:5,23 125:13 129:11 137:9 144:9,18 148:16 149:10 150:21 151:8 152:12 153:24 160:10 162:22 163:10,17 163:21,24 166:17

169:14 170:3 173:20 174:3,14 175:15 177:23 178:9,16 179:16 183:2 185:13 186:3 196:23 202:3 212:4 216:17 217:23 226:9 231:9 241:10 243:11 250:15 258:24 266:8,21 267:15 269:13,21 270:8 271:23 290:3 300:24 329:5,25 332:23

**formal** 211:23 230:11

**formally** 311:24

**format** 285:10

**formation** 159:4 161:25

**formed** 13:12 129:19 199:9

**forming** 163:25

**formula** 195:10

**formulating** 171:2

**forth** 331:14

**forty** 142:8,10,14 142:17,21,24 143:4 205:23 208:3,13 249:4 251:9,11 252:10 252:11 273:17

**forward** 68:4 71:13 88:16 124:9 128:10 158:14 180:13 330:5 332:9

**forwarding** 189:4

**foulds** 2:6 5:14,15 6:19,21 15:23 30:21 39:13 43:13 44:10,13 63:23 64:11 68:24 74:18 77:8 86:22 90:6 90:14 94:23 95:8 105:4 107:13,17 113:12 114:20,24 116:14 132:7,12 149:7 151:2 154:9 155:18 165:9 167:12 170:23 172:8 175:9 180:16 188:2 194:24 196:24 198:21 205:19 206:2,8,18 216:22 224:24 228:8,24 229:3 230:17 236:25 251:7 256:25 262:17 263:6 266:3 271:2 273:6 307:8,22 312:19 317:22 319:22 325:2,5 333:3 335:6

**foundation** 23:17 57:21 81:24 195:8

**four** 16:13 55:16 55:17 75:17 112:17 165:23 193:5 194:12 232:23,24 233:11 238:17 242:20 293:23

**fourteen** 291:21

**fourteenth** 211:15 211:21 212:17 221:15 236:7

**fourth** 159:23 177:19 220:11 224:22 226:15 227:8,21 233:11 234:2 269:10 277:8,10 283:2,18 288:15 289:8,24 291:12 293:7 296:8 326:11

**fp** 179:4

**fraction** 64:2

**frame** 49:6 50:11 51:15 62:10 76:11 80:3 85:7,13 89:10 96:19 105:11 151:10 222:15 247:6 248:10 267:8 297:2

**frames** 140:23

**framework** 166:20

**free** 166:6 205:12

**frequency** 324:14

**frequent** 40:6 168:10

**frequently** 154:19 211:16 285:16

**friday** 248:14

**friedlander** 2:3 5:15

**friedlandergorri...** 2:6

**friedman** 244:19 245:4

**friend** 168:11 312:10,15 313:3

**friendly** 272:19

**friends** 21:19 22:10

**friendship** 312:21

**front** 315:6

**frustrated** 86:17

**frustration** 25:24 28:15 87:10 88:5

**fulfilling** 166:4

**full** 22:22 112:13 190:12 227:19 228:15

**fully** 56:10 106:10 109:25 202:7

**fulsome** 120:10 303:3

**functionality** 54:15

**fund** 94:12

**funded** 56:10

**funds** 244:11,17

**funny** 309:2

**further** 71:13 159:25 189:19 246:17 324:23 339:16

**future** 11:25 12:11 35:5 37:13 40:8 51:25 70:9 72:19 88:21 103:12 106:22 107:9 109:3 117:23 138:8 144:15 150:18,24 167:21 177:4 190:11 233:17 258:10 282:16 328:21 329:11 330:9,13 330:17,18 332:2

**fy** 135:19

**g**

**g** 6:13,13 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1

**[g - given]** Page 22

16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1,8,8
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1

138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1

261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1
273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:6
**gail** 1:13 5:5,9,21
97:25 101:10
115:3 149:11
161:2 206:4,6
334:6 340:4
**game** 120:23
**gap** 230:9
**gathering** 320:11
**gauging** 320:13
**gayle** 4:7
**gc** 156:9
**gears** 288:13
297:12 306:15
308:6 313:6
317:25 321:7

**general** 13:4 46:21
47:16 61:19 76:9
76:10,24 83:24
92:19 109:15
116:15,19 130:2
130:20 159:19
175:21 242:10
259:2 279:20
318:25 325:22
**generally** 19:21
62:9 72:10,14,21
81:11 92:16 94:7
94:9 143:25
181:19 217:12
237:10 283:23,24
298:22,24 299:2
307:4
**gentleman** 176:23
**george** 245:13
**getting** 17:21 44:8
81:11 94:17 99:16
163:19 172:6
197:9 198:6
200:10 223:11
232:16 240:24
245:2 249:22
250:2 261:6
265:23 278:24
301:3,5 310:17
325:24
**gist** 96:20
**give** 7:19 63:20
107:17 159:11
175:3 195:22
200:9 246:25
286:2,9
**given** 35:3 46:22
49:17 102:15
154:10 164:25
167:7,8,11 199:13
227:17 254:6

**[given - goodman]**

| | | | |
|---|---|---|---|
| 255:23 284:23 | 317:9 318:6 | 311:9 314:16 | 76:1 77:1 78:1 |
| 285:7 289:22 | **goal**  57:12 | 320:22 322:18 | 79:1 80:1 81:1 |
| 290:8 304:23 | **goes**  288:4 | 329:22 332:7,9 | 82:1 83:1 84:1 |
| 312:14 321:4 | **going**  7:7,8,12 | 334:4 | 85:1 86:1 87:1 |
| **gives**  175:7 321:23 | 15:15 17:15 30:18 | **goldman**  154:21 | 88:1 89:1 90:1 |
| **giving**  28:16 | 32:5 39:5 44:18 | **good**  5:2,19,22 6:5 | 91:1 92:1 93:1 |
| 106:19 133:10 | 44:23 45:15 46:17 | 7:16 37:24 38:2,4 | 94:1,20,25 95:1 |
| 167:13 180:8 | 49:14 50:13,15 | 41:20 110:7 | 96:1 97:1 98:1 |
| 285:14 320:16 | 51:21 52:7,16 | 147:10 155:11 | 99:1 100:1 101:1 |
| **glad**  169:20 | 59:5 60:9 62:23 | 158:4 180:13 | 102:1 103:1 104:1 |
| **global**  193:13,16 | 66:6 68:16,24 | 182:18 196:5 | 105:1 106:1 107:1 |
| 193:19 213:13 | 72:23 74:21 79:6 | 202:18,21 204:24 | 108:1 109:1 110:1 |
| 215:2,10,25 313:7 | 86:13 88:15 94:15 | 207:16 216:3 | 111:1 112:1 113:1 |
| 313:10 315:12 | 94:21 95:4,9 | 287:20 298:23 | 114:1 115:1 116:1 |
| 317:20 | 100:12 103:22,23 | 301:22 303:3 | 116:15 117:1 |
| **go**  7:5 12:14,17,19 | 107:6,11,13 110:2 | 304:5,6 326:13 | 118:1 119:1 120:1 |
| 41:17 46:25 52:25 | 110:25 111:3 | 328:5,12 330:16 | 121:1 122:1 123:1 |
| 54:17 55:5 61:14 | 115:10 117:2 | **goodman**  1:13 5:9 | 124:1 125:1 126:1 |
| 70:14 74:16 76:22 | 131:23 138:24 | 5:21 6:20 7:1 8:1 | 127:1 128:1 129:1 |
| 87:8 93:22 95:3,6 | 139:6,9,10,16,17 | 9:1 10:1 11:1 12:1 | 130:1 131:1 132:1 |
| 95:7 118:12 | 146:2 147:6,7 | 13:1 14:1 15:1 | 133:1 134:1 135:1 |
| 137:19 138:24 | 151:7,11 156:8 | 16:1 17:1 18:1 | 136:1 137:1 138:1 |
| 139:3,10 140:14 | 172:13 173:7 | 19:1 20:1 21:1 | 139:1 140:1 141:1 |
| 142:11 148:5 | 175:16 177:12,15 | 22:1 23:1 24:1 | 142:1 143:1 144:1 |
| 149:22 160:20 | 190:21 192:25 | 25:1 26:1 27:1 | 145:1 146:1 147:1 |
| 176:14 183:11 | 193:6,22 201:16 | 28:1 29:1 30:1 | 148:1 149:1 150:1 |
| 186:4 193:4 194:4 | 204:9 205:19 | 31:1 32:1 33:1 | 151:1 152:1 153:1 |
| 194:11 196:6 | 206:2,12 213:4 | 34:1 35:1 36:1 | 154:1 155:1 156:1 |
| 205:14 209:19 | 216:8 230:10 | 37:1 38:1 39:1 | 157:1 158:1 159:1 |
| 226:12 229:9,19 | 232:15 233:4,24 | 40:1 41:1 42:1 | 160:1 161:1,2 |
| 243:15 245:22 | 241:24 247:22 | 43:1 44:1,23 45:1 | 162:1 163:1 164:1 |
| 246:5,14 250:6,16 | 248:9 251:5 | 46:1 47:1 48:1 | 165:1 166:1 167:1 |
| 252:5 253:11,13 | 253:17 254:19 | 49:1 50:1 51:1 | 168:1 169:1 170:1 |
| 253:20,22 254:6 | 256:23 257:6 | 52:1 53:1 54:1 | 171:1 172:1,18 |
| 254:11,14,15,24 | 260:2 264:19 | 55:1 56:1 57:1 | 173:1 174:1 175:1 |
| 255:9,11 256:3 | 268:13 271:13 | 58:1 59:1 60:1 | 176:1 177:1 178:1 |
| 257:19,22 258:17 | 273:5 277:25 | 61:1 62:1 63:1 | 179:1 180:1 181:1 |
| 259:10,12,21 | 280:5 281:17 | 64:1 65:1 66:1 | 182:1 183:1 184:1 |
| 260:17 261:2 | 284:6 297:4 | 67:1 68:1 69:1,4 | 185:1 186:1 187:1 |
| 263:25 271:10 | 300:21 302:10 | 70:1 71:1 72:1 | 188:1 189:1 190:1 |
| 287:24 314:13 | 303:23 309:8 | 73:1 74:1 75:1 | 191:1,11 192:1 |

**[goodman - half]**

193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1,12 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1,5 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1

313:20 314:1 315:1,5 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1,10 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1,6 335:6 340:4

**goodman's** 333:18

**gorris** 2:3 5:15

**gotten** 58:5 92:23 106:8 110:12 141:3 252:18 270:13 302:20

**gov** 132:20,23

**governance** 19:12 19:14,20,22 20:8 20:18 132:10,16

**graham** 179:22

**grammatically** 40:24

**granted** 235:23 258:18 259:3

**grants** 94:5

**granular** 78:15

**great** 7:17 8:20 111:7,25 134:17 203:4 209:18 292:3 297:10

**greater** 199:22

**greg** 178:18

**grey** 292:9

**gross** 56:25

**grossmann** 2:9

**group** 11:19 176:9 207:9 210:19,23

**grow** 58:4 131:15 139:25

**growing** 81:4 236:16

**grown** 106:11 308:23

**grows** 328:16

**growth** 36:20 50:2 51:19,24 81:7,8 88:22 100:8 103:12 105:25 109:3 131:24,25 134:11,24 135:7,9 135:13,15 141:23 142:5,7,14,15,17 142:19,22 147:5 149:20 236:12,15 237:3,15,21,21,22 237:24,25 238:6 238:25 240:15 268:12 291:18 309:3 310:24 327:15

**guarantee** 121:11

**guaranteed** 114:2

**guard** 71:5

**guardrails** 324:6

**guess** 9:21 17:25 73:7 128:24 176:22 181:19 274:25

**guidance** 47:8 141:13 171:2,6,24 173:15,24 174:10 174:17 175:4,11 175:24 177:9,21 178:5 179:9,21,24 180:9 220:24 224:19 234:8 267:17 268:2,6 283:11,18,23 284:12 285:15,18 286:2,5,19 287:9

288:14 289:8,13 289:20,25 295:5 296:9 310:23 321:15 325:15,18 326:7,12

**guide** 174:20 182:19 225:23 227:16 281:18,20 284:16 288:22,23 288:24 289:5,6 295:8 321:23 322:10

**guided** 149:19 150:11 180:3 257:23 282:6 288:21 289:3,5 295:7 321:25

**guidelines** 71:25 72:25 73:13 166:18 167:3,10 167:14 169:3,6 262:4,7

**guiding** 181:12 226:5 324:4

**guy** 81:6,12 185:5

**guys** 64:3 86:8 251:16 271:4,6,8

**gyms** 48:3 237:9

## h

**h** 178:20,21 335:10 336:3 337:3 338:3

**h&f** 169:17 246:18 247:16 248:9

**h2** 134:24

**half** 22:9 23:10 30:22 31:5 53:23 54:12 95:5 131:16 135:4,8 284:8 289:16

hampshire  1:15
hand  42:18 63:10
  63:25 64:5,12
  75:17 123:13
  124:2 133:19,21
  134:19,20 192:12
  193:2 202:10
  223:25 339:23
hands  99:18
  103:22 107:6
  123:15,16 168:13
hang  21:6 84:23
  297:20
happen  218:15
  284:11 285:22
  286:22,23 329:18
happened  15:12
  24:18 54:12 66:13
  85:6 96:19 98:15
  98:15 100:15
  104:23 105:16,21
  123:22 127:13
  148:11 175:17
  180:22 199:5
  213:5 218:12,13
  222:15 263:20
  272:24 273:3
happening  26:11
  47:13 160:15
  204:6 226:3
  235:11
happens  105:17
  105:19 147:16
happy  114:24
  287:24
hard  28:16 56:6
  86:6 104:24
  192:10 227:13
  248:6 254:5
  270:16 331:8

hardball  248:3
harm  140:15
harsh  142:3
harshly  141:18
hashtag  327:25
hat  142:4
havoc  122:12
head  7:20 23:8
  53:12 70:11 86:8
  109:24 120:22
  178:19,23 179:4
  197:6 225:3
  235:21 311:12,13
headed  98:16
  309:3
headhunters
  244:5
heading  242:25
  322:13
headway  255:2
headwinds  322:14
  323:7
health  213:24
hear  169:20
  178:25 200:21
  231:18 262:20
  263:3 280:23
  323:19 325:10
  332:21
heard  9:12 250:7
  287:4
hearing  148:23
  247:21
heated  312:24
heavily  225:22
  226:13 331:25
heavy  210:24,25
  231:23 254:16,20
heightened  202:20
heinle  178:18,21

held  1:13 35:18
  36:11 58:24 339:7
hellman  244:19
  245:3
help  11:8 79:4
  106:21 190:10
  317:18
helped  40:11
helpful  40:7 57:4
  303:7 309:11
  320:12
helps  285:19
hereunto  339:22
hesitating  172:25
heuristic  57:5
hey  80:17
hi  101:10
high  36:19 93:25
  134:5 178:2
  237:11 238:2
  252:22 268:19
  278:19 305:6
higher  58:18
  61:16 108:22
  109:6,9 125:10
  126:2,7 171:23
  189:24 224:18
  236:12 237:3,22
  237:24 238:6
  240:15 246:7
  254:11 256:15
  268:11 287:19
highest  58:3
  204:21 211:7
  236:14 237:13
highly  1:10 7:1 8:1
  9:1 10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1

25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1,16
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1

**[highly - identification]**                                              Page 26

| | | | |
|---|---|---|---|
| 148:1 149:1 150:1 | 271:1 272:1 273:1 | 284:6 | **houses**  19:6 |
| 151:1 152:1 153:1 | 274:1 275:1 276:1 | **hitting**  142:7 | **hudson**  3:15 |
| 154:1 155:1 156:1 | 277:1 278:1 279:1 | **hoc**  156:20,25 | **huge**  113:17 |
| 157:1 158:1 159:1 | 280:1 281:1 282:1 | 157:2 163:21 | 178:13 251:22 |
| 160:1 161:1 162:1 | 283:1 284:1 285:1 | **hock**  1:15 6:11 | **huh**  67:10,13 |
| 163:1 164:1 165:1 | 286:1 287:1 288:1 | 339:4 | 136:2 194:7 |
| 166:1 167:1 168:1 | 289:1 290:1 291:1 | **hold**  92:24 218:8 | **human**  307:5 |
| 169:1 170:1 171:1 | 292:1 293:1 294:1 | **holders**  38:5 | 311:13 |
| 172:1 173:1 174:1 | 295:1 296:1 297:1 | 147:19 | **humans**  70:20 |
| 175:1 176:1 177:1 | 298:1 299:1 300:1 | **holdings**  162:10 | **hundred**  63:9,16 |
| 178:1 179:1 180:1 | 301:1 302:1 303:1 | **holiday**  254:7 | 64:2,13 81:5 |
| 181:1 182:1 183:1 | 304:1 305:1 306:1 | **holidays**  259:22 | 118:15 131:10,12 |
| 184:1 185:1 186:1 | 307:1 308:1 309:1 | **home**  30:14,24 | 131:23 134:2,14 |
| 187:1 188:1 189:1 | 310:1 311:1 312:1 | **honest**  31:18 | 136:25 140:14 |
| 190:1 191:1 192:1 | 313:1 314:1 315:1 | 280:10 | 164:13 178:13 |
| 193:1 194:1 195:1 | 316:1 317:1 318:1 | **honestly**  41:25 | 208:3,13 213:7 |
| 196:1 197:1 198:1 | 319:1 320:1 321:1 | 104:2 154:8 | 229:11 232:6 |
| 199:1 200:1 201:1 | 322:1 323:1 324:1 | 181:11 211:16 | 256:18 273:18 |
| 202:1 203:1 204:1 | 325:1 326:1 327:1 | 227:23 | 284:9 291:19 |
| 205:1 206:1 207:1 | 328:1 329:1 330:1 | **hoo**  112:16 327:21 | 292:13 298:4 |
| 208:1 209:1 210:1 | 331:1 332:1 333:1 | **hoos**  331:23 | 308:24 330:2 |
| 211:1 212:1 213:1 | 333:10,16 334:1 | **hope**  22:18 139:24 | **hundreds**  310:10 |
| 214:1 215:1 216:1 | **hire**  155:5 165:5 | 188:14,15 | **hurts**  252:21 |
| 217:1 218:1 219:1 | **hired**  81:16 130:5 | **hoped**  53:17 | **husband**  18:17 |
| 220:1 221:1 222:1 | 152:18 153:6 | **hopefully**  97:17 | **hygiene**  202:18,21 |
| 223:1 224:1 225:1 | 154:11 170:19 | 156:2 191:16 | **i** |
| 226:1 227:1 228:1 | 200:6 221:18 | 203:2 | |
| 229:1 230:1 231:1 | 324:8 | **hoping**  135:6 | **iac**  210:7,17 |
| 232:1 233:1 234:1 | **hiring**  133:4,13 | 252:24 | **idea**  71:18 73:9 |
| 235:1 236:1 237:1 | 153:13 161:25 | **horizon**  52:23 | 99:17 140:7 |
| 238:1 239:1 240:1 | 186:9,21 187:4,17 | 141:4,6 147:24 | 141:14 |
| 241:1 242:1 243:1 | 204:14 218:8 | 200:9 | **identification** |
| 244:1 245:1 246:1 | 276:18 323:4 | **horizons**  141:2 | 62:17 73:20 75:4 |
| 247:1 248:1 249:1 | **historic**  253:16 | **hour**  94:16 95:5 | 79:15 84:5 97:16 |
| 250:1 251:1 252:1 | **historical**  300:17 | 98:10 205:20 | 100:18 107:21 |
| 253:1 254:1 255:1 | 330:11 | **hours**  240:13 | 126:15 145:2 |
| 256:1 257:1 258:1 | **history**  185:19 | 297:5 | 152:25 155:21,24 |
| 259:1 260:1 261:1 | 186:8,15 212:8 | **house**  19:3,5 32:5 | 165:12 183:9 |
| 262:1 263:1 264:1 | 252:16 | 322:25 | 191:8 192:6 |
| 265:1 266:1 267:1 | **hit**  121:11 143:4 | **housekeeping** | 200:15 207:22 |
| 268:1 269:1 270:1 | 147:12 171:17 | 200:18 | 214:5,8,11 219:5 |
| | | | 223:8 232:21 |

238:13 239:24
242:14 245:8
314:25 327:7
**identify** 42:22
**imagine** 212:5,7
**immediate** 148:2
**immediately**
180:24 199:22
200:5 299:11
**impact** 58:6,15
268:16
**impending** 279:7
**implied** 288:23
289:5,20
**importance** 71:19
166:3
**important** 7:18
56:10 77:23 78:4
78:11,21 164:11
165:3 168:5,16
211:3 234:4
237:19 238:2
259:23 267:2
302:16
**importantly**
276:16
**impossible** 232:8
**impression** 141:20
**improper** 264:25
**improved** 49:19
**inaccurately**
141:21
**inappropriate**
175:20
**incident** 321:6
**include** 99:20
138:8,11
**included** 13:8 67:2
67:3 234:14 300:4
**including** 82:18
162:5 196:11

208:21 219:22
**increase** 135:16,24
136:4,6,7,9,16
138:5 224:3
289:19 298:23
299:6
**increased** 143:15
**increasing** 286:20
**incredible** 120:17
**incredibly** 61:19
**incremental** 93:4
259:4
**independent** 85:8
103:18 130:18
166:6 303:4 312:4
312:7
**india** 331:9
**indicated** 275:15
**indicates** 325:21
**indication** 95:22
96:5,7,12,23 97:2
98:7 99:10 102:16
103:20 111:11
120:12 123:2
125:9 158:18
159:2 172:22
182:22 277:5
319:18
**indications** 71:16
204:4
**indicators** 77:20
**indirectly** 339:19
**individual** 54:18
73:3 104:24 230:5
243:17
**individuals** 187:21
198:17 262:13
**industry** 332:6
**inflection** 135:4
**inflects** 134:24

**influence** 166:7
**inform** 96:25
111:10 114:5,15
117:10 276:23
**information** 45:8
77:4,13 103:11
123:2 159:12
168:24 180:11
198:15,16,20
199:13 221:4
225:16,20 226:7,8
226:9 231:6
234:20 238:4
239:8 256:14
259:2,4,7 265:2
276:21 279:17,22
280:8 284:23
285:6,8 288:18
289:22 290:9
318:3,11,12,19,20
318:24,25 319:4
319:11,14,19,20
320:6,11,15 321:3
333:9,19
**informed** 71:11
91:12,24 92:7
158:22 159:13
171:8,9,14 173:6
174:17 211:18
265:25 266:5
276:11 278:8
**informing** 80:18
173:3
**infrastructure**
55:12
**inherent** 305:2
**inhibitor** 254:13
**initial** 96:20
100:10 124:14,25
158:17,25 182:22
193:20 210:4

213:10 318:4
**initially** 14:16
**initials** 316:17
**initiate** 68:8
102:15
**initiated** 13:23
123:24
**initiating** 101:13
102:2 104:19
107:10 128:10
**initiatives** 56:14
57:23 100:9
**inked** 12:4,6
**input** 47:8 82:5
207:12 210:12
**inputs** 292:25
293:2,2
**inquire** 187:4
**ins** 284:10
**inside** 26:14 27:17
177:15 198:25
301:13
**insider** 141:22
202:10,13
**insider's** 301:7
**insiders** 202:19
**insist** 93:19,24
**installed** 10:6
**instance** 34:3
321:2
**instantly** 53:21
**institutional** 22:24
**instruct** 68:8
264:25
**instructed** 8:4
68:2 71:10 72:16
72:17 111:9
**instructions** 7:6
71:24 222:23
**integrating** 59:25

**integration** 60:6 109:11 310:2
**intended** 106:4 157:6
**intensely** 190:15
**intent** 223:3 261:13 314:9
**intention** 82:14 163:7 243:14
**interact** 257:22
**interacting** 190:14
**interaction** 159:8 212:9 226:3
**interactions** 25:19 73:15 76:4 102:21 150:18,24 158:20 158:23 221:12 222:15 235:8 262:5
**interest** 15:7 68:6 71:16 95:22 96:5 96:7,12,23 97:2 98:7 99:10,23 102:16 103:20 111:12 118:23 120:13 121:17,20 121:25 122:7 123:3 124:15,25 125:9 149:16 158:18 159:2 168:18 172:22 182:23 184:16 242:5 254:4 261:14 265:4 303:6 319:16,18
**interested** 54:2 82:6 96:15 99:12 99:13 108:11 109:7 124:2,3 168:14 233:10 257:23 260:13

320:9 339:19
**interesting** 67:11 109:14 123:23
**interestingly** 300:25
**interests** 20:11 69:10 117:18 118:5 146:19 148:25 149:25 162:13
**interfering** 118:6
**internal** 63:18 78:5 83:4,13,15,25 133:7 173:17 175:12 218:6,21 219:19 220:17 230:7 231:6 233:19 234:14 239:17 240:25 273:19 281:2 289:23 290:6,25 292:24 293:7,7 321:10,14 331:16 331:19
**internally** 78:13 133:10 178:11
**international** 11:19 55:7,12 57:24 87:21 138:9 139:4
**internationalizat...** 55:7
**internationally** 309:8
**internet** 10:4 73:23 238:16
**interrupt** 249:18
**intervene** 251:19
**interview** 15:13 17:3,4,5,7,8 127:16 164:9,17

165:6 176:20 311:7
**interviewed** 164:18 189:6 311:4
**interviewing** 20:4 83:10
**interviews** 128:3 311:16,19,22
**intimately** 78:25
**intra** 276:24 277:11
**intrigued** 99:17
**introduce** 5:12 107:14
**introduced** 62:11 73:22 165:13 214:12 219:6 245:9
**introductory** 47:20 68:5,11
**invest** 31:25 87:22 88:14 139:6 144:6 145:13 147:15
**invested** 23:7
**investing** 31:8 54:14
**investment** 23:3 23:11 39:17 40:14 40:18 46:23 49:13 49:25 50:4,16,18 51:13,20,22,23 52:22 54:8,11,23 55:8,14 138:18,25 139:2 141:15 145:25 147:4 148:12 150:12 153:22 162:2 324:10
**investments** 31:4 47:2 52:5,10,12

55:3 139:14 140:20 143:15 144:12 146:5,7 304:23
**investor** 99:19 140:25 147:23
**investors** 28:16 141:3 147:13,24
**invests** 23:4
**invisible** 50:4
**invitation** 16:6 152:21 308:17 311:24
**invitations** 16:8
**invite** 43:25 97:23 98:21
**invited** 18:4 43:15 151:5 153:10 154:19 298:8
**involve** 20:19
**involved** 20:22,24 33:22 82:10 99:22 170:21,25 171:8 179:8 180:20 202:13 216:5 228:4 273:16 283:20
**ipad** 264:7
**iphone** 264:6
**ipo** 328:20 330:13
**iss** 124:11,13,24 265:23,24,25 266:5 302:3,4,6,17 302:20 303:8
**issuance** 62:24 64:23 65:3 74:7 74:10,14
**issue** 147:20 269:9 278:18 286:5 302:11 323:13

**issued** 46:3 63:6
  75:12,14 230:10
  262:25 321:15
**issues** 264:20
  302:6 309:4
  310:24 322:24
**issuing** 302:13
**item** 21:12
**items** 320:19
**ivp** 22:24 23:2,7
  23:10 36:17
  161:12 162:19
  163:6,13
**ivp's** 162:10

**j**

**jake** 2:17 6:6
  291:22 296:23
**january** 74:5
  122:22 296:7
  327:6 338:19
**jbissell** 2:18
**jc** 316:23
**jeff** 317:3,11
**jets** 32:9
**job** 107:9 109:14
  114:2 201:12
**john** 3:9 5:23 43:4
  43:8,9
**john.delmonaco**
  3:9
**johnston** 4:8
**join** 14:23 15:14
  16:6,8 308:12,17
  309:13 311:25
**joined** 14:21 43:6
  231:25 311:2
**joining** 15:7 16:19
  16:25
**joint** 13:7 310:10
**joke** 232:15

**jokes** 232:17
**josh** 83:17,21
  133:11 214:15,22
  218:6
**juggernaut** 327:23
**july** 232:3
**jump** 63:12 301:6
**jumping** 19:10
  124:9
**june** 232:3

**k**

**kayak** 154:15
**kayaking** 152:6
**keep** 68:3 71:10
  78:11,21 85:20
  95:9 114:3 116:22
  123:16 127:19
  143:13 158:22
  159:13 193:22
**keeping** 105:23
  116:18
**kept** 72:22 95:17
  120:22 171:14
  210:19
**key** 77:19 116:22
**keys** 154:17
**kimberly** 110:22
  129:24 156:9
  311:14
**kind** 94:21 117:24
  137:19 154:7
  186:6 225:25
  247:14 258:25
  270:19 284:10
  318:23 324:9
  331:12 332:11
**kinds** 70:14
  147:12
**kirkland** 3:5 5:23
  43:4,15 44:2,25
  45:9 46:6,10

264:21 265:8
**kirkland.com** 3:9
  3:11,12
**knew** 89:19,23
  147:3 168:14
  171:18,19 181:12
  196:5 201:16
  235:7 249:10
  252:16 262:15
  301:7 309:22
**know** 8:9,15 22:21
  23:2 24:18 25:13
  26:3 29:22 33:7
  34:16 35:18,22
  36:11 39:6 42:4
  42:14 43:12 45:9
  50:25 54:21 55:3
  55:22 63:11 65:23
  68:20 70:5 71:15
  72:15,20 77:2,11
  77:15 80:10 83:24
  89:8,16,20,22,25
  90:8 91:22 92:2,5
  93:7,14,21,25 94:3
  94:8,16,19 101:5
  102:9 104:12
  108:8,24 109:13
  109:24 114:11
  120:2,25 125:8,16
  126:6 128:24
  129:7,13,14
  130:16 133:9,15
  136:8 137:20
  142:9 143:20
  151:12,13,16
  153:9 155:9 163:4
  163:6 167:6
  169:22 170:2,3,8
  170:11,11,13
  173:4,5 176:7
  178:18,21 180:22

183:17 184:11,23
  185:2,10,22 192:8
  193:18 196:19
  197:3,22 198:2,7
  203:5,13 207:14
  207:25 208:12
  210:22 215:17
  216:13 220:20,23
  223:22 224:22,25
  225:7,23 226:15
  226:25 229:18
  230:12,14 232:8
  236:2 240:2
  241:17 243:14,21
  244:18,24,25
  249:3 250:5
  253:24 259:14,16
  260:14,19 261:7
  264:24 266:12,15
  268:5,20,22 271:4
  273:7 282:10
  283:22 284:22
  288:17 291:15
  294:9 301:4
  310:17 321:25
  328:25 332:25
  333:2
**knowing** 140:3
  252:22 254:25
**knowledge** 26:24
  39:15 162:17
  197:18 231:13
  250:22 303:12
  306:5
**known** 15:4 27:4
  125:16 162:11
**kpis** 77:18,19,24
  78:4,10,15,21
**ksjm** 1:6

**[l - little]** Page 30

| **l** | 130:18 312:4,7 | **leverage** 194:15 | **lightweight** |
|---|---|---|---|
| **l** 6:13 18:10 116:8 178:21 311:14 | **leader** 82:3 | **leveraged** 194:23 | 310:19 |

**l** 6:13 18:10 116:8
178:21 311:14
**labaton** 2:15 6:7
**labaton.com** 2:18
2:19
**labeled** 84:11
292:5,8 295:5
**lack** 141:16
230:25
**lacked** 120:8
**lane** 1:14
**language** 96:9
274:18 332:11
**lapsed** 51:3
**laptop** 10:6 264:9
264:11
**large** 55:8,13,14
181:17 208:2
322:22
**larger** 254:12
**largest** 37:19,20
37:23 38:3,7
236:13
**late** 33:18,20
54:23 59:22
150:16 201:7,13
232:16 301:4
313:21
**laughed** 331:22
**lavish** 154:22
**lawsuits** 305:12
**lawyer** 43:21 46:7
117:7
**lawyers** 42:15,20
43:16,20,25 44:25
**layer** 51:2
**layperson's**
217:18
**lead** 5:16 6:21
85:8 103:18

**leader** 82:3
**leadership** 51:5
**leading** 190:20
**lean** 112:24
**leaned** 324:2
**learn** 68:6 96:2
271:25 296:8,11
**learned** 42:2,6
43:20 53:11 62:12
89:10,12 98:17
201:15 296:14
310:21
**learning** 18:21
108:12 248:8
**leave** 176:16 271:7
**led** 95:13
**left** 134:21 136:11
179:13 192:12,17
193:12 232:9
315:17
**legal** 13:5 68:17
72:8 263:21
**legally** 226:25
**lenders** 268:21
**length** 12:19
**lessons** 310:21
**letter** 185:11
242:4,12,21 245:6
338:13,15,18
**letting** 243:13,15
243:21
**level** 21:9 33:14
37:11 50:2 51:4,5
53:25 58:5 88:19
106:18 134:5
140:18 177:5,6
190:18 200:3
255:21 328:24
**levels** 108:8
147:17 319:19

**leverage** 194:15
**leveraged** 194:23
**leveraging** 197:18
**levers** 134:10
**lexington** 3:7
**liaw** 22:19,22
145:8 161:2 162:7
163:5,13
**liaw's** 145:10
**license** 48:10
**lifetime** 56:22,24
57:2,3,5,10,13,18
58:17 231:19
232:4,4
**lightdale** 3:17 5:19
5:20 13:14 22:14
23:15 33:2 37:14
45:5 46:12 50:20
57:20 62:4 63:17
64:4,19 68:16
73:4 74:16 87:14
91:14 94:15 100:2
112:6 114:22
115:2,5 125:12
129:10 144:17
148:15 149:4,9
151:7 152:11
160:9 162:21
163:9,16 174:2
175:14 178:8
186:2 202:2
205:21 206:5
212:3 217:22
231:8 241:9
243:10 263:8
266:7,20 267:14
269:12,20 270:7
271:9 291:22
296:23 300:23
324:19 329:4,24
332:22 333:5

**lightweight**
310:19
**liked** 27:22 29:4
87:23
**limbaugh** 9:14
**limit** 297:6
**limited** 157:9,15
199:10 210:19
297:2 310:12
**line** 29:16,23
146:11 194:19
195:6 196:2,11
217:19 233:10
295:13,18 297:9
300:3 310:5 340:5
**linsk** 2:17,18 6:5,6
251:4,8,17 252:8
253:4 271:19
277:9 291:24
297:8 300:11
303:13 325:6
335:7
**list** 61:2 83:11
133:6,14 170:18
210:9,11 211:19
213:8,10,16,19
215:2,10 218:17
**listed** 71:3
**listened** 276:15
**lists** 295:5
**literally** 63:22
202:16 229:24
230:2 297:4,9
**litigation** 1:4 5:11
46:4 75:10
**litowitz** 2:9
**little** 9:3 56:3
59:21 94:16 95:3
133:22 143:13
151:2 200:20,22
204:2 241:24

246:2 253:2 254:24 276:6 277:17 295:3 299:12 306:16 308:7 318:2
**live** 246:18 279:5
**liz** 42:24
**llc** 340:2
**llp** 2:9,15 3:5,14 5:20
**loading** 66:5
**locked** 27:17
**logged** 320:17,18
**long** 9:8 10:16 12:17 13:18 34:13 52:5 120:13 129:14 146:19 147:15,18 148:7 149:2,15 150:2 219:19 220:17 233:14,20 234:15 239:17 241:2 253:11,14 333:15
**longer** 32:23 53:14 58:18 95:4 200:9
**longevity** 34:10
**look** 41:16,18 63:4 68:7 73:7 75:16 112:15 118:20 135:14 136:19 145:3,10 156:10 159:17 177:8,10 182:18,19 191:10 206:10 210:22 214:18 215:21 219:14 224:9 227:13 238:14 242:20,24 245:14 295:3 316:21 327:8,20 332:2

**looked** 310:4 320:19 330:9,10
**looking** 19:25 20:7 33:21 43:8 51:24 83:3,7 124:5 132:24 205:12 210:15 237:17 280:19 281:13 315:14 326:3
**lookout** 21:10
**looks** 62:20 74:4 206:4 208:14 214:15 316:17
**loop** 68:3
**lose** 36:24 107:11 139:23 264:14 332:8
**lost** 150:5
**lot** 11:8 69:21 107:5 134:5 140:12 150:4 226:3 279:6 302:21 319:11 322:2 323:2
**love** 287:16,17,20
**low** 10:16 94:2
**lower** 126:2 149:19,20,21 173:16 174:11 175:11 237:16 253:21,21 255:6 255:10 295:4,11
**lowering** 173:24 246:5
**ltv** 57:9 58:2,4,14 197:23
**luis** 18:18 311:3
**lunch** 16:16 110:11 114:21 115:11 310:20

**lunchtime** 94:17
**lx** 315:4
**lyft** 101:10
**lytikainen** 110:22 129:24,25 130:2

**m**

**m** 6:13 116:8
**m&a** 102:15 107:3 107:11 117:12 161:11 194:8 202:21 236:17
**magic** 142:8,10
**magnitude** 181:22 221:9 289:17
**mail** 79:13 97:12 97:14 100:25 101:3 107:19 110:16,19,20,21 120:20 125:5 131:6 144:24 145:7,10,11 152:23 155:19 156:7,11,12 159:20 160:24 170:3 183:5 239:22 240:5,19 245:12,14 246:12 327:5 331:20 335:18,23 336:7 336:13,15,17 338:11
**mails** 42:19 45:18 128:15 171:11 246:15
**maintain** 256:18 333:16
**major** 56:7 81:8 300:6 301:14
**majority** 18:5 48:9 265:15

**making** 7:25 20:8 20:13 31:4 120:21 216:2 218:11 221:25 274:23 305:24
**manage** 11:6
**managed** 13:4 318:22
**management** 13:10 93:23 105:9 105:11 111:10,20 112:5 119:21,23 120:22 158:8 160:16 166:7,21 167:7,8,11,14 168:20 169:7 171:3 173:16 178:12 180:18 188:24 201:20 202:6 207:12 220:15 224:19 225:20 226:6 233:8,13 240:7 242:5,7,9 243:2,9 243:13,20,21 244:6 260:15,25 261:9 274:24,25 302:12 311:23 328:25
**management's** 173:17 174:12 175:12 177:19
**manager** 83:24 109:15
**managing** 309:9 318:18
**mandate** 199:20 199:23,24 236:9
**mansbach** 83:17 83:19 90:13,16 110:22 130:24

**[mansbach - meetings]**

133:10 218:7
**manufacturing**
  177:11
**map**  255:21
**march**  224:3
  272:9
**marden**  3:20
**margin**  56:25
  134:20 142:16
  174:20 180:10
**mark**  62:18 91:6
  277:12 314:17,20
**marked**  62:16
  73:19 75:3,6
  79:14,17,20 84:4,7
  97:15,17 100:17
  100:19 107:20
  126:14,16 144:25
  145:5 152:24
  155:20,24,25
  165:11 183:8,10
  191:7,9 192:5,7
  200:14,19 207:21
  207:23 214:4,7,10
  219:4 223:7,10
  232:20,22 238:12
  239:23,25 242:13
  242:15 245:7,18
  273:6 291:4
  293:16 294:13,19
  313:18 314:24
  327:6,9
**market**  2:4 24:25
  26:12 47:14 53:18
  55:16 57:11 78:24
  87:24 99:22
  121:14 127:3,5
  139:15 140:19
  141:20 143:9,16
  150:10 163:2
  171:3,25 178:5

210:17 228:11
237:10 244:2
301:12 327:24
329:15
**marketing**  11:3
  311:13
**marketplace**
  48:24 51:9 54:5
  87:21 138:12
  139:4,22,24 140:8
  140:11 324:12
**markets**  51:11
  52:14 55:10
  122:12 138:19,22
  139:18 142:25
  143:21 147:8
  309:9 328:6,13
**marks**  322:14
**marriage**  339:18
**massages**  151:23
  154:14
**massive**  326:14,17
  326:20,23 327:15
  332:18
**match**  63:19
  321:14
**matched**  58:21
**matching**  255:17
  255:23
**material**  123:4,8
  124:8 267:12
  268:2
**materials**  45:17
  192:5,12 290:14
  290:16 291:8
  337:8
**math**  91:5
**matt**  6:2
**matter**  5:10
  251:22 339:20

**matters**  297:4
**matthew**  3:12
**matthew.solum**
  3:12
**maximize**  207:14
**maximizing**  69:17
  69:21
**mb**  110:17 126:19
  134:21 135:16,24
  156:8 165:16
  193:4,23 194:5
  208:6 209:11,12
  209:20 219:10
  223:22 327:25
**mba**  8:25
**mbod**  79:20 97:21
**mccarter**  83:17,21
  214:23 215:9,24
  218:7 313:15
**mccormick**  46:3
**mean**  9:24 12:6
  15:25 34:19 37:22
  38:4 67:9 70:24
  73:9,10 105:14
  123:8 131:18
  138:23 142:9
  161:19 167:24
  168:20,23 189:16
  222:25 249:9
  250:24 260:6
  274:11,23 282:13
  282:18 287:7,8
  292:11,22 317:2
**meaning**  166:5
  314:21
**meaningful**  89:24
  120:16 288:11
**means**  9:22 176:13
  197:21 231:24
  236:13,14,16
  274:12 282:11

292:24
**meant**  38:7
**meet**  17:19 18:14
  24:20 40:3 131:7
  159:5
**meeting**  16:15
  17:9,24 18:17,22
  25:5 40:14 41:13
  53:11 60:11,15,25
  62:13 66:7 67:16
  67:23 71:5 76:2
  84:3,12 85:3,6,13
  86:21,25 87:6
  103:16 104:7,18
  105:3 126:13,22
  127:13 132:6
  159:3 161:20
  163:20 164:5
  165:11,18 169:20
  190:20 191:4
  201:18 202:16,17
  207:20 208:7
  211:17,20,23
  212:8,12,14,24
  213:3,6,6 219:3
  220:22 221:7,8
  223:7,16 232:19
  233:6 260:25
  265:24 277:4
  280:18 291:9
  293:21 335:21
  336:11,23 337:13
  337:22,25 338:7
**meetings**  17:10,14
  42:13,16 47:20
  62:8 66:8 68:5,11
  76:12,13,20 89:15
  103:8 123:18
  168:9 170:2,12,14
  170:19 171:10
  175:18 187:25

188:4,8 203:15
235:9 260:15
273:2 285:17
302:3
**member**   18:25
22:6 25:22 61:10
77:22 82:19,25
130:21 132:17,25
143:3 162:5 188:7
188:11 248:21
249:5,13 302:12
311:16,18 320:24
**members**   18:3
20:4 21:2,11,15,22
21:25 22:5,11,17
47:12 60:13,24
80:19 89:15
103:15 104:6,17
105:8 111:10,20
119:21,23 154:6
160:24 161:5,15
166:7 202:7
229:13 240:6,7
282:21 313:3
332:8
**memory**   27:3
127:23 317:24
**mention**   61:23
161:24 235:21
**mentioned**   47:21
50:16 52:19 59:10
59:17 70:17 71:23
73:14 90:10
107:22 108:4
121:10 129:17
197:25 230:23
231:16 236:5
275:16 322:19
**mentoring**   106:20
176:8 310:19

**merge**   102:5
**merger**   42:18
64:15,22 65:2,7,13
65:19 88:8 108:16
109:10 117:3,5,10
117:11 118:16
257:15 258:3
271:21 272:3,13
272:18 273:15,16
275:22 298:9,13
299:6,13,16,16
300:13,21 302:4
**message**   100:16
101:4,7 104:13
183:7,15 191:6,15
214:3,6,9,22 238:5
238:11 245:17,21
245:24 336:5,24
337:5,15,17,19
338:9
**messaged**   170:9
240:14
**messages**   246:3
313:14,24
**messaging**   169:10
169:23 184:7
191:2
**messrs**   219:15
**met**   6:22 16:4,14
16:24 17:6,12
18:12,13,24 24:23
40:17 89:3,6,20
90:8 92:20 124:11
280:3 311:11,12
311:12,14
**methodology**
108:14
**metric**   58:10,14
286:23
**metrics**   58:8,21
78:9,14 79:10

103:10 142:4
148:13 197:22,24
231:3 286:17
**mid**   106:13 135:15
220:13 280:21
**middle**   64:16
**midpoint**   173:16
174:10 322:2,3
326:25 327:16
332:19
**midst**   51:17
**mike**   83:17,18
90:13,16 218:7
**military**   185:4,5,6
185:7,18 186:8
**million**   131:10,13
131:24 134:3
137:4 140:15
177:10 284:7,8
290:24 291:19
292:12 294:22
295:24 296:2
297:16,21,23
298:2 308:24
326:25 327:13,17
332:19
**mind**   52:25 70:23
85:8 90:19 117:22
181:12 205:16
274:12 283:15
306:7,12 311:17
**mindbody**   1:4 3:6
5:10,24 14:24
15:3,5 17:2,13,24
18:2 21:2 23:7,12
25:20,25 27:17,22
28:4 29:3 32:16
32:25 33:8,9,22
34:21 35:9 37:3
38:22 39:18 40:10
41:20 45:13 48:2

48:14 50:11,12,17
53:18,22 55:9
58:24 59:15,25
61:7,25 63:2 66:9
67:19,25 70:19
71:8 77:4,13,22
78:21 81:22 82:4
82:12,15,18 84:18
88:13 95:14,24
106:10 112:4
113:6,15 119:22
125:8 127:9 129:6
130:24 132:24
134:13 136:4,6,8,9
136:15,17 140:21
141:10,21 143:10
144:5,6,10 146:15
148:10 153:5,13
153:20 154:10
162:10,20 163:15
172:20,21 176:18
177:8 178:4,12,22
179:13 180:23
187:4,11,17 189:5
201:8 220:6
225:14 226:15
228:11 230:15
237:4,6 241:14
256:15 258:13,17
258:20 269:9
271:21 277:20
279:12,15 281:2
286:4 288:14
291:25 296:8
298:8,13 301:17
304:13 307:12,17
308:22 309:25
310:7,8,10 311:8
313:4 314:10
319:9,12 323:12
328:22,24 330:24

332:14,16 340:3
**mindbody's** 35:13
125:22,25 127:5
138:7,11,16,17
144:14 227:21
231:5 276:8,11
279:18 281:9
283:2,10,18,23
284:24 289:23
293:6 298:18,22
298:25 299:5
300:10,14 308:13
308:18
**mindset** 34:12
**minimum** 164:22
171:18
**minute** 63:13
172:7 205:25
244:4 303:19
**minuted** 212:14
**minutes** 66:21,24
67:6 84:3,11 95:6
101:10 116:18,21
126:13,21,24
128:20 130:18,20
161:22 165:11,17
201:23 205:23
207:20 208:6,12
219:3,11 223:7,15
232:19,25 233:5
234:13 235:21
293:20 303:18
335:21 336:10,23
337:13,22,25
338:6
**miracle** 73:23
238:15
**misconstrue**
203:18
**misheard** 85:15

**mishire** 81:10,13
**missed** 98:11
236:19
**missing** 143:13
**misspoke** 187:10
**mix** 138:17 244:12
**mo** 195:14,20
196:4,5,10,14
**mobile** 277:24
322:19
**model** 79:8 139:8
210:16 239:5
240:17
**modeled** 238:25
**modeling** 58:6
132:3 241:16
251:2 293:3
**models** 230:21,25
239:3,8 282:7
294:25
**modern** 49:22
**moment** 21:4
49:17 74:17
107:18 111:2
122:18 137:20
159:16 160:14
179:19 186:25
252:8 265:16
271:10 273:11
274:4 283:5
284:11 291:5
295:23
**momentum** 326:3
326:4 328:4
**monaco** 3:9 5:22
5:23 12:25 17:15
22:12 23:13,17,25
24:14 25:10 27:13
28:11 29:9,18
31:14 32:10,19
33:4,10 34:6,23

36:13 39:19 40:19
43:9,17 44:4
46:14 62:2 72:6
76:6 81:23 87:2
102:23 111:13
112:8 120:4 121:4
121:22 125:14
137:8 144:8
150:20 153:23
169:13 173:19
174:13 177:22
178:15 179:15
182:25 185:12
187:9 195:7
196:22 216:16,23
216:24 217:4
231:10 241:11
250:14 251:13
252:2 258:23
264:23 265:12,20
271:22 290:2
303:16 304:4
314:13 324:15
335:8
**monetize** 308:3
**money** 34:22
35:10 328:18
330:22
**monica** 61:3
**monitor** 276:8
**month** 14:3
292:21
**monthly** 232:11
**months** 9:10 55:16
55:17 80:14
124:10 133:9
141:13 232:7,9
237:6 241:14
**monti** 169:10
238:5,23

**morgan** 13:9
154:20
**morning** 5:2,19,22
6:6 151:23 152:5
191:3
**mortgage** 30:2,11
307:7
**mortgages** 298:3
**motivated** 87:11
88:6,12
**moultonborough**
1:14
**move** 80:13
144:15 145:4,15
145:24 146:3
158:14 168:13
182:4 231:4
252:20 254:5
297:11
**moved** 79:10
137:22 181:2
268:3,6
**movement** 123:13
**moving** 51:17
71:13 143:11
150:15 164:15
212:9
**multiple** 16:8
35:25 36:25 38:17
41:15,22 70:10
103:8 117:22
123:18 134:10
204:21 246:3
268:11 282:15
322:17 329:3,10
329:17 330:5
**multiples** 330:11

|  n  |
| --- |

**n** 2:2 3:2 4:3 6:13
116:2,2,2,8 178:21
335:4 336:2 337:2

338:2
**name** 15:17,19
  184:18,21,24
  185:11 316:17
  340:3,4
**named** 22:18
  128:21 178:21
  313:10
**names** 89:23 90:10
  90:11 178:24
  179:3
**narrative** 66:3
**narrow** 177:7
**nasdaq** 298:19,20
  298:21
**natural** 251:20
**nature** 27:25 28:6
  167:17 216:22
  255:4 308:21
**naïve** 70:25
**nda** 159:12 261:8
  317:7 319:21
**near** 26:14 48:15
  48:16 141:17
  150:8 162:20
  163:7 177:4
  252:23 268:14
  305:8
**necessarily** 50:5
  51:12 106:25
  204:17
**necessary** 157:20
  160:4
**need** 8:14 34:22
  35:10 44:8 46:23
  49:13,20 79:4
  94:22 105:25
  121:21 131:24
  139:6,9 142:20
  144:5 145:13,22
  146:7 174:18

176:10 206:9
218:13 247:15
248:7 251:24
255:22 256:23
267:23
**needed** 35:4 54:10
  78:18 85:9 102:17
  117:24 247:9,10
  256:14 259:24
  260:10 261:19
  267:7 304:24,24
  332:8
**needing** 172:6
**needs** 26:15 51:20
  51:22 188:17
**negative** 30:9
  88:20 181:14,17
  237:15
**negotiating** 93:18
  246:6 253:16
**negotiation** 11:24
  188:18 203:11
  226:5 252:15
  255:3,4 279:6
**negotiator** 188:25
**neither** 122:9
  160:15
**nervous** 182:9,11
**net** 297:13,14
  307:21,23
**neutral** 71:22
  118:6
**neutrality** 71:19
  71:23 72:2 73:13
  166:18 167:3,10
  167:14 169:3,6
  262:7 324:6
**never** 18:24 28:7
  29:15,21 86:6,6
  130:5 140:2 148:8
  150:13 154:22

163:13 227:9
252:21 278:18
329:11
**new** 1:14,16 2:16
  2:16 3:8,8,16,16
  5:20 6:16 20:4
  50:6,6 51:8 78:17
  83:8 90:9 116:11
  132:17,25 135:11
  192:7 204:7 279:3
  298:20 305:20
  339:5 340:2
**newer** 49:22
**news** 204:24
  298:23 299:3
**nice** 149:16 155:8
  278:6
**night** 30:17 42:2
**nine** 208:16
**nobody's** 320:17
**nodding** 7:20
**nom** 132:20,22
**nominating** 19:12
  19:14,19,22,25
  20:18 132:9,15
**non** 77:3,12
  159:11
**nondisclosure**
  225:13
**nonparty** 333:8
**nonprofit** 14:20
  39:4
**nonspecific** 39:25
  151:16
**normal** 24:3,19
  40:3,13 212:14
**north** 2:4
**notably** 312:24
**notary** 1:15 6:15
  116:10 339:4
  340:23

**notation** 317:6,15
**note** 317:10
**noted** 334:7
**notes** 316:7,18,23
**notice** 1:13 98:11
**noting** 296:2
**notion** 321:18
**notoriously**
  178:24 179:2
**november** 170:15
  171:3,14,25 173:7
  173:8,10,11
  174:11 179:10
  180:3,19,24
  181:23 182:5
  183:8 189:4 191:3
  191:7,25 192:13
  192:22 196:18
  197:2 199:8 200:4
  200:4 201:17,18
  208:8 209:15
  210:5,5 212:12
  213:3 214:4,7,10
  214:23 221:11,18
  221:23 224:20
  236:6 262:8
  267:18 288:19
  313:21 314:7
  336:25 337:6,16
  337:18,20
**number** 16:11
  17:22 64:6,9
  65:19 71:9 73:22
  74:13,13 79:17
  84:8 92:20 97:18
  100:20 116:17
  118:13 121:9,12
  125:17 126:17
  133:18 137:23
  153:3 159:18
  165:14,23 183:12

**[number - okay]** Page 36

191:13,17 192:25
207:24 208:16
209:9,10 219:14
221:23 226:19
227:14 228:12
233:7 237:16,19
238:25 239:11
242:22,24 246:17
262:12 267:11
284:7 291:25
292:11,14 293:9
294:20,21 296:5
301:10 315:4
323:6 327:9
**numbers**   63:18
134:6 137:19,24
147:12 209:6
227:4,9 230:13
267:7 289:19

**o**

**o**   6:13,13 18:10
116:2,2,2,8,8
**oath**   304:8
**obispo**   18:18
311:3
**object**   12:25 13:14
17:16 22:12 23:25
24:14 27:13 29:9
29:18 31:14 32:10
32:19 33:10 34:6
34:23 36:13 39:19
40:19 43:17 44:4
68:17 76:6 87:2
102:23 104:9
111:13 112:8
120:4 121:4,22
137:8 144:8
150:20 151:8
153:23 173:19
174:13 175:14
177:22 178:15

179:15 196:22
250:14 258:23
271:22 290:2
**objecting**   104:13
**objection**   22:14
23:13,15 25:10
28:11 33:2,4
37:14 45:5 46:12
46:14 50:20 57:20
62:2,4 73:4 81:23
87:14 91:14 100:2
112:6 125:12,14
129:10 144:17
148:15 149:9
152:11 160:9
162:21 163:9,16
169:13 174:2
178:8 182:25
185:12 186:2
195:7 202:2 212:3
216:16,23 217:22
231:8,10 241:9,11
243:10 264:23
266:7,20 267:14
269:12,20 270:7
300:23 307:8,22
312:19 317:22
319:22 329:4,24
332:22
**objections**   7:25
**obligation**   34:11
**obligations**   71:21
**obviously**   58:14
94:25 170:17
289:3 319:10
**occasion**   24:23
283:12
**occasional**   310:22
**occasionally**   42:25
280:17

**occur**   255:22
272:21
**occurred**   42:8
66:19 101:22
170:14 200:2
220:11 260:20,22
313:21
**occurring**   37:12
**october**   89:2,4,7
92:10 95:21 96:23
97:2,15 98:24
99:9 100:17 101:2
106:14 107:20
114:10 118:21
119:9 122:2 123:4
125:21 126:9,22
127:13,22 128:19
130:25 132:6,9
138:7 143:24
144:5,13,25 145:9
147:3 150:16
151:5 152:24
153:5,8 155:17,20
158:18 161:19
163:20 164:5
165:19 170:15
172:22 180:2
198:9 201:7,13
291:8 292:20
335:24 336:6,8,14
336:16,18
**offended**   154:7
**offer**   107:7 110:7
120:11,13 121:13
121:14 122:4
123:4,9 206:21
235:3 242:19
251:3 268:18,24
268:25 270:24
299:12

**offered**   277:23
298:15 311:24
**offering**   35:2,7,9
**officer**   311:14
**officially**   133:16
314:20
**offline**   252:4
**oh**   63:23 101:5,6
245:20,22
**okay**   7:8,15 8:7,13
8:18,20 9:7 10:8
10:13 11:9,15
15:20 19:9 20:16
21:13 23:20 28:22
38:24 44:11 46:16
56:11,17 66:18
67:7,21 69:6 75:5
75:25 80:4 88:25
97:20 99:7 100:22
101:8 107:15
110:15,18 111:7
111:25 114:14
116:25 117:14
118:14,19 119:18
121:15 123:6,12
125:20 134:17
137:12 143:5
145:19 153:4
154:25 156:24
158:15,24 160:19
165:25 166:25
167:9 172:9
173:22 175:25
176:19 177:17
180:14 183:13,19
185:9,21 188:20
189:2,22,25
191:21 200:16
203:4,16 206:6
208:5 209:4,25
212:20 213:9

**[okay - part]**

214:16,17 216:25
217:11 220:4
221:10 224:8,16
227:6 228:2,18,21
233:23 234:12,19
242:2 244:9
245:11 253:4,6
257:11 259:18
260:4 262:23
263:6,24 264:8,18
266:11 269:16
271:2 273:4
274:17 275:13
276:5 278:16
293:14 301:16
306:3 312:8 326:9
327:11,19 328:10
329:19 332:13
**onboarding** 18:20
**once** 17:6 53:20
 92:2 146:17 231:5
 247:7 287:11
 321:7
**ones** 38:19 56:10
 73:13 161:16
 211:6
**ongoing** 34:9,14
 277:19
**open** 62:19 72:16
 73:25 84:9 103:23
 120:10 291:3,6
 293:15
**opened** 273:8,9,10
**opening** 156:5
**operate** 256:16,19
**operating** 51:2
 78:9 96:9 147:25
 199:22 219:19
 220:17 233:19
 234:15 239:17
 240:25

**operational** 132:2
 146:12
**opinion** 46:2 65:15
 262:21,25 263:13
 263:16 303:8
**opportunities**
 51:19 54:17 87:19
 106:2 127:6
 133:11 284:4
 285:5
**opportunity** 48:22
 49:3 55:13 88:15
 93:4 114:17
 119:16 124:23
 125:3 155:9
 182:24 243:22
 253:13 254:9
 287:10 316:24
**opposed** 11:21
 67:5 108:25 201:9
 255:9
**optimistic** 332:4
**options** 94:5,7,9
 103:13
**orange** 277:25
 278:3
**order** 139:3
 142:13 146:4,6
 147:11 156:3
 190:6 221:8
 222:18 255:23
 289:17 333:11
**organic** 236:12,15
 237:2,20,25 238:6
 240:15
**organization**
 167:22
**organize** 319:5
**originally** 201:2
**orrico** 2:11

**ought** 142:16
**outcome** 100:6,7
 107:12 110:9,10
 158:10 165:2
 168:7 248:5
 299:10
**outlook** 219:21
 220:7
**outreach** 200:6
 204:3 206:22
 208:24 209:22
 210:4 211:13
 215:11,19 222:6
 222:10 261:7,8
**outreached** 207:2
 222:8
**outs** 284:10
**outside** 13:8 15:10
 17:23 31:3 83:10
 129:3,5 133:13
 218:8,17 226:24
 253:23 298:3
 308:3
**overcome** 139:25
**overly** 154:24
**oversee** 225:16
**overseeing** 158:19
 203:11 204:3,8
**oversight** 323:14
**overvaluing** 143:9
**overview** 193:8
 208:21 280:4
**owned** 20:23
**owners** 70:4
**ownership** 69:20

| p |
|---|

**p** 2:2,2 3:2,2,9 4:3
 4:3
**p.a.** 2:3
**p.m.** 98:12 115:12
 116:4 240:9 334:7

**packet** 266:25
**paddleboarding**
 152:6 154:15
**page** 63:8,22 64:9
 64:16,17 75:17
 112:18 133:22,23
 134:7,9,12 193:7
 193:12 208:15
 209:19 242:20
 246:15,17 250:3
 273:13,21 291:12
 291:12,20 293:24
 294:9 295:4,12
 333:21 335:5,11
 336:4 337:4 338:4
 340:5
**pages** 194:4 208:3
 208:13 293:24
**paid** 9:16 61:10
 108:22 204:21,23
**paint** 332:3
**pandemic** 175:5,8
 175:10
**paragraph** 112:17
 113:4 159:24
 243:4 273:20
 274:5,7,10 275:11
**paragraphs**
 112:18 327:21
**parallel** 59:5
**parens** 329:13
**parentheses** 328:6
**parsing** 333:13
**part** 30:20 34:10
 65:13,15 157:23
 161:14 171:7
 193:19 219:20
 221:3 231:17
 232:4 268:22
 279:2 284:24
 313:8

participant 40:10
participants
208:23 235:22
239:18
participate 164:2
180:17 211:12
227:20 257:21,22
283:9
participated 176:8
212:25
participating
130:23 254:13
particular 22:6
99:5 106:9 121:12
183:5 184:14
229:20 279:7
322:14 331:19
particularly 21:24
69:25 254:6
264:22 322:24
parties 41:15,22
41:23 42:4 61:23
168:8,15 257:23
273:16 318:13,20
319:15 333:12
339:17
partner 6:2
166:12
partners 22:25
24:11 25:9,14,19
40:9 193:9 194:2
208:24 209:13
partnership 15:5
16:14 309:25
310:18
parts 65:9,17
party 258:16
271:5 303:4
pass 291:17
passed 317:15

passion 70:6
passive 160:25
path 131:10 134:2
134:13 147:6
180:13 291:18
paths 328:19,21
pause 14:3
pay 9:16 52:10
56:14 109:9 114:6
119:11 121:2
124:15 310:9
payable 255:6
paying 236:15
payment 193:17
payments 48:6,11
49:8,10 50:9 53:8
53:13,17 55:12
58:3 87:20 134:23
135:6,9 139:5
193:13,16,19
213:13 215:3,4,10
215:12,25 216:10
216:14 217:8,15
217:20 313:7,11
314:3,6 315:12
317:20
payoff 140:20
payoffs 140:24
pays 232:5
pe 62:10 92:16,18
92:21 93:21 196:8
200:8 320:8
328:16
pebble 154:13
peer 176:8
penalized 141:18
pending 8:17
79:21
pennsylvania 8:24
people 14:6
168:17 195:19

247:15,20 249:19
pepperlane 14:22
percent 81:6 93:20
135:20 142:15,16
142:17,18,19,20
142:21 164:14
213:7 229:11
256:18 268:8
270:5,19 297:17
297:24 327:14
330:3
percentage 181:6
181:7
perception 326:19
perfect 44:10
84:10 85:24
performance
77:19 141:17
233:17 276:8,12
276:21 281:10
322:15
performing
325:22
period 66:11
88:21 100:13
103:2 124:19
168:13 196:13
197:9 207:8 210:4
218:4,24 236:5
254:7,15,25 255:9
255:12 257:20
258:18 259:10
260:17 261:2
278:24 309:14
313:22 323:4
331:2
periods 13:20
permanent 157:3
permira 244:22,23
244:24

person 16:24
17:10,12
personal 29:12
30:3 32:24 70:21
71:6 72:18 117:17
117:23 118:5
184:16 248:18,22
297:14 333:8,19
perspective 50:4
108:10 252:17
285:21
persuading 303:9
pertaining 316:19
phase 318:5
philadelphia 8:24
philosophical
287:21
phone 97:9 100:11
103:14,25 104:6
170:3 171:10
212:17,24 311:16
phrase 77:7 90:23
286:15 287:2
picked 185:10
207:6 211:7
picking 211:12
picture 190:13
332:3
piece 123:2
pieces 309:10
place 13:6 26:17
26:20 27:2 40:23
54:19 88:13 98:23
136:3 159:12
225:15 232:17
262:9 274:2
318:17 339:8
placed 319:7
places 279:14
plaintiffs 2:4,15
5:17 6:7,21

**[plaintiffs - preferred]** Page 39

305:12,16,20
306:5 323:10
**plan** 26:3,7,17,25
27:7,9,23 28:9
32:17 33:17 37:17
37:20 56:5,5
130:25 132:2
133:25 134:8,13
136:3,5 147:4
148:13 150:12
200:7 219:19,20
220:17,18,20,25
221:7 233:14,19
233:20 234:15,16
239:17,18 240:25
241:2 263:15
276:4,25 291:18
294:4
**planned** 259:14,16
**planning** 20:20,23
34:11 37:10 80:7
82:10 83:5 84:24
85:2,10 86:9
113:20 131:20
137:11,14,18,25
218:3 219:23
287:5
**plans** 34:4 163:3
276:18 305:3
**plate** 218:11
**platforming** 49:12
49:24 50:10 309:5
309:6
**platforms** 49:23
310:3
**play** 9:16 248:3
**played** 150:14
256:5
**please** 5:12 6:11
8:9,15 10:2 74:17
111:16,20 244:7

291:3,20 293:15
297:6
**pleased** 204:19
**pleasing** 281:21
**plus** 108:25 133:8
142:16,18 304:23
327:14
**point** 11:10 14:23
21:7 23:9 27:19
34:2 35:8 47:14
55:11 57:17 66:12
68:9,12 69:12
86:23 95:4,20
99:2 102:22 103:7
103:21 105:5
128:9 132:14
137:17 144:20
145:12 151:10
152:17 153:19
157:21 158:12,16
165:4 170:6 174:7
180:8 188:17
190:4,15 211:17
212:10 222:17,24
223:4 226:3,19
227:17 234:25
235:13 241:15
243:7 244:10
248:9 251:6,25
279:8 286:7 296:7
297:3 298:7,11
309:19 312:17
327:22 333:12
**pointing** 134:21
**points** 194:12
**policies** 72:25
222:19 225:15
**policy** 66:25
**polished** 226:2,10
**pool** 93:19 140:9
140:10,11

**popped** 153:2
**populated** 201:2
258:20 319:2
**portal** 279:23
314:16
**portfolio** 14:18
79:3 197:19
**portfolios** 210:25
211:2
**portion** 307:21
333:17
**position** 110:6
228:12 270:2
308:3
**possess** 264:4
**possibility** 24:13
**possible** 80:12
86:5 110:9 133:7
162:14 168:7,8
190:13 212:11,15
212:16,21,22
232:10 249:7
314:10
**possibly** 148:25
216:3 333:2
**post** 108:16
109:10 110:12
253:22 254:15
272:2,17 314:16
**posted** 279:25
**potential** 12:2
23:24 24:7 39:8
39:18 46:20 58:3
61:14,24 66:9
67:18,24 70:9,18
71:6,8 73:15
83:11 84:17 86:13
87:24 91:25 92:6
92:7 104:8 109:8
113:17 127:5
141:23 143:21

155:9 157:6,10,22
162:6 166:10,12
166:22 167:20
170:10,18 193:8
194:17 195:4
198:3,19,24
199:16 203:13
207:15 208:22
218:11,17 221:4
244:11,13 249:24
250:12 256:10,13
260:15 261:17
266:14,19 318:4
321:2 324:7
328:21 330:9
**potentially** 320:9
322:22
**pounce** 198:9
**power** 36:25
**practice** 26:23
27:8 93:15 105:14
201:22 202:5,17
286:3 287:14
288:9 325:9
**practices** 92:16,18
287:3
**pre** 62:18 281:14
281:23 290:14
**precursors** 120:9
**predict** 79:8 177:4
232:4 270:17
300:20
**predicting** 196:16
**predictive** 233:16
**preface** 117:8
**prefer** 87:12 88:7
109:19 114:25
**preference** 88:17
109:23
**preferred** 99:24

**[preliminary - process]**                                                                              Page 40

**preliminary** 127:4
226:18 233:19
234:14 239:16
**premise** 10:5
**premium** 96:7
108:22 109:6,9
114:7 119:11
121:2 122:8
124:16 254:17
268:9 270:5,16
304:19
**prep** 43:16 44:3
46:11 127:24
128:7 131:5
264:20 265:13
290:12
**preparation** 44:24
45:3,16,22 172:4
215:7 290:22
**prepare** 42:11
190:6
**preparing** 180:18
262:18 263:22
**present** 4:5 70:24
91:3,11 190:12
251:3 256:14
**presentation** 91:3
91:11 186:14,23
187:3 190:7,16
192:2 196:25
197:15 205:10
282:3,23 285:13
**presentations**
10:18 45:24 59:6
90:18 128:11
222:13 261:9
**presented** 60:6
87:19 192:22
207:10 208:20
**presenting** 195:15

**president** 83:19
**press** 32:23 171:17
269:9 279:24
**presumably**
241:16
**presume** 26:22
172:25 190:14
295:21 303:11
**presuming** 190:8
**pretty** 96:8 150:9
205:17 207:17
208:2 237:17
**previous** 213:4
**previously** 24:11
116:9 186:12
230:23 289:20
291:4 293:16
302:2
**price** 61:7,11,16
61:17 69:18 94:9
96:8 122:9 125:10
126:3 135:16,24
136:4,6,7 138:5
148:2 162:14
168:13 180:23
182:4 189:24
224:3 246:7 247:5
247:14,22 248:18
248:23 252:13
254:18,19 267:19
268:3,6,9,17
270:15,18 287:19
298:25 299:5,12
300:10,14,16,18
300:22 303:3
304:20 329:2
**priced** 236:12,14
237:3 238:6
240:16
**prices** 26:9 136:9
136:16 287:24

**pricewaterhouse...**
229:6
**primary** 19:24
43:3 171:5
**prior** 15:21 16:5,7
16:24 23:21 24:8
24:9 25:7,20
28:25 32:14 41:13
60:14 64:22 65:2
74:7,10 77:5,14
91:9 103:15 104:6
104:18 105:2
119:8 123:21
129:12 136:14
153:13 167:22
171:14 172:18
175:6,8,10 184:4,8
186:9,20 187:3,6
187:17,19 203:23
204:12 206:21
213:2 215:6,14
226:16,24 228:16
238:7 250:9 259:8
262:10 279:25
280:12 302:13
309:17,20 326:12
332:12
**prioritization** 81:9
**prioritize** 56:9
**prioritizing** 71:2
**priority** 21:12
**private** 14:20 23:4
24:21 25:17 32:9
39:3 41:17,17
46:25 47:13,16
48:17 61:15 68:7
71:12 76:23 86:14
87:12 88:7,19,23
91:17,18,24 93:14
94:12 99:18,21,25
101:14 102:3

104:8,10,15,20
105:6,19 107:25
109:2,19 123:18
161:13 204:22
206:23 244:11,17
**privilege** 71:18
72:5 265:5,6
**privileged** 45:8
72:13
**privy** 183:4 269:3
269:4
**probability**
164:25 211:8
**probable** 110:9
**probably** 252:22
254:12 303:18
**probed** 205:9
**problem** 120:14
246:13 273:24
278:17
**procedure** 223:5
**procedures** 20:15
222:19 225:14
262:4
**proceed** 108:18
168:2 271:5
**proceeded** 148:12
**proceeding** 339:7
**proceedings**
263:21
**process** 11:25
12:20 13:18,23
14:5,7 15:13 17:4
17:4,5,7,8 20:6
66:2,3 68:9 71:20
71:22 72:10,17,20
83:9,12 85:10
95:13 99:20,22
101:13 102:2,15
102:17 103:24
104:14,19 107:3

**[process - pushed]**

107:11 108:13 117:12,13,15 118:4,7 119:7 120:9 121:13 122:25 123:22,24 124:6 128:11 130:17 153:19 155:15 157:6,25 158:7 161:15 164:12,14 165:5 166:4,22 167:16 168:10,12 188:13 195:16 197:15 199:15 200:12 202:14,22 203:15 204:3,8,15 210:21 218:12 219:22 221:5 229:9,13,18 230:14 235:23 239:20 251:11 261:8 283:22 300:4 302:5 303:2 312:13 317:21 318:5,14,17 323:2 323:13,24 324:13 331:4

**processes** 194:16
**processor** 193:17
**produced** 220:16
**producing** 219:18
**product** 55:8 136:10,17 197:18
**professional** 70:22
**professor** 232:14
**profile** 138:18
**profit** 51:3,9
**profitability** 50:24 52:3 87:25 139:8 139:16 147:5
**profitable** 139:11

**program** 230:4
**progress** 71:11 250:4,6
**project** 30:15,24 184:20 208:21 315:18
**projected** 135:3 137:7 138:4
**projecting** 282:16
**projections** 138:3 174:12 219:22 233:8,15 281:19 282:19
**prone** 331:20
**pronouncing** 22:18 110:23
**properly** 297:2
**proponent** 173:23
**proposal** 204:4 243:16 255:11,24
**proposed** 160:25 161:5 219:17
**propositions** 267:22
**prospect** 207:16
**prospects** 107:9 190:11 218:17
**protected** 265:4
**protecting** 20:10
**protective** 333:11
**protocol** 318:17
**provide** 119:6 127:3 166:16 179:10 180:9 189:11 194:18 195:5 220:7 225:25 226:7,8
**provided** 71:25 72:3,9 171:2 173:15 174:11 198:12,16,20

199:2,3 224:19 225:17 235:18 236:3 239:2,7 250:11 255:17 258:21 259:5 265:11 266:13,17 266:18 267:18 285:9 318:3 319:18
**provides** 296:24
**providing** 119:2 238:4 286:8
**proxies** 63:5 74:14 300:5
**proxy** 42:17 45:17 62:21,25 64:23 65:3,6 74:4,7,10 75:21 117:2,5 122:21,24 123:17 172:18 212:2 225:5,8,11 300:4
**prudent** 321:22
**public** 1:16 6:15 11:18 14:19 16:17 23:4 24:19,21 26:12 28:19 38:8 38:17 39:3 40:5 47:6 51:11 52:13 69:20,23 77:3,12 78:12,22,23 80:23 86:18 87:23,24 88:8 92:6,20 102:6 105:7,17,18 107:24 109:13,20 116:10 117:19 122:5,12,14 137:15 138:19,22 140:19 141:2,9 142:25 144:16 145:16,25 146:8 147:7,17 154:18

159:11 161:14 162:23,25 164:19 174:23 175:2,18 176:9 179:24 210:21 226:22 256:21 282:14 285:19,22 308:23 309:8,9 310:22 319:10,11,13 321:20,21 328:5 328:13 329:14 339:4 340:23
**publicly** 12:9 103:11 279:19
**pullback** 87:25
**pulled** 215:3,11
**pulling** 79:18
**purchase** 31:21 32:5 61:16 95:23
**purchased** 93:13 94:11
**purchasing** 31:12
**purpose** 112:13 116:17 117:4,6 157:9,15,19 167:13 285:14
**purposes** 13:12 83:18 219:7,23
**pursuant** 1:13 27:23
**pursue** 100:8
**pursuing** 99:12 138:16
**push** 54:4 139:21 216:2,4 247:20 248:6 253:18,18 312:23 331:6
**pushed** 180:7 247:25 254:24 331:24 332:10

**[pushing - reach]**

**pushing** 56:8 331:8

**put** 26:18,20 51:15 117:25 123:25 142:3 218:7 225:15 235:6 248:11 261:19 314:21

**q**

**q1** 53:20 59:22

**q2** 289:4

**q3** 277:6 280:11 288:21,22 289:5,6 295:9 322:12

**q4** 136:24 137:7 173:15 174:10 178:6 179:12 220:9,10 224:9 266:5,12,17,24 267:10 268:5,13 268:23 269:18 270:2,13 279:2 288:23 289:4 292:5 294:13 295:8 322:13 326:23 327:13

**qat** 242:22 315:4

**qatalyst** 40:18 41:3,11 42:4 45:25 65:14 128:4 128:12,13 150:19 150:25 151:17 152:18 153:6,10 153:14,15 154:20 155:3 184:4,8 186:9,11,13,19,21 187:2,4,6,11,17,18 187:20,22 188:19 189:6,8,11,20 190:4,8,20 191:3 191:25 192:18,22

193:18 195:13 197:14 200:6,7 201:8,11 204:12 204:14,23 207:7 207:10,10 208:24 209:7,13,14 210:3 210:12 211:12 213:2 214:25 215:9,19 221:19 222:12,22,25 225:10,19,22 226:4,14 231:12 231:15 235:10,13 236:6 239:15 241:22 245:13 247:8,19 249:9,20 249:23 253:15 257:24 261:7,12 261:21 300:3 317:19 318:22 319:6 320:16

**qatalyst's** 151:6 151:11,14 191:25 204:10 207:18 252:17

**qp** 316:4,18

**quadrant** 192:12

**quality** 117:13 124:4,5,6 268:18

**quarter** 141:12 177:20 220:6,11 224:23 226:16 227:8,22 228:10 229:21 234:2 269:10 276:20,22 276:24 277:3,8,10 277:11 280:6,15 280:21 283:2,19 286:21,24 287:12 288:15 289:8,9,24 292:20,21 293:4,7

296:9 323:8 326:11

**quarterly** 146:13 146:15 228:16 229:12 230:12 279:18 281:14,23 292:16

**quarters** 224:10

**question** 7:14 8:3 8:16 28:23,24 32:13 50:16 52:20 58:4 69:18 88:2 91:6 109:4 111:18 116:19 124:21 141:5 148:16 149:5,5,7 152:13 187:13 229:16 232:6 249:11 251:5 261:24 264:25 287:21 322:14 327:3

**questioner** 251:15

**questioning** 251:20 297:7,10 321:8,13 324:23

**questions** 7:7 32:14 94:23 116:16 164:17 165:3 200:24 233:25 276:16 297:3 302:14 306:11,19 313:10 318:10 324:16,20 325:3 333:6

**quick** 251:5 280:4

**quickly** 111:8 144:15 145:15 146:4 183:11 212:9 231:5 241:8 254:5 264:2 323:5

**quite** 92:3 122:13 143:12 154:22 164:15 195:13 268:19 273:23 319:13 331:13

**quota** 131:21

**quote** 323:13

**r**

**r** 2:2 3:2 4:3 116:2

**races** 245:17,22

**raise** 34:22 278:18 286:12,16,24 287:5,12,14,23 288:2,9 325:7,20 326:6

**raised** 251:6

**raising** 35:10 286:20

**ramp** 10:17

**ran** 80:24 121:12

**range** 114:7,12 119:12 121:3 124:17 125:23 126:2,11 171:23 173:15 177:6,9,12 177:14,16,21 178:3 179:9 180:9 224:19 247:6,14 253:17 254:8 286:5,8,19,19 287:9 321:24,25 322:3,5,6

**rapidly** 143:13

**rare** 322:10

**rarely** 78:8

**rate** 131:24 142:7 268:12

**ratio** 57:9

**rationale** 65:12

**reach** 193:20 317:19

**reached**  193:19
316:23 317:11
**reacted**  181:24
**reaction**  87:24
181:13,15,17
182:7
**reactions**  321:18
**reacts**  141:13
**read**  46:2 65:13,13
65:16 77:9 90:2
90:21 91:8 111:2
111:6 112:10,11
113:14 146:3,4,11
157:18 160:11,12
160:21,23 171:17
185:14 214:24
217:24 243:8,12
243:15,23 262:20
274:4,7 276:13
305:15,19,21
323:18
**reading**  65:15
90:5,7 118:9
145:23 215:6
217:18 250:9
259:8 262:11
**ready**  198:9
202:24 245:21
319:6
**real**  140:5 185:22
237:21 320:22
329:11
**realities**  108:16
**reality**  70:13
146:20
**realize**  106:10
304:25
**really**  10:20 72:21
79:4 94:24 106:16
107:8 109:23
110:11 114:18

127:18 140:2,5
167:25 198:6
207:13 213:16
231:3 233:12
248:6 249:18,19
253:23 254:3
296:17 311:20
320:13
**reason**  80:21 81:2
185:23,24 250:21
314:18 340:5
**reasons**  13:25
195:12 269:5
320:2
**rebuilding**  309:7
**recall**  11:13 12:18
19:2 20:25 24:6
26:2,21 27:18,19
27:24 28:2,5,14
29:5 30:18 33:15
35:19 36:15 37:5
38:15,21 41:8,23
42:5 46:21 47:9
47:11 54:8 58:12
58:20,22 62:7,24
65:4,17 66:7
67:20 75:11,14
76:3,18,21 79:21
81:7 89:6,13,22
90:9,24 97:4,6,8
97:10,13 100:14
102:19 103:17
104:5,11,21,24
105:15,20 107:3,4
108:2 114:13,18
124:18 127:12,14
130:23 131:9
132:5,8,14,19
135:5 153:12,17
156:11 158:2
159:8 163:11

167:4 169:2
171:19 172:24
173:3,25 174:4,6
174:16 179:11,18
180:4 181:5,11,24
182:2,6,10 184:18
184:22 187:24
189:7,13 197:7
201:5,21 211:22
212:23 213:17,18
227:23 231:7
235:17,20 236:10
242:3 244:16
245:2 253:7
255:15,25 262:14
266:9 269:14,25
273:2 283:5,6,8,13
289:12 290:11,18
290:20 293:6,10
293:13 296:6,13
296:14,16,20,22
306:22 311:20
313:20 314:4
318:21 319:15
322:13 326:21
327:2 330:25
332:5
**recalling**  328:14
**receive**  93:17
167:2 276:21
277:2,7,11 279:17
279:21 280:8,14
**received**  139:18
151:23 167:6
263:10
**receiving**  154:14
156:11
**recess**  115:11
**recognition**  140:5
**recognize**  74:2
208:10,11 279:4

304:7
**recollection**  21:17
37:7 38:13 67:17
76:24 98:5,22
128:6,14,16
192:21 228:4,5
239:9 265:9
272:14 277:14
**recommendation**
207:18 283:25
284:15,17 285:2
302:8,11,14
**recommendations**
207:11
**recommended**
171:23 269:9
**record**  5:3,13
44:18,21 74:17,21
74:24 115:10
116:6,22 172:13
172:16 206:12,15
257:6,9 271:10,13
271:16 303:23
304:2 313:17
315:2 334:4
339:14
**recording**  6:23
**records**  72:22
235:24
**recruiter**  133:4
**recruiting**  20:4
**redding**  1:14
**reduce**  147:4,9
194:16 199:15
**reduced**  148:13
195:3 293:8
**redundant**  283:17
**refer**  10:9 193:7
229:15 273:5
282:9

**reference**  185:7
186:24 242:9,10
281:24 292:15
294:23 295:6,20
313:25
**referred**  281:22
**referring**  31:18
64:11 79:22 141:7
147:11 215:2
217:25 243:5
**refers**  159:20
217:21
**reflect**  201:23
297:20
**reflected**  54:24
66:20 300:10
**reflecting**  222:20
**reflects**  327:14
333:18
**refresh**  14:17 93:3
128:13 311:17
317:24
**refreshed**  93:6
127:24 128:6,16
191:19 265:9
290:23
**refreshing**  73:24
**regarding**  240:15
**regardless**  26:11
106:5 289:18
**regular**  200:11
203:15 249:22
**regularly**  175:23
**reinforcing**  287:22
**reinitiated**  14:4
**reinvest**  92:22
**reiterate**  56:12
85:4 100:12
**related**  17:25
185:18 219:25
291:8 330:3

339:17
**relation**  38:22
**relationship**  21:21
22:2,4 25:2,4
37:25 38:3,5
103:5 129:8
130:13 155:11
169:17 186:10
204:13 308:7
309:21 310:13,14
310:16,19 312:16
**relationships**  40:8
186:19 204:10
**relative**  26:14
330:13
**release**  171:17
226:24 269:10
279:25 298:23
299:2
**released**  288:18
289:7,9,25
**releasing**  228:16
**relevant**  161:9,17
268:15,17 300:22
**reliability**  323:3
**relied**  179:21
225:22
**rely**  82:22
**relying**  226:13
235:13 275:6
**remain**  82:14
**remarkable**  241:7
**remarkably**  197:8
**remember**  13:17
15:16,18 26:18,20
35:6 38:18 41:25
53:5 55:24 59:22
60:18 65:15 82:14
89:19 96:21 102:9
102:12 104:2
106:16 126:4,9

128:18 132:20
167:4,6 171:11,12
171:21 185:7,20
185:23 189:5
197:5,11 201:14
212:8 213:15,23
222:5,16 227:25
229:5 234:5,10
244:19,21 246:10
248:25 249:2,16
250:8 256:4
261:22 265:16
269:22 278:9
280:11 296:18
300:19 306:18
308:9 311:10
313:8,16 317:18
318:9 320:15
331:8,12
**remembering**
53:10 85:5 96:17
126:6 155:7 179:3
182:15 186:25
213:5,21 260:9
311:10
**reminded**  290:12
**remote**  5:8
**renewed**  276:3
**renovation**  30:15
30:24
**renovations**  30:18
**repetition**  297:2
**rephrase**  8:10
154:9
**replaced**  21:16
**report**  147:25
245:3 263:3
280:25 281:3,6,15
282:4 285:9
**reported**  90:13,16
284:13

**reporter**  6:11 7:10
7:20 77:9 95:2
115:6 339:2
**reporter's**  18:9
**reporting**  340:2
**reports**  281:23
282:16
**represent**  5:24
45:12 183:15
**representative**
188:23 221:14
**representatives**
86:25
**representing**
186:11 188:24
**represents**  45:10
**reps**  323:5
**request**  251:19
319:3
**requested**  258:18
302:11
**requests**  198:16
201:3 225:21
**require**  50:17
299:17
**required**  92:22
226:25 285:25
302:21
**research**  250:25
**reserve**  278:4
**resisting**  85:21
**resolved**  159:24
203:23
**resource**  311:13
**resources**  81:9
113:18
**respect**  166:11
323:14
**respecting**  23:23
28:3 37:2,11
38:11 52:15 67:24

68:15 69:14 70:19 71:7 72:2,25 73:14 74:12 119:2 147:18 172:19 235:4 237:3 238:5 256:9 262:5 269:10 328:25

**respond**  183:6 225:20 247:10

**responding**  143:16

**response**  265:3

**responsibilities**  166:5 167:19

**rest**  249:7

**restricted**  297:25

**restroom**  44:9 206:10

**result**  237:14

**resulting**  12:11 258:11

**results**  113:19 226:23 229:20 279:18,24 283:3 288:7 289:10

**retain**  90:11 201:8

**retained**  92:14 112:4 184:4,8 187:6,20

**retaining**  105:22 242:5,7

**retention**  197:24 197:25 204:11 231:18,19,24 232:11

**retire**  33:17 82:16 84:21

**retirement**  85:18 85:20,23

**retiring**  34:5 80:7

**retract**  232:17 277:15

**retreat**  151:6,11 151:14,17 154:13 155:3

**return**  52:23 88:21 114:23 147:13 329:14

**returns**  69:22

**reveal**  72:8

**revenue**  47:4,4,23 48:5,9 49:2,4 50:25 51:6,24 52:13 54:13 55:19 56:23 57:2,2 58:10 79:9 131:16 133:25 134:8 135:7,9,13 136:21 136:23 137:7,17 138:3,17,25 139:20,23,24 142:15 143:14 149:20 173:15 174:10 176:11 177:20 178:6 224:10 226:16 227:8,13,15,22 228:10 229:12,25 232:5 234:3 237:24 268:10 276:18 278:6,23 279:4,8,11,12,15 281:3 286:17,22 291:19 292:9,16 292:17,19,23 294:19 295:5,13 305:3 308:24 310:4,9 322:9 326:23 327:13

**revenues**  149:19 177:4

**review**  20:15 51:18,21 52:16

64:21 65:5,10 74:6 157:9 203:11 228:14,16,19 229:12 230:8 239:5 274:18 275:7 281:5 319:4 319:7

**reviewed**  42:16,17 45:17,22 131:5,6 200:6 303:4 317:17

**reviewing**  20:13 91:9 111:5 160:13 180:21 191:12 215:22 226:11 274:6

**revisited**  66:16

**reward**  287:18

**rewrite**  49:21

**rhythm**  251:25

**rica**  259:13

**rick**  3:6 5:24 15:4 15:6,12,25 16:2,24 17:18 18:22 22:2 25:4 33:19 34:8 36:16 40:2,13 41:14 45:13 47:18 68:2,9 69:16,24 70:2,10 71:2,10,16 71:17 72:9 80:3,6 87:18 88:12 96:3 97:25 98:9,21 99:14 100:25 105:12 107:8 110:21 117:21 123:17 158:21 167:15 184:25 185:4 190:9,14,23 198:7 214:15,22 216:19 222:12,23 235:15 259:24

260:12 271:20 272:9,12,16,20 274:14 275:23 276:23 283:24 285:2 309:10 312:21,23,25 324:4 331:6,20

**rick's**  109:23 120:19 275:15

**right**  9:5,14 10:24 11:3,22 22:19 41:6 55:25 60:11 63:10,25 64:5,12 66:21 67:19 75:17 80:8,9 81:6,12 83:2 85:19 95:18 95:19 99:25 106:17 113:24 122:23 124:11 129:19 133:19,21 134:2,12,19,20 136:20 144:7 145:10 147:20 149:6 152:18 156:3 159:21 163:19 167:25 174:24,25 175:13 192:2 193:2 198:13 203:24 205:3,6 209:9 212:13,18 223:25 230:11 234:22 262:21 269:19 273:12,18 274:2 284:5 290:24 291:2 294:12,17 301:4 305:13 307:12 308:13 309:15,18 311:5 312:5,11 315:15 316:6,19 322:10

325:10,15,23 326:2,7

**rights** 255:18,23

**ring** 179:6

**risk** 48:25 49:4 164:21,23 175:24 278:23 279:7 284:8 285:23 286:10,10 301:9 305:2

**risks** 140:2 284:5 285:4

**robust** 47:11,15

**role** 19:21 20:17 33:23 34:14 80:13 81:10,12,14 83:6 86:12 106:4 130:19,20 161:12 166:22 302:4 312:4 314:10

**roles** 19:24 167:18 167:21 274:16

**roll** 92:22 218:16 326:2

**rolling** 123:3

**romanette** 221:23

**room** 12:21,24 13:3,6 174:18 175:24 176:10 196:20 197:4,10 198:14 200:25 226:12 235:19,25 236:4 241:18 249:25 252:19 258:19 261:9 266:25 286:9 319:2 320:18,21 321:24

**root** 110:20 156:10

**rough** 218:4

**roughly** 297:17,24

**round** 82:4 284:7 317:13

**row** 136:20 292:8 294:19 316:16 317:5

**rule** 142:14,24 143:4

**rules** 278:21

**rumors** 301:12

**run** 72:16 81:17 103:23 142:22 257:24 321:21

**running** 20:5 80:22 83:23 137:15,22 230:3 325:24

**rush** 9:13,17

**rushing** 221:3

**s**

**s** 2:2 3:2 4:3 116:2 116:2,2 335:10 336:3 337:3 338:3 340:5

**s&b** 210:17 214:2

**saas** 9:20 10:9,9 10:17 47:3,14,15 47:22 48:5,10 49:2 57:11 177:3 198:3,5 204:22 216:2

**sachs** 154:21

**sadly** 141:2

**sage** 295:12

**sale** 11:20 12:7,8 13:13,18,19 14:14 15:8,11,16 23:24 24:7 26:14 39:18 46:20 68:15 69:14 95:14,17 99:19

105:6 112:3 113:6 113:15 117:15 118:6 119:21 153:19 161:14 188:13 308:4 312:13 317:21 318:5,14 323:12 328:19 331:4

**sales** 58:18 293:2 322:24 323:2,3,4

**salespeople** 131:21

**sample** 166:17

**san** 18:18 311:3

**santa** 61:3

**sarah** 3:17 5:20 42:24 205:20 263:7

**saroya** 169:11 235:5 238:5,23 240:15

**saved** 255:2

**saw** 70:12 75:13 88:15 128:15 171:20 172:3 182:23 254:11,16 290:13

**saying** 10:10 85:23 98:25 112:11,11 127:18 178:12 228:22 270:12,21 288:5

**says** 64:13 97:24 98:9 101:9,17,25 104:14 112:19,23 113:5,22 119:10 119:15 135:15,23 145:12 156:14 157:8,19 159:24 160:24 166:15 192:12,13,17 194:8,15 205:11

209:13 216:9 219:15 224:2,13 245:20 246:17 294:16 295:12,13 295:18 316:23 317:6,10,15 327:12 328:3,6

**scale** 81:4 117:25

**scaring** 182:8,12

**scenario** 105:24

**scenarios** 106:23

**schedule** 62:16 73:19 75:3 335:13 335:15,17

**scheduled** 128:2 152:5

**scheduling** 131:7

**school** 8:25

**science** 176:12 252:16

**scientific** 252:25

**scratch** 277:9 300:11

**scratched** 54:7

**screen** 191:18 315:15

**screening** 20:6 210:14

**script** 180:18,21

**scroll** 63:13,14 133:17 209:5,7,8 223:21 273:13 291:11,20 293:23 294:8

**scrolling** 63:11 64:7

**search** 83:10 132:16 133:4,13 133:16 218:8

**sec** 251:14

**second**  14:8,9
  16:15 20:7 54:4
  68:4 79:4 101:25
  110:20 112:19
  113:22 135:4,8
  166:2 219:15
  248:3 274:9
**seconds**  191:11
**section**  64:21
  65:14 75:20 117:4
  117:5 118:17
**sections**  65:6
**secure**  279:23
**securities**  117:7
**see**  34:17 53:7
  54:24 63:24 64:3
  64:4 65:18,21
  75:23 79:19 84:14
  84:19,20,23 97:19
  98:2,9 100:21
  101:9,19,24
  111:15,16 112:21
  113:2,8,16,20
  114:16 118:21
  119:10,14,15,19
  125:2,4 128:19,22
  134:4,18,22,25
  135:17,19,22,25
  136:23 137:2
  141:23 143:6,21
  143:22 145:7,11
  145:17 150:13
  156:22 157:13
  159:18,23 165:21
  166:13,23 180:5
  183:20,23 191:22
  192:8,10,15
  193:11,14 194:6
  194:13,20 195:14
  205:18 208:16
  209:16,22,23

  215:23 216:11
  220:2 224:4,14
  233:21 234:17
  235:8,21 237:25
  238:20 240:21
  241:22 245:12
  246:20 261:15
  263:12,15 273:20
  281:15 292:4,5,8
  294:13 295:15,19
  315:8,9,11,18,21
  316:8,11,16,22
  322:20 327:10,12
  327:18 328:2,8
  331:3,19,23
  332:11
**seeing**  75:11
  124:22 128:11
  133:20 135:8
**seeking**  105:12
**seen**  148:8 290:12
  309:4
**sees**  108:23 112:24
**selected**  195:12
**selection**  20:6
  236:6
**self**  287:22
**sell**  25:25 26:8,10
  27:21 28:4 29:3
  33:8,14 58:19
  66:2 68:10 105:18
  112:12 162:19
  163:14 304:13
  310:6
**selling**  28:8,17
  32:16 48:2 49:22
  107:24 109:19
  150:7 163:7
  204:20 237:7
  324:11

**sending**  156:15
**senior**  51:5
**sense**  46:24 47:18
  144:22 155:14
  158:14 202:20
  232:12 288:25
**sent**  317:7
**sentence**  101:12
  101:25 112:19
  113:22 157:8,18
  160:12 166:2
  219:15 233:12
  274:9,10
**separate**  26:12
  70:21 130:5
**separately**  256:16
**september**  40:22
  41:6,12 42:9
  46:17 51:16 58:22
  60:10,15 61:8,14
  61:18 65:20,24,25
  66:6 67:15,22
  71:4 76:2,11
  84:13 85:2 86:21
  169:19 170:17
  277:4
**sequence**  104:3
  105:13 128:8
**series**  211:23
  316:12
**serious**  96:14
  211:8 261:13
  319:16
**seriousness**  102:17
**serve**  19:17 166:20
  298:12
**servers**  10:7
**service**  9:25 48:4
  58:9 76:22 139:23
  140:7 142:6
  197:21 210:17,25

  213:24 231:22
  308:21 324:10
**services**  277:22
  302:7
**serving**  19:11
  162:7
**session**  48:17
  66:17,20 127:14
  127:21,24 128:20
  161:7,19 165:22
  201:20 202:5,19
  265:14,17
**sessions**  66:15,23
  265:18
**set**  26:8 49:16 58:8
  97:4 137:19
  190:10 210:14
  237:5 259:3
  266:23 267:4
  283:10,17 289:13
  318:24 339:23
**setting**  220:23,24
  283:23 284:12
  285:18 287:8
**seven**  21:5,6 63:9
  63:16 64:2,14,17
  118:15 136:24
  207:3 242:16
  273:18 289:15
  292:12 327:14
**seventeen**  9:10
**seventeenth**  159:2
  232:25 235:2
**seventh**  288:20
**seventy**  308:24
**shaking**  7:21
**shape**  54:20
**shapes**  237:8
**share**  36:5,9 69:18
  69:19 76:10 125:6
  152:22 239:15

**[share - software]** Page 48

243:25 263:22 304:14 310:9

**shared** 28:18 41:14 76:22 186:15 221:4 261:22 272:9 276:2 290:15,17

**shareholder** 69:22 75:10 148:4 149:15 299:17

**shareholders** 20:11 37:19,21,23 38:4,8 69:17,20 70:12 78:12,22 107:7 117:11 120:16 122:14 123:21 124:5 140:16 141:11 144:22 146:18,20 146:20,22 147:7 147:10 149:24 150:2,3 162:12 204:25 285:20,22 287:16,17,18,24 288:3,5,7,8 300:6 302:6,22 303:2,6 303:10 304:22 305:5 330:15,16

**shares** 26:9 35:16 35:23,24,25 36:5,8 36:12,20,24,24 37:3 38:12 302:9

**sharing** 76:21

**sheet** 35:5 340:2

**sheets** 250:3

**shift** 48:22

**shifting** 237:7 288:13

**shocked** 77:16

**shop** 12:14,17,19 246:5 253:11,13

253:20,20,22 254:7,14,15,25 255:9,12 256:3 257:19,22 258:17 259:10,21 260:17 261:2 318:6

**shopify** 174:25 175:3,7,7,10 176:2 297:20

**short** 98:16 146:23 147:14 148:6,14 148:24 150:3 196:12,12 197:9 206:3 238:21 268:15,16

**shortcut** 302:25

**shorter** 141:3,4

**shortly** 221:7

**show** 133:11 237:20 254:3,10 281:18 314:14

**showed** 14:4 183:5 186:16 254:16,22 265:8

**shown** 78:4 265:10 306:10 313:13

**shows** 123:23 127:24

**shy** 9:10

**side** 54:16 58:11 134:19 138:25,25 139:2,20 223:25 276:18,19 320:3 322:25

**sight** 34:17

**sign** 275:5 278:3

**signaling** 143:14 247:13

**signature** 334:8 339:25

**signed** 213:7 248:15 319:21

**significance** 226:21 236:11

**significant** 47:3 48:21,25 49:11 54:23 87:25 138:9 181:7 197:16 236:23 237:2 278:22

**significantly** 147:8 148:6 149:21,22

**signify** 131:13

**signing** 196:14 243:17 257:15 258:3 274:13

**signoff** 275:7

**similar** 28:24 154:19 277:7

**simple** 52:20

**simplified** 58:2

**simply** 68:10 85:23 148:12

**single** 52:24 93:25 188:17

**sitting** 61:12 122:2 147:2

**situation** 29:8,13 30:4 69:23 70:15 127:5 198:19,23 306:17

**situations** 14:2 92:13

**six** 14:3 64:16 194:12 203:22 240:12 289:15,16 326:25 327:17 332:19

**sixth** 236:8

**sixty** 136:24 224:13,18 268:8

270:5,19 289:15 289:15,16 290:24 292:12 295:24 326:25 327:17 332:19

**size** 181:10

**sizes** 237:8

**skills** 106:17 133:12

**skin** 28:21

**skip** 209:6

**skipping** 9:3

**slice** 48:8

**slide** 60:5 91:4,19 193:5 195:15 282:7 291:13,15 293:24,25 294:3,6

**slightdale** 3:17

**slightly** 149:20 178:2 288:13 295:11 297:12

**slow** 10:17 147:6 195:18,21 196:8 206:19 218:16

**slowing** 142:5

**slowly** 200:20,22

**small** 16:11 32:18 54:9 210:24

**smarter** 47:19

**smith** 82:22

**software** 9:25 10:4 10:6,19,20 48:3,4 49:15,21 50:12 53:15,15 55:11 58:9 76:22 81:17 139:23 140:6,10 142:6 176:23 197:21 210:16,25 213:24 231:22 308:20 310:7,9 324:10

**[sold - starting]**                                                                    Page 49

**sold**  11:11,17,18
  105:17 161:13
  162:24 186:16
  210:17
**solely**  196:4
**solicit**  203:14
**solicitation**  300:5
**solid**  95:5
**solum**  3:12 6:3
**solution**  135:12
**solving**  278:17
**somebody**  260:6
  319:2
**somebody's**
  320:18
**somewhat**  253:19
  309:5
**son's**  32:2
**soon**  256:24
**sorry**  30:5 37:22
  38:23 63:23 77:8
  86:3 97:10 123:14
  126:5 151:3
  152:19 178:25
  181:3,25 187:8
  200:21 201:14
  206:23 211:2
  212:6 236:20
  242:7 245:18
  246:12 249:12,17
  249:19 251:13
  252:7 272:25
  273:19 296:13,16
  329:9
**sort**  9:15 64:17
  96:9 130:12
  134:20 147:22
  192:11 270:12
  285:9 289:3
  298:16 318:25
  329:2

**sorts**  167:23
**sound**  149:16
**sounds**  7:16 309:2
**sources**  131:25
**space**  210:18
**spanned**  259:21
**spas**  54:18,18
**speak**  175:17,21
  197:15 229:23
  231:20 296:4
  310:15
**speaking**  5:5
  19:22 55:10 82:8
  91:23 92:5 176:15
**special**  13:11
  156:19 157:16
**specialist**  197:20
**specific**  24:6 39:22
  61:20 71:24 76:15
  76:24 85:13,22
  89:11,23 166:11
  176:16 187:21
  195:17 204:4,17
  212:23 217:13
  228:3,5 235:15
  242:9 283:14
  289:18 290:10
**specifically**  8:3
  12:18 24:24 25:5
  37:9 38:14,21
  42:5 44:6 46:18
  54:15 58:6 62:7
  75:15 92:15 96:22
  102:12,19 104:11
  104:21 117:3
  118:24 128:17
  133:10 151:15
  157:5 161:23
  167:5 173:3
  174:16 191:5
  197:25 201:15

  204:11 213:21
  238:9 256:4 273:2
  275:11 280:11
  283:4
**specificity**  53:25
  55:6 120:8 121:9
**specifics**  30:19
  58:20 96:18 97:6
  114:19 123:24
  169:16 171:12
  172:24 173:5
  249:16 260:9
  290:19 328:15
**spectrum**  189:17
**speculated**  249:3
**speculating**
  270:10,10
**speculation**  249:2
  301:4,8
**speculative**  139:19
**spend**  51:7 191:11
**spending**  110:8
**spent**  297:5
**spin**  207:5
**spinning**  238:18
**spirit**  252:21
**split**  252:24
**spoke**  246:18
**sponsor**  110:3,7
  208:23 222:10
  254:22
**sponsors**  110:5
  123:19 198:4
  207:4 222:9
**spontaneously**
  9:18
**spot**  114:16 278:4
**spreadsheet**  284:5
  314:23 315:3,9
  338:17

**square**  267:21
**stack**  50:12 53:9
**stage**  38:20 81:7
  121:25 190:10
**stake**  162:19 163:7
  163:15
**stamp**  240:13
  314:21
**stamped**  238:16
**standalone**  109:3
  256:19 304:22
  305:7
**standard**  26:23
  96:8 282:7
**standing**  102:10
  157:3
**stanley**  13:9
  154:20
**start**  8:21 14:22
  32:2 78:7 102:17
  108:8 111:3 121:8
  157:24 158:7
  164:24 165:4
  187:15 195:16
  214:13 237:20
  244:5 324:14
**started**  6:23 14:5,9
  70:5 122:6 123:3
  123:11 133:16
  173:4 175:5 196:7
  198:15 207:10
  319:2
**starting**  51:16
  53:22 99:21 107:3
  169:19 193:4
  196:5 202:21
  222:3 224:3
  237:25 248:2
  254:7 310:20
  316:12

**starts** 128:8 185:11

**state** 1:2,16 6:15 116:10 181:11 295:22 339:5

**statement** 62:25 64:23 65:3 75:22 125:18 274:22

**statements** 276:14

**states** 119:20 126:24

**stay** 40:6 82:10,18 106:4 157:7 242:11 243:9 271:20 276:10

**stayed** 16:19

**staying** 82:6,7 272:2,10,13,17 274:15

**stays** 93:12 94:10 243:20

**stenographically** 339:12

**step** 33:23 85:25 86:12 157:21 158:3,11 275:16

**steps** 209:2 274:21

**stir** 261:14

**stock** 25:25 26:8 26:10,13 27:22 28:4,8 29:4 32:16 32:25 33:8,14 61:7,11 94:5,7 96:8 119:15 122:9 124:22 125:3 141:16 148:2,5 149:22 150:4 162:14,25 180:23 181:2,10,22 182:4 182:23 254:18 267:19 268:3,6,9

268:17 270:14,18 287:19,23 288:4 297:18,20,22,25 298:18,20,22,25 299:5,9,11 300:14 300:16,22 301:6 301:17 302:9 304:20 307:17,20 308:3

**stockholder** 1:4 5:11 125:8 148:8 148:9 226:17 256:8 258:4 262:3 264:3 267:12

**stockholders** 38:6 86:18 87:11 88:6 117:19 119:3 120:2,24 141:8 148:25 149:3 219:9 224:20 227:10 234:21 258:12 267:25 268:4 325:14,17 332:20,25

**stockholdings** 307:16

**stollmeyer** 3:6 5:25 16:2,5,24 17:12 21:19,22 22:9 23:23 24:12 25:8,23 26:16,25 27:15,20 28:3 29:2,15,22 30:2,11 30:14,25 31:4,8,12 31:21,25 32:5,9,15 32:22 33:17 34:4 39:7,12,16 40:17 41:2,10 45:14 46:19 61:23 67:17 68:14 69:13 70:18 71:7,25 76:4 77:3

77:12 80:20 81:20 85:17 86:17,20,24 89:3 90:13,15,17 91:3,11,23 92:7 95:16,23 98:6 99:3,9,15 105:5 107:23 109:19 111:9,19 112:3 113:11 114:5,15 117:17 119:20 121:16 129:9 145:9 150:17 151:5 153:9,15,21 154:12 155:3 159:5 169:10,23 170:9 183:16,21 183:25 184:7,14 188:21 190:3,18 191:2,24 201:7 214:22 215:9 216:13 217:3,7,21 217:25 219:16 221:13 230:20 238:4 240:14 258:2,9 259:9,20 260:16 262:11 271:20 285:3,10 307:5,16 308:8,12 308:16 309:22 310:14 312:10,15 312:17 313:15 314:2,8 323:15 326:18,22 328:11 330:20 331:7 332:15,17

**stollmeyer's** 27:7 29:7 33:7 73:2,15 84:21 86:11 87:10 88:5 118:5 158:19 182:3 222:20 235:4 257:18

262:5 306:16,24 307:20

**stonewalling** 296:17

**stop** 68:25

**stopped** 279:2

**store** 278:11,20 279:5

**story** 185:8,19 186:6

**straight** 127:19

**straightforward** 79:7

**strange** 46:9

**strategic** 11:20 13:21 24:5 41:20 46:23 48:22 49:3 51:18 52:4,15 56:5 82:5,7 99:20 100:8 108:21 109:5,8 110:3 127:3,6 146:10,12 156:20 157:11 160:16 165:18 166:12 189:12,14 189:18,20 193:9 203:12 206:23 207:13 208:22,25 210:2,8,11 219:12 225:18 236:3 239:4,19 248:22 253:24 254:10,17 254:20 267:8 291:18 299:25 304:25 320:3,24 323:24

**strategics** 196:7 200:8,9 207:2,3,5 207:7 210:23 212:25 213:8,10 215:18 222:7

**strategy** 52:7 163:21

**straw** 28:10 32:18

**stream** 47:4,5,23 48:5 49:2,4 278:6 279:12,16

**streams** 54:13 278:23

**street** 2:4 52:2 237:18 294:16,25

**street's** 326:24 327:16 332:18

**strictly** 301:8

**strike** 94:8 150:4 180:16

**strong** 69:19 174:7 288:7

**strongly** 210:18 323:22

**structure** 35:13 276:19

**struggling** 55:20 143:4

**studio** 277:25

**studios** 48:3,16 70:4 278:13

**stuff** 241:18

**style** 155:14

**subcommittee** 331:18

**subject** 240:19 251:21

**submarine** 185:5

**subscribe** 302:7

**subscribed** 334:9 340:21

**subsequent** 35:8 42:3 62:13 106:5

**subset** 239:16

**substance** 72:12 107:23 218:20

**substantial** 107:12 114:6 119:11 121:2 122:8 124:16 307:16,21

**substantive** 49:5

**subtle** 164:10 247:13

**successful** 158:6 158:10 165:2 255:24

**successfully** 73:21 75:6 79:17 84:7 195:24

**succession** 20:20 20:23 34:10 80:3 83:5 84:24 85:2,9 86:9 218:3

**successor** 80:12

**successors** 133:7

**sucharow** 2:15

**sucking** 28:9 32:17

**suggest** 146:24 206:3

**suggested** 16:18

**suggesting** 270:17

**suggestion** 321:13

**suggestions** 195:17

**suitor** 13:23 249:24

**suitor's** 13:6

**suitors** 13:24 167:20 170:18 195:22 221:5 235:12,16 324:8

**sum** 107:23 142:17 218:19 237:17

**summary** 194:8 208:23,25 209:22

275:18

**summer** 126:7

**sunday** 248:14,16

**sunset** 36:19,22 37:3,6,12 38:11,16 38:22

**super** 16:9,9 139:2 200:10 262:12

**superior** 255:8,11 255:24

**supervision** 339:13

**supine** 323:14

**supplemental** 75:21

**support** 106:15 112:3,13 113:5,15 302:17,21 303:9 303:10 304:12 306:13

**supported** 304:17 306:7 324:9

**suppose** 212:22

**supposed** 263:2

**supposing** 213:20

**sure** 20:9,14 31:17 31:19 36:3 37:9 37:18,24 43:10 56:9 62:14 63:21 63:23 66:12 68:20 68:21,22 70:12 71:20 72:21 73:6 73:8 74:18 85:12 87:5,7 89:9 107:16 118:2 120:21 127:20 148:17 159:14 163:3 167:17,24 187:14 191:18 202:7 205:3,17 211:17 218:11

221:25 222:14 225:10 229:17 230:4 231:21 241:20 246:2,12 251:7 255:13 256:15 258:8 267:24 273:25 274:23 288:10 302:23 314:20

**surface** 54:8

**surprise** 25:3

**surprised** 66:16 92:4 103:18,24 104:5 181:9,21 183:21 241:22 262:15 311:19

**surprising** 13:17 254:21 281:21

**suspect** 90:10 104:22 155:12 201:22

**suspected** 88:18

**swear** 6:11 60:18 229:7

**swing** 322:22

**sworn** 6:14 116:9 334:9 339:9 340:21

**system** 230:3

**systems** 230:7

**t**

**t** 116:2 335:10 336:3 337:3 338:3

**tab** 315:11,14 317:17

**table** 120:11,18 123:5 125:18 167:22 168:8,16 195:23 204:5 248:7,10,12 268:8

**[tabs - thank]**                                                    Page 52

**tabs** 315:10
**tackle** 189:21
**tact** 41:20
**tactical** 189:18
**tag** 251:16
**take** 5:8 8:17 48:8
  55:15 63:13 83:3
  98:23 101:14
  102:2 104:8,10,14
  104:19 106:17
  107:6,8,15 111:2
  118:20 131:14
  136:15 138:4
  145:3 191:10
  199:17 205:24
  206:3 238:14
  244:7 274:4,21
  291:5 301:11
  303:19
**taken** 44:19 56:25
  74:22 115:11
  172:14 206:13
  257:7 271:14
  303:24 305:11
  308:22 339:11
**talent** 244:3 332:6
**talk** 7:11 10:22
  72:9 84:24,25
  99:8 123:15
  155:13 157:22
  159:6 197:24
  252:3 302:12
  306:15 318:2
  322:2
**talked** 82:21 87:20
  142:25 164:2
  170:16 254:23
  257:13 275:14
  308:6 309:5
**talking** 41:10
  71:11 107:22

153:22 196:7
211:16 247:7
254:14 255:25
270:20 323:2
329:9,12
**talks** 84:17 208:19
  233:7
**tamura** 152:10
**target** 23:11 26:9
  163:14
**targeting** 85:17
**tasting** 18:23
**team** 13:5,7,10
  54:9,10,22 56:8
  70:7 89:15 93:21
  93:23 105:12,23
  105:23 114:3
  120:22 158:8
  160:16 164:23
  218:5 238:25
  241:21 242:10
  243:9,14,20,21
  292:25 293:2
  309:7 311:11
  327:25 331:17
  332:8
**team's** 240:16
  275:7
**teaming** 251:16
**teams** 244:6
**tech** 332:6
**technical** 230:18
  277:18
**technically** 146:18
**technique** 9:17
  10:3 229:24
**technology** 49:13
  49:16,19 81:18
  244:2 309:6
**teens** 94:2

**telephone** 97:3,5
**telephonic** 126:13
  219:3 232:19
  233:5 336:10
  338:6
**tell** 16:20 33:6
  44:25 46:18 59:12
  59:18 61:12 75:8
  80:20 85:14 94:20
  96:4 97:22 100:23
  101:5 114:9
  124:13,24 126:20
  133:22 137:23
  150:17 159:15
  172:21 178:5
  182:12 186:5
  187:16 242:17
  304:16 309:21
  311:17 318:16
  326:18 331:5
**telling** 246:7 249:9
  312:17
**tells** 85:10 274:24
**temporally** 40:23
**ten** 36:2,5 142:20
  191:11 284:7
**tennis** 154:14
**tenure** 33:20
  34:17 275:15,24
**term** 9:20 26:14
  36:19 49:8,12
  52:5 56:18,22
  69:3 141:17
  146:19,23 147:14
  147:15,18 148:6,7
  148:14,24 149:2
  149:15 150:2,3,8
  162:20 163:8
  177:4 219:19
  220:17 231:2
  233:14,20 234:15

239:17 241:2
268:15,16 282:9
282:11,13 286:11
**termination** 255:6
  255:10
**terms** 21:21 34:13
  76:9,11 83:3 93:6
  93:16 108:11,14
  109:10 127:19
  142:6 175:24
  244:12 297:13
  318:18 323:7
  324:2
**terrific** 44:13
**teslas** 31:22
**test** 152:2
**testified** 6:17
  116:12 307:10
  308:11 309:12
  310:25 312:9,14
**testimony** 121:19
  125:7 275:19
  290:23 332:16
  339:6,10,11,15
**testing** 83:13
**text** 100:16 101:4
  101:6,7 104:13
  169:10,23 170:3,9
  183:7,15 184:7
  191:2,6,15 214:3,6
  214:9,16,21 238:5
  238:11 240:14
  313:14,24 336:5
  336:24 337:5,15
  337:17,19 338:9
**texts** 313:21
**thank** 14:12 43:22
  82:20 170:6
  173:13 236:22
  253:4 274:8
  303:15 324:15,18

**[thank - time]**                                                                                    Page 53

333:3,20
**thanks** 223:24
**theories** 197:12
**theorize** 132:4
**theory** 185:15
  237:22 278:2,3
**thereto** 219:25
**thick** 28:20
**thing** 53:11 71:19
  89:12 158:6
  225:24 262:19
  269:19 281:25
**things** 14:19 28:17
  71:9 87:19 98:14
  100:13 102:10
  107:5 127:18,19
  139:5 160:8,15
  167:23 169:18
  174:18 175:17
  176:13 177:11
  178:12 203:22
  204:5 211:4
  226:11 238:24
  255:4 274:24
  275:5 278:4
  280:19 322:17
  331:12,21
**think** 7:15 16:15
  22:5,24 30:8 35:3
  41:19,21 46:9
  47:7,18 53:17
  54:19 55:5 59:23
  67:13 73:12,21
  74:11 78:20 80:17
  81:3,25 82:9 84:6
  88:12,16,18 95:14
  96:19 98:9,11,14
  98:15,17 100:5
  101:3 106:14,18
  106:21,24 109:12
  114:3 115:2

116:21 117:6,20
119:25 120:15,19
120:24 121:6
124:4 125:15,16
126:10 142:11
143:19 144:3,19
145:22 146:23
152:12 155:8,16
157:25 158:5,9
162:16 175:19
179:4 182:21
187:9,10 191:20
195:23 196:3
198:5,8 202:18
203:17,20 205:2,3
205:11,22 206:25
207:17 210:19
217:19 218:19
229:5,13 241:5,6
241:21 247:11,21
254:24 255:2
257:12 259:13,19
259:23 265:24
266:25 267:5,10
267:23 272:7
278:16 284:6
287:21 288:3,20
293:4 299:8 301:9
301:20 302:18
305:21 309:9,12
310:25 311:15
313:25 314:17
321:12,22 323:20
325:12 328:4
329:22
**thinking** 24:4 70:9
  85:24 86:8 94:19
  157:25 197:7
  246:8 284:16
**third** 7:4 145:11
  209:19 211:2

220:5 221:16
228:10 257:16
258:4 273:20
277:3 280:6 289:9
303:4
**thirds** 193:12
**thirtieth** 159:5
**thirty** 63:9,15
  64:13 101:10
  118:15 142:19
  193:5 253:11
  259:21 273:14,19
  327:14
**thoma** 169:18
  244:18
**thorough** 324:4
**thought** 54:9,20
  78:10 82:8 96:13
  139:17 164:25
  189:14 221:21
  248:23 251:14,25
  252:19 254:20
  268:2 269:18
  285:4 330:21
**thoughtful** 319:24
**thoughts** 321:17
**thousand** 136:24
  178:13 284:9
  292:13 298:4
**three** 16:13 17:22
  49:18 62:10 75:18
  108:25 112:17
  113:19 120:7
  130:25 134:13
  141:14 170:16
  194:12 211:4
  214:12 223:25
  224:10 233:11
  235:10 242:25
  297:23 304:23
  308:23 329:21

330:22
**thrilled** 148:3
**thumbs** 117:25
**tied** 32:24
**tier** 236:16 237:3
**tiers** 236:12,14
  237:13,16 238:6
  240:16
**time** 5:7 7:25 8:2
  8:15 15:10 16:17
  17:17 21:7 22:22
  27:4 28:16 34:2
  39:6 43:6,7 44:11
  44:16,22 47:15
  48:8 49:6 50:11
  51:15 52:8,23
  53:2,3 61:9 62:10
  68:12 69:12 74:19
  74:25 76:3,11
  80:3 83:18 85:7
  85:11,12 89:10,24
  91:7 95:20 96:19
  98:13 99:2,16
  100:13 102:14,14
  103:2,19 105:11
  110:8 113:6
  114:22 115:8
  116:7 124:19
  127:15,19 128:18
  131:7 132:8,15
  133:15 136:10
  137:6 140:23
  141:2,4,6,19
  147:23 150:16
  151:10 155:8
  157:9,17 158:4,9
  158:16 159:9
  160:8 162:25
  167:15 172:5,11
  172:17 177:9
  180:2 181:25

185:19 187:3,17
190:5 196:13
197:9 200:9 201:4
206:11,16 207:15
215:17 216:6
218:2,13,15,24
219:24 222:15,17
224:17 227:3
234:9 239:10
240:8,13 245:16
246:16 247:6
248:8,10 251:15
254:9,15 255:14
257:4,10 261:18
264:15 269:24
271:11,17 274:13
280:18 284:12
290:11 295:23
298:7,11 303:21
304:2 307:3,14,19
308:15 309:14,16
309:19 310:13
312:3,18 313:7,22
314:7 319:9
322:16 323:3
330:23 331:2
333:2 334:2,7
339:8
**timeline**  256:4
**timelines**  256:2
**times**  7:3 15:21
  16:4,11,23 17:11
  17:22 18:6 59:11
  333:15
**timing**  26:13
  52:11,18 53:15,16
  94:19 219:7,17
  246:8 255:22
  297:10 329:17
**tired**  80:22 106:13
  222:3 325:24

**title**  83:25 134:9
  315:18
**titled**  75:20 273:15
  315:12,22,24
  316:3,7,11
**today**  6:2 42:12
  45:22 61:12 85:17
  121:19 125:5
  135:5 183:6
  275:14 297:5
  306:11,12 310:4
  312:11,14 318:10
  330:14
**today's**  5:6 334:5
**told**  28:7 46:19
  72:21 82:24
  111:19 159:9
  163:13 185:19,24
  185:25 215:9
  247:11 314:8
**tolerate**  88:20
  139:15
**tolerated**  154:6
**ton**  106:12 247:17
  250:2
**top**  23:8 48:6 53:9
  101:7 131:15,17
  131:22 178:19,23
  192:17 197:5
  225:3 235:20
  270:10 292:5
  315:17 322:5,6
**topic**  47:19 101:13
  101:25 216:20
**topics**  304:10
**total**  136:20,23
  224:9 292:9,16
**totally**  89:11
**touch**  16:20
**track**  78:19

**tracked**  77:25
**trade**  298:18
  299:11
**trading**  61:7,17
  114:7,12 119:12
  121:3 124:17
  125:22 126:2
  300:10,16,18
**traditional**  66:14
  66:14
**training**  48:17
**transaction**  12:15
  13:13 41:18 45:25
  46:25 61:15 68:7
  70:10 86:14 99:11
  104:8 105:20
  106:5 108:24
  109:2 119:8 120:3
  128:2 129:18,22
  130:4,11,15
  136:12,14 160:17
  161:24 162:8
  164:15,19,20
  165:18 184:19
  186:15,24 188:8
  188:12 190:21
  199:9,19,21 200:3
  203:9,21 207:13
  210:13 211:11
  218:12 219:12
  222:18 225:18
  236:8 238:8 239:4
  239:19 249:6,14
  253:8 255:8 256:7
  256:10 260:6
  262:2 267:13
  299:25 305:25
  307:3,15 320:25
  329:7,12 330:4,8
  332:12

**transactions**  47:15
  70:14 76:23
  108:22 156:21
  161:11 230:5
  236:17 299:10
**transcribe**  7:20
**transcribed**
  339:12
**transcript**  333:7
  333:14,18 339:14
**transition**  47:3
  314:9
**transitioned**  222:6
**translating**  55:11
  237:24
**traveling**  18:7
**tread**  159:10
**tremendous**  88:14
**trend**  232:11
**trends**  76:22
**tricky**  150:6
**tried**  139:21
  253:21
**trip**  331:9
**triple**  54:10
**trouble**  17:21
  38:18 53:10 85:5
  96:17 155:6
  182:14 260:8
  311:9
**true**  9:15 24:17
  66:3 69:23 70:25
  99:24 125:19
  140:20 143:23
  144:4,13 202:15
  230:13 339:14
**truly**  305:4
**truncate**  194:16
  199:15
**trust**  36:16

**[truth - updates]**

**truth** 142:4
**try** 30:7 62:19
130:8 133:24
195:18,22 198:22
207:5 249:18
297:6 301:11
**trying** 38:18 53:6
68:22 98:13 114:3
116:20 126:4
131:14 154:6
162:13 172:24
182:19 195:10
207:14 213:15
216:4 222:5 229:5
246:4,9 247:19
248:4 261:13
267:24 300:20
311:14 323:5
**tuck** 8:25
**turn** 63:8 192:24
208:9,15
**twelve** 133:8
141:13 237:6
**twenty** 55:16,17
64:16 93:20 95:6
135:20 142:17,18
211:15,21 212:13
212:18 232:23,24
236:8 238:17,19
242:16 257:16
258:4 303:18
**twice** 289:4
**two** 9:10 13:20
14:21 16:12 17:8
17:10,22 18:20
19:24 35:16 39:3
39:3 42:13 47:24
49:17 53:7 55:6
55:24 57:16 62:8
63:9,16 64:2,13
83:13,15 97:9

98:14 103:25
104:23 112:17
118:15 122:6
126:8 155:25
189:12 190:22
193:12 194:4,11
199:18 206:25
207:4,8 208:3,13
208:15 219:14
222:7 233:7,11
235:9 236:5
238:24 246:15,17
265:17,19 267:7
267:21 273:14,17
273:19 282:2
284:9 288:11
296:17 310:3,15
311:18 320:19
327:21 328:18
**type** 99:5,11
308:21
**types** 237:8 318:12
**typical** 93:15
105:13 140:25
147:15 220:5,8,25
**typically** 49:23
67:4 92:11 108:15
108:21 109:5
179:14 280:2,12

---

**u**

**uh** 136:2 194:7
**ultimately** 171:24
309:16
**unanimous** 155:23
156:16 159:18
200:14 203:7
336:20 337:10
**unaudited** 226:18
226:20 227:5,18
**unaware** 125:5
163:2 215:15

216:6,21 253:25
**unbelievably**
205:21
**uncertainty** 322:8
**uncommon** 177:24
**unconnected**
17:13
**undergraduate**
8:23
**underlying** 135:10
276:17
**underneath**
295:17 299:12
**understand** 7:23
8:5,9 9:21 24:24
34:12 51:12 79:5
93:10 105:12
118:25 122:15,20
123:7 140:19
143:7 147:23
150:23 155:10
185:15 190:11
210:16 250:23
256:8 259:24
281:4 304:18
305:10 306:6
317:2 320:21
330:14
**understanding**
69:7 92:17,19
110:4 117:9 169:5
169:8 227:7
228:23 231:12,14
247:16 257:13,18
258:15 260:10,23
261:5 274:14
286:14 324:2
**understood** 7:9,22
38:9 72:11,15
98:19 106:24
130:3 138:2 140:6

141:24 164:4
166:21 167:18,25
253:15 281:20
288:12 295:10
296:19 300:7
301:24 328:15
**undervalued**
143:18
**undervaluing**
143:10
**undue** 79:11
**unearthed** 256:12
**unfortunate** 196:3
248:12
**unfortunately**
49:20 50:3 230:17
**unique** 57:25
**universal** 176:6
**university** 8:24
**unlimited** 255:17
**unnaturally**
141:11
**unprofitable**
139:13
**unquote** 323:13
**unrestrainedly**
88:14
**untangle** 187:12
**unusual** 40:2
91:20
**upbeat** 332:4
**update** 127:4
208:20 225:10
246:19,23 247:2
263:11 277:2
280:19
**updated** 74:4,6
289:7,12
**updates** 128:13
137:16 249:23
250:3,5,7 261:6

**[updates - voted]**                                                Page 56

276:24 277:8,12
278:25 279:6,22
320:16
**upside**  284:4,9
285:5
**urgency**  51:23
218:18
**use**  9:20 50:13
108:15 133:8
156:25 197:18
264:5 284:6
286:17 326:16
**useful**  155:16
189:23 247:18
**usual**  102:25
**usually**  154:22
229:22 285:12
**uttered**  180:19
**uwc**  156:15 163:24

**v**

**v**  185:11
**vacation**  98:16,18
259:10,15,17,20
260:2,11,17 261:2
**vague**  216:24
**validate**  229:25
**validated**  121:13
**valuation**  61:21
108:14 143:12,19
216:4 231:19
268:14 305:6
330:11
**value**  56:25 57:3,5
57:11,13,18 58:17
82:11 93:5,16
140:6,8 141:15
147:9 149:15
227:17 237:11
238:2 254:11
329:22

**valuing**  109:3
141:21
**vandenberg**
184:20,24 185:2
208:21 225:10
315:19 316:4,18
**varied**  78:8
**variety**  24:23
308:2 319:25
**various**  42:18 71:3
240:6 292:25
**vast**  18:4 48:9
265:15
**vectors**  81:8
**vehicle**  23:6
**venture**  22:23,25
320:8
**verbal**  7:19 139:12
263:11
**verify**  274:22
**veritext**  5:5 340:2
**version**  192:11
**versus**  42:2 47:22
51:9 281:16,19
282:5
**vertical**  216:2
**vice**  46:3
**video**  5:9 165:11
165:17 223:7,15
336:23 337:25
**videoconference**
1:12 2:7,12,13,18
2:20 3:10,11,13,18
3:19,21 4:7,8
**videographer**  4:7
5:2,4 6:10 44:16
44:20 74:19,23
115:6,8 116:5
172:11,15 206:11
206:14 257:4,8
271:11,15 303:21

303:25 334:2
**videos**  324:13
**view**  21:23 52:17
105:6 106:14,21
110:5 119:7
131:15 138:15
143:8 144:20
158:12 174:7
184:2 248:17,18
248:22 285:20
293:4 301:7
**viewed**  166:10
**views**  24:25,25
**villegas**  2:19 6:9
**virtue**  90:4
**vision**  106:11
112:13 138:8,11
138:16 140:15
150:7 304:25
**visitors**  40:6
**vista**  24:11,24 25:9
25:13,19 42:5
63:2 76:5,12 77:4
77:13 86:25 89:4
89:7,15 90:17,18
91:12 92:11,14,16
95:14,17,22 99:14
102:21 103:7,9
106:8,19 114:6,16
119:11,15 120:12
120:25 122:17,19
122:23 123:20,25
124:15 125:2
158:20,23 159:6
168:14 169:11,17
170:10 172:19,23
182:8,12 185:17
186:11,17,20
187:7,19,22,25
188:5,9,13,22
193:25 194:22

195:2,9,18,20
197:8,13,20 199:2
199:14 204:10,13
204:23 206:20,24
221:14 222:21
224:25 225:13,17
230:21,25 231:4
235:2 238:8
240:20,24 241:2,7
242:4 247:8,23,23
248:2,11,18,23
250:10,18 252:18
255:16 256:16
258:2,12,21 259:4
262:6,13 266:18
267:13 268:24
274:15 276:4
298:16 304:13
321:4 331:5 332:2
**vista's**  89:13 98:7
99:10 102:16
111:11 118:22
124:14,24 125:9
158:17,25 168:18
172:21 182:22
195:14 196:4,5,16
201:2 204:11
230:21 239:3,5,8
241:12 242:3
244:6 248:2
253:16 255:23
**voice**  160:25
**volume**  134:23
**vote**  36:9 226:17
227:3 256:8
257:17 258:5
262:3 264:3
267:13 300:7
301:5 302:10
**voted**  163:20

**votes** 36:5

**voting** 36:2,25
  117:11 120:3
  163:24 331:11

**w**

**wait** 7:13 77:6
**waited** 211:7
**waiting** 180:6
**walleye's** 321:9
**want** 51:7 95:5
  99:4 109:22 125:8
  168:6,7 191:10
  203:18,19 210:20
  210:22 213:11
  215:4,12 216:9,14
  217:8,14,20 234:7
  246:7 248:13
  271:4 287:25
  289:14 299:14
  304:11 306:15
  313:6 317:25
  320:5 323:19
  324:21 332:25
**wanted** 32:24
  34:13 47:7 55:23
  80:10 107:8 120:2
  120:25 133:6
  144:21 147:3
  150:12 163:14
  167:17,24 168:11
  168:15 180:4
  184:11 201:8
  202:8 215:17
  248:15 253:12,13
  268:4,22 304:24
  332:3,20
**wanting** 40:6
  242:10 314:5
**wants** 112:12
**war** 244:3 332:6

**warranted** 268:12
**waste** 207:15
**wasted** 218:14
**watch** 320:21
**watched** 78:15
**watching** 253:25
**way** 7:6 10:11
  26:12 40:7 48:14
  50:10 63:12 64:17
  70:13 71:22 78:25
  79:6 87:12 88:7
  105:15 108:10
  111:3 113:21
  117:7 120:13
  139:17 140:3
  141:24 151:16
  167:25 168:12
  174:7 208:16
  224:11 243:7
  245:15,20 248:4
  254:18 256:20
  276:25 277:12
  285:17 305:6
  312:22 319:9
  321:23 323:25
  328:5
**wayne** 1:15 6:11
  339:4
**ways** 285:23 308:2
**we've** 87:20 94:15
  247:25
**wealth** 32:24
  91:25 92:8 297:18
  307:21
**week** 172:3 206:25
  207:4,8 221:8
  223:18 236:5
**weekend** 18:18
  331:15
**weeks** 199:18,23
  222:7

**welcomed** 303:17
**wellness** 327:24
**went** 8:22 15:13
  17:8 68:4 71:14
  124:7 128:7
  151:19 154:23
  155:3 161:23
  182:21 241:5
  251:11 252:22
  259:9 260:11
  262:12 279:11
**whereof** 339:22
**white** 3:7 5:25
  45:14 110:22
  171:23 219:16
  269:17 285:2,11
  311:12 323:15
**wider** 177:12
**wife** 18:13,15,23
  151:20
**wiggle** 321:23
**willing** 88:20
  148:5
**wilmington** 2:5,10
**window** 113:20
  196:12 206:25
  207:5
**wine** 18:23
**wire** 171:18
**withdraw** 132:12
  165:9 188:2
  194:25 196:24
  198:22 224:24
  228:9,24 229:3
  262:17 266:3
**withdrawn** 15:24
  30:21 39:13 86:22
  90:6,14 105:4
  113:12 132:7
  155:18 167:12
  175:9 206:18

236:25
**witness** 3:15 5:21
  6:12 13:3,16
  17:17 22:16 23:18
  24:3,16 25:12
  28:13 29:11,20
  31:16 32:12,21
  33:5,12 34:8,25
  36:15 37:16 39:21
  40:21 43:19,22
  44:6,12 45:7
  46:15 50:22 57:22
  62:6 64:20 68:19
  69:2 72:7,14 73:6
  76:8 81:25 87:4
  87:16 91:16 95:3
  95:11 100:4
  102:25 107:16
  111:15 112:10
  113:13 115:4
  120:6 121:6,24
  125:15 129:12
  137:10 144:10,19
  148:18 149:13
  150:22 151:9
  152:14 153:25
  160:11 162:23
  163:11,18 169:15
  172:10 173:21
  174:4,15 175:16
  177:24 178:10,17
  179:17 185:14
  186:5 187:12
  195:9 202:4
  205:24 206:7,9
  212:5 216:18
  217:24 231:11
  241:12 243:12
  250:17 252:7,14
  257:2 258:25
  263:10 265:2

**[witness - zoom]**                                                      Page 58

266:9,22 267:16 269:14,22 270:9 271:24 290:4 292:2 300:25 303:15 307:9 312:20 314:14 317:23 319:23 324:18,20 329:6 330:2 332:24 333:6,8 334:8 335:5 339:9,15,22 340:4,20

**wobbles**  176:11

**wonderful**  331:22

**wondering**  106:16 148:22

**woo**  112:16 327:21 331:23

**word**  69:8 78:10 123:7 154:8 156:25 325:24 326:3,16

**wording**  65:12 255:14

**words**  36:4 47:18 50:5 133:23 134:19 157:2 205:7 217:13 230:11 236:20 274:11 304:16 325:25

**work**  14:20 58:13 81:19 88:24 99:4 115:3 132:21 146:17,18 197:16 215:4,12 216:9,14 217:8,14,20 218:3 218:6 247:17,18 256:3 314:5 320:13,22

**worked**  22:22 129:23 155:13 171:6 186:17 187:19,22

**working**  37:25 38:2 56:4 59:25 60:7 155:11 187:5 225:19 272:21 298:8 300:2,5 314:2

**works**  7:7 95:12 108:13

**world**  47:16 85:25 85:25 146:24

**worried**  72:4 144:11 182:6,8

**worse**  123:10

**worst**  158:6

**worth**  297:13,14 307:23

**wow**  15:18 287:20

**wrapping**  323:9

**wright**  3:18

**write**  11:6

**writes**  246:15

**writing**  82:9 97:12 180:20 282:15

**written**  156:16 159:19 166:17 203:7,23 285:9

**wrong**  55:22 163:22 176:14 179:5 241:21 245:18

**wrote**  10:23

**x**

**x**  335:4,10 336:2,3 337:2,3 338:2,3

**y**

**yards**  3:15

**yeah**  20:21 42:23 68:19 87:4 113:25 160:14 176:25 180:11 193:3 194:3 208:18 209:21 243:3 245:22,23 270:9 288:21 322:17

**year**  11:13 49:17 113:19 130:25 134:13 141:14 220:7 286:21,24 294:4 327:15,15

**years**  9:11 14:21 15:8 49:17,18 62:8 80:24 104:23 144:7 145:14 296:17 304:23 321:22 329:21 330:22

**yep**  134:4 165:20 240:11 309:23

**york**  1:16 2:16,16 3:8,8,16,16 5:21 6:16 116:11 298:20 305:20 339:5 340:2

**youtube**  176:22

**z**

**zero**  61:20

**zeroed**  55:2

**zoom**  223:20

DELAWARE RULES OF CIVIL PROCEDURE

Part V. Depositions and Discovery

Title V, Rule 30

(e) Submission to witness; changes; signing. When the testimony is fully transcribed, the deposition shall be submitted to the witness for examination and shall be read to the witness, unless such examination and reading are waived by the witness and by the parties. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness, unless the parties by stipulation waive the signing or the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness within 30 days after the date when the reporter notifies the witness and counsel by mail of the availability for examination by the witness, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor; and the deposition may then be

used as fully as though signed, unless on a motion to suppress under Rule 32(d) the Court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.