**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Civil Action No. 1:19-cv-08331-VEC<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, APPOINTMENT**
**AS CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

I.    INTRODUCTION ............................................................................................ 1

II.   STATEMENT OF FACTS COMMON TO THE CLASS ................................. 4

      A.    Mindbody Secretly Lays the Groundwork for a Potential Merger
            with Private Equity Firm Vista ............................................................ 4

      B.    Mindbody Shocks the Market and Gives Downward Guidance
            During Its 3Q18 Earnings Call ............................................................ 5

      C.    Mindbody Learns of Its 4Q18 Results But Never Discloses the
            Results to Public Shareholders in Anticipation of Its Privatization
            With Vista ............................................................................................ 6

III.  THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE
      CERTIFIED ..................................................................................................... 7

      A.    The Proposed Class Satisfies The Requirements of Rule 23(a) ........... 8

            1.    The Class Is So Numerous That Joinder Is Impractical ............ 8

            2.    Questions of Law and Fact Are Common to the Class ............. 9

            3.    Plaintiffs' Claims Are Typical of the Class Claims ................ 10

            4.    Plaintiffs Will Fairly and Adequately Protect the Interests
                  of the Class ........................................................................... 11

      B.    The Proposed Class Satisfies the Requirements of Rule 23(b)(3) ...... 12

            1.    Common Factual and Legal Issues Predominate .................... 12

                  (a)    Plaintiffs Are Entitled to the Fraud-On-The-Market
                         Presumption of Reliance ............................................ 13

                         (i)    Mindbody's NASDAQ Listing Is Strong Evidence
                                of Market Efficiency ..................................... 15

                         (ii)   The *Cammer* and *Krogman* Factors Support a
                                Finding of Market Efficiency ........................ 15

(iii)   Additional Factors Support a Finding of Market Efficiency .......................................................... 20

(b)   Reliance Is Presumed Under *Affiliate Ute* ....................................21

(c)   Damages May Be Calculated On a Class-Wide Basis, Supporting a Finding of Predominance.............................21

2.   Superiority Is Established ..........................................................24

C.   The Court Should Appoint Labaton Sucharow As Class Counsel ......................25

IV.   CONCLUSION...........................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ........................................................................................3, 13, 21, 23

*In re Alstom SA Sec. Litig.,*
    253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................................20

*In re Am. Realty Cap. Props., Inc. Litig.,*
    No. 15-mc-40-AKH, 2017 WL 3835881 (S.D.N.Y. Aug. 31, 2017) ....................................19

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997).............................................................................................................12

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013)...........................................................................................7, 13, 14, 21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
    222 F.3d 52 (2d Cir. 2000)..............................................................................................11, 12

*In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA)
    Litig.,*
    757 F. Supp. 2d 260 (S.D.N.Y. 2010)..................................................................................13

*In re Barrick Gold Sec. Litig.,*
    314 F.R.D. 91 (S.D.N.Y. 2016) ..........................................................................................11

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)...................................................................................................3, 13, 14

*Billhofer v. Flamel Techs., S.A.,*
    281 F.R.D. 150 (S.D.N.Y. 2012) .................................................................................. *passim*

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
    310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................... *passim*

*Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed
    Care, L.L.C.,*
    504 F.3d 229 (2d Cir. 2007)....................................................................................................8

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.,*
    No. 12-cv-0256-LAK-AJP, 2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017)............................9

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)...................................................................................21

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995)...........................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011).................................................................................13

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2013)...........................................................21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)...........................................................................11

*Fogarazzao v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................21

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) .................................................................10

*Gross v. GFI Grp., Inc.*,
  No. 14-cv-9438, 2017 WL 3668844 (S.D.N.Y. Aug. 23, 2017)............................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...................................................................................13

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138 (S.D.N.Y. 2010) ...................................................................8

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006)............................................................................7

*In re JPMorgan Chase & Co. Sec. Litig.*,
  No. 12-cv-3852-GBD, 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015).................7, 15, 16, 22

*Kaplan v. S.A.C. Capital Advisors, L.P*,
  311 F.R.D. 373 (S.D.N.Y. 2015) .................................................................10

*Katz v. Image Innovations Holdings, Inc.*,
  No. 06-cv-3707-JGK, 2010 WL 2926196 (S.D.N.Y. July 22, 2010) ...................2, 12

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ................................................. *passim*

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014)...........................................9, 10, 19, 20

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ................................................. 18-19

*Mendell v. Greenberg*,
 938 F.2d 1528 (2d Cir. 1991) .................................................................................23

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
 310 F.R.D. 230 (S.D.N.Y. 2015) ...........................................................................24

*Micholle v. Ophthotech Corp.*,
 No. 17-cv-210-VSB, 2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018) ......................12

*Mills v. Elec. Auto-Lite Co.*,
 396 U.S. 375 (1970) ...............................................................................................23

*In re NYSE Specialists Sec. Litig.*,
 260 F.R.D. 55 (S.D.N.Y. 2009) ...............................................................................9

*Pellman v. Cinerama, Inc.*,
 89 F.R.D. 386 (S.D.N.Y. 1981) ................................................................................9

*Pennsylvania Ave. Funds v. Inyx, Inc.*,
 No. 08-cv-6587-PKC, 2011 WL 2732544 (S.D.N.Y. July 5, 2011) .........................9

*In re Petrobras Sec. Litig.*,
 862 F.3d 250 (2d Cir. 2017) ...............................................................14, 16, 18, 25

*In re Pfizer Inc. Sec. Litig.*,
 282 F.R.D. 38 (S.D.N.Y. 2012) .............................................................................24

*Pierre J. LeLandais & Co., Inc. v. MDS-Atron, Inc.*,
 543 F.2d 421 (2d Cir. 1976) .................................................................................23

*Pirnik v. Fiat Chrysler Autos., N.V.*,
 327 F.R.D. 38 (S.D.N.Y. 2018) ...............................................................16, 17, 18

*Roach v. T.L. Cannon Corp.*,
 778 F.3d 401 (2d Cir. 2015) ..............................................................................21-22

*In re Sanofi-Aventis Sec. Litig.*,
 293 F.R.D. 449 (S.D.N.Y. 2013) ...........................................................................25

*In re SCOR Holding (Switz.) AG Litig.*,
 537 F. Supp. 2d 556 (S.D.N.Y. 2008) ...............................................................24-25

*In re Signet Jewelers Ltd. Sec. Litig.*,
 No. 16-cv-6728-CM-RWL, 2019 WL 3001084 (S.D.N.Y. July 10, 2019) .................... *passim*

*In re SLM Corp. Sec. Litig.*,
 No. 08-cv-1029-WHP, 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012) .........................1

*In re Smith Barney Transfer Agent Litig.*,
 290 F.R.D. 42 (S.D.N.Y. 2013) .............................................................................10

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
    552 U.S. 148 (2008).................................................................................13

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd*, 875 F.3d (2d Cir. 2017)......................15, 19

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)............................................................. 21-22

*Vargas v. Howard*,
    324 F.R.D. 319 (S.D.N.Y. 2018) ........................................................7

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    No. 15-cv-1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ...............................1, 8, 10, 14

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd.*, 838 F.3d 223 (2d Cir. 2016)......................9

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)............................................................. *passim*

*In re Warner Chilcott Ltd. Sec. Litig.*,
    No. 06-cv-11515-WHP, 2008 WL 344715 (S.D.N.Y. Feb. 4, 2008) ....................................24

*Wilson v. LSB Indus., Inc.*,
    No. 15-cv-7614-RA-GWG, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...............16, 17, 20

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ..................................................16, 17

**Statutes**

Securities Exchange Act of 1934 Section 10(b), 15 U.S.C. §78j(b)..........................1, 9, 10, 13, 23

Securities Exchange Act of 1934 Section 14(a), 15 U.S.C. §78n(a) .........................1, 9, 10, 13, 23

Securities Exchange Act of 1934 Section 20(a), 15 U.S.C. §78t(a) .........................................1, 10

17 C.F.R. §239.13 ...............................................................................17

**Other Authorities**

Fed. R. Civ. P. Rule 23 ...........................................................................1, 7, 8

Fed. R. Civ. P. Rule 23(a)........................................................................ *passim*

Fed. R. Civ. P. Rule 23(b)........................................................................ *passim*

Fed. R. Civ. P. Rule 23(g)........................................................................3, 25

H.R. Rep. No. 104-369 (1995)..................................................................................................12

SEC Rule 10b-5 ........................................................................................................................13

SEC Rule 14a-9.........................................................................................................................13

Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd. ("Lead Plaintiffs" or "Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Class Certification, requesting that, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(3), and 23(g), the Court: (i) certify this case as a class action; (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Labaton Sucharow LLP as Class Counsel.

## I.    INTRODUCTION

This is a federal securities action against Mindbody, Inc. ("Mindbody" or the "Company"), CEO Richard L. Stollmeyer ("Stollmeyer"), CFO Brett White ("White"), and former director Eric Liaw ("Liaw", collectively, "Defendants")[1] for violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b), 78n(a), and 78t(a).

As courts in this Circuit have recognized, "claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *3 (S.D.N.Y. Jan. 24, 2012); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (securities fraud claims are "especially amenable to class certification").

This case is no exception—and it is well-suited for class treatment.  Plaintiffs respectfully request certification pursuant to Rule 23 of a class (the "Class") consisting of all persons and entities who sold Mindbody during the period from November 6, 2018 through February 14, 2019, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Mindbody during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Mindbody's employee retirement and benefit plan(s) and their participants or beneficiaries, to

---

[1] Stollmeyer, White, and Liaw are referred to herein collectively as the "Individual Defendants."

the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

For a class to be certified, "the Court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation."   *Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, at *1 (S.D.N.Y. July 22, 2010).  The Court must also find that the party qualifies under one of the three sets of criteria set forth in Rule 23(b)(1), (2), or (3).  *See id.*  Rule 23(b)(3), in particular, permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Each of these requirements is met here.

*First*, with between 45 million and 47 million shares of Mindbody common stock outstanding throughout the Class Period, during which time an average of nearly 7.39 million shares were traded weekly, there are likely thousands of Class members, satisfying numerosity.

*Second*, the commonality prerequisite is met because this action involves several class-wide issues of law and fact, including whether: (1) Defendants made material misrepresentations and omissions in the Company's Securities and Exchange Commission ("SEC") filings and other public disclosures; (2) Defendants acted with scienter; (3) the price of Mindbody's common stock was artificially deflated by Defendants' fraudulent conduct; (4) Class members suffered damages; and (5) the Individual Defendants were control persons of Mindbody.

*Third*, the typicality prerequisite is met where Plaintiffs' injuries and those of Class members arise from the same alleged fraudulent conduct.  Plaintiffs and Class members sold Mindbody securities at prices that had been artificially deflated by Defendants' material misrepresentations and omissions, injuring Plaintiffs and the Class thereby in the process.

**Fourth**, the adequacy requirement is met here because Plaintiffs have demonstrated that they will vigorously prosecute this case and protect the Class' interests, and because no antagonism exists between Plaintiffs and the Class.  Additionally, Plaintiffs' choice of counsel, Labaton Sucharow LLP ("Labaton Sucharow"), is highly experienced in securities class actions and is well-suited for appointment as Class Counsel under Rule 23(g).

**Fifth**, this action satisfies the predominance requirement of Rule 23(b)(3).  Several issues of fact and law—including falsity, materiality, scienter, loss causation, and damages—are subject to common proof and predominate over individual issues.  The same is true with the issue of reliance, which may be presumed using the "fraud-on-the-market" presumptions under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972).  Indeed, *Basic* permits the presumption in this case because, as established in the Expert Report of Chad Coffman, CFA, the market for Mindbody common stock, which traded on the NASDAQ was efficient throughout the Class Period.  *See* Declaration of Carol C. Villegas ("Villegas Decl."), Ex. A ("Coffman Report" or "Coffman Rpt."), ¶¶1, 6, 15-86.  Additionally, *Affiliated Ute* permits a presumption of reliance, since Plaintiffs' claims are based, in part, on Defendants' material omissions.

**Sixth**, the superiority requirement of Rule 23(b)(3) is satisfied because: (1) thousands of geographically dispersed investors were harmed by Defendants' misconduct; (2) due to litigation costs, it is highly unlikely that investors who lost relatively small amounts of money would file individual actions; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

For the reasons detailed herein, Plaintiffs' motion should be granted.

## II.   STATEMENT OF FACTS COMMON TO THE CLASS

### A.   Mindbody Secretly Lays the Groundwork for a Potential Merger with Private Equity Firm Vista

Mindbody is a "software-as-a-service" company that provides cloud-based management software for businesses that operate in the health and wellness space.  ¶68.[2]  Keeping in line with Mindbody's history of acquiring companies as it expanded, Mindbody acquired both FitMetrix, Inc. ("Fitmetrix") and Booker Software, Inc. ("Booker") during early 2018.  ¶¶74-80.  These two particular acquisitions helped fuel Mindbody's growth, and were touted as a success for the Company as they would "add substantial capabilities to [Mindbody's] platform."  ¶¶81-84.  To that end, Stollmeyer announced in May 2018 that Mindbody is "significantly investing both in Booker and Fitmetrix to set the stage for a much greater growth to come."  ¶83.

Unbeknownst to investors, as Mindbody was integrating these platforms Defendants were also simultaneously eyeing a going-private merger with Vista Equity Partners ("Vista"), as investment bank Qatalyst Partners LP ("Qatalyst") prompted Stollmeyer and Vista to begin negotiations.  ¶107.  From the beginning, the merger process was marred by conflicts and clear deficiencies.  For example, Jeff Chang, an employee of Qatalyst, advised Mindbody on the Vista merger while simultaneously advising Vista on a separate, self-described, "material" deal.  *Id.*

Throughout this negotiation process it became clear that Stollmeyer's main concern was to quickly close a deal with his preferred acquirer to address his impending liquidity concerns and to be "freed from the shackles of public market investors." ¶275.  To obtain this freedom, Stollmeyer met with Chang and informed him that he would be interested in the transaction with Vista "if"—shockingly—they would agree to employ him.  ¶108.  Although he was not yet part of Vista, Stollmeyer was invited to attend Vista's October 8-9, 2018 CXO Summit, where he met with Vista's Principal Monti Saroya and founder and CEO Robert Smith.  ¶110.  The

---

[2] The Second Amended Class Action Complaint (ECF No. 95) is referred to as the "Complaint," (cited as "¶__").

culmination of all such back-door discussions led to Stollmeyer emailing other insiders on October 17, 2018 that Mindbody had "receive[d] a direct expression of interest from Vista yesterday" and that Vista "would pay a substantial premium" to Mindbody's trading range. ¶115.

**B.    Mindbody Shocks the Market and Gives Downward Guidance During Its 3Q18 Earnings Call**

On November 6, 2018 (after-market hours), Mindbody publicly announced in its 3Q18 Earnings Call that it had earned $63.8 million in revenue, well within the guidance of $63-$65 million the Company had given in 2Q18.  ¶124.   Based off the previously announced full year 2018 guidance of $246 million to $250 million, investors could thus calculate the 4Q18 guidance to be $66.8-$70.8 million.  *Id*.  However, the Company shocked the market and adjusted the 4Q18 guidance downward to a range of $65-$67 million, falsely blaming the downward revision on the "acquisition of Fitmetrix and Booker."  ¶¶124-125.  Indeed, Defendant Stollmeyer announced that the "recent acquisitions have introduced greater operational challenges than expected in the back half of the year."  ¶¶125-126.  Such statements were in direct contrast to Mindbody's previous assurances during an Analyst Conference held in September and both the 1Q18 and 2Q18 Earnings Calls that the integrations of Fitmetrix and Booker were proceeding well.  ¶161; ¶163; ¶243.  The revision directly conflicted with the internal projections, which estimated results above the top of the publicly stated guidance range.  ¶¶138-143.

As expected, the market reacted negatively to the downward guidance revision, and Mindbody' stock price fell $6.45 from its November 6, 2018, closing price of $32.63, to close at $26.18 on November 7, 2018, an extraordinary decline of approximately 20%.  ¶129.

Shortly afterwards and in keeping with Defendants' fraudulent scheme, Qatalyst was quickly retained by Mindbody, notwithstanding its substantial conflicts.  ¶166.  The bidding process was corrupted by Mindbody's preference for Vista, where Vista was given wide and

5

immediate access to diligence, while other parties were rushed and ultimately dissuaded from bidding. ¶172. On December 24, 2018, Mindbody and Vista issued a press release announcing that the Company would be acquired by Vista for $1.9 billion. ¶179. Rather than allowing for a robust Go-Shop period, Mindbody scheduled a compressed 30-day window which ran through the holidays, despite knowing that a potential bidder would need four to five weeks to even conduct proper due diligence on the Company, and allowing Vista to have privileged, matching rights to meet any other bidder's terms. ¶170; ¶188-193. Further highlighting that the go-shop was illusory, Defendants White and Stollmeyer went on vacation, literally. ¶194. They were not set to return until January 4, 2019, and January 14, 2019, respectfully. *Id*.

In its Christmas Eve press release, Mindbody touted the "significant premium" that shareholders would receive as a result of the Merger, promising "a 68% premium to the unaffected closing price as of December 21, 2018" of $21.72 per share. ¶179. This press release was misleading because the "premium" was measured in relation to a market price of Mindbody stock that was artificially depressed by the false and misleading 4Q18 guidance.

### C. Mindbody Learns of Its 4Q18 Results But Never Discloses the Results to Public Shareholders in Anticipation of Its Privatization With Vista

According to Defendant White, Mindbody's internal forecasts were $68 million in revenue for 4Q18. ¶147. It should come as no surprise then that Mindbody performed just as it expected, with Stollmeyer proclaiming to senior management on January 5, 2019, that the results were "a massive beat against the Street's consensus midpoint of $66M." ¶215. Four days later, and with this knowledge that Mindbody had significantly beaten the previously lowered guidance given during the 3Q18 Earnings Call, the Company filed a Preliminary Proxy Statement reiterating the 68% premium—yet failed to disclose the significant beat. ¶221. The Company then issued its Definitive Proxy Statement on January 23, 2019, which again failed to disclose the significant and material 4Q18 revenue results. ¶224.

On January 24, 2018 Defendant White wrote to the Audit Committee acknowledging that the 4Q18 revenue figures "meaningfully" exceeded guidance, and yet the Company shockingly chose not to disclose those revenue figures in its January 29 and February 7 additional Proxy materials.  ¶218.  Both the Preliminary and Definitive Proxy Statements falsely claimed that "Vista and Mindbody had not engaged in any employment or retention-related discussion with regard to Mindbody management."  ¶222; ¶224.  On February 14, 2019, shareholders voted in favor of the merger, and the transaction closed the next day at $36.50 per share.  ¶¶232-233.

## III.   THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED

Certification is appropriate where a putative class meets all four requirements of Rule 23(a) and one requirement of Rule 23(b).  *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 73 (S.D.N.Y. 2015).  Though "a court's class-certification analysis must be 'rigorous' . . . Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013).  "A motion for class certification should not become a mini-trial on the merits; the question before the Court is whether Plaintiff meets Rule 23's requirements, not whether Plaintiff will prevail on the merits."  *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *7 (S.D.N.Y. July 10, 2019); *see Vargas v. Howard*, 324 F.R.D. 319, 324 (S.D.N.Y. 2018).

"If the Court finds that the requirements of Rule 23 have been met, the Court may, in its discretion, certify the class."  *Signet,* 2019 WL 3001084, at *7.  "The Second Circuit has construed Rule 23 liberally and directed district courts to err on the side of granting class certification."  *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015); *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) (cautioning against "assess[ing] any aspect of the merits unrelated to a Rule 23 requirement").

### A.    The Proposed Class Satisfies The Requirements of Rule 23(a)

#### 1.    The Class Is So Numerous That Joinder Is Impractical

Rule 23's numerosity prong requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Numerosity "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). The Second Circuit has recognized that "numerosity is presumed at a level of 40 members." *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  In the securities class action context "relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Signet*, 2019 WL 3001084, at *8.

Here, the Class is so numerous that joinder would be impracticable.  During the Class Period, there were between 45.4 million and 45.6 million shares of Mindbody stock outstanding, and the average weekly trading volume of Mindbody stock on the NASDAQ was 8.49 million shares, representing 18.67% of all outstanding shares. Coffman Rpt.  ¶¶26, 75. In addition, 187 institutional investors owned Mindbody stock during the Class Period.  *Id.* at ¶81. The numerosity requirement is therefore easily satisfied.  *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 146  (S.D.N.Y. 2010) (finding numerosity satisfied where defendant corporation had at least 40 million shares outstanding); *Virtus*, 2017 WL 2062985, at *2  (numerosity established where the daily trading volume averaged approximately 65,000 shares); *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153, 156 (S.D.N.Y. 2012) (demonstrating numerosity where defendant corporation had 23 million ADRs outstanding and between 71 and 82 institutional investors).

### 2.     Questions of Law and Fact Are Common to the Class

Rule 23(a)(2)'s requirement that "questions of law or fact common to the class," Fed. R.

Civ. P. 23(a)(2), is a "low hurdle," *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp.

3d 415, 424 (S.D.N.Y. 2014), requiring only that plaintiff "identify some unifying thread among

the members' claims that warrants class treatment." *In re Vivendi Universal, S.A.*, 242 F.R.D.

76, 84 (S.D.N.Y. 2007), *aff'd.*, 838 F.3d 223 (2d Cir. 2016); *see also City of Westland Police and

Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL 3608298, at *5 (S.D.N.Y. Aug. 22, 2017) (commonality

requirement "met if plaintiffs' grievances share a common question of law or of fact.").   Courts

have explained that "[e]ven a single common legal or factual question will suffice." *In re NYSE

Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y. 2009).   In Section 10(b) cases, "[c]ommon

questions of law and fact include whether certain statements were false and misleading, whether

those statements violated the federal securities laws, whether those statements were knowingly

and recklessly issued, and ensuing causation issues." *Pennsylvania Ave. Funds v. Inyx, Inc.*,

2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011).   In Section 14(a) cases, commonality is

usually found as "plaintiffs' claims turn upon one document sent to all shareholders." *Pellman v.

Cinerama, Inc.*, 89 F.R.D. 386, 389 (S.D.N.Y. 1981).

Here, there are numerous questions of law and fact that are common to all Class

members, whose claims for redress all arise from Defendants' (1) intentional downward revision

of 4Q18 guidance during its November 6, 2018 Earnings Call, which artificially depressed the

price of the merger consideration that shareholders would eventually receive; (2) failure to

disclose in its SEC filings and public disclosures the truth regarding employment discussions that

Defendant Stollmeyer had with Qatalyst and Vista concerning post-merger retention of

employment; (3) failure to disclose the 4Q18 revenue results once they became known to

Defendants; and (4) failure to disclose all such information in the Proxy Statements which were

used to secure votes for the merger.  These common issues create related common questions of law and fact, including whether (1) the alleged misrepresentations and/or omissions were material; (2) Defendants acted knowingly, recklessly, or negligently; (3) Defendants' misrepresentations and/or omissions caused Plaintiffs' harm; (4) Defendants violated Sections 10(b), 14(a), and 20(a); and (5) investors suffered resulting damages.  The commonality prong is therefore satisfied.  *See Virtus*, 2017 WL 2062985, at *2 ("[C]ommonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages.").

### 3.     Plaintiffs' Claims Are Typical of the Class Claims

Rule 23(a)(3)'s typicality requirement is "not demanding," *Kaplan v. S.A.C. Capital Advisors, L.P*, 311 F.R.D. 373, 378-379 (S.D.N.Y. 2015), and "is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *See McIntire*, 38 F. Supp. 3d at 424.  When assessing typicality, courts focus on "the defendant's actions."  *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014).  Thus, when "the same unlawful conduct was directed at or affected both" the class and its representative, typicality "is usually met irrespective of minor variations in the fact patterns underlying individual claims."  *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45-46 (S.D.N.Y. 2013).  For this reason, "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar" to the proposed class representative.  *Id.* at 46.

Here, typicality is easily met.  Plaintiffs' claims arise out of the same alleged facts and legal theories as the claims of all Class members—*i.e.*, Plaintiffs allege that Defendants made materially false and misleading public statements and omissions, in violation of Sections 10(b), 14(a), and 20(a) of the Exchange Act.  Moreover, the injury Plaintiffs suffered is alleged to be

the same as the injury suffered by the proposed Class as a whole—*i.e.*, Plaintiffs sold Mindbody stock at artificially deflated prices during the Class Period.  Thus, Plaintiffs' claims are typical of—if not identical to—those of other Class members.  *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016) ("[T]ypicality is established because all class members' claims arise from the same course of events and involve similar arguments on liability").

### 4.     Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement seeks to ensure that Plaintiffs' interests are not antagonistic to those of the Class and that Plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation.  *See Signet*, 2019 WL 3001084, at *9; *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "The purpose of this inquiry is to uncover conflicts of interest between the named parties and the class."  *Gross v. GFI Grp., Inc.*, 2017 WL 3668844, at *2 (S.D.N.Y. Aug. 23, 2017) (citation omitted). "[H]ypothetical conflict[s] of interest, without more," are not enough to warrant denial of class certification on "adequacy grounds."  *Id.* at *3; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (conflict "must be fundamental" to defeat class certification).

The adequacy requirement is satisfied here.  ***First***, none of Plaintiffs' interests are antagonistic to those of the proposed Class.  Plaintiffs, like all Class members, sold Mindbody common stock at an artificially deflated price during the Class Period and were injured by the same material misrepresentations and omissions as other members of the proposed Class. Plaintiffs' interests in establishing Defendants' liability and maximizing recovery are aligned with those of absent Class members.  *Billhofer*, 281 F.R.D. at 157 (stating "the interests of the other members of the proposed class will be adequately protected by [p]laintiff" in securities case where all claims arose from the same wrongful conduct).  ***Second***, Plaintiffs have already

proven their willingness and ability to serve as Class Representatives by, among other things, actively supervising and monitoring this litigation; participating in discussions with counsel concerning case developments; reviewing Court filings; and receiving regular status reports— and Plaintiffs intend to continue to perform similar activities, including participating in ongoing discovery and trial preparation.  Plaintiffs also understand their duty to the Class and are committed to vigorously prosecuting this Action to maximize the recovery of all Class members.[3] ***Finally***, Plaintiffs have engaged competent Lead Counsel that is "qualified, experienced and able to conduct the litigation."  *Baffa*, 222 F.3d at 60.  Labaton Sucharow has extensive experience litigating securities class actions throughout the country and has successfully prosecuted hundreds of securities class actions.  *See* Villegas Decl. Ex. C (Labaton Sucharow Firm Resume).  The interests of the Class are therefore protected.

**B.      The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

The proposed Class also satisfies Rule 23(b)(3)'s requirements that common questions of law or fact predominate and that a class action be the superior method to adjudicate this dispute. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

**1.      Common Factual and Legal Issues Predominate**

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017). "Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Image Innovations*, 2010 WL 2926196, at *5.

---

[3] Further, as institutional investors, Plaintiffs are particularly well-qualified to serve as Class Representatives. The PSLRA was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs."  *See* H.R. Rep. No. 104-369, at 34 (1995) (Conf. Rep.); *see also Micholle v. Ophthotech Corp.*, 2018 WL 1307285, at *6 (S.D.N.Y. Mar. 13, 2018) (recognizing such intent).

The analysis of whether common questions predominate "begins . . . with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-810 (2011) ("*Halliburton I*").  The elements of a plaintiff's claims under Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder are: (1) a material misrepresentation or omission in a proxy statement; (2) negligence; and (3) transaction and loss causation.  *See In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 290-91, 321 (S.D.N.Y. 2010).  The elements of a plaintiff's claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The Supreme Court has held that falsity, materiality, and loss causation are common issues to a class, *Amgen*, 568 U.S. at 474-75, which means that whether common questions predominate "often turns on the element of reliance."  *Halliburton I*, 563 U.S. at 810.  Here, Plaintiffs and the Class are entitled to a presumption of Class-wide reliance under the fraud-on-the-market theory set forth in *Basic Inc. v. Levinson*, 485 U.S. 224 (1998), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*"), or set forth in *Affiliated Ute*, 406 U.S. at 153-54.  As set forth below, damages will also be determined on a class-wide basis.  Accordingly, the predominance requirement is satisfied.

### (a)    Plaintiffs Are Entitled to the Fraud-On-The-Market Presumption of Reliance

In *Basic Inc. v.  Levinson*, the Supreme Court held that investors could satisfy the reliance element of Section 10(b) by invoking a rebuttable presumption of reliance. 485 U.S. at 245-49. The *Basic* presumption of reliance is premised on the fact that "the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly,

a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458; *Basic*, 485 U.S. at 229-30 (concluding that anyone who buys or sells stock at the market price may be considered to have relied on material misstatements).

Plaintiffs may invoke the presumption by establishing "the alleged misrepresentations were public, that [Mindbody's] stock traded on an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." *Virtus*, 2017 WL 2062985, at *4.  Once the *Basic* presumption of reliance is successfully invoked (as it is here), Defendants, "bear the burden of persuasion to rebut the *Basic* presumption by a preponderance of the evidence." *Signet*, 2019 WL 3001084, at *11 (citation omitted).  To meet their burden, [D]efendants must 'do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the evidence.'" *Id.* (citation omitted).

Plaintiffs have successfully invoked the *Basic* presumption.  First, Plaintiffs allege that Defendants made material misrepresentations and omissions in their public statements to investors through Mindbody's SEC filings and press releases, as well as during earnings conference calls and investor conferences, that artificially deflated the market price of Mindbody stock.  ¶¶237-243, 248-249, 252-253, 255, 257-259, 261, 263, 265, 268. Second, with respect to market timing, Plaintiffs allege that they, like other members of the proposed Class, sold stock at artificially deflated prices after the omissions and misrepresentations.  ¶¶321-327.  Third, as detailed below and in the Coffman Report, the market for Mindbody's common stock was efficient at all relevant times.

The burden to show market efficiency at class certification "is not an onerous one."  *In re Petrobras Sec. Litig.*, 862 F.3d 250, 278 (2d Cir. 2017); *see also Waggoner*, 875 F.3d at 97. Instead, it is a flexible inquiry for which the Second Circuit has declined to adopt any particular

test, instead directing "a holistic analysis based on the totality of the evidence presented." *Id.* at

94, 96-97.  As detailed herein, Plaintiffs have established that the market for Mindbody stock

was efficient at all relevant times, triggering the presumption of reliance.

### (i)   Mindbody's NASDAQ Listing Is Strong Evidence of Market Efficiency

As an initial matter, Mindbody's listing on the NASDAQ alone supports a presumption

of market efficiency.  *See Billhofer*, 281 F.R.D. at 159 (stating that a security listed on

NASDAQ, is presumed efficient at class certification stage); *Carpenters*, 310 F.R.D. at 81

(collecting cases noting that some courts presume securities traded on national markets to be

efficient).  At a minimum, Mindbody's trading on a national exchange provides "a strong

indication" of efficiency.  *JPMorgan*, 2015 WL 10433433, at *7; *accord Strougo v. Barclays

PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) ("most courts in this Circuit agree that such listing is

a good indicator of efficiency"), *aff'd, Waggoner*, 875 F.3d at 79.  *See also* Coffman Rpt. ¶40.

### (ii)   The *Cammer* and *Krogman* Factors Support a Finding of Market Efficiency

The "prevailing tests for market efficiency," *Signet*, 2019 WL 3001084, at *11, are the

factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v.

Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)—known as the *Cammer* and *Krogman* factors.

The *Cammer* factors are (1) average weekly trading volume, (2) the number of securities

analysts following and reporting on it, (3) the extent to which market makers traded in the stock,

(4) the issuer's eligibility to file an SEC registration Form S–3, and (5) a cause and effect

relationship between unexpected, material disclosures and changes in the stock's price.  *Signet*,

2019 WL 3001084, at *11.  The *Krogman* factors are: (1) market capitalization of the company;

(2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders.  *Id.*

Courts are clear that these factors should be used "as an analytical tool rather than as a checklist," *Billhofer*, 281 F.R.D. at 160, and should be analyzed holistically "based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 275, 277. A holistic consideration of the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for Mindbody common stock was efficient during the Class Period.

 **Cammer One: Weekly Trading Volume**. "Average weekly trading volume of 2% or more of outstanding securities justifies a strong presumption of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013). High trading volume suggests efficiency "because it implies significant investor interest in the company" which, "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Carpenters*, 310 F.R.D. at 79. Here, Mindbody's average weekly trading volume of 18.67% of shares outstanding easily exceeds the 2% threshold set forth in *Cammer*. Coffman Rpt. ¶26; *JPMorgan*, 2015 WL 10433433, at *5 (average weekly trading volume of 6.5% of shares outstanding weighed in favor of market efficiency); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 44 (S.D.N.Y. 2018) (average weekly trading volume of 2% justified "a strong presumption of efficiency").

 **Cammer Two: Number of Analysts**. Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446. Here, analysts from 16 separate firms (including major financial firms like JP Morgan, Morgan Stanley, and Credit Suisse) issued at least 138 reports on Mindbody during the Class Period. Coffman Rpt. ¶34. The extensive analyst coverage of Mindbody easily satisfies *Cammer* Two and supports a finding of market efficiency. *Winstar*, 290 F.R.D. at 446 (finding market efficient with at least three analysts); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (finding 45

reports by 5 analysts supportive of efficiency and noting that it well surpassed the 15 research reports in *Cammer*); *Pirnik*, 327 F.R.D. at 44 (finding of efficiency supported where at least 25 analysts covered the defendant company during the class period).

*Cammer* **Three: Market Makers**.  The number of market makers and arbitrageurs supports a finding of market efficiency because they "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."  *LSB Industries*, 2018 WL 3913115, at *10; *Winstar*, 290 F.R.D. at 446 ("Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level.").[4]  Courts in this Circuit "have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency."  *Carpenters*, 310 F.R.D. at 92 (citing cases).  Here, according to *Bloomberg*, during the Class Period there were 78 market makers for Mindbody Class A Common stock, which satisfies a finding of efficiency.  Coffman Rpt. ¶42; *see Winstar*, 290 F.R.D. at 449 (six market markers supported efficiency); *Carpenters*, 310 F.R.D. at 92 (51 market makers supported efficiency).

*Cammer* **Four: SEC Registration Form S-3**.  "The ability to file [a Form S-3 registration statement] indicates that the company is easily able to issue new securities," and is evidence of market efficiency.  *Winstar*, 290 F.R.D. at 447.  A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for 12 consecutive months and possesses a market capitalization of at least $75 million.  *See* 17 C.F.R. §239.13.  Based on his analysis, Mr. Coffman found no evidence that Mindbody was not S-3 eligible at any time during the Class Period.  Coffman Rpt.  ¶45.  This factor therefore supports a finding of market efficiency.

*Cammer* **Five: Price Reaction**.  The fifth (and final) *Cammer* factor allows, but does not require, plaintiffs to submit "direct evidence" demonstrating a "cause and effect relationship

---

[4] The NASDAQ relies on a computerized system to match orders and provide quotes and minimum requirements for listing that "virtually guarantee a liquid market for the security."  Coffman Rpt. ¶41.

between unexpected corporate events or financial releases and an immediate response in the stock price." *Waggoner*, 875 F.3d at 94.  In this Circuit, "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies," particularly where the "indirect" *Cammer* and *Krogman* factors provide compelling evidence of market efficiency.  *Waggoner*, 875 F.3d at 96-98.  Here, the first four *Cammer* factors, and all of the *Krogman* factors, support market efficiency, obviating the Court's need to analyze the fifth *Cammer* factor.  *Pirnik*, 327 F.R.D. at 45 n.3 ("As Plaintiffs easily satisfy the first four Cammer factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact."); *Carpenters*, 310 F.R.D. at 86 ("In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it."); *Signet*, 2019 WL 3001084, at *13 (finding market efficiency on basis of first four *Cammer* factors and three *Krogman* factors).

However, Plaintiffs have also established the fifth *Cammer* factor.  Mr. Coffman "performed an event study to determine whether Mindbody [Class A] Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no meaningful Mindbody-related news."[5] Coffman Rpt.  ¶49.  After controlling for market and industry factors, Mr. Coffman's event study found "a clear cause-and-effect relationship between new material news and changes in the market price of MINDBODY Common Stock during the Analysis Period, and thus the Class Period."  *Id.* ¶73.  As the report details, Mr. Coffman has shown through empirical analyses based on the results of his event study that Mindbody stock price reacted in an efficient manner to new information about the Company.  *Id.* at ¶¶49, 73*; see Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 98 (S.D.N.Y. 2018)

---

[5] "'[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.'" *Petrobras*, 862 F.3d at 278 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)).

(finding efficiency even where defendants were able to "poke[] some holes" in plaintiffs'

expert's conclusions, as "the event study goes to the basic premise of *Cammer* 5").  Thus, Mr.

Coffman's analysis further establishes market efficiency.

*Krogman* **One: Market Capitalization**.[6] During the Class Period, Mindbody had an

average market capitalization of $1.44 billion, which "ranged from the 54th to 66th percentile of

all NYSE and NASDAQ stocks."  Coffman Rpt. ¶76.  This supports a finding of market

efficiency.  *See, e.g.*, *Carpenters*, 310 F.R.D. at 92 (quarterly market capitalization ranging from

$0.5 to $3.2 billion indicated market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (market

capitalization of $292 to $585 million supported market efficiency); *Billhofer*, 281 F.R.D. at 154

($288 million to $717 million market capitalization supported efficiency).

*Krogman* **Two: Bid/Ask Spread**.  The bid-ask spread is the difference between the

prices at which investors are willing to buy and current stockholders are willing to sell shares.

*See Krogman*, 202 F.R.D. at 478. "[A] small bid-ask spread indicate[s] that trading in the stock

[is] inexpensive, suggesting efficiency."  *Strougo*, 312 F.R.D. at 316.  During the Class Period,

the time-weighted average percentage bid-ask spread for Mindbody Class A Common Stock in

each month was between 0.018% and 0.237%.  Coffman Rpt. ¶79.  This is well within what

courts have found indicative of market efficiency.  *See Signet*, 2019 WL 3001084, at *12 (noting

that "the average bid-ask spread for all stocks trading on the NYSE and NASDAQ was .68%");

*In re Am. Realty Cap. Props., Inc. Litig.*, 2017 WL 3835881, at *1 (S.D.N.Y. Aug. 31, 2017)

(bid-ask spread averaging 0.18% supported efficiency).

*Krogman* **Three: Public Float**.  The public float is the number of shares outstanding,

excluding shares held by insiders and affiliated entities.  A higher public float indicates greater

market efficiency.  *Krogman*, 202 F.R.D. at 478.  Here, Mindbody's public float was more than

---

[6] Market capitalization indicates efficiency because investors have greater reason to invest in more capitalized firms, and such firms tend to be more well-known, and closely followed.  *See Krogman*, 202 F.R.D. at 478.

96% of shares outstanding.  Coffman Rpt. ¶80.  The large size and high percentage of

Mindbody's float supports a finding of market efficiency.  *See Signet*, 2019 WL 3001084, at *12

(large public float weighed heavily in favor of a finding of market efficiency); *McIntire*, 38 F.

Supp. 3d at 433 (float between 57% and 69% of shares outstanding supported efficiency).

### (iii)   Additional Factors Support a Finding of Market Efficiency

The Coffman Report also addresses three additional factors that demonstrate market

efficiency: institutional ownership (Coffman Rpt. ¶81); autocorrelation (*id.* at ¶¶82-85); and the

presence of option trading (*id.* at ¶86).  High institutional ownership has been considered

indicative of market efficiency.  *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280

(S.D.N.Y. 2008).  Here, 187 major institutions owned Mindbody stock during the Class Period,

further supporting a finding of market efficiency.  Coffman Rpt. ¶81; *see LSB Industries*, 2018

WL 3913115, at *12 (finding ownership of company stock by 251 major institutions supported

efficiency).  Mr. Coffman also ran accepted autocorrelation analyses, which "test[] for the

presence of a statistical relationship between price changes (also known as returns) on successive

trading dates," *Billhofer*, 281 F.R.D. at 160, finding "no evidence of persistent autocorrelation,"

further indicating an efficient market.  Coffman Rpt. ¶85.  Finally, Mr. Coffman also analyzed

the option trading activity related to Mindbody – activity that academics have cited as

"improv[ing] efficiency by permitting an expansion of the contingencies that are covered by the

market."  *Id.* at ¶86.  According to Mr. Coffman, there were "43,180 Mindbody put contracts and

82,352 Mindbody call contracts" that traded during the Class Period, further supporting a finding

of market efficiency.  ¶85 n.119.

Because the *Cammer* and *Krogman* factors, as well as additional analyses, demonstrate

that the market for Mindbody's common stock was efficient during the Class Period, Plaintiffs

and Class members are entitled to rely on the fraud-on-the-market presumption of reliance.

**(b)    Reliance Is Presumed Under *Affiliate Ute***

Where, as here, a claim "involv[es] primarily a failure to disclose, positive proof of

reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153.  Instead, "[a]ll that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in the making of [their] decision." *Id.* at 153-54.  The *Affiliated Ute*

presumption reflects the reality that where no positive statements exist "'reliance as a practical

matter is impossible to prove.'" *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F.

Supp. 2d 428, 469 (S.D.N.Y. 2013).  Furthermore, because materiality itself is a common

question, a plaintiff need not prove materiality in order to invoke the *Affiliated Ute* presumption

at the class certification stage; it need only be alleged.  *See Amgen*, 568 U.S. at 466-470.

Plaintiffs' Complaint includes numerous allegations regarding what Defendants failed to

disclose.  *E.g.*, ¶¶153, 158, 180-181, 222, 226, 228-230, 246-247, 250-251, 254-255, 260, 266,

269.  Under these circumstances, a showing of reliance on the omissions is unnecessary, even if

Plaintiffs also allege misstatements.  *See Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186

(S.D.N.Y. 2005) ("the *Affiliated Ute* presumption . . . is not undermined simply because a

defendant makes misstatements at the same time it omits material information.").

**(c)    Damages May Be Calculated On a Class-Wide Basis,
Supporting a Finding of Predominance**

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), "the Supreme Court held that, 'at the

class-certification stage (as at trial), any model supporting a plaintiff's damages case must be

consistent with its liability case[,]' and that 'courts must conduct a rigorous analysis to determine

whether that is so.'" *Signet*, 2019 WL 3001084, at *19.  *Comcast* does not require "a finding

that damages are capable of measurement on a classwide basis." *Roach v. T.L. Cannon Corp.*,

778 F.3d 401, 402 (2d Cir. 2015). "All that is required at class certification is that 'the plaintiffs

must be able to show that their damages stemmed from the defendant's actions that created the

legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015).  While

not necessary for class certification, damages in this case can be calculated on a class-wide basis

using a common methodology.  *See Signet*, 2019 WL 3001084, at *20.  There are at least two

independent methods to establishing damages in this case on a class-wide basis.

 **First**, damages can be demonstrated based on the artificial deflation in Mindbody's stock

at the time Class members sold.  Mr. Coffman concludes that "damages in this matter can be

calculated on a class-wide basis using a common methodology."  Coffman Rpt. ¶93.  Mr.

Coffman explains that "[i]n this matter, where there is a claim of artificial deflation in the

securities price, the out-of-pocket method implies damages are equal to the artificial deflation in

the share price at the time of sale minus the artificial deflation per share at the time of purchase

(or just the artificial deflation at the time of sale if the share is purchased prior to the alleged

misstatements and/or omissions)  *Id.* ¶88.  Here, application of that method would apply this well

accepted approach to the facts of this case by looking at the artificial deflation at the time of sale

caused by Defendants' misrepresentations or omissions compared to the deflation in the stock at

the time of purchase.

 Quantification of artificial inflation/deflation is a factually intensive process.  One

approach that could be utilized to quantify the artificial deflation is an event study, which would

measure the price reaction to the disclosure of the false information.  "Once the deflation per

share has been quantified on each day during the class period, the computation of damages for

each class member is formulaic based upon information collected in the claims process."  *Id.*

¶89.  Courts frequently find that an event study is an appropriate method of measuring damages

in a securities fraud class action.  *Signet*, 2019 WL 3001084, at *20; *Waggoner*, 875 F.3d at 105-

06; *JPMorgan*, 2015 WL 10433433, at *7 (common damages issues predominated where

plaintiffs' expert proposed calculating class-wide, per-share damages through an event study analysis of the inflation caused by the alleged misrepresentations).

**Second**, damages can be measured based on the difference between the fair value of the stock and the price investors received upon selling.  *See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 378 389 (1970) (monetary relief would be appropriate "if the merger resulted in a reduction of the earnings or earnings potential of their holding" and "relief might be predicated on a determination of the fairness of the terms of the merger"); *Affiliated Ute*, 406 U.S. at 155 (damages measured by "the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct.").

While fair value is ultimately a question for the finder of fact, the fact finder could be assisted in this determination by an expert's analysis using accepted valuation techniques.  *E.g., Pierre J. LeLandais & Co., Inc. v. MDS-Atron, Inc.*, 543 F.2d 421, 424-25 (2d Cir. 1976) (§10(b) holding loss causation equal to "'fair cash value,' *i.e.*, the appraisal value, of their holdings" utilizing "corporate valuation experts"); *Mendell v. Greenberg*, 938 F.2d 1528, 1529 (2d Cir. 1991) (permitting trial of §14(a) claims to determine "the issue of fair value," where plaintiff argued that the "value of the company's stock[,] when assessed in accordance with recognized methods of valuation, was higher than the 'fair' price stated by the directors.").

The expert report of Benjamin Sacks opines that the fair value of Mindbody's stock could be determined using accepted valuation techniques.  *See* Villegas Decl., Ex. B, Sacks Rpt. ¶7. Determining the fair value of Mindbody's stock, and making relevant adjustments for any changes in fair value throughout the Class Period, would be conducted on a class-wide basis, as the issue of fair value is not individualized to specific shareholders.  Upon determining the fair value, damages could be assessed for each class member based on a formulaic comparison of the price at which they sold shares to the fair value of those shares at the time of those sales.

Accordingly, common issues concerning damages predominate.

### 2.     Superiority Is Established

Four factors are relevant when determining whether a class action is superior to other methods for fair and efficient adjudication: (1) the interests of members of the class in "individually controlling the prosecution or defense of separate actions," (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members," (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). It is widely recognized that "[s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3)." *In re MF Glob. Holdings Ltd. Inv. Litig.,* 310 F.R.D. 230, 239 (S.D.N.Y. 2015).  Indeed, each of the superiority factors is satisfied here.

First, the proposed Class consists of hundreds if not thousands of potential claimants "who are asserting claims based on predominantly common issues" and, as a result, "[a]djudicating individual claims would be a significant waste of judicial resources." *Billhofer*, 281 F.R.D. at 164; *see also In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 344715, at *2 (S.D.N.Y. Feb. 4. 2008) (securities class action "superior to other methods for adjudication because separate actions would be inefficient and repetitive").  Second, Plaintiffs are unaware of any other related securities litigation commenced by Class members.  Third, "concentrating the litigation in this forum would promote judicial economy." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 53 (S.D.N.Y. 2012).  Finally, Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action.  Indeed, "[l]itigating each case separately would be wasteful, and result in delay and in inefficient expenditure of judicial

resources." *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008).

Thus, the superiority requirement of Rule 23(b)(3) is satisfied.[7]

### C.   The Court Should Appoint Labaton Sucharow As Class Counsel

Under Rule 23(g)(4), the Court must appoint counsel who will fairly and adequately

represent the Class and, to that end, considers: (i) the work counsel has done in identifying or

investigating potential claims in the action; (ii) counsel's experience in handling class actions

and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;

and (iv) the resources that counsel will commit to representing the class.  *In re Sanofi-Aventis*

*Sec. Litig.*, 293 F.R.D. 449, 459 (S.D.N.Y. 2013).

Here, Labaton Sucharow has investigated and vigorously pursued the claims of the Class

in the action and will continue to do so. In detailed briefing on Defendants' motion to dismiss,

and Plaintiffs' motion to amend, Labaton Sucharow demonstrated its knowledge of applicable

law. Additionally, as discussed above, *see supra* at 12-13, and as supported by its firm résumé,

*see* Villegas Decl., Ex. C, Labaton Sucharow has consistently demonstrated its ability to litigate

securities cases, has extensive knowledge of the applicable securities laws, and has proven its

willingness to commit substantial time and resources to representing the Class.  Finally, Labaton

Sucharow has no known conflicts that would prevent it from fairly and adequately representing

the Class. Plaintiffs respectfully request that the Court appoint Labaton Sucharow as Class

Counsel pursuant to Rule 23(g).

### IV.   CONCLUSION

Plaintiffs respectfully request that the Court certify the proposed Class, appoint Plaintiffs

as Class Representatives, and appoint Labaton Sucharow as Class Counsel.

---

[7] The proposed Class meets the implied "ascertainability requirement" of Fed. R. Civ. P. 23 because it is defined using objective criteria that establish membership with definite boundaries. *Petrobras*, 862 F.3d at 257, 264-65 (2d Cir. 2017) (declining to adopt a heightened ascertainability requirement).

Dated: October 15, 2021

LABATON SUCHAROW LLP

*/s/ Carol C. Villegas*
Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
Charles Farrell
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477
Email: cvillegas@labaton.com
        dschwartz@labaton.com
        jbissell-linsk@labaton.com
        cfarrell@labaton.com

***Counsel for Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd, and Lead Counsel for the Class***