# Exhibit 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Civil Action No. 1:19-cv-08331-VEC |

**DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT**
**AS CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

I, CAROL C. VILLEGAS, declare as follows:

1. I am a partner at the law firm of Labaton Sucharow LLP, Lead Counsel for Court-appointed Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd. I am a member in good standing of the Bar of the State of New York and am duly admitted to practice before this Court.

2. I respectfully submit this Declaration, together with the attached exhibits, in support of Plaintiffs' Motion for Class Certification, Appointment as Class Representatives, and Appointment of Class Counsel filed herewith:

3. Attached hereto as **Exhibit A** is the expert report of Chad Coffman, dated October 15, 2021.

4. Attached hereto as **Exhibit B** is the expert report of Benjamin Sacks, dated October 15, 2021.

5.      Attached hereto as **Exhibit C** is the firm résumé of Labaton Sucharow LLP.

Dated: October 15, 2021

                                                /s/ Carol C. Villegas
                                                CAROL C. VILLEGAS

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Civil Action No. 1:19-cv-08331-VEC |

## EXPERT REPORT OF CHAD COFFMAN, CFA

**October 15, 2021**

# Table of Contents

**Page**

I.     INTRODUCTION .........................................................................................................3

II.    QUALIFICATIONS .....................................................................................................3

III.   SUMMARY OF OPINIONS .......................................................................................4

IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS.......................................5

V.     DISCUSSION OF RELIANCE ELEMENT ...............................................................8

VI.    *CAMMER* FACTORS ...............................................................................................11

VII.   APPLICATION OF EFFICIENCY FACTORS TO MINDBODY OVERVIEW...........12

    A.     *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME.................................14

    B.     *CAMMER* FACTOR 2: ANALYST COVERAGE .........................................................16

    C.     *CAMMER* FACTOR 3: MARKET MAKERS ...............................................................19

    D.     *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ............................................20

    E.     *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION............................21

    i.     REGRESSION MODEL APPLICABLE TO THE PRE-MERGER PERIOD ........................23

    ii.    STANDARD DEVIATION MODEL APPLICABLE TO THE OFFER PERIOD ................26

    iii.   CAUSE-AND-EFFECT ANALYSIS ...........................................................................31

    F.     *KROGMAN* FACTOR 1: MARKET CAPITALIZATION .................................................36

    G.     *KROGMAN* FACTOR 2: THE BID-ASK SPREAD.......................................................37

    H.     *KROGMAN* FACTOR 3: PUBLIC FLOAT ...................................................................39

    I.     ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP...............................................39

    J.     ADDITIONAL FACTOR: AUTOCORRELATION ...........................................................40

    K.     ADDITIONAL FACTOR: OPTIONS ...........................................................................41

VIII.  DAMAGES................................................................................................................42

IX.    CONCLUSION..........................................................................................................44

## I.    INTRODUCTION

1.    I, Chad Coffman, am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of securities litigation. I have been asked by counsel for the Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd ("Co-Lead Plaintiffs") in this matter to examine and opine on whether the market for MINDBODY, Inc. ("MINDBODY" or the "Company") Class A common stock ("MINDBODY Common Stock" or "Common Stock")[1] was efficient during the period from November 7, 2018 through February 14, 2019, inclusive (the "Class Period").  In addition, I have been asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $900 per hour for my work on this matter, and at rates between $200 and $450 for members of my staff who performed work in connection with this report under my direction and supervision. My compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.    QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The

---

[1] MINDBODY, Inc. Class B common stock was not publicly traded. See, MINDBODY, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 37. (The Form 10-K for the fiscal year ended December 31, 2017 was the last annual filing MINDBODY filed prior to its merger with Vista Equity Partners.)

CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.     I, along with several others, founded Global Economics Group on March 25, 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

**III.    SUMMARY OF OPINIONS**

6.     After analyzing MINDBODY's Common Stock during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for MINDBODY's Common Stock was efficient during the Class Period.

---

[2] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

4

7.    I have also formed the opinion that damages in this action can be calculated on a class-wide basis. These opinions are based upon my analysis described below.

8.    The remainder of this report is organized as follows: **Section IV** of this report provides an overview of MINDBODY's business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory. **Section VI** introduces the so-called *Cammer* factors and other factors that financial economists and courts, including in this Circuit, apply when evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for MINDBODY Common Stock during the Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

9.    I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.    During the Class Period, MINDBODY was incorporated in the state of Delaware with its headquarters in California.[3] MINDBODY described its business during the Class Period as follows:

> We are the leading provider of cloud- based business management software for the wellness services industry and a rapidly growing marketplace for wellness services. As of December 31, 2017, our customers employed over 372,000 wellness practitioners serving approximately 41 million consumers in more than 100 countries. Our integrated software and payments platform helps wellness business owners run, market and build their businesses, while engaging consumers by aggregating available classes and appointments, and enabling rapid discovery, booking and payment. Together, our cloud- based

---

[3] MINDBODY, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, cover page.

business and consumer software platform comprise a two- sided marketplace, enabling market innovations such as targeted introductory offers and dynamic pricing that simultaneously increases consumer engagement and wellness business capacity utilization.[4]

11.    For the fiscal year ended December 31, 2017, MINDBODY reported revenue of $182.6 million, a net loss of $14.8 million,[5] and listed total assets of $301.3 million.[6] As of December 31, 2017, MINDBODY employed 1,426 employees,[7] and its Class A Common Stock traded on the NASDAQ under the ticker "MB."[8]

12.    The Complaint alleges that MINDBODY and the Individual Defendants as defined in the Complaint,[9] made false or misleading statements during the Class Period, ultimately causing damages to *sellers* of MINDBODY Common Stock who unknowingly sold Common Stock at artificially deflated prices and suffered economic loss due to the concealed information.[10]

13.    More specifically, the Complaint alleges that Defendants made false and misleading statements and material omissions leading up to and through the completion of the acquisition agreement with Vista Equity Partners ("Vista").[11] On December 24, 2018, Vista and MINDBODY announced an acquisition agreement (the "Vista Acquisition Announcement").[12]

---

[4] MINDBODY, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 3.

[5] MINDBODY, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 39.

[6] MINDBODY, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 40.

[7] MINDBODY, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 10.

[8] MINDBODY, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017, p. 34.

[9] Complaint ¶¶ 60-62.

[10] Complaint ¶¶ 348-353.

[11] Complaint ¶ 1.

[12] Complaint ¶ 38.

Leading up to and through the Vista Acquisition Announcement date (the "Pre-Offer Period"),[13] the Complaint alleges that Defendants depressed the Company's stock price and concealed preliminary merger talks with Vista.[14] On November 6, 2018, MINDBODY announced Q3 2018 earnings and Q4 2018 guidance. Defendants reduced Q4 2018 guidance and blamed the reduction on the Company's recent acquisition of FitMetrix and Booker, which Plaintiffs allege caused a decline in the price of MINDBODY Common Stock on November 7, 2018.[15] In reality, sales were on track to hit forecasted numbers and the incorporation of the two acquired companies was proceeding smoothly.[16] Additionally, the market was not aware that preliminary talks with Vista had begun long before the November 6, 2018 announcement.[17] Following the Q3 2018 earnings, MINDBODY began engaging potential buyers, but the Defendants hindered and discouraged other interested companies.[18] On December 24, 2018, Vista and MINDBODY announced an offer of $36.50 per share (the "Offer Price"),[19] and once again, through various means, the Defendants impeded additional offers.[20] Following the Vista Acquisition Announcement, from December, 26, 2018 through the completion of the acquisition on February 14, 2019 (the "Offer Period"),[21] MINDBODY continued to mislead and deceive investors

---

[13] To evaluate market efficiency, I perform my analyses over a longer period of which the Class Period is a subset (the "Analysis Period"). The Analysis Period runs from January 9, 2017 to February 14, 2019. For more detail on the selection of the Analysis Period, refer to footnote 35. I refer to the period from the Analysis Period start on January 9, 2017 through the Vista Acquisition Announcement on December 24, 2018 as the "Pre-Offer Period."

[14] Complaint ¶¶ 105-118, 123-178.

[15] Complaint ¶¶ 19-25, 123-130.

[16] Complaint ¶¶ 26-30, 132-163.

[17] Complaint ¶¶ 5-18, 15-118.

[18] Complaint ¶¶ 31-37, 164-178.

[19] Complaint ¶¶ 179-182.

[20] Complaint ¶¶ 188-197.

[21] I refer to the period following the Vista Acquisition Announcement from December 26, 2018 through the Vista Acquisition Approval (and Class Period end) on February 14, 2019 as the "Offer Period."

through various SEC proxy statement filings.[22] When the Defendants had the opportunity to announce that the Company's preliminary Q4 2018 revenue came in above the previously reduced guidance, no announcement was made.[23] Eventually the acquisition was approved by a shareholder vote on February 15, 2019 (the "Vista Acquisition Approval").[24]

14.  As a result of the Defendants scheme, the Complaint alleges that investors who sold their shares from the time of Defendants' false statements through the acquisition were economically harmed as a result of selling at an artificially deflated stock price.[25]

## V.  DISCUSSION OF RELIANCE ELEMENT

15.  Class members' reliance on the alleged misstatements and material omissions is a required element for Co-Lead Plaintiffs' Section 10(b) claims. Co-Lead Plaintiffs assert the fraud on the market theory of reliance in this matter.[26] The fraud on the market theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the

---

[22] Complaint ¶¶ 208-230.

[23] Complaint ¶¶ 157-158.

[24] Complaint ¶ 233.

[25] Complaint ¶ 353.

[26] Complaint ¶ 331.

plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[27]

16.     The Supreme Court reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[28]

17.     As stated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed, and efficient market, market prices reflect what is publicly known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or deflated) price.

18.     It is an empirical exercise to determine whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory.[29] The esteemed economist Dr. Eugene Fama, in his seminal

---

[27] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[28] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014) ("*Halliburton II*").

[29] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

9

research, first outlined definitions of an "efficient market."[30] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[31]

19.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[32] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

20.    In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

---

[30] Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. FIN. 383 (1970).

[31] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[32] *Basic,* 485 U.S. at 241.

## VI. *CAMMER* FACTORS

21. In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[33]

22. The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (*e.g.*, price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[34]

23. While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also

---

[33] *Cammer, et al., v. Bruce M. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

[34] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

11

consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

24.     In the subsequent sections, I evaluate the market for MINDBODY Common Stock during the Class Period under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the percentage of stock not held by insiders (the float), 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 5) options trading.

## VII.    APPLICATION OF EFFICIENCY FACTORS TO MINDBODY OVERVIEW

25.     After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for MINDBODY Common Stock was efficient throughout the Class Period. To evaluate market efficiency, I perform my analyses over a longer period of which the Class Period is a subset (the "Analysis Period"). The Analysis Period runs from January 9, 2017 to February 14, 2019.[35] In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that MINDBODY Common Stock traded in an efficient market. As

---

[35] I analyzed this extended Analysis Period to increase the statistical power of my analyses. The Analysis Period was selected to capture two full calendar years or two years of earnings announcements before the class period sustained by the Court's September 25, 2020 Order (the "Initial Class Period"), whichever is longer. Since January 7, 2017 (two years before the start of the Initial Class Period) is not a trading date, I considered the Analysis Period to begin on January 9, 2017 and extend through the end of the Initial Class Period on February 14, 2019. I understand that the Class Period now begins on November 7, 2018 following the release of MINDBODY's Q3 2018 earnings on November 6, 2018 at 4:05 PM ET after trading had closed. By analyzing and applying the methodologies described herein to the longer Analysis Period, January 9, 2017 – February 14, 2019, of which the Initial Class Period is a subset, I concluded that the evidence supports efficiency during the Class Period. The Analysis Period still encompasses the current Class Period that runs 67 trading days from November 7, 2018 – February 14, 2019 and therefore supports my opinion that MINDBODY Class A Common Stock traded in an efficient market.

12

further background to my analyses, **Exhibit 2** displays MINDBODY Common Stock's closing price and trading volume for each day throughout the Analysis Period.

26. In summary, and as discussed more fully below, MINDBODY Common Stock traded in an efficient market during the Class Period (and Analysis Period). First, the average weekly trading volume of MINDBODY Common Stock far exceeded benchmarks that courts have established. During the Class Period, the average weekly trading volume for MINDBODY Common Stock was 8.49 million shares, which represents 18.67% of shares outstanding, higher than the average security traded on the New York Stock Exchange ("NYSE") and/or the NASDAQ Exchange.[36] Second, there were a large number of securities analysts following and reporting on MINDBODY. Third, MINDBODY Common Stock was actively traded on the NASDAQ, fulfilling the *Cammer* factor regarding market makers. Fourth, MINDBODY met the important eligibility criteria and was apparently eligible to file a Form S-3 throughout the Class Period since the Company had previously filed an S-3ASR and provided substantial public information to the market in its SEC filings. Fifth, there was a strong cause-and-effect relationship between new Company-specific information and the market price of MINDBODY Common Stock during the Analysis Period. Sixth, MINDBODY Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Seventh, MINDBODY Common Stock had a low bid-ask spread relative to other exchange-traded common stocks. Eighth, insiders held on average only roughly 3% of the shares outstanding while institutions, which are considered generally to be well-informed investors, held virtually all of the remaining public float of MINDBODY Common Stock during the quarters of interest.

---

[36] During the Analysis Period, the average weekly trading volume for MINDBODY Common Stock was 3.27 million shares, which represents 7.63% of shares outstanding, higher than the average security traded on the NYSE and/or the NASDAQ Exchange.

Ninth, there was no evidence of statistically significant autocorrelation. Finally, there was active trading in MINDBODY options. My analyses of all of these factors support the conclusion that MINDBODY Common Stock traded in an open, developed, and efficient market throughout the Class Period (and Analysis Period).

### A. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

27. The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[37]

28. Volume as a fraction of shares outstanding is an important indicator of market efficiency for several reasons. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[38] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Professors Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility

---

[37] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[38] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 44-45 (5th ed. 1995).

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005), 317.

standard because it affects information dissemination to the market and was an important criterion for investment analysts in deciding which stocks to follow."[39]

29.     MINDBODY Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for MINDBODY Common Stock during the Class Period was 18.67% of shares outstanding, compared to 2.26% for the average weekly trading volume on both the NYSE and NASDAQ exchanges.[40] Based on this figure, the weekly trading volume for MINDBODY Common Stock far exceeds the 1% or 2% threshold cited by *Cammer*. **Exhibit 3** plots MINDBODY Common Stock's trading volume as a percentage of shares outstanding for each week during the Class Period.[41] Indeed, the average weekly trading volume for MINDBODY Common Stock during the Class Period was 8.49 million shares.[42] This volume of trading supports the conclusion that the market for this security was efficient throughout the Class Period (and Analysis Period).

30.     Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[43] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (*i.e.*, shares traded multiplied by price per share) divided by the dollar value of all

---

[39] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

[40] The average weekly trading volume for MINDBODY Common Stock during the Analysis Period was 7.63% of shares outstanding, compared to 1.92% for the average weekly trading volume on both the NYSE and NASDAQ exchanges.

[41] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[42] The average weekly trading volume for MINDBODY Common Stock during the Analysis Period was 3.27 million shares.

[43] Turnover velocity as a formula is:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

shares outstanding (*i.e.,* shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, MINDBODY Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for MINDBODY Common Stock was 934% compared with the NYSE and NASDAQ average of 118% for the Class Period.[44,45] Thus, MINDBODY Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE and NASDAQ, further supporting that it traded in an efficient market.

31. In short, the relatively high trading volume in MINDBODY Common Stock throughout the Class Period (and Analysis Period) supports the conclusion that the market for MINDBODY Common Stock was efficient.

**B.** *CAMMER* **FACTOR 2: ANALYST COVERAGE**

32. The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [analyst] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[46]

33. Analyst coverage can be important evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an

---

[44] Over the Analysis Period, the annualized turnover velocity ratio for MINDBODY Common Stock was 382% compared with the NYSE and NASDAQ average of 100%.

[45] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[46] *Cammer*, 711 F. Supp. at 1286.

active market for information regarding the company and its securities, and that the information is widely distributed.

34.    During the Analysis Period, there was consistent analyst coverage for MINDBODY. **Exhibit 4** shows that there were at least 138 reports issued during the Analysis Period and lists 16 separate firms, including 10 reports from 9 separate firms in December 2018, the month during which MINDBODY announced the acquisition by Vista Equity Partners.[47] During the Analysis Period, equity analysts issued reports on MINDBODY, including major firms such as Wells Fargo, UBS, and Jefferies.[48] These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of MINDBODY by securities analysts supports the conclusion that MINDBODY Common Stock traded in an efficient market throughout the Class Period (and Analysis Period).

35.    Since 1989, when the *Cammer* decision was issued, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[49] and other media, the ability of

---

[47] "MINDBODY Enters into Definitive Agreement to be Acquired by Vista Equity Partners for $1.9 Billion ," *Globe Newswire,* December 24, 2018, 8:00 AM ET.

[48] I obtained MINDBODY analyst reports from Counsel for the Co-Lead Plaintiffs. This list almost certainly understates the total amount of analyst coverage. For example, I do not have access to KeyBanc analyst reports, but on January 8, 2019 Dow Jones Institutional News reported that KeyBanc downgraded MINDBODY to Sector Weight. (*See*, "Mindbody Cut to Sector Weight From Overweight by KeyBanc," *Dow Jones Institutional News*, January 8, 2019).

[49] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasingly popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (*see* http://www.rss-specifications.com/, and http://www.rss-specifications.com/what-is-rss.htm).

individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

36. Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of MINDBODY, there were many other sources of public information dissemination. For example, there was substantial public press regarding MINDBODY. A search for articles classified as related to MINDBODY by Factiva over the Class Period resulted in 162 unique articles (and 786 articles over the Analysis Period).[50] In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding MINDBODY in the public arena throughout the Analysis Period, and thus the Class Period.

37. In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding MINDBODY provide evidence of a robust and active market for public information about the Company and evidence that MINDBODY's Common Stock traded in an efficient market during the Class Period.

---

[50] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities. The 162 unique articles for the Class Period ("November 7, 2018 – February 14, 2019") were identified as a result of two searches: 1) for "All Sources" with the company field "MINDBODY, Inc." and 2) for "Major News and Business Sources" with the keyword field "MINDBODY" and excluding results with the company field "MINDBODY, Inc." and "New 52-Week Highs And Lows". The 786 unique articles for the Analysis Period ("January 9, 2017– February 14, 2019") were identified as a result of the same two searches. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

## C.    *CAMMER* FACTOR 3: MARKET MAKERS

38.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[51] The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[52]

39.    The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (*i.e.*, the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[53]

40.    MINDBODY Common Stock traded on a major exchange (*i.e.*, the NASDAQ) with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[54] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be

---

[51] *See* http://www.sec.gov/answers/mktmaker.htm.

[52] *Cammer*, 711 F. Supp. at 1293.

[53] Barber, B., et al., The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, 19 J. CORP. L. 285 (1994), 291.

[54] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[55]

41. The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[56] The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

42. Nevertheless, according to Bloomberg, throughout the Class Period, there were 78 market makers for MINDBODY Common Stock.[57,58] Therefore, MINDBODY Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period (and Analysis Period).

### D.   *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

43. The fourth *Cammer* Factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were

---

[55] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; s*ee Section 102* http://wallstreet.cch.com/LCM/Sections/. *See also*, William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 45-53 (5th ed. 1995); Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Chapter 18 – Appendix A (4th ed. 2010).

[56] For NYSE, *see* https://www.nyse.com/market-model. For NASDAQ, *see* https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.

[57] Throughout the Analysis Period, there were 117 market makers for MINDBODY Common Stock.

[58] Bloomberg RANK function.

not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[59]

44.     Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[60] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

45.     I have found no evidence that MINDBODY was not S-3 eligible throughout the Class Period.[61] Throughout the Class Period (and Analysis Period), MINDBODY had been subject to SEC filing requirements for more than one year, had filed all documents in a timely manner over the preceding twelve months, and did not fail to meet its debt obligations, to my knowledge. Therefore, MINDBODY meets this *Cammer* efficiency factor, which supports the conclusion that MINDBODY Common Stock traded in an efficient market.

**E.      *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION**

46.     The fifth *Cammer* Factor relates to how the price of a security reacts to new, company-specific information and states:

---

[59] *Cammer*, 711 F. Supp. at 1287.

[60] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

[61] MINDBODY filed a Form S-3ASR during the Analysis Period on May 22, 2017 at 4:06 PM ET with a preliminary prospectus for the Company's Secondary Public Offering ("SPO").

21

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[62]

47. Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[63] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[64]

48. An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

49. To analyze cause and effect, I performed an event study to determine whether MINDBODY Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no MINDBODY-related news. Based on the event study I performed, I find that there is a clear cause-and-effect relationship between new

---

[62] *Cammer,* 711 F. Supp. 1291.

[63] A. Craig MacKinlay, "Event Studies in Economics and Finance", 35 *J. ECON. LITERATURE*, 13 (1997).

[64] John J. Binder, "The Event Study Methodology Since 1969", 11 *REV. QUANTITATIVE FIN. & ACCT.*, 111 (1998).

public information about MINDBODY and the market price of MINDBODY Common Stock. I now describe in further detail the event study methodology, the events I tested, and the results.

### i. REGRESSION MODEL APPLICABLE TO THE PRE-MERGER PERIOD

50. A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[65] I have performed such an analysis in this matter where I evaluate the relationship between MINDBODY Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return Index (the "Market Index") and the NASDAQ Computer Price Return Index, hereafter referred to as the "Industry Index."[66,67] I perform this analysis during the Pre-Offer Period, the portion of the Analysis Period prior to the Vista Acquisition Announcement—January 9, 2017 through December 24, 2018. As I elaborate later, following the Vista Acquisition Announcement and during the Offer Period, the return generating process is fundamentally different and the regression I perform over the Pre-Offer Period would no longer be appropriate.

---

[65] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable"). In this case, the daily percentage change in MINDBODY Common Stock (the MINDBODY daily return) is the dependent variable and the contemporaneous daily returns for a market and industry index are the independent variables. For a general discussion of regression analysis, see Damodar N. Gujarati, *Basic Econometrics*, McGraw Hill, Chapters 1-3 (3rd ed. 1995).

[66] MINDBODY compares its stock price performance to the Industry Index in its SEC Form 10-K filings for the fiscal years ended December 31, 2015, December 31, 2016, and December 31, 2017. MINDBODY was not a member of the Industry Index. "The NASDAQ Computer Index contains securities of NASDAQ-listed companies classified according to the Industry Classification Benchmark as Technology excluding Telecommunications Equipment. They include computer services, internet, software, computer hardware, electronic office equipment, and semiconductors." *See,* https://indexes.nasdaqomx.com/Index/Overview/IXCO.

[67] The returns of the Industry Index are net of the S&P 500 Total Return Index.

51. Therefore, for each trading day analyzed during the Pre-Offer Period, I constructed a regression model using data from the prior 120 trading days (roughly six months).[68] Using a "rolling" estimation window allows for the relationship between MINDBODY Common Stock, industry and market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[69]

52. The model indicates that there is a positive correlation between MINDBODY Common Stock and the control variables. In other words, the movements of the Market Index and Industry Index help explain the price movements of MINDBODY Common Stock during the Pre-Offer Period. For instance, choosing a day in the Pre-Offer Period purely as an example, December 7, 2018, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.22 which means that a 1% rise (fall) in the S&P 500 predicts a 1.22% increase (decrease) in returns for MINDBODY Common Stock. The estimated coefficient for the Industry Index is 1.14, meaning that the expected return for MINDBODY Common Stock is about a 1.14% increase (decrease) for every 1% increase (decrease) in the Industry Index over and above (under and below) the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Pre-Offer Period, and it demonstrates there is a consistently positive relationship between the general market, the Industry Index, and the price of MINDBODY Common Stock.

---

[68] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 15 (1997): "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

[69] Phillip A. Braun, *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

53.     Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much unexplained price movement remains in the price movement of MINDBODY Common Stock after controlling for the Market Index and Industry Index. For instance, on the example date, December 7, 2018, the model predicted that absent any value relevant new firm-specific information, the price of MINDBODY Common Stock would decrease by 4.08% because the S&P 500 was down 2.32% and the Industry Index was down 1.15%.[70] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of -2.25%. Thus, the "abnormal return" for this day is 1.83% (the actual return of -2.25% minus the predicted return of -4.08%). I then rely on the standard deviation of the errors from the regression model to tell if this abnormal return of 1.83% is sufficiently large that I can reject random movement as the explanation.

54.     The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of 1.83% represents 0.81 standard deviations or a t-statistic of 0.81 (abnormal return of 1.83% divided by the standard deviation of the errors of 0.0225).[71] Using the standard assumption that, in the absence of new value relevant company-specific news, abnormal returns will be normally distributed

---

[70] The predicted return of -4.08% is found as follows: 1.22 * -2.32% (Coefficient on Market Index *times* Market Index return) + 1.14 * -1.15% (Coefficient on Industry Index *times* Industry Index return) + 0.06% (constant term from regression).

[71] The standard deviation of the errors is plotted in **Exhibit 6**. The standard deviation of the error is also known as the standard error. "An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates." The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011, p. 243.

around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[72,73] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of 0.81, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value relevant firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

55. **Exhibit 6** shows that the standard deviation of the errors for MINDBODY Common Stock varied over the Pre-Offer Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing Company-specific volatility.

### ii. STANDARD DEVIATION MODEL APPLICABLE TO THE OFFER PERIOD

56. Following the December 24, 2018 Vista Acquisition Announcement, the model I describe above is no longer appropriate. For the Offer Period from December 26, 2018 through the Vista Acquisition Approval on February 14, 2019, the return generating process (i.e. what

---

[72] Basic statistics state that for a normally distributed variable, 5% of the observations are expected to fall outside 1.96 standard deviations from the mean. "The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area." The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011, p. 342.

[73] David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, Ch. 19, (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

causes MINDBODY's stock price to move) is fundamentally different. The financial economics

literature documents that stock price behavior changes significantly after a merger is announced,

compared to price behavior before the announcement. According to Hutson and Kearney (2001),

there is a "change in the price formation process" during the "bid period" between the

announcement of a takeover bid and its conclusion.[74] Under their model, the stock price during

the bid period is "determined by three factors: the offer price, the probability of the bid's

success,[75] and the expected post-takeover price if it fails."[76] The influence of the Market Index

and Industry Index will either be irrelevant or greatly attenuated (assuming the market sees a

fairly high chance of success). Based on this theoretical framework, then, following the

announcement of Vista's offer of $36.50 per share, the price of MINDBODY Common Stock

during the Class Period would be $36.50 minus adjustments for the risk that a deal would not be

completed,[77] plus adjustments for the possibility of an increased offer price. Therefore, for the

period following the Vista Acquisition Announcement and leading up to and including the Vista

Acquisition Approval, I do not control for the Market Index or Industry Index.[78]

---

[74] See Hutson and Kearney (2001) "Volatility in stocks subject to takeover bids: Australian evidence using daily data," *Journal of Empirical Finance 8 (2001)* pp. 273-296, at p. 274.

[75] "Given the bid price, the value of target stocks is determined largely by the likelihood of success of the bid. The extent to which price volatility changes depends on the dispersion of trader opinion as to the takeover's likelihood of success. Convergence of opinion is likely with targets of ultimately successful bids, and so a reduction in volatility is predicted in such cases." *Id.* p. 276.

[76] Notably, in this terminology, the reference to the "post-takeover price" refers to the price once the specific offer is extinguished, meaning that price is influenced in assessing the "post-takeover price if it fails" both by the value of the company on a stand-alone basis and by the possibility of a topping or competing offer either by the would-be acquiror or by another party.

[77] In assessing this risk, the market would take into account the expected price of the stock if the deal failed to go through (the "fallback price"). *See also*, "MINDBODY Enters into Definitive Agreement to be Acquired by Vista Equity Partners for $1.9 Billion ," *Globe Newswire,* December 24, 2018, 8:00 AM ET.

[78] Indeed, when I attempt to control for the Market Index and Industry Index during the Offer Period, the model indicates that those factors have no significant explanatory power. The adjusted-R squared, which reflects the approximate percentage of the price movements that can be explained by the control factors, is under 10% during the Offer Period, while during the 120 days prior to the Vista Acquisition Announcement those control factors explain 39% of the price movements.

27

57. Hutson and Kearney make two primary empirical observations about stock price behavior following a takeover bid, both of which accurately describe the case at hand. This demonstrates that Hutson and Kearney's theoretical framework is appropriate to apply in this case.

58. First, Hutson and Kearny predict a decrease in volatility following a takeover bid.[79] Consistent with Hutson and Kearney's findings, the standard deviation of MINDBODY stock returns is much higher leading up to the Offer Period (0.0285)[80] compared to during the Offer Period (0.0041), representing a reduction in volatility of 86%.

59. Second, Hutson and Kearney predict a decrease in beta. That is, they predict that the relationship between market returns and a target company's returns becomes weaker following a takeover bid.[81] In other words, the general market has less predictive power of a stock's returns. Hence, it would not be surprising for the relationship between the market and industry indices to be insignificant.[82] Therefore, during the Offer Period, the t-statistics, p-values, and significance levels are based on comparing the MINDBODY Common Stock price percentage return on day $t$ against the standard deviation of MINDBODY Common Stock returns over the Offer Period.

60. The Vista Acquisition Announcement and subsequent influence of the Offer Price on the MINDBODY Common Stock price do not undermine market efficiency. In fact, given the

---

[79] See Hutson and Kearney (2001) "Volatility in stocks subject to takeover bids: Australian evidence using daily data," *Journal of Empirical Finance*, 8(3), 273-296, at p. 278.

[80] The standard deviation of the MINDBODY Common Stock returns for the 120 trading days prior to the Offer Period starting on December 26, 2018 and excluding returns that were also excluded from the regression is 0.0285.

[81] "Our predictions of reduced price volatility of target stocks imply that target betas should also decline post-announcement. This implication is given empirical support by Bhagat et al. (1987), who found that the average target beta declined by 65% relative to the pre-announcement beta in their sample of cash takeover bids." See Hutson and Kearney (2001) "Volatility in stocks subject to takeover bids: Australian evidence using daily data," *Journal of Empirical Finance*, 8(3), 273-296, at p. 279.

[82] A fixed regression controlling for the Market and Industry Indices over the Offer Period shows that the beta coefficients are not statistically significant, with the general market beta coefficient being essentially 0.

economic logic and empirical evidence of how stock prices are expected to behave in the wake of a takeover bid, the fact that there is very little price movement throughout the Offer Period is entirely expected and consistent with market efficiency. In other words, it appears that the market is properly reflecting the value relevance of the information.

61. Even in the context of a pending merger, the financial fundamentals of a company remain important, specifically in the case of risk and appraisal arbitrage. Risk arbitrage (also known as merger arbitrage) focuses on buying (or selling) shares based on the observed stock price and the offer price.[83] For example, if the stock price is below the proposed merger price, the risk arbitrage investor will purchase the stock with the expectation of either selling those shares in the merger or selling those shares at a higher valuation as new information implies that the merger is more likely to succeed. Similarly, investors may buy shares based on the prospect of a higher offer arising before the merger closes. Traders using these approaches will digest information both based on the risk adjustment or the likelihood of the deal succeeding and the expected price of the company if the merger fails. The fallback price, or the expected price of the company if the merger fails, is based on the fundamentals of the company.[84]

62. Appraisal arbitrageurs are investors that purchase shares after a merger in order to pursue appraisal.[85] The right to seek appraisal, or evaluation of the company (and thus stock price), relies on determining a fair value based on a company's fundamentals.[86] The appraisal

---

[83] Mitchell, Mark and Todd Pulvino (2001) "Characteristics of Risk and Return in Risk Arbitrage," *The Journal of Finance*, 56(6).

[84] Subramanian, Ajay (2004) "Option Pricing on Stocks in Mergers and Acquisitions," *Journal of Finance,* 59(2), pp. 795-829 ("The fallback price reflects the value of the target firm . . . based on fundamentals, but also based on other potential merger offers.")

[85] Weldy, Malaina J. (2018) "Appraisal Arbitrage: In Case of Emergency, Break Glass.," *Notre Dame Law Review,* 93(5), pp. 2191-2215, at p. 2191.

[86] Callahan, Scott, Darius Palia, and Eric Talley (2018) "Appraisal Arbitrage and Shareholder Value," *Journal of Law, Finance & Accounting*, 93(5), pp. 1-56, at p. 3.

remedy includes dissenting from a corporate structure or fundamental change, such as a merger and acquisition. The corporation is then required to buy the shares back at a "fair value," or the value based on appraisal proceedings.[87] Investors will buy or sell the stock based on an estimated value of an appraisal claim, and trading based on the perceived company value of the appraisal claim affects the market price of the stock.[88] As new information emerges throughout the pendency of the proposed merger, the perceived value of the appraisal claim may change, and correspondingly the market price will adjust to reflect that newly disclosed information. Arbitrage has been studied extensively and it is widely accepted that this practice increases liquidity[89] and supports market efficiency[90] during the pendency of a proposed merger.

63.     Therefore, arbitrage is an investment strategy that relies on financial fundamentals and also contributes to market efficiency. The *Cammer* Factors generally hold that the presence of sophisticated market participants supports a finding of market efficiency.  For example, in *Cammer*, the court wrote: "the existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price

---

[87] Kanda, Hideki and Saul Levmore (1985) "The Appraisal Remedy and the Goals of Corporate Law," *UCLA Law Review* 32(3), 429-473, at pp. 431-432.

[88] Callahan, Scott, Darius Palia, and Eric Talley (2018) "Appraisal Arbitrage and Shareholder Value," *Journal of Law, Finance & Accounting*, 93(5), pp. 1- 56, at pp. 4-5.

[89] Van Tassel, Peter (2016) "Merger Options and Risk Arbitrage," *Federal Reserve Bank of New York: Staff Reports No. 761*; Mitchell, Mark and Todd Pulvino (2001) "Characteristics of Risk and Return in Risk Arbitrage," *the Journal of Finance*, 56(6), pp. 2135-2175.

[90] Weldy, Malaina J. (2018) "Appraisal Arbitrage: In Case of Emergency, Break Glass," *Notre Dame Law Review*, 93(5), pp. 2191-2215; Easterbrook, F. and Fischel, D., "The Proper Role of a Target's Management in Responding to a Tender Offer," *Harvard Law Review*, Vol. 94(6), 1981.

level."[91] During the Class Period, firms specializing in arbitrage (*e.g.*, as explained in the prior paragraphs) enhanced market efficiency by trading in MINDBODY.[92]

### iii. CAUSE-AND-EFFECT ANALYSIS

64. To analyze cause-and-effect, I examined the price response of MINDBODY Common Stock to the eight earnings announcements during the Analysis Period. *See* **Exhibit 7**.

65. There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[93] Also, newly released earnings reports by a company are an objective set of news to identify and test. Considering the fourth earnings release listed in **Exhibit 7** as an example, after market close on October 26, 2017 the Company announced positive quarter results for the fiscal quarter ending September 30, 2017, including a first time positive EPS of $0.01 that beat Street estimates of -$0.04 and average monthly revenue per subscriber (ARPs) growth of 27% year over year.[94] In response, the market price of MINDBODY Common Stock increased by 15.17%, compared to the predicted return of 2.96%. Thus, the abnormal return on October 27, 2017 was

---

[91] *Cammer*, 711 F.Supp. at 1286–87.

[92] The firms that began investing in MINDBODY in the quarter ending December 31, 2018 and specialize in arbitrage held over 6% of the shares outstanding. I reviewed the firms that started investing in MINDBODY during the quarter ending December 31, 2018 and listed arbitrage as a strategy on their website. The 6% represents a minimum as I have only reviewed the companies that held at least .5% of the public float and some companies' strategies were not publicly available.

[93] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 67-92 (1968); Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 119-163 (1971); Joseph Aharony & Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, 1-12 (1980).

[94] *See*, "MINDBODY Reports Third Quarter 2017 Financial Results," *Nasdaq OMX GlobeNewswire,* October 26, 2017, 4:05 PM ET; "Q3: Subs Lag But Monetization Shines," *Jefferies,* October 27, 2017; "3Q17: 30%+ Growth and First Operating Profit," *J.P. Morgan,* October 27, 2017.

12.20%. With a t-statistic of 7.01, this abnormal price movement is statistically significant at the 99% level, and I therefore have scientific evidence that MINDBODY Common Stock reacted rapidly to this new information.

66.    Similar to this example, I analyzed the market reaction to MINDBODY's other earnings announcements I identified above. In total, of the eight earnings announcements MINDBODY issued during the Pre-Offer Period, six resulted in statistically significant price movements above the 99% confidence level.[95]

67.    **Exhibit 7** presents a summary of the earnings releases during the Analysis Period.

68.    I then compared these results against the 146 days during the Pre-Offer Period where I identified no MINDBODY-related news from the Factiva database and when there were no MINDBODY conferences or press releases, analyst reports, or SEC filings issued. Of these 146 days, there were 3 statistically significant price movements. Thus, during the Analysis Period, there was a statistically significant price reaction at the 95% confidence level or greater on 75.00% of the earnings announcements, but when compared to days with no MINDBODY-related news, I observed only 2.05% of the days having statistically significant reactions.[96, 97] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of MINDBODY Common Stock.

---

[95] It is not unusual to observe earnings announcements that are not statistically significant. This happens, for instance, in quarters where there was insufficient surprise and/or the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information.

[96] This difference between 75.00% and 2.05% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

[97] Based on randomness alone, one would expect 5% of the no news days to be statistically significant. The observed rate of 2.05% is not statistically significantly different than 5%.

69.     Furthermore, on the 146 days with no news, the average change in price of MINDBODY Common Stock was only 1.42% after controlling for market and industry factors, while the average change in MINDBODY Common Stock on earnings announcement dates after controlling for market and industry factors was 10.49%. In other words, the average magnitude of stock price movement on earnings announcement days was over 7 times higher than on no news days.[98] Again, this demonstrates that on days when important company-specific information is released to the market, the stock price moves much more than on days where there is no company-specific news. This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of MINDBODY Common Stock, and thus an efficient market.

70.     The bar charts below summarize this analysis while **Exhibit 8** gives more detail.

---

[98] This difference between 10.49% and 1.42% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).





71.    Finally, when important Company-specific news is released to the market (*e.g.*, earnings announcements), the daily trading volume of MINDBODY Common Stock also tends to be much higher[99] than on days where there is no news. For instance, the average daily trading volume of the eight days with earnings announcements was 2.75 million. Compare this to the average daily trading volume of 0.45 million for days where there is no news in the Pre-Offer Period.[100] The bar chart below summarizes this analysis.

**Average Daily Trading Volume**



72.    The bar charts above establish a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of MINDBODY Common Stock. The earnings announcement days have a much greater percentage of significant price movements,

---

[99] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 69, 84 (1968).

[100] This difference between 2.75 million and 0.45 million is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

higher daily trading volume on average, and statistically significant larger price changes than those found on days with no news.

73.     In conclusion, the event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of MINDBODY Common Stock during the Analysis Period, and thus the Class Period.

## F.     *KROGMAN* FACTOR 1: MARKET CAPITALIZATION

74.     In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[101] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[102] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[103] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

75.     MINDBODY Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period (and Analysis Period), thus suggesting this

---

[101] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). The factors identified by the *Krogman* Court are 1) market capitalization, 2) the percentage of stock not held by insiders (the float) and 3) bid-ask spread.

[102] *Krogman*, 202 F.R.D. at 478.

[103] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 117 (2000).

factor is supportive of efficiency. There were between 45.4 million and 45.6 million shares of MINDBODY Common Stock outstanding throughout the Class Period.[104,105]

76. Based on the market price, the market capitalization for MINDBODY Common Stock averaged $1.44 billion during the Class Period.[106] **Exhibit 9** shows MINDBODY's market capitalization over both the Analysis Period and the Class Period. **Exhibit 10** shows that MINDBODY Common Stock market capitalization ranged from the 54th to 66th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Analysis Period, and was in the 66th percentile during the Class Period.[107] In other words, over the Analysis Period, MINDBODY Common Stock had a higher market capitalization than at least 54% of the firms on the combined NYSE and NASDAQ exchanges. During the Class Period, MINDBODY Common Stock had a higher market capitalization than 66% of the firms on the combined NYSE and NASDAQ exchanges.

77. Given that the market capitalization for MINDBODY Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for MINDBODY Common Stock.

## G. *KROGMAN* FACTOR 2: THE BID-ASK SPREAD

78. The *Krogman* Court's second additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[108] The bid-ask spread is an important

---

[104] There were between 30.8 million and 45.6 million shares of MINDBODY Common Stock outstanding throughout the Analysis Period.

[105] MINDBODY, Inc. SEC filings submitted throughout the Class Period. *See* **Exhibit 12**.

[106] The market capitalization for MINDBODY Common Stock averaged $1.35 billion during the Analysis Period.

[107] Bloomberg EQS Function.

[108] *Krogman*, 202 F.R.D. at 478.

indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency. Thus, a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information.

79.    I analyzed bid-ask spreads for MINDBODY Common Stock during the Analysis Period. **Exhibit 11** shows that during this period, the time-weighted average percentage bid-ask spread for MINDBODY Common Stock in each month was between 0.018% and 0.237%.[109] This is well below the average bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in April 2017 (the full month during the Analysis Period when MINDBODY had the largest percentage bid-ask spread).[110,111] **Exhibit 11** demonstrates that MINDBODY Common Stock had a monthly average bid-ask spread of 0.24% in April 2017,

---

[109] This only includes the dates in January 2017 encompassed by the Analysis Period. Were one to include data for the entire month of January 2017, the average bid-ask spread was 0.0013% which is fully consistent with my conclusions set forth below that the bid-ask differential during the Analysis Period is supportive of market efficiency for MINDBODY Common Stock. The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

[110] Quote data for MINDBODY and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[111] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ for April 2017 and then randomly generated a list of 100 common stock securities trading for at least at $1. I then calculated the time-weighted average monthly bid-ask spread for April 2017.

while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.883% and a median bid-ask spread of 0.187%. MINDBODY Common Stock consistently had a bid-ask spread below the average and median during the Class Period.[112] Accordingly, MINDBODY Common Stock's bid-ask spread was low and this factor further supports market efficiency for MINDBODY Common Stock during the Class Period (and Analysis Period).

### H.   *KROGMAN* FACTOR 3: PUBLIC FLOAT

80.    The *Krogman* Court's last additional factor is the public float (*i.e.*, the amount of shares not held by insiders) which is considered to be indicative of market efficiency. As shown in **Exhibit 12**, during the Class Period, insiders held, on average, 2.72% of all outstanding shares of MINDBODY Common Stock, meaning that approximately 97% of MINDBODY's shares were held by non-insiders.[113] This large percentage of shares held by non-insiders – a substantial percentage of which were purchased and held by institutional investors – supports a finding of market efficiency.

### I.   ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP

81.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 12** shows, 187 institutions reported owning MINDBODY Common Stock

---

[112] During the Analysis Period, MINDBODY Common Stock consistently had a bid-ask spread below the average and in-line with the median.

[113] During the Analysis Period, insiders held, on average, 3.55% of all outstanding shares of MINDBODY Common Stock, meaning that approximately 96% of MINDBODY's shares were held by non-insiders.

during the Class Period, holding the vast majority of the public float.[114,115] This substantial level of institutional ownership of MINDBODY Common Stock during the Class Period (and Analysis Period) coupled with the high trading volume further supports a conclusion of market efficiency.

## J. ADDITIONAL FACTOR: AUTOCORRELATION

82. If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

83. Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Inefficiency would only be indicated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[116]

84. A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[117] If the previous day's abnormal

---

[114] 365 institutions reported owning MINDBODY Common Stock during the Analysis Period, holding the vast majority of the public float.

[115] S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are only available every quarter; therefore, occasionally the time difference in data updates may cause institutional holdings to appear to exceed shares outstanding and the public float. Furthermore, while third-party providers of institutional holdings data attempt to prevent double-counting of shares, the fact that the reported institutional holdings exceed the estimated public float suggests that some double counting may be present. This does not affect or undermine my primary point that sophisticated institutions held a large percentage of MINDBODY Common Stock.

[116] Doron Avramov, Tarun Chordia & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95-101 (1978).

[117] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

return has no statistically significant predictive power, then there is no evidence of autocorrelation.

85. **Exhibit 13** displays the autocorrelation coefficient for MINDBODY Common Stock for the Analysis Period using the abnormal returns from the event study model described above. The coefficient is not statistically different than zero, meaning there is no evidence of persistent autocorrelation in the trading of MINDBODY Common Stock during the Analysis Period.[118] These results are consistent with the notion that an investor could not consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that MINDBODY Common Stock traded in an efficient market throughout the Analysis Period.

### K.   ADDITIONAL FACTOR: OPTIONS

86. In addition to the factors analyzed above, there was also considerable option trading in MINDBODY Common Stock during the Analysis Period.[119] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[120] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market

---

[118] I note that the autocorrelation coefficients for Q3 2018 and Q1 2019 during the Analysis Period are each statistically different than zero with a t-statistic of 1.77 and -2.17 respectively. However, **Exhibit 13** shows that the autocorrelation coefficient for the Analysis Period was close to zero, not statistically significant, and switched from negative to positive during the quarters of interest. These results are not consistent with investors being able to arbitrage and earn riskless profits as a result of autocorrelation.

[119] For instance, according to Bloomberg, there were 43,180 MINDBODY Common Stock put contracts and 82,352 MINDBODY Common Stock call contracts that traded during the Analysis Period.

[120] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

quality of the underlying stocks.[121] Thus, this factor also supports that MINDBODY Common Stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

87. Counsel for the Co-Lead Plaintiffs also asked me to opine on whether per share damages could be measured for all Class members under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Co-Lead Plaintiffs' theory of liability. I understand under the specific facts and theory of Co-Lead Plaintiffs' case, Counsel for Co-Lead Plaintiffs believes class members should be legally entitled to damages based upon the difference between their sale price and the "fair value" of their shares as of the time the share was sold. This would represent the economic loss that was suffered as a result of selling their shares at less than a fair transaction price. Such an approach could be performed on a class-wide basis since the determination of the "fair value" would be the same for all class members and the remainder of the calculation would be formulaic based upon the investors' transaction price.

88. Separately, damages could also be quantified class-wide using the standard and well-accepted "out-of-pocket" method.[122] In this matter, where there is a claim of artificial deflation in the securities price, the out-of-pocket method implies damages are equal to the artificial deflation in the share price at the time of sale minus the artificial deflation per share at the time of purchase (or just the artificial deflation at the time of sale if the share is purchased

---

[121] Raman Kumar, Atulya Sarin & Kuldeep Shastri, "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," 53 *J. FIN*. 717 (1998).

[122] The common terminology "out-of-pocket" method is a term frequently used in this context, but does not imply that other approaches do not measure out of pocket damages, as opposed to – for example – benefit of the bargain damages.

prior to the alleged misstatements and/or omissions).[123] The out-of-pocket method has been applied in virtually every matter in which I have observed or participated in as a consulting, testifying, or neutral expert.

89.     Once the deflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (*i.e.*, the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

90.     Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial deflation per share that is an input to the damages methodology. The quantification of the artificial deflation per share requires a detailed loss causation analysis.[124] The method for determining the artificial deflation per share would be common to all class members.

91.     The loss causation analysis would also require an analysis of how deflation per share may have evolved over the class period. Again, the nature of this analysis is intensely

---

[123] Typically, when there are claims of artificial inflation in a security price, damages under Section 10(b) are subject to a statutory limitation. Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49. However, the application of this statutory limit is neither possible nor logical in the context of a claim of artificial deflation where the security no longer traded after the completion of the Vista Acquisition.

[124] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery. A common methodology for determining artificial inflation/deflation is to conduct a factually appropriate event study. An event study looks at a stock price reaction to a public disclosure and isolates the effect of particular disclosure. Here, for example, an event study could be performed to measure the deflation introduced into MINDBODY's stock by the disclosure of the allegedly false Q4 2018 guidance.

factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar", inflation/deflation which implies that the artificial deflation was the same dollar amount during the class period. In certain circumstances, it may be more reasonable to apply "constant percentage deflation," which implies the price was deflated by a consistent percentage in the absence of additional disclosures. Depending on the facts of the case, the artificial deflation could evolve based upon the nature and timing of specific misstatements. To summarize, the determination of how artificial deflation evolved over the class period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

92. Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations would likely depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a common methodology that can be applied to the Class as a whole.

## IX. CONCLUSION

93. In sum, every factor analyzed supports my opinion that MINDBODY Common Stock traded in an efficient market during the Class Period (and Analysis Period). Furthermore, class-wide damages in this matter can be calculated on a class-wide basis using a common methodology.

45

94. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 15, 2021

Chad Coffman

**Exhibit 1**
**Summary of Efficiency Factors for MINDBODY, Inc.**

| Factor | Summary of Factor | MINDBODY, Inc. |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • During the Analysis Period, the average weekly trading volume of 7.63%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 3.27 million shares traded weekly on average during the Analysis Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Analysis Period at least 16 securities analysts issued 138 analyst reports which implies that important information relevant to trading MINDBODY was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because MINDBODY's Class A Common Stock shares were exchange-traded on the Nasdaq during the Analysis Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Analysis Period, there were at least 117 market makers for MINDBODY Class A Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • MINDBODY filed a Form S-3ASR during the Analysis Period (after-market hours on May 22, 2017). I have found no evidence to believe that MINDBODY was not S-3 eligible throughout the Analysis Period, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for MINDBODY Class A Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 3/31/2017 and 12/31/2018, MINDBODY's Class A Common Stock market capitalization was $960.31 million and $1,652.61 million, respectively, which is at least the 54th percentile of all NYSE and NASDAQ stocks. MINDBODY therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Analysis Period, the average percentage bid-ask spread for MINDBODY Class A Common Stock in each month ranged from 0.018% to 0.237%. MINDBODY's average percentage bid-ask spread was well below the mean and in-line with the median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in April 2017 (the full month when MINDBODY had the largest bid-ask spread). This supports a finding of efficiency. |
| Float and Institutional Ownership | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • On average, over 96% of MINDBODY Class A shares were held by non-insiders. 365 institutions held the vast majority of the public float throughout the Analysis Period which further supports the finding that MINDBODY Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading MINDBODY Class A Common Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 43,180 MINDBODY put contracts and 82,352 MINDBODY call contracts that traded during the Analysis Period. MINDBODY therefore easily meets this criterion. |



**Exhibit 2**
**MINDBODY Class A Common Stock Price & Volume**
**1/1/2017- 2/14/2019**

Sources: Complaint, Opinion and Order, S&P Capital IQ, and Factiva.



**Exhibit 3**

**MINDBODY Class A Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding**

**1/9/2017 - 2/14/2019**

# Exhibit 4
## Summary of Securities Analyst Reports Issued for MINDBODY

| | Analyst Name | Reports Issued During the Analysis Period: 1/9/2017 - 2/14/2019 |
|---|---|---|
| [1] | ROTH CAPITAL PARTNERS, LLC | 29 |
| [2] | JEFFERIES LLC | 16 |
| [3] | JP MORGAN | 13 |
| [4] | NORTHLAND CAPITAL | 13 |
| [5] | UBS INVESTMENT BANK | 12 |
| [6] | CRAIG HALLUM CAPITAL GROUP LLC | 11 |
| [7] | MORGAN STANLEY | 10 |
| [8] | CREDIT SUISSE | 9 |
| [9] | JMP SECURITIES LLC | 6 |
| [10] | WELLS FARGO | 6 |
| [11] | SEEKING ALPHA | 3 |
| [12] | WRIGHT INVESTORS SERVICE | 3 |
| [13] | WILLIAM BLAIR | 3 |
| [14] | WILLIAM O'NEIL AND COMPANY | 2 |
| [15] | IMPERIAL CAPITAL, LLC | 1 |
| [16] | SUMMIT INSIGHTS GROUP | 1 |
| | **Total** | **138** |

Sources: Counsel for Lead Plaintiffs and Seeking Alpha.
Notes:
(1) We received analyst reports from Counsel for Lead Plaintiffs and this list almost certainly understates the total amount of analyst coverage. For example, I do not have access to Key Banc analyst reports and on January 8, 2019, Dow Jones Institutional News reported that KeyBanc downgraded MINDBODY to Sector Weight.

**Exhibit 5**

**Coefficients from Rolling Event Study Regression for MINDBODY Class A Common Stock During the Pre-Offer Period**

**1/9/2017 – 12/24/2018**



—— Nasdaq Computer Price Return Index Coefficient    —— S&P 500 Total Return Index Coefficient

Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (Nasdaq Computer Price Return Index). MINDBODY compares its stock performance to the Nasdaq Computer Index in its 10-Ks during the Analysis Period (Forms 10-K for the fiscal years ended December 31, 2015 - December 31, 2017). The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and 12/24/2018 (the date on which the MINDBODY acquisition by Vista was announced) have been removed from estimation.

Case 1:19-cv-08331-VEC   Document 107-1   Filed 10/15/21   Page 52 of 79

**Exhibit 6**

**Standard Deviation of the Errors for Rolling Event Study Regression for MINDBODY Class A Common Stock During the Pre-Offer Period**

**1/9/2017 – 12/24/2018**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (Nasdaq Computer Price Return Index). MINDBODY compares its stock performance to the Nasdaq Computer Index in its 10-Ks during the Analysis Period (Forms 10-K for the fiscal years ended December 31, 2015 - December 31, 2017). The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and 12/24/2018 (the date on which the MINDBODY acquisition by Vista was announced) have been removed from estimation.

**Exhibit 7**
**Event Study Analysis of MINDBODY Earnings Announcements**

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Statistic | Sig Level (2) |
|---|------|------|-------------|-------|----------|---------------|------------|-----------------|------------------------|-------------|---------------|
| | | | | | | | | Rolling Regression Model (120-day window) (1) | | | |
| 1 | 2/8/2017 | 4:05 PM | 2/9/2017 | Q4 and FY 2016 Earnings | MINDBODY Reports Fourth Quarter and Full Year 2016 Financial Results *Source - GlobeNewswire* | $24.40 | -2.98% | -3.14% | -$0.79 | -1.43 | |
| 2 | 5/4/2017 | 4:05 PM | 5/5/2017 | Q1 2017 Earnings | MINDBODY Reports First Quarter 2017 Financial Results *Source - GlobeNewswire* | $25.85 | -9.30% | -10.09% | -$2.88 | -5.16 | *** |
| 3 | 7/26/2017 | 4:05 PM | 7/27/2017 | Q2 2017 Earnings | MINDBODY Reports Second Quarter 2017 Financial Results *Source - GlobeNewswire* | $25.50 | -2.30% | -1.71% | -$0.45 | -1.13 | |
| 4 | 10/26/2017 | 4:05 PM | 10/27/2017 | Q3 2017 Earnings | MINDBODY Reports Third Quarter 2017 Financial Results *Source - GlobeNewswire* | $32.65 | 15.17% | 12.20% | $3.46 | 7.01 | *** |
| 5 | 2/21/2018 | 4:07 PM | 2/22/2018 | Q4 and FY 2017 Earnings | MINDBODY Reports Fourth Quarter and Full Year 2017 Financial Results *Source - GlobeNewswire* | $35.55 | 6.60% | 6.42% | $2.14 | 3.14 | *** |
| 6 | 5/8/2018 | 4:05 PM | 5/9/2018 | Q1 2018 Earnings | MINDBODY Reports First Quarter 2018 Financial Results *GlobeNewswire* | $36.05 | -17.60% | -19.00% | -$8.31 | -9.81 | *** |
| 7 | 7/31/2018 | 4:08 PM | 8/1/2018 | Q2 2018 Earnings | MINDBODY Reports Second Quarter 2018 Financial Results *GlobeNewswire* | $35.00 | -6.29% | -8.32% | -$3.11 | -4.46 | *** |
| 8 | 11/6/2018 | 4:05 PM | 11/7/2018 | Q3 2018 Earnings | MINDBODY Reports Third Quarter 2018 Financial Results *GlobeNewswire* | $26.18 | -19.77% | -23.01% | -$7.51 | -10.38 | *** |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index (Nasdaq Computer Price Return Index). MINDBODY compares its stock performance to the Nasdaq Computer Index in its 10-Ks during the Analysis Period (Forms 10-K for the fiscal years ended December 31, 2015 - December 31, 2017). The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements and 12/24/2018 (the date on which the MINDBODY acquisition by Vista was announced) have been removed from estimation.
(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 8**

**Comparison of Statistical Significance and Abnormal Returns
for MINDBODY Earnings Announcements
vs. Days with No News during the Pre-Offer Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 8 | 146 |
| Significant Days at 95% Confidence Level | 6 | 3 |
| % Significant Days at 95% Confidence Level [2] | 75.00% | 2.05% |
| Average Absolute Abnormal Return [3] | 10.49% | 1.42% |
| Average Volume (Millions) [4] | 2.75 | 0.45 |

Notes:

(1) Results are based on the Pre-Offer Period (1/9/2017 - 12/24/2018). For the purposes of this analysis, I selected the 146 days with no news. Days with no news were days that had zero news articles via the Factiva database, no MINDBODY conferences or press releases, and no analyst reports or SEC filings were issued.

(2) 75.00% rate of statistical significance is statistically significantly different than 2.05% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.

(3) 10.49% absolute return is statistically significantly different than 1.42% based on a t-test for difference of means at the 99% confidence level.

(4) The difference between 2.75 million and 0.45 million is statistically significant at the 99% confidence level.



**Exhibit 10**
**MINDBODY Class A Common Stock**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (millions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q1 2017 | $960.31 | 54% |
| Q2 2017 | $1,148.54 | 56% |
| Q3 2017 | $1,093.21 | 55% |
| Q4 2017 | $1,300.99 | 57% |
| Q1 2018 | $1,683.16 | 62% |
| Q2 2018 | $1,689.83 | 63% |
| Q3 2018 | $1,805.46 | 64% |
| Q4 2018 | $1,652.61 | 66% |

Sources: Bloomberg, SEC filings, and S&P Capital IQ.

Case 1:19-cv-08331-VEC    Document 107-1    Filed 10/15/21    Page 57 of 79

**Exhibit 11**

**MINDBODY Class A Common Stock Average Monthly Bid-Ask Percentage Spread**

**1/9/2017 - 2/14/2019**

Average Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in April 2017: 0.883%

Median Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in April 2017: 0.187%

Sources: Thomson Reuters Eikon and TICK Data.

Note: January 2017 and February 2019 data are limited to the Analysis Period.

**Exhibit 12**
**MINDBODY Class A Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2017 | 34,984 | 144 | 1,811 | 2,802 | 35,975 | 5.18% | 30,221 | 86.4% | 84.0% |
| 6/30/2017 | 42,226 | 159 | 1,848 | 3,028 | 43,405 | 4.38% | 40,157 | 95.1% | 92.5% |
| 9/30/2017 | 42,291 | 156 | 1,751 | 5,924 | 46,463 | 4.14% | 42,903 | 101.4% | 92.3% |
| 12/31/2017 | 42,726 | 169 | 1,494 | 4,906 | 46,137 | 3.50% | 42,586 | 99.7% | 92.3% |
| 3/31/2018 | 43,269 | 179 | 1,212 | 3,896 | 45,953 | 2.80% | 43,581 | 100.7% | 94.8% |
| 6/30/2018 | 43,778 | 195 | 1,254 | 6,359 | 48,883 | 2.86% | 46,866 | 107.1% | 95.9% |
| 9/30/2018 | 44,415 | 192 | 1,248 | 8,783 | 51,949 | 2.81% | 51,817 | 116.7% | 99.7% |
| 12/31/2018 | 45,401 | 187 | 1,234 | 9,215 | 53,382 | 2.72% | 43,246 | 95.3% | 81.0% |
| **Total Institutions over Analysis Period:** | 365 | | | | **Analysis Period Average:** | 3.55% | | 100.29% | 91.58% |

Sources: S&P Capital IQ and SEC filings.
Notes:
(1) S&P Capital IQ updates short interest every two weeks while updates to institutional holdings via 13-F filings are only available every quarter; therefore, occasionally the time difference in data updates may cause institutional holdings to appear to exceed shares outstanding and the public float.

**Exhibit 13**
**MINDBODY Class A Common Stock**
**Test for Autocorrelation During the Analysis Period**

| Quarter | Coefficient on Previous Day's Abnormal Return[1] | t-Statistic | Sig Level[2] |
|---|---|---|---|
| Q1 2017 | 0.00 | 0.02 | |
| Q2 2017 | 0.12 | 0.95 | |
| Q3 2017 | -0.04 | -0.34 | |
| Q4 2017 | -0.04 | -0.28 | |
| Q1 2018 | -0.16 | -1.20 | |
| Q2 2018 | 0.06 | 0.45 | |
| Q3 2018 | 0.22 | 1.77 | * |
| Q4 2018 | 0.00 | -0.03 | |
| Q1 2019 | -0.37 | -2.17 | ** |
| **Analysis Period** | **0.01** | **0.25** | |

Source: S&P Capital IQ.
Notes:
(1) For each quarter, I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable.
(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

# Appendix A
# Documents Considered

## Court Documents

- Amended Class Action Complaint for Violations of the Federal Securities Laws filed December 20, 2019, *In Re MINDBODY, Inc. Securities Litigation*, No. 1:19-cv-08331-VEC.
- Amended Class Action Complaint for Violations of the Federal Securities Laws filed August 18, 2021, *In Re MINDBODY, Inc. Securities Litigation*, No. 1:19-cv-08331-VEC.
- Opinion and Order filed September 25, 2020, *In Re MINDBODY, Inc. Securities Litigation*, Case No. 1:19-cv-08331-VEC, ECF No. 52.
- Opinion and Order filed August 12, 2021, *In Re MINDBODY, Inc. Securities Litigation*, Case No. 1:19-cv-08331-VEC, ECF No. 93.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283-84 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings

- MINDBODY, Inc. SEC Form 10-K filings submitted throughout the Class Period and Analysis Period.
- MINDBODY, Inc. SEC Form 10-Q filings submitted throughout the Class Period and Analysis Period.
- MINDBODY, Inc. SEC Form 8-K filings submitted during the Class Period and Analysis Period.
- MINDBODY, Inc. SEC Form S-3ASR filed on May 22, 2017.
- MINDBODY, Inc. Def 14-A, DefA 14-A, and PREM 14-A Proxy Statements submitted during the Class Period and Analysis Period.

## Security Data

- Historical data for MINDBODY, Inc. Common Stock, the S&P 500 Total Return Index, and the Nasdaq Computer Price Return Index were obtained from S&P Capital IQ.
- Trade and quote data for MINDBODY, Inc. Common Stock during the Analysis Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for April 2017 were obtained from Tick Data, *see*

https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for April 2017 were identified using Thomson Reuters Eikon.

- Institutional and insider holdings data was obtained from S&P Capital IQ.
- MINDBODY, Inc. Common Stock options data was obtained from Bloomberg.
- MINDBODY, Inc. Common Stock market makers data was obtained from Bloomberg, using the RANK function.
- MINDBODY, Inc. Common Stock market capitalization percentiles were obtained from Bloomberg.
- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

## MINDBODY, Inc. News

- MINDBODY, Inc. news headlines and select articles downloaded from Factiva for the Class Period and Analysis Period. The 162 unique articles for the Class Period ("November 7, 2018 – February 14, 2019") were identified as a result of two searches: 1) for "All Sources" with the company field "MINDBODY, Inc." and 2) for "Major News and Business Sources" with the keyword field "MINDBODY" and excluding results with the company field "MINDBODY, Inc." and "New 52-Week Highs And Lows". The 786 unique articles for the Analysis Period ("January 9, 2017– February 14, 2019") were identified as a result of the same two searches. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type. Articles include:
    - o "Mindbody Cut to Sector Weight From Overweight by KeyBanc," *Dow Jones Institutional News*, January 8, 2019.
    - o "MINDBODY Enters into Definitive Agreement to be Acquired by Vista Equity Partners for $1.9 Billion ," *Globe Newswire,* December 24, 2018, 8:00 AM ET.
- MINDBODY, Inc. earnings conference call and investor call transcripts during the Class Period and Analysis Period.
- MINDBODY, Inc. earnings and guidance update press releases during the Class Period and Analysis Period, including but not limited to:
    - o "MINDBODY Reports Third Quarter 2017 Financial Results," *Nasdaq OMX GlobeNewswire,* October 26, 2017. 4:05 PM ET.

## MINDBODY, Inc. Analyst Reports

- MINDBODY, Inc. analyst reports supplied by Counsel for the Lead Plaintiffs for the period of January 9, 2017 – February 14, 2019, including but not limited to:
    - o "Q3: Subs Lag But Monetization Shines," *Jefferies,* October 27, 2017.
    - o "3Q17: 30%+ Growth and First Operating Profit," *J.P. Morgan,* October 27, 2017.

- Seeking Alpha articles or reports for MINDBODY, Inc. published during the Analysis Period under the site's "Analysis" section.

**Academic Articles**

- Aharony, J., and Swary, I., "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).
- Avramov, D., et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994).
- Beaver, William H., "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- Binder, J., *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Braun, P., et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575 (1995).
- Callahan, S., et al., "Appraisal Arbitrage and Shareholder Value," *Journal of Law, Finance & Accounting,,* 93(5), 2018.
- Easterbrook, F. and Fischel, D., "The Proper Role of a Target's Management in Responding to a Tender Offer," *Harvard Law Review*, Vol. 94(6), 1981.
- Fabozzi, F., Modigliani, F., Jones, F., *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Fama, E., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).
- Greene, W., *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Gujarati, D., *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Huang, R., and Stoll, H., *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).
- Hutson, E.R. and Kearney, C., "Volatility in stocks subject to takeover bids: Australian evidence using daily data," *Journal of Empirical Finance,* Vol. 8, No. 3, 2001.
- Jensen, M., *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).
- Kanda, H. and Levmore, S., "The Appraisal Remedy and the Goals of Corporate Law," *UCLA Law Review* 32(3), 1985.
- Kumar, R., et al., "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," 53 *J. FIN.* 717 (1998).

- MacKinlay, A., "Event Studies in Economics and Finance," 35 *J. ECON. LITERATURE* (1997).
- May, R., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- Mitchell, M., and Pulvino, T., "Characteristics of Risk and Return in Risk Arbitrage," *The Journal of Finance*, 56(6), 2001.
- The National Academies Press, *Reference Manual on Scientific Evidence*, Third Edition, 2011.
- Ross, S., *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).
- Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995.
- Subramamian, A., "Option Pricing on Stocks in Mergers and Acquisitions," *Journal of Finance,* 59(2), 2004.
- Tabak, D., and Dunbar, F., "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, Ch. 19, Third Edition, 2001.
- Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105 (2000).
- Van Tassel, P., "Merger Options and Risk Arbitrage," *Federal Reserve Bank of New York: Staff Reports No. 761*, 2016
- Weldy, M. J., "Appraisal Arbitrage: In Case of Emergency, Break Glass," *Notre Dame Law Review*, 93(5), 2018.

**Other**

- http://www.sec.gov/answers/mktmaker.htm.
- http://wallstreet.cch.com/LCM/Sections/
- https://www.nyse.com/market-model
- https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities
- http://www.rss-specifications.com/.
- http://www.rss-specifications.com/what-is-rss.htm.
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.
- https://indexes.nasdaqomx.com/Index/Overview/IXCO.

# Appendix B

## Chad W. Coffman, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:        (312) 470-6500
Mobile:        (815) 382-0092
Email:         ccoffman@globaleconomicsgroup.com


**EMPLOYMENT:**

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)


**EDUCATION:**

**CFA**    Chartered Financial Analyst, 2003

**M.P.P.**    University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

B.A.     Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

    o In Re: Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation. Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: Schering-Plough Corporation/ Enhance Securities Litigation. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: REFCO Inc. Securities Litigation. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
    o In Re: Computer Sciences Corporation Securities Litigation. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
    o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies. One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836. Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares. Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court for the Western District of Washington at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory. Filed expert report April 30, 2010. Filed expert rebuttal report August 4, 2010. Filed declaration re: Plan of Allocation September 25, 2011.

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court for the Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009. Filed declaration re: Plan of Allocation September 9, 2009.

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>. Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010. Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD, United States District Court for the Southern District of New York</u>. Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Expert declaration in <u>Grady Scott Weston et. al v. RCS Capital Corporation, et. al, Civil Action No. 1:14-CV-10136-GBD, United States District Court for the Southern District of New York</u>. Filed declaration re: aggregate damages August 11, 2017.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>. Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court for the Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015. Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc. and Apple Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015. Filed expert report September 20, 2018. Deposition December 7, 2018. Filed expert rebuttal report February 22, 2019. Filed expert report June 7, 2019. Deposition September 6, 2019.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court for the Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016. Filed expert reply report August 15, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>In Re Genworth Financial, Inc. Securities Litigation, Civ. A. No. 3:14-cv-00682-JAG, United States District Court for the Eastern District of Virginia, Richmond Division</u>. Filed declaration re: Plan of Allocation June 2, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts</u>. Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois</u>. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017. Filed expert report November 11, 2020. Filed expert rebuttal report December 14, 2020. Deposition January 29, 2021.

- Testifying expert in <u>Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California</u>. Filed expert report May 19, 2017. Deposition July 20, 2017. Filed expert rebuttal report September 14, 2017. Filed expert report January 22, 2019. Filed expert rebuttal report March 1, 2019. Deposition March 26, 2019.

- Testifying expert in <u>Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York</u>. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in <u>Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report December 21, 2017. Deposition February 22, 2018. Filed supplemental expert report March 9, 2018. Filed expert reply report June 14, 2018. Filed expert sur-sur reply report August 28, 2018.

- Testifying expert in <u>In Re: SanDisk LLC Securities Litigation, No. 3:15-cv-01455-VC, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report January 19, 2018. Deposition January 31, 2018. Filed expert report August 30, 2018. Filed expert report October 23, 2018. Deposition November 15, 2018. Filed declaration re: Plan of Allocation and calculation of aggregate damages May 6, 2019.

- Testifying expert in <u>In Re: EZCORP, Inc. Securities Litigation, No. 1:15-cv-00608-SS, United States District Court for the Western District of Texas.</u> Filed expert report January 31, 2018. Deposition March 6, 2018.

- Testifying expert in <u>Kevin Murphy, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Precision Castparts Corp., Mark Donegan, and Shawn R. Hagel, Defendants, No. 3:16-cv-00521-SB, United States District Court for the District of Oregon, Portland Division</u>. Filed expert report March 2, 2018. Filed expert report March 22, 2019. Filed expert reply report June 19, 2019. Deposition July 19, 2019.

- Testifying expert in <u>In Re: Rent-A-Center, Inc. Securities Litigation, No. 4:16-cv-00978-ALM-CMC, United States District Court for the Eastern District of Texas, Sherman Division</u>. Filed expert report March 13, 2018. Filed rebuttal reply report July 12, 2018. Deposition August 21, 2018.

- Testifying expert in <u>Public Employees' Retirement Systems of Mississippi, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. TreeHouse Foods, Inc., Sam K. Reed, Dennis F. Riordan and Christopher D. Silva, Defendants, No. 1:16-cv-10632, United States District Court for the Northern District of Illinois</u>. Filed expert report July 13, 2018. Deposition September 21, 2018. Filed rebuttal reply report May 17, 2019.

- Testifying expert in <u>Gary Hefler, et al., Plaintiffs, v. Wells Fargo & Company, et al., Defendants, No. 1:16-cv-05479-JST, United States District Court for the Northern District of California</u>. Filed declaration re: Plan of Allocation July 27, 2018**.**

- Testifying expert in <u>In re Banco Bradesco S.A. Securities Litigation, No. 1:16-cv-04155-GHW, United States District Court for the Southern District of New York</u>. Filed expert report August 17, 2018. Filed supplemental expert report October 11, 2018. Deposition October 12, 2018. Filed expert report December 14, 2018. Filed expert report March 8, 2019. Filed declaration re: Plan of Allocation July 19, 2019.

- Testifying expert in <u>Richard Di Donato, et al., Plaintiffs, v. Insys Therapeutics Incorporated, et al. Defendants, No. CV-16-00302-PHX-NVW, United States District Court for the District of Arizona.</u> Filed expert report August 31, 2018. Deposition October 4, 2018. Filed expert report November 30, 2018. Filed expert report July 26, 2019. Filed expert report November 1, 2019.

- Consulting expert in <u>In Re: Wilmington Trust Securities Litigation, Master File No. 10-cv-00990-ER, United States District Court for the District of Delaware.</u> Filed declaration re: Plan of Allocation and calculation of aggregate damages September 17, 2018.

- Testifying expert in <u>Atul Singh Deora, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Nanthealth, Inc., Patrick Soon-Shiong, Paul A. Holt, Michael S. Sitrick, Kirck K. Calhoun, Mark Bennett, Edward Miller, Michael Blaszyk, Jefferies Llc, First Analysis Securities Corporation, Canaccord Genuity Inc., And Fbr Capital Markets & CO., Defendants., No. 2:17-CV-01825-BRO-MRW, United States District Court for the Central District of California Western Division</u>. Filed expert report September 20, 2018.

- Testifying expert in <u>City of Sunrise General Employees' Retirement Plan, Plaintiff vs. FleetCor Technologies, Inc., et al., Defendants, No. 1:17-CV-02207-LMM, United States District Court for the Northern District of Georgia Atlanta Division</u>. Filed expert report January 4, 2019. Deposition March 20, 2019. Filed expert report May 6, 2019.

- Testifying expert in <u>Guevoura Fund LTD., On Behalf of Itself and All Others Similarly Situated, Plaintiffs, v. Robert F.X. Sillerman, D. Geoffrey Armstrong, John Miller, Michael John Meyer, and SFX Entertainment, Inc., Defendants, Case No. 1:15-cv-07192-CM, Case No. 1:18-cv-09784-CM,</u>

United States District Court for the Southern District of New York. Filed expert report January 18, 2019.

• Testifying expert in Leon D. Milbeck On Behalf of Himself and All Others Similarly Situated, v. TrueCar, Inc, et al., Defendants, No. 2:18-cv-02612-SVW, United States District Court for the Central District of California. Filed expert report March 8, 2019. Deposition April 8, 2019.

• Testifying expert in Lewis Cosby, Kenneth R. Martin, as Beneficiary of the Kenneth Ray Martin Roth IRA, and Martin Weakly On Behalf of Themselves and All Others Similarly Situated, vs. KPMG, LLP, Case No. 3:16-cv-00121, United States District Court for the Eastern District of Tennessee, Knoxville Division. Filed expert report March 15, 2019. Deposition April 12, 2019. Filed supplemental expert report April 19, 2019. Deposition April 25, 2019. Filed rebuttal reply report June 14, 2019.

• Testifying expert in Shawn Sanawaz, Individually and On Behalf of All Other Similarly Situated, v. Intellipharmaceutics International Inc., Isa Odidi, and Domenic Della Penna, Defendants, No. 1:17-cv-05761-JPO, United States District Court for the Southern District of New York. Filed expert report May 06, 2019.

• Testifying expert in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

• Testifying expert in West Virginia Investment Management Board, Stichting Blue Sky Global Equity Active Low Volatility Fund, and Stitching Blue Sky Active Large Cap Equity USA Fund vs. SCANA Corporation., et al., Civ. A. No. 3:17-cv-2616-MBS, United States District Court for the District of South Carolina. Filed expert report June 28, 2019. Deposition August 16, 2019.

• Testifying expert in Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee. Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

• Testifying expert in In Re Dr. Reddy's Laboratories Limited Securities Litigation, No. 3:17-cv-06436-PGS-DEA, United States District Court for the District of New Jersey. Filed expert report July 19, 2019. Deposition September 10, 2019.

• Testifying expert in Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado. Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in <u>In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York.</u> Filed expert report February 13, 2020.

- Testifying Expert in <u>In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey.</u> Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in <u>Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York</u>. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors,</u> <u>Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California,</u> <u>San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on</u> <u>Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner,</u> <u>Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of</u> <u>New York</u>. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated,</u> <u>Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil</u> <u>Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of</u> <u>Pennsylvania</u>. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf</u> <u>of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K.</u> <u>McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-</u> <u>02031-JSR, United States District Court for the Southern District of New York</u>. Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in <u>Employees' Retirement System of the Puerto Rico Electric Power Authority,</u> <u>Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok</u> <u>Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States</u> <u>District Court for the District of New Jersey.</u> Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in <u>The Police Retirement System of St. Louis, Individually and On Behalf of All</u> <u>Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts,</u> <u>Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States</u> <u>District Court for the Northern District of California.</u> Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in <u>Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as</u> <u>Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly</u> <u>Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.),</u> <u>Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District</u> <u>of New York.</u> Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021.

- Testifying Expert in <u>Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated,</u> <u>Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-</u> <u>cv-6790, United States District Court for the Northern District of Illinois.</u> Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., Blackrock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey.</u> Filed expert report on June 23, 2021. Filed expert report on September 29, 2021.

- Testifying Expert in <u>In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York</u>. Filed expert report on July 14, 2021. Deposition September 30, 2021.

- Testifying Expert in <u>Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report on September 17, 2021.

- Testifying Expert in <u>Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report on September 30, 2021.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

- Testifying expert in <u>Vincent Torbio, et al. against Feldor Billiards Inc. D/B/A Fatcat Billiards, et al., Index No. 153384/14, Supreme Court of the State of New Your, County of New York</u>. Filed expert report May 29, 2018. Deposition July 24, 2018.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Civil Action No. 1:19-cv-08331-VEC |

**AFFIDAVIT/EXPERT REPORT**

**OF**

**BENJAMIN SACKS**

October 15, 2021



TABLE OF CONTENTS

**I.**     **Introduction** ..................................................................................................................1

**II.**    **Qualifications** ..............................................................................................................2

**III.**   **Summary of Opinions** ...............................................................................................2

**IV.**   **Overview of Company and Allegations** ...................................................................3

**V.**    **Opinions** .....................................................................................................................4

      V.A.    There are four generally accepted valuation techniques that are commonly used in corporate valuation. ....................................................................................4

      V.B.    The DCF method is an appropriate technique for determining the Fair Value of Mindbody .................................................................................................5

      V.C.    DCF is applied differently when valuing young, growing companies versus mature companies ...................................................................................................5

      V.D.    The parameters and inputs to a properly calibrated DCF model require company-specific, internal data ..........................................................................6

      V.E.    A valuation can change over a period of time, but such changes can be modeled within a consistent framework ...........................................................7

      V.F.    These Fair Values are common to all class members and the methods used to derive them are common to all class members ..................................................8

**Appendix A: Sacks Resume** ................................................................................................9

**Appendix B: Material Relied Upon** ..................................................................................25

# I.    Introduction

1.   I, Benjamin Sacks, am a principal at The Brattle Group, a global economic consulting firm
     headquartered in Boston, Massachusetts with additional offices in Beijing, Brussels, Chicago,
     London, Madrid, New York, Rome, San Francisco, Sydney, Toronto, and Washington, D.C.
     Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd
     (collectively, "Plaintiffs") allege Defendants Richard L. Stollmeyer, Brett White, Eric Liaw, and
     Mindbody, Inc ("Mindbody") (collectively, "Defendants") manipulated Mindbody's share price
     as part of a scheme to defraud investors and enable Vista Equity Partners to acquire Mindbody
     (the "Merger") at an artificially low price.

2.   I understand Plaintiffs allege that during the class period:

     a.   Mindbody management released negative information to the market that was in fact false;[1]

     b.   Mindbody management then entered into the Merger agreement;[2]

     c.   While the Merger was pending, Mindbody management withheld positive information from
          the market that was in fact true;[3]

     d.   Mindbody management released projections, and Fairness Opinions from financial advisors,
          for Mindbody in a proxy statement for the Merger.[4]

3.   Plaintiffs' counsel has asked me to provide my opinion on (a) what generally accepted valuation
     techniques may be employed to determine the fair value of Mindbody using a class-wide
     methodology, on each day during the class period, and (b) what data or inputs would be required
     in order to perform such calculations. I have not been asked to, and have not, provided an
     opinion on whether damages in this case should be determined based on the fair value of

---

[1]   *E.g.*, Second Amended Complaint in this Action, ECF No. 95 ("Complaint"), ¶¶123-63.

[2]   Complaint, ¶179.

[3]   Complaint, ¶¶208-230.

[4]   *E.g.*, Schedule 14A, January 9, 2019, at 42, A-21 at https://www.sec.gov/Archives/edgar/data/1458962—
      /000119312519005308/0001193125-19-005308-index.htm; Schedule 14A, January 23, 2019, at 42, https://
      www.sec.gov/Archives/edgar/data/1458962/000119312519014341/d681305ddefm14a.htm#toc681305_44

Mindbody's common stock, only whether fair value can be determined using generally accepted valuation techniques and on a class-wide basis, as stated above.

## II.   Qualifications

4.  As a financial economist, I routinely conduct financial analysis, including valuation analysis and assessment of damages. I received a B.A. in mathematical economics from Columbia University and an M.A. in economics from the University of Chicago. I have more than twenty years' experience providing expert advice and testimony on the application of economics, finance, and statistics to valuations, damages, and determination of liability. I have served as an expert in matters before the Delaware Court of Chancery, and before Tribunals constituted under bilateral and multilateral international treaties (International Arbitration).

5.  The matters in which I was retained to serve either as a consulting or testifying expert from 2012 through the present are listed in Appendix A. The Brattle Group charges my customary hourly rate of $875 per hour for my time in this matter and is reimbursed for all out-of-pocket expenses in connection with this matter. My opinions are my own, and my compensation is not dependent on my opinions or the outcome of the case.

6.  My opinions and findings are based on information available to me at the time this report was prepared. The sources I relied upon in writing this report are listed in Appendix B. I reserve the right to supplement and/or amend this report if and when new information becomes available, including information obtained from the Defendants' expert reports and any additional discovery in this matter.

## III.   Summary of Opinions

7.  A "Fair Value" of Mindbody stock may be determined using generally accepted valuation techniques at any point during the Class Period. That same Fair Value applies to all stockholders and the methodology is the same for all stockholders.

8.  The Discounted Cash Flow ("DCF") method is an appropriate technique to determine Fair Value for Mindbody stock.

9. The calculation of the company's Fair Value is a factually intensive process, and will require a careful calibration to company-specific data that likely includes internal projections by management over time, as well as the market conditions, industry trends, and the state of the macro-economy at the time of the valuation.

10. A valuation can change over a period of time, but such changes can be accommodated within a consistent DCF framework.

## IV. Overview of Company and Allegations

11. Mindbody was a rapidly growing software company in the online market for booking fitness classes and spa appointments.[5] Mindbody became a public company in 2015.[6] At the end of 2018, Vista Equity Partners made an offer to take Mindbody private at $36.50 per share, a 68% premium to the company's stock price at the time.[7] The transaction closed in the first quarter of 2019.[8]

12. Mindbody's founder, Chairman, and CEO Richard Stollmeyer and others in Mindbody's management are alleged to have intentionally lowballed their earnings guidance in late 2018 in order to reduce the company's stock price, so that the merger offer would seem generous to shareholders by comparison.[9] Management is alleged to have known that their earnings guidance was not consistent with their internal projections.[10] Mindbody management is alleged to have suppressed the release of the true fourth quarter 2018 earnings figures until after the merger transaction closed, because the true earnings would have confirmed that the company had beaten their prior earnings guidance and market expectations.[11]

---

[5]  Complaint, ¶¶68-73, and Revenue in Item 6 in 2017 10K.
[6]  Complaint, ¶67.
[7]  Complaint, ¶¶177.
[8]  Complaint, ¶233.
[9]  Complaint, ¶¶123, 132, 134, 144.
[10]  Complaint, ¶¶134, 143.
[11]  Complaint, ¶¶214-230.

## V. Opinions

### V.A. There are four generally accepted valuation techniques that are commonly used in corporate valuation.

13. Four generally accepted valuation techniques are most commonly used by industry practitioners to value companies: (1) the Discounted Cash Flow method ("DCF"), (2) the Comparable Company method ("Comparables"), (3) the Precedent Transactions method, and (4) Market Price.

14. The **DCF** method involves forecasts of the company's unlevered free cash flow into the future that are discounted at the firm's Weighted Average Cost of Capital ("WACC") to obtain an estimate of the firm's intrinsic value. DCF is the most detailed of the four approaches and requires the most estimates and assumptions. However, because the DCF model and its assumptions are company-specific, it can yield the most accurate valuation, and can account for privately held information. DCF is also amenable to estimating firm value based on different scenarios, and can be used to generate a sensitivity analysis to the assumptions and projections used in the model. DCF may also be the only viable method when the other methods cannot be applied.

15. The **Comparables** method estimates the current value of the company by comparing it to other similar public companies based on market-based metrics like the price-equity ratio ("P/E"), the ratio of enterprise value to earnings before interest, taxes, depreciation and amortization ("EV/EBITDA"), and other ratios. The effectiveness of a Comparables analysis depends on finding a set of peer group companies that have business attributes sufficiently alike to the subject firm's profile to make a comparison of ratios reasonable.

16. The **Precedent Transactions** method involves comparing the company to recent sales and purchases of similar companies based on the same comparison of ratios as in the Comparables analysis. The prices at which these precedent transactions occurred will have a take-over premium embedded within the price, which may need to be removed for an analysis of Fair Value. The effectiveness of a Precedent Transactions analysis depends on finding a set of

transactions where the target business attributes are sufficiently alike to the subject firm's profile to make a comparison of ratios reasonable.

17. The **Market Price** method values a company based on the price of its publicly traded securities. It may be used to determine Fair Value when conditions are such that the Market Price - or analyses based on it - are likely to reflect all and only the information that it is supposed to reflect under the conditions of the valuation.

## V.B. The DCF method is an appropriate technique for determining the Fair Value of Mindbody

18. DCF does not require a set of comparable companies like the Comparables and Precedent Transactions methods, and it does not require an analysis of the Market Price of the company's shares. As noted above, DCF requires projections of company revenues and expenses into the future and an estimate of the company's WACC, both of which may be obtained through discovery, derived from data produced in discovery, and/or derived from publicly available sources. DCF can incorporate the private information known by company insiders about operations, earnings, and other financial projections.

## V.C. DCF is applied differently when valuing young, growing companies versus mature companies

19. A DCF valuation of a young company in a new and growing market must be prepared differently from one of a mature company in a developed market. The difference is often greater when the firm is in the technology space. A DCF model comprises two principal projections: the forecasted revenues and expenses that are based on company specific inputs and assumptions, and a terminal value, which is placed at the end of the forecast and represents the value of the company beyond the yearly forecast period.

20. The terminal value is modelled as of the end of the forecast period as the net present value of a company's cash flow, which are assumed to grow at a set growth rate, called the perpetual

growth rate ("PGR") forever.[12] Except in unusual circumstances, the PGR is between the expected long-term rates of inflation and GDP growth. Therefore, the date in the future at which the terminal value is modeled must be a date past the time when the company is growing at a rate greater than the economy.

21. For a mature company, it is generally sufficient to set that date three to five years from the valuation date. For a rapidly growing tech company, that date must be significantly further in the future, because the growth curve of the company requires more time to run before it converges to a steady-state that reflects long-term expectations for the economy. That date is dependent upon where the company is on its growth curve on the valuation date, the specific inputs that are driven by the company's near-term projections, and how long it will take for the company's market to achieve saturation.

22. Because of this longer forecast period, a properly calibrated DCF analysis of a company like Mindbody will look different from that of a mature company. A longer forecast period also means that the model must carefully define how the inputs and assumptions change over time.

## V.D.   The parameters and inputs to a properly calibrated DCF model require company-specific, internal data

23. In general for a DCF model, but more so for a small, rapidly growing technology company like Mindbody, the valuation expert must derive the inputs and parameters for the model from the most accurate, company (or market)-specific data available. Ideally, a DCF model utilizes data that originate from within the company, since company insiders typically have material information that outsiders do not. Data from insiders are supplemented by publicly available data on industry trends, the product market, the competitive environment, the relevant academic literature, and the expertise and experience of the valuation expert.

---

[12]   Terminal multiples are also used. Given a terminal multiple and a discount rate, one can infer the implied PGR. Similarly, given a PGR and a discount rate, one can infer the terminal multiple.

24. In the particular case of Mindbody, a Fair Value model would also require the ability to differentiate the allegedly false statements made to the market by management from the true projections made by management.

## V.E.   A valuation can change over a period of time, but such changes can be modeled within a consistent framework

25. This matter may require valuation estimates of Mindbody at different dates over a period of weeks or months. Once an initial valuation model is parameterized, and a value is determined for a given day, deriving values for other days is possible from one (or a combination of) two methods.

26. First, the company-specific inputs into the model may be revised to reflect new information on other dates of interest. This is typically inside information – for instance, new internal projections based on a change in the company's perception of its growth prospects – which again highlights the usefulness of the company's internal documentation and models. In some cases, if it is not certain when material information was known (or how well known it was), one could take a weighted average of the old and the new information during the period of uncertainty.

27. Second, market wide effects can prompt a change in DCF model assumptions. For instance, if market interest rates rise, that will affect the discount rate of a DCF model making further-in-the-future cash flows less valuable in present value terms. DCF can also account for the effect of broader movements in market-wide stock prices on target-firm value expected based via standard market-models.

28. Under certain conditions, the market price of a company's stock can be used as a check on the reasonability of a DCF valuation. Such conditions may exist during time periods when there is no material private information, when the stock price is free to respond to all publicly available information (e.g., before a deal is announced or suspected), and when the market price can be appropriately adjusted to remove the impact of any false information.
Applying the effects of these events at the appropriate times will generate a time series of a company valuation that is financially reasonable, internally consistent, and reflects important market and company-specific events or changes in information.

### V.F. These Fair Values are common to all class members and the methods used to derive them are common to all class members

29. These Fair Values are common to all class members and the methods used to derive them are common to all class members. The Fair Value of each share of Mindbody stock can be determined as a pro-rata share of the Fair Value of the firm, which is a determination that is common to all stockholders.

Benjamin Sacks
Washington D.C.
October 15, 2021

# Appendix A: Sacks Resume

**Benjamin Sacks** is a Principal in the Washington, DC office of The Brattle Group. Mr. Sacks has more than 20 years of experience assisting corporations, investors, U.S. government agencies, and foreign governments in developing and presenting economic and financial testimony in complex litigations and arbitrations. He has provided expert reports and testimony in numerous matters before Courts and arbitral Tribunals both in the United States and internationally.

Mr. Sacks has submitted expert reports and testimony in numerous valuations and corporate governance matters before international tribunals and U.S. courts. Recently, the Tribunal in *Devas v. India* (PCA Case No. 2013-09) accepted his testimony as the basis for DCF-based damages. Mr. Sacks also served as the economic damages expert for *Washington Post* reporter Jason Rezaian and his family in their lawsuit against the Islamic Republic of Iran and the Islamic Revolutionary Guard Corp, claiming damages for Iran's holding Mr. Rezaian hostage for more than a year. The court ordered Iran to pay $180 million in damages, including $10 million in economic damages and substantially adopted Mr. Sacks' analysis in reaching that figure. Mr. Sacks has extensive experience in valuation matters, including several Yukos-related arbitrations.

In a major U.S. litigation, Mr. Sacks was retained by shareholders in the *In Re Facebook Inc., Class C Reclassification Litigation* that sought to enjoin Facebook from issuing non-voting shares designed to allow Facebook's founder, Mr. Zuckerberg, to maintain his voting control of Facebook indefinitely. Mr. Sacks submitted expert reports and was deposed several times. Facebook cancelled its plans to issue those shares five days before trial was to begin.

Mr. Sacks teaches a Continuing Legal Education course on damages featuring several valuation case studies, has taught classes to attorneys on valuation and served as a panelist on damages at the recent Fordham Conference on International Arbitration in New York City. He has lectured at several law firms on the modern DCF method, which was used in the recent Tethyan matter. Mr. Sacks received his B.A. in mathematical economics from Columbia University and his M.A. in economics from the University of Chicago.

## AREAS OF EXPERTISE

- International Arbitration
- Finance, Valuation & Securities Analysis
- Commercial Damages & Lost Profits
- Statistical Analysis

## TESTIMONY and REPORTS

- *Public Employees' Retirement System of Mississippi, individually and on behalf of all others similarly situated v Advance Auto Parts, Inc., Thomas R. Greco, Thomas Okray, Starboard Value LP, and Jeffrey C. Smith, In The United States District Court For The District Of Delaware*, Case No. 1:18-cv-00212-MN. Reasonability of forecasts. Reports July, August and September 2021. Deposition October 2021.

- *Hollywood Firefighters' Pension Fund and Sheet Metal Workers' Local Union No. 80 Pension Trust Fund, on behalf of themselves and all others similarly situated v John C. Malone, Gregory B. Maffei, Gregg L. Engles, Ronald A. Duncan, Donne F. Fisher, and Richard R. Green*, Delaware Court of Chancery C.A. No. 2020-0880-SG. Fee application for settlement of corporate governance issues. Report July 2021, Deposition September 2021.

- *Matthew Sciabacucchi and Hialeah Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated v John Malone, Gregory Maffei, Michael Huseby, Balan Nair, Eric Zinterhofer, Craig Jacobson, Thomas Rutledge, David Merritt, Lance Conn, John Markley, Defendants and Charter Communications, Nominal Defendant*, Delaware Court of Chancery C.A. No. 11418-VCG. Damages from alleged breach of fiduciary duty in the context of a merger. Reports January and March 2021. Deposition April 2021.

- Market Efficiency and possibility to calculate class-wide damages in *In Re Synchronoss Technologies, Inc. Securities Litigation*, United States District Court District Of New Jersey, Civil Action No. 17-2978 (FLW)(ZNQ). Reports October 2020 and March 2021. Deposition February 2021.

- Financial Analysis in *Washtenaw County Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated, v. Walgreen Co., et al.*, United States District Court Northern District Of Illinois, Eastern Division, Case No. 1:15-cv-3187. Report November 2020. Deposition December 2020.

- Valuation of a Russian Trucking firm (London Court of International Arbitration). Reports 2018 and 2019. Testimony September 2019.

- Damages from improper oversight of servicing. *Phoenix Light SF DAC, et al. vs. The Bank of New York Mellon*, SDNY, Case No 1:18-cv-01194-VEC. Report September 2019. Deposition January 2020.

- Value of assets transferred out of a firm by the controlling shareholders. United States District Court for the Southern District of New York. Report June 2019.

- Valuation of a Canadian Telecommunications firm (ICSID). Reports February 2018 and January 2019. Testimony April 2019.

- *Mudrick Capital Management, L.P. and Warlander Asset Management, L.P., on behalf of themselves and all other similarly situated stockholders of Globalstar, Inc. and derivatively on behalf of Nominal Defendant Globalstar, Inc v. James Monroe, et. al*., Delaware Court of Chancery, C.A. No. 2018-0699 TMR. Benefit of Settlement relating to corporate governance changes at a telecommunications firm. Deposition and Report March 2019.

- Report on contractual damages relating to a buy/sell agreement for a controlling interest in a Korean Bank (International Chamber of Commerce). Report 2018.

- Valuation of Telecommunications firm in a developing country. Bilateral Investment Treaty heard under UNICTRAL rules, Permanent Court of Arbitration. Reports 2017 and 2018. Testimony 2018.

- *In Re Starz Stockholder Litigation*, Delaware Court of Chancery Consolidated C.A. No. 12584-VCG. Damages from alleged breach of fiduciary duty in the context of a merger. Reports and Deposition 2018.

- *NexBank, SSB v. Jeffrey Soffer and Jacquelyn Soffer*, Supreme Court of the State of New York, County of New York, Index No. 652072 / 2013. Value of real estate encumbered by cloud on title. Report January 2018.

- *In Re Facebook, Inc. Class C Reclassification Litigation*, Delaware Court of Chancery, Consolidated C.A. No 12286-VCL. Harm from issuance of zero vote stock. Reports and Deposition 2017. Additional Reports and Deposition 2018.

- Damages for Mr. Jason Rezaian, who was taken hostage by Iran. U.S. District Court for the District of Columbia. Civil Action No. 1:16-cv-01960-RJL. Report June 2017.

- *Application of the National Railroad Passenger Corporation under 49 U.S.C. § 24308(a) – Canadian National Railway Company*, Before the Surface Transportation Board, Finance Docket No. 35743, Verified Statement of Benjamin Sacks filed September 4, 2015. Expert testimony on a proposed penalty system for sub-standard service to Amtrak by host railroad. September 2015. Rebuttal filed September 2017.

- *SEC Administrative Proceeding in the Matter of BioElectronics Corp, et. al*., File No. 3-17104. Event study related to a corporate disclosure. Reports and Testimony, September 2016.

- Confidential Arbitration. Valuation of privately held telecommunications firm. Report October 2015.

Written Evidence of Benjamin Sacks

- *State of West Virginia ex rel., Patrick Morrisey, Attorney General v. Wells Fargo Insurance Services of West Virginia and Wells Fargo Insurance Services USA, Inc.*, Circuit Court of Hancock County, WV, Civil Action No. 05-C-115 W. Deposition January 21, 2016. Expert Affidavit and disclosure on opinions regarding existence and size of alleged overcharge for insurance policies, and related damages. Reports September 2015; Deposition November 2015.

- *National Credit Union Administration Board, as Liquidating Agent of Central Federal Credit Union v. RBS Securities, et. al*, Case No. 11-cv-2340-JWL-JPO and *National Credit Union Administration Board, as Liquidating Agent of Western Corporate Federal Credit Union v. RBS Securities*, CV 11-05887 GW (JEMx), Declaration of Benjamin Sacks Regarding Compilation and Summarization of RBS Due Diligence data. October 2015.

- *United States of America, ex rel., Michael Saunders, v. Unisys, Inc.*, United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No 1:12 CV 379 GBL/TCB. Damages Report July 2014. Deposition, September 2014.

- *Curbow Family LLC v. Morgan Stanley Investment Advisors Inc.*, Index No. 651059/2010 (Sup. Ct. NY) and *Rotz v. Van Kampen Asset Management*, Index No. 651060/2010 (Sup. Ct. NY). Expert report in support of Plaintiff's opposition to a motion for summary judgment, September 2012.

- *Howard M. Ehrenberg, Chapter 7 Trustee for the Estate of Ruderman Capital Partners, LLC v. Kevin L. Washington, James King and Knight Capital Group, et al.*, Superior Court of the State of California for the County of Orange, Case No. 30-2011 00450602. Declaration filed in support of defendant's motion for summary judgment or adjudication of claims, July 2012.

- *In re Delphi Financial Group Shareholder Litigation*, Delaware Court of Chancery, Consolidated C.A. No. 7144-VCG. Expert report and deposition, February 2012.

- *Wolfson-Verrichia Group, et al., v. Metro Commercial Real Estate, Inc., et al.*, United States District Court for the Eastern District of Pennsylvania, No. 08-CV-4997. Expert report October 2011, deposition November 2011.

- FIFRA data compensation matter (AAA Arbitration), Summary of Expert Opinions disclosed October 2010. Testimony November 2010.

- *Eastbanc, Inc. and Anthony M. Lanier v. Georgetown Park Associates II Limited Partnership, et al*., Superior Court of the District of Columbia, 2006 CA 002291 B**.** Supplemental Expert Statement and Rule 26(b)(4) Statement filed October 2010, deposition December 2008, Rule 26(b)(4) Statement filed October 2008.

- *Navy Federal Credit Union v. Fiserv Solutions and XL Specialty Insurance Company*, Index No. 09-601217-2009. Affidavit Of Benjamin Sacks in Support of Plaintiff Navy Federal Credit Union's Motion for Partial Summary Judgment filed October 2010, Expert Witness Disclosure filed pursuant to New York State CPLR § 3101(d) filed September 2010.

- *In re ACS Shareholder Litigation, Delaware Court of Chancery*, Consolidated C.A. No. 4940-VCP**.** Expert reports March and April 2010. Deposition April 2010.

- FIFRA data compensation arbitration: Summary of Expert Opinions disclosed in August 2009.

- *Teachers Retirement System of Louisiana v. Maurice R. Greenberg, Edward E. Matthews, Howard I. Smith, Thomas R. Tizzio, and C. V. Starr & Co. Inc.*, Delaware Court of Chancery, C.A. No 20106-VCS. Expert reports January and May 2008. Deposition June 2008.

- PW 5672, Harrison County fee dispute with FEMA regarding reasonable costs. Expert written opinion July 2007.

- Breach of contract matter (AAA arbitration). Testimony October 2006.

## EXPERIENCE

### *International Arbitration / International Litigation*

- Valuations of shares in publicly traded Russian oil company (Bilateral Investment Treaty Dispute, Stockholm Chamber of Commerce).

- Valuation of firm assets and lost profits of a Russian oil company (European Court of Human Rights).

- Valuation of shares in a Russian oil company (Bilateral Investment Treaty Dispute, Stockholm Chamber of Commerce).

- Valuation of oil transshipment facility in Commonwealth of Independent States (London Court of International Arbitration).

- ICC arbitration involving construction of oil platforms in Brazil.

- Valuation of a Russian oil company (PCA).

- Consulting expert on annulment and enforcement proceedings relating to an ECT award.

- Valuation of mining concessions in Latin America (Bilateral Investment Treaty heard under UNICTRAL rules, Permanent Court of Arbitration).

- Valuation of a Russian Trucking firm (LCIA).

- Valuation of shares in a joint venture owning a Uranium mine located in the former Soviet Union (London Court of International Arbitration).

- Valuation of Canadian Telecommunications firm (ICSID).

- Valuation of a Telecommunications Company in a developing country (Bilateral Investment Treaty heard under UNICTRAL rules, Permanent Court of Arbitration).

- Contractual damages relating to a buy/sell agreement for a controlling interest in a Korean Bank (BIT, International Chamber of Commerce).

- Damages expert for Mr. Jason Rezaian, who was taken hostage by Iran. U.S. District Court for the District of Columbia. Civil Action No. 1:16-cv-01960-RJL.

- Valuation of shares in a holding company that owns a chain of luxury hotels.

- Valuation of an investment bank in the Commonwealth of Independent States (former Soviet Union).

- Consulting expert for private equity investors in a Korean bank (Bilateral Investment Treaty, ICSID).

- ICDR arbitration involving allegations of breach of contract, theft of trade secrets and tortious interference in the telecom / mobile applications industry.

- Lost profits and hypothetical licensing fee involving a Chinese chemical company (Bilateral Investment Treaty Dispute, Stockholm Chamber of Commerce).

### *Finance and Valuation*

- *Matthew Sciabacucchi and Hialeah Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated v John Malone, Gregory Maffei, Michael Huseby, Balan Nair, Eric Zinterhofer, Craig Jacobson, Thomas Rutledge, David Merritt, Lance Conn, John Markley, Defendants and Charter Communications, Nominal Defendant*, Delaware Court of Chancery C.A. No. 11418-VCG. Damages from alleged breach of fiduciary duty in the context of a merger.

- Financial Analysis in *Washtenaw County Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated, v. Walgreen Co., et al.*, United States District Court Northern District Of Illinois, Eastern Division, Case No. 1:15-cv-3187. Report November 2020.

- Market Efficiency and possibility to calculate class-wide damages in *In Re Synchronoss Technologies, Inc. Securities Litigation*, United States District Court District Of New Jersey, Civil Action No. 17-2978 (FLW)(ZNQ). Report October 2020.

- Opt out damages for a large 10b5 matter, in both US and Canadian jurisdictions. Confidential.

- *Mudrick Capital Management, L.P. and Warlander Asset Management, L.P., on behalf of themselves and all other similarly situated stockholders of Globalstar, Inc. and derivatively on behalf of Nominal Defendant Globalstar, Inc v. James Monroe, et. al.*, Delaware Court of Chancery, C.A. No. 2018-0699 TMR. Testifying expert on benefit of Settlement relating to corporate governance changes, and other matters.

- Not disclosed. Testifying expert for a minority shareholder on the value of assets transferred out of a firm by the controlling shareholders. United States District Court for the Southern District of New York.

- Confidential consulting expert for a special litigation committee relating to a conflict-of-interest merger in the technology sector.

- *In Re Starz Stockholder Litigation*, Delaware Court of Chancery, Consolidated C.A. No. 12584-VCG. Testifying expert on damages from alleged breach of fiduciary duty in the context of a merger.

- *In Re Facebook, Inc. Class C Reclassification Litigation*, Delaware Court of Chancery, Consolidated C.A. No 12286-VCL. Testifying expert on the financial impact of the Reclassification on Facebook, Inc.'s stockholders, including its public Class A stockholders.

- *Teachers Retirement System of Louisiana v. Maurice R. Greenberg, Edward E. Matthews, Howard I. Smith, Thomas R. Tizzio, and C. V. Starr & Co. Inc.*, Delaware Court of Chancery, C.A. No 20106-VCS. Expert witness on economic evaluation of entire fairness regarding Hank Greenberg, the P&C MGA Starr and AIG.

- *NexBank, SSB v. Jeffrey Soffer and Jacquelyn Soffer*, Supreme Court of the State of New York, County of New York, Index No. 652072 / 2013. Testifying expert on value of real estate encumbered by cloud on title.

- Confidential matter involving management contract for a large REIT. Delaware Court of Chancery.

- *SEC Administrative Proceeding in the Matter of BioElectronics Corp, et. al.*, File No. 3-17104. Testifying expert on an event study related to a corporate disclosure.

- Confidential matter involving alleged self-dealing and breach of fiduciary duty, in large Mexican holding company. Delaware Court of Chancery.

- Confidential matter involving issuance of low voting stock. Delaware Court of Chancery.

- *Delphi Financial Group Shareholder Litigation*, Delaware Court of Chancery, Consolidated C.A. No. 7144-VCG. Expert witness on differential merger consideration offered to different classes of stock in a merger.

- *ACS Shareholder Litigation*, Delaware Court of Chancery, Consolidated C.A. No. 4940-VCP. Expert witness on differential merger consideration offered to different classes of stock in a merger.

- *Assured Guaranty (UK) LTD., in its own right and in the right of Orkney Re II PLC, v. J.P. Morgan Investment Management Inc.*, Index No. 603755/2008, consulting expert. Portfolio management standards and damages from alleged lack of suitability of investments.

- *Ambac Assurance UK LTD., in the name of Ballantyne Re PLC, v. J.P. Morgan Investment Management Inc.*, Index No. 650259/2009, consulting expert. Portfolio management standards and damages from alleged lack of suitability of investments.

- *U.S. Securities and Exchange Commission v. Daniel Mudd, Enrico Dallavecchia and Thomas Lund*, Civil Action No 11-CIV-9202. Rebuttal expert on impact on investors of Fannie Mae disclosures regarding credit characteristics of guarantee portfolio.

- *U.S. Securities and Exchange Commission v. Richard F, Syron, Patricia L. Cook and Donald J. Bisenius*, Civil Action No 11-CV-9201 (RJS). Testifying expert. Quantitative analysis of the loans in Freddie Mac's single family guarantee portfolio, loans underlying non-agency mortgage-backed securities, analysis of various Freddie Mac models.

- *Curbow Family LLC v. Morgan Stanley Investment Advisors Inc.*, Index No. 651059/2010 (Sup. Ct. NY) and *Rotz v. Van Kampen Asset Management*, Index No. 651060/2010 (Sup. Ct. NY). Expert witness regarding damages stemming from the redemption of Auction Rate Preferred Securities.

- *Navy Federal Credit Union v. Fiserv Solutions and XL Specialty Insurance Company*, Index No. 09-601217-2009. Expert witness. Statistical analysis of automated valuation model usage.

- *Howard M. Ehrenberg, Chapter 7 Trustee for the Estate of Ruderman Capital Partners, LLC v. Kevin L. Washington*, James King and Knight Capital Group, et al., Superior Court of the State of California for the County of Orange, Case No. 30-2011 00450602. Expert witness. Statistical analysis of trading patterns in an alleged pump and dump scheme.

- *Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co. Incorporated*, Palm Beach County, Florida, Case No. 2003 CA 005045 AI. Economic and financial analysis of damages for Morgan Stanley.

- Valuation of insurance company in Delaware Chancery (confidential).

- Valuation of privately held telecommunications firm in U.S. arbitration. October 2015.

- Numerous cases against RMBS Trustees on behalf of investors. Consulting expert on reports covering: statistical sampling, the duties of Trustees, performance of mortgage servicers, quality of sponsor due diligence.

- Numerous cases for a major insurer against various banks for allegedly misrepresenting the quality of mortgages in RMBS. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *Phoenix Light SF Limited, et. al., v. The Bank of New York Mellon as Trustee*, Index No 14-cv-10104-(VEC). Consulting expert on statistical sampling and extrapolation.

- *Phoenix Light SF Limited, et. al., v. HSBC Bank USA, National Association*, Index No 14-cv-10101-SAS (rel 14-cv-09366-SAS). Consulting expert on statistical sampling and extrapolation.

- *The Western and Southern Life Insurance Company, et al., vs. The Bank of New York Mellon, Hamilton County, Ohio*, Case No. A1302490. Consulting expert on duties and powers of RMBS Trustee. January 2016.

- *National Credit Union Administration Board, as Liquidating Agent of Central Federal Credit Union v. RBS Securities, et al.*, Case No. 11-cv-2340-JWL-JPO and National Credit Union Administration Board, as Liquidating Agent of Western Corporate Federal Credit Union v. RBS Securities CV 11-05887 GW (JEMx), Declaration of Benjamin Sacks Regarding Compilation and Summarization of RBS Due Diligence data. October 2015.

- *National Credit Union Administration Board, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union, v. Credit Suisse Securities (USA) LLC, Credit Suisse First Boston Mortgage Securities Corp.*, Case No. 13-CV-6736 (DLC), Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *National Credit Union Administration Board, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union, v. Morgan Stanley & Co., and Morgan Stanley Capital I Inc.*, Case No. 13-CV-6705 (DLC). Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *National Credit Union Administration Board, as Liquidating Agent of Southwest Corporate Federal Credit Union and Members United Corporate Federal Credit Union, v. UBS Securities LLC.* Case No. 13-CV-6731 (DLC). Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *Federal Home Loan Bank of Seattle v. Goldman Sachs & Co, et al.*, Case No. 09-2-46349-2 SEA. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *Federal Home Loan Bank of Seattle v. RBS Securities Inc., f/k/a Greenwich Capital Markets, Inc., et al.*, Case No. 09-2-46347-6 SEA. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *Federal Home Loan Bank of Seattle v. Bank of America securities LLC, et al.*, Case No. 09-2-46319-1 SEA. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *Federal Home Loan Bank of Seattle v. Merrill Lynch, Pierce, Fenner & Smith, Inc. et al.*, Case No. 09-2-46352-2 SEA. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *Federal Home Loan Bank of Seattle v. Morgan Stanley & Co, Inc., et al.*, Case No. 09-2-46348-1 SEA. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *Federal Home Loan Bank of Seattle v. Credit Suisse Securities USA LLC, et al.*, Case No. 09-2-46353-1 SEA. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *In Re: Countrywide Financial Corp. Mortgage-Backed Securities Litigation*, MDL No. 11-ML-02265-MRP (MANx), Federal Deposit Insurance Corporation As Receiver For Franklin Bank v. Countrywide Financial Corp., et al., Case No. 12-CV-03279-MRP (MANx). Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *In Re: Countrywide Financial Corp. Mortgage-Backed Securities Litigation*, MDL No. 11-ML-02265-MRP (MANx), Federal Deposit Insurance Corporation As Receiver For United Western Bank v. Countrywide Financial Corp., et al., Case No. 11-CV-10400-MRP (MANx). Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *The Western and Southern Life Insurance Company, et al. Plaintiffs, v. DLJ Mortgage Capital, Inc., et al.*, Defendants, Court of Common Pleas, Hamilton County, Ohio, Case No. A05352. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *National Integrity Life Insurance Company, Plaintiff v. Countrywide Financial Corp. et al.*, Defendants, United States District Court for the Southern District of New York, case No 11-CIV-8011. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- *The Western and Southern Life Insurance Company, et al. Plaintiffs, v. Morgan Stanley Mortgage Capital, Inc., et al.*, Defendants, Court of Common Pleas, Hamilton County, Ohio, Case No. A1105563. Consulting expert. Statistical analysis of due diligence and underwriting regarding residential mortgages and mortgage backed securities.

- Lost profits and lost business value due to fraud (Chinese drywall). Matter is confidential.

- Impact of ratings downgrade and loss of reputation for Saudi real estate firm.

- Consulting expert on the impact of alleged non-disclosure of material information on the sale price of European pharmaceutical subdivision. Matter is confidential.

- Consulting expert on valuation of oil rigs. Matter is confidential.

- Evaluation of economic content in multiple alleged tax-shelter transactions.

- Estimation of the value of residual value of auto leases with claimed losses totaling more than $500 million for a coalition of insurance carriers.

### *Damages and Lost Profits*

- *State of West Virginia ex rel., Patrick Morrisey, Attorney General v. Wells Fargo Insurance Services of West Virginia and Wells Fargo Insurance Services USA, Inc.*, Circuit Court of Hancock County, WV, Civil Action No. 05-C-115 W. Expert disclosure and Affidavit on opinions regarding existence and size of alleged overcharge for insurance policies, and related damages.

- *Application of the National Railroad Passenger Corporation under 49 U.S.C. § 24308(a) – Canadian National Railway Company, Before the Surface Transportation Board*, Finance Docket No. 35743, Verified Statement of Benjamin Sacks filed September 4, 2015. Expert testimony on a proposed penalty system for sub-standard service to Amtrak by host railroad. Rebuttal filed September 2017.

- *United States of America, ex rel., Michael Saunders, v. Unisys, Inc.*, United States District Court for the Eastern District of Virginia, Alexandria Division, Civil Action No 1:12 CV 379 GBL/TCB. Expert witness on damages from alleged billing fraud on a government contract.

- *Wolfson-Verrichia Group, et al., v. Metro Commercial Real Estate, Inc., et al.*, United States District Court for the Eastern District of Pennsylvania, No. 08-CV-4997. Expert witness on damages, retail shopping center development and anchor site selection.

- *Eastbanc, Inc. v. Georgetown Park Associates II Limited Partnership, Georgetown Park Partners, LLC, and Herbert S. Miller*, Superior Court of the District of Columbia, 2006 CA 002291 B. Expert witness on lost profits from failure / delay in developing a retail mall.

- *Norfolk Southern Railway Company v. Drummond Coal Sales, Inc.*, U.S. District Court, Western District of Virginia. Civil Action No. 7:08CV00340. Consulting Expert.

- *PBM Products LLC v. Mead Johnson Nutrition Company and Mead Johnson & Company*, Eastern District of Virginia, C.A. No. 3:09CV269. Consulting expert on lost profits from false advertising.

- *National Railroad Passenger Corporation vs. ExpressTrak, LLC*, United States District Court for the District of Columbia, Index No. 02-CV-1773. Consulting expert on lost profits and operational performance.

- Expert witness on compensable costs in multiple FIFRA data compensation arbitrations. I calculated the compensation payable by a generic pesticide maker to a data owner for relying on that data to register its own equivalent product.

- Consulting expert on damages due to infringement of database security patents. Matter is confidential.

- Expert opinion on reasonable costs in PW 5672, Harrison County fee dispute with FEMA.

- Expert witness on liability and damages in a confidential arbitration (three judge panel AAA arbitration proceedings) regarding breach of contract.

- Modeled damages in a breach-of-contract dispute for a large supermarket chain.

## Mass Tort and Environmental Liability

- W.R. Grace & Co., et. al., United States District Court for the District of Delaware, Case Nos. 11-1139 through 01-1200. Estimation of foreseeable contingent liability for Sealed Air.

- Estimation of asbestos liability for a large asbestos-product manufacturing firm in a fraudulent conveyance matter.

- Estimation of silica-related liability for a major auto parts manufacturer.

- Financial reporting requirements, insurance and access to capital markets for several major companies with asbestos liability, including a large asbestos defendant, a $15 billion (sales) manufacturer, and a $4 billion (sales) manufacturer.

- Kaiser Aluminum Corporation, United States Bankruptcy for the District of Delaware, Case No: 02-10429. Estimation of asbestos liability on behalf of official committee of unsecured creditors.

- Directed due diligence on asbestos liability issues for multiple M&A transactions ranging from $50 million to $7 billion in value.

- Porter-Hayden Company, United States Bankruptcy for the District of Maryland, Case No: 02-54152 and related insurance coverage litigation. Estimation of asbestos liability for a major insurance carrier.

- Owens Corning, a Delaware Corporation, United States Bankruptcy for the District of Delaware, Case No: 00-03837 and related insurance coverage litigation. Estimation of asbestos liability for coalition of insurance carriers.

- Estimation of asbestos liability for a major insurance carrier on asbestos liability in the Western MacArthur Bankruptcy.

- The Babcock and Wilcox Company, Diamond Power International, Inc., Babcock and Wilcox Construction Company, Inc., Americon Inc., United States Bankruptcy Court, Eastern District of Louisiana, New Orleans, Case No: 00-10992. Estimation of asbestos liability on behalf of insurance carriers.

- Plibrico Company and David Gerity, United States Bankruptcy for the Northern District of Illinois, Case No: 02-BK-09952 and related insurance coverage litigation. Estimation of asbestos liability for a major insurance carrier.

- Armstrong World Industries, Inc., United States Bankruptcy for the District of Delaware, Case No: 00-04471 and related insurance coverage litigation. Estimation of asbestos liability for a major insurance carrier.

- Estimation of asbestos liability for insurance buy-out and coverage acquisition negotiation support for a $15 billion (sales) manufacturer, CSX, a $4 billion (sales) manufacturer, and a $2 billion (sales) chemical company.

- Armstrong World Industries, Inc., United States Bankruptcy for the District of Delaware, Case No: 00-04471 and related insurance coverage litigation. Estimation of asbestos liability for a major insurance carrier.

*Other*

- *United States of America, Plaintiff and Texas League of Young Voters Education Fund; and Imani Clark, Plaintiff-Intervenors v. State of Texas, et al.*, United States District Court for the Southern District of Texas Corpus Christi Division, Civ. No. 2:13-vc-00263. Consulting expert supporting Dr. Coleman Bazelon on behalf of the NAACP Legal Defense Fund in Texas voter ID litigation.

- Consulting expert on matter involving claims under Section 1 and 2 of the Sherman Act.

- Developed a method, which was accepted by a regulatory agency, for monitoring the regulatory compliance of a large telecommunications company.

- Supported expert analysis and report in multiple '337 proceedings before the ITC.

## ACADEMIC PAPERS

- Sacks, B.A, J.V. Hotz, C. Mulligan, and A. Zellner: "Three Essays on Bayesian Methods for Analyzing Limited Dependent Variable and Multinomial Choice Models with Measurement Error and Missing Data." Applications of Monte Carlo methods to statistical estimation.

- Sacks, B.A., and A. Zellner: "Bayesian Method of Moments (BMOM) Analysis of the Multiple Regression Model with Autocorrelated Errors." Presented paper at the 1996 summer conference of the International Society for Bayesian Analysis.

## PRESENTATIONS

- Speaker on Knowledge Group webcast October 21, 2020. Topic "Valuation and Forensic Accounting: Demystifying Trends, Critical Issues, and Best Practices"

- Lecture on the modern DCF method as used in the Tethyan matter (joint with Dr. Florin Dorobantu), February 2020: WilmerHale, Voltera Fietta, Boies Schiller, White & Case.

- Panelist November 2019 at Fordham Conference on International Arbitration and Mediation in New York City.

- Panelist March 2018 Juris International Arbitration conference. Session entitled "To Hot Tub or Not to Hot Tub?," March 6, 2018 in Washington D.C.

- CLE Presentation on Facebook Reclassification matter. Cleary Gottlieb, Washington, D.C., 2017.

- Panelist at May 2016 Juris International Arbitration conference. Session entitled "Damages in investment arbitration – a revolutionary remedy or reward for rich corporations at the expense of the world's poor? A fundamental examination of Chorzow's children." May 12-13, 2016 in Washington D.C.

- Seminar on DCF valuation presented to Debevoise and Plimpton, New York City, March 19, 2015.

- CLE Presentation "Lessons for Attorneys from Damages War-Stories" at WilmerHale, Washington, D.C., June 22, 2011, Venable, Washington, D.C., October 18, 2011, Kramer Levin Naftalis & Frankel, New York City, November 10, 2011, White & Case, Washington, D.C., November 15, 2011, Cadwalader Wickersham & Taft, New York City, November 17, 2011; Dilworth Paxson, Philadelphia, November 30, 2011; Baker Botts, Washington, D.C., December 19, 2011; Bernstein Litowitz Berger & Grossmann, New York City, February 16 2012; New York County Lawyers Association, February 28, 2012; Cleary Gottlieb Steen & Hamilton, Washington, D.C., June 6, 2013; Day Pitney, Newark, NJ, December 6, 2013.

- Securities and Exchange Commission, Washington, D.C., June 17, 2010. Presented on corporate governance and self-dealing.

- Lex Mundi Conference, Rome, Italy, March 5, 2004. Presented "Economic experts and asbestos liability."

- Asbestos Alliance Teach-In (joint with Jefferies & Company, Inc., and Sonnenschein Nath and Rosenthal), via teleconference, December 16, 2002. Lecturer.

- Credit Suisse First Boston, New York, New York, April 2001. Presented "Asbestos liability and M&A and divestitures."

# Appendix B: Material Relied Upon

- Second Amended Class Action Complaint, ECF No. 95, filed August 18, 2021

- Schedule 14A, January 9, 2019, at 42 at
  https://www.sec.gov/Archives/edgar/data/1458962—
  /000119312519005308/0001193125-19-005308-index.htm

- Schedule 14A, January 23, 2019, at 42,
  https://www.sec.gov/Archives/edgar/data/1458962/000119312519014341/d681305ddefm
  14a.htm#toc681305_44

- Mindbody 2017 10K,
  https://www.sec.gov/Archives/edgar/data/1458962/000145896218000003/mb_12-
  31x2017x10xk.htm