UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: MINDBODY, INC.
SECURITIES LITIGATION,

                              19 cv 8331 (VEC)
------------------------------x
                              New York, N.Y.
                              May 12, 2022
                              2:00 p.m.

Before:

          HON. VALERIE E. CAPRONI,

                              District Judge

                    APPEARANCES

LABATON & SUCHAROW LLP
     Attorneys for Plaintiffs
BY:  JAKE BISSELL-LINSK
     NICOLE M. ZEISS

KIRKLAND & ELLIS LLP
     Attorneys for Defendants MINDBODY, Stollmeyer, and White
BY:  JOHN DEL MONACO

COOLEY LLP
     Attorneys for Defendant Liaw
BY:  SARAH LIGHTDALE

(Case called)

THE DEPUTY CLERK:  Counsel, please state your appearance for the record.

MR. BISSELL-LINSK:  This is Jake Bissell-Linsk from Labaton & Sucharow for the colead plaintiff in the class.

MS. ZEISS:  Good afternoon, your Honor.  Nicole Zeiss, Z-e-i-s-s, for lead plaintiff in the class.

THE COURT:  Good afternoon.  The front table can sit down.

MS. LIGHTDALE:  Good afternoon, your Honor.  Sarah Lightdale from Cooley for Defendant Eric Liaw.

MR. DEL MONACO:  Good afternoon, your Honor.  John Del Monaco from Kirkland & Ellis on behalf of MINDBODY, Rick Stollmeyer, and Brett White.

THE COURT:  Good afternoon, everybody.  Please be seated.

So you're allowed to take your mask off when you're speaking.  I have a terrible cold.  I do not have COVID.  I have tested multiple, multiple times.

All right.  My first question goes to the plaintiffs.  Can you please explain to me the plan of allocation and why it's set up this way.

MR. BISSELL-LINSK:  Yes, your Honor.  This is Jake Bissell-Linsk from Labaton.

THE COURT:  Again, you're in person.  I realize that

we've all become used to identifying ourselves, but she can see you.

MR. BISSELL-LINSK:  Thank you.

So the structure of the plan of allocation is that there are three main buckets which are people who held as of the date and then people who sold after a misstatement until the next misstatement.

So the logic of that structure is we think in order to have good claims here, you have to have held the stock at the time of a misstatement or omission and then sold after that misstatement or omission.  Here there are several misstatements and omissions that are alleged.  So the plan basically is paying people who held over one of those misstatements or omissions.

THE COURT:  Slow way down and try again and include within the explanation why people who had a forced sale via the tender offer are out of the class.

MR. BISSELL-LINSK:  Okay.

THE COURT:  Because your whole theory was that the price of the stock was deflated to buy the company on the cheap.

MR. LINSK:  Yes.  So two sort of separate issues there, one is within the period, the three periods that we're describing as people who are getting recovery, why we've broken that up into the three different periods that we have.

THE COURT:  Correct.

MR. BISSELL-LINSK:  So the explanation of that that I just gave is that --

THE COURT:  I just don't understand.  So if you buy before the close of market, the way this is described, among other things, the problem, as it's described in the settlement agreement, does not match how it's described in the notice to the class because you describe it sort of at a high level as anybody who bought before the close of market on November 6 and sold before the tender offer will recover.  And that's not quite true because it kind of depends on this odd set of are you in the bucket or not or which bucket you're in.

So people who sold on November 6 before the close of the market but for $33.50 or less are treated as though they sold after the close of the market?

If you buy and sell within a time grouping, you're not in the class.  If you buy in time period one and sell in two or three, you are in the class.  If you sold in the tender offer, you're not in the class.

MR. BISSELL-LINSK:  Yes.  So I can sort of walk through each of those plans.

THE COURT:  Okay.  Do so.  Again, what you've told me so far doesn't explain any of this.

MR. BISSELL-LINSK:  I can start with the tender offer point.  So the amended complaint that we filed and the second

amended complaint that we filed cut off the day before the tender offer. The claims that we were litigating through this entire action were on behalf of people who sold before the tender offer.

And so the recovery here is not going to people who tendered their shares into the tender offer. And the sort of logic behind the decision to cut it off on that date was because we thought that the sort of gravamen of the federal securities action was people who were ripped off before the close of the deal and that there is a parallel Delaware action that is essentially representing people who tendered their shares in the deal. So that's the sort of distinction on the tender offer versus the dates.

THE COURT: Okay.

MR. BISSELL-LINSK: Trying to move sort of in reverse order through the points you've raised, the $33.50 marker for that day is there primarily just as a point of clarity to be able to track peoples' trades.

The idea is the stock price wasn't below that price at any point until the closing time day. I just want to make sure I have that fact right. The logic there was just to provide a more concrete measure of sort of when your trade happened, if there is any uncertainty as to when the trade actually occurred on that day. It wasn't really trying to add any additional limitations as much as to add clarity as when we get peoples'

claims forms --

THE COURT: Slow down. You're talking at 78 RPMs. You need to be at 16.

MR. BISSELL-LINSK: Okay.

THE COURT: In paragraph 61, it quite clearly says if you sold on November 6 before the close of the market for $33.50 or less, you're treated as though you sold after the close of the market.

MR. BISSELL-LINSK: Correct.

THE COURT: What does that have to do -- you either sold before the close of the market or you sold after the close of the market. The price is a different metric than the time of the trade.

MS. ZEISS: I'm sorry, your Honor. Can I clarify something in that regard?

THE COURT: Please.

MS. ZEISS: It is the case that some peoples' trading records will not show the time. The claims administrator will not always know if they sold before or after the close. The price is a proxy for when the shares were sold. Because of the way it traded, the shares before the close were always above $33.50. And it was only after the close that the price decreased.

So it's just a way for the claims administrator to be able to identify if it's before or after.

THE COURT:  Okay.  It seems to me there's probably a more straightforward way of writing that in the plan so that it makes it clear that based on all of the trading records that you have, it did not go below $33.50 a share.  Therefore, any transaction that day below $33.50 a share is necessarily after the close of the market.

What was the event that occurred on November 6?

MR. BISSELL-LINSK:  That was the earnings call where the guidance was given for the fourth quarter of 2018, and we allege that that guidance was misleading.

THE COURT:  Okay.  So that drives the price down is your theory.  So people who sold after that were harmed.

MR. BISSELL-LINSK:  Yes, your Honor.

THE COURT:  What is it that gives rise to a second bucket?  And how are you dealing with the inside and outside bucket?

MR. BISSELL-LINSK:  So the second bucket -- and noticing that there's already confusion, I regret to point this out right now.  But we also noticed that there's a typo in the plan of allocation in that the date is off.  So we'd like to correct that.  So I can explain the date that it's supposed to be tied to, which is the announcement of the merger.

THE COURT:  What page is this?

MR. BISSELL-LINSK:  Page 23.

THE COURT:  Page what?

MR. BISSELL-LINSK:  23.

THE COURT:  Okay.

MR. BISSELL-LINSK:  And it's paragraph 60 that has the hanging subparagraphs underneath it with the buckets.

THE COURT:  Yes.

MR. BISSELL-LINSK:  And the date that is listed as November 23 in A and the date that is listed as November 24 in B should say December 23 and December 24.  And then additionally --

THE COURT:  Wait a minute.  I'm sorry, sir. Subparagraph A, the end of that bucket is December 23?

MR. BISSELL-LINSK:  Yes, your Honor.

THE COURT:  And then subparagraph B, that should not be November 24 but December 24?

MR. BISSELL-LINSK:  Yes, your Honor.  And then finally under D, the November 23 date and the November 24 date should both be changed to December, just corresponding to those other two dates.

THE COURT:  Okay.  So then the December 24 event was the merger announcement?

MR. BISSELL-LINSK:  Yes.

THE COURT:  And that also drove down the price because why?

MR. BISSELL-LINSK:  So our theory is that the merger announcement touted the deal as at a substantial premium to the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

market price and that those statements were misleading and whether the fact that it was a premium that reflected the downward guidance that had been issued.

THE COURT:  So then you're giving people -- if I've gotten this correct, the loss per share is calculated at $49.50 for people who bought after that announcement through January 3 and then January 4 through the tender offer, even though the price rose to hit the tender offer price.

MR. BISSELL-LINSK:  The groupings here are intended to give claims, to give recovery, to people who held through a misstatement or omission, so who purchased before the misstatement and sold after the misstatement.  And the three categories are tracking the three misstatements that we have.

To your question about the price rising and the per-share-loss amount, the logic there is that the same per-share-loss amount is used for -- sorry.  The per-share-loss amount is determined from the price the person sold at versus the $49.50 nominal sort of value that we're using.

So if somebody sold shares while the stock was trading at a higher price during that third category, their per-share-loss amount would be lower than somebody who sold shares at a lower price earlier in the class period.

THE COURT:  I may have too much cold medicine.  Give me some actual numbers so I can understand this.

MR. BISSELL-LINSK:  Sure.  So if the stock was trading

at let's say $40 a share on -- I don't have a stock trading chart in front of me.

So using $40 a share on let's say January 5, their per-share recovery would be $49.50 minus $40.  So it would be $9.50 of loss per share.  And then that loss is used to compute the per-share recovery on a sort of pro rata basis.  So their injury, for purposes of measuring their recovery, would be $9.50 per share.

THE COURT:  So where does $49.50 come from?

MR. LINSK:  So that number is our nominal fair value of the shares.  The number comes from the range that Vista said that they would pay a substantial premium for MINDBODY's trading price.  We alleged in our complaint at paragraph 116 that we thought that suggested a fair value of $49.50 -- of --

THE COURT:  Say it again.

MR. BISSELL-LINSK:  So at paragraph 116 of the complaint, we alleged that Vista stated that they would pay a substantial premium for MINDBODY's recent trading breach.  And we estimated that in the complaint at a value of $41.25 to $49.50.

THE COURT:  Please slow down.

MR. BISSELL-LINSK:  We estimated that at $41.25 to $49.50.

THE COURT:  That would be the alleged substantial premium.  Okay.

MR. BISSELL-LINSK:  And so we are using that $49.50 number as a nominal fair value to do that subtraction that we just talked through to figure out per-share losses.  The total amount that people are getting is a factor of their losses and the total claims against the settlement amount.

THE COURT:  Wait a minute.  So, again, what were the shares trading at?  What was the tender offer price?

MR. DEL MONACO:  $36.50.

MR. BISSELL-LINSK:  Thank you.

THE COURT:  So the price rises to $36.50 once the tender offer is announced.

MR. BISSELL-LINSK:  In that range.

THE COURT:  More or less.

MR. BISSELL-LINSK:  Correct.

THE COURT:  So you're buying and selling in a range -- between the time the tender offer is announced and the time you cut off the next market, all of the trades are in the neighborhood of $36.50 plus or minus 10 cents, 25 cents, whatever.

So you're saying the loss is they trade at $36.50 but they have lost $36.50 subtracted from 49.50?

MR. BISSELL-LINSK:  Yes.  So they've lost the difference between the fair value of the stock and what they sold it for.  And we're saying, for the purposes of the plan of allocation, we're assuming that their value was $49.50.  So

they lost $49.50 minus $36.50 or what they sold for.

THE COURT:  Do they have to have a loss on their individual trade to be in the class?

MR. BISSELL-LINSK:  The answer to that is yes, but I want to clarify.  Our view is that if you sold valuable securities for less than the fair value of those securities, that the loss that you suffered was the difference between the fair value of those securities and the price you sold them at.

THE COURT:  But if you bought it at less than it was really worth to start with -- I'm struggling --

Again, so someone, after the tender offer is announced on December 24, who buys for $36.10 and sells for $36, they in fact have a 10-cent per-share loss.  They go into the class as having a $13.50 loss.

MR. BISSELL-LINSK:  That's correct, your Honor.

THE COURT:  How does that make any sense?

They've bought it at a discount, and they sold it at a discount.  But they didn't -- I don't get it.  I get how somebody who bought before the first misstatement was injured under your theory.

I'm baffled at why someone who bought when the price was suppressed by allegedly false statements and sold after the next sort of purportedly false statement --

So if you're within a bucket, you're out.  Right?

MR. BISSELL-LINSK:  Yes.

THE COURT:  So if you buy after the suppressed price and sell before the next announcement, you're out entirely, even though you've bought a security and sold a security at a depressed price under your theory and you maybe even lost money.  Right?

But if you straddle one of these, then you're viewed as sort of a loss as compared to the full value of the security.

MR. BISSELL-LINSK:  Correct.  I think I can try to shed some light on this.  So if you imagine the case as we win on all three of these dates alleging that there were false and misleading statements, the world is complicated because of the exact reason that you're saying.

THE COURT:  I'm sorry.  The world is complicated because?

MR. BISSELL-LINSK:  The world is complicated for the exact reason you're saying, which is what about somebody who bought at a depressed price in the middle of this and how were they affected by new misstatements or omissions throughout the class period.

How are people affected by new misstatements throughout the class period if the stock price has already been affected by the first misstatements.

THE COURT:  The latter of which makes the price rise.

MR. BISSELL-LINSK:  I'm sorry.  I'm not --

THE COURT:  So the December 24 announcement which you view as fraudulent caused the share price to rise.  It rose to the tender offer price, as always happens, or thereabouts, assuming people think it's going to happen.

MR. BISSELL-LINSK:  I think I understand what you're asking, which is why would they have losses on a sale after an announcement that ultimately caused the stock price to increase.

And the answer to that, from our point of view, is that while the price reaction to the entirety of the announcement was an increase, that the news that was provided on that date was still news that depressed the stock price; that ultimately the fraud in that news was negative information or information that held the stock price down.

And so it's still directionally exactly what we're saying at all points in time, which is that defendants put out false information or misleading information or omitted to say things that they should have said and that that information held the stock price at a lower price than it should have been trading at, had they made truthful disclosures.

THE COURT:  Let me ask you something:  If somebody buys on December 23 at $30 a share and sells after that announcement, let's say January 2, for $35 a share -- so they've gained $5 -- are they in or out?

MR. BISSELL-LINSK:  They are in.  And our reasoning

for this would be that while they had a gain when measured from their purchase through their sale, this case concerns their sale, and they suffered a loss on their sale.  They sold a security that was worth $49.50 or some amount for only $35.

THE COURT:  But they got a bargain buying it.

MR. BISSELL-LINSK:  Our view would be sort of two steps on that.  First, it's not clear to me that their purchase price affects their ability to recover on a seller claim.

The seller claim is focused on whether or not they were defrauded to sell.  And it's different than a normal or more conventional securities case where there's netting because the fraud wasn't necessarily in the market at the time that they made their purchase.

THE COURT:  What do you mean "it wasn't necessarily in the market"?  Your claim is that it was in the market.  The earlier announcement on November 6 depressed the price of the stock.

MR. BISSELL-LINSK:  So, to answer the question what do I mean it wasn't in the market, it is that if you purchased the stock before our class period entirely -- let's say you got a good deal on the stock or a bad deal on the stock, it doesn't have any effect on whether or not you got ripped off on when you sold the stock.

THE COURT:  That piece I understand.

MR. BISSELL-LINSK:  So then that same logic would

apply to any of the subsequent dates that we are pointing to, so the buyout announcement date, except that we have also alleged that there was fraud in the market at an earlier date; that there were earlier false statements.

That's where I was going when I was suggesting that it's complicated if we win on all three of our theories because it would seem very odd if somebody is worse off for the fact that we have succeeded at proving the fraud began earlier under these facts.

In other words, it would seem very odd if, because we chose to allege the fraud began on November 6, people who bought after that date are worse off than they would have been if we wouldn't have alleged that.

THE COURT:  I don't understand that.  They're not worse off.  Your theory is that they drove the price down.

So someone who buys at a lower price -- this isn't about you.  Like, you're looking at this from an attorney's perspective and what does it mean for you.  What does it mean for the class.

So somebody who bought the share at a depressed price because of the fraud is in a different position than someone who bought prior to the fraud.

MR. BISSELL-LINSK:  I completely agree with that, which is why we've tried to use these three buckets.  So the idea is if you bought within one of these periods and sold

within one of these periods, then that feels like traditional netting; that the person bought it at a deflated price and they sold at a price that was also deflated and they weren't affected by any new fraud.

But if you bought during one period and sold after new false statements were made, would you have been affected by the fraud. And I think this is somewhat confusing --

THE COURT: I'm sorry. Even if you gained on the trade?

MR. BISSELL-LINSK: Even if you gained on your trading in that stock, yeah. If your final sale was a sale where you were ripped off, that's what we're interested in.

I think that this question is harder to think about with category B.

THE COURT: What's category B?

MR. BISSELL-LINSK: For the bucket that's listed as B in the paragraph that we've been talking about, 60. The point that we've been focused on in this conversation, which is after the privatization is announced, and that category is a little less intuitive than category C. But I think talking about category C for a second might be able to help shed some light on this.

THE COURT: Okay. What's the January 4 announcement?

MR. BISSELL-LINSK: So that is when we allege that defendants knew that they had beaten the results in the fourth

quarter and that they had good revenue results that quarter.

THE COURT:  Right.

MR. BISSELL-LINSK:  So that claim could very easily stand alone.  That could have been the only claim we litigated in this case, and it isn't tied back necessarily to the fact that the earlier guidance had been false and misleading.

So our view and what we have alleged is that the failure to disclose those results was independently actionable. It wasn't merely actionable because the earlier guidance they had put out was fraudulent.

THE COURT:  Because there was a proxy out.

MR. BISSELL-LINSK:  Because there was a proxy out, because a merger was pending, and because they had a duty to inform investors.  So our view would be that investors who bought before the failure to make statements that were required to be made and then sold afterwards would be injured and would have losses in that they were induced to sell at a price that was lower than the price that it should have been.

That category feels very much like the first category where we're saying if you bought before the class period.  And so I think that that's clear as to why we need sort of bucket C that's there.

And I think the idea of starting the class period with bucket A also makes sense, which is if you held before the class period and sold.  So I think what we're really talking

about is whether or not the breakout of an additional bucket for bucket B makes sense.

And our view is that the false statements on that date were actionable in that it matters that they were made. It didn't have no impact on the stock price. So we worked very hard to try to put together a plan of allocation that was reasonable in providing all people who held over misstatements with some degree of recovery. It's not 100 percent perfect. It's meant to be a reasonable attempt to provide a reasonable recovery to all of the class members in a fair way.

THE COURT: Doesn't this actually end up front loading? So the people who benefit the most are the people who sold in bucket A?

MR. BISSELL-LINSK: I don't think so. I'm not following why that would be the case.

THE COURT: Because that's the lowest price that the share was normally trading at; right? Because after that, it rose to meet the tender offer price.

MR. BISSELL-LINSK: Yes. That is correct. So the people in bucket A likely end up with more recognized losses that would then be split amongst the class members.

THE COURT: And it's split by the bucket, or it's split --

MR. BISSELL-LINSK: It is not split by the bucket. The buckets are used for determining what the recognized loss

amount is, and then the total settlement, what's left over to the classes is split pro rata based on peoples' recognized loss.

THE COURT:  Okay.

Do the defendants have anything to say?  I'm sure you don't.

MS. LIGHTDALE:  Your Honor, just one minor point of clarification.  We've been referring to it as a tender offer.  This was a long-form merger.

THE COURT:  Yes.  It still operates the same way.  The share price rose to meet the price.

So the definition of the plan in the preliminary approval does not just -- it just doesn't capture all of these nuances.  It defines the class as anyone who sells between November 6 and February 15 inclusive.

That's the definition.  But that's really not accurate because if you've got someone who buys and sells within one of these time frames, they're not included in the class.  They get nothing.

MR. BISSELL-LINSK:  So is your question why is the definition of class the way that it's laid out?

THE COURT:  I'm saying it doesn't comport with what you've just described.

MS. ZEISS:  Your Honor, it's paragraph 2 of the preliminary approval order.

THE COURT:  So paragraph 2 says that the settlement class is all persons or entities who sold -- the way you've got it defined is who sold shares of publicly traded class A common stock of MINDBODY during the period from November 6 through February 15 inclusive.

So that's the class, but there are certain members of that class who get nothing by definition.

MR. BISSELL-LINSK:  The class definition I believe says "and were damaged thereby."  And our view would be that people who do not fall into one of the three buckets that are getting recovery were not damaged thereby.  So I think it is consistent in that way.

THE COURT:  So for the settlement class, they're all in, whether they were damaged or not.  Right?  They're just not getting anything.  They're just not recovering.

MS. ZEISS:  No, your Honor.  The definition says "and were allegedly damaged thereby."

THE COURT:  Yes, but I'm saying:  Is that right?  Really?  So you're excluding from the class someone who bought and sold within a time period?

MS. ZEISS:  Yes.  Our view is they were not damaged.  So they would not have a claim, and they would not be in the class.  It's fairly typical to have that language in the class language.

THE COURT:  Okay.  I guess I see that.  I think I see

how you're slicing this.

The parties need to file the termination threshold under seal.

MS. ZEISS:  Your Honor, I believe we did that.

THE COURT:  You did already?

MS. ZEISS:  Yes.  Some time ago.

Do you not have it?

THE COURT:  We'll check.

Okay.  I have just a variety of scrivener-type errors that it's easier for me to just give them to you orally.

So first off, a global change.  The address of this courthouse is 40 Foley Square, not 500 Pearl.

On the long-form notice, page 2, the heading, you can just delete "PLSRA" because it's not a defined term at that point.  It's just a summary of the notice.

Page 3, paragraph 2, the bottom line, the last line of that, insert "sold" after "sold" would be "the stock."

Page 4, paragraph 5, three lines from the bottom of the paragraph, it would be "or that the class would be decertified as the case progressed."

Page 5, right above "basic information," delete "please" please.

Page 9, paragraph 20, the carryover paragraph two lines from the bottom of the paragraph:  "Defendant's" should be "defendants'."

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Paragraph 21, first line, after the opening clause, the parties "engaged."

Page 18, that's one where the address of the courthouse needs to be changed. And throughout this, where you have "Please don't contact the Court," if you would just change it to "Do not contact the Court." It's really not a request.

On the people who object, you're not asking for any information about them or who their attorney is or whether they've objected before.

Was that intentional on your part?

MS. ZEISS: Yes, your Honor. But if you would like us to ask for that --

THE COURT: No. I'm okay if you all are okay.

Okay. The fairness hearing is going to be in person -- we certainly hope it will be -- on October 27 at 2:30. All of the intervals that you've set up are fine.

I'm going to ask you to resubmit everything with all of the dates filled in based off of that date of the fairness hearing except for the claim due date. That needs to be at least a month in advance so that you know the percentage of the class that's claimed when you put together your papers for final approval.

And you probably want to line up the date of the objectors and the claims so that all of those goes on the same date. The opt-outs, the objectors, and the claims all will be

due far enough in advance of your paperwork so that you can tell me what all those numbers are.

Make sense?

MS. ZEISS:  One clarification.  Are you all right if the objection, opt-out, and claim deadline is all the same?

THE COURT:  I'm suggesting it should be all the same.

MS. ZEISS:  Okay.

THE COURT:  And it needs to be far enough in advance that you can tell me what all of those numbers are when you put together your papers.

MS. ZEISS:  Yes.

THE COURT:  Just a heads-up.  On your attorney's fees, when we get to that point, you're going to need to give me more detail about the number of hours that you spent on the distinct phases of the case.

I think that's all I've got.

We don't have the termination threshold page

MS. ZEISS:  We will file it.

THE COURT:  Anything further from the defendant?

MS. LIGHTDALE:  Not from me, your Honor.  Thank you.

MR. DEL MONACO:  Your Honor, I don't want to make things difficult, but I think it might help if we have a moment to talk with plaintiffs' counsel about the definition of the class.

THE COURT:  Okay.

MR. DEL MONACO:  I think we were intending to include within the definition of the class all stockholders who sold any stock during the class period.  I don't know that we have any comments on the plan of allocation for our settlement agreement.  But I think it might help if we can just confer with them for a minute.

THE COURT:  Okay.  Go ahead.  I'll go away, and you can talk in the courtroom.

(Recess)

THE COURT:  Okay.  You can be seated.

Okay, Mr. Del Monaco.

MR. DEL MONACO:  I appreciate your giving us a couple moments, your Honor.

We started to have a productive conversation.  I thought it might make sense to have a little bit of time to talk to the client about it and make sure everyone is on the same page.  I think we're okay with the definition as written.

Your Honor raised some questions today that I don't know that everyone thought through completely.  I'm not saying we're going to have an issue.  I'm just saying if we could have a week to talk to the client and then get back to your Honor if we have any further comments on any issue.

THE COURT:  Okay.  That's fine.  This was a submission on consent.  So why don't I do this, the plaintiffs, even if there is no monkey wrench being thrown into the soup at this

point, to mix metaphors, you need to resubmit anyway.

I think my October date is far enough off that even if I give you two weeks, all the dates will still work. So why don't you talk to each other, talk about what we talked about, and resubmit in two weeks. If there's going to be a problem at that point, let me know. So that will be the 26th.

MR. DEL MONACO: Perfect. I appreciate that, your Honor.

THE COURT: Thank you, all.

(Adjourned)