**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Civil Action No. 1:19-cv-08331-VEC |

**MEMORANDUM OF LAW IN SUPPORT OF CO-LEAD PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**
**<u>AND PLAN OF ALLOCATION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ..........................................................................................................................2

I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
      ADEQUATE, AND WARRANTS FINAL APPROVAL ...................................................2

      A.    The Law Favors and Encourages Settlement of Class Action Litigation.....................2

      B.    The Standards for Final Approval ..................................................................................3

      C.    Co-Lead Plaintiffs and Lead Counsel Have Adequately Represented the
            Settlement Class .............................................................................................................5

      D.    The Settlement Was Reached After Robust Arm's-Length Negotiations....................6

      E.    The Relief Provided by the Settlement Is Adequate .....................................................7

            1.    The Complexity, Expense, and Likely Duration of the Litigation Support
                  Approval of the Settlement .................................................................................7

            2.    The Risks of Establishing Liability and Damages Support Approval of
                  the Settlement......................................................................................................8

                  (a)    The Risks of Achieving and Maintaining Class Certification ....................9

                  (b)    Risks Related to Proving Liability: Falsity and Scienter...........................11

                  (c)    Risks Related to Proving Loss Causation and Damages ...........................12

      F.    The Effective Process for Distributing Relief to the Settlement Class ......................14

      G.    The Anticipated Attorneys' Fees and Expenses Are Reasonable ..............................15

      H.    The Relief Provided in the Settlement Is Adequate Taking Into Account All
            Agreements Related to the Settlement ........................................................................16

      I.    Application of the Remaining *Grinnell* Factors Support Approval ..........................16

            1.    The Ability of Defendants to Withstand a Greater Judgment............................16

            2.    The Reaction of the Settlement Class to Date ...................................................17

            3.    The Stage of the Proceedings and the Amount of Information Available
                  to Counsel Support Approval of the Settlement ...............................................17

i

    4.    The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Approval of the Settlement ...................................................................18

II.    THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED .................................................................................................................20

III.    NOTICE SATISFIED RULE 23 AND DUE PROCESS ...................................................21

CONCLUSION....................................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ...................................................................................8

*Basic v. Levinson*,
  485 U.S. 224 (1988)..................................................................................................9

*In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012).......................................................4, 7, 17, 20

*In re Citigroup Inc. Sec. Litig.*,
  No. 09 MD 2070 (SHS), 2014 WL 2112136 (S.D.N.Y. May 20, 2014) ...................3

*City of Detroit v. Grinnell Corp.*
  495 F.2d 448 (2d Cir. 1974).............................................................................4, 8, 9

*City of Providence v. Aeropostale Inc. et al.*,
  No. 11-cv-7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd, Arbuthnot
  v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015) .............................................................6

*Ebbert v. Nassau Cnty.*,
  No. 05-5445, 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011)............................10, 11

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F.
  App'x. 37 (2d Cir. 2016) ........................................................................................6, 7

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
  No. 02-cv-3400, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)...............................20

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011) .............................................................................21

*In re Gilat Satellite Networks, Ltd.*,
  No. 02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) ....................................7

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000) .......................................................................................4

*Hicks v. Morgan Stanley*,
  No. 01 CIV. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) .............19

*In re IMAX Sec. Litig.*,
  283 F.R.D. 178 (S.D.N.Y. 2012) .......................................................................14, 20

iii

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)..............................................................................7, 8, 20

*Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*,
   No. 3:09-cv-00419-MMD-WGC, 2012 WL 5199742 (D. Nev. Oct. 19, 2012)................19, 20

*In re Marsh & McLennan Cos. Sec. Litig.*,
   No. 04-8144, 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ....................................................22

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
   246 F.R.D. 156 (S.D.N.Y. 2007) .............................................................................................19

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
   No. 02 MD 1484, 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) .................................................19

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)......................................................................................................18

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).................................18, 20

*In re Patriot Nat'l, Inc. Sec. Litig.*,
   828 F. App'x. 760 (2d Cir. 2020) .............................................................................................19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) ..............................................................................................4, 7

*In re Polaroid ERISA Litig.*,
   240 F.R.D. 65 (S.D.N.Y. 2006) .................................................................................................5

*In re PPDAO Grp. Inc. Sec. Litig.*,
   No. 18-CV-6716 (TAM), 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022)......................................4

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) .................................................................................................8

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
   258 F. Supp. 2d 254 (S.D.N.Y. 2003).......................................................................................8

*Teachers Ret. Sys. of La. v. A.C.L.N. Ltd.*,
   No. 01-cv-011814, 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ..........................................18

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008).............................................................................8, 11, 14

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   No. 14-cv-20880-UU, 2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) ...................................19

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 05-cv-01695, 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)........................................5, 16

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)....................................................................................2, 3, 6, 21

*In re Warner Chilcott Ltd. Sec. Litig.*,
   No. 06-cv-11515, 2009 WL 2025160 (S.D.N.Y. July 10, 2009)..............................................17

*Wong v. Arlo Tech., Inc.*,
   No. 19-cv-00372-BLF, 2021 WL 1531171 (N.D. Cal. Apr. 19, 2021) ...................................19

**Docketed Cases**

*In re Extreme Networks, Inc. Sec. Litig.*,
   No. 5:15-cv-04883-BLF (N.D. Cal. July 22, 2019)................................................................19

**Statutes**

15 U.S.C. § 78u-4(a)(7) ..............................................................................................................22

**Rules**

Fed. R. Civ. P. 23(a) ...................................................................................................................11

Fed. R. Civ. P. 23(b)(3)...............................................................................................................11

Fed. R. Civ. P. 23(c)(1)(C) ..........................................................................................................10

Fed. R. Civ. P. 23(c)(2)(B) ..........................................................................................................22

Fed. R. Civ. P. 23(e) .............................................................................................................3, 4, 21

Fed. R. Civ. P. 23(e)(2)..............................................................................................................3, 4

Fed. R. Civ. P. 23(e)(2)(A) ...........................................................................................................5

Fed. R. Civ. P. 23(e)(2)(B) ...........................................................................................................6

Fed. R. Civ. P. 23(e)(2)(C) .................................................................................................7, 14, 16

Fed. R. Civ. P. 23(e)(3)..................................................................................................................3

v

Court-appointed Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd. ("Co-Lead Plaintiffs"), on behalf of themselves and the proposed Settlement Class, respectfully submit this memorandum of law in support of their motion for: (i) final approval of the proposed Settlement of the above-captioned action (the "Action"); (ii) approval of the proposed Plan of Allocation for distribution of the Net Settlement Fund; and (iii) final certification of the Settlement Class.[1]

## PRELIMINARY STATEMENT

As set forth in the Stipulation, Co-Lead Plaintiffs have agreed to settle all claims asserted, or that could have been asserted, against Defendants in the Action and related claims, in exchange for $9,750,000 (the "Settlement Amount"), for the benefit of the Settlement Class. The terms of the Settlement are detailed in the Stipulation, which was executed on March 3, 2022.

As described below and in the accompanying Villegas Declaration, the decision to settle was well-informed by more than two years of contentious and hard-fought litigation that involved a comprehensive investigation before filing two amended complaints; opposing Defendants' motion to dismiss the Amended Complaint, which the Court partially granted and partially denied; filing a Second Amended Class Action Complaint for Violations of the Federal Securities Laws (the "SAC"); moving for class certification; and extensive fact and expert

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated March 3, 2022 (the "Stipulation") (ECF No. 118-1). Citations to "¶" in this memorandum refer to paragraphs of the Declaration of Carol C. Villegas in Support of Co-Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation and Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses (the "Villegas Declaration" or "Villegas Decl."), filed herewith, unless otherwise noted.

All exhibits are annexed to the Villegas Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical

discovery (involving the production of approximately 400,000 pages of discovery documents by Defendants and non-parties and participating in the depositions of 17 fact witnesses).

Lead Counsel, which has extensive experience and expertise in prosecuting securities class actions, believes that the Settlement represents a very favorable resolution of this complex litigation in light of the specific risks of continued litigation, particularly the challenges inherent in certifying the class in this case, and risks of failing to survive Defendants' likely summary judgment motions focused on falsity, scienter, and materiality particularly with respect to the statements concerning the Company's 4Q18 guidance and 4Q18 results, as detailed below.

Co-Lead Plaintiffs, sophisticated institutional investors that were actively involved in the Action, diligently represented the class and have approved the Settlement. *See* Declaration of Andrew Carney, Ex. 1. Accordingly, Co-Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement. In addition, the Plan of Allocation, which was developed by Lead Counsel with the assistance of Co-Lead Plaintiffs' damages expert, is a fair and reasonable method for distributing the Net Settlement Fund and should also be approved by the Court.

## ARGUMENT

I. **THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL**

A. **The Law Favors and Encourages Settlement of Class Action Litigation**

Public policy favors the settlement of disputed claims among private litigants, particularly in class actions. *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) ("We are mindful of the 'strong judicial policy in favor of settlements, particularly

---

reference is to the designation of the entire exhibit attached to the Villegas Declaration and the second reference is to the exhibit designation within the exhibit itself.

in the class action context.'").[2]  This policy would be well-served by approval of the Settlement

of this complex securities class action, which absent resolution, could consume years of

additional resources of this Court and, likely, the Court of Appeals for the Second Circuit.

### B.    The Standards for Final Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action settlement

must be presented to the Court for approval.  The Settlement should be approved if the Court

finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In ruling on final approval of a

class settlement, courts in the Second Circuit have held that a court should examine both the

negotiating process leading to the settlement, and the settlement's substantive terms.  *See Wal-*

*Mart Stores*, 396 F.3d at 116; *In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2014 WL

2112136, at *2-3 (S.D.N.Y. May 20, 2014).

Pursuant to the amendments to Rule 23(e)(2), a court may approve a settlement as "fair,

reasonable, and adequate" after considering the following four factors:

(A)     whether the class representatives and class counsel have adequately
represented the class;

(B)     whether the proposal was negotiated at arm's length;

(C)     whether the relief provided for the class is adequate, taking into account:

     i.     the costs, risks, and delay of trial and appeal;

     ii.     the effectiveness of any proposed method of distributing
relief to the class, including the method of processing class-
member claims;

     iii.     the terms of any proposed award of attorneys' fees,
including timing of payment; and

     iv.     any agreement required to be identified under Rule
23(e)(3); and

---

[2] All internal quotations and citations are omitted unless otherwise stated.

(D)        whether the proposal treats class members equitably relative to each other.

In *City of Detroit v. Grinnell Corp.*, the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *see also In re Bear Stearns, Inc. Sec. Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 265-66 (S.D.N.Y. 2012).  The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that these factors are not intended to "displace" any factor previously adopted by the Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments.  Indeed, "[t]he Court understands the new Rule 23(e) factors to add to, rather than displace, the [Second Circuit] factors."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019).  *See also In re PPDAO Grp. Inc. Sec. Litig.,* No. 18-CV-6716 (TAM), 2022 WL 198491, at *8 n.10 (E.D.N.Y. Jan. 21, 2022) (noting the significant overlap between the relevant Second Circuit case law and the Rule 23(e)(2) factors).

Accordingly, Co-Lead Plaintiffs will discuss the fairness, reasonableness, and adequacy of the Settlement principally in relation to the Rule 23(e)(2) factors and will also discuss the application of relevant, non-duplicative factors traditionally considered by the Second Circuit.

### C. Co-Lead Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, the court should consider whether the "class representatives and class counsel have adequately represented the class." Rule 23(e)(2)(A). There can be little doubt that Co-Lead Plaintiffs and Lead Counsel have adequately represented the Settlement Class. Co-Lead Plaintiffs, like all other members of the Settlement Class, were allegedly defrauded into selling shares of Mindbody common stock during the Class Period, for less than the fair value of those shares. Thus, the claims of the Settlement Class and Co-Lead Plaintiffs would prevail or fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Co-Lead Plaintiffs and all members of the Settlement Class. *See, e.g., In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members.").

Moreover, Co-Lead Plaintiffs were active and informed participants in the litigation and, among other things: (i) regularly communicated with Lead Counsel regarding the posture and progress of the Action; (ii) reviewed pleadings and motions filed in the Action; (iii) assisted with responses to discovery requests (including the search for and production of documents); and (iv) participated in settlement discussions and evaluated and approved the proposed Settlement. *See* Ex. 1 at ¶¶3-4, 9-10. A settlement reached "with the endorsement of a sophisticated institutional investor . . . is entitled to an even greater presumption of reasonableness." *In re Veeco Instruments Inc. Sec. Litig.*, No. 05-cv-01695, 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007).

Additionally, throughout the Action, Co-Lead Plaintiffs had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud

cases.  During the course of the litigation, Lead Counsel developed a deep understanding of the facts of the case and the merits of the claims.  *See generally* Villegas Declaration.  Moreover, Labaton Sucharow is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 4-D) and was able to successfully conduct the litigation against skilled opposing counsel.[3]  Accordingly, the Settlement Class has been, and remains, well represented.

**D.      The Settlement Was Reached After Robust Arm's-Length Negotiations**

In weighing approval of a class-action settlement, the Court must consider whether the settlement "was negotiated at arm's length."  Fed. R. Civ. P. 23(e)(2)(B).  A settlement is entitled to a "presumption of fairness, adequacy, and reasonableness" when "reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *Wal-Mart Stores*, 396 F.3d at 116; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, No. 12-2389, 2015 WL 6971424, at *3 (S.D.N.Y. Nov. 9, 2015), *aff'd*, 674 F. App'x. 37 (2d Cir. 2016).

The Settlement here merits such a presumption of fairness because it was achieved after thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced Mediator.  Villegas Decl. ¶¶47-50. As discussed in the Villegas Declaration, the Parties and their counsel had a well-honed understanding of the strengths and weaknesses of the case before agreeing to settle.  The judgment of Lead Counsel—a law firm that is highly experienced in securities class action litigation—that the Settlement is in the best interests of the Settlement Class is also entitled to "great weight."  *City of Providence v. Aeropostale Inc. et al.*, No. 11-cv-7132, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd*, *Arbuthnot v. Pierson*, 607 F. App'x. 73 (2d Cir. 2015).

---

[3] Defendants were represented by two well-regarded firms, Kirkland & Ellis LLP and Cooley LLP.

### E.    The Relief Provided by the Settlement Is Adequate

The Court must also consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal," as well as other relevant factors. Fed. R. Civ. P. 23(e)(2)(C).  "This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. at 36.

### 1.    The Complexity, Expense, and Likely Duration of the Litigation Support Approval of the Settlement

Securities class actions like this one are by their nature highly complex, and district courts have long recognized that "[a]s a general rule, securities class actions are notably difficult and notoriously uncertain to litigate."  *In re Facebook,* 2015 WL 6971424, at *3; *Bear Stearns,* 909 F. Supp. 2d at 266; *In re Gilat Satellite Networks, Ltd.*, No. 02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007) ("Securities class actions are generally complex and expensive to prosecute.").

This case was no exception.  As discussed in detail in the Villegas Declaration, the case involved, among other things, unique and intricate issues related to falsity, scienter, materiality, loss causation, and damages in connection with allegations that Defendants made misrepresentations and omissions concerning the Company's 4Q18 guidance and results, allegedly in order to drive down the Company's stock price in anticipation of a merger. Certifying a class, prevailing on summary judgment, and then achieving a litigated verdict (and sustaining any such verdict on appeal) would have been a very challenging and uncertain undertaking.  *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 481 (S.D.N.Y.

7

2009) (finding that the complexity, expense and duration of continued litigation supports final approval where, among other things "motions would be filed raising every possible kind of pre-trial, trial and post-trial issue conceivable").

The trial of the claims here would have required extensive expert testimony on issues related to, among other things, the fair value of Mindbody stock, the efficiency of the market in advance of a merger, and damages under the Exchange Act.  Courts routinely observe that these sorts of disputes—requiring dueling testimony from experts—are particularly difficult for plaintiffs to litigate. *See*, *e.g.*, *In re Telik, Inc. Sec. Litig.,* 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in a "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited…").  Of course, even if Co-Lead Plaintiffs had prevailed at summary judgment and then trial, it is virtually certain that appeals would be taken, which would have, at best, delayed any recovery. *See Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would in light of the time value of money, make future recoveries less valuable than this current recovery."). At worst, there was of course the possibility that the verdict could be reversed by the trial court or on appeal. *See, e.g., Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation).

### 2. The Risks of Establishing Liability and Damages Support Approval of the Settlement

In assessing the fairness, reasonableness, and adequacy of a settlement, courts should consider the "risks of establishing liability [and] the risks of establishing damages." *Grinnell*,

495 F.2d at 463.  In most cases, this will be the most important factor for a court to consider in its analysis of a proposed settlement. *See Id.* at 455 ("The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement.").  While Co-Lead Plaintiffs and Lead Counsel believe the claims asserted against Defendants are strong, they recognize that the Action presented several substantial obstacles with respect to class certification, as well as establishing both liability and damages.  Here, in particular, Defendants would have vigorously challenged Co-Lead Plaintiffs on falsity, scienter and loss causation.

(a)     **The Risks of Achieving and Maintaining Class Certification**

As discussed in the Villegas Declaration, ¶¶42-46, Co-Lead Plaintiffs' motion for class certification was pending, and not fully briefed, when the Parties agreed to settle.  Defendants had not yet submitted their opposition to Co-Lead Plaintiffs' motion.  However, Co-Lead Plaintiffs understood that Defendants would have tenaciously contested Co-Lead Plaintiffs' efforts to certify the class, by arguing, among other things, that Co-Lead Plaintiffs could not establish reliance on a class-wide basis because Co-Lead Plaintiffs would not be able to rely on the fraud-on-the market presumption set forth in *Basic v. Levinson*, 485 U.S. 224 (1988), due to the effect of the Merger on the market for Mindbody's stock.  With respect to the typicality of Co-Lead Plaintiffs, Defendants would likely have argued that their trading history makes them atypical and they could not serve as class representatives, due to the complexity of their Class Period trading, which included short selling the stock from time to time.  Defendants would also have argued that Co-Lead Plaintiffs' theory of class-wide damages – which alleged that investors suffered a loss when selling at below the fair value of the stock – was either legally deficient or insufficiently supported.  Villegas Decl. ¶75.

As to the fraud on the market presumption, Co-Lead Plaintiffs anticipated that Defendants would argue the market price for Mindbody stock no longer traded efficiently once

the Merger was announced, because the Merger price substantially controlled Mindbody's stock price from that point going forward. Mr. Coffman prepared an expert report showing that Mindbody's stock did trade efficiently, and Co-Lead Plaintiffs were prepared to defend the economic logic of why market efficiency continues even after a proposed Merger substantially affects a company's trading price. However, this is a complex issue, and posed meaningful risks to Co-Lead Plaintiffs. *Id*. ¶76.

As to damages, Defendants were likely to challenge the overall theory of damages by arguing that the fair price of Mindbody stock did not exceed the Merger price or trading prices during the Class Period. Co-Lead Plaintiffs were confident that they would prevail on these arguments at the class certification stage, especially because the issue of fair value is a fact issue. However, Defendants would likely have also challenged the ability to model damages (and valuation) throughout the Class Period, by demonstrating complexities with respect to differences in Mindbody's valuation and the effect of the alleged misstatements and omissions throughout the Class Period. *Id*. ¶77.

There was significant uncertainty with respect to how the Court would rule on these issues in connection with class certification or whether certification would be maintained through a potential appeal and a trial, militating in favor of settlement. Additionally, class certification can be reviewed and modified at any time by a court before final judgment. *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). The Settlement avoids any uncertainty with respect to class certification and the risks of maintaining certification of the Settlement Class through trial and on appeal. *See Ebbert v. Nassau Cnty.*, No. 05-5445, 2011 WL 6826121, at \*12 (E.D.N.Y. Dec. 22, 2011) (risk

of de-certification of the certified class supported approval of Settlement).[4]

### (b)        Risks Related to Proving Liability: Falsity and Scienter

At summary judgment and trial, Defendants would strenuously maintain that Co-Lead Plaintiffs could not establish that Defendants' statements were false and misleading or that Defendants acted with scienter as required by the Exchange Act.  "Proving a defendant's state of mind is hard in any circumstances."  *Telik,* 576 F. Supp. 2d at 579.  Indeed here, Co-Lead Plaintiffs must establish that Defendants knew (or believed) or were reckless in not knowing (or reckless in not believing) that their statements were false.

At summary judgment and trial, Defendants would likely argue that Co-Lead Plaintiffs simply failed to establish that Defendants' statements were false and misleading.  For example, Co-Lead Plaintiffs would have to establish that Mindbody's reduced 4Q18 guidance was misleading, and Defendants would likely have argued that while the number was conservative, it was a fair assessment of where they believed guidance should be set and within industry norms. On the omission of the 4Q18 results, Defendants would similarly have explained a counter-story as to why they did not disclose those results.  While the Court credited Co-Lead Plaintiffs' falsity theory in connection with the motion to dismiss, discovery to date was mixed, yielding evidence that was supportive of each sides' arguments—resulting in the possibility that Co-Lead

---

[4] In the Preliminary Approval Order (ECF No. 130), the Court preliminarily certified the Settlement Class.  There have been no developments in the case that would undermine that determination and, for all the reasons stated in the Memorandum of Law in Support of Co-Lead Plaintiffs' Motion for Preliminary Approval of Proposed Class Action Settlement (ECF No. 117), Co-Lead Plaintiffs now request that the Court reiterate its prior certification of the Settlement Class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), for settlement purposes, and the appointment of Co-Lead Plaintiffs as Class Representatives and Labaton Sucharow as Class Counsel.

Plaintiffs' claims would be unable to survive summary judgment or presentation to a jury. Villegas Decl. ¶¶80-81.

Additionally, Defendants could have persuasively argued that they were motivated to maximize the value of Mindbody stock, and that Co-Lead Plaintiffs' theory that they intentionally reduced the price to further the Merger process was contrary to Defendants' interests. Co-Lead Plaintiffs had a strong explanation of why Defendants were motivated to decrease the stock price, and why they were willing to accept a suboptimal Merger price for greater certainty that a Merger would occur, but this issue would have been factually contentious. Villegas Decl. ¶¶83-85.

In short, it was far from certain that Co-Lead Plaintiffs would be able to prove the falsity of Defendants' statements and Defendants' scienter through summary judgment and at trial, militating in favor of a settlement.

### (c)    Risks Related to Proving Loss Causation and Damages

With respect to loss causation, Defendants would have likely argued that the alleged misstatements did not cause Mindbody's stock price to drop. Among other things, Defendants would argue that to recover damages Co-Lead Plaintiffs would need to prove that had the 4Q18 results been disclosed, Mindbody's stock would have actually traded at a higher price. If such a requirement were imposed, proving an alternative price reaction would have been hotly contested by both sides' experts and could have been viewed by the jury as highly speculative. If such arguments were accepted by the Court or a jury, in whole or part, they would have dramatically limited any potential recovery. Villegas Decl. ¶¶ 92-93.

Co-Lead Plaintiffs also alleged damages based on the difference between the fair value of Mindbody's common stock and the price received by class members upon selling. The ultimate matter of proving the fair value of Mindbody's stock would have been a highly contested issue

for the fact finder at trial, with the Parties putting forth widely diverging and complex expert evidence. Villegas Decl. ¶94.

Although a comprehensive appraisal of Mindbody's value had not been completed given the stage of the litigation, Lead Counsel, with the assistance of Co-Lead Plaintiffs' experts, has estimated classwide damages of approximately $453 million,[5] if liability were established with respect to all of the allegedly false statements/omissions alleged in the SAC during the Class Period.  However, if Co-Lead Plaintiffs only prevailed on the claims alleging that Mindbody's 4Q18 guidance was false and misleading, estimated classwide damages would decrease to approximately $299 million.[6]  Additionally, if Co-Lead Plaintiffs only prevailed on the claims alleging Defendants failed to disclose Mindbody's 4Q18 results, estimated classwide damages would decrease to approximately $133 million.[7]  Here, the lower end of the damages range was a real possibility given, among other reasons: (i) these damage estimates are premised on proving Mindbody's fair value was in the range of $41.25 to $49.50 per share, but a reasonable fact finder could have determined that the fair value was lower; and (ii) as the Court expressed during the September 9, 2021 status conference (*see* Ex. 2), there was a substantial risk that Co-Lead Plaintiffs would fail to recover on the claim that the 4Q18 guidance was actionable and

---

[5] This figure is calculated using an estimated fair value of $41.25 to $49.50 per share (based on the price Co-Lead Plaintiffs allege Vista implied it was willing to pay when it offered to pay a "substantial premium" to Mindbody's trading range on October 16, 2016, SAC ¶116), an estimate of approximately 38 million shares sold during the Class Period, and a volume-weighted average sale price of $33.41 per share. The midpoint of the resulting range is $453 million.

[6] This figure is calculated using an estimated fair value of $41.25 to $49.50 per share, an estimate of approximately 22 million shares sold during the Class Period, and a volume-weighted average sale price of $31.13 per share. The midpoint of the resulting range is $299 million.

[7] This figure is calculated using an estimated fair value of $41.25 to $49.50 per share, an estimate of approximately 16 million shares sold during the Class Period at a volume-weighted average sale price of $36.53 per share. The midpoint of the resulting range is $133 million.

materially misleading or fraudulent. ¶¶95-96.

While Lead Counsel would work extensively with Co-Lead Plaintiffs' damages expert with a view towards presenting compelling arguments to the jury and prevailing at trial, Defendants would have put forth well-qualified experts of their own who were likely to opine that the class suffered little or no damages.  As Courts have long recognized, the substantial uncertainty as to which side's experts might be credited by a jury presents a serious litigation risk.  *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 193 (S.D.N.Y. 2012) ("[I]t is well established that damages calculations in securities class actions often descend into a battle of experts."); *Telik,* 576 F. Supp. 2d at 579-80 (in this "battle of experts, it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found…").

Given all of these risks with respect to liability, loss causation, and damages, Co-Lead Plaintiffs and Lead Counsel respectfully submit that it is in the best interests of the Settlement Class to accept the certain and substantial benefit conferred by the Settlement.

### F.    The Effective Process for Distributing Relief to the Settlement Class

Rule 23(e)(2)(C) instructs courts to consider whether the relief provided to the class is adequate in light of the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."  The proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, Strategic Claims Services ("SCS"). The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action.  Namely, a potential class member will submit, either by mail or online using the Claims Administrator's website, the Court-approved Claim Form.  Based on the trade information provided by claimants, the Claims Administrator will determine each claimant's eligibility to recover by, among other things, calculating their

14

respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determine each eligible claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation at ¶24. Co-Lead Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. *Id*. at ¶30(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id*.

After the Settlement reaches its Effective Date (*id*. at ¶40) and the claims process is completed, Authorized Claimants will be issued payments. If there are un-claimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Co-Lead Plaintiffs recommend that any *de minimis* balance that still remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses, shall be contributed to a private, non-profit, non-sectarian 501(c)(3) organization designated by Co-Lead Plaintiffs and approved by the Court. *Id*. at ¶27.

**G.      The Anticipated Attorneys' Fees and Expenses Are Reasonable**

As discussed in the accompanying Fee Memorandum, the proposed attorneys' fees of 30% of the Settlement Fund, to be paid as ordered by the Court, are reasonable in light of the efforts of Lead Counsel and the risks in the litigation. Most importantly with respect to the Court's consideration of the fairness of the Settlement, is the fact that approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Co-Lead Plaintiffs nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's

ruling with respect to attorneys' fees and/or Litigation Expenses.

> **H.    The Relief Provided in the Settlement Is Adequate Taking Into Account All Agreements Related to the Settlement**

Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the Parties in connection with the proposed Settlement.  On December 22, 2021, the Parties entered into a settlement term sheet and on March 3, 2022, they entered into the Stipulation and a confidential Supplemental Agreement Regarding Requests for Exclusion, (the "Supplemental Agreement"), which has been filed under seal.  Stipulation at ¶42.  The Supplemental Agreement sets forth the conditions under which Mindbody has the option to terminate the Settlement in the event that requests for exclusion from the Settlement Class exceed a certain agreed-upon threshold.  As is standard in securities class actions, the Supplemental Agreement is being kept confidential in order to avoid incentivizing the formation of a group of opt-outs for the sole purpose of leveraging a larger individual settlement, to the detriment of the Settlement Class.   The Supplemental Agreement, Stipulation, and Term Sheet are the only agreements concerning the Settlement entered into by the Parties.

> **I.    Application of the Remaining *Grinnell* Factors Support Approval**

> **1.    The Ability of Defendants to Withstand a Greater Judgment**

The ability of a defendant to pay a judgment greater than the amount offered in settlement is relevant to whether the settlement is fair.  *Grinnell*, 495 F.2d at 463.  While it is Co-Lead Plaintiffs' understanding that Defendants could withstand a judgment in excess of $9.75 million, courts generally do not find the ability of a defendant to withstand a greater judgment to be an impediment when the other factors favor the settlement.  *See, e.g., Veeco*, 2007 WL 4115809, at *11 ("this factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied").

16

### 2. The Reaction of the Settlement Class to Date

The reaction of the class to a proposed settlement is a significant factor to be weighed in considering its fairness and adequacy. *See, e.g.*, *Bear Stearns*, 909 F. Supp. 2d at 266-67. Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, SCS, mailed copies of the Notice Packet (consisting of the Notice and Claim Form) to potential Settlement Class Members and their nominees. *See* Declaration of Josephine Bravata Concerning (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date ("Mailing Decl."), Ex. 3 at ¶¶2-9. As of September 30, 2022, SCS has mailed 22,387 copies of the Notice Packet to potential Settlement Class Members. *Id*. at ¶8. In addition, the Summary Notice was published in *The Wall Street Journal* on June 27, 2022 and transmitted over the internet using *PR Newswire* on July 1, 2022. *Id*. at ¶10.

While the deadline set by the Court for Settlement Class Members to object (October 14, 2022) has not yet passed, to date, no objections to the Settlement or Plan of Allocation have been received and only one request for exclusion has been received. *See In re Warner Chilcott Ltd. Sec. Litig.*, No. 06-cv-11515, 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009) (no class member objections since preliminary approval supported final approval). As provided in the Preliminary Approval Order, Co-Lead Plaintiffs will file reply papers no later than October 20, 2022, addressing any objections and any additional requests for exclusion.

### 3. The Stage of the Proceedings and the Amount of Information Available to Counsel Support Approval of the Settlement

Here, as detailed in the Villegas Declaration, Lead Counsel conducted a robust investigation; prepared comprehensive amended complaints; successfully opposed, in part, Defendants' motion to dismiss; moved for certification of the class; engaged in extensive and

thorough fact discovery, including participating in the depositions of 17 fact witnesses (and was preparing for the depositions of additional witnesses at the time the Parties settled), and analyzing more than 400,000 pages of documents produced by Defendants and third-parties; engaged in expert discovery, including retaining professionals with expertise in (a) materiality, loss causation, and damages and (b) corporate valuation and appraisal rights; and prepared for and participated in a rigorous mediation process, involving two mediation sessions. *See generally* Villegas Decl. at §§III & IV.

Armed with this substantial base of knowledge, Co-Lead Plaintiffs were in a position to balance the proposed settlement with a well-educated assessment of the likelihood of overcoming the risks of litigation. Accordingly, Co-Lead Plaintiffs and Lead Counsel respectfully submit that they had "a clear view of the strengths and weaknesses of their case[]" and of the range of possible outcomes at trial. *Teachers Ret. Sys. of La. v. A.C.L.N. Ltd.*, No. 01-cv-011814, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004). The Court thus should find that this factor also supports approval.

### 4. The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and All the Attendant Risks of Litigation Support Approval of the Settlement

Courts agree that the determination of a "reasonable" settlement "is not susceptible [to] a mathematical equation yielding a particularized sum." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 130 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997). Instead, "in any case there is a range of reasonableness with respect to a settlement…." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972). Here, as discussed above and in the Villegas Declaration (*see* ¶¶5-6, 95), the Settlement recovers between approximately 2.2% to 7.3% of the estimated range of Lead Counsel's estimation of likely recoverable damages, depending on which claims Co-Lead Plaintiffs won and a factual determination of the value of the Mindbody shares sold.

This recovery falls within the range of reasonableness that courts within the Second Circuit regularly approve. *See, e.g.*, *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 246 F.R.D. 156, 167 (S.D.N.Y. 2007) (approving settlement that was "between approximately 3% and 7% of estimated damages [and] within the range of reasonableness for recovery in the settlement of large securities class actions"); *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, No. 02 MD 1484, 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (approving $40.3 million settlement representing approximately 6.25% of estimated damages and noting this was at the "higher end of the range of reasonableness of recovery in class actions securities litigations"); *Hicks v. Morgan Stanley*, No. 01 CIV. 10071 (RJH), 2005 WL 2757792, at *7 (S.D.N.Y. Oct. 24, 2005) (approving $10 million settlement representing 3.8% of estimated damages); *see also In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x. 760, 762 (2d Cir. 2020) (affirming district court's approval of $6.5 million settlement representing 6.1% of the class's maximum potentially recoverable damages).

Courts in other jurisdictions have approved similar ranges in other securities class action settlements. *See, e.g., Wong v. Arlo Tech., Inc.,* No. 19-cv-00372-BLF, 2021 WL 1531171, at *9 (N.D. Cal. Apr. 19, 2021) (approving settlement representing 2.35% of estimated total damages, assuming lead plaintiff was successful on all issues of liability and damages); *In re Extreme Networks, Inc. Sec. Litig.*, No. 5:15-cv-04883-BLF (N.D. Cal. July 22, 2019) (ECF Nos. 182 & 183) (Ex. 8) (approving settlement representing recovery between approximately 3% and 7% of estimated damages); *Thorpe v. Walter Inv. Mgmt. Corp.*, No. 14-cv-20880-UU, 2016 WL 10518902, at *3 (S.D. Fla. Oct. 17, 2016) (approving settlement representing 5.5% of best-case scenario); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech., Inc.*, No. 3:09-cv-00419-MMD-WGC, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving

19

settlement representing about 3.5% of estimated damages, noting that the "amount [was] within the median recovery in securities class actions").

The Settlement is also in-line with industry trends. The $9.75 million Settlement Amount is just above the median recovery in securities class actions in 2021 of $8.3 million, as well as the $9.3 million median recovery for securities class actions prosecuted and settled within the Second Circuit from 2012 to 2021. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2021 Review and Analysis*, at 1 and 19 (Cornerstone Research 2022), Ex. 7.

**II.      THE PLAN OF ALLOCATION FOR THE PROCEEDS OF THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED**

A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable, and adequate. *See IMAX*, 283 F.R.D. at 192; *Bear Stearns*, 909 F. Supp. 2d at 270. A plan of allocation with a "rational basis" satisfies this requirement. *In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, No. 02-cv-3400, 2010 WL 4537550, at *21 (S.D.N.Y. Nov. 8, 2010); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 497. A plan of allocation that reimburses class members based on the relative strength and value of their claims is reasonable. *See IMAX*, 283 F.R.D. at 192. However, a plan of allocation does not need to be tailored to fit each and every class member with "mathematical precision." *PaineWebber*, 171 F.R.D. at 133.

Here, the proposed Plan, which was developed by Lead Counsel in consultation with Co-Lead Plaintiffs' damages experts, provides a fair and reasonable method to allocate the Net Settlement Fund among class members who submit valid claims. The Plan is set forth in full in the Notice. *See* Ex. 3-A at ¶¶55-68. The Plan provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Loss Amounts," calculated according to the Plan's formulas. Recognized losses will be calculated by the Claims Administrator and are based on the number of shares held and sold during one of

three periods of time.  The three periods of time are: (A) shares held just before the release of the 4Q18 guidance and sold before the Merger was announced; (B) shares held just before the Merger was announced and sold before Defendants learned of the 4Q18 results; (C) shares held just before Defendants learned the 4Q18 results and sold before the Merger closed. Shares both purchased and sold within these time periods, *i.e.,* shares that were "in and out", have no recognized losses under the Plan, as is standard in plans of allocation because such shares were similarly impacted at both their purchase and sale. Villegas Decl. §VIII.

The sum of a claimant's Recognized Loss Amounts will be the claimant's "Recognized Claim."  If the aggregate amount of Recognized Claims is greater than the Net Settlement Fund, each Claimant will receive a settlement equal to their *pro rata* share of the Net Settlement Fund. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund.  *See In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[i]n determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel").  Moreover, as noted above, to date, no objections to the proposed plan have been received.

### III.    NOTICE SATISFIED RULE 23 AND DUE PROCESS

Co-Lead Plaintiffs have provided the Settlement Class with notice of the proposed Settlement that satisfied all the requirements of Rule 23(e) and due process, which require that notice of a settlement be "reasonable"—*i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart Stores*, 396 F.3d at 114.  Both the substance of the Notice and the method of its dissemination satisfied these standards.

The Notice provided all of the necessary information for Settlement Class Members to make an informed decision regarding the Settlement, the Fee and Expense Application, and the

Plan of Allocation.  The Notice informed Settlement Class Members of, among other things: (i) the amount of the Settlement; (ii) the reasons why the Parties are proposing the Settlement; (iii) the estimated average recovery per affected share of Mindbody Class A common stock; (iv) the maximum amount of attorneys' fees and expenses that will be sought; (v) the right of Settlement Class Members to object to the Settlement or seek exclusion; and (vi) the binding effect of a judgment on Settlement Class Members.  *See* 15 U.S.C. § 78u-4(a)(7).  The Notice also contained the Plan of Allocation and provided information about how to submit a Claim Form.

In addition, SCS caused the Summary Notice to be published in *The Wall Street Journal* and to be released over the internet using *PR Newswire.*  Ex. 3 at ¶10.  SCS also has a webpage for the Settlement, www.strategicclaims.net/mindbody to provide information about the Settlement, as well as access to copies of the Notice, the Claim Form, Stipulation, and the Preliminary Approval Order (*id*. at ¶12).  Lead Counsel also posted copies of the Notice and Claim Form on its website, Villegas Decl. at ¶164.

This combination of individual mail to those who could be identified with reasonable effort, supplemented by publication and internet notice, was "the best notice . . . practicable under the circumstances."  Fed. R. Civ. P. 23(c)(2)(B); *see, e.g.*, *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04-8144, 2009 WL 5178546, at *12-13 (S.D.N.Y. Dec. 23, 2009).

**CONCLUSION**

Co-Lead Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement, approve the proposed Plan of Allocation, and finally certify the Settlement Class for purposes of the Settlement only.  Proposed orders will be submitted with the reply papers, after the deadline for objecting has passed.

Dated:  October 4, 2022                    Respectfully submitted,

                                            **LABATON SUCHAROW LLP**

                                             */s/ Carol C. Villegas*
                                            Carol C. Villegas
                                            David J. Schwartz
                                            Jake Bissell-Linsk
                                            140 Broadway, 34th Floor
                                            New York, NY  10005
                                            Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477
                                            cvillegas@labaton.com
                                            dschwartzabaton.com
                                            jbissell-linsk@labaton.com

                                            *Lead Counsel for Walleye Trading LLC and*
                                            *Walleye Opportunities Master Fund Ltd. and the*
                                            *Proposed Settlement Class*

23

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered ECF participants.

/s/ *Carol C. Villegas*
CAROL C. VILLEGAS

24