**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MINDBODY, INC. SECURITIES LITIGATION | Civil Action No. 1:19-cv-08331-VEC |

**DECLARATION OF CAROL C. VILLEGAS IN SUPPORT OF CO-LEAD PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND**
**PLAN OF ALLOCATION AND LEAD COUNSEL'S MOTION FOR AN AWARD OF**
**ATTORNEYS' FEES AND PAYMENT OF EXPENSES**

I, CAROL C. VILLEGAS, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.      I am a member of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), which serves as court-appointed Lead Counsel for Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund Ltd. ("Co-Lead Plaintiffs").[1]  I have been actively involved throughout the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth below based upon my close supervision of the material aspects of the Action.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Co-Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation, as well as Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses.  Both motions have the full support of Co-Lead Plaintiffs.  *See* Declaration of Andrew Carney on behalf of Co-Lead Plaintiffs (the "Carney Decl."), dated September 26, 2022, attached as Exhibit 1.[2]  To date, there have been no objections to any aspect of the Settlement.

## I.     PRELIMINARY STATEMENT

3.      Co-Lead Plaintiffs have succeeded in obtaining a favorable recovery for the Settlement Class in the amount of $9,750,000 in cash.  As set forth in the Stipulation, in exchange for this payment, the proposed Settlement resolves all claims asserted in the Action by Co-Lead

---

[1] All capitalized terms not otherwise defined below have the same meaning as in the Stipulation and Agreement of Settlement, dated as of March 3, 2022 (the "Stipulation", ECF No. 118-1).

[2] Citations to "Exhibit" or "Ex.___" refer to exhibits to this Declaration.  For clarity, exhibits that themselves have attached exhibits will be referenced as "Ex. __-__."  The first numerical reference is to the designation of the entire exhibit and the second alphabetical reference is to the exhibit designation within the exhibit itself.

Plaintiffs and the Settlement Class and related claims against the Released Defendant Parties.  ECF No. 118-1.

4.     This case was vigorously litigated over the course of more than two years.  The Settlement was achieved only after Lead Counsel, *inter alia*, and as detailed below:  (i) conducted a wide-ranging investigation concerning the allegedly fraudulent misrepresentations and omissions; (ii) prepared and filed two detailed amended class action complaints; (iii) researched and drafted an opposition to Defendants' comprehensive motion to dismiss the amended complaint, after which the Court entered an Order partially granting and partially denying the motion; (iv) moved for class certification, which was accompanied by an expert report on market efficiency and an expert report on corporate valuation; (v) engaged in extensive and thorough fact discovery, including participating in the depositions of 17 witnesses (and was preparing for the depositions of additional witnesses at the time the Parties settled), and analyzing more than 400,000 pages of documents produced by Defendants and third-parties; (vi) filed petitions in Delaware Court of Chancery challenging the confidential treatment of certain documents in the action *In re Mindbody Stockholder Litigation*, C.A. No. 2019-0442-KSJM (Del. Ch.) (the "*Luxor Action*"), a class action and appraisal proceeding challenging the acquisition of Mindbody by Vista Equity Partners ("Vista"), resulting in a partial unsealing of documents relevant to the claims in the Action; (vii) engaged in expert discovery, including retaining professionals with expertise in (a) materiality, loss causation, and damages,  (b) corporate valuation and appraisal rights, and (c) the software as a service (or SaaS) industry; and (viii) objected to the proposed settlement of *Philip Ryan Jr. v. Mindbody, Inc.*, C.A. No. 2019-0061-KSJM (Del. Ch), a case seeking to invalidate the Merger (the "*225 Action*"), as overly broad to the extent it would impact the class and claims in

the Action without providing any consideration.  At the time the Settlement was reached, Lead Counsel had a thorough understanding of the strengths and weaknesses of the Action.

5.      As discussed in detail below, maximum aggregate damages in the Action depended upon which claims Co-Lead Plaintiffs were able to establish and a factual determination of the value of the Mindbody shares sold by class members.  Estimated damages ranged from $133 million to $453 million.  However, loss causation and damages were expected to be especially contested issues in this case, and there was a substantial risk that Co-Lead Plaintiffs would not have succeeded at establishing even the low end of this estimate ($133 million), even if Co-Lead Plaintiffs succeeded in establishing that Defendants made materially false statements or omissions with the requisite mental state.

6.      The $9,750,000 Settlement, therefore, represents a recovery of approximately 2.2% to 7.3% of the estimated range — a favorable recovery that is well within the range of reasonableness, particularly in light of the countervailing legal and factual arguments tenaciously pursued by Defendants and the attendant litigation risks.  *See* Section V, below, and the accompanying Memorandum of Law in Support of Co-Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Settlement Brief").

7.      In deciding to settle, Co-Lead Plaintiffs and Lead Counsel took into consideration the significant risks associated with advancing the claims alleged in the operative complaint, the risks of certifying a class for the full Class Period, and the complexity of the then-upcoming proceedings, including *Daubert* motions directed at experts, summary judgment motions, and trial. The Settlement was achieved in the face of staunch opposition by Defendants who would have, had the Settlement not been reached, continued to raise serious challenges to each of the elements

of Co-Lead Plaintiffs' claims.  The Settlement eliminates these risks while providing a guaranteed recovery to the Settlement Class in a timely manner.

8.      In addition to seeking approval of the Settlement, Co-Lead Plaintiffs also seek approval of the proposed Plan of Allocation for distributing the proceeds of the Settlement.  As discussed in further detail below and in the Settlement Brief, the proposed Plan of Allocation was developed by Lead Counsel with the assistance of Co-Lead Plaintiffs' damages expert, reflects the theory of the case, and will provide for the fair and equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment.

9.      With respect to the Fee and Expense Application, as discussed in Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses ("Fee Brief"), the requested fee of 30% of the Settlement Fund would be fair to the Settlement Class, and warrants the Court's approval.  This fee request is within the range of fee percentages frequently awarded in this type of action and would provide no multiplier on Lead Counsel's lodestar to date.  Lead Counsel also seeks Litigation Expenses totaling $560,715.36 and an award to Co-Lead Plaintiffs, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(4), in the amount of $8,000 — which, when combined, are less than the cap on expenses of $800,000 provided for in the Notice.

## II.      SUMMARY OF CO-LEAD PLAINTIFFS' CLAIMS

10.      Mindbody, Inc. was a publicly traded company providing business management software for the wellness services industry and a rapidly growing marketplace for wellness services.  ECF No. 22, ¶2.  This lawsuit alleged that Mindbody issued 4Q18 guidance that was lower than Mindbody's true expectations, allegedly to lower its stock price and tee up a takeover by Vista Equity Partners ("Vista").  *Id.* ¶¶1-32.  As the deal proceeded, the lawsuit alleged, Defendants issued misleading information about the deal, including denying that Defendant

4

Stollmeyer had engaged in any discussions with Vista about post-merger employment, and allegedly omitted to disclose that the Company's 4Q18 results had exceeded the guidance they had previously issued. *Id.*

11.     The First Amended Complaint asserted violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by Mindbody, Richard L. Stollmeyer, Brett White, and Eric Liaw.  ECF No. 22.

12.     Defendants filed a motion to dismiss the First Amended Complaint, which after fulsome briefing (including sur-replies), resulted in the Court sustaining only certain claims related to misstatements and omissions after the merger was announced, and dismissing claims relating to the 4Q18 guidance.  ECF No. 52.  The parties then began formal discovery, and Co-Lead Plaintiffs uncovered additional facts that they believed supported their allegation that the 4Q18 guidance was actionable and misleading.  As a result, Co-Lead Plaintiffs filed a motion to amend the complaint to add allegations related to those additional facts.  After thorough briefing, the Court granted the motion to amend.  ECF No. 93.

13.     Co-Lead Plaintiffs' core theory of the case was that Defendants' statements and omissions defrauded Mindbody investors into selling their shares at less than fair value.

III.    **RELEVANT PROCEDURAL HISTORY**

   A.    **Commencement of the Action and Appointment of Co-Lead Plaintiffs and Lead Counsel**

14.     The Action was commenced on September 6, 2019, with the filing of a putative securities class action in this Court by one of the two Co-Lead Plaintiffs.  ECF No. 1.  On November 5, 2019, consistent with the PSLRA, Co-Lead Plaintiffs moved for appointment as Lead Plaintiff and Lead Counsel moved for appointment as Lead Counsel.  ECF Nos. 12-15.  No other

plaintiff or firm moved for such appointment.  On November 7, 2019, the Court granted Co-Lead Plaintiffs' Motion.  ECF No. 16.

### B.    The First Amended Complaint

15.    On December 20, 2019, Co-Lead Plaintiffs filed the first Amended Complaint asserting claims against Defendants Mindbody, Richard L. Stollmeyer, Brett White, and Eric Liaw under Sections 10(b), 14(a), and 20(a) of the Exchange Act.  ECF No. 22.

16.    Co-Lead Plaintiffs engaged in a thorough investigation for the purpose of drafting the comprehensive Amended Complaint so that it would survive the strictures of the PSLRA.  The Amended Complaint was the result of a significant effort by Lead Counsel that included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Mindbody, conference call transcripts, news articles, press releases and other public statements by the Company, analyst reports about the Company, secondary sources about typical M&A practices, other publicly available sources, interviews with 25 former Mindbody employees, and consultation with individuals with expertise in damages.

17.    As part of their investigation, Co-Lead Plaintiffs successfully contested the confidential status of documents filed in *In re Mindbody Inc. Stockholder Litigation*, No. 2019-0442-KSJM (Del. Ch.), which resulted in documents from that action being made available to the public.  Co-Lead Plaintiffs were able to review those documents and utilize the information in them to bolster their pleadings.

18.    Lead Counsel's preparation of the thorough Amended Complaint required many meetings to discuss strategy and a high degree of partner and senior associate-level involvement, given the complexities of the case.  The litigation of the claims required an understanding of both the securities laws, Mindbody's business, and its dealmaking process, including the ways the

6

process would have involved discrete decisions that Co-Lead Plaintiffs believed could bolster the allegations.

### C.   Defendants' Motion to Dismiss the Amended Complaint

19.   On January 17, 2020, Defendants sought leave to file an oversized motion to dismiss, given the "complexity" of the case. ECF No. 29. The Court granted their unopposed motion for oversized briefing. ECF No. 30.

20.   On February 18, 2020, Defendants filed their motion to dismiss. ECF Nos. 35-36. Defendants argued, among other things, that Co-Lead Plaintiffs failed to: (i) allege with the required specificity why any of the alleged misstatements were false, or why Defendants' purported omissions were actionable; or (ii) plead the highly particularized allegations of scienter required by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.

21.   Regarding the falsity of statements or omissions, Defendants divided up the statements and omissions into ten categories and argued none were actionable. With respect to scienter, Defendants argued that management was incentivized to seek the highest deal price such that the theory of the fraud did not make sense, and that the allegations of recklessness or knowledge were insufficiently strong to meet the PSLRA's pleading burden.

22.   Co-Lead Plaintiffs filed an opposition to Defendants' motion to dismiss the Complaint on April 3, 2020. ECF No. 39. Co-Lead Plaintiffs argued that they had sufficiently alleged that Defendants made materially false and misleading statements and omissions. Co-Lead Plaintiffs also identified a critical well pled allegation that Defendants failed to address, regarding a Delaware law duty to disclose material information before the Merger, which Co-Lead Plaintiffs alleged could support an allegation of an "omission" under federal securities law.

23.     With respect to scienter, Co-Lead Plaintiffs detailed how the alleged fraud served Defendants' incentives, such as by allowing much needed immediate liquidity, and because of the specific dynamics of post-private equity acquisition compensation of retained managers.

24.     On May 4, 2020, Defendants filed a reply brief in further support of their motion to dismiss the Amended Complaint.  ECF No. 42.

25.     Co-Lead Plaintiffs filed a letter on May 6, 2020 requesting leave to file a sur-reply to address arguments, raised by Defendants for the first time in reply, regarding the alleged omissions in violation of Delaware law duties.  ECF No. 43.  The Court granted leave to file a sur-reply but permitted Defendants their own sur-sur reply.  ECF Nos. 44, 48.

26.     On August 24, 2020, Defendants filed a letter regarding purported supplemental authority (ECF No. 50) and Co-Lead Plaintiffs filed a response the following day (ECF No. 51).

27.     Altogether (including the supplemental authority letters), there was 136 pages of briefing on the motion to dismiss, far more than is typical even in securities class action cases, demonstrating the complexity of the case and the vigor of the litigation.

**D.      The Court's Order on the Motion to Dismiss**

28.     On September 25, 2020, the Court issued a detailed Order and Opinion partially denying Defendants' motion to dismiss.  ECF No. 52 (reported as *In re Mindbody Inc., Securities Litigation*, 489 F. Supp. 3d 188 (S.D.N.Y. 2020)).  The Court found that statements regarding the Merger premium and the absence of pre-merger employment discussions found in the merger proxies was adequately pled as materially misleading.  The Court also found that scienter was adequately pled as to these claims.

29.     Additionally, the Court found that Defendants' failure to disclose the known 4Q18 results constituted an actionable material omission, based upon the affirmative duty to disclose non-public information prior to a Merger owed by Defendants under Delaware law.  While Co-

Lead Plaintiffs pled this omissions theory based upon a strong belief that it was legally and factually valid (which was ultimately credited by the Court), it is a good example of the complex and innovative legal work that resulted in the success of this case, as Co-Lead Plaintiffs developed this case theory based on a careful reading of the history of "omissions" cases and an understanding of both federal securities law and Delaware fiduciary law.

30.     However, the Court also found that several of the claims were not adequately alleged to be false and misleading.  Most notably, the Court found that the 4Q18 guidance statements and statements concerning the rationale for that guidance were insufficient, because Co-Lead Plaintiffs did not have sufficient support that the public guidance was lower than true expectations within the Company.  With this ruling, the actionable class period was shortened to a period from December 26, 2018 to February 14, 2019.  However, as referenced below, the full Class Period was restored in the second amended complaint with the amended allegations concerning the 4Q18 guidance.

31.     On October 30, 2020, Defendants filed their Answer to the Amended Complaint, denying the Amended Complaint's substantive allegations and raising 21 affirmative defenses. ECF No. 61.

### E.     Discovery

32.     After the Court's order partially denying the motion to dismiss, the Parties quickly went to work on discovery.  From the beginning, discovery was hard fought. The Parties attempted to work collaboratively to agree upon a case management schedule, but ultimately reached an impasse on the issue of whether discovery should be "bifurcated," with Defendants contending that a motion for class certification should come early and all discovery should be limited to class certification issues until they motion was decided.  The Parties submitted competing proposals to the Court and the Court held a hearing on the issue, before ultimately deciding in Co-Lead

Plaintiffs' favor that class certification should occur after sufficient discovery to determine the contours of the case that would be tried. ECF Nos. 57, 58.

33.    Following that ruling, the Parties again worked collaboratively to determine an efficient discovery schedule. In particular, the Parties negotiated a protocol that would allow Co-Lead Plaintiffs in this Action to participate in depositions scheduled in the ongoing *Luxor Action*, which would avoid the waste of resources and duplication of work while still allowing Co-Lead Plaintiffs to fully develop their claims.

34.    As described in more detail in Section IV, below, the discovery in this case was extremely fulsome. The Parties negotiated a protective order and ESI protocol, exchanged document requests and interrogatories, participated in the depositions of 17 witnesses (some of which were multiple days), exchanged voluminous amounts of documents, and worked productively to resolve discovery disputes without the need for Court involvement. Co-Lead Plaintiffs also sought discovery from relevant non-parties through more than 22 subpoenas, negotiated productions pursuant to those subpoenas, and ultimately received more than 64,000 party and non-party documents, which were subject to an efficient review process. Additionally, as detailed below, this case required substantial assistance from experts, requiring Co-Lead Plaintiffs to interview many prospective experts and ultimately retain experts in the fields of damages and market efficiency, corporate valuation, and software companies. Before settlement, Co-Lead Plaintiffs' experts prepared reports in connection with class certification on damages, valuation, and market efficiency.

F.    **Co-Lead Plaintiffs' Motion to Amend**

35.    In early 2020, Co-Lead Plaintiffs faced a complex strategic choice. The deadline for class certification was fast approaching, and Co-Lead Plaintiffs were eager to secure certification for the class, however evidence produced in discovery had, in Co-Lead Plaintiffs'

view, substantially strengthened the claims regarding the 4Q18 guidance that the Court had previously found to be insufficiently pled, as well as additional evidence that Co-Lead Plaintiffs believed strengthened the allegations concerning Defendants' motives with respect to those claims. Furthermore, any motion for class certification would require complex analysis of how best to position the potential class for success, and the answer to that question could depend on whether the Court granted Co-Lead Plaintiffs leave to amend.

36.     Co-Lead Plaintiffs determined that the best path forward would be to amend the complaint and to postpone the class certification motion, but doing so required Co-Lead Plaintiffs to continue working to prepare for class certification to ensure a motion would be ready if the extension were denied and, moreover, if the Court quickly denied the motion to amend.

37.     After several, unsuccessful, conferences with Defendants' Counsel concerning a consented to schedule for amending the complaint and filing a motion for class certification, Co-Lead Plaintiffs moved for an extension of the deadline for a class certification motion and a schedule for a motion to amend on February 19, 2021, ECF No. 68, which the Court granted the following day, ECF No. 69.

38.     While the motion to amend was being prepared, an additional complexity arose. The case was in the middle of discovery, and in light of the PSLRA the Court had ordered discovery stayed while the motion to amend was pending.  However, the Parties had previously agreed to a discovery protocol wherein Co-Lead Plaintiffs would participate in depositions noticed in the *Luxor Action*, which would be disrupted if discovery was halted.  As such, the Parties worked to negotiate a resolution that would be mutually acceptable, while avoiding any burden to the Court, and proposed a limited ability to continue discovery while the motion to amend was pending, ECF No. 78, which the Court granted on March 3, 2021, ECF No. 79.

39.    Co-Lead Plaintiffs then prepared the motion to amend, highlighting the new evidence supporting their claims and, on February 24, 2021, filed a letter motion discussing why leave to amend was appropriate.  ECF No. 71.  Defendants filed a full opposition brief arguing both the merits of the proposed amended complaint (raising complex issues about the application of the PSLRA safe harbor to guidance statements) and claiming the amendment was barred by the prior decision on the motion to dismiss.  ECF No. 86.  Co-Lead Plaintiffs then filed a reply, carefully analyzing the law regarding whether the prior motion to dismiss opinion barred further amendment to renew the 4Q18 guidance.  Additionally, Co-Lead Plaintiffs carefully analyzed the PSLRA issues and the factual theory Defendants advanced, *i.e.,* that issuing guidance below true expectations is normal and not fraudulent, which among other things, required a detailed review of secondary sources to fully understand corporate practices and the merits of this defense.

40.    The briefing on the motion to amend was further complicated by the fact that the amendment was partially predicated on information obtained in discovery and marked confidential.  Thus, Co-Lead Plaintiffs worked expeditiously and efficiently to simultaneously, ensure the motion for class certification would be ready when needed, continue with the approved of discovery efforts, draft the proposed amended complaint, litigate merits and procedural issues about that motion to amend, collaborate with Defendants on the treatment of potentially confidential information, and move the Court for confidential treatment of information at Defendants request.  *See* ECF Nos. 80, 84.

41.    On August 9, 2021, the Court granted Co-Lead Plaintiffs motion to amend finding that Co-Lead Plaintiffs' new allegations sufficiently pled falsity and scienter as to the 4Q18 guidance statements.  ECF No. 92-93.  On August 18, 2021, Co-Lead Plaintiffs promptly filed the

second amended complaint (the "SAC"). ECF No. 95. On August 27, 2021, Defendants promptly filed an answer to the SAC. ECF No. 98.

### G.    Motion for Class Certification

42.    On October 15, 2021, Co-Lead Plaintiffs moved for certification of the class, appointment as class representatives pursuant to Rules 23(a) and 23(b)(3), and appointment of Labaton Sucharow LLP as Lead Counsel. ECF Nos. 105-08.

43.    In connection with this motion, Co-Lead Plaintiffs filed an expert report on market efficiency by Mr. Coffman, CFA. ECF No. 107-1. Mr. Coffman conducted a detailed event study concerning: (i) the average weekly trading volume of Mindbody's stock, (ii) the number of securities analysts following and reporting on Mindbody, (iii) the extent to which market makers traded in Mindbody's stock, (iv) Mindbody's eligibility to file an SEC registration Form S–3, and (v) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in Mindbody's stock's price. Mr. Coffman concluded that the market for Mindbody's stock was efficient throughout the Class Period. This analysis included a consideration of the market conditions unique to Mindbody's status for a portion of the Class Period as a company subject to an ongoing proposed acquisition.

44.    Additionally, Co-Lead Plaintiffs submitted an expert report from Benjamin Sacks, a leading expert on corporate valuation at the Brattle Group, on the subject of valuation. ECF No. 107-2. The efforts to determine the correct approach to valuation were substantial. Unlike most securities fraud cases, there was not a simple "corrective event" through which damages could be measured. Co-Lead Plaintiffs believed, and believe, that a correct measure of damages in a seller case is to determine the fair value of the stock at the time of the sale and subtract from that the price received upon selling.

45.     Establishing valuation in this context was complicated due to the interplay of Co-Lead Plaintiffs' views that: (i) the market price of Mindbody shares was artificially low throughout the Class Period because of Defendants' allegedly misleading 4Q18 guidance; (ii) the additional misrepresentations and omissions also resulted in shareholders receiving less than fair value upon selling both their shares in the open market and their shares into the Merger; (iii) the omissions were "continuing," such that every subsequent day that Defendants failed to disclose required information, they defrauded those who sold shares after that omission; (iv) the touted premium was misleading, but the Merger was at a price at or around the price before the issuance of the 4Q18 guidance; (v) Mindbody's stock price had traded in a range far above that price as recently as a month prior to the 4Q18 guidance; (vi) Vista had indicated a willingness to pay a "substantial premium" to that higher trading price; and (vii) non-public information supporting a higher valuation existed, in addition to the information that Co-Lead Plaintiffs had pled was misrepresented or fraudulently omitted..

46.     As discussed below, before Defendants filed their opposition to class certification, the Parties reached an agreement to settle.

**H.     Mediation**

47.     At various points during the litigation, counsel for the Parties conferred about the possibility of a pre-trial resolution of the Action.  The Parties agreed to engage in mediation and retained Michelle Yoshida of Phillips ADR ("Mediator") to act as mediator in the Action.

48.     On May 12, 2021, the Parties participated in a full-day mediation session before the Mediator. In advance of the session, the Parties provided detailed mediation statements and exhibits to the Mediator, which addressed issues of liability, class certification, and damages. However, no agreement was reached during the mediation.

49.     The Parties continued to actively discuss a potential settlement with the assistance of the Mediator over the course of the next several months.  On November 30, 2021, the Mediator made a formal mediator's proposal recommending that the Parties agree to settle the case for $9,750,000.  On December 2, 2021, the Parties accepted the mediator's proposal, which was memorialized in a binding term sheet executed and finalized on December 22, 2021 (the "Term Sheet"), subject to the execution of a "customary long form" stipulation and agreement of settlement and related papers.  On December 22, 2021, the Parties notified the Court of the Settlement and requested a stay of the Action, which was ordered on December 23, 2021.  ECF No. 112.

50.     The Parties subsequently negotiated and executed the Stipulation, which sets forth the final terms and conditions of the Settlement, including, among other things, a release of all claims asserted against Defendants in the Action and related claims ("Released Plaintiff's Claims").  Once the Settlement reaches its Effective Date, the Released Plaintiff's Claims against Defendants and the other Released Defendant Parties will be forever dismissed with prejudice.

51.     In exchange for these releases, Mindbody has caused the payment of $9,750,000 for the benefit of the Settlement Class.

## IV.    DISCOVERY

52.     As explained below, Co-Lead Plaintiffs: (i) prepared and served detailed discovery requests on Defendants, including Requests for Production of Documents, Interrogatories, and Requests for Admission; (ii) met and conferred with Defense Counsel remotely on numerous occasions concerning the discovery; (iii) prepared and served 22 subpoenas on non-parties and negotiated the production of information pursuant to many of those subpoenas; (iv) received approximately 400,000 pages of production documents; (v) participated in 19 remote depositions (for the depositions of 17 different people); (vi) negotiated and resolved myriad discovery disputes;

and (vii) engaged and consulted frequently with several experts, who were preparing expert reports before the Parties reached a settlement.

53.     Prior to document production by the Parties, Lead Counsel and Defendants' Counsel negotiated a comprehensive confidentiality agreement, detailing two levels of confidentiality.  The protective order was So Ordered by the Court on November 24, 2020.  ECF No. 67.

54.     During discovery, Lead Counsel operated efficiently and flexibly, altering the size of the litigation team to fit the needs of the case and designating sub-teams to handle the many different aspects of discovery, such as Co-Lead Plaintiffs' document production, Defendants' production, non-party productions, and deposition preparation.

### A.     Discovery Propounded on Defendants

55.     Co-Lead Plaintiffs served their first set of document requests on Defendants on November 10, 2020. Thereafter, Co-Lead Plaintiffs served their second set of document requests on Defendants on November 23, 2020.  Co-Lead Plaintiffs served their first set of interrogatories on Defendants on December 2, 2020.

56.     The Parties engaged in numerous remote meet-and-confer conferences and exchanged multiple meet and confer letters and emails, as to the scope and manner of the requested document productions, privilege logs, interrogatories, and alleged discovery deficiencies. Through this comprehensive effort, the Parties were able to reach an understanding as to the scope of Defendants' discovery, and reached many compromises without having to request the Court's assistance.

57.     Co-Lead Plaintiffs conducted an efficient review of the documents produced in discovery.  Defendants began a rolling production of documents on December 8, 2020.  To

facilitate an economical and time-efficient document review process, all of the documents were placed in an electronic database, using a platform called Relativity to organize the data.

58.    A small team of three experienced Labaton Sucharow attorneys reviewed and analyzed the production.  These document review attorneys have all worked on multiple securities cases while at Labaton, specialize in securities and/or corporate governance litigation, and are experienced in utilizing the latest technology with respect to document review.  Each were W-2 employees of Labaton, which means that the firm paid FICA and Medicare taxes on their behalf, along with state and federal unemployment taxes.  Once certain eligibility requirements were met, these attorneys had access to the firm's 401(k) program and were eligible to receive year-end bonuses.

59.    The review began in December 2020 and peaked in March 2021 with three reviewers. These attorneys were integral to the litigation team and focused on reviewing Defendants' and third-parties' document productions for the purpose of preparing for class certification, fact depositions, expert reports and depositions, as well as a large volume of Co-Lead Plaintiffs' discovery to prepare for production pursuant to Defendants' Requests for Production.

60.    To efficiently focus on the most relevant documents, these attorneys used the document platform's software tools to analyze and search the data.  The team used a variety of methods to conduct targeted searches.  The attorneys culled documents based on legal issues, custodians, and relevant time periods, in order to narrow the scope of the review universe.

61.    The document review attorneys did not only review documents.  They also participated in frequent meetings with more senior attorneys to discuss important documents, deposition preparation efforts, and case strategy.  The document review attorneys also: (i) assisted

17

in selecting relevant documents for expert review; and (ii) assisted in the preparation of deposition binders.

### B.    Fact Depositions

62.    Lead Counsel participated in the depositions of seventeen fact witnesses.  The fact depositions took place via electronic methods due to COVID restrictions and for the convenience of the parties.  The fact depositions were of:

(a)    Gail Goodman (Director on Mindbody's Board) on December 18, 2020

(b)    Graham Smith (Director on Mindbody's Board) on January 15, 2021

(c)    Cipora Herman (Director on Mindbody's Board) on January 18, 2021

(d)    Dominic Calvani (UBS Private Wealth Advisor) on February 5, 2021

(e)    Court Cunningham (Director on Mindbody's Board) on March 2, 2021

(f)    Derek Klomhaus (Vista Equity Partners, Vice President) on March 29, 2021

(g)    Craig Heinle (Mindbody, Sr. Director of Finance) on April 2, 2021

(h)    Monti Saroya (Vista Equity Partners, Principal) on April 8, 2021

(i)    Defendant Brett White (Mindbody, Chief Financial Officer) on April 13, 2021 and April 16, 2021

(j)    David Handler (Centerview Partners LP, Partner) on April 14, 2021

(k)    Former Defendant Eric Liaw (Director on Mindbody's Board) on April 27, 2021

(l)    Defendant Richard Stollmeyer (Mindbody, Chief Executive Officer) on May 4-5, 2021.

(m)    Brian Sheth (Vista Equity Partners, President) May 17, 2021

(n)    Michael Mansbach (Mindbody, President) May 18, 2021

18

(o)     Kimberly Lytikainen (Mindbody, General Counsel) May 20, 2021

(p)     Jeffrey Chang (Qatalyst Partners, Partner) May 21, 2021

(q)     Nicholas Stahl (Vista Equity Partners, President) May 24, 2021

63.     Collectively, the depositions provided substantial evidence and insight into events during the Class Period, including the process of setting Mindbody's public guidance, Mindbody's financial planning and analysis function, the deal process leading to the Merger, and the public disclosures during the pendency of the Merger. While Co-Lead Plaintiffs believe that the depositions confirmed many of their allegations, they also revealed that Defendants would have arguments in response regarding the motivations for reducing Mindbody's 4Q18 guidance and the reasons for not disclosing Mindbody's 4Q18 results.

64.     The Parties were in the process of arranging and preparing for additional fact depositions at the time they reached the Settlement.

**C.     Discovery Propounded on Co-Lead Plaintiffs**

65.     Defendants also aggressively sought discovery from Co-Lead Plaintiffs. Defendants' discovery requests led to: (i) the production of approximately 1,130 documents; (ii) a 30(b)(6) deposition notice on Co-Lead Plaintiffs; (iii) multiple meet-and-confer sessions to discuss the scope of Co-Lead Plaintiffs' production, and (iv) a contentious letter writing campaign.

66.     While the total number of documents produced was not unusually large, Co-Lead Plaintiffs' document collection was far reaching.  Co-Lead Plaintiffs processed approximately 7 terabytes of data as part of the collection process.  The nature of Co-Lead Plaintiffs' investment in Mindbody required a broad collection across both identified custodians and shared files.  Upon review of the collected information, there was very little correspondence related to Mindbody – a fact Co-Lead Plaintiffs did not believe would have a significant bearing on their ability to demonstrate reliance through the fraud on the market presumption.  However, Defendants sought

19

additional information regarding Co-Lead Plaintiffs trading and how the trading fit into Walleye's overall investment strategy.  Through meet and confers the Parties were able to resolve these disputes without court intervention.

67.    Defendants also served two sets of interrogatories on Co-Lead Plaintiffs.  The first set was served on December 23, 2020.  Co-Lead Plaintiffs served their responses and objections on January 25, 2021.  Defendants served their second set of interrogatories on October 22, 2021.  Co-Lead Plaintiffs were in the process of preparing detailed responses and objections at the time the Parties reached the Settlement.

68.    Defendants served a 30(b)(6) deposition notice on Co-Lead Plaintiffs on November 14, 2021.  Co-Lead Plaintiffs were in the process of preparing for that deposition at the time of settlement.

**D.     Non-Party Discovery**

69.    In addition to the documents collected from Defendants, Lead Counsel also served 22 subpoenas for the production of documents on third-parties that Lead Counsel believed had documentary evidence relevant to the claims in the Action.  For example, Co-Lead Plaintiffs sought documents from securities analysts that followed Mindbody during the relevant period of time and on parties that had been contacted as part of the "go shop" portion of the Merger process, wherein other potential acquirors were invited to consider purchasing Mindbody.  Additionally, Co-Lead Plaintiffs received documents from Vista (the acquirer), Qatalyst Partners (the investment bank working on the Merger) and UBS (private wealth advisors to Defendants).

70.    Defendants served third party subpoenas on three entities (Jet Capital Investors, LP; Provenire Capital LLC; and 4Alphas Capital LLC) that traded securities on Co-Lead Plaintiffs behalf (the "sub advisors") and received documents in response to these subpoenas.  Defendants

had given notice of their intent to depose these sub advisors, but depositions had not yet been taken at the time the Settlement was reached.

### E.   Expert Discovery

71.   Co-Lead Plaintiffs worked with three experts during the course of fact discovery and in connection with class certification: (i) Mr. Sacks, to opine on the value of Mindbody's shares; (ii) Mr. Coffman, to opine on market efficiency, loss causation and damages; and (iii) Edward Mallen, to opine on issues related to Mindbody's performance within the context of the Software as a Service industry.  At the time the Parties agreed to settle the Action, Mr. Coffman and Mr. Sacks had prepared expert reports in support of Co-Lead Plaintiffs' motion for class certification and were preparing to draft reports on the merits, and Mr. Mallen was preparing to begin drafting his expert report.

72.   The experts provided valuable assistance to Lead Counsel and were key with respect to framing arguments and rebuttals to Defendants' challenges.

## V.   RISKS FACED BY CO-LEAD PLAINTIFFS IN THE ACTION

73.   Based on publicly available information and documents obtained through counsel's investigation and the extensive fact and expert discovery conducted in the Action, Lead Counsel believes that it had adduced substantial evidence to support Co-Lead Plaintiffs' and the Settlement Class's claims and was prepared to proceed to trial.  However, Lead Counsel also recognized that Co-Lead Plaintiffs and the Settlement Class faced significant risks and defenses in continuing to litigate.  If any of the risks materialized, Co-Lead Plaintiffs' and the Settlement Class's potential recovery could be seriously jeopardized. These risks were made apparent through document discovery, depositions, and class certification briefing.  Co-Lead Plaintiffs and Lead Counsel carefully considered these risks during the months and weeks leading up to the Settlement and throughout the settlement discussions with Defendants.

74.    In agreeing to settle, Co-Lead Plaintiffs and Lead Counsel weighed, among other things, the substantial certain cash benefit to Settlement Class Members against: (i) the uncertainty of certifying a class covering the full Class Period; (ii) the uncertainties of surviving Defendants' upcoming summary judgment motion, which could result in the termination of the Action, no recovery for the Settlement Class, and a lengthy appellate process; (iii) the difficulties and challenges involved in proving falsity, scienter, loss causation, reliance, materiality, and damages at trial; (iv) the fact that, even if Co-Lead Plaintiffs prevailed at summary judgment and trial, any monetary recovery could have been less than the Settlement Amount; and (v) the delays that would follow even a favorable jury finding, including a contested claims process and appeals to the Second Circuit and beyond.

A.    **Risks at Class Certification**

75.    At the time the Settlement was reached, Co-Lead Plaintiffs had filed their motion to certify the class and accompanying expert reports, but Defendants had not yet filed their opposition.  However, Co-Lead Plaintiffs understood that Defendants would have tenaciously contested Co-Lead Plaintiffs' efforts to certify the class, by arguing, among other things, that: (i) the fraud on the market presumption of reliance could not be applied due to the effect of the Merger on the market for Mindbody's stock; (ii) that Co-Lead Plaintiffs' theory of class-wide damages – which alleged that investors suffered a loss when selling at below the fair value of the stock – was either legally deficient or insufficiently supported; and (iii) Co-Lead Plaintiffs could not serve as a class representative, due to the complexity of their Class Period trading, which included short selling the stock from time to time.

76.    As to the fraud on the market presumption, Co-Lead Plaintiffs anticipated that Defendants would argue that the market price for Mindbody stock no longer traded efficiently once the Merger was announced, because the Merger price substantially controlled Mindbody's

22

stock price from that point going forward.  Mr. Coffman prepared an expert report showing that Mindbody's stock did trade efficiently, and Co-Lead Plaintiffs were prepared to defend the economic logic of why market efficiency continues even after a proposed Merger substantially affects a company's trading price.  However, this is a complex issue, and posed meaningful risks to Co-Lead Plaintiffs.

77.    As to damages, Defendants were likely to challenge the overall theory of damages by arguing that the fair price of Mindbody stock did not exceed the Merger price or trading prices during the Class Period.  Co-Lead Plaintiffs were confident that they would prevail on these arguments at the class certification stage, especially because the issue of fair value is a fact issue.  However, Defendants would likely have also challenged the ability to model damages (and valuation) throughout the Class Period, by demonstrating complexities with respect to differences in Mindbody's valuation and the effect of the alleged misstatements and omissions throughout the Class Period.

### B.    Risks in Proving Liability and Damages

78.    Beyond class certification challenges, there were significant risks that: (i) the Court would find that Co-Lead Plaintiffs failed to establish falsity, scienter, loss causation, reliance, materiality, or damages as a matter of law at summary judgment; (ii) Defendants would ultimately succeed in their *Daubert* challenges to Co-Lead Plaintiff's experts' analyses; or (iii)—if the Court were to permit the claims to proceed to trial—that a jury (or appeals court) would rule against Co-Lead Plaintiffs on liability and/or damages grounds.  While Co-Lead Plaintiffs and Lead Counsel believe they would have advanced strong arguments and evidence on the merits, they nonetheless acknowledge that Defendants' arguments and counter evidence posed very credible threats to Co-Lead Plaintiffs' ability to ultimately succeed.  Furthermore, if the Court or a jury were to find that

23

any of the alleged corrective disclosures identified in the SAC were not actionable, the potential recovery for the class would be significantly diminished.

79.    Even beyond these substantial challenges, Defendants would hold Co-Lead Plaintiffs to their burden of proof on each of the elements of securities fraud, and establishing the class's claims would require the jury to make complicated assessments of credibility in several complex and hotly contested factual disputes.

### 1.    Risks in Proving Falsity

80.    At summary judgment and trial, Defendants would likely argue that Co-Lead Plaintiffs simply failed to establish that Defendants' statements were false and misleading.  For example, Co-Lead Plaintiffs would seek to establish that Mindbody's reduced 4Q18 guidance was misleading, and Defendants would likely have argued that while the number was conservative, it was a fair assessment of where they believed guidance should be set.  Defendants would have argued that setting guidance below internal expectations is common practice, and a jury may have credited this argument.  On the omission of the 4Q18 results, Defendants would similarly have explained a counter-story as to why they did not disclose those results.  As to the employment discussion claims, Defendants would have argued that there was no documentary evidence of such discussions.

81.    While the Court credited Co-Lead Plaintiffs' falsity theory in connection with the motion to dismiss, discovery to date was mixed, yielding evidence that was supportive of each sides' arguments—resulting in the possibility that Co-Lead Plaintiffs' claims would be unable to survive summary judgment or presentation to a jury.

### 2.    Risks in Proving Scienter

82.    Co-Lead Plaintiffs also faced significant challenges in establishing that Defendants had an intent to deceive or otherwise acted with recklessness nearing such intent.

83.     First, Defendants had a persuasive argument that they were motivated to maximize the value of Mindbody stock, and that Co-Lead Plaintiffs' theory that they intentionally reduced the price to further the Merger process was contrary to Defendants' interests.  Co-Lead Plaintiffs had a strong explanation of why Defendants were motivated to decrease the stock price, and why they were willing to accept a suboptimal Merger price for greater certainty that a Merger would occur, but this issue would have been factually contentious.

84.     Second, while Co-Lead Plaintiffs believe they could have established that Defendants were aware of the true information regarding the disparity between Mindbody's internal forecasts and public guidance, they would have faced strong arguments from Defendants that the statements they made about that guidance were not intended to mislead, but instead were merely an act of appropriate conservative guidance setting.

85.     Third, while Co-Lead Plaintiffs also believe they could have shown that Defendants were aware of the 4Q18 results that they omitted to disclose, Defendants would have responded that they believed not publishing the results was the responsible course – and not aimed at misleading.  Specifically, Defendants would have argued that the complete financial results for the quarter were complex and the Company had not yet determined the overall effect of those results on its view of future performance, such that any disclosure would have been premature and perhaps given investors an inaccurately optimistic view of the Company.  Co-Lead Plaintiffs believe they have responses to these arguments, including documents that Co-Lead Plaintiffs believe spoke to Defendants' true motivations for not disclosing these results, but the issue would have been factually contentious.

### 3.      Risks in Proving Reliance

86.     As discussed above, in opposing class certification, Defendants would likely have made strong arguments challenging the applicability of the fraud on the market presumption of

reliance--due to, among other arguments, the effect of the Merger on the market for Mindbody's stock.   While Co-Lead Plaintiffs are confident that they ultimately would have prevailed in establishing the applicability of the presumption, there was substantial risk of trying the issue.

87.     Co-Lead Plaintiffs also alleged that reliance as to the omission claims could be supported under the "*Affiliated Ute*" presumption of reliance that applies to omissions.  Defendants likely would have argued that the *Affiliated Ute* doctrine cannot apply unless the *case* primarily alleged omissions rather than misstatements, and then would have pointed to the alleged false statements (concerning the premium and the guidance) to challenge application of *Affiliated Ute*. Co-Lead Plaintiffs believe that *Affiliated Ute* applies whenever an affirmative duty requires disclosure or whenever the challenged omission is not merely the inverse of a false statement, but the issue would likely have been the subject of substantial legal dispute.

88.     Even if Co-Lead Plaintiffs were appointed as the class representatives and the class was certified, Defendants likely would have reasserted these same arguments at summary judgment and at trial—this time, arguing that Co-Lead Plaintiffs had not met their burden to establish an actionable claim, including the element of reliance.

### 4.     Risks in Proving Materiality

89.     Defendants also would have likely strenuously challenged materiality.  As to the guidance claim, Defendants likely would not have argued that the guidance itself was immaterial, but instead would have argued that to the extent that the failure to disclose the internal forecasts was improper, a proper and fulsome statement about the results would still have included a pessimistic gloss (consistent with their arguments as to why they lowered guidance altogether) that would have offset the significance of the undisclosed information.

90.     As to the 4Q18 results, Defendants would have argued that a fulsome disclosure of the results would have also included pessimistic forecasts for the following year that would have

26

offset the alleged positive results.  Furthermore, Defendants would have argued that the results themselves were not overwhelmingly positive, because – while Mindbody's revenue was good – the quarterly results were more mixed.

91.    How a jury would have weighed the competing evidence was far from known.

### 5.    Risks in Proving Loss Causation and Damages

92.    Co-Lead Plaintiffs would have also confronted significant challenges in proving loss causation and damages.  Proving that the fair value of Mindbody stock was higher than the prices class members received when they sold Mindbody stock would be very difficult, and would have been hotly contested by the Parties' experts.  Although Co-Lead Plaintiffs have retained a well-respected expert to explain why the Company's fair value exceeded the prices members of the class sold their shares for during the Class Period, Defendants would have put forth their own experts who would argue to the contrary.  Ultimately, the fair value of the shares would be the subject of a complex "battle of the experts" and up to a jury to decide.

93.    With respect to loss causation, Defendants would have likely argued that the alleged misstatements did not cause Mindbody's stock price to drop.  Among other things, Defendants would argue that to recover damages, Co-Lead Plaintiffs would need to prove that had the 4Q18 results been disclosed, Mindbody's stock would have actually traded at a higher price.  If such a requirement were imposed, proving an alternative price reaction would have been hotly contested by both sides' experts and could have been viewed by the jury as highly speculative.  Regarding the employment statements, Defendants would likely argue that Co-Lead Plaintiffs could not prove the employment statements artificially deflated Mindbody's stock because, as an initial matter, no such conversations actually took place and, even if they did, there was no evidence that the statements had any impact on Mindbody's stock price given that the stock price hardly moved on

27

the days when the statements were made. If such arguments were accepted by the Court or a jury, in whole or part, they would have dramatically limited any recovery for the class.

94. Co-Lead Plaintiffs alleged damages based on the difference between the fair value of Mindbody's common stock and the price received by class members upon selling. The ultimate matter of proving the fair value of Mindbody's stock would have also been a highly contested issue for the fact finder at trial, with the Parties putting forth widely diverging and complex expert evidence.

95. Although a comprehensive appraisal of Mindbody's value had not been completed given the stage of the litigation, Lead Counsel, with the assistance of Co-Lead Plaintiffs' experts, has estimated classwide damages of approximately \$453 million,[3] if liability were established with respect to all of the allegedly false statements/omissions alleged in the SAC during the Class Period. However, if Co-Lead Plaintiffs only prevailed on the claims alleging that Mindbody's 4Q18 guidance was false and misleading, estimated classwide damages would decrease to approximately \$299 million.[4] Additionally, if Co-Lead Plaintiffs only prevailed on the claims alleging Defendants failed to disclose Mindbody's 4Q18 results, estimated classwide damages would decrease to approximately \$133 million.[5]

---

[3] This figure is calculated using an estimated fair value of \$41.25 to \$49.50 per share (based on the price Co-Lead Plaintiffs allege Vista implied it was willing to pay when it offered to pay a "substantial premium" to Mindbody's trading range on October 16, 2018, SAC ¶116), an estimate of approximately 38 million shares sold during the Class Period, and a volume-weighted average sale price of \$33.41 per share. The midpoint of the resulting range is \$453 million.

[4] This figure is calculated using an estimated fair value of \$41.25 to \$49.50 per share, an estimate of approximately 22 million shares sold during the Class Period, and a volume-weighted average sale price of \$31.13 per share. The midpoint of the resulting range is \$299 million.

[5] This figure is calculated using an estimated fair value of \$41.25 to \$49.50 per share, an estimate of approximately 16 million shares sold during the Class Period at a volume-weighted average sale price of \$36.53 per share. The midpoint of the resulting range is \$133 million.

96.    Here, the lower end of the damages range was a real possibility given, among other reasons: (i) these damage estimates are premised on proving Mindbody's fair value was in the range of $41.25 to $49.50 per share, but a reasonable fact finder could have determined that the fair value was lower; and (ii) as the Court expressed during the September 9, 2021 status conference, there was a substantial risk that Co-Lead Plaintiffs would fail to recover on the claim that the 4Q18 guidance was actionable and materially misleading or fraudulent.[6]

### C.    Risks Attendant at Trial

97.    In addition to the specific liability risks discussed above and the typical uncertainties attendant to placing complex securities fraud issues before a jury, a trial of this case presented its own unique hurdles.  Given the complexity of the issues involved in this case, including the process of setting corporate guidance, the intricacies of the M&A process and the motives of actors therein, and the valuation of Mindbody's stock, persuasively presenting the case to a jury would have been very challenging.

98.    More broadly, in presenting the claims and the documentary and deposition evidence supporting the falsity of the statements, Defendants' scienter, and materiality of the allegedly withheld information, Co-Lead Plaintiffs intended to rely heavily on witnesses aligned with the Defendants and experts who would certainly have been countered by highly credible experts presented by Defendants.

99.    Further, at the time the Settlement was reached, the Parties had not yet filed *Daubert* motions, where Defendants would undoubtedly seek to exclude all or most of the

---

[6] *See, e.g.*, Hr'g. Tr. Sept. 9, 2019 at 6, Ex. 2 ("Well, I mean, again, I let you amend the complaint but it was barely -- and I let you amend it because I felt like there were fact questions that could only be resolved at summary judgment. But that does not mean that you should think that all of a sudden this case has become a lot more valuable because I am not at all convinced that's [ ] going to work.").

testimony that Co-Lead Plaintiffs intended to offer through their experts.  Had Defendants prevailed in excluding any of this testimony, the presentation of many aspects of Co-Lead Plaintiffs' case would have been decimated.

100.    Lastly, even if Co-Lead Plaintiffs were successful in obtaining a jury verdict on all or part of their claims, it was a foregone certainty that a jury verdict would have been just the beginning of a long and arduous post-trial and appellate process.  Given the novelty of the issues concerning falsity, scienter, materiality, reliance, and the duties attendant under Section 10(b), an appellate process, with the possibility of reversal, presented a very real hurdle to obtaining a recovery for the class.

## VI.    SETTLEMENT NEGOTIATIONS

101.    The settlement discussions were at all times arm's-length and under the purview of an experienced mediator.  Co-Lead Plaintiffs do not believe that a better outcome could have been secured through a negotiated settlement.

102.    As discussed above, the settlement negotiations began with a full-day mediation before the Mediator on May 12, 2021.  In advance of that mediation, the Parties exchanged detailed mediation statements and exhibits.  That initial session was highly substantive.  The Parties discussed their respective views regarding liability, class certification, and damages with the Mediator.  However, the session did not result in any agreement.

103.    The Parties continued to discuss a potential settlement with the assistance of the Mediator over the course of the next several months.  On November 30, 2021, the Mediator made a formal mediator's proposal recommending that the Parties agree to settle the case for $9,750,000.  On December 2, 2021, the Parties accepted the Mediator's proposal, subject to the negotiation of a formal settlement agreement.  After reaching an agreement on the settlement amount, the Parties worked to draft the Term Sheet.

104. The Parties subsequently negotiated the Stipulation, which sets forth the final terms and conditions of the Settlement, including, among other things, a release of all claims asserted against Defendants in the Action and related claims (Released Plaintiff's Claims).  Defendants have agreed to release all Released Defendants' Claims, concerning the prosecution and settlement of the Action, against Co-Lead Plaintiffs and the other members of the Settlement Class.  Once the Settlement reaches its Effective Date, the Released Plaintiff's Claims against the Released Defendant Parties and the Released Defendants' Claims against Co-Lead Plaintiffs and the Settlement Class will be forever dismissed with prejudice.

105. Co-Lead Plaintiffs were careful to negotiate release language that would not prevent Settlement Class Members from recovering in the Delaware *Luxor Action*, if any recovery is achieved in that suit.

106. The Parties spent significant time drafting and conferring on, and ultimately memorializing, the terms of the Settlement in the Stipulation, and its associated exhibits, which was filed with the Court on March 3, 2022 (ECF No. 118-1), along with Co-Lead Plaintiff's unopposed motion and supporting memorandum of law seeking preliminary approval of the proposed Settlement (ECF Nos. 117).[7]

---

[7] Contemporaneous with executing the Stipulation, as referenced in ¶42, the Parties also executed a Confidential Supplemental Agreement Regarding Requests for Exclusion ("Supplemental Agreement"), which governs the circumstances under which Defendants can terminate the Settlement if a certain threshold of exclusion requests is received.  It is typical to keep such agreements confidential so that potential opt outs do not use them to leverage additional recoveries for themselves, at the expense of the class.  The Supplemental Agreement was filed with the Court under seal.  If the termination threshold is ultimately reached, notice will be filed with the Court before the Settlement Hearing. The term sheet, Stipulation, and Supplemental Agreement are the only agreements between the Parties in connection with the Settlement.

## VII.  CO-LEAD PLAINTIFFS' COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND THE REACTION OF THE SETTLEMENT CLASS

107.    On June 3, 2022, the Court granted Co-Lead Plaintiffs' unopposed motion for preliminary approval of the Settlement (the "Preliminary Approval Order").  ECF No. 130. Pursuant to the Preliminary Approval Order, the Court: (i) preliminarily approved the Settlement; (ii) approved the forms and manner of notice to the Settlement Class; and (iii) preliminarily certified, for Settlement purposes only, the Settlement Class and appointed Co-Lead Plaintiffs as Class Representatives and Labaton Sucharow LLP as Class Counsel for the Settlement Class.  *Id*.

108.    Pursuant to the Preliminary Approval Order, the Court appointed Strategic Claims Services ("SCS") as the Claims Administrator and instructed SCS to disseminate copies of the Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses and Proof of Claim (collectively the "Notice Packet") and to publish the Summary Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses.  Prior to selecting SCS, Lead Counsel received bids from other highly regarded and experienced claims administration firms and ultimately selected SCS based on its fee proposal and familiarity with "seller" cases.

109.    The Notice, attached as Exhibit A to the Declaration of Josephine Bravata Concerning (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received to Date, dated September 30, 2022 (the "Mailing Declaration", Ex. 3), provides potential Settlement Class Members with information about the terms of the Settlement and, among other things: their right to opt-out of the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Claim Form to be eligible for a payment from the net proceeds of the Settlement.  The Notice also informs Settlement Class

32

Members of Lead Counsel's intention to apply for an award of attorneys' fees of no more than 30% of the Settlement Fund and for payment of Litigation Expenses in an amount not to exceed $800,000.

110.    As detailed in the Mailing Declaration, on June 7, 2022, SCS began mailing Notice Packets to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees whose clients may be Settlement Class Members.  Ex. 3 at ¶¶3-8.  In total, to date, SCS has mailed 22,387 Notice Packets to potential Settlement Class Members and nominees by first-class mail, postage prepaid.  *Id.* at ¶8.

111.    On June 27, 2022, SCS caused the Summary Notice to be published in *The Wall Street Journal* and on July 1, 2022 to be transmitted over the *PR Newswire* for dissemination across the internet.  *Id*. at ¶10 and Exhibit B attached thereto.

112.    SCS also maintains and posts information regarding the Settlement on its website, www.StrategicClaims.net/mindbody/, to provide Settlement Class Members with information, including downloadable copies of the Notice Packet and the Stipulation, and an online claim portal. *Id*. at ¶12.  The web page for Mindbody has been viewed by 3,277 unique users more than 11,000 times. *Id*.

113.    The Notice informed Settlement Class Members that in order to qualify for a payment from the Net Settlement Fund, a Claim Form must be timely filed either online at www.strategicclaims.net/mindbody/ or by mail, with a postmark of no later than September 27, 2022.  To date, SCS has received 5,135 claims. Out of the 5,135 claims received, 4,861 were filed by institutions and 274 were filed by individuals/entities by mail or online filing. *Id*. ¶15. Additional Claim Forms will be submitted as many filers submit claims right at the deadline.  SCS is currently processing the Claim Forms received and will provide additional information

regarding the claims submitted in its supplemental declaration, which will be filed with the Court on October 20, 2022, after the exclusion deadline has passed.

114.    Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application is October 14, 2022, and the deadline to request exclusion from the Settlement Class was September 27, 2022.  To date, no objections to the Settlement have been received and the Claims Administrator has only received one invalid request for exclusion.  *Id*. at ¶13, Ex. C.

115.    Lead Counsel will respond to any future objections and exclusion requests and report additional claim information in its reply papers, which are due on October 20, 2022.

## VIII.    PLAN OF ALLOCATION

116.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in a distribution of the Settlement proceeds must submit a valid Claim Form, including all required information, no later than September 27, 2022.  As provided in the Notice, after the deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Expenses, Taxes, and any other fees or expenses approved by the Court, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed to eligible claimants by the Claims Administrator according to the plan of allocation approved by the Court (the "Plan of Allocation" or "Plan").

117.    The proposed Plan of Allocation, which was set forth in full in the Notice (Ex. 3-A at ¶¶55-68), is designed to achieve an equitable and rational distribution of the Net Settlement Fund.  The Plan was prepared by Lead Counsel with the assistance of Co-Lead Plaintiffs' damages expert and is consistent with Co-Lead Plaintiffs' theories of damages in the case.  All Settlement Class Members that were allegedly harmed as a result of the alleged fraud, and that have an eligible

34

claim, will receive their *pro rata* share of the Net Settlement Fund.  Notice at ¶¶56-57.  Lead Counsel believes that the Plan provides a fair and reasonable method to equitably distribute the Net Settlement Fund among Authorized Claimants.

118.    The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants on a *pro rata* basis based on their "Recognized Loss Amounts," calculated according to the Plan's formulas.  Recognized Loss Amounts are derived from the number of shares held and sold during one of three periods of time.  The three periods of time are: (A) shares held just before the release of the 4Q18 guidance and sold before the Merger was announced; (B) shares held just before the Merger was announced and sold before Defendants' learned of the 4Q18 results (C) shares held just before Defendants learned the 4Q18 results and sold before the Merger closed.  Shares both purchased and sold within these time periods, *i.e.* shares that were "in and out", have no recognized losses under the Plan, as is standard in plans of allocation because such shares were similarly impacted at both their purchase and sale.

119.    Eligible shares sold within these three periods will have Recognized Loss Amounts equal to the difference between Co-Lead Plaintiffs' estimate of the nominal "fair value" of Mindbody stock of $49.50 and the price at which the shares were sold.  The nominal fair value was set based on an estimate of what Vista had once indicated it was willing to pay. It is not a factual determination of the actual fair value of Mindbody's stock, which would have been hotly contested at trial.

120.    For example, under the proposed Plan of Allocation, a shareholder who owned 100 shares before the allegedly false 4Q18 guidance, and who sold those shares for $26.18 per share on November 7, 2019, would have a Recognized Loss Amount of $2,332 (($49.50-$26.18) x 100).

35

121.    The sum of a claimant's Recognized Loss Amounts will be the claimant's "Recognized Claim."    If the aggregate amount of all Recognized Claims of all Authorized Claimants is greater than the Net Settlement Fund, which is likely given that the Settlement does not recover 100% of alleged damages, each Authorized Claimant will receive a payment equal to their *pro rata* share of the Net Settlement Fund, assuming that their payment would be $10.00 or greater.[8]

122.    The Court-approved Claims Administrator, under Lead Counsel's direction, will calculate claimants' Recognized Loss Amounts using the transactional information provided in their Claim Forms.  Claims may be submitted to the Claims Administrator through the mail, online using the case webpage or, for large investors with thousands of transactions, through email to SCS's electronic filing team. (Neither the Parties nor the Claims Administrator independently have claimants' transactional information.) Co-Lead Plaintiffs' losses will be calculated in the same manner.

123.    After the Effective Date of the Settlement, in accordance with the terms of the Stipulation, the Plan of Allocation, any such further approval and further order(s) of the Court as may be necessary or as circumstances may require, the Net Settlement Fund will be distributed to Authorized Claimants.   After the distribution, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise) after at least six (6) months from the date of the distribution, the Claims Administrator will, if feasible and economical after payment of any outstanding Notice and Administration Expenses, and Taxes redistribute the balance among Authorized Claimants who have cashed their checks in an equitable and economic fashion.  There may be multiple re-distributions.  Once it is no longer economical

---

[8] $10.00 is a standard "*de minimis*" figure for payments given the costs associated with issuing payments and to lessen the number of uncashed checks.

to make further distributions, any balance that still remains in the Net Settlement Fund after re-distribution(s) and after payment of any outstanding Notice and Administration Expenses, and Taxes, if any, will be contributed to a private, non-profit, non-sectarian 501(c)(3) organization designated by Co-Lead Plaintiffs and approved by the Court.

124.   To date, there have been no objections to the proposed Plan of Allocation.

125.   In sum, the proposed Plan of Allocation was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants.  Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## IX.   LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES

126.   For its significant efforts on behalf of Co-Lead Plaintiffs and the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis.  As explained in Lead Counsel's Fee Brief, courts within the Second Circuit recognize that the percentage method is the appropriate method of fee recovery and the prevailing method of determining attorneys' fees in the Second Circuit.

127.   Consistent with the Notice, Lead Counsel seeks a fee award of 30% of the Settlement Fund, *i.e.,* $2,925,000, plus accrued interest, if any.  Lead Counsel also requests payment of its expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $560,715.36, plus Co-Lead Plaintiffs' request for $8,000, pursuant to the PSLRA.  Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

### A.    Co-Lead Plaintiffs Support the Fee and Expense Application

128.   Co-Lead Plaintiffs are sophisticated institutional investors that played a central role in monitoring and participating in the Action by, among other things, (i) regularly communicating with Lead Counsel regarding the posture and progress of the Action; (ii) reviewing and/or discussing significant pleadings, motions, and briefs filed in the Action; (iii) assisting with responses to Defendants' discovery requests (including the search for and production of documents); (iv) monitoring and participating in settlement discussions; and (v) evaluating and approving the proposed Settlement.  *See* Ex. 1.

129.   Co-Lead Plaintiffs evaluated and fully support the Fee and Expense Application. *See* Ex. 1.  In coming to this conclusion, Co-Lead Plaintiffs considered the efficient prosecution of the action, the amount and quality of the work performed, and the recovery obtained for the Settlement Class.  Co-Lead Plaintiffs agreed to allow Lead Counsel to apply for 30% of the Settlement Fund. *See id* at 6.

### B.    The Favorable Settlement Achieved

130.   Here, as described above, the $9.75 million Settlement is a favorable result, particularly when considered in view of the substantial risks and obstacles to recovery if the Action were to continue through decisions on class certification and summary judgment, to trial, and through likely post-trial motions and appeals.

131.   As set forth in detail above, the recovery obtained for the Settlement Class was the result of thorough and diligent investigative and prosecutorial efforts, complicated motion practice, and extensive discovery efforts.  As a result of this Settlement, thousands of Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery (or significantly less recovery) in the absence of a settlement.

###### C.    The Risks and Unique Complexities of Contingent Class Action Litigation

132.    This Action presented substantial challenges from the outset of the case.  The specific complexities and risks Co-Lead Plaintiffs faced in proving Defendants' liability and damages are detailed in Section V. above.  These case-specific risks, which were made evident to Lead Counsel and Co-Lead Plaintiffs as the case advanced in discovery and through class certification briefing, are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent basis.  Here, there was no restatement, no Company admissions, and no parallel governmental or criminal proceedings, which would have aided Co-Lead Plaintiffs or Lead Counsel in proving elements of the case, like materiality and scienter.

133.    From the outset, Lead Counsel understood that it was embarking on a complex and expensive litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and cover the considerable costs that a case such as this requires.  With no promise of recovery, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Lead Counsel received no compensation during the course of the Action but has dedicated 6,535.8 hours of time with a lodestar value of $3,254,648.50 and has incurred $560,715.36 in expenses in prosecuting the Action for the benefit of the Settlement Class.  *See* Declaration of Carol C. Villegas on Behalf of Labaton Sucharow LLP, Ex. 4.

134.    Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.  Lead Counsel knows from experience that the

39

commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint, win at trial, or convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case was commenced—like that existed in the Action—or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of plaintiff's bar produced no fee for counsel.

135.    Federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases. The many appellate decisions affirming summary judgment and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery. *See, e.g.*, *In re Oracle Corp., Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Sci.-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig.*, 669 F.3d 68 (1st Cir. 2012); *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Digi Int'l, Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

136.    Even successfully certifying a class and successfully opposing a motion for summary judgment would not guarantee that Co-Lead Plaintiffs would prevail at trial. Indeed, while only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), litigated by Lead Counsel, or partially lost, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

137. Even plaintiffs who succeed at trial may find their verdict overturned. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.*, No. 07-cv-61542 (S.D. Fla. 2010) (in case tried by Lead Counsel, after plaintiff's jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd*, 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law for lack of loss causation); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011)); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiff's jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiff's verdict obtained after two decades of litigation). And, the path to maintaining a favorable jury verdict can be arduous and time consuming. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court tossing unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id.*) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity & Benefit Fund*, 131 S. Ct. 1602 (2011)).

138. Losses such as those described above are exceedingly expensive for plaintiff's counsel to bear. The fees that are awarded in successful cases are used to cover enormous overhead expenses incurred during the course of litigations and are taxed by federal, state, and local authorities.

41

139. Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws and state corporation laws can only occur if private plaintiffs can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that will adequately compensate private plaintiff's counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

140. As discussed in detail above, this case was fraught with significant risk factors concerning liability and damages. Were this Settlement not achieved, and even if Co-Lead Plaintiffs prevailed at trial, Co-Lead Plaintiffs and Lead Counsel potentially faced years of costly and risky appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery significant. Lead Counsel therefore respectfully submits that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### D. The Time and Labor of Lead Counsel

141. The work undertaken by Lead Counsel in investigating and prosecuting this case and arriving at the present Settlement in the face of serious hurdles, has been time-consuming and challenging. As explained above, counsel conducted a robust investigation into the class's claims; researched and prepared a comprehensive amended complaint in less than a month from when the Walleye Funds were appointed Co-Lead Plaintiffs; briefed a thorough opposition to Defendants' motions to dismiss the Amended Complaint; prepared for and participated in a motion to dismiss hearing; moved to amend the complaint and filed a second amended complaint; moved for certification of the class; engaged in extremely thorough discovery efforts that led to obtaining

more than approximately 400,000 pages of documents from Defendants and third-parties; conducted weekly (or often more frequent) meetings during discovery to discuss the continued investigation, Defendants' document production, Co-Lead Plaintiffs' document production, third party subpoenas, depositions, interrogatories, requests for admissions, class certification, and numerous other issues; engaged in numerous phone meet and confers with Defendants' Counsel and exchanged numerous emails with counsel regarding discovery issues; participated in the depositions of 17 witnesses, and prepared for several others; retained and had numerous meetings with several experts; and prepared for the mediation, including formulating detailed mediation submissions.

142.    Attached as Exhibit 4 is the Villegas Declaration detailing Lead Counsel's time and expenses.  Included with this declaration is a schedule that reports the amount of time spent by the attorneys and professional staff of Labaton Sucharow and the "lodestar" calculations, *i.e.,* their hours multiplied by their 2021 hourly rates.[9]  *See* Ex. 4-A.  Exhibit B is a breakdown of Lead Counsel's time organized by category of work.  As explained in the declaration, it was prepared from records regularly prepared and maintained by Lead Counsel.  *Id.* ¶3.

143.    At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial, by the most efficient means possible. Lead Counsel carefully and efficiently staffed the Action from the beginning, and litigated the case with just one main partner, Carol Villegas.  Other partners were involved, but only at particular stages of the case, such as lead plaintiff appointment or settlement, consistent with their areas of expertise.  The

---

[9] Although courts regularly approve the use of current rates in class action fee applications, we are using Labaton Sucharow's 2021 rates given that the agreement in principle to settle was reached in 2021.

result of this staffing by Lead Counsel was that associates and of counsel with lower hourly rates handled the case on a day-to-day basis, as opposed to more expensive partners.

144.    The hourly rates of Lead Counsel here range from $800 to $1,150 for partners, $500 to $800 for of counsels, $400 to $550 for associates, and $355 to $375 for paralegals.  *See* Ex. 4-A.  The rates for the staff attorneys, who focused on document review and deposition preparation, ranged from $335 to $435. *Id*.  It is respectfully submitted that the hourly rates for Lead Counsel included in this schedule are reasonable and customary for this type of complex commercial litigation.  A table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2021 is attached as Exhibit 5.  The analysis shows that across all types of attorneys, Lead Counsel's rates are consistent with, or lower than, the firms surveyed.

145.    Lead Counsel has expended 6,535.8 hours in the prosecution and investigation of the Action through September 26, 2022.  *See* Ex. 4-A.  The resulting lodestar is $3,254,648.50, which does not include any time that will necessarily be spent from this date forward administering the Settlement, preparing for and attending the Settlement Hearing, and assisting Settlement Class Members.  *Id*.  Pursuant to a lodestar "cross-check," applied within the Second Circuit, the requested fee of 30% of the Settlement Fund (or $2,925,000) results in a negative "multiplier" of 0.90 on the lodestar – meaning that Lead Counsel is seeking less than its lodestar in fees.

### E.    The Skill Required and Quality of the Work

146.    Lead Counsel Labaton Sucharow is among the most experienced and skilled securities litigation law firms in the field.  The expertise and experience of its attorneys are described in Exhibit 4-D.

147.    Since the passage of the PSLRA, Labaton Sucharow has been approved by courts to serve as lead counsel in numerous notable securities class actions throughout the United States,

44

and has taken three of the approximately 21 post-PSLRA securities class actions to trial.  Here, Labaton Sucharow attorneys have devoted considerable time and effort to this case, thereby bringing to bear many years of collective experience.  For example, Labaton Sucharow has served as lead counsel in a number of high profile matters:  *In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million); *In re Schering-Plough Corp. / ENHANCE Sec. Litig.*, No. 08-397 (D.N.J.) (representing Massachusetts Pension Reserves Investment Management Board and reaching a settlement of $473 million).  *See* Ex. 4-D.

F.     **Standing and Caliber of Defendants' Counsel**

148.     The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented Kirkland & Ellis LLP and Cooley LLP, two prestigious and experienced defense firms, which vigorously represent their clients.  In the face of this experienced, formidable, and well-financed opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the case on terms favorable to the Settlement Class.

X.     **LEAD COUNSEL'S REQUEST FOR LITIGATION EXPENSES**

149.     Lead Counsel seeks payment from the Settlement Fund of $560,715.36 in Litigation Expenses reasonably and necessarily incurred in connection with prosecuting the claims against Defendants.  *See* Ex. 4-C. The Notice informs the Settlement Class that Lead Counsel will

45

apply for payment of Litigation Expenses of no more than $800,000, which would include Co-Lead Plaintiffs' request for expenses directly related to their representation of the Settlement Class, pursuant to the PSLRA. *See* Ex. 3-A at ¶¶4, 42. The amount requested is below this cap. To date, no objection to Lead Counsel's request for expenses has been raised.

150. As attested to, Lead Counsel's expenses are reflected on the books and records maintained by Labaton Sucharow. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. Lead Counsel's declaration identifies the specific category of expense – *e.g.*, expert fees, deposition transcription fees, document management and storage fees, electronic financial and factual research, service of process fees, travel costs, duplicating, and overnight delivery expenses.

151. A significant component of Lead Counsel's expenses is the cost of experts, which totals $140,661.25 or approximately 25% of its total expenses. *See* Ex. 4 ¶6. As explained above, Lead Counsel retained three experts: (i) Mr. Sacks, to opine on the value of Mindbody's shares; (ii) Mr. Coffman, to opine on materiality, loss causation and damages; and (iii) Edward Mallen, to opine on issues related to Mindbody's performance within the context of the Software as a Service industry. It is highly likely that each expert would have been deposed and would have assisted with crafting arguments countering the Defendants' experts. Lead Counsel spent numerous hours meeting, albeit virtually, with each of the retained experts. These professionals were essential to the prosecution of the Action.

152. Costs related to discovery comprise a sizable amount of the litigation expenses, totaling $359,121.73, or approximately 64% of all expenses. Ex. 4-C. These costs include $59,121.73 in court reporting fees related to the 19 depositions taken by the Parties (*id*. ¶6(g), as well as $300,000.00 in litigation support e-discovery vendor fees to forensically gather Co-Lead

Plaintiffs' documents and data and to host and review the electronic documents produced by Defendants, third parties, and Co-Lead Plaintiffs, *id*. ¶6(f). This case involved thousands of complex trades by the Co-Lead Plaintiffs and in order for Co-Lead Plaintiffs to appropriately respond to Defendants' discovery requests regarding the same, the e-discovery vendor performed a thorough collection of their documents and data, which involved processing over 7 terabytes of the collected data.[10] *Id*.

153.    The expenses also include $33,265.48 in professional fees paid to counsel for five potential witnesses in the case, who were former employees of Mindbody or sub-advisors for the Co-Lead Plaintiffs. These witnesses were subpoenaed by Defendants and asked to produce documents and appear for depositions. *Id*. ¶6(e).

154.    Because of the COVID-19 pandemic, travel expenses were significantly less than in a typical securities case that was in the midst of fact and expert discovery. However, costs totaling $408.42 were incurred in connection with train travel to Wilmington, Delaware to attend a court hearing in *Philip Ryan Jr. v. Mindbody, Inc.*, C.A. No. 2019-0061-KSJM (Del. Ch), an action related to the same merger at issue in this Action. *Id*. ¶6(c).

155.    Co-Lead Plaintiffs' share of the fees of Phillips ADR Enterprises totaled $9,140.00. Mediator Michelle Yoshida oversaw the formal mediation session that the Parties participated in and she facilitated ongoing negotiations between the Parties, which ultimately resulted in the settlement of the litigation. *Id*. ¶6(h).

156.    Computerized electronic research totaled $3,010.63 or approximately 5% of aggregate expenses. *Id*. ¶6(j). These are the charges of vendors such as BNA and Pacer. These

---

[10] The total e-discovery vendor expense for collecting, processing, and hosting the electronic discovery in the case exceeded $300,000, however Lead Counsel is only seeking reimbursement of $300,000, which is consistent with amounts reimbursed in other complex securities cases.

resources were used to obtain access to SEC filings, court filings, and factual and financial information. The costs for these vendors vary depending upon the type of services requested and usage is tracked using a case or administrative client-matter code. (Given the Court's practices, we have not included costs related to legal research conducted using Westlaw or Lexis/Nexis, which totaled approximately $23,000.)

157.    The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients who pay by the hour. These expenses include, among others, duplicating/printing costs, service and filing fees, and overnight delivery expenses.

158.    All of the Litigation Expenses incurred, which total $560,715.36, were necessary to the successful prosecution and resolution of the claims against Defendants.

159.    In view of the complex nature of the Action, the expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class. Accordingly, it is respectfully submitted that the expenses incurred by Lead Counsel should be paid in full from the Settlement Fund.

## XI.    CO-LEAD PLAINTIFFS' REIMBURSEMENT PURSUANT TO THE PSLRA

160.    Additionally, in accordance with 15 U.S.C. § 78u-4(a)(4), Co-Lead Plaintiffs Walleye Trading LLC and Walleye Opportunities Master Fund collectively seek reimbursement for the time they dedicated to the representation of the Settlement Class in the aggregate amount of $8,000, which, when included with Lead Counsel's expenses, is below the $800,000 that the Notice informed the Settlement Class would be the cap on expenses. The amount of time and effort devoted to this Action by Co-Lead Plaintiffs is detailed in the accompanying Declaration of Andrew Carney, Chief Executive Officer of Walleye Capital LLC, which manages and advises Walleye Trading and Walleye Opportunities Master Fund, attached as Exhibit 1. Lead Counsel

respectfully submits that the amount requested by Co-Lead Plaintiffs is consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional investors to take an active role in commencing and supervising private securities litigation.

161.    As discussed in the Fee Brief and in Co-Lead Plaintiffs' supporting declaration, Co-Lead Plaintiffs have been committed to pursuing the class's claims since they became involved in the litigation. As large institutional investors, Co-Lead Plaintiffs actively and effectively fulfilled their obligations as representatives of the class, complying with all of the many demands placed upon them during the litigation and settlement of the Action.  For instance, Mr. Carney, the CEO of Walleye Capital (i) regularly communicated with Lead Counsel regarding the posture and progress of the Action; (ii) reviewed pleadings and motions filed in the Action; (iii) coordinated and assisted with Co-Lead Plaintiffs' production of documents and written discovery responses to Defendants; and (v) discussed mediation strategy and evaluated settlement proposals.  Ex. 1 at ¶4, 9-10.

162.    More specifically, Mr. Carney and Jim Moeller, Chief Legal Officer and General Counsel of Walleye Capital, collectively dedicated at least 20 hours to the Action on behalf of the Co-Lead Plaintiffs. *Id*. at ¶10.  This was time that they did not spend conducting the usual business of the Co-Lead Plaintiffs, which represents a cost to them. Mr. Carney and Mr. Moeller's respective effective hourly rates, based on their annual compensation, exceed $400 per hour. *Id*. The total cost of their time at the reduced rate of $400 per hour is $8,000.

163.    The efforts expended by Co-Lead Plaintiffs during the course of the Action are precisely the types of activities courts have found support reimbursement to class representatives, and support Co-Lead Plaintiffs' request.

## XII.    THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION

164.    As mentioned above, consistent with the Preliminary Approval Order, to date a total of 22,387 Notices have been mailed to potential Settlement Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 30% of the Settlement Fund, and payment of expenses in an amount not greater than $800,000, which includes Co-Lead Plaintiffs' reimbursement of expenses directly related to their representation of the Settlement Class.  *See* Ex. 3 at ¶8 and Ex. A.  Additionally, the Summary Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire*.  *Id*. at ¶10.  The Notice has also been available on the case webpage maintained by the Claims Administrator (*id.* at ¶12) and on Labaton Sucharow's website.[11]

165.    While the deadline set by the Court for Settlement Class Members to object to the requested fees and expenses has not yet passed, to date no one has objected to the fee or expense request.  Lead Counsel will respond to any objections that may be received in its reply papers.

## XIII.    MISCELLANEOUS EXHIBITS

166.    Attached as Exhibit 6 is a true and correct copy of Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA 2021).

167.    Attached as Exhibit 7 is a true and correct copy of Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2021 Review and Analysis* (Cornerstone Research 2022).

---

[11] Co-Lead Plaintiffs' motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement webpage and Labaton Sucharow's website.

168.    Attached as Exhibit 8 is a compendium of unreported cases, in alphabetical order, cited in the accompanying memoranda of law.

## XIV.    CONCLUSION

169.    In view of the significant recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying memorandum of law, Co-Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate, and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the significant recovery in the face of substantial risks; the quality, efficiency, and amount of work performed; the contingent nature of the fee; and the standing and experience of Lead Counsel, as described above and in the accompanying memorandum of law, Lead Counsel respectfully submits that a fee in the amount of 30% of the Settlement Fund be awarded, that its expenses in the amount of $560,715.36 be paid, and that Co-Lead Plaintiffs be reimbursed $8,000, pursuant to the PSLRA.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on October 4, 2022.

*/s/ Carol C. Villegas*
CAROL C. VILLEGAS

51